**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | Civil Action No. 07-333-SLR |
| | ) | Civil Action No. 07-348-SLR |
| v. | ) ) | Civil Action No. 07-409-SLR |
| JOHNSON & JOHNSON, CORDIS CORPORATION, and WYETH | ) ) ) | |
| | ) | **REDACTED** |
| Defendants/ Counter-Plaintiffs. | ) ) | **PUBLIC VERSION** |

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | |
| v. | ) ) ) | Civil Action No. 07-765-SLR |
| JOHNSON & JOHNSON, CORDIS CORPORATION, and WYETH | ) ) ) | |
| Defendants/ Counter-Plaintiffs. | ) ) ) | |

**DECLARATION OF ANTONIOS G. MIKOS IN SUPPORT OF THE OPENING MARKMAN BRIEF OF JOHNSON & JOHNSON, CORDIS, AND WYETH**

I, Antonios G. Mikos, Ph.D., under penalty of perjury declare as follows:

1.      I have been retained in this litigation on behalf of Cordis Corp., Johnson & Johnson, Inc. and Wyeth (collectively "Cordis").  I understand that Cordis asserts that Boston Scientific Corp. and Boston Scientific Scimed, Inc. (collectively "Boston Scientific") infringe claims 1-5 of U.S. Patent No. 7,217,286; claims 9, 10, 21, 25, 27-39, 51, 52, 63, 67, 69-77 of

U.S. Patent No. 7,223,286[1]; claims 1-5 of U.S. Patent No. 7,229,473; and claims 1-3, 5-7, 9-11, 13-15, and 17-25 of U.S. Patent No. 7,300,662.

## I.   BACKGROUND

2.      I am Louis Calder Professor of Bioengineering and Chemical and Biomolecular Engineering, Departments of Bioengineering and Chemical and Biomolecular Engineering, Rice University ("Rice"), a position I have held since 2008.  I am also Director of the J.W. Cox Laboratory for Biomedical Engineering and the Director of the Center for Excellence in Tissue Engineering at Rice.  I am also President, Biomedical and Informatics Consultants, Inc., a position I have held since 2002.

3.      In 1983 I received my Diploma in Chemical Engineering from the Aristotle University of Thessaloniki, Greece.  In 1988 I received my Ph.D. in Chemical Engineering from Purdue University.  From 1990-1991 I was a postdoctoral researcher at the Department of Chemical Engineering, Massachusetts Institute of Technology and the Department of Surgery, The Children's Hospital of Boston, Harvard Medical School.  From 1992-1996 I was the T.N. Law Assistant Professor of Chemical Engineering and Bioengineering, Department of Chemical Engineering, Rice.  From 1996-1999 I was Associate Professor of Bioengineering and Chemical Engineering, Departments of Bioengineering and Chemical Engineering at Rice.  From 1999-2008, I have been the John W. Cox Professor of Bioengineering and Chemical and Biomolecular Engineering, Departments of Bioengineering and Chemical and Biomolecular Engineering at Rice.

4.      I have twenty years of experience in bioengineering, regenerative medicine, and biomaterials research.  My expertise is in the synthesis, fabrication and application of

---

[1] I understand that Cordis has amended the claims of the '3286 patent in Reexamination No. 95/001,097.  The asserted claims of the '3286 patent as amended in the Reexamination are claims 1, 2, 6, 10, 21, 25, 27-30, 32-41, 44, 48, 52, 63, 67, 69-77.

biomaterials, specifically polymers, for medical applications, including cardiovascular applications. My work has resulted in novel orthopedic, ophthalmic, and cardiovascular biomaterials. My laboratory at Rice specializes in biomaterials science, drug delivery, gene therapy, and tissue engineering. My curriculum *vitae* lists my publications, awards, and additional qualifications. It is attached as Exhibit 76 to Cordis's Appendix, A1190-A1323-.[2]

5.     I submit this declaration in support of the Opening Markman Brief of Johnson & Johnson, Cordis, and Wyeth. In this declaration I will provide my understanding of the meaning a person of ordinary skill would ascribe to various terms in the patents-in-suit.

## II.     PERSON OF ORDINARY SKILL IN THE ART

6.     In this case, a person of ordinary skill is a Ph.D., chemist, biologist, materials scientist, biomedical engineer or physician, all with experience in drug delivery systems and biomaterials research, specifically experience with polymers in contact with blood. This person would also have knowledge of, or worked in conjunction with, a physician experienced in the use of medical devices implanted in blood-contacting environments, such as a cardiologist.

7.     Because I am a Ph.D with extensive experience in biomaterials, specifically polymers, for medical applications, including cardiovascular applications, I am a person of at least ordinary skill in the art to which the patents-in-suit pertain.

## III.     DISPUTED CLAIM TERMS IN THE PATENTS-IN-SUIT

### A.     "Polymer" ('7286, '3286 and '473 Patents)

8.     The patents-in-suit describe and claim stents that contain a "polymer" coating that contains and releases a drug. Below I will discuss the ordinary meaning of the term "polymer," and its usage in the specification, claims, and prosecution history of the patents-in-suit.

