**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs/Counter-Defendants, ) ) | Civil Action No. 07-333-SLR |
| | Civil Action No. 07-348-SLR |
| v. ) ) | Civil Action No. 07-409-SLR |
| JOHNSON & JOHNSON, INC., ) CORDIS CORPORATION, and WYETH ) ) | |
| Defendants/ Counter-Plaintiffs. ) ) | |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., ) ) ) | |
| Plaintiffs/Counter-Defendants, ) ) | |
| v. ) ) | Civil Action No. 07-765-SLR |
| JOHNSON & JOHNSON, INC., ) CORDIS CORPORATION, and WYETH ) ) | |
| Defendants/ Counter-Plaintiffs. ) ) | |

**DECLARATION OF CAMPBELL ROGERS IN SUPPORT OF THE OPENING MARKMAN BRIEF OF JOHNSON & JOHNSON, CORDIS, AND WYETH**

I, Campbell Rogers, M.D., under penalty of perjury declare as follows:

1.      I am the Chief Scientific Officer, Cordis Corporation ("Cordis"), where I have

worked since 2006. I received my A.B., *cum laude*, from Harvard College in 1983, and my

M.D. from Harvard Medical School in 1988. I completed my internship, residency, and

fellowship at Brigham and Women's Hospital from 1988-1995 in internal medicine and

cardiology. From 1994-1995, I was the Chief Medical Resident at Brigham and Women's

Hospital. I am Board certified by the American Board of Internal Medicine in various

disciplines, including Cardiovascular Diseases and Interventional Cardiology.

2.      From 1995 to 2000, I held a series of hospital appointments at Brigham and Women's Hospital in Boston, including Associate Physician (1995-1998), Associate Director, Interventional Cardiology (1998-2000), Director, Experimental Cardiovascular Interventional Laboratory (1998-2006) and Director, Cardiac Catheterization Laboratory (2000-2006).  As Director of the Cardiac Catheterization Laboratory, I was responsible for overseeing all aspects of the Cardiac Catheterization Laboratory, including faculty practice, clinical care, medical student and cardiology fellow education, and clinical research.  As a core member of Brigham and Women's Hospital interventional cardiology faculty, my clinical activities included approximately 300 coronary angioplasty, stenting, and atherectomy procedures, and 400 diagnostic left and right heart catheterizations, pacemakers, myocardial biopsies, and pericardiocenteses per year, in addition to general cardiology outpatient and inpatient care.

3.      From 1998-2006, I served as Principal Investigator of a large animal experimental vascular biology laboratory (Experimental Cardiovascular Interventional Laboratory, Cardiovascular Division, Brigham and Women's Hospital).  The laboratory's main focus was on cellular and extracellular responses to mechanical arterial injury, and projects included the evaluation of novel technologies for modulating the events of vascular repair via stent-based delivery of pharmaceutical agents.  From about 1995-2006, I also served as Principal Investigator and Co-Investigator for multi-center clinical device and pharmacologic trials based in the Cardiac Catheterization Laboratory.

4.      I have been involved in pre-clinical and clinical investigations relating to the treatment of arterial injury for all the major coronary stent companies through the non-profit Center for Biological Sciences and Engineering Trust.

5.      Brigham and Women's Hospital has been hired to carry out human clinical trials on virtually all the drug eluting stents that have been evaluated in humans in the United States. A full list of the human clinical trials that I have participated in as an investigator can be found in my CV, which is attached to Cordis's Appendix at A1324-A1356.

6.      I understand that Cordis asserts that Boston Scientific Corp. and Boston Scientific Scimed, Inc. (collectively "Boston Scientific") infringe claims 1-5 of U.S. Patent No. 7,217,286; claims 9, 10, 21, 25, 27-39, 51, 52, 63, 67, 69-77 of U.S. Patent No. 7,223,286[1]; claims 1-5 of U.S. Patent No. 7,229,473; and claims 1-3, 5-7, 9-11, 13-15, and 17-25 of U.S. Patent No. 7,300,662.

7.      I submit this declaration in support of Cordis's Opening Markman Brief. In this declaration I will provide my understanding of the meaning a person of ordinary skill would ascribe to various terms in the patents-in-suit.

