**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | C.A. No. 07-333-SLR |
| | ) | C.A. No. 07-348-SLR |
| JOHNSON & JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | C.A. No. 07-409-SLR |
| *Defendants.* | ) ) | |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | C.A. No. 07-765-SLR |
| JOHNSON & JOHNSON, INC., CORDIS CORPORATION, and WYETH, | ) ) ) |  |
| *Defendants.* | ) ) ) | |

---

**BSC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF U.S PATENT NOS. 7,217,286, 7,223,286, 7,229,473,
AND 7,300,662 UNDER 35 U.S.C. § 112**

---

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter
Michael K. Levy
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004
(212) 425-7200

James F. Hibey
Matthew M. Wolf
John E. Nilsson
**HOWREY LLP**
1299 Pennsylvania Avenue NW
Washington, DC 20004
(202) 783-0800

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600

*Attorneys for Plaintiffs, Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*

September 16, 2009

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ..........................................................................................................1

NATURE AND STAGE OF THE PROCEEDING........................................................3

SUMMARY OF THE ARGUMENT .............................................................................3

I.   BSC IS ENTITLED TO SUMMARY JUDGMENT OF NONENABLEMENT
     AND LACK OF WRITTEN DESCRIPTION AS TO THE ASSERTED CLAIMS
     OF THE '7286, '3286, AND '473 PATENTS ......................................................5

     A.   Undisputed Material Facts ........................................................................5

          1.   Each Asserted Claim Requires The Use Of A Macrocyclic Lactone
               Analog As A Therapeutic Agent Or Drug, But The Specification
               Fails To Disclose Any Such Analog Or Its Use .........................................6

          2.   The Inventors Admitted That They Did Not Contemplate Using A
               Macrocyclic Lactone Analog ...................................................................8

          3.   The Selection, Synthesis And Screening Of Potential Macrocyclic
               Lactone Analogs Of Rapamycin Are Challenging And The
               Pharmacologic Effect Of Such Analogs Cannot Be Predicted .................10

          4.   The Development Of Drug-Eluting Stents Based On Rapamycin
               Analogs Was Highly Unpredictable In 1997-1998....................................13

     B.   ARGUMENT...........................................................................................14

          1.   The Asserted Claims Of The '7286, '3286, and '473 Patents Fail
               To Satisfy The Enablement Requirement As A Matter Of Law................14

          2.   The Asserted Claims Of The '7286, '3286, and '473 Patents Fail
               To Satisfy The Written Description Requirement As A Matter Of
               Law .........................................................................................................21

II.  BSC IS ENTITLED TO SUMMARY JUDGMENT OF NONENABLEMENT
     AND LACK OF WRITTEN DESCRIPTION AS TO THE ASSERTED CLAIMS
     OF THE '662 PATENT ....................................................................................24

     A.   Undisputed Material Facts ......................................................................24

     B.   ARGUMENT...........................................................................................28

1.    The Asserted Claims Of The '662 Patent Fail To Satisfy The
      Enablement Requirement As A Matter Of Law .........................................28

2.    The Asserted Claims Of The '662 Patent Fail To Satisfy The
      Written Description Requirement As A Matter Of Law............................30

III.   BSC IS ENTITLED TO SUMMARY JUDGMENT OF INDEFINITENESS OF
       THE ASSERTED CLAIMS OF THE '7286, '3286, '473, AND '662 PATENTS...........32

CONCLUSION.........................................................................................................................36

# TABLE OF AUTHORITIES

## CASES

*AK Steel Corp. v. Sollac & Ugine,*
   344 F.3d 1234 (Fed. Cir. 2003)..................................................................................14, 15

*Automotive Technologies International, Inc. v. BMW of North America, Inc.,*
   501 F.3d 1274 (Fed. Cir. 2007)........................................................................3, 15, 16, 17

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.,*
   533 F.3d 1353 (Fed. Cir. 2008).........................................................................................19

*Enzo Biochem, Inc. v. Gen-Probe Inc.,*
   323 F.3d 956 (Fed. Cir. 2002)...........................................................................................22

*Fiers v. Revel,*
   984 F.2d 1164 (Fed. Cir. 1993).............................................................................21, 22, 23

*Genentech, Inc. v. Novo Nordisk A/S,*
   108 F.3d 1361 (Fed. Cir. 1997)...................................................................................15, 17

*In re Goodman,*
   11 F.3d 1046 (Fed. Cir. 1993)...........................................................................................20

*Halliburton Energy Services, Inc. v. M-I LLC,*
   514 F.3d 1244 (Fed. Cir. 2008)............................................................5, 32, 33, 34, 35

*Honeywell International, Inc. v. ITC,*
   341 F.3d 1332 (Fed. Cir. 2003)...........................................................................................32

*In re Kubin,*
   561 F.3d 1351, 1360 (Fed. Cir. 2009)................................................................................19

*Martek BioSciences Corp. v. Nutrinova, Inc.,*
   No. 2008-1459, -1476 (Fed. Cir. Sept. 3, 2009) ...........................................................18, 19

*Monsanto Co. v. Syngenta Seeds, Inc.,*
   503 F.3d 1352 (Fed. Cir. 2007)..............................................................................14, 17, 18

*Morton International, Inc. v. Cardinal Chemical Co.,*
   5 F.3d 1464 (Fed. Cir. 1993)...............................................................................................32

*PIN/NIP, Inc. v. Platte Chemical Co.,*
   304 F.3d 1235 (Fed. Cir. 2002)...........................................................................................21

*Rasmusson v. SmithKline Beecham Corp.*,
   413 F.3d 1318 (Fed. Cir. 2005)..................................................................................17

*Regents of the University of California v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997)..................................................................................22

*Reiffin v. Microsoft Corp.*,
   214 F.3d 1342 (Fed. Cir. 2000)..................................................................................21

*TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*,
   264 F.3d 1111 (Fed. Cir. 2001)..................................................................................22

*United Carbon Co. v. Binney & Smith Co.*,
   317 U.S. 228 (1942)..................................................................................................35

*University of Rochester v. G.D. Searle & Co.*,
   358 F.3d 916 (Fed. Cir. 2004)..............................................................4, 21, 22, 23, 24

*In re Vaeck*,
   947 F.2d 488 (Fed. Cir. 1991)...................................................................................17

*Vas-Cath Inc., v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991)..................................................................................21

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988)..................................................................18, 21, 29, 30

*In re Wright*,
   999 F.2d 1557 (Fed. Cir. 1993)..................................................................................14

## STATUTES

35 U.S.C. § 112.................................................................................................2, 14, 32, 35

## INTRODUCTION

In 1997 and 1998, the inventors of U.S. Patent Nos. 7,217,286 ('7286 Patent), 7,223,286 ('3286 Patent), and 7,229,473 ('473 Patent) described in those patents nothing more than a stent with channels in the struts to act as reservoirs for rapamycin. To the extent that Cordis claims a proposal to coat stents with rapamycin to treat restenosis, those claims are obvious, as are the claims of U.S. Patent No. 7,300,662 ('662 Patent), effectively filed in 2001, in which the inventors disclosed human clinical trial data based on well-known dosages of rapamycin on drug-coated stents.[1] Cordis now goes even further, claiming all "macrocyclic lactone analogs" and "macrocyclic triene analogs" of rapamycin. Nowhere in these four asserted Patents, however, did the inventors provide any meaningful disclosure regarding such analogs of rapamycin – no examples, figures, diagrams, structures, formulae, or physical properties. Indeed, the inventors candidly admitted that they had never tested any rapamycin analog prior to filing the patents at issue. It was not until seven years after the filing of those patents – and after the successful clinical results of Abbott Laboratories' (Abbott's) and Boston Scientific Corporation and Boston Scientific Scimed, Inc.'s (collectively, BSC's) Everolimus-eluting stents – that Cordis drafted the asserted claims here, all of which are directed to a stent coated with virtually any macrocyclic lactone analogs or macrocyclic triene analogs of rapamycin for human therapeutic use. The inventors failed, however, to teach or describe how to make or use these embodiments.

