## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION and )
BOSTON SCIENTIFIC SCIMED, INC., )
                              )
        Plaintiffs, )

v.

JOHNSON & JOHNSON, INC. and )
CORDIS CORPORATION, )
                              )
        Defendants. )

Civil Action No. 07-333-SLR
Civil Action No. 07-348-SLR
Civil Action No. 07-409-SLR

**REDACTED**

### PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR
### MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF
### THE ASSERTED CLAIMS OF THE '7286, '3286, AND '473 PATENTS-IN-SUIT

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004
(212) 425-7200

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

Dated: September 16, 2009

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

NATURE AND STAGE OF THE PROCEEDING ................................................. 2

SUMMARY OF THE ARGUMENT ........................................................................ 2

STATEMENT OF FACTS ........................................................................................ 4

I.      The '7286 Patent-In-Suit ............................................................................... 4

II.     The '3286 Patent-In-Suit ............................................................................... 4

III.    The '473 Patent-In-Suit ................................................................................ 7

IV.     The Parties' Proposed Claim Constructions ................................................ 8

V.      Reexamination of the '7286, '3286, and '473 Patents.................................. 10

VI.     The Accused PROMUS Stent........................................................................ 10

LAW AND ARGUMENT........................................................................................... 14

I.      The Legal Standards With Respect to Summary Judgment of Non-Infringement........... 14

        A.      Summary Judgment in General............................................................ 14

        B.      Legal Standards Relating to Infringement .......................................... 15

II.     Applying BSC's Proposed Claim Constructions, the PROMUS Stent Does Not Infringe
        Any of the Asserted Claims of the '7286, '3286, or '473 Patents ..................................... 17

        A.      The PROMUS Stent Does Not Utilize a "Biocompatible" Polymeric Material As
                Required by All the Asserted Claims of the '7286, '3286, and '473 Patents ....... 17

        B.      The PROMUS Stent Does Not Include a "Coating" Which Is "Applied Thereto"
                As Required by Claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38,
                and 39 of the '3286 Patent and Claims 1, 2, 3, 4, and 5 of the '473 Patent.......... 20

        C.      The PROMUS Stent Does Not Utilize the Specific Types of "Polymer(s)"
                Required by Claims 1, 2, 3, 4, and 5 of the '7286 Patent, Claims 9, 10, 21, 25, 27,
                28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 72, 73, 76, and 77 of
                the '3286, and Claims 1, 2, 3, 4, and 5 of the '473 Patent .................................... 22

                1.      The PROMUS Stent Does Not Meet the "Polymer" Limitations present in
                        Claims 1, 2, 3, 4, and 5 of the '7286 Patent.............................................. 23

2.    The PROMUS Stent Does Not Meet the "Polymer/Drug Mixture" Limitation Present in Claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 Patent ................................................. 24

3.    The PROMUS Stent Does Not Meet the "Nonabsorbable Polymer" Limitation Present in Claims 9 and 51 of the '3286 Patent ...................... 25

4.    The PROMUS Stent Does Not Meet the Additional "Polymer" Limitations Present in Claims 10 and 52 of the '3286 Patent ...................................... 25

5.    The PROMUS Stent Does Not Meet the "Fluorinated Polymer" Limitation Present in Claims 25, 35, 38, 67, 72, and 76 of the '3286 Patent ............. 26

6.    The PROMUS Stent Does Not Meet the Similar "Acrylate Based Polymer" and "Acrylate Based Polymer or Copolymer" Limitations Present in Claims 21, 36, 39, 63, 73, and 77 of the '3286 Patent ............. 26

7.    The PROMUS Stent Does Not Meet the "Polymer" Limitations Present in Claims 1, 2, 3, 4, and 5 of the '473 Patent ................................................. 27

D.    The PROMUS Stent Does Not Meet the "Present in an Amount Effective to Inhibit Neointimal Proliferation" Limitation Required by Asserted Claims 1, 2, 3, 4, and 5 of the '7286 Patent, Claims 32, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 Patent, and Claims 1, 2, 3, 4, and 5 of the '473 Patent ...................................................................................... 29

CONCLUSION ........................................................................................................................ 30

DB01:2738129.1

054604.1003

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................... 14

*Asyst Techs., Inc. v. Emtrak, Inc.*,
402 F.3d 1188 (Fed. Cir. 2005)..........................................................passim

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
73 F.3d 1573 (Fed. Cir. 1996)....................................................................... 15

*Bai v. L & L Wings, Inc.*,
160 F.3d 1350 (Fed. Cir. 1998)..................................................................... 15

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*,
268 F.3d 1352 (Fed. Cir. 2001)..................................................................... 15

*Bayer AG v. Elan Pharm. Research Corp.*,
212 F.3d 1241 (Fed. Cir. 2000)..................................................................... 15

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
541 F.3d 1115 (Fed. Cir. 2008)..........................................................passim

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................... 14

*Desper Prods, Inc.. v. Qsound Labs., Inc.*,
157 F.3d 1325 (Fed. Cir. 1998)..................................................................... 15

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
344 F.3d 1359 (Fed. Cir. 2003) *(en banc)* .............................................. 16, 18

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002)................................................................................ 16, 18

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,
389 F.3d 1370 (Fed. Cir. 2004)..................................................................... 15

*Freedman Seating Co. v. American Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005)..........................................................passim

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)..................................................................... 15

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) .............................. 16

DB01:2738129.1

054604.1003

*Moore U.S.A., Inc. v. Standard Register Co.,*
    229 F.3d 1091 (Fed. Cir. 2000)...................................................................... passim

*Rheox, Inc. v. Entact, Inc.,*
    276 F.3d 1319 (Fed. Cir. 2002)............................................................................. 15

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
    247 F.3d 1316 (Fed. Cir. 2001)............................................................................. 16

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997)............................................................................................ passim

*Wolverine World Wide v. Nike, Inc.,*
    38 F.3d 1192 (Fed. Cir. 1994)............................................................................... 15

## Rules

Fed. R. Civ. P. 56(c) .............................................................................................. 2, 14

DB01:2738129.1

054604.1003

# INTRODUCTION

Plaintiffs Boston Scientific Corp. and Boston Scientific Scimed, Inc. (collectively, "BSC") respectfully submit this brief in support of their motion for summary judgment that the accused PROMUS™ Everolimus-Eluting Coronary Stent ("the PROMUS stent") does not infringe (either literally or under the doctrine of equivalents) any of the claims of U.S. Patent No. 7,217,286 ("the '7286 patent," attached as Ex. 1)[1], U.S. Patent No. 7,223,286 ("the '3286 patent," attached as Ex. 2), and U.S. Patent No. 7,229,473 ("the '473 patent," attached as Ex. 3) asserted by defendants Cordis Corp. and Johnson & Johnson, Inc. (collectively, "Cordis") when certain of BSC's proposed claim constructions are applied.

