# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No. 07-333-SLR<br>Civil Action No. 07-348-SLR<br>Civil Action No. 07-409-SLR |
| JOHNSON & JOHNSON, INC. and CORDIS CORPORATION, ) ) ) | |
| Defendants. ) ) | REDACTED |

---

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF
THE '7286, '3286, AND '473 PATENTS-IN-SUIT PURSUANT TO 35 U.S.C. §103**

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004
(212) 425-7200

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4489) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600

*Attorneys for Plaintiffs
Boston Scientific Corporation and
Boston Scientific Scimed, Inc.*

Dated: September 16, 2009

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDING........................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................... 3

STATEMENT OF FACTS ............................................................................................... 6

I.      The '7286, '3286, and '473 Patents-In-Suit.......................................................... 6

        A.      The Specification of the '7286 Patent.......................................................... 6

        B.      The Asserted Claims of the '7286, '3286, and '473 Patents ................................. 9

II.     The Parties' Proposed Claim Constructions ........................................................ 9

III.    The Prior Art Discloses Polymeric Coated-DES and the Use of Rapamycin for Restenosis
        ............................................................................................................................. 9

        A.      U.S. Patent No. 5,464,650 to Berg et al. .................................................... 10

        B.      U.S. Patent No. 5,516,781 to Morris et al. ................................................. 13

        C.      U.S. Patent No. 5,508,286 to Skotnicki et al. ............................................. 14

IV.     Reexamination of the '7286, '3286, and '473 Patents............................................ 16

LAW AND ARGUMENT ............................................................................................. 17

I.      The Legal Standards With Respect to Summary Judgment of Invalidity...................... 17

        A.      Invalidity of Patent Claims Can Be Appropriately Decided Via Summary
                Judgment ...................................................................................................... 17

        B.      Obviousness Pursuant to 35 U.S.C. § 103 ................................................. 18

II.     All of the Asserted Claims of the '7286, '3286, and '473 Patents Are Invalid for
        Obviousness Pursuant to 35 U.S.C. § 103 .......................................................... 21

        A.      Claims 1, 3, and 5 of the '7286 Patent, Claims 1, 2, 5, 6, 9, 10, 21, 25, 28, 30, 32,
                40, 41, 44, 47, 48, 51, 52, 63, 67, 70, and 74 of the '3286 Patent, and Claims 1, 3,
                4, and 5 of the '473 Patent Are Invalid As Obvious Over the Berg Patent in View
                of the Morris Patent ...................................................................................... 24

        B.      Claims 2 and 4 of the '7286 Patent, Claims 27, 29, 31, 33, 34, 35, 36, 37, 38, 39,
                69, 71, 72, 73, 75, 76, and 77 of the '3286 Patent, and Claim 2 of the '473 Patent

DB01:2738134.1                                                                                              054604.1003

Are Invalid as Obvious Over the Berg Patent in Combination with the Morris Patent, Further in View of the Skotnicki '286 Patent ........................................... 29

III.   The Record Is Replete With Other Evidence Confirming that the Subject Matter Claimed by the '7286, '3286, and '473 Patents Would Have Been Obvious To One of Skill in the Art ................................................................................................................................. 31

    A.   Both the Prior Art and Cordis Itself Confirms a Clear Preference for the Local Delivery of Therapeutic Agents to Treat Restenosis ........................................... 31

    B.   Documents Produced by Cordis and Cordis Deposition Testimony Confirm that the Subject Matter Claimed by the '7286, '3286, and '473 Patents Is Nothing More than an Obvious Combination of Old Elements Disclosed in the Prior Art 34

    C.   Cordis Repeatedly Admitted that Drug-Eluting Stents Were Commonplace ....... 35

IV.   Evidence of Supposed "Secondary Considerations of Non-Obviousness" Cannot Overcome the Strong Prima Facie Obviousness Case ..................................................... 39

CONCLUSION ................................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Andrx Pharms.,*
    452 F.3d 1331 (Fed. Cir. 2006)................................................................ 23, 25

*Agrizap, Inc. v. Woodstream Corp.,*
    520 F.3d 1337 (Fed. Cir. 2008)................................................................ 21, 39

*Alza Corp. v. Andrx Pharms., LLC,*
    607 F. Supp. 2d 614 (D. Del. 2009)............................................................. 28

*Alza Corp. v. Mylan Labs., Inc.,*
    464 F.3d 1286 (Fed. Cir. 2006)................................................................ 23, 25

*Asyst Techs., Inc. v. Emtrak, Inc.,*
    544 F.3d 1310 (Fed. Cir. 2008)..................................................................... 39

*Altana Pharma AG v. Teva Pharms. USA, Inc.*
    566 F.3d 999 (Fed. Cir. 2009)...................................................................... 19

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.,*
    555 F.3d 984 (Fed. Cir. 2009)...................................................................... 21

*Big Apple BMW v. BMW of N. Am.,*
    974 F.2d 1358 (3d Cir.1992)......................................................................... 17

*Bristol-Meyers Squibb Co. v. Ben Venue Lab., Inc.,*
    246 F.3d 1368 (Fed. Cir. 2001)..................................................................... 18

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,*
    229 F.3d 1120 (Fed. Cir. 2000)..................................................................... 20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...................................................................................... 17

*Chore-Time Equip., Inc. v. Cumberland Corp.,*
    713 F.2d 774 (Fed. Cir. 1983)....................................................................... 18

*Constant v. Advanced Micro Devices, Inc.,*
    848 F.2d 1560 (Fed. Cir. 1988)..................................................................... 26

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
    567 F.3d 1314 (Fed. Cir. 2009)..................................................................... 27

*Dystar Textilfarben GMBH & Co. v. C.H. Patrick Co.,*
    464 F.3d 1356 (Fed. Cir. 2006)..................................................................... 28

DB01:2738134.1                                                      054604.1003

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ........................................................................................... 19

*Grayzel v. St. Jude Med., Inc.*,
    345 F.Supp. 2d 466 (D.N.J. 2004) ................................................................ 18

*In re Fulton*,
    391 F.3d 1195 (Fed. Cir. 2004)..................................................................... 28

*In re Gorman*,
    933 F.2d 982 (Fed. Cir. 1991)....................................................................... 19

*In re Wright*,
    848 F.2d 1216 (Fed. Cir. 1988),
    *overruled on other grounds by In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990)................... 19

*Iron Grip Barbell Co. v. U.S. Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004)..................................................................... 18

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ................................................................................ passim

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007)..................................................................... 40

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997)..................................................................... 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................................................... 17

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008)............................................................... 26, 39

*Newell Cos. v. Kenney Mfg. Co.*,
    864 F.2d 757 (Fed. Cir. 1988)....................................................................... 39

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
    469 F.3d 978 (Fed. Cir. 2006)....................................................................... 18

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007 ...................................................................... 26

*Purdue Pharma Prods. L.P. v. Par Pharm, Inc.*,
    2009 U.S. Dist LEXIS 72703, Case No. 07-255 (D. Del. Aug. 14, 2009) ................. 18, 21

*Richardson-Vicks Inc. v. The Upjohn Co.*,
    122 F.3d 1476 (Fed. Cir. 1997)..................................................................... 39

DB01:2738134.1                                                                                           054604.1003

*Ruiz v. A.B. Chance Co.,*
    234 F.3d 654 (Fed. Cir. 2000)..................................................................................... 20

*Ryko Mfg. Co. v. Nu-Star, Inc.,*
    950 F.2d 714 (Fed. Cir. 1991)............................................................................... 18, 39

*Sakraida v. AG Pro, Inc.,*
    425 U.S. 273 (1976)................................................................................................... 20

*SRI Int'l v. Matsushita Elec. Corp. of America,*
    775 F.2d 1107 (Fed. Cir. 1985) (en banc)................................................................. 17

*Union Carbide Corp. v. Am. Can Co.,*
    724 F.2d 1567 (Fed. Cir. 1984).................................................................................. 18

**Statutes**

35 U.S.C. §102(b) ............................................................................................................ 10, 14

35 U.S.C. §103 .................................................................................................................... 1, 20

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................................ 3, 17

DB01:2738134.1                                                                                                    054604.1003

## INTRODUCTION

Plaintiffs Boston Scientific Corp. and Boston Scientific Scimed, Inc. (collectively, "BSC") respectfully submit this brief in support of their motion for summary judgment that all the claims of U.S. Patent No. 7,217,286 ("the '7286 patent," attached as Ex. 1)[1], U.S. Patent No. 7,223,286 ("the '3286 patent," attached as Ex. 2), and U.S. Patent No. 7,229,473 ("the '473 patent," attached as Ex. 3) asserted by defendants Cordis Corp. and Johnson & Johnson, Inc. (collectively, "Cordis") are invalid under 35 U.S.C. §103 as obvious.

The claims of the '7286, '3286, and '473 patents are all similarly directed to a simple polymer-coated rapamycin or rapamycin analog eluting stent intended to treat coronary restenosis. This claimed subject matter amounts to nothing more than an obvious combination of what the '7286, '3286, and '473 patents all describe as "conventional" polymer coated drug-eluting stent technology – disclosed by numerous prior art references, including for example U.S. Patent No. 5,464,650 to Berg et al. ("the Berg patent") (attached as Ex. 12) – and the drug rapamycin – which is admittedly described by prior art such as U.S. Patent No. 5,516,781 to Morris et al. ("the Morris patent") (attached as Ex. 13), as being effective at treating restenosis. Confirming this view, and in connection with the reexamination of the '7286, '3286, and '473 patents, the U.S. Patent and Trademark Office ("PTO") has rejected all of the presently asserted claims as obvious in view of these very same prior art references.

