IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-333-SLR Civil Action No. 07-348-SLR |
| v. | ) ) | Civil Action No. 07-409-SLR |
| JOHNSON & JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-765-SLR |
| v. | ) ) | |
| JOHNSON & JOHNSON, INC., CORDIS CORPORATION, and WYETH | ) ) ) | **REDACTED** |
| Defendants. | ) ) | |

## PLAINTIFFS' OPENING MARKMAN BRIEF

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004
(212) 425-7200

Dated: September 16, 2009

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600

*Attorneys for Plaintiffs Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*

## TABLE OF CONTENTS

Page

STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS ........................ 1

SUMMARY OF THE ARGUMENT ........................................................................... 2

STATEMENT OF FACTS ......................................................................................... 2

    I.    The 1997 Patents ........................................................................................ 2

    II.    The '662 Patent .......................................................................................... 5

    III.    The Ongoing Reexamination of the Patents-in-Suit .............................. 6

ARGUMENT .............................................................................................................. 6

    I.    CLAIM TERMS FROM THE 1997 PATENTS ...................................... 6

        A.    Rapamycin and Its Analogs ........................................................... 6

            1.    "Rapamycin" ........................................................................ 6

            2.    "Macrocyclic Lactone Analog" ........................................... 8

        B.    "Biocompatible" ........................................................................... 12

        C.    "Polymer," "Copolymer," and Related Terms .......................... 14

            1.    In the Claims, "Polymer" Does Not Include "Copolymers" ......... 14

            2.    "Polymer" Should Be Construed Consistently Within All the Claims to Exclude "Copolymers" ................................... 17

        D.    "Mixtures" and "Blends" of Materials ....................................... 20

        E.    Polymeric "Carrier" ..................................................................... 22

        F.    "Stent" Having a "Coating" "Applied Thereto" And Related Terms ....... 22

            1.    "Stent" .................................................................................. 23

            2.    "Coating" ............................................................................. 23

            3.    "Applied Thereto," "Is Applied" to the Stent ................. 26

        G.    "An Amount Effective to Inhibit Neointimal Proliferation" ..... 27

i

H. "Provides a Controlled Release . . . Over a Period of Several Weeks." ... 29

II. CLAIM TERMS FROM THE '662 PATENT ....................................................... 30

 A. Rapamycin and Its Analogs ................................................................ 30

  1. "Rapamycin" ................................................................................ 30

  2. "Macrocyclic Triene Analog" of Rapamycin .............................. 31

 B. "Biocompatible," "Stent," and "Coating" ............................................ 33

 C. "Polymeric" ........................................................................................... 33

 D. "Affixed to the Intraluminal Stent" ...................................................... 33

 E. "In-Stent Late Loss" and Related Terms .............................................. 34

 F. "Human Population" .............................................................................. 36

 G. "About" ................................................................................................. 37

CONCLUSION ................................................................................................................. 39

DB01:2738059.1

054604.1003

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Labs. v. Novopharm Ltd.,*
  323 F.3d 1324 (Fed. Cir. 2003)..................................................................................... 13

*Amgen, Inc. v. Chugai Pharm. Co.,*
  927 F.2d 1200 (Fed. Cir. 1991)..................................................................................... 14

*Automed Techs., Inc. v. Microfil, LLC,*
  Fed. Appx. 354 (Fed. Cir. 2007)................................................................................... 34

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
  334 F.3d 1294 (Fed. Cir. 2003)............................................................................... 17, 33

*Cook Biotech Inc. v. Acell, Inc.,*
  460 F.3d 1365 (Fed. Cir. 2006)..................................................................................... 13

*Ecolab, Inc. v. Envirochem, Inc.,*
  264 F.3d 1358 (Fed. Cir. 2001)..................................................................................... 11

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC,*
  349 F.3d 1373 (Fed. Cir. 2003)..................................................................................... 13

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.,*
  205 F.3d 1377 (Fed. Cir. 2000)............................................................................... 11, 38

*Mangosoft, Inc. v. Oracle Corp.,*
  525 F.3d 1327 (Fed. Cir. 2008)......................................................................... 12, 16, 31

*Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys. Inc.,*
  No. 98-80-SLR, 2005 U.S. Dist. LEXIS 822 (D. Del. Jan. 5, 2005)............................... 24

*Ormco Corporation v. Align Technology,*
  463 F.3d 1299 (Fed. Cir. 2006)..................................................................................... 29

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005)............................................................................... passim

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998)..................................................................................... 15

*Southwall Techs., Inc. v. Cardinal IG Co.,*
  54 F.3d 1570 (Fed. Cir. 1995)................................................................................... 17, 19

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
  247 F.3d 1316 (Fed. Cir. 2001)............................................................................... 12, 16

DB01:2738059.1                                                                                          054604.1003

*Toro Co. v. White Consol. Indus., Inc.,*
    266 F.3d 1367 (Fed Cir. 2004).......................................................................................... 11

*V-Formation, Inc. v. Benetton Group SpA,*
    401 F.3d 1307 (Fed. Cir. 2005).......................................................................................... 17

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)............................................................................................ 14

**Statutes**

35 U.S.C. § 103............................................................................................................................... 4

35 U.S.C. § 112...................................................................................................................... passim

DB01:2738059.1

054604.1003

Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively "BSC") submit this *Markman* brief in support of their proposed claim constructions with respect to United States Patent Nos. 7,217,286 ("the '7286 patent"), 7,223,286 ("the '3286 patent"), 7,229,473 ("the '473 patent"), and 7,300,662 (the '662 patent"). Attached as Exhibit A to this brief is a chart setting forth the parties' respective proposed claim constructions.[1]

## STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS

The present case is one of four declaratory judgment actions through which BSC seeks a declaration that its Promus® Everolimus-Eluting Stent does not infringe any valid claim of the '7286 patent, the '3286 patent, the '473 patent, and the '662 patent. BSC's Promus® stent is an intravascular stent used to treat coronary artery disease. It elutes a drug designed to diminish reblocking (restenosis) of the patient's blood vessel into which the stent has been inserted.

Defendant Cordis is the owner of the '7286, '3286 and '473 patents-in-suit. Cordis and defendant Wyeth co-own the '662 patent-in-suit. Cordis and Wyeth answered the four declaratory judgment actions and asserted in counterclaims that BSC is infringing each of the four patents-in-suit.

Trial in these cases is set to begin on February 4, 2010, with a hearing on claim construction and summary judgment motions set for October 30, 2009.

---

[1]    Citations to "Ex." refer to exhibits to either (1) the duplicative exhibits in the Joint Appendix of Exhibits to the Parties' *Markman* Briefs, or (2) the independent exhibits in Plaintiffs' Appendix of Exhibits to Their *Markman* Brief, both of which are submitted herewith. Citations to the Joint Appendix are denoted by the pin-cites "JA-__," while citations to the Plaintiffs' Appendix are denoted by the pin-cites "BSC-A-__."

## SUMMARY OF THE ARGUMENT

BSC's proposed claim constructions are dictated by the claim language, specification, and prosecution history (including ongoing reexamination) of the patents-in-suit. Further, BSC's constructions are easier to understand than Cordis's and are more likely to be helpful to the jury. The Court should thus adopt BSC's proposed claim constructions as set forth in Exhibit A.

## STATEMENT OF FACTS

There are four patents-in-suit, three of which – the '7286 patent, the '3286 patent, and the '473 patent – share the same specification and claim priority to 1997. These three patents are referred to herein as "the 1997 Patents." The '662 patent was written about three years later and has a specification that overlaps with, but is not identical to, the 1997 Patents.

## I.      THE 1997 PATENTS

The 1997 Patents generally claim a metallic stent having a drug-containing coating applied thereto. The coating comprises a biocompatible polymeric carrier blended with a drug that stops neointimal proliferation upon implantation.[2] It was hoped by the inventors that this would prevent restenosis of the blood vessel.[3] The claimed drug is rapamycin or a macrocyclic lactone analog of rapamycin.

The common specification for the 1997 Patents ("Common Disclosure") is bare-boned, containing no substantive discussion of the various claimed drug-eluting stents. (*See* '7286

---

[2]      Neointimal proliferation refers to new cell growth on the inside (intima) of the vessel wall following balloon angioplasty (PTCA) or implantation of a stent.

[3]      Restenosis refers to the re-narrowing of a vessel following balloon angioplasty (PTCA) or implantation of a stent. (*See, e.g.*, Ex. 1 at 1:34-38 (JA15)).

