IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) |
| Plaintiffs, | ) ) Civil Action No. 07-333-SLR ) Civil Action No. 07-348-SLR |
| v. | ) Civil Action No. 07-409-SLR ) |
| JOHNSON & JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) |
| Defendants. | ) ) |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) |
| Plaintiffs, | ) ) Civil Action No. 07-765-SLR |
| v. | ) ) |
| JOHNSON & JOHNSON, INC., CORDIS CORPORATION, and WYETH | ) **REDACTED –** ) **PUBLIC VERSION** ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' APPENDIX OF EXHIBITS TO
THEIR MARKMAN BRIEF**

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated: September 16, 2009

YOUNG CONAWAY STARGATT & TAYLOR LLP
Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
jingersoll@ycst.com
kkeller@ycst.com
(302) 571-6554

*Attorneys for Plaintiffs*

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and<br>BOSTON SCIENTIFIC SCIMED, INC.,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>JOHNSON & JOHNSON, INC. and<br>CORDIS CORPORATION,<br><br>    *Defendants.* | Civil Action No. 07-333-SLR<br>Civil Action No. 07-348-SLR<br>Civil Action No. 07-409-SLR |
| BOSTON SCIENTIFIC CORPORATION and<br>BOSTON SCIENTIFIC SCIMED, INC.,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>JOHNSON & JOHNSON, INC.,<br>CORDIS CORPORATION, and WYETH<br><br>    *Defendants.* | Civil Action No. 07-765-SLR |

## JOINT CLAIM CONSTRUCTION STATEMENT

Pursuant to paragraph 7 of the Court's Scheduling Order, Plaintiffs Boston Scientific

Corp. and Boston Scientific Scimed, Inc. (collectively, "BSC") and Defendants Johnson &

Johnson, Inc., Cordis Corp., and Wyeth (collectively, "Cordis") jointly submit the accompanying

claim charts which identify the disputed terms appearing in the asserted claims of U.S. Patent

Nos. 7,217,286 ("the '7286 patent"), 7,223,286 ("the '3286 patent"), 7,229,473 ("the '473

BSC-A-000001

patent"), and 7,300,662 ("the '662 patent") and provide the parties' proposed constructions for

those terms.

YOUNG CONAWAY STARGATT &         ASHBY & GEDDES
   TAYLOR, LLP


/s/ Karen E. Keller                /s/ Lauren E. Maguire

Josy W. Ingersoll (No. 1088)       Steven J. Balick (No. 2114)
Karen L. Pascale (No. 2903)        John G. Day (No. 2403)
Karen E. Keller (No. 4489)         Lauren E. Maguire (No. 4261)
Andrew A. Lundgren (No. 4429)      500 Delaware Avenue, 8th Floor
The Brandywine Building, 17th Floor P.O. Box 1150
1000 West Street                   Wilmington, DE 19899
Wilmington, DE 19801               sbalick@ashby-geddes.com
jingersoll@ycst.com                jday@ashby-geddes.com
kpascale@ycst.com                  lmaguire@ashby-geddes.com
kkeller@ycst.com                   (302) 654-1888
alundgren@ycst.com
(302) 571-6600                     *Attorneys for Defendants Johnson & Johnson,
                                   Inc., Cordis Corp., and Wyeth*
*Attorneys for Plaintiffs
Boston Scientific Corporation and
Boston Scientific Scimed, Inc.*


DATED: August 21, 2009

BSC-A-000002

U.S. Patent No. 7,217,286

| '7286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "stent" (claim 1) | A device for providing support for a lumen in the body. | a tube-shaped mesh device used to treat certain forms of cardiac disease |
| "biocompatible" (claim 1) | Does not elicit any negative tissue reaction or promote mural thrombosis formation. | able to perform its function in the body with an acceptable biological response |
| "carrier" (claim 1) | A therapeutic agent-containing material co-formulated with the therapeutic agent. | material that carries the drug |
| "therapeutic agent" (claim 1) | The parties have agreed on the following construction: A substance administered to treat or prevent a disease or condition. | |
| "polymer" (claim 1) | A molecule composed of many repeating units of a single monomer. | a material formed by polymerization and comprising repeating units of the same or different types of monomers |
| "copolymer" (claim 1) | A molecule composed of many repeating units of at least two different monomers. | a "polymer" (previously defined) having two or more types of monomers |
| "polymeric" (claim 1) | Relating to a material comprising a polymer or copolymer. | containing a "polymer" (previously defined) |

DB02:8633817.1

067379.1001

BSC-A-000003

| '7286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "acrylate-based polymer" (claim 1)<br><br>"acrylate-based copolymer" (claim 1)<br><br>"acrylate-based polymer or copolymer" (claim 1) | "acrylate-based polymer or copolymer".<br><br>A molecule comprising many repeating units of a single acrylate monomer, or a molecule comprising many repeating units of at least two different monomers where at least one of the monomers is an acrylate. | "acrylate-based polymer".<br><br>a "polymer" (previously defined) in which all of the monomers are based on the structure of a salt or ester of acrylic acid.<br><br>"acrylate-based copolymer".<br><br>a "copolymer" (previously defined) in which at least one of the types of monomers is based on the structure of a salt or ester of acrylic acid.<br><br>"acrylate-based polymer or copolymer".<br><br>(previously defined) |
| "fluorinated polymer" (claim 1) | A molecule comprising many repeating units of a single monomer wherein the monomer contains one or more fluorine atoms. | a "polymer" (previously defined) containing one or more fluorine atoms |
| "mixture thereof" (claim 1) | To the extent not indefinite: A composition in which substances are combined and intermingled. | "mixture thereof" means combination of the foregoing |

067379.1001

DB02:8633817.1

BSC-A-000004

| "7286 Claim Term" | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "rapamycin" (claim 1) | The chemical compound with the following structure:<br><br> | sirolimus |
| "analog" (claim 1)<br>"analog thereof" (claim 1) | "analog thereof":<br><br>To the extent not indefinite: A chemical compound with a structure similar to rapamycin (as defined). | "analog":<br><br>a compound structurally similar to sirolimus which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response. |
| "macrocyclic lactone analog" (claim 1) | To the extent not indefinite: A macrocyclic lactone molecule with a structure similar to rapamycin (as defined). | A compound structurally similar to sirolimus having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response |

DB02:8633817.1

087379.1001

BSC-A-000005

| '7286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "rapamycin, or a macrocyclic lactone analog thereof" (claim 1) | (as defined above) | sirolimus, or a structurally similar compound having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response. |
| "an amount effective to inhibit neointimal proliferation" (claim 1) | To the extent not indefinite: An amount sufficient to stop neointimal proliferation. | an amount that works to reduce neointimal proliferation |
| "provides a controlled release of said therapeutic agent over a period of several weeks" (claim 3) | To the extent not indefinite: Therapeutic agent is discharged in a controlled manner over a period of more than one week and up to six weeks. | releases said therapeutic agent gradually, where some drug is released during each of several weeks |
| "several" (claim 3) | | "several": <br><br> more than two or three but not many |

### U.S. Patent No. 7,223,286

| '3286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "stent" (claim 1) | A device for providing support for a lumen in the body. | a tube-shaped mesh device used to treat certain forms of cardiac disease |
| "coating" (claim 1) | To the extent not indefinite: A distinct covering layer of a particular composition. | covering layer(s) |

-4-

DB02:8633817.1

067379.1001

BSC-A-000006

| '3286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "applied thereto" (claim 1)<br><br>"is applied" (claim 2)<br><br>"are applied" (claim 44) | To the extent not indefinite: Brought into direct contact with the stent surface. | put thereon |
| "biocompatible" (claim 1) | Does not elicit any negative tissue reaction or promote mural thrombosis formation. | able to perform its function in the body with an acceptable biological response |
| "mixture" (claim 1) | To the extent not indefinite: A composition in which substances are combined and intermingled. | "mixture" means combination |
| "rapamycin" (claim 1) | The chemical compound with the following structure:<br><br> | sirolimus |
| "analog" (claim 1)<br><br>"analog thereof" (claim 1) | "analog thereof" / "analog of rapamycin":<br><br>To the extent not indefinite: A chemical | "analog":<br><br>a compound structurally similar to sirolimus which is capable of inhibiting |

DB02:8633817.1

067379.1001

BSC-A-000007

| '3286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "analog of rapamycin" (claim 31) | compound with a structure similar to rapamycin (as defined). | both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response.<br><br>"analog of rapamycin":<br><br>a structurally similar compound to sirolimus, having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation and the smooth muscle cell hyperproliferative response |
| "macrocyclic lactone analog" (claim 1) | To the extent not indefinite: A macrocyclic lactone molecule with a structure similar to rapamycin (as defined). | A compound structurally similar to sirolimus having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response |
| "rapamycin or a macrocyclic lactone analog thereof" (claim 1) | (as defined above) | sirolimus, or a structurally similar compound having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response. |

DB02:8633817.1

067379.1001

BSC-A-000008

| '3286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "onto the stent" (claims 5, 6, 47, 48) | To the extent not indefinite: Brought into direct contact with the stent surface. | on the "stent" (previously defined) |
| "polymer" (claim 1) | A molecule composed of many repeating units of a single monomer. | a material formed by polymerization and comprising repeating units of the same or different types of monomers |
| "polymeric" (claim 40) | Relating to a material comprising a polymer or copolymer. | containing a "polymer" (previously defined) |
| "copolymer" (claim 10) | A molecule composed of many repeating units of at least two different monomers. | a "polymer" (previously defined) having two or more types of monomers |
| "acrylate-based polymer" (claims 10, 52) | A molecule composed of many repeating unit of a single acrylate monomer. | a "polymer" (previously defined) in which all of the monomers are based on the structure of a salt or ester of acrylic acid. |
| "acrylate-based copolymer" (claims 10, 52) | A molecule composed of many repeating units of at least two different monomers where at least one of the monomers is an acrylate. | a "copolymer" (previously defined) in which at least one of the types of monomers is based on the structure of a salt or ester of acrylic acid. |
| "fluorinated polymer" (claims 10, 52) | A molecule comprising many repeating units of a single monomer wherein the monomer contains one or more fluorine atoms. | a "polymer" (previously defined) containing one or more fluorine atoms |
| "poly(ether-ester) copolymer" (claim 10) | A molecule composed of many repeating units of at least two different monomers, where one monomer is an ether and another monomer is an ester. | a "copolymer" (previously defined) containing one monomer that includes an ether and another monomer that includes an ester |

-7-

DB02.8633817.1

067379.1001

| '3286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "blend thereof" (claim 10) | To the extent not indefinite: A composition of combined and intermingled substances. | a mixture of two or more of the foregoing |
| "provides a controlled release of [X] over a period of several weeks" (claims 28, 70) | To the extent not indefinite: [X] is discharged in a controlled manner over a period of more than one week and up to six weeks. | releases X gradually, where some drug is released during each of several weeks |
| "several" (claims 28, 70) | | "several": more than two or three but not many |
| "releases" (claims 30, 34, 74) | "releases [X] over a period of at least 14 days": | "releases": discharges |
| "releases [X] over a period of at least 14 days" (claims 30, 34, 74) | To the extent not indefinite: Discharges [X] over a period of 14 days or longer. | "releases [X] over a period of at least 14 days": "releases" (previously defined) [X] over no less than 14 days |
| "present in a therapeutically beneficial amount to inhibit neointimal proliferation" (claim 32) | To the extent not indefinite: An amount sufficient to stop neointimal proliferation. | present in an amount that is enough to help the patient by reducing neointimal proliferation |
| "present in an amount effective to inhibit neointimal proliferation" (claim 40) | | |
| "carrier" (claim 40) | A drug-containing material co-formulated with the drug. | material that carries the drug |
| "drug" (claim 40) | The parties have agreed on the following construction: A substance administered to treat or prevent a disease or condition. | |

-8-

DB02.8633817.1

087378.1001

BSC-A-000010

| '3286 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "mixed together" (claim 41) | To the extent not indefinite: Combined and intermingled. | combined together |

## U.S. Patent No. 7,229,473

| '473 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "stent" (claim 1) | A device for providing support for a lumen in the body. | a tube-shaped mesh device used to treat certain forms of cardiac disease |
| "coating" (claim 1) | To the extent not indefinite: A distinct covering layer of a particular composition. | covering layer(s) |
| "applied thereto" (claim 1) | To the extent not indefinite: Brought into direct contact with the stent surface. | put thereon |
| "mixture" (claim 1) | To the extent not indefinite: A composition in which substances are combined and intermingled. | "mixture" means combination |
| "biocompatible" (claim 1) | Does not elicit any negative tissue reaction or promote mural thrombosis formation. | able to perform its function in the body with an acceptable biological response |
| "carrier" (claim 1) | A therapeutic agent-containing material co-formulated with the therapeutic agent. | material that carries the drug |
| "therapeutic agent" (claim 1) | The parties have agreed on the following construction:  A substance administered to treat or prevent a disease or condition. | |

-9-

BSC-A-000011

| '473 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "rapamycin" (claim 1) | The chemical compound with the following structure:  | sirolimus |
| "analog" (claim 1) "analog thereof" (claim 1) | "analog thereof": To the extent not indefinite: A chemical compound with a structure similar to rapamycin (as defined). | "analog": a compound structurally similar to sirolimus which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response. |
| "macrocyclic lactone analog" (claim 1) | To the extent not indefinite: A macrocyclic lactone molecule with a structure similar to rapamycin (as defined). | A compound structurally similar to sirolimus having the same macrocyclic lactone ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response |

-10-

DB02:8833817.1

067379.1001

BSC-A-000012

| '662 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "polymeric" (claim 1) | Relating to a material comprising a polymer or copolymer. | containing a "polymer," a material formed by polymerization and comprising repeating units of the same or different types of monomers |
| "coating" (claim 1) | To the extent not indefinite: A distinct covering layer of a particular composition. | covering layer(s) |
| "affixed to the intraluminal stent" (claim 1) | To the extent not indefinite: Attached to the stent surface. | attached to the intraluminal "stent" (previously defined) |
| "rapamycin" (claim 1) | The chemical compound with the following structure:<br><br>and analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as the above chemical compound. | sirolimus and all analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as sirolimus. |

-13-

BSC-A-000015

| '662 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "analog" (claim 1) | "analog thereof": | "analog": |
| "analog thereof" (claim 1) | To the extent not indefinite: A chemical compound with a structure similar to rapamycin (as defined above). | a compound structurally similar to sirolimus which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response. |
| "macrocyclic triene analog" (of rapamycin) (claim 1) | To the extent not indefinite: A macrocyclic triene molecule with a structure similar to rapamycin (as defined above). | a compound structurally similar to sirolimus having the same macrocyclic triene ring structure which is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the smooth muscle cell hyperproliferative response. |
| "incorporated into" (claim 1) | To the extent not indefinite: Combined with. | combined into |
| "in-stent late loss" (claim 1) | To the extent not indefinite: The minimal luminal diameter (determined by a specific protocol) within the stent immediately following implantation minus minimal luminal diameter (determined by a specific protocol) within the stent at a specified time following implantation. | the loss of lumen diameter, calculated by taking the smallest lumen diameter, after implantation, anywhere within the stent, and then subtracting the smallest lumen diameter, at a specified time (such as one year) following implantation, anywhere within the stent |

-14-

DB02:8633817.1

067379.1001

BSC-A-000016

| '662 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "in stent diameter stenosis" (claim 3) | To the extent not indefinite:<br><br>100 X [1 – (minimal lumen diameter determined by a specific protocol / reference vessel diameter determined by a specific protocol)]. | 100 X [1 – (minimal lumen diameter / reference vessel diameter)] |
| "quantitative coronary angiography" (claim 1) | To the extent not indefinite: An analytical technique employing particular specified hardware and software, and technician assumptions. | a test to measure the lumen diameter of coronary vessels |
| "mean in-stent late loss" (claim 5) | To the extent not indefinite: The average of in-stent late loss values. | the arithmetic average "in-stent late loss" (previously defined) |
| "human population" (claim 5) | To the extent not indefinite: A class of people distinguished by particular traits or characteristics. | a group of human patients that are candidates for coronary stent therapy and would be a suitable group for testing in a clinical trial for stents |
| "mean in-stent diameter stenosis" (claim 7) | To the extent not indefinite: The average of in-stent diameter stenosis values. | the arithmetic average "in stent diameter stenosis" (previously defined) |
| "releases a portion" (claim 18) | To the extent not indefinite: Discharge less than all of X. | discharges a portion |
| "about [X] ug" (claim 1) | Very close to X ug. | Approximately X ug. |
| "about [X] mm (claim 1) | Very close to X mm. | Approximately X mm. |
| "about [X] %" (claim 3) | Very close to X %. | Approximately X %. |

-15-

DB02:8833817.1

067379.1001

BSC-A-000017

| '662 Claim Term | BSC's Proposed Construction | Cordis's Proposed Construction |
|---|---|---|
| "about six weeks" (claim 18) | Very close to six weeks. | Approximately six weeks. |

-16-

0673789.1001

BSC-A-000018

# EXHIBIT B

# APPENDIX D

# Declaration of Antonios G. Mikos, Ph.D.

BSC-A-000019

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*In re Inter Partes* Reexamination of

U.S. Patent No. 7,217,286

**Examiner: Catherine Serke Williams**

**Control No.: 95/001,096**

**Art Unit: 3993**

**Filed: October 24, 2008**

**Confirmation No.: 8893**

For:   **Local Delivery Of Rapamycin For Treatment Of Proliferative Sequelae Associated With PTCA Procedures, Including Delivery Using A Modified Stent**

## DECLARATION OF ANTONIOS G. MIKOS, PH.D.

I, Antonios G. Mikos, Ph.D., hereby declare the following:

1.      I am Louis Calder Professor of Bioengineering and Chemical and Biomolecular Engineering, Departments of Bioengineering and Chemical and Biomolecular Engineering, Rice University ("Rice"), a position I have held since 2008. I am also Director of the J.W. Cox Laboratory for Biomedical Engineering and the Director of the Center for Excellence in Tissue Engineering at Rice. I am also President, Biomedical and Informatics Consultants, Inc., a position I have held since 2002.

2.      In 1983 I received my Diploma in Chemical Engineering from the Aristotle University of Thessaloniki, Greece. In 1988 I received my Ph.D. in Chemical Engineering from Purdue University. From 1990-1991 I was a postdoctoral researcher at the Department of Chemical Engineering, Massachusetts Institute of Technology and the Department of Surgery, The Children's Hospital of Boston, Harvard Medical School. From 1992-1996 I was the T.N. Law Assistant Professor of Chemical Engineering and Bioengineering, Department of Chemical Engineering, Rice. From 1996-1999 I was Associate Professor of Bioengineering and Chemical Engineering, Departments of Bioengineering and Chemical

BSC-A-000020

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

Engineering at Rice. From 1999-2008, I was the John W. Cox Professor of Bioengineering and Chemical and Biomolecular Engineering, Departments of Bioengineering and Chemical and Biomolecular Engineering at Rice. My *curriculum vitae* is attached as Exhibit 1.

3.      I have twenty years of experience in bioengineering, regenerative medicine, and biomaterials research. My expertise is in the synthesis, fabrication and application of biomaterials, specifically polymers, for medical applications, including cardiovascular applications. My work has resulted in novel orthopedic, ophthalmic, and cardiovascular biomaterials. My laboratory at Rice specializes in biomaterials science, drug delivery, gene therapy, and tissue engineering.

4.      In the course of my career I have received numerous awards for my research, including the 2009 Outstanding Chemical Engineer Award from Purdue University; the 2008 Distinguished Scientist Award from the Houston Society for Engineering in Medicine and Biology; the 2007 Robert A. Pritzker Distinguished Lecturer Award from the Biomedical Engineering Society; and the 2007 Alpha Chi Sigma Award for Chemical Engineering Research from the American Institute of Chemical Engineers. In 2005 I received the Marshall R. Urist Award for Excellence in Tissue Regeneration Research from the Orthopaedic Research Society. I was a fellow of the International Union of Societies for Biomaterials Science and Engineering in 2000, and a fellow of the American Institute for Medical and Biological Engineering in 1999. I also received the Outstanding Young Investigator Award from the Materials Research Society in 1996.

5.      I am currently the Editor-in-Chief of the following journals: *Tissue Engineering Part A*; *Tissue Engineering Part B: Reviews*; and *Tissue Engineering Part C: Methods*. I serve on the Faculty Operating Committee and Executive Committee of the Medical Scientist Training Program at Baylor College of Medicine and Rice. I also currently serve as the Continental Chair of the Tissue Engineering and Regenerative Medicine International Society (TERMIS)-North America. I have been active in other professional societies, including service as Vice-President (1998-2000) and Member Governor (2003-2005) of the Tissue Engineering Society International (TESi), of which I am a founding member.

6.      Over the course of my academic career I have authored or co-authored eleven books and approximately 300 journal publications (in addition to proceedings and abstracts), published in, among others, the *Journal of Controlled Release, Biomacromolecules, Biomaterials,* and the *Journal of Biomedical Materials Research.* I have also been listed as a co-inventor on 24 patents in the area of biomaterials and bone tissue regeneration.

7.      I have received research grants as the principal investigator of studies of biomaterials for bone tissue engineering and regeneration from the National Institutes of Health and the National Science Foundation, among others. I also have receive research grants from the

2

BSC-A-000021

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

Whitaker Foundation for development of cardiovascular biomaterials for the treatment of restenosis. I have trained approximately 26 post-doctoral students and over 40 doctoral students in the area of tissue engineering and biomaterials.

8.      Since 1993 I have been involved in research activities directed toward the development of local drug delivery systems for the prevention of restenosis. As a result of my research activities, I am knowledgeable about efforts that were underway in the 1990s for the development of an effective treatment for the prevention of restenosis.

9.      I am being compensated for my work on this matter at the rate of $500/hour for consulting services, and $700/hour for time spent testifying. From 1994-1995, I received a research grant to study Biodegradable Polymer Foams For Dermal Tissue Repair from Johnson & Johnson Medical in the amount of $18,834. *See* CV, Ex. 1, at p. 119. On June 2, 1997, I presented a lecture entitled "Guided Bone Regeneration Using Biodegradable Polymer Scaffolds" at Johnson & Johnson's Corporate Biomaterials Center, Somerville, NJ. *Id.* at p. 103.

I.      THE '7286 PATENT

10.      U.S. Patent No. 7,217,286 (the "'7286 patent"), assigned to Cordis, is entitled "Local Delivery Of Rapamycin For Treatment Of Proliferative Sequelae Associated With PTCA Procedures, Including Delivery Using A Modified Stent." The '7286 patent issued on May 15, 2007.

11.      The '7286 patent describes and claims important inventions that are incorporated in Cordis's ground-breaking and highly successful Cypher® Sirolimus-eluting Coronary Stent (the "Cypher® stent"). By delivering rapamycin in a controlled fashion to a patient, the Cypher® stent finally solved the long-standing problem of in-stent restenosis. The Cypher® stent is the first drug-eluting stent to obtain FDA approval and to be sold in the United States.

12.      The '7286 patent claims, among other things, (a) a metallic stent having (b) a biocompatible, nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, and (c) rapamycin or a macrocyclic lactone analog of rapamycin ("analog of rapamycin") present in an amount effective to inhibit neointimal proliferation. The '7286 patent also claims a method of using such stents for the inhibition of neointimal proliferation resulting from percutaneous transluminal coronary angioplasty ("PTCA").

13.      The "Background of the Invention" section of the '7286 patent describes the problem of restenosis, *i.e.*, re-narrowing of the coronary arteries following PTCA, which had plagued the interventional cardiology field for many years. '7286 Patent, Column 1, lines 34-53.

3

BSC-A-000022

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

The Background goes on to describe prior art experimental approaches for preventing smooth muscle cell ("SMC") proliferation underlying restenosis, including the administration of agents such as heparin, angiopeptin, calcium channel blockers, angiotensin converting enzyme ("ACE") inhibitors such as captopril and cilazapril, cyclosporin A, anti-platelet agents such as trapidil, antifungal agents such as terbinafine, colchicine, taxol, c-myc and c-myb antisense oligonucleotides, and a goat antibody to SMC mitogen platelet derived growth factor ("PDGF"). *Id.* at Column 1, line 54 to Column 2, line 11. As the '7286 patent explains, the *in vivo* experimental success in animal models of several agents known to inhibit SMC growth suggested that these agents as a class have the capacity to prevent clinical restenosis. Despite this, "no therapy has as yet proven successful clinically in preventing restenosis after angioplasty." *Id.* at Column 2, lines 11-16. Thus "restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease." *Id.* at Column 3, lines 28-30.

14.    The '7286 patent contains 5 claims, the text of which is set forth below:

1.    A device comprising a metallic stent, a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent, wherein:

said polymeric carrier comprises an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, and

said therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof, and is present in an amount effective to inhibit neointimal proliferation.

2.    The device according to claim 1 wherein said therapeutic agent is a macrocyclic lactone analog of rapamycin.

3.    The device according to claim 1 that provides a controlled release of said therapeutic agent over a period of several weeks.

4.    The device according to claim 2 that provides a controlled release of said therapeutic agent over a period of several weeks.

5.    A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a device according to any one of claims 1 to 4 in the lumen of said coronary artery.

15.    I am informed and understand that claims 1, 2 and 5 of the '7286 patent are entitled to a priority date of April 18, 1997, and that claims 3 and 4 of the '7286 patent are entitled to a priority date of April 16, 1998.

4

BSC-A-000023

## II.   THE PROBLEM OF RESTENOSIS

16.     Coronary artery disease ("CAD") is the most common form of heart disease in the United States, affecting approximately 13 million Americans. *See, e.g.,* http://my.clevelandclinic.org/disorders/coronary_artery_disease/hic_coronary_artery_disease.aspx. CAD and its complications, including heart failure, arrhythmia, angina, and myocardial infarction (heart attack), are the leading causes of death in the United States for both men and women. CAD is also the leading cause of death worldwide.

17.     Occlusive CAD in most cases is caused by coronary atherosclerosis. Atherosclerosis is a pathologic condition in which fibrous "plaques" made up of fat, cholesterol, calcium, and other substances build up inside the arteries, resulting in stenosis (narrowing) of the artery. Progressive plaque build-up can result in blockage of the coronary arteries, depriving the heart of vital oxygen and nutrients, and causing tissue damage and potentially serious complications.

18.     PTCA is a well-accepted non-surgical revascularization method used to treat patients with occlusive CAD. During this procedure, the physician makes an incision to create an opening to the patient's artery in the groin area. A guide catheter and then a guidewire are inserted into the artery and guided to the area of the blockage in the coronary blood vessels. A catheter with a small balloon on its tip is inserted over the guide wire and positioned at the stenotic site. After assessing the lesion, the physician inflates the balloon at the end of the catheter, applying pressure that fractures the plaque or compresses the plaque against the wall of the artery, thereby widening the artery and increasing blood flow to the heart. The size of the balloon, inflation pressure, and the number and duration of inflations vary according to the lesion characteristics.

19.     The first PTCA in a human was performed in September 1977. It provided a valuable treatment option for physicians, but a number of limitations remained. One problem was that sometimes the coronary artery would close, narrow or collapse after the balloon was inflated or withdrawn ("abrupt vessel closure"). In addition, in 30-50% of all initially successful PTCA procedures, restenosis (re-narrowing) occurred within 3-6 months, resulting in new blockages of the coronary artery at the site of angioplasty. Brieger *et al.,* Local drug delivery systems and prevention of restenosis, *Cardio Res* 1997;35(3):405-413 ("Brieger (1997)"), Ex. 2, at p. 405.

20.     The high pressures used during the PTCA balloon dilatation process inflict trauma to the delicate arterial tissue. Restenosis occurs in response to this PTCA-induced injury to the coronary artery. Complex and multifactorial, the restenotic process comprises three components: vascular recoil, late remodeling, and intimal hyperplasia. Vascular recoil occurs when plaque elements and tissue torn during balloon dilation gradually "fall back" into the

BSC-A-000024

lumen. The angioplasty balloon also stretches the vascular cells, causing them to "remodel" or constrict after the PTCA procedure. PTCA-induced injury also results in the growth of smooth muscle cells, fibroblasts and extracellular matrix into the lumen of the vessel, a process known as intimal hyperplasia.

21.     Intimal hyperplasia occurs as a result of the wound-healing process initiated in response to PTCA-mediated vascular injury. The angioplasty balloon damages the inner arterial wall ("intima," lined with endothelium), exposing deeper arterial tissues (the "media") and outer arterial layers ("adventitia") to the blood. The exposure of arterial tissue to the blood results in thrombus formation. The loss of antithrombotic factors caused by tissue damage contributes to the deposition and aggregation of platelets on the injured artery. These platelets secrete PDGF and other mitogenic factors, which penetrate the vessel wall and help trigger the proliferation and migration of smooth muscle cells ("neointima"). Smooth muscle cells normally exist in a "contractile" state, in which they rarely divide. The mitogenic factors target specific cell-surface receptors, activating intracellular signaling pathways that cause smooth muscle cells to assume a "synthetic" state, in which they begin proliferating by cell division. The growth factors also cause the cells to produce and secrete extracellular matrix, further thickening the vessel wall and narrowing its lumen. In addition, damage to the endothelial lining affects the production of molecules that down-regulate smooth muscle cell proliferation. The absence of these molecules is thought to accelerate the migration and proliferation of smooth muscle cells in the intima.

22.     In 1994, the FDA approved "bare metal" coronary stents, pioneered and developed by Johnson & Johnson together with Julio Palmaz, M.D. Stents are tiny, spring-like tubes made from metal or alloys that are placed in an artery during PTCA. Once in place, the stent forms a scaffold that keeps the artery open, improving blood flow and preventing the artery from collapsing. Bare metal stents solved the problem of abrupt vessel closure. Bare metal stents also eliminated the recoil and remodeling components of restenosis, substantially reducing the incidence of restenosis following balloon angioplasty.

23.     However, restenosis caused by neointimal hyperplasia remained a major problem following coronary stent placement, resulting in restenosis rates of 20-30% of patients who received an intravascular stent. Brieger (1997), Ex. 2, at p. 405. Described as the "Achilles Heel" of the interventional cardiologist, restenosis can cause catastrophic results with regard to the ability to successfully treat CAD. As explained by Dr. Paul S. Teirstein, Chief of Cardiology and Director of Interventional Cardiology, Scripps Clinic, La Jolla, CA, in Teirstein, Living the Dream of No Restenosis. *Circulation* 2001;104:1996-1998 ("Teirstein (2001)"), Ex. 3, at p.1996:

> When you take out the gall bladder, it doesn't grow back. No
> matter how much skill, experience, time and effort the
> interventionist brings to the table, restenosis can entirely reverse a

BSC-A-000025

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

perfect procedural result within months . . . . Ever since
angioplasty's inception, almost 25 years ago, restenosis has pulled
on its reins, holding it back by denying patients a predictably long-
lasting result.

24.    As early as 1993, one study estimated the economic impact of treating
coronary restenosis at $1.6 billion in the United States alone. *See* Topol *et al.*, Analysis of
coronary angioplasty practice in the United States with an insurance-claims data base.
*Circulation* 1993;87:1489-1497 (1993) , Ex. 4, at p.1495.

## III.    CORDIS'S GROUNDBREAKING CYPHER® DRUG ELUTING STENT AND ITS REMARKABLE RESULT OF "ZERO RESTENOSIS"

### A.    Cordis's Cypher® Stent

25.    In order to solve the problem of restenosis, Cordis developed the Cypher®
stent, which embodies the inventions claimed in the '7286 patent. The Cypher® stent was
approved for sale in Europe in April 2002. In April 2003, the Cypher stent became the first
drug-eluting stent to be approved by the FDA and sold in the United States.

26.    The Cypher® stent is a combination product comprised of two regulated
components: a device (a stent system) and a drug product (a formulation of sirolimus in a
polymer coating). Sirolimus, a rapamycin, is the active ingredient in the Cypher® stent.

27.    Sirolimus inhibits T-lymphocyte activation and smooth muscle cell and
endothelial cell proliferation in response to cytokine and growth factor stimulation. In the cell,
sirolimus binds to FK Binding Protein-12 (FKBP-12). The sirolimus-FKBP-12 complex binds to
and inhibits the activation of mammalian Target of Rapamycin ("mTor"), leading to the
inhibition of cell-cycle progression from the G1 to S phase. Thus, sirolimus limits the
multiplication of cells (*i.e.*, it is cytostatic), rather than killing them (cytotoxic).

28.    In the Cypher® stent, sirolimus is combined with a polymer blend of two
non-erodible polymers, polyethylene-co-vinyl acetate (PEVA) and poly *n*-butyl methacrylate
(PBMA), to form the basecoat which is applied to the stent. An outer layer of PBMA is applied
to the stent surface to control the release kinetics of sirolimus. A claim chart showing how the
Cypher stent is covered by claims of the '7286 patent is attached hereto as Exhibit 5.

29.    The polymer-drug combination used in the Cypher® stent, and the
controlled elution of the drug, are critical components responsible for the success of the Cypher®
stent in solving the problem of restenosis and for its commercial success. These aspects of the
Cypher® stent resulted in the stent's remarkable clinical results, which in turn let to its near-

BSC-A-000026

immediate adoption by interventional cardiologists and substantial commercial success. As I explain in more detail below, many other companies attempted to use materially different drugs and/or polymers or release systems, but failed to achieve the clinical results and commercial success attained by the Cypher® stent.

## B.    The Cypher® Stent's Remarkable Clinical Result Of "Zero Restenosis"

30.    After conducting extensive preclinical testing, Cordis conducted a pilot clinical study of the Cypher® stent, beginning in late 1999. This was the first time a drug-eluting stent was tested in a human, and was referred to as the First in Man ("FIM") clinical trial. The FIM trial was a non-randomized, open-label, pilot study conducted at two sites, the Institute Dante Pazzanese of Cardiology, Sao Paulo, Brazil, and Thoraxcenter, Dijkzigt University Hospital, Rotterdam, the Netherlands.

31.    In 2001, Cordis published the results of the FIM clinical trial of the Cypher® stent. At both the Brazil and Netherlands sites, patients treated with the Cypher® stent showed a absence of late loss by quantitative coronary angiography ("QCA") and a virtual absence of intimal hyperplasia by intravenous ultrasound ("IVUS") immediately after the procedure and at follow-up (4 or 6 months, depending on the site). The results of clinical follow-up were also excellent. *See* Sousa *et al.*, Lack of Neointimal Proliferation After Implantation Of Sirolimus-Coated Stents in Human Coronary Arteries: A Quantitative Coronary Angiography and Three-Dimensional Intravascular Ultrasound Study. *Circulation* 2001;103:192-195, Ex. 6, at p. 193; Rensing *et al.*, Coronary restenosis elimination with a sirolimus-eluting stent: first European human experience with 6-month angiographic and intravascular ultrasound follow-up. *Eur Heart J* 2001;22:2125-30, Ex. 7, at p. 2125-2127.

