hydroxyethylmethacrylate, vinylalcohol, ethylene-vinylacetate . . ." The substitution of

one known element (any of the polymers of Dayton) for another (a lactone-based

polymer, lactone based-copolymer, polyanhydride, ethylene-vinylacetate or

poly(hydroxyl) ethylmethylmethacrylate of Kaplan) would have been obvious to one of

ordinary skill in the art at the time of the invention since the substitution of the polymer

disclosed by Dayton with that of Kaplan would have yielded predictable results, namely,

delivery of a drug to the vascular system and would merely be a substitution of one

known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

Accordingly, this rejection of claims 11-13, 19, 20, 53-55 and 62 based on

Dayton 722 and Skolnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or

Nelson 790, and Kaplan 348 was proposed by the third party requester in the request

for reexamination and is being adopted essentially as proposed in the request.


### Ground # 73.

The request submits that claims 11, 12, 14, 53, 54 and 56 are unpatentable
under 35 U.S.C. § 103(a) as being obvious over Dayton 075 in view of Skotnicki
579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied
to claims 1 and 40 above, and further in view of Dinh 227.

Claims 11, 12, 14, 53, 54 and 56 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Dayton 075 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in

view of Dinh 227.  Dayton does not disclose that the polymer may be a lactone-base

polyester, a lactone based copolymer or polyaminoacid.  Dinh discloses that the

Application/Control Number: 95/001,097                                    Page 152
Art Unit: 3993

polymer may comprise lactone-based polymers and copolymers (poly(Lactic acid) and

poly(lactide-co-glycolide)) (column 7, lines 46-47) or polyamino acids (proteins and

peptides, page 3, line18). The substitution of one known element (any of the polymers

of Dayton) for another (a lactone-based polyester, lactone based-copolymer or

polyaminoacid of Dinh) would have been obvious to one of ordinary skill in the art at the

time of the invention since the substitution of the polymer disclosed by Dayton with that

of Dinh would have yielded predictable results, namely, delivery of a drug to the

vascular system and would merely be a substitution of one known element for another.

*KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 11, 12, 14, 53, 54 and 56 based on Dayton

722 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson

790, and Dinh 227 was proposed by the third party requester in the request for

reexamination and is <u>being adopted</u> essentially as proposed in the request.


## Ground # 74.

The request submits that claims 18, 19, 60 and 61 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Dayton 075 in view of Skotnicki 579,
Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to
claims 1 and 40 above, and further in view of Ding 313.

Claims 18, 19, 60 and 61 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Dayton 075 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in

view of Ding 313. Dayton does not disclose that the polymer may comprise

polydimethylsiloxane or poly(ethylene)vinylacetate. Ding discloses that it is known to

Application/Control Number: 95/001,097                    Page 153
Art Unit: 3993

use polydimethylsiloxane or poly(ethylene)vinylacetate as the coating on a drug delivery stent. See column 4, lines 9-10, "[f]or example, silicone or polysiloxane materials (such as polydimethylsiloxane) have been used successfully" and lines 57-58 "ethylene vinyl acetate copolymers". The substitution of one known element (any of the polymers of Dayton) for another (polydimethylsiloxane or poly(ethylene)vinylacetate of Ding) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymers disclosed by Dayton with that of Ding would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 18, 19, 60 and 61 based on Dayton 722 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, and Ding 313 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

## Tuch Patent Proposed Obviousness Combinations.

### Ground # 75.

The request submits that claims 1-2, 5-17, 19-22, 24, 25, 28, 30, 32, 40-41, 44, 47-59, 61-64, 66, 67, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Tuch 411 in view of Morris 781 or Mitchell 711.

Claims 1-2, 5-17, 19-22, 24, 25, 26/1, 26/2, 26/5-17, 26/19-22, 26/24, 26/25, 30/1, 30/2, 30/5-17, 30/19-22, 30/24, 30/25, 32/1, 32/2, 32/5-17, 32/19-22, 32/24, 32/25, 40-41, 44, 47-59, 61-64, 66-67, 70/40, 70/41, 70/44, 70/47-59, 70/61-64, 70/66, 70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61-64, 74/66 and 74/67 are rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch 411 in view of Morris 781 or Mitchell 711.

*Regarding claims 1 and 40*, Tuch teaches an intravascular stent having a coating thereon.  The coating may comprise a polymer and a therapeutic substance (column 2, lines 50-51) to prevent restenosis (see Background of the Invention).  Tuch does not disclose that the therapeutic substance is rapamycin or a macrocyclic lactone analog thereof but states, at column 5, last line to column 6, line 2, "could be virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel."

Morris teaches that it is known to use an antiproliferative effective amount rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3, lines 51-64).  Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Mitchell  teaches that it is known to use rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3, lines 24-31).  A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine (column 6, lines 24-28 and column 7, lines 10-15).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Tuch to include rapamycin, in view of the

BSC-SJA-0310

teaching of Morris or Mitchell. All three references teach treating the vessel with

therapeutic agents in order to inhibit or lessen restenosis. Both Morris and Mitchell

disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used

to treat restenosis via a vascular stent. Furthermore, and the combination would have

yielded nothing more than predictable results to one of ordinary skill in the art at the

time of the invention, i.e., one skilled in the art would have recognized that rapamycin

would allow the stent of Tuch to be used as Tuch intended, e.g. to prevent restenosis in

the vascular system.

Regarding claims 2 and 44, Tuch discloses that the stent disclosed by Palmaz in

U.S. Patent No. 4,733,665 may be used. The Palmaz stent comprises a thinned walled

cylinder 71 containing a plurality of struts.

Regarding claims 5, 6, 47 and 48, Tuch discloses that the coating may be applied

to the stent by dipping or by spraying (column 2, lines 50-53).

Regarding claim 7, Tuch discloses: "[t]he ratio of therapeutic substance to

polymer in the solution will depend on the efficacy of the polymer in securing the

therapeutic substance onto the stent and the rate at which the coating is to release the

therapeutic substance . . . A wide ratio of therapeutic substance to polymer could

therefore be appropriate and could range from about 10:1 to about 1:100 (column 5,

lines 63-65). It would have been obvious to one having ordinary skill in the art at the

time the invention was made to provide the rapamycin in the coating at a weight

percentage of about 30% or a weight ratio of drug to polymeric carrier of about 3:7,

since it has been held that discovering an optimum value of a result effective variable

involves only routine skill in the art. *In re Boesch*, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claims 8 and 9,* Tuch discloses "[t]he polymer may either be a biostable or bioabsorbable polymer" (column 5, lines 17-18).

*As to claims 10-17, 19-22, 24, 25, 53-59, 61-64, 66 and 67,* Tuch discloses that the polymer may comprise polycaprolactone, poly(lactide-co-glycolide) (column 4, line 24), polyanhydride (column 5, line 26), poly(amino acids) (column 5, line 29), polysaccharide, e.g. cellulose, starch (column 5, line 33), polyphosphazenes (column 5, line 32), copoly(ether-esters) (column 5, line 30-31), vinyl homopolymers and copolymers (claim 7), polyvinyl acetate, copolymers of vinyl monomers (column 5, line 45), ethylene-methyl methacrylate copolymers (column 5, lines 46-47), an acrylate based polymer, e.g. cyanoacrylates (column 5, line 29), ethylene-methyl methacrylate copolymers (column 5, lines 46-47), cellulose acetate, cellulose butyrate, cellulose acetate butyrate etc (column 5, lines 51-52), and polyvinylidene fluoride (column 5, line 42).

*Regarding claims 28/1, 28/2, 28/5-17, 28/19-22, 28/24, 28/25, 30/1, 30/2, 30/5-17, 30/19-22, 30/24, 30/25, 70/40, 70/41, 70/44, 70/47-59, 70/61-64, 70/66, 70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61-64, 74/66 and 74/67,* Tuch discloses that the drug may be released at a controlled rate for a period of days. "[T]he rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or biostable polymer and by the ratio of drug to polymer in the solution" (column 3, lines 5-7 and Figure 1). It would have been obvious to one having ordinary skill in the art at the

Application/Control Number: 95/001,097                                    Page 157
Art Unit: 3993

time the invention was made to formulate the coating of Tuch as modified by Morris to

release the rapamycin for a period of 14 days or several weeks as it is known that cell

proliferation occurs in the first two weeks after injury to the arterial smooth muscle cells,

and since it has been held that discovering an optimum value of a result effective

variable involves only routine skill in the art.  In re Boesch, 617 F.2d 272, 205 USPQ

215 (CCPA 1980).

As to claims 32/1, 32/2, 32/5-17, 32/19-22, 32/24, 32/25,  both Tuch and Morris

disclose that the drug is present a therapeutically beneficial amount to inhibit neointimal

proliferation (see Tuch, column 2, lines 13-15; Morris, abstract).

Regarding claim 41, Tuch discloses that the polymeric carrier and drug are

mixed together (abstract).

Accordingly, this rejection of claims 1-2, 5-17, 19-22, 24, 25, 28/1, 28/2, 28/5-17,

28/19-22, 28/24, 28/25, 30/1, 30/2, 30/5-17, 30/19-22, 30/24, 30/25, 32/1, 32/2, 32/5-17,

32/19-22, 32/24, 32/25, 40-41, 44, 47-59, 61-64, 66-67, 70/40, 70/41, 70/44, 70/47-59,

70/61-64, 70/66, 70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61-64, 74/66 and 74/67

based on Tuch 411 in view of Morris 781 or Mitchell 711 was proposed by the third

party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Furthermore, claims 28/3, 28/4, 28/18, 28/23, 28/26, 30/3, 30/4, 30/18, 30/23,

30/26, 32/3, 32/4, 32/18, 32/23, 32/26, 70/42, 70/43, 70/45, 70/46, 70/60, 70/65, 70/68,

74/42, 74/43, 74/45, 74/46, 74/60 74/65 and 74/68 depend upon claims that are not

rejected with the combination of Tuch and Morris or Mitchell 711.  Accordingly, the

BSC-SJA-0313

Application/Control Number: 95/001,097                         Page 158
Art Unit: 3993

rejection of these claims based on Tuch 411 and Morris 781 or Mitchell 711 is <u>not</u>

<u>adopted</u> essentially as proposed in the request.


### Ground #76.

The request submits that claims 3, 4, 43, 45, and 46 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Tuch 411 in view of Morris 781 or
Mitchell 711 as applied to claims 1 and 40 above, and further in view of Ragheb
070.

Claims 3, 4, 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Tuch 411 in view of Morris 781 or Mitchell 711 as applied to claims 2

and  above, and further in view of Ragheb 070.

*Regarding claims 3 and 45*, the stent of Tuch as modified by Morris, set forth

above, does not include a channel formed in at least one strut. Ragheb shows a stent

10 having a coating thereon. The stent is formed of struts 14 having channels 28'

formed therein. Ragheb discloses that "[t]he wells 28' may also be in the form of slots

or grooves in the surface of the base material 14 of the medical device. This aspect of

the invention provides the advantage of better controlling the total amount of the

bioactive material 18 to be released as well as the rate at which it is released." (column

16, lines 48-51). It would have been obvious to one of ordinary skill in the art at the time

the invention was made to modify the stent of Tuch as modified by Morris with channels

located in the struts, as taught by Ragheb, in order to control the amount and rate of

release of rapamycin. *Regarding claims 4 and 46*, Figure 10B of Ragheb shows a

rectangular channel with a close perimeter and an open top. The channel is smaller in

all dimensions than the strut.

Application/Control Number: 95/001,097                          Page 159
Art Unit: 3993

*Regarding claim 43,* Tuch and Morris or Mitchell 711 fails to disclose that the

drug is entrapped on the surface of the stent by the polymeric carrier.  Ragheb

discloses that the drug 18 is entrapped by a polymeric layer 20 which controls the

release of the drug.  Ragheb discloses "any degradation of the bioactive material which

might otherwise occur by other polymer coating techniques is avoided" (column 19,

lines 51-53).  Thus, the manner of enhancing a particular device (stent with drug

delivery capabilities) was made part of the ordinary capabilities of one skilled in the art

based upon the teaching of such improvement in Ragheb.  Accordingly, one of ordinary

skill in the art would have been capable of applying this known "improvement" technique

in the same manner to the stent of Tuch and the results would have been predictable to

one of ordinary skill in the art, namely, one skilled in the art would have readily

recognized that the entrapment system of Ragheb would reduce the degradation of the

drug as might occur with the polymer coating technique of Tuch.

Accordingly, this rejection of claims 3, 4, 43, 45, and 46 based on Tuch 411 in

view of Morris 781 or Mitchell 711 and Ragheb 070 was proposed by the third party

requester in the request for reexamination is and being adopted essentially as proposed

in the request.


## Ground # 77.

The request submits that claim 42[2] is unpatentable under 35 U.S.C. § 103(a)
as being obvious over Tuch 411 and Morris 781 or Mitchell 711 as applied to claim
40 above, and further in view of Sahatjian 121.

---

[2] See footnote 1.

Application/Control Number: 95/001,097                                Page 160
Art Unit: 3993

Claim 42 is rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch

411 and Morris 781 or Mitchell 711 as applied to claim 40 above, and further in view of

Sahatjian 121. The coating of Tuch comprises a mixture of polymer and a drug but fails

to disclose a coating wherein the polymer is bound to the drug. Sahatjian discloses a

coating that is delivered to the vascular system to prevent restenosis. The coating

comprises a polymer which is bound to a drug. The substitution of one known element

(coating of Tuch) for another (coating of Sahatjian) would have been obvious to one of

ordinary skill in the art at the time of the invention since the substitution of the coating

disclosed by Tuch with that of Sahatjian would have yielded predictable results, namely,

delivery of a drug to the vascular system and would merely be a substitution of one

known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

Accordingly, this rejection of claim 42 based on Tuch 411 and Morris 781 or

Mitchell 711 and Sahatjian 121 was proposed by the third party requester in the request

for reexamination and is being adopted essentially as proposed in the request.

### Ground # 78.

The request submits that claims 18 and 60 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Tuch 411 and Morris 781 or Mitchell 711 as
applied to claims 1 and 40 above, and further in view of Ding 313.

Claims 18 and 60 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Tuch 411 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and

further in view of Ding 313. Tuch does not disclose that the polymer may comprise

polydimethylsiloxane. Ding discloses that it is known to use polydimethylsiloxane as the

Application/Control Number: 95/001,097                               Page 161
Art Unit: 3993

coating on a drug delivery stent. See column 4, lines 9-10, "[f]or example, silicone or

polysiloxane materials (such as polydimethylsiloxane) have been used successfully."

The substitution of one known element (any of the polymers of Tuch) for another

(polydimethylsiloxane of Ding) would have been obvious to one of ordinary skill in the

art at the time of the invention since the substitution of the polymer disclosed by Tuch

with that of Ding would have yielded predictable results, namely, delivery of a drug to

the vascular system and would merely be a substitution of one known element for

another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 18 and 60 based on Tuch 411 and Morris

781 or Mitchell 711 and Ding 313 was proposed by the third party requester in the

request for reexamination and is being adopted essentially as proposed in the request.



### Ground #79.

**The request submits that claims 23, 26, 65, and 68 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Tuch 411 and Morris 781 or Mitchell 711
as applied to claims 1 and 40 above, and further in view of Helmus 724.**

Claims 23, 26, 65, and 68 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Tuch 411 and Morris 781 or Mitchell 711 as applied to claims 1 and

40 above, and further in view of Helmus 724.  Tuch does not disclose that the polymer

may comprise polyvinyl pyrrolidone or polytetrafluoroethylene.  Helmus discloses that

polyvinyl pyrrolidone or polytetrafluoroethylene may be used as the coating on a drug

delivery stent. See page 3, lines 7-14 and page 3, line 34 to page 4, line 1.  The

substitution of one known element (any of the polymers of Tuch) for another (polyvinyl

Application/Control Number: 95/001,097          Page 162
Art Unit: 3993

pyrrolidone or polytetrafluoroethylene of Helmus) would have been obvious to one of

ordinary skill in the art at the time of the invention since the substitution of the polymer

disclosed by Tuch with that of Helmus would have yielded predictable results, namely,

delivery of a drug to the vascular system and would merely be a substitution of one

known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

       Accordingly, this rejection of claims 23, 26, 65, and 68 based on Tuch 411 and

Morris 781 or Mitchell 711 and Helmus 724 was proposed by the third party requester in

the request for reexamination is <u>being adopted</u> essentially as proposed in the request.


### Ground # 80.

**The request submits that claims 26 and 68 are unpatentable under 35 U.S.C. § 103(a) as being obvious over obvious Tuch 411 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Dayton 075.**

       Claims 26 and 68 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Tuch 411 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and

further in view of Dayton 075. Tuch does not disclose that the polymer may comprise

polytetrafluoroethylene. Dayton discloses that polytetrafluoroethylene may be used as

the coating on a drug delivery stent. See column 4, lines 1-7-11. The substitution of one

known element (any of the polymers of Tuch) for another (polytetrafluoroethylene of

Dayton) would have been obvious to one of ordinary skill in the art at the time of the

invention since the substitution of the polymer disclosed by Tuch with that of Dayton

would have yielded predictable results, namely, delivery of a drug to the vascular

system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 26 and 68 based on Tuch 411 and Morris 781 or Mitchell 711 and Dayton 075 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.


### Ground # 81.

**The request submits that claims 20 and 62 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Tuch 411 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Kaplan 348.**

Claims 20 and 62 are rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch 411 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Kaplan 348. Tuch does not disclose that the polymer may comprise poly(hydroxyl)ethylmethylmethacrylate. Kaplan discloses that poly(hydroxyl) ethylmethylmethacrylate may be used as the coating on a drug delivery stent. See column 6, lines 60-61, "[o]ther acceptable polymers may contain monomers of hydroxyethylmethacrylate . . ." The substitution of one known element (any of the polymers of Tuch) for another (poly(hydroxyl) ethylmethylmethacrylate of Kaplan) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Tuch with that of Kaplan would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Application/Control Number: 95/001,097                                    Page 164
Art Unit: 3993

Accordingly, this rejection of claims 20 and 62 based on Tuch 411 and Morris

781 or Mitchell 711 and Kaplan 348 was proposed by the third party requester in the

request for reexamination and is being adopted essentially as proposed in the request.


### Ground # 82.

The request submits that claims 1-2, 5-17, 19-22, 24, 25, 27-41, 44, 47-59, 61-
64, 66-67, and 69-77 are unpatentable under 35 U.S.C. § 103(a) as being obvious
over Tuch 411 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718,
Skotnicki 730 or Nelson 790.

Claims 1-2, 5-17, 19, 21-22, 24-25, 27, 27/1, 27/2, 27/5-17, 27/19, 27/21, 27/22,

27/24, 27/25, 28/1, 28/2, 28/5-17, 28/19, 28/21, 28/22, 28/24, 28/25, 29/28/1, 29/28/2,

29/28/5-17, 29/28/19, 29/28/21, 29/28/22, 29/28/24, 29/28/25, 30/1, 30/2, 30/5-17,

30/19, 30/21, 30/22, 30/24, 30/25, 31/30/1, 31/30/2, 31/30/5-17, 31/30/19, 31/30/21,

31/30/22, 31/30/24, 31/30/25, 32/1, 32/2, 32/5-17, 32/19, 32/21, 32/22, 32/24, 32/25,

33/32/1, 33/32/2, 33/32/5-17, 33/32/19, 33/32/21, 33/32/22, 33/32/24, 33/32/25,

34/33/32/1, 34/33/32/2, 34/33/32/5-17, 34/33/32/19, 34/33/32/21, 34/33/32/22,

34/33/32/24, 34/33/32/25, 35/34/33/32/1, 35/34/33/32/2, 35/34/33/32/5-17,

35/34/33/32/19, 35/34/33/32/21, 35/34/33/32/22, 35/34/33/32/24, 35/34/33/32/25,

36/35/34/33/32/1, 36/35/34/33/32/2, 36/35/34/33/32/5-17, 36/35/34/33/32/19,

36/35/34/33/32/21, 36/35/34/33/32/22, 36/35/34/33/32/24, 36/35/34/33/32/25,

37/33/32/1, 37/33/32/2, 37/33/32/5-17, 37/33/32/19, 37/33/32/21, 37/33/32/22,

37/33/32/24, 37/33/32/25, 38/37/33/32/1, 38/37/33/32/2, 38/37/33/32/5-17,

38/37/33/32/19, 38/37/33/32/21, 38/37/33/32/22, 38/37/33/32/24, 38/37/33/32/25,

39/38/37/33/32/1, 39/38/37/33/32/2, 39/38/37/33/32/5-17, 39/38/37/33/32/19,

39/38/37/33/32/21, 39/38/37/33/32/22, 39/38/37/33/32/24, 39/38/37/33/32/25, 40, 41,

44, 47-59, 61-64, 66, 67, 69/40, 69/41, 69/44, 69/47-59, 69/61-64, 69/66, 69/67, 70/40,

70/41, 70/44, 70/47-59, 70/61-64, 70/66, 70/67, 71/70/40, 71/70/41, 71/70/44, 71/70/47-

59, 71/70/61-64, 71/70/66, 71/70/67, 72/71/70/40, 72/71/70/41, 72/71/70/44,

72/71/70/47-59, 72/71/70/61-64, 72/71/70/66, 72/71/70/67, 73/72/71/70/40,

73/72/71/70/41, 73/72/71/70/44, 73/72/71/70/47-59, 73/72/71/70/61-64, 73/72/71/70/66,

73/72/71/70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61-64, 74/66, 74/67, 75/74/40,

75/74/41, 75/74/44, 75/74/47-59, 75/74/61-64, 75/74/66, 75/74/67, 76/75/74/40,

76/75/74/41, 76/75/74/44, 76/75/74/47-59, 76/75/74/61-64, 76/75/74/66, and

76/75/74/67, 77/76/75/74/40, 77/76/75/74/41, 77/76/75/74/44, 77/76/75/74/47-59,

77/76/75/74/61-64, 77/76/75/74/66, and 77/76/75/74/67 are rejected under 35 U.S.C.

103(a) as being unpatentable over Tuch 411 in view of Skotnicki 57 , Russo 977, Failli

145, Skotnicki 718, Skotnicki 730 or Nelson 790.

Regarding claims 1, 27/1, 27/2, 27/5-17, 27/19-22, 27/24, 27/25, 29/28/1, 29/28/2,

29/28/5-17, 29/28/19-22, 29/28/24, 29/28/25, 31/30/1, 31/30/2, 31/30/5-17, 31/30/19-22,

31/30/24, 31/30/25, 33/32/1, 33/32/2, 33/32/5-17, 33/32/19, 33/32/21, 33/32/22,

33/32/24, 33/32/25, 40, 69/40, 69/41, 69/44, 69/47-59, 69/61-64, 69/66, 69/67,

71/70/40, 71/70/41, 71/70/44, 71/70/47-59, 71/70/61-64, 71/70/66, 71/70/67, 75/74/40,

75/74/41, 75/74/44, 75/74/47-59, 75/74/61-64, 75/74/66 and 75/74/67,  Tuch teaches an

intravascular stent having a coating thereon.   The coating may comprise a polymer and

a therapeutic substance (column 2, lines 50-51) to prevent restenosis (see Background

of the invention).   Tuch does not disclose that the therapeutic substance is rapamycin or

BSC-SJA-0321

a macrocyclic lactone analog thereof but states, at column 5, last line to column 6, line
2, "could be virtually any therapeutic substance which possesses desirable therapeutic
characteristics for application to a blood vessel."

Skotnicki 579 teaches that it is known to use rapamycin and macrocyclic lactone
derivatives of rapamycin (abstract) to prevent restenosis or cell proliferation (column 9,
lines 1-11). Skotnicki 579 further discloses that the rapamycin derivatives may be
encapsulated in a polymer carrier for delivery (column 9, lines 34-38). The derivative
compounds have similar profile activity to rapamycin, exhibit antiproliferative activities
and are useful in treating restenosis.

Russo teaches that an analog of rapamycin, 21-norrapamycin, to prevent
restenosis or cell proliferation (abstract, column 1, lines 6-12, 39-46 and column 7, lines
10-16). The compound may be administered with a carrier that could include a
reservoir matrix (column 4, line 67 through column 5, line 4).  Russo discloses that
polyvinylpyrrolidine may be used as a carrier (column 4, lines 4-20).

Failli teaches rapamycin 42-oximes and hydroxylamines are to prevent
restenosis or cell proliferation (column 1, lines 9-15, 64-66 and column 6, lines 36-48).
Failli discloses that the compounds may be delivered via an encapsulating material or
matrix including polyvinylpyrrolidine (column 7, lines 13-14 and column 8, line 3-7).

Skotnicki 718 teaches rapamycin hydroxyesters useable to prevent restenosis or
cell proliferation (abstract, column 1, lines 6-12, 40-51, 65-68 and column 6, lines 46-
59). The derivatives may be used to treat hyperproliferative disease such as restenosis

BSC-SJA-0322

following angioplasty procedures. The compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 7, lines 34-38 and column 8, line 19-24).

Skotnicki 730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof that are useful as anti-inflammatories and antiproliferatives (column 1, lines 65-68). The derivatives may be used to treat hyperproliferative disease such as restenosis (column 7, lines 10-16). Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 7, lines 50-54 and column 8, lines 35-40).

Nelson teaches 27-hydroxyrapamycin and derivatives of rapamycin to prevent restenosis or cell proliferation (abstract, column 1, lines 11-17, lines 44-51 and column 15, lines 41-54). The derivatives are useful as anti-inflammatories and antiproliferatives (column 2, lines 43-46). Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 16, lines 9-12 and lines 24-28 and column 17, lines 11-15).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Tuch to include rapamycin or macrocyclic lactone derivatives of rapamycin, in view of the teachings of Skotnicki 579 , Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, that rapamycin and macrocyclic lactone derivatives of rapamycin have superior anti-inflammatory and anti-proliferative properties. All of these references teach treating the vessel with therapeutic agents in order to inhibit or lessen restenosis. These references disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis. Each

Case 1:07-cv-00333-SLR   Document 298-2   Filed 09/30/09   Page 18 of 153

Application/Control Number: 95/001,097                    Page 168
Art Unit: 3993

disclose that the agent may be contained in a polymer carrier/matrix. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that rapamycin would allow the stent of Tuch to be used as Tuch intended, e.g. to prevent restenosis in the vascular system.

Regarding claims 2 and 44, Tuch discloses that the stent disclosed by Palmaz in U.S. Patent No. 4,733,665 may be used. The Palmaz stent comprises a thinned walled cylinder 71 containing a plurality of struts.

Regarding claims 5, 6, 47 and 48, Tuch discloses that the coating may be applied to the stent by dipping or by spraying (column 2, lines 50-53).

Regarding claim 7 and 49, Tuch discloses: "[t]he ratio of therapeutic substance to polymer in the solution will depend on the efficacy of the polymer in securing the therapeutic substance onto the stent and the rate at which the coating is to release the therapeutic substance . . . A wide ratio of therapeutic substance to polymer could therefore be appropriate and could range from about 10:1 to about 1:100 (column 5, lines 63-65). It would have been obvious to one having ordinary skill in the art at the time the invention was made to provide the rapamycin in the coating at a weight percentage of about 30% or a weight ratio of drug to polymeric carrier of about 3:7, since it has been held that discovering an optimum value of a result effective variable involves only routine skill in the art. In re Boesch, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

BSC-SJA-0324

*Regarding claims 8 and 9*, Tuch discloses "[t]he polymer may either be a biostable or bioabsorbable polymer" (column 5, lines 17-18).

*As to claims* 10-17, 19-22, 24, 25, 35/34/33/32/1, 35/34/33/32/2, 35/34/33/32/5-17, 35/34/33/32/19-22, 35/34/33/32/24, 35/34/33/32/25, 36/35/34/33/32/1, 36/35/34/33/32/2, 36/35/34/33/32/5-17, 36/35/34/33/32/19-22, 36/35/34/33/32/24, 36/35/34/33/32/25, 38/37/33/32/1, 38/37/33/32/2, 38/37/33/32/5-17, 38/37/33/32/19-22, 38/37/33/32/24, 38/37/33/32/25, 39/38/37/33/32/1, 39/38/37/33/32/2, 39/38/37/33/32/5-17, 39/38/37/33/32/19-22, 39/38/37/33/32/24, 39/38/37/33/32/25, 52, 53-59, 61-64, 66, 67, 72/71/70/40, 72/71/70/41, 72/71/70/44, 72/71/70/47-59, 72/71/70/61-64, 72/71/70/66, 72/71/70/67, 73/72/71/70/40, 73/72/71/70/41, 73/72/71/70/44, 73/72/71/70/47-59, 73/72/71/70/61-64, 73/72/71/70/66, 73/72/71/70/67, 76/75/74/40, 76/75/74/41, 76/75/74/44, 76/75/74/47-59, 76/75/74/61-64, 76/75/74/66, and 76/75/74/67, 77/76/75/74/40, 77/76/75/74/41, 77/76/75/74/44, 77/76/75/74/47-59, 77/76/75/74/61-64, 77/76/75/74/66, and 77/76/75/74/67, Tuch discloses that the polymer may comprise polycaprolactone, poly(lactide-co-glycolide) (column 4, line 24), polyanhydride (column 5, line 26), poly(amino acids) (column 5, line 29), polysaccharide, e.g. cellulose, starch (column 5, line 33), polyphosphazenes (column 5, line 32), copoly(ether-esters) (column 5, line 30-31), vinyl homopolymers and copolymers (claim 7), polyvinyl acetate, copolymers of vinyl monomers (column 5, line 45), ethylene-methyl methacrylate copolymers (column 5, lines 46-47), an acrylate based polymer, e.g. cyanoacrylates (column 5, line 29), ethylene-methyl methacrylate copolymers (column 5, lines 46-47), cellulose acetate, cellulose butyrate, cellulose

acetate butyrate etc (column 5, lines 51-52), and polyvinylidene fluoride (column 5, line 42).

