# EXHIBIT 7

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,102 | 10/24/2008 | 7,229,473 | A9882 | 8914 |

45511    7590    01/05/2009
WOODCOCK WASHBURN LLP
CIRA CENTRE, 12TH FLOOR
2929 ARCH STREET
PHILADELPHIA, PA 19104-2891

| EXAMINER |
|---|
| WILLIAMS, CATHERINE SERKE |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/05/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

BSC-SJA-0460

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

SUGRHUE MION, PLLC
2100 PENNSYLVANIA AVENUE, N.W.
SUITE 800
WASHINGTON, DC 20037

## Transmittal of Communication to Third Party Requester
### *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER <u>95/001,102</u>.

PATENT NUMBER <u>7,229,473</u>.

TECHNOLOGY CENTER <u>3999</u>.

ART UNIT <u>3993</u>.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev.07-04)

BSC-SJA-0461

| *OFFICE ACTION IN* INTER PARTES *REEXAMINATION* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/001,102 | 7,229,473 |
| | Examiner | Art Unit | |
| | ANDY KASHNIKOW | 3993 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address.* --

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on <u>24 October 2008</u>

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response:*
    <u>2</u> MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE
GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS
OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II. SUMMARY OF ACTION:**

1a. ☒ Claims <u>1-5</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims <u>1-5</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____     ☐ are acceptable     ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:   ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
       ☐ been received.     ☐ not been received.     ☐ been filed in Application/Control No <u>95001102</u>.
10. ☐ Other _____

BSC-SJA-0462

Application/Control Number: 95/001,102                                          Page 2
Art Unit: 3993

## DETAILED ACTION

### *Requester's Proposed Rejections*

**Issue A.      Berg Patent Proposed Obviousness Combinations.**

1-2.          The requester has proposed that claims 1 and 3-5 of the 7,229,473 Patent are

obvious under 35 U.S.C. 103(a) as being unpatentable over Berg in view of either Morris or

Mitchell.  The rejection as proposed by requester in the request for inter partes reexamination

filed 10/24/08 is being adopted as modified below.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the
> manner in which the invention was made.

Claims 1 and 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg in

view of either Morris or Mitchell.

Berg discloses a device comprising a metallic stent (column 3 lines 29-35) having a

coating that includes a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent

(column 4 lines 19-21 and lines 35-38).  The polymeric carrier comprises an acrylate-based

polymer or copolymer or a fluorinated polymer.  See Berg column 4 line 54 through column 5

line 7 for list of polymers, specifically polyvinylidene fluoride and ethylene-methyl methacrylate

copolymers (column 4 lines 62 and 66 and claim 6).  The therapeutic agent could be "virtually

BSC-SJA-0463

any therapeutic substance which possesses desirable therapeutic characteristics for application to
a blood vessel" (column 5 lines 19-22), can include anti-inflammatory agents (column 5 line 28)
and specifically dexamethasone (examples 1-7). One aspect of restenosis, neointimal
proliferation is the migration of medial smooth muscle cells (SMC) into the intimal layer of the
vascular wall after angioplasty. See Berg column 1 lines 38-43. Therapeutic agents are
incorporated onto stents in order to treat this aspect of restenosis. See Berg column 1 lines 54-
67. An objective of Berg is "to provide a stent having a therapeutically significant amount of a
drug", i.e. present in an amount effective to inhibit neointimal proliferation. See Berg column 7
lines 14-15. The device provides a controlled release of the therapeutic agent. See Berg column
2 lines 21-23, lines 37-40 and lines 52-54. The release may be over a period of two weeks. See
Berg example 6 and figure 1. Berg also discloses a method of inhibiting neointimal proliferation
in a coronary artery resulting from percutaneous transluminal coronary angioplasty (Berg
Background of the Invention) comprising implanting the above stent in the lumen of the
coronary artery (column 3 lines 1-9 and column 7 lines 5-15). Berg fails to include that the
therapeutic agent is rapamycin or a macrocyclic lactone analog thereof.

        Morris discloses a "Method for Treating Restenosis with Rapamycin". The method
includes preventing or treating hyperproliferative vascular disease in a mammal by administering
an antiproliferative effective amount of rapamycin via a vascular stent impregnated with
rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth
muscle cell hyperplasia and restenosis following percutaneous transluminal coronary
angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be
encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific

BSC-SJA-0464

Application/Control Number: 95/001,102                                    Page 4
Art Unit: 3993

mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in

intimal thickening. See Morris column 6 lines 57-59.

Mitchell discloses a method of treating hyperproliferative vascular disease. The method

includes preventing or treating via a vascular stent impregnated with an antiproliferative

effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines

17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See

Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as

taught by either Morris or Mitchell, into the invention of Berg. All three references teach

treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,

specifically the hyperproliferative aspects of the disease. Therefore, a combination of Berg with

Morris or Berg with Mitchell is proper. Additionally, the motivation to use rapamycin as the 

therapeutic agent in the stent of Berg can be found in the references themselves. First, Berg

teaches treating restenosis, specifically intimal proliferation in the coronary artery, using a stent

coated with a polymer and therapeutic agent. The polymer allows for controlled release of the

agent from the stent over time. See Berg description. Furthermore, both Morris and Mitchell,

independently, disclose that rapamycin is a known and effective inhibitor of cell proliferation

and is used to treat restenosis via a vascular stent. Each discloses that rapamycin may be

contained in a polymer carrier. See descriptions of Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution

for the agent or an additional therapeutic agent into the polymer coated stent of Berg. As set

forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell

BSC-SJA-0465

proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically intimal

proliferation, is a stated objective of Berg; therefore, incorporating rapamycin into the stent

would enhance or further the ability of the device of Berg to treat patients after PTCA with an

increased array of therapeutics thereby enhancing the performance of the device and method.


Regarding claim 4, requester asserts that the prior art meets these limitations because the

prior art teaches acrylate-based polymer and fluorinated polymers. However, claim 4 does not

contain these limitations in the alternative. Conversely, claim 4 depends from claim 3; therefore,

the polymeric carrier of claim 4 includes a fluorinated polymer and an acrylate-based polymer.

The prior art does not teach a carrier having a combination/mixture of these polymers.

However, USPN 7,229,473 does not set forth that the mixture of a fluorinated polymer

and an acrylate-based polymer solves a stated problem, was done for a particular purpose or

provides an advantage. Therefore, it would have been obvious to incorporate both a fluorinated

polymer and an acrylate-based polymer into the coating of the prior art since this mixture would

be expected to administer rapamycin or an analog thereof equally well.


3-8.        The requester has proposed that claims 1-5 of the 7,229,473 Patent are obvious

under 35 U.S.C. 103(a) as being unpatentable over Berg in view of any of Skotnicki '579, Russo,

Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester in the

request for inter partes reexamination filed 10/24/08 is being adopted as modified below.

Claims 1-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg in view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

Berg discloses a device comprising a metallic stent (column 3 lines 29-35) having a coating that includes a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent (column 4 lines 19-21 and lines 35-38). The polymeric carrier comprises an acrylate-based polymer or copolymer or a fluorinated polymer. See Berg column 4 line 54 through column 5 line 7 for list of polymers, specifically polyvinylidene fluoride and ethylene-methyl methacrylate copolymers (column 4 lines 62 and 66 and claim 6). The therapeutic agent could be "virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel" (column 5 lines 19-22), can include anti-inflammatory agents (column 5 line 28) and specifically dexamethasone (examples 1-7). One aspect of restenosis, neointimal proliferation is the migration of medial smooth muscle cells (SMC) into the intimal layer of the vascular wall after angioplasty. See Berg column 1 lines 38-43. Therapeutic agents are incorporated onto stents in order to treat this aspect of restenosis. See Berg column 1 lines 54-67. An objective of Berg is "to provide a stent having a therapeutically significant amount of a drug", i.e. present in an amount effective to inhibit neointimal proliferation. See Berg column 7 lines 14-15. The device provides a controlled release of the therapeutic agent. See Berg column 2 lines 21-23, lines 37-40 and lines 52-54. The release may be over a period of two weeks. See Berg example 6 and figure 1. Berg also discloses a method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty (Berg Background of the Invention) comprising implanting the above stent in the lumen of the

BSC-SJA-0467

coronary artery (column 3 lines 1-9 and column 7 lines 5-15). Berg fails to teach that the therapeutic agent is a macrocyclic lactone analog of rapamycin.

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column 1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery. See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579 column 9 lines 34-38.

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68. Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67 through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier. See Russo column 4 lines 4-20.

BSC-SJA-0468

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-

inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used

to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-

45. The compound is administered in an antiproliferative effective amount. See Failli claim 13.

Failli also discloses that the compounds can be delivered via an encapsulating material or matrix

including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories

and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to

treat hyperproliferative disease such as restenosis following an angioplasty procedure. See

Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an

antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim

22. Additionally, the compounds may be delivered via a carrier or matrix including

polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof

that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines

65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See

Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a

carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and

column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating

hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and

column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives.

See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and column 17 lines 11-15.

At the time of the invention, it would have been obvious to incorporate any of the macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Berg. All of the these references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. See description of references above. Therefore, a combination of Berg with any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic lactone analog of rapamycin as the therapeutic agent in the stent of Berg can be found in the references themselves. First, Berg teaches treating restenosis, specifically intimal proliferation in the coronary artery, using a stent coated with a polymer and therapeutic agent. The polymer allows for controlled release of the agent from the stent over time. See description of Berg above. Furthermore, any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, independently, disclose that each of their respective macrocyclic lactone analogs of rapamycin is a known and effective antiproliferative agent and may be used to treat restenosis. Each discloses that the agent may be contained in a polymer carrier/matrix. See descriptions of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Berg. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or

BSC-SJA-0470

Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or

preventing proliferation, restenosis. Clearly, treating restenosis, specifically intimal

proliferation, is a stated objective of Berg; therefore, incorporating any of the rapamycin analogs

into the stent would enhance or further the ability of the device of Berg to treat patients after

PTCA with an increased array of therapeutics thereby enhancing the performance of the device

and method.


     Regarding claim 4, see obviousness motivation provided in Issue A.


**Issue B.**　　　**Ding Patent Proposed Obviousness Combinations.**

1-2.　　　　The requester has proposed that claims 1 and 3-5 of the 7,229,473 Patent are

obvious under 35 U.S.C. 103(a) as being unpatentable over Ding in view of either Morris or

Mitchell. The rejection as proposed by requester in the request for inter partes reexamination

filed 10/24/08 is being adopted as modified below.


     Claims 1 and 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Ding in

view of either Morris or Mitchell.

     Ding discloses a drug release stent coating process that includes a metallic stent (column

10 lines 31-34) having a coating including a biocompatible, nonabsorbable polymeric carrier and

a therapeutic agent. See Ding column 3 lines 27-31; column 4 lines 49-54; column 6 lines 38-42

and column 10 lines 42-44. The polymeric carrier comprises a fluorinated polymer. Ding

incorporates by reference co-pending application Serial No. 08/663,518 ("Ding 518

BSC-SJA-0471

Application"). See Ding column 1 lines 13-20. The Ding 518 Application ultimately issued as U.S. Patent No. 6,120,536 (the "Ding 536 Patent"). The Ding 536 Patent discloses a polymer-drug coated stent that includes a biostable fluorinated silicone polymer layer that carries and elutes a drug. See Ding '536 column 5 lines 43-46. Additionally, Ding discloses that the therapeutic agent may be, among other things, antiproliferatives, anti-inflammatories or agents that inhibit hyperplasia and in particular restenosis, i.e. effective amount. See Ding column 4 lines 63-66. Ding discloses that the stent enables "the initial burst effect of drug elation to be controlled" and allows for long term delivery of biologically active materials. See Ding column 2 lines 28-32 and lines 60-63. Furthermore, figures 2-5 generally show drug release rates over a two week period. Ding fails to teach the therapeutic agent being rapamycin or a macrocyclic lactone analog thereof or the method step of implanting the device in the lumen of a coronary artery.

Morris discloses a "Method for Treating Restenosis with Rapamycin". The method includes preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative effective amount of rapamycin via a vascular stent impregnated with rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth muscle cell hyperplasia and restenosis following percutaneous translumenal coronary angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in intimal thickening. See Morris column 6 lines 57-59.

BSC-SJA-0472

Application/Control Number: 95/001,102                                    Page 12
Art Unit: 3993

Mitchell discloses a method of treating hyperproliferative vascular disease. The method
includes preventing or treating via a vascular stent impregnated with an antiproliferative
effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines
17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See
Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as
taught by either Morris or Mitchell, into the invention of Ding. All three references teach
treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,
specifically the hyperproliferative aspects of the disease. Therefore, a combination of Ding with
Morris or Ding with Mitchell is proper. Additionally, the motivation to use rapamycin as the
therapeutic agent in the stent of Ding can be found in the references themselves. Ding discloses
that the therapeutic agent may be, among other things, antiproliferatives, anti-inflammatories or
agents that inhibit hyperplasia and in particular restenosis, i.e. effective amount. See Ding
column 4 lines 63-66. Ding discloses that the stent enables "the initial burst effect of drug
elation to be controlled" and allows for long term delivery of biologically active materials. See
Ding column 2 lines 28-32 and lines 60-63. Furthermore, both Morris and Mitchell,
independently, disclose that rapamycin is a known and effective inhibitor of cell proliferation
and is used to treat restenosis via a vascular stent. Each discloses that rapamycin may be
contained in a polymer carrier. See descriptions of Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution
for the agent or an additional therapeutic agent into the polymer coated stent of Ding. As set
forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell

BSC-SJA-0473

proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically inhibiting hyperplasia, is a stated objective of Ding; therefore, incorporating rapamycin into the stent would enhance or further the ability of the device of Ding to treat patients exhibiting restenosis with a vast array of therapeutics thereby enhancing the performance of the device and method.

Regarding claim 5, Ding does not explicitly disclose a method step of implanting the stent in the lumen of a coronary artery. However, Ding does teach that the device is "for implantation in body lumens, e.g. vascular implantation". See Ding column 1 lines 20-29. Additionally, as addressed by Ding, implantation of stents is known in the art. See Ding column 1 lines 30-43. Finally, Ding teaches using a therapeutic to treat hyperplasia and in particular restenosis. See Ding column 4 lines 63-66.

Treating restenosis in vascular lumens generally by implantation of a stent was well known in the art as evidenced by many of the references cited herein, e.g. Berg, Ding, Dinh, Dayton, Tuch and Kaplan. Additionally, it was well known in the art that restenosis after percutaneous translumenal coronary angioplasty (PTCA) occurred anywhere from 30-60% post treatment. See Berg column 1 lines 12-20. Therefore, it would have been obvious to implant the device of Ding into a coronary artery in order to carry out the purpose of the device as disclosed.


Regarding claim 4, see obviousness motivation provided in Issue A.


3-8.        The requester has proposed that claims 1-5 of the 7,229,473 Patent are obvious under 35 U.S.C. 103(a) as being unpatentable over Ding in view of any of Skotnicki '579, Russo,

BSC-SJA-0474

Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester in the
request for inter partes reexamination filed 10/24/08 is being adopted as modified below.

Claims 1-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Ding in view
of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

Ding discloses a drug release stent coating process that includes a metallic stent (column
10 lines 31-34) having a coating including a biocompatible, nonabsorbable polymeric carrier and
a therapeutic agent. See Ding column 3 lines 27-31; column 4 lines 49-54; column 6 lines 38-42
and column 10 lines 42-44. The polymeric carrier comprises a fluorinated polymer. Ding
incorporates by reference co-pending application Serial No. 08/663,518 ("Ding 518
Application"). See Ding column 1 lines 13-20. The Ding 518 Application ultimately issued as
U.S. Patent No. 6,120,536 (the "Ding 536 Patent"). The Ding 536 Patent discloses a polymer-
drug coated stent that includes a biostable fluorinated silicone polymer layer that carries and
elutes a drug. See Ding '536 column 5 lines 43-46. Additionally, Ding discloses that the
therapeutic agent may be, among other things, antiproliferatives, anti-inflammatories or agents
that inhibit hyperplasia and in particular restenosis, i.e. effective amount. See Ding column 4
lines 63-66. Ding discloses that the stent enables "the initial burst effect of drug elation to be
controlled" and allows for long term delivery of biologically active materials. See Ding column
2 lines 28-32 and lines 60-63. Furthermore, figures 2-5 generally show drug release rates over a
two week period. Ding fails to teach the therapeutic agent being rapamycin or a macrocyclic
lactone analog thereof or the method step of implanting the device in the lumen of a coronary
artery.

BSC-SJA-0475

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of

rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical

structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column

1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further

discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery.

See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The

derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative

activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See

Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid

carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579

column 9 lines 34-38.

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat

hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is

effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68.

Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle

cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be

administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67

through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier.

See Russo column 4 lines 4-20.

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-

inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used

to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-

BSC-SJA-0476

45. The compound is administered in an antiproliferative effective amount. See Failli claim 13.
Failli also discloses that the compounds can be delivered via an encapsulating material or matrix
including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories
and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to
treat hyperproliferative disease such as restenosis following an angioplasty procedure. See
Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an
antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim
22. Additionally, the compounds may be delivered via a carrier or matrix including
polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof
that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines
65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See
Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a
carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and
column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating
hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and
column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives.
See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or
matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and
column 17 lines 11-15.

BSC-SJA-0477

At the time of the invention, it would have been obvious to incorporate any of the
macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli,
Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Ding. All of these references
teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,
specifically the hyperproliferative aspects of the disease. See description of references above.
Therefore, a combination of Ding with any one of Skotnicki '579, Russo, Failli, Skotnicki '718,
Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic lactone
analog of rapamycin as the therapeutic agent in the stent of Ding can be found in the references
themselves. Ding discloses that the therapeutic agent may be, among other things,
antiproliferatives, anti-inflammatories or agents that inhibit hyperplasia and in particular
restenosis, i.e. effective amount. See Ding column 4 lines 63-66. Ding discloses that the stent
enables "the initial burst effect of drug elation to be controlled" and allows for long term delivery
of biologically active materials. See Ding column 2 lines 28-32 and lines 60-63. Furthermore,
any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson,
independently, disclose that each of their respective macrocyclic lactone analogs of rapamycin is
a known and effective antiproliferative agent and may be used to treat restenosis. Each discloses
that the agent may be contained in a polymer carrier/matrix. See descriptions of Skotnicki '579,
Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple
substitution for the agent or an additional therapeutic agent into the polymer coated stent of
Ding. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki
'730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or

BSC-SJA-0478

preventing proliferation, restenosis. Clearly, treating restenosis, specifically inhibiting
hyperplasia, is a stated objective of Ding; therefore, incorporating any of the rapamycin analogs
into the stent would enhance or further the ability of the device of Ding to treat patients
exhibiting restenosis with a vast array of therapeutics thereby enhancing the performance of the
device and method.

Regarding claim 5, Ding does not explicitly disclose a method step of implanting the
stent in the lumen of a coronary artery. However, Ding does teach that the device is "for
implantation in body lumens, e.g. vascular implantation". See Ding column 1 lines 20-29.
Additionally, as addressed by Ding, implantation of stents is known in the art. See Ding column
1 lines 30-43. Finally, Ding teaches using a therapeutic that treats hyperplasia and in particular
restenosis. See Ding column 4 lines 63-66.

Treating restenosis in vascular lumens generally by implantation of a stent was well
known in the art as evidenced by many of the references cited herein, e.g. Berg, Ding, Dinh,
Dayton, Tuch and Kaplan. Additionally, it was well known in the art that restenosis after
percutaneous translumenal coronary angioplasty (PTCA) occurred anywhere from 30-60% post
treatment. See Berg column 1 lines 12-20. Therefore, it would have been obvious to implant the
device of Ding into a coronary artery in order to carry out the purpose of the device as disclosed.


Regarding claim 4, see obviousness motivation provided in Issue A.



**Issue C.        Helmus Patent Proposed Obviousness Combinations.**

BSC-SJA-0479

.1-2.            The requester has proposed that claims 1 and 3-5 of the 7,229,473 Patent are

obvious under 35 U.S.C. 103(a) as being unpatentable over Helmus in view of either Morris or

Mitchell. The rejection as proposed by requester in the request for inter partes reexamination

filed 10/24/08 is being adopted as modified below.

            Claims 1 and 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Helmus

in view of either Morris or Mitchell.