---

[2] Citations in this brief are to the exhibits in Cordis's Appendix.

### 1.   Ordinary Meaning of "Polymer"

9.      In ordinary usage, the term "polymer" refers to a class of materials made up of a long chain of repeating units, known as "monomers" or "mers."

10.     The process by which polymers are formed is called "polymerization."  In this process, each monomeric unit begins as a separate, individual molecule.  In polymerization, the monomers become bound together, forming a single molecule.  Think of links on a metal chain: the links are initially separate, oval-shaped pieces of metal, but are subsequently latched to each other to form a long chain.[3]

11.     Polymers are used in many everyday products.  Many of the materials known colloquially as "plastics" are polymers.  Both natural and synthetic rubbers are also polymers.  Polymers are also used in medical applications – for example, as coatings or as the material for some types of sutures.  Polymers are also used as a coating on drug-eluting stents, to assist with the delivery of drugs from the stent into the coronary artery.  The molecular chains of the polymer can form a matrix, and the molecules of drug are placed within the gaps in the matrix, keeping the drug on the stent until the stent is implanted in the body.

12.     The molecules known as polymers can be more specifically described and named using a number of different characteristics.  For example, polymers can be categorized into homopolymers and copolymers based on the number of types of different monomers in the molecule.

---

[3] Note that monomers can be linked together to form a variety of shapes of polymers – they need not form a straight chain.

13.     In a homopolymer, the repeating units in the molecule (denoted by "A") are all

the same, as pictured below; in a copolymer, the repeating units consist of two or more different

monomers (denoted by "A" and "B"), as pictured below.



14.     A real-world example of a homopolymer and a copolymer would be polyethylene

(a homopolymer) and polyethylene vinyl acetate (a copolymer):



15.     To a person of ordinary skill, the ordinary meaning of the term "polymer"

encompasses both homopolymers and copolymers.  This ordinary meaning is reflected in both

general-purpose and scientific dictionaries.  For example, the following definitions of "polymer"

clearly do not limit the term to homopolymers or polymers consisting of only one type of

repeating unit:

- Polymer: "a natural or synthetic chemical compound or mixture of compounds formed by polymerization and consisting essentially of repeating structural units." (*Webster's Third New International Dictionary* at 1759 (2002).)

- Polymer: "[a]ny of numerous natural or synthetic compounds of usually high molecular weight consisting of up to millions of repeated linked units, each a relatively light and simple molecule." (*American Heritage Dictionary of the English Language* at 1404 (3d ed. 1992).)

- Polymer: "[a] long-chain molecule of repeating monomer subunits that are arranged in a straight-chain or branching pattern." (*Magill's Survey of Science: Physical Science Series* at 1920 (Frank N. Magill ed., 1992).)

- Polymer: "[a] complex compound of high molecular weight formed by a chain of simpler molecules; e.g., the combining of many ethylene molecules to form polyethylene. *addition p.* A large molecule formed by a chain of smaller molecules (monomers) without the formation of any other product." (*The HarperCollins Illustrated Medical Dictionary* at 384 (1993).)

- Polymer: "[a] chemical compound or mixture of compounds formed by polymerization and consisting essentially of repeating structural units." (*Merriam-Webster's Collegiate Dictionary* at 903 (10th ed. 1993).)

- Polymer: "[a] product of polymerization: biological polymers include polysaccharides, proteins, and nucleic acids." (*The Penguin Dictionary of Science* at 344 (E. B. Uvarov and Alan Isaacs eds., 7th ed. 1993).)

- Polymer: "[a] compound formed by the joining of smaller molecules, referred to as monomers." (*Dorland's Illustrated Medical Dictionary* at 1329 (28th ed. 1994).)

- Polymer: a "[s]ubstance made of giant molecules formed by the union of simple molecules (monomers); for example polymerization of ethylene forms a polyethylene chain, or condensation of phenol and formaldehyde (with production of water) forms phenol-formaldehyde resins." (*McGraw-Hill Dictionary of Scientific and Technical Terms* at 1543 (5th ed. 1994).)

- Polymer: "[a] material built up from a series of smaller units (*monomers*), which may be relatively simple, such as ethene (the unit of polythene), or relatively complex, such as methyl methacrylate (see Perspex). The molecular size of the polymer helps to determine the mechanical properties of the plastic material and ranges from a few hundred of the basic units to perhaps hundreds of thousands."

(*Larousse Dictionary of Science and Technology* at 853 (Peter M. B. Walker ed., 1995). (*Plastics*).)

- Polymer: "[a] substance of high molecular weight, made up of a chain of repeated units sometimes called 'mers.'" (*Stedman's Medical Dictionary* at 1403 (26th ed. 1995).)

- Polymer: "[a] substance having large molecules consisting of repeated units (the monomers)...." (*Concise Science Dictionary* at 574 (3rd ed. 1996).)