## I.   BACKGROUND

### A.   Level of Skill

8.      In this case, a person of ordinary skill is a Ph.D., chemist, biologist, materials scientist, biomedical engineer or physician, all with experience in drug delivery systems and biomaterials research, specifically experience with polymers in contact with blood. This person would also have knowledge of, or worked in conjunction with, a physician experienced in the use of medical devices implanted in blood-contacting environments, such as a cardiologist.

### B.   The Problem of Restenosis

9.      I understand that Cordis is asserting four patents in this litigation: U.S. Patent No. 7,217,286 (the "'7286 patent"), U.S. Patent No. 7,223,286 (the "'3286 patent"), U.S. Patent No.

---

[1] I understand that Cordis has amended the claims of the '3286 patent in Reexamination No. 95/001,097. The asserted claims of the '3286 patent as amended in the Reexamination are claims 1, 2, 6, 10, 21, 25, 27-30, 32-41, 44, 48, 52, 63, 67, 69-77.

7,229,473 (the "'473 patent") and U.S. Patent No. 7,300,662 (the "'662 patent"). I will collectively refer to these patents as the "patents-in-suit."

10.   The patents-in-suit are directed to a treatment for the problem of restenosis. In order to understand what restenosis is, it is first necessary to discuss the most common form of heart disease in the United States: coronary artery disease. Coronary artery disease is caused in most cases by coronary atherosclerosis. Atherosclerosis is a pathologic condition in which fibrous "plaques" made up of fat, cholesterol, calcium, and other substances build up inside the arteries, resulting in stenosis (narrowing) of the artery. Progressive plaque build-up can result in blockage of the coronary arteries, depriving the heart of vital oxygen and nutrients, and causing tissue damage and potentially serious complications.

11.   One treatment for coronary artery disease is percutaneous transluminal coronary angioplasty ("angioplasty"). During angioplasty, a physician inserts a thin guide wire and other devices into an artery in a patient's leg or arm and guides them near to the stenotic area in the heart. A long, flexible tube – called a catheter – with a small balloon on its tip is inserted over the guide wire and positioned at the stenotic site. After assessing the lesion, the physician inflates the balloon on the catheter, applying pressure that fractures the plaque or compresses the plaque against the wall of the artery, thereby widening the artery and increasing blood flow to the heart. The size of the balloon, inflation pressure, and the number and duration of inflations varies according to the lesion characteristics.

12.   Although PTCA provided a valuable treatment option for physicians, a number of limitations remained. One problem was that sometimes the coronary artery would close, narrow or collapse after the balloon was deflated or withdrawn ("abrupt vessel closure"). In addition, in 30-50% of all initially successful angioplasty, more gradual restenosis (re-narrowing) occurred

within 3-6 months, resulting in new blockages of the coronary artery at the site of angioplasty. The high pressures used during the angioplasty balloon dilatation process inflict trauma to the delicate arterial tissue. Restenosis occurs in response to this injury to the coronary artery. Restenosis following angioplasty is a result of three components: early vascular recoil, late negative remodeling, and neointimal hyperplasia. Early vascular recoil occurs when elastic elements and tissue in the vessel wall that are overstretched during balloon dilation attempt to return to their original dimensions causing luminal narrowing. The angioplasty procedure also injures the vascular wall, causing it to scar and "remodel" or constrict after the angioplasty procedure. The injury also induces proliferation of smooth muscle cells, fibroblasts, and other cells ("neointimal proliferation") and the production of extracellular matrix which clogs the lumen of the vessel, a process known as neointimal hyperplasia.

13.     Stents were developed in an effort to prevent abrupt vessel closure and restenosis. Stents are tiny, spring-like tubes made from metal alloys that are placed in an artery during angioplasty. Once in place, the stent forms a scaffold that keeps the artery open, improving blood flow and preventing the artery from collapsing. Bare-metal stents, however, aggravate the injury to the artery caused by angioplasty. This results in an increase in neointimal proliferation. The proliferating cells and the extracellular matrix that they produce clog the stented area. This results in "in-stent restenosis."

14.     Cardiologists sought numerous treatments for restenosis. Many different treatments were attempted, including the use of drugs to prevent the cell proliferation that drove in-stent restenosis. The patents-in-suit are, at a very general level, directed to the application of drugs locally – at the site of angioplasty – to prevent restenosis. More specifically, the patents-in-suit describe a stent that carries drug and releases it into the wall of the artery – a "drug-

eluting stent." The patents-in-suit describe and claim important inventions that are incorporated in Cordis's ground-breaking and highly successful Cypher® Sirolimus-eluting Coronary Stent (the "Cypher® stent"). The Cypher® stent is the first drug-eluting stent to obtain FDA approval and to be sold in the United States.