---

[1] BSC is contemporaneously filing motions for summary judgment that the asserted claims are invalid for obviousness. Based on the pending Reexaminations of the patents-in-suit, the PTO agrees the claims are obvious over the prior art. The instant motion presents separate and additional grounds for invalidity based on violation of the enablement, written description, and definiteness requirements of 35 U.S.C. § 112, specifically with regard to the claims for all "macrocyclic lactone analogs" and "macrocyclic triene analogs" of rapamycin.

The enablement and written description requirements under 35 U.S.C. § 112(1) represent the fundamental bargain between the public and the inventors, a bargain that underlies the patent system itself.  In exchange for the right to exclude all others from practicing the claimed invention, § 112(1) mandates that the patent contain a description: (1) demonstrating that the inventors actually invented and possessed the full scope of what they have claimed; and (2) teaching the public how to make and use the full scope of the invention without undue experimentation.  The specifications at issue here do neither.

There is simply no disclosure – much less a specific and helpful disclosure – that would inform a person of skill in the art how to make macrocyclic lactone or triene analogs, how to screen them, how to test them, or how to use them in a human being.  Given the unpredictability of the development of a drug-eluting stent, it is inconceivable that one skilled in the art reading the specifications of the patents-in-suit – which disclose nothing useful regarding macrocyclic lactone or triene analogs – would be able to practice the claimed inventions in humans absent undue experimentation.  Indeed, it took Abbott years of extensive testing and inventive endeavor to develop a drug-eluting stent based on Everolimus for human applications.

Not only do the asserted claims fail to meet the enablement and written description requirements, they are also indefinite.  There is no generally accepted understanding of a macrocyclic lactone or triene analog of rapamycin and the specifications of the patents-in-suit offer no definition, example, or test for identifying such analogs.  Rapamycin – a large, complex molecule consisting of 144 atoms – could be derivatized at any position, or at multiple positions, with virtually any atom or functional group.  Thus, the universe of macrocyclic lactone or triene analogs of rapamycin is indeterminate, possibly even infinite.  Under 35 U.S.C. § 112(2), a patent claim must be sufficiently definite to inform the public of the metes and bounds of a

claimed invention so that a potential competitor can know with reasonable certainty whether or not he is infringing.  The universe of macrocyclic lactone or triene analogs is a moving target that may suit Cordis's litigation purposes, but cannot satisfy the definiteness requirement of the patent laws and the public notice function of a patent claim.

## NATURE AND STAGE OF THE PROCEEDING

In this action, BSC seeks a declaration that its Promus® Everolimus-Eluting Stent – an intravascular stent used to treat coronary artery disease – does not infringe any valid claim of the '7286, '3286, '473, and '662 Patents.  Defendant Cordis is the owner of the '7286, '3286 and '473 Patents and, along with defendant Wyeth, the co-owner the '662 Patent.  Defendants have asserted counterclaims alleging that BSC is infringing each of the four patents-in-suit.  While fact and expert discovery were respectively scheduled to close May 22, 2009, and August 21, 2009 (see D.I. 197), the parties have yet to complete the depositions of several fact and expert witnesses.  A hearing on claim construction and summary judgment motions is scheduled for October 30, 2009, with trial scheduled to commence on February 4, 2010.

## SUMMARY OF THE ARGUMENT

1.      Each asserted claim of the '7286, '3286, and '473 Patents encompasses the use of a "macrocyclic lactone analog" of rapamycin coated on a stent as a "therapeutic agent" or a "drug" for humans.  The common specification of these patents fails to disclose, however, any example, figure, diagram, structure, formula, or physical property of a macrocyclic lactone analog of rapamycin.  In 1997 or 1998, the effective filing dates of the asserted claims, the field of drug-eluting stents based on rapamycin analogs for human use was highly unpredictable.  In *Automotive Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007), the Federal Circuit affirmed summary judgment of nonenablement where the specification's disclosure of the embodiment in question was merely conceptual and the field of endeavor was

new at the time of patent filing.  Because developing and using a macrocyclic lactone analog of rapamycin in humans would require undue experimentation, summary judgment of nonenablement is warranted here.

2.  Each asserted claim of the '7286, '3286, and '473 Patents recites the use of a broad class of macrocyclic lactone analogs of rapamycin, each member of which performs the function of human therapeutic use.  The specification, however, fails to disclose any analog that actually performs such a function.  In *University of Rochester v. G.D. Searle & Co.,* 358 F.3d 916, 922 (Fed. Cir. 2004), the Federal Circuit affirmed summary judgment of lack of written description where the claims required the use of a class of chemical compounds defined by their common function and the specification failed to identify any compound that performed the function.  As in *Rochester,* summary judgment of lack of written description is justified here.

3.  Each asserted claim of the '662 Patent recites the use of "a macrocyclic triene analog" of rapamycin coated on a stent as a drug for human use.  Yet, the specification merely discloses the clinical results for rapamycin coated stents; it fails to disclose any example, figure, diagram, structure, or formula of a macrocyclic triene analog of rapamycin that could be used as a drug coating for stents in humans.  In 2001, the effective filing date of the '662 Patent, the field of drug-eluting stents based on rapamycin analogs was still unpredictable.  Because undue experimentation would therefore be required to practice human use of a stent coated with a macrocyclic triene analog of rapamycin, even following the specification of the '662 Patent, BSC is entitled to summary judgment of nonenablement.

4.  Because the specification of the '662 Patent fails to disclose any macrocyclic triene analog to perform the function of acting as a drug in a human, summary judgment for lack of written description is warranted.

5.    The scope of a "macrocyclic lactone analog" of rapamycin is undefined in the specification of the '7286, '3286, and '473 Patents and indeterminate in the chemical and pharmacological field.  Similarly, the scope of a "macrocyclic triene analog" of rapamycin is undefined in the specification of the '662 Patent and indeterminate in the chemical and pharmacological field.  In *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008), the Federal Circuit held the term "fragile gel" indefinite.  The terms "macrocyclic lactone analog" and "macrocyclic triene analog" of rapamycin are similarly indefinite because they do not allow a potential competitor reasonably to ascertain whether a given chemical compound infringes the patents-in-suit.

**I.    BSC IS ENTITLED TO SUMMARY JUDGMENT OF NONENABLEMENT AND LACK OF WRITTEN DESCRIPTION AS TO THE ASSERTED CLAIMS OF THE '7286, '3286, AND '473 PATENTS**

**A.    Undisputed Material Facts**

The '7286, '3286, and '473 Patents are continuations of three earlier issued patents (U.S. Patent Nos. 6,273,913, 6,585,764, and 6,808,536), all of which were based on a provisional application filed April 17, 1997.  (*Appendix to BSC's Motion for Summary Judgment of Invalidity under 35 § 112*, Ex. 1; Ex. 2; Ex. 3.)  The claims in the three earlier patents relate generally to specific stent designs coated with mixtures of rapamycin (or its analogs).  (*E.g.*, Ex. 1 at A1837 (claim 1: "A stent comprising: ... struts ... having ... a channel ... wherein the therapeutic agent is rapamycin"); Ex. 2 at A1843 (claim 1: "A stent having a coating containing rapamycin ..."); Ex. 3 at A1855 (claim 1: "A stent having a coating containing rapamycin or its analogs ... at a weight percentage of 0.0001% to 30% ... comprising struts ... and a channel ...").)  None of these claims is directed to a "macrocyclic lactone analog" of rapamycin.