The claims of the '7286, '3286, and '473 patents are all directed to a simple polymeric-coated rapamycin or rapamycin analog eluting stent intended to treat coronary restenosis. Among other things, the claims of these patents include limitations requiring: (1) that the stent be coated with a "biocompatible" polymeric, drug containing material, (2) that this drug containing polymeric material be "applied" to the stent surface, (3) that this drug containing polymeric material be comprised of certain types of "polymer(s)," and (4) that rapamycin or a macrocylic lactone analog of rapamycin be "present in an amount effective to inhibit neointimal proliferation." If the Court adopts BSC's proposed construction of any of these claim limitations, as it should for the reasons discussed in BSC's opening *Markman* brief filed concurrently herewith, each of these limitations is missing from the PROMUS stent and independently necessitates a finding of no infringement of the asserted claims of the '7286, '3286, and '473 patents as described below.

---

[1]   Exhibits 1 through 116 refer to exhibits attached to the *Appendix in Support of BSC's Motions for Summary Judgment of Non-Infringement and Invalidity Pursuant to 35 U.S.C. § 103*, which was filed concurrently with this brief.

## NATURE AND STAGE OF THE PROCEEDING

The present cases were initiated via a series of declaratory judgment actions through which BSC seeks declarations that its PROMUS stent does not infringe any valid claim of the '7286 patent, '3286 patent, '473 patent, and U.S. Patent No. 7,300,662 ("the '662 patent"). While additional detail is provided below, generally BSC's PROMUS stent is an intravascular stent used to treat coronary artery disease.  It advantageously releases a drug designed to diminish reblocking (restenosis) of the patient's blood vessel.

Defendant Cordis is the owner of the '7286, '3286 and '473 patents-in-suit.  Cordis and defendant Wyeth co-own the '662 patent-in-suit.  Defendants have asserted counterclaims alleging that BSC is infringing each of the four patents-in-suit.

While fact and expert discovery were respectively scheduled to close May 22, 2009 and August 21, 2009 (*see* D.I. 197)[2], depositions are still ongoing and the parties have yet to schedule dates for the deposition of several fact and expert witnesses.

Trial in these cases is set to begin on February 4, 2010, with a hearing on claim construction and summary judgment motions set for October 30, 2009.

## SUMMARY OF THE ARGUMENT

1.      BSC submits this memorandum in support of its motion, pursuant to  Fed. R. Civ. P. 56(c), for entry of summary judgment holding that the accused BSC PROMUS stent does not infringe (either literally or under the doctrine of equivalents) asserted claims 1, 2, 3, 4, or 5 of the '7286 patent, claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent, or claims 1, 2, 3, 4, or 5 of the '473 patent.

---

[2]    The D.I. numbers provided in this brief refer to documents filed in connection with Civil Action No. 07-333-SLR.

2.      The PROMUS stent uses a polymeric coating that raises an inflammatory response in vivo, and therefore does not satisfy (a) the "biocompatible, nonabsorbable polymeric carrier" limitation present in claims 1, 2, 3, 4, or 5 of the '7286 patent, (b) the "biocompatible polymer/drug mixture" and "biocompatible polymeric carrier" limitations alternatively present in claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent, or (c) the "biocompatible polymeric carrier" limitation present in claims 1, 2, 3, 4, and 5 of the '473 patent.

3.      The PROMUS stent does not have a polymeric drug-containing coating affixed to the stent. Rather, the drug-containing coating on the PROMUS stent is affixed to a drug-free primer that has previously been affixed to the stent. Accordingly, PROMUS does not satisfy the "coating applied thereto" limitation present in claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 patent and claims 1, 2, 3, 4, and 5 of the '473 patent.

4.      The PROMUS stent utilizes a fluorinated copolymer, PVDF-HFP, as a polymeric carrier and thus does not satisfy the "said polymeric carrier comprises an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof" limitation present in claims 1, 2, 3, 4, and 5 of the '7286 patent and the various limitations requiring the use of particular polymeric materials present in the asserted claims of the '3286 and '473 patents.

5.      The PROMUS stent does not stop neointimal proliferation. Accordingly, it does not satisfy the "present in an amount effective to inhibit neointimal proliferation" and "present in a therapeutically beneficial amount to inhibit neointimal proliferation" limitations that are part of claims 1, 2, 3, 4, and 5 of the '7286 patent,  claims 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent, and claims 1, 2, 3, 4, and 5 of the '473 patent.

5. The absence of these limitations from the accused PROMUS stent all independently support an entry of summary judgment of no infringement (either literally or under the doctrine of equivalents) of the identified claims.

## STATEMENT OF FACTS

### I. The '7286 Patent-In-Suit

The '7286 patent is generally directed to intravascular stents with polymeric coatings containing rapamycin or a macrocyclic lactone analog of rapamycin and methods of treating a coronary artery with such coated, drug-eluting stents to inhibit neointimal proliferation.

Cordis is presently asserting claims 1, 2, 3, 4, and 5 of the '7286 patent. These claims read as follows:

> 1. A device comprising a metallic stent, a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent, wherein: said polymeric carrier comprises an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, and said therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof, and is present in an amount effective to inhibit neointimal proliferation.

> 2. The device according to claim 1 wherein said therapeutic agent is a macrocyclic lactone analog of rapamycin.

> 3. The device according to claim 1 that provides a controlled release of said therapeutic agent over a period of several weeks.

> 4. The device according to claim 2 that provides a controlled release of said therapeutic agent over a period of several weeks.

> 5. A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a device according to any on of claims 1 to 4 in the lumen of said coronary artery.

### II. The '3286 Patent-In-Suit

The '3286 patent shares a common specification with the '7286 patent and claims similar subject matter.

Cordis is presently asserting claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent. All of the asserted claims depend either directly or indirectly on non-asserted independent claims 1 and 40. The asserted claims read as follows (the non-asserted independent claims are also reproduced below for reference):

> 1 *(not asserted)*. A stent having a coating applied thereto, wherein said coating comprises a biocompatible polymer/drug mixture and said drug is rapamycin or a macrocyclic lactone analog thereof.
>
> 9. A stent according to claim 1 wherein the coating comprises a nonabsorbable polymer.
>
> 10. A stent according to claim 1 wherein the coating comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.
>
> 21. A stent according to claim 10 wherein the coating comprises an acrylate based polymer.
>
> 25. A stent according to claim 10 wherein the coating comprises a fluorinated polymer.
>
> 27. A stent according to any one of claims 1 to 26 wherein said drug is a macrocyclic lactone analog of rapamycin.
>
> 28. A stent according to any one of claims 1 to 26 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.
>
> 29. A stent according to claim 28 wherein said drug is a macrocyclic lactone analog of rapamycin.
>
> 30. A stent according to any one of claims 1 to 26 that releases said rapamycin or macrocyclic lactone analog thereof over a period of at least 14 days.
>
> 31. A stent according to claim 30 wherein said drug is a macrocyclic lactone analog of rapamycin.

32.  A stent according to any one of claims 1 to 26 wherein said rapamycin or macrocyclic lactone analog thereof is present in a therapeutically beneficial amount to inhibit neointimal proliferation.