While the prior art itself establishes the obviousness of the claimed subject matter with unmistakable clarity, discovery obtained from Cordis relating to the development of the Cypher stent – which Cordis claims is an embodiment of the '7286, '3286, and '473 patents' claims –

---

[1]   Exhibits 1 through 116 refer to exhibits attached to the *Appendix in Support of BSC's Motions for Summary Judgment of Non-Infringement and Invalidity Pursuant to 35 U.S.C. § 103*, which were filed concurrently with this brief.

further confirms that the claims of the '7286, '3286, and '473 patents amount to nothing more than a quintessentially obvious "simpl[e] arrange[ment of] old elements with each performing the same function it had been known to perform" that "yields no more than one would expect from such an arrangement." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓ Moreover, the record has made clear that one of skill in the art would have had more than a reasonable expectation that a rapamycin-eluting stent like that claimed by the '7286, '3286, and '473 patents would be able to inhibit neointimal proliferation. ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## NATURE AND STAGE OF THE PROCEEDING

The present cases were initiated via a series of declaratory judgment actions through which BSC seeks a declaration that its PROMUS™ Everolimus-Eluting Stent ("the PROMUS stent") does not infringe any valid claim of the '7286 patent, '3286 patent, '473 patent, and U.S. Patent No. 7,300,662 ("the '662 patent"). BSC's PROMUS stent is an intravascular stent used to treat coronary artery disease. It advantageously releases a drug designed to diminish reblocking (restenosis) of the patient's blood vessel.

DB01:2738134.1

054604.1003

Defendant Cordis is the owner of the '7286, '3286 and '473 patents-in-suit. Cordis and defendant Wyeth co-own the '662 patent-in-suit. Defendants have asserted counterclaims alleging that BSC is infringing each of the four patents-in-suit.

While fact and expert discovery were respectively scheduled to close May 22, 2009 and August 21, 2009 (*see* D.I. 197)[2], depositions are still ongoing and the parties have yet to schedule dates for the deposition of several fact and expert witnesses.

Trial in these cases is set to begin on February 4, 2010, with a hearing on claim construction and summary judgment motions set for October 30, 2009.

## SUMMARY OF THE ARGUMENT

1.      BSC hereby submits this memorandum in support of its motion, pursuant to Fed. R. Civ. P. 56(c), for entry of summary judgment holding the asserted claims of the '7286, '3286, and '473 patents invalid as obvious.

2.      The claims of the '7286, '3286, '473 patents are directed to a stent coated with a biocompatible, polymeric material (which, depending on the claim at issue, can be a non-absorbable polymeric material, an acrylate-based polymer or copolymer, a fluorinated polymer, a mixture thereof, or other types of identified polymeric materials) and rapamycin or a macrocyclic lactone analog of rapamycin. This stent is intended to inhibit neointimal proliferation (restenosis).

3.      With the exception of the use of the specific drug rapamycin (or its analogs), the Berg patent discloses all of the limitations of the '7286, '3286, and '473 patents' claims. The Berg patent, however, states that the polymeric coated drug-eluting stent it discloses can be used with any therapeutic agent that can effectively treat restenosis. The Berg patent is directed to the

---

[2]    The D.I. numbers provided in this brief refer to documents filed in connection with Civil Action No. 07-333-SLR.

same purpose as the '7286, '3286, and '473 patents – the treatment of restenosis – and also teaches the use of anti-inflammatory, anti-proliferative, and anti-restenotic agents.

4.      The Morris patent discloses that rapamycin is an anti-inflammatory, anti-proliferative, and anti-restenotic agent (the exact same type of drug referenced by the Berg patent) and explains repeatedly that rapamycin can be used to treat restenosis.  Morris also notes that rapamycin can be delivered via a stent.

5.      U.S. Patent No. 5,508,286 ("the Skotnicki '286 patent") (attached as Ex. 14) discloses rapamycin analogs that can be used to treat restenosis.

6.      The Berg and Morris patent together indisputably disclose all the limitations of claims 1, 3, and 5 of the '7286 patent, claims 1, 2, 5, 6, 9, 10, 21, 25, 28, 30, 32, 40, 41, 44, 47, 48, 51, 52, 63, 67, 70, and 74 of the '3286 patent, and claims 1, 3, 4, and 5 of the '473 patent.

7.      The Berg, Morris, and Skotnicki patents together indisputably disclose all the limitations of claims 2 and 4 of the '7286 patent, claims 27, 29, 31, 33, 34, 35, 36, 37, 38, 39, 69, 71, 72, 73, 75, 76, and 77 of the '3286 patent, and claim 2 of the '473 patent.

8.      The record in this case makes it unmistakably clear that one of skill in the art would have been motivated to combine the teachings of the Berg, Morris, and Skotnicki '286 patents to arrive at the subject matter claimed in the '7286, '3286, and '473 patents.

9.      First, a motivation to combine can be found in the Berg and Morris references themselves, both of which address the exact same problem – the treatment of restenosis.

10.     Second, the record is replete with evidence that the teachings of Berg and Morris would have been combined in April of 1997 with more than a reasonable expectation of success. In fact, the '7286, '3286, and '473 patents themselves acknowledge this by characterizing the type of drug-eluting stent disclosed by Berg as the "conventional approach" and admitting that

-4-

the prior art "clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis."

11.     Third, neither the specifications of the '7286, '3286, and '473 patents nor their prosecution histories provide any indication that it would have been unexpected to one of skill in the art in April of 1997 that a polymer-coated rapamycin or rapamycin analog eluting stent would be able to inhibit neointimal proliferation.

12.     Fourth, there is no evidence that incorporating Morris's rapamycin into Berg's polymeric coated drug-eluting stent would have frustrated the purpose of the disclosed Berg drug-eluting stent or require any modification whatsoever of that drug-eluting stent.

13.     Fifth, Cordis has not pointed to any credible evidence showing that the prior art teaches away from the subject matter claimed by the '7286, '3286, and '473 patents.

14.     As explained by the U.S. Supreme Court in *KSR Int'l*, 550 U.S. at 417, a patent claim, like the claims of the '7286, '3286, and '473 patents, that "simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement" is invalid as obvious.

15.     Supporting the obviousness of the claimed subject matter, Cordis has repeatedly admitted, both in this case and in prior cases, that drug-eluting stents were common, well-known, and easily constructed and modified by those of skill in the art long before the filing of the '7286, '3286, and '473 patents.  Cordis has also admitted, as it must, that rapamycin was a known anti-restenotic agent before the filing of the '7286, '3286, and '473 patents.

16.     Further evincing obviousness, the PTO is currently reexamining the claims of the '7286, '3286, and '473 patents and has rejected the claims identified above as obvious over, among other things, the Berg and Morris patents.

-5-

17.     And, because it made narrowing amendments to independent claims 1 and 40 of the '3286 patent in response to obviousness rejections made during reexamination, Cordis has effectively conceded that these claims are invalid as obvious as originally issued.  This concession, coupled with the specifications' failure to attribute any particular importance to other limitations present in the '7286, '3286, and '473 patents' claims, further bolsters the obviousness of the patents-in-suit.

## STATEMENT OF FACTS

**I.     The '7286, '3286, and '473 Patents-In-Suit**

**A.     The Specification of the '7286 Patent**

The '7286, '3286, and '473 patents all share a common specification.[3]  These patents all claim priority back to a utility application filed 4/16/98 (U.S. App. No. 09/061,568) (attached as Ex. 17) and a provisional application filed 4/18/97 (U.S. Prov. App. No. 60/044,692) (attached as Ex. 18).[4]

The '7286, '3286, and '473 patents' specification begins by summarizing and characterizing prior art relating to the claimed subject matter.  First, the patents note that restenosis following percutaneous transluminal coronary angioplasty ("PTCA") is thought to be the result of the proliferation of vascular smooth muscle cells (*see, e.g.,* Ex. 1 at BSC-SJA-0015 (col. 1, ll. 34–53)), and that numerous agents, such as heparin, have been shown to inhibit this proliferation (*see id.* at BSC-SJA-0015 (col. 1, l. 57–col. 2, l. 6)).  The specification also

---

[3]   For purposes of consistency, this brief will cite to the '7286 patent's specification by column and line number (it should be understood, however, that the '3286 and '473 patents' specifications include identical language at slightly different column and line numbers).

[4]   Despite the filing of the earlier provisional application, Cordis has confirmed that some asserted claims are only entitled to the priority date of April 16, 1998.  This includes claims 3 and 4 of the '7286 patent, claims 28-31, 34-39, and 70-77 of the '3286 patent, and all of the claims (1 through 5) of the '473 patent.  (*See* Ex. 52 at BSC-SJA-1108 to 1110).

discusses various anti-proliferative agents disclosed in the prior art which proved effective in treating restenosis in animal models. These include, among other things, angiopeptin, taxol, and rapamycin. (*See id.* at BSC-SJA-0017 (col. 5, ll. 8–33)).