2

patent (Ex. 1 at JA1-20)).  For instance, there is no discussion of which of the countless analogs

of rapamycin would prevent neointimal proliferation and restenosis.  (*Id.*)  Indeed, not a single

useful analog of rapamycin is identified, and there is no indication that the inventors themselves

had any inkling of which particular analogs could be used to make a claimed stent.  (*Id.*)

Likewise, there is no meaningful description of how to make one of the claimed drug-eluting

stents to successfully inhibit neointimal proliferation.  (*Id.*)  There also is no indication that the

inventors had ever actually manufactured, much less implanted, a drug-eluting stent prior to

filing the 1997 applications, or that they had any data whatsoever as to whether the claimed

stents would be biocompatible or prevent neointimal proliferation.  (*Id.*)

     The specification contains four, brief prophetic "experiments," but *three of the four*

involve products that are not the subject of the claims of the 1997 Patents.  Only the first

experiment relates to the claimed stents, but simply states, without elaboration, that rapamycin

can be formulated in solution with a wide variety of polymers (in a vast concentration range of

0.001% to 30% by weight) and then coated onto a stent.  Little detail is provided regarding how

much rapamycin to use with which polymers or how to create or apply the drug/carrier coating,

and there is no data confirming the in vivo effects of any such stent.  (*Id.* at 6:34-54 (JA17)).

     The claimed stents simply are not the focus of the specification.  The "Summary of the

Invention" actually identifies a *non-claimed* stent – where the drug is embedded in reservoirs

carved in the stent itself and a non-drug polymer is placed thereover – as the invention:

> Currently, attempts to improve the clinical performance of stents
> have involved some variation of either applying a coating to the
> metal, attaching a covering or membrane, or embedding material
> on the surface via ion bombardment. *A stent designed to include
> reservoirs is a new approach which offers several important
> advantages over existing technologies.* (*Id.* at 3:39-45 (JA16))
> (emphasis added).

3

The "Summary of the Invention" then describes the "existing technology."  Stents with a

drug-containing polymeric coating (*i.e.*, the stents that are actually claimed in the 1997 Patents)

are described as using the "conventional approach," and the "new" reservoir-containing stent is

touted as having various advantages over this conventional approach:

> In this application, it is desired to deliver a therapeutic agent to the
> site of arterial injury. *The conventional approach has been to
> incorporate the therapeutic agent into a polymer material which is
> then coated on the stent.* . . . .
>
> An alternative would be to design the stent to contain reservoirs
> which could be loaded with the drug.  A coating or membrane of
> biocompatible material could be applied over the reservoirs which
> would control the diffusion of the drug from the reservoirs to the
> artery wall.
>
> One advantage of this system is that the properties of the coating
> can be optimized for achieving superior biocompatibility and
> adhesion properties, without the addition requirement of being able
> to load and release the drug.

(*Id.* at 3:47-4:2 (JA16) (emphasis added)).  Later, the specification concedes that *the prior art*

teaches that rapamycin would be a good drug to use to prevent restenosis following balloon

angioplasty.  (*Id.* at 5:56-58 (JA17)).  Thus, in this rather peculiar case, the Court is confronted

with a patent specification directed to one invention (drug reservoir-containing stents) onto

which sets of claims have been grafted directed to a different alleged invention (stents coated

with a rapamycin-containing polymeric carrier) that is described in the specification as using the

"conventional approach" and having been suggested by the prior art.[4]  Given that the

---

[4]	Not surprisingly, BSC has moved for summary judgment that the claims of the 1997
Patents are obvious under 35 U.S.C. § 103, and not properly supported by the specification under
35 U.S.C. § 112.  BSC also contends that several of the claim terms being discussed herein are
indefinite, rendering the claims in which they are recited invalid under 35 U.S.C. § 112.  BSC's
(continued...)

DB01:2738059.1                                                                                    054604.1003

specification is almost entirely directed to an invention not embodied in the asserted claims, the intrinsic record provides limited guidance for construing the disputed claim terms.[5] The intrinsic evidence – and particularly the claim language itself – that is relevant, however, mandates the adoption of BSC's proposed constructions.

## II.   THE '662 PATENT

The '662 patent, which asserts priority to 2001, contains much of the same disclosure of the 1997 Patents, but also contains some additional testing and information relating to the theorized mechanisms of action of rapamycin in vivo.  The specification also contains data pertaining to in-stent late loss following implantation of a rapamycin-coated stent.[6]  It appears that in the three years between 1997 and 2000 the inventors finally made and tested one of the rapamycin-coated stents they claimed in the 1997 Patents, and report on those tests in the '662 patent to claim the same stent yet again.[7]  Accordingly, the claims of the '662 patent contain limitations regarding the performance of the claimed drug in vivo, including that it must bind to a particular protein (FKBP12) and provide an in-stent late loss at twelve months following

_____

proposed definitions for these various terms are not intended to suggest that the terms comply with the definiteness requirement of Section 112.

[5]      Unfortunately, in at least one instance where the specification does provide an explicit definition for a term – "biocompatible" – Cordis refuses to accept that definition. *See infra* at 12-14.

[6]      As explained below, in-stent late loss is a measurement of the amount of re-narrowing that occurs over time in a stented vessel.

[7]      Unfortunately for Cordis, the 1997 Patents' disclosure is prior art to the '662 patent, rendering it invalid. *See Plaintiffs' Opening Brief in Support of Their Motion for Summary Judgment of Invalidity of the '662 Patent-in-Suit Pursuant to 35 U.S.C. § 103*, filed concurrently herewith.

DB01:2738059.1                                                                                                   054604.1003

implantation of less than about 0.5 mm.  Except for a few instances, most of the terms used in the '662 patent should be interpreted in the same manner as in the 1997 Patents.

**III.    THE ONGOING REEXAMINATION OF THE PATENTS-IN-SUIT**

The various patents-in-suit are all undergoing reexamination at the Patent Office.  As of the submission of this brief, each and every asserted claim of each patent has been rejected by the Patent Office as being obvious in light of the prior art.  Cordis has submitted hundreds of pages of declarations in an attempt to save its claims.  These reexamination papers are part of the intrinsic evidence and pertinent to the construction of the claims of the patents.

## ARGUMENT[8]

**I.    CLAIM TERMS FROM THE 1997 PATENTS[9]**

      **A.    Rapamycin and Its Analogs**

            **1.    "Rapamycin"**

Cordis proposes that the term "rapamycin" be construed to mean "sirolimus."  BSC proposes that the term "rapamycin" be construed to mean: "**The chemical compound with the following structure:**

---

[8]    As the Court is very familiar with the tenets of claim construction and *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), BSC will discuss particular relevant cases at the points in the brief where they are directly applicable to the facts.

[9]    A complete listing of every disputed claim term and the proposed constructions for those terms are set forth in the chart accompanying this brief at Ex. A (BSC-A-1-18), which has been previously provided to the Court.

                                                          

Both parties agree that the terms "rapamycin" and "sirolimus" refer to the same compound, and are used synonymously in the 1997 Patents. (Ex. 1 at 6:4 (JA17)). Cordis's construction thus simply substitutes a synonym for the claimed "rapamycin," whereas BSC's construction actually provides a definition therefor, *i.e.*, the particular chemical compound that is being referenced.[10] Given the nature of the claims and defenses in this action, including the extensive testimony regarding the chemistry of rapamycin and other related or prior art compounds, it will be helpful to the Court and the jury to have the chemical structure for rapamycin identified in the claim construction. For instance, in describing other claim limitations, such as "macrocyclic lactone," it will be helpful to be able to point to the actual

---

[10]     Cordis has never claimed that BSC's construction is not the proper chemical structure of rapamycin. However, to the extent that Cordis asserts that the terms rapamycin and sirolimus refer to something other than or in addition to the particular chemical structure identified in BSC's claim construction, then its construction must be rejected. The 1997 Patents consistently refer to rapamycin as a particular, individual compound, the structure of which BSC has correctly identified. (Ex. 1 at 6:34-35, 6:58-60, 7:5, 7:12, 7:20, 7:28, 7:33-35 (JA17-18); ██████

rapamycin structure. Cordis's proposal, while properly listing another *name* for rapamycin, does nothing to actually identify or clarify the chemical structure that is being claimed.

### 2. "Macrocyclic Lactone Analog"

The 1997 Patents claim the use of rapamycin and "macrocyclic lactone analogs" thereof, a term BSC proposes should be construed to mean: **"A macrocyclic lactone molecule with a structure similar to rapamycin (as defined)."**[11] Cordis urges the Court to narrow the term dramatically, proposing as a construction: "A compound structurally similar to sirolimus having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response."