32.    These remarkable results were sustained over the long-term, and confirmed in multiple multi-center, double-blind, randomized clinical trials. Sousa *et al.*, Sustained Suppression of Neointimal Proliferation by Sirolimus-Eluting Stents: One-Year Angiographic and Intravascular Ultrasound Follow-Up. *Circulation*, 2001;104:2007-2011, Ex. 8, at p. 2007, 2009; Degertekin *et al.*, Persistent Inhibition of Neointimal Hyperplasia After Sirolimus-Eluting Stent Implantation Long Term (Up to 2 Years) Clinical, Angiographic, and Intravascular Ultrasound Follow-Up. *Circulation* 2002;106:1610-1613 ("Degertekin (2002)"), Ex. 9, at p. 1610, 1611-1612; Regar, *et al.* Angiographic Findings of the Multicenter Randomized Study With the Sirolimus-Eluting Bx Velocity Balloon-Expandable Stent (RAVEL): Sirolimus-Eluting Stents Inhibit Restenosis Irrespective of the Vessel Size. *Circulation* 2002;106:1949-56, Ex. 10, at p. 1956; Moses *et al.*, Sirolimus-eluting Stents versus Standard Stents in Patients with Stenosis in Native Coronary Artery. *N Engl J Med* 2003;349:1315-23, Ex. 11, at p. 1318, 1323; Schofer *et al.*, Sirolimus-eluting stents for treatment of patients with long atherosclerotic lesions in small coronary arteries: double-blind, randomised controlled trial (E-SIRIUS). *The Lancet* 2003;362:1093-99, Ex. 12, at p. 1093, 1096;

8

Schampaert, *et al.* The Canadian Study of the Sirolimus-Eluting Stent in the Treatment of Patients With Long De Novo Lesions in Small Native Coronary Arteries (C-SIRIUS). *J Am Coll Card* 2004;43:1110-15, Ex. 13, at p. 1110, 1112.

33.     When I read the initial reports of the clinical trials with Cypher®, I was surprised and delighted. Simply put, no one in the field of restenosis research could have predicted the dramatic clinical results obtained with the Cypher® stent. The Cypher® stent did not simply make incremental progress in treating restenosis – the initial reports indicated that it had eliminated the problem.

34.     The remarkable long-term result of "zero restenosis" obtained with the Cypher® stent in humans in the FIM and RAVEL trials had not been predicted by the animal studies that were done before the first human trial. Those showed an improvement over bare metal stents, but not the dramatic improvement seen in the first human trial. "For the first time in interventional cardiology, a new antirestenosis therapy performed better in humans than in animal models" – an unexpected result. Degertekin (2002), Ex. 9, at p. 1612.

## IV.   DEVELOPMENT OF DRUG ELUTING STENTS FOR RESTENOSIS

### A.   Drug-Eluting Stents Were Only One Of Numerous, Disparate Approaches Being Attempted

35.     At the time of the '7286 patent invention, researchers in the interventional cardiology field had been desperately seeking a treatment capable of widespread clinical use for the prevention of restenosis. A large number of different approaches had been tried, including physical and mechanical methods to remove arterial smooth muscle cells, delivery of radiation to the artery, systemic drugs, and a variety of local drug delivery catheters and other approaches.

36.     These efforts are documented in Teirstein (2001), Ex. 3, at pp 1996-997:

> The dream of an effective treatment for restenosis has eluded decades of effort by an army of investigators. Scores of devices, hundreds of drugs, and innumerable revascularization 'strategies' have failed to eliminate the 10% to 50% risk of recurrence after angioplasty. . . . Since the late 1970s, mammoth efforts and resources have been directed at restenosis.

37.     Garas *et al.*, Overview of therapies for prevention of restenosis after coronary interventions. *Pharmacol & Therapeutics* 2001;92:165-178 ("Garas (2001)"), Ex. 14, at p. 167, 174, also describes the "disappointing" results of clinical trials of numerous different pharmacological and mechanical approaches:

9

BSC-A-000028

> Large numbers of clinical trials have investigated various drug
> therapies in an attempt to reduce the rate of restenosis. . . . To date,
> no large-scale clinical trials of pharmacological therapy have
> demonstrated a significant reduction in the rate of restenosis. . . .
> Restenosis remains a major limitation in the long-term success of
> PTCA. Early trials with numerous pharmacological and
> mechanical devices have been disappointing.

38.     Brieger (1997), Ex. 2, at p. 405, describes that numerous, disparate
approaches were being attempted, but the results in clinical trials were disappointing:

> [O]ver recent years there has been a widespread intensive research
> effort directed towards identifying pharmacotherepeutic regimens
> targeting primarily (but not exclusively) the smooth muscle cell, to
> prevent the neointimal restenotic process. These have involved
> conventional pharmacological agents, as well as novel gene
> therapies, and many of these have been found to be effective in
> preventing restenosis in animal models of vascular injury
> following systemic administration. However, when these agents
> have progressed to clinical trials, the results have been almost
> uniformly disappointing.

39.     The wide variety of approaches proposed and tested reflects the complex
and multifactorial nature of restenosis, and a lack of complete understanding about its underlying
mechanisms. Poon *et al.*, Overcoming restenosis with sirolimus: from alphabet soup to clinical
reality. *The Lancet* 2002;359:619-22, Ex. 15, at p. 619 ("Neointimal formation remains an
enigma to interventional cardiologists and vascular biologists at large"); Brieger (1997), Ex. 2, at
p. 411 ("It is perhaps inevitable that our lack of understanding of the complex processes
responsible for restenosis resulted in a 'shotgun' approach to research into its prevention").
Restenosis encompasses multiple and distinct biological problems, including thrombosis,
inflammation, and hyperplasia. While it was known that neointimal hyperplasia, the primary
cause of in-stent restenosis, occurred as part of a wound-healing response to PTCA-induced
injury, the optimal mechanisms by which this response could be inhibited were not known.

40.     With regard to drug-based approaches, there was no consensus on the
manner in which the drug should be delivered or the time period for which it should be
administered. For example, some researchers believed that it was important to pre-treat the
patient prior to PTCA, others believed that the drug should be delivered in a burst at the time of
the procedure, and still others believed it should be delivered over a longer period of time. *See,*
*e.g.*, Gallo *et al.*, Inhibition of Intimal Thickening After Balloon Angioplasty in Porcine
Coronary Arteries by Targeting Regulators of the Cell Cycle. *Circulation* 1999;99:2164-2170,

10

BSC-A-000029

Ex. 16, at p. 2165 (rapamycin administered intramuscularly 3 days before angioplasty and continued for an additional 14 days); Poon *et al.*, Rapamycin Inhibits Vascular Smooth Muscle Cell Migration. *J Clin Invest* 1996;98(10):2277-283, Ex. 17, at p. 2278 (suggesting a 1 week treatment with oral rapamycin).

41.     Systemic drugs were tried without success. There were also many possible ways of delivering a drug locally, including delivery from the lumen, such as via a stent, or delivery from the adventitia, such as via the use of polymer sleeves, local pumps, or microparticles encapsulating drugs. Brieger (1997), Ex. 2, describes a "shotgun" approach to local drug delivery -- a "plethora of local drug delivery devices, vehicles and therapies" -- being attempted to solve the problem of restenosis, and their limitations. *Id.* at p. 411. These approaches included, for example:

- double balloon catheters (in which drug is infused into the isolated vessel segment between two balloons);

- porous and microporous balloon catheters (in which the drug infuses through pores into the arterial wall);

- channel balloon catheters (central balloon surrounded by a series of channels)

- transport catheters (central balloon surrounded by an outer porous balloon for drug infusion)

- infusion sheaths (which can be advanced over standard angioplasty catheters and advanced to the lesion after balloon dilatation);

- hydrogel balloon catheters (which use a hydrophilic acid polymer coating which swells when exposed to aqueous solution that may include drugs);

- dispatch catheters (which consist of an outer helix-shaped infusion balloon with delivery channels);

- iontophoretic balloon catheters (which rely on an electric current to increase cell permeability and facilitate transport into the vessel wall);

- catheters with circumferential injection needles (which allow direct application of the drug into the adventitia);

- attempts to use stents for local delivery, including using polymer-drug coated stents, coated removable stents, and stents seeded with genetically engineered cells; and

11

BSC-A-000030

- catheter-based delivery of local radiation.

*Id.* at pp. 405-411.

42.     My own laboratory was studying two possible approaches for prevention of restenosis:  a) intraluminal paving of arteries; and b) delivery of drugs from the adventitia, the outer connective tissue of the arterial wall.  The latter procedure is a risky one, because the artery is first isolated and then wrapped with a polymer coating.  The fact that such a risky approach was considered worth pursuing is a testament to how challenging the problem of restenosis was at the time.  Neither of the approaches studied in my laboratory resulted in a commercial product.

**B.     Unpredictability Associated With Polymer-Drug Coated Stents**

43.     Although local drug delivery via stents was being attempted in the mid-1990s, some investigators were skeptical that a polymer-drug coated stent would be available for widespread clinical use in the near future to achieve an antiproliferative effect. Fischell T., Polymer Coatings for Stents: Can We Judge a Stent by Its Cover? *Circulation* 1996;94:1494–95, Ex. 18, at p. 1495 ("[d]espite a wealth of potential drugs that might be incorporated into the ideal, but yet-to-be-identified, noninflammatory polymer, it remains unclear which agent, if any, can be delivered locally in adequate concentrations and over an appropriate period of time to achieve a favorable antiproliferative effect. . . . We should not expect to see such a device available for widespread clinical use in the near future").

44.     Numerous publications recognized the challenges and uncertainties associated with the development of a polymer-drug coated stent for the prevention of restenosis, particularly the identification of the correct drug-drug delivery vehicle combination. *Id.* at p. 1495 (describing "several challenges to the development of a stent coating that will inhibit neointimal hyperplasia," including the choice of polymer and drug); Brieger (1997), Ex. 3, at p. 410 ("Considerable effort has been directed towards developing stents coated with a biodegradable-drug-impregnated polymer . . . Realizing this goal has been difficult. . .").

45.     First, the drug had to be efficacious in adequately preventing smooth muscle cell proliferation.  In addition, because there is only a small amount of surface area on a stent, the drug had to be highly potent (*i.e.*, active in microgram quantities).  The drug also had to be safe and not have any local toxic effects on the vessel walls.

46.     In turn, it was desirable that the polymer be capable of binding to the stent without interfering with the stent's performance.  In order to achieve a reliable and predictable drug dose on each stent, it was also desirable that the polymer coating be capable of being applied smoothly and uniformly.  A polymer with the right amount of expandability and durability was preferred.  Polymer coatings that cracked upon stent expansion were undesirable,

12

BSC-A-000031

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

because this risked the release of solid particles into the bloodstream where the stent coating cracked, as well as embolism (over time). In addition, it was desirable that the combination of drug and polymer achieve control of a desired drug release profile, neither too fast nor too slow.

47.     The polymer coating had to be compatible with the chosen drug. Thus, it was important to select a suitable polymer based on the particular drug that was used; one could not simply mix and match or substitute drugs and polymers and expect to achieve an optimal result. Depending on which polymer-drug combination was used, different properties, such as the physical characteristics of the stent coating and the stent's drug release kinetics, could change, affecting the stent's ability to treat restenosis. Replacing either the polymer or the drug in a particular combination could affect the physical properties of the coating, the rate of release of the drug, and the efficacy.

48.     There were many possible polymer choices. Which to pick was unclear. Synthetic or natural polymers could be used. Polymers could also be bioabsorbable (bioerodible) or nonabsorbable (biostable). Absorbable polymers release drug and eventually disintegrate, leaving a bare metal stent. Nonabsorbable polymers release drug, but then remain on the stent for the remaining life of the patient.

49.     At the time the '7286 inventions were made, researchers were particularly concerned about the possibility of polymer coatings causing inflammation. This is illustrated by van der Giessen *et al.*, Marked Inflammatory Sequelae to Implantation of Biodegradable and Nonbiodegradable Polymers in Porcine Coronary Arteries. *Circulation* 1996;94(7):1690–1697, Ex. 19, at p. 1690, 1696. van der Giessen *et al.* studied the biocompatability of 8 different polymers, including absorbable and nonabsorbable polymers. Each polymer was cast on a balloon expandable stent and implanted in pig coronary arteries. The results showed that all of the implanted polymer coatings were associated with significant inflammatory and exaggerated neointimal proliferative responses. *Id.* at p. 1694-95. In addition, at least some of the polymer coatings provoked an enhanced thrombotic response. *Id.* at 1695-1696. These results generated concern that no polymeric stent coating would work. Based on these results, the authors explained:

> The present study demonstrates the marked inflammatory and
> neointimal response to an array of biodegradable as well as
> nonbiodegradable polymers after implantation in the porcine
> coronary artery. This reaction must be fully understood before we
> can make use of these or other polymers as implant materials in
> stents or drug delivery devices.

*Id.* at p. 1696.

13

BSC-A-000032

50.     Brieger (1997), Ex. 2, also expresses concern about the problem of polymer-induced inflammation, stating that "[c]onsiderable effort has been directed towards developing stents coated with biodegradable-drug-impregnated polymer, capable of gradually releasing therapeutic agents into the vessel wall. Realizing this goal has been difficult, as a number of polymers, although biocompatible in other settings, excite an extensive inflammatory response when implanted in porcine coronary arteries." *Id.* at p. 410.

51.     Numerous other references express concern about the use of nonabsorbable polymers or describe strategies for using absorbable polymers with stents. *See, e.g.*, Rechavia *et al.*, Biocompatibility of polyurethane-coated stents: tissue and vascular aspects. *Catheterization and Cardiovascular Diagnosis* 1998;45(2):202-207, Ex. 20, at p. 202; Orloff *et al.*, Biodegradable implant strategies for inhibition of restenosis. *Advanced Drug Delivery Reviews* 1997;24:3-9, Ex. 21, at p. 3; Wilczek *at al.*, Comparison of self-expanding polyethylene terephthalate and metallic stents implanted in porcine iliac arteries. *Cardiovascular Intervent Radiol* 1996;19:176-180, Ex. 22, at p. 176; Murphy *et al.*, Percutaneous polymeric stents in porcine coronary arteries. Initial experience with polyethylene terephthalate stents. *Circulation*, 1992;86(5):1596–1604, Ex. 23, at p. 1596.

52.     As discussed in more detail below, certain cited prior art references also taught that if a polymer coating was to be used at all on a stent, an absorbable polymer should be used. *See, e.g.*, Berg '650, at Column 4, lines 39-42 and Tuch '411, at Column 5, lines 19-22 ("[A] bioabsorbable polymer is more desirable since, unlike a biostable polymer, it will not be present long after implantation to cause any adverse, chronic local response"); Kaplan '348, Column 6, lines 25-26 ("Generally, the filaments are polymers which are degradable over time, within the vascular environment"); Dinh '227, at Column 2, lines 39-45 ("[f]ibrin is a naturally occurring bioabsorbable polymer . . . providing fibrin at the site of treatment provides a readily tolerated bioabsorbable surface which will interact in a natural manner with the body's healing mechanism and reduce the prospect for intimal hyperplasia that causes restenosis").

53.     Indeed, the general concern that the use of polymers in medical devices would give rise to inflammation was not limited to the cited prior art. Later patents expressed this concern as well. For example, this same concern is expressed in United States Patent 6,855,770 (the "'770 patent"), whose parent application was filed in December 2000. The '770 patent is entitled "Drug Delivery Compositions And Medical Devices Containing Block Copolymer" and is assigned to Boston Scientific. The '770 patent states that: "It is also known to use polymers in connection with implantable or insertable medical devices. However, such polymers frequently elicit a vigorous immune or foreign body response. This is particularly true of intravascular or intervascular medical devices, which commonly suffer from the consequences of inflammation and neointimal thickening after placement within the vasculature." '770 patent, at Column 1, Ex. 24, lines 27-30.

14

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

54.     Different polymeric drug release systems used different drug release mechanisms. For example, in diffusion-controlled systems, the drug is dissolved or dispersed in the polymer and diffuses out of the polymer. Nonabsorbable polymers release drug by diffusion. In swelling-controlled system, the drug is incorporated in a polymer which can absorb large amounts of water; exposure to the bloodstream causes swelling of the polymer which results in release of the drug. In biodegradable release systems, the drug is released by a combination of diffusion and by degradation as the polymer erodes or decays.

55.     Polymeric drug release systems could also be matrix systems or reservoir systems. In matrix systems, the drug is dispersed in the polymeric matrix. Reservoir systems are built of a core matrix that contains the drug, and a barrier or shell that controls the rate of drug release. The drug diffuses out of the core (reservoir) based upon the concentration gradient between the core and the barrier coating.

56.     The various polymeric drug delivery systems described above could also be combined with surface modifications within the stent, such as pores, micropores, pits, perforations, etc. to control the release of the drug.

## V.     THE SCOPE AND CONTENT OF THE CITED PRIOR ART

57.     Taken as a whole, the cited prior art describes a "shotgun" approach to prevention of restenosis. To the extent one focused on a drug-eluting stent where the drug was carried in a polymer coating, the cited prior art provides virtually no direction as to which polymer-drug combinations to select. To the extent that any direction is provided, it generally leads away from the inventions claimed in the '7286 patent.

58.     While certain cited references state that rapamycin can be delivered via a stent for the treatment of restenosis, these references do not teach the specific combinations claimed in the '7286 patent. In these references, delivery via a stent is only one of many possible methods for delivering rapamycin. Oral, parenteral, intravascular, intrabronchial, transdermal and rectal delivery were also contemplated. In particular, these references do not describe the use of non-absorbable polymers in a drug-eluting stent.

59.     In turn, other cited references that do not describe a rapamycin (or a macrocyclic lactone analog thereof) contain lengthy listings of other possible drugs and drug classes, as well as a long list of possible polymers and polymer classes. These cited references encompass thousands of potential polymer-drug combinations for use in a drug-eluting stent. They too do not provide any guidance that would lead to the specific combinations claimed in the '7286 patent. To the contrary, many of the cited references teach a preference for biodegradable polymers, a path that is divergent from the inventions claimed in the '7286 patent.

15

BSC-A-000034

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

60.     Moreover, in the cited prior art, very few of the thousands of possible polymer-drug combinations are actually used, much less shown to successfully inhibit neointimal proliferation in animal models. None is shown to be successful in humans. Notably, there is no disclosure in the cited prior art of the actual use of a nonabsorbable acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, in combination with a drug on a stent for the successful inhibition of neointimal proliferation, either in animal models or humans. All of the actual examples provided in the cited prior art use combinations of drugs and polymers that are significantly different from the combinations claimed in the '7286 patent.

61.     These deficiencies are not corrected by what was otherwise known to a person of ordinary skill in the art. As I have explained, due to the limited understanding of the complex mechanisms underlying restenosis, researchers in the interventional cardiology field were pursuing a wide variety of disparate approaches in their search for a solution for restenosis. The spectacular results achieved by the combinations claimed in the '7286 patent were not predictable before the inventions were made.

62.     Indeed, despite the thousands of possible polymer-drug combinations for use on a drug-eluted stent disclosed in the cited prior art, prior to the development of the Cypher® stent, brachytherapy, a radiation-based therapy that bore no relation whatsoever to drug-eluting stents, was considered to be the most promising therapy for prevention of restenosis. Garas (2001), Ex. 14, at p. 173; Teirstein (2001), Ex. 3, at p. 1996. Compared to drug-eluting stents, brachytherapy was highly impractical to deliver clinically and commercially, particularly when high energy gamma radiation is used. It required the participation of cardiologists, radiation oncologists, medical physicists, and radiation safety specialists. Close monitoring of patients and operating personnel was required to ensure minimal radiation exposure, and only specially equipped catheterization laboratories were able to perform the procedure. Yet, despite these complexities, in the face of so many other failed options, numerous companies were willing to incur the costs and risks associated with developing a radiation-based product in the hope of finding a solution for restenosis.

63.     A summary of the prior art references cited by the Examiner, and a summary of their teachings, is provided below.

## 1.     U.S. Patent No. 5,464,650 ("Berg '650")

64.     Berg '650, entitled "Intravascular Stent and Method," issued on November 7, 1995 from an application filed on April 26, 1993. Assigned to Medtronic, Inc., Berg '650 describes and claims methods for making polymer-drug coated intravascular stents. Berg '650 discloses that the stents of the invention can be used for the treatment of blood vessel injuries, including restenosis.

16

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

65.     The Berg '650 patent includes a lengthy list of possible drugs and drug classes that could conceivably be delivered from a stent. According to Berg '650, the drug that is to be used with the claimed invention can be "virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel," and can include both solid substances and liquid substances. Berg '650, at Column 5, lines 19-23. Berg '650 describes numerous disparate classes of therapeutic substances encompassing numerous distinct compounds, including, for example, glucocorticoids, ACE inhibitors, growth factors, oligonucleotides, antiplatelet agents, anticoagulant agents, antimitotic agents, antioxidants, antimetabolite agents, and anti-inflammatory agents. Specific drugs described in Berg '650 include glucocorticoids such as dexamethasone and betamethasone; aspirin and dipyridamole; tocopherol; angiopeptin; anticoagulant agents such as heparin, coumadin, protamine, hirudin and tick anticoagulant protein; and antimitotic and antimetabolite agents such as methotrexate, azathioprine, vincristine, vinblastine, fluorouracil, adriamycin and mutamycin. *Id.* at Column 2, lines 55-60; Column 5, lines 22-39. Despite this extensive list, however, Berg '650 makes no mention of a rapamycin or any of its analogs as a possible drug for use on a stent.

66.     Similarly, Berg '650 includes a lengthy list of possible polymers that could be used on a drug eluting stent. These include poly(L-lactid acid), polycaprolactone, poly(lactide-co-glycolide), poly(hydroxybutyrate), poly(hydroxybutyrate-co-glycolide), poly(hydroxybutyrate), poly(hydroxybutyrate-co-valerate), polydioxanone, polyorthoester, polyanhydride, poly(glycolic acid), poly(D,L-lactic acid), poly(glycolic acid-co-trimethylene carbonate), polyphosphoester, polyphosphoester urethane, poly(amino acids), cyanoacrylates, poly(trimethylene carbonate), poly(iminocarbonate), copoly(ether-esters) (e.g. PEO/PLA), polyalkylene oxalates, polyphosphazenes and biomolecules such as fibrin, fibrinogen, cellulose starch, collagen, hyaluronic acid, polyurethanes, silicones, polyesters; polyolefins, polyisobutylene and ethylene-alphaolefin copolymers; acrylic polymers and copolymers, vinyl halide polymers and copolymers, such as polyvinyl chloride; polyvinyl ethers, such as polyinyl methyl ether; polyvinylidene halides, such as polyvinylidene fluoride and polyvinylidene chloride; polyacrylonitrile, polyvinyl ketones; polyvinyl aromatics, such as polystyrene, polyvinyl esters, such as polyvinyl acetate; copolymers of vinyl monomers with each other and olefins, such as ethylene-methyl methacrylate copolymers, acrylonitrile-styrene copolymers, ABS resins and ethylene-vinyl acetate copolymers; polyamides, such as Nylon 66 and polycaprolactam; alkyd resins; polycarbonates, polyoxymethylenes; polyimides; polyethers; epoxy resins, polyurethanes; rayon; rayon-triacetate; cellulose, cellulose acetate, cellulose butyrate; cellulose acetate butyrate; cellophane; cellulose nitrate; cellulose propionate; cellulose ethers; and carboxymethyl cellulose. *Id.* at Column 4, line 43 to Column 5, line 7.

67.     Berg states a clear preference for bioabsorbable polymers and teaches away from nonabsorbable polymers. Although Berg includes the general statement that the polymer used with the claimed invention "may be either a biostable or a bioabsorbable polymer," *id.* at Column 4, lines 37-38, Berg teaches that "a bioabsorbable polymer is probably more

17

BSC-A-000036

desirable since, unlike a biostable polymer, it will not be present long after implantation to cause any adverse, chronic local response." *Id.* at Column 4, lines 37-42. Berg goes on to state that biostable polymers could only be used if they have "a relatively low chronic tissue response." *Id.* at Column 4, lines 53-54. The van der Giessen (1996) publication, Ex. 20, discussed above, had tested 3 biostable polymers and found that all of them produced significant inflammatory and exaggerated neointimal proliferative responses. Berg '650 presents no data showing acceptable performance for any biostable polymer.

68.    The specific examples set forth in Berg '650 (Examples 1-7), show stents using the drug dexamethosone, a steroid hormone. *Id.* at Column 5, line 45 to Column 7, line 15. Dexamethasone is very different in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog thereof. It is used primarily as an anti-inflammatory drug. Moreover, in the stents of Examples 1 and 2, dexamethasone is sprayed or dipped directly onto the stent, not applied in a polymeric carrier. *Id.* at Column 5, lines 59-67. The stents of Examples 3-7 use the bioabsorbable polymers, poly(caprolactone) (Example 3) and poly (L-lactic acid) (Examples 4-7) with the drug dexamethasone. Table 1 of Berg '650 lists a number of suitable polymer-drug combinations for use in the invention, namely, poly(L-lactic acid)/dexamethasone, poly(lactic acid-co-glycolic acid)/dexamethasone, polyether urethane/tocopherol (vitamin E), silicone adhesive/dexamethasone, poly(hydroxyl-butyrate-co-hydroxyvalerate)/aspirin, and fibrin/heparin. *Id.* at Column 4, lines 1-19. Tocopherol, aspirin, and heparin are also very different in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog of rapamycin.

69.    None of the specific examples of Berg '650 describes stents comprising a rapamycin, a macrocyclic lactone analog thereof, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

70.    Berg '650 also does not show actual use of a rapamycin, a macrocyclic lactone analog thereof, a nonabsorbable polymer, acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof, for the inhibition of neointimal proliferation.

**2.    United States Patent No. 5,837,313 ("Ding '313")**

71.    Ding '313, entitled "Drug Release Stent Coating Process," issued on November 17, 1998 from an application filed June 13, 1996. Assigned to Schneider (USA), Inc. (now Boston Scientific), Ding '313 describes and claims a method for coating a stent with a cured biostable hydrophobic elastomeric material incorporating a drug. Ding further explains that the drug can be released in a variety of ways, including "via interparticle paths or be administered via transport or diffusion through the encapsulating material itself." Ding '313 at Column 5, lines 28-31.

18

BSC-A-000037

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

72.    In the Ding '313 invention, the elastomeric coating is cured at room temperature or elevated temperatures or the solvent evaporated away. *Id.* at Column 3, lines 59-61; *see also* Figure 1. "[C]uring is defined as the process of converting the elastomeric or polymeric material into the finished or useful state by the application of heat and/or chemical agents which include physical-chemical cha[n]ges." *Id.* at Column 3, lines 62-66.

73.    Ding '313 sets forth a lengthy list of possible drug classes suitable for use in the Ding '313 invention. These include "antithrombotics, anticoagulants, antiplatelet agents, thrombolytics, antiproliferatives, antiinflammatories, agents that inhibit hyperplasia and in particular restenosis, smooth muscle cell inhibitors, antibiotic growth factors, growth factor inhibitors, cell adhesion inhibitors, cell adhesion promoters and drugs that may enhance the formation of healthy neointimal tissue, including endothelial cell regeneration." *Id.* at Column 4, line 63 to Column 5, line 3. Despite this extensive list, Ding '313 makes no mention of a rapamycin or any analogs thereof as a possible drug for use on a stent.

74.    Similarly, Ding '313 provides a lengthy list of elastomeric polymers and polymer classes suitable for use in the invention, including silicones (e.g., polysiloxanes and substituted polysiloxanes), polyurethanes (including polycarbonate urethanes), thermo-plastic elastomers in general, ethylene vinyl acetate copolymers, polyolefin elastomers, EPDM (ethylene-propylene terpolymer) rubbers and polyamide elastomers. *Id.* at Column 4, lines 54-59.

75.    The specific examples set forth in Ding '313 describe stents comprising silicone and heparin or dexamethosone. *Id.* at Column 6, line 52 to Column 10, line 30. Both heparin and dexamethasone are very different in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog of rapamycin. Heparin is a carbohydrate, and is an anticoagulant. Dexamethasone is a steroid hormone, and its primary efficacy is anti-inflammatory. Moreover, the silicone-heparin and the silicone-dexamethasone coatings are subject to a curing process. *Id.* at Column 8, lines 21-37; Figure 1.

76.    None of the specific examples in Ding '313 describes stents comprising a rapamycin, a macrocyclic lactone analog thereof, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

77.    Ding '313 does not show the actual use of a rapamycin, a macrocyclic lactone analog of rapamycin, a nonabsorbable polymer, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof for the inhibition of neointimal proliferation.

### 3.    International Patent Publication No. WO 91/17724 ("Helmus '724")

78.    Helmus '724, titled "Medical Device Polymer," published on November 28, 1991, from an application filed on May 17, 1991 by applicant Harbor Medical Devices, Inc.

19

BSC-A-000038

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

Helmus '724 relates generally to medical devices that release drugs, and their manufacture and use. Helmus '724, at p. 1, lines 3-5. Helmus '724 describes a wide variety of possible medical devices, including "catheters, implantable vascular access ports, blood storage bags, vascular stents, blood tubing, central venous catheters, arterial catheters, vascular grafts, intraaortic balloon pumps, heart valves, cardiovascular sutures, total artificial heart and ventricular assist pumps, extracorporeal devices such as blood oxygenators, blood filters, hemodialysis units, hemoperfusion units, plasmapheresis units, hybrid artificial organs such as pancreas or live and artificial lungs." *Id.* p. 4, lines 19-28, p. 17, line 28 to p. 18, line 6.

79.     The specific embodiments described in Helmus '724 are drug-delivery catheters, not stents.  For example, Figure 1 describes a "9-French, 2-lumen polyurethane catheter 10" which "extends from the port 8 and is introduced to a blood vessel 12 such as the subclavian vein or internal jugular, for delivery of the medicines through one of the lumens 14." *Id.* p. 8, lines 18-23. Figures 2-2c also describe "a drug delivery catheter" which "is formed entirely from a polymer." *Id.* p. 10, lines 3-8. Figure 3 describes a method of coating a "catheter 50." *Id.* p. 15, lines 32-36. Examples 1 -3, the only examples in the patent, also describe catheters. *Id.* p. 18, line 9 to p. 24, line 34. Other than the inclusion of stents in a disparate list of possible medical devices, there is no teaching of the use of the described system on stents.

80.     In the disclosed catheters, the drug is contained in a reservoir system in a "manner that permits substantially free outward release of the agent from the reservoir." *Id.* at p. 2, lines 1-3.  The reservoir incorporates "communicating pockets" of the drug in a polymer. *Id.* at p. 9, lines 18-20. An overlying surface layer defines metering "outward passages" that control outward migration of the drug. *Id.* at p. 2, lines 3-5. The overlying surface layer may incorporate an elutable component to enable formation of pore structure in the surface layer. *Id.* at p. 5, lines 4-6.

81.     Helmus '724 sets forth a lengthy list of possible drugs and drug classes suitable for use in the described catheters and other medical devices.  These generally include "agents with beneficial therapeutic effect relating to the prevention of body-rejection reactions, such as thrombus formation, platelet aggregation, or cell proliferation." *Id.* at p. 11, lines 31-35. Specific drugs and drug classes disclosed in Helmus '724 include antithrombogenic drugs (such as heparin), antiplatelet drugs (such as aspirin), prostaglandins (such as prostacyclin), or thrombolytic agents (such as tPA, urokinase, streptokinase, prourokinase), antiproliferative agents (such as heparin) and steroids (such as cortisone), anti-rejection drugs (such as cyclosporin), antimicrobial agents (such as antibiotics, for example, Vancomycin), peptide or protein drugs (such as cell growth factors, for example, epidermal growth factor, platelet derived growth factor or fibroblast growth factor), and anticalcifying drugs (such as diphosphonates). *Id.* at p. 2, line 29 to p. 3, line 3; p. 11, line 35 to p. 12, line 18. Despite this extensive list, however, Helmus '724 makes no mention of a rapamycin or any analogs thereof as a possible drug for use on a stent.

20

BSC-A-000039

82.     Helmus '724 also sets forth a lengthy list of possible polymers and polymer classes suitable for use in the described catheters and other medical devices. These include polyurethane and its copolymers; silicone and its copolymers, ethylene vinyl acetate, thermoplastic elastomers, polyvinylchloride, polyolefins, cellulosics, polyamides, polytetrafluoroethylenes, polyesters, polycarbonates, polysulfones, acrylics such as polymethylmethacrylate, and acrylonitrile butadiene styrene copolymers. *Id.* at p. 3, line 33 to p. 4, line 3.

83.     The specific examples in Helmus '724 (Examples 1 to 3 ) describe catheters coated with a reservoir formed from the polyurethane polymer, Pellthane®, incorporating the drug heparin. Heparin is very different in structure and mechanism of action from a rapamycin or its analogs. Heparin is a carbohydrate, and is an anticoagulant. In the examples, the catheters also have a polyurethane surface layer containing PEO (Example 1), Dextran (Example 2) or albumin (Example 3) as the elutable agent.

84.     None of the specific examples in Helmus '724 describes a stent comprising a rapamycin, a macrocyclic lactone analog thereof, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

85.     Helmus '724 does not show the actual use of a rapamycin, a macrocyclic lactone analog of rapamycin, a nonabsorbable polymer, an acrylate-based polymer or copolymer, or a flourinated polymer for the inhibition of neointimal proliferation.

4.      **U.S. Patent No. 5,591,227 ("Dinh '227")**

86.     Dinh '227, entitled "Drug Eluting Stent," issued on January 7, 1997 from an application filed on April 27, 1995. Assigned to Medtronic, Inc., Dinh '227 describes and claims drug-eluting intravascular stents coated with the natural, bioabsorbable protein fibrin, and describes use of such fibrin-based stents for treatment of restenosis. Dinh '227, at Column 2, lines 26-38.

87.     The stents of the Dinh '227 invention require the presence of the bioabsorbable natural polymer fibrin. Dinh '227 states: "[T]he present invention provides a stent comprising fibrin." *Id.* at Column 4, line 10. The term "stent" is also defined to mean "any device which when placed into contact with a site in the wall of a lumen to be treated, will also place fibrin at the lumen wall and retain it at the lumen wall." *Id.* at Column 8, lines 20-24. Dinh '227 generally describes various embodiments of the invention. In one embodiment, the stent is coated with a first layer incorporating a polymer and a drug, which is then overcoated with a second layer including fibrin. *Id.* at Column 2, lines 51-62. In another embodiment, the first layer comprises a fibrin matrix containing a drug, which is then overcoated with a second fibrin layer. *Id.* at Column 3, lines 24-31.

21

BSC-A-000040

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

88.    Dinh '227 contains the same lengthy listing of different drugs and drug classes for use in the invention as described in Berg '650 (discussed *supra*) and Tuch '411 (discussed *infra*).  *Compare* Dinh '227, at Column 3, lines 14-22, Column 6, lines 26-30, Column 7, lines 14-22; Berg '650, at Column 2, lines 55-62 and Tuch '411, at Column 3, lines 8-15.  Thus, Dinh '227 describes numerous different drug classes encompassing numerous distinct compounds, including, for example, glucocorticoids, ACE inhibitors, growth factors, oligonucleotides, antiplatelet agents, anticoagulant agents, antimitotic agents, antioxidants, antimetabolite agents, and anti-inflammatory agents.  Specific drugs described in Dinh '227 include the glucocorticoids dexamethasone and betamethasone, heparin, hirudin, tocopherol, angiopeptin, and aspirin.  Dinh '227, at Column 3, lines 14-22, Column 6, lines 26-30, Column 7, lines 14-22.  Despite this extensive list, however, Dinh '227 makes no mention of a rapamycin or any of its analogs as a possible drug for use on a stent.

89.    Dinh '227 also contains a lengthy list of polymers and polymer classes that may be used, in conjunction with the fibrin stents of the claimed invention, including poly(L-lactic acid), poly(lactide-co-glycolide) and poly(hydroxybutyrate-co-valerate), silicones, polyurethanes, polyesters, vinyl homopolymers and copolymers, acrylate homopolymers and copolymers, poly-ethers and cellulosics.  *Id.* at Column 7, lines 45-52.