Regarding claims 28/1, 28/2, 28/5-17, 28/19-22, 28/24, 28/25, 30/1, 30/2, 30/5-17, 30/19-22, 30/24, 30/25, 34/33/32/1, 34/33/32/2, 34/33/32/5-17, 34/33/32/19-22, 34/33/32/24, 334/33/32/25, 70/40, 70/41, 70/44, 70/47-59, 70/61-64, 70/66, 70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61-64, 74/66 and 74/67, Tuch discloses that the drug may be released at a controlled rate for a period of days. "[T]he rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or biostable polymer and by the ratio of drug to polymer in the solution" (column 3, lines 5-7 and Figure 1). It would have been obvious to one having ordinary skill in the art at the time the invention was made to formulate the coating of Tuch as modified by Skotnicki to release the rapamycin for a period of 14 days or several weeks as it is known that cell proliferation occurs in the first two weeks after injury to the arterial smooth muscle cells, and since it has been held that discovering an optimum value of a result effective variable involves only routine skill in the art. In re Boesch, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

As to claims 32/1, 32/2, 32/5-17, 32/19-22, 32/24, 32/25, Tuch discloses that the drug is present a therapeutically beneficial amount to inhibit neointimal proliferation (see Tuch, column 2, lines 13-15).

Accordingly, this rejection of claims 1-2, 5-17, 19, 21-22, 24-25, 27/1, 27/2, 27/5-17, 27/19, 27/21, 27/22, 27/24, 27/25, 28/1, 28/2, 28/5-17, 28/19, 28/21, 28/22, 28/24, 28/25, 29/28/1, 29/28/2, 29/28/5-17, 29/28/19, 29/28/21, 29/28/22, 29/28/24, 29/28/25,

Application/Control Number: 95/001,097                          Page 171
Art Unit: 3993

30/1, 30/2, 30/5-17, 30/19, 30/ 21, 30/22, 30/24, 30/25, 31/30/1, 31/30/2, 31/30/5-17,

31/30/19, 31/30/21, 31/30/22, 31/30/24, 31/30/25, 32/1, 32/2, 32/5-17, 32/19, 32/21,

32/22, 32/24, 32/25, 33/32/1, 33/32/2, 33/32/5-17, 33/32/19, 33/32/21, 33/32/22,

33/32/24, 33/32/25, 34/33/32/1, 34/33/32/2, 34/33/32/5-17, 34/33/32/19, 34/33/32/21,

34/33/32/22, 34/33/32/24, 34/33/32/25, 35/34/33/32/1, 35/34/33/32/2, 35/34/33/32/5-17,

35/34/33/32/19, 35/34/33/32/21, 35/34/33/32/22, 35/34/33/32/24, 35/34/33/32/25,

36/35/34/33/32/1, 36/35/34/33/32/2, 36/35/34/33/32/5-17, 36/35/34/33/32/19,

36/35/34/33/32/21, 36/35/34/33/32/22, 36/35/34/33/32/24, 36/35/34/33/32/25,

37/33/32/1, 37/33/32/2, 37/33/32/5-17, 37/33/32/19, 37/33/32/21, 37/33/32/22,

37/33/32/24, 37/33/32/25, 38/37/33/32/1, 38/37/33/32/2, 38/37/33/32/5-17,

38/37/33/32/19, 38/37/33/32/21, 38/37/33/32/22, 38/37/33/32/24, 38/37/33/32/25,

39/38/37/33/32/1, 39/38/37/33/32/2, 39/38/37/33/32/5-17, 39/38/37/33/32/19,

39/38/37/33/32/21, 39/38/37/33/32/22, 39/38/37/33/32/24, 39/38/37/33/32/25, 40, 41,

44, 47-59, 61, 63-64, 66, 67, 69/40, 69/41, 69/44, 69/47-59, 69/61, 69/63, 69/64, 69/66,

69/67, 70/40, 70/41, 70/44, 70/47-59, 70/61, 70/63, 70/64, 70/66, 70/67, 71/70/40,

71/70/41, 71/70/44, 71/70/47-59, 71/70/61, 71/70/63, 71/70/64, 71/70/66, 71/70/67,

72/71/70/40, 72/71/70/41, 72/71/70/44, 72/71/70/47-59, 72/71/70/61, 72/71/70/63,

72/71/70/64, 72/71/70/66, 72/71/70/67, 73/72/71/70/40, 73/72/71/70/41, 73/72/71/70/44,

73/72/71/70/47-59, 73/72/71/70/61, 73/72/71/70/63, 73/72/71/70/64, 73/72/71/70/66,

73/72/71/70/67,74/40, 74/41, 74/44, 74/47-59, 74/61, 74/63, 74/64, 74/66, 74/67,

75/74/40, 75/74/41, 75/74/44, 75/74/47-59, 75/74/61, 75/74/63, 75/74/64, 75/74/66,

75/74/67, 76/75/74/40, 76/75/74/41, 76/75/74/44, 78/75/74/47-59, 76/75/74/61,

BSC-SJA-0327

76/75/74/63, 76/75/74/64, 76/75/74/66, and 76/75/74/67, 77/76/75/74/40,

77/76/75/74/41, 77/76/75/74/44, 77/76/75/74/47-59, 77/76/75/74/61, 77/76/75/74/63,

77/76/75/74/64, 77/76/75/74/66, and 77/76/75/74/67, based on Tuch 411 in view of

Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, was

proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.

Furthermore, claims 28/3, 28/4, 28/18, 28/23, 28/26, 30/3, 30/4, 30/18, 30/23,

30/26, 31/30/3, 31/30/4, 31/30/18, 31/30/23, 31/30/26, 32/3, 32/4, 32/18, 32/23, 32/26,

33/32/3, 33/32/4, 33/32/18, 33/32/23, 33/32/26, 34/33/32/3, 34/33/32/4, 34/33/32/18,

34/33/32/23, 34/33/32/26, 35/34/33/32/3, 35/34/33/32/4, 35/34/33/32/18,

35/34/33/32/23, 35/34/33/32/26, 36/35/34/33/32/3, 36/35/34/33/32/4, 36/35/34/33/32/18,

36/35/34/33/32/23, 36/35/34/33/32/26, 37/33/32/3, 37/33/32/4, 37/33/32/18,

37/33/32/23, 37/33/32/26, 38/37/33/32/3, 38/37/33/32/4, 38/37/33/32/18,

38/37/33/32/23, 38/37/33/32/26, 39/38/37/33/32/3, 39/38/37/33/32/4, 39/38/37/33/32/18,

39/38/37/33/32/23, 39/38/37/33/32/26, 69/42, 69/43, 69/45, 69/46, 69/60, 69/65, 69/68,

70/42, 70/43, 70/45, 70/46, 70/60, 70/65, 70/68, 71/70/42, 71/70/43, 71/70/45, 71/70/46,

71/70/60, 71/70/65, 71/70/68, 72/71/70/42, 72/71/70/43, 72/71/70/45, 72/71/70/46,

72/71/70/60, 72/71/70/62, 72/71/70/68, 73/72/71/70/42, 73/72/71/70/43, 73/72/71/70/45,

73/72/71/70/46, 73/72/71/70/60, 73/72/71/70/65, 73/72/71/70/68, 74/42, 74/43, 74/45,

74/46, 74/60, 74/65, 74/68, 75/74/42, 75/74/43, 75/74/45, 75/74/46, 75/74/60, 75/74/65,

75/74/68, 76/75/74/42, 76/75/74/43, 76/75/74/45, 76/75/74/46, 76/75/74/60,

76/75/74/65, 76/75/74/68, 77/76/75/74/42, 77/76/75/74/43, 77/76/75/74/45,

77/76/75/74/46, 77/76/75/74/60, 77/76/75/74/65 and 77/76/75/74/68 depend upon

claims that are not rejected with the combination of Tuch and Skotnicki, Russo 977,

Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790. Accordingly, the rejection of

these claims based on Tuch 411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790 is <u>not adopted</u> essentially as proposed in the request.

### Ground # 83.

The request submits that claims 3, 4, 43, 45, and 46 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Tuch 411 in view of Skotnicki 579, Russo
977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1
and 40 above, and further in view of Ragheb 070.

Claims 3, 4, 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Tuch 411 in view of Skotnicki 57 , Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790, as applied to claims 2 and  above, and further in view

of Ragheb 070.

*Regarding claims 3 and 45*, the stent of Tuch as modified by Skotnicki 579,

Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, set forth above, does

not include a channel formed in at least one strut. Ragheb shows a stent 10 having a

coating thereon. The stent is formed of struts 14 having channels 28' formed therein.

Ragheb discloses that "[t]he wells 28' may also be in the form of slots or grooves in the

surface of the base material 14 of the medical device. This aspect of the invention

provides the advantage of better controlling the total amount of the bioactive material 18

to be released as well as the rate at which it is released." (column 16, lines 48-51). It

would have been obvious to one of ordinary skill in the art at the time the invention was

made to modify the stent of Tuch as modified by Skotnicki 579, Russo 977, Failli 145,

Skotnicki 718, Skotnicki 730 or Nelson 790, with channels located in the struts, as

taught by Ragheb, in order to control the amount and rate of release of rapamycin.

  *Regarding claims 4 and 46,* Figure 10B of Ragheb shows a rectangular channel

with a close perimeter and an open top. The channel is smaller in all dimensions than

the strut.

  *Regarding claim 43,* Tuch and Skotnicki 579, Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790, fails to disclose that the drug is entrapped on the

surface of the stent by the polymeric carrier.  Ragheb discloses that the drug 18 is

entrapped by a polymeric layer 20 which controls the release of the drug.  Ragheb

discloses "any degradation of the bioactive material which might otherwise occur by

other polymer coating techniques is avoided" (column 19, lines 51-53).  Thus, the

manner of enhancing a particular device (stent with drug delivery capabilities) was

made part of the ordinary capabilities of one skilled in the art based upon the teaching

of such improvement in Ragheb.  Accordingly, one of ordinary skill in the art would have

been capable of applying this known "improvement" technique in the same manner to

the stent of Tuch and the results would have been predictable to one of ordinary skill in

the art, namely, one skilled in the art would have readily recognized that the entrapment

system of Ragheb would reduce the degradation of the drug as might occur with the

polymer coating technique of Tuch.

  Accordingly, this rejection of claims 3, 4, 43, 45, and 46 based on Tuch 411 in

view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson

790, and Ragheb 070 was proposed by the third party requester in the request for

reexamination is and being adopted essentially as proposed in the request.

### Ground # 84.

The request submits that claim 42 is unpatentable under 35 U.S.C. § 103(a)
as being obvious over Tuch 411 in view of Skotnicki 579, Russo 977, Failli 145,
Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above,
and further in view of Sahatjian 121.

Claim 42 is rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch

411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson

790, as applied to claim 40 above, and further in view of Sahatjian 121. The coating of

Tuch comprises a mixture of polymer and a drug but fails to disclose a coating wherein

the polymer is bound to the drug. Sahatjian discloses a coating that is delivered to the

vascular system to prevent restenosis. The coating comprises a polymer which is

bound to a drug. The substitution of one known element (coating of Tuch) for another

(coating of Sahatjian) would have been obvious to one of ordinary skill in the art at the

time of the invention since the substitution of the coating disclosed by Tuch with that of

Sahatjian would have yielded predictable results, namely, delivery of a drug to the

vascular system and would merely be a substitution of one known element for another.

*KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claim 42 based on Tuch 411 and Skotnicki 579,

Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, and Sahatjian 121

was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.

Application/Control Number: 95/001,097                    Page 176
Art Unit: 3993

### Ground # 85.

The request submits that claims 18 and 60 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Tuch 411 in view of Skotnicki 579, Russo
977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1
and 40 above, and further in view of Ding 313.

Claims 18 and 60 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Tuch 411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or

Nelson 790, as applied to claims 1 and 40 above, and further in view of Ding 313. Tuch

does not disclose that the polymer may comprise polydimethylsiloxane. Ding discloses

that it is known to use polydimethylsiloxane as the coating on a drug delivery stent. See

column 4, lines 9-10, "[f]or example, silicone or polysiloxane materials (such as

polydimethylsiloxane) have been used successfully." The substitution of one known

element (any of the polymers of Tuch) for another (polydimethylsiloxane of Ding) would

have been obvious to one of ordinary skill in the art at the time of the invention since the

substitution of the polymer disclosed by Tuch with that of Ding would have yielded

predictable results, namely, delivery of a drug to the vascular system and would merely

be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82

USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 18 and 60 based on Tuch 411 and Skotnicki

579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, and Ding 313

was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.

### Ground # 86.

The request submits that claims 23, 26, 65 and 68 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Tuch 411 in view of Skotnicki 579, Russo
977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1
and 40 above, and further in view of Helmus 724.

Claims 23, 26, 65, and 68 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Tuch 411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718,

Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in view of

Helmus 724.  Tuch does not disclose that the polymer may comprise polyvinyl

pyrrolidone or polytetrafluoroethylene.  Helmus discloses that polyvinyl pyrrolidone or

polytetrafluoroethylene may be used as the coating on a drug delivery stent. See page

3, lines 7-14 and page 3, line 34 to page 4, line 1.  The substitution of one known

element (any of the polymers of Tuch) for another (polyvinyl pyrrolidone or

polytetrafluoroethylene of Helmus) would have been obvious to one of ordinary skill in

the art at the time of the invention since the substitution of the polymer disclosed by

Tuch with that of Helmus would have yielded predictable results, namely, delivery of a

drug to the vascular system and would merely be a substitution of one known element

for another.  *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 23, 26, 65, and 68 based on Tuch 411 and

Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, and

Helmus 724 was proposed by the third party requester in the request for reexamination

is being adopted essentially as proposed in the request.

### Ground # 87.

The request submits that claims 26 and 68 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Tuch 411 in view of Skotnicki 579, Russo

Application/Control Number: 95/001,097                                    Page 178
Art Unit: 3993

**977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in view of Dayton 075.**

Claims 26 and 68 are rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch 411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in view of Dayton 075. Tuch does not disclose that the polymer may comprise polytetrafluoroethylene. Dayton discloses that polytetrafluoroethylene may be used as the coating on a drug delivery stent. See column 4, lines 1-7-11. The substitution of one known element (any of the polymers of Tuch) for another (polytetrafluoroethylene of Dayton) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Tuch with that of Dayton would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 26 and 68 based on Tuch 411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, and Dayton 075 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

### Ground # 88.

The request submits that claims 20 and 62 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Tuch 411 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in view of Kaplan 348.

Claims 20 and 62 are rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch 411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in view of Kaplan 348. Tuch does not disclose that the polymer may comprise poly(hydroxyl)ethylmethylmethacrylate. Kaplan discloses that poly(hydroxyl) ethylmethylmethacrylate may be used as the coating on a drug delivery stent. See column 6, lines 60-61, "[o]ther acceptable polymers may contain monomers of hydroxyethylmethacrylate . . ." The substitution of one known element (any of the polymers of Tuch) for another (poly(hydroxyl) ethylmethylmethacrylate of Kaplan) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Tuch with that of Kaplan would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 20 and 62 based on Tuch 411 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, and Kaplan 348 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

## Kaplan Patent Proposed Obviousness Combinations.

### Ground # 89.

The request submits that claims 1, 2, 5, 8-13, 19-22, 25, 26, 28, 30, 32, 40, 41, 44, 47, 50-55, 61-64, 67, 68, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view of Morris 781 or Mitchell 711.

Claims 1, 2, 8-13, 19-22, 25, 26, 28/1, 28/2, 28/8-13, 28/19-22, 28/25, 28/26,

30/1, 30/2, 30/8-13, 30/19-22, 30/25, 30/26, 32/1, 32/2, 32/8-13, 32/19-22, 32/25, 32/26,

40, 41, 44, 50-55, 61-64, 67, 68, 70/40, 70/41, 70/44, 70/50-55, 70/61-64, 70/67, 70/68,

74/40, 74/41, 74/44, 74/50-55, 74/61-64, 74/67 and 74/68 are rejected under 35 U.S.C.

103(a) as being unpatentable over Kaplan 348 in view of Morris 781or Mitchell 711.

*Regarding claims 1 and 40*, Kaplan teaches an intravascular stent 2 having a

coating thereon (laminated filaments, Figure 5b and 5c). The coating may comprise a

polymer (column 6, line 25) and a therapeutic substance (column 5, lines 4-10) to

prevent restenosis (abstract and column 5, lines 8-9 and column 8, lines 15-19). A

variety of pharmaceutical and other therapeutic agents may be delivered from the

polymer coating and may include antiproliferative substances for inhibiting smooth

muscle cell proliferation and restenosis. Kaplan does not disclose that the therapeutic

substance is rapamycin or a macrocyclic lactone analog thereof.

Morris teaches that it is known to use an antiproliferative effective amount

rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3,

lines 51-64). Morris further discloses that rapamycin may be encapsulated in a polymer

matrix for delivery (column 3, lines 51-64).

· Mitchell teaches that it is known to use rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3, lines 24-31). A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine (column 6, lines 24-28 and column 7, lines 10-15).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Kaplan to include rapamycin, in view of the teaching of Morris or Mitchell. All three references teach treating the vessel with therapeutic agents in order to inhibit or lessen restenosis. Both Morris and Mitchell disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, and the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that rapamycin would allow the stent of Kaplan to be used as Kaplan intended, e.g. to prevent restenosis in the vascular system.

Regarding claims 2 and 44, Kaplan shows a stent in the form of a thinned walled cylinder containing a plurality of struts 6.

Regarding claims 8, 9, 50 and 51, Kaplan discloses the use of "polymers which are degradable over time" (column 6, lines 25-26). Kaplan also discloses "[a]s an alternative to biodegradable polymers, the present invention can employ filaments of no-degradable materials" (column 7, lines 42-44).

. As to claims 10-13, 19-22, 52-55 and 61-64, Kaplan discloses that the polymer may comprise polycaprolactone (claim 8), polyanhydride (column 6, line 64),

BSC-SJA-0337

Application/Control Number: 95/001,097                                    Page 182
Art Unit: 3993

ethylenevinylacetate (column 6, lines 61-61), monomers of hydroxyethylmentacrylate
(column 6, line 60-61) and methyl methacrylate-ethylene glycol and
dimethylmethacrylate copolymer and ethylene-vinyl acetate copolymer (column 7, lines
47-49).

Regarding claims 25, 26, 67 and 68,  the requests avers, that since Kaplan
incorporates by reference U.S. Patent No. 5,019,090 to Pinchuck, all the features of
Pinchuck are part of Kaplan's invention.  However, Kaplan's incorporation of Pinchuck is
merely to set forth the state of the prior art and does not necessarily mean that the
entire disclosure is part of Kaplan's invention. Accordingly, Kaplan does not disclose
the use of polytetrafluororethylene as a polymer for forming the strands.  However, the
substitution of one known element (any of the polymers of Kaplan) for another (e. g.
polytetrafluororethylene) would have been obvious to one of ordinary skill in the art at
the time of the invention since the substitution of the polymer disclosed by Kaplan with
polytetrafluororethylene would have yielded predictable results, namely, delivery of a
drug to the vascular system and would merely be a substitution of one known element
for another.  KSR Int'l Co. v. Teleflex Inc., 82 USPQ2d 1385, 1396 (2007).

Regarding claims 28/1, 28/2, 28/8-13, 28/19-22, 28/25, 28/26, 30/1, 30/2, 30/8-13,
30/19-22, 30/25, 30/26, 70/40, 70/41, 70/44, 70/50-55, 70/61, 70/61-64, 70/67, 70/68,
74/40, 74/41, 74/44, 74/50-55, 74/61-64, 74/67 and 74/67, Kaplan discloses that the
drug may be released at a controlled rate for a period of four to six months (column 8,
lines 31-37.

*As to claims 32/1, 32/2, 32/8-13, 32/19-22, 32/25, 32/26, and 40,* both Kaplan and Morris disclose that the drug is present a therapeutically beneficial amount to inhibit neointimal proliferation (see Kaplan, column 8, lines 33-35).

*Regarding claim 41,* Kaplan discloses that the polymeric carrier and drug are mixed together (column 7, lines 17-21).

Accordingly, this rejection of claims 1, 2, 8-13, 19-22, 25, 26, 28/1, 28/2, 28/8-13, 28/19-22, 30/1, 30/2, 30/8-13, 30/19-22, 30/25, 30/26, 32/1, 32/2, 32/8-13, 32/19-22, 40, 41, 44, 50-55, 61-64, 67, 68, 70/40, 70/41, 70/44, 70/50-55, 70/61-64, 74/40, 74/41, 74/44, 74/50-55 and 74/61-64, based on Kaplan 348 in view of Morris 781or Mitchell 711 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request and the rejection of claims 28/25, 28/26, 30/25, 30/26, 32/25, 32/26, 70/67, 70/68, 74/67 and 74/68 is adopted with modification.

Additionally, the rejection of claims 5 and 47 based on Kaplan 348 in view of Morris 781or Mitchell 711 is not adopted essentially as proposed in the request. The requests avers, that since Kaplan incorporates by reference U.S. Patent No. 5,053,048 to Pinchuck, all the features of Pinchuck are part of Kaplan's invention. However, Kaplan's incorporation of Pinchuck is merely to set forth the state of the prior art and does not necessarily mean that the entire disclosure is part of Kaplan's invention. In fact, the coating in Kaplan is in the form of a strand which is woven through or laminated on the stent structure which teaches away from applying the coating by dipping the stent into the coating.

BSC-SJA-0339

Application/Control Number: 95/001,097                                    Page 184
Art Unit: 3993

Furthermore, claims 28/3, 28/4, 28/6, 28/7, 28/14-18, 28/23, 28/24, 30/3, 30/4,

30/28/6, 30/28/7, 30/14-18, 30/23, 30/24, 32/3, 32/4, 32/18, 32/20, 32/23, 70/42, 70/43,

70/45, 70/46, 70/56-60, 70/65, 70/66, 74/42, 74/43, 74/45, 74/46, 74/56-60, 74/65 and

74/66 depend upon claims that are not rejected with the combination of Kaplan and

Morris or Mitchell 711.  Accordingly, the rejection of these claims based on Kaplan 348

and Morris 781 or Mitchell 711 is not adopted essentially as proposed in the request.


### Ground #90.

The request submits that claims 3, 4, 43, 45, and 46 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view of Morris 781 or
Mitchell 711 as applied to claims 1 and 40 above, and further in view of Ragheb
070.

Claims 3, 4, 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Kaplan 348 in view of Morris 781 or Mitchell 711 as applied to claims

2 and  above, and further in view of Ragheb 070.

*Regarding claims 3 and 45,* the stent of Kaplan as modified by Morris or Mitchell

711, set forth above, does not include a channel formed in at least one strut.  Ragheb

shows a stent 10 having a coating thereon.  The stent is formed of struts 14 having

channels 28' formed therein.  Ragheb discloses that "[t]he wells 28' may also be in the

form of slots or grooves in the surface of the base material 14 of the medical device.

This aspect of the invention provides the advantage of better controlling the total

amount of the bioactive material 18 to be released as well as the rate at which it is

released." (column 16, lines 48-51).  It would have been obvious to one of ordinary skill

in the art at the time the invention was made to modify the stent of Kaplan as modified
by Morris or Mitchell 711 with channels located in the struts, as taught by Ragheb, in
order to control the amount and rate of release of rapamycin.

*Regarding claims 4 and 46,* Figure 10B of Ragheb shows a rectangular channel
with a close perimeter and an open top. The channel is smaller in all dimensions than
the strut.

*Regarding claim 43,* Kaplan and Morris fails to disclose that the drug is
entrapped on the surface of the stent by the polymeric carrier. Ragheb discloses that
the drug 18 is entrapped by a polymeric layer 20 which controls the release of the drug.
Ragheb discloses "any degradation of the bioactive material which might otherwise
occur by other polymer coating techniques is avoided" (column 19, lines 51-53). Thus,
the manner of enhancing a particular device (stent with drug delivery capabilities) was
made part of the ordinary capabilities of one skilled in the art based upon the teaching
of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have
been capable of applying this known "improvement" technique in the same manner to
the stent of Kaplan and the results would have been predictable to one of ordinary skill
in the art, namely, one skilled in the art would have readily recognized that the
entrapment system of Ragheb would reduce the degradation of the drug as might occur
with the polymer coating technique of Kaplan.

Accordingly, this rejection of claims 3, 4, 43, 45, and 46 based on Kaplan 348 in
view of Morris 781 or Mitchell 711 and Ragheb 070 was proposed by the third party

Application/Control Number: 95/001,097

Art Unit: 3993

Page 186

requester in the request for reexamination is and <u>being adopted</u> essentially as proposed in the request.

## Ground #91.

**The request submits that claim 42 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 and Morris 781 or Mitchell 711 as applied to claim 40 above, and further in view of Sahatjian 121.**

Claim 42 is rejected under 35 U.S.C. 103(a) as being unpatentable over Kaplan 348 and Morris 781 or Mitchell 711 as applied to claim 40 above, and further in view of Sahatjian 121. The coating of Kaplan comprises a mixture of polymer and a drug but fails to disclose a coating wherein the polymer is bound to the drug. Sahatjian discloses a coating that is delivered to the vascular system to prevent restenosis. The coating comprises a polymer which is bound to a drug. The substitution of one known element (coating of Kaplan) for another (coating of Sahatjian) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the coating disclosed by Kaplan with that of Sahatjian would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claim 42 based on Kaplan 348 and Morris 781 or Mitchell 711 and Sahatjian 121 was proposed by the third party requester in the request for reexamination and is <u>being adopted</u> essentially as proposed in the request.

## Ground #92.

**The request submits that claims 6, 7, 14-17, 24, 48, 49, 56-59 and 66 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view**

BSC-SJA-0342

of Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in
view of Berg 650.

Claims 7, 14-17, 24, 49, 56-59 and 66 are rejected under 35 U.S.C. 103(a) as

being unpatentable over Kaplan 348 and Morris 781 or Mitchell 711 as applied to claims

1 and 40 above, and further in view of Berg.

*Regarding claims 7 and 49,* Kaplan states that the strand may "contain an

antiproliferative agent such as methotrexate. The antiproliferative agent will inhibit over-

proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated segment

of the vessel. The antiproliferative containing strand will generally degrade over a period

of four to six months. The physical presence of the stent will also inhibit re-stenosis of

the vessel." (column 8, lines 40-42). Kaplan does not disclose the weight percentage or

the ratio of the bioactive substance in the coating. Berg discloses: "[t]he ratio of

therapeutic substance to polymer in the solution will depend on the efficacy of the

polymer in securing the therapeutic substance onto the stent and the rate at which the

coating is to release the therapeutic substance . . . A wide ratio of therapeutic substance

to polymer could therefore be appropriate and could range from about 10:1 to about

1:100 (column 5, lines 5-18). It would have been obvious to one having ordinary skill in

the art at the time the invention was made to provide the rapamycin in the coating at a

weight percentage of about 30% or weight ratio of drug to polymeric carrier of about 3:7,

since it has been held that discovering an optimum value of a result effective variable

involves only routine skill in the art and particularly since both Berg and Kaplan are

concerned with preventing SMC proliferation and restenosis following PCTA

procedures. *In re Boesch,* 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claims 14-17, 24, 56-59 and 66,* Berg discloses that the polymer may comprise poly(amino acids) (column 4, line 49), polysaccharide, e.g. cellulose, starch (column 4, line 54), polyphosphazenes (column 4, line 52), poly(ether-ester) copolymer (column 4, line 51), copoly(ether-esters) (column 4, line 51), cellulose acetate, cellulose butyrate, cellulose acetate butyrate, etc. (column 5, lines 4-7). The substitution of one known element (any of the polymers of Kaplan 348) for another would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Kaplan 348 with that of Berg would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.,* 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 14-17, 24, 56-59 and 66 based on Kaplan 348 and Morris 781 or Mitchell 711 and Berg 650 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

Furthermore, regarding claims 6 and 48, while Berg discloses that a polymer coating may be applied to a stent by spray coating, the coating in Kaplan is in the form of a strand which is woven through or laminated on the stent structure which teaches away from applying the coating by spraying the stent with the coating. Accordingly, the rejection of claims 6 and 48 based on Kaplan 348 and Morris 781 or Mitchell 711 and Berg 650 is not adopted essentially as proposed in the request.