            Helmus discloses a medical device polymer that includes a metallic stent embodiment

(page 4 lines 8-21) the disclosed devices have a coating (page 4 line 9) including a

biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent. See Helmus page 1

line 33 through page 2 line 8. The polymeric carrier comprises an acrylate-based polymer or

copolymer or a fluorinated polymer; specifically, the polymeric carrier may include

polytetrafluoroethylenes or polymethylmethacrylate. See Helmus page 3 line 36 through page 4

line 3. Helmus recommends drugs/agents that prevent clot formation or inhibit cell proliferation

that can lead to hyperplasia, i.e. occlusion of blood vessels. See Helmus page 1 lines 16-25. The

delivery lasts a period of up to one month. See Helmus page 21 lines 12-15. The stent with

polymeric carrier and impregnated drug may be implanted in vascular lumens. See Helmus page

17 line 31 through page 18 line 1. Helmus does not disclose that the therapeutic agent is

rapamycin or a macrocyclic lactone analog thereof or the method step of implanting the device in

the lumen of a coronary artery.

            Morris discloses a "Method for Treating Restenosis with Rapamycin". The method

includes preventing or treating hyperproliferative vascular disease in a mammal by administering

BSC-SJA-0480

an antiproliferative effective amount of rapamycin via a vascular stent impregnated with
rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth
muscle cell hyperplasia and restenosis following percutaneous translumenal coronary
angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be
encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific
mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in
intimal thickening. See Morris column 6 lines 57-59.

Mitchell discloses a method of treating hyperproliferative vascular disease. The method
includes preventing or treating via a vascular stent impregnated with an antiproliferative
effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines
17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See
Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as
taught by either Morris or Mitchell, into the invention of Helmus. All three references teach
treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,
specifically the hyperproliferative aspects of the disease. Therefore, a combination of Helmus
with Morris or Helmus with Mitchell is proper. Additionally, the motivation to use rapamycin as
the therapeutic agent in the stent of Helmus can be found in the references themselves. Helmus
sets forth the objective of inhibiting cell proliferation and specifically hyperplasia. See Helmus
page 1 lines 21-26. Furthermore, both Morris and Mitchell, independently, disclose that
rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis

BSC-SJA-0481

via a vascular stent. Each discloses that rapamycin may be contained in a polymer carrier. See
descriptions of Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution
for the agent or an additional therapeutic agent into the polymer coated stent of Helmus. As set
forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell
proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically
hyperplasia, is a stated objective of Helmus; therefore, incorporating rapamycin into the stent
would enhance or further the ability of the device of Helmus to treat patients exhibiting
restenosis with a vast array of therapeutics thereby enhancing the performance of the device and
method.

Regarding claim 5, Helmus does not explicitly disclose a method step of implanting the
stent in the lumen of a coronary artery. However, Helmus does teach that the device has
application as a vascular stent. See Helmus page 4 line 21.

Treating restenosis in vascular lumens generally by implantation of a stent was well
known in the art as evidenced by many of the references cited herein, e.g. Berg, Ding, Dinh,
Dayton, Tuch and Kaplan. Additionally, it was well known in the art that restenosis after
percutaneous translumenal coronary angioplasty (PTCA) occurred anywhere from 30-60% post
treatment. See Berg column 1 lines 12-20. Therefore, it would have been obvious to implant the
device of Helmus into a coronary artery in order to carry out the purpose of the device as
disclosed.


Regarding claim 4, see obviousness motivation provided in Issue A.

3-8.          The requester has proposed that claims 1-5 of the 7,229,473 Patent are obvious

under 35 U.S.C. 103(a) as being unpatentable over Helmus in view of any of Skotnicki '579,

Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester

in the request for inter partes reexamination filed 10/24/08 is being adopted as modified below.


          Claims 1-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Helmus in

view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

          Helmus discloses a medical device polymer that includes a metallic stent embodiment

(page 4 lines 8-21) the disclosed devices have a coating (page 4 line 9) including a

biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent.  See Helmus page 1

line 33 through page 2 line 8.  The polymeric carrier comprises an acrylate-based polymer or

copolymer or a fluorinated polymer; specifically, the polymeric carrier includes

polytetrafluoroethylenes or polymethylmethacrylate. See Helmus page 3 line 36 through page 4

line 3.  Helmus recommends drugs/agents that prevent clot formation or inhibit cell proliferation

that can lead to hyperplasia, i.e. occlusion of blood vessels.  See Helmus page 1 lines 16-25. The

delivery lasts a period of up to one month.  See Helmus page 21 lines 12-15.  The stent with

polymeric carrier and impregnated drug may be implanted in vascular lumens.  See Helmus page

17 line 31 through page 18 line 1.  Helmus does not disclose that the therapeutic agent is

rapamycin or a macrocyclic lactone analog thereof or the method step of implanting the device in

the lumen of a coronary artery.

BSC-SJA-0483

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column 1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery. See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579 column 9 lines 34-38.

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68. Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67 through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier. See Russo column 4 lines 4-20.

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-

BSC-SJA-0484

45. The compound is administered in an antiproliferative effective amount. See Failli claim 13.
Failli also discloses that the compounds can be delivered via an encapsulating material or matrix
including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories
and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to
treat hyperproliferative disease such as restenosis following an angioplasty procedure. See
Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an
antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim
22. Additionally, the compounds may be delivered via a carrier or matrix including
polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof
that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines
65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See
Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a
carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and
column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating
hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and
column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives.
See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or
matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and
column 17 lines 11-15.

BSC-SJA-0485

At the time of the invention, it would have been obvious to incorporate any of the

macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli,

Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Helmus. All of these references

teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,

specifically the hyperproliferative aspects of the disease. See description of references above.

Therefore, a combination of Helmus with any one of Skotnicki '579, Russo, Failli, Skotnicki

'718, Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic

lactone analog of rapamycin as the therapeutic agent in the stent of Helmus can be found in the

references themselves. Helmus sets forth the objective of inhibiting cell proliferation and

specifically hyperplasia. See Helmus page 1 lines 21-26. Furthermore, any one of Skotnicki

'579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, independently, disclose that each

of their respective macrocyclic lactone analogs of rapamycin is a known and effective

antiproliferative agent and may be used to treat restenosis. Each discloses that the agent may be

contained in a polymer carrier/matrix. See descriptions of Skotnicki '579, Russo, Failli,

Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple

substitution for the agent or an additional therapeutic agent into the polymer coated stent of

Helmus. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki

'730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or

preventing proliferation, restenosis. Clearly, treating restenosis, specifically cell proliferation, is

a stated objective of Helmus; therefore, incorporating any of the rapamycin analogs into the stent

would enhance or further the ability of the device of Helmus to treat patients exhibiting

BSC-SJA-0486

restenosis with an increased array of therapeutics thereby enhancing the performance of the device and method.

Regarding claim 5, Helmus does not explicitly disclose a method step of implanting the stent in the lumen of a coronary artery. However, Helmus does teach that the device has application as a vascular stent. See Helmus page 4 line 21.

Treating restenosis in vascular lumens generally by implantation of a stent was well known in the art as evidenced by many of the references cited herein, e.g. Berg, Ding, Dinh, Dayton, Tuch and Kaplan. Additionally, it was well known in the art that restenosis after percutaneous translumenal coronary angioplasty (PTCA) occurred anywhere from 30-60% post treatment. See Berg column 1 lines 12-20. Therefore, it would have been obvious to implant the device of Helmus into a coronary artery in order to carry out the purpose of the device as disclosed.

Regarding claim 4, see obviousness motivation provided in Issue A.

**Issue D.         Dinh Patent Proposed Obviousness Combinations.**

1 and 2.         The requester has proposed that claims 1 and 5 of the 7,229,473 Patent are obvious under 35 U.S.C. 103(a) as being unpatentable over Dinh in view of either Morris or Mitchell. The rejection as proposed by requester in the request for inter partes reexamination filed 10/24/08 is being adopted as modified below.

Claims 1 and 5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Dinh in view of either Morris or Mitchell.

Dinh discloses a drug eluting metallic stent (column 2 line 66 through column 3 line 1) having a coating (column 2 lines 52-54) that includes a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent (see column 2 lines 57-61 and column 3 line 13). The polymeric carrier comprises an acrylate-based polymer or copolymer. See Dinh column 7 line 50 for specific mention of acrylate homopolymers and copolymers. Dinh discloses that the therapeutic substance can include anti-inflammatory agents and also specifically mentions dexamethasone. See Dinh column 7 lines 14-15 and 19. An objective of the invention is to provide a therapeutically effective amount to inhibit neointimal proliferation. See Dinh column 1 lines 11-13 and lines 25-27. The therapeutic substance can be eluted over a period of days. See column 2 lines 28-32. The stent may be placed in the coronary arteries. See Dinh column 8 lines 20-24. Dinh fails to include that the therapeutic agent is rapamycin or a macrocyclic lactone analog thereof or that the release of the therapeutic agent is over a period of several weeks.

Morris discloses a "Method for Treating Restenosis with Rapamycin". The method includes preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative effective amount of rapamycin via a vascular stent impregnated with rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth muscle cell hyperplasia and restenosis following percutaneous translumenal coronary angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific

mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in
intimal thickening. See Morris column 6 lines 57-59.

Mitchell discloses a method of treating hyperproliferative vascular disease. The method
includes preventing or treating via a vascular stent impregnated with an antiproliferative
effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines
17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See
Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as
taught by either Morris or Mitchell, into the invention of Dinh. All three references teach
treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,
specifically the hyperproliferative aspects of the disease. Therefore, a combination of Dinh with
Morris or Ding with Mitchell is proper. Additionally, the motivation to use rapamycin as the
therapeutic agent in the stent of Dinh can be found in the references themselves. As set forth by
Dinh, intimal hyperplasia is an integral aspect of restenosis and an objective, as stated by Dinh, it
to prevent or limit restenosis. See Dinh column 1 lines 14-30 and column 2 lines 28-32.
Furthermore, both Morris and Mitchell, independently, disclose that rapamycin is a known and
effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Each
discloses that rapamycin may be contained in a polymer carrier. See descriptions of Morris and
Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution
for the agent or an additional therapeutic agent into the polymer coated stent of Dinh. As set
forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell

BSC-SJA-0489

proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically intimal

hyperplasia, is a stated objective of Dinh; therefore, incorporating rapamycin into the stent would

enhance or further the ability of the device of Dinh to treat patients exhibiting restenosis with an

increased array of therapeutics thereby enhancing the performance of the device and method.

Regarding the claim limitation of "releasing the therapeutic over a period of several

weeks, Dinh only teaches drug elution over a period of several days. However, it was well

known in the art to treat the vessel wall for a period of several weeks or months via drug elution

from a stent. See Berg, Ding, Helmus, Tuch, Kaplan and Wolff described herein. Therefore, it

would have been obvious to extend the time period of drug release from a few days to a few

weeks or months in order to optimize effectiveness of preventing restenosis as was common in

the art.

1a and 2a.      The requester has proposed that claims 3 and 4 of the 7,229,473 Patent are

obvious under 35 U.S.C. 103(a) as being unpatentable over Dinh in view of Berg and further in

view of either Morris or Mitchell. The rejection as proposed by requester in the request for inter

partes reexamination filed 10/24/08 is being adopted as modified below.

Claims 3-4 are rejected under 35 U.S.C. 103(a) as being unpatentable over Dinh in view

of Berg in further view of either Morris or Mitchell.

Dinh discloses a drug eluting metallic stent (column 2 line 66 through column 3 line 1)

having a coating (column 2 lines 52-54) that includes a biocompatible, nonabsorbable polymeric

carrier, and a therapeutic agent (see column 2 lines 57-61 and column 3 line 13). The polymeric

BSC-SJA-0490

carrier comprises an acrylate-based polymer or copolymer. See Dinh column 7 line 50 for specific mention of acrylate homopolymers and copolymers. Dinh discloses that the therapeutic substance can include anti-inflammatory agents and also specifically mentions dexamethasone. See Dinh column 7 lines 14-15 and 19. An objective of the invention is to provide a therapeutically effective amount to inhibit neointimal proliferation. See Dinh column 1 lines 11-13 and lines 25-27. The therapeutic substance can be eluted over a period of days. See column 2 lines 28-32. The stent may be placed in the coronary arteries. See Dinh column 8 lines 20-24. Dinh fails to include that the therapeutic agent is rapamycin or a macrocyclic lactone analog thereof or that the release of the therapeutic agent is over a period of several weeks.

Morris discloses a "Method for Treating Restenosis with Rapamycin". The method includes preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative effective amount of rapamycin via a vascular stent impregnated with rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth muscle cell hyperplasia and restenosis following percutaneous translumenal coronary angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in intimal thickening. See Morris column 6 lines 57-59.

Mitchell discloses a method of treating hyperproliferative vascular disease. The method includes preventing or treating via a vascular stent impregnated with an antiproliferative effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines

BSC-SJA-0491

17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as taught by either Morris or Mitchell, into the invention of Dinh. All three references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. Therefore, a combination of Dinh with Morris or Ding with Mitchell is proper. Additionally, the motivation to use rapamycin as the therapeutic agent in the stent of Dinh can be found in the references themselves. As set forth by Dinh, intimal hyperplasia is an integral aspect of restenosis and an objective, as stated by Dinh, it to prevent or limit restenosis. See Dinh column 1 lines 14-30 and column 2 lines 28-32. Furthermore, both Morris and Mitchell, independently, disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Each discloses that rapamycin may be contained in a polymer carrier. See descriptions of Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Dinh. As set forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically intimal hyperplasia, is a stated objective of Dinh; therefore, incorporating rapamycin into the stent would enhance or further the ability of the device of Dinh to treat patients exhibiting restenosis with an increased array of therapeutics thereby enhancing the performance of the device and method.

Regarding the claim limitation of "releasing the therapeutic over a period of several weeks, Dinh only teaches drug elution over a period of several days. However, it was well known in the art to treat the vessel wall for a period of several weeks or months via drug elution from a stent. See Berg, Ding, Helmus, Tuch, Kaplan and Wolff described herein. Therefore, it would have been obvious to extend the time period of drug release from a few days to a few weeks or months in order to optimize effectiveness of preventing restenosis as was common in the art.

Furthermore, Dinh in view of either Morris or Mitchell meet the claim limitations as described above but fail to teach the biocompatible polymeric carrier comprising a fluorinated polymer.

However, Berg discloses a polymeric carrier that comprises a fluorinated polymer. See Berg column 4 line 54 through column 5 line 7 for list of polymers, specifically polyvinylidene fluoride or ethylene-methyl methacrylate copolymers (column 4 lines 62 and 66) and claim 6.

At the time of the invention, it would have been obvious to substitute the biocompatible polymer of Dinh for the fluorinated polymer of Berg. Both Dinh and Berg teach polymer-drug coated stents for treating restenosis; therefore, a combination is proper. Additionally, the motivation to make the combination would have been simple substitution of one known polymer for another that would perform the function of delivering an agent to the arterial wall for treating restenosis equally well.


Regarding claim 4, see obviousness motivation provided in Issue A.

3, 4, 5, 6, 7 and 8.

The requester has proposed that claims 1-2 and 5 of the 7,229,473 Patent are obvious

under 35 U.S.C. 103(a) as being unpatentable over Dinh in view of any of Skotnicki '579, Russo,

Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester in the

request for inter partes reexamination filed 10/24/08 is being adopted as modified below.


Claims 1-2 and 5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Dinh in

view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

Dinh discloses a drug eluting metallic stent (column 2 line 66 through column 3 line 1)

having a coating (column 2 lines 52-54) that includes a biocompatible, nonabsorbable polymeric

carrier, and a therapeutic agent (see column 2 lines 57-61 and column 3 line 13). The polymeric

carrier comprises an acrylate-based polymer or copolymer or a fluorinated polymer. See Dinh

column 7 line 50 for specific mention of acrylate homopolymers and copolymers. Dinh

discloses that the therapeutic substance can include anti-inflammatory agents and also

specifically mentions dexamethasone. See Dinh column 7 lines 14-15 and 19. An objective of

the invention is to provide a therapeutically effective amount to inhibit neointimal proliferation.

See Dinh column 1 lines 11-13 and lines 25-27. The therapeutic substance can be eluted over a

period of days. See column 2 lines 28-32. The stent may be placed in the coronary arteries. See

Dinh column 8 lines 20-24. Dinh fails to include that the therapeutic agent is rapamycin or a

macrocyclic lactone analog thereof or that the release of the therapeutic agent is over a period of

several weeks.

BSC-SJA-0494

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of
rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical
structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column
1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further
discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery.
See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The
derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative
activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See
Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid
carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579
column 9 lines 34-38.

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat
hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is
effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68.
Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle
cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be
administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67
through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier.
See Russo column 4 lines 4-20.

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-
inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used
to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-

45. The compound is administered in an antiproliferative effective amount. See Failli claim 13. Failli also discloses that the compounds can be delivered via an encapsulating material or matrix including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis following an angioplasty procedure. See Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim 22. Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines 65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives. See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and column 17 lines 11-15.

BSC-SJA-0496

At the time of the invention, it would have been obvious to incorporate any of the

macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli,

Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Dinh. All of these references

teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,

specifically the hyperproliferative aspects of the disease. See description of references above.

Therefore, a combination of Dinh with any one of Skotnicki '579, Russo, Failli, Skotnicki '718,

Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic lactone

analog of rapamycin as the therapeutic agent in the stent of Dinh can be found in the references

themselves. As set forth by Dinh, intimal hyperplasia is an integral aspect of restenosis and an

objective, as stated by Dinh, it to prevent or limit restenosis. See Dinh column 1 lines 14-30 and

column 2 lines 28-32. Furthermore, any one of Skotnicki '579, Russo, Failli, Skotnicki '718,

Skotnicki '730 or Nelson, independently, disclose that each of their respective macrocyclic

lactone analogs of rapamycin is a known and effective antiproliferative agent and may be used to

treat restenosis. Each discloses that the agent may be contained in a polymer carrier/matrix. See

descriptions of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple

substitution for the agent or an additional therapeutic agent into the polymer coated stent of

Dinh. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki

'730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or

preventing proliferation, restenosis. Clearly, treating restenosis, specifically intimal hyperplasia,

is a stated objective of Dinh; therefore, incorporating any of the rapamycin analogs into the stent

would enhance or further the ability of the device of Dinh to treat patients exhibiting restenosis

BSC-SJA-0497

with an increased array of therapeutics thereby enhancing the performance of the device and
method.

Regarding the claim limitation of "releasing the therapeutic over a period of several
weeks, Dinh only teaches drug elution over a period of several days. However, it was well
known in the art to treat the vessel wall for a period of several weeks or months via drug elution
from a stent. See Berg, Ding, Helmus, Tuch, Kaplan and Wolff described herein. Therefore, it
would have been obvious to extend the time period of drug release from a few days to a few
weeks or months in order to optimize effectiveness of preventing restenosis as was common in
the art.

3a, 4a, 5a, 6a, 7a and 8a.

The requester has proposed that claims 3 and 4 of the 7,229,473 Patent are obvious under
35 U.S.C. 103(a) as being unpatentable over Dinh in view of Berg and further in view of any of
Skolnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as
proposed by requester in the request for inter partes reexamination filed 10/24/08 is being
adopted as modified below.

Claims 3-4 are rejected under 35 U.S.C. 103(a) as being unpatentable over Dinh in view
of Berg in further view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or
Nelson.

Dinh discloses a drug eluting metallic stent (column 2 line 66 through column 3 line 1)
having a coating (column 2 lines 52-54) that includes a biocompatible, nonabsorbable polymeric

carrier, and a therapeutic agent (see column 2 lines 57-61 and column 3 line 13). The polymeric

carrier comprises an acrylate-based polymer or copolymer. See Dinh column 7 line 50 for

specific mention of acrylate homopolymers and copolymers. Dinh discloses that the therapeutic

substance can include anti-inflammatory agents and also specifically mentions dexamethasone.

See Dinh column 7 lines 14-15 and 19. An objective of the invention is to provide a

therapeutically effective amount to inhibit neointimal proliferation. See Dinh column 1 lines 11-

13 and lines 25-27. The therapeutic substance can be eluted over a period of days. See column 2

lines 28-32. The stent may be placed in the coronary arteries. See Dinh column 8 lines 20-24.

Dinh fails to include that the therapeutic agent is rapamycin or a macrocyclic lactone analog

thereof or that the release of the therapeutic agent is over a period of several weeks.

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of

rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical

structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column

1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further

discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery.

See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The

derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative

activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See

Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid

carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579

column 9 lines 34-38.

BSC-SJA-0499

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68. Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67 through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier. See Russo column 4 lines 4-20.