- Polymer: "(*Plastics*) A material built up from a series of smaller units (*monomers*)." "Polymers" is defined as "(*Chem*) Long-chain molecules built up by multiple repetition of groups of atoms known as repeat units. See stereoregular polymers and panel on Polymers." (*Chambers Dictionary of Science and Technology* at 893 (Peter M. B. Walker ed., 1999).)

- Polymer: "A substance polymeric with another; any one of a series of polymeric compounds. In modern use, any substance which has a molecular structure built up largely or completely from a number (frequently very large) of similar polyatomic units bonded together." (*Oxford English Dictionary* at 64 (2nd ed. 1989).)

- Polymer: "[o]riginally: a compound whose formula is an exact multiple of that of another compound, being composed of the same elements in the same proportions. Now: a compound with a molecular structure in which a (usually large) number of similar polyatomic units are bonded together; *spec.* any of the mainly synthetic organic compounds of this kind which form plastics, resins, etc. The repeating units often correspond to molecules of a single compound, but polymers may also result from combination of two or more different constituents; in either case, linking of the component units may be accompanied by the elimination of small molecules, so that the formula and molecular weight of the polymer are unlikely to be exact multiples of those of a constituent monomer. In some contexts, the use of the term *polymer* is restricted to cases where the number of units in the molecular structure is large." (*Oxford English Dictionary Online* (2007).)

16.      The definitions of the terms "homopolymer" and "copolymer" indicate that these are types of "polymers." Dictionary definitions define "copolymer" as a "polymer in which the repeating units consist of two or more different monomers.

- Copolymer: *Materials Science.* "Copolymer" is "**[a] polymer** that is composed of polymer chains made up of two or more chemically different repeating units that can be in different sequences. *Organic Chemistry.* Any polymer produced by the simultaneous polymerization of two or more dissimilar monomers." (*Academic Press Dictionary of Science and Technology* at 521 (1992).)

- Copolymer: "**[a] polymer** of two or more different monomers." (*American Heritage Dictionary of the English Language* at 415 (3d ed. 1992).)

- Copolymer: "**[a] polymer** containing monomers of more than one kind." (*Dorland's Illustrated Medical Dictionary* at 375 (28th ed. 1994).)

- Copolymer: "**[a] mixed polymer**, the product of polymerization of two or more substances at the same time." (*McGraw-Hill Dictionary of Scientific and Technical Terms* at 460 (5th ed. 1994).)

- Copolymer: a "**[p]olymer** formed from the reaction of more than one species of monomer in order to modify the physical properties of the parent homopolymer…The structure of copolymers is described by the sequence of repeat units along the backbone chain." (*Larousse Dictionary of Science and Technology* at 853 (Peter M. B. Walker ed., 1995).)

- Copolymer: "**[a] polymer** in which two or more monomers or base units are combined." (*Stedman's Medical Dictionary* at 392 (26th ed. 1995).)

- Copolymer: a "**[p]olymer** formed from the reaction of more than one species of monomer in order to modify the physical properties of the parent homopolymer. See panel on polymers." (*Chambers Dictionary of Science and Technology* at 264 (Peter M. B. Walker ed., 1999).)

- Copolymer: "**[a] mixed polymer**, the product of polymerization of two or more substances at the same time." (*McGraw-Hill Dictionary of Scientific and Technical Terms* at 487 (6th ed. 2003).)

17.   Similarly, dictionaries define the term "homopolymer" as a "polymer in which the

repeating units consist of only one type of repeating monomer:

- Homopolymer: **a polymer** that is derived from a single repeated monomer. (*Academic Press Dictionary of Science and Technology* 1040 (1992).)

- Homopolymer: **a polymer** containing the same repeating units of one amino acid in a molecule. (*Dorland's Illustrated Medical Dictionary* 775 (28th ed. 1994).)

- Homopolymer: **A polymer** formed from a single monomer; an example is polyethylene, formed by polymerization of ethylene. (*McGraw-Hill Dictionary of Scientific and Technical Terms* 949 (5th ed. 1994).)

- Homopolymer: **a polymer** (as polyethylene) consisting of identical monomer units. (*Merriam-Webster's Collegiate Dictionary* 556 (10th ed. 1993).)

- Homopolymer: **a polymer** formed from only one kind of monomer. (*Oxford English Dictionary* (2nd ed. 1989).)

8

- Homopolymer: **a polymer** (as polyethylene, polyvinyl acetate) containing only units of one single monomer. (*Webster's Third New International Dictionary of the English Language (Unabridged)* 1085 (1993).)

18.    Persons of ordinary skill in the stent field also use the term "polymer" to encompass both homopolymers and copolymers. For example, both BSC and Abbott (who makes the Xience stent and sells it to BSC under the name Promus) have repeatedly used the term "polymer" to refer to the copolymer used on the Xience/Promus stent -- Poly(vinylidene fluoride-co-hexafluoropropylene) ("PVDF-HFP"). As the name of the molecule shows, this is a copolymer that contains two types of monomers: vinylidene fluoride and hexafluoropropylene.