### C.    The Patents-In-Suit

15.    The '7286, '3286 and '473 patents (all assigned to Cordis) are entitled "Local Delivery Of Rapamycin For Treatment Of Proliferative Sequelae Associated With PTCA Procedures, Including Delivery Using A Modified Stent." The '3286, '7286 and '473 patents are directed to, among other things,  polymer-drug coated intravascular stents for the controlled, local delivery of rapamycin (which the patents refer to as "sirolimus") or a macrocyclic lactone analog of rapamycin. *See, e.g.,* '3286 patent at 1:25-30. The '7286, '3286, and '473 patents share the same specification, but they each contain a different set of claims.

16.    United States Patent No. 7,300,662 ("the '662 patent") is entitled "Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular Disease." The drug delivery devices claimed in the '662 patent comprise, *inter alia*:  (a) an intraluminal stent; (b) a biocompatible, nonerodible polymeric coating affixed to the stent; and (c) from about 64 μg to 197 μg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 ("analog of Rapamycin") incorporated into the coating, wherein the device provides, at 12 months following implantation in a human, an in-stent late loss in diameter of less than about 0.5 mm or less than about 0.3 mm, and in-stent diameter stenosis of less than about 22% or less than about 15%, as measured by quantitative coronary angiography ("QCA").

## II.    THE MEANING OF CERTAIN TERMS IN THE PATENTS-IN-SUIT

### A.    "In-Stent Late Loss" and "In-Stent Diameter Stenosis"

17.     Late loss and percent diameter stenosis are measures that quantify the degree of restenosis suffered by a patient.  When a stent is first implanted, it is possible to measure the smallest distance between the walls of the artery in the stented region – known as the in-stent minimum luminal diameter.  At some later time point, the minimum luminal diameter can be measured again.  Late loss is the difference between the MLD immediately following the procedure and the MLD at pre-specified point, such as 6, 9 or 12 months.  Late loss is a measure of the change in MLD of the treated coronary segment due to vascular contraction and neointimal hyperplasia.  "In-stent" late loss is a measure of vessel re-narrowing within the margins of the stent.  Percent diameter stenosis is a relative measure of restenosis in which the MLD is compared to the normal lumen diameter in the absence of stenosis.  It is calculated using the following formula:  $\%DS = [1 - (MLD/RVD)] \times 100$.  RVD is the reference vessel diameter which is a measure of the normal diameter of the vessel adjacent to the stenosis.  Late loss and percent diameter stenosis are calculated using QCA (see below).

**B.      "Quantitative Coronary Angiography"**

18.     Quantitative coronary angiography ("QCA") is a well established means for measuring the interior dimensions of arteries.  It is frequently used in clinical trials of drug-eluting stents, such as those of the Xience/Promus stent.  To perform QCA, a physician must first capture an image of the artery.  This is done by injecting a radiopaque dye into the artery and taking an X-ray image.  Next, the image is analyzed by a computer, which calibrates the image (*i.e.* determines the millimeters per pixel on the image) and then measures the distance between the edges of the artery.  There are a few different software packages for performing this part of the procedure, and the accurate software packages are well known to persons of ordinary skill who set up clinical trials of stents.  A person of ordinary skill would understand the acceptable

protocols to use for determining the MLD measurements described above and could choose an acceptable one.

19.     Over the years, techniques have been developed to minimize sources of variability in QCA and maximize its accuracy.  This includes, in a clinical trial of stents, sending the images to a core laboratory, which specializes in taking QCA measurements.  These techniques are also well known and practiced by those who set up and run clinical trials.

**C.     "Human Population"**

20.     The '662 patent claims a device that provides certain mean in-stent late loss and percent diameter stenosis values in a "human population" at 12 months following implantation. The parties have proposed the following definitions for the claim term "human population":

| "human population" | |
|---|---|
| **Cordis's Proposed Construction** | **Boston Scientific's Proposed Construction** |
| a group of human patients that are candidates for coronary stent therapy and would be a suitable group for testing in a clinical trial for stents | To the extent not indefinite: A class of people distinguished by particular traits or characteristics. |

21.     In my opinion, a person of ordinary skill would understand a human population, as used in the '662 patent, to refer to a group of human patients that are candidates for coronary stent therapy and would be suitable for testing in a clinical trial for stents.