On September 28, 2004, during the prosecution of the '3286 Patent, Cordis first introduced claims directed to a "macrocyclic lactone analog" of rapamycin.  (Ex. 4 at A1858-

70.)  This was more than seven years after the filing of the first provisional application and around the time when Abbott began its clinical trials of the XIENCE stent, which uses the drug Everolimus rather than rapamycin.  (Ex. 5 at A1890.)  Cordis accompanied a subsequent August 7, 2006 amendment with a request to make special, seeking to expedite the prosecution of the claims and specifically citing the alleged infringement by the XIENCE stent.  (Ex. 4 at A1886.)  On August 24, 2006, after Abbott received European approval for the XIENCE stent, Cordis filed two new patent applications encompassing new macrocyclic lactone analog claims. (Ex. 6 at A1907; Ex. 7 at A1935; Ex. 8 at A1944.)  Cordis also accompanied these applications with a request to make special, again seeking to expedite the prosecution of the new claims, citing alleged infringement by the XIENCE stent.  (Ex. 6 at 1909; Ex. 7 at A1937.)

### 1.   Each Asserted Claim Requires The Use Of A Macrocyclic Lactone Analog As A Therapeutic Agent Or Drug, But The Specification Fails To Disclose Any Such Analog Or Its Use

The '7286, '3286, and '473 Patents share a common written description, and all relate to stents having a therapeutic agent as part of a coating material to inhibit cell growth following angioplasty procedures.  (Ex. 9; Ex. 10; Ex. 11.)  Proliferation of cells after angioplasty procedures is a major cause of restenosis – the recurrence of blockages in a treated blood vessel – a condition that is undesirable because it may require additional angioplasty procedures or coronary artery bypass surgeries.  Each asserted claim recites the use of "rapamycin or a macrocyclic lactone analog thereof" coated on a stent device as a "therapeutic agent" or a "drug."[2]

---

[2]   The asserted claims are claims 1-5 of the '7286 Patent, claims 1-2, 5-6, 9-10, 21, 25, 27-41, 44, 48, 51-52, 63, 67, and 69-77 of the '3286 Patent, and claims 1-5 of the '473 Patent. Cordis contends that the effective filing dates are April 18, 1997, for claims 1-2 and 5 of the '7286 Patent and claims 1-2, 5-6, 9-10, 21, 25, 27, 32-33, 40-41, 44, 47-48, 51-52, 63, 67, and 69 of the '3286 Patent and April 16, 1998, for the remaining asserted claims.

There is no dispute that the following structure is rapamycin:



The parties also agree that a "therapeutic agent" in the asserted claims means a substance administered to treat or prevent a disease or condition.[3] Thus, there is no dispute that each asserted claim encompasses the administration of a substance (or drug) for treatment or prevention of a disease or condition in humans.

Although the asserted claims of the '7286, '3286, and '473 Patents recite "macrocyclic lactone analog" of rapamycin, the patents' specification does not define this term, contains no actual examples of such analogs, and provides no embodiments showing that the patentees even envisioned using such analogs in their invention. The specification of the '7286, '3286, and '473 Patents makes only a single reference to a macrocyclic lactone analog of rapamycin: "Agents: Rapamycin (sirolimus) structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression." (Ex. 9 (A1961) at 6:4-5.)[4] The specification fails to depict the chemical structure of any compound that the patentees believe to be a macrocyclic lactone analog of rapamycin.

---

[3]  Although the parties dispute the meanings of "rapamycin," "analog," and "macrocyclic lactone analog," as discussed below, the specification fails to teach or disclose *any* macrocyclic lactone analog of rapamycin. The asserted claims are therefore invalid for failure to satisfy the enablement and written description requirements under either party's proposed construction.
[4]  Because the '7286, '3286, and '473 Patents share the same specification, citations to the specification are made only to that of the '7286 Patent.

The written description contains four examples, all of which are directed to rapamycin – not to any macrocyclic lactone analog thereof. (*Id.* at 6:32-8:5.) Notably, the written description includes rapamycin among a long list of agents that "are being actively studied as antiproliferative agents for use in restenosis" but fails to mention any of rapamycin's macrocyclic lactone analogs. (*Id.* at 5:8-33.)

Even with respect to rapamycin, the written description fails to disclose working examples. Each of the four examples is written in the present tense, indicating that the inventors had never actually performed any of the procedures prior to the filing of the '7286, '3286, and '473 Patents. (*See, e.g., id.* at 6:32-8:5.) *See* Manual of Patent Examining Procedure § 608.01(p) ("Paper examples should not be described using the past tense"). These four "prophetic" examples are referred to as "experimental" methods and "concepts." (Ex. 9 (A1961-62) at 6:32, 6:55, 7:3, 7:10, 7:36, 8:6.) Moreover, the specification teaches dipping the stent into a concentration of "0.001 wt % to saturated" rapamycin (*id.* at 6:60) – a hypothetical range that covers everything from no rapamycin to a saturated solution of rapamycin – thereby providing no meaningful guidance as to the optimal dipping concentration of rapamycin or any analog thereof.                    **REDACTED**

**REDACTED**

2.     **The Inventors Admitted That They Did Not Contemplate Using A Macrocyclic Lactone Analog**

The inventors themselves have readily admitted that they never thought their invention included macrocyclic lactone analogs of rapamycin. For example, Dr. Gerald Llanos, a named inventor of the '7286, '3286, and '473 Patents testified:

**REDACTED**

**REDACTED**

(Ex. 13 (A2005) at 58:23-61:9 (emphasis added).)

    Dr. Robert Falotico, the lead inventor,         **REDACTED**

**REDACTED**

3.      **The Selection, Synthesis And Screening Of Potential Macrocyclic Lactone Analogs Of Rapamycin Are Challenging And The Pharmacologic Effect Of Such Analogs Cannot Be Predicted**

The universe of potential analogs of rapamycin is so large that the mere selection of

potential candidates for use in a drug-eluting stent is a daunting task.  There are 51 carbon atoms

(including 15 asymmetric carbon atoms), 79 hydrogen atoms, one nitrogen atom, and 13 oxygen

atoms in rapamycin – a total of 144 atoms.  (Ex. 37 at A2226-28.)        **REDACTED**

**REDACTED**

Thus, with numerous possibilities of chemical

deletions and modifications and indeterminate possibilities of chemical additions, the scope of a

"macrocyclic lactone (or triene) analog" of rapamycin is vast (and, perhaps, infinite).

Once selected, the synthesis of a rapamycin analog is a complex and laborious enterprise.

Because of the molecule's complexity and large size, the synthesis of such an analog typically

requires dozens of chemical transformation steps, and the final products and their intermediates

are prone to decomposition under a variety of conditions.  (*See, e.g.*, Ex. 18 at A2051-77 (a

review of syntheses of rapamycin).)  Wyeth's efforts to develop rapamycin analogs prove the

difficulty of the endeavor.