33.  A stent according to claim 32 wherein said drug is a macrocyclic lactone analog of rapamycin.

34.  A stent according to claim 33 that releases said macrocyclic lactone analog of rapamycin over a period of at least 14 days.

35.  A stent according to claim 34 wherein the coating comprises a fluorinated polymer.

36.  A stent according to claim 35 wherein the coating further comprises an acrylate based polymer or copolymer.

37.  A stent according to claim 33 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

38.  A stent according to claim 37 wherein the coating comprises a fluorinated polymer.

39.  A stent according to claim 38 wherein the coating further comprises an acrylate based polymer or copolymer.

40 *(not asserted)*.  A device comprising a metallic stent, a biocompatible polymeric carrier and a drug, wherein said drug is rapamycin or a macrocyclic lactone analog thereof and is present in an amount effective to inhibit neointimal proliferation.

51.  A device according to claim 40 wherein the polymeric carrier comprises a nonabsorbable polymer.

52.  A device according to claim 40 wherein the polymeric carrier comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

63.  A device according to claim 52 wherein the polymeric carrier comprises an acrylate based polymer.

67. A device according to claim 52 wherein the polymeric carrier comprises a fluorinated polymer.

69. A device according to any one of claims 40 to 68 wherein said drug is a macrocyclic lactone analog of rapamycin.

70. A device according to any one of claims 40 to 68 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

71. A device according to claim 70 wherein said drug is a macrocyclic lactone analog of rapamycin.

72. A device according to claim 71 wherein the polymeric carrier comprises a fluorinated polymer.

73. A device according to claim 72 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

74. A device according to any one of claims 40 to 68 that releases said drug over a period of at least 14 days.

75. A device according to claim 74 wherein said drug is a macrocyclic lactone analog of rapamycin.

76. A device according to claim 75 wherein the polymeric carrier comprises a fluorinated polymer.

77. A device according to claim 76 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

## III.   The '473 Patent-In-Suit

The '473 patent shares the same specification as the '7286 and '3286 patents, and likewise claims intravascular stents with polymeric coatings containing rapamycin or a macrocyclic lactone analog of rapamycin.

Cordis is presently asserting claims 1, 2, 3, 4, and 5 of the '473 patent. These claims read as follows:

1. A metallic stent having a coating applied thereto, wherein: said coating comprises a mixture of a biocompatible polymeric carrier and a therapeutic agent; said polymeric carrier comprises at least one nonabsorbable polymer; said therapeutic agent is rapamycin,

or a macrocyclic lactone analog thereof, present in an amount
effective to inhibit neointimal proliferation; and said stent provides
a controlled release of said therapeutic agent over a period of
several weeks.

2.  The metallic stent according to claim 1 wherein said therapeutic
agent is a macrocyclic lactone analog of rapamycin.

3.  The metallic stent according to claim 1 wherein said
biocompatible polymeric carrier comprises a fluorinated polymer.

4.  The metallic stent according to claim 3 wherein said
biocompatible polymeric carrier further comprises an acrylate-
based polymer or copolymer.[3]

5.  A method of inhibiting neointimal proliferation in a coronary
artery resulting from percutaneous transluminal coronary
angioplasty comprising implanting a metallic stent according to
any one of claims 1 to 4 in the lumen of said coronary artery.

## IV.  The Parties' Proposed Claim Constructions

The parties submitted proposed constructions of the terms of the '7286, '3826, and '473

patents' claims on August 21, 2009. (*See* D.I. 247).  Concurrent with the filing of this summary

judgment motion, BSC has submitted claim construction briefing detailing why its proposed

constructions of the disputed terms of the '7286, '3286, and '473 patents are correct and dictated

by the claims, specifications, and prosecution histories of the '7286, '3286, and '473 patents and

should be adopted.  BSC has proposed the following constructions which are relevant to this

summary judgment motion:

- "biocompatible" means "does not elicit any negative tissue reaction or promote

  mural thrombosis formation" (*see* BSC's 9/16/09 Markman Brief at pp. 12-14);

- "carrier" means "a therapeutic agent-containing material co-formulated with the

  therapeutic agent" (*see id.* at p. 22);

---

[3]  See certificate of correction dated June 24, 2008.

- "coating" means "a distinct covering layer of a particular composition" (*see id.* at 24-26);

- "applied thereto" means "brought into direct contact with the stent surface" (*see id.* at pp. 26-27);

- "polymer" means "a molecule composed of many repeating units of a single monomer" (*see id.* at pp. 14-20);

- "copolymer" means "a molecule composed of many repeating units of at least two different monomers" (*see id.*);

- "acrylate-based polymer" means "a molecule composed of many repeating units of a single acrylate monomer" (*see id.*);

- "acrylate-based copolymer" means "a molecule composed of many repeating units of at least two different monomers where at least one of the monomers is an acrylate" (*see id.*);

- "fluorinated polymer" means "a molecule comprising many repeating units of a single monomer wherein the monomer contains one or more fluorine atoms" (*see id.*);

- "mixture" means "a composition in which substances are combined and intermingled" (*see id.* at pp. 20-22); and

- "an amount effective to inhibit neointimal proliferation" or "a therapeutically beneficial amount to inhibit neointimal proliferation" means "an amount sufficient to stop neointimal proliferation" (*see id.* at 27-29).

## V.   Reexamination of the '7286, '3286, and '473 Patents

The '7286, '3286, and '473 patents, along with the '662 patent which is also being asserted against BSC, are currently being reexamined by the PTO.  While these reexaminations are currently ongoing, to date all of the asserted claims of the '7286, '3286, and '473 patents have been rejected.  (*See* Reex. App. No. 95/001,096, 12/22/08 Office Action (attached as Ex. 5); Reex. App. No. 95/001,097, 1/30/09 Office Action) (attached as Ex. 6); Reex. App. No. 95/001,102, 1/5/09 Office Action) (attached as Ex. 7)).

## VI.   The Accused PROMUS Stent

The BSC PROMUS stent is a private label version of the XIENCE V everolimus-eluting coronary stent ("the XIENCE stent") manufactured by Abbott Laboratories.  (*See* Ex. 19 (PROMUS IFU) at BSC-SJA-0716).  While they bear different names, the XIENCE and PROMUS stents are identical in all other respects.

The PROMUS stent is available for sale in a variety of different lengths and diameters. (*See id.*).  Depending on the particular stent length and diameter at issue, the PROMUS stent utilizes either the MULTI-LINK VISION or the MULTI-LINK MINI VISION bare metal coronary stent as its underlying metallic stent platform.  (*Id.*)  The PROMUS stent employs two separate and distinct coatings.  A drug-free poly (n-butyl methacrylate) ("PBMA") primer coating is deposited directly on the underlying metallic stent surface.  (*Id.* at BSC-SJA-0717). Next, a coating that consists of a vinylidene fluoride and hexafluoropropylene copolymer ("PVDF-HFP") co-formulated with the drug everolimus is applied to the surface of the PBMA primer coating to form a PVDF-HFP / everolimus coating.  (*Id.*)  Thus, the PBMA primer coating functions as a tie coating between the metallic stent surface and the PVDF-HFP / everolimus coating.  (*Id.*)  No topcoat coating is applied.  (*Id.*)  A cross section (not to scale) depicting the PROMUS stent's various coatings is shown below:



The structures of PBMA and PVDF-HFP are shown below. The variables "n" and "m" represent the number of respective monomer units in the PBMA homopolymer or PVDF-HFP copolymer:

**PBMA**                                    **PVDF-HFP**

(*Id.* at BSC-SJA-0718).