The specifications assert that rapamycin is "[o]f particular interest." (*Id.* at BSC-SJA-0017 (col. 5, l. 34)). The '7286, '3286, and '473 patents explain that the prior art describes rapamycin's ability to inhibit the proliferation of smooth muscle cells, the inflammatory response known to occur after stent implantation, and the smooth muscle cell hyperproliferative response. (*See id.* at BSC-SJA-0017 (col. 5, ll. 41–56)). According to the '7286, '3286, and '473 patents, these "observations clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis." (*Id.* at BSC-SJA-0017 (col. 5, ll. 56-58)). The '7286, '3286, and '473 patents also indicate that "it is desired to deliver a therapeutic agent to the site of arterial injury" to treat restenosis and "[t]he conventional approach has been to incorporate the therapeutic agent into a polymer material which is then coated on the stent." (*Id.* at BSC-SJA-0016 (col. 3, ll. 47-50)).

According to the specifications, the "novel features" of the disclosure are a "stent designed to include reservoirs" that could "be loaded with the drugs" optionally with a polymer membrane applied over the reservoir to control drug transfer from the reservoir to the artery. (*Id.* at BSC-SJA-0016 (col. 3, ll. 38, 42–45, 61–65); *see also id.* at BSC-SJA-0013 to 0014 (Fig. 1a, 2a, 3a, and 4), BSC-SJA-0018 (col. 7, ll. 26–37)). The specifications identify this stent with reservoirs or channels carved into its struts as "an alternative" to the previously described "conventional approach" of polymer-coated drug-eluting stents. (*See id.* at BSC-SJA-0016 (col. 3, ll. 61–62)).

The specifications note that the "agents" to be employed in connection with the claimed subject matter include: "Rapamycin (sirolimus) structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression." (*Id.* at BSC-SJA-0017 (col. 6 ll. 4–5)). The '7286, '3286, and '473 patents' specification does not disclose any examples of rapamycin analogs or describe how a person of skill in the art would go about making or identifying a rapamycin analog, nor does the specification identify the dosage of rapamycin or rapamycin analog one would use to inhibit neointimal proliferation.

The specifications also include four examples. Despite identifying this mode of drug delivery as the "conventional approach" adopted by the prior art, the '7286, '3286, and '473 patents' first example relates to delivery of rapamycin from a simple polymer matrix. (*See id.* at BSC-SJA-0017 (col. 6, ll. 32–54)). The specifications disclose various classes of biocompatible, biodegradable polymers suitable for this delivery method, including: "lactone-based polyesters or copolyesters, e.g., polylactide, polycaprolacton-glycolide, polyorthoesters, polyanhydrides; poly-amino acids; polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof." (*Id.* at BSC-SJA-0017 (col. 6, ll. 39–43)). Non-absorbable biocompatible polymer and copolymer classes for use in this polymeric matrix delivery method are separately disclosed: "Polydimethylsiolxane; poly(ethylene-vingylacetate) [*sic*]; acrylate based polymers or copolymers, e.g., poly(hydroxyethyl methymethacrylate, polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters." (*Id.* at BSC-SJA-0017 (col. 6, ll. 45–49)). The '7286, '3286, and '473 patents do not express a preference for biodegradable versus non-absorbable polymeric materials and do not identify or highlight any individual polymers or copolymers as particularly appropriate for use in connection with the claimed stent.

-8-

The common specification's other examples relate to drug delivery from microporous depots (*see id.* at BSC-SJA-0017 to 0018 (col. 6, l. 58-col. 7, l. 2)), delivery via lysis of a covalent drug tether (*see id.* at BSC-SJA-0018 (col. 7, ll. 5–9)), and finally pericardial delivery using either a polymeric sheet (*see id.* at BSC-SJA-0018 (col. 7, ll. 12–18)) or a conformal coating applied to the external side of a vessel (*see id.* at BSC-SJA-0018 (col. 7, ll. 20–25)).

**B.     The Asserted Claims of the '7286, '3286, and '473 Patents**

Cordis originally asserted claims 1, 2, 3, 4, and 5 of the '7286 patent, claims 1, 2, 5, 6, 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 44, 47, 48, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent[5], and claims 1, 2, 3, 4, and 5 of the '473 patent.  All of these claims are directed to polymer-drug coated stent technology.

**II.     The Parties' Proposed Claim Constructions**

The parties submitted proposed constructions of the terms of the '7286, '3286, and '473 patents' claims on August 21, 2009.  (*See* D.I. 247).  Further, concurrent with the filing of this summary judgment motion, BSC filed claim construction briefing detailing why its proposed constructions of the disputed terms of the '7286, '3286, and '473 patents are correct and dictated by the claims, specifications, and prosecution histories of the '7286, '3286, and '473 patents. The asserted claims of the '7286, '3286, and '473 patent are obvious applying either parties' proposed constructions.

**III.     The Prior Art Discloses Polymeric Coated-DES and the Use of Rapamycin for Restenosis**

The prior art is replete with references disclosing the various elements of the polymeric coated, rapamycin-eluting stent claimed by the '7286, '3286, and '473 patents.

---

[5]   Cordis has recently reduced the number of '3286 patent claims it is asserting.  This brief, however, will address the originally asserted set of '3286 patent claims.

First, numerous prior art patents, applications, and other publications discuss drug-eluting stents in general confirming the conventionality of polymeric-coated stents for delivering drugs. These references all address the same problem purportedly addressed by the '7286, '3286, and '473 patents – treating restenosis caused in part by smooth muscle cell proliferation and migration after PTCA. While this drug-eluting stent prior art does not specifically mention the use of rapamycin or rapamycin analogs as required by the claims of the '7286, '3286, and '473 patents, it does note that the disclosed drug-eluting stents can employ virtually any drug useful for treating restenosis. Moreover, these prior art references recommend the use of the same class of drugs to which rapamycin and its analogs belong (*i.e.* antiinflammatories, antiproliferatives, anti-restenosis drugs, etc.). The Berg patent is exemplary of this type of prior art and will be discussed in more detail below.

Other prior art references discuss rapamycin (and analogs of rapamycin) in detail. These prior art references make clear that rapamycin can be used to inhibit restenosis and/or smooth muscle cell proliferation (again, the very problem allegedly addressed by the patents-in-suit). Several of these references also note that rapamycin can be delivered via a stent. The Morris patent is exemplary.[6]

A.     U.S. Patent No. 5,464,650 to Berg et al.

The Berg patent issued on 11/7/95 and is thus prior art pursuant to 35 U.S.C. § 102(b).

---

[6]     While the present summary judgment motion focuses on the obviousness of the asserted claims of the '7286, '3286, and '473 patents over the Berg patent in view of the Morris patent and a few other prior art references, BSC notes that many other prior art combinations also render the asserted claims obvious. The present motion focuses on the Berg and Morris patents for purposes of simplification. BSC reserves its right to argue invalidity in view of other prior art and other prior art combinations at trial and does not intend to waive any of its invalidity defenses.

The Berg patent's disclosure relates to stents coated with a polymeric/drug mixture intended for the treatment of restenosis. (*See* Ex. 12 at BSC-SJA-0621 (Abstract); *see also id.* at BSC-SJA-0624 (col. 2, l. 30–col. 3, l. 10)). Like the '7286 patent, Berg discusses stent-based interventions for the treatment of restenosis following PCTA (balloon angioplasty). Also like the '7286, '3286, and '473 patents, the Berg patent notes that restenosis is caused in part by vascular smooth muscle cell proliferation. (*See id.* at BSC-SJA-0624 (col. 1, l. 5–col. 2, l. 26)).

Berg states that an object of the disclosed invention is to "provide a stent having a therapeutically significant amount of a drug applied thereto" and "which allows for a sustained release of the drug to vascular tissue." (*Id.* at BSC-SJA-0624 (col. 2, ll. 13–23)). Berg's coatings are intended to improve upon the prior art by maintaining a therapeutically significant amount of drug on the stent and controlling the rate at which the drug is delivered. (*Id.* at BSC-SJA-0624 (col. 2, ll. 7–12)).

Berg discusses the use of a metal stent platform (polymeric stents are also discussed). (*See id.* at BSC-SJA-0625 (col. 3, ll. 29–32)). In connection with the disclosed coatings, Berg provides that the coating polymer must be biocompatible and can be either biostable or bioabsorbable. (*See id.* at BSC-SJA-0624 (col. 4, ll. 35–42)). Much like the '7286, '3286, and '473 patents, the Berg patent discloses a list of suitable bioabsorbable polymers. (*See id.* at BSC-SJA-0624 (col. 4, ll. 43–53)). The Berg patent also provides a list of suitable biostable polymers. (*See id.* at BSC-SJA-0625 to 0625 (col. 4, l. 54–col. 5, l. 7)). Like the '7286, '3286, and '473 patents, the Berg patent's listing of exemplary non-absorbable polymers includes both acrylate-based polymers or copolymers (*i.e.* "ethylene-methyl methacrylate copolymers") and fluorinated polymers (*i.e.* "polyvinylidene fluoride"). (*See id.*)

-11-

Berg also discusses applying the polymer/drug coating to the stent. In particular, the patent provides that the desired drug and polymer can be combined with a solvent, thereby forming a solution which can be applied directly to the stent by spray-coating or by "immersing" the stent in a solution. (*See id.* at BSC-SJA-0624 to 0625 (col. 2, ll. 31–40; col. 4, ll. 21–24)).