In this instance, there is little intrinsic evidence other than the claim language itself, since the patent specification contains no real discussion of what a macrocyclic lactone analog is.[12] BSC's proposal (unlike Cordis's) closely follows the plain meaning of the claim language. An "analog" to a chemical compound is simply another structurally similar compound having a portion that is different than the original. (*See, e.g.*, Dorland's Med. Dictionary 66 (26th ed. 1981) (Ex. H at BSC-A-234) (defining analog as "a chemical compound with a structure similar to that of another but differing from it in respect to a certain component."); McGraw-Hill

---

[11]     BSC submits that this term is indefinite under Section 112, in that it is impossible to determine whether a compound is similar enough to rapamycin to constitute an analog. Nothing in this brief is meant to suggest that this term is not indefinite.

[12]     Excluding the claims, the word "analog" appears only three times in the specification: a reference to "macrocyclic lactone (such as rapamycin or its analogs)" in the Abstract (JA1); a reference to "structural analogs (macrocyclic lactones)" at col. 6, lines 4-5 (JA17); and a reference to a "somatostatin analog" that is unrelated to rapamycin at col. 2, line 1 (JA15).

Dictionary of Scientific and Technical Terms 87 (5th ed. 1994) (Ex. J at BSC-A-240 ) (defining analog as "[a] compound whose structure is similar to that of another compound but whose composition differs by one element."); Stedman's Med. Dictionary 60 (24th ed. 1982) (Ex. M at BSC-A-253) (defining analog as "[a] compound that resembles another in structure[.]")). That the term analog deals with structural similarity appears to be confirmed by what little mention of analogs there is in the 1997 Patents. (See Ex. 1 at 6:4-5 (JA17) (referencing "structural analogs (macrocyclic lactones)")). The particular type of analog at issue is a "macrocyclic lactone" analog.[13] Thus, BSC's proposed construction – "a macrocyclic lactone molecule with a structure similar to rapamycin" – comes directly from the claim language itself.

Cordis's proposal improperly imposes additional limitations into this term. First, Cordis requires that the analog have the *identical* macrocyclic lactone ring as rapamycin, but there is nothing in the claim language itself ("macrocyclic lactone analog") that would require the macrocyclic lactone ring to be identical to that found in rapamycin. Indeed, this runs counter to the accepted definition of analog, which allows for the analog to differ from the original with respect to any particular component.[14] By its own terms, the claim language requires only that

---

[13]   "Macrocyclic," as can be gleaned from the word itself, refers generally to a compound having a large ring of atoms. (See McGraw-Hill Dictionary of Scientific and Technical Terms 1291 (5th ed. 1994) (Ex. J at BSC-A-000243) (defining a macrocycle and macrocyclic as "an organic macromolecule containing a cyclic element of usually more than 15 atoms.")). For instance, the chain of rapamycin's lactone ring is made up of 29 atoms. A "lactone" is a type of cyclic ester. (See id. at 1101 (BSC-A-242) (defining lactone as a particular type of "internal cyclic mono ester[.]")). Thus, a macrocyclic lactone molecule would have a large ring system with at least one ester functional group embedded therein.

[14]   ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

the compound (1) be a macrocyclic lactone (of which there are at least millions, if not billions), and (2) be structurally similar (be an analog) to rapamycin.

As noted above, the specification does not discuss or provide any examples of macrocyclic lactone analogs, and thus there is nothing in the specification that would support Cordis's requirement that the analog (despite being an analog) have the exact same macrocyclic lactone ring as rapamycin.[15] There are only two passing references in the specification to rapamycin analogs, and these simply state that the analogs are macrocyclic lactones, not that they all possess the same macrocyclic lactone ring as rapamycin. (*See* Ex. 1 at Abstract (JA1) and 6:4-5 (JA17)). Thus, there is no basis for including this additional requirement.

Cordis also adds a requirement that the macrocyclic lactone analog be "capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response." This proposal is a manifestly improper attempt to read unrelated language from the specification into the claim.

To begin with, the term "analog" refers to a *structural* similarity between compounds that may not carry with it a functional similarity. (*See, e.g.*, Mosby's Medical, Nursing, and Allied Health Dictionary 60 (3rd ed. 1990) (Ex. L at BSC-A-250) ("analog: (2) a...compound that resembles another in structure or constituents but has different effects.")).[16] And, to the extent

---

[15]  The utter lack of disclosure in the 1997 Patents relating to macrocyclic lactone analogs highlights that: (1) these claims are not properly enabled or described under Section 112; and (2) Cordis is generating its lengthy claim construction out of whole cloth, likely in an attempt to somehow narrow the claims and forestall invalidation under Section 112.

[16]  *See also* Blakiston's Gould Med. Dictionary 81 (3rd ed. 1972) (Ex. G at BSC-A-231) ("analog: (3) A chemical compound which resembles a metabolically active substance structurally, but may differ functionally by being either inactive or opposite in effect."). Cordis itself has submitted an appeal brief to the Patent Office with respect to a patent application (continued...)

that anything about rapamycin analogs can be gleaned from the specification, it is that they are *structural* analogs. (*See* Ex. 1 at 6:4-5 (JA17) (referencing "structural analogs (macrocyclic lactones)" of rapamycin)).  There is no definition or discussion of rapamycin analogs set forth in the 1997 Patents at all, much less a discussion that would support the additional functional limitation Cordis now seeks to add.  *See Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed Cir. 2001) (finding that claim constructions cannot import into the claim a function recited in the specification when the claim recites only structural limitations); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (finding that it is improper to import functional limitations into the claims); *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1382-83 (Fed. Cir. 2000) (same).  While the language that Cordis seeks to add to the claim does appear in the patent specification (column 5, lines 48-51), it is part of a larger general discussion about the surmised properties of rapamycin and in no way sets forth a definition of macrocyclic lactone analogs of rapamycin.  *Phillips*, 415 F.3d at 1316, 1323 (summarizing Federal Circuit precedent and explaining that unless the specification is clearly defining a claim term, it is inappropriate to read limitations from the specification into the claims).

Cordis's proposal is also undermined by the claim itself.  The functionality of the therapeutic agent is claimed separately – it must be "present in an amount effective to inhibit neointimal proliferation."  (*See* Ex. 1 at 8:22-23 (JA18)).  Given this explicit functional claim language, Cordis's imported functional limitation would render later claim language superfluous

(09/575,480 – related to the '662 patent) containing the following definition of analog: "analogue: 2. a chemical compound with a structure similar to that of another but differing from it in respect to a certain component; it may have a similar or opposite action metabolically."  (Ex. P at BSC-A-267, 275 (citing Dorland's Med. Dictionary 66 (26th ed. 1981))).

and thus is particularly difficult to justify. *See Mangosoft, Inc. v. Oracle Corp.,* 525 F.3d 1327, 1330-31 (Fed. Cir. 2008) (rejecting a claim construction that renders claim language superfluous); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (same).

For all of these reasons, BSC's proposed construction of "macrocyclic lactone analog" should be adopted.

### B.   "Biocompatible"

Another claim term that requires construction is "biocompatible," a required characteristic in each of the claims of the 1997 Patents for the polymeric carrier.  BSC proposes that "biocompatible" be construed to mean: **"does not elicit any negative tissue reaction or promote mural thrombosis formation."**  Cordis proposes that "biocompatible" means: "able to perform its function in the body with an acceptable biologic response."  BSC's proposal comes straight from the definition set forth in the 1997 Patents and should be adopted in favor of Cordis's facially indefinite proposal.

The 1997 Patents expressly define "biocompatible": "Polymers are biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation) and degradable, such as lactone-based polyesters or copolyesters . . . ."  (*See* Ex. 1 at 6:37-40 (JA17)).  The specification's use of "i.e." immediately following "biocompatible" clearly indicates that what follows ("not elicit any negative tissue reaction or promote mural thrombus formation") is the definition of biocompatible. *See Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1327, 1330 (Fed. Cir. 2003) (finding that by using the language "co-micronization of fenofibrate and a solid surfactant (i.e., the micronization of an intimate mixture of fenofibrate and a solid surfactant)" in the patent specification, the patentee acted as its own lexicographer).  And, when a patent sets forth such an express definition for a claim term, that definition controls. *Phillips*, 415 F.3d at

12

1316 (holding that the inventor's lexicography controls when the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess); *see also Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373-74 (Fed. Cir. 2006). BSC's construction is further supported by the "Summary of the Invention," which provides that "the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.)." (*See* Ex. 1 at 3:56-58 (JA16)).[17] The 1997 Patents unambiguously provide that "biocompatible," in the context of those patents, means that the material will not elicit any negative tissue reaction or promote mural thrombus formation.