90.    Dinh '227 emphasizes the importance of the bioabsorbable nature of fibrin to the invention, as well as the benefits of bioabsorbability:  "[f]ibrin is a naturally occurring bioabsorbable polymer of fibrinogen, involved in blood coagulation. . . . providing fibrin at the site of treatment provides a readily tolerated bioabsorbable surface which will interact in a natural manner with the body's healing mechanism and reduce the prospect for intimal hyperplasia that causes restenosis."  *Id.* at Column 2, lines 39-45.  Dinh '227 also emphasizes that the implanted fibrin can be rapidly biodegraded based upon the body's natural repair mechanism.  *Id.* at Column 4, lines 37-39.

91.    Dinh '227 does not describe any examples of a drug-eluting stent coated with a non-bioabsorbable polymer without fibrin.  By requiring the presence of fibrin on the stent, even when a non-absorbable polymer is used, Dinh '227 teaches a preference for a bioabsorbable polymer.

92.    Table 1 of Dinh '227 lists a number of suitable polymer-drug combinations for use in the fibrin-based stent of the invention, namely, poly(L-lactic acid)/dexamethasone, poly(lactic acid-co-glycolic acid)/dexamethasone, polyether urethane/tocopherol (vitamin E), silicone adhesive/dexamethasone, and poly(hydroxyl-butyrate-co-hydroxyvalerate)/aspirin.  *Id.* at 7, lines 30-44.  Dexamethasone is very different in structure and mechanism of action from a rapamycin or an analog thereof.  Dexamethasone is a steroid hormone, and its primary efficacy is anti-inflammatory.  Tocopherol and aspirin are also very different in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog of rapamycin.

22

BSC-A-000041

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

93.     Dinh '227 does not describe a stent comprising a rapamycin, a macrocyclic lactone analog of rapamycin, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

94.     Dinh '227 does not show the actual use of a rapamycin, a macrocyclic lactone analog thereof, a nonabsorbable polymer, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof for the inhibition of neointimal proliferation.

5.     **U.S. Patent No. 5,578,075 ("Dayton '075")**

95.     Dayton '075, entitled "Minimally Invasive Bioactivated Endoprosthesis for Vessel Repair," issued on November 26, 1996, from an application filed on June 1, 1995. Dayton '075 describes and claims intravascular stents having a microporous coating, and methods for making them, that permit the localized delivery of drugs.

96.     In the Dayton '075 invention, the drug elutes from the microporous structure of the stent coating by achieving equilibrium with the surrounding body tissues or fluids. Equilibrium is controlled by charge distribution, concentration and molecular weight of the drug in relation to the pore size of the polymeric carrier. Dayton '075, at Column 4, lines 1-7, 20-27; Column 6, lines 54-65. Thus, the drug is located within the pores of the polymer and released by equilibrium.

97.     The drug for use in the Dayton '075 invention can be "virtually any bioactive substance of need to the patient." *Id.* at Column 7, lines 30-33. Dayton '075 sets forth a lengthy list of preferred drugs and drug classes for use in the invention, including heparin, hirudin, prostacyclenes and analogs thereof, antithrombogenic agents, steroids, ibuprofen, antimicrobials, antibiotics, tissue plasma activators, rifamicin, monoclonal antibodies, snake venom protein by-products, antifibrosis agents, cyclosporine, hyaluronte and mixtures of these drugs. *Id.* at Column 4, lines 30-30; Column 7, lines 24-29. Despite this extensive list, however, Dayton '075 makes no mention of a rapamycin or a macrocyclic lactone analog thereof as a possible drug for use on a stent.

98.     Dayton '075 also sets forth a lengthy list of polymers for use in the invention, including silicone, polyurethane, polyvinyl alcohol, polyethylene, polylactic acid polymers, polyglycolic acid polymers, polyesters, hydrogels, tetrafluoroethylene and polytetrafluroethylene, fluorosilicone, hyaluronte and combinations and copolymers and blended mixtures thereof. *Id.* at Column 4, lines 8-13; Column 6, line 66 to Column 7, line 4. Polymethylmethacrylate is disclosed to be useful when the stent is formed from a polymer. *Id.* at Column 7, lines 8-11. Biodegradable polylactic acid and polyglycolic acid are preferred. *Id.* at Column 7, lines 4-5. When a metallic stent is contemplated, a silicone elastomer is preferred. *Id.* at Column 7, lines 35-38.

23

BSC-A-000042

99.     Dayton '075 does not provide any specific examples of stents in which a rapamycin or a macrocyclic lactone analog thereof is incorporated in a polymeric carrier. Dayton '075 also does not provide any specific examples with polymeric carriers comprising a nonabsorbable polymer, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

100.     Dayton '075 does not show the actual use of a rapamycin, a macrocyclic lactone analog of rapamycin, a nonabsorbable polymer, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof for the inhibition of neointimal proliferation.

6.     **U.S. Patent No. 5,624,411 ("Tuch '411")**

101.     Tuch '411, entitled " Intravascular stent and method," issued on April 29, 1997, from an application filed on June 7, 1995. Assigned to Medtronic, Inc., Tuch '411 issued from a continuation-in-part application of the Berg '650 patent application.

102.     Tuch '411 contains the identical disclosure as in Berg '650 of a lengthy list of drugs and drug classes for use in the invention. *Compare* Berg '650, at Column 2, lines 55-62, Column 5, lines 19-39 and Tuch '411, at Column 3, lines 8-15, Column 5, line 66 to Column 6, line 19. The drug that is to be used with the claimed invention can be "virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel." Tuch '411, at Column 5, line 66 to Column 6, line 2. Tuch '411 describes numerous disparate classes of drugs encompassing numerous distinct compounds, including, for example, glucocorticoids, ACE inhibitors, growth factors, oligonucleotides, antiplatelet agents, anticoagulant agents, antimitotic agents, antioxidants, antimetabolite agents, and anti-inflammatory agents. Specific drugs described in Tuch '411 include glucocorticoids such as dexamethasone and betamethasone; aspirin and, dypiridamole; tocopherol; angiopeptin; angicoagulant agents such as heparin, coumadin, protamine, hirudin and tick anticoagulant protein; and antimitotic and antimetabolite agents such as methotrexate, azathioprine, vincristine, vinblastine, fluorouracil, adriamycin and mutamycin. *Id.* at Column 6, lines 3-19. Despite this extensive list, Tuch '411 makes no mention of a rapamycin or any of its analogs as a possible drug for use on a stent.

103.     Similarly, Tuch '411 includes a lengthy list of possible polymers that could be used on a drug eluting stent. These include poly(L-lactid acid), polycaprolactone, poly(lactide-co-glycolide), poly(hydroxybutyrate), poly(hydroxybutyrate-co-glycolide), poly(hydroxybutyrate), poly(hydroxybutyrate-co-valerate), polydioxanone, polyorthoester, polyanhydride, poly(glycolic acid), poly(D,L-lactic acid), poly(glycolic acid-co-trimethylene carbonate), polyphosphoester, polyphosphoester urethane, poly(amino acids), cyanoacrylates, poly(trimethylene carbonate), poly(iminocarbonate), copoly(ether-esters) (e.g. PEO/PLA), polyalkylene oxalates, polyphosphazenes and biomolecules such as fibrin, fibrinogen, cellulose

24

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

starch, collagen and hyaluronic acid, polyurethanes, silicones, polyesters, polyolefins, polyisobutylene and ethylene-alphaolefin copolymers; acrylic polymers and copolymers, vinyl halide polymers and copolymers, such as polyvinyl chloride; polyvinyl ethers, such as polyinyl methyl ether; polyvinylidene halides, such as polyvinylidene fluoride and polyvinylidene chloride; polyacrylonitrile, polyvinyl ketones; polyvinyl aromatics, such as polystyrene, polyvinyl esters, such as polyvinyl acetate; copolymers of vinyl monomers with each other and olefins, such as ethyene-methyl methacrylate copolymers, acrylonitrile-styrene copolymers, ABS resins and ethylene-vinyl acetate copolymers; polyamides, such as Nylon 66 and polycaprolactam; alkyd resins; polycarbonates, polyoxymethylenes; polyimides; polyethers; epoxy resins, polyurethanes; rayon; rayon-triacetate; cellulose, cellulose acetate, cellulose butyrate; cellulose acetate butyrate; cellophane; cellulose nitrate; cellulose propionate; cellulose ethers; and carboxymethyl cellulose. *Id.* at Column 5, lines 23-54.

104.    Tuch '411 states a clear preference for bioabsorbable polymers and teaches away from nonabsorbable polymers, stating that:  "The polymer may be either a biostable or a bioabsorbable polymer depending on the desired rate of release or the desired degree of polymer stability, but a bioabsorbable polymer is probably more desirable since, unlike a biostable polymer, it will not be present long after implantation to cause  any adverse, chronic local response." *Id.* at Column 5, lines 17-22. Tuch '411 goes on to state that biostable polymers could only be used if they have "a relatively low chronic tissue response." *Id.* at Column 5, lines 34-35.

105.    The specific examples set forth in Tuch '411 (Examples 1-10), show stents using the drugs dexamethosone, colchicine, or heparin. *Id.* at Column 7, line 65 to Column 11, line 30. These drugs are very different in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog thereof. Dexamethasone is a steroid hormone that is used primarily as an anti-inflammatory drug. Colchicine is an antiinflammatory drug used to treat gout. Heparin is a carbohydrate, and is an anticoagulant. Moreover, in the stents of Examples 1 and 2, dexamethasone is sprayed directly onto the stent, not applied in a polymeric carrier. *Id.* at Column 7, line 65 to Column 8, line 21. The polymers used in the stent coatings of Examples 3-10 are the bioabsorbable polymers poly(caprolactone) (Example 3), poly(lactic-acid-co-glycolic acid) (Example 4), and poly (L-lactic acid) (Examples 5-10). *Id.* at Column 8, line 24 to Column 11, line 30. Table 1 of Tuch '411 lists a number of suitable polymer-drug combinations for use in the invention, namely, poly(L-lactic acid)/dexamethasone, poly(L-lactic acid)/colchicine, poly(lactic acid-co-glycolic acid)/dexamethasone, polyether urethane/tocopherol (vitamin E), silicone adhesive/dexamethasone phosphate, poly(hydroxy-butyrate-co-hydroxyvalerate)/aspirin, and fibrin/heparin. *Id.* at Column 4, lines 47-65. Tocopherol and aspirin are also very different in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog of rapamycin.

25

BSC-A-000044

106.    None of the specific examples of Tuch '411 describes a stent comprising a rapamycin, a macrocyclic lactone analog thereof, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

107.    Tuch '411 also does not show actual use of a rapamycin, a macrocyclic lactone analog of rapamycin, a nonabsorbable polymer, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof for the inhibition of neointimal proliferation.

### 7.    U.S. Patent No. 5,342,348 ("Kaplan '348")

108.    Kaplan '348, entitled "Method and device for treating and enlarging body lumens," issued on August 30, 2004, from an application filed on December 4, 1992. Kaplan '348 describes and claims vascular stents for localized delivery of drugs and methods of treating body lumens using such stents, including for the prevention of restenosis.

109.    In the Kaplan '348 invention, the drug delivery matrix comprises at least one filament that is interlaced or laminated with the stent, and expandable with it. Kaplan '348, at Column 4, lines 65-68, Column 12, lines 3-5. The drug is contained within the filament and is released from the filament upon exposure to a vascular environment. *Id.* at Column 3, lines 7-10.

110.    Drugs useful in the Kaplan '348 invention are those that exert biological effects such as anti-proliferative activity, thrombotic inhibition, or inhibition of vasospasm. *Id.* at Column 5, lines 8-10. Kaplan '348 discloses a lengthy list of drugs and drug classes for use with the invention, including organic molecules, proteins, peptides, nucleotides, carbohydrates, polysaccharides, mucopolysaccharides, simple sugars, glycoaminoglycans and steroids, antithrombotics (e.g. lytic agents such as recombinant tissue plasminogen activator (TPA), urokinase and streptokinase), antiplatelet agents (aspirin, ticlopdine), inhibitors or surface glycoprotein receptors (e.g. GP IIb/IIIa, GP Ib-IX), antimetabolites (e.g. methotrexate), growth factor inhibitors, growth factor promoters, anticoagulants (e.g. heparin, low molecular weight heparins), direct thrombin inhibitors (e.g. hirudin and its derivatives, hirulog, thrombin aptamer, argatroban, D-phenylalanyl-L-poly-L-arginyl chloromethyl ketone), antimitotics (e.g. colchicine), antibiotics, antisense nucleotides, and the like. *Id.* at Column 7, lines 53 to Column 8, line 3. Despite this extensive list, Kaplan '348 makes no mention of a rapamycin or any of its analogs as a possible drug for use on a stent.

111.    Kaplan '348 also discloses a lengthy list of polymers and polymer classes for use in the filaments of the invention, including co-polymers of poly[bis(p-carboxyphenoxy)propane anhydride] and sebacic acid, poly-L-lactide polymers, lactic acid-glycolic acid copolymers, polymers comprising monomers of hydroxyethylmethacrylate, vinylalcohol, ethylene vinylacetate, lactic acid, or glycolic acid, polyanhydrides, polymers comprising monomers such as carboxyphenoxyacetic acid, carboxyphenoxyvaleric acid, carboxyphenoxyoctanoic acid, terephthalic acid, and carbophenoxy propane-sebacic acid,

26

BSC-A-000045

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

styrene-divinyl benzene copolymer, methyl methacrylate-ethylene glycol and dimethylmethacrylate copolymer and ethylene-vinyl acetate copolymer. *See id.* at Column 6, lines 39-40; Column 6, line 52 to Column 7, line 13; Column 7, lines 46-49.

112.    Kaplan '348 states that "Generally, the filaments are polymers which are degradable over time . . . By 'biodegradable polymer,' it is meant that the polymer will naturally erode in a physiological environment." *Id.* at Column 6, lines 25-29. The drug is mixed in the polymer and released as the polymer degrades, with the rate of polymer degradation and drug concentration in the polymer determining the release rate of the drug. *Id.* at Column 6, lines 29-36. Although Kaplan '348 focuses on biodegradable polymers, it also mentions the use of non-absorbable polymers as a possibility, where the dimensions of the filament control the release of the drug. *Id.* at Column 7, lines 25-27, 42-46.

113.    Kaplan '348 specifically describes an example of a stent having two types of biodegradable strands (filaments), one containing heparin, and the other methotrexate. *Id.* at Column 8, lines 19-41. Heparin is very different in structure and mechanism of action from a rapamycin or its analogs. Heparin is a carbohydrate, and is an anticoagulant. Methotrexate is also very different in structure and mechanism of action from a rapamycin or its analogs. Methotrexate is an antimetabolite drug that inhibits folic acid synthesis, thereby interfering with synthesis of RNA and DNA. The stent may also have a third strand containing a vasodilator such as a calcium channel blocker or a nitrate. These drugs that are also very different in structure and mechanism of action from a rapamycin or its analogs.

114.    Kaplan '348 does not provide any specific examples of stents in which a rapamycin or a macrocyclic lactone analog is incorporated in a polymeric carrier. Kaplan '348 also does not provide any specific examples of stents with polymeric carriers comprising a nonabsorbable polymer, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

115.    Kaplan '348 does not show actual use of a rapamycin, a macrocyclic lactone analog thereof, a nonabsorbable polymer, acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof for the inhibition of neointimal proliferation.

**8.      International Patent Publication No. WO 91/12779 ("Wolff '779")**

116.    Wolff '779, entitled "Intralumenal Drug Eluting Prosthesis," issued on September 5, 1991, from an application filed on February 19, 1991 by applicant Medtronic, Inc. Wolff '779 describes and claims prosthetic devices, including stents, and methods of using them for decreasing restenosis.

117.    Wolff '779 provides a lengthy list of disparate drugs and drug classes for use in the claimed invention, including antiplatelet drugs, anticoagulant drugs, growth factor and

27

BSC-A-000046

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

receptor blockers and antagonists, antiinflammatory drugs, antimitotic drugs, and antimetabolite drugs (antimitotic and antimetabolite drugs are known as antireplicate drugs). Examples of antiplatelet drugs provided in Wolff '779 include aspirin and dipyridamole. Examples of anticoagulant drugs include heparin, coumadin, protamine, and hirudin. Examples of antimitotics and antimetabolite drugs include methotrexate, azothioprine, vincristine, vinblastine, fluorouracil, adriamycin and mutamycin. *Id* at p. 8, line 13 to p. 9, line 22. Despite this extensive list, however, Wolff '779 makes no mention of a rapamycin or any of its analogs as a possible drug for use on a stent.

118.   Wolff '779 generally teaches the use of bioabsorbable polymers, stating that "[c]ontrolled release, via a bioabsorbable polymer, offers to maintain the drug level within the desired therapeutic range for the duration of the treatment." *Id.* at p. 3, lines 17-19; p. 12, lines 16-18. Wolff further states that "[t]he compound which is preferred is a polyphosphate ester," a bioabsorbable polymer, *id.* at p. 13, lines 16-17, which is "a superior drug delivery system for a prosthesis," *id.* at p. 15, lines 9-10. While Wolff '779 states in passing that the polymeric stent coatings used in the invention may be bioabsorbable or biostable, it does not describe any specific classes of biostable polymers. *Id.* at p. 10, lines 37-38. Instead, Wolff '779 focuses on polyphosphate ester and other bioabsorbable polymers and polymer classes for use with the invention. *Id.* at p. 12, line 23 to p. 15, line 10.

119.   Wolff '779 does not provide any specific examples of stents in which a rapamycin or a macrocyclic lactone analog thereof is incorporated in a polymeric carrier. Wolff '779 also does not provide any specific examples of stents with polymeric carriers comprising a nonabsorbable polymer, an acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof.

120.   Wolff '779 does not show actual use of a rapamycin, a macrocyclic lactone analog thereof, a nonabsorbable polymer, acrylate-based polymer or copolymer, a flourinated polymer, or a mixture thereof for the inhibition of neointimal proliferation.

9.      **U.S. Patent No. 5,516,781 ("Morris '781")**

121.   Morris '781, entitled "Method of Treating Restenosis with Rapamycin," issued on May 14, 1996, from an application filed on May 12, 1994. Morris '781 is assigned to Wyeth and licensed to Cordis. Morris '781 discloses and claims a method of treating hyperproliferative vascular disease, including restenosis, resulting from smooth muscle cell proliferation in a mammal comprising administering an antiproliferative effective amount of rapamycin alone or in combination with mycophenolic acid.

122.   Morris '781 generally describes numerous disparate systemic and local methods for administering rapamycin, including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via a vascular stent impregnated with

28

rapamycin. Morris '781, at Column 3, lines 45-50. Morris '781 does not teach a preference for or selection of any particular method of delivery.

123.    Morris does not disclose a stent having a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

**10.    U.S. Patent No. 5,288,711 ("Mitchell '711")**

124.    Mitchell '711, entitled "Method of Treating Hyperproliferative Vascular Disease," issued on February 22, 1994, from an application filed on April 28, 1992. Mitchell '711 is assigned to Wyeth. Mitchell '711 discloses and claims a method of treating hyperproliferative vascular disease, including restenosis, resulting from smooth muscle cell proliferation in a mammal comprising administering an antiproliferative effective amount of the combination of rapamycin and heparin.

125.    Mitchell '711 generally describes numerous disparate systemic and local methods for administering the combination of rapamycin and heparin, including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via a vascular stent impregnated with rapamycin. Mitchell '711, at Column 3, lines 24-31. Mitchell '711 does not teach a preference for or selection of any particular method of delivery.

126.    Mitchell '711 does not disclose a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

**11.    U.S. Patent No. 5,252,579 ("Skotnicki '579")**

127.    Skotnicki '579, titled "Macrocyclic Immunomodulators" issued on October 12, 1993, from an application filed on February 16, 1993. Assigned to Wyeth, Skotnicki '579 discloses derivatives of rapamycin in which the oxygen at the 24-position within rapamycin's macrocyclic ring is modified. *See, e.g.,* Skotnicki, '579, at Column 2, lines 1-37.

128.    Skotnicki '579 states that the disclosed derivatives are useful for a variety of purposes including as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents. Skotnicki '579, at Column 1, lines 65-68. Skotnicki '579 further discloses that the derivatives of the invention are also useful in treating a variety of conditions including transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. *Id.* at Column 8, line 54 to Column 9, line 4.

BSC-A-000048

129.    Skotnicki '579 does not disclose stents or the use on a stent of a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

### 12.    U.S. Patent No. 5,441,977 ("Russo '977")

130.    Russo '977, titled "21-Norrapamycin," issued on August 15, 1995, from an application filed on March 1, 1994.  Assigned to Wyeth, Russo '977 discloses the compound 21-norrapamycin, an analog of rapamycin.

131.    Russo '977 states that the disclosed derivatives are useful for a variety of purposes including as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents.  Russo '977, at Column 1, lines 65-68, Column 2, line 1.  Russo '977 further discloses that the derivatives of the invention are also useful in treating a variety of conditions including transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular disorders such as restenosis and atherosclerosis.  *Id.* at Column 1, line 17; Column 3, lines 36-50.

132.    Russo '977 does not disclose stents or the use on a stent of a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

### 13.    U.S. Patent No. 5,563,145 ("Failli '145"),

133.    Failli '145, titled "Rapamycin 42-Oximes and Hydroxylamines," issued on October 8, 1996, from an application filed on December 7, 1994.  Assigned to Wyeth, Failli '145 discloses 42-oximes and hydroxylamines of rapamycin.

134.    Failli '145 states that the disclosed derivatives are useful for a variety of purposes including as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents.  Failli '145, at Column 1, lines 63 - 66.  Failli '145 further discloses that the derivatives of the invention are also useful in treating a variety of conditions including transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis.  *Id.* at Column 6, lines 38-42.

135.    Failli '145 does not disclose stents or the use on a stent of a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

BSC-A-000049

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

### 14.   U.S. Patent No. 5,362,718 ("Skotnicki '718")

136.   Skotnicki '718, titled "Rapamycin Hydroxyesters," issued on November 8, 1994, from an application filed April 18, 1994.  Assigned to Wyeth, Skotnicki '718 discloses hydroxyesters of rapamycin.

137.   Skotnicki '718 states that the disclosed derivatives are useful for a variety of purposes including as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents.  Skotnicki '718, at Column 1, lines 64-67.  Skotnicki '718 further discloses that the derivatives of the invention are also useful in treating a variety of conditions including transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis.  *Id.* at Column 1, lines 11-12 and Column 6, lines 49-52.

138.   Skotnicki '718 does not disclose stents or the use on a stent of a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

### 15.   U.S. Patent No. 5,391,730 ("Skotnicki '730")

139.   Skotnicki '730, titled "Phosphorylcarbamates of Rapamycin and Oxime Derivatives Thereof" issued on February 21, 1995, from an application filed on October 8, 1993.  Assigned to Wyeth, Skotnicki '730 discloses phosphorylcarbamates of rapamycin and oxime derivatives thereof.

140.   Skotnicki '730 states that the disclosed derivatives are useful for variety of purposes including as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents.  Skotnicki '730, at Column 1, lines 65-67.  Skotnicki '730 further discloses that the derivatives of the invention are also useful in treating a variety of conditions including transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis.  *Id.* at Column 6, line 67 to Column 7 line 1, Column 7, lines 13-16.

141.   Skotnicki '730 does not disclose stents or the use on a stent of a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

### 16.   U.S. Patent No. 5,256,790 ("Nelson '790")

142.   Nelson '790, titled "27-Hydroxyrapamycin and Derivatives Thereof" issued on October 26, 1993 from Application No. 9,605 (the "'605 application") filed on January 27, 1993.  Assigned to Wyeth, Nelson '790 discloses 27-hydroxyrapamycin and derivatives thereof.

31

BSC-A-000050

143.   Nelson '790 states that the disclosed derivatives are useful for a variety of purposes including as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents. *Id.* at Column 2, lines 35-36.   Nelson '790 further discloses that the derivatives of the invention are also useful in treating a variety of conditions including transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. *Id.* at Column 15, lines 46-54.

144.   Nelson '790 does not disclose stents or the use on a stent of a polymeric carrier comprising a non-absorbable polymer, an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

## VI.   DIFFERENCES BETWEEN THE PRIOR ART AND THE INVENTIONS CLAIMED IN THE '7286 PATENT, AND  RESPONSE TO REJECTIONS

### A.   Berg '650 Proposed Obviousness Combinations

145.   Claims 1 - 5 of the '7286 patent are directed to, *inter alia,* the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

146.   Berg '650 discloses polymer-drug-coated stents and polymers, but does not disclose rapamycin or a macrocyclic lactone analog thereof. Additional cited prior art discloses rapamycin or macrocyclic lactone analogs thereof. However, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Berg '650 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

#### 1.   Berg '650 In View Of Either Morris '781 Or Mitchell '711

147.   There would have been no reason or motivation for a person of ordinary skill in the art to combine a rapamycin or a macrocyclic lactone analog thereof, as taught by either Morris '781 or Mitchell '711, into the Berg '650 invention, nor would such a combination teach the specific inventions of claims 1, 3 and 5 of the '7286 patent.

148.   At Column 4, lines 43 to Column 5, line 7, Berg '650 provides a generic of polymers. The disclosed polymers encompass approximately 50 polymers or polymer classes, embracing thousands of individual polymers. This generic disclosure of polymers, involving little more than a laundry list of possible polymers for use in the Berg '650 invention, does not given any indication of which polymers to select or what the results of such selection would be.

32

BSC-A-000051

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

Although this expansive laundry list includes polyvinylidene fluoride and ethylene-methyl methacrylate copolymers, Berg '650 provides no direction or reason to select these particular polymers from the many others in the list, nor are these polymers ever used or referenced in any actual example. A person of ordinary skill in the art would not have any reason or motivation to select from this generic laundry list an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent.

149.    To the contrary, the specific disclosures of Berg '650 teach away from the use of the specific polymers claimed and instead in favor of bioabsorbable polymers. At Column 4, lines 39-42, Berg '650 states that "a bioabsorbable polymer is probably more desirable, since, unlike a biostable polymer, it will not be present long after implantation to cause any adverse, chronic local response." This teaching expressed a commonly held view at the time that the extended presence of polymers in the coronary artery would be detrimental, and that one should therefore use a bioabsorbable polymer which would eventually disappear over time. *See* ¶¶ 49-53 above.

150.    The specific examples that Berg '650 teaches as preferred would also lead a person of ordinary skill in the art further away from the combination claimed in the present invention. The specific examples in Berg '650, Examples 1-7, all use either no polymer or the absorbable polymers poly(caprolactone) and poly (L-lactic acid), none of which are an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof. To the contrary, they are bioabsorbable polymers which release drug not solely by diffusion but by a combination of diffusion and degradation. A person of ordinary skill reading this disclosure would therefore be led away from the claimed invention and toward the use of absorbable polymers like poly(caprolactone) and poly(L-lactic acid).

151.    There is also nothing in Berg '650 that would in any way lead a person of ordinary skill to a rapamycin or analog thereof as claimed in claims 1, 3 and 5. At Column 2, lines 55-60 and Column 5, lines 22-39, Berg '650 generically discloses numerous therapeutic agents, including anti-inflammatory agents, for use with the claimed invention. This generic disclosure of drugs, which covers an enormous number of possible compounds, does not give any indication of which drugs to select or what the results of such selection would be. To the extent Berg '650 provides guidance, it points in a different direction from the claimed invention. Examples 1-7, the only specific examples in the patent, disclose use of the drug dexamethasone, which is very different in structure and mechanism of action from a rapamycin. Dexamethasone is a steroid hormone, and its primary efficacy is anti-inflammatory. Thus, Berg '650 teaches a person of ordinary skill to use a steroid hormone such as dexamethosone with bioabsorbable polymers which will not be present long after implantation.

152.    Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally,

33

BSC-A-000052

intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

153.    While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *Id.* at Column 10, lines 40-54. Morris '781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

154.    Thus, a person of ordinary skill in the art reading Berg '650 in view of Morris '781, would not have any reason or motivation to substitute rapamycin as taught by Morris '781 in the Berg '650 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Berg '650. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight points one in the direction of the inventions claimed in the '7286 patent.

155.    Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent. Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Mitchell '711 does not teach a preference for or selection of any particular method of delivery. Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

156.    While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *Id.* at Column 6, lines 13-28. Mitchell '711 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

157.    Thus, a person of ordinary skill in the art, reading Berg '650 in view of Mitchell '781, would have no reason or motivation to substitute rapamycin as taught by Mitchell

BSC-A-000053

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579 patent are specific to restenosis. The patent describes the testing set forth in the specification as designed to evaluate "immunosuppressive activity," not restenosis. *Id.* at Column 7, line 41 to Column 8, line 53. The same is true of Russo '977, at Column 3, lines 1-31; Failli '145, at Column 4, line 52 to Column 6, line 21; Skotnicki '718, at Column 4, line 51 to Column 6, line 31; Skotnicki '730, at Column 5, line 48 to Column 6, line 66; and Nelson '790, at Column 14, line 32 to Column 15, line 40.

162.    Moreover, none of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790, describe the use of stents to administer the drug, much less the use of the claimed polymers for elution of the drug from a stent coating. Skotnicki '579 discusses a variety of other routes of administration, such as use of a solid carrier like a tablet or powder, a liquid carrier for oral administration, a liquid composition for injection or intravenous administration, rectal administration via a suppository, intranasally or intrabroncially via an aerosol, transdermally via use of a patch, or as a solution, cream or lotion. Skotnicki '579, at Column 9, line 18 to Column 10, line 30. Similar teachings are found in Russo '977, at Column 4, line 1 to Column 5, line 23; Failli '145, at Column 7, line 3 to Column 8, line 13; Skotnicki '718, at Column 7, at line 15 to Column 8, line 30; Skotnicki '730, at Column 7, line 35 to Column 8, line 41; and Nelson '790, at Column 16, line 9 to Column 17, line 21.

163.    While Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 disclose the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Skotnicki '579, at Column 9, lines 23-38; Russo '977, at Column 4, lines 4-19; Failli '145, at Column 7, lines 10-24; Skotnicki '718, at Column 7, lines 23-38; Skotnicki '730, Column 7, lines 39-54; Nelson '790, Column 16, lines 13-28. None of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

164.    Thus, a person of ordinary skill in the art reading Berg '650 in view of either of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 would not have any reason or motivation to incorporate or substitute a macrocyclic lactone analog of rapamycin as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 in the Berg '650 invention to arrive at the inventions set forth in claims 1 - 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Berg '50. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight leads one to the inventions of the '7286 patent.

36

BSC-A-000055

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

165.    A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Berg '650 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

### B.    Ding '313 Proposed Obviousness Combinations

166.    Claims 1 - 5 of the '7286 patent are directed to, *inter alia*, the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

167.    Ding '313 discloses polymeric stent coatings comprising hydrophobic elastomers, but does not disclose rapamycin or a macrocyclic lactone analog of rapamycin. Additional cited prior art discloses rapamycin or macrocyclic lactone analogs of rapamycin. However, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Ding '313 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

### 1.    Ding '313 In View Of Either Morris '781 Or Mitchell '711

168.    There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute a rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Morris '781 or Mitchell '711, into the Ding '313 invention to arrive at the inventions of claims 1, 3 and 5 of the '7286 patent.

169.    At Column 4, lines 48-59, Ding '313 provides a generic listing of nonabsorbable, hydrophobic elastomeric polymers for use as stent coatings. The polymers or polymer classes disclosed in Ding '313 embrace thousands of individual polymers. This generic disclosure of elastomeric polymers in Ding '313, involving little more than a laundry list of possible polymers for use in the Ding '313 invention, does not give any indication of which polymers to select or what the results of such selection would be. Ding '313 also does not specifically describe or show actual use of an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof. A person of ordinary skill in the art would not have any reason or motivation to select from this generic disclsoure an acrylate-based polymer or copolymer, a fluorinated polymer or a mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent.

37

BSC-A-000056

170.    At Column 1, lines 13-20, Ding '313 incorporates by reference patent application Serial No. 08/663,518 ("the '518 application"), which issued as United States Patent No. 6,120,536 ("Ding '536 patent")). The Ding '536 patent describes the use of a top coat that can be made of a variety of materials such as fluorosilicone, which is used to cover and slow the release of the drug from an underlayer containing the drug. *See, e.g.,* Ding '536 patent at Column 5, lines 35-49. Ding '313, however, does not reference the disclosure of fluorosilicone in the '518 application, or otherwise identify any specific portion of the '518 application that is deemed incorporated by reference. Rather, Ding '313 incorporates the '518 application "for any purpose." *See* Column 1, lines 19-20. A person of ordinary skill in the art reading Ding '313 would have no reason or motivation to select fluorosilicone or any other fluorinated polymer, as set forth in claims 1, 3 and 5 of the '7286 patent.

171.    Moreover, the only reference in Ding '313 to fluorosilicone is for use as "the top coat or surface coat" that is used "to further control thrombolitic effects and optionally, control the release profile especially the initial very high release rate associated with the elution of heparin." *See* Ding '536 patent at Column 5, lines 9-13. Ding ' '536 does not suggest use of fluorosilicone or any fluorinated polymer for the drug-containing underlayers, but instead teaches use of "silicones (e.g., polysiloxanes and substituted polysiloxanes), polyurethanes, thermoplastic elastomers in general, ethylene vinyl acetate copolymers, polyolefin elastomers, polyamide elastomers, and EPDM rubbers." *Id.* at Column 5, lines 50-54. Ding '536 also teaches the use of heparin as the "preferred" active material (Column 5, line 60), and teaches that the fluorosilicone top coat layer is specifically tailored for use with "the initial very high release rate associated with the elution of heparin." *Id.* at Column 5, lines 9-13. There is no teaching or suggestion anywhere in Ding '536 that such a polymer would be beneficial for containing and releasing a rapamycin or an analog thereof, which have properties and characteristics very different from those of heparin.

172.    At Column 4, lines 63-67 to Column 5, line 7, Ding '313 generically discloses numerous classes of therapeutic agents, including "anti-proliferatives" and "anti-inflammatories." This generic disclosure of drugs, which covers numerous possible compounds, does not give any indication of which drug to select or what the results of such selection would be. In addition, the specific examples in Ding '313 describe heparin and dexamethasone, drugs that are very different in structure and mechanism of action from a ramapycin. Heparin is a highly-sulfated glycosaminoglycan widely used as an anticoagulant, while dexamethasone is a steroid hormone generally used as an anti-inflammatory. Neither has a structure or mechanism of action similar to a rapamycin or its analogs. These disclosures in Ding '313 would direct the person of ordinary skill in the art away from the use of a rapamycin or a macrocyclic lactone analog of rapamycin as set forth in claims 1, 3 and 5 of the '7286 patent.

173.    Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally,

38

intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

174.    While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *Id.* at Column 10, lines 40-54. Morris '781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

175.    Thus, a person of ordinary skill in the art reading Ding '313 in view of Morris '781, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Morris '781 in the Ding '313 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the numerous drugs specifically taught by Ding '313. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight leads one to the inventions of the '7286 patent.