BSC-SJA-0344

Application/Control Number: 95/001,097            Page 189
Art Unit: 3993

### Ground #93.

The request submits that claims 14, 15, 23, 56, 57 and 65 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Helmus 724.

Claims 14, 15, 23, 56, 57 and 65 are rejected under 35 U.S.C. 103(a) as being unpatentable over Kaplan 348 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Helmus 724. Kaplan does not disclose that the polymer may comprise polyaminoacid, polysaccharide or polyvinyl pyrrolidone. Helmus discloses that polyaminoacid (e.g. proteins and peptides, column 3, line 18), polysaccharide (page 3, line 19) or polyvinyl pyrrolidone (page 3, line 14) may be used as the coating on a drug delivery stent. The substitution of one known element (any of the polymers of Kaplan) for another (polyaminoacid, polysaccharide or polyvinyl pyrrolidone or of Helmus) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Kaplan with that of Helmus would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 14, 15, 23, 56, 57 and 67 based on Kaplan 348 and Morris 781 or Mitchell 711 and Helmus 724 was proposed by the third party requester in the request for reexamination is being adopted essentially as proposed in the request.

Application/Control Number: 95/001,097                                    Page 190
Art Unit: 3993 .

### Ground # 94.

The request submits that claims 6, 15, 48 and 57 are unpatentable under 35
U.S.C. § 103(a) as being obvious over obvious Kaplan 348 and Morris 781 or
Mitchell 711 as applied to claims 1 and 40 above, and further in view of Dayton
075.

Claims 15 and 57 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Kaplan 348 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above,

and further in view of Dayton 075. Kaplan does not disclose that the polymer may

comprise polysaccharide. Dayton discloses that polysaccharide (e.g. hyaluronte,

column 7, line 29) may be used as the coating on a drug delivery stent. The substitution

of one known element (any of the polymers of Kaplan) for another (polysaccharide of

Dayton) would have been obvious to one of ordinary skill in the art at the time of the

invention since the substitution of the polymer disclosed by Kaplan with that of Dayton

would have yielded predictable results, namely, delivery of a drug to the vascular

system and would merely be a substitution of one known element for another. *KSR Int'l*

*Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 15 and 57 based on Kaplan 348 and Morris

781or Mitchell 711 and Dayton 075 was proposed by the third party requester in the

request for reexamination and is being adopted essentially as proposed in the request.

Furthermore, regarding claims 6 and 48, while Dayton discloses that a polymer

coating may be applied to a stent by spray coating, the coating in Kaplan is in the form

of a strand which is woven through or laminated on the stent structure which teaches

away from applying the coating by spraying the stent with the coating. Accordingly, the

BSC-SJA-0346

rejection of claims 6 and 48 based on Kaplan 348 and Morris 781 or Mitchell 711 and

Dayton 075 is not adopted essentially as proposed in the request.


### Ground # 95.

**The request submits that claims 6, 7, 18, 48, 49 and 60 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Ding 313.**

Claims 7, 18, 49 and 60 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Kaplan 348 and Morris 781or Mitchell 711 as applied to claims 1 and

40 above, and further in view of Ding 313.

Regarding claims 7 and 49, Kaplan states that the strand may "contain an

antiproliferative agent such as methotrexate. The antiproliferative agent will inhibit over-

proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated segment

of the vessel. The antiproliferative containing strand will generally degrade over a period

of four to six months. The physical presence of the stent will also inhibit re-stenosis of

the vessel." (column 8, lines 40-42). Kaplan does not disclose the weight percentage or

the ratio of the bioactive substance in the coating. Ding discloses "the loading [of the

biologically active material] generally most advantageously used is in the range from

about 10% to 45% of the total weight of the layer" (column 10, lines 25-26 and claim 4).

It would have been obvious to one having ordinary skill in the art at the time the

invention was made to provide the rapamycin in the coating at a weight percentage of

about 30% or a weight ratio of drug to polymeric carrier of about 3:7, since it has been

Page 192

held that discovering an optimum value of a result effective variable involves only routine skill in the art. *In re Boesch*, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claims 18 and 60*, Kaplan does not disclose that the polymer may comprise polydimethylsiloxane. Ding discloses that it is known to use polydimethylsiloxane as the coating on a drug delivery stent. See column 4, lines 9-10, "[f]or example, silicone or polysiloxane materials (such as polydimethylsiloxane) have been used successfully." The substitution of one known element (any of the polymers of Kaplan) for another (polydimethylsiloxane of Ding) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Kaplan with that of Ding would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).



Accordingly, this rejection of claims 7, 18, 49 and 60 based on Kaplan 348 and Morris 781 or Mitchell 711 and Ding 313 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

Furthermore, regarding claims 6 and 48, while Ding discloses that a polymer coating may be applied to a stent by spray coating, the coating in Kaplan is in the form of a strand which is woven through or laminated on the stent structure which teaches away from applying the coating by spraying the stent with the coating. Accordingly, the

rejection of claims 6 and 48 based on Kaplan 348 and Morris 781 or Mitchell 711 and

Ding 313 is not adopted essentially as proposed in the request.


## Ground # 96.

**The request submits that claims 6, 7, 14, 15, 48, 49, 56 and 57 are
unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view
of Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in
view of Dinh 227.**

Claims 7, 14, 15, 49, 56 and 57 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Kaplan in view of Morris 781 or Mitchell 711 as applied to claims 1

and 40 above, and further in view of Dinh 227.

*Regarding claims 7 and 49,* Kaplan states that the strand may "contain an

antiproliferative agent such as methotrexate. The antiproliferative agent will inhibit over-

proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated segment

of the vessel. The antiproliferative containing strand will generally degrade over a period

of four to six months. The physical presence of the stent will also inhibit re-stenosis of

the vessel." (column 8, lines 40-42). Kaplan does not disclose the weight percentage or

the ratio of the bioactive substance in the coating. Dinh discloses "[a] ratio of drug to

dissolved polymer in the solution can vary widely (e.g. in the range of 10:1 to 1:100"

(column 7, lines 51-53). It would have been obvious to one having ordinary skill in the

art at the time the invention was made to provide the rapamycin in the coating at a

weight percentage of about 30% or a weight ratio of drug to polymeric carrier of about

3:7, since it has been held that discovering an optimum value of a result effective

Application/Control Number: 95/001,097                              Page 194
Art Unit: 3993

variable involves only routine skill in the art. *In re Boesch*, 617 F.2d 272, 205 USPQ
215 (CCPA 1980).

 *Regarding claims 14, 15, 56 and 57,* Kaplan does not disclose that the polymer
may be a polyaminoacid or polysaccharide. Dinh discloses that the polymer may be
polyamino acids (proteins and peptides, page 3, line18) or polysaccharides (page 3, line
14). The substitution of one known element (any of the polymers of Kaplan) for another
(polyaminoacid or polysaccharide of Dinh) would have been obvious to one of ordinary
skill in the art at the time of the invention since the substitution of the polymer disclosed
by Kaplan with that of Dinh would have yielded predictable results, namely, delivery of a
drug to the vascular system and would merely be a substitution of one known element
for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

 Accordingly, this rejection of claims 7, 14, 15, 49, 56 and 57 based on Kaplan
348 and Morris 781 or Mitchell 711 and Dinh 227 was proposed by the third party
requester in the request for reexamination and is being adopted essentially as proposed
in the request.

 Furthermore, regarding claims 6 and 48, while Dinh discloses that a polymer
coating may be applied to a stent by spray coating, the coating in Kaplan is in the form
of a strand which is woven through or laminated on the stent structure which teaches
away from applying the coating by spraying the stent with the coating. Accordingly, the
rejection of claims 6 and 48 based on Kaplan 348 and Morris 781 or Mitchell 711 and
Dinh 227 is not adopted essentially as proposed in the request.

Application/Control Number: 95/001,097                        Page 195
Art Unit: 3993

### Ground # 97

The request submits that claims 1, 2, 5, 8-13, 19-22, 25-41, 44, 47, 50-55, 61-64, 67-74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790.

Claims 1, 2, 8-13, 19-22, 25, 26, 27/1, 27/2, 27/8-13, 27/19-22, 27/25, 27/26, 28/1, 28/2, 28/8-13, 28/19-22, 28/25, 28/26, 29/28/1, 29/28/2, 29/28/8-13, 29/28/19-22, 29/28/25, 29/28/26, 30/1, 30/2, 30/8-13, 30/19-22, 30/25, 30/26, 31/30/1, 31/30/2, 31/30/8-13, 31/30/19-22, 31/30/25, 31/30/26, 32/1, 32/2, 32/8-13, 32/19-22, 32/25, 32/26, 33/32/1, 33/32/2, 33/32/8-13, 33/32/19-22, 33/32/25, 33/32/26, 34/33/32/1, 34/33/32/2, 34/33/32/8-13, 34/33/32/19-22, 34/33/32/25, 34/33/32/26, 35/34/33/32/1, 35/34/33/32/2, 35/34/33/32/8-13, 35/34/33/32/19-22, 35/34/33/32/25, 35/34/33/32/26, 36/35/34/33/32/1, 36/35/34/33/32/2, 36/35/34/33/32/8-13, 36/35/34/33/32/19-22, 36/35/34/33/32/25, 36/35/34/33/32/26, 37/33/32/1, 37/33/32/2, 37/33/32/8-13, 37/33/32/19-22, 37/33/32/25, 37/33/32/26, 38/37/33/32/1, 38/37/33/32/2, 38/37/33/32/8-13, 38/37/33/32/19-22, 38/37/33/32/25, 38/37/33/32/26, 39/38/37/33/32/1, 39/38/37/33/32/2, 39/38/37/33/32/8-13, 39/38/37/33/32/19-22, 39/38/37/33/32/25, 39/38/37/33/32/26, 40, 41, 44, 50-55, 61-64, 67, 68, 69/40, 69/41, 69/44, 69/50-55, 69/61-64, 69/67, 69/68, 70/40, 70/41, 70/44, 70/50-55, 70/61-64, 70/67, 70/68, 71/70/40, 71/70/41, 71/70/44, 71/70/50-55, 71/70/61-64, 71/70/67, 71/70/68, 72/71/70/40, 72/71/70/41, 72/71/70/44, 72/71/70/50-55, 72/71/70/61-64, 72/71/70/67, 72/71/70/68, 73/72/71/70/40, 73/72/71/70/41, 73/72/71/70/44, 73/72/71/70/50-55, 73/72/71/70/61-64, 73/72/71/70/67, 73/72/71/70/68, 74/40, 74/41, 74/44, 74/50-55, 74/61-64, 74/67, 74/68, 75/74/40, 75/74/41, 75/74/44, 75/74/50-55, 75/74/61-64,

75/74/67, 75/74/68, 76/75/74/40, 76/75/74/41, 76/75/74/44, 76/75/74/50-55,

76/75/74/61-64, 76/75/74/67, 76/75/74/68, 77/76/75/74/40, 77/76/75/74/41,

77/76/75/74/44, 77/76/75/74/50-55, 77/76/75/74/61-64, 77/76/75/74/67 and

77/76/75/74/68 are rejected under 35 U.S.C. 103(a) as being unpatentable over Kaplan

348 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or

Nelson 790.

Regarding claims 1 and 40, Kaplan teaches an intravascular stent 2 having a

coating thereon (laminated filaments, Figure 5b and 5c). The coating may comprise a

polymer (column 6, line 25) and a therapeutic substance (column 5, lines 4-10) to

prevent restenosis (abstract and column 5, lines 8-9 and column 8, lines 15-19). A

variety of pharmaceutical and other therapeutic agents may be delivered from the

polymer coating and may include antiproliferative substances for inhibiting smooth

muscle cell proliferation and restenosis. Kaplan does not disclose that the therapeutic

substance is rapamycin or a macrocyclic lactone analog thereof.

Skotnicki 579 teaches that it is known to use rapamycin and macrocyclic lactone

derivatives of rapamycin (abstract) to prevent restenosis or cell proliferation (column 9,

lines 1-11). Skotnicki 579 further discloses that the rapamycin derivatives may be

encapsulated in a polymer carrier for delivery (column 9, lines 34-38). The derivative

compounds have similar profile activity to rapamycin, exhibit antiproliferative activities

and are useful in treating restenosis.

Russo teaches that an analog of rapamycin, 21-norrapamycin, to prevent

restenosis or cell proliferation (abstract, column 1, lines 6-12, 39-46 and column 7, lines

10-16). The compound may be administered with a carrier that could include a
reservoir matrix (column 4, line 67 through column 5, line 4).   Russo discloses that
polyvinylpyrrolidine may be used as a carrier (column 4, lines 4-20).

Failli teaches rapamycin 42-oximes and hydroxylamines are to prevent
restenosis or cell proliferation (column 1, lines 9-15, 64-66 and column 6, lines 36-48).
Failli discloses that the compounds may be delivered via an encapsulating material or
matrix including polyvinylpyrrolidine (column 7, lines 13-14 and column 8, line 3-7).

Skotnicki 718 teaches rapamycin hydroxyesters useable to prevent restenosis or
cell proliferation (abstract, column 1, lines 6-12, 40-51, 65-68 and column 6, lines 46-
59).   The derivatives may be used to treat hyperproliferative disease such as restenosis
following angioplasty procedures.  The compounds may be delivered via a carrier or
matrix including polyvinylpyrrolidine (column 7, lines 34-38 and column 8, line 19-24).

Skotnicki 730 teaches phosphorylcarbamates of rapamycin and oxime
derivatives thereof that are useful as anti-inflammatories and antiproliferatives (column
1, lines 65-68). The derivatives may be used to treat hyperproliferative disease such as
restenosis (column 7, lines 10-16). Additionally, the compounds may be delivered via a
carrier or matrix including polyvinylpyrrolidine (column 7, lines 50-54 and column 8, lines
35-40).

Nelson teaches 27-hydroxyrapamycin and derivatives of rapamycin to prevent
restenosis or cell proliferation (abstract, column 1, lines 11-17, lines 44-51 and column
15, lines 41-54).  The derivatives are useful as anti-inflammatories and antiproliferatives
(column 2, lines 43-46). Additionally, the derivatives may be delivered via a carrier or

Application/Control Number: 95/001,097                         Page 198
Art Unit: 3993

matrix including polyvinylpyrrolidine (column 16, lines 9-12 and lines 24-28 and column 17, lines 11-15).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Kaplan 348 to include rapamycin or macrocyclic lactone derivatives of rapamycin, in view of the teachings of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, that rapamycin and macrocyclic lactone derivatives of rapamycin have superior anti-inflammatory and anti-proliferative properties. All of these references teach treating the vessel with therapeutic agents in order to inhibit or lessen restenosis. These references disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis. Each disclose that the agent may be contained in a polymer carrier/matrix. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that rapamycin would allow the stent of Kaplan 348 to be used as Kaplan 348 intended, e.g. to prevent restenosis in the vascular system.

*Regarding claims 2 and 44*, Kaplan shows a stent in the form of a thinned walled cylinder containing a plurality of struts 6.

*Regarding claims 8, 9, 50 and 51*, Kaplan discloses the use of "polymers which are degradable over time" (column 6, lines 25-26). Kaplan also discloses "[a]s an alternative to biodegradable polymers, the present invention can employ filaments of no-degradable materials" (column 7, lines 42-44).

BSC-SJA-0354

As to claims 10-13, 19-22, 52-55 and 61-64, Kaplan discloses that the polymer

may comprise polycaprolactone (claim 8), polyanhydride (column 6, line 64),

ethylenevinylacetate (column 6, lines 61-61), monomers of hydroxyethylmentacrylate

(column 6, line 60-61) and methyl methacrylate-ethylene glycol and

dimethylmethacrylate copolymer and ethylene-vinyl acetate copolymer (column 7, lines

47-49).

Regarding claims 25, 26, 35/34/33/32/1, 35/34/33/32/2, 35/34/33/32/8-13,

35/34/33/32/19-22, 35/34/33/32/25, 35/34/33/32/26, 38/37/33/32/1, 38/37/33/32/2,

38/37/33/32/8-13, 38/37/33/32/19-22, 38/37/33/32/25, 38/37/33/32/26, 67, 68,

72/71/70/40, 72/71/70/41, 72/71/70/44, 72/71/70/50-55, 72/71/70/61-64, 72/71/70/67,

72/71/70/68, 76/75/74/40, 76/75/74/41, 76/75/74/44, 76/75/74/50-55, 76/75/74/61-64,

76/75/74/67 and 76/75/74/68, the requests avers, that since Kaplan incorporates by

reference U.S. Patent No. 5,019,090 to Pinchuck, all the features of Pinchuck are part

of Kaplan's invention. However, Kaplan's incorporation of Pinchuck is merely to set

forth the state of the prior art and does not necessarily mean that the entire disclosure is

part of Kaplan's invention. Kaplan does not specifically state that the polymers of

Pinchuk are used as a polymer for forming the strands. However, the substitution of

one known element (any of the polymers of Kaplan) for another (e. g. a fluorinated

polymer or polytetrafluororethylene) would have been obvious to one of ordinary skill in

the art at the time of the invention since the substitution of the polymer disclosed by

Kaplan with a fluorinated polymer or polytetrafluororethylene would have yielded

predictable results, namely, delivery of a drug to the vascular system and would merely

Application/Control Number: 95/001,097                                  Page 200
Art Unit: 3993

be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82
USPQ2d 1385, 1396 (2007).

Regarding claims 28/1, 28/2, 28/8-13, 28/19-22, 28/25, 28/26, 30/1, 30/2, 30/8-13,
30/19-22, 30/25, 30/26, 34/33/32/1, 34/33/32/2, 34/33/32/8-13, 34/33/32/19-22,
34/33/32/25, 34/33/32/26, 37/33/32/1, 37/33/32/2, 37/33/32/8-13, 37/33/32/19-22,
37/33/32/25, 37/33/32/26, 70/40, 70/41, 70/44, 70/50-55, 70/61-64, 70/67, 70/68, 74/40,
74/41, 74/44, 74/50-55, 74/61-64, 74/67 and 74/68, Kaplan discloses that the drug may
be released at a controlled rate for a period of four to six months (column 8, lines 31-
37).

As to claims 32/1, 32/2, 32/8-13, 32/19-22, 32/25, 32/26, and 40, both Kaplan
and Morris disclose that the drug is present a therapeutically beneficial amount to inhibit
neointimal proliferation (see Kaplan, column 8, lines 33-35).

Regarding claims 36/35/34/33/32/1, 36/35/34/33/32/2, 36/35/34/33/32/8-13,
36/35/34/33/32/19-22, 36/35/34/33/32/25, 36/35/34/33/32/26, 39/38/37/33/32/1,
39/38/37/33/32/2, 39/38/37/33/32/8-13, 39/38/37/33/32/19-22, 39/38/37/33/32/25,
39/38/37/33/32/26, 73/72/71/70/40, 73/72/71/70/41, 73/72/71/70/44, 73/72/71/70/50-55,
73/72/71/70/61-64, 73/72/71/70/67, 73/72/71/70/68, 77/76/75/74/40, 77/76/75/74/41,
77/76/75/74/44, 77/76/75/74/50-55, 77/76/75/74/61-64, 77/76/75/74/67 and
77/76/75/74/68, Kaplan discloses that an acrylate based polymer or copolymer may be
used (e.g. methyl methacrylate-ethylene glycol and dimethylmethacrylate copolymer
and ethylene-vinyl acetate copolymer (column 7, lines 47-49)).

BSC-SJA-0356

*Regarding claim 41*, Kaplan discloses that the polymeric carrier and drug are
mixed together (column 7, lines 17-21).

Accordingly, this rejection of claims 1, 2, 8-13, 19-22, 27/1, 27/2, 27/8-13, 27/19-
22, 28/1, 28/2, 28/8-13, 28/19-22, 29/28/1, 29/28/2, 29/28/8-13, 29/28/19-22, 30/1, 30/2,
30/5, 30/8-13, 30/19-22, 30/25, 30/26, 32/1, 32/2, 32/5, 32/8-13, 32/19-22, 40, 41, 44,
50-55, 61-64, 67, 68, 70/40, 70/41, 70/44, 70/47, 70/50-55, 70/61-64, 74/40, 74/41,
74/44, 74/47, 74/50-55 and 74/61-64, based on Kaplan 348 in view of Morris 781 or
Mitchell 711 was proposed by the third party requester in the request for reexamination
and is being adopted essentially as proposed in the request and the rejection of claims
*25, 26*, 27/25, 27/26, 28/25, 28/26, 29/28/25, 29/28/26, 30/25, 30/26, 31/30/25,
31/30/26, 32/25, 32/26, 33/32/25, 33/32/26, 34/33/32/25, 34/33/32/26, 35/34/33/32/1,
35/34/33/32/2, 35/34/33/32/8-13, 35/34/33/32/19-22, 35/34/33/32/25, 35/34/33/32/26,
36/35/34/33/32/1, 36/35/34/33/32/2, 36/35/34/33/32/8-13, 36/35/34/33/32/19-22,
36/35/34/33/32/25, 36/35/34/33/32/26, 37/33/32/25, 37/33/32/26, 38/37/33/32/1,
38/37/33/32/2, 38/37/33/32/8-13, 38/37/33/32/19-22, 38/37/33/32/25, 38/37/33/32/26,
39/38/37/33/32/1, 39/38/37/33/32/2, 39/38/37/33/32/8-13, 39/38/37/33/32/19-22,
39/38/37/33/32/25, 39/38/37/33/32/26, *67, 68,* 69/27, 69/68, 70/67, 70/68, 71/70/67,
71/70/68, 72/71/70/40, 72/71/70/41, 72/71/70/44, 72/71/70/50-55, 72/71/70/61-64,
72/71/70/67, 72/71/70/68, 73/72/71/70/40, 73/72/71/70/41, 73/72/71/70/44,
73/72/71/70/50-55, 73/72/71/70/61-64, 73/72/71/70/67, 73/72/71/70/68, 74/67, 74/68,
75/74/67, 75/74/68, 76/75/74/40, 76/75/74/41, 76/75/74/44, 76/75/74/50-55,

BSC-SJA-0357

Application/Control Number: 95/001,097                    Page 202
Art Unit: 3993

76/75/74/61-64, 76/75/74/67, 76/75/74/68, 77/76/75/74/67 and 77/76/75/74/68 is
adopted with modification.

    Additionally, the rejection of claims 5, 27/5-39/5, 47 and 69/47-77/47 based on
Kaplan 348 in view of Morris 781 or Mitchell 711 is not adopted essentially as proposed
in the request. The requests avers, that since Kaplan incorporates by reference U.S.
Patent No. 5,053,048 to Pinchuck, all the features of Pinchuck are part of Kaplan's
invention. However, Kaplan's incorporation of Pinchuck is merely to set forth the state
of the prior art and does not necessarily mean that the entire disclosure is part of
Kaplan's invention. In fact, the coating in Kaplan is in the form of a strand which is
woven through or laminated on the stent structure which teaches away from applying
the coating by dipping the stent into the coating.

    Furthermore, claims 27/3, 27/4, 27/6, 27/7, 27/14-18, 27/23, 27/24, 28/3, 28/4,
28/6, 28/7, 28/14-18, 28/23, 28/24, 29/28/3, 29/28/4, 29/28/6, 29/28/7, 29/28/14-18,
29/28/23, 29/28/24, 30/3, 30/4, 30/6, 30/7, 30/14-18, 30/23, 30/24, 31/30/3, 31/30/4,
31/30/6, 31/30/7, 31/30/14-18, 31/30/23, 31/30/24, 32/3, 32/4, 32/6, 32/7, 32/14-18,
32/23, 32/24, 33/32/3, 33/32/4, 33/32/6, 33/32/7, 33/32/14-18, 33/32/23, 33/32/24,
34/33/32/3, 34/33/32/4, 34/33/32/6, 34/33/32/7, 34/33/32/14-18, 34/33/32/23,
34/33/32/24, 35/34/33/32/3, 35/34/33/32/4, 35/34/33/32/6, 35/34/33/31/7,
35/34/33/32/14-18, 35/34/33/32/23, 35/34/33/32/24, 36/35/34/33/32/3, 36/35/34/33/32/4,
36/35/34/33/32/6, 36/35/34/33/32/7, 36/35/34/33/32/14-18, 36/35/34/33/32/23,
36/35/34/33/32/24, 37/33/32/3, 37/33/32/4, 37/33/32/6, 37/33/32/7, 37/33/32/14-18,
37/33/32/23, 37/33/32/24, 38/37/33/32/3, 38/37/33/32/4, 38/37/33/32/6, 38/37/33/32, 7,

BSC-SJA-0358

38/37/33/32/14–18, 38/37/33/32/23, 38/37/33/32/24, 39/38/37/33/32/3, 39/38/37/33/32/4,

39/38/37/33/32/6, 39/38/37/33/32/7, 39/38/37/33/32/14-8, 39/38/37/33/32/23,

39/38/37/33/32/24, 42, 43, 45, 46, 48, 49, 56-60, 65-66, 69/42, 69/43, 69/45, 69/46,

69/60, 69/69, 70/42, 70/43, 70/45, 70/46, 70/60, 70/68, 71/70/42, 71/70/43, 71/70/45,

71/70/46, 71/70/60, 71/70/68, 72/71/70/42, 72/71/70/43, 72/71/70/45, 72/71/70/46,

72/71/70/60, 72/71/70/68, 73/72/71/70/42, 73/72/71/70/43, 73/72/71/70/45,

73/72/71/70/46, 73/72/71/70/60, 73/72/71/70/68, 74/42, 74/43, 74/45, 74/46, 74/60,

74/68, 75/74/42, 75/74/43, 75/74/45, 75/74/46, 75/74/60, 75/74/68, 76/75/74/42,

76/75/74/43, 76/75/74/45, 76/75/74/46, 76/75/74/60, 76/75/74/68, 77/76/75/74/42,

77/76/75/74/43, 77/76/75/74/45, 77/76/75/74/46, 77/76/75/74/60 and 77/76/75/74/68

depend upon claims that are not rejected with the combination of Kaplan and Morris or

Mitchell 711.  Accordingly, the rejection of these claims based on Kaplan 348 and

Morris 781 or Mitchell 711 is not adopted essentially as proposed in the request.


### Ground #98.

The request submits that claims 3, 4, 43, 45, and 46 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view of Skotnicki 579,
Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to
claims 1 and 40 above, and further in view of Ragheb 070.

Claims 3, 4, 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Kaplan 348 in view of Morris 781 or Mitchell 711 as applied to claims

2 and  above, and further in view of Ragheb 070.

Regarding claims 3 and 45, the stent of Kaplan as modified by Skotnicki 579,

Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, set forth above, does

not include a channel formed in at least one strut. Ragheb shows a stent 10 having a

coating thereon. The stent is formed of struts 14 having channels 28' formed therein.

Ragheb discloses that "[t]he wells 28' may also be in the form of slots or grooves in the

surface of the base material 14 of the medical device. This aspect of the invention

provides the advantage of better controlling the total amount of the bioactive material 18

to be released as well as the rate at which it is released." (column 16, lines 48-51). It

would have been obvious to one of ordinary skill in the art at the time the invention was

made to modify the stent of Kaplan as modified by Skotnicki 579, Russo 977, Failli 145,

Skotnicki 718, Skotnicki 730 or Nelson 790 with channels located in the struts, as taught

by Ragheb, in order to control the amount and rate of release of rapamycin.

Regarding claims 4 and 46, Figure 10B of Ragheb shows a rectangular channel

with a close perimeter and an open top. The channel is smaller in all dimensions than

the strut.

Regarding claim 43, Kaplan and Skotnicki 579, Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790 fails to disclose that the drug is entrapped on the

surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18 is

entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb

discloses "any degradation of the bioactive material which might otherwise occur by

other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the

manner of enhancing a particular device (stent with drug delivery capabilities) was

made part of the ordinary capabilities of one skilled in the art based upon the teaching

of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have

been capable of applying this known "improvement" technique in the same manner to

the stent of Kaplan and the results would have been predictable to one of ordinary skill

in the art, namely, one skilled in the art would have readily recognized that the

entrapment system of Ragheb would reduce the degradation of the drug as might occur

with the polymer coating technique of Kaplan.

Accordingly, this rejection of claims 3, 4, 43, 45, and 46 based on Kaplan 348 in

view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790

and Ragheb 070 was proposed by the third party requester in the request for

reexamination is and being adopted essentially as proposed in the request.