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-45. The compound is administered in an antiproliferative effective amount. See Failli claim 13. Failli also discloses that the compounds can be delivered via an encapsulating material or matrix including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis following an angioplasty procedure. See Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim 22. Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

BSC-SJA-0500

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines 65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives. See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and column 17 lines 11-15.

At the time of the invention, it would have been obvious to incorporate any of the macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Dinh. All of these references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. See description of references above. Therefore, a combination of Dinh with any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic lactone analog of rapamycin as the therapeutic agent in the stent of Dinh can be found in the references themselves. As set forth by Dinh, intimal hyperplasia is an integral aspect of restenosis and an objective, as stated by Dinh, it to prevent or limit restenosis. See Dinh column 1 lines 14-30 and

column 2 lines 28-32. Furthermore, any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, independently, disclose that each of their respective macrocyclic lactone analogs of rapamycin is a known and effective antiproliferative agent and may be used to treat restenosis. Each discloses that the agent may be contained in a polymer carrier/matrix. See descriptions of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Dinh. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or preventing proliferation, restenosis. Clearly, treating restenosis, specifically intimal hyperplasia, is a stated objective of Dinh; therefore, incorporating any of the rapamycin analogs into the stent would enhance or further the ability of the device of Dinh to treat patients exhibiting restenosis with an increased array of therapeutics thereby enhancing the performance of the device and method.

Regarding the claim limitation of "releasing the therapeutic over a period of several weeks, Dinh only teaches drug elution over a period of several days. However, it was well known in the art to treat the vessel wall for a period of several weeks or months via drug elution from a stent. See Berg, Ding, Helmus, Tuch, Kaplan and Wolff described herein. Therefore, it would have been obvious to extend the time period of drug release from a few days to a few weeks or months in order to optimize effectiveness of preventing restenosis as was common in the art.

BSC-SJA-0502

Furthermore, Dinh in view of any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson meet the claim limitations as described above but fail to teach the biocompatible polymeric carrier comprising a fluorinated polymer.

However, Berg discloses a polymeric carrier that comprises a fluorinated polymer. See Berg column 4 line 54 through column 5 line 7 for list of polymers, specifically polyvinylidene fluoride and ethylene-methyl methacrylate copolymers (column 4 lines 62 and 66) and claim 6.

At the time of the invention, it would have been obvious to substitute the biocompatible polymer of Dinh for the fluorinated polymer of Berg. Both Dinh and Berg teach polymer-drug coated stents for treating restenosis; therefore, a combination is proper. Additionally, the motivation to make the combination would have been simple substitution of one known polymer for another that would perform the function of delivering an agent to the arterial wall for treating restenosis equally well.

Regarding claim 4, see obviousness motivation provided in Issue A.


**Issue E.          Dayton Patent Proposed Obviousness Combinations.**

1-2.          The requester has proposed that claims 1 and 3-5 of the 7,229,473 Patent are obvious under 35 U.S.C. 103(a) as being unpatentable over Dayton in view of either Morris or Mitchell. The rejection as proposed by requester in the request for inter partes reexamination filed 10/24/08 is being adopted as modified below.

Claims 1 and 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Dayton in view of either Morris or Mitchell.

Dayton teaches a minimally invasive bioactivated endoprosthesis for vessel repair that includes a metal stent (column 3 line 61 and column 7 lines 35+) having a coating including a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent (column 4 lines 19-21 and column 7 lines 41-43). The polymer may include a biostable polymer such as polytetrafluroethylene and fluorosilicone. See Dayton column 4 lines 11-12 and column 7 line 2. Dayton discloses an array of bioactive substances (column 7 lines 24-33) and a quantity/amount sufficient to substantially prevent hyperplasia. See claim 1. Likewise, an objective of the invention is to provide a device that avoids the problems associated with restenosis. See Dayton column 3 lines 28-32. The bioactive substance is eluted from the coating by a controlled and prolonged release. See Dayton column 4 lines 19-29. Furthermore, Dayton teaches the stent is permanently or temporarily implanted within a body/blood vessel and then states that common approaches involved implanting stents in coronary arteries. See column 1 lines 12-14 and lines 32-33. Dayton fails to include that the therapeutic agent is rapamycin or a macrocyclic lactone analog thereof or that the release of the therapeutic agent is over a period of several weeks.

Morris discloses a "Method for Treating Restenosis with Rapamycin". The method includes preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative effective amount of rapamycin via a vascular stent impregnated with rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth muscle cell hyperplasia and restenosis following percutaneous translumenal coronary angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be

encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in intimal thickening. See Morris column 6 lines 57-59.

Mitchell discloses a method of treating hyperproliferative vascular disease. The method includes preventing or treating via a vascular stent impregnated with an antiproliferative effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines 17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as taught by either Morris or Mitchell, into the invention of Dayton. All three references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. Therefore, a combination of Dayton with Morris or Dayton with Mitchell is proper. Additionally, the motivation to use rapamycin as the therapeutic agent in the stent of Dayton can be found in the references themselves. Dayton discloses delivering a bioactive substance via a stent to treat restenosis and specifically intimal hyperplasia. See Dayton column 3 lines 21-32. Furthermore, both Morris and Mitchell, independently, disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Each discloses that rapamycin may be contained in a polymer carrier. See descriptions of Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Dayton. As set forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell

BSC-SJA-0505

proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically intimal

hyperplasia, is a stated objective of Dayton; therefore, incorporating rapamycin into the stent

would enhance or further the ability of the device of Dayton to treat patients exhibiting restenosis

with an increased array of therapeutics thereby enhancing the performance of the device and

method.

Regarding the claim limitation of "releasing the therapeutic over a period of several

weeks, Dayton only teaches general prolonged substance release. See Dayton column 4 lines 19-

29. However, it was well known in the art to treat the vessel wall for a period of several weeks

or months via drug elution from a stent. See Berg, Ding, Helmus, Tuch, Kaplan and Wolff

described herein. Therefore, it would have been obvious to extend the time period of drug

release to a few weeks or months in order to optimize effectiveness of preventing restenosis as

was common in the art.

Regarding claim 4, see obviousness motivation provided in Issue A.


3-8.        The requester has proposed that claims 1-5 of the 7,229,473 Patent are obvious

under 35 U.S.C. 103(a) as being unpatentable over Dayton in view of any of Skotnicki '579,

Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester

in the request for inter partes reexamination filed 10/24/08 is being adopted as modified below.


Claims 1-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Dayton in

view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

BSC-SJA-0506

Dayton teaches a minimally invasive bioactivated endoprosthesis for vessel repair that includes a metal stent (column 3 line 61 and column 7 lines 35+) having a coating including a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent (column 4 lines 19-21 and column 7 lines 41-43). The polymer may include a biostable polymer such as polytetrafluroethylene and fluorosilicone. See Dayton column 4 lines 11-12 and column 7 line 2. Dayton discloses an array of bioactive substances (column 7 lines 24-33) and a quantity/amount sufficient to substantially prevent hyperplasia. See claim 1. Likewise, an objective of the invention is to provide a device that avoids the problems associated with restenosis. See Dayton column 3 lines 28-32. The bioactive substance is eluted from the coating by a controlled and prolonged release. See Dayton column 4 lines 19-29. Furthermore, Dayton teaches the stent is permanently or temporarily implanted within a body/blood vessel and then states that common approaches involved implanting stents in coronary arteries. See column 1 lines 12-14 and lines 32-33. Dayton fails to include that the therapeutic agent is rapamycin or a macrocyclic lactone analog thereof or that the release of the therapeutic agent is over a period of several weeks.

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column 1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery. See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See

BSC-SJA-0507

Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid

carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579

column 9 lines 34-38.

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat

hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is

effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68.

Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle

cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be

administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67

through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier.

See Russo column 4 lines 4-20.

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-

inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used

to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-

45. The compound is administered in an antiproliferative effective amount. See Failli claim 13.

Failli also discloses that the compounds can be delivered via an encapsulating material or matrix

including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories

and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to

treat hyperproliferative disease such as restenosis following an angioplasty procedure. See

Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an

antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim

BSC-SJA-0508

22. Additionally, the compounds may be delivered via a carrier or matrix including

polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof

that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines

65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See

Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a

carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and

column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating

hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and

column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives.

See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or

matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and

column 17 lines 11-15.

At the time of the invention, it would have been obvious to incorporate any of the

macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli,

Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Dayton. All of these references

teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,

specifically the hyperproliferative aspects of the disease. See description of references above.

Therefore, a combination of Dayton with any one of Skotnicki '579, Russo, Failli, Skotnicki

'718, Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic

lactone analog of rapamycin as the therapeutic agent in the stent of Dayton can be found in the

BSC-SJA-0509

references themselves. Dayton discloses delivering a bioactive substance via a stent to treat
restenosis and specifically intimal hyperplasia. See Dayton column 3 lines 21-32.

Furthermore, any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson,
independently, disclose that each of their respective macrocyclic lactone analogs of rapamycin is
a known and effective antiproliferative agent and may be used to treat restenosis. Each discloses
that the agent may be contained in a polymer carrier/matrix. See descriptions of Skotnicki '579,
Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple
substitution for the agent or an additional therapeutic agent into the polymer coated stent of
Dayton. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki
'730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or
preventing proliferation, restenosis. Clearly, treating restenosis, specifically intimal hyperplasia,
is a stated objective of Dayton; therefore, incorporating any of the rapamycin analogs into the
stent would enhance or further the ability of the device of Dayton to treat patients exhibiting
restenosis with a vast array of therapeutics thereby enhancing the performance of the device and
method.

Regarding the claim limitation of "releasing the therapeutic over a period of several
weeks, Dayton only teaches general prolonged substance release. See Dayton column 4 lines 19-
29. However, it was well known in the art to treat the vessel wall for a period of several weeks
or months via drug elution from a stent. See Berg, Ding, Helmus, Tuch, Kaplan and Wolff
described herein. Therefore, it would have been obvious to extend the time period of drug

BSC-SJA-0510

release to a few weeks or months in order to optimize effectiveness of preventing restenosis as

was common in the art.


Regarding claim 4, see obviousness motivation provided in Issue A.


**Issue F.        ·   Tuch Patent Proposed Obviousness Combinations.**

1-2.            The requester has proposed that claims 1 and 3-5 of the 7,229,473 Patent are

obvious under 35 U.S.C. 103(a) as being unpatentable over Tuch in view of either Morris or

Mitchell. The rejection as proposed by requester in the request for inter partes reexamination

filed 10/24/08 is being adopted as modified below.


.Claims 1 and 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch in

view of either Morris or Mitchell.

Tuch discloses an intravascular stent and method that includes a metallic stent (column 2

line 47) having a coating that includes a biocompatible, nonabsorbable polymeric carrier, and a

therapeutic agent (column 2 lines 32-34). The polymeric carrier comprises an acrylate-based

polymer or copolymer or a fluorinated polymer, specifically polyvinylidene fluoride and

ethylene-methyl methacrylate copolymers. See Tuch column 5 lines 34-48. The therapeutic

substance could be any possessing desirable therapeutics for a blood vessel. See Tuch column 5

line 66 through column 6 line 31. The primary purpose of the bioactive substance is to inhibit

restenosis, it should be present in a therapeutically significant amount, and may be released over

a period of a few weeks. See Tuch column 1 line 11 through column 2 line 14, column 2 lines

BSC-SJA-0511

15-17 and figure 3. Tuch discloses that stents may be placed translumenally in a selected blood

vessel. See Tuch column 2 lines 18-21 and column 3 lines 51-59. Tuch does not disclose that

the therapeutic agent is rapamycin or a macrocyclic lactone analog thereof and does not teach the

method step of implanting the device in the lumen of the coronary artery.

Morris discloses a "Method for Treating Restenosis with Rapamycin". The method

includes preventing or treating hyperproliferative vascular disease in a mammal by administering

an antiproliferative effective amount of rapamycin via a vascular stent impregnated with

rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth

muscle cell hyperplasia and restenosis following percutaneous translumenal coronary

angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be

encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific

mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in

intimal thickening. See Morris column 6 lines 57-59.

Mitchell discloses a method of treating hyperproliferative vascular disease. The method

includes preventing or treating via a vascular stent impregnated with an antiproliferative

effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines

17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See

Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as

taught by either Morris or Mitchell, into the invention of Tuch. All three references teach

treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,

specifically the hyperproliferative aspects of the disease. Therefore, a combination of Tuch with

Morris or Tuch with Mitchell is proper. Additionally, the motivation to use rapamycin as the

therapeutic agent in the stent of Tuch can be found in the references themselves. Tuch

acknowledges that intimal hyperplasia is an integral aspect of restenosis. See Tuch column 1

lines 40-45. Furthermore, both Morris and Mitchell, independently, disclose that rapamycin is a

known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular

stent. Each discloses that rapamycin may be contained in a polymer carrier. See descriptions of

Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution

for the agent or an additional therapeutic agent into the polymer coated stent of Tuch. As set

forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell

proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically intimal

hyperplasia, is a stated objective of Tuch; therefore, incorporating rapamycin into the stent

would enhance or further the ability of the device of Tuch to treat patients exhibiting restenosis

with an increased array of therapeutics thereby enhancing the performance of the device and

method.

Regarding claim 5, Tuch does not explicitly disclose a method step of implanting the

stent in the lumen of a coronary artery. However, Tuch does teach that restenosis can occur in a

coronary artery post angioplasty. See Tuch column 1 lines 12-22.

Treating restenosis in vascular lumens generally by implantation of a stent was well

known in the art as evidenced by many of the references cited herein, e.g. Berg, Ding, Dinh,

Dayton, Tuch and Kaplan. Additionally, it was well known in the art that restenosis after

percutaneous translumenal coronary angioplasty (PTCA) occurred anywhere from 30-60% post

BSC-SJA-0513

treatment. See Berg column 1 lines 12-20. Therefore, it would have been obvious to implant the

device of Tuch into a coronary artery in order to carry out the purpose of the device as disclosed.


Regarding claim 4, see obviousness motivation provided in Issue A.


3-8.        The requester has proposed that claims 1-5 of the 7,229,473 Patent are obvious

under 35 U.S.C. 103(a) as being unpatentable over Tuch in view of any of Skotnicki '579,

Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester

in the request for inter partes reexamination filed 10/24/08 is being adopted as modified below.


Claims 1-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Tuch in view

of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

Tuch discloses an intravascular stent and method that includes a metallic stent (column 2

line 47) having a coating that includes a biocompatible, nonabsorbable polymeric carrier, and a

therapeutic agent (column 2 lines 32-34). The polymeric carrier comprises an acrylate-based

polymer or copolymer or a fluorinated polymer, specifically polyvinylidene fluoride and

ethylene-methyl methacrylate copolymers. See Tuch column 5 lines 34-48. The therapeutic

substance could be any possessing desirable therapeutics for a blood vessel. See Tuch column 5

line 66 through column 6 line 31. The primary purpose of the bioactive substance is to inhibit

restenosis, it should be present in a therapeutically significant amount, and may be released over

a period of a few weeks. See Tuch column 1 line 11 through column 2 line 14, column 2 lines

15-17 and figure 3. Tuch discloses that stents may be placed translumenally in a selected blood

BSC-SJA-0514

vessel. See Tuch column 2 lines 18-21 and column 3 lines 51-59. Tuch does not disclose that
the therapeutic agent is rapamycin or a macrocyclic lactone analog thereof and does not teach the
method step of implanting the device in the lumen of the coronary artery.

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of
rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical
structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column
1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further
discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery.
See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The
derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative
activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See
Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid
carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579
column 9 lines 34-38.

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat
hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is
effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68.
Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle
cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be
administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67
through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier.
See Russo column 4 lines 4-20.

BSC-SJA-0515

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-45. The compound is administered in an antiproliferative effective amount. See Failli claim 13. Failli also discloses that the compounds can be delivered via an encapsulating material or matrix including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis following an angioplasty procedure. See Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim 22. Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines 65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives.

See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and column 17 lines 11-15.

At the time of the invention, it would have been obvious to incorporate any of the macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Tuch. All of these references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. See description of references above. Therefore, a combination of Tuch with any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic lactone analog of rapamycin as the therapeutic agent in the stent of Tuch can be found in the references themselves. Tuch acknowledges that intimal hyperplasia is an integral aspect of restenosis. See Tuch column 1 lines 40-45. Furthermore, any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, independently, disclose that each of their respective macrocyclic lactone analogs of rapamycin is a known and effective antiproliferative agent and may be used to treat restenosis. Each discloses that the agent may be contained in a polymer carrier/matrix. See descriptions of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Tuch. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or preventing proliferation, restenosis. Clearly, treating restenosis, specifically intimal hyperplasia,

BSC-SJA-0517

is a stated objective of Tuch; therefore, incorporating any of the rapamycin analogs into the stent
would enhance or further the ability of the device of Tuch to treat patients exhibiting restenosis
with an increased array of therapeutics thereby enhancing the performance of the device and
method.

Regarding claim 5, Tuch does not explicitly disclose a method step of implanting the
stent in the lumen of a coronary artery. However, Tuch does teach that restenosis can occur in a
coronary artery post angioplasty. See Tuch column 1 lines 12-22.

Treating restenosis in vascular lumens generally by implantation of a stent was well
known in the art as evidenced by many of the references cited herein, e.g. Berg, Ding, Dinh,
Dayton, Tuch and Kaplan. Additionally, it was well known in the art that restenosis after
percutaneous translumenal coronary angioplasty (PTCA) occurred anywhere from 30-60% post
treatment. See Berg column 1 lines 12-20. Therefore, it would have been obvious to implant the
device of Tuch into a coronary artery in order to carry out the purpose of the device as disclosed.


Regarding claim 4, see obviousness motivation provided in Issue A.


**Issue G.          Kaplan Patent Proposed Obviousness Combinations.**

1-2.          The requester has proposed that claims 1 and 3-5 of the 7,229,473 Patent are
obvious under 35 U.S.C. 103(a) as being unpatentable over Kaplan in view of either Morris or
Mitchell. The rejection as proposed by requester in the request for inter partes reexamination
filed 10/24/08 is being adopted as modified below.

Claims 1 and 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Kaplan
in view of either Morris or Mitchell.

Kaplan discloses a method and device for treating and enlarging body lumens that
includes a metal stent (column 5 lines 12-17) having a coating including a biocompatible,
nonabsorbable polymeric carrier, and a therapeutic agent (laminated filaments, see figure 5B and
5C). See also Kaplan column 4 lines 62-65. The polymer may include methyl methacrylate-
ethylene glycol and dimethylmethacrylate copolymer. See Kaplan column 7 lines 46-48. A
variety of pharmaceutical and other therapeutic agents may be delivered from the polymer
matrix. See Kaplan column 7 lines 53+. The therapeutic agent may include antiproliferative
substances for inhibiting smooth muscle cell proliferation and will be released over a period of
four to six months. See Kaplan column 8 lines 31-37. Finally, Kaplan discloses that these stents
are intracoronary stents. See Kaplan column 8 line 21 and column 9 lines 31-34. Kaplan fails to
include that the therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof.

Morris discloses a "Method for Treating Restenosis with Rapamycin". The method
includes preventing or treating hyperproliferative vascular disease in a mammal by administering
an antiproliferative effective amount of rapamycin via a vascular stent impregnated with
rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth
muscle cell hyperplasia and restenosis following percutaneous translumenal coronary
angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be
encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific
mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in
intimal thickening. See Morris column 6 lines 57-59.

BSC-SJA-0519

Mitchell discloses a method of treating hyperproliferative vascular disease. The method includes preventing or treating via a vascular stent impregnated with an antiproliferative effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines 17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See Mitchell column 6 lines 24-28 and column 7 lines 10-15.

At the time of the invention, it would have been obvious to incorporate rapamycin, as taught by either Morris or Mitchell, into the invention of Kaplan. All three references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. Therefore, a combination of Kaplan with Morris or Kaplan with Mitchell is proper. Additionally, the motivation to use rapamycin as the therapeutic agent in the stent of Kaplan can be found in the references themselves. Kaplan teaches the treatment of restenosis via bioactive substance delivery on vascular grafts and that delivery of these agents would specifically treat the proliferative aspects of the disease. See Kaplan column 1 lines41-60. Furthermore, both Morris and Mitchell, independently, disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Each discloses that rapamycin may be contained in a polymer carrier. See descriptions of Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Kaplan. As set forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically cell proliferation, is a stated objective of Kaplan; therefore, incorporating rapamycin into the stent

BSC-SJA-0520

Application/Control Number: 95/001,102                                        Page 60
Art Unit: 3993

would enhance or further the ability of the device of Kaplan to treat patients exhibiting restenosis
with an increased array of therapeutics thereby enhancing the performance of the device and
method.