19.    As one example, Boston Scientific's Patient Information Guide for the Promus stent describes the PVDF-HFP copolymer as "a thin polymer (a type of plastic) coating." (*See* Ex. 35, Promus Patient Information Guide, A409-461 at A429.) The document also states that "[t]he polymer coating helps control the release of everolimus into the arterial wall," and "[the polymer used on the Promus stent has a long history of being used in medical products in contact with blood." (*Id.*) Additional references to PVDF-HFP as a "polymer" can be found on Boston Scientific's web page for Promus, which describes the stent as having an "Effective Drug and Polymer Design," which uses a "[t]hin, fluorinated copolymer matrix for controlled drug release." (*See* Ex. 34, Boston Scientific, PROMUS Everolimus-Eluting Coronary Stent System, http://www.bostonscientific.com/Device.bsci?page=HCP_Overview&navRelId=1000.1003&method=DevDetailHCP&id=10104231&pageDisclaimer=Disclaimer.ProductPage (last visited Sep. 16, 2009), A406-408 at 406.)

**REDACTED**

20.    Patents issued to Boston Scientific employees and owned by Boston Scientific use the term polymer to include both homopolymers and copolymers. For example, Boston

Scientific's U.S. Patent No. 6,120,536 (the "Ding '536" patent) states that "[p]olymers generally suitable for the undercoats or underlayers include . . . ethylene vinyl acetate copolymers." (*See* Ex. 30, Ding '536 Patent at 5:50-53. A327-A343 at A339.)

  21. Publications recently authored by Abbott scientists involved in the design and development of the Xience stent also show that Abbott routinely refers to PVDF-HFP as a "polymer" even though it is a copolymer that contains two different monomers. (*See* Ex. 28, Ding, Ni (Nadine), Xience V Stent Design and Rationale, *J of Interventional Cardiol* 2009 ("Ding 2009"); 22:S18-S27, A311-A320 (emphasis added below)):

- "The Xience V system utilizes a two-layer coating construct composed of a primer layer and a drug-*polymer* reservoir layer with no topcoat." (*Id.* at A312.)

- "Preclinical studies performed at Abbott Vascular further confirm the hemocompatibility and biocompatibility of the Xience V PVDF-HFP *polymer*." (*Id.* at A314.)

- "The PVDF-HFP *polymer* backbone is composed entirely of saturated carbon-carbon single bonds, which improves oxidative stability." (*Id.* at A314.)

- "The lack of chemical reactivity of the *polymer* ensures no chemical interactions occur between PVDF-HFP and everolimus during the manufacturing process, on the shelf or in vivo." (*Id.* at A315.)

- "After extracting the *polymer* off the stents, [19]F NMR spectroscopy allowed for selective quantification of the PVDF-HFP polymer." (*Id.* at A315.)

- "Total organic carbon extractable tests per United States Pharmacopeia (USP) on PVDF-HFP *polymer* have shown low levels of organic extractables at ppm levels." (*Id.* at A315.)

- "The presence of the drug in the *polymer* does not appreciably alter the PVDF-HFP degree of crystallinity or melting point." (*Id.* at A318.)

  22. Similar statements were made in another recent article by Abbott scientists. (*See* Ex. 27, Perkins, Laura E.L., Xience V Everolimus-Eluting Coronary Stent System: A Preclinical Assessment, *J of Interventional Cardiol* 2009; 22:S27-S40, A299-A310:

- "The fourth and final component of the Xience V is the PVDF-HFP *polymer*, a benign fluoropolymer that has been used in other vascular and nonvascular applications. The principal end-points of the preclinical safety studies evaluating the PVDF-HFP *polymer* were to establish its long-term safety and integrity, as for all durable polymer-based DES systems, these two factors have been the source of recent apprehensions in clinical setting." (*Id.* at A307.)

- "The combination of thin struts (Fig. 5), reduced everolimus load, and the biocompatible durable PVDF-HFP *polymer* of the Xience V EECSS contributes to overall rapid vessel healing characterized by a consistent and benign neointimal response over time." (*Id.* at A307.)

23.  Additional references in which BSC and Abbott use the term "polymer to refer to the PVDF/HFP copolymer used on the Promus stent are attached as Ex. 74, A994-A1017.

**2.  The Specification**

24.  A person of ordinary skill reading the specification of the '7286, '3286, and '473 patents would understand that it uses the term "polymer" consistent with its ordinary meaning to include homopolymers and copolymers. There is nothing in the specification that would indicate to a person of ordinary skill that the inventors of the patents sought to deviate from the ordinary meaning of the term.

25.  The Abstract of the '7286, '3286, and '473 patents describes the invention broadly as including methods of "preparing intravascular stents with a polymeric coating." (Abstract, lns. 1-2)

26.  The specification describes the invention using the heading "Experimental Stent Delivery Method—Delivery from *Polymer* Matrix." ('7286 patent, 6:29-30.). In this section, the specification provides a list of absorbable "polymers":

> ***Polymers*** are biocompatible ... and degradable, such as lactone-based polyesters or copolyesters, e.g. polylactide, polycaprolacton-glycolide, polyorthoesters, polyanhydrides, poly-amino acids, polysaccharides, polyphosphazenes, ***poly(ether-ester) copolymers***, e.g., PEO-PLLA, or blends thereof.