22.     Any time a company wants to market and sell a new medical device, it must enter the device into clinical trials to test the safety and efficacy of the device.  For drug-eluting stents, late loss and percent diameter stenosis are measures of efficacy commonly collected during clinical trials.  Late loss is not, however, frequently measured in the everyday clinical practice of a cardiologist.  Because late loss and percent diameter stenosis are strongly associated with

clinical trials, a person of ordinary skill would initially understand the "human population" to refer to a group of people that was tested in a clinical trial of a drug-eluting stent.

23.     The populations of these clinical trials are defined by what are called inclusion and exclusion criteria.  As the names imply, to be part of the clinical trial, a patient must meet all of the inclusion critera and cannot have any of the exclusion criteria.  Though not all clinical trials of a drug-eluting stent measuring late loss and percent diameter stenosis have the same inclusion and exclusion criteria, there is often substantial overlap.

24.     A person of ordinary skill would also understand that, to have a suitable group for a clinical trial, it's necessary to select a group of patients that would provide some scientifically reasonable test of the efficacy of the stent.  Persons of ordinary skill know how to select or at least identify such groups.  Generally, for drug-eluting stents, there is a "First in Man" trial in which only patients with a single lesion of a specified size range can be treated.  Larger trials follow, in which patients with multiple lesions are included and various sizes are tested.  In both of these types of trials, however, there are similar inclusion and exclusion criteria that apply to the population.  These criteria are known to persons of ordinary skill.  While there is some variability in the composition of these populations, the fact that these trials are often randomized causes the populations to remain relatively consistent and comparable.

25.     Moreover, cardiologists know that the two most important factors which affect late loss and percent diameter stenosis are diabetes and longer lesions.  These two factors exist in relatively constant proportions in the group of people who are candidates for stent therapy and suitable for testing in a clinical trial of stents. Therefore, clinical trials of a drug-eluting stent will generally test similar groups of people with similar propensity for late loss and percent diameter stenosis.

9

26.     A person of ordinary skill, reading the specification of the '662 patent, would understand the claimed "human population" to refer to a group of people who are candidates for coronary stent therapy and suitable for a clinical trial.  The specification of the '662 patent describes the results of Cordis's First-in-Man study of the Cypher stent.  The patients in this study are an example of the kind of "human population" described in the '662 patent.  (*See* '662 Patent at Table 5.0.)

27.     Results from the First-in-Man trial are reported in Table 5.0 of the '662 patent. The '662 patent notes that "[t]he human clinical response to rapamycin reveals essentially total abolition of neointimal hyperplasia inside the stent using both angiographic and intravascular ultrasound measurements." ('662 Patent at 10:43-10:46.)  The patent uses "human" to describe the patients in the First-in-Man trial.  Moreover, the description of the trial as measuring the "human clinical response" shows that the patent is referring to testing on a group of human patients that is suitable for testing in a clinical trial for stents.

28.     Further evidence that supports this meaning of "human population" comes from the prosecution history of the '662 patent.  The May 22, 2007 Pre-Appeal Brief Request for Review filed by the applicants cites the a 2005 paper on the 12-month late loss and percent diameter stenosis measures from the SPIRIT First trial as an example of measuring late loss at 12 months post implantation.  (See Ex. 17, Patent App. No. 10/829,074 Pre-Appeal Brief Request for Review (May 22, 2007) A224-A228 at A227.)  It is apparent from this filing that the applicants intended to include the SPIRIT First subjects in the definition of a "human population."

**D.     "Inhibit"**

29.     The '7286, '3286, and '473 patents contain claims with similar limitations that relate to the inhibition of neointimal proliferation.  As I explained above, neointimal proliferation

refers to the expansion of the number of cells in the intima of the artery, which leads to the re-narrowing of the artery.