Even when a rapamycin analog is made in the laboratory and its structure determined, the pharmacological effect of each analog cannot be predicted based on that structure.  **REDACTED**

In other words, one could not predict the biological function of an analog based on its structural relation to another molecule.     **REDACTED**

Even minor changes in the structure of a molecule such as rapamycin may have profound functional effects.  For example, a 1995 study reported that a change in the shape of the rapamycin molecule – without any change in chemical composition – resulted in 30-fold less potency in an *in vitro* T-cell proliferation assay.  (Ex. 22 at A2101-11.)  As another example, the addition of a small methyl group ($-CH_3$) to a rapamycin-related compound was found to affect its biological activity significantly because of the sensitivity of biological interactions to even the slightest structural changes.  (Ex. 23 at A2112-16.)     **REDACTED**

**REDACTED**

**REDACTED**

Because the functional effects of structural changes are so uncertain, extensive screening must be conducted to select those analogs that are suitable for further evaluation.   **REDACTED**

**REDACTED**

REDACTED

### 4.    The Development Of Drug-Eluting Stents Based On Rapamycin Analogs Was Highly Unpredictable In 1997-1998

Throughout the disclosure, the specification of the patents-in-suit stresses the significant

challenges and uncertainties in the field of drug-eluting stents at the time of patent filing:

- "The ideal coating material must be able to adhere strongly to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). *To date, the ideal coating material has not been developed for this application.*" (Ex. 9 (A1960) at 3:50-60 (emphasis added).)

- "These agents must be given systemically, however, and *attainment of a therapeutically effective dose may not be possible; antiproliferative (or anti-restenosis) concentrations may exceed the known toxic concentrations* of these agents so that levels sufficient to produce smooth muscle inhibition may not be reached." (*Id.* at 4:34-40 (emphasis added).)

- "Additional clinical trials in which the effectiveness for preventing restenosis of dietary fish oil supplements, thromboxane receptor antagonists, cholesterol lowering agents, and serotonin antagonists has been examined have shown either *conflicting or negative results so that no pharmacological agents are as yet clinically available to prevent post-angioplasty restenosis*." (*Id.* at 4:42-48 (emphasis added).)

The efforts to develop and test Everolimus for use on the accused products likewise

illustrate the difficulties and uncertainties inherent in identifying a rapamycin analog suitable for

human therapeutic use.  BSC's Promus® Everolimus-Eluting Stent is an Abbott-made, private

labeled XIENCE stent.  (Ex. 28 at A2150.)  The undisputed evidence shows that Abbott (and its

predecessor in developing the XIENCE stent, Guidant Corporation) conducted prolonged,

intensive studies of Everolimus XIENCE prior to launch and commercialization.  **REDA CTED**

**REDACTED**

Thereafter, Abbott conducted a series of human clinical trials over a period of several years to establish the safety and efficacy of XIENCE in humans. (Ex. 31 at A2168-69.)

In sum, the undisputed evidence shows that making and evaluating potentially useful rapamycin analogs is an arduous and challenging process requiring extensive experimentation.

**B.   ARGUMENT**

**1.   The Asserted Claims Of The '7286, '3286, and '473 Patents Fail To Satisfy The Enablement Requirement As A Matter Of Law**

Under the enablement requirement of 35 U.S.C. § 112, the specification must enable the full scope of the claimed invention. *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1362 (Fed. Cir. 2007); *Auto. Techs.*, 501 F.3d at 1284; *see Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys. Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999) ("The specification must teach those skilled in the art how to make and use the invention as broadly as it is claimed").  Significantly, the specification must be enabling as of the patent application's effective filing date – *i.e.*, April 18, 1997 or April 1998 for the '7286, '3286, and '473 Patents. *See AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003); *In re Wright*, 999 F.2d 1557, 1562-63 (Fed. Cir. 1993).  A district court may grant summary judgment of invalidity for failure to satisfy the enablement requirement. *Monsanto*, 503 F.3d at 1354 (affirming summary judgment of invalidity for nonenablement); *Auto. Techs.*, 501 F.3d at 1274; *Liebel-Flarsheim Co. v. Medrad*,

*Inc.*, 481 F.3d 1371 (Fed. Cir. 2007) (same); *see Ak Steel*, 344 F.3d at 1238 (whether a patent

satisfies the enablement requirement "is a question of law based on underlying facts").

**a.    The Specification Fails To Teach How To Make Or Use
A Drug-Coated Stent Based On A Macrocyclic Lactone
Analog Of Rapamycin**

Each claim of the '7286, '3286, and '473 Patents requires the use of "rapamycin or a

macrocyclic lactone analog thereof" as a "therapeutic agent" or "drug." Because the

specification of those patents fails to teach those skilled in the art how to make and use a

rapamycin macrocyclic lactone analog in humans, it fails to satisfy the enablement requirement.

The Federal Circuit's decision in *Automotive Technologies* is squarely on point. In that

case, the scope of the limitation at issue covered both mechanical and electronic side impact

sensors for an automotive airbag system. While the specification taught extensively regarding

mechanical sensors, it only provided one short paragraph and one figure relating to electronic

sensors. 501 F.3d at 1282-83. Neither the one-paragraph description nor the figure, which was

referred to as a "conceptional view," offered significant detail concerning how the electronic

sensor is built or operated. *Id.* In addition, side impact sensing was a new field and there were

no electronic sensors in existence that would detect side impact crashes. *Id.* at 1284. Finding

that the specification provided "only a starting point, a direction for further research" on the use

of electronic sensors, the Federal Circuit affirmed summary judgment of invalidity for failing to

enable the use of electronic side impact sensors. *Id.* (quoting *Genentech, Inc. v. Novo Nordisk
A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997)).

The rationale for granting summary judgment here is even stronger than in *Automotive
Technologies*. *First*, the specification refers to a macrocyclic lactone analog of rapamycin only

once: "Agents: Rapamycin (sirolimus) structural analogs (macrocyclic lactones)," essentially

repeating the claim language of "macrocyclic lactone analog." There is no disclosure of any

kind in the specification – not a single figure, diagram, chemical formula, chemical structure, or physical property – regarding any rapamycin macrocyclic lactone analog. Of the four prophetic examples or "concepts" in the specification, none is directed to a rapamycin macrocyclic lactone analog. While the full scope of each asserted claim encompasses the use of a rapamycin macrocyclic lactone analog to treat or prevent human conditions, the specification fails to provide any teaching as to how that could be accomplished. The critical aspects of practicing the claimed invention as to which the specification contains no disclosure whatsoever include:

- How to select, from the vast universe of potential macrocyclic lactone analogs of rapamycin, those that have suitable properties for coating, release, and efficacy without adverse biological effects;

- How to make such analogs in sufficient quantity and purity;

- How to coat the stent with such analog to ensure that the drug stays on the stent during the procedure and is released in a controlled fashion; and

- The dosage of such analog that is high enough to be effective in humans but not so high as to cause toxic side effects.

While the disclosures in *Automotive Technologies* at least provided a general overview of the nonenabled embodiment, the specification of the '7286, '3286, and '473 Patents lacks even a conceptual discussion of any macrocyclic lactone analog of rapamycin.

*Second*, as in *Automotive Technologies*, there can be no dispute that the relevant field was new at the time of the invention. There were no drug-eluting stents for human use available in the market as of the critical dates of the '7286, '3286, and '473 Patents. For example, as discussed above, the specification itself admits that "the ideal coating material has not been developed" and identifies many challenges in developing such candidate for concerns such as toxicity and dosage amount.

Indeed, the field of endeavor here was even more unpredictable than that in *Automotive*

*Technologies*. As discussed above, identifying a rapamycin analog suitable for human

therapeutic use, testing it and confirming that it can be delivered effectively on a stent, is a

monumental enterprise. This fact is borne out by the testimony of the lead inventor, the

testimony of Wyeth and Cordis scientists, and the evidence of the extensive research into

rapamycin analogs undertaken by Wyeth and Abbott.