Everolimus, the active ingredient in PROMUS, is a semi-synthetic macrolide. (*Id.* at BSC-SJA-0717). Its chemical name is 40-O-(2-hydroxyethyl)-rapamycin. (*Id.*) The PROMUS stent's everolimus drug load is 100 µg per cm$^2$ of stent surface area for all product sizes. (*Id.*) The nominal everolimus content for PROMUS ranges from 37 to 181 µg based on the size of the stent. (*Id.* at BSC-SJA-0719).

The PROMUS stent has been the subject of several clinical trials.[4] These trials are collectively referred to as the "SPIRIT trials." (*See id.* at BSC-SJA-0730 to 0732). The SPIRIT

---

[4]    The trials were conducted by Abbott, the stent's manufacturer, and the tested stent was referred to as the XIENCE stent.

First trial was a first-in-man single blind multi-center randomized controlled trial assessing the safety and efficacy of the XIENCE stent. (*See* Ex. 21 at BSC-SJA-0796; *see also* Ex. 22). Sixty patients were allocated to receive either the XIENCE stent (n=28) or an identical bare metal stent (n=32). (Ex. 21 at BSC-SJA-0794). The patients all suffered from single *de novo* native coronary lesions with 50-99% stenosis that could be covered by an 18mm stent. (*Id.*) There were additional exclusion criteria applied to limit the types of patients that could enroll in the trial. (*Id.* at BSC-SJA-0795) The primary endpoint was in-stent late loss at 180 days. (*Id.* at BSC-SJA-0794). Secondary endpoints included in-stent late loss and percentage diameter stenosis at 6 months and 1 year. (*Id.* at BSC-SJA-0796).

The SPIRIT II trial was a single blind multi-center non-inferiority randomized (3:1) controlled trial that evaluated the safety and performance of the XIENCE stent versus the Taxus stent in the treatment of patients with a maximum of two *de novo* native coronary artery lesions located in two different epicardial vessels. (*See* Ex. 23 at BSC-SJA-0809). Patients were also selected based on a set of exclusionary criteria. (*Id.* at BSC-SJA-0810). Three hundred patients were allocated to stent implantation with a XIENCE stent (n=223) or a Taxus stent (n=77). (*Id.* at BSC-SJA-0809) The lesions being treated had a diameter stenosis of ≤50-99%, a length of ≤28mm, and a reference vessel diameter between 2.5mm and 4.25mm. (*Id.*) The primary endpoint was in-stent late loss at 180 days. (*Id.* at BSC-SJA-0811) Secondary endpoints included in-stent late loss and in-stent percent diameter stenosis at 180 days and 2 years (a subset of 152 consecutive patients enrolled at selected centers). (*Id.*)

The SPIRIT III trial was designed to evaluate the safety and efficacy of the XIENCE stent compared with BSC's Taxus stent. (*See* Ex. 24 at BSC-SJA-0819). The trial was a prospective, randomized, single blind, controlled trial enrolling patients at 65 institutions. (*Id.*)

Patients were 1002 men and women undergoing percutaneous coronary intervention in lesions 28mm or less in length and with reference vessel diameter between 2.5 and 3.75mm. (*Id.*) Angiographic follow-up was prespecified at 8 months in 564 patients and completed in 436 patients. (*Id.*) Clinical follow-up was performed at 1, 6, 9 and 12 months. (*Id.*) Patients were randomized 2:1 to receive the XIENCE stent (n=669) or the Taxus stent (n=333). (*Id.*) The primary endpoint was non-inferiority or superiority of angiographic in-segment late loss. (*Id.*) The major secondary endpoint was ischemia-driven target vessel failure at 9 months. (*Id.*) Patients enrolled in the study were subject to a set of exclusionary criteria. (*Id.* at BSC-SJA-0820)

Collectively, these and other studies show that while the PROMUS / XIENCE stent can be used to treat restenosis, the stent does not and cannot stop neointimal proliferation. For instance, angiographic data collected as part of the SPIRIT I trial showed that patients exhibited 4.3% in-segment binary restenosis 180 days after stent implantation. (*See* Ex. 19 at BSC-SJA-0755). Small but quantifiable amounts of in-stent late loss and lumen diameter reductions were also observed. (*See id.*) In-stent late loss is the angiographic representation of the extent of neointimal proliferation or hyperplasia within a stent at a certain specified time after implantation. Similarly, 180 days after stent implantation in the SPIRIT II trial, 1.3% in-stent and 3.4% in-segment binary restenosis and small but measurable amounts of late loss and lumen diameter reductions were observed. (*See id.* at BSC-SJA-0751). And, 2.3% in-stent and 4.7%

in-segment binary restenosis was observed 8 months after stent implantation during the SPIRIT III trial. (*See, e.g., id.* at BSC-SJA-0743; 

## LAW AND ARGUMENT

Cordis is asserting claims 1, 2, 3, 4, and 5 of the '7286 patent, claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent, and claims 1, 2, 3, 4, and 5 of the '473 patent against the PROMUS stent. By this motion, BSC seeks summary judgment that the PROMUS stent does not infringe any of these claims.

## I.     The Legal Standards With Respect to Summary Judgment of Non-Infringement

### A.     Summary Judgment in General

Generally, summary judgment serves to "isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); Fed. R. Civ. P. 56(c).

There are no material issues of fact regarding the PROMUS stent's physical structure. Similarly, the stent's operation and effect when implanted in the body – as evinced by applicable clinical trials and other testing – is clear and incontrovertible (at least as is relevant to this motion). This motion thus presents questions of pure law – can the asserted claims of the '7286, '3286, and '473 patents be interpreted to cover PROMUS? *See Desper Prods, Inc.. v. Qsound Labs, Inc.*, 157 F.3d 1325, 1332-33 (Fed. Cir. 1998) (noting that when the structure "of the allegedly infringing process or product is undisputed[,] literal infringement collapses into claim construction – a matter of law – amenable to summary judgment"); *see also Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1324 (Fed. Cir. 2002); *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1362 (Fed. Cir. 2001); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996). Accordingly, granting summary judgment at this time is perfectly appropriate. *See Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1115-16 (Fed. Cir. 2000).