As noted above, the Berg patent discloses controlled drug delivery. In particular, Berg provides that "[i]t is also an object of the present invention to … allow[] for sustained release of the drug to vascular tissue." (*Id.* at BSC-SJA-0624 (col. 2, ll. 21–23)). To achieve this goal, Berg notes that "a polymer in intimate contact with a drug on the stent . . . slows the administration of drug following implantation." (*Id.* at BSC-SJA-0624 (col. 2, ll. 36–40)). "[T]he rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or biostable polymer and by the ratio of drug to polymer in the solution." (*Id.* at BSC-SJA-0624 (col. 2, ll. 52–54)). "By this method, drugs such as . . . antiinflammatory agents can be applied to a stent, retained on a stent during expansion of the stent and elute the drug at a controlled rate. The release rate can be further controlled by varying the ration of drug to polymer." (*Id.* at BSC-SJA-0624 (col. 2, ll. 55–63)).

Going beyond these general statements, the Berg patent specifically discloses the controlled release of drug (dexamethasone) from a polymer coating (poly(L-lactic acid)) over a period of at least 10 days as shown in Figure 1 of the Berg patent (associated with Example 6 at col. 6, ll. 35–48). (*See id.* at BSC-SJA-0622 (Fig. 1); BSC-SJA-0625 (col. 3, ll. 14–17)).

The Berg patent discloses numerous possible therapeutic substances suitable for incorporation into a polymeric stent coating. (*See id.* at BSC-SJA-0626 (col. 5, ll. 19–39)). While rapamycin is not identified, the Berg patent expressly states that "virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel"

-12-

can be utilized in connection with the disclosed polymeric coating delivery system. (*Id.* at BSC-SJA-0626 (col. 5, ll. 20–22)). Berg also notes that "anti-inflammatory agents could be used." (*Id.* at BSC-SJA-0626 (col. 5, ll. 28)).[7]

B.   **U.S. Patent No. 5,516,781 to Morris et al.**

The Morris patent issued on 5/14/96 and is also prior art pursuant to 35 U.S.C. §102(a). The Morris patent discloses a method of treating restenosis with an anti-proliferative effective amount of rapamycin from a drug-impregnated stent. (*See* Ex. 13 at BSC-SJA-0628 (Abstract); BSC-SJA-0630 (col. 3, l. 45–col. 4, l. 22).

Like the '7286, '3286, and '473 patents, Morris notes that "rapamycin is useful in treating intimal smooth muscle cell hyperplasia, restenosis, and vascular occlusion in a mammal, particularly following either biologically or mechanically mediated vascular injury, or under conditions that would predispose a mammal to suffering such a vascular injury." (*Id.* at BSC-SJA-0630 (col. 3, ll. 51–56)). Specifically, the Morris patent provides that rapamycin is useful "for the prevention of restenosis." (*Id.* at BSC-SJA-0630 (col. 4, ll. 3–4)). The Morris patent discloses that rapamycin can be administered, for example, via a "vascular stent impregnated with rapamycin." (*Id.* at BSC-SJA-0634 (col. 11, ll. 41-45; Claim 1)).[8]

---

[7]   Again, the Berg patent is not the only patent disclosing polymeric coated stents that are designed to locally deliver a therapeutic agent to treat restenosis. For example, U.S. Patent No. 6,120,536 to Ding et al. ("the Ding '536 patent") (attached as Ex. 53) discloses a metallic stent having a coating/drug mixture for the treatment of restenosis. *See* Ding '536 patent, Abstract; *see also id.* at BSC-SJA-1123 to 1124 (col. 3, l. 50–col. 6, l. 55). Other examples include U.S. Patent No. 5,624,411 to Tuch ("the Tuch patent") (attached as Ex. 54), U.S. Patent No. 5,837,313 to Ding (attached as Ex. 55), U.S. Patent No. 5,545,208 to Wolff ("the Wolff patent") (attached as Ex. 56), and U.S. Patent No. 5,578,075 to Dayton (attached as Ex. 57).

[8]   Cordis has confirmed repeatedly that the Morris patent discloses the delivery of rapamycin via a stent. For instance, during the prosecution of another patent application it owns, Cordis represented to the PTO that "Morris discloses treating or preventing hyperproliferative vascular disease in a mammal by administering an anti-proliferative effective amount of rapamycin to the mammal in any number of ways, including a stent." (Ex. 58 at BSC-SJA-1189). ▮▮▮▮▮▮▮▮ (continued...)

Moreover, unlike the '7286, '3286, and '473 patents, the Morris patent provides test results showing the effectiveness of rapamycin for treating hyperproliferative vascular disease: "The effect of rapamycin on hyperproliferative vascular disease was established in an in vitro and an in vivo standard pharmacological test procedure that emulates the hyperproliferative effects observed in mammals that are undergoing intimal smooth muscle proliferation and are therefore developing restenosis." (*Id.* at BSC-SJA-0630 (col. 4, ll. 23–28)). "The results of the standard in vitro test procedure showed that rapamycin had a pronounced antiproliferative effect." (*Id.* at BSC-SJA-0631 (col. 5, ll. 55–56)).

The Morris patent discloses that the treatment should last for 13 or more days following PTCA. (*See id.* at BSC-SJA-0631 (col. 6, ll. 23–28, 39–64)). Specifically, "treatment with rapamycin (1.5 mg/kg for 14 days) resulted in an 80% decrease in the mean percentage intimal thickening compared with the untreated injured control group." (*Id.* at BSC-SJA-0631 (col. 6, ll. 57–60)).

### C.   U.S. Patent No. 5,508,286 to Skotnicki et al.

The Skotnicki '286 patent issued on 4/16/96 and is prior art pursuant to § 102(b).

The Skotnicki '286 patent discloses certain rapamycin derivatives that are useful for inhibiting hyperproliferative vascular disorders such as restenosis. (*See* Ex. 4 at BSC-SJA-0638 (col. 5, l. 57–col. 6, l. 2)). More particularly, "derivatives of rapamycin which are useful as immunosuppressive, antiinflamatory, antifungal, antiproliferative, and antitumor agents" are disclosed. (*Id.* at BSC-SJA-0636 (col. 1, ll. 64–66)). Furthermore, the Skotnicki '286 patent

DB01:2738134.1                                                                      054604.1003

teaches that the disclosed compounds are "useful in treating . . . hyperproliferative vascular diseases such as restenosis and atherosclerosis." (*Id.* at BSC-SJA-0638 (col. 5, ll. 60–63)).

The derivatives disclosed in the Skotnicki '286 patent include macrocyclic lactone analogs of rapamycin and are structurally similar to rapamycin. (*Id.* at BSC-SJA-0636 (col. 2, ll. 1–50)). The structural formula shown below presents the general structure of the types of rapamycin analogs disclosed by the Skotnikci '286 patent wherein the variations in structure are confined to the substituent groups R and $R^1$. The disclosed rapamycin derivatives are structurally identical to rapamycin except at positions R and $R^1$. R and $R^1$ are both hydrogen atoms for rapamycin:



(*Id.* at BSC-SJA-0636 (col. 2, ll. 1–19)).

The Skotnicki '286 patent also discloses that rapamycin had been shown by Morris to inhibit smooth muscle cell proliferation prior to its 1995 filing date. (*Id.* at BSC-SJA-0636 (col. 1, ll. 39–46) ("Rapamycin has also been shown to be useful in preventing or treating . . . smooth muscle cell proliferation and intimal thickening following vascular injury. [Morris, R. J. *Heart Lung Transplant* 11 (pt. 2); 197 (1992)].")).

One particular compound disclosed in the Skotnicki '286 patent is example 3, which demonstrates improved properties over rapamycin. (*See id.* at BSC-SJA-0637 (col. 4, ll. 39–42)).[9]

## IV.  Reexamination of the '7286, '3286, and '473 Patents

The '7286, '3286, and '473 patents, along with the '662 patent which are also being asserted against BSC, are currently being reexamined by the PTO. While these reexaminations are currently ongoing, to date all of the asserted claims of the '7286, '3286, and '473 patents have been rejected.

More particularly, in a December 22, 2008 office action, the PTO rejected all the claims of the '7286 patent as invalid as obvious under 35 U.S.C. § 103. (*See* Reex. App. No. 95/001,096, 12/22/08 Office Action) (attached as Ex. 5). Similarly, in a January 30, 2009 office action, the PTO rejected all the claims of the '3286 patent as invalid as obvious. (*See* Reex. App. No. 95/001,097, 1/30/09 Office Action) (attached as Ex. 6). And, in a January 5, 2009 office action, the PTO rejected all the claims of the '473 patent on similar grounds. (*See* Reex. App. No. 95/001,102, 1/5/09 Office Action) (attached as Ex. 7). In making these rejections, the PTO cited, among other things, the very references that are the focus of this summary judgment motion – the Berg and Morris patents. (*See* Ex. 5 at BSC-SJA-0086; Ex. 6 at BSC-SJA-0158; Ex. 7 at BSC-SJA-0463).

Also of note, in connection with the reexamination of the '3286 patent, in response to the PTO's rejections, Cordis proposed narrowing amendments to independent claims 1 and 40 of the

---

[9]   In addition to the Morris and Skotnicki '286 patents, numerous other prior art references disclose the rapamycin and rapamycin analogs to treat restenosis, including, for example, U.S. Patent No. 5,288,711 to Mitchell (attached as Ex. 61). Other examples include U.S. Patent No. 5,256,790 to Nelson (attached as Ex. 62), U.S. Patent No. 5,563,145 to Failli (attached as Ex. 63), and U.S. Patent No. 5,362,718 to Skotnicki (attached as Ex. 64).