Cordis's suggestion that a "biocompatible" polymer should be construed to mean: "able to perform its function in the body with an acceptable biologic response" is both unsupported and vague: what function or biologic response is being referenced, what does "acceptable" mean, etc. Indeed, were the Court to adopt Cordis's claim construction, it would immediately render the asserted claims invalid as indefinite under Section 112. *See Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (rejecting a claim construction that would make it impossible for one of skill in the art to determine if there is infringement or not); *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1217-18 (Fed. Cir. 1991). BSC's proposal, aside from being the one actually set forth in the 1997 Patents, has the additional benefit of being clear and readily understood. Either the polymer elicits a negative tissue reaction or does not. If it does, it is not biocompatible.

---

[17]    *See also id.* at 5:66-6:2 (JA17) (providing that "an agent which prevents inflammation . . . may provide the most efficacious treatment for post-angioplasty restenosis.").

13

The recent reexamination prosecution history of the 1997 Patents also supports BSC's proposed construction. The applicants submitted a declaration highlighting that it was important for intravascular devices to be biocompatible, since artery interiors apparently are particularly susceptible to negative tissue reaction. (*See* Mikos Decl. at ¶ 49, 50, 53 (Ex. B at BSC-A-32-33)). This would help explain the inventors' insistence in the 1997 Patent specification that the polymers not elicit *any* negative tissue reaction in order to be considered "biocompatible."

To the extent that Cordis attempts to rely on extrinsic evidence to support its construction, that evidence should be rejected. Extrinsic evidence should not be used to vary an explicit definition set forth in a patent specification. *Phillips*, 415 F.3d at 1322; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). BSC does not doubt that the 1997 Patents possibly *could* have set forth a less stringent definition of "biocompatible" that would have allowed for a greater degree of negative tissue reaction, but they did not. Instead, the inventors were their own lexicographer and crafted a definition allowing for no negative tissue reaction. The fact that other definitions of "biocompatible" are used outside the context of the 1997 Patents is irrelevant. *Phillips*, 415 F.3d at 1314-17.

**C.    "Polymer," "Copolymer," and Related Terms**

**1.    In the Claims, "Polymer" Is Different From and Does Not Include "Copolymers"**

The claims of the 1997 Patents use the following related terms: polymer, copolymer, acrylate-based polymer, acrylate-based copolymer, and fluorinated polymer. The parties' dispute surrounding these elements essentially is whether, in the claims of the 1997 Patents, the word "polymer" (either when used alone or in terms such as acrylate-based polymer and fluorinated polymer) includes copolymers. BSC submits that the word "polymer" as used in the claims is distinguished from copolymers, and means: **"a molecule composed of many repeating**

14

units of a single monomer." Copolymer, in contrast, means "**a molecule composed of many repeating units of at least two different monomers.**" Cordis submits that "polymer" broadly includes copolymers, and means: "a material formed by polymerization and comprising repeating units of the same or different types of monomers." Cordis then defines "copolymer" to mean "a polymer having two or more types of monomers." Cordis's definitions, in which "polymer" is the genus and "copolymer" is a species of that genus, render portions of the claims superfluous, and should be rejected.

Both parties recognize that polymers are materials that are made up of many smaller repeating units, called monomers. The parties also agree that copolymers are created when different monomers are polymerized. In its broadest sense, "polymer" can refer to all polymeric[18] materials, regardless of the types of monomers used. More narrowly, the term "polymer" can also be used in contradistinction to copolymer to refer to a polymeric material in which all the monomers are the same.

In this case, the claim language itself indicates which of these two meanings to apply. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim."). Of particular relevance to the instant dispute is the principle that claim terms generally should not be construed to render other claim language surplusage. *See Mangosoft*, 525 F.3d at 1330-31; *Telemac Cellular*, 247 F.3d at 1325.

For example, Claim 1 of the '7286 patent reads in part:

---

[18]   The parties essentially agree that a "polymeric" material broadly includes either a polymer or copolymer. (*See* Ex. A at 1, 7, and 11 (BSC-A-3, 9, and 13)).

15

> said polymeric carrier comprises an acrylate-based polymer or
> copolymer, a fluorinated polymer, or a mixture thereof

(Ex. 1 at 8:18-20 (JA18)).  Plainly, the '7286 patent uses the terms "polymer" and "copolymer"

as defined in BSC's proposed construction.  If polymers included copolymers (as Cordis

suggests), then there would be no need to separately recite "acrylate-based copolymers" – the

acrylate-based copolymers would be necessarily included in the category of acrylate-based

polymers.  Cordis's construction of "polymer" would render superfluous the recitation of

acrylate-based copolymers.  Likewise, BSC respectfully submits that nobody could look at the

claimed list of "acrylate-based polymers and copolymers, fluorinated polymers, or a mixture

thereof" and fairly conclude that fluorinated copolymers are included in that list.  Rather,

fluorinated copolymers have been specifically *excluded* from the list.

Similarly, claims 3 and 4 of the '473 patent read as follows:

> 3. The metallic stent according to claim 1 wherein said
> biocompatible polymeric carrier comprises a fluorinated polymer.
>
> 4. The metallic [stent] according to claim 3 wherein said
> biocompatible polymeric carrier further comprises an acrylate-
> based polymer or copolymer.

(Ex. 3 at 8:28-33 (JA57)).  If "polymer" included copolymers, as suggested by Cordis, there

would be no need to separately list "acrylate-based polymer *or copolymer*" in claim 4.  An

acrylate-based polymer would already include acrylate-based copolymers.  The same analysis

applies, *e.g.*, to claims 10 and 52 of the '3286 patent, which also distinguish acrylate-based

polymers from acrylate-based copolymers, and claim only fluorinated polymers but not

fluorinated copolymers.  (*See* Ex. 2 at 8:8-15; 9:46-53 (JA38-39)).  *See Southwall Techs., Inc. v.*

16

*Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) (holding that claim terms found in different claims should be interpreted consistently).

BSC acknowledges that, in the specification, the word "polymer" is used both in the broad sense and in the narrow sense.[19] The claims, however, plainly use "polymer" in the sense that excludes copolymer.[20] *Cf. Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.' 35 U.S.C. § 112 [¶] 2.").

### 2. "Polymer" Should Be Construed Consistently Within All the Claims to Exclude "Copolymers"

The language of the claims, in which "polymer" is distinct from and does not include "copolymer," presents a formidable problem for Cordis's proposed claim construction. Cordis recognizes, as it must, that "acrylate-based polymer" cannot include "acrylate-based copolymers." Otherwise, the claim would never have been written to specifically include both acrylate-based polymers and acrylate-based copolymers. However, Cordis rejects the common-sense conclusion that "polymer" as used in the claims does not include copolymers (because this would mean that "fluorinated polymers" do not include fluorinated copolymers, rendering a fatal

---

[19]    For instance, the specification references: "[p]olymers such as . . . acrylate based polymers or copolymers . . . fluorinated polymers . . . ." (*See* Ex. 1 at 6:45-49 (JA17)).

[20]    Similarly, the fact that it is used in the broad sense outside the context of the patent is irrelevant – claim construction should be based on intrinsic evidence. *See Phillips*, 415 F.3d at 1313, 1317, 1320; *see also V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310-11 (Fed. Cir. 2005).

blow to Cordis's claims of infringement). Instead, as explained below, Cordis engages in verbal

gymnastics so that "acrylate-based polymers" do *not* include all acrylate-based copolymers, even

though – according to Cordis – "polymer" still includes all copolymers and "fluorinated

polymer" still includes all fluorinated copolymers. Below are simple Venn diagrams showing

how the relationship between "polymer" and "copolymer" varies, depending upon whether the

words are used alone, or modified by "acrylate-based" or "fluorinated":

### Cordis's Proposed Constructions



There is no justification for this inconsistency.

Cordis defines "fluorinated polymer" to mean "a polymer (previously defined) containing

one or more fluorine atoms." (*See* Ex. A at BSC-A-4). To be "fluorinated" under this definition

a polymer need only contain a single fluorine atom somewhere within its molecule. Also, since

Cordis defines polymer to include all copolymers, a copolymer comprising one monomer

possessing a fluorine atom and numerous other different fluorinated or non-fluorinated

monomers, would still constitute a fluorinated polymer. Under Cordis's definitions, "polymer"

18

and "fluorinated polymer" are the genus, to which "copolymer" and "fluorinated copolymer"

respectively belong as species.