176.    Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent. Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Mitchell '711 does not teach a preference for or selection of any particular method of delivery. Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

177.    While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *See* Column 6, lines 13-28. Mitchell '711 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

178.    Thus, a person of ordinary skill in the art reading Ding '313 in view of Mitchell '781, would not have any reason or motivation to incorporate or substitute rapamycin as

BSC-A-000058

taught by Mitchell '781 in the Ding '313 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the numerous drugs specifically taught by Ding '313. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct the deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

179.    A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Morris '781 nor Mitchell '711 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach that stents are the preferred mode of delivery. To the contrary, the specific examples in these references involve systemic delivery over a variety of different time periods. Similarly, Ding '313 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

2.    **Ding '313 In View Of Either Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790**

180.    There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790, into the Ding '313 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

181.    As discussed above, Ding '313 provides only a generic of hydrophobic elastomeric polymers for use as stent coatings, embracing thousands of individual polymers, and specifically teaches the use of only silicone, rather than an acrylate-based polymer or copolymer, a fluorinated polymer or a mixture thereof, as claimed in the '7286 patent. Ding '313 also only generically discloses numerous drug classes, and specifically teaches use of the drugs heparin and dexamethasone, which are distinct in structure and mechanism of action from a rapamycin or an analog of rapamycin. *See supra* ¶¶ 169-172.

182.    Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 are cumulative of Morris '781 as described above and contain no additional teaching that would lead a person of ordinary skill to the claimed invention. Each of these references disclose macrocyclic lactone analog derivatives of rapamycin. Skotnicki '579 does not focus on the use of the derivatives described to treat restenosis, but rather describes a variety of proposed uses such as in treating transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. Skotnicki '579, at Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579

40

BSC-A-000059

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

186.     A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Ding '313 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

## C.     Helmus '724 Proposed Obviousness Combinations

187.     Claims 1 - 5 of the '7286 patent are directed to, *inter alia*, the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

188.     As discussed above, Helmus '724 is directed to drug-delivery catheters using a reservoir-based system for delivery of drugs to a patient. Helmus '724 does not teach the claimed invention. Moreover, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Helmus '724 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

### 1.     Helmus '724 In View Of Either Morris '781 Or Mitchell '711

189.     There would have been no motivation for the person of ordinary skill in the art to incorporate or substitute a rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Morris '781 or Mitchell '711, into the Helmus '724 invention, nor would such a combination teach the inventions of claims 1, 3 and 5 of the '7286 patent.

190.     Helmus '724 is primarily directed to the use of catheters, not stents. All of the Figures in Helmus '724 describe catheters, not stents, as do all of the specific examples. The only mention of stents is as one of a long and disparate list of possible medical devices, which includes "catheters, implantable vascular access ports, blood storage bags, vascular stents, blood tubing, central venous catheters, arterial catheters, vascular grafts, intraaortic balloon pumps, heart valves, cardiovascular sutures, total artificial heart and ventricular assist pumps, extracorporeal devices such as blood oxygenators, blood filters, hemodialysis units, hemoperfusion units, plasmapheresis units, hybrid artificial organs such as pancreas or live and artificial lungs." *Id.* p. 4, lines 19-28, p. 17, line 28- p. 18, line 6.

191.     Helmus '724 also describes a reservoir system in a "manner that permits substantially free outward release of the agent from the reservoir." *Id.* at p. 2, lines 1-3. The reservoir incorporates "communicating pockets" of the drug in a polymer. *Id.* at p. 9, lines 18-

42

BSC-A-000061

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

20.  An overlying surface layer defines metering "outward passages" that control outward migration of the drug. *Id.* at p. 2, lines 3-5. The overlying surface layer may incorporate an elutable component to enable formation of pore structure in the surface layer. *Id.* at p. 5, lines 4-6. This reservoir system appears to be designed for a catheter-type device. There is no indication in Helmus '724 that such a system would be suitable for use as a coating for an expandable stent, which has very different requirements from the catheters or other medical devices described in Helmus '724.

192.  In addition, Helmus '724 fails to teach selection of acrylate-based polymers or copolymers or fluorinated polymers as claimed in the '7286 patent. At p. 3, line 32 to p. 4, line 7, Helmus '724 provides a generic listing of polymers for possible use in the claimed invention. The polymers or polymer classes disclosed in Helmus '724 embrace thousands of individual polymers. Nor is the Helmus '724 invention somehow limited to nonabsorbable polymers. Rather, the "time-release" polymers generically disclosed in Helmus '724 encompass both absorbable and non-absorbable polymers. *See, e.g., id.* at p. 10, line 26, p. 15, line 17. This generic disclosure of polymers, involving little more than a laundry list of possible polymers for use in the Helmus '724 invention, does not give any indication of which polymers to select or what the results of such selection would be. A person of ordinary skill in the art would not have any reason to select from this generic disclosure an acrylate-based polymer or copolymer, a fluorinated polymer or a mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent.

193.  At p. 3, line 36 to p. 4, line 2, Helmus '724 discloses the polymers polytetrafluoroethylenes and polymethylmethacrylate as part of a listing of polymers that could be used for the "surface layer and reservoir polymer" of the catheters and other medical devices of the invention. Helmus '724, however, does not provide any direction or reason to select these particular polymers over the other polymers it discloses. Nor does Helmus '724 provide any indication that such polymers would be suitable for a stent, much less disclose actual use of polytetrafluoroethylene or polymethylmethacrylate. The only polymer actually used in the Helmus '724 invention for incorporation of the drug substance is the polyether urethane, Pellthane®.

194.  At pp. 2-3 and 11-12, Helmus '724 generically discloses numerous therapeutic agents for use with the claimed invention. This generic disclosure of drugs, which covers numerous possible compounds, does not give any indication of which drugs to select or what the results of such selection would be. In addition, the specific examples in Helmus, Examples 1-3, disclose heparin, which is very different from rapamycin in structure and mechanism of action. These disclosures in Helmus '724 of the preferred drugs teach away from the selection of rapamycin or a macrocylic lactone analog of rapamycin as set forth in Columns 1, 3 and 5 of the '7286 patent.

43

BSC-A-000062

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

195.   Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

196.   While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Morris '781, at Column 10, lines 40-54. Morris '781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

197.   Thus, a person of ordinary skill in the art reading Helmus '781 in view of Morris '781, would not have any reason or motivation to substitute rapamycin as taught by Morris '781 in the Helmus '781 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Helmus '724. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight leads one to the inventions of the '7286 patent

198.   Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent. Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Mitchell '711 does not teach a preference for or selection of any particular method of delivery. Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

199.   While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *See* Column 6, lines 13-28. Mitchell '711 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

44

BSC-A-000063

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

200.    Thus, a person of ordinary skill in the art reading Helmus '781 in view of Mitchell '781, would not have any no reason or motivation to incorporate or substitute rapamycin as taught by Mitchell '781 in the Helmus '724 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Helmus '274. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

201.    A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Morris '781 nor Mitchell '711 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach that stents are the preferred mode of delivery. To the contrary, the specific examples in these references involve systemic delivery over a variety of different time periods. Similarly, Helmus '724 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

### 2.    Helmus '724 In View Of Either Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790

202.    There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790, into the Helmus '724 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

203.    As discussed above, Helmus '724 is primarily directed to catheters and provides only a generic listing of polymers for use in the described catheters and other medical devices, embracing thousands of individual polymers. Helmus '724 specifically teaches the use of the polyether urethane polymer, Pellthane®, and not an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, as claimed in the '7286 patent. Helmus '724 also only generically discloses numerous drugs, and specifically teaches use of the drug heparin, which is distinct in structure and mechanism of action from a rapamycin or an analog therof. *See supra* ¶¶ 190-194.

204.    Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 are cumulative of Morris '781 as described above and contain no additional teaching that would lead a person of ordinary skill to the claimed invention. Each of these references disclose macrocyclic lactone analog derivatives of rapamycin. Skotnicki '579 does not focus on the use of the derivatives described to treat restenosis, but rather describes a variety of proposed

45

uses such as in treating transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. Skotnicki '579, at Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579 patent are specific to restenosis. The patent describes the testing set forth in the specification as designed to evaluate "immunosuppressive activity," not restenosis. *Id.* at Column 7, line 41 to Column 8, line 53. The same is true of Russo '977, at Column 3, lines 1-31; Failli '145, at Column 4, line 52 to Column 6, line 21; Skotnicki '718, at Column 4, line 51 to Column 6, line 3; Skotnicki '730, at Column 5, line 48 to Column 6, line 66; and Nelson '790, at Column 14, line 32 to Col. 15, line 40.

205.    Moreover, none of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of stents to administer the drug, much less the use of the claimed polymers for elution of the drug from a stent coating. Skotnicki '579 discusses a variety of other routes of administration, such as use of a solid carrier like a tablet or powder, a liquid carrier for oral administration, a liquid composition for injection or intravenous administration, rectal administration via a suppository, intranasally or intrabroncially via an aerosol, transdermally via use of a patch, or as a solution, cream or lotion. *Id.* at Column 9, line 18 to Column 10, line 30. Similar teachings are found in Russo '977, at Column 4, line 1 to Column 5, line 23; Failli '145, at Column 7, line 3 to Column 8, line 13; Skotnicki '718, at Column 7, line 15 to Column 8, line 30; Skotnicki '730, at Column 7, line 35 to Column 8, line 41; and Nelson '790, at Column 16, line 9 to Column 17, line 21.

206.    While Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 disclose the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Skotnicki '579, at Column 9, lines 23-38; Russo '977, at Column 4, lines 4-19; Failli '145, at Column 7, lines 10-24; Skotnicki '718, at Column 7, lines 23-38; Skotnicki '730, Column 7, lines 39-54; Nelson '790, Column 16, lines 13-28. None of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

207.    Thus, a person of ordinary skill in the art reading Helmus '724 in view of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 would not have any reason or motivation to incorporate or substitute a macrocyclic lactone analog of rapamycin as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 in the Helmus '724 invention to arrive at the inventions set forth in claims 1 - 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Helmus '724. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology

BSC-A-000065

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

208.    A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Helmus '724 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

### D.    Dinh '227 Proposed Obviousness Combinations

209.    Claims 1 - 5 of the '7286 patent are directed to, *inter alia*, the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

210.    Dinh '227 discloses fibrin-based drug-eluting intravascular stents, but does not disclose rapamycin or a macrocyclic lactone analog of rapamycin. Additional cited prior art discloses rapamycin or macrocyclic lactone analogs of rapamycin. However, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Dinh '227 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

### 1.    Dinh '227 In View Of Either Morris '781 Or Mitchell '711

211.    There would have been no motivation for the person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Morris '781 or Mitchell '711, into the Dinh '227 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

212.    The stents of the Dinh '227 invention require the presence of the bioabsorbable natural polymer fibrin. Dinh '227 states: "[T]he present invention provides a stent comprising fibrin." *Id.* at Column 4, line 10. The term "stent" is also defined to mean "any device which when placed into contact with a site in the wall of a lumen to be treated, will also place fibrin at the lumen wall and retain it at the lumen wall." *Id.* at Column 8, lines 20-24. Dinh '227 generally describes various embodiments of the invention. In one embodiment, the stent is coated with a first layer incorporating a polymer and a drug, which is then overcoated with a second layer including fibrin. *Id.* at Column 2, lines 51-62. In another embodiment, the

47

BSC-A-000066

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

first layer comprises a fibrin matrix containing a drug, which is then overcoated with a second fibrin layer. *Id.* at Column 3, lines 24-31.

213.    Only one of the various embodiments described in Dinh even contemplates the potential use of nonabsorbable polymers. At Column 7, lines 45-51, Dinh '227 provides a generic listing of absorbable and nonabsorbable polymers that can be used as a baselayer which is overlayed by the fibrin layer. The disclosed polymers or polymer classes embrace thousands of individual polymers. This generic disclosure of polymers, involving little more than a laundry list of possible polymers for use in the Dinh '227 invention, does not give any indication of which polymers to select or what the results of such selection would be. Although the laundry list in Dinh includes acrylate homopolymers and copolymers, a person of ordinary skill in the art would not have any reason or motivation to select from this generic disclosure an acrylate-based polymer or copolymer, a fluorinated polymer or a mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent. Notably, Dinh '227 does not provide any direction or reason to select these particular polymers over the other polymers it discloses, or show actual use of acrylate homopolymers and copolymers. In particular, Dinh '227 does not disclose or show actual use of any fluorinated polymer.

214.    To the contrary, Dinh '227 requires that the stents of the invention contain the absorbable polymer, fibrin. Dinh '227 emphasizes the bioabsorbable nature of fibrin, including "providing fibrin at the site of treatment provides a readily tolerated surface which will interact in a natural manner with the body's healing mechanism and reduce the prospect for intimal hyperplasia that causes restenosis." *Id.* at Column 2, lines 40-44. By requiring the presence of fibrin, Dinh '227 teaches a preference for an absorbable polymer, a path that is divergent from the '7286 inventions.

215.    At Column 3, lines 14-22, Column 6, lines 26-30 and Column 7, lines 14-22, Dinh '227 generically discloses numerous drugs and drug classes for use with the claimed invention, including "anti-inflammatory agents." This generic disclosure of drugs and drug classes, which encompasses numerous possible compounds, does not give any indication of which drugs to select or what the results of such selection would be. To the extent a preference is expressed, it is for heparin. *See id.*, Column 9, lines 64-67.

216.    Dinh '227 also discloses in Table 1 examples of suitable combinations of polymers and therapeutic substances. *Id.* Column 7, lines 26-44. None of these combinations include a rapamycin or a macrocyclic lactone analog thereof, or an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof. The only drugs included are dexamethasone, tocopherol (vitamin E), dexamethasone phosphate, and aspirin. These compounds are very different in structure and mechanism of action from a rapamycin or macrocylic lactone analogs of rapamycin. These disclosures in Dinh '227 of the preferred drugs

48

teach away from the selection of a rapamycin or a macrocyclic lactone analog of rapamycin as set forth in claims 1, 3 and 5 of the '7286 patent.

217.    Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

218.    While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Morris '781, at Column 10, lines 40-54. Morris '781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

219.    Thus, a person of ordinary skill in the art reading Dinh '227 in view of Morris '781, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Morris '781 in the Dinh '227 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Dinh '227. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight leads one to the particular combinations claimed in the '7286 patent.

220.    Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent. Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Mitchell '711 does not teach a preference for or selection of any particular method of delivery. Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

221.    While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *See* Column 6, lines 13-28. Mitchell '711 does

BSC-A-000068

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

222.   Thus, a person of ordinary skill in the art reading Dinh '227 in view of Mitchell '781, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Mitchell '781 in the Dinh '227 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent.  The person of ordinary skill would first try the dozens of drugs specifically taught by Dinh '227.  Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that.  Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art.  Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

223.   A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks.  Neither Morris '781 nor Mitchell '711 describe the optimal time for release of rapamycin from a polymer-coated stent.  Indeed, they do not teach that stents are the preferred mode of delivery.  To the contrary, the specific examples in these references involve systemic delivery over a variety of different time periods.  Similarly, Dinh '227 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

2.     **Dinh '227 In View Of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790**

224.   There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790, into the Dinh '227 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

225.   As discussed above, the stents of the Dinh '227 invention require the presence of the bioabsorbable natural polymer fibrin.  Dinh '227 also provides only a generic of polymers, embracing thousands of individual polymers, that can be used as a baselayer, overlayed by the fibrin layer.  Dinh '227 also only generically discloses various drug classes, and specifically describes only polymer-drug combinations comprising dexamethasone, tocopherol (vitamin E), dexamethasone phosphate, and aspirin, which are distinct in structure and mechanism of action from a rapamycin or an analog thereof.  *See supra* ¶¶ 212-216.

226.   Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 are cumulative of Morris '781 as described above and contain no additional teaching that would lead a person of ordinary skill to the claimed invention.  Each of these references disclose macrocyclic lactone analog derivatives of rapamycin.  Skotnicki '579 does not focus on

50

BSC-A-000069

the use of the derivatives described to treat restenosis, but rather describes a variety of proposed uses such as in treating transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. Skotnicki '579, at Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579 patent are specific to restenosis. The patent describes the testing set forth in the specification as designed to evaluate "immunosuppressive activity," not restenosis. *Id.* at Column 7, line 41 to Column 8, line 53. The same is true of Russo '977, at Column 3, lines 1-31; Failli '145, at Column 4, line 52 to Column 6, line 21; Skotnicki '718, at Column 4, line 51 to Column 6, line 31; Skotnicki '730, at Column 5, line 48 to Column 6, line 66; and Nelson '790, at Column 14, line 32 to Col. 15, line 40.

227.   Moreover, none of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of stents to administer the drug, much less the use of the claimed polymers for elution of the drug from a stent coating. Skotnicki '579 discusses a variety of other routes of administration, such as use of a solid carrier like a tablet or powder, a liquid carrier for oral administration, a liquid composition for injection or intravenous administration, rectal administration via a suppository, intranasally or intrabroncially via an aerosol, transdermally via use of a patch, or as a solution, cream or lotion. Skotnicki '579, at Column 9, line 18 to Column 10, line 30. Similar teachings are found in Russo '977, at Column 4, line 1 to Column 5, line 23; Failli '145, at Column 7, line 3 to Column 8, line 13; Skotnicki '718, at Column 7, line 15 to Column 8, line 30; Skotnicki '730, at Column 7, line 35 to Column 8, line 41; and Nelson '790, at Column 16, line 9 to Column 17, line 21.

228.   While Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 disclose the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *See* Skotnicki '579, at Column 9, lines 23-38; Russo '977, at Column 4, lines 4-19; Failli '145, at Column 7, lines 10-24; Skotnicki '718, at Column 7, lines 23-38; Skotnicki '730, Column 7, lines 39-54; Nelson '790, Column 16, lines 13-28. None of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

229.   Thus, a person of ordinary skill in the art reading Dinh '227 in view of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 would not have any reason or motivation to incorporate or substitute a macrocyclic lactone analog of rapamycin as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 in the Dinh '227 invention to arrive at the inventions set forth in claims 1 - 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Dinh '227. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that

51

BSC-A-000070

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

230.   A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Dinh '227 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

### E.   Dayton '075 Proposed Obviousness Combinations

231.   Claims 1 - 5 of the '7286 patent are directed to, *inter alia*, the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

232.   Dayton '075 discloses polymer-drug coated stents and non-absorbable polymers, but does not disclose rapamycin or a macrocyclic lactone analog of rapamycin. Additional cited prior art discloses rapamycin or macrocyclic lactone analogs of rapamycin. However, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Dayton '075 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

### 1.   Dayton '075 In View Of Either Morris '781 Or Mitchell '711

233.   There would have been no motivation for the person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Morris '781 or Mitchell '711, into the Dayton '075 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

234.   Dayton '075 discloses a system in which the drug elutes from the microporous structure of the stent coating by achieving equilibrium with the surrounding body tissues or fluids. Equilibrium is controlled by charge distribution, concentration and molecular weight of the drug in relation to the pore size of the polymeric carrier. *Id.* at Column 4, lines 1-7, 20-27; Column 6, lines 54-65. Thus, the drug is located within the pores of the polymer and released by equilibrium.

235.   At Column 4, lines 7 to 13, Dayton '075 provides a generic listing of both bioabsorbable and nonabsorbable polymers for use in the microporous structure of the stent. The

BSC-A-000071

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

polymers or polymer classes disclosed in Dayton '075 embrace thousands of individual polymers. This generic disclosure of polymers, involving little more than a laundry list of possible polymers for use in the Dayton '075 invention, does not give any indication of which polymers to select or what the results of such selection would be. A person of ordinary skill in the art would not have any reason to select from this generic disclosure an acrylate-based polymer or copolymer, a fluorinated polymer or a mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent.

236.    At Column 4, lines 11 to 12, Dayton '075 includes on its list of possible polymers for the microporous structure the polymers polytetrafluorethylene and fluorosilicone. Dayton '075, however, does not provide any direction or reason to select these particular polymers over the other polymers it discloses, or show actual use of polytetrafluroethylene or fluorosilicone. In particular, Dayton '075 also does not disclose or show actual use of any acrylate-based polymer or copolymer for inhibition of neointimal proliferation. Indeed, when a metallic stent is contemplated, Dayton '075 teaches that the use of a silicone elastomer is preferred. *See* Dayton '075, Column 7, lines 35-38.

237.    At Column 4, lines 30-36 and Column 7, lines 24-29, Dayton '075 generically discloses numerous therapeutic agents for use with the claimed invention, including heparin, hirudin, prostacyclenes and analogs thereof, antithrombogenic agents, steroids, ibuprofen, antimicrobials, antibiotics, tissue plasma activators, rifamicin, monoclonal antibodies, snake venom protein by-products, antifibrosis agents, cyclosporine, hyaluronte and mixtures of these drugs. *Id.* at Column 4, lines 30-30; Column 7, lines 24-29. There is no disclosure of rapamycin or a macrocyclic lactone analog thereof. This generic disclosure of drugs, which covers numerous possible compounds, does not give any indication of which drugs to select or what the results of such selection would be. This generic disclosure in Dayton '075 would not direct a person of ordinary skill in the art toward the use of rapamycin in a polymer-drug coated stent as set forth in claims 1, 3 and 5 of the '7286 patent.

238.    Moreover, there is no indication in Dayton '075 that the particular microporous delivery system disclosed would be suitable for rapamycin or a macrocyclic analog thereof. In Dayton '075, the drug elutes from the microporous structure of the stent coating by achieving equilibrium with the surrounding body tissues or fluids. Equilibrium is controlled by charge distribution, concentration and molecular weight of the drug in relation to the pore size of the polymeric carrier. There is no teaching or disclosure that such a system would be suitable for use with rapamycin or a macrocyclic lactone analog thereof in an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.

239.    Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent

53

BSC-A-000072

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

240. While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Morris '781, at Column 10, lines 40-54. Morris '781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

241. Thus, a person of ordinary skill in the art reading Dayton '075 in view of Morris '781, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Morris '781 in the Dayton '075 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Dayton '075. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

242. Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent. Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Mitchell '711 does not teach a preference for or selection of any particular method of delivery. Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

243. While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *Id.* at Column 6, lines 13-28. Mitchell '711 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

244. Thus, a person of ordinary skill in the art reading Dayton '075 in view of Mitchell '781, would not have any no reason or motivation to incorporate or substitute rapamycin as taught by Mitchell '781 in the Dayton '075 invention to arrive at the inventions set forth in

54

BSC-A-000073

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Dayton '075. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

245.     A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Morris '781 nor Mitchell '711 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach that stents are the preferred mode of delivery. To the contrary, the specific examples in these references involve systemic delivery over a variety of different time periods. Similarly, Dayton '075 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

**2.     Dayton '075 In View Of Either Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790**

246.     There would have been no motivation for the person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 into the Dayton '075 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

247.     As discussed above, Dayton '075 discloses a system in which the drug elutes from the microporous structure of the stent coating by achieving equilibrium with the surrounding body tissues or fluids. Dayton '075 provides only a generic listing of polymers for use in the invention, embracing thousands of individual polymers, and does not specifically teach actual use to inhibit neointimal proliferation of an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof. Dayton '075 also only generically discloses numerous drugs for use with the claimed invention. *See supra* ¶¶ 234-238.

248.     Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 are cumulative of Morris '781 as described above and contain no additional teaching that would lead a person of ordinary skill to the claimed invention. Each of these references disclose macrocyclic lactone analog derivatives of rapamycin. Skotnicki '579 does not focus on the use of the derivatives described to treat restenosis, but rather describes a variety of proposed uses such as in treating transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. Skotnicki '579, at Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579 patent are specific to restenosis. The patent describes the testing set forth in the specification as

55

BSC-A-000074

designed to evaluate "immunosuppressive activity," not restenosis. *Id.* at Column 7, line 41 to Column 8, line 53. The same is true of Russo '977, at Column 3, lines 1-31; Failli '145, at Column 4, line 52 to Column 6, line 21; Skotnicki '718, at Column 4, line 51 to Column 6, line 31; Skotnicki '730, at Column 5, line 48 to Column 6, line 66; and Nelson '790, at Column 14, line 32 to Col. 15, line 40.

249.    Moreover, none of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of stents to administer the drug, much less the use of the claimed polymers for elution of the drug from a stent coating. Skotnicki '579 discusses a variety of other routes of administration, such use of a solid carrier like a tablet or powder, a liquid carrier for oral administration, a liquid composition for injection or intravenous administration, rectal administration via a suppository, intranasally or intrabroncially via an aerosol, transdermally via use of a patch, or as a solution, cream or lotion. Skotnicki '579, at Column 9, line 18 to Column 10, line 30. Similar teachings are found in Russo '977, at Column 4, line 1 to Column 5, line 23; Failli '145, at Column 7, line 3 to Column 8, line 13; Skotnicki '718, at Column 7, line 15 to Column 8, line 30; Skotnicki '730, at Column 7, line 35 to Column 8, line 41; and Nelson '790, at Column 16, line 9 to Column 17, line 21.

250.    While Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 disclose the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *See* Skotnicki '579, at Column 9, lines 23-38; Russo '977, at Column 4, lines 4-19; Failli '145, at Column 7, lines 10-24; Skotnicki '718, at Column 7, lines 23-38; Skotnicki '730, Column 7, lines 39-54; Nelson '790, Column 16, lines 13-28. None of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

251.    Thus, a person of ordinary skill in the art reading Dayton '075 in view of either of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 would not have any reason or motivation to incorporate or substitute a macrocyclic lactone analog of rapamycin as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 in the Dayton '075 invention to arrive at the inventions set forth in claims 1 - 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Dayton '075. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

252.    A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone

56

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Dayton '075 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

### F.  Tuch '411 Proposed Obviousness Combinations

253.  Claims 1 - 5 of the '7286 patent are directed to, *inter alia*, the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

254.  Tuch '411 discloses polymer-drug coated stents, but does not disclose rapamycin or a macrocyclic lactone analog of rapamycin. Additional cited prior art discloses rapamycin or macrocyclic lactone analogs of rapamycin. However, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Tuch '411 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

#### 1.  Tuch '411 In View of Either Morris '781 Or Mitchell '711

255.  There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Morris '781 or Mitchell '711, into the Tuch '411 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

256.  The Tuch '411 patent issued from a continuation-in-part application of the Berg '650 patent application. Tuch '411 contains the identical disclosure to Berg '650 with regard to the type of polymer to be used with the Tuch '411 invention.

257.  At Column 5, lines 17-54, Tuch '411 provides a generic of polymers. The disclosed polymers encompass approximately 50 polymers or polymer classes, embracing thousands of individual polymers. This generic disclosure of polymers, involving little more than a laundry list of possible polymers for use in the Tuch '411 invention, does not give any indication of which polymers to select or what the results of such selection would be. Although this expansive laundry list includes polyvinylidene fluoride and ethylene-methyl methacrylate copolymers, Tuch '411 provides no direction or reason to select these particular polymers from the many others in the list, nor are these polymers ever used or referenced in any actual example. A person of ordinary skill in the art would not have any reason to select from this generic

57

laundry list an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent.

258.   To the contrary, the specific disclosures of Tuch '411 teach away from the use of the specific polymers claimed and instead teach the use of bioabsorbable polymers.  At Column 5, lines 17-22, Tuch '411 states that "a bioabsorbable polymer is probably more desirable, since, unlike a biostable polymer, it will not be present long after implantation to cause any adverse, chronic local response." This teaching expressed a commonly held view at the time that the extended presence of polymers in the coronary artery would be detrimental, and that one should therefore use a bioabsorbable polymer which would eventually disappear over time. *See supra* ¶¶ 49-53.

259.   The specific examples that Tuch teaches as preferred would also lead a person of ordinary skill in the art further away from the combination claimed in the present invention. The specific examples in Tuch '411, Examples 1-10, all use either no polymer or the absorbable polymers poly(caprolactone), poly(Lactic acid-co-glycolic acid), or poly(L-lactic acid).  Poly(caprolactone), poly(Lactic acid-co-glycolic acid), and poly(L-lactic acid) are not an acrylate based polymer or copolymer or a fluorinated polymer. To the contrary, they are bioabsorbable polymers which release drug not solely by diffusion but by a combination of diffusion and degradation.  A person of ordinary skill reading this disclosure would be lead away from the claimed invention and toward the use of absorbable polymers like poly(caprolactone), poly(Lactic acid-co-glycolic acid), or poly(L-lactic acid).

260.   There is also nothing in Tuch '411 that would in any way lead a person of ordinary skill to a rapamycin or analog thereof as claimed in claims 1, 3 and 5. At Column 5, line 66 to Column 6 , line 19, Tuch '411 generically discloses numerous therapeutic agents for use with the claimed invention, including anti-inflammatory agents, for use with the claimed invention.  This generic disclosure of drugs, which covers an enormous number of possible compounds, does not give any indication of which drugs to select or what the results of such selection would be.  To the extent Tuch '411 provides guidance, it points in a different direction from the claimed invention.  Examples 1-10 disclose the drugs dexamethasone, colchicine, and heparin. These drugs are very different in structure and mechanism of action from a rapamycin or analog thereof. Heparin is a carbohydrate, and is an anticoagulant.  Dexamethasone is a steroid hormone, and its primary efficacy is anti-inflammatory.  Colchicine is a toxic natural product extracted from plants that is used to treat gout.  These disclosures in Tuch '411 of the preferred drugs teach away from the selection of a rapamycin or macrocyclic lactone analog thereof in a polymer-drug coated stent as set forth in claims 1, 3 and 5 of the '7286 patent.

261.   Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent

58

BSC-A-000077

impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

262.    While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Morris '781, at Column 10, lines 40-54. Morris '781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

263.    Thus, a person of ordinary skill in the art reading Tuch '411 in view of Morris '781, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Morris '781 in the Tuch '411 invention, nor would such a result teach the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Tuch '411. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight leads one to the particular combinations claimed in the '7286 patent.

264.    Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent. Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Mitchell '711 does not teach a preference for or selection of any particular method of delivery. Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

265.    While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *Id.* at Column 6, lines 13-28. Mitchell '711 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

266.    Thus, a person of ordinary skill in the art reading Tuch '411 in view of Mitchell '781, would not have any no reason or motivation to incorporate or substitute rapamycin as taught by Mitchell '781 in the Tuch '411 invention to arrive at the inventions set forth in

59

BSC-A-000078

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Tuch '411. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

267.    A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Morris '781 nor Mitchell '711 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach that stents are the preferred mode of delivery. To the contrary, the specific examples in these references involve systemic delivery over a variety of different time periods. Similarly, Tuch '411 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

**2.      Tuch '411 In View Of Either Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790**

268.    There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 into the Tuch '411 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

269.    As discussed above, Tuch '411 provides only a generic of polymers, and the specific examples teach the use of only bioabsorbable polymers such as poly(caprolactone), poly(Lactic acid-co-glycolic acid), and poly(L-lactic acid), rather than nonabsorbable polymers such as an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, as claimed in the '7286 patent. Indeed, Tuch '411 teaches a clear preference for bioabsorbable polymers. Tuch '411 also provides only a generic of drugs and drug classes, and specifically teaches use of dexamethasone, colchicine, and heparin, which are distinct in structure and mechanism of action from a rapamycin or   analogs thereof. *See supra* ¶¶ 257-260.

270.    Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 are cumulative of Morris '781 as described above and contain no additional teaching that would lead a person of ordinary skill to the claimed invention. Each of these references disclose macrocyclic lactone analog derivatives of rapamycin. Skotnicki '579 does not focus on the use of the derivatives described to treat restenosis, but rather describes a variety of proposed uses such as in treating transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. Skotnicki '579, at Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579

60

BSC-A-000079

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

patent are specific to restenosis. The patent describes the testing set forth in the specification as designed to evaluate "immunosuppressive activity," not restenosis. *Id.* at Column 7, line 41 to Column 8, line 53. The same is true of Russo '977, at Column 3, lines 1-31; Failli '145, at Column 4, line 52 to Column 6, line 21; Skotnicki '718, at Column 4, line 51 to Column 6, line 31; Skotnicki '730, at Column 5, line 48 to Column 6, line 66; and Nelson '790, at Column 14, line 32 to Col. 15, line 40.

271.    Moreover, none of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790, however, describe the use of stents to administer the drug, much less the use of the claimed polymers for elution of the drug from a stent coating. Skotnicki '579 discusses a variety of other routes of administration, such as use of a solid carrier like a tablet or powder, a liquid carrier for oral administration, a liquid composition for injection or intravenous administration, rectal administration via a suppository, intranasally or intrabroncially via an aerosol, transdermally via use of a patch, or as a solution, cream or lotion. Skotnicki '579, at Column 9, line 18 to Column 10, line 30. Similar teachings are found in Russo '977, at Column 4, line 1 to Column 5, line 23; Failli '145, at Column 7, line 3 to Column 8, line 13; Skotnicki '718, at Column 7, line 15 to Column 8, line 30; Skotnicki '730, at Column 7, line 35 to Column 8, line 41; and Nelson '790, at Column 16, line 9 to Column 17, line 21.

272.    While Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 disclose the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Skotnicki '579, at Column 9, lines 23-38; Russo '977, at Column 4, lines 4-19; Failli '145, at Column 7, lines 10-24; Skotnicki '718, at Column 7, lines 23-38; Skotnicki '730, Column 7, lines 39-54; Nelson '790, Column 16, lines 13-28. None of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

273.    Thus, a person of ordinary skill in the art reading Tuch '411 in view of either of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 would not have any reason or motivation to incorporate or substitute a macrocyclic lactone analog of rapamycin as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 in the Tuch '411 invention to arrive at the inventions set forth in claims 1 - 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Tuch '411. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combination claimed in the '7286 patent.

BSC-A-000080

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

274.   A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Tuch '411 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

## G.   Kaplan '348 Proposed Obviousness Combinations

275.   Claims 1 - 5 of the '7286 patent are directed to, *inter alia*, the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

276.   Kaplan '348 discloses endovascular stents with polymeric drug delivery filaments, but does not disclose rapamycin or a macrocyclic lactone analog of rapamycin. Additional cited prior art discloses rapamycin or macrocyclic lactone analogs of rapamycin. However, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Kaplan '348 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

### 1.   Kaplan '348 In View Of Either Morris '781 Or Mitchell '711

277.   There would have been no motivation for a person of ordinary skill in the art to substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Morris '781 or Mitchell '711, into the Kaplan '348 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

278.   In the Kaplan '348 invention, the drug delivery matrix comprises at least one filament that is interlaced or laminated with the stent, and expandable with it. Kaplan '348, at Column 4, lines 65-68; Column 12, lines 3-5. The drug is contained within the filament and is released from the filament upon exposure to a vascular environment. *Id.* at Column 3, lines 7-10.

279.   Kaplan '348 teaches the use of biodegradable polymers for the filaments. It states that "[g]enerally the filaments are polymers which are degradable over time, within the vascular environment." *Id.* at Column 6, lines 25-27. It further explains that the "bioactive compunds are mixed in the polymer and released as the polymer degrades." *Id.* at Column 6, lines 29-30. "The rate of polymer degradation and the concentration of bioactive compound in the polymer determines the release rate of the bioactive compound to the surrounding tissue." *Id.* at Column 6, lines 33-36. The specification further explains that certain biodegradable

BSC-A-000081

polyanhydrides are "[p]articularly useful polymers in the present invention." *Id.* at Column 6, line 63 to Column 7, line 8.

280.    Although "non-degradable materials" are mentioned in Kaplan '348, they are merely discussed as an "alternative to biodegradable polymers." At Column 6, line 52 to Column 7, line 13, and Column 7, lines 43-49, Kaplan '348 provides a generic of polymers for use in the claimed invention. The polymers or polymer classes disclosed in Kaplan '348 embrace thousands of individual polymers. Other than the specific bioabsorbable polymers mentioned above, this generic disclosure of polymers, involving little more than a laundry list of possible polymers for use in the Kaplan '348 invention, does not give any indication of which polymers to select or what the results of such selection would be. A person of ordinary skill in the art would not have any reason or motivation to select from this generic disclosure an acrylate-based polymer or copolymer, a fluorinated polymer or a mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent.