### Ground #99.

**The request submits that claim 42 is unpatentable under 35 U.S.C. § 103(a)
as being obvious over Kaplan 348 and Skotnicki 579, Russo 977, Failli 145,
Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to claim 40 above, and
further in view of Sahatjian 121.**

Claim 42 is rejected under 35 U.S.C. 103(a) as being unpatentable over Kaplan

348 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson

790 as applied to claim 40 above, and further in view of Sahatjian 121. The coating of

Kaplan comprises a mixture of polymer and a drug but fails to disclose a coating

wherein the polymer is bound to the drug. Sahatjian discloses a coating that is

delivered to the vascular system to prevent restenosis. The coating comprises a

polymer which is bound to a drug. The substitution of one known element (coating of

Kaplan) for another (coating of Sahatjian) would have been obvious to one of ordinary

skill in the art at the time of the invention since the substitution of the coating disclosed

BSC-SJA-0361

by Kaplan with that of Sahatjian would have yielded predictable results, namely, delivery

of a drug to the vascular system and would merely be a substitution of one known

element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claim 42 based on Kaplan 348 and Skotnicki 579,

Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Sahatjian 121

was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.


### Ground #100.

The request submits that claims 6, 7, 14-17, 24, 48, 49, 56-59 and 66 are
unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view
of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790
as applied to claims 1 and 40 above, and further in view of Berg 650.

Claims 7, 14-17, 24, 49, 56-59 and 66 are rejected under 35 U.S.C. 103(a) as

being unpatentable over Kaplan 348 and Morris 781 or Mitchell 711 as applied to claims

1 and 40 above, and further in view of Berg.

*Regarding claims 7 and 49,* Kaplan states that the strand may "contain an

antiproliferative agent such as methotrexate. The antiproliferative agent will inhibit over-

proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated segment

of the vessel. The antiproliferative containing strand will generally degrade over a period

of four to six months. The physical presence of the stent will also inhibit re-stenosis of

the vessel." (column 8, lines 40-42). Kaplan does not disclose the weight percentage or

the ratio of the bioactive substance in the coating. Berg discloses: "[t]he ratio of

therapeutic substance to polymer in the solution will depend on the efficacy of the

polymer in securing the therapeutic substance onto the stent and the rate at which the

BSC-SJA-0362

Application/Control Number: 95/001,097                                    Page 207
Art Unit: 3993

coating is to release the therapeutic substance . . . A wide ratio of therapeutic substance

to polymer could therefore be appropriate and could range from about 10:1 to about

1:100 (column 5, lines 5-18). It would have been obvious to one having ordinary skill in

the art at the time the invention was made to provide the rapamycin in the coating at a

weight percentage of about 30% or weight ratio of drug to polymer carrier of about 3:7,

since it has been held that discovering an optimum value of a result effective variable

involves only routine skill in the art and particularly since both Berg and Kaplan are

concerned with preventing SMC proliferation and restenosis following PCTA

procedures. *In re Boesch*, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

   *Regarding claims 14-17, 24, 56-59 and 66,* Berg discloses that the polymer may

comprise poly(amino acids) (column 4, line 49), polysaccharide, e.g. cellulose, starch

(column 4, line 54), polyphosphazenes (column 4, line 52), poly(ether-ester) copolymer

(column 4, line 51), copoly(ether-esters) (column 4, line 51), cellulose acetate, cellulose

butyrate, cellulose acetate butyrate, etc. (column 5, lines 4-7). The substitution of one

known element (any of the polymers of Kaplan 348) for another would have been

obvious to one of ordinary skill in the art at the time of the invention since the

substitution of the polymer disclosed by Kaplan 348 with that of Berg would have

yielded predictable results, namely, delivery of a drug to the vascular system and would

merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex

Inc.*, 82 USPQ2d 1385, 1396 (2007).

   Accordingly, this rejection of claims 7, 14-17, 24, 49, 56-59 and 66 based on

Kaplan 348 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or

Application/Control Number: 95/001,097                               Page 208
Art Unit: 3993

Nelson 790 and Berg 650 was proposed by the third party requester in the request for
reexamination and is <u>being adopted</u> essentially as proposed in the request.

    Furthermore, regarding claims 6 and 48, while Berg discloses that a polymer
coating may be applied to a stent by spray coating, the coating in Kaplan is in the form
of a strand which is woven through or laminated on the stent structure which teaches
away from applying the coating by spraying the stent with the coating. Accordingly, the
rejection of claims 6 and 48 based on Kaplan 348 and Skotnicki 579, Russo 977, Failli
145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Berg 650 is <u>not adopted</u> essentially
as proposed in the request.

### Ground #101.

    **The request submits that claims 14, 15, 23, 56, 57 and 65 are unpatentable
under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 and Skotnicki 579,
Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to
claims 1 and 40 above, and further in view of Helmus 724.**

    Claims 14, 15, 23, 56, 57 and 65 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Kaplan 348 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718,
Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in view of
Helmus 724. Kaplan does not disclose that the polymer may comprise polyaminoacid,
polysaccharide or polyvinyl pyrrolidone. Helmus discloses that polyaminoacid (e.g.
proteins and peptides, column 3, line 18), polysaccharide (page 3, line 19) or polyvinyl
pyrrolidone (page 3, line 14) may be used as the coating on a drug delivery stent. The
substitution of one known element (any of the polymers of Kaplan) for another
(polyaminoacid, polysaccharide or polyvinyl pyrrolidone or of Helmus) would have been

obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Kaplan with that of Helmus would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 14, 15, 23, 56, 57 and 67 based on Kaplan 348 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Helmus 724 was proposed by the third party requester in the request for reexamination is being adopted essentially as proposed in the request.

**Ground # 102.**

**The request submits that claims 6, 15, 48 and 57 are unpatentable under 35 U.S.C. § 103(a) as being obvious over obvious Kaplan 348 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in view of Dayton 075.**

Claims 15 and 57 are rejected under 35 U.S.C. 103(a) as being unpatentable over Kaplan 348 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in view of Dayton 075. Kaplan does not disclose that the polymer may comprise polysaccharide. Dayton discloses that polysaccharide (e.g. hyaluronte, column 7, line 29) may be used as the coating on a drug delivery stent. The substitution of one known element (any of the polymers of Kaplan) for another (polysaccharide of Dayton) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Kaplan with that of Dayton would have yielded predictable results,

namely, delivery of a drug to the vascular system and would merely be a substitution of

one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

Accordingly, this rejection of claims 15 and 57 based on Kaplan 348 and

Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and

Dayton 075 was proposed by the third party requester in the request for reexamination

and is being adopted essentially as proposed in the request.

Furthermore, regarding claims 6 and 48, while Dayton discloses that a polymer

coating may be applied to a stent by spray coating, the coating in Kaplan is in the form

of a strand which is woven through or laminated on the stent structure which teaches

away from applying the coating by spraying the stent with the coating. Accordingly, the

rejection of claims 6 and 48 based on Kaplan 348 and Skotnicki 579, Russo 977, Failli

145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Dayton 075 is not adopted

essentially as proposed in the request.


### Ground # 103.

**The request submits that claims 6, 7, 18, 48, 49 and 60 are unpatentable
under 35 U.S.C. § 103(a) as being obvious over Kaplan and Skotnicki 579, Russo
977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to claims 1
and 40 above, and further in view of Ding 313.**

Claims 7, 18, 49 and 60 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Kaplan 348 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718,

Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in view of

Ding 313.

*Regarding claims 7 and 49,* Kaplan states that the strand may "contain an antiproliferative agent such as methotrexate. The antiproliferative agent will inhibit over-proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated segment of the vessel. The antiproliferative containing strand will generally degrade over a period of four to six months. The physical presence of the stent will also inhibit re-stenosis of the vessel." (column 8, lines 40-42).  Kaplan does not disclose the weight percentage or the ratio of the bioactive substance in the coating.  Ding discloses "the loading [of the biologically active material] generally most advantageously used is in the range from about 10% to 45% of the total weight of the layer" (column 10, lines 25-26 and claim 4). It would have been obvious to one having ordinary skill in the art at the time the invention was made to provide the rapamycin in the coating at a weight percentage of about 30% or a weight ratio of drug to polymeric carrier of about 3:7, since it has been held that discovering an optimum value of a result effective variable involves only routine skill in the art. *In re Boesch,* 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claims 18 and 60,* Kaplan does not disclose that the polymer may comprise polydimethylsiloxane.  Ding discloses that it is known to use polydimethylsiloxane as the coating on a drug delivery stent. See column 4, lines 9-10, "[f]or example, silicone or polysiloxane materials (such as polydimethylsiloxane) have been used successfully."  The substitution of one known element (any of the polymers of Kaplan) for another (polydimethylsiloxane of Ding) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Kaplan with that of Ding would have yielded predictable results,

namely, delivery of a drug to the vascular system and would merely be a substitution of

one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

Accordingly, this rejection of claims 7, 18, 49 and 60 based on Kaplan 348 and

Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and

Ding 313 was proposed by the third party requester in the request for reexamination

and is being adopted essentially as proposed in the request.

Furthermore, regarding claims 6 and 48, while Ding discloses that a polymer

coating may be applied to a stent by spray coating, the coating in Kaplan is in the form

of a strand which is woven through or laminated on the stent structure which teaches

away from applying the coating by spraying the stent with the coating. Accordingly, the

rejection of claims 6 and 48 based on Kaplan 348 and Skotnicki 579, Russo 977, Failli

145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Ding 313 is not adopted essentially

as proposed in the request.


## Ground # 104.

**The request submits that claims 6, 7, 14, 15, 48, 49, 56 and 57 are
unpatentable under 35 U.S.C. § 103(a) as being obvious over Kaplan 348 in view
of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790
as applied to claims 1 and 40 above, and further in view of Dinh 227.**

Claims 7, 14, 15, 49, 56 and 57 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Kaplan in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718,

Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in view of

Dinh 227.

*Regarding claims 7 and 49,* Kaplan states that the strand may "contain an antiproliferative agent such as methotrexate. The antiproliferative agent will inhibit over-proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated segment of the vessel. The antiproliferative containing strand will generally degrade over a period of four to six months. The physical presence of the stent will also inhibit re-stenosis of the vessel." (column 8, lines 40-42). Kaplan does not disclose the weight percentage or the ratio of the bioactive substance in the coating. Dinh discloses "[a] ratio of drug to dissolved polymer in the solution can vary widely (e.g. in the range of 10:1 to 1:100" (column 7, lines 51-53). It would have been obvious to one having ordinary skill in the art at the time the invention was made to provide the rapamycin in the coating at a weight percentage of about 30% or a weight ratio of drug to polymeric carrier of about 3:7, since it has been held that discovering an optimum value of a result effective variable involves only routine skill in the art. *In re Boesch,* 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claims 14, 15, 56 and 57,* Kaplan does not disclose that the polymer may be a polyaminoacid or polysaccharide. Dinh discloses that the polymer may be polyamino acids (proteins and peptides, page 3, line18) or polysaccharides (page 3, line 14). The substitution of one known element (any of the polymers of Kaplan) for another (polyaminoacid or polysaccharide of Dinh) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Kaplan with that of Dinh would have yielded predictable results, namely, delivery of a

Case 1:07-cv-00333-SLR   Document 298-2   Filed 09/30/09   Page 64 of 153

drug to the vascular system and would merely be a substitution of one known element
for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 7, 14, 15, 49, 56 and 57 based on Dayton
722 and Morris 781 or Mitchell 711 and Dinh 227 was proposed by the third party
requester in the request for reexamination and is being adopted essentially as proposed
in the request.

Furthermore, regarding claims 6 and 48, while Dinh discloses that a polymer
coating may be applied to a stent by spray coating, the coating in Kaplan is in the form
of a strand which is woven through or laminated on the stent structure which teaches
away from applying the coating by spraying the stent with the coating. Accordingly, the
rejection of claims 6 and 48 based on Kaplan 348 and Skotnicki 579, Russo 977, Failli
145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Dinh 227 is not adopted essentially
as proposed in the request.

# Wolff 779 Patent Proposed Obviousness Combinations.

### Ground # 105.

The request submits that claims 1, 2, 8-10, 13, 28, 30, 32, 40, 41, 44, 50-52,
55, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over
Wolff 779 in view of Morris 781 or Mitchell 711.

Claims 1, 2, 8-10, 13, 28/1, 28/2, 28/8-10, 28/13, 30/1, 30/2, 30/8-10, 30/13,

32/1, 32/2, 32/8-10, 32/13, 40, 41, 44, 50-52, 55, 70/40, 70/41, 70/44, 70/50-52, 70/55,

BSC-SJA-0370

Application/Control Number: 95/001,097                    Page 215
Art Unit: 3993

74/40, 74/41, 74/44, 74/50-52 and 74/55 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Wolff 779 in view of Morris 781 or Mitchell 711.

*Regarding claims 1 and 40*, Wolff teaches an intravascular stent 10 for the
vascular system having a coating 14 thereon. The coating may comprise a biostable or
bioabsorbable polymer and a therapeutic substance (page 10, line 34-37) to inhibit SMC
proliferation and prevent restenosis. A variety of pharmaceutical and other therapeutic
agents may be delivered from the polymer coating and may include antiproliferative
substances for inhibiting smooth muscle cell proliferation (page 3, lines 7-10). Wolff
does not disclose that the therapeutic substance is rapamycin or a macrocyclic lactone
analog thereof.

Morris teaches that it is known to use an antiproliferative effective amount
rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3,
lines 51-64). Morris further discloses that rapamycin may be encapsulated in a polymer
matrix for delivery (column 3, lines 51-64).

Mitchell teaches that it is known to use rapamycin, delivered via a stent, to
prevent restenosis or cell proliferation (column 3, lines 24-31). A solid carrier can be
used to administer rapamycin including polyvinylpyrrolidine (column 6, lines 24-28 and
column 7, lines 10-15).

It would have been obvious to one of ordinary skill in the art at the time the
invention was made to modify the stent of Wolff to include rapamycin, in view of the
teaching of Morris or Mitchell. All three references teach treating the vessel with
therapeutic agents in order to inhibit or lessen restenosis. Both Morris and Mitchell

BSC-SJA-0371

disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, and the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that rapamycin would allow the stent of Wolff to be used as Wolff intended, e.g. to prevent restenosis in the vascular system.

*Regarding claims 2 and 44,* Wolff shows a stent in the form of a thinned walled cylinder containing a plurality of struts12.

*Regarding claims 8, 9, 50 and 51,* Wolff discloses that the "polymer may be are biostable or bioabsorbable" (page 10, line 37).

*As to claims 10, 13, 52 and 55,* Wolff discloses that the polymer may comprise polyanhydride (page 12, lines 23-28).

*Regarding claims 28/1, 28/2, 28/8-10, 28/13, 30/1, 30/2, 30/8-10, 28/13, 70/40, 70/41, 70/44, 70/50-52, 70/55, 74/40, 74/41, 74/44, 74/50-52 and 74/55,* Wolff discloses that the drug may be released at a controlled rate for a period of about four months (page 9, lines 33-38).

*As to claims 32/1, 32/2, 32/8-13, 32/19-22, 32/25, 32/26, and 40,* both Wolff and Morris disclose that the drug is present a therapeutically beneficial amount to inhibit neointimal proliferation.

Accordingly, this rejection of claims 1, 2, 8-10, 13, 28/1, 28/2, 28/8-10, 28/13, 30/1, 30/2, 30/8-10, 30/13, 32/1, 32/2, 32/8-10, 32/13, 40, 41, 44, 50-52, 55, 70/40, 70/41, 70/44, 70/50-52, 70/55, 74/40, 74/41, 74/44, 74/50-52 and 74/55, based on Wolff

Application/Control Number: 95/001,097                                    Page 217
Art Unit: 3993

779 in view of Morris 781or Mitchell 711 was proposed by the third party requester in

the request for reexamination and is <u>being adopted</u> essentially as proposed in the

request.

Additionally, claims 28/3-7, 28/11, 28/12, 28/14-26, 30/3-7, 30/11, 30/12, 30/14-

26, 32/3-7, 32/11, 32/12, 32/14-26, 70/42, 70/43, 70/45-49, 70/53, 70/54, 70/56-68,

74/42, 74/43, 74/45-49, 74/53, 74/54 and 74/56-68 depend upon claims that are not

rejected with the combination of Wolff and Morris or Mitchell 711.   Accordingly, the

rejection of these claims based on Wolff 779 and Morris 781 or Mitchell 711 is <u>not</u>

<u>adopted</u> essentially as proposed in the request.


### Ground #106.

**The request submits that claims 3, 4, 43, 45, and 46 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Wolff 779 in view of Morris 781 or
Mitchell 711 as applied to claims 1 and 40 above, and further in view of Ragheb
070.**

Claims 3, 4, 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Wolff 779 in view of Morris 781 or Mitchell 711 as applied to claims 2

and  above, and further in view of Ragheb 070.

*Regarding claims 3 and 45*, the stent of Wolff as modified by Morris or Mitchell

711, set forth above, does not include a channel formed in at least one strut.  Ragheb

shows a stent 10 having a coating thereon.  The stent is formed of struts 14 having

channels 28' formed therein.  Ragheb discloses that "[t]he wells 28' may also be in the

form of slots or grooves in the surface of the base material 14 of the medical device.

This aspect of the invention provides the advantage of better controlling the total

BSC-SJA-0373

amount of the bioactive material 18 to be released as well as the rate at which it is released." (column 16, lines 48-51). It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Wolff as modified by Morris or Mitchell 711 with channels located in the struts, as taught by Ragheb, in order to control the amount and rate of release of rapamycin.

Regarding claims 4 and 46, Figure 10B of Ragheb shows a rectangular channel with a close perimeter and an open top. The channel is smaller in all dimensions than the strut.

Regarding claim 43, Wolff and Morris fails to disclose that the drug is entrapped on the surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18 is entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb discloses "any degradation of the bioactive material which might otherwise occur by other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the manner of enhancing a particular device (stent with drug delivery capabilities) was made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have been capable of applying this known "improvement" technique in the same manner to the stent of Wolff and the results would have been predictable to one of ordinary skill in the art, namely, one skilled in the art would have readily recognized that the entrapment system of Ragheb would reduce the degradation of the drug as might occur with the polymer coating technique of Wolff.

Accordingly, this rejection of claims 3, 4, 43, 45, and 46 based on Wolff 779 in

view of Morris 781 or Mitchell 711 and Ragheb 070 was proposed by the third party

requester in the request for reexamination is and being adopted essentially as proposed

in the request.

### Ground #107.

**The request submits that claim 42 is unpatentable under 35 U.S.C. § 103(a)
as being obvious over Wolff 779 and Morris 781 or Mitchell 711 as applied to
claim 40 above, and further in view of Sahatjian 121.**

Claim 42 is rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff

779 and Morris 781 or Mitchell 711 as applied to claim 40 above, and further in view of

Sahatjian 121. The coating of Wolff comprises a mixture of polymer and a drug but fails

to disclose a coating wherein the polymer is bound to the drug. Sahatjian discloses a

coating that is delivered to the vascular system to prevent restenosis. The coating

comprises a polymer which is bound to a drug. The substitution of one known element

(coating of Wolff) for another (coating of Sahatjian) would have been obvious to one of

ordinary skill in the art at the time of the invention since the substitution of the coating

disclosed by Wolff with that of Sahatjian would have yielded predictable results, namely,

delivery of a drug to the vascular system and would merely be a substitution of one

known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

Accordingly, this rejection of claim 42 based on Wolff 779 and Morris 781 or

Mitchell 711 and Sahatjian 121 was proposed by the third party requester in the request

for reexamination and is being adopted essentially as proposed in the request.

### Ground #108.

**The request submits that claims 5-7, 11, 12, 14-17, 19, 21, 22, 24, 25, 47-49, 53, 54, 56-59, 61-64, 66 and 67 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Wolff 779 in view of Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Berg 650.**

Claims 5-7, 11, 12, 14-17, 19, 21, 22, 24, 25, 47-49, 53, 54, 56-59, 61-64, 66 and

67 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff 779 and

Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of

Berg.

*Regarding claims 5, 6, 47 and 48,* Wolff does not disclose how the coating is

applied to the stent. Berg discloses that the coating may be applied to the stent by

dipping (column 5, Example 2) or by spraying (column 5, Example 1). It would have

been obvious to one of ordinary skill in the art at the time the invention was made to

coat the stent of Wolff by spraying or dipping, as taught by Berg, because these are two

well known coating techniques, particularly in coating stents, and would yield

predictable results, namely, coating a stent for delivery of a drug to the vascular system.

*KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claims 7 and 49,* Wolff states that the drug may comprise

methotrexate, azathioprine etc (page 9, lines 11-18). The antiproliferative agent will

inhibit over-proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated

segment of the vessel. The antiproliferative containing strand will generally degrade

over a period of four to six months. Wolff does not disclose the weight percentage or the

ratio of the bioactive substance in the coating. Berg discloses: "[t]he ratio of therapeutic

substance to polymer in the solution will depend on the efficacy of the polymer in

securing the therapeutic substance onto the stent and the rate at which the coating is to

release the therapeutic substance . . . A wide ratio of therapeutic substance to polymer

could therefore be appropriate and could range from about 10:1 to about 1:100 (column

5, lines 5-18). It would have been obvious to one having ordinary skill in the art at the

time the invention was made to provide the rapamycin in the coating at a weight

percentage of about 30% or weight ratio of drug to polymeric carrier of about 3:7, since

it has been held that discovering an optimum value of a result effective variable involves

only routine skill in the art and particularly since both Berg and Wolff are concerned with

preventing SMC proliferation and restenosis following PCTA procedures. *In re Boesch*,

617 F.2d 272, 205 USPQ 215 (CCPA 1980).

  *Regarding claims 11, 12, 14-17, 19, 21, 22, 24, 25, 56-59, 53, 54, 56-59, 61-64,*

*66 and 67*, Berg discloses that the polymer may comprise polycaprolactone,

poly(lactide-co-glycolide) (column 4, line 44), poly(amino acids) (column 4, line 49),

polysaccharide, e.g. cellulose, starch (column 4, line 54), polyphosphazenes (column 4,

line 52), (copoly(ether-esters) (column 4, line 51), vinyl homopolymers and copolymers

(claim 6), polyvinyl acetate, copolymers of vinyl monomers (column 4, line 65), an

acrylate based polymer, e.g. cyanoacrylates (column 4, line 49), ethylene-methyl

methacrylate copolymers (column 4, lines 66-67), cellulose acetate, cellulose butyrate,

cellulose acetate butyrate etc (column 5, lines 4-7), and polyvinylidene fluoride (column

4, line 62). The substitution of one known element (any of the polymers of Wolff 779)

for another would have been obvious to one of ordinary skill in the art at the time of the

invention since the substitution of the polymer disclosed by Wolff 779 with that of Berg

BSC-SJA-0377

would have yielded predictable results, namely, delivery of a drug to the vascular

system and would merely be a substitution of one known element for another. *KSR Int'l*

*Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 5-7, 11, 12, 14-17, 19, 21, 22, 24, 25, 47-49,

53, 54, 56-59, 61-64, 66 and 67 based on Wolff 779 and Morris 781 or Mitchell 711 and

Berg 650 was proposed by the third party requester in the request for reexamination

and is being adopted essentially as proposed in the request.


## Ground #109.

**The request submits that claims 23, 25, 65 and 68 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Wolff 779 and Morris 781 or Mitchell 711
as applied to claims 1 and 40 above, and further in view of Helmus 724.**

Claims 23, 25, 65 and 68 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Wolff 779 and Morris 781 or Mitchell 711 as applied to claims 1 and

40 above, and further in view of Helmus 724.

Wolff does not disclose that the polymer may comprise polyvinyl pyrrolidone or a

fluorinated polymer. Helmus discloses that polyvinyl pyrrolidone (page 3, line 14) or a

fluorinated polymer (e.g. polytetrafluroethylene (page 3, line 36 to page 4, line 1)) may

be used as the coating on a drug delivery stent. The substitution of one known element

(any of the polymers of Wolff) for another (polyvinyl pyrrolidone or a fluorinated polymer

of Helmus) would have been obvious to one of ordinary skill in the art at the time of the

invention since the substitution of the polymer disclosed by Wolff with that of Helmus

would have yielded predictable results, namely, delivery of a drug to the vascular

BSC-SJA-0378

system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 23, 25, 65 and 68 based on Wolff 779 and Morris 781 or Mitchell 711 and Helmus 724 was proposed by the third party requester in the request for reexamination is <u>being adopted</u> essentially as proposed in the request.

### Ground # 110.

**The request submits that claims 11-13, 20, 53-55 and 62 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Wolff 779 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Kaplan 348.**

Claims 11-13, 20, 53-55 and 62 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff 779 in view of Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and further in view of Kaplan 348.

Wolff does not disclose that the polymer may comprise a lactone-based polymer, lactone based-copolymer, polyanhydride or poly(ethylene)vinylacetate or poly(hydroxyl) ethylmethylmethacrylate.  Kaplan discloses that a lactone-based polymer, lactone based-copolymer (e.g. polycaprolactone (claims 8 and 16)), polyanhydride (claims 8 and 16), ethylene-vinylacetate or poly(hydroxyl) ethylmethylmethacrylate may be used as the coating on a drug delivery stent. See column 6, lines 60-62, "[o]ther acceptable polymers may contain monomers of hydroxyethylmethacrylate, vinylalcohol, ethylene-vinylacetate . . ."  The substitution of one known element (any of the polymers of Wolff) for another (a lactone-based polymer, lactone based-copolymer, polyanhydride, ethylene-vinylacetate or poly(hydroxyl) ethylmethylmethacrylate of Kaplan) would have

been obvious to one of ordinary skill in the art at the time of the invention since the

substitution of the polymer disclosed by Wolff with that of Kaplan would have yielded

predictable results, namely, delivery of a drug to the vascular system and would merely

be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82

USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 11-13, 20, 53-55 and 62 based on Wolff 779

and Morris 781 or Mitchell 711 and Kaplan 348 was proposed by the third party

requester in the request for reexamination and is being adopted essentially as proposed

in the request.


## Ground # 111.

**The request submits that claims 18 and 60 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Wolff and Morris 781 or Mitchell 711 as
applied to claims 1 and 40 above, and further in view of Ding 313.**

Claims 18 and 60 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Wolff 779 and Morris 781 or Mitchell 711 as applied to claims 1 and 40 above, and

further in view of Ding 313.

*Regarding claims 18 and 60*, Wolff does not disclose that the polymer may

comprise polydimethylsiloxane. Ding discloses that it is known to use

polydimethylsiloxane as the coating on a drug delivery stent. See column 4, lines 9-10,

"[f]or example, silicone or polysiloxane materials (such as polydimethylsiloxane) have

been used successfully." The substitution of one known element (any of the polymers

of Wolff) for another (polydimethylsiloxane of Ding) would have been obvious to one of

BSC-SJA-0380

Application/Control Number: 95/001,097                                    Page 225
Art Unit: 3993

ordinary skill in the art at the time of the invention since the substitution of the polymer

disclosed by Wolff with that of Ding would have yielded predictable results, namely,

delivery of a drug to the vascular system and would merely be a substitution of one

known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

    Accordingly, this rejection of claims 18 and 60 based on Wolff 779 and Morris

781 or Mitchell 711 and Ding 313 was proposed by the third party requester in the

request for reexamination and is being adopted essentially as proposed in the request.


### Ground # 112.

    **The request submits that claims 1, 2, 8-10, 13, 27-34, 37, 40, 41, 44, 50-52,
55, 69-71, 74 and 75 are unpatentable under 35 U.S.C. § 103(a) as being obvious
over Wolff 779 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718,
Skotnicki 730 or Nelson 790.**

    Claims 1, 2, 8-10, 13, 27/1, 27/2, 27/8-10, 27/13, 28/1, 28/2, 28/8-10, 28/13,

29/28/1, 29/28/2, 29/28/8-10, 29/28/13, 30/1, 30/2, 30/8-10, 30/13, 31/30/1, 31/30/2,

31/30/8-10, 31/30/13, 32/1, 32/2, 32/8-10, 32/13, 33/32/1, 33/32/2, 33/32/8-10,

33/32/13, 34/33/32/1, 34/33/32/2, 34/33/32/8-10, 34/33/32/13,  40, 41, 44, 50-52, 55,

69/40, 69/41, 69/44, 69/50-52, 69/55, 70/40, 70/41, 70/44, 70/50-52, 70/55, 71/70/40,

71/70/41, 71/70/44, 71/70/50-52, 71/70/55, 74/40, 74/41, 74/44, 74/50-52, 74/55,

75/74/40, 75/74/41, 75/74/44, 75/74/50-52 and 75/74/55 are rejected under 35 U.S.C.

103(a) as being unpatentable over Wolff 779 in view of Skotnicki 579, Russo 977, Failli

145, Skotnicki 718, Skotnicki 730 or Nelson 790.

*Regarding claims 1,* 27/1, 27/2, 27/8-10, 27/13, *and 40,* Wolff teaches an

intravascular stent 10 for the vascular system having a coating 14 thereon. The coating

may comprise a biostable or bioabsorbable polymer and a therapeutic substance (page

10, line 34-37) to inhibit SMC proliferation and prevent restenosis. A variety of

pharmaceutical and other therapeutic agents may be delivered from the polymer coating

and may include antiproliferative substances for inhibiting smooth muscle cell

proliferation (page 3, lines 7-10). Wolff does not disclose that the therapeutic substance

is rapamycin or a macrocyclic lactone analog thereof.