Regarding claim 4, see obviousness motivation provided in Issue A.

3-8.        The requester has proposed that claims 1-5 of the 7,229,473 Patent are obvious
under 35 U.S.C. 103(a) as being unpatentable over Kaplan in view of any of Skotnicki '579,
Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester
in the request for inter partes reexamination filed 10/24/08 is being adopted as modified below.

Claims 1-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Kaplan in
view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

Kaplan discloses a method and device for treating and enlarging body lumens that
includes a metal stent (column 5 lines 12-17) having a coating including a biocompatible,
nonabsorbable polymeric carrier, and a therapeutic agent (laminated filaments, see figure 5B and
5C). See also Kaplan column 4 lines 62-65. The polymer may include methyl methacrylate-
ethylene glycol and dimethylmethacrylate copolymer. See Kaplan column 7 lines 46-48. A
variety of pharmaceutical and other therapeutic agents may be delivered from the polymer
matrix. See Kaplan column 7 lines 53+. The therapeutic agent may include antiproliferative
substances for inhibiting smooth muscle cell proliferation and will be released over a period of
four to six months. See Kaplan column 8 lines 31-37. Finally, Kaplan discloses that these stents

BSC-SJA-0521

are intracoronary stents. See Kaplan column 8 line 21 and column 9 lines 31-34. Kaplan fails to include that the therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof.

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column 1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery. See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579 column 9 lines 34-38.

Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68. Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67 through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier. See Russo column 4 lines 4-20.

BSC-SJA-0522

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-
inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used
to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-
45. The compound is administered in an antiproliferative effective amount. See Failli claim 13.
Failli also discloses that the compounds can be delivered via an encapsulating material or matrix
including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories
and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to
treat hyperproliferative disease such as restenosis following an angioplasty procedure. See
Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an
antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim
22. Additionally, the compounds may be delivered via a carrier or matrix including
polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof
that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines
65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See
Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a
carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and
column 8 lines 35-40.

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating
hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and
column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives.

BSC-SJA-0523

See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and column 17 lines 11-15.

At the time of the invention, it would have been obvious to incorporate any of the macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Kaplan. All of these references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. See description of references above. Therefore, a combination of Kaplan with any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic lactone analog of rapamycin as the therapeutic agent in the stent of Kaplan can be found in the references themselves. Kaplan teaches the treatment of restenosis via bioactive substance delivery on vascular grafts and that delivery of these agents would specifically treat the proliferative aspects of the disease. See Kaplan column 1 lines 41-60. Furthermore, any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson, independently, disclose that each of their respective macrocyclic lactone analogs of rapamycin is a known and effective antiproliferative agent and may be used to treat restenosis. Each discloses that the agent may be contained in a polymer carrier/matrix. See descriptions of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

Therefore, it would have been obvious to incorporate any of the analogs as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Kaplan. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki

BSC-SJA-0524

'730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or

preventing proliferation, restenosis. Clearly, treating restenosis, specifically cell proliferation, is

a stated objective of Kaplan; therefore, incorporating any of the rapamycin analogs into the stent

would enhance or further the ability of the device of Kaplan to treat patients exhibiting restenosis

with an increased array of therapeutics thereby enhancing the performance of the device and

method.


Regarding claim 4, see obviousness motivation provided in Issue A.


**Issue H.          Wolff Patent Proposed Obviousness Combinations.**

1 and 2.

The requester has proposed that claims 1 and 5 of the 7,229,473 Patent are obvious under

35 U.S.C. 103(a) as being unpatentable over Wolff in view of either Morris or Mitchell. The

rejection as proposed by requester in the request for inter partes reexamination filed 10/24/08 is

being adopted as modified below.


Claims 1 and 5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff in

view of either Morris or Mitchell.

Wolff discloses an intralumenal drug eluting prosthesis that includes a metal stent (page 3

line 4) having a coating (page 4 line 4-6) including a biocompatible, nonabsorbable polymeric

carrier, and a therapeutic agent. See Wolff page 10 lines 34-38. The therapeutic agent may

include any therapeutic drug that would be useful in treating blood vessels and address or

prevent proliferation of smooth muscle cells. See Wolff page 3 lines 7-10 and page 7 lines 19-20. The agent/drug should be released at a controlled rate for about four months. See Wolff page 2 lines 23-25 and page 9 lines 34-38. The stent is placed in the lumen wherever needed as per the usual procedure for stents. See Wolff page 15 line 23+.

Wolff meets the claim limitations as described above but fails to include the therapeutic agent being rapamycin, or a macrocyclic lactone analog thereof and a method step that includes implanting the stent in a coronary artery.

Morris discloses a "Method for Treating Restenosis with Rapamycin". The method includes preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative effective amount of rapamycin via a vascular stent impregnated with rapamycin. See Morris column 3 lines 45-49. Rapamycin is useful in treating intimal smooth muscle cell hyperplasia and restenosis following percutaneous translumenal coronary angioplasty (PTCA). See column 3 lines 51-64. Morris further discloses that rapamycin may be encapsulated in a polymer matrix for delivery. See Morris column 10 line 53-54 for specific mention of polyvinylpyrrolidine. Treatment over the course of 14 days resulted in a decrease in intimal thickening. See Morris column 6 lines 57-59. ·

Mitchell discloses a method of treating hyperproliferative vascular disease. The method includes preventing or treating via a vascular stent impregnated with an antiproliferative effective amount of rapamycin. See Mitchell column 3 lines 16-21 and 24-31 and column 5 lines 17-20. A solid carrier can be used to administer rapamycin including polyvinylpyrrolidine. See Mitchell column 6 lines 24-28 and column 7 lines 10-15.

BSC-SJA-0526

At the time of the invention, it would have been obvious to incorporate rapamycin, as taught by either Morris or Mitchell, into the invention of Wolff. The references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. Therefore, a combination of Wolff in view of Morris or Mitchell is proper. Additionally, the motivation to use rapamycin as the therapeutic agent in the stent of Wolff can be found in the references themselves. Wolff teaches that intimal hyperplasia is an integral aspect of restenosis and in order to stop restenosis, proliferation of smooth muscles cells must be prevented. See Wolff page 5 lines 18-30. Furthermore, both Morris and Mitchell, independently, disclose that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent. Each discloses that rapamycin may be contained in a polymer carrier. See descriptions of Morris and Mitchell above.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Wolff. As set forth by both Morris and Mitchell, rapamycin is a known therapeutic agent for treating cell proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically intimal proliferation, is a stated objective of Wolff; therefore, incorporating rapamycin into the stent would enhance or further the ability of the device of Wolff to treat patients exhibiting restenosis with an increased array of therapeutics thereby enhancing the performance of the device and method.

BSC-SJA-0527

Regarding claim 5, Wolff does not explicitly disclose a method step of implanting the
stent in the lumen of a coronary artery. However, treating restenosis in vascular lumens
generally by implantation of a stent was well known in the art as evidenced by many of the
references cited herein, e.g. Berg, Ding, Dinh, Dayton, Tuch and Kaplan. Additionally, it was
well known in the art that restenosis after percutaneous translumenal coronary angioplasty
(PTCA) occurred anywhere from 30-60% post treatment. See Berg column 1 lines 12-20.
Therefore, it would have been obvious to implant the device of Wolff in view of Morris or
Mitchell into a coronary artery in order to carry out the purpose of the device as disclosed.


1a and 2a.

The requester has proposed that claims 3 and 4 of the 7,229,473 Patent are obvious under
35 U.S.C. 103(a) as being unpatentable over Wolff in view of Berg in further view of either
Morris or Mitchell. The rejection as proposed by requester in the request for inter partes
reexamination filed 10/24/08 is being adopted as modified below.


Claims 3-4 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff in view
of Berg in further view of either Morris or Mitchell.

Wolff in view of Morris or Mitchell meets the claim limitations as described above.
However, Wolff in view of Morris or Mitchell fails to include an acrylate-based polymer or a
fluorinated polymer.

Berg discloses a device comprising a metallic stent (column 3 lines 29-35) having a
coating that includes a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent

BSC-SJA-0528

(column 4 lines 19-21 and lines 35-38). The polymeric carrier comprises an acrylate-based

polymer or copolymer or a fluorinated polymer. See Berg column 4 line 54 through column 5

line 7 for list of polymers, specifically polyvinylidene fluoride and ethylene-methyl methacrylate

copolymers (column 4 lines 62 and 66) and claim 6. The therapeutic agent could be "virtually

any therapeutic substance which possesses desirable therapeutic characteristics for application to

a blood vessel" (column 5 lines 19-22), can include anti-inflammatory agents (column 5 line 28)

and specifically dexamethasone (examples 1-7). One aspect of restenosis, neointimal

proliferation is the migration of medial smooth muscle cells (SMC) into the intimal layer of the

vascular wall after angioplasty. See Berg column 1 lines 38-43. Therapeutic agents are

incorporated onto stents in order to treat this aspect of restenosis. See Berg column 1 lines 54-

67. An objective of Berg is "to provide a stent having a therapeutically significant amount of a

drug", i.e. present in an amount effective to inhibit neointimal proliferation. See Berg column 7

lines 14-15. The device provides a controlled release of the therapeutic agent. See Berg column

2 lines 21-23, lines 37-40 and lines 52-54. The release may be over a period of two weeks. See

Berg example 6 and figure 1. Berg also discloses a method of inhibiting neointimal proliferation

in a coronary artery resulting from percutaneous transluminal coronary angioplasty (Berg

Background of the Invention) comprising implanting the above stent in the lumen of the

coronary artery (column 3 lines 1-9 and column 7 lines 5-15).

    At the time of the invention, it would have been obvious to incorporate the polymeric

coating as taught by Berg into the invention of Wolff in view of Morris or Mitchell. Wolff and

Berg both teach treating restenosis, specifically the cell proliferation aspects of restenosis;

therefore, a combination is proper. Additionally, the polymeric materials of Berg are disclosed

BSC-SJA-0529

as low chronic tissue response materials. See Berg column 4 lines 54-55. Therefore, one would have been motivated to simply substitute the existing coating of Wolff in view of Morris or Mitchell with the coating of Berg in order to enhance the long term performance of the stent in terms of reduced immunological reactions.

Regarding claim 4, see obviousness motivation provided in Issue A.

3, 4, 5, 6, 7 and 8.

The requester has proposed that claims 1-2 and 5 of the 7,229,473 Patent are obvious under 35 U.S.C. 103(a) as being unpatentable over Wolff in view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as proposed by requester in the request for inter partes reexamination filed 10/24/08 is being adopted as modified below.

Claims 1-2 and 5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff in view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson.

Wolff discloses an intraluminal drug eluting prosthesis that includes a metal stent (page 3 line 4) having a coating (page 4 line 4-6) including a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent. See Wolff page 10 lines 34-38. The therapeutic agent may include any therapeutic drug that would be useful in treating blood vessels and address or prevent proliferation of smooth muscle cells. See Wolff page 3 lines 7-10 and page 7 lines 19-20. The agent/drug should be released at a controlled rate for about four months. See Wolff

BSC-SJA-0530

page 2 lines 23-25 and page 9 lines 34-38. The stent is placed in the lumen wherever needed as per the usual procedure for stents. See Wolff page 15 line 23+.

Wolff meets the claim limitations as described above but fails to include the therapeutic agent being rapamycin, or a macrocyclic lactone analog thereof and a method step that includes implanting the stent in a coronary artery.

Skotnicki '579 teaches derivatives of rapamycin that are macrocyclic lactone analogs of rapamycin. See Skotnicki '579 column 1 lines 5-7,11-12 and 65-68 and shown chemical structures. The derivatives are useful as anti-inflammatory and antiproliferative agents (column 1 lines 65-68) and may be used to treat restenosis (column 9 lines 1-4). Skotnicki '579 further discloses that the rapamycin derivatives may be encapsulated in a polymer carrier for delivery. See Skotnicki '579 column 9 lines 34-38 for specific mention of polyvinylpyrrolidine. The derivative compounds have a similar profile activity to rapamycin, exhibit antiproliferative activities and are useful in treating hyperproliferative vascular diseases such as restenosis. See Skotnicki '579 column 8 line 65 through column 9 line 4. Skotnicki '579 also teaches a solid carrier for the derivative compound that may include polyvinylpyrrolidine. See Skotnicki '579 column 9 lines 34-38.

. Russo discloses an analog of rapamycin, 21-norrapamycin, that is used to treat hyperproliferative vascular disorders. See Russo column 1 lines 10-16. The compound is effective as an anti-inflammatory and antiproliferative. See Russo column 1 lines 65-68. Specifically 21-norrapamycin is useful in the treatment or inhibition of intimal smooth muscle cell proliferation, i.e. restenosis. See Russo column 3 lines 36-51. The compound may be administered with a carrier that could include a reservoir matrix. See Russo column 4 line 67



BSC-SJA-0531

through column 5 line 4. Russo discloses that polyvinylpyrrolidine may be used as a carrier.
See Russo column 4 lines 4-20.

Failli discloses rapamycin 42-oximes and hydroxylamines that are useful as an anti-
inflammatories and antiproliferatives. See Failli column 1 lines 64-66. The compounds are used
to treat restenosis that occurs following an angioplasty procedure. See Failli column 6 lines 38-
45. The compound is administered in an antiproliferative effective amount. See Failli claim 13.
Failli also discloses that the compounds can be delivered via an encapsulating material or matrix
including polyvinylpyrrolidine. See Failli column 7 lines 13-14 and column 8 lines 3-7.

Skotnicki '718 teaches rapamycin hydroxyesters that are useful as anti-inflammatories
and antiproliferatives. See Skotnicki '718 column 1 lines 65-68. The derivatives may be used to
treat hyperproliferative disease such as restenosis following an angioplasty procedure. See
Skotnicki '718 column 6 lines 46-53. Skotnicki '718 also teaches administering an
antiproliferative effective amount in a method of treating restenosis. See Skotnicki '718 claim
22. Additionally, the compounds may be delivered via a carrier or matrix including
polyvinylpyrrolidine. See Skotnicki '718 column 7 lines 34-38 and column 8 lines 19-24.

Skotnicki '730 teaches phosphorylcarbamates of rapamycin and oxime derivatives thereof
that are useful as anti-inflammatories and antiproliferatives. See Skotnicki '730 column 1 lines
65-68. The derivatives may be used to treat hyperproliferative disease such as restenosis. See
Skotnicki '730 column 7 lines 10-16. Additionally, the compounds may be delivered via a
carrier or matrix including polyvinylpyrrolidine. See Skotnicki '730 column 7 lines 50-54 and
column 8 lines 35-40.

BSC-SJA-0532

Application/Control Number: 95/001,102                                              Page 72
Art Unit: 3993

Nelson teaches 27-hydroxyrapamycin and derivatives thereof that are useful in treating

hyperproliferative vascular disorders such as restenosis. See Nelson column 1 lines 11-17 and

column 15 lines 41-54. The derivatives are useful as anti-inflammatories and antiproliferatives.

See Nelson column 2 lines 43-46. Additionally, the derivatives may be delivered via a carrier or

matrix including polyvinylpyrrolidine. See Nelson column 16 lines 9-12 and lines 24-28 and

column 17 lines 11-15.

At the time of the invention, it would have been obvious to incorporate any of the

macrocyclic lactone analogs of rapamycin, as taught by any one of Skotnicki '579, Russo, Failli,

Skotnicki '718, Skotnicki '730 or Nelson, into the invention of Wolff. These references teach

treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis,

specifically the hyperproliferative aspects of the disease. See description of references above.

Therefore, a combination of Wolff with any one of Skotnicki '579, Russo, Failli, Skotnicki '718,

Skotnicki '730 or Nelson is proper. Additionally, the motivation to use a macrocyclic lactone

analog of rapamycin as the therapeutic agent in the stent of Wolff can be found in the references

themselves. Wolff teaches that intimal hyperplasia is an integral aspect of restenosis and in order

to stop restenosis, proliferation of smooth muscles cells must be prevented. See Wolff page 5

lines 18-30. Furthermore, any one of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki

'730 or Nelson, independently, disclose that each of their respective macrocyclic lactone analogs

of rapamycin is a known and effective antiproliferative agent and may be used to treat restenosis.

Each discloses that the agent may be contained in a polymer carrier/matrix. See descriptions of

Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 and Nelson above.

BSC-SJA-0533

Application/Control Number: 95/001,102                                      Page 73
Art Unit: 3993

Therefore, it would have been obvious to incorporate any of the analogs as a simple

substitution for the agent or an additional therapeutic agent into the polymer coated stent of

Wolff. As set forth independently by Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki

'730 or Nelson, each of these analogs of rapamycin is a known therapeutic agent for treating or

preventing proliferation, restenosis. Clearly, treating restenosis, specifically intimal

proliferation, is a stated objective of Wolff; therefore, incorporating any of the rapamycin

analogs into the stent would enhance or further the ability of the device of Wolff to treat patients

exhibiting restenosis with an increased array of therapeutics thereby enhancing the performance

of the device and method.

Regarding claim 5, Wolff does not explicitly disclose a method step of implanting the

stent in the lumen of a coronary artery. However, treating restenosis in vascular lumens

generally by implantation of a stent was well known in the art as evidenced by many of the

references cited herein, e.g. Berg, Ding, Dinh, Dayton, Tuch and Kaplan. Additionally, it was

well known in the art that restenosis after percutaneous translumenal coronary angioplasty

(PTCA) occurred anywhere from 30-60% post treatment. See Berg column 1 lines 12-20.

Therefore, it would have been obvious to implant the device of Wolff in view of Skotnicki '579,

Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson into a coronary artery in order to carry

out the purpose of the device as disclosed.

3a, 4a, 5a, 6a, 7a, 8a.

BSC-SJA-0534

The requester has proposed that claims 3 and 4 of the 7,229,473 Patent are obvious under

35 U.S.C. 103(a) as being unpatentable over Wolff in view of Berg in further view of any of

Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson. The rejection as

proposed by requester in the request for inter partes reexamination filed 10/24/08 is being

adopted in part as modified below.


Claims 3-4 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wolff in view

of Berg in further view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or

Nelson.

Wolff in view of any of Skotnicki '579, Russo, Failli, Skotnicki '718, Skotnicki '730 or

Nelson meets the claim limitations as described above. Wolff in view of any of Skotnicki '579,

Russo, Failli, Skotnicki '718, Skotnicki '730 or Nelson fails to include the polymer including an

acrylate-based polymer or copolymer or a fluorinated polymer.

Berg discloses a device comprising a metallic stent (column 3 lines 29-35) having a

coating that includes a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent

(column 4 lines 19-21 and lines 35-38). The polymeric carrier comprises an acrylate-based

polymer or copolymer or a fluorinated polymer. See Berg column 4 line 54 through column 5

line 7 for list of polymers, specifically polyvinylidene fluoride and ethylene-methyl methacrylate

copolymers (column 4 lines 62 and 66) and claim 6. The therapeutic agent could be "virtually

any therapeutic substance which possesses desirable therapeutic characteristics for application to

a blood vessel" (column 5 lines 19-22), can include anti-inflammatory agents (column 5 line 28)

and specifically dexamethasone (examples 1-7). One aspect of restenosis, neointimal

BSC-SJA-0535

Application/Control Number: 95/001,102                                    Page 75
Art Unit: 3993

proliferation is the migration of medial smooth muscle cells (SMC) into the intimal layer of the

vascular wall after angioplasty.   See Berg column 1 lines 38-43.   Therapeutic agents are

incorporated onto stents in order to treat this aspect of restenosis.   See Berg column 1 lines 54-

67.   An objective of Berg is "to provide a stent having a therapeutically significant amount of a

drug", i.e. present in an amount effective to inhibit neointimal proliferation.   See Berg column 7

lines 14-15.   The device provides a controlled release of the therapeutic agent.   See Berg column

2 lines 21-23, lines 37-40 and lines 52-54.   The release may be over a period of two weeks.   See

Berg example 6 and figure 1.   Berg also discloses a method of inhibiting neointimal proliferation

in a coronary artery resulting from percutaneous transluminal coronary angioplasty (Berg

Background of the Invention) comprising implanting the above stent in the lumen of the

coronary artery (column 3 lines 1-9 and column 7 lines 5-15).