27.    This description clearly includes what a person of ordinary skill would recognize as homopolymers and copolymers.  Polylactide is a homopolymer.  Poly(ether-ester) copolymers are (as the name implies) copolymers.  Based on this description, a person of ordinary skill would understand that the inventors intended the term "polymer" to encompass homopolymers and copolymers.

28.    The specification also contains a list of nonabsorbable, biocompatible "polymer" candidates for the stent that include homopolymers and copolymers:

> Nonabsorbable biocompatible *polymers* are also suitable candidates. *Polymers such as* polydimethylsiloxane, poly(ethylene-vinylacetate), acrylate based polymers or copolymers, e.g., poly(hydroxyethyl methylmethacrylate, polyvinyl pyrrolidinone, fluorinated polymers such as polytetrafluoroethylene, cellulose esters.

('7286 patent at 6:43-46.)  Again, this list of "polymers" includes what a person of ordinary skill would recognize as homopolymers and copolymers.    Polytetrafluoroethylene is a homopolymer. Poly(ethylene-vinylacetate) and acrylate-based copolymers are copolymers.

29.    In Col. 7, the specification again uses the term "polymer" to encompass homopolymers and copolymers.  There, it refers to "a degradable polymer such as poly(caprolactone-glycolide)."  Col. 7:11-12.  Poly(caprolactone-glycolide) is a copolymer.

### 3.    The Claims

30.    The claims of the patents also demonstrate that the use of the term "polymer" is consistent with its ordinary meaning and includes homopolymers and copolymers.  For example, independent claim 1 of the '3286 patent recites:

> a stent having a coating applied thereto, wherein said coating comprises a biocompatible *polymer*/drug mixture

31.    Dependent Claim 10, which depends from Claim 1, lists examples of the "polymers" that can be used in the "polymer/drug mixture."  These "polymers" include

homopolymers such as "polyphosphazene." They also include copolymers such as "a poly(ether-ester) copolymer," "poly(ethylene)vinylacetate," or an "acrylate-based copolymer."

32.     Dependent Claims 17, 19 and 22 further limit the "polymer" to a particular copolymer, specifically "a poly(ether-ester) copolymer" (Claim 17), "poly(ethylene)vinylacetate" (Claim 19), or an "acrylate-based copolymer" (Claim 22).

33.     Similarly, independent Claim 1 of the '473 patent covers a stent having "a biocompatible *polymeric* carrier" that comprises "at least one nonabsorbable *polymer*."

34.     Dependent Claim 4, which depends from Claim 1, specifies that "said biocompatible polymeric carrier further comprises an acrylate based polymer or *copolymer*."

35.     A person of ordinary skill would understand from this claim language that the term "polymer" includes homopolymers and copolymers, including the ones set forth in the claims.

### 4.     The Prosecution History

36.     The prosecution history of the patents-in-suit also indicates that the word "polymer" was understood to include both homopolymers and copolymers by both the inventors and the Patent Examiner.

37.     For example, in Application No. 09/874,117, the Examiner rejected claims that included a "polymer mixed carrier" over U.S. Patent No. 5,968,091 to Pinchuk et al. The Examiner noted that "Pinchuk et al. teaches stents which have been coated with a *polymer* by dipping or spraying." (*Id.* (emphasis added).)   The "polymers" listed in the Pinchuk patent encompass both homopolymers and copolymers:

> Suitable *polymers* include *polyurethane*, polycarbonate urethane, polyurethane urea, silicone rubber, *polyisobutylene copolymer* (with styrene, etc.), polyolefin, polyester, glycolated polyester, polyamide, amorphous polyamide, combinations of the above and the like.

(Ex. 31, Pinchuk '091 patent, Abstract lns. 4-9; *id* at Col. 3:27-32, (A344-354).)

38.     For example, polyurethane is a homopolymer.  Polyisobutylene copolymer is (as its name suggests) a copolymer.

**B.     Copolymer ('7286, '3286 and '473 Patents)**

39.     As I explained above, in both ordinary usage and in the patents-in-suit, a copolymer is a type of polymer.  Specifically, it is a polymer having two or more types of monomers.

**C.     Acrylate-Based Polymer or Copolymer**

40.     The '7286, '3286, and '473 patents claim "acrylate-based polymers and copolymers."  An acrylate is a salt or ester of acrylic acid.  (*See* Ex. 5, *Webster's Third New International Dictionary* at 20 (3d ed. 1993), A101.)  The structures of both acrylic acid and its anion (part of the sale)  are shown below:



Acrylic Acid                    Acrylate

41.     In the patents-in-suit, "acrylic acid" includes methacrylic acids.  Methacrylic acids have the same structure as acylic acid, but a methyl group (-CH$_3$) replaces a hydrogen atom on the carbon in the double-bond next to the carboxyl group in the molecule.  That the '7286, '3286, and '473 patents include methacrylic acid within the meaning of acrylic acid is shown by the specification of the '7286, '3286, and '473 patents, which list poly(hydroxyethyl methylmethacrylate) as an example of an "acrylated-based polymer."  ('7286 Patent at 6:46-47.)