30.     Sirolimus and its analogs impede cell division – the process by which cells proliferate. An artery treated with rapamycin will thus have less neointimal proliferation as compared to an untreated artery. The '7286, '3286, and '473 patents claim drug-eluting stents with rapamycin or analogs present in amounts effective to "inhibit neointimal proliferation." In the cardiology field, persons of ordinary skill use the term "inhibit" in the context of neointimal proliferation to mean reducing neointimal proliferation. They do not use it to mean completely stopping all neointimal proliferation.

31.     This understanding is consistent with the ordinary meaning of the word "inhibit" as reflected in various dictionary definitions

- Inhibit: "2a(2): to operate against the full development or activity of: check, restrain, or diminish the force, intensity or vitality of. b(1): *to reduce* or suppress the activity of (2): *to retard* or prevent the formation of (3): to retard, interfere with, or prevent: to cause inhibition." (*Webster's Third New International Dictionary* at 1163 (2002).) (emphasis added)
- Inhibit: "1. to hold back, *restrain*." (*American Heritage Dictionary of the English Language* at 929 (3d ed. 1992).) (emphasis added)
- Inhibit: "1. to *restrain*, hinder, arrest or check." (*Random House Webster's Unabridged Dictionary* at 982 (2nd ed. 2001).) (emphasis added)

32.     Articles published contemporaneously to the '7286, '3286, and '473 patents – including some articles discussed in the specification of the patents – reflect the fact that persons of ordinary skill use the word inhibit to mean reduce in the context of inhibiting neointimal proliferation. For example, the common specification of the patents discuss an article by Marx et al. (*See, e.g.,* U.S. Patent 7,223,286 Col. 5, Lines 41-43.) The Marx study concluded that rapamycin "inhibited" smooth muscle cell proliferation in rat aortas (*see* Ex. 26, Marx et al., Rapamycin-FKBP Inhibits Cell Cycle Regulators of Proliferation in Vascular Smooth Muscle

Cells, *Circ. Res.* 1995; 76:412-17 ("Marx") A292-A298, at p. 414), even though there was some small increase in cells in rapamycin treated arteries. Similarly, the specification cites to an article by Poon et al., which is titled "Rapamycin *Inhibits* Vascular Smooth Muscle Cell Migration" and states that rapamycin "*inhibits* aortic smooth muscle cell migration (Ex.2 5, Poon et al., Rapamycin Inhibits Vascular Smooth Muscle Cell Migration, *J. Clin. Invest.*, 1996; 98:2277-2283, A285-A291 at 2279.) The article, however, reported reporting small amounts of cell migration in rapamycin treated cultures, and therefore migration was "reduced" rather than completely prevented.

E.     **"Coating"**

33.     Drug-eluting stents can be made by placing a coating on a metal struts of the stent. The '662 patent claims a stent with, among other things, a "polymeric coating." The ordinary meaning of the word "coating" in the context of drug-eluting stents, is the portion of the stent that covers the metal struts. The scientists who designed the Promus/Xience stent use the term this way in describing the coating that is on Promus/Xience, which contains two layers:

> The Xience V system utilizes a ***two-layer coating*** construct composed of a primer layer and a drug-polymer reservoir layer with no topcoat. Poly(n-butyl methacrylate) (PBMA) is used as the thin, primer adhesion layer, and the drug reservoir layer is composed of poly(vinylidene fluoride-co-hexafluoropropylene) (PVDF-HFP) combined with everolimus. ***This two-layer coating*** construct is designed to ensure excellent adhesion of the drug matrix to the stent, while minimizing unwanted adhesions to the delivery balloon.

(*See* Ex. 28, Ding, Ni (Nadine), Xience V Stent Design and Rationale, *J of Interventional Cardiol* 2009; 22:S18-S27, A311-A320 at A312.) Another example comes from U.S. Patent No. 6,908,624, which claims the polymeric coating on Xience/Promus. That patent uses the word coating to refer to the two layers of material covering the stents struts: the primer layer and the reservoir layer. (Ex. 32, U.S. Patent No. 6,908,624, col. 2, lines 5-8, A355-A391.)

34.     Prior art cited in the file history of the '662 patent also uses coating in this way.

U.S. Patent No. 6,120,536 to Ding describes a stent "coating" that includes two layers, a

"relatively thin layer of biostable elastomeric material" containing a drug "in combination with a

non-thrombogenic surface" layer topcoat.  (Ex. 30, '536 patent, Abstract lns. 2-6, A327-A343.)

September 16, 2009

Campbell Rogers, M.D.