Despite the unpredictability of the technology at the critical dates of the '7286, '3286,

and '473 Patents, the specification fails to provide those skilled in the art with any teaching –

much less any specific and useful teaching – as to the manufacture or use of a macrocyclic

lactone analog for humans. Under *Automotive Technologies*, the asserted claims of these patents

are therefore invalid for nonenablement as a matter of law. *See also Monsanto*, 503 F.3d at 1361

(affirming summary judgment of nonenablement based on (1) "those skilled in the art could not

transform a monocot plant cell as of the filing date of the patent application" and (2) the claims

required transformation in all plant cells); *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d

1318, 1325 (Fed. Cir. 2005) ("If mere plausibility were the test for enablement under section

112, applicants could obtain patent rights to 'inventions' consisting of little more than

respectable guesses as to the likelihood of their success. When one of the guesses later proved

true, the 'inventor' would be rewarded the spoils instead of the party who demonstrated that

method actually worked"); *Genentech*, 108 F.3d at 1367-68 ("Where, as here, the claimed

invention is the application of an unpredictable technology in the early stage of development, an

enabling description in the specification must provide those skilled in the art with a specific and

useful teaching"); *In re Vaeck*, 947 F.2d 488, 495 (Fed. Cir. 1991) ("Taking into account the

relatively incomplete understanding of the biology of cyanobacteria as of appellants' filing date,

as well as the limited disclosure by appellants...," the Fed. Cir. affirmed the Patent Office's rejection based on nonenablement).

  **b. One Skilled In The Art Could Not Make Or Use A**
    **Drug-Coated Stent Based On A Macrocyclic Lactone**
    **Analog Of Rapamycin Without Undue Experimentation**

  Absent undue experimentation, a person of skill in the art could not have made or used a macrocyclic lactone analog of rapamycin to practice the claimed inventions in 1997 or 1998 after reading the specification. *See Monsanto*, 503 F.3d at 1360 ("to be enabling, the specification of the patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation"). The determination of what constitutes undue experimentation depends on eight factors set forth by the Federal Circuit in *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Consideration of the *Wands* factors further demonstrates that the breadth of the asserted claims greatly exceeds the scope of that which is enabled by the specification.

  **(1-2) The breadth of the claims and the nature of the invention**. As shown above, the scope of the asserted claims is sweeping, encompassing a potentially infinite universe of molecules whose pharmacologic properties are impossible to predict. A recent Federal Circuit case, *Martek BioSciences Corp. v. Nutrinova, Inc.*, No. 2008-1459, -1476 (Fed. Cir. Sept. 3, 2009), illustrates the impact of the number of potential embodiments on the enablement inquiry. In *Martek*, the district court granted JMOL for the defendant, relying on testimony from the defendant's expert that "claim 1 potentially covers very many – perhaps 10,000 – euryhaline organisms, while the patent discloses only one such organism in a working example." Slip Op. at 23. The Federal Circuit found that other, much narrower claims of the patent-in-suit – encompassing as few as 22 organisms, were enabled, and reversed the district court as to those claims. *Id.* at 24-25. The Federal Circuit did not, however, disturb the district court's finding

that Claim 1 was not enabled. Here, the claims at issue are even more problematic than Claim 1

in *Martek* – a vast number of potential analogs with *no* working examples.

Moreover, the nature of the claimed invention – a biochemical agent – is inherently

unpredictable. *See, e.g., In re Kubin*, 561 F.3d 1351, 1360 (Fed. Cir. 2009) (referring to

biotechnology as "unpredictable art"); *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353,

1359 (Fed. Cir. 2008) (The "chemical arts" are often "unpredictable"). The breadth of the

asserted claims and the nature of the invention strongly support a finding of nonenablement.

**(3) The quality of experimentation necessary.** As discussed above, the specification

provides no guidance as to how to develop a drug-eluting stent based on a macrocyclic lactone

analog of rapamycin, and the inventors themselves never actually tested or even contemplated

any rapamycin analogs prior to patent filing. To develop a drug-eluting stent coated with a

macrocyclic lactone analog of rapamycin for human therapeutic use, a person skilled in the art

would have to: (1) make analogs, whose chemical and biological properties cannot be known in

advance, from an vast universe of candidates; (2) screen those analogs based on *in vitro*

biological activities and physiochemical properties; (3) test the most promising analogs on stents;

(4) further test promising analogs in animal models; and (5) perform clinical trials of successful

analogs in humans. These efforts would have required large teams of chemists, biologists,

polymer scientists, engineers, pharmacologists, clinicians, and doctors, as well as years of

sophisticated and systematic experimentation. In short, there can be no dispute that the amount

of experimentation needed to develop a drug-eluting stent based on a macrocyclic lactone analog

at the time of the effective filing dates in 1997 and 1998 would have been extraordinary. Indeed,

it took Abbott such wide-ranging and multi-disciplinary efforts over at least four years to

develop its Everolimus-eluting stent – despite the availability of the "teaching" of the

specification of the '7286, '3286 and '473 Patents.  Because the specification fails even to address the steps necessary to identify a macrocyclic lactone analog of rapamycin, the asserted claims (all of which cover the use of such an analog) are not enabled as a matter of law.

(4) **The presence or absence of working examples.**  As discussed above, the specification is devoid of any working examples of the use of a macrocyclic lactone analog of rapamycin.  Even the paper examples are all directed to rapamycin – not to any macrocyclic lactone analog thereof.  The absence of any working examples also supports a finding of nonenablement.  *See In re Goodman*, 11 F.3d 1046, 1050 (Fed. Cir. 1993) (a single example of producing a protein one type of plant cell "does not enable a biotechnician of ordinary skill to produce any type of [] protein in any type of plant cell").

(5) **The amount of direction or guidance presented**.  Although the specification provides conceptual discussions relating to rapamycin, it provides no meaningful direction or guidance as to the use of any macrocyclic lactone analog of rapamycin.  There are no experimental results showing the efficacy of rapamycin in humans to direct or guide the use of any of its macrocyclic lactone analogs.  Further, because it was well-established at the time of patent filing that the biological activity of a complex molecule such as rapamycin is sensitive to structural changes, one could not predict the biological function of an analog based on its structural relation to another molecule.  The lack of any direction or guidance for making or using macrocyclic lactone analogs of rapamycin, and the unpredictable pharmacologic properties of such analogs, also supports a finding of nonenablement.

(6-7) **The state of the prior art and the relative skill of those in the art.**  Although the use of rapamycin in drug-eluting stents was obvious in light of the prior art, there had been no successful human clinical trials of drug-eluting stents – much less successfully marketed drug-

eluting stents – as of the effective filing dates of the '7286, '3286, and '473 Patents. Thus, there is no meaningful guidance in the prior art that could supply the missing disclosure in the specification with regard to all macrocyclic lactone analogs of rapamycin. These factors therefore also support a finding of nonenablement.

**(8) The predictability or unpredictability of the art.** As shown above, the field of drug-eluting stents for human use based on rapamycin analogs was highly unpredictable at the time of patent filing. This unpredictability complicated the selection of, *inter alia*, (1) a macrocyclic lactone analog of rapamycin as an active and releasable drug, (2) a biocompatible and effective coating polymer, (3) an optimal coating procedure, (4) suitable animal models, (5) an efficacious and non-toxic dosage, and (6) a proper release mechanism. The undeniable unpredictability of the art at the time of the invention supports a finding of nonenablement.

In sum, the *Wands* factors compel a finding of nonenablement as a matter of law.