## B.  Legal Standards Relating to Infringement

The party charging patent infringement — here, Cordis — must prove infringement by a preponderance of the evidence. *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). To find infringement, every limitation of a patent claim must be found in the accused product. *See Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1376 (Fed. Cir. 2004). The absence of any one limitation of a claim in an accused product precludes a finding of infringement of that claim. *See Wolverine World Wide v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994). Indeed, a summary judgment of non-infringement is appropriate and warranted where no reasonable finder of fact could find that every limitation of a claim is present in the accused product. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353-54 (Fed. Cir. 1998).

The determination of whether an accused product infringes a patent is a two-step process. First, as a matter of law, the Court must determine "the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

In the second step of an infringement analysis, the properly-construed claims are compared to the accused device to determine whether every claim limitation is present in the accused device. *See Markman*, 52 F.3d at 976. For literal infringement, each limitation of a claim must be satisfied exactly. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("Any deviation from the claim precludes [literal infringement].").

While an accused product that is literally missing a required claim element can, under certain circumstances, still be infringing under the so-called "doctrine of equivalents," there are a variety of limitations to this doctrine. For instance, prosecution history estoppel precludes a patentee from using the doctrine of equivalents to recapture subject matter abandoned during prosecution, either by amendment or argument. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1365, 1366-67 (Fed. Cir. 2003) (*en banc*) ("*Festo II*"); *see also Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 30 (1997); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002) (*"Festo I"*). During prosecution, claim amendments or arguments "made for ... reason[s] of patentability" give rise to a presumption that the patentee "surrender[ed] the entire territory between the original claim limitation and the amended claim limitation." *Festo II*, 344 F.3d at 1365. In addition to circumstances where prosecution history estoppel applies, the doctrine of equivalents cannot be utilized to impermissibly vitiate (or eliminate) claim limitations. *See Warner-Jenkinson*, 520 U.S. at 29-30; *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1129 (Fed. Cir.

2008); *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005); *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005); *Moore U.S.A.*, 229 F.3d at 1106.

## II.     Applying BSC's Proposed Claim Constructions, the PROMUS Stent Does Not Infringe Any of the Asserted Claims of the '7286, '3286, or '473 Patents

### A.     The PROMUS Stent Does Not Utilize a "Biocompatible" Polymeric Material As Required by All the Asserted Claims of the '7286, '3286, and '473 Patents

All of the asserted claims of the '7286, '3286, and '473 patents include limitations requiring the use of "biocompatible" polymeric materials.

In particular, claim 1 of the '7286 patent requires that the claimed drug-eluting stent include a "biocompatible, nonabsorbable polymeric carrier." Because claims 2, 3, 4, and 5 all depend on claim 1, these claims also include this same limitation. Asserted claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 patent – via their dependency on non-asserted claim 1 – require that the claimed drug-eluting stent include a "biocompatible polymer/drug mixture." Similarly, asserted claims 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent – via their dependency on non-asserted claim 40 – require a "biocompatible polymeric carrier." Claim 1 of the '473 patent (and associated dependent claims 2, 3, 4, and 5) also includes this same "biocompatible polymeric carrier" limitation.

As described above and in its claim construction briefing, BSC has proposed that the term "biocompatible" can only be properly construed to mean "does not elicit any negative tissue reaction or promote mural thrombosis formation." (*See* BSC's 9/16/09 Markman Brief at pp. 12-14.) If the Court adopts BSC's proposed construction, the PROMUS stent does not literally meet the various "biocompatible" limitations present in all the asserted claims of the '7286, '3286, and '473 patents.

While the PROMUS stent includes a coating that consists of a PVDF-HFP copolymer co-formulated with the drug everolimus, that drug-containing polymeric material is not "biocompatible" under BSC's proposed construction. ███████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ Inflammation is a negative tissue reaction. Therefore, the polymeric carrier of the PROMUS drug-eluting stent is not a "biocompatible, nonabsorbable polymeric carrier," "biocompatible polymer/drug mixture," or "biocompatible polymeric carrier" and cannot literally infringe any of the asserted claims of the '7286, '3286, and '473 patents.

Additionally, the accused PROMUS stent cannot infringe these asserted claims under the doctrine of equivalents. As an initial matter, allowing the claim term "biocompatible," which limits the claims to stents which employ materials which elicit <u>no</u> negative tissue reactions, to extend to materials that elicit <u>some</u> discernable negative tissue reaction would impermissibly vitiate the "biocompatible" limitation. *See Warner-Jenkinson*, 520 U.S. at 29-30; *Carnegie Mellon Univ.*, 541 F.3d at 1129; *Asyst Techs.*, 402 F.3d at 1195; *Freedman Seating*, 420 F.3d at 1358; *Moore U.S.A.*, 229 F.3d at 1106 (Fed. Cir. 2000).

Moreover, the patentee distinguished the coating of its alleged invention over prior art coatings by focusing on this "biocompatible" limitation both in the specifications of the patents-in-suit themselves and during prosecution. These statements give rise to an estoppel which prohibits recourse to the doctrine of equivalents. *See generally Festo II*, 355 F.3d at 1365, 1366-67; *see also Warner-Jenkinson*, 520 U.S. at 30; *Festo I*, 535 U.S. at 736. For instance, the common specification shared by the patents-in-suit distinguishes the prior art by stating that "the coating material should not contribute to any adverse response by the body (i.e., should be non-

thrombogenic, non-inflammatory, etc.).  To date, the ideal coating material has not been

developed for this application."  (Ex. 1 at BSC-SJA-0015 (col. 3, ll. 56-60)).

Additionally, in the reexamination of the '7286, '3286, and '473 patents, Cordis's expert

Dr. Antonios G. Mikos criticized a prior art study published in Willem J. van der Giessen, M.D.,

Ph.D. et al., *Marked Inflammatory Sequelae to Implantation of Biodegradable and*

*Nonbiodegradable Polymers in Porcine Coronary Arteries*, Circulation, 94:1690-97 (1996) (the

"van der Giessen article" (attached as Ex. 27)).  (*See* Ex. 28 at BSC-SJA-0886 (¶ 49)).  In the

van der Giessen article, the authors were, according to Dr. Mikos, unable to develop a suitable

implantable polymeric coated stent because the polymeric materials disclosed in the van der

Giessen article exhibited adverse tissue reactions upon implantation, including inflammation and

neointimal proliferation.  (*See id.*).  Some of the same polymers identified in the van der Giessen

article, however, appear in the specifications of the '7286, '3286, and '473 patents (e.g.,

polyorthoester and lactone-based polyesters or copolyesters).  (*Compare* Ex. 1 at BSC-SJA-0017

('7286 patent, col. 6, ll. 37–43) with Ex. 27 at BSC-SJA-0876 (Abstract of van der Giessen

article, identifying "polycaprolactone" (a lactone based polyester) and "polyorthoester")).  Thus,

according to Cordis, a coating that contributes to an adverse response by the body – including

those utilizing the very same polymers referenced by the patents-in-suit themselves – is

admittedly in the prior art and outside the scope of the claims.