'3286 patent which would limit those claims to only those stents that utilize a "nonabsorbable polymer" (the claims currently extend to rapamycin-eluting stents utilizing any "biocompatible" polymer).  (*See* Ex. 65 at BSC-SJA-1262 to 1264).

## LAW AND ARGUMENT

Again, Cordis originally asserted claims 1-5 of the '7286 patent, claims 1, 2, 5, 6, 9, 10, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 44, 47, 48, 51, 52, 63, 67, 69, 70, 71, 72, 73, 74, 75, 76, and 77 of the '3286 patent, and claims 1-5 of the '473 patent against BSC's PROMUS stent.  By this motion, BSC seeks summary judgment that all of these asserted claims are invalid as obvious under 35 U.S.C. § 103.

**I.    The Legal Standards With Respect to Summary Judgment of Invalidity**

**A.    Invalidity of Patent Claims Can Be Appropriately Decided Via Summary Judgment**

Summary judgment should be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  In order to rebut a motion for summary judgment, a nonmoving party must offer admissible evidence that establishes a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *See, e.g., id.* at 586.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *See, e.g., Big Apple BMW v. BMW of N. Am.,* 974 F.2d 1358, 1363 (3d Cir.1992).

"[S]ummary judgment ... is entirely appropriate ... in a patent as in any other case." *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en banc). And, while a patent challenger like BSC bears the burden of proving invalidity by clear and

convincing evidence (*see Bristol-Meyers Squibb Co. v. Ben Venue Lab., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001)), this does not necessarily preclude the entry of summary judgment.  In fact, the Federal Circuit has explained that district courts "should not hesitate to avoid an unnecessary trial by proceeding under Fed. R. Civ. P. 56" where there is no genuine issue of material fact regarding the invalidity of the patent claims at issue.  *Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 778-79 (Fed. Cir. 1983).

Many district courts – including this Court – have granted summary judgment of invalidity based on obviousness.  *See, e.g., Purdue Pharma Prods. L.P. v. Par Pharm, Inc.*, 009 U.S. Dist LEXIS 72703, Case No. 07-255 (D. Del. Aug. 14, 2009) (attached as Ex. 66); *Grayzel v. St. Jude Med., Inc.*, 345 F.Supp. 2d 466 (D.N.J. 2004).  These judgments are routinely affirmed by the Federal Circuit.  *See, e.g., Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978 (Fed. Cir. 2006); *Iron Grip Barbell Co. v. U.S. Sports, Inc.*, 392 F.3d 1317 (Fed. Cir. 2004); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714 (Fed. Cir. 1991); *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567 (Fed. Cir. 1984).  In the context of an obviousness analysis, "the prior art's content, the patent claim's scope, and the level of ordinary skill in the art are not in material dispute and the claim's obviousness is apparent, summary judgment is appropriate." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

B.     **Obviousness Pursuant to 35 U.S.C. § 103**

A finding of obviousness is proper where "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).  The ultimate determination of obviousness is a question of law, based on underlying factual determinations.  *See KSR Int'l*, 550 U.S. at 427; *Altana Pharma AG v. Teva Pharms. USA, Inc.* 566 F.3d 999, 1007 (Fed. Cir. 2009).

-18-

These factual determinations include: (1) the scope and content of the prior art; (2) the

differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art;

and (4) secondary factors, known as objective indicia of non-obviousness. *See id.*; *see also*

*Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

The determination of obviousness must take place through the eyes of a person of

ordinary skill in the art, *i.e.*, a hypothetical person who is presumed to be aware of all prior art in

the field of invention and any analogous fields. *See In re Gorman,* 933 F.2d 982, 986 (Fed. Cir.

1991). This person of ordinary skill in the art is an individual who, at the time of invention,

would have been "attempting to solve the problem upon which the inventor was working."[10] *In*

*re Wright,* 848 F.2d 1216, 1219 (Fed. Cir. 1988), *overruled on other grounds by In re Dillon,*

919 F.2d 688, 693 (Fed. Cir. 1990).

A claim may be proven obvious in view of a single prior art reference, or in view of a

combination of prior art references. While "it can be important to identify a reason that would

have prompted a person of ordinary skill in the relevant field to combine the elements [disclosed

by the prior art] in the way the claimed new invention does," "[r]igid preventative rules that deny

factfinders recourse to common sense are neither necessary under, nor consistent with, [Supreme

Court] case law." *KSR Int'l,* 550 U.S. at 418, 421. In fact, an obviousness analysis "need not

seek out precise teachings directed to the specific subject matter of the challenged claim," but

should instead "take account of the inferences and creative steps that a person of ordinary skill in

---

[10]   The claimed subject matter of the patents-in-suit draws from several disciplines, and, as such, a collaborative effort would likely involve persons experienced in these varied disciplines so that the knowledge and skills of each collaborator would be available to the other. The persons of ordinary skill in the art relevant to the subject matter of the asserted claims in the patents-in-suit in the 1997 to 2001 period would be a Ph.D. chemist, chemical engineer, polymer chemist, pharmacologist or M.D. physician. These persons would have knowledge of, or would have collaborated with a person having experience with (i) polymer-based drug delivery systems; (ii) cardiovascular drug-eluting stents; and/or (iii) the synthesis of therapeutic agents.

the art would employ." *Id.* at 418. This is because the person of ordinary skill in the art can be creative and is "able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421.

A motivation to combine various prior art references or modify a particular reference "may flow from the prior art references themselves, the knowledge of one of ordinary skill in the art, or, in some cases, from the nature of the problem to be solved." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,* 229 F.3d 1120, 1125 (Fed. Cir. 2000); *see also Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 665 (Fed. Cir. 2000). A "design need or market pressure" can also supply the individual of ordinary skill in the art with motivation to combine or modify prior art. *KSR Int'l,* 550 U.S. at 421. Further, one of ordinary skill is not bound to use prior art elements for the reasons taught in the prior art. *See id.*

When "'a patent simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. AG Pro, Inc.,* 425 U.S. 273, 282 (1976) (internal quotations omitted)). A claimed invention may also be obvious under §103 if it would have been obvious for one of ordinary skill in the art to try:

> [When] there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reasons to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance, the fact that a combination was obvious to try might show that it was obvious under section §103.

*Id.* at 423-24. Simply put, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416.

II.    **All of the Asserted Claims of the '7286, '3286, and '473 Patents Are Invalid for**
**Obviousness Pursuant to 35 U.S.C. § 103**

The claims of the '7286, '3286, and '473 patents are generally directed to a polymer-

coated rapamycin eluting stent intended to treat coronary restenosis.  This amounts to nothing

more than a simple combination of "conventional" drug eluting stent technology, long known to

have utility in treating restenosis (and disclosed, for example, by the Berg patent), with the drug

rapamycin, which is identified to be effective at treating restenosis and capable of being

delivered via a stent by numerous prior art references (including, but certainly not limited to, the

Morris patent).

The Berg patent indisputably discloses all of the elements of the claimed subject matter

with the exception of the use of the specific drug rapamycin.  Berg, however, notes that its stent

can be used to deliver essentially any anti-restenotic or anti-inflammatory agent.  The Morris

patent discloses the drug rapamycin, explains that this drug is an anti-restenotic and anti-

inflammatory, and states that it can be delivered via stent.  The straightforward application of

Morris's rapamycin to Berg's polymeric coated drug-eluting stent is just the type of combination

that the Supreme Court highlighted as a quintessentially obvious "simpl[e] arrang[ment of] old

elements with each performing the same function it had been known to perform." *KSR Int'l*, 550

U.S. at 417; *see also Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984,

992-93 (Fed. Cir. 2009) (holding that claimed subject matter that was nothing more than a

"predictable variation" of the prior art to be obvious); *Agrizap, Inc. v. Woodstream Corp.*, 520

F.3d 1337, 1344 (Fed. Cir. 2008) (finding claims that were no more than "a combination of

familiar elements according to known methods that does no more than yield predictable results"

obvious); *Purdue Pharma Prods.*, 2009 U.S. Dist LEXIS 72703 at *105-126 (finding claims

directed to a controlled release pain medication obvious in light of prior art references which

respectively disclose (1) the claimed type of polymeric controlled release coatings and (2) the claimed opioid analgesic compound).

In addition to disclosing all the elements of the claimed subject matter, the Berg and Morris patents themselves provide one of skill in the art with an overt motivation to combine via their common purpose and related disclosures. Further, the record makes clear that by April 1997 (or April of 1998), one of skill in the art would have been able to combine the teachings of Berg and Morris with more than a reasonable expectation of success. In fact, the '7286, '3286, and '473 patents themselves highlight this by characterizing the type of drug-eluting stent disclosed by Berg as the "conventional approach" (Ex. 1 at BSC-SJA-0016 (col. 3, ll. 48-50)) and admitting that the prior art "clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis" (id. at BSC-SJA-0017 (col. 5, ll. 56-58)). Moreover, neither the common specification of the '7286, '3286, and '473 patents nor the prosecution histories of these patents provide any indication that it would have been unexpected to one of skill in the art that a polymer-coated rapamycin or rapamycin analog eluting stent can inhibit neointimal proliferation. Instead, the '7286, '3286, and '473 patents and Cordis's own admissions make clear that this result was nothing other than expected. And, any claim by Cordis that the prior art left any uncertainty as to rapamycin's efficacy for treating neointimal proliferation rings hollow since the common specifications contain no testing results that assuage any such concerns. Furthermore, not only has Cordis failed to credibly establish that the prior art teaches away from the subject matter claimed by the '7286, '3286, and '473 patents, there is also no evidence that incorporating Morris's rapamycin into Berg's polymeric coated drug-eluting stent would have frustrated the purpose of Berg's drug-eluting stent or otherwise required modification of that stent.