Yet, when it comes to "acrylate-based polymer" Cordis inverts its argument. Cordis

defines "acrylate-based polymer" to mean "a polymer (previously defined) in which *all* of the

monomers are based on the structure of a salt or ester of acrylic acid."[21] (emphasis added).

Cordis then defines "acrylate-based copolymer" as "a copolymer (previously defined) in which

at least one of the types of monomers is based on the structure of a salt or ester of acrylic acid."

Suddenly "acrylate-based polymer" is no longer a broad genus of which "acrylate-based

copolymer" is a species.[22]  The specification, which offers no discussion whatsoever of these

polymers, other than to list them in broad classes as potential candidates for use in a stent,

provides no support for this differing treatment.

In contrast, BSC's definitions of polymer, acrylate-based polymer, and fluorinated

polymer are consistent with each other.  The use of "acrylate-based polymer" in distinction to

---

[21]    Under Cordis's definitions, there need be no commonality whatsoever among all the
monomers of either a "polymer" or a "fluorinated polymer."  Yet, in an "acrylate-based
polymer" there must be a common feature of the monomers – they must all be acrylates.  If
"polymers" include all "copolymers" then there is no reason that an "acrylate-based polymer"
would have to have *every* monomer be an acrylate.  If Cordis were being consistent with its prior
definitions of "polymer" and "fluorinated polymer," it would have defined "acrylate-based
polymer" to mean "a polymer (previously defined) containing one or more acrylate."  This,
however, as explained above, would render the additional recitation of "acrylate-based
copolymer" in the claims superfluous, and points out the fundamental flaw in Cordis's definition
of "polymer."  "Polymer" should have the same relationship to "copolymer" – mutual exclusivity
– regardless of whether it is written alone, modified by "acrylate-based," or modified by
"fluorinated." *Southwall,* 54 F.3d at 1579.

[22]    A simple example elucidates this point.  Assume a polymeric material made of two
monomers, one of which is an acrylate ("AC") and one is not ("X").  The material (AC-X-AC-X
. . . ) according to Cordis would be an acrylate-based copolymer, but not an acrylate-based
polymer.

19

"acrylate-based copolymer" indicates that in an acrylate-based polymer, the monomers must all be the same acrylate. In an acrylate-based copolymer, the monomers can be different, as long as one is an acrylate. Thus, BSC defines "**acrylate-based polymer**" to mean "**a molecule composed of many repeating unit of a single acrylate monomer**" and defines "**acrylate-based copolymer**" to mean "**a molecule composed of many repeated units of at least two different monomers where at least one of the monomers is an acrylate.**" These definitions are completely consistent and logically follow from BSC's definitions of "polymer" and "copolymer." Similarly, BSC's definition of "**fluorinated polymer**" as meaning "**a molecule comprising many repeating units of a single monomer wherein the monomer contains one or more fluorine atoms**" is completely consistent with its definition of "polymer."

**BSC's Proposed Constructions**



### D.    "Mixtures" and "Blends" of Materials

Certain claims call for either "mixtures" or "blends" of the polymeric materials or polymeric materials and drug contained therein. BSC proposes that "**mixture**" means: "**a composition in which substances are combined and intermingled.**" Similarly, BSC proposes that "blend thereof" means "**a composition of combined and intermingled substances.**"

054604.1003

Cordis proposes that "mixture" means "combination," and that a "blend" is "a mixture of two or more of the foregoing."[23]

The parties basically agree that a mixture or a blend is a combination of materials. BSC's construction, however, recognizes that a mixture and a blend are materials that are not just combined (even to a miniscule degree), but rather are combined in a manner that the materials are interspersed throughout each other. (See, e.g., Webster's New World Dictionary 150 (2nd ed. 1984) (Ex. N at BSC-A-256) (defining blend (n) to be: "thorough mixture."); Academic Press Dictionary of Sci. and Tech. 1395 (1992) (Ex. E at BSC-A-224) (defining mixture as "the mass that results from the thorough blending of two or more substances."); Webster's Third New Int'l Dictionary 233 (1993) (Ex. O at BSC-A-261-62) (defining blend (n) as a "congruous mixture."); McGraw-Hill Dictionary of Scientific and Technical Terms 239 (5th ed. 1994) (Ex. J at BSC-A-241) (defining blend to be "[a] mixture so combined as to render the parts indistinguishable from one another.")). Thus, BSC's construction which includes "intermingled" clarifies that a mixture or blend requires that the materials be combined thoroughly throughout one another.

The specification also supports this interpretation, since the materials being mixed or blended are, in fact, thoroughly intermingled. While there is almost no discussion of how to make the claimed drug-eluting stents, the only description of the "comixture" of a drug and its polymeric carrier involves mixing them in solution, and then applying the solution to the stent, such that the solvent is allowed to evaporate "to leave a film with entrapped rapamycin." (See Ex. 1 at 6:10-11; 6:34-37; 6:50-54 (JA17)). Plainly the drug is intermingled throughout the

---

[23]   Likewise, BSC proposes that "mixed together" means "combined and intermingled" while Cordis proposes that it means "combined together." (See Ex. A at BSC-A-11).

polymeric carrier. Likewise, the only reference in the specification to blends of polymers is in the context of the polymers being blended in solution. (*Id.* at 6:34-43 (JA17)). Combining these materials in this manner necessarily leaves them intermingled.

Accordingly, BSC submits that its proposals should be adopted as more precisely describing the meaning of "mixture" and "blend."

### E.   Polymeric "Carrier"

Many of the claims of the 1997 Patents describe the polymeric material into which the drug has been mixed as a polymeric "carrier." BSC proposes that "carrier" in this context means: **"a therapeutic agent-containing material co-formulated with the therapeutic agent."** Cordis proposes that "carrier" means "material that carries the drug."

Cordis's proposed construction provides little helpful context to a lay jury as to the structure being described wherein the polymeric material carries the drug. Being a carrier in this context is different than the manner in which most people think of carrying something. Here, the polymeric carrier and the drug have been co-formulated in solution so as to form a film with the drug entrapped therein. (*See* Ex. 1 at 6:50-54 (JA17)). The polymeric carrier is the material identified in the specification that has been particularly chosen for its ability to be a biocompatible drug matrix and by implication has the necessary properties to facilitate the drug's controlled release. (*See id.* at 6:32-54 (JA17)). This is consistent with BSC's proposals for "mixture" set forth above, in which it is clear that the polymeric carrier has been intermingled with the drug. It is this intermingling that forms the polymeric carrier layer.

### F.   "Stent" Having a "Coating" "Applied Thereto" And Related Terms

Many of the claims of the 1997 Patents are directed to a "stent" having a "coating" "applied thereto" wherein the coating comprises a drug in a polymeric carrier. These terms are discussed below.

22

### 1.    "Stent"

BSC proposes that "stent" means "**a device for providing support for a lumen in the body.**" Cordis, proposes that stent means: "a tube shaped mesh device used to treat certain forms of cardiac disease." BSC's proposal should be adopted because it accurately describes the plain meaning of a stent, without adding unnecessary limitations that are not required by the claim language itself. *See Phillips*, 415 F.3d at 1328.

Stents are, by standard definition, devices that provide support to lumens in the body. (*See* Am. Heritage Dictionary 1699 (4th ed. 2000) (Ex. F at BSC-A-228) (defining stent as "[a] slender thread, rod, or catheter inserted into a tubular structure, such as a blood vessel, *to provide support* during or after anastomosis.") (emphasis added); *see also* Ex. 1 at 4:52-56 (JA16) ("Stents . . . when expanded within the lumen of an angioplastied coronary artery, provide structural support to the arterial wall.")).  Cordis's additional requirement that the stent be "used to treat certain forms of cardiac disease" is both too narrow, in that it is unnecessarily limited to cardiac disease, and too broad, in that it provides no indication that the manner in which the stent is "used to treat" is by supporting a lumen.  Cordis further adds unnecessary limitations that the stent be tube-shaped and mesh.  Neither of these additional limitations is required in the ordinary meaning of "stent."  Indeed, the Court has previously defined "stent" simply to mean "a device implanted to maintain the patency of a vessel." *See Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.*, Civ. No. 98-80-SLR, 2005 U.S. Dist. LEXIS 822, at *1 (D. Del. Jan. 5, 2005).  This is similar to BSC's current proposal, which should be adopted.