281.    At Column 7, lines 47-48, Kaplan '348 discloses the polymers methyl methacrylate-ethylene glycol and dimethylmethacrylate copolymer. Kaplan '348, however, does not provide any direction or reason to select these particular polymers over the other polymers it discloses. To the contrary, as explained above, Kaplan teaches the use of biodegradable polymers such as biodegradable polyanhydrides. In particular, Kaplan '348 does not show actual use of methyl methacrylate-ethylene glycol and dimethylmethacrylate copolymers, or any other nonabsorbable polymer.

282.    At Column 7, lines 53 to Column 8, line 3, Kaplan '348 generically discloses numerous therapeutic agents for use with the claimed invention. This generic disclosure of drugs, which covers numerous compounds, does not give any indication or which drugs to select or what the results of such selection would be. In addition, the specific example in Kaplan '348 describes biodegradable filaments contaning heparin, methotrexate or a vasodilator such as a calcium channel blocker or a nitrate, drugs which are all distinct in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog thereof. These disclosures in Kaplan '348 of the preferred drugs teach away from the selection of a rapamycin or a macrocyclic lactone analog of rapamycin as set forth in claims 1, 3 and 5 of the '7286 patent.

283.    Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent,

63

BSC-A-000082

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

284.    While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Morris '781, at Column 10, lines 40-54. Morris '781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

285.    Thus, a person of ordinary skill in the art reading Kaplan '348 in view of Morris '781, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Morris '781 in the Kaplan '348 invention, nor would such a result teach the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the numerous drugs specifically taught by Kaplan '348. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

286.    Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent. Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Mitchell '711 does not teach a preference for or selection of any particular method of delivery. Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

287.    While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Mitchell '711, at Column 6, lines 13-28. Mitchell '711 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

288.    Thus, a person of ordinary skill in the art reading Kaplan '348 in view of Mitchell '781, would not have any no reason or motivation to incorporate or substitute rapamycin as taught by Mitchell '781 in the Kaplan '348 invention to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent. The person of ordinary skill would first try the numerous drugs specifically taught by Kaplan '348. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional

BSC-A-000083

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

289.   A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Morris '781 nor Mitchell '711 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach that stents are the preferred mode of delivery. To the contrary, the specific examples in these references involve systemic delivery over a variety of different time periods. Similarly, Kaplan '348 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

**2.     Kaplan '348 In View Of Either Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790**

290.   There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 into the Kaplan '348 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

291.   As discussed above, in the Kaplan '348 invention, a filament containing the drug delivery matrix is interlaced or laminated with the stent. Kaplan '348 teaches the use of biodegradable polymers for the filaments. While Kaplan '348 discusses nonabsorbable materials as a possible alternative to biodegradable materials, it provides only a generic of polymers, embracing thousands of individual polymers, and does not provide any direction or reason to select an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, as claimed in the '7286 invention. To the contrary, biodegradable polyanhydrides are described as being particularly useful. Kaplan '348 also only provides only a generic listing of drugs for use in the invention, and specifically teaches the use of only heparin, methotrexate, or a vasodilator such as a calcium channel blocker or a nitrate, which are distinct in structure and mechanism of action from a rapamycin or a macrocyclic lactone analog thereof. *See supra*, ¶¶ 278-282.

292.   Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 are cumulative of Morris '781 as described above and contain no additional teaching that would lead a person of ordinary skill to the claimed invention. Each of these references disclose macrocyclic lactone analog derivatives of rapamycin. Skotnicki '579 does not focus on the use of the derivatives described to treat restenosis, but rather describes a variety of proposed uses such as in treating transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. Skotnicki, at Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579 patent are specific to restenosis. The patent describes the testing set forth in the specification as

65

BSC-A-000084

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

designed to evaluate "immunosuppressive activity," not restenosis. *Id.* at Column 7, line 41 to Column 8, line 53. The same is true of Russo '977, at Column 3, lines 1-31; Failli '145, at Column 4, line 52 to Column 6, line 21; Skotnicki '718, at Column 4, line 51 to Column 6, line 31; Skotnicki '730, at Column 5, line 48 to Column 6, line 66; and Nelson '790, at Column 14, line 32 to Col. 15, line 40.

293.    Moreover, none of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of stents to administer the drug, much less the use of the claimed polymers for elution of the drug from a stent coating. Skotnicki '579 discusses a variety of other routes of administration, such as use of a solid carrier like a tablet or powder, a liquid carrier for oral administration, a liquid composition for injection or intravenous administration, rectal administration via a suppository, intranasally or intrabroncially via an aerosol, transdermally via use of a patch, or as a solution, cream or lotion. *Id.* at Column 9, line 18 to Column 10, line 30. Similar teachings are found in Russo '977, at Column 4, line 1 to Column 5, line 23; Failli '145, at Column 7, line 3 to Column 8, line 13; Skotnicki '718, at Column 7, line 15 to Column 8, line 30; Skotnicki '730, at Column 7, line 35 to Column 8, line 41; and Nelson '790, at Column 16, line 9 to Column 17, line 21.

294.    While Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 disclose the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." *See* Skotnicki '579, at Column 9, lines 23-38; Russo '977, at Column 4, lines 4-19; Failli '145, at Column 7, lines 10-24; Skotnicki '718, at Column 7, lines 23-38; Skotnicki '730, Column 7, lines 39-54; Nelson '790, Column 16, lines 13-28. None of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

295.    Thus, a person of ordinary skill in the art reading Kaplan '348 in view of either of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 would not have any reason or motivation to incorporate or substitute a macrocyclic lactone analog of rapamycin as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 in the Kaplan '348 invention to arrive at the inventions set forth in claims 1 - 5 of the '7286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Kaplan '348. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

296.    A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone

66

BSC-A-000085

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Kaplan '348 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

## H.    Wolff '779 Proposed Obviousness Combinations

297.    Claims 1 - 5 of the '7286 patent are directed to, *inter alia*, the use of a nonabsorbable polymeric carrier comprising an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, to be used with rapamycin or a macrocyclic lactone analog of rapamycin, on a metallic stent for inhibition of neointimal proliferation. The claimed stents also provide controlled release of the drug over a period of several weeks.

298.    Wolff '779 discloses polymer-drug coated stents, but does not disclose rapamycin or a macrocyclic lactone analog of rapamycin. Additional cited prior art discloses rapamycin or macrocyclic lactone analogs of rapamycin. However, as set forth more fully below, at the time of the '7286 invention, a person of ordinary skill in the art would not have modified the teachings of Wolff '779 based upon the cited prior art to arrive at the inventions claimed in claims 1 - 5 of the '7286 patent.

### 1.    Wolff '779 In View of Berg '650 And Further In View Of Either Morris '781 Or Mitchell '711

299.    There would have been no motivation for a person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by either Morris '781 or Mitchell '711, into the Wolff '779 invention, in view of Berg '650, to arrive at the inventions of claims 1 - 5 of the '7286 patent.

300.    At p. 12, line 23 to p. 15, line 10, Wolff '779 discloses a generic listing of polymers. The disclosed polymers or polymer classes embrace thousands of individual polymers. While at page 10, line 37, Wolff '779 states that the polymer used in the claimed invention may be biostable or bioabsorbable, Wolff '779 makes only a passing reference to non-absorbable polymers, and does not describe any specific class of individual non-absorbable polymers. A person of ordinary skill in the art would not have any reason or motivation to select from this generic disclosure an acrylate-based polymer or copolymer, a fluorinated polymer or mixture thereof, as set forth in claims 1, 3 and 5 of the '7286 patent.

301.    To the contrary, the teachings in Wolff '779 would have directed a person of ordinary skill in the art toward bioabsorbable polymers. Wolff '779 states in the Summary of the Invention and in the preferred embodiment that "[c]ontrolled release, via a bioabsorbable

67

polymer, offers to maintain the drug level within the desired therapeutic range for the duration of the treatment." *Id.* p. 3, lines 17-19; p. 12, lines 16-18. The specification goes on to describe in detail a number of bioabsorbable polymers, including poly-l-lactic acid/polyglycolic acid, polyanhydride, and polyphosphate ester. *Id.* at p. 12, line 23 to p. 15, line 11. "The compound which is preferred" for use in the invention is "a polyphosphate ester," a bioabsorbable polymer. *Id.* at p. 13, lines 16-17.

302.     The lack of disclosure of the claimed biostable polymers in Wolff '779 is not remedied by Berg '650. Berg '650 provides only a generic listing of polymers. Like Wolff '779, the specific examples in Berg '650 teach the use of bioabsorbable polymers (such as poly(caprolactone) and poly(L-lactic acid)) rather than nonabsorbable polymers such as an acrylate-based polymer or copolymer or a fluorinated polymer as claimed. *See supra*, ¶¶ 149-150.

303.     Both Wolff '779 and Berg '650 generically disclose numerous therapeutic agents, including anti-inflammatory and anti-replicate drugs, for use with their claimed inventions. These generic disclosure of drugs, which covers numerous possible compounds, do not give any indication of which drugs to select or what the results of such selection would be. A person of ordinary skill in the art reading Wolff '779 in view of Berg '650 would not be directed toward the use of a rapamycin or a macrocyclic lactone analog of rapamycin in a polymer-drug coated stent as set forth in claims 1, 3 and 5 of the '7286 patent.

304.     In particular, Wolff '779 teaches the use of anti-replicate drugs (including antimitotics and antimetabolites), including methotrexate, azathiprine, vincristine, vinblastine, fluorouracil, adriamycin, and mutamycin. *Id.* at p. 9, lines 11-22. There is no suggestion of the use of a rapamycin or a macrocyclic lactone analog thereof, or even any similar compound.

305.     Morris '781 is directed to the use of rapamycin to treat restenosis. Morris discloses administration of rapamycin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin. Morris does not teach a preference for or selection of any particular method of delivery, nor does it teach that stents would be a better approach than other routes of administration. Indeed, the specific examples in Morris '781 involve systemic administration. Morris '781 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer as a stent coating as claimed.

306.     While at Column 10, lines 53-54, Morris '781 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets." Morris '781 at Column 10, lines 40-54. Morris

BSC-A-000087

'781 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

307.   Thus, a person of ordinary skill in the art reading Wolff '779 in view of Berg '650, and further in view of Morris '781, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Morris '781 in the Wolff '779 invention viewed in light of Berg '650, nor would such a result teach the inventions set forth in claims 1, 3 and 5 of the '7286 patent.  The person of ordinary skill would first try the dozens of drugs specifically taught by Wolff '779 and Berg '650.  Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that.  Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art.  Only hindsight would lead one to the particular combination claimed in the '7286 patent.

308.   Mitchell '711 adds nothing to Morris '781 that would teach or suggest the invention claimed in the '7286 patent.  Like Morris '781, Mitchell '711 discloses administration of a combination of rapamycin and heparin in a variety of ways including orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally or via a vascular stent impregnated with rapamycin.  Mitchell '711 does not teach a preference for or selection of any particular method of delivery.  Mitchell '711 also does not describe the use of nonabsorbable polymers on a stent, much less the use of an acrylate-based polymer or copolymer or a fluorinated polymer on a stent.

309.   While at Column 6, lines 27-28, Mitchell '711 discloses the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of "[s]uitable solid carriers" for use in "powders and tablets."  Mitchell '711 Column 6, lines 13-28.  Mitchell '711 does not describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

310.   Thus, a person of ordinary skill in the art reading Wolff '779 in view of Berg '650, and further in view of Mitchell '711, would not have any reason or motivation to incorporate or substitute rapamycin as taught by Mitchell '781 in the Wolff '779 invention viewed in light of Berg '650 to arrive at the inventions set forth in claims 1, 3 and 5 of the '7286 patent.  The person of ordinary skill would first try the dozens of drugs specifically taught by Wolff '779 and Berg '650.  Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that.  Nor does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art.  Only hindsight would lead one to the particular combinations claimed in the '7286 patent.

BSC-A-000088

311.   A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Morris '781 nor Mitchell '711 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach that stents are the preferred mode of delivery. To the contrary, the specific examples in these references involve systemic delivery over a variety of different time periods. Similarly, neither Wolff '779 nor Berg '650 discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

2.   **Wolff '779 In View of Berg '650 And Further In View Of Either Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790**

312.   There would have been no motivation for the person of ordinary skill in the art to incorporate or substitute rapamycin or a macrocyclic lactone analog of rapamycin, as taught by any of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 into the Wolff '779 invention to arrive at the inventions of claims 1 - 5 of the '7286 patent.

313.   As discussed above, Wolff '779 discloses only a generic of polymers, embracing thousands of individual polymers. Furthermore, while Wolff '779 makes a passing reference to non-absorbable polymers, it does not describe any specific class of individual non-absorbable polymers. To the contrary, Wolff '779 emphasizes the use of bioabsorbable polymers, and teaches that polyphosphate ester, a bioabsorbable polymer, is preferred. Nor is the lack of disclosure of biostable polymers in Wolff '779 remedied by Berg '650. Berg '650 provides a only a generic of polymers, and specifically teaches the use of bioabsorbable polymers such as poly (caprolactone) and poly(L-lactic acid), rather than nonabsorbable polymers such as an acrylate-based polymer or copolymer or a fluorinated polymer as claimed in the '7286 patent. Finally, both Wolff '779 and Berg '650 only generically disclose numerous therapeutic agents, and specifically teach the use of drugs that are distinct in structure and mechanism of action different from a rapamycin or a macrocyclic lactone analog of rapamycin, such as dexamethasone or anti-replicate drugs. *See supra* ¶¶ 300-304.

314.   Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 are cumulative of Morris '781 as described above and contain no additional teaching that would lead a person of ordinary skill to the claimed invention. Each of these references disclose macrocyclic lactone analog derivatives of rapamycin. Skotnicki '579 does not focus on the use of the derivatives described to treat restenosis, but rather describes a variety of proposed uses such as in treating transplant rejection, solid tumors, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. Column 8, line 54 to Column 9, line 4. Indeed, none of the tests described in the Skotnicki '579 patent are specific to

70

restenosis. The patent describes the testing set forth in the specification as designed to evaluate "immunosuppressive activity," not restenosis. Column 7, line 41 to Column 8, line 53. The same is true of Russo '977, at Column 3, lines 1-31; Failli '145, at Column 4, line 52 to Column 6, line 21; Skotnicki '718, at Column 4, line 51 to Column 6, line 31; Skotnicki '730, at Column 5, line 48 to Column 6, line 66; and Nelson '790, at Column 14, line 32 to Col. 15, line 40.

315.    Moreover, none of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of stents to administer the drug, much less the use of the claimed polymers for elution of the drug from a stent coating. Skotnicki '579 discusses a variety of other routes of administration, such as use of a solid carrier like a tablet or powder, a liquid carrier for oral administration, a liquid composition for injection or intravenous administration, rectal administration via a suppository, intranasally or intrabroncially via an aerosol, transdermally via use of a patch, or as a solution, cream or lotion. Skotnicki '579, at Column 9, line 18 to Column 10, line 30. Similar teachings are found in Russo '977, at Column 4, line 1 to Column 5, line 23; Failli '145, at Column 7, line 3 to Column 8, line 13; Skotnicki '718, at Column 7, line 15 to Column 8, line 30; Skotnicki '730, at Column 7, line 35 to Column 8, line 41; and Nelson '790, at Column 16, line 9 to Column 17, line 21.

316.    While Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, and Nelson '790 disclose the polymer polyvinylpyrrolidine, the disclosure of polyvinylpyrrolidine occurs in the context of the use of "[s]uitable solid carriers" for use in "powders and tablets." Skotnicki '579, at Column 9, lines 23-38; Russo '977, at Column 4, lines 4-19; Failli '145, at Column 7, lines 10-24; Skotnicki '718, at Column 7, lines 23-38; Skotnicki '730, Column 7, lines 39-54; Nelson '790, Column 16, lines 13-28. None of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the use of polyvinylpyrrolidine as a polymeric carrier for use on a polymer-drug coated stent.

317.    Thus, a person of ordinary skill in the art reading Wolff '779 in view of Berg '650, and further in view of either of Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790, would not have any reason or motivation to incorporate or substitute a macrocyclic lactone analog of rapamycin as taught by Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 in the Wolff '779 invention viewed in light of Berg '650 to arrive at the inventions set forth in claims 1 - 5 of the '286 patent. The person of ordinary skill would first try the dozens of drugs specifically taught by Wolff '779 and Berg '650. Nor would the person of ordinary skill in the art have any indication of what the results of such substitution would be because nothing in the cited prior art addresses that. Nor

71

*Inter Partes* Reexamination No. 95/001,096
U.S. Patent No. 7,217,286
Attorney Docket No. CRDS-0109
Declaration of Antonios G. Mikos

does the examiner cite to any common knowledge in the interventional cardiology field that would correct these deficiencies in the cited prior art. Only hindsight leads one to the invention of the '7286 patent.

318. A person of ordinary skill in the art would also not have been motivated based on these references to provide controlled release of a rapamycin or a macrocyclic lactone analog thereof over a period of several weeks. Neither Skotnicki '579, Russo '977, Failli '145, Skotnicki '718, Skotnicki '730, or Nelson '790 describe the optimal time for release of rapamycin from a polymer-coated stent. Indeed, they do not teach the delivery of a drug from a stent. Similarly, Wolff '779 does not even discuss a rapamycin or a macrocyclic lactone analog thereof (or any similar drug), much less describe how it should be released in order to treat restenosis.

## VII. ADDITIONAL EVIDENCE OF NONOBVIOUSNESS

319. I am informed and understand that Cordis is in possession of additional evidence relating to the objective indicia of nonobviousness that has come to light during the ongoing *Cordis Corporation v. Abbott Laboratories et al.* litigations referenced in the Request for Reexamination. However, protective orders that are in effect in these litigations preclude submission of such evidence with this response. Efforts are underway to obtain the requisite permission to submit such evidence to the Office to thereby assure that the record before the Office in this regard is complete.

Dated: April 22, 2009

Antonios G. Mikos, Ph.D.

72

# EXHIBIT C

# REDACTED IN ITS ENTIRETY

# EXHIBIT D

# REDACTED IN ITS ENTIRETY

# EXHIBIT E



# Academic Press
# Dictionary
# of Science and
# Technology

KENYON & KENYON
LIBRARY

SEP 8 - 1992

Edited by
Christopher Morris



**Academic Press**
Harcourt Brace Jovanovich, Publishers
San Diego   New York   Boston   London   Sydney   Tokyo   Toronto

BSC-A-000222

This book is printed on acid-free paper. ∞

Copyright © 1992 by ACADEMIC PRESS, INC.
All Rights Reserved.
No part of this publication may be reproduced or transmitted in any form or by any
means, electronic or mechanical, including photocopy, recording, or any information
storage and retrieval system, without permission in writing from the publisher.

Academic Press, Inc.
1250 Sixth Avenue, San Diego, California 92101-4311

*United Kingdom Edition published by*
Academic Press Limited
24-28 Oval Road, London NW1 7DX

Library of Congress Cataloging-in-Publication Data

Academic Press dictionary of science and technology / edited by
    Christopher Morris
        p.   cm.
    ISBN 0-12-200400-0
    1. Science--Dictionaries.   2. Technology--Dictionaries.
I. Morris, Christopher G.   II. Academic Press.   III. Title:
Dictionary of science and technology.
    Q123.A33   1991
    503--dc20                                                90-29032
                                                                  CIP

PRINTED IN THE UNITED STATES OF AMERICA
92  93  94  95  96  97   DO    9  8  7  6  5  4  3  2  1

BSC-A-000223

**mixed potential** *Physical Chemistry.* the amount of energy a material can generate when two or more electrochemical reactions occur simultaneously.

**mixed salvo** *Ordnance.* a series of shots, some falling short of the target and some falling beyond it in uneven distribution.

**mixed schizophrenia** *Psychology.* a form of schizophrenia having symptoms from two or more of the four basic categories of schizophrenia, so that a classification in one of these categories cannot be made.

**mixed state** *Quantum Mechanics.* a system that is not a single state and may be any of a number of states, each with some probability; such a system is usually presumed to be in some particular state, but the state is unknown for experimental reasons or because the system is only described statistically.

**mixed tide** *Oceanography.* a tide, that exhibits both diurnal and semidiurnal characteristics; characterized by large inequalities in the heights (and sometimes the durations) of either the two high tides or the two low tides of a tidal day; common in many areas of the Pacific Ocean.

**mixed vaccine** *Immunology.* a vaccine that contains antigens from several different species of pathogens and thus provides protection against several diseases simultaneously.

**mixed water** *Volcanology.* a combination of volcanic and atmospheric waters.

**mixer,** something that mixes; specific uses include: *Mechanical Devices.* a mechanical appliance used to mix foods. *Electronics.* a circuit or device that combines two or more input signals or frequencies to produce a single output.

**mixer-settler** *Chemical Engineering.* a liquid-liquid extraction device that mixes phases and then allows the liquid to settle and separate.

**mixer tube** *Electronics.* an electron tube that performs the frequency-conversion function of a converter in a superheterodyne receiver when it is supplied with voltage or power from an external oscillator.

**mixing,** a process in which something is mixed; specific uses include: *Chemical Engineering.* the mechanical agitation of the ingredients of a mixture in order to blend, cool, heat, react, or coat them. *Electronics.* the process of combining two or more signals, such as the outputs of multiple microphones, in order to produce special effects.

**mixing extruder** *Materials Science.* a device for mixing polymers as well as incorporating additives such as color concentrates, fillers, reinforcing fibers, stabilizers, lubricants, antioxidants, foaming agents, and crosslinking agents. Convection is the dominant mixing mechanism in mixing extruders.

**mixing length** *Fluid Mechanics.* the distance that a turbulent wake eddy travels before mixing with the ambient fluid. Also, PRANDTL MIXING LENGTH.

**mixing ratio** *Meteorology.* the dimensionless ratio of a mass of water vapor to a unit of mass of dry air, in a system of moist air.

**mixing transformation** *Mathematics.* a function on a measure space (to itself) such that the image of any measurable set is uniformly distributed throughout the space.

**mixite** *Mineralogy.* $BiCu_2^{2+}(AsO_4)_3(OH)_6 \cdot 3H_2O$, a whitish or emerald-to-blue-green hexagonal mineral of the mixite group occurring as aggregates of acicular crystals and in fibrous masses, having a specific gravity of 3.79 and a hardness of 3 to 4 on the Mohs scale.

**Mixodectidae** *Paleontology.* a proposed family of dermopteran mammals in the extinct superfamily Plagiomenoidea; known only from the Paleocene of North America.

**mixolimnion** *Hydrology.* in a meromictic lake, the low-density, freely circulating upper layer.

**mixoploid** *Cell Biology.* describing an organism or a population of cells having a variable number of chromosomes in each cell.

**mixotrophic** *Biology.* obtaining nutrition by combining autotrophic and heterotrophic mechanisms, such as an insectivorous plant.

**mixt.** mixture.

**mixtite** see DIAMICTITE.

**mixture** *Science.* the mass that results from the thorough blending of two or more substances. *Pharmacology.* any combination of different drugs, or of a drug with other ingredients, that do not react chemically with one another.

**mixture ratio** *Space Technology.* in the propellant of a rocket or space vehicle, the ratio of fuel to oxidizer (or oxidizer to fuel) expressed in terms of mass flow rate.

**Mizar** *Astronomy.* Zeta (ζ) Ursae Majoris, a 2nd-magnitude star at the bend in the Big Dipper's handle; it makes a close visual pair with 4th-magnitude Alcor.

**mizzer** see MISER.

**mizzenmast** *Naval Architecture.* 1. the third mast from the bow in a vessel of three or more masts. 2. the small rear mast of some two-masted vessels, such as a ketch or yawl.

**mizzonite** *Mineralogy.* an intermediate member of the marialite-meionite isomorphous series, scapolite group. Also, DIPYRE, DIPYRITE.

**mk. mark.**

**MKC** *Aviation.* the airport code for Downtown Kansas City Airport, Kansas City, Missouri.

**MKE** *Aviation.* the airport code for Milwaukee, Wisconsin.

**MKS** or **M.K.S.** meter-kilogram-second. Also, mks or m.k.s.

**MKSA** or **mksa** meter-kilogram-second-ampere.

**MKSA system** *Metrology.* a system of measurement in which the meter is the basic unit of length, the kilogram is the basic unit of mass, the second is the basic unit of time, and the ampere is the basic unit of electric current.

**MKS system** *Metrology.* a system of measurement in which the meter is the basic unit of length, the kilogram is the basic unit of mass, and the second is the basic unit of time.

**MK system** *Astrophysics.* a system of spectral classification developed by W.W. Morgan and P.C. Keenan that assigns stars to one of six luminosity classes.

**ml** or **ml.** milliliter.

**mL** millilambert.

**MLA** left mentoanterior. (From Latin *mento-laeva anterior*.)

**MLA** or **M.L.A.** Medical Library Association; Modern Language Association.

**m-lange** *Geology.* a mappable mixture of rock material that generally consists of an assortment of exotic and native fragments of various sizes, origins, and geologic ages embedded in a fine-grained, sheared matrix of more tractable material. Also, BLOCK CLAY.

**MLB** *Aviation.* the airport code for Melbourne, Florida.

**MLC** mixed lymphocyte culture.

**MLD** or **M.L.D.** median lethal dose; minimum lethal dose.

**MLF** multilateral force.

**M.L.P.** left mentotransverse. (From Latin *mento-laeva transversa*.)

**MLW** mean low water.

**mm** or **mm.** millimeter; millimeters.

**MM** necessary changes being made. (From Latin *mutatis mutandis*.)

**mM** millimolar.

**M.M.** mucous membranes.

**MMA** monomethyl aniline.

**M meter** *Meteorology.* any instrument that is used to measure moisture in the atmosphere.

**mmf** or **m.m.f.** millimicrofarad; magnetomotive force.

**mm Hg** millimeter of mercury.

**mmho** millimho.

**M mode** *Acoustics.* a method of ultrasonic medical tomography in which sweeping motions at modulated frequencies are used to form detailed images of organs such as the heart.

**MMPI** Minnesota Multiphasic Personality Inventory.

**MMR** *Immunology.* an active immunizing agent consisting of a combination of measles, mumps, and rubella live vaccine; used in the immunization of children.

**M.M.Sc.** Master of Medical Science.

**MN** magnetic north.

**Mn** the chemical symbol for manganese.

**M'Naghten rule** or **M'Naghten test** [mə nô´tən] *Psychology.* the traditional principle that a person is considered to be legally insane if that person does not understand the nature and consequences of his or her actions. (From a famous 19th-century British case in which Daniel *M'Naghten* was acquitted of murder for this reason.)

**M-N blood groups** *Genetics.* a system of human blood groups caused by the presence or absence on erythrocytes of two antigens, designated M and N, that are coded for by two codominant alleles.

**mnemonic** [nə mŏn´ĭk] *Psychology.* 1. a particular device or technique used to improve one's memory or one's ability to memorize specific material. 2. relating to memory or the improvement of memory. Thus, mnemonic device.

**mnemonic code** *Computer Programming.* an easy-to-recall assembly language code that uses a name for an operation, such as "ADD" for addition.

**mnemonics** [nə mŏn´ĭks] *Psychology.* the use of various devices, strategies, and other artificial aids to improve memory.

**Mnesarchaeidae** *Invertebrate Zoology.* a superfamily of New Zealand moths, lepidopteran insects in the suborder Homoneura.

BSC-A-000224

# EXHIBIT F

*The*

# American
# Heritage®Dictionary

## *of the English Language*

FOURTH EDITION



 HOUGHTON MIFFLIN COMPANY
Boston   New York

BSC-A-000225

Words are included in this Dictionary on the basis of their usage.
Words that are known to have current trademark registrations are
shown with an initial capital and are also identified as trademarks. No
investigation has been made of common-law trademark rights in any
word, because such investigation is impracticable. The inclusion of any
word in this Dictionary is not, however, an expression of the
Publisher's opinion as to whether or not it is subject to proprietary
rights. Indeed, no definition in this Dictionary is to be regarded as
affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of
Forbes Inc. Their use is pursuant to a license agreement with
Forbes Inc.

Copyright © 2000 Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or
by any means, electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval system without
the prior written permission of Houghton Mifflin Company unless
such copying is expressly permitted by federal copyright law. Address
inquiries to Reference Permissions, Houghton Mifflin Company,
222 Berkeley Street, Boston, MA 02116.

Visit our Web site: www.hmco.com/trade.

*Library of Congress Cataloging-in-Publication Data*

The American Heritage dictionary of the English language.—4th ed.
    p.   cm.
    ISBN 0-395-82517-2 (hardcover) --- ISBN 0-618-08230-1
    (hardcover with CD ROM)
    1. English language–Dictionaries
PE1628 .A623 2000
423–dc21

                                    00-025369

Manufactured in the United States of America

BSC-A-000226

**popper | pork**



poppy



porch



porcupine
common porcupine
*Erethizon dorsatum*



porcupine fish
*Diodon hystrix*

**pop·per** (pŏp′ər) *n.* 1. One that pops. 2. A container or pan for making popcorn. 3. *Slang* An ampoule of amyl nitrite or butyl nitrite, used illicitly to induce euphoria and enhance sexual stimulation.

**Pop·per** (pŏp′ər), Sir Karl Raimund 1902–1994. British philosopher known for his contributions to the understanding of scientific reasoning and his attacks on historicism. His works include *The Logic of Scientific Discovery* (1931) and *The Open Society and Its Enemies* (1945).

**pop·pet** (pŏp′ĭt) *n.* 1. A poppet valve. 2. *Nautical* A. A small wooden strip on a gunwale that forms or supports an oarlock. B. One of the beams of a launching cradle supporting a ship's hull. 3. *Chiefly British* A darling. [Middle English *popet*, small child, doll, puppet. See PUPPET.]

**poppet valve** *n.* An intake or exhaust valve, operated by springs and cams, that plugs and unplugs its opening by axial motion.

**pop·ping** (pŏp′ĭng) *n.* A style of dancing that incorporates the rhythmic contraction of the dancer's muscles and pantomimed movements, usually to funk or hip-hop music.

**pop·ple** (pŏp′əl) *intr.v.* -pled, -pling, -ples To move in a tossing, bubbling, or rippling manner, as choppy water. ✦ *n.* 1. Choppy water. 2. The motion or sound of boiling liquid. [Middle English *poplen*, probably of Middle Dutch origin.]

**pop·ple²** (pŏp′əl) *n. Informal* A poplar. [Middle English *popel* (perhaps from Old English *popul*-), from Latin *pōpulus*.]

**pop·py** (pŏp′ē) *n., pl.* -pies 1. Any of numerous plants of the genus *Papaver*, having nodding buds with four crumpled petals, showy red, orange, or white flowers, a milky juice, and capsules that dehisce through terminal pores. 2. Any of several similar or related plants, such as the California poppy. 3. An extract from the sap of unripe poppy seedpods, used in medicine and narcotics. 4. A vivid red to reddish orange. [Middle English *popi*, from Old English *popig*, probably alteration of Vulgar Latin *papavum*, alteration of Latin *papāver*.]

**pop·py·cock** (pŏp′ē-kŏk′) *n.* Senseless talk; nonsense. [Dutch dialectal *pappekak*: *pap*, pap (from Middle Dutch *pappe*, perhaps from Latin *pappa*, food) + *kak*, dung (from *kakken*, to defecate, from Middle Dutch *kacken*, from Latin *cacāre*; see *kakka-* in Appendix I).]

**Pop·si·cle** (pŏp′sĭ-kəl, -sĭk′əl) A trademark used for a colored, flavored ice confection with one or two flat sticks for a handle.

**pop·top** (pŏp′tŏp′) *n.* 1. The tab of a container that can be pulled off to make an opening. 2. A container having such a tab. ✦ *adj.* Having a tab that can be pulled up or off to make an opening in a container: *pop-top beer cans.*

**pop·u·lace** (pŏp′yə-lĭs) *n.* 1. The general public; the masses. 2. A population. [French, from Italian *popolaccia*, rabble, from *popolo*, the people, from Latin *populus*. See POPULAR.]

**pop·u·lar** (pŏp′yə-lər) *adj.* 1. Widely liked or appreciated: *a popular resort.* 2. Liked by acquaintances: *sought after for company: "Beware of over-great pleasure in being popular or even beloved"* (Margaret Fuller). 3. Of, representing, or carried on by the people at large: *the popular vote.* 4. Fit for, adapted to, or reflecting the taste of the people at large: *popular entertainment; popular science.* 5. Accepted by or prevalent among the people in general: *a popular misunderstanding of an issue.* 6. Suited to or within the means of ordinary people: *popular prices.* 7. Originating among the people: *popular legend.* [Middle English *populer*, commonly known, from Old French *populaire*, from Latin *populāris*, from Latin *populus*, from *populus*, the people, of Etruscan origin.] —**pop·u·lar·ly** *adv.*

**popular front** *n.* A political coalition of leftist parties against fascism, such as that formed among European countries during the 1930s.

**pop·u·lar·i·ty** (pŏp′yə-lăr′ĭ-tē) *n.* The quality or state of being popular, especially the state of being widely admired, accepted, or sought after.

**pop·u·lar·ize** (pŏp′yə-lə-rīz′) *tr.v.* -ized, -iz·ing, -iz·es 1. To make popular: *A famous dancer popularized the new hairstyle.* 2. To present in a widely understandable or acceptable form: *popularize technical material for a general audience.* —**pop′u·lar·i·za′tion** (-lər-ĭ-zā′shən) *n.* —**pop′u·lar·iz′er** *n.*

**pop·u·late** (pŏp′yə-lāt′) *tr.v.* -lat·ed, -lat·ing, -lates 1. To supply with inhabitants, as by colonization; people. 2. To live in; inhabit: *creatures that populate the ocean depths.* [Medieval Latin *populāre, populāt-*, from Latin *populus*, the people. See POPULAR.]

**pop·u·la·tion** (pŏp′yə-lā′shən) *n.* 1a. All of the people inhabiting a specified area. b. The total number of such people. 2. The total number of inhabitants constituting a particular race, class, or group in a specified area. 3. The act or process of furnishing with inhabitants. 4. *Ecology* All the organisms that constitute a specific group or occur in a specified habitat. 5. *Statistics* The set of individuals, items, or data from which a statistical sample is taken. Also called *universe.*

**population control** *n.* A government program to limit or slow population growth, as by birth control education, the wide availability of contraceptives, and economic incentives.

**population explosion** *n.* The geometric expansion of a biological population, especially the unchecked growth in human population resulting from a decrease in infant mortality and an increase in longevity.

**population genetics** *n. (used with a sing. verb)* The branch of science that deals with the statistical analysis of the inheritance and prevalence of genes in populations.

**pop·u·lism** (pŏp′yə-lĭz′əm) *n.* 1a. A political philosophy supporting the rights and power of the people in their struggle against the privileged elite. b. The movement organized around this philosophy. 2. *Populism* The philosophy of the Populist Party.

**pop·u·list** (pŏp′yə-lĭst) *n.* 1. A supporter of the rights and power of the people. 2. *Populist* A supporter of the Populist Party. ✦ *adj.* 1. Of or relating to populism or its advocates: *a populist aversion to business monopolies.* 2. *Populist* Of or relating to the Populist Party.

**Populist Party** *n.* A U.S. political party that sought to represent the interests of farmers and laborers in the 1890s, advocating a free-silver currency issue, free coinage of gold and silver, public ownership of railroads, and a graduated federal income tax. Also called *People's Party.*

**pop·u·lous** (pŏp′yə-ləs) *adj.* Containing many people or inhabitants; having a large population. [Middle English, from Latin *populōsus*, from *populus*, the people. See POPULAR.] —**pop′u·lous·ly** *adv.* —**pop′u·lous·ness** *n.*

**Pop·o·luxe** also **pop·u·luxe** (pŏp′yə-lŭks′) *n.* A futuristic design style of the late 1950s and early 1960s often using pastel colors, synthetic materials, and stainless steel and evoking a sense of luxury. ✦ *adj.* Of or relating to this design style: *nostalgia for Populuxe furniture of the sixties.* [Blend of POPULAR and DELUXE.]