Skotnicki 579 teaches that it is known to use rapamycin and macrocyclic lactone

derivatives of rapamycin (abstract) to prevent restenosis or cell proliferation (column 9,

lines 1-11). Skotnicki 579 further discloses that the rapamycin derivatives may be

encapsulated in a polymer carrier for delivery (column 9, lines 34-38). The derivative

compounds have similar profile activity to rapamycin, exhibit antiproliferative activities

and are useful in treating restenosis.

Russo teaches that an analog of rapamycin, 21-norrapamycin, to prevent

restenosis or cell proliferation (abstract, column 1, lines 6-12, 39-46 and column 7, lines

10-16). The compound may be administered with a carrier that could include a

reservoir matrix (column 4, line 67 through column 5, line 4). Russo discloses that

polyvinylpyrrolidine may be used as a carrier (column 4, lines 4-20).

Failli teaches rapamycin 42-oximes and hydroxylamines are to prevent

restenosis or cell proliferation (column 1, lines 9-15, 64-66 and column 6, lines 36-48).

BSC-SJA-0382

Failli discloses that the compounds may be delivered via an encapsulating material or matrix including polyvinylpyrrolidine (column 7, lines 13-14 and column 8, line 3-7).

Skotnicki 718 teaches rapamycin hydroxyesters useable to prevent restenosis or cell proliferation (abstract, column 1, lines 6-12, 40-51, 65-68 and column 6, lines 46-59). The derivatives may be used to treat hyperproliferative disease such as restenosis following angioplasty procedures. The compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 7, lines 34-38 and column 8, line 19-24).

Skotnicki 730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof that are useful as anti-inflammatories and antiproliferatives (column 1, lines 65-68). The derivatives may be used to treat hyperproliferative disease such as restenosis (column 7, lines 10-16). Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 7, lines 50-54 and column 8, lines 35-40).

Nelson teaches 27-hydroxyrapamycin and derivatives of rapamycin to prevent restenosis or cell proliferation (abstract, column 1, lines 11-17, lines 44-51 and column 15, lines 41-54). The derivatives are useful as anti-inflammatories and antiproliferatives (column 2, lines 43-46). Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 16, lines 9-12 and lines 24-28 and column 17, lines 11-15).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Wolff 348 to include rapamycin or macrocyclic lactone derivatives of rapamycin, in view of the teachings of Skotnicki 579,

Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, that rapamycin and macrocyclic lactone derivatives of rapamycin have superior anti-inflammatory and anti-proliferative properties. All of these references teach treating the vessel with therapeutic agents in order to inhibit or lessen restenosis. These references disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis. Each disclose that the agent may be contained in a polymer carrier/matrix. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that rapamycin would allow the stent of Wolff 348 to be used as Wolff 348 intended, e.g. to prevent restenosis in the vascular system.

Regarding claims 2 and 44, Wolff shows a stent in the form of a thinned walled cylinder containing a plurality of struts12.

Regarding claims 8, 9, 50 and 51, Wolff discloses that the "polymer may be biostable or bioabsorbable" (page 10, line 37).

As to claims 10, 13, 52 and 55, Wolff discloses that the polymer may comprise polyanhydride (page 12, lines 23-28).

Regarding claims 28/1, 28/2, 28/8-10, 28/13, 30/1, 30/2, 30/8-10, 30/13, 34/33/32/1, 34/33/32/2, 34/33/32/8-10, 34/33/32/13, 70/40, 70/41, 70/44, 70/50-52, 70/55, 74/40, 74/41, 74/44, 74/50-52 and 74/55, Wolff discloses that the drug may be released at a controlled rate for a period of about four months (page 9, lines 33-38).

*As to claims 32/1, 32/2, 32/8-10, 32/13 and 40,* both Wolff and Morris disclose
that the drug is present a therapeutically beneficial amount to inhibit neointimal
proliferation.

Accordingly, this rejection of claims 1, 2, 8-10, 13, 27/1, 27/2, 27/8-10, 27/13,
28/1, 28/2, 28/8-10, 28/13, 29/28/1, 29/28/2, 29/28/8-10, 29/28/13, 30/1, 30/2, 30/8-10,
30/13, 31/30/1, 31/30/2, 31/30/8-10, 31/30/13, 32/1, 32/2, 32/8-10, 32/13, 33/32/1,
33/32/2, 33/32/8-10, 33/32/13, 34/33/32/1, 34/33/32/2, 34/33/32/8-10, 34/33/32/13,  40,
41, 44, 50-52, 55, 69/40, 69/41, 69/44, 69/50-52, 69/55, 70/40, 70/41, 70/44, 70/50-52,
70/55, 71/70/40, 71/70/41, 71/70/44, 71/70/50-52, 71/70/55, 74/40, 74/41, 74/44, 74/50-
52, 74/55, 75/74/40, 75/74/41, 75/74/44, 75/74/50-52 and 75/74/55 based on Wolff 779
in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson
790 was proposed by the third party requester in the request for reexamination and is
being adopted essentially as proposed in the request.

Additionally, claims 27/3-7, 27/11, 27/12, 27/14-26, 28/3-7, 28/11, 28/12, 28/14-
26, 29/28/3-7, 29/28/11, 29/28/12, 29/28/14-26, 30/3-7, 30/11, 30/12, 30/14-26, 31/30/3-
7, 31/30/11, 31/30/12, 31/30/14-26, 32/3-7, 32/11, 32/12, 32/14-26, 33/32/3-7, 33/32/11,
33/32/12, 33/32/14-26, 34/33/32/3-7, 34/33/32/11, 34/33/32/12, 34/33/32/14-26, 69/42,
69/43, 69/45-49, 69/53, 69/54, 70/56-68, 70/42, 70/43, 70/45-49, 70/53, 70/54, 70/56-
68, 71/70/42, 71/70/43, 71/70/45-49, 71/70/53, 71/70/54, 71/70/56-68, 74/42, 74/43,
74/45-49, 74/53, 74/54, 74/56-68, 75/74/42, 75/74/43, 75/74/45-49, 75/74/53, 75/74/54
and 75/74/56-68 depend upon claims that are not rejected with the combination of Wolff
and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790.

Application/Control Number: 95/001,097                                        Page 230
Art Unit: 3993

Accordingly, the rejection of these claims based on Wolff 779 and Skotnicki 579, Russo

977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 is not adopted essentially as

proposed in the request.


### Ground #113.

The request submits that claims 3, 4, 43, 45, and 46 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Wolff 779 in view of Skotnicki 579,
Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to
claims 1 and 40 above, and further in view of Ragheb 070.

Claims 3, 4, 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Wolff 779 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790 as applied to claims 2 and  above, and further in view

of Ragheb 070.

*Regarding claims 3 and 45*, the stent of Wolff as modified by Skotnicki 579,

Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, set forth above, does

not include a channel formed in at least one strut. Ragheb shows a stent 10 having a

coating thereon. The stent is formed of struts 14 having channels 28' formed therein.

Ragheb discloses that "[t]he wells 28' may also be in the form of slots or grooves in the

surface of the base material 14 of the medical device. This aspect of the invention

provides the advantage of better controlling the total amount of the bioactive material 18

to be released as well as the rate at which it is released." (column 16, lines 48-51). It

would have been obvious to one of ordinary skill in the art at the time the invention was

made to modify the stent of Wolff as modified by Skotnicki 579, Russo 977, Failli 145,

BSC-SJA-0386

Skotnicki 718, Skotnicki 730 or Nelson 790 with channels located in the struts, as taught

by Ragheb, in order to control the amount and rate of release of rapamycin.

_Regarding claims 4 and 46_, Figure 10B of Ragheb shows a rectangular channel

with a close perimeter and an open top. The channel is smaller in all dimensions than

the strut.

_Regarding claim 43_, Wolff fails to disclose that the drug is entrapped on the

surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18 is

entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb

discloses "any degradation of the bioactive material which might otherwise occur by

other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the

manner of enhancing a particular device (stent with drug delivery capabilities) was

made part of the ordinary capabilities of one skilled in the art based upon the teaching

of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have

been capable of applying this known "improvement" technique in the same manner to

the stent of Wolff and the results would have been predictable to one of ordinary skill in

the art, namely, one skilled in the art would have readily recognized that the entrapment

system of Ragheb would reduce the degradation of the drug as might occur with the

polymer coating technique of Wolff.

Accordingly, this rejection of claims 3, 4, 43, 45, and 46 based on Wolff 779 in

view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790

and Ragheb 070 was proposed by the third party requester in the request for

reexamination is and being adopted essentially as proposed in the request.

Application/Control Number: 95/001,097                                    Page 232
Art Unit: 3993

### Ground #114.

The request submits that claim 42 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Wolff 779 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claim 40 above, and further in view of Sahatjian 121.

Claim 42 is rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff

779 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson

790 as applied to claim 40 above, and further in view of Sahatjian 121.

The coating of Wolff comprises a mixture of polymer and a drug but fails to

disclose a coating wherein the polymer is bound to the drug. Sahatjian discloses a

coating that is delivered to the vascular system to prevent restenosis. The coating

comprises a polymer which is bound to a drug. The substitution of one known element

(coating of Wolff) for another (coating of Sahatjian) would have been obvious to one of

ordinary skill in the art at the time of the invention since the substitution of the coating

disclosed by Wolff with that of Sahatjian would have yielded predictable results, namely,

delivery of a drug to the vascular system and would merely be a substitution of one

known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396

(2007).

Accordingly, this rejection of claim 42 based on Wolff 779 and Skotnicki 579,

Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Sahatjian 121

was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.

BSC-SJA-0388

### Ground #115.

**The request submits that claims 5-7, 11, 12, 14-17, 19, 21, 22, 24, 25, 47-49, 53, 54, 56-59, 61-64, 66 and 67 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Wolff 779 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, as applied to claims 1 and 40 above, and further in view of Berg 650.**

Claims 5-7, 11, 12, 14-17, 19, 21, 22, 24, 25, 47-49, 53, 54, 56-59, 61-64, 66 and

67 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff 779 and

Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as

applied to claims 1 and 40 above, and further in view of Berg.

*Regarding claims 5, 6, 47 and 48,* Wolff does not disclose how the coating is

applied to the stent. Berg discloses that the coating may be applied to the stent by

dipping (column 5, Example 2) or by spraying (column 5, Example 1). It would have

been obvious to one of ordinary skill in the art at the time the invention was made to

coat the stent of Wolff by spraying or dipping, as taught by Berg, because these are two

well known coating techniques, particularly in coating stents, and would yield

predictable results, namely, coating a stent for delivery of a drug to the vascular system.

*KSR Int'l Co. v. Teleflex Inc.,* 82 USPQ2d 1385, 1396 (2007).

*Regarding claims 7 and 49,* Wolff states that the drug may comprise

methotrexate, azathioprine etc (page 9, lines 11-18). The antiproliferative agent will

inhibit over-proliferation of smooth muscle cells and thus inhibit re-stenosis of the dilated

segment of the vessel. The antiproliferative containing strand will generally degrade

over a period of four to six months. Wolff does not disclose the weight percentage or the

ratio of the bioactive substance in the coating. Berg discloses: "[t]he ratio of therapeutic

Application/Control Number: 95/001,097                        Page 234
Art Unit: 3993

substance to polymer in the solution will depend on the efficacy of the polymer in

securing the therapeutic substance onto the stent and the rate at which the coating is to

release the therapeutic substance . . . A wide ratio of therapeutic substance to polymer

could therefore be appropriate and could range from about 10:1 to about 1:100 (column

5, lines 5-18). It would have been obvious to one having ordinary skill in the art at the

time the invention was made to provide the rapamycin in the coating at a weight

percentage of about 30% or weight ratio of drug to polymeric carrier of about 3:7, since

it has been held that discovering an optimum value of a result effective variable involves

only routine skill in the art and particularly since both Berg and Wolff are concerned with

preventing SMC proliferation and restenosis following PCTA procedures. *In re Boesch*,

617 F.2d 272, 205 USPQ 215 (CCPA 1980).

    *Regarding claims 11, 12, 14-17, 19, 21, 22, 24, 25, 56-59, 53, 54, 56-59, 61-64,

66 and 67*, Berg discloses that the polymer may comprise polycaprolactone,

poly(lactide-co-glycolide) (column 4, line 44), poly(amino acids) (column 4, line 49),

polysaccharide, e.g. cellulose, starch (column 4, line 54), polyphosphazenes (column 4,

line 52), (copoly(ether-esters) (column 4, line 51), vinyl homopolymers and copolymers

(claim 6), polyvinyl acetate, copolymers of vinyl monomers (column 4, line 65), an

acrylate based polymer, e.g. cyanoacrylates (column 4, line 49), ethylene-methyl

methacrylate copolymers (column 4, lines 66-67), cellulose acetate, cellulose butyrate,

cellulose acetate butyrate etc (column 5, lines 4-7), and polyvinylidene fluoride (column

4, line 62). The substitution of one known element (any of the polymers of Wolff 779)

for another would have been obvious to one of ordinary skill in the art at the time of the

BSC-SJA-0390

invention since the substitution of the polymer disclosed by Wolff 779 with that of Berg

would have yielded predictable results, namely, delivery of a drug to the vascular

system and would merely be a substitution of one known element for another.  KSR Int'l

Co. v. Teleflex Inc., 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 5-7, 11, 12, 14-17, 19, 21, 22, 24, 25, 47-49,

53, 54, 56-59, 61-64, 66 and 67 based on Wolff 779 and Skotnicki 579, Russo 977,

Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and  Berg 650 was proposed by

the third party requester in the request for reexamination and is being adopted

essentially as proposed in the request.


### Ground #116.

The request submits that claims 23, 25, 65 and 68 are unpatentable under
35 U.S.C. § 103(a) as being obvious over Wolff 779 and Skotnicki 579, Russo 977,
Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to claims 1 and
40 above, and further in view of Helmus 724.

Claims 23, 25, 65 and 68 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Wolff 779 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718,

Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in view of

Helmus 724.

Wolff does not disclose that the polymer may comprise polyvinyl pyrrolidone or a

fluorinated polymer.  Helmus discloses that polyvinyl pyrrolidone (page 3, line 14) or a

fluorinated polymer (e.g. polytetrafluroethylene (page 3, line 36 to page 4, line 1)) may

be used as the coating on a drug delivery stent. The substitution of one known element

(any of the polymers of Wolff) for another (polyvinyl pyrrolidone or a fluorinated polymer

Application/Control Number: 95/001,097                                    Page 236
Art Unit: 3993

of Helmus) would have been obvious to one of ordinary skill in the art at the time of the

invention since the substitution of the polymer disclosed by Wolff with that of Helmus

would have yielded predictable results, namely, delivery of a drug to the vascular

system and would merely be a substitution of one known element for another. *KSR Int'l*

*Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

    Accordingly, this rejection of claims 23, 25, 65 and 68 based on Wolff 779 and

Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and

Helmus 724 was proposed by the third party requester in the request for reexamination

is being adopted essentially as proposed in the request.


### Ground # 117.

**The request submits that claims 11-13, 20, 53-55 and 62 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Wolff 779 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in view of Kaplan 348**

    Claims 11-13, 20, 53-55 and 62 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Wolff 779 in view of Skotnicki 579, Russo 977, Failli 145, Skotnicki

718, Skotnicki 730 or Nelson 790 as applied to claims 1 and 40 above, and further in

view of Kaplan 348.

    Wolff does not disclose that the polymer may comprise a lactone-based

polymer, lactone based-copolymer, polyanhydride or poly(ethylene)vinylacetate or

poly(hydroxyl) ethylmethylmethacrylate.  Kaplan discloses that a lactone-based

polymer, lactone based-copolymer (e.g. polycaprolactone (claims 8 and 16)),

polyanhydride (claims 8 and 16), ethylene-vinylacetate or poly(hydroxyl)

ethylmethylmethacrylate may be used as the coating on a drug delivery stent. See

column 6, lines 60-62, "[o]ther acceptable polymers may contain monomers of

hydroxyethylmethacrylate, vinylalcohol, ethylene-vinylacetate . . ." The substitution of

one known element (any of the polymers of Wolff) for another (a lactone-based polymer,

lactone based-copolymer, polyanhydride, ethylene-vinylacetate or poly(hydroxyl)

ethylmethylmethacrylate of Kaplan) would have been obvious to one of ordinary skill in

the art at the time of the invention since the substitution of the polymer disclosed by

Wolff with that of Kaplan would have yielded predictable results, namely, delivery of a

drug to the vascular system and would merely be a substitution of one known element

for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Accordingly, this rejection of claims 11-13, 20, 53-55 and 62 based on Wolff 779

and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790

and Kaplan 348 was proposed by the third party requester in the request for

reexamination and is being adopted essentially as proposed in the request.


### Ground # 118.

**The request submits that claims 18 and 60 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Wolff and Skotnicki 579, Russo 977, Failli
145, Skotnicki 718, Skotnicki 730 or Nelson 790 as applied to claims 1 and 40
above, and further in view of Ding 313.**

Claims 18 and 60 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Wolff 779 and Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or

Nelson 790 as applied to claims 1 and 40 above, and further in view of Ding 313.

Application/Control Number: 95/001,097                                         Page 238
Art Unit: 3993

*Regarding claims 18 and 60,* Wolff does not disclose that the polymer may
comprise polydimethylsiloxane. Ding discloses that it is known to use
polydimethylsiloxane as the coating on a drug delivery stent. See column 4, lines 9-10,
"[f]or example, silicone or polysiloxane materials (such as polydimethylsiloxane) have
been used successfully." The substitution of one known element (any of the polymers
of Wolff) for another (polydimethylsiloxane of Ding) would have been obvious to one of
ordinary skill in the art at the time of the invention since the substitution of the polymer
disclosed by Wolff with that of Ding would have yielded predictable results, namely,
delivery of a drug to the vascular system and would merely be a substitution of one
known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396
(2007).

Accordingly, this rejection of claims 18 and 60 based on Wolff 779 and Skotnicki
579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 and Ding 313
was proposed by the third party requester in the request for reexamination and is being
adopted essentially as proposed in the request.

## Morris 781 Patent Proposed Anticipation and Obviousness

## Combinations.


### Ground # 119.

The request submits that claims 1, 8, 10, 14, 15, 28, 30 and 32 are
unpatentable under 35 U.S.C. § 102 as being anticipated by Morris 781.

The rejection of claims 1, 8, 10, 14, 15, 28, 30 and 32 based on Morris 781 is not
adopted essentially as proposed in the request for the reasons set forth below.

Morris discloses that rapamycin may be delivered to the location of a

percutaneous transluminal coronary angioplasty procedure "via a vascular stent

impregnated with rapamycin" (column 11, lines 41-42 and claim 1). Morris does not set

forth any structure of the stent other that it is *impregnated* with rapamycin. The request

states that Cordis' patents (U.S. Patent Nos. 6,955,685, 7,001,422 and 6,960,228)

indicate that the Morris 781 patent discloses a stent coating with rapamycin:

"Preferably, the [Cordis] stent 10 is coated with an agent, such as heparin or rapamycin,

to prevent stenosis or restenosis of the vessel. Examples of such coatings are

disclosed in U.S. Pat. Nos. . . . 5,516,781. . ." (U.S. Patent No. 6,955,685).

To anticipate a claim, a prior art reference must disclose every limitation of the

claimed invention, either explicitly or inherently. Glaxo Inc. v. Novopharm Ltd., 52 F. 3d

1043, 1047, 34 USPQ2d 1565, 1567 (Fed. Cir. 1995). A claim is anticipated only if

each and every element as set forth in the claim is found, either expressly or inherently

described, in a single prior art reference. Verdegalal Bros. v Union Oil Co. of California,

Application/Control Number: 95/001,097                                    Page 240
Art Unit: 3993

814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987).  Anticipation is an issue of

fact.  In re Graves, 69 F.3d 1147, 1141, 36 USPQ2d 1697, 1700 (Fed. Cir. 1995).

MPEP 2131.01 states:

> Normally, only one reference should be used in making a rejection under
> 35 U.S.C. 102.  However, a 35 U.S.C. 102 rejection over multiple references has
> been held to be proper when the extra references are cited to:
>    (A)  Prove the primary reference contains an "enabled disclosure;"
>    (B)  Explain the meaning of a term used in the primary reference; or
>    (C)  Show that a characteristic not disclosed in the reference is inherent.

Evaluation of the Cordis statements reveals that they do not actually state that

the stent in Morris 781 is actually coated with the rapamycin.  For example, U.S. Patent

No. 6,955,685 states that the stent (of the 685 patent) is coated with a coating such as

that disclosed in the Morris '781 patent but does not state that the stent of the Morris

781 patent is *coated* with such a coating.  The Cordis statements in Federal court only

state that Morris teaches the administration of rapamycin using a vascular stent

impregnated with rapamycin not that the stent is *coated* with the rapamycin.

Furthermore, Cordis states that the Morris 781 discloses occlusive devices covered with

a drug containing a matrix delivery system as well as using a semipermeable

membrane to cover a drug containing reservoir.  Again, these disclosures in Morris 781

do not indicate that the *stent* is coated with the rapamycin coating.

Furthermore, the various Cordis statements referred to in the Request do not

meet any of the criteria for using multiple references in a 35 U.S.C. 102 rejection.  The

statements do not prove Morris 781 contains an enabled disclose do they explain the

meaning of a term used in Morris 781.  Further, the statements do not show that a

characteristic not disclosed in the reference is inherent.  The statement in the Cordis'

Case 1:07-cv-00333-SLR   Document 298-2   Filed 09/30/09   Page 91 of 153

Application/Control Number: 95/001,097                                        Page 241
Art Unit: 3993

patents merely state that the coating of Morris is used on Cordis' stents.  The Federal

court statements do not add anything that was not already known from Morris, e.g. that

Morris teaches a vascular stent impregnated with rapamycin, occlusive devices covered

with a drug matrix delivery system, a semipermeable membrane to cover a drug

containing reservoir and rapamycin formulated in a solid carrier which may comprise a

polymer.  The Cordis' statements do not prove that the Morris disclosure is enabled for

a stent having a coating comprising, inter alia, rapamycin.

　　　　To constitute anticipation, each and every element as set forth in the claim must

be found, either expressly or inherently described, within the four corners of the prior

art, namely, Morris 781.  The claims of the patent under reexamination state "A stent

having a coating thereon. . ."  This claim requires a structure (the stent) separate from

the coating wherein the coating is placed on the structure.  In fact, a coating is generally

a covering layer.  Morris discloses that the stent is impregnated with rapamycin.

Contrary to a coating, an object that is impregnated has the material dispersed

throughout the object.   Thus, Morris does not disclose that the stent has a coating

thereon.

　　　　Regarding the Requestor's assertion that the coating disclosed by Morris is on

the stent, Morris 781 states that the invention is a method for preventing or treating

hyperproliferative vascular disease by administering rapamycin to a mammal "orally,

parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via

a vascular stent impregnated with rapamycin" (column 3, lines 48-50).  The closest

Morris comes to disclosing a "coating" is in reference to the occlusive devices, referred

Application/Control Number: 95/001,097                    Page 242
Art Unit: 3993

to above, which Morris states are used to deliver the rapamycin intravascularly.  Morris

further states that rapamycin "can be administered intravascularly or via a vascular stent

impregnated with rapamycin" (column 11, lines 40-42).  Accordingly, Morris only

discloses a coating in association with an occlusive device and not in association with

the impregnated vascular stent.

Accordingly, Morris does not anticipate claims 1, 8, 10, 14, 15, 28, 30 and 32.


### Ground # 120.

The request submits that claims 3 and 4 are unpatentable under 35 U.S.C. §
103(a) as being obvious over Morris 781 in view of Ragheb 070.

The rejection of claims 3 and 4 based on Morris 781 in view of Ragheb 070 is <u>not</u>
<u>adopted</u> essentially as proposed in the request for the reasons set forth below.

Claims 3 and 4 are dependent upon claim 2 which is dependent upon claim 1.  A

dependent claim includes of all of the limitations of the base claim and any intervening

claims.  Since Morris 781 does not anticipate claim 1, a rejection of claims 3 and 4

based on Morris 781 is not appropriate.  Furthermore, the Request does not specifically

address the issue of modifying Morris 781 with Ragheb 070 to meet the limitations of

claims 1 and 2.


### Ground # 121.

The request submits that claims 2, 5-7, 11-13, 16, 17, 19-22, 24, 25, 40, 41,
44, 47-59, 61-67, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being
obvious over Morris 781 in view of Berg 650.

Claims 40, 41, 44, 47-59, 61-67, 70/40, 70/41, 70/44, 70/47-59, 70/61-67, 74/40, 74/41, 74/44, 74/47-59, 74/61 and 74/61-67 are rejected under 35 U.S.C. 103(a) as being unpatentable over Morris 781 in view of Berg 650.

*Regarding claim 40,* Morris teaches that it is known to use an antiproliferative effective amount rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3, lines 51-64). Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Berg teaches an intravascular stent having a coating thereon (column 3, line 52). The coating may comprise a polymer and a therapeutic substance (column 3, line 56) to prevent restenosis (column 1, lines 10-11 and column 7, lines 1-15). Berg states, at column 5, lines 19, "[t]he therapeutic substance used in the present invention could be virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel." Berg discloses "to provide a stent having a therapeutically significant amount of a drug", i.e. present a therapeutically beneficial amount to inhibit neointimal proliferation (see Berg, column 2, lines 13-15).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to replace the impregnated stent of Morris with the coated stent of Berg because both references teach treating the vessel with therapeutic agents, delivered via a vascular stent, in order to inhibit or lessen restenosis. Morris discloses that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the

invention, i.e., one skilled in the art would have recognized that the stent of Berg would

allow the rapamycin of Morris to be delivered to the vascular system as intended, e.g. to

prevent restenosis in the vascular system.  Furthermore, it would have been obvious to

substitute the impregnated stent of Morris with the coated stent of Berg since the

substitution of the stent disclosed by Morris with that of Berg would have yielded

predictable results, namely, delivery of a drug to the vascular system to prevent and

treat restenosis and would merely be a substitution of one known element for another.

*KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Regarding *claim 41*, Berg discloses that the polymeric carrier and the drug are

mixed together (abstract).

Regarding *claim 44*, Berg discloses that the stent disclosed by Palmaz in U.S.

Patent No. 4,733,665 may be used.  The Palmaz stent comprises a thinned walled

cylinder 71 containing a plurality of struts.

Regarding *claims 47 and 48*, Berg discloses that the coating may be applied to

the stent by dipping (column 5, Example 2) or by spraying (column 5, Example 1).

Regarding *claim 49*, Berg discloses: "[t]he ratio of therapeutic substance to

polymer in the solution will depend on the efficacy of the polymer in securing the

therapeutic substance onto the stent and the rate at which the coating is to release the

therapeutic substance . . . A wide ratio of therapeutic substance to polymer could

therefore be appropriate and could range from about 10:1 to about 1:100 (column 5,

lines 5-18).  It would have been obvious to one having ordinary skill in the art at the time

the invention was made to provide the rapamycin in the coating at a weight ratio of

about 3:7, since it has been held that discovering an optimum value of a result effective variable involves only routine skill in the art. *In re Boesch*, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claims 50 and 51*, Berg discloses "[t]he polymer may either be a biostable or bioabsorbable polymer" (column 4, lines 37-38).

*As to claims 52-59, 61, 63-64, 66 and 67*, Berg discloses that the polymer may comprise polycaprolactone, poly(lactide-co-glycolide) (column 4, line 44), polyanhydride (column 4, line 46), poly(amino acids) (column 4, line 49), polysaccharide, e.g. cellulose, starch (column 4, line 54), polyphosphazenes (column 4, line 52), copoly(ether-esters) (column 4, line 51), vinyl homopolymers and copolymers (claim 6), polyvinyl acetate, copolymers of vinyl monomers (column 4, line 65), an acrylate based polymer, e.g. cyanoacrylates (column 4, line 49), ethylene-methyl methacrylate copolymers (column 4, lines 66-67), cellulose acetate, cellulose butyrate, cellulose acetate butyrate etc (column 5, lines 4-7), and polyvinylidene fluoride (column 4, line 62).

*Regarding claims 62 and 65*, neither Morris nor Berg discloses the use of poly(hydroxyl)ethylmethylmethacrylate or polyvinyl pyrrolidone as a polymer for forming the coating. However, the substitution of one known element (any of the polymers of Morris or Berg) for another (e. g. poly(hydroxyl)ethylmethylmethacrylate or polyvinyl pyrrolidone) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Morris or Berg with poly(hydroxyl)ethylmethylmethacrylate or polyvinyl pyrrolidone would have yielded

BSC-SJA-0401

Application/Control Number: 95/001,097                              Page 246
Art Unit: 3993

predictable results, namely, delivery of a drug to the vascular system and would merely

be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82

USPQ2d 1385, 1396 (2007).