    At the time of the invention, it would have been obvious to incorporate the polymeric

coating as taught by Berg into the invention of Wolff.   Wolff and Berg both teach treating

restenosis, specifically the cell proliferation aspects of restenosis; therefore, a combination is

proper.   Additionally, the polymeric materials of Berg are disclosed as low chronic tissue

response materials.   See Berg column 4 lines 54-55.   Therefore, one would have been motivated

to simply substitute the existing coating of Wolff with the coating of Berg in order to enhance

the long term performance of the stent in terms of reduced immunological reactions.


    Regarding claim 4, see obviousness motivation provided in Issue A.


**Issue I.          Obviousness Combinations in view of Cordis' Admissions.**

BSC-SJA-0536

Application/Control Number: 95/001,102                                    Page 76
Art Unit: 3993

1-2.          The requester has proposed that claims 1 and 3-5 of the 7,229,473 Patent are

obvious under 35 U.S.C. 103(a) as being unpatentable over Berg in view of Morris and in further

view of Cordis' own admissions. Additionally, requester has proposed that claims 1-5 of the

7,229,473 Patent are obvious under 35 U.S.C. 103(a) as being unpatentable over Berg in view of

Skotnicki '579 and in further view of Cordis' own admissions. The rejections as proposed by

requester in the request for inter partes reexamination filed 10/24/08 are being adopted as

modified below.


          Claims 1 and 3-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg in

view of Morris and in further view of Cordis' own admissions and claims 1-5 are obvious under

35 U.S.C. 103(a) as being unpatentable over Berg in view of Skotnicki '579 and in further view

of Cordis' own admissions.

          A rejection of claims 1 and 3-5 under 35 U.S.C. 103(a) as being unpatentable over Berg

in view of Morris and claims 1-5 under 35 U.S.C. 103(a) as being unpatentable over Berg in

view of Skotnicki '579 has already been set forth above. See Issue A above for reference

descriptions.

          Cordis admits in USPN 7,229,473 that it was well known in the art to deliver a

therapeutic agent to a site of arterial injury by incorporating the agent into a polymeric coating

on a stent. See USPN 7,229,473 column 3 lines 46-50. Additionally, Cordis admits it was well

known that rapamycin was capable of inhibiting SMC hyperproliferation. See USPN 7,229,473

column 5 lines 48-55.

BSC-SJA-0537

Application/Control Number: 95/001,102                                                      Page 77
Art Unit: 3993

Additionally, Cordis has made admissions in court that it was well known in the art to
incorporate an agent into a polymeric coating on a stent for delivery to the arterial lining. See
Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-SLR, specifically Cordis Opening Claim
Construction Brief, filed 3/31/05, at pages 2 and 3; Cordis Expert Report by Hanson, filed
1/27/05 at page 10; Cordis Expert Report by Hanson, filed 5/23/03, at page 11; Cordis Motion
for JMOL, filed 9/2/05, at pages 29-30; Cordis Post Hearing Answering Brief, filed 9/12/03, at
page 32; Cordis Summary Judgment Opposition, filed 4/14/05, at page 9; Cordis Combined Post
Hearing Brief, filed 8/29/03, at pages 32-33; Cordis Reply Brief, filed 10/24/05, at pages 18-19;
Cordis Expert Report by Storey, filed 5/23/03, at page 11; and Cordis Answering Memorandum,
filed 4/3/03, at page 7.

Cordis has also made admission in court that polymer selection for drug/polymer coated
stents was well known in the art. Specifically, Cordis has described polymer development as
"straightforward" and "not a challenge". See Boston Scientific v. Cordis, C.A. No. 1:03-cv-
00283-SLR, specifically Cordis Expert Report by Hanson, filed 1/27/05 at pages 10 and 13;
Cordis Expert Report by Hanson, filed 5/23/03, at page 11; Cordis Motion for JMOL, filed
9/2/05, at pages 30 and 38; Cordis Summary Judgment Opposition, filed 4/14/05, at pages 1, 7
and 9; and Cordis Reply Brief, filed 10/24/05, at pages 18-19.

Cordis has admitted in court that long term drug release from polymer-drug coated stents
was well known. See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-SLR, specifically
Cordis Expert Report by Hanson, filed 1/27/05 at pages 11 and 15; Cordis Expert Report by
Hanson, filed 5/23/03, at pages 9-12; Cordis Summary Judgment Opposition, filed 4/14/05, at
page 7; and Cordis Expert Report by Storey, filed 5/23/03, at page 12.

BSC-SJA-0538

Cordis has also admitted in court and during the prosecution of patent application no. 09/850,482 that delivering rapamycin for the treatment of restenosis using a vascular stent with a drug delivery matrix was also known in the art. See Boston Scientific v. Cordis, C.A. No. 1:03-cv-00283-SLR, specifically Cordis Expert Report by Hanson, filed 1/27/05 at pages 13-14 and also see file history of patent application no. 09/850,482 Reply/Amendment filed 12/31/02 at pages 9 and 11 and Reply/Amendment filed 4/7/03 at page 8.

At the time of the invention, it would have been obvious to incorporate rapamycin, as taught by Morris into the invention of Berg. Both references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen restenosis, specifically the hyperproliferative aspects of the disease. Therefore, a combination of Berg with Morris is proper. Additionally, the motivation to use rapamycin as the therapeutic agent in the stent of Berg can be found in the references themselves and in Cordis' Admissions as described above. First, Berg teaches treating restenosis, specifically intimal proliferation in the coronary artery, using a stent coated with a polymer and therapeutic agent. The polymer allows for controlled release of the agent from the stent over time. See description of Berg above. Additionally, Cordis sets forth that drug eluting stent via a polymer-drug matrix/carrier for treating restenosis and specifically intimal proliferation was well known in the art. Furthermore, Morris discloses that rapamycin is a known and effective inhibitor of cell proliferation and is used to treat restenosis via a vascular stent.

Therefore, it would have been obvious to incorporate rapamycin as a simple substitution for the agent or an additional therapeutic agent into the polymer coated stent of Berg. As set forth by Morris and Cordis' Admissions, rapamycin is a known therapeutic agent for treating cell

Application/Control Number: 95/001,102                                    Page 79
Art Unit: 3993

proliferation, restenosis, via a vascular stent. Clearly, treating restenosis, specifically intimal

proliferation, is a stated objective of Berg; therefore, incorporating rapamycin into the stent

would enhance or further the ability of the device of Berg to treat patients after PTCA with an

increased array of therapeutics thereby enhancing the performance of the device and method.


    At the time of the invention, it would have been obvious to incorporate the macrocyclic

lactone analog of rapamycin, as taught by Skotnicki '579 into the invention of Berg. Both

references teach treating the vessel wall with therapeutic agents in order to inhibit or lessen

restenosis, specifically the hyperproliferative aspects of the disease. See description of

references above. Therefore, a combination of Berg with Skotnicki '579 is proper. Additionally,

the motivation to use a macrocyclic lactone analog of rapamycin as the therapeutic agent in the

stent of Berg can be found in the references themselves and in Cordis' Admission as described

above. First, Berg teaches treating restenosis, specifically intimal proliferation in the coronary

artery, using a stent coated with a polymer and therapeutic agent. The polymer allows for

controlled release of the agent from the stent over time. See description of Berg above.

Furthermore, Skotnicki '579 discloses that the macrocyclic lactone analog of rapamycin is a

known and effective antiproliferative agent and may be used to treat restenosis. Furthermore, the

agent may be contained in a polymer carrier/matrix. See descriptions of Skotnicki '579 above.

    Therefore, it would have been obvious to incorporate any of the analogs as a simple

substitution for the agent or an additional therapeutic agent into the polymer coated stent of Berg.

As set forth independently by Skotnicki the analog of rapamycin is a known therapeutic agent for

treating or preventing proliferation, restenosis. Clearly, treating restenosis, specifically intimal

BSC-SJA-0540

proliferation, is a stated objective of Berg; therefore, incorporating any of the rapamycin analogs into the stent would enhance or further the ability of the device of Berg to treat patients after PTCA with an increased array of therapeutics thereby enhancing the performance of the device and method.

Regarding claim 4, it would have been obvious at the time of the invention to utilize a biocompatible polymeric carrier that includes both fluorinated polymer and acrylate-based polymer or copolymer. As admitted by Cordis, polymer selection for drug/polymer coated stents was well known in the art. Specifically, Cordis has stated that "[o]nce the right drug was identified, developing a suitable coating was 'straightforward'" and "developing a polymer coating for a drug–eluting stent was not a challenge for persons of skill in this art". Furthermore, fluorinated polymers and acrylate-based polymers were both well known materials for use as biocompatible polymeric carrier stent coatings. Therefore, as based on Cordis' own admissions a biocompatible polymeric carrier coating comprising a fluorinated polymer and an acrylate-based polymer would have been obvious to one skilled in the art.

Application/Control Number: 95/001,102                                    Page 82 83
Art Unit: 3993



### *Conclusion*

All correspondence relating to this *inter partes* reexamination proceeding should be
directed as follows:

By EFS:            Registered users may submit via the electronic filing system, EFS-Web,
                   at:
                   https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html.

By Mail:           Mail Stop *Inter Partes* Reexam
                   ATTN: Central Reexamination Unit
                   Commissioner for Patents
                   U.S. Patent & Trademark Office
                   P.O. Box 1450
                   Alexandria, VA 22313-1450

By FAX:            (571) 273-9900 (for Central Reexamination Unit)

By hand:           Customer Service Window
                   Randolph Building
                   401 Dulany St.
                   Alexandria, VA 22314

For EFS-Web transmissions, 37 CFR 1.8(a)(1) (i)(C) and (ii) states that correspondence
(except for a request for reexamination and a corrected or replacement request for
reexamination) will be considered timely filed if: (a) it is transmitted via the Office's electronic
filing system in accordance with 37 CFR 1.6(a)(4); and, (b) includes a certificate of transmission
for each piece of correspondence stating the date of transmission, which is prior to the expiration
of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications from the
Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be
directed to the Central Reexamination Unit at telephone number: 571.272.7705. The
reexaminer's supervisor is Andres Kashnikow whose phone number is: 571.272.4361. Both the
Patent Owner and the Third Party Requester are reminded that interviews that discuss the merits
are prohibited in *inter partes* reexamination proceedings. Questions on strictly procedural
matters may be discussed (*see* MPEP § 2685; 37 CFR § 1.955).


*/Catherine S. Williams/*                          Conferees:
Catherine S. Williams
AU 3993, Central Reexamination Unit

# EXHIBIT 8

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,095 | 10/24/2008 | 7300662 | A9884 | 8887 |

45511            7590            12/31/2008
WOODCOCK WASHBURN LLP
CIRA CENTRE, 12TH FLOOR
2929 ARCH STREET
PHILADELPHIA, PA 19104-2891

| EXAMINER |
|---|
| BRUMBACK, BRENDA G |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/31/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

BSC-SJA-0543

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS
Michael G. Raucci
SUGHRUE MION PLLC
2100 Pennsylvania Ave., NW, Suite 800
Washington, DC 20037

Date: MAILED

DEC 3 1 2008

CENTRAL REEXAMINATION UNIT

**Transmittal of Communication to Third Party Requester**
**Inter Partes Reexamination**

REEXAMINATION CONTROL NO. : 95001095
PATENT NO. : 7300662
TECHNOLOGY CENTER : 3999
ART UNIT : 3991

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the inter partes reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an ex parte reexamination has been merged with the inter partes reexamination, no responsive submission by any ex parte third party requester is permitted.

All correspondence relating to this inter partes reexamination proceeding should be directed to the Central Reexamination Unit at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070(Rev.07-04)



BSC-SJA-0544

| **OFFICE ACTION IN INTER PARTES REEXAMINATION** | Control No. 95/001,095 | | Patent Under Reexamination 7300662 | |
|---|---|---|---|---|
| | Examiner BRENDA BRUMBACK | | Art Unit 3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on 24 October 2008

### RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:

*For Patent Owner's Response:*
    2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

### PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

### PART II. SUMMARY OF ACTION:

1a. ☒ Claims 1-25 are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims 1-25 are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____    ☐ are acceptable    ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:    ☐ approved. ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
        ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No 95001095.
10. ☐ Other _____

BSC-SJA-0545

| Transmittal of Communication to Third Party Requester Inter Partes Reexamination | Control No. 95/001,095 | Patent Under Reexamination 7300662 |  |
|---|---|---|---|
|  | Examiner BRENDA BRUMBACK | Art Unit 3991 |  |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address.* --

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

BSC-SJA-0546

| INTER PARTES REEXAMINATION COMMUNICATION | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/001,095 | 7300662 |
| | Examiner | Art Unit | |
| | BRENDA BRUMBACK | 3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE ☒ 2 MONTH(S) ☐ THIRTY DAYS  FROM THE MAILING DATE OF THIS LETTER. EXTENSIONS OF TIME FOR PATENT OWNER ARE GOVERNED BY 37 CFR 1.956.

Each time the patent owner responds to this Office action, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

1

BSC-SJA-0547

Application/Control Number: 95/001,095                                                    Page 2
Art Unit: 3991

### *Detailed Action*

This first Office action on the merits is being mailed together with the Order granting

*inter partes* reexamination of claims 1-25 of U.S. Patent 7,300,662 to Falotico *et al.* 37 CFR

1.935.

### *Priority*

U.S. Patent 7,300,662 is a continuation-in-part of U.S. Application Number 09/850,293

filed on 05/07/2001, now abandoned; which is a continuation-in-part of U.S. Application

Number 09/575,480 with a filing date of 05/19/2000; and claims benefit of Provisional

Application Numbers 60/263,979 with a filing date of 01/25/2001, 60/263,806 with a filing date

of 01/24/2001; 60/262,614 with a filing date of 01/18/2001; 60/262,461 with a filing date of

01/18/01; and 60/204,417 with a filing date of 05/12/2000. As was set forth in the Request filed

10/24/08 by Requestor, the earliest **priority date** for claims 1-25, which recite drug delivery

stents with a polymeric coating incorporating from about 64μg to about 197μg of rapamycin

within the coating, is **01/24/2001**, with the filing of Provisional Application Number **60/263,806**,

which contained the first disclosure of the claimed amounts of rapamycin.

### *Issues Not Within The Scope of Reexamination*

It is noted that issues not within the scope of reexamination proceedings have been raised

At page 4, line 3 through page, line 2, of the request, Requestor argues that while the

'662 patent defines rapamycin as encompassing "... all analogs, derivatives and cogeners that

bind FKBP12 and possess the same pharmacologic properties as rapamycin", none are disclosed



BSC-SJA-0548

and there is no teaching in the '662 specification of how to make or use any of them. However, as discussed in the Request and in the present Office action, numerous prior art patents disclose how to make and use rapamycin derivatives and analogs for treating and preventing restenosis.

At pages 4-16 of the Request, Requestor argues that the claimed ranges of rapamycin based on selecting certain data points from disclosed experimental data, the lack of disclosure of specific dosages in human clinical trials and the actual polymeric coatings used in human clinical trials, and the failure to provide a definition of the measurements reproduced in the clinical data, such as "late-loss", raise written description issues.

These issues will not be considered in a reexamination proceeding. 37 CFR 1.552(c). While these issues are not within the scope of reexamination, the patentee is advised that it may be desirable to consider filing a reissue application provided that the patentee believes one or more claims to be partially or wholly inoperative or invalid based upon the issues.

### Scope of claims

In reexamination, patent claims are construed broadly. *In re Yamamoto*, 740 F.2d 1569, 1571,222 USPQ 934, 936 (Fed. Cir. 1984) (claims given "their broadest reasonable interpretation consistent with the specification"). The '662 patent contains claims to drug delivery devices comprising an intraluminal stent having a polymeric coating with rapamycin incorporated within. Claims 1, 5, 9, and 13 are representative:

> 1. A drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said device provides an in-stent late loss in diameter at 12 months following implantation in a human of less than about 0.5 mm, as measured by quantitative coronary angiography.

BSC-SJA-0549

Application/Control Number: 95/001,095                                     Page 4
Art Unit: 3991

    5. A drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said device provides a mean in-stent late loss in diameter in a human population at 12 months following implantation of less than about 0.5 mm, as measured by quantitative coronary angiography.

    9. A method of inhibiting neointimal proliferation in a human coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting in the lumen of said coronary artery a drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said method provides an in-stent late loss in diameter at 12 months following implantation of less than about 0.5 mm, as measured by quantitative coronary angiography.

    13. A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting in the lumen of said coronary artery a drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said method provides a mean in-stent late loss in diameter in a human population at 12 months following implantation of less than about 0.5 mm, as measured by quantitative coronary angiography.



### *35 U.S.C §102*

    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

    A person shall be entitled to a patent unless --

    (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

BSC-SJA-0550

### *Requester's Proposed Rejection*

**A1.  Claims 1-25 are rejected under 35 U.S.C. 102(b) as being anticipated by EP 0
970 711 to Hossainy *et al.* (hereinafter "Hossainy").**

The rejection of claims 1-25 was proposed by the third party requester (see pages 30-37,
85-90, and Appendix A of the Request) and is **adopted** for the reasons stated in the request and
for those reasons set forth below.

Hossainy discloses an intraluminal stent for drug delivery comprising a biocompatible,
nonerodible polymeric coating (e.g., non-absorbable or biostable) polymer with rapamycin
incorporated therein, wherein the rapamycin is delivered over an extended period of time after
implantation of the stent for treatment or prevention of complications resulting from angioplasty,
including stenosis. (2:11-16; 3:26-32 and 56-58; 7:11-12; and 11:54-56).  Hossainy teaches
exemplary concentrations of the rapamycin in the polymeric coating equivalent to about 63, 132-
144, 149, 156-168 and 182 µg of rapamycin, according to the following calculations (see 9:31-
10:11; Example 8):

> At 9:31-10:11, Hossainy discloses exemplary concentrations of rapamycin in the
> polymeric coating by disclosing the total weight of the coatings and the weight percents
> of rapamycin in each coating. By multiplying the weight percent of rapamycin by the
> total coating weight, the dosage of rapamycin on each stent is calculated as follows:
>
> (1) "The total weight of the coating and rapamycin on the each stent was approximately
> 450 µg and contained 33 percent by weight of rapamycin." (see 9:34-35.) (450 µg * 0.33
> = <u>149 µg</u>).
>
> (2) "The total weight of the coating and drug was approximately 450 µg, which contained
> 14 percent by weight rapamycin." (see 9:37-38.) (450 µg * 0.14 = 63 µg).
>
> (3) "The total weight of the coating and rapamycin was 650-700 µg, which contained 24
> percent by weight rapamycin." (see 9:42- 43.) (650 µg * 0.24 = 156 µg and 700 µg * 0.24

= 168 µg).

(4) "The total weight of the coating and rapamycin was 550-600 µg, which contained 24 percent by weight rapamycin." (see 9:46- 47.) (550 µg * 0.24 = 132 µg and 600g * 0.24 = 144 µg).

(5) "The total weight of the coating and rapamycin was approximately 550 µg, which contained 33 percent by weight rapamycin." (see 9:50-51.) (550 µg * 0.33 = 182 µg).

Hossainy also teaches an exemplary concentration of rapamycin in the polymeric coating of stents used in a porcine coronary artery model in Example 10 as 166 µg (see 11:16). Each of the aforementioned concentrations anticipates the claimed ranges of about 64 µg to about 197 µg and/or about 64 µg to about 125 µg respectively (*claims 1, 5, 9, 13, 17, and 22*).

With regard to *claims 1-16*, which are drawn to an in-stent late loss in diameter at 12 months following implantation in a human of less than about 0.5 mm or less than about 0.3mm, or an in-stent diameter stenosis at 12 months of less than 22% or 15%, as measured by quantitative coronary angiography, Hossainy teaches inhibiting neointimal proliferation in a human coronary artery using drug-coated stents through delivery of the therapeutic compound to the lumen. (2:11-16 and 11:54-56). Example 10 of Hossainy describes the *in vivo* testing of rapamycin-coated stents in a porcine coronary artery model of human disease (see 10:58-11:56). Although Hossainy does not specifically disclose the particularly claimed amounts of reduction of in-stent late loss or percentages of restenosis, Hossainy does teach reductions in the intima/media ratio and percent diameter stenosis as a result of the treatment (11:48-53). Additionally, since the stents disclosed by Hossainy have the same structural elements as those of the stents of the present claims, *i.e.*, rapamycin (at concentrations which anticipate the claimed dosage ranges) in a biocompatible, nonerodible polymeric coating affixed to an intraluminal

BSC-SJA-0552

stent, the specifically recited limitations regarding in-stent late loss in diameter and in-stent

diameter stenosis in *claims 1-16* are deemed to be inherent features of the stents disclosed by

Hossainy.