For the same reasons, in the '7286, '3286, and '473 patents, acrylates would include methacrylates.

42.    An acrylate can be formed, for example, by reacting the carboxylic acid terminus of acrylic acid with the hydroxyl group of an alcohol (to create an ester of acrylic acid).  For example, BMA (butyl methacrylate) is formed by reacting methacrylic acid with butyl alcohol, as shown below:



43.     I believe a person of ordinary skill would understand "acrylate-based" to mean that the basic structure or foundation of the polymer is based on the structure of an acrylate.  In ordinary usage, the word "base" means "to serve as a base for" (as a verb) and "the fundamental part of something" (as a noun).  (Ex. 14, *Webster's Third New International Dictionary* at 180 (3d ed. 1993), A202-205.)  Thus, an acrylate-based polymer is a polymer in which acrylate serves as the fundamental part of the monomers used in the polymer.  The term "acrylate-based polymer" therefore would be understood by a person of ordinary skill to mean that the polymer as a whole (each monomer) is based on the structure of a salt or ester of acrylic acid.

44.     As discussed above, the term "polymer" encompasses both homopolymers and copolymers.  Thus, when the term "polymer" is used in the phrase "acrylate-based polymer or copolymer," it also encompasses both homopolymers and copolymers.

45.     A person of ordinary skill would understand that an acrylate-based polymer can be composed of the same repeating acrylate unit, in which case it would be a homopolymer, or different acrylates units, in which case it would be a copolymer.  But in both cases the polymer would be composed of all acrylate units.

46.     By contrast, because a copolymer must have more than one type of monomer, a person of ordinary skill would understand an acrylate-based copolymer in this context to be a copolymer in which at least one (but not necessarily all) of the types of monomers be based on the structure of a salt or ester of acrylic acid.

47.     Thus, the phrase "acrylate-based polymer or copolymer" would encompass polymers where all *or just some* of the monomers are based on the structure of a salt or ester of acrylic acid.

D.      "Fluorinated Polymer"

48.      The '7286, '3286, and '473 patents also claim stents coated with "fluorinated

polymers."  As I discussed previously, the term polymer includes both homopolymer and

copolymers.  Consistent with the above discussion of the term "polymer," person of ordinary

skill would understand a "fluorinated polymer" to include both homopolymers and copolymers..

The patents do not use the word "based" in conjunction with "fluorinated polymer."  The absence

of the word "based" indicates that – in contrast to "acrylate-based polymers and copolymers" –

fluorinated polymers do not need to be composed of monomers based on any particular structure.

So long as the polymer contains a fluorine atom somewhere on its structure, it is a "fluorinated

polymer."

49.      Abbott scientists who helped design the Xience/Promus stent have used the term

fluorinated polymer consistent with this meaning in the context of drug-eluting stent coatings:

U.S. Patent Application No. 2004/0063805 states that "[f]or the purposes of the present

invention, the term 'highly fluorinated polymer' is defined as any homopolymer, copolymer,

terpolymer or a blend thereof in which at least 50% of monovalent atoms [atoms which have

only one available electron to share with other atoms] in the macromolecule are fluorine atoms."

(Ex. 33, U.S. Patent App. No. 2004/0063805 at ¶ 40, A392-A405.)  The Abbott scientists thus

use "fluorinated" to mean "containing fluorinated atoms"; hence it's use of the adverb "highly" to

indicate that the polymer contains many fluorine atoms.  The Abbott scientists use the term

polymer to refer to both homopolymers and copolymers.  Finally, the Abbott scientists omit the

word "based," and they correspondingly indicate that a fluorinated polymer can be "any"

homopolymer or copolymer.

### E.  "Biocompatible"

50.  Each of the patents-in-suit contains claims that require the polymers used on the stent to be "biocompatible." Because the '7286, '3286, and '473 share one specification, and the '662 patent has a different specification, I will first discuss the ordinary meaning of the term "biocompatbile" and then show how each specification comports with this meaning.

51.  Typically, whether a material is considered "biocompatible" depends on whether it is suitable for its intended use in the body.  If the material is suitable for its intended use and does not provoke an unacceptable response in the body, then it is considered biocompatible. Cordis's proposed construction of "biocompatible," therefore, is the ordinary definition used by persons of ordinary skill in the biomaterials field.

52.  This ordinary meaning of "biocompatible" is also reflected in dictionaries and scientific treatises.  For example:

- Biocompatibility: "[t]he ability of a material to perform with an appropriate host response in a specific application." J.S. Temenoff & A.G. Mikos, *Biomaterials: (The Intersection of Biology and Materials Science* 2 (2008).)

- Biocompatible material: "[o]ne having acceptable host and material response in specific application." (*Biological Performance of Materials* at 444-45 (1999).)