### 2. The Asserted Claims Of The '7286, '3286, and '473 Patents Fail To Satisfy The Written Description Requirement As A Matter Of Law

To satisfy the written description requirement, the specification must clearly allow persons of ordinary skill in the art to recognize that the inventor was in possession of the full scope of the claims. *See Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed. Cir. 1993); *Vas-Cath Inc., v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). This requirement ensures that "the scope of the right to exclude ... does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000). While compliance with the written description requirement is an issue of fact, a patent can be held invalid as a matter of law on its face where it is clear from an examination of the specification that the inventor was not in possession of the invention as claimed. *See Rochester*, 358 F.3d at 927; *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002);

*TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111 (Fed. Cir. 2001). "After all, it is in the patent specification where the written description requirement must be met." *Rochester*, 358 F.3d at 927.

When the claims broadly encompass the use of a class of chemical compounds, as do the claims here, the written description must allow one skilled in the art to identify or describe the members of the class. *Regents of Univ. of California v. Eli Lilly & Co., Inc.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997); *Rochester*, 358 F.3d at 927. The recitation of a common function performed by the class members is insufficient. *Id.*; *See Fiers*, 984 F.2d at 1169. It is not sufficient to define the class member by what it does or how it might be discovered. *See Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002). Functional descriptions must be "coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics." *Rochester*, 358 F.3d at 925 (citing *Enzo*, 323 F.3d at 964). The written description requirement is not satisfied by "[t]he appearance of mere indistinct words in a specification or a claim, even an original claim.... A description of what a material does, rather than what it is, usually does not suffice." *Enzo*, 323 F.3d at 968 (citation omitted); *see Rochester*, 358 F.3d at 923 ("Generalized language may not suffice if it does not convey the detailed identity of an invention").

In *Rochester*, the claims required the use of a category of chemical compounds – called "non-steroidal compounds" – to selectively inhibit the gene product of an enzyme (PGHS-2) in a human host. *Id.* at 918. The specification, however, described only "assays for screening compounds" that could be used in the claimed method. *Id.* at 927. It failed to disclose any actual compound that possessed the inhibitory activities: "the '850 patent does not disclose just 'which peptides, polynucleotides, and small organic molecules have the desired characteristic of

selectively inhibiting PGHS-2.'" *Id.* The Federal Circuit noted that, "[w]ithout such disclosure, the claimed methods cannot be said to have been described." *Id.* (citation omitted). The Federal Circuit thus held that the patent did not satisfy the written description requirement as a matter of law and affirmed the district court's summary judgment of invalidity. *Id.*

The situation here is strikingly similar. As in *Rochester*, the claims at issue also broadly cover the use of a class of chemical compounds – in this case, "macrocyclic lactone analogs" of rapamycin – as a therapeutic agent or drug in humans. Moreover, as in *Rochester*, the specification here fails to disclose any member of that class – *i.e.*, the specification fails to disclose any macrocyclic lactone analog that could be used as a therapeutic agent or drug in humans. If anything, the specification here discloses even less regarding the claimed class of compounds than was disclosed in *Rochester*; whereas the patent *Rochester* at least disclosed assays that might be useful in screening, the '7286, '473 and '3286 Patents fail to identify a single macrocyclic lactone analog for its use as a therapeutic agent or drug. Indeed, the specification makes only a single passing reference to macrocyclic lactone analogs, without disclosing any figures, diagrams, structures, formulae, or physical properties for any actual macrocyclic lactone analog to practice the claimed invention.

This case presents a classic example of "an attempt to preempt the future before it has arrived." *Fiers*, 984 F.2d at 1171. In 1997 and 1998, the inventors possessed, and the specification disclosed, nothing more than a proposal for using rapamycin in a stent coating. There is no description in the specification of the '7286, '3286, and '473 Patents to support the claims to a macrocyclic lactone analog of rapamycin. It was only after ten years of prosecution, and after the successful development of other drug-eluting stents, that Cordis sought and obtained patent claims to such analogs – a subject matter never contemplated by the inventors.

Under the controlling Federal Circuit precedent in *Rochester*, those claims are invalid as a matter of law for failure to satisfy the written description requirement.[5]

## II.    BSC IS ENTITLED TO SUMMARY JUDGMENT OF NONENABLEMENT AND LACK OF WRITTEN DESCRIPTION AS TO THE ASSERTED CLAIMS OF THE '662 PATENT

### A.    Undisputed Material Facts

The '662 Patent is a continuation-in-part of a series of patent applications, the first of which was filed in May 2000.  None of the claims in these parent applications is directed to a "macrocyclic triene analog" of rapamycin.  (*E.g.*, Exs. 4, 6, 7.)  On August 7, 2006, more than six years after the original filing and after Abbott received European approval for the XIENCE stent, Cordis cancelled all previously pending claims and introduced entirely new claims, each directed to "rapamycin or a macrocyclic triene analog thereof."  (Ex. 32 at A2176-78.)  On the same day, Cordis also submitted a request to make special, seeking to expedite the prosecution of

---

[5]    Additionally, the specification fails to teach or disclose additional limitations that appear in certain independent and dependent claims.  In particular, the specification does not provide enabling disclosure or written description regarding: (1) a device or a method requiring a macrocyclic lactone analog be "present in an amount effective to inhibit neointimal proliferation (proliferation of new cells in the innermost region of an artery)" (each asserted claim of '7286 and '473 Patents); (2) a device providing controlled release of a macrocyclic lactone analog of rapamycin over a period of several weeks (claims 3-4 of the '7286 Patent and claims 37 and 70 of the '3286 Patent); (3) a stent that releases a macrocyclic lactone analog of rapamycin over a period of at least 14 days (claims 30 and 74 of the '3286 Patent); (4) a method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a device [coated with a macrocyclic lactone analog of rapamycin, among others] in the lumen of the coronary artery (claim 5 of the '7286 and '473 Patents); (5) a stent where a macrocyclic lactone analog of rapamycin is present in a therapeutically beneficial amount to inhibit neointimal proliferation (claims 32 and 34 of the '3286 Patent); and (6) a device where a macrocyclic lactone analog of rapamycin is present in an amount effective to inhibit neointimal proliferation (claim 40 of the '3286 Patent).  Thus, these claims are invalid for failure to satisfy the enablement and written description requirements because (1) the independent claims are not enabled or disclosed as discussed above and (2) the additional limitations identified are not enabled or disclosed by the specification for similar reasons.

these new claims (which subsequently issued as the '662 Patent), specifically citing alleged

infringement by the XIENCE stent.  (*Id.* at A2180-81).)

Like the '7286, '3286, and '473 Patents above, the '662 Patent relates to stents coated

with a therapeutic agent to address the restenosis problem.  More specifically, the '662 Patent is

directed to the remodeling aspect of restenosis – *i.e.*, the shrinkage of the diameter of arterial

lumen over time.  Cordis asserts claims 1-3, 5-7, 9-11, 13-15, and 17-25 of the '662 Patent, of

which claims 1, 5, 9, and 13 are independent claims.  Claim 1 reads:

> 1. *A drug delivery device* comprising: an intraluminal stent; a biocompatible,
> nonerodible polymeric coating affixed to the intraluminal stent; and from about
> 64 μg to about 197 μg of *rapamycin or a macrocyclic triene analog thereof that
> binds FKBP12 incorporated into the polymeric coating*, wherein said device
> provides an in-stent late loss in diameter at 12 months following implantation in a
> human of less than about 0.5 mm, as measured by quantitative coronary
> angiography.

(Ex. 33 (A2208) at 17:23-31 (emphasis added).)  Claim 5 is similar to claim 1 (except that the

word "mean" is added before the phrase "in-stent late loss in diameter" in claim 5).  Claims 9

and 13 are method claims, generally corresponding to the devices of claims 1 and 5, respectively.

Each asserted claim recites the use of a specific dosage amount of "rapamycin or a macrocyclic

triene analog thereof that binds FKBP12" to provide a specific degree of reduction in stent

diameter in a "human."  Cordis contends that the effective filing date for each asserted claim is

January 21, 2001.