In view of the applicants' criticism of prior art polymers, and the very restrictive

definition of "biocompatible" in the specifications of the '7286, '3286, and '473 patents, the

patentee has thus distinguished the claimed subject matter as something discernibly different

than the prior art.  The doctrine of equivalents cannot now be used to extend to polymeric

materials that are not truly "biocompatible" as that term is used by the patents-in-suit.

**B.      The PROMUS Stent Does Not Include a "Coating" Which Is "Applied Thereto" As Required by Claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 Patent and Claims 1, 2, 3, 4, and 5 of the '473 Patent**

Several of the asserted claims of the '3286 and '473 patents include a limitation which requires a "coating applied thereto."

In particular, asserted claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 patent – via their dependency on non-asserted claim 1 – require that the claimed drug-eluting stent include a "coating" which "comprises a biocompatible polymer/drug mixture" and is "applied thereto." Claim 1 of the '473 patent similarly requires that the claimed drug-eluting stent include a "coating" which "comprises a mixture of a biocompatible polymeric carrier and a therapeutic agent" and is "applied thereto." Because claims 2, 3, 4, and 5 all depend on claim 1, these claims also include this same limitation.

As described above and in its claim construction briefing, BSC has proposed that the term "coating" be construed to mean "a distinct covering layer of a particular composition." (*See* BSC's 9/16/09 Markman Brief at pp. 24-26). Further, BSC has proposed that the term "applied thereto" be construed to mean "brought into direct contact with the stent surface." (*See id.* at pp. 26-27). BSC has also proposed that the term "mixture" be construed to mean "a composition in which substances are combined and intermingled." (*See id.* at pp. 20-22). And, BSC has proposed that the term "carrier" be construed to mean "a therapeutic agent-containing material co-formulated with the therapeutic agent" (*see id.* at pp. 22). If the Court adopts BSC's proposed constructions, the PROMUS stent does not meet this particular claim limitation.

The PROMUS stent utilizes two different polymeric materials, a PBMA primer applied directly to the metallic surface of the stent and a PVDF-HFP coating (which is co-formulated with everolimus) applied on top of the PBMA primer. (*See* Ex. 19 at BSC-SJA-0717).

While the PBMA primer is "applied" to the PROMUS stent under BSC's proposed

construction (it rests directly on the stent's underlying metallic surface), it does not "comprise[] a

biocompatible polymer/drug mixture" as required by this '3286 patent claim limitation or

"comprise[] a mixture of a biocompatible polymeric carrier and a therapeutic agent" as required

by the '473 patent. As explained above, PBMA is not mixed with everolimus prior to

application to the PROMUS stent. Instead, drug-free PBMA is applied to the metallic stent

surface solely as a primer. (*See* Ex. 19 at BSC-SJA-0717; *see generally* Ex. 29 at BSC-SJA-

0894 to 0895 (¶ 152) (in his 6/12 report, Cordis's expert Dr. Mikos appears to agree that the

PROMUS stent's PBMA coating can be characterized as a "primer")). As a result, everolimus is

not interspersed throughout the PROMUS stent's PBMA primer as would be required for it to

constitute a "polymer/drug mixture" (per the '3286 patent), a "polymeric carrier" (per the '473

patent), or a "mixture of a biocompatible polymeric carrier and a therapeutic agent" (per the '473

patent) under BSC's proposed constructions.

Further, while PVDF-HFP is mixed with everolimus, it is not "applied thereto" pursuant

to BSC's construction. Rather than being brought in direct contact with the stent surface, the

PVDF-HFP / everolimus coating is applied on top of the PBMA primer. (*See* Ex. 19 at BSC-

SJA-0717). Therefore, the PROMUS stent cannot literally infringe claims 9, 10, 21, 25, 27, 28,

29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 patent or claims 1, 2, 3, 4, and 5 of the

'473 patent, which all require a "coating" (composed of a mixture of a polymer and drug) which

is "applied thereto."

Additionally, the accused PROMUS stent cannot infringe these asserted claims under the

doctrine of equivalents. Allowing the claim term "coating applied thereto," which under BSC's

proposed construction limits the claims to stents which have a "polymeric carrier" or

"polymer/drug mixture" in direct contact with the stent surface, to extend to stents which do not

have such a carrier or mixture in contact with the stent surface, would impermissibly vitiate the

"coating applied thereto" limitation. *See Warner-Jenkinson*, 520 U.S. at 29-30; *Carnegie Mellon*

*Univ.*, 541 F.3d at 1129; *Asyst Techs.*, 402 F.3d at 1195; *Freedman Seating*, 420 F.3d at 1358;

*Moore U.S.A.*, 229 F.3d at 1106.

C.     **The PROMUS Stent Does Not Utilize the Specific Types of "Polymer(s)" Required by Claims 1, 2, 3, 4, and 5 of the '7286 Patent, Claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 72, 73, 76, and 77 of the '3286, and Claims 1, 2, 3, 4, and 5 of the '473 Patent**

As discussed in more detail below, various asserted claims of the '7286, '3286, and '473

patents require the use of certain types of "polymer(s)" and "copolymer(s)." In addition to the

other constructions described above, BSC has proposed that the term "polymer" be construed to

mean "a molecule composed of many repeating units of a single monomer" (*see* BSC's 9/16/09

Markman Brief at pp. 14-20) and "copolymer" be construed to mean "a molecule composed of

many repeating units of at least two different monomers" (*see id.*). Consistent with these

constructions, BSC has proposed that "acrylate-based polymer" be construed to mean "a

molecule composed of many repeating units of a single acrylate monomer" (*see id.*), "acrylate-

based copolymer" be construed to mean "a molecule composed of many repeating units of at

least two different monomers where at least one of the monomers is an acrylate" (*see id.*), and

"fluorinated polymer" be construed to mean "a molecule comprising many repeating units of a

single monomer wherein the monomer contains one or more fluorine atoms" (*see id.*). If the

Court adopts BSC's proposed constructions, the PROMUS stent does not meet these various

claim limitations.

1.   **The PROMUS Stent Does Not Meet the "Polymer" Limitations present in Claims 1, 2, 3, 4, and 5 of the '7286 Patent**

Claim 1 of the '7286 patent requires that the claimed drug-eluting stent's "polymeric carrier" "comprise[] an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof." Because claims 2, 3, 4, and 5 all depend on claim 1, these claims also include this same limitation.

As described above, the PROMUS stent only utilizes two polymeric materials: a PBMA polymer primer and a PVDF-HFP copolymer that carries the drug.

The PROMUS stent's PBMA primer is not the drug carrier and therefore is not a "polymeric carrier" and thus cannot itself satisfy the "acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof" limitation present in all the asserted claims of the '7286 patent. Rather than being co-formulated with everolimus as would be required for this material to meet the "polymeric carrier" limitation, drug-free PBMA is applied to the metallic stent surface solely as a primer. *See supra* section II.B. The drug-containing PVDF-HFP coating is then applied on top of this drug-free PBMA primer. (*See* Ex. 19 at BSC-SJA-0717.)