-22-

The Federal Circuit has invalidated patent claims as obvious in circumstances remarkably similar to the present. For example, in *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286 (Fed. Cir. 2006), the claims at issue related to a sustained release oxybutynin formulation that utilized a particular dosage form. *See id.* at 1288. In finding these claims invalid as obvious, the Federal Circuit highlighted three prior art references: the Morrela, Baichwal, and Wong patents. *Id.* at 1292. The Morrela and Baichwal prior art patents disclosed sustained release oxybutynin formulations (these references are analogous to the Morris patent, which discloses rapamycin and notes that it can be delivered via a stent). *Id.* The Morrela and Baichwal references did not, however, disclose the particular dosage form required by the claims of the patent-in-suit. *Id.* at 1293. Another prior art reference, the Wong reference, disclosed the claimed dosage form (the Wong reference is analogous to Berg, which discloses a drug-eluting stent with all the elements required by the '7286, '3286, and '473 patents with the exception of the specific drug rapamycin). While the Wong patent did not specifically mention oxybutynin, it did "teach using several categories of drugs which oxybutynin is a member, such as anti-cholinergics, analgesics, muscle relaxants and urinary tract drugs" (similarly, Berg discloses the use of certain classes of therapeutics of which rapamycin in a member) *Id.* at 1293. The Federal Circuit noted that while the prior art did not "guarantee[]" that the claimed combination would be efficacious, "the evidence, viewed as a whole, is clear and convincing that a person of ordinary skill in the art would nonetheless have perceived a reasonable likelihood of success and that she would have been motivated to combine prior art references to make the claimed invention." *Id.* at 1295; *see also Abbott Labs. v. Andrx Pharms.*, 452 F.3d 1331, 1337, 1340-1342 (Fed. Cir. 2006) (finding that an accused infringer had established a substantial question that claims directed to extended release pharmaceutical compositions employing a specific class of drug and a specific type of

polymer designed to achieve a particular pharmacokinetic result were invalid as obvious in light of (1) a prior art reference disclosing a drug within the claimed class and noting that the claimed pharmacokinetic results could be achieved by administering this type of drug and (2) another prior art reference disclosing the administration of drugs related to the claimed class via the claimed types of polymers).  Similarly, armed with the disclosures of Berg and Morris, one of skill in the art in April of 1997 (or April of 1998) would have been motivated to combine those disclosures to arrive at the rapamycin-eluting stent claimed by the '7286, '3286, and '473 patents with a reasonable expectation of success.

   A.   **Claims 1, 3, and 5 of the '7286 Patent, Claims 1, 2, 5, 6, 9, 10, 21, 25, 28, 30, 32, 40, 41, 44, 47, 48, 51, 52, 63, 67, 70, and 74 of the '3286 Patent, and Claims 1, 3, 4, and 5 of the '473 Patent Are Invalid As Obvious Over the Berg Patent in View of the Morris Patent**

   Claims 1, 3, and 5 of the '7286 patent, claims 1, 2, 5, 6, 9, 10, 21, 25, 28, 30, 32, 40, 41, 44, 47, 48, 51, 52, 63, 67, 70, and 74 of the '3286 patent, and claims 1, 3, 4, and 5 of the '473 patent are obvious in view of the Berg patent in combination with the Morris patent.  With the exception of the claim limitations specifically requiring that the "therapeutic agent" or "drug" utilized by the stent be "rapamycin" or "a macrocyclic lactone analog thereof", the Berg patent discloses all of the elements of these claims of the '7286, '3286, and '473 patents.

   As noted above, the Berg patent, like the '7286, '3286 and '473 patents, is directed to a polymer coated, drug-eluting stent used to inhibit restenosis. (*See supra* Section III.A). Moreover, the Berg patent generally teaches that the drug, or therapeutic agent, utilized by the stent can be an anti-restenotic agent, and in particular the Berg patent teaches the use of anti-inflammatory agents for this purpose. (*See id.*).  The Morris patent discloses that rapamycin is an anti-proliferative, anti-inflammatory, and anti-restenotic drug and can be used to prevent vascular smooth muscle cell proliferation and restenosis following vascular injury. (*See supra*

-24-

Section III.C).  Charts identifying where the various elements of these '7286, '3286, and '473 patent claims can be found in the prior art are respectively attached as Exs. 9, 10, and 11.

There can be no dispute that the Berg and Morris patents collectively disclose all of the limitations of claims 1, 3, and 5 of the '7286, claims 1, 2, 5, 6, 9, 10, 21, 25, 28, 30, 32, 40, 41, 44, 47, 48, 51, 52, 63, 67, 70, and 74 of the '3286 patent, and claims 1, 3, 4, and 5 of the '473 patent.[11]

Moreover, a person of ordinary skill in the art at the time of the filing of the '7286, '3286, and '473 patents (April 1997 or April 1998) would have been motivated to employ rapamycin (disclosed in the Morris patent) in connection with the polymeric coated drug-eluting stent disclosed by the Berg patent to arrive, with a reasonable expectation of success, at a medical device as claimed.[12]  *See, e.g., Alza*, 464 F.3d at 1288, 1292-93; *Abbott Labs.*, 452 F.3d at 1337, 1340-1342.

Motivation to make this combination can be found in the prior art references themselves. The Morris patent expressly teaches that rapamycin is an anti-restenotic therapeutic agent that can be delivered from a stent to treat restenosis.  The Berg patent discloses polymeric coated intravascular stents containing therapeutic agents designed to address restenosis.  Berg also notes that the therapeutic agent can be "any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel."  (Ex. 12 at BSC-SJA-0626 (col. 5, ll. 19–22)).  The common purpose of the inventions disclosed in these two patents, along with Berg's disclosure that "any therapeutic substance" is appropriate, would have provided one of

---

[11]   The PTO agrees that Berg and Morris collectively disclose all the limitations of these claims. (*See* Ex. 5 at BSC-SJA-0086 to 0089; Ex. 6 at BSC-SJA-0175 to 0178; Ex. 7 at BSC-SJA-0463 to 0466).
[12]   The PTO also agrees that one of skill in the art would have been motivated to combine Berg and Morris to arrive at the claimed invention.  (*See* Ex. 5 at BSC-SJA-0088 to 0089; Ex. 6 at BSC-SJA-0176; Ex. 7 at BSC-SJA-0465).

ordinary skill with motivation to combine.  The motivation to combine the teachings of the Morris and Berg patents is further supported by the disclosure in the Morris patent that rapamycin is appropriate for treating and preventing restenosis in a mammal (as particularly evidenced by *in vivo* animal model results), and that rapamycin "can be administered intravascularly or via a vascular stent impregnated with rapamycin." (Ex. 13 at BSC-SJA-0634 (col. 11, ll. 40–44, col. 12, ll. 29–42)).

Further, the common specification of the '7286, '3286, and '473 patents themselves highlight that one of skill in the art would have had more than a reasonable expectation of success when combining the teachings of Berg and Morris.  Specifically, the '7286, '3286, and '473 patents describe polymeric coated drug-eluting stent technology like that disclosed by Berg as "[t]he conventional approach." (Ex. 1 at BSC-SJA-0016 (col. 3, ll. 48-50)).  And, the '7286, '3286, and '473 patents state that the prior art relating to rapamycin "clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis" (*id.* at BSC-SJA-0017 (col. 5, ll. 56-58)).  These statements make clear that one of skill in the art in April of 1997 (or April of 1998), armed with the teachings of Morris and Berg, would have expected a polymeric coated rapamycin or rapamycin analog-eluting stent to be able to inhibit neointimal proliferation.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1326 (Fed. Cir. 2008) (holding asserted claims obvious based in part on specification admission that certain technology relating to the claimed subject matter was "conventional"); *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness."); *see also Constant v. Advanced Micro Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988).  Neither the common specification nor the '7286, '3286, and '473 patents' prosecution histories include any statements

indicating that this result would have been unexpected (instead, as described above, they state the opposite) and Cordis has failed to come forward with evidence to the contrary.

Rapamycin would also have been a particularly obvious drug to employ in combination with the "conventional" polymeric coated drug-eluting stents of the Berg patent because numerous prior art references describe the ability of rapamycin to inhibit vascular smooth muscle cell proliferation. (*See generally* Morris patent; *see, e.g.*, Ex. 67 at BSC-SJA-1315 ("rapamycin . . . blocks rat, porcine, and human [smooth muscle cell] migration" and "[o]ur results also demonstrate that administration of rapamycin in vivo inhibits the ability of [smooth muscle cells] to migrate"); Ex. 68 at BSC-SJA-1318 ("In animal models, rapamycin . . . appears to retard the development of accelerated arteriosclerosis after alograft transplantation and restenosis following mechanical injury."); Ex. 69 at BSC-SJA-1326 ("we have shown that [rapamycin] inhibits not only the vascular response to injury caused by allograph rejection, but also the response to balloon catheter injury.")). These disclosures would collectively give one of skill in the art an even greater expectation of success.