### 2.    "Coating"

Certain claims of the 1997 Patents require that the stent has a "coating" applied to it. The coating contains the polymeric carrier and the drug. For instance, '3286 patent claim 1 reads:

23

> 1. A stent having a coating applied thereto, wherein said coating comprises a biocompatible polymer/drug mixture and said drug is rapamycin or a macrocyclic lactone analog thereof. (Ex. 2 at 7:51-54 (JA38)).

BSC proposes that "**coating**" be interpreted to mean "**a distinct covering layer of a particular composition.**" Cordis proposes: "covering layer(s)" The primary difference between the parties' constructions is that Cordis, by including an enigmatic "(s)" at the end of its construction, apparently would allow several distinct coatings, applied separately, to collectively constitute "a coating" on the stent. That, however, does not comport with the ordinary meaning of the claim language, nor is it supported by the specification. Rather, as explained below, the claim language itself – "coating" – is singular, and the specification discloses only a stent with a single, distinct covering layer as a coating. Therefore, BSC's proposal better conforms to the intrinsic evidence.

The claim language is singular, and does not suggest that multiple, distinct covering layers, applied separately, would somehow constitute a single "coating."[24]  (*See, e.g.,* Webster's New World Dictionary 272 (2nd ed. 1984) (Ex. N at BSC-A-257) (defining coating as "a coat or layer over a surface.")).  Rather, the claim language suggests each covering layer would constitute a separate coating.

The specification supports BSC in this regard. In the "Summary of the Invention" section, the patent discusses a coating on the stent:

> In this application, it is desired to deliver a therapeutic agent to the site of arterial injury. The conventional approach has been to

---

[24]  The first such covering layer would constitute a coating applied to the stent. A further covering layer would be a separate coating, and it would not be applied to the stent, but rather to the first coating.

> incorporate the therapeutic agent into a polymer material which is then coated on the stent. The ideal coating material must be able to adhere strongly to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). To date, the ideal coating material has not been developed for this application.

(Ex. 1 at 3:47-60 (JA16)). From this description, it is clear that the coating is a single layer of a distinct composition that contains the polymeric carrier and drug mixture, adheres to the metal stent, and releases the drug without causing a negative reaction in the tissue which it abuts upon expansion of the stent in vivo.[25] Indeed, the caution that the coating should be as thin as possible only highlights that the coating is not multiple distinct covering layers. Even when the patent describes coatings that are part of non-claimed embodiments (such as a coating that contains no drug, but that is applied onto a drug reservoir-containing stent), it is clear that the coating is an individual, distinct layer. (*See id.* at 3:61-4:2; 4:63-5:7 (JA16)). In short, there is nothing in the specification disclosing a stent with multiple covering layers on it, and certainly nothing that would suggest that "coating" would include all of these non-disclosed multiple, distinct covering layers. Cordis's construction should be rejected.

Also, Cordis distinguished prior art during reexamination in a manner suggesting that multiple, separate covering layers did not constitute a single coating. For instance, Cordis's expert, Dr. Mikos, distinguished a reference (Ding '313) that disclosed the use of a fluorinated

---

[25]   *See also* Ex. 1 at 6:50-54 (JA17), describing in the only example of a claimed embodiment that the coating is a single film of polymer intermingled with drug that is applied to the surface of the stent.

polymer as a top coat because the Ding reference "does not suggest use of fluorosilicone or any fluorinated polymer for the drug-containing underlayers, but instead teaches use of [other materials]." (*See* Mikos Decl. at ¶ 171 (Ex. B at BSC-A-57)). This confirms both that (1) separate covering layers are each separate coatings, not a single coating; and (2) the coating is applied directly to the stent surface (see below), and is not some form of top layer.

### 3.   "Applied Thereto," "Is Applied" to the Stent

As noted above, the coating material is "applied" to the stent. BSC proposes that **"applied thereto"** means **"brought into direct contact with the stent surface."**[26] Cordis proposes "put thereon." To the extent that Cordis intends its definition, which includes the word "thereon" to refer only to coatings applied to the surface of the stent itself, then there is little difference between the parties with respect to this claim construction. However, to the extent that Cordis disputes that "applied" to the stent means applied directly to the stent surface, then Cordis's construction should be rejected. Both the plain language of the claim and the specification support that the coating is applied directly to the surface of the stent.

To begin with, the claim language (*e.g.*, "a stent having a coating applied thereto" (Ex. 2 at 7:51 (JA38)) indicates that the coating is placed directly on the stent surface. And, as noted, the specification also clearly indicates that the coating is applied directly to the stent surface, and therefore, for instance, must be able to "adhere strongly to the metal stent."[27] (*See, e.g.*, Ex. 1 at 3:47-60; 6:50-54 (JA16-17)). To the extent that Cordis is asserting that a coating "applied" to

---

[26]    BSC similarly proposes that "onto the stent" be construed to mean "brought into direct contact with the stent surface."

[27]    Similarly, during reexamination, Cordis stressed that the polymer "be capable of binding to the stent . . . ." (*See* Ex. B, Mikos Decl. at ¶ 46 (BSC-A-31-32)).

26

the stent could cover a coating that is *not* applied directly to the surface of the stent, but rather to, *e.g.*, a covering layer that has previously been placed on the surface of the stent, Cordis's claim construction is not supported by the intrinsic evidence.

### G.    "An Amount Effective to Inhibit Neointimal Proliferation"

The claims of the 1997 Patents require that the drug be present in an "amount effective to inhibit neointimal proliferation."  BSC contends this means: **"an amount sufficient to stop neointimal proliferation."**  Cordis proposes: "an amount that works to reduce neointimal proliferation."  The difference between the constructions is whether the drug must stop neointimal proliferation (as BSC suggests) or merely reduce it by any amount at all (as Cordis suggests).[28]

The accepted meaning of inhibit is to stop, not merely reduce by any amount, no matter how small.[29]  (*See* Merriam-Webster Dictionary 269 (1998) (Ex. K at BSC-A-246) (defining inhibit to mean "prohibit, forbid," or "hold in check: restrain.")).  Further, the specification uses the words "inhibit" and "prevent" interchangeably when referring to proliferation:

> The antiproliferative action of rapamycin is not limited to T-cells; Marx et al. . . . have demonstrated that *rapamycin prevents proliferation* of both rat and human SMC in vitro while Poon et al. have shown the rat, porcine, and *human SMC migratin can also be inhibited by rapamycin* . . . . (Ex. 1 at 5:41-47 (JA17)) (emphasis added).

---

[28]    It is unclear what Cordis means by "works to" reduce, as opposed to simply "reduces." BSC assumes that Cordis's definition requires at least some actual reduction caused by the drug.

[29]    To the extent that Cordis argues that its construction somehow implicitly requires a particular degree of reduction, then it is hopelessly indefinite, since there would be no way to determine if a stent reduced proliferation enough to meet this undisclosed standard.

27

> Although the ideal agent for restenosis has not yet been identified, some desired properties are clear: inhibition of local thrombosis without the risk [of] systemic bleeding complications and continuous and [sic] prevention of the dequale [sic] of arterial injury, including local inflammation and *sustained prevention [of] smooth muscle proliferation* at the site of angioplasty without serious systemic complications.  Inasmuch as stents prevent at least a portion of the restenosis process, *an agent which prevents inflammation and the proliferation of SMC* combined with a stent may provide the most efficacious treatment for post-angioplasty restenosis.  (*Id.* at 5:59-6:2 (JA17)) (emphasis added).

> Uses: for inhibition of cell proliferation to prevent neointimal proliferation and restenosis. (*Id.* at 6:26-28 (JA17)).