**pop-up** (pŏp′ŭp′) *n.* 1. Emerging quickly from a recessed or concealed position when activated: *pop-up gun emplacements.* 2. Rising to form a three-dimensional structure when a page is opened: *pop-up illustrations in a children's book.* ✦ *n.* 1. A device or illustration that pops up. 2. *Baseball* See pop fly.

**pop wine** *n.* A sweet, often fruit-flavored, inexpensive wine.

**por·bea·gle** (pôr′bē′gəl) *n.* A mackerel shark (*Lamna nasus*) of temperate Atlantic waters. [Cornish *porbugel*.]

**por·ce·lain** (pôr′sə-lĭn, pôr′-, pôrs′lĭn, pôrs′-) *n.* 1. A hard, white, translucent ceramic made by firing a pure clay and then glazing it with variously colored fusible materials; china. 2. An object made of this substance. [French *porcelaine*, cowry shell, porcelain, from Old Italian *porcellana*, from feminine of *porcellāno*, of a young sow (from the shell's resemblance to a pig's back), from *porcella*, young sow, diminutive of *porca*, sow, from Latin, feminine of *porcus*, pig. See porko- in Appendix I.] —**por′ce·la′ne·ous** (-lā′nē-əs) *adj.*

**porcelain enamel** *n.* A glass coating fired on metal. Also called *vitreous enamel.*

**porcelain flower** *n.* See hoya.

**porch** (pôrch, pôrch) *n.* 1. A covered platform, usually having a separate roof, at an entrance to a building. 2. An open or enclosed gallery or room attached to the outside of a building; a verandah. 3. Obsolete A portico or covered walk. [Middle English *porche*, from Old French, from Latin *porticus*, portico, from *porta*, gate. See per-² in Appendix I.]

**por·cine** (pôr′sīn′) *adj.* Of or resembling swine or a pig: *"a bold porcine old man"* (Vladimir Nabokov). [Middle English, from Old French *porcin*, from Latin *porcīnus*, from *porcus*, pig. See porko- in Appendix I.]

**por·ci·no** (pôr-chē′nō) *n., pl.* -ni (-nē) A large edible mushroom (*Boletus edulis*) widely distributed in woodlands, having a thick rounded brown cap. Also called *cep.* [Italian, short for *fungo porcino, porcine mushroom*, from Latin *porcīnus*. See PORCINE.]

**por·cu·pine** (pôr′kyə-pīn′) *n.* Any of various rodents of the Old World family Hystricidae or the New World family Erethizontidae, having long, sharp, erectile quills interspersed with coarse hair. [Middle English *porke despine*, from Old French *porc espin : Latin porcus*, pig, see porko- in Appendix I + Latin *spīna*, thorn, spine.]

**porcupine fish** *n.* Any of various tropical marine fishes of the family Diodontidae, having strong sharp spines on the body and capable of inflating themselves when attacked.

**Por·cu·pine River** (pôr′kyə-pīn′) A river, about 721 km (448 mi) long, rising in northwest Yukon Territory, Canada, and flowing north then west to the Yukon River in northeast Alaska. It was discovered in 1842.

**pore¹** (pôr, pōr) *intr.v.* pored, por·ing, pores 1. To read or study carefully and attentively: *pored over the classified ads in search of a new job.* 2. To gaze intently; stare. 3. To meditate deeply; ponder: *pored over the matter.* [Middle English *pouren*.]

**pore²** (pôr, pōr) *n.* 1. A minute opening in tissue, as in the skin of an animal, serving as an outlet for perspiration, or in a plant leaf or stem, serving as a means of absorption and transpiration. 2. A space in rock, soil, or unconsolidated sediment that is not occupied by mineral matter and that allows the passage or absorption of fluids: *Water seeped into the pores of the rock.* [Middle English, from Old French, from Late Latin *porus*, passage, from Greek *poros*. See per-² in Appendix I.]

**pore fungus** *n.* Any of various basidiomycetous fungi of the families Boletaceae and Polyporaceae, whose basidia line the inside of tubes that lead to exterior pores. Also called *polypore.*

**por·gy** (pôr′gē) *n., pl.* porgy or -gies 1. Any of various deep-bodied marine food fishes of the family Sparidae, especially a common species, *Pagrus pagrus* of Mediterranean and Atlantic waters. 2. Any of several fishes similar to the porgy. [Alteration of Spanish and Portuguese *pargo*, both alteration of Latin *phager*, a kind of fish, from Greek *phagros*, sea bream. See bhag- in Appendix I.]

**Po·ri** (pôr′ē) A city of southwest Finland on an inlet of the Gulf of Bothnia northwest of Helsinki. Chartered in 1564, it was initially dominated by the Hanseatic League. Population: 78,933.

**po·rif·er·an** (pə-rĭf′ər-ən) *n.* Any of various members of the phylum Porifera constituting the sponges. [From New Latin *Porifera*, phylum name : Latin *porus*, passage (from Latin *porus*, passage) + Latin *-fera*, neuter pl. of *-fer, -fera.*] —**po·rif′er·al, po·rif′er·an** *adj.*

**po·rif·er·ous** (pə-rĭf′ər-əs) *adj.* 1. Having pores. 2. Of or relating to the poriferans. [New Latin *porus*, pore; see PORIFERAN + -FEROUS.]

**pork** (pôrk, pōrk) *n.* 1. The flesh of a pig or hog used as food. 2. Government funds, appointments, or benefits dispensed or legislated by politicians to gain favor with their constituents: *"However much [the voters] may distrust Congress and dislike pork, the advantages of being represented by an incumbent with seniority are hard to deny"* (Richard Lacayo). ✦ *intr.v.* porked, pork·ing, porks *Slang* 1. To eat ravenously; gorge.

BSC-A-000227

organisms. [STENO- + Greek *halinos*, of salt (from *hals*, *hal-*, salt; -INO-).]

**sten·oph·a·gous** (stə-nŏf′ə-gəs) *adj.* Feeding on a single kind or variety of food.

**ste·nosed** (stə-nōzd′, -nōst′) *adj.* Characterized by stenosis. -(s) + -ED'.]

**ste·no·sis** (stə-nō′sĭs) *n., pl.* -ses (-sēz) A constriction or narrowing of a duct or passage; a stricture. [Greek *stenōsis*, a narrowing, from *stenoun*, to narrow, from *stenos*, narrow.] —**ste·not′ic** (-nŏt′ĭk) *adj.*

**sten·o·ther·mal** (stĕn′ə-thûr′məl) also **sten·o·ther·mic** (-mĭk) or **sten·o·ther·mous** (-məs) *adj.* Capable of living or growing only within a limited range of temperature. —**sten′o·therm′** *n.*

**sten·o·top·ic** (stĕn′ə-tŏp′ĭk) *adj.* Able to adapt only to a narrow range of environmental conditions. Used of a plant or an animal. [STENO- + Greek *topos*, place + -IC.]

**sten·o·type** (stĕn′ə-tīp′) *n.* **1.** A keyboard machine used to record speech in shorthand by a series of phonetic symbols. **2.** A phonetic symbol or combination of symbols produced by such a machine. — *tr.v.* -typed, -typ·ing, -types To record or transcribe (matter) with a stenotype machine. [STENO(GRAPHY) + TYPE.] —**sten′o·typ′ist** *n.*

**sten·o·typ·y** (stĕn′ə-tī′pē) *n., pl.* -ies The art or process of transcribing with a stenotype machine.

**stent** (stĕnt) *n.* **1.** A device used to support a bodily orifice or cavity during grafting or to immobilize a skin graft following placement. **2.** A slender thread, rod, or catheter inserted into a tubular structure, such as a blood vessel, to provide support during or after anastomosis. [After Charles R. *Stent* (1845–1901), English dentist.]

**sten·tor** (stĕn′tôr′) *n.* Any of several trumpet-shaped, ciliate protozoans of the genus *Stentor*, living in dark freshwater pools and feeding mostly on smaller microorganisms. [After *Stentor*, a Greek herald.]

**sten·to·ri·an** (stĕn-tôr′ē-ən, -tōr′-) *adj.* Extremely loud: *a stentorian voice.* See synonyms at **loud**. [After *Stentor*, a loud-voiced Greek herald in the *Iliad*.]



stentor

**step** (stĕp) *n.* **1a.** The single complete movement of raising one foot and putting it down in another spot, as in walking. **b.** A manner of walking; a particular gait. **c.** A fixed rhythm or pace, as in marching: *keep step.* **d.** The sound of a footstep. **e.** A footprint: *steps in the mud.* **2a.** The distance traversed by moving one foot ahead of the other. **b.** A very short distance: *just a step away.* **c. steps** Course; path: *turned her steps toward home.* **3.** One of a series of rhythmical, patterned movements of the feet in a dance: *diagrammed the basic steps to the mamba.* **4a.** A rest for the foot in ascending or descending, as in climbing. **b.** One of a series of stairs. **c.** Something, such as a ledge or an offset, that resembles a step of a stairway. **5a.** One of a series of actions, processes, or measures taken to achieve a goal. **b.** A stage in a process: *followed every step in the instructions.* **6.** A degree in progress or a grade or rank in a scale: *a step up in the corporate hierarchy.* **7. Music a.** The interval that separates two successive tones of a scale. **b.** A degree of a scale. **8. Nautical** The block in which the heel of a mast is fixed. — *v.* stepped, step·ping, steps — *intr.* **1.** To put or press the foot: *step on the brake.* **2.** To shift or move slightly by taking a step or two back. **3.** To walk a short distance to a specified place or in a specified direction: *step over to the corner.* **4.** To move with the feet in a particular manner: *step lively.* **5.** To move into a new situation by or as if taking a single step: *stepping into a life of ease.* **6.** To treat someone arrogant indifference: *He is always stepping on other people.* — *tr.* **1.** To set (the foot) down; *step foot on land.* **2.** To measure by pacing: *step off ten yards.* **3.** To furnish with steps; make steps *his terraces that stepped along the hillside.* **4. Computer Science** To cause (a computer) to execute a single instruction. **5. Nautical** To place (a mast) in its step. — *phrasal verbs:* **step aside** To resign from a post, especially when replaced. **step down 1.** To resign from a high post. **2.** To reduce, especially in stages: *stepping down the electric power.* **step in 1.** To walk in or enter. **2.** To intervene. **step out 1.** To walk briefly. **2.** To go outside for a short time. **3.** *Informal* To go out for a social evening of entertainment. **4.** To withdraw; quit. **step up 1.** To increase, especially in stages: *step up production.* **2.** To come forward: *step up to be counted.* **3.** To improve one's performance or take on more responsibility, especially at a crucial time. —*Idioms:* **in step 1.** Moving or performing, as in rhythm. **2.** In conformity with one's environment or a source. **out of step 1.** Not moving in rhythm: *recruits marching out of step.* **2.** Not in conformity with one's environment: *out of step with the times.* **step by step** By degrees. **step on it** *Informal* To go faster; hurry. [Middle English, from Old English *stæpe*, *stepe*.]

**step-** *pref.* Related by virtue of a remarriage rather than by blood; step- [Middle English, from Old English *steop-*.]

**step aerobics** *n.* (used with a sing. or pl. verb) Aerobics performed as a choreographed routine by stepping up onto and down from a portable platform.



step aerobics

**step·broth·er** (stĕp′brŭth′ər) *n.* A son of one's stepparent.

**step·child** (stĕp′chīld′) *n.* **1.** A child of one's spouse by a previous marriage. **2.** Something that does not receive appropriate care, respect, or attention: *"Demography has a reputation for being the stepchild of . . . economics"* (Louis Bal).

**step dance** *n.* A dance in which emphasis is placed on certain steps, such as clogging or tapping, rather than body position or movement.

**step·daugh·ter** (stĕp′dô′tər) *n.* A spouse's daughter by a previous marriage.

**step-down** (stĕp′doun′) *adj.* **1.** Decreasing in stages: *a step-down policy.* **2.** *Electricity* Serving to reduce voltage: *a step-down transformer.* **3.** A reduction in amount or size.

**step·fam·i·ly** (stĕp′făm′ə-lē, -făm′lē) *n., pl.* -lies A family with one or more stepchildren.

**step·fa·ther** (stĕp′fä′thər) *n.* The husband of one's mother and not one's natural father.

**steph·a·no·tis** (stĕf′ə-nō′tĭs) *n., pl.* -tis·es Any of various woody climbing plants of the genus *Stephanotis*, especially *S. floribunda* of Madagascar, cultivated for its showy fragrant white flowers. [Greek *stephanōtis*, deserving a crown, from *stephanos*, crown, wreath, from *stephein*, to crown.]

**Stephen** (stē′vən), Saint. Died c A.D. 36. Christian protomartyr who, according to the New Testament, was stoned to death after his defense of Christianity before the Sanhedrin.

**Stephen I** Often called Saint Stephen. 975?–1038. King of Hungary (997?–1038). Considered the founder of the Hungarian state, he maintained strong ties with the Roman Catholic Church, advocated the building of churches and abbeys, and organized a standing army.

**Stephen,** Sir Leslie 1832–1904. British writer and editor whose works include *The History of English Thought in the Eighteenth Century* (1876) and biographies of Samuel Johnson, Alexander Pope, and others.

**Stephen of Blois** (blwä) 1097?–1154. King of England (1135–1154). The grandson of William the Conqueror, he was the last Norman king of England.

**Stephens** (stē′vənz), Alexander Hamilton 1812–1883. American politician who was vice president of the Confederacy (1861–1865) under Jefferson Davis.

**Stephens,** James 1882–1950. Irish writer of poems and novels, such as *The Crock of Gold* (1912).

**Ste·phen·son** (stē′vən-sən), George 1781–1848. British railway pioneer who built a practical steam locomotive (1814) and the first passenger railway (1825). His son Robert (1803–1859) built railroads, locomotives, and bridges.



Alexander Stephens

**step-in** (stĕp′ĭn′) *adj.* Put on by stepping into: *a step-in robe.* ❖ *n.* **1.** step-ins Panties with wide legs. **2.** A step-in garment.

**step·lad·der** (stĕp′lăd′ər) *n.* A portable ladder with a hinged supporting frame and usually topped with a small platform.

**step·moth·er** (stĕp′mŭth′ər) *n.* The wife of one's father and not one's natural mother.

**step·par·ent** (stĕp′pâr′ənt, -păr′-) *n.* A stepfather or stepmother.

**steppe** (stĕp) *n.* A vast semiarid grass-covered plain, as found in southeast Europe, Siberia, and central North America. [German, from Russian *step'*.]

**stepped-up** (stĕpt′ŭp′) *adj.* Increased in pace or intensity; heightened: *a stepped-up political campaign.*

**step·per** (stĕp′ər) *n.* **1.** One that steps, especially in a fast or spirited manner. **2.** *Informal* A dancer.

**step·ping-off place** (stĕp′ĭng-ôf′, -ŏf′) *n.* **1.** The last stop on an outbound line, as of a train. **2.** A place or point from which one leaves for unfamiliar regions.

**step·ping·stone** (stĕp′ĭng-stōn′) *n.* **1.** A stone that provides a place to step, as in crossing a stream. **2.** An advantageous position for advancement toward a goal.

**step rocket** *n.* See **multistage rocket**.

**step·sib·ling** (stĕp′sĭb′lĭng) *n.* A stepbrother or a stepsister.

**step·sis·ter** (stĕp′sĭs′tər) *n.* A daughter of one's stepparent.

**step·son** (stĕp′sŭn′) *n.* A spouse's son by a previous union.

**step stool** *n.* A stool, often with folding steps attached, on which one stands to reach high objects.

**step turn** *n.* A turn in skiing made by lifting one ski, putting it down again pointed in the direction of the turn, and transferring one's weight to it while bringing the other ski into a parallel position.

**step-up** (stĕp′ŭp′) *adj.* **1.** Increasing in steps or by stages. **2.** *Electricity* Serving to increase voltage: *a step-up transformer.* ❖ *n.* An increase in size, amount, or activity.

**step·wise** (stĕp′wīz′) *adj.* **1.** Marked by a gradual progression as if step by step: *"Quantum mechanics is a natural system of stepwise intentions that governs very small things"* (Malcom W. Browne). **2.** *Music* Moving from one tone to an adjacent one. —**step′wise′** *adv.*

**ster.** *abbr.* sterling

**-ster** *suff.* **1.** One that is associated with, participates in, makes, or does: *songster.* **2.** One that is: *youngster.* [Middle English, from Old English *-estre*, female agent suffix.]

**ste·ra·di·an** (stĭ-rā′dē-ən) *n. Abbr.* **sr** A unit of measure equal to the solid angle subtended at the center of a sphere by an area on the surface of the sphere that is equal to the radius squared: *The total solid angle of a sphere is 4π steradians.* See table at **measurement**. [ST(E)REO- + RADIAN.]

**ster·co·ra·ceous** (stûr′kə-rā′shəs) also **ster·co·rous** (stûr′kər-əs) *adj.* Consisting of or relating to excrement. [Latin *stercus, stercor-*, dung; see **sker-²** in Appendix I. + -ACEOUS.]

**stere** (stîr) *n. Abbr.* **s** A unit of volume equal to one cubic meter. [French *stère*, from Greek *stereos*, solid, hard. See **ster-¹** in Appendix I.]

**ster·e·o** (stĕr′ē-ō′, stîr′-) *n., pl.* -os **1a.** A stereophonic sound-reproduction system. **b.** Stereophonic sound. **2.** A stereotype. **3.** A stereoscopic system or photograph. ❖ *adj.* **1.** Stereophonic. **2.** Stereoscopic.

**stereo-** *pref.* **1.** Solid; solid body: *stereotropism.* **2.** Three-dimensional: *stereoscope.* [Greek, from *stereos*, solid. See **ster-¹** in Appendix I.]

**ster·e·o·bate** (stĕr′ē-ə-bāt′, stîr′-) *n.* **1.** See **stylobate**. **2.** The foundation of a stone building, its top course sometimes being a stylobate. [Latin *stereobatēs*, from Greek *stereobatēs : stereos*, solid; see STEREO- + *-batēs*, walker (from *bainein*, to go; see **g<sup></sup>ā-** in Appendix I).]

**ster·e·o·chem·is·try** (stĕr′ē-ō-kĕm′ĭ-strē, stîr′-) *n.* The branch of chemistry that deals with spatial arrangements of atoms in molecules



BSC-A-000228

# EXHIBIT G

Blakiston's

# GOULD MEDICAL DICTIONARY

*Third Edition*

A modern comprehensive dictionary of the terms used in
all branches of medicine and allied sciences; with
illustrations and tables

*Chairman of the Editorial Board*
**Arthur Osol, Ph.D.**

**McGraw-Hill Book Company**
A Blakiston Publication
New York  St. Louis  San Francisco  Düsseldorf  Johannesburg
Kuala Lumpur  London  Mexico  Montreal  New Delhi
Panama  Rio de Janeiro  Singapore  Sydney  Toronto

BSC-A-000229

Blakiston's Gould Medical Dictionary

Copyright © 1956, 1972 by McGraw-Hill, Inc. All rights reserved. Copyright 1949 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher.

*Library of Congress Catalog Card Number:* 78-37376

1 2 3 4 5 6 7 8 9 0   D O D O   7 9 8 7 6 5 4 3 2

GOULD'S MEDICAL DICTIONARY

Fifth Edition, 1941
Fourth Edition, 1935
Third Edition, 1931
Second Edition, 1928
First Edition, 1926

A DICTIONARY OF MEDICAL TERMS—GOULD

First Edition, 1904

AN ILLUSTRATED DICTIONARY OF
MEDICINE, BIOLOGY, AND ALLIED SCIENCES—GOULD

First Edition, 1894

A NEW MEDICAL DICTIONARY—GOULD

First Edition, 1890

The vocabulary portion of this book was set in Times Roman by Rocappi, Inc. The Appendix was set, also, in Times Roman, by York Graphic Services, Inc. The editors were Joseph J. Brehm, Peter Karsten, Ida Abrams Wolfson, and Mark W. Cowell, assisted by Margaret G. Cobb, Bettye G. Morrow, and Robert I. Jones; the designer was Merrill Haber; and the production supervisor was Peter Guilmette. The printer and binder was R. R. Donnelly & Sons Company.

BSC-A-000230

ana-kata-did-y-mus (an"uh-kat"uh-did'i-mus) n. [ana- + kata- + -didymus]. Conjoined twins exhibiting both inferior and superior duplicity. —anakatadidymous adj.

anakhre (a-nack'reh) n. Goundou.

an-a-ku-sis (an"uh-koo'sis, -kew'sis) n. Anacousia.

anal (ay'nul) adj. 1. Pertaining to or situated near the anus. 2. In psychoanalytic theory, pertaining to that stage of personality development following the oral stage, during which the infant becomes concerned with his excreta and the parents with toilet training. See also anal character, anal erotism.

an-al-bu-min-emia, an-al-bu-min-ae-mia (an"al-bew"mi-nee'mee-uh) n. [an- + albumin + -emia]. 1. A hereditary disorder in which the synthesis of plasma albumin is impaired. 2. Deficiency or absence of plasma albumin.

anal canal. The terminal portion of the large intestine extending from the rectum to the anus. Also called canalis analis.

anal character. A type of personality in which anal erotic traits dominate beyond the period of childhood.

anal columns. Vertical folds of the mucous membrane of the anal canal. Also called columnae anales. See also rectal columns.

anal crypt. One of the small cul-de-sacs between the rectal columns. Syn., rectal sinus.

an-a-lep-tic (an"uh-lep'tick) n. [Gk. analeptikos, restorative, from ana-, up, + lambanein, to take]. 1. Any agent that restores depressed medullary and other functions of the central nervous system, or that stimulates normal as well as depressed cerebral nervous system functions. 2. Any agent that restores consciousness after fainting, anesthesia, or coma, or that hastens convalescence. —analeptic, adj.

anal erotism. Localization of libido in the anal zone.

Analexin. Trademark for phenyramidol, an analgesic drug used as the hydrochloride salt.

anal fissure. An elongated break in the anal mucosa, frequently causing itching, pain, and bleeding, that tends to persist because of repeated trauma from passage of hard feces, infection, and sphincter spasm. The lesion may be associated with a sentinel pile.

anal fistula. A sinus opening from the anorectal area into the connective tissue about the rectum or discharging externally.

an-al-ge-sia (an"al-jee'zee-uh) n. [Gk. analgesia, from an- + algos, pain]. Insensibility to pain without loss of consciousness.

analgesia al-ge-ra (al'je-ruh, al-jeer'uh) [NL., from Gk. algeos, painful]. Severe pain in a part with loss of general sensibility.

analgesia do-lo-ro-sa (do-lo-ro'suh). Analgesia algera.

an-al-ge-sic (an"al-jee'zick, -jee'sick) adj. [analgesia + -ic]. 1. Relieving pain. 2. Not affected by pain. —an-al-ge-sia (an"al-jee'zist) n.; an-al-gize (an'al-jize) v.

analgesic, n. A drug that produces analgesia.

analgesic panaris. Painless lesions of the fingers, as in Morvan's disease.

an-al-get-ic (an"al-jet'ick) adj. [Gk. analgetos, painless, insensible to pain, from an- + algos, pain]. Analgesic.

an-al-gia (an-al'jee-uh) n. [an- + -algia]. Analgesia. —an-al-gic (-jick) adj.

anal gland. Any gland of the anal region.

anal hillock. Anal tubercle.

an-al-ler-gic (an"uh-lur'jick) adj. [an- + allergic]. Not producing allergy, anaphylaxis, or hypersensitivity.

anal membrane. In embryology, the dorsal part of the cloacal membrane caudal to the urorectal septum.

anal mound. In embryology, a mound produced by the anterior median union of the anal tubercles.

ana-logue, ana-log (an'uh-log) n. [F., from Gk. analogos, conformable, proportionate]. 1. An organ or part having the same function as another but differing in structure and origin, as the wing of an insect and the wing of a bird. 2. One of a group of compounds with similar electronic structure, but with different atoms, as an isologue. 3. A chemical compound which resembles a metabolically active substance structurally, but may differ functionally by being either inactive or opposite in effect.

anal-o-gy (uh-nal'uh-jee) n. [Gk. analogia, proportion, correspondence]. 1. Resemblance in two or more attributes between two things which differ in other respects. 2. In biology, a similarity in function without correspondence in structure and origin. —ana-lo-gous (-gus) adj.

anal papilla. Any of the small elevations occasionally present on the free margins of the anal valves or at the bases of the rectal columns. Also called papilla of Morgagni.

anal pit. The proctodeum.

anal plate. The anal membrane.

anal reflex. Contraction of the external anal sphincter in response to stroking or pricking the skin or mucous membrane in the perianal region. Syn., wink response.

anal ring. A ring-shaped ridge about the embryonic anal orifice produced by growth and fusion of the anal tubercles.

anal sinus. 1. The proctodeum. 2. One of the depressions between the rectal columns. Also called sinus analis.

anal sphincter. Either of the sphincter ani muscles.

anal stage. In psychoanalysis, the stage of development, from 9 or 12 months of age to as late as 36 months, during which the child becomes concerned with his excreta. See also anal character, anal erotism.

anal triangle. A triangle with the base between the two ischial tuberosities and the apex at the coccyx.

anal tubercle. One of a pair of eminences lateral to the anal opening in the embryo.

anal valves. Valve-like folds in anal mucous membrane which join together the lower ends of the rectal columns. Also called valvulae anales.

anal-y-sis (a-nal'i-sis) n., pl. anal-y-ses (-seez) [Gk., dissolving, resolution, from analyein, to dissolve]. 1. The determination of the nature, properties, or composition of a substance. 2. The resolution of a compound body into its constituent parts. 3. In psychiatry, psychoanalysis. —ana-lyt-ic (an"uh-lit'ick), ana-lyt-i-cal (-i-kul) adj.

an-a-lyst (an'uh-list) n. 1. A person who performs analyses to determine the properties of a substance. 2. In psychiatry, one who analyzes the psyche; usually, one who adheres to Freudianism; a psychoanalyst.

analytical chemistry. The branch of chemistry concerned with the detection (qualitative analysis) and determination (quantitative analysis) of substances.

analytic psychiatry. Analytic psychology.

BSC-A-000231

# EXHIBIT H

# DORLAND'S ILLUSTRATED

# Medical Dictionary

## Twenty-sixth Edition

**W. B. SAUNDERS COMPANY**   Philadelphia   London   Toronto
Mexico City   Sydney   Tokyo

BSC-A-000232

The Library of Congress Cataloged the First Issue
of this Serial as follows:

Dorland's illustrated medical dictionary. [1st] — ed.

Philadelphia, Saunders, 1900–

illus. (part col.) 23–25 cm.

Title varies: 1st–22d ed., The American illustrated medical
dictionary.

1. Medicine—Dictionaries.   I. Dorland, William Alexander
   Newman, 1864–1956.   II. Title: The American illustrated
   medical dictionary.

R121.D73        610.3        0–6383 rev 4*

Library of Congress        [r65i²7]        MARC–S

© 1981 by W. B. Saunders Company

Copyright 1900, 1901, and 1903 by W. B. Saunders and Company.  Copyright 1906, 1909, 1911, 1913, 1915, 1917, 1919,
1921, 1923, 1925, 1927, 1929, 1932, 1935, 1938, 1941, 1944, 1947, 1951, 1957, 1965, and 1974 by W. B. Saunders Company.

Copyright under the Uniform Copyright Convention.  Simultaneously published in Canada.  All Copyright Renewals
Registered.

Derechos reservados conforme a la ley para la Republica Mexicana.

All Rights Reserved.  This book is protected by copyright.  No part of it may be duplicated or reproduced in any manner
without written permission from the publisher.  Made in the United States of America.  Press of W. B. Saunders Company.

Some of the words appearing in the Dictionary are proprietary names (trademarks) even though no reference to this fact is
made in the text. The appearance of any name without designation as a trademark is therefore not to be regarded as a repre-
sentation by the editors or publisher that it is not a trademark or is not the subject of proprietary rights.

The use of portions of the text of the United States Pharmacopeia, Twentieth Revision, official from July 1, 1980, of the National
Formulary, Fifteenth Edition, official from July 1, 1980, and of USAN and the USP Dictionary of Drug Names 1981 is by
permission received from the Board of Trustees of the United States Pharmacopeial Convention, Inc. The said Convention is
not responsible for any inaccuracy of quotation, or for any false or misleading implication that may arise by reason of the
separation of excerpts from the original context or by obsolescence resulting from publication of a supplement.

Listed here are the latest translated editions of this book together with the languages for the translations and the publishers.

Japanese (25th Edition)—Hirokawa Publishing Company, Tokyo, Japan

Spanish (25th Edition) (Adaptation)—El Ateneo, Buenos Aires, Argentina

Braille edition (24th Edition)—American Printing House for the Blind, Louisville, Kentucky

ISBN 0-7216-3150-9   Standard
ISBN 0-7216-3151-7   Indexed

Library of Congress Catalog Card Number: 78-50050

Last digit is the print number:   9   8   7   6   5   4   3   2

BSC-A-000233

**anal** (a'nal) [L. *analis*]  pertaining to the anus.

**analbuminemia** (an''al-bu''mĭ-ne'me-ah)  a state characterized by deficiency or absence of albumins in the blood serum.

**analeptic** (an''ah-lep'tik) [Gr. *analepsis* a repairing]  a drug which acts as a restorative, such as caffeine, amphetamine, pentylenetetrazol, etc.

**analgesia** (an''al-je'ze-ah) [*an* neg. + Gr. *algēsis* pain + -*ia*]  absence of sensibility to pain; absence of pain on noxious stimulation; designating particularly the relief of pain without loss of consciousness; called also *alganesthesia*.  **a. al'gera,** spontaneous pain in a denervated part; pain in an area or region which is anesthetic; called also *a. dolorosa.*  **audio a.,** audioanalgesia.  **continuous caudal a.,** the relief of the pain of labor and childbirth by the continuous bathing of the sacral and lumbar plexuses within the epidural space by the injection of an anesthetic solution. This method is used also in general surgery to block the pain pathways below the navel. Called also *continuous caudal anesthesia.*  **a. doloro'sa,** a. algera.  **epidural a.,** analgesia induced by introduction of the analgesic agent into the epidural space of the vertebral canal.  **infiltration a.,** paralysis of the nerve endings at the site of operation by subcutaneous injection of an anesthetic.  **narcolocal a.,** local analgesia preceded by premedication.  **paretic a.,** loss of the sense of pain accompanied by partial paralysis.  **permeation a.,** surface a.  **relative a.,** in dental anesthesia, a maintained level of conscious-sedation, short of general anesthesia, in which the pain threshold is elevated, usually induced in inhalation of nitrous oxide and oxygen.  **surface a.,** local analgesia produced by an anesthetic applied to the surface of such mucous membranes as those of the eye, nose, throat, larynx, and urethra; called also *permeation a.*

**analgesic** (an''al-je'zik)  1. relieving pain.  2. not sensitive as to pain.  3. an agent that alleviates pain without causing loss of consciousness.

**Analgesine** (an''al-je'sin)  trademark for a preparation of antipyrine.

**analgetic** (an''al-jet'ik)  analgesic.

**analgia** (an-al'je-ah) [*an* neg. + Gr. *algos* pain + -*ia*]  absence of pain.

**analgic** (an-al'jik)  insensible to pain.

**anallergic** (an''ah-ler'jik)  not allergic; not causing anaphylaxis or hypersensitivity.

**analogous** (ah-nal'o-gus) [Gr. *analogos* according to a due ratio, conformable, proportionate]  resembling or similar in some respects, as in function or appearance, but not in origin or development; cf. *homologous*, def. 1.

**analogue** (an'ah-log)  1. a part or organ having the same function as another, but of a different evolutionary origin; cf. *homologue* (def. 1).  2. a chemical compound with a structure similar to that of another but differing from it in respect to a certain component; it may have a similar or opposite action metabolically. Cf. *homologue* (def. 2).  **base a.,** an analogue of a purine or pyrimidine, as aminopurine.  **homologous a.,** a part that is similar to another in both function and structure.  **metabolic a.,** a closely similar compound which tends to replace an essential metabolite.  **substrate a.,** a substance with a structure similar to the natural substrate of an enzyme and which, because of this similarity, inhibits the action of the enzyme, as in competitive inhibition.

**analogy** (ah-nal'o-je) [Gr. *analogia* equality of ratios, proportion]  the quality of being analogous; resemblance or similarity in function or appearance, but not in origin or development.

**analphalipoproteinemia** (an-al''fah-lip''o-pro''te-in-e'me-ah)  Tangier disease.

**analysand** (ah-nal'ĭ-sand)  one who is being psychoanalyzed.

**analysis** (ah-nal'ĭ-sis), pl. *anal'yses* [*ana-* + Gr. *lysis* dissolution]  1. separation into component parts or elements; the act of determining the component parts of a substance.  2. psychoanalysis.  **activation a.,** a quantitative determination of the presence of certain types of nuclei in a sample by transmuting them into radioactive nuclei and analyzing the emanating radiation.  **antigenic a.,** the determination of the components of the antigenic mosaic of a bacterial species.  **bite a.,** occlusal a.  **blood gas a.,** the determination of oxygen and carbon dioxide concentrations and the pH of the blood by laboratory tests; the following measurements may be made: $PO_2$, partial pressure of oxygen in arterial blood; $PCO_2$, partial pressure of carbon dioxide in arterial blood; $SO_2$, percent saturation of hemoglobin with oxygen in arterial blood; the total $CO_2$ content of (venous) plasma; and the pH.  **bradycinetic a.,** cineradiographic study of motor activity.  **cephalometric a.,** a study or analysis of the skeletal and dental relationships used in orthodontic case analysis, as seen in cephalograms.  **character a.,** the systematic psychotherapeutic investigation or analysis of the personality traits or defenses of an individual.  **chromatographic a.,** chromatography.  **colorimetric a.,** analysis by means of the various color tests.  **densimetric a.,** analysis by ascertaining the specific gravity of a solution and estimating the amount of matter dissolved.  **distributive a.,** psychobiologic treatment by the

directed study and interpretation of the patient's present and past behavior.  **Downs' a.,** a series of cephalometric criteria developed by Downs as an aid in orthodontic diagnosis.  **ego a.,** the intensive therapeutic study and analysis of the ways in which the ego resolves or attempts to deal with intrapsychic conflicts.  **end-group a.,** evaluation of the degree of linearity and branching of polysaccharide by determination of the number of end groups; determination of the amino- and carboxyl-terminal amino acids of a protein permitting an evaluation of the number of peptide chains per molecule as well as the state of purity of the protein.  **existential a.,** existential psychoanalysis.  **gasometric a.,** the measurement of the different components of a gaseous mixture.  **gravimetric a.,** quantitative a.  **group a.,** intensive psychotherapeutic analysis in which two or more patients actively participate.  **occlusal a.,** a study of the relations of the occlusal surfaces of opposing teeth, and of the relations of the teeth in one jaw to those in the opposite jaw as units; called also *bite a.*  **organic a.,** the analysis of animal and vegetable tissues.  **polariscopic a.,** analysis by means of the polariscope.  **proximate a.,** the determination of the simpler constituents of a substance.  **qualitative a.,** qualitative a., the determination of the nature of the constituents of a compound or a mixture of compounds.  **quantitative a., quantitive a.,** the determination of the proportionate quantities of the constituents of a compound.  **radiochemical a.,** direct or indirect identification or determination of the content of specific elements in a substance through measurement of the disintegration rates of radionuclides.  **spectroscopic a., spectrum a.,** analysis by means of determining the wave length(s) at which electromagnetic energy is absorbed by a sample.  **tetrad a.,** the analysis of crossing over by studying all the tetrads arising from the meiotic divisions of a single primary gametocyte.  **transactional a.,** a type of psychotherapy involving an understanding of the interpersonal interchanges between the components of the personalities of the participants (individuals or members of a group).  **ultimate a.,** the determination of the ultimate elements of a compound.  **vector a.,** analysis of a moving force to determine both its magnitude and its direction, e.g., analysis of the scalar electrocardiogram to determine the magnitude and direction of the electromotive force for one complete cycle of the heart.  **volumetric a.,** quantitative analysis by measuring volumes of liquids.