Regarding claims 70/40, 70/41, 70/44, 70/47-59, 70/61, 70/63, 70/64, 70/66,

70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61, 74/61, 74/63, 74/64, 74/66, 74/67, Berg

discloses that the drug may be released at a controlled rate for a period of days. "[T]he

rate at which the drug is delivered can be controlled by the selection of an appropriate

bioabsorbable or biostable polymer and by the ratio of drug to polymer in the solution"

and "[t]he release rate can be further controlled by varying the ratio of drug to polymer in

the multiple layers. For example, a higher drug-to-polymer ratio in the outer layers than

in the inner layers would result in a higher early dose which would decrease over time".

(see column 2, lines 52-67 and Figure 1).

Accordingly, this rejection of claims  40-41, 44, 47-59, 61, 63-64, 66-67, 70/40,

70/41, 70/44, 70/47-59, 70/61, 70/61, 70/63, 70/64, 70/66, 70/67, 74/40, 74/41, 74/44,

74/47-59, 74/61, 74/61, 74/63, 74/64, 74/66 and 74/67, based on Morris 781 in view of

Berg 650 was proposed by the third party requester in the request for reexamination

and is being adopted essentially as proposed in the request.

Furthermore, 70/42, 70/43, 70/45, 70/46, 70/60, 70/68, 74/42, 74/43, 74/45,

74/46, 74/60 and 74/68 depend upon claims that are not rejected with the combination

of Berg and Morris.  Accordingly, the rejection of these claims based on Morris 781 and

Berg 650 is not adopted essentially as proposed in the request and the rejection of

claims 62, 65, 70/62, 70/65, 74/62 and 74/65 based on Morris 781 in view of Berg 650

BSC-SJA-0402

was proposed by the third party requester in the request for reexamination and is being
adopted as modified..

The rejection of claims 2, 5-7, 11-13, 16, 17, 19-22, 24 and 25 based on Morris
781 in view of Berg 650 is not adopted essentially as proposed in the request for the
reasons set forth below.

Claims 11-13, 16, 17, 19-22, 24 and 25 are dependent upon claim 10 which is
dependent upon claim 1.  Claims 2 and 5-7 are dependent upon claim 1.  A dependent
claim includes of all of the limitations of the base claim and any intervening claims.
Since Morris 781 does not anticipate claim 1, a rejection of claims 2, 5-7, 11-13, 16, 17,
19-22, 24 or 25 based on Morris 781 is not appropriate.  Furthermore, the Request does
not specifically address the issue of modifying Morris 781 with Berg 650 to meet the
limitations of claims 1 and 10.

### Ground # 122.

**The request submits that claims 43, 45 and 46 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Morris 781 in view of Berg 650 and Ragheb
070.**

Claims 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Morris 781 in view of Berg 650 as applied to claim 40 above, and
further in view of Ragheb 070.

*Regarding claim 45*, the stent of Berg and Morris, set forth above, does not
include a channel formed in at least one strut.  Ragheb shows a stent 10 having a
coating thereon.  The stent is formed of struts 14 having channels 28' formed therein.

Application/Control Number: 95/001,097                                    Page 248
Art Unit: 3993

Ragheb discloses that "[t]he wells 28' may also be in the form of slots or grooves in the surface of the base material 14 of the medical device. This aspect of the invention provides the advantage of better controlling the total amount of the bioactive material 18 to be released as well as the rate at which it is released." (column 16, lines 48-51). It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Berg and Morris with channels located in the struts, as taught by Ragheb, in order to control the amount and rate of release of rapamycin.

*Regarding claim 46*, Figure 10B of Ragheb shows a rectangular channel with a close perimeter and an open top. The channel is smaller in all dimensions than the strut.

*Regarding claim 43*, Berg and Morris fails to disclose that the drug is entrapped on the surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18 is entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb discloses "any degradation of the bioactive material which might otherwise occur by other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the manner of enhancing a particular device (stent with drug delivery capabilities) was made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have been capable of applying this known "improvement" technique in the same manner to the stent of Berg and Morris and the results would have been predictable to one of ordinary skill in the art, namely, one skilled in the art would have readily recognized that the entrapment system of Ragheb would reduce the degradation of the drug as might occur with the polymer coating technique of Berg.

Accordingly, this rejection of claims 43, 45, and 46 based on Morris 781 in view

of Berg 650 and Ragheb 070 was proposed by the third party requester in the request

for reexamination is and being adopted essentially as proposed in the request.


### Ground # 123.

The request submits that claims 2, 5-7, 18, 19, 25, 35, 38, 40, 41, 44, 47-52,
56, 57, 60, 61, 67, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being
obvious over Morris 781 in view of Ding 313.

Claims 40, 41, 44, 47-52, 56, 57, 60, 61, 67, 70/40, 70/41, 70/44, 70/47-52,

70/56, 70/57, 70/60, 70/61, 70/67, 74/40, 74/41, 74/44, 74/47-52, 74/60, 74/61 and

74/67 are rejected under 35 U.S.C. 103(a) as being unpatentable over Morris 781 in

view of Ding 313.

*Regarding claim 40,* Morris teaches that it is known to use an antiproliferative

effective amount rapamycin, delivered via a stent, to prevent restenosis or cell

proliferation (column 3, lines 51-64). Morris further discloses that rapamycin may be

encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Ding teaches an intravascular stent having a coating thereon (column 1, lines 60-

63).   The coating may comprise a polymer and a drug (column 3, lines 26-45) to

prevent restenosis (column 1, lines 31-43). The coating of Ding provides for a

controlled and long-term release of the drug. The drug is present in a therapeutically

beneficial amount to inhibit neointimal proliferation (column 2, lines 28-33)

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to replace the impregnated stent of Morris with the coated stent of

BSC-SJA-0405

Ding because both references teach treating the vessel with therapeutic agents, delivered via a vascular stent, in order to inhibit or lessen restenosis. Morris discloses that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that the stent of Ding would allow the rapamycin of Morris to be delivered to the vascular system as intended, e.g. to prevent restenosis in the vascular system. Furthermore, it would have been obvious to substitute the impregnated stent of Morris with the coated stent of Ding since the substitution of the stent disclosed by Morris with that of Ding would have yielded predictable results, namely, delivery of a drug to the vascular system to prevent and treat restenosis and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Regarding claim 41, Ding discloses that the polymeric carrier and drug are mixed together (claim 16).

Regarding claim 44, Ding discloses that the stent is comprised of a tubular body formed of an open braid of fine metal wire which can be considered struts (see column 3, lines 17-21 and Figures 8-11).

Regarding claims 47 and 48, Ding discloses that the coating may be applied to the stent by dipping or by spraying (column 3, line 46).

Regarding claim 49, Ding discloses "the loading [of the biologically active material] generally most advantageously used is in the range from about 10% to 45% of

the total weight of the layer" (column 10, lines 25-26 and claim 4). It would have been obvious to one having ordinary skill in the art at the time the invention was made to provide the rapamycin in the coating at a weight percentage of about 30% or a weight ratio of drug to polymeric carrier of about 3:7, since it has been held that discovering an optimum value of a result effective variable involves only routine skill in the art. *In re Boesch*, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claim 51*, Ding discloses the polymer should be biostable (column 10, lines 30-41).

*As to claims, 52, 60, 61 and 67*, Ding discloses that the polymer may comprise polydimethylsiloxane (column 4, line 10), ethylene vinyl acetate copolymers (column 4, lines 57-58) and fluroxilicone (Ding 536, column 5, 43-46 incorporated by reference in Ding 313, column 1, lines 6-20).

*Regarding claims 56 and 57*, neither Morris nor Ding discloses the use of polyamino acid or polysaccharide as a polymer for forming the coating. However, the substitution of one known element (any of the polymers of Morris or Ding) for another (e. g. polyamino acid or polysaccharide) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Morris or Ding with polyamino acid or polysaccharide would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

Application/Control Number: 95/001,097                          Page 252
Art Unit: 3993

Regarding claims 70/40, 70/41, 70/44, 70/47-52, 70/60, 70/61, 70/67, 74/40, 74/41, 74/44, 74/47-52, 74/60, 74/61 and 74/67, Ding discloses that the drug may be released at a controlled rate for a period of at least two weeks (Figures 2-4 and 6 and column 6, lines 10-26).

Accordingly, this rejection of claims 40, 41, 44, 47-52, 56, 57, 60, 61, 67, 70/40, 70/41, 70/44, 70/47-52, 70/56, 70/57, 70/60, 70/61, 70/67, 74/40, 74/41, 74/44, 74/47-52, 74/60, 74/61 and 74/67, based on Morris 781 in view of Ding 313 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request and the rejection of claims 56, 57, 70/56, 70/57, 74/56 and 74/57 based on Morris 781 in view of Ding 313 was proposed by the third party requester in the request for reexamination and is being adopted as modified.

Furthermore, 70/42, 70/43, 70/45, 70/46, 70/53-70/59, 70/62-66, 70/68, 74/42, 74/43, 74/45, 74/46, 74/53-74/59, 74/62-66 and 74/68 depend upon claims that are not rejected with the combination of Ding and Morris. Accordingly, the rejection of these claims based on Morris 781 and Ding 313 is not adopted essentially as proposed in the request

The rejection of claims 2, 5-7, 18, 19, 25, 35, 38, based on Morris 781 in view of Ding 313 is not adopted essentially as proposed in the request for the reasons set forth below.

Claims 18, 19, 25, 25, 35 and 38 are dependent upon claim 10 which is dependent upon claim 1. Claims 2 and 5-7 are dependent upon claim 1. A dependent claim includes of all of the limitations of the base claim and any intervening claims.

BSC-SJA-0408

Application/Control Number: 95/001,097                                   Page 253
Art Unit: 3993

Since Morris 781 does not anticipate claim 1, a rejection of claims 2, 5-7, 18, 19, 25, 35

and 38, based on Morris 781 is not appropriate. Furthermore, the Request does not

specifically address the issue of modifying Morris 781 with Ding 313 to meet the

limitations of claims 1 and 10.


### Ground # 124.

**The request submits that claims 43, 45 and 46 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Morris 781 in view of Ding 313 and Ragheb
070.**

Claims 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Ding 313 in view of Morris 781 as applied to claim 40 above, and

further in view of Ragheb 070.

*Regarding claim 45*, the stent of Ding as modified by Morris, set forth above,

does not include a channel formed in at least one strut. Ragheb shows a stent 10

having a coating thereon. The stent is formed of struts 14 having channels 28' formed

therein. Ragheb discloses that "[t]he wells 28' may also be in the form of slots or

grooves in the surface of the base material 14 of the medical device. This aspect of the

invention provides the advantage of better controlling the total amount of the bioactive

material 18 to be released as well as the rate at which it is released." (column 16, lines

48-51). It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the stent of Ding as modified by Morris with channels

located in the struts, as taught by Ragheb, in order to control the amount and rate of

release of rapamycin.

*Regarding claim 46,* Figure 10B of Ragheb shows a rectangular channel with a

close perimeter and an open top. The channel is smaller in all dimensions than the strut.

*Regarding claim 43,* Ding and Morris fails to disclose that the drug is entrapped

on the surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18

is entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb

discloses "any degradation of the bioactive material which might otherwise occur by

other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the

manner of enhancing a particular device (stent with drug delivery capabilities) was

made part of the ordinary capabilities of one skilled in the art based upon the teaching

of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have

been capable of applying this known "improvement" technique in the same manner to

the stent of Ding and the results would have been predictable to one of ordinary skill in

the art, namely, one skilled in the art would have readily recognized that the entrapment

system of Ragheb would reduce the degradation of the drug as might occur with the

polymer coating technique of Ding.

Accordingly, this rejection of claims 43, 45, and 46 based on Ding 313 in view of

Morris 781 and Ragheb 070 was proposed by the third party requester in the request for

reexamination is and <u>being adopted</u> essentially as proposed in the request.


### Ground # 125.

The request submits that claims 5, 11-13, 19, 21-26, 35, 36, 38-41, 47, 50-57, 61-68, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Morris 781 in view of Helmus 724.

BSC-SJA-0410

Application/Control Number: 95/001,097                                    Page 255
Art Unit: 3993

Claims 40, 41, 47, 50-57, 61-68, 70/40, 70/41, 70/47, 70/50-57, 70/61-68, 74/40, 74/41, 74/47, 74/50-57 and 74/61-68 are rejected under 35 U.S.C. 103(a) as being unpatentable over Morris 781 in view of Helmus 724.

Regarding claim 40, Morris teaches that it is known to use an antiproliferative effective amount rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3, lines 51-64). Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Helmus teaches an intravascular stent (page 4, line 21 and claim 6) having a coating thereon (20 or 24). The coating may comprise a polymer (page 3, lines 7-24) and a therapeutic substance (column 3, lines 26-45) to prevent cell proliferation (page 1, lines 21-24). Helmus discloses that the drug is present a therapeutically beneficial amount to inhibit neointimal proliferation.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to replace the impregnated stent of Morris with the coated stent of Helmus because both references teach treating the vessel with therapeutic agents, delivered via a vascular stent, in order to inhibit or lessen restenosis. Morris discloses that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that the stent of Helmus would allow the rapamycin of Morris to be delivered to the vascular system as intended, e.g. to prevent restenosis in the vascular system. Furthermore, it would have been

BSC-SJA-0411

obvious to substitute the impregnated stent of Morris with the coated stent of Helmus

since the substitution of the stent disclosed by Morris with that of Helmus would have

yielded predictable results, namely, delivery of a drug to the vascular system to prevent

and treat restenosis and would merely be a substitution of one known element for

another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claim 41*, Helmus discloses that the polymeric carrier and drug are
mixed together (page 6, lines 3-28).

*Regarding claims 47*, Helmus discloses that the coating may be applied to the
stent by dipping (page 15, line 29-page 17, line 12).

*Regarding claim 50*, Helmus discloses that the polymer may be absorbable
(page 3, line19, "biodegradeable polymers").

*Regarding claims 51*, Helmus discloses the polymers that are biostable (e.g.
polytetrafluoroethylene and polymethymethacrylates (page 3, line 36 to page 4, line 2).

As to claims 52-57, 60-68, Helmus discloses that the polymer may comprise
lactone-based polymers and copolymers (polylactides and their copolymers, page 3,
lines 20-24), polyanhydrides (page 3, line 23), polyamino acids (proteins and peptides,
page 3, line18), polysaccharides (page 3, line 14), ethylene vinyl acetate (page 3, line
34), polymethylmethacrylate (page 4, line 2), polyvinylpyrollidone (page 3, line14),
cellulosics (page 3, line 35) and polytetrafluroethylenes (page 3, line 36 to page 4, line
1).

Regarding claims 70/40, 70/41, 70/47, 70/50-57, 70/60-68, 74/40, 74/41, 74/47, 74/50-57 and 74/61-68, Helmus discloses that the drug may be released at a controlled rate for a period of at least two weeks ("several weeks", page11, lines 1-4).

Accordingly, this rejection of claims 40, 41, 47, 50-57, 61-68, 70/40, 70/41, 70/47, 70/50-57, 70/61-68, 74/40, 74/41, 74/47, 74/50-57 and 74/61-68, based on Morris 781 in view of Helmus 724 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

Furthermore, 70/42-46, 70/48, 70/49, 70/58-60, 74/42-46, 74/48, 74/49 and 74/58-60 depend upon claims that are not rejected with the combination of Helmus and Morris.  Accordingly, the rejection of these claims based on Morris 781 and Helmus 724 is not adopted essentially as proposed in the request.

The rejection of claims 5, 11-13, 19, 21-26, 35, 36, 38 and 39 based on Morris 781 in view of Helmus is not adopted essentially as proposed in the request for the reasons set forth below.

Claims 11-13, 19, 21-26, 35, 36, 38 and 39 are dependent upon claim 10 which is dependent upon claim 1.  Claim 5 is dependent upon claim 1.  A dependent claim includes of all of the limitations of the base claim and any intervening claims.  Since Morris 781 does not anticipate claim 1, a rejection of claims 5, 11-13, 19, 21-26, 35, 36, 38 and 39 based on Morris 781 is not appropriate.  Furthermore, the Request does not specifically address the issue of modifying Morris 781 with Hemlus 724 to meet the limitations of claims 1 and 10.

### Ground # 126.

The request submits that claims 43, 45 and 46 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Morris 781 in view of Helmus 724 and Ragheb 070.

Claims 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Morris 781 in view of Helmus 781 as applied to claim 40 above, and

further in view of Ragheb 070.

*Regarding claim 45*, the stent of Morris as modified by Helmus, set forth above,

does not include a channel formed in at least one strut.  Ragheb shows a stent 10

having a coating thereon.  The stent is formed of struts 14 having channels 28' formed

therein.   Ragheb discloses that "[t]he wells 28' may also be in the form of slots or

grooves in the surface of the base material 14 of the medical device. This aspect of the

invention provides the advantage of better controlling the total amount of the bioactive

material 18 to be released as well as the rate at which it is released." (column 16, lines

48-51).  It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use the stent of Ragheb in Morris as modified by Helmus, in

order to control the amount and rate of release of rapamycin.

*Regarding claim 46*, Figure 10B of Ragheb shows a rectangular channel with a

close perimeter and an open top. The channel is smaller in all dimensions than the strut.

*Regarding claim 43*, Morris and Helmus fails to disclose that the drug is

entrapped on the surface of the stent by the polymeric carrier.  Ragheb discloses that

the drug 18 is entrapped by a polymeric layer 20 which controls the release of the drug.

Ragheb discloses "any degradation of the bioactive material which might otherwise

occur by other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the manner of enhancing a particular device (stent with drug delivery capabilities) was made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have been capable of applying this known "improvement" technique in the same manner to the stent of Morris and Helmus and the results would have been predictable to one of ordinary skill in the art, namely, one skilled in the art would have readily recognized that the entrapment system of Ragheb would reduce the degradation of the drug as might occur with the polymer coating technique of Helmus.

Accordingly, this rejection of claims 43, 45, and 46 based on Morris 781 in view of Helmus 781 and Ragheb 070 was proposed by the third party requester in the request for reexamination is and being adopted essentially as proposed in the request.

### Ground # 127.

The request submits that claims 2, 5-7, 11, 12, 19-22, 24, 40, 41, 44, 47-57, 61-64, 66, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Morris 781 in view of Dinh 227.

Claims 40, 41, 44, 47-57, 61-64, 66, 70/40, 70/41, 70/44, 70/47-57, 70/61-64, 70/66, 74/40, 74/41, 74/44, 74/47-57, 74/61-64 and 74/66are rejected under 35 U.S.C. 103(a) as being unpatentable over Morris 781 in view of Dinh 227.

Regarding claim 40, Morris teaches that it is known to use an antiproliferative effective amount rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3, lines 51-64). Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Dinh teaches an intravascular stent having a coating thereon. The coating may comprise a polymer and a therapeutic substance (column 2, lines 52-54), "a first layer is applied to a stent body, the first layer incorporating a polymer and the therapeutic substance", to prevent cell proliferation (page 1, lines 21-24). Dinh does not disclose that the therapeutic substance is rapamycin or a macrocyclic lactone analog.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to replace the impregnated stent of Morris with the coated stent of Dinh because both references teach treating the vessel with therapeutic agents, delivered via a vascular stent, in order to inhibit or lessen restenosis. Morris discloses that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that the stent of Dinh would allow the rapamycin of Morris to be delivered to the vascular system as intended, e.g. to prevent restenosis in the vascular system. Furthermore, it would have been obvious to substitute the impregnated stent of Morris with the coated stent of Dinh since the substitution of the stent disclosed by Morris with that of Dinh would have yielded predictable results, namely, delivery of a drug to the vascular system to prevent and treat restenosis and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claim 44*, Dinh discloses that the stent is comprised of a tubular body formed of helically wound filaments 42 which can be considered struts (Figure 3).

*Regarding claims 47 and 48*, Dinh discloses that the coating may be applied to
the stent by dipping or spraying The solution "can be applied by simply immersing the
stent into the solution or by spaying the solution onto the stent" (column 3, lines 2-3).

*Regarding claim 49*, Dinh discloses "[a] ratio of drug to dissolved polymer in the
solution can vary widely (e.g. in the range of 10:1 to 1:100" (column 7, lines 51-53). It
would have been obvious to one having ordinary skill in the art at the time the invention
was made to provide the rapamycin in the coating at a weight percentage of about 30%
or a weight ratio of drug to polymeric carrier of about 3:7, since it has been held that
discovering an optimum value of a result effective variable involves only routine skill in
the art. *In re Boesch*, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

*Regarding claims 50 and 51*, Dinh discloses "[t]he polymer may be a
bioabsorbable or a biostable polymer (column 7, lines 45-46).

*As to claims 52-54, 56, 57, 63 and 64*, Dinh discloses that the polymer may
comprise lactone-based polymers and copolymers (poly(Lactic acid) and poly(lactide-
co-glycolide)) (column 7, lines 46-47), fibrin (claim 6), cellulosis (column 7, line 51),
acrylate homopolymers and copolymers (column 7, line 50), polyanhydrides (page 3,
line 23), polyamino acids (proteins and peptides, page 3, line18), polysaccharides (page
3, line 14), ethylene vinyl acetate (page 3, line 34), polymethylmethacrylate (page 4, line
2), and cellulosics (page 3, line 36).

*Regarding claim 55*, neither Morris nor Dinh discloses the use of polyvinyl
pyrrolidone as a polymer for forming the coating. However, the substitution of one
known element (any of the polymers of Morris or Dinh) for another (polyvinyl

BSC-SJA-0417

pyrrolidone) would have been obvious to one of ordinary skill in the art at the time of the

invention since the substitution of the polymer disclosed by Morris or Dinh with polyvinyl

pyrrolidone would have yielded predictable results, namely, delivery of a drug to the

vascular system and would merely be a substitution of one known element for another.

*KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claims 70/40, 70/41, 70/44, 70/47-54, 70/56, 70/57, 70/61-64, 74/40,*

*74/41, 74/44, 74/47-54, 74/56 and 74/61-64,* Dinh discloses that the drug may be

released at a controlled rate (column 6, lines 36-56).   The period of release may be

several weeks as disclosed in column 3, lines 1-2 of U.S. Patent No. 4,897,268 to Tice,

incorporated by reference in Dinh at column 6, lines 45-50.

*Regarding claim 41,* Dinh discloses that the polymeric carrier and drug are mixed

together (column 2, lines 57-61).

Accordingly, this rejection of claims 40, 41, 44, 47-54, 57-59, 61-67, 70/40,

70/41, 70/44, 70/47-54, 70/57-59, 70/61-67, 74/40, 74/41, 74/44, 74/47-59 and 74/61-67

based on Morris 781 in view of Dinh 227 was proposed by the third party requester in

the request for reexamination and is being adopted essentially as proposed in the

request and the rejection of claims 55, 70/55 and 74/55 based on Morris 781 in view of

Dinh 227 was proposed by the third party requester in the request for reexamination

and is being adopted as modified.

Furthermore, claims 70/42, 70/43, 70/45, 70/46, 70/58-60, 70/65, 70/67, 70/68,

74/42, 74/43, 74/45, 74/46, 74/58-60, 74/65, 74/67 and 74/68, depend upon claims that

are not rejected with the combination of Morris and Dinh.  Accordingly, the rejection of

these claims based on Morris 781 and Dinh 227 is <u>not adopted</u> essentially as proposed
in the request.

The rejection of claims 2, 5-7, 11-13, 16, 17, 19-22, 24 and 25, based on Morris
781 in view of Dinh 227 is <u>not adopted</u> essentially as proposed in the request for the
reasons set forth below.

Claims 11-13, 16, 17, 19-22, 24 and 25 are dependent upon claim 10 which is
dependent upon claim 1. Claims 2 and 5-7 are dependent upon claim 1. A dependent
claim includes of all of the limitations of the base claim and any intervening claims.
Furthermore, the Request does not specifically address the issue of modifying Morris
781 with Dinh 227 to meet the limitations of claims 1 and 10. Since Morris 781 does not
anticipate claim 1, a rejection of claims 2, 5-7, 11-13, 16, 17, 19-22, 24 and 25, based
on Morris 781 is not appropriate.

### Ground # 128.

**The request submits that claims 43, 45 and 46 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Morris 781 in view of Dinh 227 and Ragheb
070.**

Claims 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Morris 781 in view of Dinh as applied to claim 40 above, and further
in view of Ragheb 070.

*Regarding claim 45*, the stent of Morris as modified by Dinh, set forth above,
does not include a channel formed in at least one strut. Ragheb shows a stent 10
having a coating thereon. The stent is formed of struts 14 having channels 28' formed
therein. Ragheb discloses that "[t]he wells 28' may also be in the form of slots or

grooves in the surface of the base material 14 of the medical device. This aspect of the invention provides the advantage of better controlling the total amount of the bioactive material 18 to be released as well as the rate at which it is released." (column 16, lines 48-51). It would have been obvious to one of ordinary skill in the art at the time the invention was made to use the stent of Ragheb in Morris as modified by Dinh, in order to control the amount and rate of release of rapamycin.

Regarding claim 46, Figure 10B of Ragheb shows a rectangular channel with a close perimeter and an open top. The channel is smaller in all dimensions than the strut.

Regarding claim 43, Morris and Dinh fail to disclose that the drug is entrapped on the surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18 is entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb discloses "any degradation of the bioactive material which might otherwise occur by other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the manner of enhancing a particular device (stent with drug delivery capabilities) was made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have been capable of applying this known "improvement" technique in the same manner to the stent of Morris and Dinh and the results would have been predictable to one of ordinary skill in the art, namely, one skilled in the art would have readily recognized that the entrapment system of Ragheb would reduce the degradation of the drug as might occur with the polymer coating technique of Dinh.

BSC-SJA-0420

Accordingly, this rejection of claims 43, 45, and 46 based on Morris 781 in view

of Dinh 227 and Ragheb 070 was proposed by the third party requester in the request

for reexamination is and <u>being adopted</u> essentially as proposed in the request.


### Ground # 129.

The request submits that claims 2, 5, 6, 11, 12, 21, 22, 25, 40, 41, 44, 47, 50-
54, 56, 57, 64, 67, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being
obvious over Morris 781 in view of Dayton 075.

Claims 40, 41, 44, 47, 50-54, 56, 57, 64, 67, 70/40, 70/41, 70/44, 70/47, 70/50-

54, 70/56, 70/57, 70/64, 70/67, 74/40, 74/41, 74/44, 74/47, 74/50-54, 74/56, 74/57,

74/64, 74/67, are rejected under 35 U.S.C. 103(a) as being unpatentable over Morris

781 in view of Dayton 075.

*Regarding claim 40*, Morris teaches that it is known to use an antiproliferative

effective amount rapamycin, delivered via a stent, to prevent restenosis or cell

proliferation (column 3, lines 51-64). Morris further discloses that rapamycin may be

encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Dayton teaches an intravascular stent 11 having a coating thereon. The coating

may comprise a polymer and a therapeutic substance. The "stent is . . . then coated

with a polymer which contains a bioactive substance" (column 4, lines 1-2) to prevent

restenosis (column 2, lines 27-31). Dayton states "virtually any bioactive substance of

need to the patient is a possible agent for treating the patient, depending upon the

needs of the treatment" (column 7, lines 33).

Application/Control Number: 95/001,097                           Page 266
Art Unit: 3993

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to replace the impregnated stent of Morris with the coated stent of

Dayton because both references teach treating the vessel with therapeutic agents,

delivered via a vascular stent, in order to inhibit or lessen restenosis.  Morris discloses

that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat

restenosis via a vascular stent. Furthermore, the combination would have yielded

nothing more than predictable results to one of ordinary skill in the art at the time of the

invention, i.e., one skilled in the art would have recognized that the stent of Dayton

would allow the rapamycin of Morris to be delivered to the vascular system as intended,

e.g. to prevent restenosis in the vascular system.  Furthermore, it would have been

obvious to substitute the impregnated stent of Morris with the coated stent of Dayton

since the substitution of the stent disclosed by Morris with that of Dayton would have

yielded predictable results, namely, delivery of a drug to the vascular system to prevent

and treat restenosis and would merely be a substitution of one known element for

another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claim 44*, Dayton discloses that the stent is comprised of a tubular

body formed of struts (Figures 2 and 5).

*Regarding claim 47*, Dayton discloses that the coating may be applied to the

stent by dipping (column 7, lines 46-47).

*Regarding claims 50 and 51*, Dayton discloses "[t]he polymer may be a

bioabsorbable (column 7, lines 4-5) or a biostable polymer (e.g. polytetrafluroethylene,

column 4, line 11).

Application/Control Number: 95/001,097                                    Page 267
Art Unit: 3993

As to claims 52, 57 and 67, Dayton discloses that the polymer may comprise polysaccharides (e.g. hyaluronte, column 7, line 29), polymethylmethacrylate (column 7, line 11), polytetrafluroethylene and fluorosilicone (column 4, lines 11-12).