*Claims 19, 20, 23, and 24*, which are drawn to incorporation of about 2 μg to 20 μg of

rapamycin per mm of stent length or about 3 μg to 13 μg of rapamycin per mm, are anticipated

by Hossainy, as is evidenced by van der Giessen *et al.*, (pp. 51-61 in Handbook of Coronary

Stents, Patrick W. Serruys, *ed.*, University Hospital Dijkzigt, Rotterdam, 1997; hereinafter "van

der Giessen").

Hossainy teaches rapamycin dosages that overlap the dosages recited in the claims as

follows:

> Hossainy  discloses commercially available stents (e.g., the Palmaz stent, the Gianturco
> stent, the Wiktor stent, and the Guidant RX Multi-Link TM stent; see 3:22-25.) The
> Guidant RX Multi- Link TM, for example, was available at least in 15 mm, 25 mm, and
> 35 mm stent lengths at the time of filing of Hossainy, as is evidenced by van der Giessen
> (page 54 of Exhibit 24 filed with the Request).  Using the rapamycin amounts disclosed
> in Hossainy and the known lengths of the stents disclosed by van der Giessen, the amount
> of rapamycin per millimeter of stent length can be calculated. For example, the 166 μg
> dose on a 15 mm stent is calculated as 11 μg/mm, (166 μg/15=11.07 μg) which
> anticipates both ranges recited in the present claims.

Additional examples of concentrations which anticipate the claimed ranges are set forth

by Requester in Table 1 (pp. 35-37) of the Request filed 10/24/08, which is herein incorporated

by reference.

Regarding *claims 18, 21 and 25*, which recite release of a portion of the rapamycin at

about six weeks, Hossainy discloses "prolonged delivery over, say 1 to 2,000 hours, preferably 2

to 800 hours of effective amounts." (see 7:11-12.). The Hossainy disclosure of a range of from

BSC-SJA-0553

Application/Control Number: 95/001,095                                    Page 8
Art Unit: 3991

about 1 hour to about 2,000 hours (equivalent to about 11.9 weeks) encompasses the claimed

"about six weeks".

### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

### Requester's Proposed Rejections

**A2.  On pages 78-82 and 90-92 of the request, requester urges that claims 1-25 are**

**obvious under 35 U.S.C 103(a) over Hossainy in view of Kimura.**

The proposed rejection of claims 1-25 under 35 U.S.C. §103, as obvious over Hossainy in

view of Kimura, is **not adopted**.

As was set forth *supra*, claims 1-25 are anticipated by Hossainy alone because Hossainy

teaches all of the limitations of *claims 1-25* of the '662 patent.  The Kimura reference does not

add anything to Hossainy and is not required to meet any of the claim limitations.  Furthermore,

the requestor did not point to any deficiencies in Hossainy that require the addition of the Kimura

reference.  Therefore, the proposed rejection of claims 1-25 under 35 U.S.C. §103, as obvious

over Hossainy in view of Kimura, is **not adopted**.

Application/Control Number: 95/001,095 · Page 9
Art Unit: 3991

A3. On pages 82-84 and 91-92 of the request, requester urges that claims 1-25 are
obvious under 35 U.S.C 103(a) over Hossainy in view of Haase.

The proposed rejection of claims 1-25 under 3 U.S.C. 103(a) as obvious over Hossainy in
view of Haase is **not adopted**.

As was set forth *supra*, claims 1-25 are anticipated by Hossainy alone because Hossainy
teaches all of the limitations of *claims 1-25* of the '662 patent. The Haase reference does not
add anything to Hossainy and is not required to meet any of the claim limitations. Furthermore,
the requestor did not point to any deficiencies in Hossainy that require the addition of the Haase
reference. Therefore, the proposed rejection of claims 1-25 under 35 U.S.C. §103, as obvious
over Hossainy in view of Haase, is **not adopted**.

B1-2.  **Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Wright *et al.* (EPA 0 950 386; hereinafter Wright) in view of Hossainy.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 37-40,
92-95, and Appendix B of the request) and is **adopted** for the reasons stated in the request and
for those reasons set forth below.

Regarding *claims 1, 5, 9, and 13*, Wright discloses an intraluminal stent comprising a
biocompatible, nonerodible polymeric coating with rapamycin (or a rapamycin analog)
incorporated therein (see 4:5-13 and 7:1-5 and 48- 52).  Wright further discloses that
incorporation of the drug into the polymeric coating is a conventional approach to treatment with
stents (see 4:4-8). Wright teaches that the contemplated therapeutic for incorporation into the
stents encompasses both rapamycin and macrocyclic lactones, which are structural analogs of

rapamycin (a macrocyclic triene, as defined in the '662 patent specification at 5:31-51) and

which are inhibitors of cell-cycle progression." (6:21-46; 7:48-51; and 7:3-5.).   While Wright

does not specify the mechanism of action by which the analogs inhibit cell cycle progression,

absent evidence to the contrary, structural analogs would be expected to inherently inhibit cell

cycle progression in the same manner as rapamycin, which is via binding to the FKBP12

molecule (see the '662 patent specification at 5:48-6:10). Wright teaches that delivery of

rapamycin locally from an intravascular stent coated with a biocompatible, nonerodible polymer,

inhibits neointimal tissue proliferation and prevents restenosis (Abstract; 1:5-11; 6:21-46; and

7:15-17.).   While Wright teaches the concentration range of rapamycin as 0.001 weight % to 30

weight % in the polymeric coating, Wright does not explicitly disclose the rapamycin as present

in a dosage range of about 64 µg to about 197 µg, as in the present claims. Also, while Wright

does teach that the polymeric coating must be capable of retaining the drug at a sufficient load

level to obtain the required dose and be able to release the drug in a controlled way over time

(4:5-13.), Wright does not teach the claimed mean in-stent late loss in diameter at 12 months as

less than 0.5mm or 0.3mm, or the in-stent diameter stenosis at 12 months as less than about 22

percent or 15 percent.

As was set forth *supra* at paragraph A1, Hossainy teaches rapamycin incorporated into

the polymeric coating of a stent at concentrations which anticipate the claimed ranges.

Additionally, Hossainy teaches testing two concentrations (32 µg [which does not overlap with

the claimed range] and 166 µg [which does anticipate the claimed range] in a porcine coronary

artery model.  While Hossainy teaches that both concentrations were effective in reducing

BSC-SJA-0556

neointimal proliferation when compared to control, Hossainy teaches that the higher 166 μg dosage was more effective than the lower 32 μg dosage (11:Table 1 and 46-56).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to have used the rapamycin or rapamycin analog dosage amounts disclosed by Hossainy for incorporation into the polymeric coating on the stents disclosed by Wright for *in vivo* therapy because Hossainy teaches that these dosage amounts are effective for treating restenosis. One of ordinary skill in the art at the time the invention was made would have had a reasonable expectation of success because Hossainy teaches that reduction in a porcine coronary artery model of restinosis is correlative with the concentration of rapamycin in the polymeric coating of the stent used. Alternatively, one of ordinary skill in the art at the time the invention was made would further have found it *prima facie* obvious to have adjusted the concentration of rapamycin in the stent used in order to achieve optimal performance, based on the guidance found in Hossainy. Where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. *In re Aller*, 220 F.2d 454, 456, 105 USPQ 233, 235.

**B3-4. On pages 95-97 of the request, requester argues that claims 1-25 are obvious under 35 U.S.C 103(a) over Wright in view Hossainy and further in view of Kimura or Haase.**

The proposed rejection of claims 1-25 under 35 U.S.C. 103(a) as obvious over Hossainy in view of Wright and further in view of either Kimura or Haase is **not adopted** for the same

reasons as those set forth above in paragraphs **A2** and **A3** *supra* regarding the combination of

Hossainy with either Kimura or Haase.


**C1.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over**

**WO 99/55396 to Chudzik et al. (hereinafter "Chudzik") in view of Hossainy.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 40-43,

97-102, and Appendix C of the request) and is adopted for the reasons as stated in the request

and those reasons set forth below.

Chudzik discloses drug delivery stents having a biocompatible, noncrodible polymeric

coating "to provide the release of pharmaceutical agents from the surface of the devices under

physiological conditions." (Abstract and 1:9-13).  Chudzik teaches use of the stents for

prevention of complications resulting from placing the device in the body, and specifically

contemplates prevention of hyperplasia and restenosis (1:16-22 and 2:1-2).  With respect to the

drug dosage range, Chudzik discloses that the dosage of bioactive agent is "preferably in the

range of about 0.05 mg to about 10 mg" (equivalent to about 50 μg to about 10,000 μg) of

bioactive agent per $cm^2$ of the gross surface area of the stent (8:24-30).  Chudzik teaches the use

of commercially available stents, such as the MultiLink stent, for example (8:14-18).  As was set

forth in the Request and as is evidenced by van der Giessen, the MultiLink stent was available in

15 mm lengths (among others).  On a 15 mm MultiLink stent, the dosage of bioactive agent

would be equivalent to about 0.7 μg/mm to about 140 μg per mm, for a total dosage of about

10.5μg-2100μg (see the calculations by the Requestor at pages 42-43 of the Request, especially

footnote 23, which is incorporated herein by reference).  Based on these calculations, the range

BSC-SJA-0558

taught by Chudzik encompasses the ranges of instant *claims 1, 5, 9, 13, 17, 19, 20, 22, 23, and 24*. Chudzik teaches suitable biocompatible polymers as EVA/BMA (see the abstract and 7:1-13), which is also the preferred embodiment of the polymers of the instant claims (see for example Table 3.0 at columns 7-8 and 9-10 and 16:32-37 of the instant specification). Therefore, regarding the drug delivery device releasing a portion of the drug at about six weeks following intraluminal implantation (*claims 18, 21 and 25*), since Chudzik discloses the same combination of polymers as that of the instant specification and teaches the drug within the polymeric coating in concentrations which encompass the claimed ranges, the release of a portion of the drug at about six weeks would be an inherent feature of the polymeric coatings of Chudzik, absent evidence to the contrary. Furthermore, Chudzik suggests long-term release of the drug by teaching that it is desirable for the drug to be released for a duration of at least 30 days (11:7-8). Chudzik additionally recites that "the ability of the coating to control the release rates of a variety of pharmaceutical agents can preferably be manipulated by varying the absolute and relative concentrations of the polymers." (6:7-9). Because Chudzik teaches dosage ranges of drug which encompass those of the instant claims and teaches the same combination of polymers used in the instant specification, the recited late loss in diameter and percentage of restenosis recited in *claims 1-17* would also be inherent features of the stents disclosed by Chudzik. Chudzik teaches that the bioactive (e.g., pharmaceutical) agent can be an antiproliferative, anti-inflammatory, or immunosuppressive agent. (7:24-26.); however, Chudzik does not teach the agent specifically as rapamycin.

Hossainy teaches drug delivery stents comprising a biocompatible, nonerodible polymer and rapamycin and teaches that the stents are useful for inhibiting neointimal proliferation and

BSC-SJA-0559

restinosis resulting from stent deployment after coronary angioplasty (2:11-16 and 10:56 -
11:56).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the

invention was made to have used the rapamycin disclosed by Hossainy as the antiproliferative

anti-inflammatory, or immunosuppressive agent in the stents taught by Chudzik because Chudzik

teaches that the stents comprising an antiproliferative, anti-inflammatory, or immunosuppressive

agent useful for treating restenosis and Hossainy teach rapamycin as a specific antiproliferative

drug, which is effective when applied to an intraluminal stent for inhibiting and treating

restenosis.


**C2. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over**

**Chudzik in view of Wright.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 102-

106 of the request) and is **adopted** for the reasons as stated in the request and those reasons set

forth below.

As was set forth *supra* in paragraph C1, Chudzik teaches drug delivery stents comprising

a polymeric coating with an antiproliferative, anti-inflammatory, or immunosuppressive drug

within for long term release *in vivo* to help prevent complications resulting from surgical

intervention, such as restenosis, in ranges encompassing the claimed range. Chudzik does not

teach the agent specifically as rapamycin.

BSC-SJA-0560

As was set forth *supra* in paragraph **B1-2**, Wright teaches delivery of rapamycin to the

site of arterial injury by incorporating rapamycin into a polymeric coating on the surface of an

intravascular stent in order to prevent restenosis (abstract and 4:4-8).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the

invention was made to have chosen rapamycin as the antiproliferative drug for use in the stents

disclosed by Chudzik because Chudzik teaches use of an antiproliferative within a polymeric

coating prevents restenosis and Wright teaches that rapamycin is an effective drug for preventing

restenosis.


**C3.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over**
**Chudzik in view of U.S. Patent 5,516,781 to Morris et al. (hereinafter "Morris").**

This rejection of claims 1-25 was proposed by the third party requester (see pages 107-

111 of the request) and **is adopted** for the reasons as stated in the request and those reasons set

forth below.

As set forth *supra* in paragraph **C1**, Chudzik teaches drug delivery stents comprising a

polymeric coating with an antiproliferative drug therein for long term release *in vivo* to help

prevent complications resulting from surgical implantation of the stents, such as restenosis, in

ranges encompassing the claimed ranges.  Chudzik does not teach the agent specifically as

rapamycin.

Morris teaches that rapamycin is effective for treating or preventing restenosis resulting

from percutaneouos transluminal coronary angioplasty (abstract and 6:3-7).  Morris teaches that

rapamycin may be administered via a vascular stent impregnated with rapamycin during balloon catheterization (11:41-45 and 12: claims 1 and 2).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the inventin was made to have chosen rapamycin as the antiproliferative drug for use in the stents disclosed by Chudzik because Chudzik teaches that use of an antiproliferative within a polymeric coating prevents restenosis and Morris teaches that rapamycin is effective for preventing restenosis when administered via a vascular stent.

**C4. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Chudzik in view of U.S. Patent 5,252,579 to Skotnicki (hereinafter Skotnicki 579).**

This rejection of claims 1-25 was proposed by the third party requester (see pages 111-116 of the request) and **is adopted** for the reasons as stated in the request and those reasons set forth below.

As set forth *supra* in paragraph **C1**, Chudzik teaches drug delivery stents comprising a polymeric coating with an antiproliferative drug within for long term release of the drug *in vivo* to prevent complications resulting from surgical intervention, such as restenosis, in ranges encompassing the claimed range. Chudzik does not teach the agent specifically as rapamycin.

Skotnicki 579 teaches that rapamycin and macrocyclic derivatives of rapamycin are effective antiproliferative drugs for treating or preventing intimal thickness following vascular injury (1:5-12, 40-48 and 65-68) and for treating restenosis (9:1-4). Skotnicki teaches that the compounds may be formulated in a number of carriers, including the polymer, polyvinylpyrrolidine (9:22-37). Skotnicki teaches that the drug can be administered in a variety

BSC-SJA-0562

of ways (9:63 - 10:26) including a variety of occlusive devices, such as a matrix containing the drug (10:19-24).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the inventin was made to have chosen rapamycin as the antiproliferative drug for use in the stents disclosed by Chudzik because Chudzik teaches use of an antiproliferative drug within a polymeric coating on the stent to prevent restenosis and Skotnicki 579 teaches that rapamycin and macrocyclic derivatives thereof are effective for treating and preventing restenosis when incorporated into a matrix in an occlusive device.

**C5.   Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Chudzik in view of U.S. Patent 5,441,977 to Russo *et al.* (hereinafter "Russo").**

This rejection of claims 1-25 was proposed by the third party requester (see pages 116-120 of the Request) and is adopted for the reasons as stated in the request and for those reasons set forth below.

As set forth *supra* in paragraph C1, Chudzik teaches drug delivery stents comprising a polymeric coating with an anti-proliferative drug within for long term release of the drug *in vivo* to help prevent complications resulting from surgical intervention, such as restenosis, in ranges encompassing the claimed range.  Chudzik does not teach the agent specifically as an analog of the macrocyclic triene, rapamycin.

Russo teaches that the rapamycin analog 21-norrapamycin is an effective antiproliferative drug for treating or preventing diseases involving intimal smooth muscle proliferation, such as restenosis, following mechanically mediated vascular injury (3:36-54).  Russo teaches that 21-

BSC-SJA-0563

Application/Control Number: 95/001,095                                    Page 18
Art Unit: 3991

norrapamycin has the same structure as rapamycin with a substitution of profine for lysine (2:48-66). Because 21-norrapamycin is a structural analog of rapamycin, it would inherently inhibit cellular proliferation in the same manner as rapamycin, which is via binding to the FKBP12 molecule (see the '662 patent specification at 5:48-6:10), absent evidence to the contrary. Russo teaches that the compound may be formulated in a number of carriers, including the polymer polyvinylpyrrolidine (4:18-19). Russo teaches that a variety of occlusive devices may be used to release the drug, including a matrix (see 4:60 through 5:5).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the inventin was made to have chosen 21-norrapamycin as the antiproliferative drug for use in the stents disclosed by Chudzik because Chudzik teaches use of an antiproliferative drug o prevent restenosis and Russo teaches that 21-norrpamycin is an effective antiproliferative drug for treating restenosis when incorporated into a matrix in an occlusive device.

**C6. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Chudzik in view of U.S. Patent 5,563,145 to Failli *et al.* (hereinafter "Failli").**

This rejection of claims 1-25 was proposed by the third party requester (see pages 120-125 of the Request) and is adopted for the reasons as stated in the request and those reasons set forth below.

As set forth *supra* in paragraph C1, Chudzik teaches drug delivery stents comprising a polymeric coating with an antiproliferative, anti-inflammatory, immunosuppressive drug therein in ranges encompassing the claimed range for long term release *in vivo*, in order to help prevent

BSC-SJA-0564

complications resulting from surgical intervention, such as restenosis. Chudzik does not teach the agent specifically as an analog of the macrocyclic triene, rapamycin.

Failli teaches rapamycin analogs, specifically rapamycin 42-oximes and hydroxylamines, which are derivatives and structural analogs of rapamycin. Failli teaches that the analogs are effective antiproliferative drugs for treating or preventing vascular diseases, such as restenosis, that occur following angioplasty (abstract; 1:8-14; and 6:36-48). Because 21-norrapamycin is a structural analog of rapamycin, it would inherently inhibit cellular proliferation in the same manner as rapamycin, which is via binding to the FKBP12 molecule (see the '662 specification at 5:48-6:10), absent evidence to the contrary. Failli teaches that the compound may be formulated in a number of carriers, including polyvinylpyrrolidine (7:10-24). Failli teaches that occlusive devices may be used to release the drug, including a matrix containing the drug therein (7:64 to 8:8).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to have chosen the rapamycin 42-oximes and hydroxylamine analogs taught by Failli as the antiproliferative drug for use in the stents disclosed by Chudzik because Chudzik teaches use of an antiproliferative drug within a polymeric coating on the stent to prevent restenosis and Failli teaches that rapamycin 42-oximes and hydroxylamins are effective for treating and preventing restenosis when incorporated into a matrix in an occlusive device.

**C7. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Chudzik in view of U.S. Patent 5,362,718 to Skotnicki *et al.* (hereinafter "Skotnicki 718").**

This rejection of claims 1-25 was proposed by the third party requester (see pages 125-129 of the Request) and **is adopted** for the reasons as stated in the request and those reasons set forth below.

As set forth *supra* in paragraph C1, Chudzik teaches drug delivery stents comprising a polymeric coating with an antiproliferative drug therein for long term release *in vivo* to help prevent complications resulting from surgical intervention, such as restenosis, in ranges encompassing the claimed range. Chudzik does not teach the agent specifically as an analog of the macrocyclic triene, rapamycin.

Skotnicki 718 teaches rapamycin hydroesters which are derivatives and structural analogs of rapamycin. Skotnicki teaches that the analogs are effective antiproliferative drugs for treating or preventing hyperproliferative vascular disorders following angioplasty, and specifically for treating or preventing restenosis. (1:6-12, 40-51 and 65-68; 6:46-59). Because rapamycin hydroesters are structural analogs of rapamycin, absent evidence to the contrary, they would inherently inhibit cellular proliferation in the same manner as rapamycin, which is via binding to the FKBP12 molecule (see the '662 specification at 5:48-6:10). Skotnicki 718 teaches that the compounds may be formulated in a number of carriers, including the polymer polyvinylpyrrolidine (7:23-38). Skotnicki 718 teaches that occlusive devices may be used to release the drug *in vivo*, including a matrix containing the drug therein (8:1-26).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to have chosen the rapamycin hydroxyester analogs taught by Skotnicki 718 as the antiproliferative drug for use in the stents disclosed by Chudzik because Chudzik teaches use of an antiproliferative within a polymeric coating on the stent to prevent restenosis and

Skotnicki 718 teaches that rapamycin hydroxyesters are effective for treating and preventing

restenosis when incorporated into a matrix in an occlusive device.