- Biocompatibility: [t]he ability of a material to perform with an appropriate host response in a specific application. (*Id.*)

- Biocompatibility: "[t]he property of being biologically compatible by not producing a toxic, injurious, or immunological response in living tissue: As a result of its strength and biocompatibility, the material is often used in medical devices." (*American Heritage Dictionary of the English Language* at 188 (3d ed. 1992).)

- Biocompatibility: "the capability of being harmonious with biological life without causing toxic or injurious effects." (*Academic Press Dictionary of Science and Technology* at 259 (1992).)

- Biocompatibility: "compatibility with living tissue or a living system by not being toxic or injurious and not causing immunological rejection." (*Merriam-Webster's Collegiate Dictionary* at 114 (10th ed. 1993).)

- Biocompatible:  "being harmonious with life; not having toxic or injurious effects on biological function."  (*Dorland's Illustrated Medical Dictionary* at 198 (28th ed. 1994).)

- Biocompatibility:  "[t]he condition of being compatible with living tissue by virtue of a lack of toxicity or ability to cause immunological rejection."  (*McGraw-Hill Dictionary of Scientific and Technical Terms* at 226 (5th ed. 1994).)

53.

**REDACTED**

### 1.   The '7286, '3286, and '473 Patents

54.   I believe that a person of ordinary skill in the art reviewing the common specification of the '7286, '3286, and '473 patents would conclude that the term "biocompatible" was used consistent with its ordinary meaning.

55.   The patent specification states that the polymers that can be used with the invention must be "biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation)." (*see, e.g.,* '7286 patent at 6:37-39.) The specification then lists various bioabsorbable polymers, including "lactone-based polyesters or copolyesters, polylactide, polycaprolacton-glycolide, polyorthoesters, polyanhydrides; poly-amino acids; polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof." ('7286 patent Col. 6:37-43.) As of 1997, a person of ordinary skill would have known that these polymers could cause at least some inflammation in some patients.  Nonetheless, the inventors believed that they would be able to perform their function with an appropriate host response. The scientific literature, which would have been known to the person of ordinary skill, described how some of the listed polymers could cause some inflammation, at least in some instances.  A summary of representative articles is attached as Exhibit 75. (Ex. 75, A1018-1189.) The specification then goes on to say that "[n]onabsorbable biocompatible polymers are also suitable candidates," and lists various nonabsorbable polymers. ('7286 patent at 6:43-44.)  These 'biocompatible" nonabsorbable polymers include "polydimethylsiloxane; poly(ethylene-vingylacetate); acrylate based polymers or copolymers, e.g., poly(hydroxyethyl methylmethacrylate, polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters." ('3286, 6:37-43)  Scientific journal articles also show that these nonabsorbable polymers listed caused some reaction from the body.  Representative articles and a summary contained in Exhibit 75. (Ex. 75, A1018-1189.)  By referring to these

polymers as "biocompatible," the specification acknowledges that biocompatibility does not require zero tissue reaction or inflammation.

56.     A person of ordinary skill would view this usage in the '7286, '3286, and '473 patents as being consistent with the ordinary meaning of biocompatible.  Such a person would not believe that this usage would require absolutely no tissue reaction or inflammation whatsoever, since it was believed and understood at the time that all polymers (including the ones listed in the specification) would cause at least some small tissue reaction or inflammation. What would be important would be that the tissue reaction or inflammation not be negative, *i.e.* unacceptable for its function in the body.

## 2.     The '662 Patent

57.     The '662 patent's specification does not contain the words "elicit any negative tissue reaction or promote mural thrombus formation."  The ordinary meaning of "biocompatible" that I discussed above thus also applies to the '662 patent's use of the term.  The '662 patent also describes the polymer used in the preferred embodiment of the stent as including a blend of two polymers: poly(ethylene-co-vinyl acetate) and poly(butylmethacrylate).  Each of these polymers is used on the Cypher stent, and each is known to cause at least some small amount of tissue reaction.

## REDACTED

                          This reinforces my conclusion that the term biocompatible takes on its ordinary meaning in the '662 patent.

## F.     "Applied thereto"

58.     The claims of the '473 patent required that the coating is "applied" to the stent.  I understand that the parties have proposed the following definitions for the phrase "applied thereto"

| "applied thereto" | |
|---|---|
| **Cordis's Proposed Construction** | **Boston Scientific's Proposed Construction** |
| Put thereon | To the extent not indefinite:  Brought into direct contact with the stent surface. |

59.    As I explained previously, drug-eluting stents can be made by coating the metal struts of a stent with a polymer, which carries and releases the drug.  This coating can be put on the stent in several ways.  For example, the polymer and drug can be dissolved into a liquid (a solvent), creating a solution.  The solution can then be sprayed onto the stent.  Once the solvent dries, the polymer is left on the stent, with the drug entrapped within the strands of polymer.

60.    A common technique for improving the adherence of the coating to the stent's struts is to first apply another polymer that acts as a "primer."  Like the primer used in painting walls, the polymeric primer insures that the coating adheres well to the stent's struts.  In 1997, a person of ordinary skill would have understood that a primer could be used on a bare metal stent to secure better adherence to the stent coating.