With respect to an "analog," "derivative," "congener," or "macrocyclic triene analog" of

rapamycin, the specification states only that rapamycin "shall include rapamycin, rapamycin

analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic

properties as rapamycin."  (*Id.* at 5:48-51.)  The same boilerplate language is repeated a total of

four times in the specification.  (*Id.* at 5:48-51; 7:29-31; 11:38-42; 11:67-12:36.)  With respect to

a "macrocyclic triene analog" of rapamycin, the specification makes a single reference, stating

that "[r]apamycin is a macrocyclic triene antibiotic produced by streptomyces hygroscopicus as disclosed in U.S. Patent No. 3,929,992." (*Id.* at 5:31-32.)

Although the parties dispute the meanings of "rapamycin," "analog," and "macrocyclic triene analog," there is no dispute that (1) FKBP12 is a cellular protein that binds to rapamycin and triggers the antiproliferative effect; and (2) the definition of "rapamycin" includes its "analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as rapamycin." Because the specification fails to teach or disclose *any* "analog," "derivative," "congener," or "macrocyclic triene analog" of rapamycin, the asserted claims are invalid for failure to satisfy the enablement and written description requirements under either party's proposed claim construction.

**REDACTED**

In addition, each asserted claim of the '662 Patent requires a specific dosage range ("about 64 µg to about 197 µg" in claims 1, 5, 9, and 13) for drug-eluting stents based on a "macrocyclic triene analog" of rapamycin "in a human."            **REDACTED**

**REDACTED**

Furthermore, the human clinical data reported in the '662 Patent were conducted at a single dosage with a single polymer composition. (Ex. 33 (A2204) at Table 5.) The specification fails to show any other dosage amount with the claimed range or any other "biocompatible, nonerodible" polymer that is applicable in humans.

Moreover, despite promising human clinical results reported in 2001, the field of drug-eluting stents for human use based on rapamycin analogs continued to be unpredictable. As Dr. Teirstein concluded in 2001:

- "Of course, amid fireworks, we should maintain our skepticism. The results are very preliminary, the number of patients studied small, the lesions enrolled simple, and the follow-up period still short." (Ex. 35 at A2215.)

- "[N]o matter how much skill, experience, time, and effort the interventionist brings to the table, restenosis can entirely reverse a perfect procedural result within months." (*Id.*)

- "Developing the stent as a drug delivery vehicle posed substantial challenges. The stent's stainless steel struts are poorly designed for drug

> delivery. Drugs do not bind readily to stent struts and, if bound, the
> surface area is not very large, providing only a limited drug reservoir....
> The initial stent coatings, however, were dismal failures.... Many of these
> coatings were born of systemic trial-and-error experimentation involving
> multiple and lengthy animal implant studies. This required the
> development of predictable animal models." (*Id.*)

- "Today, we still do not have an animal model that accurately mimics the human condition, and the best model to test coated stents remains controversial." (*Id.* at 1998.)

## B.   ARGUMENT

### 1.   The Asserted Claims Of The '662 Patent Fail To Satisfy The Enablement Requirement As A Matter Of Law

#### a.   The Specification Fails To Teach How To Make Or Use A Drug-Coated Stent Based On A Rapamycin Analog

Like the claims in the '7286, '3286, and '473 Patents, each asserted claim of the '662 Patent encompasses the use of an analog, derivative, congener, and a macrocyclic triene analog of rapamycin that binds FKBP12 and possesses the same pharmacologic properties as rapamycin (hereinafter, a "Rapamycin Analog") for human use. And like the specification of the '7286, '3286, and '473 Patents, the specification of the '662 Patent fails to disclose any Rapamycin Analog. No Rapamycin Analog is disclosed in any figure, diagram, chemical formula, or chemical structure of the specification. Every clinical result described in the specification relates to rapamycin, not a Rapamycin Analog. Thus, while each asserted claim requires the use of a Rapamycin Analog for humans, the specification fails to provide any teaching as to how that could be accomplished. Like the specification of the '7286, '3286, and '473 Patents, the specification of the '662 Patent contains no disclosure whatsoever concerning how one of skill in the art could go about selecting potential Rapamycin Analogs from the vast universe of candidates, making such analogs, and/or ultimately coating such analogs on a stent. Nor does the '662 Patent indicate the effective, non-toxic dosage of such a Rapamycin Analog.

As discussed above, even in January of 2001 (the effective filing date of the '662 Patent), the field of drug-eluting stents based on rapamycin analogs for human use remained unpredictable.  In light of that unpredictability, the lack of any meaningful disclosure regarding Rapamycin Analogs in the specification of the '662 Patent renders the asserted claims of the '662 Patent covering the use of such analogs in humans invalid for nonenablement as a matter of law.

> **b.    One Skilled In The Art Could Not Make Or Use A Drug-Coated Stent Based On A Rapamycin Analog Without Undue Experimentation**

Application of the eight *Wands* factors establishes that, after having read the specification of the '662 patent, a person of skill in the art could not have made or used a Rapamycin Analog to practice the claimed inventions as of January 21, 2001, without undue experimentation.

**(1-2) The breadth of the claims and the nature of the invention**.  The scope of the asserted claims is enormous.  Each asserted claim covers, at a minimum, the use of all Rapamycin Analogs for therapeutic uses in humans, supporting a finding of nonenablement.

**(3) The Quality of Experimentation Necessary**.  As discussed above, the specification provides no guidance as to critical aspects of practicing the invention, such as the proper dosage in humans or appropriate polymers.  The substantial effort required by Abbott to develop its Everolimus-coated stent for human applications demonstrates the need for extensive experimentation.  This factor clearly supports a finding of nonenablement.

**(4) The presence of absence of working examples**.  As discussed above, the specification is devoid of any working example of a Rapamycin Analog, again favoring a finding of nonenablement.

**(5) The amount of direction or guidance presented**.  As in the discussion of this factor above, even as of January 21, 2001 – indeed even as of today – the correlation between the

biological activity of a complex molecule like a Rapamycin Analog and its structure required trial and error. One could not predict the biological function of a structurally related compound, especially for a large, complex molecule such as rapamycin, based on the structural similarities and differences. Thus, even if the specification had disclosed the structure of a Rapamycin Analog, there is no guarantee that its biological functions – *e.g.*, toxicity, proper dosage, and biocompatibility – could be predicted from its structural relationship with rapamycin. Given the lack of any disclosure of reliable screening methods of a Rapamycin Analog or any guidance on the structure-function relationship with rapamycin, this factor clearly supports a finding of nonenablement.

(6-8) **The state of the prior art, the relative skill of those in the art, and the predictability or unpredictability of the art**. As discussed above, there was no drug-eluting stent for human use on the market as of January 21, 2001. Although the use of rapamycin in drug-coated stents was obvious in light of the prior art, the process of identifying a workable rapamycin analog for human therapeutic use remained arduous. Nor was there specific guidance in the prior art that would teach one of skill in the art in 2001 how to identify a macrocyclic triene analog of rapamycin, how to apply it to a stent, or what the proper dosage would be. These factors, taken together with the overall unpredictability of the field of art in 2001, again support a finding of nonenablement.

In sum, each of the *Wands* factors clearly favors a finding of nonenablement and summary judgment of nonenablement of the asserted claims is warranted.