The polymeric carrier of the PROMUS stent is PVDF-HFP. (*See id.*) Unlike PBMA, the PROMUS stent's PVDF-HFP is co-formulated with everolimus prior to its application to the stent. (*See id.*; *see also* Ex. 29 at BSC-SJA-0892 (¶ 144) (in his 6/12 report, Cordis's expert Dr. Mikos appears to agree that PVDF-HFP is the "carrier" used in the PROMUS stent)). PVDF-HFP, however, is not an "acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof" as required by the claims of the '7286 patent.

In particular, PVDF-HFP is not an "acrylate-based polymer or copolymer" because it does not include an acrylate monomer. (*See* Ex. 19 at BSC-SJA-0717 to 0718). Cordis does not appear to dispute this. Further, PVDF-HFP is not a "fluorinated polymer" because it is

comprised of many repeating units of two different monomers and is thus a copolymer. (*See id.* at BSC-SJA-0718). Claims 1, 2, 3, 4, and 5 of the '7286 patent extend only to "fluorinated polymers" (*i.e.* a molecule comprising many repeating units of a single monomer wherein the monomer contains one or more fluorine atoms) and not fluorinated copolymers like PVDF-HFP. Fluorinated copolymers have been specifically excluded from the list of claimed polymers. Finally, PVDF-HFP is not a "mixture thereof" because it is a single molecule and not a combination of a fluorinated polymer and an acrylate-based polymer or copolymer.

> **2.    The PROMUS Stent Does Not Meet the "Polymer/Drug Mixture" Limitation Present in Claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 Patent**

As noted above, asserted claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 patent – via their dependency on non-asserted claim 1 – all require that the claimed drug-eluting stent include a "polymer/drug mixture."

Again, the PROMUS stent only utilizes two polymeric materials: a PBMA homopolymer primer and a PVDF-HFP copolymer that carries the drug everolimus.

For the reasons outlined above, the PROMUS stent's PBMA primer is not a "polymer/drug mixture" and thus cannot itself satisfy this claim limitation. *See supra* section II.B.  While PVDF-HFP, unlike PBMA, is co-formulated with everolimus before application to the PROMUS stent, PVDF-HFP is not a "polymer" as required by these claims of the '3286 patent.  Because it is comprised of many repeating units of two different monomers, PVDF-HFP is a copolymer. (*See* Ex. 19 at BSC-SJA-0717 to 0718).  Claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39 of the '3286 patent extend only to stents that utilize drugs mixed with homopolymers (*i.e.* a molecule comprising many repeating units of a single monomer) and not copolymers like PVDF-HFP.

### 3. The PROMUS Stent Does Not Meet the "Nonabsorbable Polymer" Limitation Present in Claims 9 and 51 of the '3286 Patent

Claim 9 of the '3286 patent, which depends on claim 1, requires that the claimed "coating" comprise a "nonabsorbable polymer." Claim 51, which depends on claim 40, includes a similar limitation requiring that the claimed "polymeric carrier comprise[] a nonabsorbable polymer."

For the reasons outlined above, the PROMUS stent's PBMA primer is not a "polymer/drug mixture" and thus cannot itself constitute a "coating comprising a biocompatible polymer/drug mixture" "wherein the coating comprises a nonabsorbable polymer" as required by claim 9. *See supra* section II.B. Similarly, the PBMA primer is not a "polymeric carrier" and thus cannot itself be a "biocompatible polymeric carrier" "wherein the polymeric carrier comprises a nonabsorbable polymer" as required by claim 51.

While PVDF-HFP, unlike PBMA, is co-formulated with everolimus before application to the PROMUS stent, as described above, PVDF-HFP is not a "polymer" for the same reasons described above and thus cannot satisfy the additional "nonabsorbable polymer" limitation of claims 9 and 51.

### 4. The PROMUS Stent Does Not Meet the Additional "Polymer" Limitations Present in Claims 10 and 52 of the '3286 Patent

Claim 10 of the '3286 patent, which depends on claim 1, requires that the claimed "coating" comprise a "a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof." Claim 52, which depends on claim 40, includes a

similar limitation requiring that the claimed "polymeric carrier" comprise one of the same types of polymeric materials listed by claim 10.

For the reasons outlined above, the PROMUS stent's PBMA primer does not meet this additional limitation of claims 10 and 52. *See supra* section II.B, II.C.1-3. Further, the PROMUS stent's PVDF-HFP also fails to satisfy this additional limitation. The only species in these claims' list of polymeric materials remotely related to PVDF-HFP is a "fluorinated polymer." PVDF-HFP, however, is not a "fluorinated polymer." *See supra* section II.C.1.

5. **The PROMUS Stent Does Not Meet the "Fluorinated Polymer" Limitation Present in Claims 25, 35, 38, 67, 72, and 76 of the '3286 Patent**

Claim 25, which depends on claim 10, claim 35, which depends on claim 34, and claim 38, which depends on claim 37, all include an additional limitation requiring that the "coating" comprise "a fluorinated polymer." Claim 67, which depends on claim 52, claim 72, which depends on claim 71, and claim 76, which depends on claim 75, all include a similar limitation requiring that the claimed "polymeric carrier comprise[] a fluorinated polymer."

The PROMUS stent does not meet these additional similar limitations for the same reasons described in the preceding section.

6. **The PROMUS Stent Does Not Meet the Similar "Acrylate Based Polymer" and "Acrylate Based Polymer or Copolymer" Limitations Present in Claims 21, 36, 39, 63, 73, and 77 of the '3286 Patent**

Claim 21, which depends on claim 10, includes an additional limitation requiring that the "coating" comprise "an acrylate based polymer" (claim 36, which depends on claim 35, and claim 39, which depends on claim 38, likewise require that the coating "further comprise[] an acrylate based polymer or copolymer"). Claim 63, which depends on claim 52, includes a similar limitation requiring that the claimed "polymeric carrier comprise[] an acrylate based polymer" (claim 73, which depends on claim 72, and claim 77, which depends on claim 76,

likewise require that the "polymeric carrier further comprise[] an acrylate based polymer or copolymer").

For the reasons outlined above, the PROMUS stent's PBMA primer is not a "polymer/drug mixture" and thus cannot itself constitute a "coating comprising a biocompatible polymer/drug mixture" "wherein the coating comprises an acrylate based polymer" as required by claim 21 (or "further comprises an acrylate based polymer or copolymer" as required by claims 36 and 38). *See supra* section II.B, II.C.1-3. Similarly, the PBMA primer is not a "polymeric carrier" and thus cannot itself be a "biocompatible polymeric carrier" "wherein the polymeric carrier comprises an acrylate based polymer" as required by claim 63 (or "further comprise[] an acrylate based polymer or copolymer" as required by claims 73 and 77). *See id.*

While PVDF-HFP, unlike PBMA, is co-formulated with everolimus before application to the PROMUS stent, PVDF-HFP is not an "acrylate based polymer" or "acrylate based copolymer" because it does not include an acrylate monomer. As a result neither PBMA nor PVDF-HFP can satisfy the additional limitations of claims 21, 36, 39, 63, 73, and 77.