Neither the Berg patent nor the Morris patent teach away from the claimed combination. Cordis has suggested that the Berg patent teaches towards the selection of bioabsorbable polymers, and by implication away from the use of non-absorbable polymers, by virtue of the exclusive use of bioabsorbable polymeric material in its examples. The mere fact that the Berg patent expresses a preference for bioabsorbable polymers, however, does not mean that that it teaches away from non-absorbable polymers. *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away, however, if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." (quoting *In re*

*Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004); *Dystar Textilfarben GMBH & Co. v. C.H. Patrick Co.*, 464 F.3d 1356, 1364 (Fed. Cir. 2006) (similar); *Alza Corp. v. Andrx Pharms.*, LLC, 607 F. Supp. 2d 614, 637-38 (D. Del. 2009) (similar). Instead, the Berg patent expressly identifies non-absorbable polymers as suitable and even claims them! (*See* Ex. 12 at BSC-SJA-0625 (col. 4, ll. 35–42); BSC-SJA-0627 (claims 5, 6)).

It also would have been obvious to a person of ordinary skill in the art to select the recited and claimed acrylate-based polymers or copolymers, or fluorinated polymers as the polymeric carrier on a drug-eluting stent. Not only are these types of polymers explicitly disclosed by Berg, but it was also well known to a person of ordinary skill in the art in April of 1997 (and April of 1998) that acrylate-based or fluorinated polymeric materials were particularly useful as coatings blood-contacting implantable devices. (*See, e.g.*, Ex. 70 (patent disclosing the use of polymethyl methacrylate coatings on heart valves); Ex. 71 (patent disclosing the use of poly(2-hydroxyethyl methacrylate) for use on a medical device); Ex. 72 (patent discussing vascular prosthesis with a non-thrombogenic fluorinated coating); Ex. 73 (patent discussing improved endothelialization of vascular grafts when a fluoropolymer coating is applied); Ex. 74 (article disclosing the use of fluoropolymers for vascular grafts); Ex. 75 (article discussing the use of cardiac catheters coated with polytetrafluoroethylene); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As such, a person of ordinary skill in the art would have been motivated to choose acrylate-based polymers or fluoropolymers to coat a drug-eluting stent.

Further, the specifications of the '7286, '3286, and '473 patents do not themselves express any preference for acrylate-based or fluorinated polymeric materials, but instead just briefly mention these types of materials in a longer list of purportedly suitable polymers and

-28-

copolymers. (*See* Ex. 1 at BSC-SJA-0017 (col. 6, ll. 37-49)).  Thus, to the extent the '7286,

'3286, and '473 patents' common specification provides written description support for claims

directed to the use of acrylate-based or fluorinated polymeric materials, the Berg patent also

discloses the use of these types of materials in connection with a drug-eluting stent.  *See*

*Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) ("[T]he [asserted] patent

itself does not disclose the level of detail [the patentee] would have us require of the prior art.").

> **B.      Claims 2 and 4 of the '7286 Patent, Claims 27, 29, 31, 33, 34, 35, 36, 37, 38, 39, 69, 71, 72, 73, 75, 76, and 77 of the '3286 Patent, and Claim 2 of the '473 Patent Are Invalid as Obvious Over the Berg Patent in Combination with the Morris Patent, Further in View of the Skotnicki '286 Patent**

Claims 2 and 4 of the '7286 patent, claims 27, 29, 31, 33, 34, 35, 36, 37, 38, 39, 69, 71,

72, 73, 75, 76, and 77 of the '3286 patent, and claim 2 of the '473 patent are all dependant claims

which include an additional limitation requiring that the claimed stent's "therapeutic agent" or

"drug" be "a macrocyclic lactone analog of rapamycin."

As discussed above, with the exception of analogs of rapamycin, the Berg patent in

combination with the Morris patent discloses every other element of the other asserted claims of

the '7286, '3286, and '473 patents.  And, as shown by the claim charts attached as Exs. 9 (for the

'7286 patent), 10 (for the '3286 patent), and 11 (for the '473 patent), the Skotnicki '286 patent

complements the disclosure of the Morris patent, and discloses "macrocyclic lactone analog[s] of

rapamycin."  Thus, the combination of the Berg patent and the Morris patent, further in view of

the Skotnicki '286 patent, renders claims 2 and 4 of the '7286 patent, claims 27, 29, 31, 33, 34,

35, 36, 37, 38, 39, 69, 71, 72, 73, 75, 76, and 77 of the '3286 patent, and claim 2 of the '473

patent invalid as obvious.[13]

---

[13]    The PTO agrees that several patents naming Dr. Jerauld Skotnicki as an inventor (Dr. Skotnicki is a named inventor on the Skotnicki '286 patent) disclose the use of macrocyclic (continued...)

-29-

A person of ordinary skill in the art at the time of the filing of the '7286, '3286, and '473 patents would have been motivated to employ the rapamycin analogs disclosed in the Skotnicki '286 patent in the drug-eluting polymer coated stents of the Berg patent, based on the teaching of both the Morris and Skotnicki '286 patents. As discussed above, a person of ordinary skill in the art would have been motivated to combine the teachings of the Berg patent and the Morris patent. A person of ordinary skill in the art would have been further motivated to combine the teachings of the Berg and Morris patents with the teachings of the Skotnicki '286 patent, because the Skotnicki '286 patent teaches that the disclosed rapamycin derivatives are, like rapamycin, effective anti-proliferative and anti-inflammatory agents for inhibiting smooth muscle cell proliferation. Moreover, neither the Berg patent, Morris patent, nor the Skotnicki '286 patent teach away from the combination.

Cordis agrees with this position, as evidenced by arguments it has asserted in opposing a European patent assigned to Novartis, EP 0 893 996 B1 (attached as Ex. 77). This patent includes claims directed to the specific use of everolimus "for preventing or treating neointimal proliferation or thickening" (claim 1) and restenosis and/or vascular occlusion following vascular injury (claim 3). One of Cordis's European affiliates filed an opposition to these claims on June 18, 2003, asserting that a prior art Patent Cooperation Treaty application (PCT WO 84/09,010, which published on April 28, 1994) disclosed rapamycin derivatives, including everolimus, that exhibited "an improved pharmacological profile," and, furthermore, addressed problems associated with the restricted bioavailability and low solubility of rapamycin. (See Ex. 78 at BSC-SJA-1450). Cordis asserted that since everolimus had improved pharmacological

---

lactone analogs of rapamycin to treat restenosis as required by these claims of the '7286, '3286, and '473 patents. (See Ex. 5 at BSC-SJA-0090 to 0093; Ex. 6 at BSC-SJA-0188 to 0190; Ex. 7 at BSC-SJA-0468 to 0471).

properties to rapamycin, it was reasonably expected to be successful for the same purposes as

rapamycin, and cited the European counterpart to the Morris patent for teaching that rapamycin

was already known to treat restenosis.  (*Id.* at BSC-SJA-1452, 1455 to 1456).  Cordis therefore

asserted it would have been obvious to employ everolimus to treat restenosis.[14]  Consistent with

Cordis's opposition to Novartis's European patent, it would have been obvious to the ordinarily

skilled artisan, in April 1997 (or April 1998), to employ a rapamycin derivative or analog

disclosed in the Skotnicki '286 patent in connection with Berg's polymeric coated, drug-eluting

stent to treat restenosis

**III.    The Record Is Replete With Other Evidence Confirming that the Subject Matter
Claimed by the '7286, '3286, and '473 Patents Would Have Been Obvious To One of
Skill in the Art**

While the prior art discussed above unmistakably establishes the obviousness of the

subject matter claimed by the '7286, '3286, and '473 patents, a plethora of other evidence,

including various admissions made by Cordis before filing the present lawsuit, provide further

confirmation that claims 1, 2, 3, 4, and 5 of the '7286 patent, claims 1, 2, 5, 6, 9, 10, 21, 25, 27,

28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 44, 47, 48, 51, 52, 63, 67, 69, 70, 71, 72, 73,

74, 75, 76, and 77 of the '3286 patent, and claims 1, 2, 3, 4, and 5 of the '473 patent are invalid.

**A.    Both the Prior Art and Cordis Itself Confirms a Clear Preference for the
Local Delivery of Therapeutic Agents to Treat Restenosis**

The prior art demonstrates a clear preference for local delivery of a therapeutic agent

from a stent over other approaches for addressing treatment of restenosis (*i.e.* systemic drug

administration or catheter-based delivery of radiation).  This provides further evidence that one

of skill in the art in 1997 or 1998 would have been motivated to combine the teachings of Berg

---

[14]    Wyeth made a similar argument in its own opposition to Novartis' European Application No.
EP 97915441.  (*See* Ex. 79 at BSC-SJA-1466 to 1468).

and Morris with a reasonable expectation of success.  For example, Cordis's competitors in the

cardiac stent business in the mid 1990s were also developing polymer-coated, drug-eluting stents.

Specifically, Medtronic, Inc. ("Medtronic") was actively conducting research in the area of

polymer-coated, drug-eluting stents as is evident by the large number of drug eluting stent

patents assigned to Medtronic.  (*See, e.g.*, Berg patent, Tuch patent, Wolff patent). ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DB01:2738134.1   054604.1003



DB01:2738134.1

054604.1003



Thus, both the prior art and the statements of Cordis's own witnesses confirm that the effort to design a drug-eluting stent to address restenosis (including rapamycin eluting stents) was not contrary to any prevailing view in the cardiovascular medical device community, but rather consistent with the prior art.