The plain meaning of "prevent" is to stop something from occurring.  (*See* Merriam-Webster Dictionary 413 (1998) (Ex. K at BSC-A-247) (defining prevent to mean "to keep from happening or existing.")).  The fact that the specification uses "inhibit" and "prevent" interchangeably with respect to proliferation, and repeatedly references rapamycin preventing proliferation of smooth muscle cells indicates that BSC's proposed construction is correct.[30]

Further, during the reexamination of the 1997 Patents, Cordis has submitted a declaration from Dr. Mikos stressing that the drug on the claimed stents "had to be efficacious in adequately preventing smooth muscle cell proliferation."  (*See* Mikos Decl. at ¶ 45 (Ex. B at BSC-A-31)).  He also, in attempting to prove the commercial success and non-obviousness of the claims, references the "zero restenosis" achieved by Cordis's Cypher stent.  (*See id.* at ¶¶ 30-34 (BSC-A-27-28)).  Of course, the total prevention of restenosis in the Cypher stent would be relevant to

_____

[30] The specification similarly contains multiple references to rapamycin "preventing restenosis," which could not be accomplished merely by reducing neointimal proliferation by any small amount.  (*See, e.g.,* Ex. 1 at 1:25-29 (JA15) (Describing the field of the invention as "Delivery of rapamycin . . . to inhibit neointimal tissue proliferation and thereby prevent restenosis.")).

non-obviousness only if Cypher were an embodiment of the claims and the claims, themselves, required a stent that caused zero restenosis. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006) (holding that commercial success is irrelevant to the issue of obviousness if it is due to an unclaimed feature of the device). It is difficult to see how the claims could require zero restenosis if, in fact, they required only some tiny reduction in neointimal proliferation. Cordis's recent arguments to the Patent Office undermine Cordis's position to this Court that the claims require only a small modicum of reduction in neointimal proliferation (instead of the stopping of neointimal proliferation altogether).

### H.   "Provides a Controlled Release . . . Over a Period of Several Weeks."

Certain claims of the 1997 Patents require that the device "provides a controlled release of said therapeutic agent over a period of several weeks." BSC proposes that this means: **"Therapeutic agent is discharged in a controlled manner over a period of more than one week and up to six weeks."** Cordis proposes: "releases said therapeutic agent gradually, where some drug is released during each of several weeks." Cordis then defines "several" to be "more than two or three but not many."

One difference between these definitions is that BSC identifies a particular upper time frame in which the drug has to be released: six weeks. Cordis, in contrast, states that drug is released for more than two (or three) weeks but not "many." It is entirely unclear what would constitute "many" weeks, rendering Cordis's definition indefinite.[31]

_____

[31]   The indefiniteness of this term is further shown by Cordis's apparent uncertainty as to whether more than two weeks constitutes several weeks, or whether you need more than three weeks.

BSC acknowledges that there is nothing inherent in the term "several" which gives it an upper limit of six weeks. Indeed, this is what makes "several" an indefinite term. During the prosecution of an application related to the '662 patent (and, like the 1997 Patents, directed to drug-eluting stents), however, Cordis amended its claims to require drug delivery for about two to six weeks. (5/13/03 Amd. in App. No. 09/850232 (Ex. Q at BSC-A-276-82). In that application, Cordis discusses that it is known that rapamycin exhibits an inflammatory response when administered from a stent in low doses for a sustained period of about two to six weeks. (App. No. 09/850232 at 17:13-17 (Ex. R at BSC-A-302)). The Examiner understood the period of two to six weeks as synonymous with "few." It is from this statement that BSC proposes that "several" be construed to mean from 2 to 6 weeks.

## II.    CLAIM TERMS FROM THE '662 PATENT

### A.    Rapamycin and Its Analogs

#### 1.    "Rapamycin"

Unlike the 1997 Patents, the '662 patent alters the ordinary meaning of rapamycin and its analogs. Both parties agree that the '662 patent sets forth an express definition of "rapamycin" that includes not just the chemical compound rapamycin, but also includes "rapamycin analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as rapamycin." (*See* Ex. 4 at 5:48-51 (JA75)). Thus, BSC proposes that "rapamycin" be construed to mean: **The chemical compound with the following structure:**

**and analogs, derivatives, congeners that bind FKBP12 and possess the same pharmacologic properties as rapamycin.**" This construction is taken straight from the explicit definition set forth in the specification. The only difference between the parties' definitions is that instead of actually showing the chemical structure of rapamycin, Cordis replaces the word rapamycin with sirolimus. For the reasons set forth above with respect to the 1997 Patents, BSC submits that the Court should use the diagram in its construction that actually identifies the structure of rapamycin.

> 2. **"Macrocyclic Triene Analog" of Rapamycin**

The claims of the '662 patent claim rapamycin or "a macrocyclic triene analog thereof."[32] BSC proposes that "macrocyclic triene analog" be construed as: **"a macrocyclic triene molecule with a structure similar to rapamycin (as defined)."** Cordis proposes: "a compound structurally similar to sirolimus having the same macrocyclic triene ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and

---

[32]     A "triene" refers to a molecule with three double carbon bonds. *See* Grant & Hackh's Chemical Dictionary 601 (5th ed. 1987) (Ex. I at BSC-A-237). As explained above, "macrocyclic" means that the molecule has a large ring structure.

31

stent implantation, as well as the smooth muscle cell hyperproliferative response." These are the same constructions that the parties proposed for "macrocyclic lactone analog" in the 1997 Patents (see *supra* at 8), except with the words "macrocyclic triene" inserted in place of "macrocyclic lactone."

Cordis's construction is too narrow in that it requires that the analog have the exact same macrocyclic triene ring structure as rapamycin. This runs counter to the meaning of "analog," and is nowhere required by the plain language of the claim. Rather, the claim simply requires that the analog be a macrocyclic triene. This, in and of itself, is grounds for rejecting Cordis's construction. *Brookhill-Wilk*, 334 F.3d at 1298. Cordis's construction makes even less sense with respect to the '662 patent, because in this patent "rapamycin" does not have its ordinary meaning. Rather, "rapamycin" is, by definition, not limited to the compound rapamycin (the chemical depicted above), but also refers to the various analogs, derivatives, and congeners of rapamycin that bind with FKBP12 and have the same pharmacologic properties as rapamycin. (*See* Ex. 4 at 5:48-51 (JA75)). Since even "rapamycin" under this definition may or may not have the same macrocyclic triene ring as the chemical compound that ordinarily is referred to as rapamycin, there is no basis for importing into the claims a counterintuitive requirement that a macrocyclic triene *analog* of rapamycin have that particular structure. In other words, it makes even less sense for an analog of an analog of rapamycin to have the exact same macrocyclic triene ring as rapamycin.

Cordis's requirement that the macrocyclic triene analog be capable of inhibiting inflammation and neointimal proliferation also should be rejected as unnecessary. As noted above, the '662 patent (unlike the 1997 Patents) makes clear in its definition of "rapamycin" that the patent relates to those analogs having the same pharmaceutical properties as rapamycin. This

32

functional requirement is already included in BSC's proposed definition of "macrocyclic triene analog" by explicitly referencing the prior definition of rapamycin.

**B.    "Biocompatible," "Stent," and "Coating"**

Both parties submit that the terms "biocompatible," "stent," and "coating" be given the same meaning proposed with respect to the 1997 Patents. Accordingly, BSC refers to the Court to its arguments found *supra* at 12-14, 23-26. There is nothing in the '662 patent requiring a different construction of these terms. Indeed, Courts should generally apply the same meaning to the same terms in patents with overlapping specifications. *See Automed Techs., Inc. v. Microfil, LLC*, Fed. Appx. 354, 357 (Fed. Cir. 2007).

**C.    "Polymeric"**

BSC proposes that "polymeric" means "**relating to a material comprising a polymer or copolymer**." Cordis proposes: "containing a 'polymer,' a material formed by polymerization and comprising repeating units of the same or different types of monomers." Both parties agree that "polymeric" could be a material having a single repeating monomer or different repeating monomers. However, Cordis incorporates into its definition of "polymeric" its erroneous definition of "polymer" (see *supra* at 14-20). Accordingly, the Court should adopt BSC's proposal for "polymeric."

**D.    "Affixed to the Intraluminal Stent"**

The claims of the '662 patent requires that the biocompatible polymeric coating be "affixed to the intraluminal stent." BSC proposes that this means "**attached to the stent surface.**" Cordis suggests: "attached to the intraluminal stent." As discussed *supra* with respect to the 1997 Patents, as long as Cordis concedes that the coating is being attached to the stent surface, and not, *e.g.*, to a coating that has previously been applied to the stent surface, then there is little disagreement between the parties with respect to this element. However, to the extent

33

that Cordis is arguing that the coating need not be affixed to the surface of the underlying stent itself, then BSC submits that Cordis is wrong for the reasons outlined above with respect to the claim terms such as "applied thereto" in the 1997 Patents.