**analysor** (an'ah-li''zor)  analyzer.

**analyte** (an'ah-lit)  a substance undergoing analysis.

**analytic** (an''ah-lit'ik)  pertaining to analysis.

**analyzer** (an'ah-li''zer)  1. a Nicol prism attached to a polarizing apparatus which extinguishes the ray of light polarized by the polarizer.  2. Pavlov's name for a specialized part of the nervous system which controls the reactions of the organism to changing external conditions.  3. a nervous receptor together with its central connections, by means of which sensitivity to stimulations is differentiated.  **amino acid a.,** an analytical instrument that separates, identifies, and measures quantities of amino acids and related compounds.  **amino acid sequence a.,** an instrument for determining protein components in plasma, useful in blood-lipid evaluation.  **blood gas a.,** an instrument for measuring partial pressures of oxygen, carbon dioxide, carbon monoxide, and nitrogen in blood.  **breath a.,** an instrument for determining the volume and composition of respired gases; some types are specifically designed for detecting alcohol in the breath.  **image a.,** an instrument that counts, measures and classifies cells and images viewed on microscopes, photographs, transparencies, etc.  **oxygen gas a.,** an instrument for measuring the oxygen content of a gaseous mixture, or dissolved oxygen in a liquid, or saturation of blood hemoglobin with $O_2$ or partial pressure of $O_2$ in blood.  **voice a.,** an electronic instrument for printing out waveforms corresponding to vocal characteristics, as an aid in identifying voice and speech problems or a particular speaker.

**Aname** (an'ah-me)  a genus comprising the venomous "bird spiders" of the family Theraphosidae.

**Anamirta cocculus**  L. Wight & Arn. (Menispermáceae) (an''ah-mer'tah kok'u-lus) a species of East Indian woody vines whose dried berries or fruit, cocculus indicus, yield picrotoxin. Called also *A. paniculata.*

**anamirtin** (an''ah-mer'tin)  an oily glyceride, $C_{19}H_{24}O_{10}$, from the dried berries or fruit of *Anamirta cocculus.*

**anamnesis** (an''am-ne'sis) [Gr. *anamnēsis* a recalling]  1. the faculty of memory.  2. the collected data concerning a patient, his family, previous environment, and experiences, including any abnormal sensations, moods, or acts observed by the patient himself or by others, with the dates of their appearance and duration, as well as any results of treatment.  3. in immunology, the faculty of immunological memory as exemplified by events in the secondary or anamnestic immune response.

**anamnestic** (an''am-nes'tik)  pertaining to anamnesis. See also under *response.*

**Anamniota** (an''am-ne-o'tah) [*an* priv. + Gr. *amnion*]  a major group of vertebrates comprising those which develop no amnion, including fishes and amphibians; opposed to Amniota.

BSC-A-000234

# EXHIBIT I

# GRANT & HACKH'S
# CHEMICAL DICTIONARY

[American, International, European and British Usage]

*Containing the Words Generally Used in Chemistry, and Many of the Terms Used in the Related Sciences of Physics, Medicine, Engineering, Biology, Pharmacy, Astrophysics, Agriculture, Mineralogy, etc.*

*Based on Recent Scientific Literature*

**FIFTH EDITION**
*Completely Revised and Edited by*

# ROGER GRANT

M.A., D. de l'U., Ph.D., C. Chem., M.R.S.C.   *Consultant*

# CLAIRE GRANT

M.B., B.S., M.R.C.P.E.   *Medical Practitioner*

## McGRAW-HILL BOOK COMPANY

New York  St. Louis  San Francisco  Auckland  Bogotá
Hamburg  Johannesburg  London  Madrid  Mexico
Milan  Montreal  New Delhi  Panama
Paris  São Paulo  Singapore
Sydney  Tokyo  Toronto

BSC-A-000235

Library of Congress Cataloging-in-Publication Data

Hackh, Ingo W. D. (Ingo Waldemar Dagobert), 1890–1938.
  Grant & Hackh's chemical dictionary.

  Rev. ed. of: Chemical dictionary. 4th ed. 1969.
  1. Chemistry—Dictionaries.   I. Grant, Roger L.,
II. Grant, Claire.   III. Title.   IV. Title: Grant &
Hackh's chemical dictionary.   V. Title: Chemical
dictionary.
QD5.H3   1987       540'.3        86-7496
ISBN 0-07-024067-1

Copyright © 1987 by McGraw-Hill, Inc. All rights reserved.
Printed in the United States of America. Except as permitted
under the United States Copyright Act of 1976, no part of this
publication may be reproduced or distributed in any form or by
any means, or stored in a data base or retrieval system, without
the prior written permission of the publisher.

1234567890   DOCDOC   8943210987

ISBN 0-07-024067-1

The previous edition of this book was *Hackh's Chemical Dictionary*,
4th ed., published by McGraw-Hill in 1969. It was prepared by Dr.
Julius Grant from a *Chemical Dictionary* compiled by Ingo W. D.
Hackh. The current, or 5th, edition of this book was prepared by Dr.
Roger L. Grant, whose father prepared the 4th edition.

*The editors for this book were Betty J. Sun and Susan Thomas,
the designer was Naomi Auerbach, and the production
supervisor was Teresa F. Leaden. It was set in Palatino
by University Graphics, Inc.*

*Printed and bound by R. R. Donnelley & Sons Company.*

BSC-A-000236

the leaves of wheat (especially khopli, *Triticum dicoccum*). Yellow needles, m.292, soluble in acetic acid.

**Triclens** Trademark for trichloroethylene.

**triclinic** Anticlitic, asymmetric. A crystal with 3 unequal, long axes at oblique angles. See *crystal systems; prism.*

**tricosane*** Me$(CH_2)_{21}$Me = 324.6. Crystals, m.48. 12-methyl $\sim$* C$_{24}$H$_{50}$ = 337.7. Isotetracosane, m.138, soluble in ether.

**tricosanoic acid*** C$_{22}$H$_{45}$COOH = 354.6. m.79, soluble in benzene from plant wax and oils. 12-methyl $\sim$* Isotetracosanoic acid, m.80; from pine oil. trimethyl $\sim$* Phthioic acid.

**tricosanol*** C$_{23}$H$_{47}$OH = 340.6. 1-$\sim$ m.74; in conifer wax. 12-$\sim$ m.76.

**tricosanoic** 12-$\sim$ Laurone.

**tricosoic acid** Tricosanoic acid*.

**tricresol** A mixture of o-, m-, and p-cresols.

**tricresyl** Indicating 3 cresol radicals. t. phosphate (C$_6$H$_4$Me)$_3$PO$_4$ = 368.4. Tritolyl phosphate. Lindol, tri-p-cresyl phosphate. Colorless liquid, d.1.18, m.77; a plasticizer, waterproofing, and softener for resins and rubber. It causes "ginger paralysis."

**tricyanic acid** Cyanuric acid.

**tricyano-** Indicating the ring $\backslash$C:N·C:N·C:N, derived from cyano compounds by polymerization.

**tricyanogen chloride** C$_3$N$_3$Cl$_3$ = 184.4. Cyanuric trichloride. The heterocyclic polymer of cyanogen chloride. Colorless crystals, m.146, slightly soluble in water.

**tricyclic** Describing: (1) A molecule containing 3 rings of atoms; as anthracene. (2) A group of antidepressant drugs, as, amitriptyline hydrochloride, related to phenothiazine, but with substitution at 10 (i.e., the N atom) and replacement of the S atom by a $-CH_2·CH_2-$ linkage.

**tridecane*** C$_{13}$H$_{28}$ = 184.4. An alkane. Colorless liquid, d.0.757, b.234, soluble in EtOH.

**tridecanoic acid*** C$_{12}$H$_{25}$COOH = 214.3. Tridecoylic acid, n-tridecoic acid, isocerylic acid, in figs and coconuts. Colorless crystals, m.51. cyclopentene $\sim$ Chaulmoogric acid.

**tridecanol*** Tridecyl alcohol*.

**tridecene*** C$_{13}$H$_{26}$ = 182.3. Tridecylene. An alkene. Colorless liquid, d.0.845, b.233, insoluble in water, soluble in alcohol or ether. Tridecanoic acid*.

**tridecyl*** The radical C$_{13}$H$_{27}$—, from tridecane. t. alcohol* C$_{12}$H$_{27}$OH = 200.4. Tridecanol*. Colorless liquid, b.31. Lamine* C$_{13}$H$_{29}$N = 199.4. n-Aminotridecane. Crystals, m.27.

**tridecylene** Tridecene*.

**tridecylic acid** Tridecanoic acid*.

**tridemorph*** See *fungicides*, Table 37 on p. 250.

**Tridione** Trademark for trimethadione.

**tridiphenylmethyl** (Ph·C$_6$H$_4$)$_3$C. Triphenylmethyl. A "free radical" compound, in colorless crystals that form a colored solution.

**tridymite** A solid solution of silica and impurities, formerly thought to be a natural form of silica; d.2.26, stable below 1470.

**triela*** The Group 3B elements of the periodic table: B, Al, Ga, In, and Tl.

**trien*** Indicating triethylenetetramine as a ligand.

**-triene*** Suffix indicating 3 double bonds.

**trienal** A conjugated triene glyceride made from castor oil, and having the properties of tung oil.

**triethanolamine** N(C$_2$H$_4$OH)$_3$ = 149.2. Tris(2-hydroxyethyl)amine. Colorless liquid, b$_{150mm}$ 277, soluble in

water; a soap base, oil emulsifier, reagent for antimony and tin, and pharmaceutic aid (USP). T. (NF, BP) is a mixture of t. with mono- and diethanolamines.

**triethoxy*** Indicating 3 ethoxy radicals, EtO—. t. boron See *ethyl borate.*

**triethyl-*** Prefix indicating 3 C$_2$H$_5$ radicals in a compound. t.amine* NEt$_3$ = 101.2. Colorless liquid, b.89, soluble in water; a ptomaine in decaying fish. t.arsine* Et$_3$As = 162.1. Colorless liquid, b$_{755mm}$140, soluble in alcohol. t.benzene* 1,3,5-$\sim$ C$_6$H$_3$Et$_3$ = 162.3. Colorless liquid, b.218, insoluble in water. t.bismuthine* Et$_3$Bi = 296.2. Colorless liquid, b$_{760mm}$107, insoluble in water. t.borane* Et$_3$B = 98.0. Colorless liquid, insoluble in water. t.gallium Et$_3$Ga = 156.9. Colorless liquid, b.143, decomp. by water. t.methanol CEt$_3$OH = 116.2. Colorless liquid, b.141, soluble in water. t.phosphine* Et$_3$P = 118.2. Colorless liquid, b.127, insoluble in water; a reagent for carbon disulfide. t. phosphite (C$_2$H$_5$)$_3$PO$_3$ = 166.2. Colorless liquid, b.155, insoluble in water.

**triethylene** t.diamine* (CH$_2$)$_6$N$_2$ = 112.2. 1,4-Diazabicyclo[2.2.2]octane, m.154; a catalyst. t.glycol (CH$_2$OCH$_2$CH$_2$OH)$_2$ = 150.2, b.278. A high-temperature solvent. t.tetramine* (H$_2$N·CH$_2$CH$_2$·NH·CH$_2$)$_2$ = 146.2. A reagent for sulfates and copper; b.272.

**triferrin** Iron paranucleinate. Red powder (Fe 22, P 2.5%), insoluble in water; a hematinic.

**trifluoperazine hydrochloride** C$_{21}$H$_{24}$N$_3$F$_3$S·HCl = 480.4. Stelazine. Creamy, bitter crystals, m.240, soluble in water; a tranquilizer and antiemetic. A phenothiazine drug, also used in psychiatry (USP, BP).

**trifluralin*** See *herbicides*, Table 42 on p. 281.

**triforine*** See *fungicides*, Table 37 on p. 250.

**triformol** 1,3,5-Trioxane.

**trifructosan** C$_{18}$H$_{32}$O$_{15}$ = 469.3. Secalose, triructose anhydride. White, sweet crystals from rye flour, used to detect its presence in other flours; insoluble in 70% alcohol.

**trigalloyl** Indicating 3 galloyl radicals, C$_6$H$_2$(OH)$_3$CO—. t.acetone glucose C$_{20}$H$_{30}$O$_{18}$ = 676.5. Brown mass, soluble in water. t. glucose (C$_6$H$_5$O$_4$)$_3$C$_6$H$_9$O$_6$ = 636.5. Yellow mass, soluble in water. t. glyceryl (C$_6$H$_5$O$_4$)$_3$·C$_3$H$_4$O$_3$ = 548.4. Brown mass, soluble in water; a tanning agent.

**trigger** A substance that initiates a chain reaction.

**triglyceride** See *glyceride*.

**trigonal** Describing a crystal with 2 equal axes and a third shorter or longer axis, all at right angles. See *crystal systems.*

**trigonelline** C$_7$H$_7$O$_2$N = 137.1. Nicotinic methylbetaine, in many plant seeds; sea urchin, *Arabacia pustulosa*; the Coelenteria *Velia spirans*, jellyfish. Colorless crystals, m.218 (decomp.). Cf. *stachydrine.*

**triguaiacyl** Indicating three 2-methoxyphenyl radicals, MeO·C$_6$H$_4$·O—. t. phosphate Tris(2-methoxyphenyl)phosphate.

**trihemellitic acid** Trimellitic acid.

**trihexosan** A beer dextrin.

**trihexyphenidyl hydrochloride** C$_{20}$H$_{31}$ON·HCl = 337.9. Benzhexol hydrochloride. Artane, Tremin. White crystals, sparingly soluble in water.

**trihydrate*** A compound containing 3 molecules of water.

**trihydric*** Describing a compound with 3 OH groups.

**trihydrocyanic acid** See *cyanidines.*

**trihydrol** H$_2$O·H·O·H·O:H$_2$. An assumed threefold polymer of water. Cf. *dihydrol.*

**trihydroxy-*** Prefix indicating 3 OH groups. t.anthraquinone* 1,2,3-$\sim$ Anthragallol. 1,2,4-$\sim$ Purpurin. t.benzene* C$_6$H$_3$(OH)$_3$ = 126.1. 1,2,3-$\sim$ Pyrogallol*.

BSC-A-000237

# EXHIBIT J

# McGraw-Hill
# Dictionary of
# Scientific and
# Technical
# Terms

## Fifth Edition

Sybil P. Parker
Editor in Chief

McGraw-Hill, Inc.

New York    San Francisco    Washington, D.C.

Auckland   Bogotá   Caracas   Lisbon   London   Madrid   Mexico City   Milan
Montreal   New Delhi   San Juan   Singapore   Sydney   Tokyo   Toronto

BSC-A-000238

On the cover: Photomicrograph of crystals of vitamin B₁.
(*Dennis Kunkel, University of Hawaii*)

Included in this Dictionary are definitions which have been published previously in the following works: P. B. Jordain, *Condensed Computer Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. J. Markus, *Electronics and Nucleonics Dictionary*, 4th ed., Copyright © 1960, 1966, 1978 by McGraw-Hill, Inc. All rights reserved. J. Quick, *Artists' and Illustrators' Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. *Blakiston's Gould Medical Dictionary*, 3d ed., Copyright © 1956, 1972 by McGraw-Hill, Inc. All rights reserved. T. Baumeister and L. S. Marks, eds., *Standard Handbook for Mechanical Engineers*, 7th ed., Copyright © 1958, 1967 by McGraw-Hill, Inc. All rights reserved.

In addition, material has been drawn from the following references: R.E. Huschke, *Glossary of Meteorology*, American Meteorological Society, 1959; *U.S. Air Force Glossary of Standardized Terms*, AF Manual 11-1, vol. I, 1972; *Communications-Electronics Terminology*, AF Manual 11-1, vol. 3, 1970; W.H. Allen, ed., *Dictionary of Technical Terms for Aerospace Use*, 1st ed., National Aeronautics and Space Administration, 1965; J. M. Gilliland, *Solar-Terrestrial Physics: A Glossary of Terms and Abbreviations*, Royal Aircraft Establishment Technical Report 67158, 1967; *Glossary of Air Traffic Control Terms*, Federal Aviation Agency; *A Glossary of Range Terminology*, White Sands Missile Range, New Mexico, National Bureau of Standards, AD 467-424; *A DOD Glossary of Mapping, Charting and Geodetic Terms*, 1st ed., Department of Defense, 1967; P. W. Thrush, comp. and ed., *A Dictionary of Mining, Mineral, and Related Terms*, Bureau of Mines, 1968; *Nuclear Terms: A Glossary*, 2d ed., Atomic Energy Commission; F. Casey, ed., *Compilation of Terms in Information Sciences Technology*, Federal Council for Science and Technology, 1970; *Glossary of Stinfo Terminology*, Office of Aerospace Research, U.S. Air Force, 1963; *Naval Dictionary of Electronic, Technical, and Imperative Terms*, Bureau of Naval Personnel, 1962; *ADP Glossary*, Department of the Navy, NAVSO P-3097.

## McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, Fifth Edition

Copyright © 1994, 1989, 1984, 1978, 1976, 1974 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

4 5 6 7 8 9 0    DOW/DOW    9 9 8

ISBN 0-07-042333-4

Library of Congress Cataloging-in-Publication Data

McGraw-Hill dictionary of scientific and technical terms /
   Sybil P. Parker, editor in chief. —5th ed.
       p.    cm.
   ISBN 0-07-042333-4
   1. Science—Dictionaries.   2. Technology—Dictionaries.
I. Parker, Sybil P.
Q123.M34   1993
503—dc20                                    93-34772
                                              CIP

## INTERNATIONAL EDITION

Copyright © 1994. Exclusive rights by McGraw-Hill, Inc. for manufacture and export. This book cannot be re-exported from the country to which it is consigned by McGraw-Hill The International Edition is not available in North America.

When ordering this title, use ISBN 0-07-113584-7.

BSC-A-000239

**anaerobiosis** [BIOL] A mode of life carried on in the absence of molecular oxygen. { ,an·ə,rō'bī·ə·səs }

**anaerophyte** [ECOL] A plant that does not need free oxygen for respiration. { ə'ner·ə,fīt }

**anafront** [METEOROL] A front at which the warm air is ascending the frontal surface up to high altitudes. { 'an·ə,frənt }

**anaglyph** [GRAPHICS] 1. A stereogram in which the two views are printed or projected superimposed in complementary colors, usually red and blue; by viewing through filter spectacles of corresponding complementary colors, a stereoscopic image is formed. 2. A surface worked in low relief. { 'an·ə,glif }

**anakinesis** [BIOCHEM] A process in living organisms by which energy-rich molecules, such as adenosinetriphosphate, are formed. { ,an·ə·kə'nē·səs }

**anal** [ANAT] Relating to or located near the anus. { 'ān·əl }

**analbite** [MINERAL] A triclinic albite which is not stable and becomes monoclinic at about 700°C. { ə'nal,bīt }

**analbuminemia** [MED] A disorder transmitted as an autosomal recessive, characterized by drastic reduction or absence of serum albumin. { ,an,al,byü·mə'nēm·ē·ə }

**anal character** [PSYCH] A personality type that exhibits excessive orderliness, miserliness, and obstinacy. { 'ān·əl 'kar·ik·tər }

**analcime** [MINERAL] NaAlSi₂O₆·H₂O A white or slightly colored isometric zeolite found in diabase and in alkali-rich basalts. Also known as analcite. { ə'nal,sēm }

**analcimite** [PETR] An extrusive or hypabyssal rock that consists primarily of pyroxene and analcime. { ə'nal·sə,mīt }

**analcimization** [GEOL] The replacement in igneous rock of feldspars or feldspathoids by analcime. { ə,nal·sə·mə,zā'shən }

**analcite** See analcime. { ə'nal,sīt }

**analemma** [ASTRON] A figure-eight-shaped diagram on a globe showing the declination of the sun throughout the year and also the equation of time. { ,an·ə'lem·ə }

**analeptic** [PHARM] Any drug used to restore respiration and a wakeful state. { ,an·ə'lep·tik }

**anal fin** [VERT ZOO] An unpaired fin located medially on the posterior ventral part of the fish body. { 'ān·əl ,fin }

**analgesia** [PHYSIO] Insensibility to pain with no loss of consciousness. { ,an·əl'jēz·ē·ə }

**analgesic** [PHARM] Any drug, such as salicylates, morphine, or opiates, used primarily for the relief of pain. { ,an·əl'jēz·ik }

**anal gland** [INV ZOO] A gland in certain mollusks that secretes a purple substance. [VERT ZOO] A gland located near the anus or opening into the rectum in many vertebrates. { 'ān·əl ,gland }

**anallagmatic curve** [MATH] A curve that is its own inverse curve with respect to some circle. { ə,nal·əg'mad·ik 'kərv }

**anallobaric center** See pressure-rise center. { ə'nal·ə,bär·ik 'sen·tər }

**analog** [CHEM] A compound whose structure is similar to that of another compound but whose composition differs by one element. [FOOD ENG] A meat-substitute food manufactured from vegetable ingredients, such as soybeans. [ELECTR] 1. A physical variable which remains similar to another variable insofar as the proportional relationships are the same over some specified range; for example, a temperature may be represented by a voltage which is its analog. 2. Pertaining to devices, data, circuits, or systems that operate with variables which are represented by continuously measured voltages or other quantities. [METEOROL] A past large-scale synoptic weather pattern which resembles a given (usually current) situation in its essential characteristics. { 'an·əl,ög }

**analog adder** [ELECTR] A device with one output voltage which is a weighted sum of two input voltages. { 'an·əl,äg 'ad·ər }

**analog channel** [ELECTR] A channel on which the information transmitted can have any value between the channel limits, such as a voice channel. { 'an·əl,äg 'chan·əl }

**analog communications** [COMMUN] System of telecommunications employing a nominally continuous electric signal that varies in frequency, amplitude, and so on, in some direct correlation to nonelectrical information (sound, light, and so on) impressed on a transducer. { 'an·əl,äg kə,myü·nə'kā·shənz }

**analog comparator** [ELECTR] 1. A comparator that checks digital values to determine whether they are within predetermined upper and lower limits. 2. A comparator that produces high and low digital output signals when the sum of two analog voltages is positive and negative, respectively. { 'an·əl,äg kəm'par·əd·ər }

**analog computer** [COMPUT SCI] A computer in which quantities are represented by physical variables; problem parameters are translated into equivalent mechanical or electrical circuits as an analog for the physical phenomenon being investigated. { 'an·əl,äg kəm'pyüd·ər }

**analog data** [COMPUT SCI] Data represented in a continuous form, as contrasted with digital data having discrete values. { 'an·əl,äg 'dad·ə }

**analog-digital computer** See hybrid computer. { 'an·əl,äg 'dij·əd·əl kəm,pyüd·ər }

**analog indicator** [ELECTR] A device in which the result of a measurement is indicated by a pointer deflection or other visual quantity. { 'an·əl,äg 'in·də,kād·ər }

**analog monitor** [ELECTR] A display unit that accepts only analog signals, which must be converted from digital signals by the computer's video display board. { 'an·əl,äg ,män·əd·ər }

**analog multiplexer** [ELECTR] A multiplexer that provides switching of analog input signals to allow use of a common analog-to-digital converter. { 'an·əl,äg 'məl·tə,plek·sər }

**analog multiplier** [ELECTR] A device that accepts two or more inputs in analog form and then produces an output proportional to the product of the input quantities. { 'an·əl,äg 'məl·tə,plī·ər }

**analog network** [ELECTR] A circuit designed so that circuit variables such as voltages are proportional to the values of variables in a system under study. { 'an·əl,äg 'net,wərk }

**analogous** [BIOL] Referring to structures that are similar in function and general appearance but not in origin, such as the wing of an insect and the wing of a bird. { ə'nal·ə·gəs }

**analogous pole** [SOLID STATE] The pole of a crystal that acquires a positive charge when the crystal is heated. { ə'nal·ə·gəs ,pōl }

**analog output** [CONT SYS] Transducer output in which the amplitude is continuously proportional to a function of the stimulus. { 'an·əl,äg 'aut,püt }

**analog radio system** See AR system. { 'an·əl,äg 'rād·ē·ō 'sis·təm }

**analog readout** [ENG] A scale on a balance that continuously indicates measurement values by the position of an index mark, either a line or a pointer, opposite a graduated scale which is usually marked with numbers. { 'an·əl,äg 'rēd,aut }

**analog recording** [ELECTR] Any method of recording in which some characteristic of the recording signal, such as amplitude or frequency, is continuously varied in a manner analogous to the time variations of the original signal. { 'an·əl,äg ri'kȯrd·iŋ }

**analog signal** [ELECTR] A nominally continuous electrical signal that varies in amplitude or frequency in response to changes in sound, light, heat, position, or pressure. { 'an·əl,äg 'sig·nəl }

**analog simulation** [COMPUT SCI] The representation of physical systems and phenomena by variables such as translation, rotation, resistance, and voltage. { 'an·əl,äg ,sim·yə'lā·shən }

**analog states** [NUC PHYS] Certain nuclear states belonging to neighboring nuclear isobars and possessing identical structure except for the transformation of one or more neutrons into the same number of protons. Also known as isobaric analog states. { 'an·əl,äg ,stāts }

**analog switch** [ELECTR] 1. A device that either transmits an analog signal without distortion or completely blocks it. 2. Any solid-state device, with or without a driver, capable of bilaterally switching voltages or current. { 'an·əl,äg ,swich }

**analog-to-digital converter** [ELECTR] A device which translates continuous analog signals into proportional discrete digital signals. { 'an·əl,äg tə 'dij·əd·əl kən'vərd·ər }

**analog-to-frequency converter** [ELECTR] A converter in which an analog input in some form other than frequency is converted to a proportional change in frequency. { 'an·əl,äg tə 'frē·kwən·sē kən'vərd·ər }

**analog voltage** [ELECTR] A voltage that varies in a continuous fashion in accordance with the magnitude of a measured variable. { 'an·əl,äg 'vōl·tij }

**anal phase** [PSYCH] In psychoanalytic theory, the period of pregenital psychosexual development, usually from 1 to 3 years of age, in which the child has particular interest in the process of defecation and the sensations connected with the anus. { 'ān·əl ,fāz }

**bleaching powder**                                                        **blepharoplasty** | **239**

bleaching powder [MATER] A mixture of calcium hydroxide, calcium chloride, and calcium hypochlorite that is used as a bleaching agent. Also known as chloride of lime; chlorinated lime. { 'blēch·iŋ ˌpau̇d·ər }

bleach liquor [MATER] A water solution of calcium hypochlorite used as a laundry and textile bleach, germicide, and deodorant. { 'blēch ˌlik·ər }

bleach spot [GEOL] A green or yellow area in red rocks formed by reduction of ferric oxide around an organic particle, also known as deoxidation sphere. { 'blēch ˌspät }

bleary effect [ENG] The dependence of the signal from an ionization gage on the geometry of the system being measured when an organic vapor is present in the vacuum; the effect can falsify measurement results by up to an order of magnitude. { 'blir·ē iˌfekt }

bleb [MATER] A small bubble in a material that has solidified, such as glass. [PETR] A small, usually spherical inclusion in a rock mass. [MED] A localized collection of fluid, as serum or blood, in the epidermis. { bleb }

bleed [CHEM] Diffusion of coloring matter from a substance. [COMPUT SCI] In optical character recognition, the flow of ink or printed characters beyond the limits specified for the recognition by a character reader. [ENG] To let a fluid, such as air or liquid oxygen, escape under controlled conditions from a pipe, tank, or the like through a valve or outlet. [GRAPHICS] The extension of a photograph or other artwork to the very edge of the printed page. [MED] To exude blood from a wound. { blēd }

bleeder [ELECTR] A high resistance connected across the output of a high-voltage power supply which serves to discharge the filter capacitors after the power supply has been turned off, and to provide a stabilizing load. [ENG] A connection located at a low place in an air line or a gasoline container so that, by means of a small valve, the condensed water or other liquid can be drained or bled off from the line or container without discharging the air or gas. [MED] 1. A person subject to frequent hemorrhages, as a hemophiliac. 2. A blood vessel from which there is persistent uncontrolled bleeding. 3. A blood vessel which has escaped closure by cautery or ligature during a surgical procedure. [MET] An incomplete casting that results from some molten metal draining out of the mold cavity after pouring has ceased. { 'blēd·ər }

bleeder cloth [MATER] A layer of material placed over a composite material during the curing process to allow escape of excess gas and resin. { 'blēd·ər ˌklȯth }

bleeder current [ELEC] Current drawn continuously from a voltage source to lessen the effect of load changes or to provide a voltage drop across a resistor. { 'blēd·ər ˌkər·ənt }

bleeder resistor [ELEC] A resistor connected across a power or other voltage source to improve voltage regulation by drawing a fixed current value continuously; also used to dissipate the charge remaining in filter capacitors when equipment is turned off. { 'blēd·ər ri'zist·ər }

bleeder turbine [MECH ENG] A multistage turbine where some is extracted (bled) at pressures intermediate between inlet and exhaust, for process or feedwater heating purposes. { 'blēd·ər 'tər·bən }

bleeding [CHEM ENG] The undesirable movement of certain components of a plastic material to the surface of a finished article. Also known as migration. 2. Natural separation of a liquid from a liquid-solid or semisolid mixture; for example, separation of oil from a stored lubricating grease, or water from freshly poured concrete. Also known as bleedout. [MATER] The outward penetration of a coloring agent from a substrate through the surface coat of paint. 2. The movement of groundwater from below a road surfacing material to the road surface. [TEXT] Referring to a fabric in which the dye runs out and therefore comes out when the fabric is wet. { 'blēd·iŋ }

bleeding canker [PL PATH] A fungus disease of hardwoods caused by Phytophthora cactorum and characterized by cankers which exude a reddish ooze on the trunk and branches. { 'blēd·iŋ 'kaŋ·kər }

bleeding cycle [MECH ENG] A steam cycle in which steam is drawn from the turbine at one or more stages and used to heat feedwater. Also known as regenerative cycle. { 'blēd·iŋ ˌsī·kəl }

bleeding disease [PL PATH] A fungus disease of the coconut palm caused by Ceratostomella paradoxa, characterized by a

rust-colored exudation from cracks on the stem. { 'blēd·iŋ diˌzēz }

bleeding time [PHYSIO] The time required for bleeding to stop after a small puncture wound. { 'blēd·iŋ ˌtīm }

bleed line [GRAPHICS] A line-width change usually due to overexposure or overdeveloping in photography. { 'blēd ˌlīn }

bleedout See bleeding. { 'blēd·au̇t }

bleed-through [GRAPHICS] Of records printed on both sides, the obtrusive show-through of printed matter from one side to the other. [MATER] Discoloration in the surface layer of wood veneer construction that is caused by oozing of glue through the face veneers. Also known as strike-through. { 'blēd·thrü }

bleed valve [ENG] A small-flow valve connected to a fluid process vessel or line for the purpose of bleeding off small quantities of contained fluid. { 'blēd ˌvalv }

blend [MATER] A mixture so combined as to render the parts indistinguishable from one another. { blend }

blende See sphalerite. { blend }

blended data [ENG] Q point that is the combination of scan data and track data to form a vector. { 'blen·dəd 'dad·ə }

blended fuel oil [MATER] A mixture of petroleum residual and distillate fuel oils. { 'blen·dəd 'fyül ˌȯil }

blended unconformity [GEOL] An unconformity that is not sharp because the original erosion surface was covered by a thick residual soil that graded downward into the underlying rock. { 'blen·dəd ˌən·kən'fȯr·məd·ē }

blended whiskey [FOOD ENG] Whiskey containing at least 20% by volume of 100 proof straight whiskey and mixed with other whiskey or neutral spirits, the mixture being not less than 80 proof at the time of bottling. { 'blen·dəd 'wis·kē }

blending [MATER] The process of mixing two or more substances having different properties to obtain a final product having characteristics different from those of the starting materials. [TEXT] Producing uniform yarn and fabric by bringing together two or more distinctive types of fibers of different lengths. { 'blen·diŋ }

blending inheritance [GEN] Inheritance in which the character of the offspring is a blend of those in the parents; a common feature for quantitative characters, such as stature, determined by large numbers of genes and affected by environmental variation. { 'blen·diŋ in·her·əd·əns }

blending naphtha [MATER] A petroleum distillate used to thin or dilute heavy petroleum stocks (for example, lubricating oil) to simplify handling and processing. { 'blen·diŋ ˌnaf·thə }

blending problem [IND ENG] A linear programming problem in which it is required to find the least costly mix of ingredients which yields the desired product characteristics. { 'blen·diŋ ˌpräb·ləm }

blending stock [CHEM ENG] Any substance used for compounding gasoline, including natural gasoline, catalytically reformed products, and additives. { 'blen·diŋ ˌstäk }

blending value [ENG] Measure of the ability of an added component (for example, tetraethyllead, isooctane, and aromatics) to affect the octane rating of a base gasoline stock. { 'blen·diŋ ˌval·yü }

blend stop [BUILD] A thin wood strip fastened to the exterior vertical edge of the pulley stile or jamb to hold the sash in position. { 'blend ˌstäp }

Blenniidae [VERT ZOO] The blennies, a family of carnivorous marine fishes in the suborder Blennioidei. { blē'nī·əˌdē }

Blennioidei [VERT ZOO] A large suborder of small marine fishes in the order Perciformes that live principally in coral and rock reefs. { ˌble·nē'ȯi·dēˌī }

blennorrhagia [MED] Excessive discharge of mucus. Also known as blennorrhea. { ˌble·nō'rä·jē·ə }

blennorrhea See blennorrhagia. { ˌble·nə're·ə }

Blephariceridae [INV ZOO] A family of dipteran insects in the suborder Orthorrhapha. { ˌblef·ə'ris·er·əˌdē }

blepharism [MED] Spasm of the eyelids causing rapid, repetitive involuntary winking. { 'blef·əˌriz·əm }

blepharitis [MED] Inflammation of the eyelids. { ˌblef·ə'rīd·əs }

blepharoconjunctivitis [MED] Inflammation of the eyelids and the conjunctiva. { ˌblef·ə·rō·kənˌjəŋk·tə'vīd·əs }

blepharoplast [MICROBIO] A cytoplasmic granule bearing a bacterial flagellum. { 'blef·ə·rōˌplast }

blepharoplasty [MED] Any plastic surgical operation on the eyelid. Also known as tarsoplasty. { 'blef·ə·rəˌplas·dē }

**lactase** [BIOCHEM] An enzyme that catalyzes the hydrolysis of lactose to dextrose and galactose. { 'lak,tās }

**lactase deficiency syndrome** [MED] Diarrhea induced by ingestion of a lactose-containing food such as milk, secondary to congenital or acquired deficiency of lactase. { 'lak,tās di,fish·ən·sē ,sin,drōm }