*Regarding claims 53, 54, 56 and 64,* neither Morris nor Dayton discloses the use of a lactone-based polyester or copolyester, polyamino acid or an acrylate based copolymer as a polymer for forming the coating. However, the substitution of one known element (any of the polymers of Morris or Dayton) for another (e. g. a lactone-based polyester or copolyester, polyamino acid or an acrylate based copolymer) would have been obvious to one of ordinary skill in the art at the time of the invention since the substitution of the polymer disclosed by Morris or Dayton with a lactone-based polyester or copolyester, polyamino acid or an acrylate based copolymer would have yielded predictable results, namely, delivery of a drug to the vascular system and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claims 70/40, 70/41, 70/44, 70/47, 70/50-54, 70/56, 70/57, 70/64, 70/67, 74/40, 74/41, 74/44, 74/47, 74/50-54, 74/56, 74/57, 74/64, 74/67,* Dayton discloses that the drug may be released at a controlled rate (column 4, lines 20-29). Dayton also states "long term treatment by the drugs within the polymer takes place" (column 8, lines 30-32). Given that Dayton discloses that the stent may prevent restenosis it would have been obvious to elute the drug over a period of several weeks since it is well known that restenosis occurs over a period of several weeks or longer.

BSC-SJA-0423

*As to claim 40,* Dayton discloses that the drug is present a therapeutically beneficial amount to inhibit neointimal proliferation (column 3, lines 21-24).

*Regarding claim 41,* Dayton discloses that the polymeric carrier and drug are mixed together (column 2, lines 57-61).

Accordingly, this rejection of claims 40, 41, 44, 47, 50-54, 56, 57, 64, 67, 70/40, 70/41, 70/44, 70/47, 70/50-52, 70/57, 70/67, 74/40, 74/41, 74/44, 74/47, 74/50-52, 74/57 and 74/67 based on Morris 781 in view of Dayton 075 was proposed by the third party requester in the request for reexamination and the rejection of claims 53, 54, 56, 64, 70/53, 70/54, 70/56, 70/64, 74/53, 74/54, 74/56 and 74/64 based on Morris 781 in view of Dayton 075 was proposed by the third party requester in the request for reexamination and is <u>being adopted</u> as modified.

Furthermore, claims 70/42, 70/43, 70/45, 70/46, 70/48, 70/49, 70/55, 70/58, 70/59-63, 70/65, 70/66, 70/68, 74/42, 74/43, 74/45, 74/46, 74/48, 74/49, 74/55, 74/58, 74/59-63, 74/65, 74/66, 74/68, depend upon claims that are not rejected with the combination of Morris and Dayton. Accordingly, the rejection of these claims based on Morris 781 and Dayton 075 is <u>not adopted</u> essentially as proposed in the request.

The rejection of claims 2, 5, 6, 11, 12, 21, 22, 25, based on in view of Morris 781 Dayton 075 is <u>not adopted</u> essentially as proposed in the request for the reasons set forth below.

Claims 11, 12, 21, 22 and 25 are dependent upon claim 10 which is dependent upon claim 1. Claims 2, 5 and 6 are dependent upon claim 1. A dependent claim includes of all of the limitations of the base claim and any intervening claims.

BSC-SJA-0424

Furthermore, the Request does not specifically address the issue of modifying Morris

781 with Dayton 075 to meet the limitations of claims 1 and 10. Since Morris 781 does

not anticipate claim 1, a rejection of claims 2, 5, 6, 11, 12, 21, 22, 25, based on Morris

781 is not appropriate.


### Ground # 130.

The request submits that claims 43, 45 and 46 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Morris 781 in view of Dayton 075 and
Ragheb 070.

Claims 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Morris 781 in view of Dayton 075 as applied to claim 40 above, and

further in view of Ragheb 070.

*Regarding claim 45*, the stent of Morris as modified by Dayton, set forth above,

does not include a channel formed in at least one strut. Ragheb shows a stent 10

having a coating thereon. The stent is formed of struts 14 having channels 28' formed

therein. Ragheb discloses that "[t]he wells 28' may also be in the form of slots or

grooves in the surface of the base material 14 of the medical device. This aspect of the

invention provides the advantage of better controlling the total amount of the bioactive

material 18 to be released as well as the rate at which it is released." (column 16, lines

48-51). It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use the stent of Ragheb in Morris as modified by Dayton, in

order to control the amount and rate of release of rapamycin.

*Regarding claim 46,* Figure 10B of Ragheb shows a rectangular channel with a close perimeter and an open top. The channel is smaller in all dimensions than the strut.

*Regarding claim 43,* Morris and Dayton fail to disclose that the drug is entrapped on the surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18 is entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb discloses "any degradation of the bioactive material which might otherwise occur by other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the manner of enhancing a particular device (stent with drug delivery capabilities) was made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have been capable of applying this known "improvement" technique in the same manner to the stent of Morris and Dayton and the results would have been predictable to one of ordinary skill in the art, namely, one skilled in the art would have readily recognized that the entrapment system of Ragheb would reduce the degradation of the drug as might occur with the polymer coating technique of Dayton.

Accordingly, this rejection of claims 43, 45, and 46 based on Morris 781 in view of Dayton 075 and Ragheb 070 was proposed by the third party requester in the request for reexamination is and <u>being adopted</u> essentially as proposed in the request.

### Ground # 131.

The request submits that claims 2, 5-7, 11-13, 16, 17, 19-22, 24, 25, 40, 41, 44, 47-59, 61-67, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Morris 781 in view of Tuch 411.

Claims 40, 41, 44, 47-59, 61-67, 70/40, 70/41, 70/44, 70/47-59, 70/6-67, 74/40,
74/41, 74/44, 74/47-59 and 74/61-67 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Morris 781 in view of Tuch 411.

*Regarding claim 40*, Morris teaches that it is known to use an antiproliferative
effective amount rapamycin, delivered via a stent, to prevent restenosis or cell
proliferation (column 3, lines 51-64). Morris further discloses that rapamycin may be
encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Tuch teaches an intravascular stent having a coating thereon. The coating may
comprise a polymer and a therapeutic substance (column 2, lines 50-51) to prevent
restenosis (see Background of the Invention). Tuch does not disclose that the
therapeutic substance is rapamycin or a macrocyclic lactone analog thereof but states,
at column 5, last line to column 6, line 2, "could be virtually any therapeutic substance
which possesses desirable therapeutic characteristics for application to a blood vessel."

It would have been obvious to one of ordinary skill in the art at the time the
invention was made to replace the impregnated stent of Morris with the coated stent of
Tuch because both references teach treating the vessel with therapeutic agents,
delivered via a vascular stent, in order to inhibit or lessen restenosis. Morris discloses
that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat
restenosis via a vascular stent. Furthermore, the combination would have yielded
nothing more than predictable results to one of ordinary skill in the art at the time of the
invention, i.e., one skilled in the art would have recognized that the stent of Tuch would
allow the rapamycin of Morris to be delivered to the vascular system as intended, e.g. to

prevent restenosis in the vascular system. Furthermore, it would have been obvious to substitute the impregnated stent of Morris with the coated stent of Tuch since the substitution of the stent disclosed by Morris with that of Tuch would have yielded predictable results, namely, delivery of a drug to the vascular system to prevent and treat restenosis and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claim 44*, Tuch discloses that the stent disclosed by Palmaz in U.S. Patent No. 4,733,665 may be used. The Palmaz stent comprises a thinned walled cylinder 71 containing a plurality of struts.

*Regarding claim 47 and 48*, Tuch discloses that the coating may be applied to the stent by dipping or by spraying (column 2, lines 50-53).

*Regarding claim 49*, Tuch discloses: "[t]he ratio of therapeutic substance to polymer in the solution will depend on the efficacy of the polymer in securing the therapeutic substance onto the stent and the rate at which the coating is to release the therapeutic substance . . . A wide ratio of therapeutic substance to polymer could therefore be appropriate and could range from about 10:1 to about 1:100 (column 5, lines 63-65). It would have been obvious to one having ordinary skill in the art at the time the invention was made to provide the rapamycin in the coating at a weight percentage of about 30% or a weight ratio of drug to polymeric carrier of about 3:7, since it has been held that discovering an optimum value of a result effective variable involves only routine skill in the art. *In re Boesch*, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

Application/Control Number: 95/001,097                           Page 273
Art Unit: 3993

*Regarding claims 50 and 51,* Tuch discloses "[t]he polymer may either be a
biostable or bioabsorbable polymer" (column 5, lines 17-18).

*As to claims 53-59, 61-64, 66 and 67,* Tuch discloses that the polymer may
comprise polycaprolactone, poly(lactide-co-glycolide) (column 4, line 24), polyanhydride
(column 5, line 26), poly(amino acids) (column 5, line 29), polysaccharide, e.g.
cellulose, starch (column 5, line 33), polyphosphazenes (column 5, line 32),
copoly(ether-esters) (column 5, line 30-31), vinyl homopolymers and copolymers (claim
7), polyvinyl acetate, copolymers of vinyl monomers (column 5, line 45), ethylene-
methyl methacrylate copolymers (column 5, lines 46-47), an acrylate based polymer,
e.g. cyanoacrylates (column 5, line 29), ethylene-methyl methacrylate copolymers
(column 5, lines 46-47), cellulose acetate, cellulose butyrate, cellulose acetate butyrate
etc (column 5, lines 51-52), and polyvinylidene fluoride (column 5, line 42).

*Regarding claim 65,* neither Morris nor Tuch discloses the use of polyvinyl
pyrrolidone as a polymer for forming the coating. However, the substitution of one
known element (any of the polymers of Morris or Tuch) for another (e. g. polyvinyl
pyrrolidone) would have been obvious to one of ordinary skill in the art at the time of the
invention since the substitution of the polymer disclosed by Morris or Tuch with a
polyvinyl pyrrolidone would have yielded predictable results, namely, delivery of a drug
to the vascular system and would merely be a substitution of one known element for
another. *KSR Int'l Co. v. Teleflex Inc.,* 82 USPQ2d 1385, 1396 (2007).

*Regarding claims 70/40, 70/41, 70/44, 70/47-59, 70/61-67, 74/40, 74/41, 74/44,
74/47-59 and 74/61-67,* Tuch discloses that the drug may be released at a controlled

BSC-SJA-0429

Application/Control Number: 95/001,097                                   Page 274
Art Unit: 3993

rate for a period of days. "[T]he rate at which the drug is delivered can be controlled by

the selection of an appropriate bioabsorbable or biostable polymer and by the ratio of

drug to polymer in the solution" (column 3, lines 5-7 and Figure 1). It would have been

obvious to one having ordinary skill in the art at the time the invention was made to

formulate the coating of Tuch as modified by Morris to release the rapamycin for a

period of 14 days or several weeks as it is known that cell proliferation occurs in the first

two weeks after injury to the arterial smooth muscle cells, and since it has been held

that discovering an optimum value of a result effective variable involves only routine skill

in the art.  In re Boesch, 617 F.2d 272, 205 USPQ 215 (CCPA 1980).

    *Regarding claim 41,* Tuch discloses that the polymeric carrier and drug are

mixed together (abstract).

    Accordingly, this rejection of claims 40, 41, 44, 47-59, 61-67, 70/40, 70/41, 70/44,

70/47-59, 70/61-64, 70/66, 70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61-64, 74/66 and

74/67 based on Morris 781 in view Tuch 411 of was proposed by the third party

requester in the request for reexamination and is being adopted essentially as proposed

in the request and the rejection of claims 65, 70/65 and 74/65 based on Morris 781 in

view Tuch 411 of was proposed by the third party requester in the request for

reexamination and is being adopted as modified.

    Furthermore, claims 70/42, 70/43, 70/45, 70/46, 70/60, 70/68, 74/42, 74/43,

74/45, 74/46, 74/60 and 74/68 depend upon claims that are not rejected with the

combination of Morris and Tuch.  Accordingly, the rejection of these claims based on

Morris 781 and Tuch 411 is not adopted essentially as proposed in the request.

BSC-SJA-0430

The rejection of claims 2, 5-7, 11-13, 16, 17, 19-22, 24 and 25 based on Morris

781 in view of Tuch 411 is not adopted essentially as proposed in the request for the

reasons set forth below.

Claims 11-13, 16, 17, 19-22, 24 and 25 are dependent upon claim 10 which is

dependent upon claim 1. Claims 2 and 5-7 are dependent upon claim 1. A dependent

claim includes of all of the limitations of the base claim and any intervening claims.

Furthermore, the Request does not specifically address the issue of modifying Morris

781 with Tuch 411 to meet the limitations of claims 1 and 10. Since Morris 781 does

not anticipate claim 1, a rejection of claims 2, 5-7, 11-13, 16, 17, 19-22, 24 and 25,

based on Morris 781 is not appropriate.


### Ground # 132.

**The request submits that claims 43, 45 and 46 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Morris 781 in view of Tuch 411 and Ragheb
070.**

Claims 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Morris 781 in view of Tuch 411 as applied to claim 40 above, and

further in view of Ragheb 070.

*Regarding claim 45*, the stent of Morris as modified by Tuch, set forth above,

does not include a channel formed in at least one strut. Ragheb shows a stent 10

having a coating thereon. The stent is formed of struts 14 having channels 28' formed

therein. Ragheb discloses that "[t]he wells 28' may also be in the form of slots or

grooves in the surface of the base material 14 of the medical device. This aspect of the

invention provides the advantage of better controlling the total amount of the bioactive

material 18 to be released as well as the rate at which it is released." (column 16, lines

48-51). It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use the stent of Ragheb in Morris as modified by Tuch, in order

to control the amount and rate of release of rapamycin.

   *Regarding claim 46*, Figure 10B of Ragheb shows a rectangular channel with a

close perimeter and an open top. The channel is smaller in all dimensions than the strut.

   *Regarding claim 43*, Morris and Tuch fail to disclose that the drug is entrapped

on the surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18

is entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb

discloses "any degradation of the bioactive material which might otherwise occur by

other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the

manner of enhancing a particular device (stent with drug delivery capabilities) was

made part of the ordinary capabilities of one skilled in the art based upon the teaching

of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have

been capable of applying this known "improvement" technique in the same manner to

the stent of Morris and Dinh and the results would have been predictable to one of

ordinary skill in the art, namely, one skilled in the art would have readily recognized that

the entrapment system of Ragheb would reduce the degradation of the drug as might

occur with the polymer coating technique of Tuch.

BSC-SJA-0432

Application/Control Number: 95/001,097                              Page 277
Art Unit: 3993

Accordingly, this rejection of claims 43, 45, and 46 based on Morris 781 in view

of Tuch 411 and Ragheb 070 was proposed by the third party requester in the request

for reexamination is and <u>being adopted</u> essentially as proposed in the request.


**Ground # 133.**

The request submits that claims 11-13, 19-22, 25, 26, 40, 41, 44, 50-57, 61-
64, 67, 68, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious
over Morris 781 in view of Kaplan 348.

Claims 40, 41, 44, 50-57, 61-64, 67, 68, 70/40, 70/41, 70/44, 70/50-57, 70/61-64,

70/67, 70/68, 74/40, 74/41, 74/44, 74/50-57, 74/61-64, 74/67 and 74/68 are rejected

under 35 U.S.C. 103(a) as being unpatentable over Morris 781 in view of Kaplan 348.

*Regarding claim 40,* Morris teaches that it is known to use an antiproliferative

effective amount rapamycin, delivered via a stent, to prevent restenosis or cell

proliferation (column 3, lines 51-64). Morris further discloses that rapamycin may be

encapsulated in a polymer matrix for delivery (column 3, lines 51-64).

Kaplan teaches an intravascular stent 2 having a coating thereon (laminated

filaments, Figure 5b and 5c). The coating may comprise a polymer (column 6, line 25)

and a therapeutic substance (column 5, lines 4-10) to prevent restenosis (abstract and

column 5, lines 8-9 and column 8, lines 15-19). A variety of pharmaceutical and other

therapeutic agents may be delivered from the polymer coating and may include

antiproliferative substances for inhibiting smooth muscle cell proliferation and

restenosis. Kaplan and Morris disclose that the drug is present a therapeutically

beneficial amount to inhibit neointimal proliferation (see Kaplan, column 8, lines 33-35).

BSC-SJA-0433

It would have been obvious to one of ordinary skill in the art at the time the invention was made to replace the impregnated stent of Morris with the coated stent of Kaplan because both references teach treating the vessel with therapeutic agents, delivered via a vascular stent, in order to inhibit or lessen restenosis. Morris discloses that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that the stent of Kaplan would allow the rapamycin of Morris to be delivered to the vascular system as intended, e.g. to prevent restenosis in the vascular system. Furthermore, it would have been obvious to substitute the impregnated stent of Morris with the coated stent of Kaplan since the substitution of the stent disclosed by Morris with that of Kaplan would have yielded predictable results, namely, delivery of a drug to the vascular system to prevent and treat restenosis and would merely be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claim 41*, Kaplan discloses that the polymeric carrier and drug are mixed together (column 7, lines 17-21).

*Regarding claim 44*, Kaplan shows a stent in the form of a thinned walled cylinder containing a plurality of struts 6.

*Regarding claims 50 and 51*, Kaplan discloses the use of "polymers which are degradable over time" (column 6, lines 25-26). Kaplan also discloses "[a]s an

Application/Control Number: 95/001,097                                         Page 279
Art Unit: 3993

alternative to biodegradable polymers, the present invention can employ filaments of

no-degradable materials" (column 7, lines 42-44).

   *As to claims 52-55 and 61-64*, Kaplan discloses that the polymer may comprise

polycaprolactone (claim 8), polyanhydride (column 6, line 64), ethylenevinylacetate

(column 6, lines 61-61), monomers of hydroxyethylmentacrylate (column 6, line 60-61)

and methyl methacrylate-ethylene glycol and dimethylmethacrylate copolymer and

ethylene-vinyl acetate copolymer (column 7, lines 47-49).

   *Regarding claims 56 and 57*, neither Morris nor Kaplan discloses the use of

polysaccharide or a polyamino acid as a polymer for forming the coating. However, the

substitution of one known element (any of the polymers of Morris or Kaplan) for another

(e. g. polysaccharide or a polyamino acid) would have been obvious to one of ordinary

skill in the art at the time of the invention since the substitution of the polymer disclosed

by Morris or Kaplan with a polysaccharide or a polyamino acid would have yielded

predictable results, namely, delivery of a drug to the vascular system and would merely

be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82

USPQ2d 1385, 1396 (2007).

   *Regarding claims 67 and 68*, the requests avers, that since Kaplan incorporates

by reference U.S. Patent No. 5,019,090 to Pinchuck, all the features of Pinchuck are

part of Kaplan's invention. However, Kaplan's incorporation of Pinchuck is merely to set

forth the state of the prior art and does not necessarily mean that the entire disclosure is

part of Kaplan's invention. Accordingly, Kaplan does not disclose the use of

polytetrafluororethylene as a polymer for forming the strands. However, the substitution

BSC-SJA-0435

of one known element (any of the polymers of Kaplan) for another (e. g.

polytetrafluororethylene) would have been obvious to one of ordinary skill in the art at

the time of the invention since the substitution of the polymer disclosed by Kaplan with

polytetrafluororethylene would have yielded predictable results, namely, delivery of a

drug to the vascular system and would merely be a substitution of one known element

for another. *KSR Int'l Co. v. Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

*Regarding claims 70/40, 70/41, 70/44, 70/50-57, 70/61-64, 70/67, 70/68, 74/40,

74/41, 74/44, 74/50-57, 74/61-64, 74/67 and 74/68*, Kaplan discloses that the drug may

be released at a controlled rate for a period of four to six months (column 8, lines 31-37.

Accordingly, this rejection of claims 40, 41, 44, 50-55, 61-64, 70/40, 70/41, 70/44,

70/50-55, 70/61-64, 74/40, 74/41, 74/44, 74/50-55 and 74/61-64 based on Morris 781 in

view of Kaplan 348 was proposed by the third party requester in the request for

reexamination and is <u>being adopted</u> essentially as proposed in the request and the

rejection of claims 56, 57, 67, 68, 70/56, 70/57, 70/67, 70/68, 74/56, 74/57, 74/67 and

74/68 is <u>adopted with modification</u>.

Furthermore, claims 70/42, 70/43, 70/45-49, 70/58-60, 70/65, 74/42, 74/43,

74/45-49, 74/58-60 and 74/65 depend upon claims that are not rejected with the

combination of Morris and Kaplan. Accordingly, the rejection of these claims based on

Morris 781 and Kaplan 348 is <u>not adopted</u> essentially as proposed in the request.

The rejection of claims 11-13, 19-22, 25 and 26 based on Morris 781 in view of

Kaplan 348 is <u>not adopted</u> essentially as proposed in the request for the reasons set

forth below.

BSC-SJA-0436

Application/Control Number: 95/001,097                    Page 281
Art Unit: 3993

Claims 11-13, 19-22, 25 and 26 are dependent upon claim 10 which is
dependent upon claim 1. A dependent claim includes of all of the limitations of the base
claim and any intervening claims. Furthermore, the Request does not specifically
address the issue of modifying Morris 781 with Kaplan 348 to meet the limitations of
claims 1 and 10. Since Morris 781 does not anticipate claim 1, a rejection of claims 11-
13, 19-22, 25 and 26, based on Morris 781 is not appropriate.


### Ground # 134.

**The request submits that claims 43, 45 and 46 are unpatentable under 35
U.S.C. § 103(a) as being obvious over Morris 781 in view of Kaplan 348 and
Ragheb 070.**

Claims 43, 45, and 46 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Morris 781 in view of Kaplan 348 as applied to claim 40 above, and
further in view of Ragheb 070.

*Regarding claim 45*, the stent of Morris as modified by Kaplan, set forth above,
does not include a channel formed in at least one strut. Ragheb shows a stent 10
having a coating thereon. The stent is formed of struts 14 having channels 28' formed
therein. Ragheb discloses that "[t]he wells 28' may also be in the form of slots or
grooves in the surface of the base material 14 of the medical device. This aspect of the
invention provides the advantage of better controlling the total amount of the bioactive
material 18 to be released as well as the rate at which it is released." (column 16, lines
48-51). It would have been obvious to one of ordinary skill in the art at the time the

BSC-SJA-0437

invention was made to use the stent of Ragheb in Morris as modified by Kaplan, in order to control the amount and rate of release of rapamycin.

*Regarding claim 46,* Figure 10B of Ragheb shows a rectangular channel with a close perimeter and an open top. The channel is smaller in all dimensions than the strut.

*Regarding claim 43,* Morris and Kaplan fail to disclose that the drug is entrapped on the surface of the stent by the polymeric carrier. Ragheb discloses that the drug 18 is entrapped by a polymeric layer 20 which controls the release of the drug. Ragheb discloses "any degradation of the bioactive material which might otherwise occur by other polymer coating techniques is avoided" (column 19, lines 51-53). Thus, the manner of enhancing a particular device (stent with drug delivery capabilities) was made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in Ragheb. Accordingly, one of ordinary skill in the art would have been capable of applying this known "improvement" technique in the same manner to the stent of Morris and Kaplan and the results would have been predictable to one of ordinary skill in the art, namely, one skilled in the art would have readily recognized that the entrapment system of Ragheb would reduce the degradation of the drug as might occur with the polymer coating technique of Kaplan.

Accordingly, this rejection of claims 43, 45, and 46 based on Morris 781 in view of Kaplan 348 and Ragheb 070 was proposed by the third party requester in the request for reexamination is and <u>being adopted</u> essentially as proposed in the request.

BSC-SJA-0438

## Cordis Admissions Proposed Obviousness Combinations.

### Ground # 135.

The request submits that claims 1-2, 5-17, 19, 21, 22, 24, 25, 28, 30, 32, 40, 41, 44, 47-59, 61, 63, 64, 66, 67, 70 and 74 are unpatentable under 35 U.S.C. § 103(a) as being obvious over Berg 650 in view of Morris 781 and further in view of Cordis' admissions.

Claims 1-2, 5-17, 19, 21, 22, 24, 25, 28, 30, 32, 40, 41, 44, 47-59, 61, 63, 64, 66, 67, 70 and 74 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg 650 in view of Morris 781 and further in view of Cordis' admissions.

A rejection of claims 1-2, 5-17, 19, 21, 22, 24, 25, 28, 30, 32, 40, 41, 44, 47-59, 61, 63, 64, 66, 67, 70 and 74 under 35 U.S.C. 103(a) as being unpatentable over Berg in view of Morris has already been set forth above. See Ground #1 for reference descriptions.

Cordis admits in United States Patent No. 7,229,473 that it was well known in the art to deliver a therapeutic agent to a site of arterial injury by incorporating the agent into a polymeric coating on a stent (column 3 lines 46-50). Additionally, Cordis admits it was well known that rapamycin was capable of inhibiting SMC hyperproliferation (column 5 lines 48-55).

Additionally, Cordis has made admissions in court that it was well known in the art to incorporate an agent into a polymeric coating on a stent for delivery to the arterial lining. See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-SLR, specifically Cordis Opening Claim Construction Brief, filed 3/31/05, at pages 2 and 3; Cordis Expert Report

Application/Control Number: 95/001,097                                    Page 284
Art Unit: 3993

by Hanson, filed 1/27/05 at page 10; Cordis Expert Report by Hanson, filed 5/23/03, at

page 11; Cordis Motion for JMOL, filed 9/2/05, at pages 29-30; Cordis Post Hearing

Answering Brief, filed 9/12/03, at page 32; Cordis Summary Judgment Opposition, filed

4/14/05, at page 9; Cordis Combined Post Hearing Brief, filed 8/29/03, at pages 32-33;

Cordis Reply Brief, filed 10/24/05, at pages 18-19; Cordis Expert Report by Storey, filed

5/23/03, at page 11 ; and Cordis Answering Memorandum, filed 4/3/03, at page 7.

       Cordis has also made admission in court that polymer selection for drug/polymer

coated stents was well known in the art. Specifically, Cordis has described polymer

development as "straightforward" and "not a challenge". See Boston Scientific v. Cordis,

C.A. No. 1:03-cv-00283-SLR, specifically Cordis Expert Report by Hanson, filed 1/27/05

at pages 10 and 13; Cordis Expert Report by Hanson, filed 5/23/03, at page 11; Cordis

Motion for JMOL, filed 9/2/05, at pages 30 and 38; Cordis Summary Judgment

Opposition, filed 4/14/05, at pages 1, 7 and 9; and Cordis Reply Brief, filed 10/24/05, at

pages 18-19.

       Cordis has admitted in court that long term drug release from polymer-drug

coated stents was well known. See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-

SLR, specifically Cordis Expert Report by Hanson, filed 1/27/05 at pages 11 and 15;

Cordis Expert Report by Hanson, filed 5/23/03, at pages 9-12; Cordis Summary

Judgment Opposition, filed 4/14/05, at page 7; and Cordis Expert Report by Storey, filed

5/23/03, at page 12.

Cordis has also admitted in court and during the prosecution of patent application no.09/850,482 that delivering rapamycin for the treatment of restenosis using a vascular stent with a drug delivery matrix was also known in the art. See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-SLR, specifically Cordis Expert Report by Hanson, filed 1/27/05 at pages 13-14 and also see file history of patent application no. 09/850,482 Reply/Amendment filed 12/31/02 at pages 9 and 11 and Reply/Amendment filed 4/7/03 at page 8.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Berg to include rapamycin, in view of the teachings of Morris and the Cordis' Admissions. Morris and the Cordis' Admissions teach that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Furthermore, and the combination would have yielded nothing more than predictable results to one of ordinary skill in the art at the time of the invention, i.e., one skilled in the art would have recognized that rapamycin would allow the stent of Berg to be used as Berg intended, e.g. to prevent restenosis in the vascular system.

Accordingly, this rejection of claims 1-2, 5-17, 19, 21, 22, 24, 25, 28/1, 28/2, 28/5-17, 28/19, 28/21, 28/22, 28/24, 28/25, 30/1, 30/2, 30/5-17, 30/19, 30/ 21, 30/22, 30/24, 30/25, 32/1, 32/2, 32/5-17, 32/19, 30/21, 30/22, 30/24, 30/25, 32/1, 32/2, 32/5-17, 32/19, 32/21, 32/22, 32/24, 32/25, 40-41, 44, 47-59, 61, 63, 64, 66, 67, 70/40, 70/41, 70/44, 70/47-59, 70/61, 70/61, 70/63, 70/64, 70/66, 70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61, 74/61, 74/63, 74/64, 74/66 and 74/67, based on Berg 650 in view of

Morris 781 and the Cordis' Admissions was proposed by the third party requester in the
request for reexamination and is being adopted essentially as proposed in the request.