**C8. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Chudzik in view of U.S. Patent 5,391,730 to Skotnicki *et al.* (hereinafter Skotnicki 730).**

This rejection of claims 1-25 was proposed by the third party requester (see pages 72-75

and 129-134 of the Request) and **is adopted** for the reasons as stated in the request and those

reasons set forth below.

As set forth *supra* in paragraph C1, Chudzik teaches drug delivery stents comprising a

polymeric coating with an antiproliferative drug therein for long term release *in vivo* to help

prevent complications resulting from surgical intervention, such as restenosis, in ranges

encompassing the claimed range. Chudzik does not teach the agent specifically as an analog of

the macrocyclic triene, rapamycin.

Skotnicki 730 teaches that phosphorylcarbamates and oxime dervatives of rapamycin are

antiproliferative drugs effective for the treatment and prevention of hyperproliferative vascular

disorders, such as restenosis following vascular injury (1:1-12, 39-46, and 65-68 and 7:10-16).

Because phosphorylcarbamates and oxime dervatives of rapamycin are structural analogs of

rapamycin, absent evidence to the contrary, they would inherently inhibit cellular proliferation in

the same manner as rapamycin, which is via binding to the FKBP12 molecule (according to the

'662 specification at 5:48-6:10). Skotnicki 730 teaches that the rapamycin analogs may be

formulated in a number of carriers, including the polymer polyvinylpyrrolidine (7:39-54).

BSC-SJA-0567

Skotnicki 730 teaches that occlusive devices may be used to release the drug *in vivo*, including a
matrix containing the drug therein (8:17-41).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the
invention was made to have chosen the phosphorylcarbamates and oxime dervatives of
rapamycin taught by Skotnicki 718 as the antiproliferative drug for use in the stents disclosed by
Chudzik because Chudzik teaches use of an antiproliferative within a polymeric coating on the
stent to prevent restenosis and Skotnicki 730 teaches that phosphorylcarbamates and oxime
dervatives of rapamycin are effective for treating and preventing restenosis when incorporated
into a matrix in an occlusive device.

**C9. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Chudzik in view of U.S. Patent 5,256,790 to Nelson (hereinafter "Nelson").**

This rejection of claims 1-25 was proposed by the third party requester (see pages 72-75
and 129-134 of the Request) and **is adopted** for the reasons as stated in the request and those
reasons set forth below.

As set forth *supra* in paragraph **C1**, Chudzik teaches drug delivery stents comprising a
polymeric coating with an antiproliferative drug therein for long term release *in vivo* to help
prevent complications resulting from surgical intervention, such as restenosis, in ranges
encompassing the claimed range. Chudzik does not teach the agent specifically as an analog of
the macrocyclic triene, rapamycin.

Nelson teaches the rapamycin derivative 27-hydroxyrapamycin, which is an
antiproliferative drug effective for the treatment and prevention of hyperproliferative vascular

disorders, such as restenosis (2:43-46 and 15:46-54). Because 27-hydroxyrapamycin is a

derivative and structural analog of rapamycin, absent evidence to the contrary, it would

inherently inhibit cellular proliferation in the same manner as rapamycin, which is via binding to

the FKBP12 molecule (see the '662 specification at 5:48-6:10). Nelson teaches that the

compounds may be formulated in a number of carriers, including the polymer

polyvinylpyrrolidine (16:13-28). Nelson teaches that occlusive devices may be used to release

the drug *in vivo*, including a matrix containing the drug therein (17:10-16).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the

invention was made to have chosen 27-hydroxyrapamycin, as taught by Nelson, for use as the

antiproliferative drug in the stents disclosed by Chudzik because Chudzik teaches use of an

antiproliferative within a polymeric coating on the stent to prevent restenosis and Nelson teaches

that 27-hydroxyrapamycin is effective for treating and preventing restenosis when incorporated

into a matrix in an occlusive device.

**C10-C18. On pages 78-82 and 139-145 of the request, requester urges that claims 1-
25 are unpatentable under 35 U.S.C 103(a) as obvious over Chudzik; in view of any of
Hossainy, Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki 730 or
Nelson; and further in view of Kimura.**

The proposed rejections of claims 1-25 under 3 U.S.C. 103(a) as obvious over Chudzik in

view of any of Hossainy, Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki

730 or Nelson and further in view of Kimura are **not adopted.** The combination of Chudzik in

view of any of Hossainy, Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki

730 or Nelson meets all of the claim limitations of *claims 1-25* of the '662 patent. Kimura adds

nothing and is not required to meet any of the claim limitations. Therefore the proposed

rejection of *claims 1-25* as obvious over Chudzik; in view of any of Hossainy, Wright, Morris,

Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki 730 or Nelson; and further in view of

Kimura is **not adopted.**


**C19-C27.   On pages 145-153 of the request, requester urges that claims 1-25 are**

**unpatentable under 35 U.S.C 103(a) as obvious Chudzik; in view of any of Hossainy,**

**Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki 730 or Nelson; and**

**further in view of Haase.**

The proposed rejections of claims 1-25 under 3 U.S.C. 103(a) as obvious over Chudzik in

view of any of Hossainy, Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki

730 or Nelson and further in view of Haase are **not adopted.**  The combination of Chudzik in

view of any of Hossainy, Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki

730 or Nelson meets all of the claim limitations of *claims 1-25* of the '662 patent. Haase adds

nothing and is not required to meet any of the claim limitations. Therefore the proposed

rejection of *claims 1-25* as obvious over Chudzik; in view of any of Hossainy, Wright, Morris,

Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki 730 or Nelson; and further in view of

Haase is **not adopted.**


**D1.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over**

**U.S. Patent 5,464,650 to Berg et al. (hereinafter "Berg") in view of Hossainy.**

BSC-SJA-0570

This rejection of claims 1-25 was proposed by the third party requester (see pages 44-47,

154-158, and Appendix D of the Request) and is adopted for the reasons as stated in the request

and those reasons set forth below.

Berg teaches intraluminal stents comprising a biostable (biocompatible, nonerodible)

polymeric coating with a drug incorporated into the coating for sustained delivery of the drug to

vascular tissue (abstract and 2:21-23). Berg teaches that the amount of drug on the stent can be

readily controlled by applying multiple layers and also by controlling the ratio of drug to

polymer in the layers (2:36-40 and 44-47). Berg teaches that the layers can be designed to

deliver different levels of drug at different times after implantation of the stent (2:63-68). Berg

teaches that the stents can be used to help alleviate intimal hyperplasia and to reduce restenosis

in patients following angioplasty (1:5-43). Regarding the dosage ranges recited in *claims 1, 5, 9,*

*13, 17, and 22,* Berg discloses from about 6 μg to about 540 μg of the therapeutic incorporated

into a polymeric coating affixed to an intraluminal stent, which encompasses the claimed dosage

of from about 64 μg to about 197 μg calculated as follows.

> Berg teaches that "[a] wide ratio of therapeutic substance to polymer could therefore be
> appropriate and could range from about 10:1 to about 1:100." (5:8-18 and claims 7 &
> 16.). This is equivalent to a range of drug weight percentages of from about 90 % to
> about 1% by weight of the polymeric coating. The absolute amount of the drug in the
> polymeric coating can then be determined by multiplying this drug weight percentage
> range by the total weight of the coating. For example, Berg 650 discloses "a coating
> weight of about 0.0006-0.0015 grams." (6:35-50). Multiplying the lower end of this
> sample coating weight (600 μg) by the drug weight percentage range (about 90 % to
> about 1%) translates into a dosage range of from about 6 μg to about 540 μg (600 μg *
> 0.01 = 6 ug and 600 μg * 0.9 = 540 ug).

Therefore, Berg discloses at least from about 6 μg to about 540 μg of the therapeutic

incorporated into a polymeric coating affixed to an intraluminal stent, which encompasses the

claimed dosage range of from about 64 μg to about 197 μg. Regarding *claims 2-4, 6-8, 10-12,*

*14-16, 18, 21 and 25*, while Berg teaches sustained release of the drug over time, he does not

teach specific in-stent last loss values or percentage reduction of in-stent diameter stenosis at 12

months. Additionally, Berg teaches that anti-inflammatory drugs are desirable drugs for

incorporation into the polymeric coating in order to treat restenosis, but does not specifically

teach rapamycin or a macrocyclic triene analog thereof as the anti-inflammatory drug (*claims 1,

5, 9, 13*; see 5:8-28). Finally, while Berg contemplates sustained release of the drug over time

and teaches that the timed release of the drug can be readily controlled, Berg does not recite

release of a portion of the drug specifically at six weeks (*claims 18, 21, and 25*).

       As was set forth in paragraph **A1** *supra*, Hossainy discloses an intraluminal stent for drug

delivery for treatment of post-angioplasty restenosis comprising a biocompatible, nonerodible

polymeric coating with rapamycin incorporated therein, wherein the rapamycin is delivered over

an extended period after implantation of the stent. (2:11-16; 3:26-32 and 56-58; 7:11-12 and

Example 8 at 9:31-10:11). Hossainy teaches exemplary concentrations of the rapamycin in the

polymeric coating as equivalent to about 63, 132- 144, 149, 156-168 and 182 μg of rapamycin

(see paragraph **A1** *supra* for calculations). Each of the aforementioned concentrations falls

within the claimed ranges of about 64 μg to about 197 μg and about 64 μg to about 125 μg

respectively (*claims 1, 5, 9, 13, 17, and 22*). Furthermore, based on the surface area of

exemplary stents available to one of ordinary skill in the art at the time of the invention (as is

evidenced by van der Giessen), the concentrations of rapamycin disclosed by Hossainy are

within the recited ranges of *claims 19, 20, 23, and 24* (see paragraph **A1** *supra* for calculations).

Regarding *claims 18, 21, and 25*, which recite release of a portion of the rapamycin at about six

weeks, Hossainy discloses "prolonged delivery over, say 1 to 2,000 hours, preferably 2 to 800

BSC-SJA-0572

hours of effective amounts." (7:11-12.). The Hossainy disclosure of a range of from about 1

hour to about 2,000 hours ( which is equivalent to 11.9 weeks) encompasses the claimed "about

six weeks".

     With regard *to claims 2-4, 6-8, 10-12 and 14-16,* drawn to an in-stent late loss in

diameter at 12 months following implantation in a human of less than about 0.5 mm or 0.3mm or

an in-stent diameter stenosis of less than 22% or 15%, as measured by quantitative coronary

angiography, although Hossainy does not disclose the particularly claimed amounts or

percentages; Hossainy does disclose the same structural elements as those of the stents of the

present claims, *i.e.,* rapamycin (including the claimed dosages) in a biocompatible, nonerodible

polymeric coating affixed to an intraluminal stent. Further, the results of *in vivo* testing

disclosed by Hossainy showed that local delivery of rapamycin to injured coronary arteries via

the drug delivery device resulted in a reduction in intima/media ratio, intimal area and %

diameter stenosis. (*claims 9 and 22*; see 11:1-56 and especially 55-56) Therefore, because the

stents disclosed by Berg in view of Hossainy are structurally the same as those of the instant

claims and absent evidence to the contrary, the limitations set forth in *claims 1-16* regarding in-

stent late loss in diameter and in-stent diameter stenosis are deemed to be inherent features of the

stents disclosed by Berg in view of Hossainy.

     It would have been *prima facie* obvious to one of ordinary skill in the art at the time the

invention was made to have used the rapamycin in the concentrations taught by Hossainy as the

anti-inflammatory drug in the stents disclosed by Berg because both Berg and Hossainy are

drawn to intraluminal stents comprising polymeric coatings with a therapeutic drug for treating

or preventing restenosis following angioplasty by sustained release of the drug over time, Berg

BSC-SJA-0573

teaches that anti-inflammatory drugs are exemplary of such drugs, and Hossainy specifically

teaches the efficacy of rapamycin for treating and preventing restenosis. Additionally, with

regard to the specifically recited ranges of rapamycin for incorporation into the polymeric

coating, where the general conditions of a claim are disclosed in the prior art, it is not inventive

to discover the optimum or workable ranges by routine experimentation. *In re Aller*, 220 F.2d

454, 456, 105 USPQ 233, 235.


**D2.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Berg in view of Wright.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 154-

158 of the Request) and **is adopted** for the reasons as stated in the request and those reasons set

forth below.

.Berg teaches intraluminal stents comprising a biostable (biocompatible, nonerodible)

polymeric coating with a therapeutic incorporated into the coating for sustained delivery of the

drug to vascular tissue (abstract and 2:21-23) in order to alleviate intimal hyperplasia and reduce

restenosis in patients following angioplasty (1:5-43). Regarding the dosage ranges recited in

*claims 1, 5, 9, 13, 17, and 22*, Berg discloses from about 6 μg to about 540 μg of the therapeutic

incorporated into a polymeric coating affixed to an intraluminal stent, which encompasses the

claimed dosage of from about 64 μg to about 197 μg, as was set forth *supra* in paragraph **D1**.

Additionally, Berg teaches that the amount of drug on the stent can be readily controlled by

applying multiple layers and also by controlling the ratio of drug to polymer in the layers (2:30-

68). Berg teaches that the polymer allows for sustained delivery of the drug and that the

BSC-SJA-0574

polymeric layers can be designed to deliver different levels of drug at different times after
implantation of the stent. Berg teaches that anti-inflammatory drugs are desirable drugs for
incorporation into the polymeric coating in order to treat restenosis, but does not specifically
teach rapamycin or a macrocyclic triene analog thereof as the anti-inflammatory drug (*claims 1,
5, 9, 13*; see 5:8-28). Berg does not teach specific in-stent last loss values or percentage reduction
of in-stent diameter stenosis (*claims 2–4, 5-8, 10-12, and 14-16*) or recite release of a portion of
the drug specifically at six weeks (*claims 18, 21 and 25*).

As was set forth *supra* in paragraph B1-2, Wright discloses an intraluminal stent
comprising a biocompatible, nonerodible polymeric coating with rapamycin (or a rapamycin
analog) incorporated therein (7:1-5 and 48- 51; and 4:5-13). Wright further discloses that
incorporation of the drug into the polymeric coating is a conventional approach to treatment with
stents (see 4:4-8 and 3:50-52). Wright teaches that the contemplated therapeutic for
incorporation into the stents encompasses both rapamycin and macrocyclic lactones which are
structural analogs of rapamycin (a macrocyclic triene, as defined in the '662 patent specification
at 5:31-51) and which are inhibitors of cell-cycle progression." (6:21-46; 7:48-51; and 7:3-5).
Wright teaches that delivery of rapamycin locally from an intravascular stent coated with a
biocompatible, nonerodible polymer, inhibits neointimal tissue proliferation and prevents
restenosis (see Abstract; 1:5-11; 6:21-46; and 7:15-17.). Wright teaches that the polymeric
coating is capable of retaining the drug at a sufficient load level to obtain the required dose and
releasing the drug in a controlled way over time (4:5-13.). While neither Berg nor Wright teach
the claimed mean in-stent late loss in diameter at 12 months as less than 0.5mm, 0.3mm, or the
in-stent diameter stenosis at 12 months as 22 percent or 15 percent, since the combination of

Berg and Wright teach stents having identical structure with rapamycin at dosages which overlap
the claimed dosage ranges,  the specifically recited release of a portion of the drug at six weeks,
the in-stent late loss in diameter of 0.5 mm or 0.3 mm at 12 months, and the in-stent diameter
stenosis at 12 months of 22% or 15% are deemed to be inherent features of the stents taught by
Berg in view of Wright, absent evidence to the contrary.


**D3.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Berg in view of Morris.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 162-
165 of the request) and is adopted for the reasons as stated in the request and those reasons set
forth below.

As set forth *supra* in paragraphs **D1** and **D2**, Berg teaches teaches intraluminal stents
comprising a biostable (biocompatible, nonerodible) polymeric coating with a therapeutic
incorporated into the coating for sustained delivery of the drug to vascular tissue (abstract and
2:21-23) in order to alleviate intimal hyperplasia and reduce restenosis in patients following
angioplasty (1:5-43) in ranges which encompass the claimed ranges. Berg does not teach the
therapeutic specifically as rapamycin or a rapamycin analog.

Morris teaches that rapamycin is effective for treating or preventing restenosis resulting
from percutaneouos transluminal coronary angioplasty (abstract and 6:3-7). Morris teaches that
rapamycin may be administered via a vascular stent impregnated with rapamycin during balloon
catheterization (11:41-45 and 12: claims 1 and 2).

BSC-SJA-0576

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to have chosen rapamycin as the therapeutic for use in the stents disclosed by Berg because Berg teaches use of a therapeutic within a polymeric coating to prevent restenosis and Morris teaches that rapamycin is an effective therapeutic for preventing restenosis when administered via a vascular stent.

**D4.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg in view of Skotnicki 579.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 166-169 of the request) and is adopted for the reasons as stated in the request and those reasons set forth below.

As set forth *supra* in paragraphs **D1** and **D2**, Berg teaches teaches intraluminal stents comprising a biostable (biocompatible, nonerodible) polymeric coating with a therapeutic incorporated into the coating for sustained delivery of the drug to vascular tissue (abstract and 2:21-23) in order to alleviate intimal hyperplasia and reduce restenosis in patients following angioplasty (1:5-43) in ranges which encompass the claimed ranges.  Berg does not teach the therapeutic  specifically as rapamycin or a rapamycin analog.

Skotnicki 579 teaches that rapamycin and macrocyclic derivatives of rapamycin are effective drugs for treating or preventing intimal thickness following vascular injury (1:5-12, 40-48 and 65-68) and for treating restenosis (9:1-4).  Skotnicki teaches that the compounds may be formulated in a number of carriers, including the polymer, polyvinylpyrrolidine (9:22-37).

BSC-SJA-0577

Skotnicki teaches that the drug can be administered in a variety of ways (9:63 - 10:56) including a variety of occlusive devices, such as a matrix containing the drug (10:19-26).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the inventin was made to have chosen rapamycin as the therapeutic for use in the stents disclosed by Berg because Berg teaches use of a therapeutic within a polymeric coating on the stent to prevent restenosis and Skotnicki 579 teaches that rapamycin and macroclyclic derivatives thereof are effective therapeutics for treating and preventing restenosis when incorporated into a matrix in an occlusive device.

### D5. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg in view of Russo.

This rejection of claims 1-25 was proposed by the third party requester (see pages 170-173 of the Request) and is adopted for the reasons as stated in the request and for those reasons set forth below.

As set forth *supra* in paragraphs **D1** and **D2**, Berg teaches teaches intraluminal stents comprising a biostable (biocompatible, nonerodible) polymeric coating with a therapeutic incorporated into the coating for sustained delivery of the drug to vascular tissue (abstract and 2:21-23) in order to alleviate intimal hyperplasia and reduce restenosis in patients following angioplasty (1:5-43) in ranges which encompass the claimed ranges. Berg does not teach the therapeutic specifically as rapamycin or a rapamycin analog.

Russo teaches that the rapamycin analog 21-norrapamycin is an effective antiproliferative drug for treating or preventing diseases involving intimal smooth muscle proliferation, such as

BSC-SJA-0578

restenosis, following mechanically mediated vascular injury (3:36-54). Russo teaches that 21-

norrapamycin has the same structure as rapamycin with a substitution of profine for lysine (2:57-

64). Because 21-norrapamycin is a structural analog of rapamycin, it would inherently inhibit

cellular proliferation in the same manner as rapamycin, which is via binding to the FKBP12

molecule (see the '662 patent specification at 5:48-6:10), absent evidence to the contrary. Russo

teaches that the compound may be formulated in a number of carriers, including the polymer

polyvinylpyrrolidine (4:18-19). Russo teaches that a variety of occlusive devices may be used to

release the drug, including a matrix (see 4:60 through 5:5).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the

inventin was made to have chosen 21-norrapamycin as the therapeutic for use in the stents

disclosed by Berg because Berg teaches use of a therapeutic within a polymeric coating on the

stent to prevent restenosis and Russo teaches that 21-norrapamycin is an effective therapeutic for

treating restenosis when incorporated into a matrix in an occlusive device.

**D6. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Berg in view of Failli.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 175-

177 of the Request) and is adopted for the reasons as stated in the request and those reasons set

forth below.