61.    Persons of ordinary skill commonly use the term apply to refer to the addition of a polymer layer or a drug to a stent, and do not require physical contact with the metallic portion of the stent.  This is consistent with the dictionary definition of the term "apply":

- Apply: "1. To bring into nearness or contact with something; put on, upon, or to: *applied glue sparingly to the paper. (American Heritage Dictionary of the English Language* at 89 (3d ed. 1992).)

- Apply: "To lay or spread on." (*Merriam-Webster's Collegiate Dictionary* at 57 (10th ed. 1993).)

- Applied: "Brought into or placed in effective contact; connected, attached; laid or spread on to a surface." (*Oxford English Dictionary Online* (2009).)

- Apply: "1 e (1): To place in contact : lay or spread on : overlay." (*Webster's Third New International Dictionary* at 105 (2002).)

**G.    "Affixed to"**

62.    Similarly, some claims of the '662 patent require that a polymeric coating is "affixed to" the stent.  The parties have proposed the following definitions for "affixed to":

| "affixed to" | |
|---|---|
| **Cordis's Proposed Construction** | **Boston Scientific's Proposed Construction** |
| Attached to the intraluminal "stent" (previously defined) | To the extent not indefinite:  Attached to the stent surface. |

Again, a person of ordinary skill would understand "affix" to carry its ordinary meaning in the '662 patent.  As several dictionary definitions demonstrate, the ordinary meaning of affix is "to attach":

- Affix is "1. to attach physically (as by nails or glue): Fasten.  2. to attach in any way: connect with."  Webster's Third New International Dictionary at 36 (2002).

- "Affix" is "1. to secure to something; attach."  (American Heritage Dictionary of the English Language at 30 (3d ed. 1992).)

- "Affix" is "1. to attach physically.  2. to attach in any way; add, append." (Merriam-Webster's Collegiate Dictionary at 20 (10th ed. 1993).)

63.    The specification of the '662 patent explains that a drug can be "affixed to the stent" in "a number of ways and utilizing any number of biocompatible materials."  ('662 Patent at 16:22-25.)  The patent describes an exemplary embodiment, in which the drug is "directly incorporated into a polymeric matrix and sprayed onto the outer surface of the stent."  (*Id.* at 16:25-27.)  But this is merely one example of affixing something to the stent.  The non-limited use of "affix" earlier in the specification indicates to a person of ordinary skill that any method of attaching the polymer coating to the stent is appropriate.

64.     As I explained above, a person of ordinary skill would understand that polymeric carriers can be attached to a stent that is coated with a primer.  (*See* ¶ 60.)

65.     The specification of the '662 patent uses the term "affix" broadly, explaining that the drug can be "affixed to the stent" in "a number of ways and utilizing any number of biocompatible materials."  ('662 patent at Col 16:22-25.)

**H.     "Coating"**

66.     As discussed above, the '662 patent describes and claims a polymeric "coating" that is affixed to a stent.  The parties have proposed the following definition for "coating":

| Cordis's Proposed Construction | Boston Scientific's Proposed Construction |
| --- | --- |
| Covering layer(s) | To the extent not indefinite:  A distinct covering layer of a particular composition. |

67.     In ordinary usage, a coating is a covering layer of covering layers.  The article written by the designers of the Xience/Promus stent uses the word in this way, describing the stent coating as containing two layers – a primer layer and a reservoir layer that holds the drug:

> The Xience V system utilizes a ***two-layer coating*** construct composed of a primer layer and a drug-polymer reservoir layer with no topcoat.  Poly(n-butyl methacrylate) (PBMA) is used as the thin, primer adhesion layer, and the drug reservoir layer is composed of poly(vinylidene fluoride-co-hexafluoropropylene) (PVDF-HFP) combined with everolimus.  ***This two-layer coating*** construct is designed to ensure excellent adhesion of the drug matrix to the stent, while minimizing unwanted adhesions to the delivery balloon.

(*See* Ex. 28, Ding, Ni (Nadine), Xience V Stent Design and Rationale, *J of Interventional Cardiol* 2009; 22:S18-S27 (A311-A320), A312.)

68.

**REDACTED**

REDACTED

69.     Finally, U.S. Patent No. 6,908,624 claims the polymeric coating on the Xience stent.  This patent also uses the word "coating" in the context of a drug-eluting stent to refer to multiple layers – the primer layer and the drug reservoir layer.  (*See* Ex. 32, U.S. Patent No. 6,908,624 at col. 2, lines 5-8 (A355-A391), A365.)

70.     Though the word "coating" is not defined in the specification of the '662 patent, prior art cited during the prosecution of the patent uses coating in a way that includes multiple layers.  U.S. Patent No. 6,120,536 to Ding describes a stent "coating" that includes two layers, a "relatively thin layer of biostable elastomeric material" containing a drug "in combination with a non-thrombogenic surface" layer topcoat.  ('536 patent, Abstract lns. 2-6.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

//
//

September *16*, 2009

_____
Antonios G. Mikos