2.   **The Asserted Claims Of The '662 Patent Fail To Satisfy The Written Description Requirement As A Matter Of Law**

As in *Rochester*, the asserted claims of the '662 broadly cover the use of a class of chemical compounds – Rapamycin Analogs – for use in humans. And as in *Rochester*, the

specification fails to disclose any member of that class; that is, it does not disclose any actual Rapamycin Analog that is suitable for human use.  Simply put, there is no disclosure of any figure, diagram, structure, or formula for any actual Rapamycin Analogs to practice the claimed invention.  Without the disclosure of any Rapamycin Analog and without any reliable guidance in the art to identify such compound, the inventors of the '662 Patent could not have possessed the invention on a Rapamycin Analog.  Thus, the asserted claims covering these uses are invalid for lack of written description as a matter of law.  *Rochester*, 358 F.3d at 927.

In reality, as detailed above, Abbott spent years and conducted numerous *in vitro* screening testing, biocompatibility testing, animal testing, and human clinical trials—none of which are trivial—to successfully develop a drug-eluting stent based on a rapamycin analog. "[A] patent is not a hunting license.  It is not a reward for the search, but compensation for its successful conclusion."  *Rochester*, 358 F.3d at 930 n.10 (citation omitted).  Cordis has not successfully concluded a search for a drug-eluting stent based on a rapamycin analog.  Claims covering not only rapamycin, but also all Rapamycin Analogs, far exceed the scope described in the specification and are thus invalid as a matter of law for failing to satisfy the written description requirement.[6]

---

[6]    Additionally, the specification fails to teach or disclose additional limitations that appear in dependent claims of the '662 Patent.  In particular, the specification does not provide enabling disclosure or written description regarding: (1) a drug delivery device or a method providing an in-stent late loss or a mean in-stent late loss … of less than "about 0.3 mm" or "about 22%" (claims 2, 3, 6, 7, 10, 11, 14, and 15); (2) a drug delivery device or a method using a dosage of "from about 64 μg to 125 μg," "from about 2 μg to about 30 μg per millimeter of stent length," or "from about 3 μg to 13 μg per millimeter of stent length" (claims 17, 19, 20, and 22-24); and (3) a drug delivery device using "six weeks" following intraluminal implantation (claims 18, 21, and 25).  Thus, these dependent claims are invalid for failure to satisfy the enablement and written description requirements because (1) the independent claims from which they depend are not enabled or disclosed as discussed above and (2) the additional limitations identified are not enabled or disclosed by the specification for similar reasons.

### III.   BSC IS ENTITLED TO SUMMARY JUDGMENT OF INDEFINITENESS OF THE ASSERTED CLAIMS OF THE '7286, '3286, '473, AND '662 PATENTS

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. The definiteness requirement of § 112, ¶ 2 "focuses on whether the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the [scope of the] patentee's right to exclude." *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1338 (Fed. Cir. 2003) (quoting *S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1371-72 (Fed. Cir. 2001)). Thus, the definiteness inquiry turns on whether "the claims at issue [are] sufficiently precise to permit a potential competitor to determine whether or not he is infringing." *See Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).

In *Halliburton*, the term at issue was a "fragile gel." The "patentee attempted to define the claimed structure (a "fragile gel" for use in drilling machinery) according to its functional effect – that is, "by what it does rather than what it is." 514 F.3d at 1255 (quoting *In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971)). The term was ambiguous as to, among other things, "how quickly the gel must transition to a liquid when force is applied and how quickly it must return to a gel when the force is removed." *Id.* at 1254. Focusing on this ambiguity, the Federal Circuit held that the term "fragile gel" was indefinite. *Id.* at 1256. The *Halliburton* court went on to note that that, in considering whether a claim is indefinite, a court should look to whether the claim or the specification supplies a metric, formula, or some other means for determining whether a device meets the functional limitation. *Id.* at 1255-56. In addition, a claim term might be sufficiently definite if it provides examples of devices that meet and fail to meet the functional limitation. *Id.* (citing *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1341 (Fed. Cir. 2003)).

The asserted claims of '7286, '3286, '473 and '662 Patents clearly fail the *Halliburton* test.  As discussed above, the specifications of those patents do not provide any specific teaching, much less a definition of a "macrocyclic lactone (or triene) analog" of rapamycin.  Furthermore, the knowledge of those skilled in the art does not adequately define a macrocyclic lactone (or triene) analog.  There is no generally accepted understanding of the precise scope of the term "macrocyclic lactone (or triene) analog" in the chemical and pharmaceutical fields.  The universe of such analogs is so large and indeterminate that one of ordinary skill would not know whether a compound is a macrocyclic lactone (or triene) analog of rapamycin.     **REDACTED**

**REDACTED**

Recognizing the fatal ambiguity in the scope of a "macrocyclic lactone (or triene) analog," Cordis proposes narrowing constructions:

- A "macrocyclic lactone analog" means "a compound structurally similar to sirolimus having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response." (D.I. 247 at 3)

- A "macrocyclic triene analog" means "a compound structurally similar to sirolimus having the same macrocyclic triene ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response." (*Id.* at 14.)

Cordis's attempt to salvage these terms, however, merely serves to create even more uncertainty as to their scope. *First*, even limiting to the same macrocyclic lactone (or triene) ring structure, there remains an indeterminate number of chemical deletions, modifications, and additions to rapamycin that might fall within the scope of a "macrocyclic lactone (or triene) analog." Simply taking away the macrocyclic lactone (or triene) ring structure, a small portion of the rapamycin structure, has little effect on the enormous variables that remain in the structure of a possible "macrocyclic lactone (or triene) analog." *Second*, the functional limitation added by Cordis fails the *Halliburton* test. None of the patents-in-suit discloses any assay or test that would allow one skilled in the art to determine whether a potential "macrocyclic lactone (or triene) analog" is "capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response." The specifications of these patents also lack examples of such analogs that would satisfy the requirements of *Halliburton*. Indeed, a person skilled in the art would be even more uncertain about the scope of a "macrocyclic lactone (or triene) analog" – *e.g.*, whether the functional test

proposed by Cordis should be conducted *in vitro*, in animals, or in humans, and under what conditions.

In sum, the terms "macrocyclic lactone analog" and "macrocyclic triene analog" are moving targets.  There is no reasonable way for a potential competitor or the public to determine which compounds constitute a "macrocyclic lactone (or triene) analogs" of rapamycin.  As explained in *Halliburton*, the crucial purpose of a definiteness inquiry is to give the public notice as to how to meet – and to avoid meeting – patent claims.  *See United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) ("The statutory requirement of particularity and distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise").  The '7286, '3286, '473, and '662 Patents fail to inform the public how to determine whether a chemical entity is or is not a "macrocyclic lactone analog" or a "macrocyclic triene analog" of rapamycin.  The claims are therefore indefinite and should be held invalid under 35 U.S.C. § 112, ¶ 2.

## CONCLUSION

For the foregoing reasons, BSC respectfully requests that the Court grant this motion for summary judgment of invalidity for failure to meet the enablement, written description, and definiteness requirements under 35 U.S.C. § 112.

September 23, 2009

OF COUNSEL:

Richard L. DeLucia
Paul M. Richter
Michael K. Levy
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

James F. Hibey
Matthew M. Wolf
John E. Nilsson
HOWREY LLP
1299 Pennsylvania Ave NW
Washington DC 20004
(202) 783-0800

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600

*Attorneys for Plaintiffs,*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 23, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
> John G. Day, Esquire [jday@ashby-geddes.com]
> Lauren E. Maguire, Esquire [lmaguire@ashby-geddes.com]
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on September 23, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail*
>
> David T. Pritikin, Esquire [dpritikin@sidley.com]
> William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
> Russell E. Cass, Esquire [rcass@sidley.com]
> Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
> SIDLEY AUSTIN LLP
> One  South Dearborn
> Chicago, IL 60603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
*Attorneys for Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc.*