### 7. The PROMUS Stent Does Not Meet the "Polymer" Limitations Present in Claims 1, 2, 3, 4, and 5 of the '473 Patent

Claim 1 of the '473 patent requires that the claimed drug-eluting stent's "polymeric carrier" "comprise[] at least one nonabsorbable polymer." Again, because claims 2, 3, 4, and 5 all depend on claim 1, these claims also include this same limitation. Claim 3 of the '473 patent depends on claim 1 and adds an additional narrowing limitation requiring that "said biocompatible polymeric carrier comprises a fluorinated polymer." Claim 4 of the '473 patent depends on claim 3 and adds a further limitation requiring that "said biocompatible polymeric carrier further comprises an acrylate-based polymer or copolymer."

The PROMUS stent does not meet these "nonabsorbable polymer," "fluorinated polymer" or "acrylate-based polymer or copolymer" limitations for the same reasons discussed above (*i.e.* the PBMA primer is not a "polymeric carrier" and thus cannot itself satisfy any of the limitations; PVDF-HFP is not a "polymer" and thus cannot be a "nonabsorbable polymer" or "fluorinated polymer"; and PVDF-HFP is also not an "acrylate-based polymer or copolymer" because it lacks an acrylate monomer).

In sum, PBMA and PVDF-HFP are the only polymeric materials on the PROMUS stent. Because PBMA is not a "polymeric carrier" or a "coating" that is a mixture of polymer and drug, and PVDF-HFP is not a "polymer," "nonabsorbable polymer," "fluorinated polymer" or "acrylate-based polymer or copolymer," the PROMUS stent does not satisfy any of the various "polymer" limitations present in claims 1, 2, 3, 4, and 5 of the '7286 patent, claims 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 72, 73, 76, and 77 of the '3286 patent, or claims 1, 2, 3, 4, and 5 of the '473 patent and cannot literally infringe those claims. This creates another independent basis supporting entry of summary judgment of non-infringement.

Additionally, the PROMUS stent cannot infringe these asserted claims under the doctrine of equivalents. Allowing the claim term "polymer" to extend to stents which do not employ such a "polymer," would impermissibly vitiate the "polymer" limitation. *See Warner-Jenkinson*, 520 U.S. at 29-30; *Carnegie Mellon Univ.*, 541 F.3d at 1129; *Asyst Techs.*, 402 F.3d at 1195; *Freedman Seating*, 420 F.3d at 1358; *Moore U.S.A.*, 229 F.3d at 1106.

**D.    The PROMUS Stent Does Not Meet the "Present in an Amount Effective to Inhibit Neointimal Proliferation" Limitation Required by Asserted Claims 1, 2, 3, 4, and 5 of the '7286 Patent, Claims 32, 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 Patent, and Claims 1, 2, 3, 4, and 5 of the '473 Patent**

With the exception of certain of the asserted claims of the '3286 patent, all of the claims of the '7286, '3286, and '473 patents at issue include limitations directed to the amount of drug and/or therapeutic agent utilized by the claimed stent.

More particularly, Claim 1 of the '7286 patent requires that the claimed drug-eluting stent contain rapamycin or a macrocyclic lactone analog of rapamycin "in an amount effective to inhibit neointimal proliferation." Because of their dependency on claim 1, this same limitation is also present in claims 2, 3, 4, and 5. Claims 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent – via their dependency on claim 40, and claim 1 of the '473 patent (along with associated dependent claims 2, 3, 4, and 5) all include the same limitation. Claims 32, 33, 34, 35, 36, 37, 38, 39, of the '3286 patent includes a similar limitation requiring that the drug be "present in a therapeutically beneficial amount to inhibit neointimal proliferation."

As noted above, BSC has proposed that these claim limitations be construed to mean "an amount sufficient to stop neointimal proliferation." (*See* BSC's 9/16/09 Markman Brief at 27-29). While the PROMUS stent utilizes the drug everolimus, as evinced by its clinical trial and other testing results, however, an implanted PROMUS stent does not stop neointimal proliferation. (*See, e.g.,* Ex. 19 at BSC-SJA-0743, 0751, 0755; *see also* Exs. 114, 115, 116). And, Cordis has failed to come forward with evidence to the contrary. As a result, the PROMUS stent does not meet the "present in an amount effective to inhibit neointimal proliferation" or "present in a therapeutically beneficial amount to inhibit neointimal proliferation" limitations. This creates another independent basis supporting entry of summary judgment of non-infringement of claims

1, 2, 3, 4, and 5 of the '7286 patent, claims 32, 33, 34, 35, 36, 37, 38, 39, 51, 52, 63, 67, 69, 70,

71, 72, 73, 74, 75, 76, and 77 of the '3286 patent, and claims 1, 2, 3, 4, and 5 of the '473 patent.

Additionally, the accused PROMUS stent cannot infringe these asserted claims under the

doctrine of equivalents. Allowing the claim term "present in an amount effective to inhibit

neointimal proliferation," which limits the claims to stents that stop neointimal proliferation, to

extend to stents which do so would impermissibly vitiate this claim limitation. *See Warner-*

*Jenkinson*, 520 U.S. at 29-30; *Carnegie Mellon Univ.*, 541 F.3d at 1129; *Asyst Techs.*, 402 F.3d

at 1195; *Freedman Seating*, 420 F.3d at 1358; *Moore U.S.A.*, 229 F.3d at 1106.

## CONCLUSION

For the foregoing reasons, BSC respectfully requests that the Court grant this motion for

summary judgment of non-infringement.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Andrew A. Lundgren*

Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6600

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated: September 16, 2009

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 16, 2009, I caused true and correct copies of the foregoing sealed document to be served upon the following counsel of record in the manner indicated:

### *By E-Mail*

Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
John G. Day, Esquire [jday@ashby-geddes.com]
Lauren E. Maguire [lmaguire@ashby-geddes.com]
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

David T. Pritikin, Esquire [dpritikin@sidley.com]
William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
Russell E. Cass, Esquire [rcass@sidley.com]
Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
*Attorneys for Plaintiffs, Boston Scientific Corporation and Boston Scientific Scimed, Inc.*

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 25, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
> John G. Day, Esquire [jday@ashby-geddes.com]
> Lauren E. Maguire, Esquire [lmaguire@ashby-geddes.com]
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on September 25, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

### *By E-Mail*

> David T. Pritikin, Esquire [dpritikin@sidley.com]
> William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
> Russell E. Cass, Esquire [rcass@sidley.com]
> Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
> SIDLEY AUSTIN LLP
> One South Dearborn
> Chicago, IL 60603

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> */s/ Andrew A. Lundgren*

> Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
> Karen L. Pascale (No. 2903) [kpascale@ycst.com]
> Karen E. Keller (No. 4489) [kkeller@ycst.com]
> Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801
> (302) 571-6600
> *Attorneys for Plaintiffs Boston Scientific Corporation
> and Boston Scientific Scimed, Inc.*