**B.      Documents Produced by Cordis and Cordis Deposition Testimony Confirm that the Subject Matter Claimed by the '7286, '3286, and '473 Patents Is Nothing More than an Obvious Combination of Old Elements Disclosed in the Prior Art**

Discovery obtained from Cordis has further emphasized that the subject matter claimed by the '7286, '3286, and '473 patents is nothing more than an obvious combination of old prior art elements that would have been reasonably expected to succeed at inhibiting neointimal proliferation. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

-34-



### C.   Cordis Repeatedly Admitted that Drug-Eluting Stents Were Commonplace

Cordis also made numerous statements that confirm the obviousness of the '7286, '3286, and '473 patents in connection with another case that was previously pending before this Court –

---

[15]   *See* Ex. 94 at BSC-SJA-1549 to 1550.

*Boston Scientific Scimed, Inc. et al. v. Cordis Corp. et al.*, Case No. 03-283-SLR (D. Del.) ("the

Ding litigation").[16]

      For instance, in its post-trial briefing, Cordis argued that "[polymer coating] was well-

known and ... developing a polymer coating for a drug-eluting stent was not a challenge for

persons of skill in this art." (Ex. 98 at BSC-SJA-1568); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ And, Stephen Hanson, one of Cordis's expert witnesses in

connection with the Ding litigation, stated: "My review of the [polymer-drug stent patent] file

histories confirms that controlled, timed release drugs from polymers on stents was well known

before [1995]." (Ex. 101 at BSC-SJA-1580 to 1581); *see also* Ex. 102 at 1586 ("The technology

utilized by Ding – and by Cypher – is many years old. (What is novel about Cypher is not its

technology, but the use of the drug Sirolimus [i.e., the drug identified in the prior art Morris and

Mitchell patents] ....)").

      In addition to the statements it made before this Court, Cordis continued to affirm in its

Federal Circuit appeal briefing that polymer coatings for controlled drug delivery were well

known long before 1997. For example, Cordis stated: "The challenge in developing a drug-

eluting stent was not creating a barrier topcoat – that was well-known. Rather, the challenge was

identifying an appropriate drug. Cordis tested 800 different drugs before identifying sirolimus as

a safe and effective agent for delivery on a stent to reduce restenosis. Once Cordis identified the

---

[16]   The PTO agrees that Cordis's various statements regarding the prior art are relevant to and
further evince the obviousness of the claims of the '7286, '3286, and '473 patents. (*See* Ex. 5 at
BSC-SJA-0148 to 0152; Ex. 6 at BSC-SJA-0439 to 0447; Ex. 7 at BSC-SJA-0536 to 0541).

                                            

right drug, developing a polymer coating was a straightforward application of old technology."
(Ex. 103 at BSC-SJA-1591 (internal citations omitted)).[17]

Cordis's other statements in court provide further evidence of obviousness. For example,
Cordis stated to the Federal Circuit that "when Cordis came upon Cypher, it was easy for it to
create the drug eluting, the drug coated surface. That was child's play." (Ex. 104 at BSC-SJA-
1594 to 1595). ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████

One of Cordis's expert in the present case, Dr. Campbell Rogers, previously submitted
expert reports in connection with a patent action pending in the UK that include statements
which also confirm the obviousness of the '7286, '3286, and '473 patents. (*See, e.g.,* 8/05
Expert Report of Professor Campbell David Kinsey Rogers from UK *Conor v. Angiotech* Action
(attached as Ex. 106); 9/05 Second Expert Report of Professor Campbell David Kinsey Rogers
from UK *Conor v. Angiotech* Action (attached as Ex. 107)).

For instance, Dr. Rogers notes that "[b]y the start of the 1990s ... it was becoming clear
that systemic delivery was not succeeding and the focus was moving towards local delivery of

---

[17]   The Federal Circuit held that certain claims of the Ding '536 patent – the patent at issue in
the previous litigation discussed in this and the preceding paragraph – were invalid as obvious.
*See Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 988-992 (Fed. Cir. 2009). Like
the '7286 patent, the Ding '536 patent discloses a polymeric coated drug-eluting stent. *See id.* at
983.   It also claims priority to an application filed in 1995.   The fact that the earlier-filed Ding
'536 patent was determined to be obvious weighs heavily against the validity of the later filed
and similarly directed claims of the '7286, '3286, and '473 patents.

anti-proliferative drugs" (Ex. 106 at BSC-SJA-1617 (¶61)) and that "researchers in the field

generally were fairly confidant that anti-proliferative drugs would work to treat restenosis." (*Id.*

at BSC-SJA-1619 (¶67)).  And, according to Dr. Rogers, far from there being skepticism,

"[t]here was great enthusiasm about the potential of drug-eluting stents as indicated by

discussions at conferences." (Ex. 107 at BSC-SJA-1628 (¶16)).  "Local delivery of anti-

thrombotic and anti-proliferative drugs to prevent and treat restenosis was still by far and away

the mainstream area of research in this field at the time." (*Id.* at BSC-SJA-1628 to 1629 (¶17)).

Thus, in view of the foregoing, Cordis itself repeatedly confirmed (a) that polymeric

coated, drug-eluting stents were commonplace, perceived as promising means for treating

restenosis, and easy for those in skill in the art to accomplish, (b) that rapamycin was known by

those in skill in the art to be effective at treating restenosis, and (c) that it would have been

obvious to a person of ordinary skill in the art to combine, with a reasonable expectation of

success, the teachings of the Berg,  Morris, and Skotnicki '286 patents to arrive at the stent

claimed by the '7286, '3286, and '473 patents.

Finally, as discussed in Section IV above, during the reexamination of the '3286 patent

Cordis proposed narrowing amendments to independent claims 1 and 40 after those claims were

rejected by the PTO.  In particular, Cordis abandoned its pursuit of claims directed to a

rapamycin-eluting stent that utilized any "biocompatible" polymeric material and instead limited

claims 1 and 40 to stents employing only "nonabsorbable polymers." (*See* Ex. 65 at BSC-SJA-

1262 to 1264).  By making this amendment, Cordis effectively conceded that claims directed to a

simple rapamycin-eluting stent with a "biocompatible" polymeric coating are obvious in light of

the prior art.  The specifications of the '7286, '3286, and '473 patents, however, do not highlight

that "nonabsorbable" polymeric materials (or the "flourinated" or "acrylate based" polymeric

materials required by other claims) are particularly appropriate polymeric choices or somehow superior to polymeric materials disclosed in the prior art.  As a result, Cordis's tacit admission regarding the invalidity of original claims 1 and 40 strongly evinces the obviousness of the other asserted claims of the patents-in-suit.

**IV.   Evidence of Supposed "Secondary Considerations of Non-Obviousness" Cannot Overcome the Strong Prima Facie Obviousness Case**

While evidence of purported secondary factors should be part of any obviousness analysis, these factors cannot overcome a strong prima facie case of obviousness and do not necessarily make summary judgment any less appropriate.  *See, e.g., Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (holding that it was proper for the district court to find the asserted claim invalid as obvious in light of the "strength of the prima facie obviousness showing" and despite "substantial evidence of commercial success, praise, and long felt-need"); *see also Agrizap*, 520 F.3d at 1344 (finding that "objective evidence of nonobviousness simply cannot overcome … a strong prima facie case of obviousness"); *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1317 (Fed. Cir. 2008) (finding that secondary considerations evidence did not overcome strong prima facie obviousness case); *Muniauction,* 532 F.3d at 1328 (finding evidence of secondary considerations to be "simply inadequate to overcome a final conclusion that [the asserted claims] are obvious as a matter of law"); *Richardson-Vicks Inc. v. The Upjohn Co.*, 122 F.3d 1476, 1483-84 (Fed. Cir. 1997); *Ryko Mfg.*, 950 F.2d at 719-20; *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).

In this case, given the significant evidence of obviousness of the claims of the '7286, '3286, and '473 patents in light of the prior art outlined above, any purported "secondary considerations," including evidence of alleged commercial success and the like, cannot create a

material issue of fact and is simply inadequate to overcome a final conclusion that the asserted

claims of the '7286, '3286, and '473 patents would have been obvious.

## CONCLUSION

For the foregoing reasons, BSC respectfully requests that the Court grant this motion for

summary judgment of invalidity.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Andrew A. Lundgren*

Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6600

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

Dated: September 16, 2009

-40-

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 16, 2009, I caused true

and correct copies of the foregoing sealed document to be served upon the following counsel of

record in the manner indicated:

### *By E-Mail*

Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
John G. Day, Esquire [jday@ashby-geddes.com]
Lauren E. Maguire [lmaguire@ashby-geddes.com]
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

David T. Pritikin, Esquire [dpritikin@sidley.com]
William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
Russell E. Cass, Esquire [rcass@sidley.com]
Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
SIDLEY AUSTIN LLP
One  South Dearborn
Chicago, IL 60603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

*Attorneys for Plaintiffs, Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 25, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
> John G. Day, Esquire [jday@ashby-geddes.com]
> Lauren E. Maguire, Esquire [lmaguire@ashby-geddes.com]
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on September 25, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### By E-Mail
>
> David T. Pritikin, Esquire [dpritikin@sidley.com]
> William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
> Russell E. Cass, Esquire [rcass@sidley.com]
> Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
> SIDLEY AUSTIN LLP
> One  South Dearborn
> Chicago, IL 60603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
*Attorneys for Plaintiffs Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*