### E.   "In-Stent Late Loss" and Related Terms

The claims of the '662 patent are directed to drug-eluting stents that achieve certain clinical results in vivo. In particular, the stents must "provide[] an in-stent late loss in diameter at 12 months following implantation in a human of less than about 0.5 mm, as measured by quantitative coronary angiography." (*See* Ex. 4 at 17:28-31 (JA81)). Other claims require that the device provides a "mean in-stent late loss in diameter at 12months following implantation in a human population of less than about 0.5 mm, as measured by quantitative coronary angiography." BSC proposes that "in-stent late loss" be defined as **"the minimal luminal diameter (determined by a specific protocol) within the stent immediately following implantation minus minimal luminal diameter (determined by a specific protocol) within the stent at a specified time following implantation."** Cordis proposes: "the loss of lumen diameter, calculated by taking the smallest lumen diameter, after implantation, anywhere within the stent, and then subtracting the smallest lumen diameter, at a specified time (such as one year) following implantation, anywhere within the stent."[33]

The parties appear to agree generally that in-stent late loss is the difference in minimum lumen diameter in the stent immediately following implantation and some specified time period following implantation. BSC submits that its definition is more precise in that it clarifies that the

---

[33]   Both parties essentially agree that "mean" in-stent late loss is the average of the in-stent late loss values. (*See* Ex. A at BSC-A-17).

first measurement must be taken immediately following implantation. Cordis's definition leaves the timing of the first measurement unclear. BSC's definition also clarifies that the measurement of the minimal lumen diameter is done pursuant to a specific protocol.[34] This is required because these diameters cannot be directly measured, but rather are measured indirectly using complicated angiography techniques.

The claims of the '662 patent require that the claimed measurements be taken by quantitative coronary angiography ("QCA"). (*See* Ex. 4 at claims 1, 2, 3, 5, 6, 7, 9, 10, 11, 13, 14 and 15 (JA81)). ████████████████████████████████████████

████████████████████████████████████████████████

████████████     ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ BSC's proposed construction is the only one that reflects that a protocol must be specified in order to make QCA measurements. (*See* Ex. A at BSC-A-17). Cordis's construction, on the other hand, ignores QCA protocols entirely,

---

[34]     Similarly, the only difference between the parties' definitions of "in-stent diameter stenosis" is that BSC notes that minimal lumen diameter needs to be determined pursuant to a specific protocol. (*See* Ex. A at BSC-A-17).

35

effectively reading the limitation that the claims be "as measured by quantitative coronary angiography" out of the claims.  Thus, BSC's construction should be adopted.

F.   **"Human Population"**

BSC proposes that the term "human population" be construed to mean "**a class of people distinguished by particular traits or characteristics.**"  Cordis originally proposed that this term simply means "a group of human beings," but recently engrafted additional limitations on its proposal: "a group of human patients that are candidates for coronary stent therapy and would be a suitable group for testing in a clinical trial for stents."  To the extent that this is intended to be substantively different than the original proposal, it should be rejected for improperly adding limitations to the claim.

BSC's proposal comports with the ordinary meaning of what a human population is – a group of humans classified together in some way.  (*See* Webster's New World Dictionary 1109 (2nd ed. 1984) (Ex. N at BSC-A-258) (defining population as "a (specified) part of the people in a given area [the Japanese population of Hawaii]."); Am. Heritage Dictionary 1366 (4th ed. 2000) (Ex. F at BSC-A-227) (defining population as "[a]ll of the people inhabiting a specified area" or the "total number of inhabitants constituting a particular race, class, or group in a specified area.")).  The specification provides no reason to alter this ordinary meaning.

Cordis's proposal not only contains limitations nowhere found in the claim terms or specification, but also is indefinite.  It leaves undecided what makes a group "suitable" for testing in a clinical trial, and who decides suitability.  Each clinical trial is different, and has different suitable populations, depending on the purpose of the study.  There is no discussion in the specification that would shed light on what is meant by suitability here.

Further, Cordis's added limitations do not even make sense in the context of the claimed invention.  The claim is for a drug-eluting stent and it requires that the stent have certain broad

36

biological effects in vivo. The purpose of the stent is to treat patients, not generate clinical trials. The claim is not limited to the use of stents in clinical trials or on only those patients who meet some unspecified clinical testing protocol. Rather, the claim applies to anybody who has a stent implanted (*i.e.*, the population), provided that whole population achieves the claimed in vivo effects – a much broader and more diverse group than the participants in a particular clinical trial. Cordis's construction should be rejected.

### G.    "About"

BSC proposes that the term "about" be construed to mean "**very close to.**" Cordis proposes the broader construction of "approximately." BSC's proposal should be adopted because it better reflects how this term should be construed in light of the intrinsic record, and specifically the data that underlies the numerical claimed values that are modified by the term.

The term "about" is commonly used in patent claims, and "is not subject to a precise construction…but is dependent on the factual situation presented." *Jeneric/Pentron*, 205 F.3d at 1381. In this particular factual situation, the '662 patent specification reveals that the measurements to which "about" is applied in the claims are specific values that favor construing "about" more narrowly as BSC proposes.

The first context in which "about" is used as a claim limitation is with respect to limitations on the amount of rapamycin on the claimed stent. (*See, e.g.*, '662 patent at claim 1 (Ex. 4 at JA81) ("from about 64 μg to about 197 μg of rapamycin…")). In claim 1, these values are taken from Table 3 in the '662 patent specification, which summarizes the results from Cordis's rabbit study. (*Id.* at cols. 9-10 (JA77)). Table 3, however shows that only three possible amounts of rapamycin were actually tested in rabbits—64 μg, 196 μg and 197 μg. (*Id.*) Given how close two of these values are to one another (196 μg and 197 μg), the specification does not support any substantial variation from the claimed values of 64 μg and 197 μg. Thus,

37

the specification supports a narrower construction of "about" with respect to these values, as proposed by BSC.

"About" is also used with respect to claim limitations covering in-stent late loss in diameter at 12 months following implantation in a human, for instance, 0.5 mm. (*See, e.g., id.* at claims 1, 5, 9, 13 (Ex. 4 at JA81)). These values come in part from Table 5 in the specification, which sets forth results from Cordis's "First-in-Man" trial. Table 5 notes that mean 12 month in-stent late loss (mm) was ".11±.36mm." (*Id.* at col. 11-12 (JA78)). When .11mm and .36mm are added, the result, .47mm, is very close to the .5mm upper limit in several of the claims. (*Id.* at claims 1, 5, 9 and 13 (JA81)). Thus, the data underlying these claim limitations also support BSC's narrower construction of "about."

Another way in which "about" appears in the claims is with respect to the limitation covering in-stent diameter stenosis at 12 months. (*Id.* at claims 4, 8, 12 and 16 (JA81)). Again, Table 5 of the specification supports a narrow interpretation of "about." When the 8.9% and 6.1% are added, they equal 15%, the exact upper limit recited in claims 4, 8, 12 and 16. Table 5 also notes that the maximum in-stent diameter stenosis at 12 months was 22%, the exact upper limit for mean and in-stent diameter stenosis at 12 months in claims 3, 7, 11 and 15.

The data in the '662 patent specification that the claims refer to support BSC's narrower and more precise proposed construction of "about." Cordis's broader proposal is not only unsupported by the limited data set forth in the patent, but also adds a level of indefiniteness that creates the potential to effectively eviscerate these values and upper limits as discernible claim limitations and makes determination of infringement next to impossible.

38

## CONCLUSION

For the foregoing reasons, BSC respectfully requests that the Court adopt BSC's

proposed claim constructions.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Andrew A. Lundgren*

Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4489) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6600

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated: September 16, 2009

054604.1003

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 16, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
> John G. Day, Esquire [jday@ashby-geddes.com]
> Lauren E. Maguire, Esquire [lmaguire@ashby-geddes.com]
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on September 16, 2009, I caused a copy of the foregoing document to be served by E-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

### BY E-MAIL

> David T. Pritikin, Esquire [dpritikin@sidley.com]
> William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
> Russell E. Cass, Esquire [rcass@sidley.com]
> Jon M. Spanbauer (jspanbauer@sidley.com)
> SIDLEY AUSTIN LLP
> One South Dearborn
> Chicago, IL 60603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Andrew A. Lundgren

Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

*Attorney for Plaintiffs, Boston Scientific Corporation and Boston Scientific Scimed, Inc.*

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 25, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
> John G. Day, Esquire [jday@ashby-geddes.com]
> Lauren E. Maguire, Esquire [lmaguire@ashby-geddes.com]
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on September 25, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail*
>
> David T. Pritikin, Esquire [dpritikin@sidley.com]
> William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
> Russell E. Cass, Esquire [rcass@sidley.com]
> Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
> SIDLEY AUSTIN LLP
> One  South Dearborn
> Chicago, IL 60603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*
_____
Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
*Attorneys for Plaintiffs Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*