**lactate** [ORG CHEM] A salt or ester of lactic acid in which the acidic hydrogen of the carboxyl group has been replaced by a metal or an organic radical. [PHYSIO] To secrete milk. { 'lak,tāt }

**lactate dehydrogenase** [BIOCHEM] A zinc-containing enzyme which catalyzes the oxidation of several α-hydroxy acids to corresponding α-keto acids. { 'lak,tāt dē'hī·drə·jə,nās }

**lactation** [PHYSIO] Secretion of milk by the mammary glands. { lak'tā·shən }

**lacteal** [ANAT] One of the intestinal lymphatics that absorb chyle. [PHYSIO] Pertaining to or resembling milk. { 'lak·tē·əl }

**lactescent** [BIOL] Having a milky appearance. [PHYSIO] Secreting milk or a milklike substance. { lak'tes·ənt }

**lactic acid** [BIOCHEM] $C_3H_6O_3$ A hygroscopic α-hydroxy acid, occurring in three optically isomeric forms: L form, in blood and muscle tissue as a product of glucose and glycogen metabolism; D form, obtained by fermentation of sucrose; and DL form, a racemic mixture present in foods prepared by bacterial fermentation, and also made synthetically. { 'lak·tik 'as·əd }

**lactic dehydrogenase** [BIOCHEM] An enzyme that catalyzes the dehydrogenation of L-lactic acid to pyruvic acid. Abbreviated LDH. { 'lak·tik dē'hī·drə·jə,nās }

**lactic dehydrogenase virus** [VIROL] A virus of the rubella group which infects mice. { 'lak·tik dē'hī·drə·jə,nās ,vī·rəs }

**lactide** [ORG CHEM] A cyclic, intermolecular, double ester formed from α-hydroxy acids; most lactides are relatively low melting solids and are easily hydrolyzed by base to form salts of the parent acid, such as sodium lactate. { 'lak,tīd }

**lactiferous duct** [BOT] A tubular channel consisting of latex vessels or latex cells; carries the latex produced by the plant. { lak'tif·ə·rəs 'dəkt }

**lactim** [ORG CHEM] A tautomeric enol form of a lactam with which it forms an equilibrium whenever the lactam nitrogen carries a free hydrogen. { 'lak·təm }

**lactin** See lactose. { 'lak·tən }

**lactivorous** [ZOO] Feeding on milk. { lak'tiv·ə·rəs }

**Lactobacillaceae** [MICROBIO] The single family of gram-positive, asporogenous, rod-shaped bacteria; they are saccharoclastic, and produce lactate from carbohydrate metabolism. { ,lak·tō·bə,sil·'ā·sē,ē }

**lactobacillene** [MICROBIO] Formerly a tribe of rod-shaped bacteria in the family Lactobacillaceae. { ,lak·tō·bə'sil·ə,n }

**Lactobacillus** [MICROBIO] Lactic acid bacteria, the single genus of the family Lactobacillaceae; found in dairy products, meat products, fruits, beer, wine, and other food products. { ,lak·tō·bə'sil·əs }

**lactoferrin** [BIOCHEM] An iron-binding protein found in milk, saliva, tears, and intestinal and respiratory secretions that interferes with the iron metabolism of bacteria; in conjunction with antibodies, it plays an important role in resistance to certain infectious diseases. { ,lak·tō'fer·ən }

**lactoflavin** See riboflavin. { ,lak·tō'flav·ən }

**lactogenic hormone** See prolactin. { ,lak·tə'jen·ik 'hor,mōn }

**lactoglobulin** [BIOCHEM] A crystalline protein fraction of milk, which is soluble in half-saturated ammonium sulfate solution and insoluble in pure water. { ,lak·tō'gläb·yə·lən }

**lactometer** [ENG] A hydrometer used to measure the specific gravity of milk. { lak'täm·əd·ər }

**lactonase** [BIOCHEM] The enzyme that catalyzes the hydrolysis of 6-phosphoglucono-Δ-lactone to 6-phosphogluconic acid in the pentose phosphate pathway. { 'lak·tō,nās }

**lactone** [ORG CHEM] An internal cyclic mono ester formed from gamma (γ) or delta (δ) hydroxy acids spontaneously; thus γ-hydroxybutyric acid forms γ-butyrolactone. { 'lak,tōn }

**lactonitrile** [ORG CHEM] $CH_3CHOHCN$ A straw-colored liquid boiling at 183°C; soluble in water, insoluble in carbon disulfide and petroleum ether; used as a solvent, and as a chemical intermediate in making esters of lactic acid. Also known as acetaldehyde cyanohydrin. { ,lak·tō'nī,tril }

**lactonization** [ORG CHEM] The process in which a lactone is formed by intramolecular attack of a hydroxyl group on an activated carbonyl group. { ,lak·tō·nə'zā·shən }

**lactophenine** See para-lactophenetide. { ,lak·tō'fə,nēn }

**para-lactophenetide** [PHARM] $C_{11}H_{15}NO_3$ A water-soluble compound, crystallizing from ethyl acetate and hexane solution, and melting at 117–118°C; used in medicine as an analgesic and antipyretic. { 'par·ə ,lak·tō'fen·ə,tīd }

**lactoprene** [MATER] Any of several synthetic rubbers that have good resistance to hydrocarbon oil, ozone, oxygen, and other weather elements excepting cold, and that are polymers or copolymers of an acrylic acid ester. { 'lak·tə,prēn }

**lactose** [BIOCHEM] $C_{12}H_{22}O_{11}$ A disaccharide composed of D-glucose and D-galactose which occurs in milk. Also known as lactin; milk sugar. { 'lak,tōs }

**lactosuria** [MED] Presence of lactose in the urine. { ,lak·tōs'yur·ē·ə }

**lactron** [TEXT] A thread made from natural rubber latex by extrusion. { 'lak·trən }

**lacuna** [BIOL] A small space or depression. [HISTOL] A cavity in the matrix of bone or cartilage which is occupied by the cell body. { lə'kü·nə }

**lacunaris** See lacunosus. { ,lak·yə'nar·əs }

**lacunar system** [INV ZOO] A series of intercommunicating spaces branching from two longitudinal vessels in the hypodermis of many acanthocephalans. { lə'kü·nər ,sis·təm }

**lacunosus** [METEOROL] A cloud variety characterized more by the appearance of the spaces between the cloud elements than by the elements themselves, the gaps being generally rounded, often with fringed edges, and the overall appearance being that of a honeycomb or net; it is the negative of clouds composed of separate rounded elements. Formerly known as lacunaris. { ,lak·yə'nō·səs }

**lacustrine** [GEOL] Belonging to or produced by lakes. { lə'kəs·trən }

**lacustrine sediments** [GEOL] Sediments that are deposited in lakes. { lə'kəs·trən 'sed·ə·məns }

**lacustrine soil** [GEOL] Soil that is uniform in texture but variable in chemical composition and that has been formed by deposits in lakes which have become extinct. { lə'kəs·trən 'soil }

**Lacydonlidae** [INV ZOO] A benthic family of pelagic errantian polychaetes. { ,las·ə'dän·ə,dē }

**ladanum oil** See labdanum oil. { 'lad·ən·əm ,oil }

**lidar** [OPTICS] A missile-tracking system that uses a visible light beam in place of a microwave radar beam to obtain measurements of speed, altitude, direction, and range of missiles. Derived from laser detecting and ranging. Also known as colidar; laser radar. { 'lī,där }

**ladder** [ENG] A structure, often portable, for climbing up and down; consists of two parallel sides joined by a series of crosspieces that serve as footrests. { 'lad·ər }

**ladder attenuator** [ELECTR] A type of ladder network designed to introduce a desired, adjustable loss when working between two resistive impedances, one of which has a shunt arm that may be connected to any of various switch points along the ladder. { 'lad·ər ə'ten·yə,wād·ər }

**ladder-bucket dredge** See bucket-ladder dredge. { 'lad·ər 'bək·ət ,drej }

**ladder diagram** [CONT SYS] A diagram used to program a programmable controller, in which power flows through a network of relay contacts arranged in horizontal rows called rungs between two vertical rails on the side of the diagram containing the symbolic power. { 'lad·ər ,dī·ə,gram }

**ladder ditcher** See ladder trencher. { 'lad·ər 'dich·ər }

**ladder dredge** See bucket-ladder dredge. { 'lad·ər ,drej }

**ladder drilling** [MECH ENG] An arrangement of retractable drills with pneumatic powered legs mounted on banks of steel ladders connected to a holding frame; used in large-scale rock tunneling, with the advantage that many drills can be worked at the same time by a small labor force. { 'lad·ər ,dril·iŋ }

**ladder fire** [ORD] A method of establishing a gun range to a target by firing a succession of salvos with established differences in elevation. { 'lad·ər ,fīr }

**ladder jack** [ENG] A scaffold support which hooks onto a ladder. { 'lad·ər ,jak }

**ladder network** [ELECTR] A network composed of a sequence of H, L, T, or pi networks connected in tandem; chiefly used as an electric filter. Also known as series-shunt network. { 'lad·ər 'net,wərk }



Equation showing tautomeric equilibrium between the lactam and lactim forms of a lactim.

**LACTOBACILLEAE**



20 μm

Photomicrograph showing morphology of *Lactobacillus brevis*.

**LACUNAR SYSTEM**



Lacunar system of *Moniliformis*, dorsal view, showing regular circular branches. (*After Meyer in L. H. Hyman, The Invertebrates, vol. 3, McGraw-Hill, 1951*)

Case 1:07-cv-00333-SLR   Document 296   Filed 09/25/09   Page 121 of 128

**Macleod equation** *Fluid Mechanics.* a relationship expressing the fact that the fourth root of the surface tension of a liquid is proportional to the difference between the liquid density and its vapor density at saturation conditions; the proportionality constant depends upon the values of Sugden's parachor and the molecular weight.

**MacMichael degree** *Fluid Mechanics.* a unit used in viscosity measurement in a rotational (Couette) viscometer; the size of the unit depends on the stiffness of the inner cylinder suspension.

**Macoma** *Paleontology.* a genus of deep-burrowing clams in the order Veneroida; Pleistocene to the present.

**MACOP-B** *Oncology.* an acronym for a chemotherapy regimen for cancer treatment that includes methotrexate, Adriamycin, cyclophosphamide, Oncovin, prednisone, and bleomycin.

**Macquer's salt** see POTASSIUM ARSENATE.

**macro-** a combining form meaning: 1. large, as in *macrourous*. 2. excessively or abnormally large, as in *macrencephaly*.

**macrandrous** *Botany.* of a species, having male plants of normal size, as distinguished from nannandrous species, in which the male plants are considerably smaller than the females.

**Macraucheniidae** *Paleontology.* a family of camel-like hoofed mammals in the order Litopterna, having a nasal opening on top of the head that indicates adaptation to living in water; found only in South America; the Macraucheniidae date back to the Paleocene and were the last surviving litopterns, persisting into the Middle Quaternary.

**macrencephaly** *Neurology.* a congenital anomaly marked by an abnormally large brain. Also, MACROENCEPHALY.

**Macristiidae** *Vertebrate Zoology.* the family of oceanic fishes sometimes assigned to the order Ctenothrissiformes.

**macro-** *Computer Programming.* an instruction written as part of a source language that will expand into multiple source language instructions when compiled. Also, MACROINSTRUCTION.

**macro-** a combining form meaning: 1. large, as in *macroscopic.* 2. excessively or abnormally large, as in *macrocephalic.*

**macroanalytical balance** *Engineering.* a very accurate balance scale, typically capable of weighing as much as 200 grams to the nearest 0.1 milligram.

**macroassembler** *Computer Programming.* a program that translates assembly language, including user defined and created macros, into machine language. Also, macroassembler, macroassembly program.

**macrobead** *Biotechnology.* a large round particle often used as the stationary phase in affinity chromatography, when large molecules or whole cells are being separated.

**macrobiotic** *Science.* having a long life span; long-lived. *Nutrition.* describing a dietary program advocating the restrictive use of certain foods, such as one rich in whole grain cereals; maintained by proponents as a diet promoting good health, but regarded by many nutritionists as deficient in essential proteins.

**macroblepharia** *Medicine.* an abnormally large eyelid.

**macrobrachia** *Medicine.* an abnormal size or length of the arm.

**macrocephalus** *Medicine.* an individual with an abnormally large head.

**macrocephaly** *Medicine.* an abnormally large head.

**macrocheiria** *Medicine.* abnormally large hands.

**macroclastic** *Petrology.* rock composed of fragments visible to the naked eye.

**macroclimate** *Meteorology.* the general climate over a broad area of the earth's surface, as distinguished from mesoclimate or microclimate.

**macrocode** *Computer Programming.* a coding language containing macros.

**macroconidium** *Mycology.* a large sexual spore or conidium. Also, MACROSPORE.

**macroconsumer** *Ecology.* any large organism that ingests smaller organisms.

**macrocosm** *Science.* a very large or very general frame of reference.

**macrocrania** *Medicine.* an exceptionally large cranium in relation to the face, a characteristic of hydrocephalus.

**macrocrystalline** *Petrology.* 1. of or relating to the texture of holocrystalline rocks in which crystals are visible to the naked eye. 2. of or relating to the texture of a recrystallized sedimentary rock with grains or crystals of a diameter greater than 0.75 millimeter.

**macrocycle** *Organic Chemistry.* an organic macromolecule containing a cyclic element of usually more than 15 atoms. Thus, macrocyclic.

**Macrocypracea** *Invertebrate Zoology.* a superfamily of marine ostracod crustaceans, in the suborder Podocarpa, with variously modified thoracic legs.

**macrocyst** *Medicine.* 1. a massive cyst. 2. in the study of molds, a huge spore container or the gamete of a slime mold.

**macrocyte** *Hematology.* an abnormally enlarged erythrocyte.

**macrocytic anemia** *Hematology.* a decrease in red blood cells with the remaining cells being larger than normal.

**macrocytosis** *Hematology.* an accelerated production of macrocytes.

**macrodactyly** *Medicine.* abnormally large fingers and toes.

**Macrodasyida** *Invertebrate Zoology.* an order of tiny, marine littoral, hermaphroditic worms in the phylum Gastrotricha, having anterior, lateral, and posterior adhesive suckers. Also, Macrodasyoidea.

**macrodefinition** *Computer Programming.* a specification or statement that defines a macro.

**Macrodontia** *Invertebrate Zoology.* a genus of South American longhorn beetles having saw-toothed mandibles; native to tropical forests, they are among the world's largest insects.

**macrodontia** *Medicine.* a developmental disorder characterized by increase in the size of the teeth.

**macroencephaly** see MACRENCEPHALY.

**macroenzyme** *Enzymology.* any very large enzyme.

**macroesthesia** *Neurology.* a perception of all objects as larger than their actual size.

**macroetching** *Metallurgy.* in metallography, etching to reveal structural features visible at no or low magnification.

**macroevolution** *Evolution.* the process of evolutionary change as manifest over the course of geological time in biological events above the level of species. Also, TRANSPECIFIC EVOLUTION.

**macroexpansion** *Computer Programming.* a sequence of statements produced from a macrogeneration operation.

**macrofacies** *Geology.* see FACIES TRACT.

**macrofauna** *Zoology.* animals that are large enough to be seen with the naked eye. *Ecology.* 1. widely distributed fauna. 2. the fauna of a macrohabitat.

**macrofiber** *Microbiology.* a helically twisted chain of bacterial cells, formed under certain culture conditions by *Bacillus subtilis.*

**macroflora** *Botany.* plants that are large enough to be seen with the naked eye. *Ecology.* 1. widely distributed flora. 2. the flora of a macrohabitat.

**macro flow chart** see FLOW CHART.

**macrofollicular adenoma** *Medicine.* a disease of the thyroid gland, or other gland, characterized by large spaces which contain colloid. Also, COLLOID ADENOMA.

**macrofossil** *Paleontology.* a fossil that is large enough to be studied directly, without the aid of a microscope.

**macrogamete** *Biology.* the larger gamete, always female, produced by a heterogamous organism.

**macro generation** *Computer Programming.* the production of a sequence of machine instructions by a macroassembler.

**macrogenerator** see MACROPROCESSOR.

**macrogenesis** see SALTATION.

**macrogeography** *Geography.* large-scale, usually highly theoretical, geographical study.

**macroglia** *Histology.* the portion of the neuroglia that includes two types of astrocytes and oligodendrocytes.

**macroglobulin** *Biochemistry.* a plasma globulin with molecular weight over 400 kDa.

**macroglobulinemia** *Medicine.* a condition characterized by an abnormal increase of macroglobulins in the blood.

**macroglossia** *Medicine.* an abnormally large tongue.

**macrograph** *Graphic Arts.* a usually photographic reproduction whose size is equal to, nearly equal to, or up to ten times as large as the object reproduced. *Metallurgy.* a recorded image of a metallic structure obtained at no or low magnification; usually below 10×.

**macrogyria** *Neurology.* an abnormal coarseness or breadth of the brain substance, resulting in expansion in the size of the gyri. Also, PACHYGYRIA.

**macrohabitat** *Ecology.* a habitat that contains a variety of environments and ecological niches capable of supporting a wide range of plants and animals.

**macroinstruction** *Computer Programming.* 1. see MACRO. 2. a machine-language instruction containing several microinstructions.

**Macrolepidoptera** *Invertebrate Zoology.* a former classification of large moths and butterflies, now used for descriptive purposes rather than for taxonomy.

**macro library** *Computer Programming.* a collection of commonly used macros available to multiple users.

BSC-A-000243

# EXHIBIT K

# The
# Merriam-Webster
# Dictionary



Merriam-Webster, Incorporated, Publishers
Springfield, Massachusetts

BSC-A-000244

## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1998 by Merriam-Webster, Incorporated

Philippines Copyright 1998 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

The Merriam-Webster dictionary.
    p.    cm.
    ISBN 0-87779-606-8 (alk. paper)
    1. English language — Dictionaries.  I. Merriam-Webster Inc.
PE1628.M353    1998
423—dc21                            97-39927
                                       CIP

The Merriam-Webster Dictionary, principal copyright 1995

All rights reserved. No part of this book covered by the copyrights herein may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

26RRD04

BSC-A-000245

son who informs against others for illegalities esp. for financial gain

**in·fo·tain·ment** \in-fō-ˈtān-mənt\ *n* : a television program that presents information (as news) in a manner intended to be entertaining

**in·frac·tion** \in-ˈfrak-shən\ *n* [ME, fr. ML *infractio*, fr. L, subduing, fr. *infringere* to break, crush] : the act of infringing : VIOLATION

**in·fra dig** \in-frə-ˈdig\ *adj* [short for L *infra dignitatem*] : being beneath one's dignity

**in·fra·red** \in-frə-ˈred\ *adj* : being, relating to, or using radiation having wavelengths longer than those of red light — **infrared** *n*

**in·fra·struc·ture** \ˈin-frə-ˌstrək-chər\ *n* 1 : the underlying foundation or basic framework (as of a system or organization) 2 : the system of public works of a country, state, or region; *also* : the resources (as buildings or equipment) required for an activity

**in·fre·quent** \(ˌ)in-ˈfrē-kwənt\ *adj* 1 : seldom happening : RARE 2 : placed or occurring at wide intervals in space or time *syn* uncommon, scarce, sporadic — **infrequently** *adv*

**in·fringe** \in-ˈfrinj\ *vb* **infringed; infringing** 1 : VIOLATE, TRANSGRESS (~ a patent) 2 : ENCROACH, TRESPASS — **infringement** *n*

**in·fu·ri·ate** \in-ˈfyur-ē-ˌāt\ *vb* **-ated; -ating** : to make furious : ENRAGE — **infuriatingly** *adv*

**in·fuse** \in-ˈfyüz\ *vb* **infused; infusing** 1 : to instill a principle or quality in : INTRODUCE 2 : INSPIRE, ANIMATE 3 : to steep (as tea) without boiling — **infusion** \-ˈfyü-zhən\ *n*

**¹-ing** \iŋ\ *n suffix* 1 : action or process (sleeping) : instance of an action or process (a meeting) 2 : product or result of an action or process (an engraving) (earnings) 3 : something used in an action or process (a bed covering) 4 : something connected with, consisting of, or used in making (a specified thing) (scaffolding) 5 : something related to (a specified concept) (offing)

**²-ing** *vb suffix* : one of a (specified) kind

**³-ing** *vb suffix or adj suffix* — used to form the present participle (sailing) and sometimes to form an adjective resembling a present participle but not derived from a verb (swashbuckling)

**in·gath·er** \in-ˈga-thər\ *vb* : to gather in : ASSEMBLE

**in·gen·ious** \in-ˈjen-yəs\ *adj* 1 : marked by special aptitude at discovering, inventing, or contriving 2 : marked by originality, resourcefulness, and cleverness in conception or execution — **ingeniously** *adv* — **ingeniousness** *n*

**in·ge·nue** *or* **in·gé·nue** \ˈan-jə-ˌnü, ˈän-; ˈaⁿ-zhə-, ˈäⁿ-\ *n* : a naive girl or young woman; *esp* : an actress portraying such a person

**in·ge·nu·i·ty** \ˌin-jə-ˈnü-ə-tē, -ˈnyü-\ *n, pl* **-ties** : skill or cleverness in planning or inventing : INVENTIVENESS

**in·gen·u·ous** \in-ˈjen-yə-wəs\ *adj* [L *ingenuus* native, freeborn, fr. *gignere* to beget] 1 : STRAIGHTFORWARD, FRANK 2 : NAIVE — **ingenuously** *adv* — **ingenuousness** *n*

**in·gest** \in-ˈjest\ *vb* : to take in for or as if for digestion — **ingestion** \-ˈjes-chən\ *n*

**in·gle·nook** \ˈiŋ-gəl-ˌnuk\ *n* : a nook by a large open fireplace; *also* : a bench occupying this nook

**in·glo·ri·ous** \(ˌ)in-ˈglōr-ē-əs\ *adj* 1 : SHAMEFUL 2 : not glorious : lacking fame or honor — **ingloriously** *adv*

**in·got** \ˈiŋ-gət\ *n* : a mass of metal cast in a form convenient for storage or transportation

**¹in·grain** \(ˌ)in-ˈgrān\ *vb* : to work indelibly into the natural texture or mental or moral constitution — **ingrained** *adj*

**²in·grain** \ˈin-ˌgrān\ *adj* 1 : made of fiber that is dyed before being spun into yarn 2 : made of yarn that is dyed before being woven or knitted 3 : INNATE — **ingrain** *n*

**in·grate** \ˈin-ˌgrāt\ *n* : an ungrateful person

**in·gra·ti·ate** \in-ˈgrā-shē-ˌāt\ *vb* **-ated; -ating** : to gain favor by deliberate effort

**in·gra·ti·at·ing** *adj* 1 : capable of winning favor : PLEASING (an ~ smile) 2 : FLATTERING (an ~ manner)

**in·grat·i·tude** \(ˌ)in-ˈgra-tə-ˌtüd, -ˌtyüd\ *n* : lack of gratitude : UNGRATEFULNESS

**in·gre·di·ent** \in-ˈgrē-dē-ənt\ *n* : one of the substances that make up a mixture or compound : CONSTITUENT

**in·gress** \ˈin-ˌgres\ *n* : ENTRANCE, ACCESS — **ingression** \in-ˈgre-shən\ *n*

**in·grow·ing** \ˈin-ˌgrō-iŋ\ *adj* : growing or tending inward

**in·grown** \ˈin-ˌgrōn\ *adj* : grown in; *esp* : having the free tip or edge embedded in the flesh (~ toenail)

**in·gui·nal** \ˈiŋ-gwən-ᵊl\ *adj* : of, relating to, or situated in or near the region of the groin

**in·hab·it** \in-ˈha-bət\ *vb* : to live or dwell in — **inhabitable** *adj*

**in·hab·i·tant** \in-ˈha-bə-tənt\ *n* : a permanent resident in a place

**in·hal·ant** \in-ˈhā-lənt\ *n* : something (as a medicine) that is inhaled

**in·ha·la·tor** \ˈin-hə-ˌlā-tər\ *n* : a device that provides a mixture of carbon dioxide and oxygen for breathing

**in·hale** \in-ˈhāl\ *vb* **inhaled; inhaling** : to breathe in — **inhalation** \ˌin-hə-ˈlā-shən\ *n*

**in·hal·er** \in-ˈhā-lər\ *n* : a device by means of which medicinal material is inhaled

**in·here** \in-ˈhir\ *vb* **inhered; inhering** : to be inherent

**in·her·ent** \in-ˈhir-ənt, -ˈher-\ *adj* : established as an essential part of something : INTRINSIC — **inherently** *adv*

**in·her·it** \in-ˈher-ət\ *vb* : to receive esp. from one's ancestors — **inheritable** \-ə-tə-bəl\ *adj* — **inheritance** \-ə-təns\ *n* — **inheritor** \-ə-tər\ *n*

**in·hib·it** \in-ˈhi-bət\ *vb* 1 : PROHIBIT, FORBID 2 : to hold in check : RESTRAIN

**in·hi·bi·tion** \ˌin-hə-ˈbi-shən\ *n* 1 : PROHIBITION, RESTRAINT 2 : a psic. inner check on free activity, expression, or functioning

**in·house** \ˈin-ˌhaus, -ˈhaus\ *adj* : existing, originating, or carried on within a group or organization

**in·hu·man** \(ˌ)in-ˈhyü-mən, -ˈyü-\ *adj* 1 : lacking pity, kindness, or mercy : SAVAGE 2 : COLD, IMPERSONAL 3 : not worthy of or conforming to the needs of human beings 4 : of or suggesting a nonhuman class of beings — **inhumanly** *adv* — **inhumanness** *n*

**in·hu·mane** \ˌin-hyü-ˈmān, -yü-\ *adj* : not humane : INHUMAN

**in·hu·man·i·ty** \-ˈma-nə-tē\ *n, pl* **-ties** 1 : the quality or state of being cruel or barbarous 2 : a cruel or barbarous act

**in·im·i·cal** \i-ˈni-mi-kəl\ *adj* 1 : being adverse often by reason of hostility 2 : HOSTILE, UNFRIENDLY — **inimically** *adv*

**in·im·i·ta·ble** \(ˌ)i-ˈni-mə-tə-bəl\ *adj* : not capable of being imitated

**in·iq·ui·ty** \i-ˈni-kwə-tē\ *n, pl* **-ties** [ME *iniquite*, fr. MF *iniquité*, fr. L *iniquitas*, fr. *iniquus* uneven, fr. *aequus* equal] 1 : WICKEDNESS 2 : a wicked act — **iniquitous** \-təs\ *adj*

**¹in·i·tial** \i-ˈni-shəl\ *adj* 1 : of or relating to the beginning : INCIPIENT 2 : FIRST — **initially** *adv*

**²initial** *n* : the first letter of a word or name

**³initial** *vb* **-tialed** *or* **-tialled; -tialing** *or* **-tialling** : to affix an initial to

**in·i·ti·ate** \i-ˈni-shē-ˌāt\ *vb* **-ated; -ating** 1 : START, BEGIN 2 : to induct into membership by or as if by special ceremonies 3 : to instruct in the rudiments or principles of something — **initiation** \-ˌni-shē-ˈā-shən\ *n*

**²in·i·ti·ate** \i-ˈni-shē-ət\ *n* 1 : a person who is undergoing or has passed an initiation 2 : a person who is instructed or adept in some special field

BSC-A-000246



¹pret·ty \'pri-lē\ adj pret·ti·er; -est [ME praty, pretty, fr. OE prættig tricky, fr. prætt trick] 1 : pleasing by delicacy or grace : having conventionally accepted elements of beauty (~ flowers) 2 : MISERABLE, TERRIBLE (a ~ state of affairs) 3 : moderately large (a ~ profit) syn comely, fair, beautiful, attractive, lovely — pret·ti·ly \-tə-lē\ adv — pret·ti·ness \-ē-nəs\ n

²pretty adv : in some degree : MODERATELY

³pretty vb pret·tied; pret·ty·ing : to make pretty

pret·zel \'pret-səl\ n [G Brezel, ultim. fr. L brachiatus having branches like arms, fr. brachium arm] : a brittle or chewy glazed usu. salted slender bread often shaped like a loose knot

prev abbr previous; previously

pre·vail \pri-'vāl\ vb 1 : to win mastery : TRIUMPH 2 : to be or become effective : SUCCEED 3 : to urge successfully (~ed upon her to sing) 4 : to be frequent : PREDOMINATE — pre·vail·ing·ly adv

prev·a·lent \'prev-ə-lənt\ adj : generally or widely existent : WIDESPREAD — prev·a·lence \-ləns\ n

pre·var·i·cate \pri-'var-ə-ˌkāt\ vb -cat·ed; -cat·ing : to deviate from the truth : EQUIVOCATE — pre·var·i·ca·tion \-ˌvar-ə-'kā-shən\ n, — pre·var·i·ca·tor \-'var-ə-ˌkā-tər\ n

pre·vent \pri-'vent\ vb 1 : to keep from happening or existing (steps to ~ war) 2 : to hold back : HINDER, STOP (~ us from going) — pre·vent·able also pre·vent·ible \-'vent-ə-bəl\ adj — pre·ven·tion \-'ven-chən\ n — pre·ven·tive \-'ven-tiv\ adj or n — pre·ven·ta·tive \-'ven-tə-tiv\ adj or n

pre·ver·bal \ˌprē-'vər-bəl\ adj : having not yet acquired the faculty of speech

¹pre·view \'prē-ˌvyü\ vb : to see or discuss beforehand; esp : to view or show in advance of public presentation

²pre·view n 1 : an advance showing or viewing 2 also pre·vue \-ˌvyü\ : a showing of snatches from a motion picture advertised for future appearance 3 : FORETASTE

pre·vi·ous \'prē-vē-əs\ adj : going before : EARLIER, FORMER syn foregoing, prior, preceding, antecedent — pre·vi·ous·ly adv

pre·vi·sion \prē-'vi-zhən\ n 1 : FORESIGHT, PRESCIENCE 2 : FORECAST, PREDICTION

pre·war \'prē-'wȯr\ adj : occurring or existing before a war

¹prey \'prā\ n, pl prey also preys 1 : an animal taken for food by a predator; also : VICTIM 2 : the act or habit of preying

²prey vb 1 : to raid for booty 2 : to seize and devour prey 3 : to have a harmful or wearing effect

pvt abbr proof

¹price \'prīs\ n 1 archaic : VALUE 2 : the amount of money paid or asked for the sale of a specified thing; also : the cost at which something is obtained

²price vb priced; pric·ing 1 : to set a price on 2 : to ask the price of 3 : to drive by raising prices (priced themselves out of the market)

price-fix·ing \'prīs-ˌfik-siŋ\ n : the setting of prices artificially (as by producers or sellers)

price·less \-ləs\ adj : having a value beyond any price : INVALUABLE syn precious, costly, expensive

price support n : artificial maintenance of prices of a commodity at a level usu. fixed through government action

price war n : a period of commercial competition in which prices are repeatedly cut by the competitors

pric·ey also pric·y \'prī-sē\ adj pric·i·er; -est : EXPENSIVE

¹prick \'prik\ n 1 : a mark or small wound made by a pointed instrument 2 : something sharp or pointed 3 : an instance of pricking; also : a sensation of being pricked

²prick vb 1 : to pierce slightly with a sharp point; also : to have or cause a pricking sensation 2 : to affect with anguish or remorse (~s his conscience) 3 : to

outline with punctures (~ out a pattern) 4 : to stand or cause to stand erect (the dog's ears ~ed up at the sound) syn punch, puncture, perforate, bore, drill

prick·er \'pri-kər\ n : BRIAR; also : THORN

¹prick·le \'pri-kəl\ n 1 : a small sharp process (as on a plant) 2 : a slight stinging pain — prick·ly \'pri-klē\ adj

²prick·le vb prick·led; prick·ling 1 : to prick lightly 2 : TINGLE

prickly heat n : a red cutaneous eruption with intense itching and tingling caused by inflammation around the ducts of the sweat glands

prickly pear n : any of numerous cacti with usu. yellow flowers and prickly flat or rounded joints; also : the sweet pulpy pear-shaped edible fruit of various prickly pears

¹pride \'prīd\ n 1 : CONCEIT 2 : justifiable self-respect 3 : elation over an act or possession 4 : haughty behavior : DISDAIN 5 : ostentatious display — pride·ful adj

²pride vb prid·ed; prid·ing : to indulge (as oneself) in pride

priest \'prēst\ n [ME preist, fr. OE prēost, ultim. fr. LL presbyter elder, priest, fr. Gk presbyteros, fr. compar. of presbys old man, elder] : a person having authority to perform the sacred rites of a religion; esp : a member of the Anglican, Eastern, or Roman Catholic clergy ranking below a bishop and above a deacon — priest·hood n — priest·li·ness n — priest·ly adj

priest·ess \'prē-stəs\ n : a woman authorized to perform the sacred rites of a religion

prig \'prig\ n : one who irritates by rigid or pointed observance of proprieties — prig·gish \'pri-gish\ adj — prig·gish·ly adv

¹prim \'prim\ adj prim·mer; prim·mest : stiffly formal and precise — prim·ly adv — prim·ness n

²prim abbr 1 primary 2 primitive

pri·ma·cy \'prī-mə-sē\ n 1 : the state of being first (as in rank) 2 : the office, rank, or character of an ecclesiastical primate

pri·ma don·na \ˌpri-mə-'dä-nə\ n, pl prima donnas [It, lit., first lady] 1 : a principal female singer (as in an opera company) 2 : an extremely sensitive, vain, or undisciplined person

pri·ma fa·cie \ˌprī-mə-'fā-shə, -shē, -shē\ adj or adv [L, at first view] 1 : based on immediate impression : APPARENT 2 : SELF-EVIDENT

pri·mal \'prī-məl\ adj 1 : ORIGINAL, PRIMITIVE 2 : first in importance

pri·mar·i·ly \prī-'mer-ə-lē\ adv 1 : FUNDAMENTALLY 2 : ORIGINALLY

¹pri·ma·ry \'prī-ˌmer-ē, -mə-rē\ adj 1 : first in order of time or development; also : PREPARATORY 2 : of first rank or importance; also : FUNDAMENTAL 3 : not derived from or dependent on something else (~ sources)

²pri·ma·ry n, pl -ries : a preliminary election in which voters nominate or express a preference among candidates usu. of their own party

primary color n : any of a set of colors from which all other colors may be derived

primary school n : a school usu. including grades 1-3 and sometimes kindergarten 2 : ELEMENTARY SCHOOL

pri·mate \'prī-ˌmāt or esp for 1 -mət\ n 1 often cap : the highest-ranking bishop of a province or nation 2 : any of an order of mammals including humans, apes, and monkeys

¹prime \'prīm\ n 1 : the earliest stage of something; esp : SPRINGTIME 2 : the most active, thriving, or successful stage or period (as of one's life) 3 : the best individual; also : the best part of something 4 : any integer other than 0, +1, or -1 that is not divisible without remainder by any integer except +1, -1, and plus or minus itself; esp : any such integer that is positive

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on September 25, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
> John G. Day, Esquire [jday@ashby-geddes.com]
> Lauren E. Maguire, Esquire [lmaguire@ashby-geddes.com]
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on September 25, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail*
>
> David T. Pritikin, Esquire [dpritikin@sidley.com]
> William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
> Russell E. Cass, Esquire [rcass@sidley.com]
> Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
> SIDLEY AUSTIN LLP
> One  South Dearborn
> Chicago, IL 60603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*

_____

Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
Karen E. Keller (No. 4489) [kkeller@ycst.com]
Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
*Attorneys for Plaintiffs Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*