Furthermore, claims 28/3, 28/4, 28/18, 28/20, 28/23, 28/26, 30/3, 30/4, 30/18,
30/20, 30/23, 30/26, 32/3, 32/4, 32/18, 32/20, 32/23, 32/26, 70/42, 70/43, 70/45, 70/46,
70/60, 70/62, 74/42, 74/43, 74/45, 74/46, 74/60, 74/62 and 74/65 depend upon claims
that are not rejected with the combination of Berg and Morris.  Accordingly, the
rejection of these claims based on Berg 650 and Morris 781 and the Cordis admissions
is not adopted essentially as proposed in the request.


### Ground # 136.

**The request submits that claims 1-2, 5-17, 19, 21, 22, 24, 25, 27-41, 44, 47-
59, 61, 63, 64, 66, 67, and 69-77 are unpatentable under 35 U.S.C. § 103(a) as being
obvious over Berg 650 in view of Skotnicki 579 and Cordis' Admissions.**

Claims 1-2, 5-17, 19, 21, 22, 24, 25, 27-41, 44, 47-59, 61, 63, 64, 66, 67, and 69-
77 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg 650 in view of
Skotnicki 579 and Cordis' Admissions.

A rejection of claims 1-2, 5-17, 19, 21, 22, 24, 25, 27-41, 44, 47-59, 61, 63, 64,
66, 67, and 69-77 under 35 U.S.C. 103(a) as being unpatentable over Berg in view of
Skotnicki 579 has already been set forth above.  See Ground #8 for reference
descriptions.

Cordis admits in U.S. Patent No. 7,229,473 that it was well known in the art to
deliver a therapeutic agent to a site of arterial injury by incorporating the agent into a
polymeric coating on a stent (column 3 lines 46-50). Additionally, Cordis admits it was

well known that rapamycin was capable of inhibiting SMC hyperproliferation (column 5 lines 48-55).

Additionally, Cordis has made admissions in court that it was well known in the art to incorporate an agent into a polymeric coating on a stent for delivery to the arterial lining. See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-SLR, specifically Cordis Opening Claim Construction Brief, filed 3/31/05, at pages 2 and 3; Cordis Expert Report by Hanson, filed 1/27/05 at page 10; Cordis Expert Report by Hanson, filed 5/23/03, at page 11; Cordis Motion for JMOL, filed 9/2/05, at pages 29-30; Cordis Post Hearing Answering Brief, filed 9/12/03, at page 32; Cordis Summary Judgment Opposition, filed 4/14/05, at page 9; Cordis Combined Post Hearing Brief, filed 8/29/03, at pages 32-33; Cordis Reply Brief, filed 10/24/05, at pages 18-19; Cordis Expert Report by Storey, filed 5/23/03, at page 11; and Cordis Answering Memorandum, filed 4/3/03, at page 7.

Cordis has also made admissions in court that polymer selection for drug/polymer coated stents was well known in the art. Specifically, Cordis has described polymer development as "straightforward" and "not a challenge". See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-SLR, specifically Cordis Expert Report by Hanson, filed 1/27/05 at pages 10 and 13; Cordis Expert Report by Hanson, filed 5/23/03, at page 11; Cordis Motion for JMOL, filed 9/2/05, at pages 30 and 38; Cordis Summary Judgment Opposition, filed 4/14/05, at pages 1, 7 and 9; and Cordis Reply Brief, filed 10/24/05, at pages 18-19.

BSC-SJA-0443

Application/Control Number: 95/001,097                                        Page 288
Art Unit: 3993

Cordis has admitted in court that long term drug release from polymer-drug

coated stents was well known. See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-

SLR, specifically Cordis Expert Report by Hanson, filed 1/27/05 at pages 11 and 15;

Cordis Expert Report by Hanson, filed 5/23/03, at pages 9-12; Cordis Summary

Judgment Opposition, filed 4/14/05, at page 7; and Cordis Expert Report by Storey, filed

5/23/03, at page 12.

Cordis has also admitted in court and during the prosecution of patent application

no.09/850,482 that delivering rapamycin for the treatment of restenosis using a vascular

stent with a drug delivery matrix was also known in the art. See Boston Scientific v.

Cordis, C.A. No. 1:03-cv-00283-SLR, specifically Cordis Expert Report by Hanson, filed

1/27/05 at pages 13-14 and also see file history of patent application no. 09/850,482

Reply/Amendment filed 12/31/02 at pages 9 and 11 and Reply/Amendment filed 4/7/03

at page 8.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the stent of Berg to include rapamycin or macrocyclic

lactone derivatives of rapamycin, in view of the teachings of Skotnicki '579 and the

Cordis' Admissions. Skotnicki '579 and the Cordis' Admissions teach that rapamycin

and macrocyclic lactone derivatives of rapamycin is a known and effective inhibitor of

cell proliferation and is used to treat restenosis. Furthermore, the combination would

have yielded nothing more than predictable results to one of ordinary skill in the art at

the time of the invention, i.e., one skilled in the art would have recognized that

BSC-SJA-0444

rapamycin or macrocyclic lactone derivatives of rapamycin would allow the stent of Berg

to be used as Berg intended, e.g. to prevent restenosis in the vascular system.

Accordingly, this rejection of claims 1-2, 5-17, 19, 21, 22, 24, 25, 27, 27/1, 27/2,

27/5-17, 27/19, 27/21, 27/22, 27/24, 27/25, 28/1, 28/2, 28/5-17, 28/19, 28/21, 28/22,

28/24, 28/25, 29/28/1, 29/28/2, 29/28/5-17, 29/28/19, 29/28/21, 29/28/22, 29/28/24,

29/28/25, 30/1, 30/2, 30/5-17, 30/19, 30/ 21, 30/22, 30/24, 30/25, 31/30/1, 31/30/2,

31/30/5-17, 31/30/19, 31/30/21, 31/30/22, 31/30/24, 31/30/25, 32/1, 32/2, 32/5-17,

32/19, 32/21, 32/22, 32/24, 32/25, 33/32/1, 33/32/2, 33/32/5-17, 33/32/19, 33/32/21,

33/32/22, 33/32/24, 33/32/25, 34/33/32/1, 34/33/32/2, 34/33/32/5-17, 34/33/32/19,

34/33/32/21, 34/33/32/22, 34/33/32/24, 34/33/32/25, 35/34/33/32/1, 35/34/33/32/2,

35/34/33/32/5-17, 35/34/33/32/19, 35/34/33/32/21, 35/34/33/32/22, 35/34/33/32/24,

35/34/33/32/25, 36/35/34/33/32/1, 36/35/34/33/32/2, 36/35/34/33/32/5-17,

36/35/34/33/32/19, 36/35/34/33/32/21, 36/35/34/33/32/22, 36/35/34/33/32/24,

36/35/34/33/32/25, 37/33/32/1, 37/33/32/2, 37/33/32/5-17, 37/33/32/19, 37/33/32/21,

37/33/32/22, 37/33/32/24, 37/33/32/25, 38/37/33/32/1, 38/37/33/32/2, 38/37/33/32/5-17,

38/37/33/32/19, 38/37/33/32/21, 38/37/33/32/22, 38/37/33/32/24, 38/37/33/32/25,

39/38/37/33/32/1, 39/38/37/33/32/2, 39/38/37/33/32/5-17, 39/38/37/33/32/19,

39/38/37/33/32/21, 39/38/37/33/32/22, 39/38/37/33/32/24, 39/38/37/33/32/25, 40, 41,

44, 47-59, 61, 63, 64, 66, 67, 69/40, 69/41, 69/44, 69/47-59, 69/61, 69/63, 69/64, 69/66,

69/67, 70/40, 70/41, 70/44, 70/47-59, 70/61, 70/63, 70/64, 70/66, 70/67, 71/70/40,

71/70/41, 71/70/44, 71/70/47-59, 71/70/61, 71/70/63, 71/70/64, 71/70/66, 71/70/67,

72/71/70/40, 72/71/70/41, 72/71/70/44, 72/71/70/47-59, 72/71/70/61, 72/71/70/63,

Application/Control Number: 95/001,097                                    Page 290
Art Unit: 3993

72/71/70/64, 72/71/70/66, 72/71/70/67, 73/72/71/70/40, 73/72/71/70/41, 73/72/71/70/44,

73/72/71/70/47-59, 73/72/71/70/61, 73/72/71/70/63, 73/72/71/70/64, 73/72/71/70/66,

73/72/71/70/67, 74/40, 74/41, 74/44, 74/47-59, 74/61, 74/63, 74/64, 74/66, 74/67,

75/74/40, 75/74/41, 75/74/44, 75/74/47-59, 75/74/61, 75/74/63, 75/74/64, 75/74/66,

75/74/67, 76/75/74/40, 76/75/74/41, 76/75/74/44, 76/75/74/47-59, 76/75/74/61,

76/75/74/63, 76/75/74/64, 76/75/74/66, and 76/75/74/67, 77/76/75/74/40,

77/76/75/74/41, 77/76/75/74/44, 77/76/75/74/47-59, 77/76/75/74/61, 77/76/75/74/63,

77/76/75/74/64, 77/76/75/74/66, and 77/76/75/74/67, based on Berg 650 in view of

Skotnicki 579 and the Cordis' Admissions, was proposed by the third party requester in

the request for reexamination and is being adopted essentially as proposed in the

request.

    Furthermore, claims 28/3, 28/4, 28/18, 28/20, 28/23, 28/26, 30/3, 30/4, 30/18,

30/20, 30/23, 30/26, 32/3, 32/4, 32/18, 32/20, 32/23, 32/26, 69/42, 69/43, 69/45, 69/46,

69/60, 69/62, 69/68, 70/42, 70/43, 70/45, 70/46, 70/60, 70/62, 70/68, 71/70/42, 71/70/43,

71/70/45, 71/70/46, 71/70/60, 71/70/62, 71/70/68, 72/71/70/42, 72/71/70/43,

72/71/70/45, 72/71/70/46, 72/71/70/60, 72/71/70/62, 72/71/70/68, 73/72/71/70/42,

73/72/71/70/43, 73/72/71/70/45, 73/72/71/70/46, 73/72/71/70/60, 73/72/71/70/62,

73/72/71/70/68, 74/42, 74/43, 74/45, 74/46, 74/60, 74/62, 74/68, 75/74/42, 75/74/43,

75/74/45, 75/74/46, 75/74/60, 75/74/62, 75/74/63, 76/75/74/42, 76/75/74/43,

76/75/74/45, 76/75/74/46, 76/75/74/60, 76/75/74/62, 77/76/75/74/42, 77/76/75/74/43,

77/76/75/74/45, 77/76/75/74/46, 77/76/75/74/60, 77/76/75/74/62 and 77/76/75/74/68

depend upon claims that are not rejected with the combination of Berg and Skotnicki

579 and the Cordis' Admissions.  Accordingly, the rejection of these claims based on

Berg 650 and Skotnicki 579 and the Cordis' Admissions is <u>not adopted</u> essentially as

proposed in the request.


## Examiner Proposed Rejections.

### Ground # 137.

Claims 40, 43-48, 50-59, 63-68, 70/40, 70/43-48, 70/50-59, 70/63-68, 74/40,

74/43-48, 74/50-59 and 74/63-68 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Ragheb et al 070 in view of Morris 781 or Mitchell 711.

Ragheb shows a metallic stent (column 7, lines 30-31) comprising a polymeric

carrier 20 and a drug 18.  The drug (such as methotrexate) is used to inhibit SMC

proliferation and prevent restenosis.  Ragheb does not disclose that the therapeutic

substance is rapamycin or a macrocyclic lactone analog thereof.

Morris teaches that it is known to use an antiproliferative effective amount

rapamycin, delivered via a stent, to prevent restenosis or cell proliferation (column 3,

lines 51-64).  Morris further discloses that rapamycin may be encapsulated in a polymer

matrix for delivery (column 3, lines 51-64).

Mitchell  teaches that it is known to use rapamycin, delivered via a stent, to

prevent restenosis or cell proliferation (column 3, lines 24-31).  A solid carrier can be

used to administer rapamycin including polyvinylpyrrolidine (column 6, lines 24-28 and

column 7, lines 10-15).

BSC-SJA-0447

Application/Control Number: 95/001,097                                      Page 292
Art Unit: 3993

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to modify the stent of Ragheb to include rapamycin, in view of the

teaching of Morris or Mitchell. All three references teach treating the vessel with

therapeutic agents in order to inhibit or lessen restenosis. Both Morris and Mitchell

disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used

to treat restenosis via a vascular stent. Furthermore, the combination would have

yielded nothing more than predictable results to one of ordinary skill in the art at the

time of the invention, i.e., one skilled in the art would have recognized that rapamycin

would allow the stent of Ragheb to be used as Ragheb intended, e.g. to prevent

restenosis in the vascular system.

Regarding claim 43, Ragheb discloses that the drug 18 is entrapped by a

polymeric layer 20 which controls the release of the drug. Ragheb discloses "any

degradation of the bioactive material which might otherwise occur by other polymer

coating techniques is avoided" (column 19, lines 51-53).

Regarding claims 44 and 45, the stent of Ragheb is formed of as a generally thin

walled cylinder comprising struts 14 having channels 28' formed therein. Ragheb

discloses that "[t]he wells 28' may also be in the form of slots or grooves in the surface

of the base material 14 of the medical device. This aspect of the invention provides the

advantage of better controlling the total amount of the bioactive material 18 to be

released as well as the rate at which it is released." (column 16, lines 48-51).

Regarding claim 46, Figure 10B of Ragheb shows a rectangular channel with a

close perimeter and an open top. The channel is smaller in all dimensions than the strut.

BSC-SJA-0448

*Regarding claims 47 and 48*, Ragheb discloses that the carrier and drug may be applied to the stent by dipping or by spraying (column 4, lines 37-41).

*Regarding claim 50 and 51*, Raheb discloses "[t]he polymer may either be a biostable or bioabsorbable polymer" (column 11, lines 55-56).

*As to claims 52-59, 63-68*, Ragheb discloses that the polymer may comprise polycaprolactone (column 11, lines 62), poly(lactide-co-glycolide) (column 11, line 62-63), polyanhydride (column 11, line 65), poly(amino acids) (column 11, last line to column 12, line 1), polysaccharide, e.g. cellulose, starch (column 12, line 4), polyphosphazenes (column 12, line 3), copoly(ether-esters) (column 12, line 2), an acrylate based polymer, ethylene-methyl methacrylate copolymers (column 12, line 18), N-vinyl pyrrolidene (column 11, line 42), cellulose acetate, cellulose butyrate, cellulose acetate butyrate etc (column 12, lines 23-24), and tetrafluoroethylene (including TEFLON® (column 4, line 35).

*Regarding claims 70/40, 70/43-48, 70/50-59, 70/63-68, 74/40, 74/43-48, 74/50-59, 74/63-68*, Ragheb discloses that the drug may be released at a controlled rate for a period of days, weeks or months. "It would be desirable that such devices would deliver their agents over both the short term (that is, the initial hours and days after treatment) and the long term (the weeks and months after treatment). It would also be desirable to provide precise control over the delivery rate for the agents, drugs or bioactive materials, and to limit systemic exposure to them". (See column 2, lines 56-59).

Application/Control Number: 95/001,097
Art Unit: 3993

Page 294

### Ground # 138.

Claims 60, 70/60 and 74/60 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Ragheb 070 and Morris 781 or Mitchell 711 as applied to claim 40
above, and further in view of Ding 313. Ragheb 070 does not disclose that the polymer
may comprise polydimethylsiloxane. Ding discloses that it is known to use
polydimethylsiloxane or ethylene vinyl acetate copolymers (column 4, lines 57-58) as
the coating on a drug delivery stent. See column 4, lines 9-10, "[f]or example, silicone or
polysiloxane materials (such as polydimethylsiloxane) have been used successfully."
The substitution of one known element (any of the polymers of Ragheb) for another
(polydimethylsiloxane or ethylene vinyl acetate copolymers of Ding) would have been
obvious to one of ordinary skill in the art at the time of the invention since the
substitution of the polymer disclosed by Ragheb with that of Ding would have yielded
predictable results, namely, delivery of a drug to the vascular system and would merely
be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82
USPQ2d 1385, 1396 (2007).

### Ground # 139.

Claims 62, 70/62 and 74/62 rejected under 35 U.S.C. 103(a) as being
unpatentable over Ragheb 070 and Morris 781 or Mitchell 711 as applied to claim 40
above, and further in view of Kaplan 348. Ragheb does not disclose that the polymer
may comprise poly(hydroxyl)ethylmethylmethacrylate. Kaplan discloses that
poly(hydroxyl) ethylmethylmethacrylate may be used as the coating on a drug delivery
stent. See column 6, lines 60-61, "[o]ther acceptable polymers may contain monomers

of hydroxyethylmethacrylate . . ." The substitution of one known element (any of the

polymers of Ragheb) for another (poly(hydroxyl) ethylmethylmethacrylate of Kaplan)

would have been obvious to one of ordinary skill in the art at the time of the invention

since the substitution of the polymer disclosed by Ragheb with that of Kaplan would

have yielded predictable results, namely, delivery of a drug to the vascular system and

would merely be a substitution of one known element for another. *KSR Int'l Co. v.*

*Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

### Ground # 140.

Claims 40, 43-48, 50-59, 63-68, 69/40, 69/43-48, 69/50-59, 69/63-68, 70/40,

70/43-48, 70/50-59, 70/63-68, 71/70/40, 71/70/43-48, 71/70/50-59, 71/70/63-68,

72/71/70/40, 72/71/70/43-48, 72/71/70/50-59, 72/71/70/63-68, 73/72/71/70/40,

73/72/71/70/43-48, 73/72/71/70/50-59, 73/72/71/70/63-68, 74/40, 74/43-48, 74/50-59,

74/63-68, 75/74/40, 75/74/43-48, 75/74/50-59, 75/74/63-68, 76/75/74/40, 76/75/74/43-

48, 76/75/74/50-59, 76/75/74/63-68, 77/76/75/74/40, 77/76/75/74/43-48,

77/76/75/74/50-59 and 77/76/75/74/63-68 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Ragheb 070 in view of Skotnicki 579 , Russo 977, Failli 145,

Skotnicki 718, Skotnicki 730 or Nelson 790.

*Regarding claims 69/40, 69/43-48, 69/50-59, 69/63-68, 71/70/40, 71/70/43-48,*

*71/70/50-59, 71/70/63-68, 75/74/40, 75/74/43-48, 75/74/50-59 and 75/74/63-68,*

Ragheb shows a metallic stent (column 7, lines 30-31) comprising a polymeric carrier

20 and a drug 18. The drug (such as methotrexate) is used to inhibit SMC proliferation

and prevent restenosis. Ragheb does not disclose that the therapeutic substance is

rapamycin or a macrocyclic lactone analog thereof.

Skotnicki 579 teaches that it is known to use rapamycin and macrocyclic lactone

derivatives of rapamycin (abstract) to prevent restenosis or cell proliferation (column 9,

lines 1-11). Skotnicki 579 further discloses that the rapamycin derivatives may be

encapsulated in a polymer carrier for delivery (column 9, lines 34-38). The derivative

compounds have similar profile activity to rapamycin, exhibit antiproliferative activities

and are useful in treating restenosis.

Russo teaches that an analog of rapamycin, 21-norrapamycin, to prevent

restenosis or cell proliferation (abstract, column 1, lines 6-12, 39-46 and column 7, lines

10-16). The compound may be administered with a carrier that could include a

reservoir matrix (column 4, line 67 through column 5, line 4). Russo discloses that

polyvinylpyrrolidine may be used as a carrier (column 4, lines 4-20).

Failli teaches rapamycin 42-oximes and hydroxylamines are to prevent

restenosis or cell proliferation (column 1, lines 9-15, 64-66 and column 6, lines 36-48).

Failli discloses that the compounds may be delivered via an encapsulating material or

matrix including polyvinylpyrrolidine (column 7, lines 13-14 and column 8, line 3-7).

Skotnicki 718 teaches rapamycin hydroxyesters useable to prevent restenosis or

cell proliferation (abstract, column 1, lines 6-12, 40-51, 65-68 and column 6, lines 46-

59). The derivatives may be used to treat hyperproliferative disease such as restenosis

following angioplasty procedures. The compounds may be delivered via a carrier or

matrix including polyvinylpyrrolidine (column 7, lines 34-38 and column 8, line 19-24).

Skotnicki 730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof that are useful as anti-inflammatories and antiproliferatives (column 1, lines 65-68). The derivatives may be used to treat hyperproliferative disease such as restenosis (column 7, lines 10-16). Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 7, lines 50-54 and column 8, lines 35-40).

Nelson teaches 27-hydroxyrapamycin and derivatives of rapamycin to prevent restenosis or cell proliferation (abstract, column 1, lines 11-17, lines 44-51 and column 15, lines 41-54). The derivatives are useful as anti-inflammatories and antiproliferatives (column 2, lines 43-46). Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine (column 16, lines 9-12 and lines 24-28 and column 17, lines 11-15).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to modify the stent of Ragheb to include rapamycin or macrocyclic lactone derivatives of rapamycin, in view of the teachings of Skotnicki 579 , Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790, that rapamycin and macrocyclic lactone derivatives of rapamycin have superior anti-inflammatory and anti-proliferative properties. All of these references teach treating the vessel with therapeutic agents in order to inhibit or lessen restenosis. The Skotnicki 579, Russo 977, Failli 145, Skotnicki 718, Skotnicki 730 or Nelson 790 references disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis. Each disclose that the agent may be contained in a polymer carrier/matrix. Furthermore, the combination

BSC-SJA-0453

would have yielded nothing more than predictable results to one of ordinary skill in the

art at the time of the invention, i.e., one skilled in the art would have recognized that

rapamycin would allow the stent of Ragheb to be used as Ragheb intended, e.g. to

prevent restenosis in the vascular system.

Regarding claim 43, Ragheb discloses that the drug 18 is entrapped by a

polymeric layer 20 which controls the release of the drug. Ragheb discloses "any

degradation of the bioactive material which might otherwise occur by other polymer

coating techniques is avoided" (column 19, lines 51-53).

Regarding claims 44 and 45, the stent of Ragheb is formed of as a generally thin

walled cylinder comprising struts 14 having channels 28' formed therein. Ragheb

discloses that "[t]he wells 28' may also be in the form of slots or grooves in the surface

of the base material 14 of the medical device. This aspect of the invention provides the

advantage of better controlling the total amount of the bioactive material 18 to be

released as well as the rate at which it is released." (column 16, lines 48-51).

Regarding claim 46, Figure 10B of Ragheb shows a rectangular channel with a

close perimeter and an open top. The channel is smaller in all dimensions than the strut.

Regarding claims 47 and 48, Ragheb discloses that the carrier and drug may be

applied to the stent by dipping or by spraying (column 4, lines 37-41).

Regarding claim 50 and 51, Raheb discloses "[t]he polymer may either be a

biostable or bioabsorbable polymer" (column 11, lines 55-56).

As to claims 52-59, 63-68, 72/71/70/43-48, 72/71/70/50-59, 72/71/70/63-68,

73/72/71/70/40, 73/72/71/70/43-48, 73/72/71/70/50-59, 73/72/71/70/63-68, 76/75/74/40,

76/75/74/43-48, 76/75/74/50-59, 76/75/74/63-68, 77/76/75/74/40, 77/76/75/74/43-48,
77/76/75/74/50-59 and 77/76/75/74/63-68, Ragheb discloses that the polymer may
comprise polycaprolactone (column 11, lines 62), poly(lactide-co-glycolide) (column 11,
line 62-63), polyanhydride (column 11, line 65), poly(amino acids) (column 11, last line
to column 12, line 1), polysaccharide, e.g. cellulose, starch (column 12, line 4),
polyphosphazenes (column 12, line 3), copoly(ether-esters) (column 12, line 2), an
acrylate based polymer, ethylene-methyl methacrylate copolymers (column 12, line 18),
N-vinyl pyrrolidene (column 11, line 42), cellulose acetate, cellulose butyrate, cellulose
acetate butyrate etc (column 12, lines 23-24), and tetrafluoroethylene (including
TEFLON® (column 4, line 35).

Regarding claims 70/40, 70/43-48, 70/50-59, 70/63-68, 74/40, 74/43-48, 74/50-
59, 74/63-68, Ragheb discloses that the drug may be released at a controlled rate for a
period of days, weeks or months. "It would be desirable that such devices would deliver
their agents over both the short term (that is, the initial hours and days after treatment)
and the long term (the weeks and months after treatment). It would also be desirable to
provide precise control over the delivery rate for the agents, drugs or bioactive
materials, and to limit systemic exposure to them". (See column 2, lines 56-59).


**Ground # 141.**

Claims 60, 69/60, 70/60, 71/70/60, 72/71/70/60, 73/72/71/70/60, 74/60, 75/74/60,
76/75/74/60 and 77/76/75/74/60  are rejected under 35 U.S.C. 103(a) as being
unpatentable over Ragheb 070 and Skotnicki 579 , Russo 977, Failli 145, Skotnicki 718,

Application/Control Number: 95/001,097                                      Page 300
Art Unit: 3993

Skotnicki 730 or Nelson 790 as applied to claim 40 above, and further in view of Ding

313. Ragheb 070 does not disclose that the polymer may comprise

polydimethylsiloxane. Ding discloses that it is known to use polydimethylsiloxane or

ethylene vinyl acetate copolymers (column 4, lines 57-58) as the coating on a drug

delivery stent. See column 4, lines 9-10, "[f]or example, silicone or polysiloxane

materials (such as polydimethylsiloxane) have been used successfully." The

substitution of one known element (any of the polymers of Ragheb) for another

(polydimethylsiloxane or ethylene vinyl acetate copolymers of Ding) would have been

obvious to one of ordinary skill in the art at the time of the invention since the

substitution of the polymer disclosed by Ragheb with that of Ding would have yielded

predictable results, namely, delivery of a drug to the vascular system and would merely

be a substitution of one known element for another. *KSR Int'l Co. v. Teleflex Inc.*, 82

USPQ2d 1385, 1396 (2007).


### Ground # 142.

Claims 62, 69/62, 70/62, 71/70/62, 72/71/70/62, 73/72/71/70/62, 74/62, 75/74/62,

76/75/74/62 and 77/76/75/74/62 rejected under 35 U.S.C. 103(a) as being

unpatentable over Ragheb 070 and Skotnicki 579 , Russo 977, Failli 145, Skotnicki 718,

Skotnicki 730 or Nelson 790 as applied to claim 40 above, and further in view of Kaplan

348. Ragheb does not disclose that the polymer may comprise

poly(hydroxyl)ethylmethylmethacrylate. Kaplan discloses that poly(hydroxyl)

ethylmethylmethacrylate may be used as the coating on a drug delivery stent. See

column 6, lines 60-61, "[o]ther acceptable polymers may contain monomers of

BSC-SJA-0456

Application/Control Number: 95/001,097                               Page 301
Art Unit: 3993

hydroxyethylmethacrylate . . ." The substitution of one known element (any of the

polymers of Ragheb) for another (poly(hydroxyl) ethylmethylmethacrylate of Kaplan)

would have been obvious to one of ordinary skill in the art at the time of the invention

since the substitution of the polymer disclosed by Ragheb with that of Kaplan would

have yielded predictable results, namely, delivery of a drug to the vascular system and

would merely be a substitution of one known element for another. *KSR Int'l Co. v.*

*Teleflex Inc.*, 82 USPQ2d 1385, 1396 (2007).

BSC-SJA-0457

Application/Control Number: 95/001,097                                    Page 302
Art Unit: 3993

All correspondence relating to this *inter partes* reexamination proceeding should
be directed as follows:

By EFS:    Registered users may submit via the electronic filing system, EFS–
           Web, at:
           https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html.

By Mail:   Mail Stop *Inter Partes* Reexam
           ATTN: Central Reexamination Unit
           Commissioner for Patents
           U.S. Patent & Trademark Office
           P.O. Box 1450
           Alexandria, VA 22313-1450

By FAX:    (571) 273-9900 (for Central Reexamination Unit)

By hand:   Customer Service Window
           Randolph Building
           401 Dulany St.
           Alexandria, VA 22314

For EFS-Web transmissions, 37 CFR 1.8(a)(1) (i)(C) and (ii) states that

correspondence (except for a request for reexamination and a corrected or replacement

request for reexamination) will be considered timely filed if: (a) it is transmitted via the

Office's electronic filing system in accordance with 37 CFR 1.6(a)(4); and, (b) includes a

certificate of transmission for each piece of correspondence stating the date of

transmission, which is prior to the expiration of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should

be directed to the Central Reexamination Unit at telephone number: (571) 272-7705.

The examiner's supervisor is Andres Kashnikow whose phone number is: (571) 272-

BSC-SJA-0458

Application/Control Number: 95/001,097                          Page 303
Art Unit: 3993

4361. Both the Patent Owner and the Third Party Requester are reminded that

interviews that discuss the merits are prohibited in *inter partes* reexamination

proceedings. Questions on strictly procedural matters may be discussed (*see* MPEP §

2685; 37 CFR § 1.955).


/Cary E. O'Connor/
Primary Examiner
Central Reexamination Unit
(571) 272-4702


Conferee /JGF/

Conferee /BKG/

BSC-SJA-0459