As set forth *supra* in paragraphs **D1** and **D2**, Berg teaches teaches intraluminal stents

comprising a biostable (biocompatible, nonerodible) polymeric coating with a therapeutic

incorporated into the coating for sustained delivery of the drug to vascular tissue (abstract and

2:21-23) in order to alleviate intimal hyperplasia and reduce restenosis in patients following angioplasty (1:5-43) in ranges which encompass the claimed ranges. Berg does not teach the therapeutic specifically as rapamycin or a rapamycin analog.

Failli teaches rapamycin analogs, specifically rapamycin 42-oximes and hydroxylamines, which are derivatives and structural analogs of rapamycin. Failli teaches that the analogs are effective therapeutics for treating or preventing vascular diseases, such as restenosis that occurs following angioplasty (abstract; 1:8-14; and 6:36-48). Because 21-norrapamycin is a structural analog of rapamycin, it would inherently inhibit cellular proliferation in the same manner as rapamycin, which is via binding to the FKBP12 molecule (see the '662 patent specification at 5:48-6:10), absent evidence to the contrary. Failli teaches that the compound may be formulated in a number of carriers, including the polymer polyvinylpyrrolidine (7:10-24). Failli teaches that occlusive devices may be used to release the drug, including a matrix containing the drug within (7:64 to 8:8).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to have chosen the rapamycin 42-oximes and hydroxylamine analogs taught by Failli as the therapeutic for use in the stents disclosed by Berg because Berg teaches use of a therapeutic within a polymeric coating on the stent to prevent restenosis and Failli teaches that rapamycin 42-oximes and hydroxylamins are effective therapeutics for treating and preventing restenosis when incorporated into a matrix in an occlusive device.

**D7. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg in view of Skotnicki 718.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 179-181 of the Request) and is adopted for the reasons as stated in the request and those reasons set forth below.

As set forth *supra* in paragraphs **D1** and **D2**, Berg teaches teaches intraluminal stents comprising a biostable (biocompatible, nonerodible) polymeric coating with a therapeutic incorporated into the coating for sustained delivery of the drug to vascular tissue (abstract and 2:21-23) in order to alleviate intimal hyperplasia and reduce restenosis in patients following angioplasty (1:5-43) in ranges which encompass the claimed ranges. Berg does not teach the therapeutic specifically as rapamycin or a rapamycin analog.

Skotnicki 718 teaches rapamycin hydroesters which are derivatives and structural analogs of rapamycin. Skotnicki 718 teaches that the analogs are effective therapeutics for treating or preventing hyperproliferative vascular disorders following angioplasty, and specifically for restenosis. (1:6-12, 40-51 and 65-68; 6:46-59). Because rapamycin hydroesters are structural analogs of rapamycin, absent evidence to the contrary, they would inherently inhibit cellular proliferation in the same manner as rapamycin, which is via binding to the FKBP12 molecule (see the '662 patent specification at 5:48-6:10). Skotnicki 718 teaches that the compounds may be formulated in a number of carriers, including the polymer polyvinylpyrrolidine (7:23-38). Skotnicki 718 teaches that occlusive devices may be used to release the drug *in vivo*, including a matrix containing the drug therein (8:1-26).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to have chosen the rapamycin hydroxyester analogs taught by Skotnicki 718 as the therapeutic for use in the stents disclosed by Berg because Berg teaches use of a

BSC-SJA-0581

therapeutic within a polymeric coating on the stent to prevent restenosis and Skotnicki 718
teaches that rapamycin hydroxyesters are effective therapeutics for treating and preventing
restenosis when incorporated into a matrix in an occlusive device.


**D8.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Berg in view of Skotnicki 730.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 183-
186 of the Request) and is adopted for the reasons as stated in the request and those reasons set
forth below.

As set forth *supra* in paragraphs **D1** and **D2**, Berg teaches teaches intraluminal stents
comprising a biostable (biocompatible, noncrodible) polymeric coating with a therapeutic
incorporated into the coating for sustained delivery of the drug to vascular tissue (abstract and
2:21-23) in order to alleviate intimal hyperplasia and reduce restenosis in patients following
angioplasty (1:5-43) in ranges which encompass the claimed ranges.  Berg does not teach the
therapeutic specifically as rapamycin or a rapamycin analog.

Skotnicki 730 teaches that phosphorylcarbamates and oxime derivatives of rapamycin are
antiproliferative drugs effective as therapeutics for the treatment and prevention of
hyperproliferative vascular disorders such as restenosis following vascular injury (1:1-12, 39-46,
and 65-68 and 7:10-16).  Because phosphorylcarbamates and oxime derivatives of rapamycin are
structural analog of rapamycin, absent evidence to the contrary, they would inherently inhibit
cellular proliferation in the same manner as rapamycin, which is via binding to the FKBP12
molecule (see the '662 patent specification at 5:48-6:100).  Skotnicki 730 teaches that the

BSC-SJA-0582

rapamycin analogs may be formulated in a number of carriers, including the polymer polyvinylpyrrolidine (7:39-54). Skotnicki 730 teaches that occlusive devices may be used to release the drug *in vivo*, including a matrix containing the drug therein (8:17-41).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to have chosen the phosphorylcarbamates and oxime derivatives of rapamycin taught by Skotnicki 718 as the therapeutics for use in the stents disclosed by Berg because Berg teaches use of a therapeutic within a polymeric coating on the stent to prevent restenosis and Skotnicki 730 teaches that phosphorylcarbamates and oxime derivatives of rapamycin are effective as therapeutics for treating and preventing restenosis when incorporated into a matrix in an occlusive device.

**D9.  Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Berg in view of Nelson.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 187-190 of the Request) and **is adopted** for the reasons as stated in the request and those reasons set forth below.

As set forth *supra* in paragraphs **D1** and **D2**, Berg teaches teaches intraluminal stents comprising a biostable (biocompatible, nonerodible) polymeric coating with a therapeutic incorporated into the coating for sustained delivery of the drug to vascular tissue (abstract and 2:21-23) in order to alleviate intimal hyperplasia and reduce restenosis in patients following angioplasty (1:5-43) in ranges which encompass the claimed ranges.  Berg does not teach the therapeutic specifically as rapamycin or a rapamycin analog.

Nelson teaches the rapamycin derivative 27-hydroxyrapamycin, which is a therapeutic

effective for the treatment and prevention of hyperproliferative vascular disorders, such as

restenosis (2:43-46 and 15:46-54). Because 27-hydroxyrapamycin is a derivative and structural

analog of rapamycin, absent evidence to the contrary, it would inherently inhibit cellular

proliferation in the same manner as rapamycin, which is via binding to the FKBP12 molecule

(see the '662 patent specification at 5:48-6:10). Nelson teaches that the compounds may be

formulated in a number of carriers, including the polymer polyvinylpyrrolidine (16:13-28).

Nelson teaches that occlusive devices may be used to release the drug *in vivo*, including a matrix

containing the drug therein (17:10-16).

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the

invention was made to have chosen 27-hydroxyrapamycin, as taught by Nelson, for use as the

therapeutic in the stents disclosed by Berg because Berg teaches use of a therapeutic within a

polymeric coating on the stent to prevent restenosis and Nelson teaches that 27-

hydroxyrapamycin is an effective therapeutic for treating and preventing restenosis when

incorporated into a matrix in an occlusive device.


**D10-D18. On pages 191-197 of the request, requester urges that claims 1-25 are**

**unpatentable under 35 U.S.C 103(a) as obvious Berg; in view of any of Hossainy, Wright,**

**Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki 730 or Nelson; and further in**

**view of Kimura.**

The proposed rejections of claims 1-25 under 3 U.S.C. 103(a) as obvious over Berg in

view of any of Hossainy, Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki

730 or Nelson and further in view of Kimura are **not adopted** for the same reasons as those set

forth *supra* in paragraph A2 regarding the proposed rejection over Hossainy in view of Kimura .

**D19-C27.   On pages 198-206 of the request, requester urges that claims 1-25 are**

**unpatentable under 35 U.S.C 103(a) as obvious Berg; in view of any of Hossainy, Wright,**

**Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki 730 or Nelson; and further in**

**view of Haase.**

The proposed rejections of claims 1-25 under 3 U.S.C. 103(a) as obvious over Berg in

view of any of Hossainy, Wright, Morris, Skotnicki 579, Russo, Failli, Skotnicki 718, Skotnicki

730 or Nelson and further in view of Haase are **not adopted** for the same reasons as those set

forth *supra* in paragraph A3 regarding the proposed rejection over Hossainy in view of Haase.

**E1.   Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over**

**U.S. Patent 5,837,313 to Ding et al. (hereinafter "Ding") in view of Hossainy.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 47-50,

207-209, and Appendix E of the Request) and is **adopted** for the reasons as stated in the request

and those reasons set forth below.

Ding teaches a process for applying a biocompatible polymer-drug coating on a stent for

intravascular implantation which is used to inhibit, among other things, restenosis and smooth

muscle cell proliferation/migration via controlled release of a therapeutic anti-inflammatory or

antiproliferative drug. (abstract; 1:20-36; 4:62-67; 5:3-7)  Ding teaches the coating as being

capable of an initial burst effect followed by a long-term therapeutic effect that lasts up to

months, which encompasses the release "of a portion of said dose... at about six weeks" of

*claims 18, 21, and 25* (2:24-33). Regarding the recited dosages of therapeutic, Ding teaches

drug weight percentages broadly in the range of 0.4 weight % to 45 weight %. Ding teaches the

therapeutics as antiproliferatives and/or antiinflammatory drugs designed to treat or prevent

restenosis but does not specify rapamycin as one such drug.

As was set forth in paragraph **A1** *supra*, Hossainy discloses an intraluminal stent for drug

delivery for treatment of post-angioplasty restenosis comprising a biocompatible, nonerodible

polymeric coating with rapamycin incorporated therein, wherein the rapamycin is delivered over

an extended period after implantation of the stent. (2:11-16; 3:26-32 and 56-58; 7:11-12 and

Example 8 at 9:31-10:11). Hossainy teaches exemplary concentrations of the rapamycin in the

polymeric coating as equivalent to about 63, 132- 144, 149, 156-168 and 182 µg of rapamycin

(see paragraph **A1** *supra* for calculations). Each of the aforementioned concentrations falls

within the claimed ranges of about 64 µg to about 197 µg and about 64 µg to about 125 µg

respectively (which encompasses the ranges recited in instant *claims 1, 5, 9, 13, 17, and 22*.

Furthermore, based on the surface area of exemplary stents available to one of ordinary skill in

the art at the time of the invention (as is evidenced by van der Giessen), the concentrations of

rapamycin disclosed by Hossainy are within the recited ranges of *claims 19, 20, 23, and 24* (see

paragraph **A1** *supra* for calculations). Regarding *claims 18, 21 and 25*, which recite release of a

portion of the rapamycin at about six weeks, Hossainy discloses "prolonged delivery over, say 1

to 2,000 hours, preferably 2 to 800 hours of effective amounts." (7:11-12.). The Hossainy

disclosure of a range of from about 1 hour to about 2,000 hours ( which is equivalent to 11.9

weeks) encompasses the claimed "about six weeks". With regard *to claims 1-16*, drawn to an in-

BSC-SJA-0586

stent late loss in diameter at 12 months following implantation in a human of less than about 0.5
mm or 0.3mm or an in-stent diameter stenosis of less than 22% or 15% as measured by
quantitative coronary angiography, although neither Ding nor Hossainy discloses the particularly
claimed amounts or percentages; Ding in view of Hossainy do disclose the same structural
elements as those of the stents of the present claims, *i.e.*, rapamycin (including the claimed
dosages) in a biocompatible, nonerodible polymeric coating affixed to an intraluminal stent.
Further, the results of *in vivo* testing disclosed by Hossainy showed that local delivery of
rapamycin to injured coronary arteries via the drug delivery device resulted in a reduction in
intima/media ratio, intimal area and % diameter stenosis. (1:1-56 and especially 55-56)
Therefore, because the stents disclosed by Ding in view of Hossainy are structurally the same as
those of the instant claims and absent evidence to the contrary, the limitations set forth in *claims*
*1-16* regarding in-stent late loss in diameter and in-stent diameter stenosis are deemed to be
inherent features of the stents disclosed by Ding in view of Hossainy.

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the
invention was made to have used the rapamycin in the concentrations taught by Hossainy as the
antiproliferative/ antiinflammatory drug in the stents disclosed by Ding because both Ding and
Hossainy are drawn to intraluminal stents comprising polymeric coatings with a therapeutic drug
for treating or preventing restenosis following angioplasty by sustained release of the drug over
time and Hossainy specifically teaches the efficacy of rapamycin for treating and preventing
restenosis. Furthermore, with regard to the recited ranges of rapamycin for incorporation into the
polymeric coating, where the general conditions of a claim are disclosed in the prior art, it is not

inventive to discover the optimum or workable ranges by routine experimentation. *In re Aller*, 220 F.2d 454, 456, 105 USPQ 233, 235.

**E2-E3. On page 211 of the request, requester urges that claims 1-25 are unpatentable under 35 U.S.C 103(a) as obvious Ding, in view of Hossainy and further in view of either Kimura or Haase.**

The proposed rejections of claims 1-25 under 3 U.S.C. 103(a) as obvious over Ding in view of Hossainy and further in view of either Kimura or Haase are **not adopted.** Ding, in view of Hossainy, meets all of the claim limitations of *claims 1-25* of the '662 patent. Neither Kimura nor Haase are needed to teach any of the claim limitations and neither Kimura nor Haase adds anything. Therefore the proposed rejections over Ding in view of Hossainy and further in view of either Kimura or Haase are not adopted.

**F1. Claims 1-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over U.S. Patent 5,591,227 to Dinh et al. (hereinafter "Dinh"), in view of Hossainy.**

This rejection of claims 1-25 was proposed by the third party requester (see pages 50-54, 212-215, and Appendix F of the Request) and is **adopted** for the reasons as stated in the request and those reasons set forth below.

Dinh teaches a drug eluting intravascular stent comprising a biocompatible polymer and a therapeutic in an adherent layer or coating on the stent body (12: claims 1, 6, and 8) for treating restenosis (1:10-13). Dinh teaches that the polymer in intimate contact with the therapeutic allows for a slowing of administration of the drug following implantation, so as to achieve a

BSC-SJA-0588

controlled rate. Dinh also teaches that the rate of release of the therapeutic can be further
controlled by the choice of polymer and the ratio of the drug and polymer in the layers of the
coating (2:62-3:23). Dinh teaches useful drugs for treating restenosis to be incuded in the stent
as anti-inflammatory drugs, among others (6:26-30 and 12: claim 11). Regarding the recited
dosages of therapeutic, Ding teaches the ratio of the therapeutic to polymer in the layer in a
broad range of about 10:1 to about 1:100, however, Dinh does not specifically disclose the
specifically claimed ranges of about 64μg-197μg, 64μg-125μg, 2μg-30μg per mm of stent length
or 3μg-13 μg per mm of stent length. Although Dinh teaches effective therapeutics for inclusion
in the stents to treat restenosis as anti-inflammatory drugs, Dinh does not specify rapamycin as
the anti-inflammatory drug.

As was set forth in paragraph A1 *supra*, Hossainy discloses an intraluminal stent for drug
delivery for treatment of post-angioplasty restenosis comprising a biocompatible, nonerodible
polymeric coating with rapamycin incorporated therein, wherein the rapamycin is delivered over
an extended period after implantation of the stent. (2:11-16; 3:26-32 and 56-58; 7:11-12 and
Example 8 at 9:31-10:11). Hossainy teaches exemplary concentrations of the rapamycin in the
polymeric coating as equivalent to about 63, 132- 144, 149, 156-168 and 182 μg of rapamycin
(see paragraph A1 *supra* for calculations). Each of the aforementioned concentrations falls
within the claimed ranges of about 64 μg to about 197 μg and about 64 μg to about 125 μg
respectively (*claims 1, 5, 9, 13, 17, and 22*). Furthermore, based on the surface area of
exemplary stents available to one of ordinary skill in the art at the time of the invention (as is
evidenced by van der Giessen), the concentrations of rapamycin disclosed by Hossainy are
within the recited ranges of *claims 19, 20, 23, and 2*4 (see paragraph A1 *supra* for calculations).

BSC-SJA-0589

Regarding *claims 21, and 25*, which recite release of a portion of the rapamycin at about six

weeks, Hossainy discloses "prolonged delivery over, say 1 to 2,000 hours, preferably 2 to 800

hours of effective amounts." (7:11-12.). The Hossainy disclosure of a range of from about 1

hour to about 2,000 hours ( which is equivalent to 11.9 weeks) encompasses the claimed "about

six weeks". With regard to *claims 1-16*, drawn to an in-stent late loss in diameter at 12 months

following implantation in a human of less than about 0.5 mm or 0.3mm or an in-stent diameter

stenosis of less than 22% or 15% as measured by quantitative coronary angiography, although

neither Dinh nor Hossainy discloses the particularly claimed amounts or percentages; Dinh in

view of Hossainy do disclose the same structural elements as those of the stents of the present

claims, *i.e.*, rapamycin (including the claimed dosages) in a biocompatible, nonerodible

polymeric coating affixed to an intraluminal stent. Further, the results of *in vivo* testing

disclosed by Hossainy showed that local delivery of rapamycin to injured coronary arteries via

the drug delivery device resulted in a reduction in intima/media ratio, intimal area and %

diameter stenosis. (see 11:1-56 and especially 55-56) Therefore, because the stents disclosed by

Dinh in view of Hossainy are structurally the same as those of the instant claims and absent

evidence to the contrary, the limitations set forth in *claims 1-16* regarding in-stent late loss in

diameter and in-stent diameter stenosis are deemed to be inherent features of the stents disclosed

by Dinh in view of Hossainy.

It would have been *prima facie* obvious to one of ordinary skill in the art at the time the

invention was made to have used the rapamycin in the concentrations taught by Hossainy as the

antiinflammatory drug in the stents disclosed by Dinh because both Dinh and Hossainy are

drawn to intraluminal stents comprising polymeric coatings with a therapeutic drug for treating

or preventing restenosis following angioplasty by sustained release of the drug over time and

Hossainy specifically teaches the efficacy of rapamycin for treating and preventing restenosis.

Additionally, with regard to the specifically recited ranges of rapamycin for incorporation into

the polymeric coating, where the general conditions of a claim are disclosed in the prior art, it is

not inventive to discover the optimum or workable ranges by routine experimentation. *In re*

*Aller*, 220 F.2d 454, 456, 105 USPQ 233, 235.


**F2-F3. On pages 216-217 of the request, requester urges that claims 1-25 are
unpatentable under 35 U.S.C 103(a) as obvious Dinh in view of Hossainy and further in
view of either Kimura or Haase.**

The proposed rejections of claims 1-25 under 3 U.S.C. 103(a) as obvious over Dinh in

view of Hossainy and further in view of either Kimura or Haase are **not adopted.** Dinh, in view

of Hossainy, meets all of the claim limitations of *claims 1-25* of the '662 patent. Neither Kimura

nor Haase are needed to teach any of the claim limitations and neither Kimura nor Haase adds

anything. Therefore the proposed rejections over Dinh in view of Hossainy and further in view

of either Kimura or Haase are not adopted.


### *Conclusion*

In order to ensure full consideration of any amendments, affidavits or declarations, or

other documents as evidence of patentability, such documents must be submitted in response to

this Office action. Submissions after the next Office action, which is intended to be an Action

Application/Control Number: 95/001,095                                    Page 46
Art Unit: 3991

Closing Prosecution (ACP), will be governed by 37 CFR 1.116(b) and (d), which will be strictly enforced.

### Duty to Disclose

The patent owner is reminded of the continuing responsibility under 37 CFR 1.985 to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 7,300,662 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding.

### Correspondence

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

All correspondence relating to this Inter Partes Reexamination proceeding should be directed to:

**By EFS:**

Registered users may submit via the electronic filing system EFS-Web at

https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

BSC-SJA-0592

Application/Control Number: 95/001,095                                          Page 47
Art Unit: 3991

By Mail to:

      Attn: Mail Stop "Inter Partes Reexam"
      Central Reexamination Unit
      Commissioner for Patents
      P. O. Box 1450
      Alexandria VA  22313-1450

By FAX to:
      (571) 273-9900
      Central Reexamination Unit

Hand-deliver any communications to:
      Customer Service Window
      Attn: Central Reexamination Unit
      Randolph Building, Lobby Level
      401 Dulany Street
      Alexandria, VA  22314

Signed:

/Brenda Brumback/
Primary Examiner CRU
Art Unit 3991

DEBORAH D. JONES
CRU SPE-AU 3991

PADMASHRI PONNALURI
PRIMARY EXAMINER
CRU - AU 3991