# EXHIBIT 9

**EXHIBIT 9**

## COMPARISON OF THE PRIOR ART
## WITH THE CLAIMS OF THE "7286 PATENT

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| 1. A device comprising a metallic stent, | Applying either parties' proposed claim construction, the Berg patent discloses "*[a] device comprising a metallic stent*." For instance, Berg notes that the "the underlying structure of the stent can be virtually any stent design . . . whether metal or polymeric." (Berg patent, col. 3, ll. 29–32). |
| a biocompatible, nonabsorbable polymeric carrier; and | If the Court adopts Cordis's proposed construction of the term "biocompatible" (which, according to Cordis, simply requires that a polymeric material be "able to perform its function in the body with an acceptable biological response"), the Berg patent also discloses "*a biocompatible, nonabsorbable polymeric carrier.*" Berg notes that "[t]he polymer chosen must be a polymer that is biocompatible" and "[t]he polymer may be either a biostable or a bioabsorbable polymer." (Berg patent at col. 4, ll. 35–42).[1] |
| a therapeutic agent, | The Berg patent discloses "*a therapeutic agent.*" In particular, Berg states that its "invention relates to intravascular stents for treatment of injuries to blood vessels and particularly to stents having a framework onto which a therapeutic substance or drug is applied." (Berg patent at col. 1, ll. 5–8; *see also* col. 5, ll. 19–39 |

---

[1]   Furthermore, the Berg patent states, for example, that "polysaccharides" and "poly(ethylene- vinylacetate) [sic]" are deemed biocompatible polymers. (Berg patent at col. 4, l. 35–col. 5, l. 7). The specification of the '7286 patent further acknowledge that these polymers are biocompatible. (*See, e.g.*, '7286 patent, col. 6, ll. 43–49). In light of this, the Berg patent also discloses a "biocompatible, nonabsorbable polymeric carrier" under BSC's proposed construction of this term.

BSC-SJA-0594

BSC-SJA-0595

| Asserted Claim Limitation | Location in the Morris Art |
|---|---|
| | (disclosing possible therapeutic agents for use on a stent)). |
| wherein: said polymeric carrier comprises an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, and | The Berg patent discloses the "*wherein: said polymeric carrier comprises an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof*" limitation regardless of which parties' claim construction the Court adopts. Berg notes that "biostable polymers with a relatively low chronic tissue response [could be used] such as . . . polyvinylidene fluoride," a type of fluorinated polymer (Berg patent at col. 4, 1. 54–62), and "acrylic polymers and copolymers" (*id.* at col. 4, 1. 59, *see also id.* at col. 7, ll. 49–52), which are examples of an acrylate-based polymer or copolymer. Furthermore, Claim 6 of the Berg patent expressly recites several polymer classes from among the larger group disclosed in the patent, including both acrylate homopolymers and copolymers. (*Id.* at col. 7, ll. 49–53). |
| said therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof, and | The Berg patent in combination with the Morris patent discloses "*rapamycin, or a macrocyclic lactone analog thereof*". Specifically, the Berg patent teaches that "[t]he therapeutic substance used in the present invention could be virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel. . . . . For example, . . . anti-inflammatory agents could be used." (Berg patent at col. 5, ll. 19–28). The Berg patent also discloses the use of a drug that "reduce[s] the amount of proliferation associated with arterial injury," (*id.* at col. 7, ll. 14–15) and that vascular smooth muscle cell proliferation causes restenosis (*id.* at col. 1, ll. 38–43). And the Morris patent discloses the use of rapamycin, a known anti-proliferative and anti-inflammatory agent, to inhibit vascular smooth muscle cell proliferation. For instance, the Morris patent claims, among other things, "administering an antirestenosis effective amount of rapamycin to said mammal . . . |

BSC-SJA-0596

| Asserted Claim Limitation | Location in the Prior Art |
| --- | --- |
| | via a vascular stent impregnated with rapamycin." (Morris patent, Claim 1) |
| is present in an amount effective to inhibit neointimal proliferation. | The Berg patent discloses this limitation, which recites: *"and is present in an amount effective to inhibit neointimal proliferation."* For instance, Berg notes that "[i]t is therefore an object of the present invention to provide a stent having a therapeutically significant amount of a drug applied thereto." (Berg patent, col. 2, ll. 13–15). Moreover, the Morris patent discloses specific *in vivo* dosing amounts for rapamycin when used to treat restenosis. (Morris patent, col. 6, ll. 39–64) |
| 2. The device according to claim 1 wherein said therapeutic agent is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent discloses *"macrocyclic lactone analog[s] of rapamycin"* (under either parties' proposed claim construction) useful for the treatment of hyperproliferative vascular disease and restenosis as required by claims 2 and 4.[2] (See Skotnicki '286 patent, col. 1, ll. 64–66; col. 2, ll. 1–50; col. 5, l. 57–col. 6, l. 2). In addition to disclosing rapamycin analogs in general, the Skotnicki '286 patent discloses at least one particular rapamycin derivative (a macrocyclic lactone analog) that demonstrates superior activity to rapamycin in the disclosed thymocyte proliferation assay. (See id. at col. 8, ll. 43–col. 9, l. 2). |
| 3. The device according to claim 1 that provides a controlled release of said therapeutic agent over a period of several weeks. | Claim 3 further adds the additional limitation: *"that provides a controlled release of said therapeutic agent over a period of several weeks."* Under either parties' proposed construction the |

[2] In fact, the Skotnicki '286 patent references Morris's work concerning the effect of rapamycin on smooth muscle cell proliferation and intimal thickening following vascular injury. (Skotnicki '286 patent, col. 1, ll. 43–46).

-3-

BSC-SJA-0597

| Asserted Claim Limitation | Limitation in the Prior Art |
|---|---|
|  | Berg patent teaches this additional limitation: |
|  | It is also an object of the present invention to provide a drug-containing stent which allows for sustained release of the drug to vascular tissue. |
|  | (Berg patent at col. 2, ll. 21–23 (emphasis added)). Further, Berg notes that: |
|  | The adhesion of the coating and the rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or biostable polymer and by the ratio of drug to polymer in the solution. By this method, drugs such as . . . antiinflammatory agents can be applied to a stent, retained on a stent during expansion of the stent and elute the drug at a controlled rate. |
|  | (Id. at col. 2, ll. 51–62 (emphasis added)). |
|  | In addition to this general disclosure of controlled, sustained release, the Berg patent provides an example of a drug-eluting stent that elutes drug over a period of at least 10 days. (See id. at Fig. 1, col. 6, ll. 35–49). A person of ordinary skill in the art would understand that the Berg patent discloses how to formulate a polymer/drug mixture capable of eluting drug over a period of several weeks, and longer than the 10 days explicitly shown in Figure 1, by teaching that "[t]he release rate can be further controlled by varying the ratio of drug to polymer." (Id. at col. 2, ll. 62–63). Thus, it would have been obvious to a person of ordinary skill in the art – and well within that person's skill consistent with the specification's admission that such coating |

-4-

BSC-SJA-0598

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| | technology was "conventional" -- to vary the ratio of drug to polymer to obtain a controlled release of drug over a period of two, three, or more weeks (i.e., "several weeks"). It was also well known that restenosis occurs over a period of several weeks, and therefore, it would have been reasonable for a person of ordinary skill in the art to develop a dosage form that would release drug from the stent over a period of several weeks. (*See, e.g.,* Morris patent, col. 6, ll. 57--60 (disclosing treatment with rapamycin for 14 days). ▮▮▮▮▮▮▮▮ |
| 4. The device according to claim 2 that provides a controlled release of said therapeutic agent over a period of several weeks. | Claim 4 depends on claim 2 and further adds the additional limitation: *"that provides a controlled release of said therapeutic agent over a period of several weeks." See* claim 3 for disclosure of this element in the prior art. |
| 5. A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a device according to any one of claims 1 to 4 in the lumen of said coronary artery. | Claim 5 further adds the additional limitation: *"[a] method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a device according to claims 1 to 4 in the lumen of said coronary artery."*<br><br>The Berg patent teaches this additional limitation of claim 5. Specifically, the Berg patent discloses a polymer-drug coated stent designed for implantation into a coronary artery to inhibit neointimal proliferation following percutaneous transluminal coronary angioplasty:<br><br>This invention relates to intravascular stents for treatment of injuries to blood vessels and particularly to stents having a framework onto which a therapeutic |

BSC-SJA-0599

| Asserted Claim Limitations | Location in the Prior Art |
|---|---|
| | substance or drug is applied. |
| | (Berg patent, col. 1, ll. 5–8 (emphasis added)).  Further: |
| | In operation, the stent made according to the present invention can deliver drugs to a body lumen by introducing the stent transluminally into a selected portion of the body lumen and radially expanding the stent into contact with the body lumen.  The transluminal delivery can be accomplished by a catheter designed for the delivery of stents and the radial expansion can be accomplished by balloon expansion of the stent, self-expansion of the stent, or a combination of self-expansion and balloon expansion. |
| | (*Id.* at col. 3, ll. 1–9). |

# EXHIBIT 10

# EXHIBIT 10

## COMPARISON OF THE PRIOR ART
## WITH THE CLAIMS OF THE '3286 PATENT

| Asserted Claim Limitation | Found in the Prior Art |
|---|---|
| 1. A stent having a coating applied thereto, | Applying either parties' proposed claim construction, the Berg patent discloses *"[a] stent having a coating applied thereto."* Again, the Berg patent generally discloses a polymeric coated, drug-eluting stent. (Berg Patent, Abstract). Regarding the type of stent that can be used, Berg notes that the "the underlying structure of the stent can be virtually any stent design . . . whether metal or polymeric." *(Id.* at col. 3, ll. 29–32). And, as noted above, Berg discloses the application of a polymeric / drug coating to the stent itself. For instance, Berg describes "[t]he inclusion of a polymer in intimate contact with a drug on the stent allows the drug to be retained on the stent in a resilient matrix." *(Id.* at col. 2, ll. 36–38). And, Berg notes that "[i]n order to provide the coated stent according to the present invention, a solution which includes a solvent, a polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent is first prepared . . . . The solution is applied to the stent and the solvent is allowed to evaporate, thereby leaving on the stent surface a coating of the polymer and the therapeutic substance." *(Id.* at col. 3, l. 52–col. 4, l. 21). |
| wherein said coating comprises a biocompatible polymer/drug mixture and | If the Court adopts Cordis's proposed construction of the term "biocompatible" (which, according to Cordis, simply requires that a polymeric material be "able to perform its function in the body with an acceptable biological response"), the Berg patent discloses the *"said coating comprises a biocompatible polymer/drug mixture"* limitation. Again, the Berg patent |

BSC-SJA-0600

BSC-SJA-0501

| Asserted Claim Limitation | Location in the Patents Set |
|---|---|
| | teaches "intravascular stents for treatment of injuries to blood vessels and particularly to stents having a framework onto which a therapeutic substance or drug is applied." (Berg patent at col. 1, ll. 5–8, *see also* col. 5, ll. 19–39 (disclosing possible therapeutic agents for use on a stent)). As noted above, Berg teaches the inclusion of the therapeutic substance or drug in a polymeric "matrix" (or alternatively stated, "[t]he inclusion of a polymer in intimate contact with a drug") which "allows the drug to be retained on the stent." (*Id.* at col. 2, ll. 36–38). Berg also notes that "[t]he polymer chosen must be a polymer that is biocompatible." (*Id.* at col. 4, ll. 35–42).[1] |
| said drug is rapamycin or a macrocyclic lactone analog thereof. | The Berg patent in combination with the Morris patent discloses *"said drug is rapamycin or a macrocyclic lactone analog thereof."* Specifically, the Berg patent teaches that "[t]he therapeutic substance used in the present invention could be virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel. . . . . For example, . . . anti-inflammatory agents could be used." (Berg patent at col. 5, ll. 19–28). The Berg patent also discloses the use of a drug that "reduce[s] the amount of proliferation associated with arterial injury." (*Id.* at col. 7, ll. 14–15) and that vascular smooth muscle cell proliferation causes restenosis (*id.* at col. 1, ll. 38–43). And the Morris patent discloses the use of rapamycin, *a known anti-proliferative and anti-inflammatory agent*, to inhibit vascular smooth muscle cell proliferation. For instance, the |

-2-

---

[1] Furthermore, the Berg patent states, for example, that "polysaccharides" and "poly(ethylene–vinyl acetate) [*sic*]" are deemed biocompatible polymers. (Berg patent, col. 4, l. 35–col. 5, l. 7). The specification of the '3286 patent acknowledge that these polymers are biocompatible. (*See, e.g.*, '3286 patent, col. 6, ll. 34-47). In light of this, the Berg patent also discloses "biocompatible" polymeric materials under BSC's proposed construction of this term.

BSC-SJA-0602

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| | Morris patent claims, among other things "administering an antirestenosis effective amount of rapamycin to said mammal . . . via a vascular stent impregnated with rapamycin." (Morris patent, Claim 1) |
| 2. A stent according to claim 1 comprising a generally thin walled cylinder containing a plurality of generally solid struts to which said coating is applied. | Claim 2 additionally requires that the claimed stent comprise *"a generally thin walled cylinder containing a plurality of generally solid struts to which said coating is applied."* The Berg patent also discloses this additional limitation. Specifically, the Berg patent teaches that "the underlying structure of the stent can be virtually any stent design, whether of the self-expanding type or of the balloon-expandable type and whether metal or polymeric." (Berg patent, col. 3, ll. 29–32). Moreover, the Berg patent incorporates by reference the disclosure of U.S. Patent No. 4,733,665 (the "Palmaz patent"), and indicates the that the stent disclosed in the Palmaz patent can be used with the invention of the Berg patent. (*See id.* at col. 1, ll. 31–37, col. 3, ll. 32–36). The Palmaz patent discloses a stent that comprises a thin walled cylinder containing a plurality of generally solid struts. (*See* Palmaz patent, col. 7, ll. 3–28 ("tubular shaped member 71 is initially a thin-walled stainless steel tube, and the openings 82 between the intersecting bars 78 and 79 are formed by a conventional etching process, such as electromechanical or laser etching, whereby the resultant structure is a tubular shaped member 71 having a plurality of intersecting elongate members 78, 79"). Finally, the stent design illustrated in Figure 1 of the '3286 patent is identical to the stent design illustrated in Figure 2A of the Palmaz patent (but for the inclusion of channels 11 in Figure 1); |

BSC-SJA-0603

| Asserted Claim Limitation | Disclosure in the Berg patent |
|---|---|
| |  FIG. 1    FIG. 2A |
| | (Compare '3286 patent, Fig. 1 with Palmaz patent, Fig. 2A). The Berg patent also discloses a coating that is applied to the stent structure. (*See* Berg patent, col. 2, ll. 40–44). |
| 5. A stent according to claim 1 wherein the coating is dip-coated onto the stent. | Claim 5 additionally requires a stent where "*the coating is dip-coated onto the stent.*" The Berg patent discloses that the coating can be dip-coated onto the stent by teaching that "the solution can be applied to the stent by . . . immersing the stent in the solution." (Berg patent at col. 4, ll. 22–24). |
| 6. A stent according to claim 1 wherein the coating is spray-coated onto the stent. | Claim 6 additionally requires a stent where "*the coating is spray-coated onto the stent.*" The Berg patent discloses a coating that can be sprayed onto the stent – "the solution can be applied to the stent by . . . spraying the solution onto the stent." (Berg patent at col. 4, ll. 22–23). |
| 9. A stent according to claim 1 wherein the coating comprises a nonabsorbable polymer. | Claim 9 requires that the "coating" of claim 1 "*comprises a nonabsorbable polymer.*" Applying either parties' proposed construction, the Berg patent discloses this additional limitation. |

-4-

BSC-SJA-0604

| Asserted Claim Limitations | Disclosure in the Berg Patent |
|---|---|
| | Specifically, the Berg patent states that "[t]he polymer may be either a biostable or a bioabsorbable polymer." (Berg patent at col. 4, ll. 37–38 (emphasis added)). Berg also provides a list of suitable non-absorbable polymers – identified as "biostable" polymers by Berg – for use as stent coatings. (*See id.* at col. 4, l. 54–col. 5, l. 7). |
| 10. A stent according to claim 1 wherein the coating comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof. | Claim 10 includes an additional limitation that requires the claimed stent's coating *"comprise[] a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof."* The Berg patent discloses this additional limitation. Specifically, Berg references "polycaprolactone" (which is a lactone-based polyester), "polyanhydride," "poly(amino acids)," "cellulose" (which is a polysaccharide), "polyphosphazenes," "copoly(ether-esters) (e.g. PEO/PLA)" (which is a poly(ether-ester) copolymer), "ethylene-vinyl acetate copolymers" (which are poly(ethylene)vinylacetates), and "polyvinylidene fluoride" (which is a fluorinated polymer). (*See* Berg patent at col. 4, l. 43–col. 5, l. 7). The Berg patent also discloses that the coating can consist of "acrylate homopolymers and copolymers." (*Id.* at col. 7, l. 52). |
| 21. A stent according to claim 10 wherein the coating comprises an acrylate based polymer. | Claim 21 requires that the claimed coating *"comprise[] an acrylate based polymer."* The Berg patent also discloses the additional limitation of claims 21 and 64 under either parties' proposed construction – specifically, the Berg patent discloses |

| Asserted Claim Limitation | Teaching in the Prior Art |
|---|---|
| | that the coating can consist of "acrylate homopolymers and copolymers." (Berg patent at col. 7, l. 52). |
| 25. A stent according to claim 10 wherein the coating comprises a fluorinated polymer. | Claim 25 requires that the claimed coating *"comprise[ ] a fluorinated polymer."* Applying either parties' proposed construction, the Berg patent discloses this additional limitation by teaching the use of "polyvinylidene fluoride" (which is a fluorinated polymer). (*See* Berg patent at col. 4, l. 62). |
| 27. A stent according to any one of claims 1 to 26 wherein said drug is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent complements the disclosure of the Morris patent, and discloses (under either parties' proposed claim construction) claim 27's additional limitation which requires that the drug be *"macrocyclic lactone analog of rapamycin"* useful for the treatment of hyperproliferative vascular disease and restenosis as required these dependent claims.[2] (*See* Skotnicki '286 patent, col. 1, ll. 64–66; col. 2, ll. 1–50; col. 5, l. 57–col. 6, l. 2). In addition to disclosing rapamycin analogs in general, the Skotnicki '286 patent discloses at least one particular rapamycin derivative (a macrocyclic lactone analog) that demonstrates superior activity to rapamycin in the disclosed thymocyte proliferation assay. (*See id.* at col. 8, ll. 43–col. 9, l. 2). |
| 28. A stent according to any one of claims 1 to 26 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks. | Claim 28 require that the claimed stent *"provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks."* Under either parties' proposed construction, the Berg patent discloses the additional limitation present in dependent claims 28. The Berg patent teaches that: |
| | It is also an object of the present invention to |

² In fact, the Skotnicki '286 patent references Morris's work concerning the effect of rapamycin on smooth muscle cell proliferation and intimal thickening following vascular injury. (Skotnicki '286 patent, col. 1, ll. 43–46).

-6-

BSC-SJA-0805

BSC-SJA-0606

| Asserted Claim Limitation | Prior Art Reference |
|---|---|
| | provide a drug-containing stent which allows for sustained release of the drug to vascular tissue. |
| | (*Id* at col. 2, ll. 21–23 (emphasis added)). Further, Berg notes that: |
| | The adhesion of the coating and the rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or biostable polymer and by the ratio of drug to polymer in the solution. By this method, drugs such as . . . antiinflammatory agents can be applied to a stent, retained on a stent during expansion of the stent and elute the drug at a controlled rate. |
| | (*Id*, at col. 2, ll. 51–62 (emphasis added)). |
| | In addition to this general disclosure of controlled, sustained release, the Berg patent provides an example of a drug-eluting stent that elutes drug over a period of at least 10 days. (*See id.* at Fig. 1; col. 6, ll. 35–49). A person of ordinary skill in the art would understand that the Berg patent discloses how to formulate a polymer/drug mixture capable of eluting drug over a period of several weeks, and longer than the 10 days explicitly shown in Figure 1, by teaching that "[t]he release rate can be further controlled by varying the ratio of drug to polymer" (*Id.* at col. 2, ll. 62–63). Thus, it would have been obvious to a person of ordinary skill in the art – and well within that person's skill – consistent with the specification's admission that such coating technology was "conventional" – to vary the ratio of drug to polymer to obtain a controlled release of drug over a period of two, three, or more weeks (i.e., "several weeks"). It was also well known that restenosis occurs over a period of several weeks, and therefore, it would have been reasonable for a person of ordinary |

-7-

BSC-SJA-0607

| Asserted '286 Claim Limitation | Disclosure in the Berg or Other Patents |
|---|---|
| | skill in the art to develop a dosage form that would release drug from the stent over a period of several weeks. (*See, e.g.*, Morris patent, col. 6, ll. 57–60 (disclosing treatment with rapamycin for 14 days). ▇▇▇▇▇▇▇ |
| 29. A stent according to claim 28 wherein said drug is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent discloses the additional limitation of claim 29 ("*wherein said drug is a macrocyclic lactone analog of rapamycin*") for the same reasons discussed in connection with claim 27. |
| 30. A stent according to any one of claims 1 to 26 that releases said rapamycin or macrocyclic lactone analog thereof over a period of at least 14 days. | Claim 30 requires that the claimed stent "*release[ ] said rapamycin or macrocyclic lactone analog thereof over a period of at least 14 days.*" For the same reasons discussed above in connection with dependent claims 28, the Berg patent discloses all the limitations of claim 30. |
| 31. A stent according to claim 30 wherein said drug is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent discloses the additional limitation of claim 31 ("*wherein said drug is a macrocyclic lactone analog of rapamycin*") for the same reasons discussed in connection with claim 27. |
| 32. A stent according to any one of claims 1 to 26 wherein said rapamycin or macrocyclic lactone analog thereof is present in a therapeutically beneficial amount to inhibit neointimal proliferation. | Claim 32 additionally requires: "*wherein said rapamycin or macrocyclic lactone analog thereof is present in a therapeutically beneficial amount to inhibit neointimal proliferation.*" Applying either parties' claim construction, the Berg patent also discloses the additional limitation of claim 32. For instance, Berg notes that "[i]t is therefore an object of the present invention to provide a stent having a therapeutically significant amount of a drug applied thereto." (Berg patent, col. |

BSC-SJA-0608

| Asserted Claim Limitations | Disclosure in the Prior Art |
|---|---|
| | 2, ll. 13–15). Moreover, the Morris patent discloses specific *in vivo* dosing amounts for rapamycin when used to treat restenosis. (Morris patent, col. 6, ll. 39–64). |
| 33. A stent according to claim 32 wherein said drug is a macrocyclic lactone analog of rapamycin. | The Skornicki '286 patent discloses the additional limitation of claim 33 (*"wherein said drug is a macrocyclic lactone analog of rapamycin"*) for the same reasons discussed in connection with claim 27. |
| 34. A stent according to claim 33 that releases said macrocyclic lactone analog of rapamycin over a period of at least 14 days. | The Berg patent discloses the additional limitation of claim 34 (*"releases said macrocyclic lactone analog of rapamycin over a period of at least 14 days"*) for the same reasons discussed in connection with claim 30. |
| 35. A stent according to claim 34 wherein the coating comprises a fluorinated polymer. | The Berg patent discloses the additional limitation of claim 35 (*"wherein the coating comprises a fluorinated polymer"*) for the same reasons discussed in connection with claim 25. |
| 36. A stent according to claim 35 wherein the coating further comprises an acrylate based polymer or copolymer. | The Berg patent discloses the additional limitation of claim 36 (*"wherein the coating further comprises an acrylate based polymer or copolymer"*) for the same reasons discussed in connection with claim 21. |
| 37. A stent according to claim 33 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks. | The Berg patent discloses the additional limitation of claim 37 (*"provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks"*) for the same reasons discussed in connection with claim 28. |
| 38. A stent according to claim 37 wherein the coating comprises a fluorinated polymer. | The Berg patent discloses the additional limitation of claim 38 (*"wherein the coating comprises a fluorinated polymer"*) for the same reasons discussed in connection with claim 25. |

BSC-SJA-0609

| Asserted Claim Limitation | Limitation in the Prior Art |
|---|---|
| 39. A stent according to claim 38 wherein the coating further comprises an acrylate based polymer or copolymer. | The Berg patent discloses the additional limitation of claim 39 (*"wherein the coating further comprises an acrylate based polymer or copolymer"*) for the same reasons discussed in connection with claim 21. |
| 40. A device comprising a metallic stent, | Applying either parties' proposed claim construction, the Berg patent discloses *"[a] device comprising a metallic stent"* for the same reasons discussed above in connection with claim 1's *"[a] stent having a coating applied thereto"* limitation. |
| a biocompatible polymeric carrier and a drug, | The Berg patent discloses the *"a biocompatible polymeric carrier and a drug"* limitation of claim 40 for the same reasons discussed in connection with the *"said coating comprises a biocompatible polymer/drug mixture"* limitation of claim 1. |
| wherein said drug is rapamycin or a macrocyclic lactone analog thereof and | The Berg patent in combination with the Morris patent discloses the *"wherein said drug is rapamycin or a macrocyclic lactone analog thereof"* limitation of claim 40 for the same reasons described in connection with the *"said drug is rapamycin or a macrocyclic lactone analog thereof"* limitation of claim 1. |
| is present in an amount effective to inhibit neointimal proliferation. | The Berg patent discloses this limitation, which requires that the drug be *"present in an amount effective to inhibit neointimal proliferation."* For instance, Berg notes that "[i]t is therefore an object of the present invention to provide a stent having a therapeutically significant amount of a drug applied thereto." (Berg patent, col. 2, ll. 13–15). Moreover, the Morris patent discloses amounts specific *in vivo* dosing amounts for rapamycin when used to treat restenosis. (Morris patent, col. 6, ll. 39–64). |
| 41. A device according to claim 40 wherein said polymeric carrier | Claim 41 requires that: *"said polymeric carrier and drug are* |

BSC-SJA-0610

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| and drug are mixed together. | *mixed together.*" The Berg patent discloses this additional limitation of claim 41. Berg states that the coating is prepared using "a solution which includes a solvent, a polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent . . . . The solution is applied to the stent and the solvent is allowed to evaporate, thereby leaving on the stent surface a coating of the polymer and the therapeutic substance." (Berg patent, col. 3, 1. 53–col. 4, 1. 21). Moreover, "[t]he inclusion of a polymer in intimate contact with a drug on the stent allows the drug to be retained in a resilient matrix during expansion of the stent and also slows the administration of drug following implantation." (*Id.* at col. 2, ll. 36–40). |
| 44. A device according to claim 40 wherein said stent comprises a generally thin walled cylinder containing a plurality of generally solid struts to which said polymeric carrier and drug are applied. | The Berg patent discloses the additional limitation of claim 44 ("*wherein said stent comprises a generally thin walled cylinder containing a plurality of generally solid struts to which said polymeric carrier and drug are applied*." for the same reasons discussed above in connection with claim 2. |
| 47. A device according to claim 40 wherein the polymeric carrier and drug are dip-coated onto the stent. | The Berg patent discloses the additional limitation of claim 47 ("*wherein the polymeric carrier and drug are dip-coated onto the stent*") for the same reasons discussed above in connection with claim 5. |
| 48. A device according to claim 40 wherein the polymeric carrier and drug are spray-coated onto the stent. | The Berg patent discloses the additional limitation of claim 48 ("*wherein the polymeric carrier and drug are spray-coated onto the stent*") for the same reasons discussed in connection with claim 6. |
| 51. A device according to claim 40 wherein the polymeric carrier comprises a nonabsorbable polymer. | The Berg patent discloses the additional limitation of claim 51 ("*comprises a nonabsorbable polymer*") for the same reasons described in connection with the "*comprises a nonabsorbable*" |

-11-

BSC-SJA-0611

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| | *polymer*" limitation of claim 9. |
| 52. A device according to claim 40 wherein the polymeric carrier comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate, a poly(hydroxy)ethylmethylmethacrylate, an acrylate based polymer, an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester, a fluorinated polymer; or a blend thereof. | The Berg patent discloses the additional limitation of claim 52 (which requires that the polymeric carrier "*comprise[s] a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester, a fluorinated polymer; or a blend thereof*") for the same reasons discussed above in connection with the additional limitation of claim 10. |
| 63. A device according to claim 52 wherein the polymeric carrier comprises an acrylate based polymer. | The Berg patent discloses the additional limitation of claim 63 (which requires that the polymeric carrier "*comprise[s] an acrylate based polymer*") for the same reasons discussed above in connection with the additional limitation of claim 21. |
| 67. A device according to claim 52 wherein the polymeric carrier comprises a fluorinated polymer. | The Berg patent discloses the additional limitation of claim 67 (which requires that the polymeric carrier "*comprise[s] a fluorinated polymer*") for the same reasons discussed above in connection with claim 25. |
| 69. A device according to any one of claims 40 to 68 wherein said drug is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent discloses the additional limitation of claim 69 ("*wherein said drug is a macrocyclic lactone analog of rapamycin*") for the same reasons discussed in connection with claim 27. |
| 70. A device according to any one of claims 40 to 68 that provides a controlled release of said rapamycin or macrocyclic | The Berg patent discloses the additional limitation of claim 70 (which requires that the claimed stent "*provides a controlled release of said rapamycin or macrocyclic lactone analog thereof* |

BSC-SJA-0612

| Asserted Claim Limitation | Disclosure in the Prior Art |
|---|---|
| lactone analog thereof over a period of several weeks. | over a period of several weeks") for the same reasons discussed in connection with the additional limitation of claim 28. |
| 71. A device according to claim 70 wherein said drug is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent discloses the additional limitation of claim 71 ("*wherein said drug is a macrocyclic lactone analog of rapamycin*") for the same reasons discussed in connection with claim 27. |
| 72. A device according to claim 71 wherein the polymeric carrier comprises a fluorinated polymer. | The Berg patent discloses the additional limitation of claim 72 ("*wherein the polymeric carrier comprises a fluorinated polymer*") for the same reasons discussed in connection with claim 25. |
| 73. A device according to claim 72 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer. | The Berg patent discloses the additional limitation of claim 73 ("*wherein the polymeric carrier further comprises an acrylate based polymer or copolymer*") for the same reasons discussed in connection with claim 21. |
| 74. A device according to any one of claims 40 to 68 that releases said drug over a period of at least 14 days. | The Berg patent discloses the additional limitation of claim 74 ("*release[] said rapamycin or macrocyclic lactone analog thereof over a period of of at least 14 days*") for the same reasons described in connection with claim 30. |
| 75. A device according to claim 74 wherein said drug is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent discloses the additional limitation of claim 75 ("*wherein said drug is a macrocyclic lactone analog of rapamycin*") for the same reasons discussed in connection with claim 27. |
| 76. A device according to claim 75 wherein the polymeric carrier comprises a fluorinated polymer. | The Berg patent discloses the additional limitation of claim 76 ("*wherein the polymeric carrier comprises a fluorinated polymer*") for the same reasons discussed in connection with claim 25. |

BSC-SJA-0613

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| 77. A device according to claim 76 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer. | The Berg patent discloses the additional limitation of claim 77 (*"wherein the polymeric carrier further comprises an acrylate based polymer or copolymer"*) for the same reasons discussed in connection with claim 21. |

-14-

# EXHIBIT 11

**EXHIBIT 11**

**COMPARISON OF THE PRIOR ART**
**WITH THE CLAIMS OF THE '473 PATENT**

| Asserted Claim Limitation | Disclosure in the Prior Art |
|---|---|
| 1. A metallic stent having a coating applied thereto, wherein: | Applying either parties' proposed claim construction, the Berg patent discloses "*[a] metallic stent having a coating applied thereto.*" For instance, Berg notes that the "the underlying structure of the stent can be virtually any stent design . . . whether metal or polymeric." (Berg patent, col. 3, ll. 29–32). And, as noted above, Berg discloses the application of a polymeric / drug coating to the stent itself. For instance, Berg describes "[t]he inclusion of a polymer in intimate contact with a drug on the stent allows the drug to be retained on the stent in a resilient matrix." (*Id.* at col. 2, ll. 36–38). And, Berg notes that "[i]n order to provide the coated stent according to the present invention, a solution which includes a solvent, a polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent is first prepared . . . . The solution is applied to the stent and the solvent is allowed to evaporate, thereby leaving on the stent surface a coating of the polymer and the therapeutic substance." (*Id.* at col. 3, l. 52–col. 4, l. 21). |
| said coating comprises a mixture of a biocompatible polymeric carrier and a therapeutic agent; | If the Court adopts Cordis's proposed construction of the term "biocompatible" (which, according to Cordis, simply requires that a polymeric material be "able to perform its function in the body with an acceptable biological response"), the Berg patent also discloses "*said coating comprises a mixture of a biocompatible polymeric carrier and a therapeutic agent.*" Again, the Berg patent teaches "intravascular stents for treatment of injuries to blood vessels and particularly to stents having a framework onto |

-1-

BSC-SJA-0614

BSC-SJA-0515

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| | which a therapeutic substance or drug is applied." (Berg patent at col. 1, ll. 5–8; *see also* col. 5, ll. 19–39 (disclosing possible therapeutic agents for use on a stent). As noted above, Berg teaches the inclusion of the therapeutic substance or drug in a polymeric "matrix" (or alternatively stated, "[t]he inclusion of a polymer in intimate contact with a drug"). (*Id.* at col. 2, ll. 36–38). Berg also notes that "[t]he polymer chosen must be a polymer that is biocompatible." (*Id.* at col. 4, ll. 35–42).[1] |
| said polymeric carrier comprises at least one nonabsorbable polymer; | The Berg patent also discloses "*said polymeric carrier comprises at least one nonabsorbable polymer,*" regardless of which parties' claim construction the Court adopts. For example, Berg notes that "[t]he polymer may be either a biostable or a bioabsorbable polymer." (Berg patent at col. 4, ll. 35–42). |
| said therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof, | The Berg patent in combination with the Morris patent discloses (again, under either parties' claim construction), this limitation which recites: "*said therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof.*" Specifically, the Berg patent teaches that "[t]he therapeutic substance used in the present invention could be virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel. . . . For example, . . . anti-inflammatory agents could be used." (Berg patent at col. 5, ll. 19–28). The Berg patent also discloses the use of a drug that "reduce[s] the amount of proliferation associated with arterial injury." (*Id.* at col. 7, ll. |

---

[1]   Furthermore, the Berg patent states, for example, that "polysaccharides" and "poly(ethylene- vinyl acetate) [*sic*]" are deemed biocompatible polymers. (Berg patent, col. 4, l. 35–col. 5, l. 7). The specification of the '473 patent acknowledge that these polymers are biocompatible. (*See, e.g.,* '473 patent, col. 6, ll. 38–50). In light of this, the Berg patent also discloses a "biocompatible polymeric carrier" under BSC's proposed construction of this term.

BSC-SJA-0616

| Asserted Claim Limitation | Identified in the Prior Art |
|---|---|
| | 14–15) and that vascular smooth muscle cell proliferation causes restenosis (*id.* at col. 1, ll. 38–43). And the Morris patent discloses the use of rapamycin, a known anti-proliferative and anti-inflammatory agent, to inhibit vascular smooth muscle cell proliferation. For instance, the Morris patent claims, among other things, "administering an antirestenosis effective amount of rapamycin to said mammal . . . via a vascular stent impregnated with rapamycin." (Morris patent, Claim 1). |
| present in an amount effective to inhibit neointimal proliferation; and | The Berg patent discloses this limitation, which requires that the therapeutic agent be "*present in an amount effective to inhibit neointimal proliferation.*" For instance, Berg notes that "[i]t is therefore an object of the present invention to provide a stent having a therapeutically significant amount of a drug applied thereto." (Berg patent, col. 2, ll. 13–15). Moreover, the Morris patent discloses specific *in vivo* dosing amounts for rapamycin when used to treat restenosis. (Morris patent, col. 6, ll. 39–64). |
| said stent provides a controlled release of said therapeutic agent over a period of several weeks. | The final limitation of claim 1 of the '473 patent, requires that "*said stent provides a controlled release of said therapeutic agent over a period of several weeks.*" Under either parties' proposed construction the Berg patent teaches this limitation: <br><br> It is also an object of the present invention to provide a drug-containing stent which allows for sustained release of the drug to vascular tissue. <br><br> (Berg patent at col. 2, ll. 21–23 (emphasis added)). Further, Berg notes that: <br><br> The adhesion of the coating and the rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or |

BSC-SJA-0617

| Asserted Claim Limitations | Location in this Prior Art |
|---|---|
| | biostable polymer and by the ratio of drug to polymer in the solution. By this method, drugs such as . . . antiinflammatory agents can be applied to a stent, retained on a stent during expansion of the stent and elute the drug at a controlled rate.<br><br>(*Id.* at col. 2, ll. 51–62 (emphasis added)).<br><br>In addition to this general disclosure of controlled, sustained release, the Berg patent provides an example of a drug-eluting stent that elutes drug over a period of at least 10 days. (*See id.* at Fig. 1, col. 6, ll. 35–49). A person of ordinary skill in the art would understand that the Berg patent discloses how to formulate a polymer/drug mixture capable of eluting drug over a period of several weeks, and longer than the 10 days explicitly shown in Figure 1, by teaching that "[t]he release rate can be further controlled by varying the ratio of drug to polymer." (*Id.* at col. 2, ll. 62–63). Thus, it would have been obvious to a person of ordinary skill in the art – and well within that person's skill consistent with the specification's admission that such coating technology was "conventional" – to vary the ratio of drug to polymer to obtain a controlled release of drug over a period of two, three, or more weeks (i.e., "several weeks"). It was also well known that restenosis occurs over a period of several weeks, and therefore, it would have been reasonable for a person of ordinary skill in the art to develop a dosage form that would release drug from the stent over a period of several weeks. (*See, e.g.,* Morris patent, col. 6, ll. 57–60 (disclosing treatment with rapamycin for 14 days); ██████████████ |

-4-

BSC-SJA-0618

| Asserted Claim Limitation | Location in the Prior Art |
|---|---|
| 2. The metallic stent according to claim 1 wherein said therapeutic agent is a macrocyclic lactone analog of rapamycin. | The Skotnicki '286 patent complements the disclosure of the Morris patent, and discloses *"macrocyclic lactone analog[s] of rapamycin"* (under either parties' proposed claim construction) useful for the treatment of hyperproliferative vascular disease and restenosis as required by claim 2.[2]  (*See* Skotnicki '286 patent, col. 1, ll. 64–66; col. 2, ll. 1–50; col. 5, l. 57–col. 6, l. 2.)  In addition to disclosing rapamycin analogs in general, the Skotnicki '286 patent discloses at least one particular rapamycin derivative (a macrocyclic lactone analog) that demonstrates superior activity to rapamycin in the disclosed thymocyte proliferation assay. (*See id.* at col. 8, ll. 43–col. 9, l. 2). |
| 3. The metallic stent according to claim 1 wherein said biocompatible polymeric carrier comprises a fluorinated polymer. | Under either parties' proposed claim constructions, the Berg patent also teaches the additional limitation of dependent claim 3 which additionally requires that: *"said biocompatible polymeric carrier comprises a fluorinated polymer."*  Berg notes that "biostable polymers with a relatively low chronic tissue response [could be used] such as . . . polyvinylidene fluoride," a type of fluorinated polymer. (Berg patent at col. 4, l. 54–62). |
| 4. The metallic according to claim 3 wherein said biocompatible polymeric carrier further comprises an acrylate-based polymer or copolymer. | Claim 4 of the '473 patent depends on claim 3 and further requires that: *"said biocompatible polymeric carrier further comprises an acrylate-based polymer or copolymer."*  Applying either parties' proposed claim construction, Berg also discloses this limitation. More specifically, Berg describes the use of "acrylic polymers and copolymers," which are examples of acrylate-based polymers or copolymers. (Berg patent at col. 4, l. 59, *see also id.* at col. 7, ll. 49–52). Furthermore, Claim 6 of the |

[2] In fact, the Skotnicki '286 patent references Morris's work concerning the effect of rapamycin on smooth muscle cell proliferation and intimal thickening following vascular injury. (Skotnicki '286 patent, col. 1, ll. 43–46).

BSC-SJA-0619

| Asserted Claim Limitation | Disclosure in the Prior Art |
|---|---|
| | Berg patent expressly recites several polymer classes from among the larger group disclosed in the patent, including both acrylate homopolymers and copolymers. (*Id.* at col. 7, ll. 49–53). |
| 5. A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a metallic stent according to any one of claims 1 to 4 in the lumen of said coronary artery. | Claim 5 of the '473 patent depends on claim 1, 2, 3, or 4, and requires the step of *"implanting a metallic stent according to any one of claims 1 to 4 in the lumen of said coronary artery."*<br><br>The Berg patent teaches this additional limitation of claim 5. Specifically, the Berg patent discloses a polymer-drug coated stent designed for implantation into a coronary artery to inhibit neointimal proliferation following percutaneous transluminal coronary angioplasty:<br><br>This invention relates to intravascular stents for treatment of injuries to blood vessels and particularly to stents having a framework onto which a therapeutic substance or drug is applied.<br><br>(Berg patent, col. 1, ll. 5–8 (emphasis added)). Further:<br><br>In operation, the stent made according to the present invention can deliver drugs to a body lumen by introducing the stent transluminally into a selected portion of the body lumen and radially expanding the stent into contact with the body lumen. The transluminal delivery can be accomplished by a catheter designed for the delivery of stents and the radial expansion can be accomplished by balloon expansion of the stent, self-expansion of the stent, or a combination of self-expansion and balloon expansion.<br><br>(*Id.* at col. 3, ll. 1–9) |

BSC-SJA-0620

# EXHIBIT 12

US005464650A

# United States Patent [19]

## Berg et al.

[11] Patent Number: 5,464,650

[45] Date of Patent: Nov. 7, 1995

[54] INTRAVASCULAR STENT AND METHOD

[75] Inventors: Eric P. Berg; Ronald J. Tuch, both of Plymouth; Michael Dror, Edina; Rodney G. Wolff, Minnetonka Beach, all of Minn.

[73] Assignee: Medtronic, Inc., Minneapolis, Minn.

[21] Appl. No.: 52,878

[22] Filed: Apr. 26, 1993

[51] Int. Cl.⁶ .................... B05D 1/12; B05D 1/18; B05D 1/38

[52] U.S. Cl. ................. 427/2.30; 427/2.25; 427/2.28

[58] Field of Search .................. 427/2, 421, 2.12, 427/2.13, 2.28, 2.30, 430.1, 2.25

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,292,965 | 10/1981 | Nash et al. | 427/2 |
| 4,529,614 | 7/1985 | Burns | 427/2 |
| 4,532,929 | 8/1985 | Mattei et al. | 427/2 |
| 4,733,665 | 3/1988 | Palmaz | 128/343 |
| 4,733,652 | 6/1988 | Langer et al. | 623/1 |
| 4,776,337 | 10/1988 | Palmaz | 128/343 |
| 4,800,882 | 1/1989 | Gianturco | 128/343 |
| 4,886,062 | 12/1989 | Wiktor | 128/343 |
| 4,886,069 | 12/1989 | Lodenson et al. | 623/2 |
| 4,894,231 | 1/1990 | Moreau et al. | 427/2 |
| 4,955,899 | 9/1990 | Della Corna et al. | 427/2 |
| 5,102,417 | 4/1992 | Palmaz | 128/343 |
| 5,176,907 | 1/1993 | Leong | 424/78.08 |
| 5,192,308 | 3/1993 | Ostapchenko | 427/322 |
| 5,221,698 | 6/1993 | Amidon et al. | 427/2 |
| 5,234,456 | 8/1993 | Silvestrini | 606/194 |
| 5,242,391 | 9/1993 | Place et al. | 604/60 |
| 5,280,266 | 3/1994 | Rohling et al. | 604/272 |
| 5,304,121 | 4/1994 | Sahatjian | 604/53 |
| 5,356,433 | 10/1994 | Rowland | 427/2.24 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 9013332 | 11/1990 | WIPO . |
| 9112779 | 9/1991 | WIPO . |
| 9116102 | 10/1991 | WIPO . |
| 9117789 | 11/1991 | WIPO . |
| 9118940 | 12/1991 | WIPO . |
| 9215286 | 9/1992 | WIPO . |
| 9306792 | 4/1993 | WIPO . |
| 0566245 | 10/1993 | WIPO . |

OTHER PUBLICATIONS

"Seeding of Intravascular Stents with Genetically Engineered Endothelial Cells" by Dichek et al., in Circulation, vol. 80, No. 5, Nov. 1989 pp. 1347–1353.

"Restenosis After Balloon Angioplasty" by Schwartz, et al., in Circulation, vol. 82, No. 6, pp. 2190–2198 Dec. 1990.

Primary Examiner—Diana Dudash
Attorney, Agent, or Firm—Daniel W. Latham; Harold R. Patton

[57]     ABSTRACT

A method for making an intravascular stent by applying to the body of a stent a solution which includes a solvent, a polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent and then evaporating the solvent. The inclusion of a polymer in intimate contact with a drug on the stent allows the drug to be retained on the stent during expansion of the stent and also controls the administration of drug following implantation. The adhesion of the coating and the rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or biostable polymer and the ratio of drug to polymer in the solution. By this method, drugs such as dexamethasone can be applied to a stent, retained on a stent during expansion of the stent and elute at a controlled rate.

22 Claims, 2 Drawing Sheets



CONCENTRATION (mg/L)

TIME (hr)

BSC-SJA-0621



FIG. I

BSC-SJA-0622



FIG. 2

BSC-SJA-0623

5,464,650

1

# INTRAVASCULAR STENT AND METHOD

## BACKGROUND OF THE INVENTION

This invention relates to intravascular stents for treatment of injuries to blood vessels and particularly to stents having a framework onto which a therapeutic substance or drug is applied.

Although angioplasty procedures have increased greatly in popularity for treatment of occluded arteries, the problem of restenosis following the angioplasty treatment remains a significant problem. Restenosis is the closure of a peripheral or coronary artery following trauma to the artery caused by efforts to open an occluded portion of the artery by angioplasty, such as, for example, by balloon dilation, atherectomy or laser ablation treatment of the artery. For these angioplasty procedures, restenosis occurs at a rate of about 30–60% depending upon the vessel location, lesion length and a number of other variables.

One aspect of restenosis may be simply mechanical; e.g. caused by the elastic rebound of the arterial wall and/or by dissections in the vessel wall caused by the angioplasty procedure. These mechanical problems have been successfully addressed by the use of stents to tack-up dissections and prevent elastic rebound of the vessel, thereby reducing the level of restenosis for many patients. The stent is typically inserted by catheter into a vascular lumen and expanded into contact with the diseased portion of the arterial wall, thereby providing internal support for the lumen. Examples of stents which have been successfully applied over a PTCA balloon and radially expanded at the same time as the balloon expansion of an affected artery include the stents disclosed in U.S. Pat. No. 4,733,665 issued to Palmaz, U.S. Pat. No. 4,800,882 issued to Giantureo and U.S. Pat. No. 4,886,062 issued to Wiktor which are incorporated herein by reference in their entirety.

Another aspect of restenosis is believed to be a natural healing reaction to the injury of the arterial wall that is caused by angioplasty procedures. The final result of the complex steps of the healing process is intimal hyperplasia, the migration and proliferation of medial smooth muscle cells, until the artery is again occluded.

To address both aspects of the restenosis problem, it has been proposed to provide stents which are seeded with endothelial cells (Dichek,D. A. et al Seeding of Intravascular Stents With Genetically Engineered Endothelial Cells; Circulation 1989; 80: 1347–1353). In that experiment, sheep endothelial cells that had undergone retrovirus-mediated gene transfer for either bacterial beta-galactosidase or human tissue-type plasminogen activator were seeded onto stainless steel stents and grown until the stents were covered. The cells were therefore able to be delivered to the vascular wall where they could provide therapeutic proteins. Other methods of providing therapeutic substances to the vascular wall include simple heparin-coated metallic stents, whereby a heparin coating is ionically or covalently bonded to the stent. Still other methods of providing therapeutic substances to the vascular wall by means of stents have also been proposed such as is U.S. Pat. No. 5,102,417 issued to Palmaz or in international patent application WO 91/12779 "Intraluminal Drug Eluting Prosthesis" and international patent application WO 90/13332 "Stent With Sustained Drug Delivery". In those applications, it is suggested that antiplatelet agents, anticoagulant agents, antimicrobial agents, antimetabolic agents and other drugs could be supplied in stents to reduce the incidence of restenosis.

2

Metal stents such as those disclosed in U.S. Pat. No. 4,733,665 issued to Palmaz, U.S. Pat. No. 4,800,882 issued to Giantureo or U.S. Pat. No. 4,886,062 issued to Wiktor could be suitable for drug delivery in that they are capable of maintaining intimate contact between a substance applied to the outer surface of the stent and the tissues of the vessel to be treated. However, there are significant problems to be overcome in order to secure a therapeutically significant amount of a substance onto the metal of the stent; to keep it on the stent during expansion of the stent into contact with the blood vessel wall; and also controlling the rate of drug delivery from the drug on the stent to the vessel wall.

It is therefore an object of the present invention to provide a stent having a therapeutically significant amount of a drug applied thereto.

It is also an object of the present invention to provide a stent which may be delivered and expanded in a selected blood vessel without losing a therapeutically significant amount of a drug applied thereto.

It is also an object of the present invention to provide a drug-containing stent which allows for a sustained release of the drug to vascular tissue.

It is also an object of the present invention to provide a simple method for applying to a stent a coating of a therapeutic substance.

## SUMMARY OF THE INVENTION

These and other objects are accomplished by the present invention. We have discovered a method for making an intravascular stent by applying to the body of a stent, and in particular to its tissue-contacting surface, a solution which includes a solvent, a polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent and then evaporating the solvent. The inclusion of a polymer in intimate contact with a drug on the stent allows the drug to be retained on the stent in a resilient matrix during expansion of the stent and also slows the administration of drug following implantation. The method can be applied whether the stent has a metallic or polymeric surface. The method is also an extremely simple method since it can be applied by simply immersing the stent into the solution or by spraying the solution onto the stent. The amount of drug to be included on the stent can be readily controlled by applying multiple thin coats of the solution while allowing it to dry between coats. The overall coating should be thin enough so that it will not significantly increase the profile of the stent for intravascular delivery by catheter. It is therefore preferably less than about 0.002 inch thick and most preferably less than 0.001 inch thick. The adhesion of the coating and the rate at which the drug is delivered can be controlled by the selection of an appropriate bioabsorbable or biostable polymer and by the ratio of drug to polymer in the solution. By this method, drugs such as glucocorticoids (e.g. dexamethasone, betamethasone), heparin, hirudin, tocopherol, angiopeptin, aspirin, ACE inhibitors, growth factors, oligonucleotides, and, more generally, antiplatelet agents, anticoagulant agents, antimitotic agents, antioxidants, antimetabolite agents, and anti-inflammatory agents can be applied to a stent, retained on a stent during expansion of the stent and elute the drug at a controlled rate. The release rate can be further controlled by varying the ratio of drug to polymer in the multiple layers. For example, a higher drug-to-polymer ratio in the outer layers than in the inner layers would result in a higher early dose which would decrease over time.

BSC-SJA-0624

5,464,650

3

In operation, the stent made according to the present invention can deliver drugs to a body lumen by introducing the stent transluminally into a selected portion of the body lumen and radially expanding the stent into contact with the body lumen. The transluminal delivery can be accomplished by a catheter designed for the delivery of stents and the radial expansion can be accomplished by balloon expansion of the stent, by self-expansion of the stent, or a combination of self-expansion and balloon expansion.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plot showing elution profiles for stents according to the present invention with a coating of dexamethasone and poly(L-lactic acid) made according to Example 6.

FIG. 2 is a plot showing elution profiles for sterilized stents according to the present invention with a coating of dexamethasone and poly(L-lactic acid) made according to Example 7.

DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to a method for making an intravascular stent. The underlying structure of the stent can be virtually any stent design, whether of the self-expanding type or of the balloon-expandable type and whether metal or polymeric. Thus metal stent designs such as those disclosed in U.S. Pat. No. 4,733,665 issued to Palmaz, U.S. Pat. No. 4,800,882 issued to Gianturco or U.S. Pat. No. 4,886,062 issued to Wiktor could be used in the present invention. The stent could be made of virtually any bio-compatible material having physical properties suitable for the design. For example, tantalum and stainless steel have been proven suitable for many such designs and could be used in the present invention. Also, stents made with biostable or bioabsorbable polymers such as poly(ethylene terephthalate), polyacetal, poly(lactic acid), poly(ethylene oxide)/poly(butylene terephthalate) copolymer could be used in the present invention. Although the stent surface should be clean and free from contaminants that may be introduced during manufacturing, the stent surface requires no particular surface treatment in order to retain the coating applied in the present invention. Both the inner and outer surfaces of the stent may be provided with the coating according to the present invention.

In order to provide the coated stent according to the present invention, a polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent is first prepared. It is important to choose a solvent, a polymer and a therapeutic substance that are mutually compatible. It is essential that the solvent is capable of placing the polymer into solution at the concentration desired in the solution. It is also essential that the solvent and polymer chosen do not chemically alter the therapeutic character of the therapeutic substance. However, the therapeutic substance only needs to be dispersed throughout the solvent so that it may be either in a true solution with the solvent or dispersed in fine particles in the solvent. Examples of some suitable combinations of polymer, solvent and therapeutic substance are set forth in Table 1 below.

4

TABLE 1

| POLYMER | SOLVENT | THERAPEUTIC SUBSTANCE |
|---|---|---|
| poly(L-lactic acid) | chloroform | dexamethasone |
| poly(lactic acid-co-glycolic acid) | acetone | dexamethasone |
| polyether urethane | N-methyl pyrrolidone | tocopherol (vitamin E) |
| silicone adhesive | xylene | dexamethasone phosphate |
| poly(hydroxy-butyrate-co-hydroxyvalerate) | dichloro-methane | aspirin |
| fibrin | water (buffered saline) | heparin |

The solution is applied to the stent and the solvent is allowed to evaporate, thereby leaving on the stent surface a coating of the polymer and the therapeutic substance. Typically, the solution can be applied to the stent by either spraying the solution onto the stent or immersing the stent in the solution. Whether one chooses application by immersion or application by spraying depends principally on the viscosity and surface tension of the solution, however, it has been found that spraying in a fine spray such as that available from an airbrush will provide a coating with the greatest uniformity and will provide the greatest control over the amount of coating material to be applied to the stent. In either a coating applied by spraying or by immersion, multiple application steps are generally desirable to provide improved coating uniformity and improved control over the amount of therapeutic substance to be applied to the stent.

The polymer chosen must be a polymer that is biocompatible and minimizes irritation to the vessel wall when the stent is implanted. The polymer may be either a biostable or a bioabsorbable polymer depending on the desired rate of release or the desired degree of polymer stability, but a bioabsorbable polymer is probably more desirable since, unlike a biostable polymer, it will not be present long after implantation to cause any adverse, chronic local response. Bioabsorbable polymers that could be used include poly(L-lactic acid), polycaprolactone, poly(lactide-co-glycolide), poly(hydroxybutyrate), poly(hydroxybutyrate-co-valerate), polydioxanone, polyorthoester, polyanhydride, poly(glycolic acid), poly(D,L-lactic acid), poly(glycolic acid-co-trimethylene carbonate), polyphosphoester, polyphosphoester urethane, poly(amino acids), cyanoacrylates, poly(trimethylene carbonate), poly(iminocarbonate), copoly(ether-esters) (e.g. PEO/PLA), polyalkylene oxalates, polyphosphazenes and biomolecules such as fibrin, fibrinogen, cellulose, starch, collagen and hyaluronic acid. Also, biostable polymers with a relatively low chronic tissue response such as polyurethanes, silicones, and polyesters could be used and other polymers could also be used if they can be dissolved and cured or polymerized on the stent such as polyolefins, polyisobutylene and ethylene-alphaolefin copolymers; acrylic polymers and copolymers, vinyl halide polymers and copolymers, such as polyvinyl chloride; polyvinyl ethers, such as polyvinyl methyl ether; polyvinylidene halides, such as polyvinylidene fluoride and polyvinylidene chloride; polyacrylonitrile, polyvinyl ketones; polyvinyl aromatics, such as polystyrene, polyvinyl esters, such as polyvinyl acetate; copolymers of vinyl monomers with each other and olefins, such as ethylene-methyl methacrylate copolymers, acrylonitrile-styrene copolymers, ABS resins,

BSC-SJA-0625

5,464,650

5

and ethylene-vinyl acetate copolymers; polyamides, such as Nylon 66 and polycaprolactam; alkyd resins; polycarbonates; polyoxymethyicnes; polyimides; polyethers; epoxy resins, polyurethanes; rayon; rayon-triacetate; cellulose, cellulose acetate, cellulose butyrate; cellulose acetate butyrate; cellophane; cellulose nitrate; cellulose propionate; cellulose ethers; and carboxymethyl cellulose.

The ratio of therapeutic substance to polymer in the solution will depend on the efficacy of the polymer in securing the therapeutic substance onto the stent and the rate at which the coating is to release the therapeutic substance to the tissue of the blood vessel. More polymer may be needed if it has relatively poor efficacy in retaining the therapeutic substance on the stent and more polymer may be needed in order to provide an elution matrix that limits the elution of a very soluble therapeutic substance. A wide ratio of therapeutic substance to polymer could therefore be appropriate and could range from about 10:1 to about 1:100.

The therapeutic substance used in the present invention could be virtually any therapeutic substance which possesses desirable therapeutic characteristics for application to a blood vessel. This can include both solid substances and liquid substances. For example, glucocorticoids (e.g. dexamethasone, betamethasone), heparin, hirudin, tocopherol, angiopeptin, aspirin, ACE inhibitors, growth factors, oligonucleotides, and, more generally, antiplatelet agents, anticoagulant agents, antimitotic agents, antioxidants, antimetabolite agents, and anti-inflammatory agents could be used. Antiplatelet agents can include drugs such as aspirin and dipyridamole. Aspirin is classified as an analgesic, anti-pyretic, anti-inflammatory and antiplatelet drug. Dypridimole is a drug similar to aspirin in that it has anti-platelet characteristics. Dypridimole is also classified as a coronary vasodilator. Anticoagulant agents can include drugs such as heparin, coumadin, protamine, hirudin and tick anticoagulant protein. Antimitotic agents and antimetabolite agents can include drugs such as methotrexate, azathioprine, vincristine, vinblastine, fluorouracil, adriamycin and mutamycin.

The following examples are exemplary of various aspects of the invention.

EXAMPLE 1

A 1% solution of dexamethasone in acetone was made, forming a clear solution. The solution was placed in an airbrush reservoir (Badger #200). Wiktor type tantalum wire stents were sprayed with the solution in short bursts while rotating the stents. The acetone quickly evaporated from the stents, leaving a white residue on the stent wire. The process was continued until all of the stent wires were coated. The drug elution rate for the stent was determined by immersing the stent in phosphate buffered saline solution (pH=7.4). Traces of dexamethasone were observed to remain on the immersed stents for less than 31 hours.

EXAMPLE 2

A 2% solution of dexamethasone in acetone was made, forming a solution with suspended particles of dexamethasone. The solution was placed into a tube. Wiktor type tantalum wire stents were dipped rapidly and were allowed to dry. Each stent was dipped into the solution 12–15 times to provide a white surface coating. Two stents were placed on an angioplasty balloon and were inflated on the balloon. Approximately 80% of the dexamethasone coating flaked off of the stents.

6

EXAMPLE 3

A solution of 1% dexamethasone and 0.5% poly(caprolactone) (Aldrich 18,160–9) in acetone was made. The solution was placed into a tube. Wiktor type tantalum wire stents were dipped rapidly and were allowed to dry. Each stent was dipped into the solution 12–15 times to provide a white surface coating. A stent so coated was expanded on a 3.5 mm angioplasty balloon causing a significant amount of the coating to become detached.

EXAMPLE 4

A solution of 1% dexamethasone and 0.5% poly(L-lactic acid) (Medisorb) in acetone was made. The solution was placed into a tube. Wiktor type tantalum wire stents were dipped rapidly and were allowed to dry. Each stent was dipped into the solution 12–15 times to provide a white surface coating. A stent so coated was expanded on a 3.5 mm angioplasty balloon causing only a small portion of the coating (less than 25%) to become detached.

EXAMPLE 5

A solution including a 2% dispersion of dexamethasone and a 1% solution of poly(L-lactic acid) (CCA Biochem MW=550,000) in chloroform was made. The solution was placed into an airbrush (Badger). Wiktor type tantalum wire stents were sprayed in short bursts and were allowed to dry. Each stent was sprayed with the solution about 20 times to provide a white surface coating. A stent so coated was expanded on a 3.5 mm angioplasty balloon. The coating remained attached to the stent throughout the procedure.

EXAMPLE 6

A solution including a 2% dispersion of dexamethasone and a 1% solution of poly(L-lactic acid) (CCA Biochem MW=550,000) in chloroform was made. The solution was placed into an airbrush (Badger #250–2). Wiktor type tantalum wire stents were suspended from a fixture and sprayed in 24 short bursts (6 bursts from each of the four directions perpendicular to the stent axis) and were allowed to dry. The resulting stents had a coating weight of about 0.0006–0.0015 grams. Three of the stents were tested for long term elution by placing one stent in 3.0 ml of phosphate buffered saline solution (pH=7.4) at room temperature without stirring. The amount of dexamethasone eluted was evaluated by measuring absorbance at 244 nm in a UV-VIS spectrophotometer. The results of this test are given in FIG. 1.

EXAMPLE 7

A solution including a 2% dispersion of dexamethasone and a 1% solution of poly(L-lactic acid) (Medisorb 100-L) in chloroform was made along with a control solution of 1% of poly(L-lactic acid) (Medisorb 100-L) in chloroform. The solutions was placed into an airbrush (Badger #250 2). Wiktor type tantalum wire stents were expanded on a 3.0 mm balloon, suspended from a fixture and sprayed in 16 short bursts (2–3 bursts of about 1 second followed by several minutes drying time between applications). The resulting dexamethasone-coated stents had an average coating weight of about 0.0012 grams while the polymer-coated stents had an average polymer weight of about 0.0004 grams. The stents were sterilized in ethylene oxide. Three of the sterilized dexamethasone-coated stents were tested for long term elution by placing one stent in 3.0 ml of phosphate buffered saline solution (pH=7.4) at room temperature with-

BSC-SJA-0626

5,464,650

7

out stirring. The amount of dexamethasone eluted was evaluated by measuring absorbance at 244 nm in a UV-VIS spectrophotometer. The results of this test are given in FIG. 2. Dexamethasone-coated stents and polymer-coated control stents were implanted in the coronary arteries of 8 pigs (N=12 for each type) according to the method set forth in "Restenosis After Balloon Angioplasty—A Practical Proliferative Model in Porcine Coronary Arteries," by Robert S. Schwartz, et al, Circulation 82(6):2190–2200, Dec. 1990, and "Restenosis and the Proportional Neointimal Response to Coronary Artery Injury: Results in a Porcine Model" by Robert S. Schwartz et al, J Am Coll Cardiol; 19;267–74 Feb. 1992 with the result that when compared with the controls, the dexamethasone-coated stents reduced the amount of proliferation associated with the arterial injury.

It will be appreciated by those skilled in the art that while the invention has been described above in connection with particular embodiments and examples, the invention is not necessarily so limited and that numerous other embodiments, examples, uses, modifications and departures from the embodiments, examples and uses may be made without departing from the inventive concepts.

We claim:

1. A method for making an intravascular stent comprising the steps of:

(a) providing a cylindrical, radially expandable stent body;

(b) applying to the stent body by spraying a solution which includes a solvent, a polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent;

(c) evaporating the solvent;

(d) repeating application and evaporating steps (b) and (c) to provide an amount of polymer and therapeutic substance on the stent body; and

(e) radially expanding the stent body and applied polymer and therapeutic substance are retained on the stent body.

2. A method according to claim 1, wherein the stent body has a metal surface.

3. A method according to claim 1, wherein the stent body has a polymeric surface.

4. A method according to claim 1 wherein the ratio of drug to dissolved polymer in the solution is varied in some of the application steps.

5. A method according to claim 1 wherein the polymer is a biostable polymer.

6. A method according to claim 5 wherein the polymer is selected from the group consisting of silicones, polyurethanes, polyesters, vinyl homopolymers and copolymers, acrylate homopolymers and copolymers, polyethers and cellulosics.

7. A method according to claim 1 wherein the ratio of drug to dissolved polymer in the solution is in the range of about 10:1 to 1:100.

8. A method according to claim 1 wherein the drug is selected from the groups consisting of glucocorticoids, dexamethasone, dexamethasone sodium phosphate, anticoagulants, heparin, hirudin, tick anticoagulant peptide, angiopeptin, antimitotic agents, and oligonucleotides.

9. A method for making an intravascular stent comprising the steps of:

8

(a) providing a cylindrical, radially expandable stent body;

(b) applying to the stent body a solution which includes a solvent, a bioabsorbable polymer dissolved in the solvent and a therapeutic substance dispersed in the solvent;

(c) evaporating the solvent;

(d) repeating application and evaporating steps (b) and (c) to provide an amount of polymer and therapeutic substance on the stent body; and

(e) radially expanding the stent body and applied polymer and therapeutic substance such that the polymer and therapeutic substance are retained on the stent body.

10. A method according to claim 9 wherein the polymer is selected from the group consisting of poly(L-lactic acid), poly(lactide-co-glycolide) and poly(hydroxybutyrate-co-valerate).

11. A method according to claim 9 wherein the stent body has a metal surface.

12. A method according to claim 9 wherein the stent body has a polymeric surface.

13. A method according to claim 9 wherein the solution is applied by spraying.

14. A method according to claim 9 wherein the solution is applied by immersion.

15. A method according to claim 9 wherein the ratio of drug to dissolved polymer in the solution is varied in some of the plurality of application steps.

16. A method according to claim 9 wherein the ratio of drug to dissolved polymer in the solution is in the range of about 10:1 to 1:100.

17. A method according to claim 9 wherein the drug is selected from the groups consisting of glucocorticoids, dexamethasone, dexamethasone sodium phosphate, anticoagulants, heparin, hirudin, tick anticoagulant peptide, angiopeptin, antimitotic agents, and oligonucleotides.

18. A method for making an intravascular stent comprising the steps of:

(a) providing a cylindrical, radially expandable, metal stent body;

(b) spraying onto the stent body a solution which includes a solvent, a bioabsorbable polymer dissolved in the solvent and a glucocorticoid dispersed in the solvent; and

(c) evaporating the solvent; and

(d) radially expanding the stent body and applied polymer and glucocorticoid such that the polymer and glucocorticoid are retained on the stent body.

19. A method according to claim 18 wherein the solution is applied in a plurality of application and drying steps.

20. A method according to claim 19 wherein the ratio of drug to dissolved polymer in the solution is varied in some of the plurality of application steps.

21. A method according to claim 18 wherein the polymer is selected from the group consisting of poly(L-lactic acid), poly(lactide-co-glycolide), fibrin, silicone, polyurethane, and poly(phosphoester urethane).

22. A method according to claim 18 wherein the glucocorticoid is dexamethasone.

* * * * *

BSC-SJA-0627

# EXHIBIT 13

US005516781A

# United States Patent [19]

## Morris et al.

[11]  **Patent Number:**  **5,516,781**

[45]  **Date of Patent:**  *May 14, 1996

[54]  **METHOD OF TREATING RESTENOSIS WITH RAPAMYCIN**

[75]  Inventors: **Randall E. Morris**, Los Altos; **Clare R. Gregory**, Menlo Park, both of Calif.

[73]  Assignee: **American Home Products Corporation**, Madison, N.J.

[ * ]  Notice:  The term of this patent shall not extend beyond the expiration date of Pat. No. 5,288,711.

[21]  Appl. No.: **238,305**

[22]  Filed: **May 12, 1994**

### Related U.S. Application Data

[63]  Continuation-in-part of Ser. No. 980,000, Nov. 23, 1992, abandoned, which is a continuation of Ser. No. 819,314, Jan. 9, 1992, abandoned.

[51]  Int. Cl.⁶ .................................................. **A61K 31/345**
[52]  U.S. Cl. .................................................. **514/291**
[58]  Field of Search .................... 514/291, 56; 424/122

[56]  **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,929,992 | 12/1975 | Sehgal et al. | 514/291 |
| 4,885,171 | 12/1989 | Surendra et al. | 424/122 |
| 5,078,999 | 1/1992 | Warner et al. | 424/122 |
| 5,080,899 | 1/1992 | Sturm et al. | 424/122 |
| 5,100,899 | 3/1992 | Calne | 514/122 |
| 5,252,579 | 10/1993 | Skotnicki et al. | 514/291 |
| 5,256,790 | 10/1993 | Nelson | 514/291 |
| 5,288,711 | 2/1994 | Mitchell et al. | 514/56 |

#### FOREIGN PATENT DOCUMENTS

0401747  6/1990  European Pat. Off. .

#### OTHER PUBLICATIONS

Akselband, Y., Transplantation Proc., 23:2833 (1991).
Woo, J., Cytokine, 3: 472 (1991).
Stepkowski, S., Transplantation Proc., 23: 507 (1991).
Cramer, D., Transplantation, 50: 554 (1990).
Kay, J., Immunology, 72: 544 (1991).
Ferns, G., Am. J. Path., 137: 403 (1990).

Gregory, C., R., et al., American Society of Transplant Physicians, 13th Annual Meeting, May 16–18, 1994; Abstract (38) 9, mailed to attendees Apr. 27, 1994.
Gregory, C. R., et al., American Society of Transplant Physicians, 13th Annual Meeting, May 16–18, 1994; Abstract (38) 10, mailed to attendees Apr. 27, 1994.
Gregory, C. R., et al., Transplantation Proceedings, 25:1, 120–121 (Feb. 1993).
Gregory, C. R., et al., Transplantation Proceedings, 25:1, 770–771 (Feb. 1993).
Gregory, C. R., et al., Transplantation, 55:1409–1418 (Jun. 1993).
Gregory, C. R., et al., Veterinary Surgery, Abstract 11:40 (Jan. 1993).
Gregory, C. R. et al., J. Heart and Lung Transplantation, Abstract 27, 11:197 (1992).
Gregory, C. R. et al., FASEB, Abstract 21: 6:A940 (1992).
Meiser, B. M. et al., J. Heart and Lung Transplantation, Abstract 3:9–55 (1990).
Meiser, B. M. et al., Lancet 338:1297–1298 (1991).
Ferns, G. A. et al., Circulation, Abstract 0727, 80 (Supp. II) 183 (1989).
Jonasson, L. et al., Proc. Natl. Acad. Sci., 85:2303–2306 (Apr. 1988).
Morris, P. J. et al., Transplantation Reviews, 6:39 (1992).
Staruch, M. J., FASEB 3:3411 (1989).
Martel, R. R., Canadian Journal of Physiol. Pharmacology, 55:48 (1977).
Morris, R. E., Med. Sci. Res. 17:877 (1989).
Baeder, W. L., Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract) (1990).
Eng, C. P. et al., The Journal of Antibiotics, 37:1231 (1984).
The Merck Index, 9th ed., 6152:820–821 (1976).
Weaver, J. L., J. Cell Biology, Abstract 1308, 111:(5 Part 2)234a.

*Primary Examiner*—Michael G. Wityshyn
*Assistant Examiner*—Jean C. Witz
*Attorney, Agent, or Firm*—Arnold S. Milowsky

[57]  **ABSTRACT**

This invention provides a method of preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative effective amount of rapamycin alone or in combination with mycophenolic acid.

5 Claims, No Drawings

BSC-SJA-0628

5,516,781

1

# METHOD OF TREATING RESTENOSIS WITH RAPAMYCIN

## CROSS REFERENCE TO RELATED APPLICATIONS

This is a continuation-in-part of U.S. patent application Ser. No. 07/980,000, filed Nov. 23, 1992, now abandoned, which is a continuation of U.S. patent application Ser. No. 07/819,314, filed Jan. 9, 1992, now abandoned.

## BACKGROUND OF THE INVENTION

Many individuals suffer from heart disease caused by a partial blockage of the blood vessels that supply the heart with nutrients. More severe blockage of blood vessels in such individuals often leads to hypertension, ischemic injury, stroke, or myocardial infarction. Typically vascular occlusion is preceded by vascular stenosis resulting from intimal smooth muscle cell hyperplasia. The underlying cause of the intimal smooth muscle cell hyperplasia is vascular smooth muscle injury and disruption of the integrity of the endothelial lining. The overall disease process can be termed a hyperproliferative vascular disease because of the etiology of the disease process. Intimal thickening following arterial injury can be divided into three sequential steps: 1) initiation of smooth muscle cell proliferation following vascular injury, 2) smooth muscle cell migration to the intima, and 3) further proliferation of smooth muscle cells in the intima with deposition of matrix. Investigations of the pathogenesis of intimal thickening have shown that, following arterial injury, platelets, endothelial cells, macrophages and smooth muscle cells release paracrine and autocrine growth factors (such as platelet derived growth factor, epidermal growth factor, insulin-like growth factor, and transforming growth factor) and cytokines that result in the smooth muscle cell proliferation and migration. T-cells and macrophages also migrate into the neointima. Hansdenschild, C., Lab. Invest, 41:407 (1979); Clowes, A., Circ. Res. 56:139 (1985); Clowes, A., J, Cardiovas. Pharm. 14 (Suppl. 6): S12 (1989); Manderson, J., Arterio, 9:289 (1989); Forrester, J., J. Am. Coll. Cardiol. 17:758 (1991)]. This cascade of events is not limited to arterial injury, but also occurs following injury to veins and arterioles.

Vascular injury causing intimal thickening can be broadly categorized as being either biologically or mechanically induced. Atherosclerosis is one of the most commonly occurring forms of biologically mediated vascular injury leading to stenosis. The migration and proliferation of vascular smooth muscle plays a crucial role in the pathogenesis of artherosclerosis. Artherosclerotic lesions include massive accumulation of lipid laden "foam cells" derived from monocyte/macrophage and smooth muscle cells. Formation of "foam cell" regions is associated with a breach of endothelial integrity and basal lamina destruction. Triggered by these events, restenosis is produced by a rapid and selective proliferation of vascular smooth muscle cells with increased new basal lamina (extracellular matrix) formation and results in eventual blocking of arterial pathways. [Davies, P. F., Artherosclerosis Lab. Invest. 55:5 (1986)].

Mechanical injuries leading to intimal thickening result following balloon angioplasty, vascular surgery, transplantation surgery, and other similar invasive processes that disrupt vascular integrity. Intimal thickening following balloon catheter injury has been studied in animals as a model for arterial restenosis that occurs in human patients following balloon angioplasty. Clowes, Ferns, Reidy and others

2

have shown that deendothelization with an intraarterial catheter that dilates an artery injures the innermost layers of medial muscle and may even kill some of the innermost cells. [Schwartz, S. M., Human Pathology 18:240 (1987); Fingerle, J., Aterisclerosis 10:1082 (1990)]. Injury is followed by a proliferation of the medial smooth muscle cells, after which many of them migrate into the intima through fenestrae in the internal elastic lamina and proliferate to form a neointimal lesion.

Vascular stenosis can be detected and evaluated using angiographic or sonographic imaging techniques [Evans, R. G., JAMA 265:2382 (1991)] and is often treated by percutaneous transluminal coronary angioplasty (balloon catheterization). Within a few months following angioplasty, however, the blood flow is reduced in approximately 30–40 percent of these patients as a result of restenosis caused by a response to mechanical vascular injury suffered during the angioplasty procedure, as described above. [Pepine, C., Circulation 81:1753 (1990); Hardoff, R., J. Am. Coll. Cardiol. 15 1486 (1990)].

In an attempt to prevent restenosis or reduce intimal smooth muscle cell proliferation following angioplasty, numerous pharmaceutical agents have been employed clinically, concurrent with or following angioplasty. Most pharmaceutical agents employed in an attempt to prevent or reduce the extent of restenosis have been unsuccessful. The following list identifies several of the agents for which favorable clinical results have been reported: lovastatin [Sahni, R., Circulation 80 (Suppl.) 65 (1989); Gellman, J., J. Am. Coll. Cardiol. 17:251 (1991)]; thromboxane A$_2$ synthetase inhibitors such as DP-1904 [Yabe, Y., Circulation 80 (Suppl.) 260 (1989)]; eicosapentanoic acid [Nye, E., Aust. N.Z. J. Med. 20:549 (1990)]; ciprostene (a prostacyclin analog) [Demke, D., Brit. J. Haematol 76 (Suppl.): 20 (1990); Darius, H., Eur. Heart J. 12 (Suppl.): 26 (1991)]; trapidil (a platelet derived growth factor) [Okamoto, S., Circulation 82 (Suppl.): 428 (1990)]; angiotensin converting enzyme inhibitors [Gottlich, N., J. Am. Coll. Cardiol. 17 (Suppl. A): 181A (1991)]; and low molecular weight heparin [de Vries, C., Eur. Heart J. 12 (Suppl.): 386 (1991)].

In an attempt to develop better agents for preventing or reducing smooth muscle proliferation and intimal thickening, the use of balloon catheter induced arterial injury in a variety of mammals has been developed as a standard model of vascular injury that will lead to intimal thickening and eventual vascular narrowing. [Cheven, A., Surg. Gynecol. Obstet. 171:443 (1990); Fishman, J., Lab. Invest. 32:339 (1975); Haudenschild, C., Lab. Invest. 41:407 (1979); Clowes, A. W., Lab. Invest. 49:208 (1983); Clowes, A. W., J. Cardiovas. Pharm. 14:S12 (1989); and Ferns, G. A., Science 253:1129 (1991)]. Many compounds have been evaluated in this standard animal model. The immunosuppressive agent cyclosporin A has been evaluated and has produced conflicting results. Jonasson reported that cyclosporin A caused an inhibition of the intimal proliferative lesion following arterial balloon catheterization in vivo, but did not inhibit smooth muscle cell proliferation in vitro. [Jonasson, L., Proc. Natl. Acad. Sci. 85:2303 (1988)]. Ferns, however reported that when de-endothelized rabbits were treated with cyclosporin A, no significant reduction of intimal proliferation was observed in vivo. Additionally, intimal accumulations of foamy macrophages, together with a number of vacuolated smooth muscle cells in the region adjacent to the internal elastic lamina were observed, indicating that cyclosporin A may modify and enhance lesions that form at the sites of arterial injury. [Ferns. G. A., Circulation 80 (Supp): 384 (1989); Ferns, G., Am. J. Path. 137:403 (1990)].

5,516,781

3

Rapamycin, a macrocyclic triene antibiotic produced by *Streptomyces hygroscopicus* [U.S. Pat. No. 3,929,992] has been shown to prevent the formation of humoral (IgE-like) antibodies in response to an albumin allergic challenge [Martel, R., *Can. J. Physiol. Pharm.* 55:48 (1977)], inhibit murine T-cell activation [Staruch, M., *FASEB* 3:3411 (1989)], prolong survival time of organ grafts in histincompatible rodents [Morris, R., *Med. Sci. Res.* 17:877 (1989)], and inhibit transplantation rejection in mammals [Calne, R., European Patent Application 401,747]. Rapamycin blocks calcium-dependent, calcium-independent, cytokine-independent and constitutive T and B cell division at the G1-S interface. Rapamycin inhibits gamma-interferon production induced by Il -1 and also inhibits the gamma-interferon induced expression of membrane antigen [Morris, R. E., *Transplantation Rev.* 6:39 (1992)]. The use of rapamycin in preventing coronary graft atherosclerosis (CGA) in rats has been disclosed by Meiser [*J. Heart Lung Transplant* 9:55 (1990)]. Arterial thickening following transplantation, known as CGA, is a limiting factor in graft survival that is caused by a chronic immunological response to the transplanted blood vessels by the transplant recipient's immune system. [Dec. G. *Transplantation Proc.* 23:2095 (1991) and Dunn, M. *Lancet* 339:1566 (1992)]. The disclosed invention is distinct from the use of rapamycin for preventing CGA, in that CGA does not involve injury to the recipients own blood vessels; it is a rejection type response. The disclosed invention is related to vascular injury to native blood vessels. The resulting intimal smooth muscle cell proliferation dose not involve the immune system, but is growth factor mediated. For example, arterial intimal thickening after balloon catheter injury is believed to be caused by growth factor (PGDF, bFGF, TGFb, IL-1 and others)-induced smooth muscle cell proliferation and migration. [Ip, J. H., *J. Am. Coll. Cardiol* 15:1667 (1990)]. Ferns has also shown that the immune response is not involved in arterial intimal thickening following balloon catheterization, as he found that there was no difference in intimal thickening between arteries from athymic nude rats (rats lacking T-cells) and normal rats after balloon catheterization [*Am. J. Pathol.* 138:1045 (1991)].

## DESCRIPTION OF THE INVENTION

This invention provides a method of preventing or treating hyperproliferative vascular disease in a mammal in need thereof by administering an antiproliferative effective amount of rapamycin to said mammal orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via a vascular stent impregnated with rapamycin.

As such, rapamycin is useful in treating intimal smooth muscle cell hyperplasia, restenosis, and vascular occlusion in a mammal, particularly following either biologically or mechanically mediated vascular injury, or under conditions that would predispose a mammal to suffering such a vascular injury. Biologically mediated vascular injury includes, but is not limited to injury attributed to infectious disorders including endotoxins and herpes viruses such as cytomegalovirus; metabolic disorders such as atherosclerosis; and vascular injury resulting from hypothermia, and irradiation. Mechanically mediated vascular injury includes, but is not limited to vascular injury caused by catheterization procedures or vascular scraping procedures such as percutaneous transluminal coronary angioplasty; vascular surgery; transplantation surgery; laser treatment; and other invasive procedures which disrupt the integrity of the vascular intima or endothelium. Rapamycin is also useful in preventing intimal

4

smooth muscle cell hyperplasia, restenosis, and vascular occlusion resulting from mechanically mediated injury. In particular, for the prevention of restenosis following a percutaneous transluminal coronary angioplasty procedure.

Treating includes retarding the progression, arresting the development, as well as palliation. Preventing includes inhibiting the development of and prophylacticly preventing of hyperproliferative vascular disease in a susceptible mammal.

This invention also provides a method of using a combination of rapamycin and mycophenolic acid for the same utilities described above. Mycophenolic acid, an antiproliferative antimetabolite, inhibits inosine monophosphate dehydrogenase and guanosine monophosphate synthetase, enzymes in the de novo purine biosynthetic pathway. This results in an inhibition of DNA synthesis which causes an accumulation of cells at the G 1-S interface. Other combinations containing rapamycin that are useful for preventing or treating hyperproliferative vascular disease will be apparent to one skilled in the art. These include, but are not limited to, using rapamycin in combination with other antiproliferative antimetabolites.

The effect of rapamycin on hyperproliferative vascular disease was established in an in vitro and an in vivo standard pharmacological test procedure that emulates the hyperproliferative effects observed in mammals that are undergoing intimal smooth muscle proliferation and are therefore developing restenosis. Cyclosporin A was also evaluated in these test procedures for the purpose of comparison. The combination of rapamycin and mycophenolic acid was evaluated in the in vivo test procedure. The procedures and the results obtained are described below.

Rapamycin and cyclosporin A were evaluated in an in vitro standard pharmacological test procedure which emulates the intimal smooth muscle cell proliferation observed following vascular injury. Results were obtained by measuring DNA and protein synthesis in rat smooth muscle cells that have been stimulated with a growth factor such as fetal calf serum or a hypertrophic mitogen, such as angiotensin II. The following briefly describes the procedure that was used. Rat smooth muscle cells were maintained in a 1:1 mixture of defined Eagle's medium (DEM) and Ham's F12 medium with 10% fetal calf serum, penicillin (100 U/mL), streptomycin (100 mg/mL) and 25 mL Hepes at pH 7.4. Cells were incubated at 37° C. in a humidified atmosphere of 5% $CO_2$ with media changes every 2-3 days. Each compound tested was diluted with an appropriate vehicle to obtain a 1 mM stock solution. Ethanol was used as the vehicle for rapamycin and 20% tween 80 in ethanol was the vehicle for cyclosporin A. Test concentrations of drug were obtained by diluting appropriate concentrations of stock solution with serum free media. The smooth muscle cell culture was maintained in a defined serum free media containing 1:1 DEM and Ham's F12 medium, insulin ($5 \times 10^{-7}$M), transferrin (5 $\mu$g/mL), and ascorbate (0.2 mM) for 72 hours before testing in a multi-well plate. After the 72 hour period, an appropriate quantity of stock solution containing either rapamycin or cyclosporin A was added to the smooth muscle cell culture and media mixture. After a 24 hours the appropriate growth factor was added. For the measurement of DNA synthesis, $^3$H-thymidine was added at 12 hours after the growth factor was added, and the cells were harvested at 36 hours. For the measurement of protein synthesis, $^3$H-leucine was added at 14 hours after the growth factor was added, and the cells were harvested at 18 hours. The amount of incorporated radioactive label was measured on a scintillation counter.

BSC-SJA-0630

5,516,781

| 5 | 6 |

The following table shows the results obtained for rapamycin on DNA and protein synthesis in smooth muscle cells that were stimulated with 10% fetal calf serum, as measured by incorporation of tritiated thymidine or leucine into smooth muscle cells. The amount of tritiated label incorporated by the smooth muscle cells that were treated with media only was normalized to 100%, and the results for cells treated with fetal calf serum or fetal calf serum plus the test compound are expressed as a percent comparison with the cells treated with media only.

EFFECT OF RAPAMYCIN ON DNA AND PROTEIN
SYNTHESIS IN SMOOTH CELLS STIMULATED
WITH FETAL CALF SERUM*

| | [3]H-Thymidine Incorporation (% of Media) | [3]H-Leucine Incorporation (% of Media) |
|---|---|---|
| Media | 100% | 100% |
| FCS | 495% | 174% |
| 1000 nM RAP + FCS | 136% | 95% |
| 100 nM RAP + FCS | 172% | 91% |
| 10 nM RAP + FCS | 204% | 74% |
| 1 nM RAP + FCS | 405% | 106% |

*Abbreviations:
RAP = rapamycin;
Media = defined serum free media; and
FCS = 10% fetal calf serum.

The following table shows the results obtained for rapamycin on protein synthesis in smooth muscle cells that were stimulated with $10^{-6}$ nM angiotensin II, as measured by incorporation of tritiated leucine into smooth muscle cells. The amount of tritiated label incorporated by the smooth muscle cells that were treated with media only were normalized to 100%, and the results for cells treated with angiotensin or angiotensin plus the test compound are expressed as a percent comparison with the cells treated with media only.

EFFECT OF RAPAMYCIN ON PROTEIN
SYNTHESIS IN SMOOTH CELLS STIMULATED
WITH ANGIOTENSIN II*

| | [3]H-Leucine Incorporation (% of Media) |
|---|---|
| Media | 100% |
| ANG | 159% |
| 1000 nM RAP + ANG | 53% |
| 100 nM RAP + ANG | 57% |
| 10 nM RAP + ANG | 61% |
| 1 nM RAP + ANG | 60% |

*Abbreviations:
RAP = rapamycin;
Media = defined serum free media; and
ANG = $10^{-6}$ nM angiotensin II.

The results of the standard in vitro test procedure showed that rapamycin had a pronounced antiproliferative effect in the presence of FCS and an anti-hypertrophic effect in the presence of angiotensin II. Following vascular injury, DNA and protein synthesis of smooth muscle cells are necessary for the development of restenosis to occur. These results showed that rapamycin inhibited both DNA and protein synthesis in stimulated smooth muscle cells. An antiproliferative effect was also observed with cyclosporin A; however, at 1000 nM, cyclosporin A was cytotoxic and not merely cytostatic. At 1000 nM, cyclosporin A caused lysis of the smooth muscle cells as evidenced by the presence of lactic acid dehydrogenase in the supernatant of the cell

culture. Similar toxicity to smooth muscle cells was not observed for rapamycin.

Rapamycin, rapamycin plus mycophenolic acid, and cyclosporin A were evaluated in an in vivo standard pharmacological test procedure that emulates the vascular injury suffered and restenosis that develops following percutaneous transluminal coronary angioplasty in humans. The ability of a test compound to inhibit restenosis was determined by comparing intimal thickening in mammals treated with test compound following balloon catheterization versus intimal thickening in untreated control mammals after the same test procedure. [Chevru, A., Surg. Gynecol. Obstet. 171:443 (1990); Fishman, J., Lab. Invest. 32:339 (1975); Haudenschild, C., Lab. Invest. 41:407 (1979); Clowes, A. W., Lab. Invest, 49:208 (1983); Clowes, A. W., J. Cardiovas. Pharm. 14:S12 (1989); and Ferns, G. A., Science 253:1129 (1991)]. The following briefly describes the procedure that was used. The left carotid arteries of male Sprague-Dawley rats were injured with an inflated 2 Fr balloon catheter. During a 14 day postoperative period, these rats were divided into groups and treated daily with rapamycin (1.5 mg/kg; i.p.), rapamycin plus mycophenolic acid (1.5 mg/kg; i.p.+ 40 mg/kg; p.o.), or cyclosporin A (3 mg/kg; i.p.). Treatment was administered on days 0 to 13 postoperatively. Additionally, one group each also received rapamycin (6 mg/kg/day; i.p.) or cyclosporin A (40 mg/kg/day; i.p.) for two days postoperatively, and then received no treatment for the next 12 days. An untreated group was used an injured control to establish the amount of intimal growth in the absence of treatment. The right carotid was used as an uninjured control in all groups. After the 14-day period, the rats were sacrificed, the carotids removed. The mean areas of the intima and blood vessel wall were measured by morphometry. Results are expressed as an intima percent which can be expressed according to the following formula:

$$\frac{\text{area of intima}}{\text{area of vessel}} * 100$$

The following table shows the results that were obtained.

EFFECT OF RAPAMYCIN ON INTIMAL
THICKENING IN INJURED CAROTID
ARTERIES (DAY 14)*

| Test Group | Intima Percent ± S.E. |
|---|---|
| Uninjured Control | 0.00 ± 0.00 |
| Untreated Injured Control | 33.3 ± 19.66 |
| RAP (1.5 mg/kg - 14 days) | 6.78 ± 4.69 |
| RAP (6 mg/kg - 2 days) | 16.56 ± 6.22 |
| RAP + MPA (14 days) | 1.6 ± 3.5 |
| CsA (3 mg/kg - 14 days) | 26.46 ± 27.42 |
| CsA (40 mg/kg - 2 days) | 31.14 ± 20.66 |

*Abbreviations:
RAP = rapamycin;
MPA = mycophenolic acid; and
CsA = cyclosporin A.

These results show that treatment with rapamycin (1.5 mg/kg for 14 days) resulted in an 80% decrease in the mean percentage intimal thickening compared with the untreated injured control group. Similarly, treatment with the combination of rapamycin and mycophenolic acid produced almost a complete inhibition of intimal thickening (95% reduction in intimal thickening compared with untreated injured control). Cyclosporin A failed to produce any meaningful reduction in intimal thickening.

Similar results were obtained when rapamycin was evaluated at different doses in the above in vivo standard phar-

5,516,781

7

macological test procedure that emulates the vascular injury that occurs following a percutaneous transluminal coronary angioplasty in humans. Rapamycin was administered on postoperative days 0–13, and examination by morphometry was performed on day 14. Rapamycin, at a dose of 1.5 and 3 mg/kg significantly arrested the development of restenosis as measured by the intima percent 14 days after balloon catheterization, whereas restenosis was clearly observed in the untreated injured control group. These results are summarized in the table below.

EFFECT OF RAPAMYCIN ON INTIMAL
THICKENING IN INJURED CAROTID
ARTERIES (DAY 14)

| Group | Dose | Treatment Days | Intima Percent ± S.P. |
|---|---|---|---|
| Uninjured Control | | | 0.00 ± 0.00 |
| Untreated Injured Control | | | 44.51 ± 5.03 |
| Rapamycin | 6 mg/kg | 0–13 | 30.92 ± 4.06 |
| Rapamycin | 3 mg/kg | 0–13 | 22.68 ± 6.28 |
| Rapamycin | 1.5 mg/kg | 0–13 | 21.89 ± 4.2 |

The results of the in vitro and in vivo standard test procedures demonstrate that rapamycin and rapamycin in combination with mycophenolic acid are useful in treating hyperproliferative vascular disease.

As such, rapamycin is useful in treating intimal smooth muscle cell hyperplasia, restenosis, and vascular occlusion in a mammal, particularly following either biologically or mechanically mediated vascular injury, or under conditions that would predispose a mammal to suffering such a vascular injury. Biologically mediated vascular injury includes, but is not limited to injury attributed to infections disorders including endotoxins and herpes viruses such as cytomegalovirus; metabolic disorders such as atherosclerosis; and vascular injury resulting from hypothermia, and irradiation. Mechanically mediated vascular injury includes, but is not limited to vascular injury caused by catheterization procedures or vascular scraping procedures such as percutaneous transluminal coronary angioplasty; vascular surgery; transplantation surgery; laser treatment; and other invasive procedures which disrupt the integrity of the vascular intima or endothelium.

Rapamycin and rapamycin plus mycophenolic acid were also evaluated in a modification of the in vivo test procedure described above. In the modified test procedure, treatment with rapamycin or rapamycin plus mycophenolic acid was stopped on day 14, as above, but the animals were not sacrificed immediately. Intimal thickening was observed when the animals were sacrificed on 1, 2, 4 weeks, and 44 days after treatment had been stopped. Microscopic analysis showed that endothelium regeneration had not occurred during the two week treatment period. For example, 44 days after undergoing balloon catheterization procedure of the carotid artery, untreated injured control rats had an intima percent (±S.E.) of 62.85±3.63, and rats treated with rapamycin+mycophenolic acid (1.5/40 mg/kg) on postoperative days 0–13 had an intima percent (±S.E.) of 50.39±2.58. Better results were not obtained when the same regimen was administered on days 0–30 (intima percent (±S.E.) of 53.55± 2.85). Following cessation of treatment with rapamycin or rapamycin plus mycophenolic acid intimal proliferation, that was previously suppressed, was able to occur. These results are consistent with the results shown in the table above, in which treatment for 2 days with rapamycin followed by 12 days of no treatment inhibited intimal thickening to a lesser

8

degree than treatment with rapamycin for 14 days. These results are expected, as in the absence on an integral endothelial layer, the intimal smooth muscle cells will proliferate. It has been shown that intimal smooth muscle cell growth does not have an inhibitory effect on normal endothelial regeneration, and that intimal smooth muscle cell proliferation ceases when the endothelial layer is established. [Reidy, M., Lab. Invest. 59:36 (1988); Chevru, A., Surg. Gynecol. Obstet. 171:443 (1990); Fishman, J., Lab. Invest. 32:339 (1975); Haudenschild, C., Lab. Invest 41:407 (1979)]. As such, treatment with rapamycin or rapamycin in combination with mycophenolic acid should be employed so long as the beneficial effect is seen. As the degree of restenosis can be monitored by angiographic and sonographic techniques, the dosage necessary to sustain the opened vessels can be adjusted.

To evaluate the ability of rapamycin and rapamycin plus mycophenolic acid to prevent restenosis following an angioplasty procedure, rapamycin was evaluated in the same in vivo standard pharmacological test procedure for restenosis that was described above, except that treatment with rapamycin began three days before (day-3) the angioplasty procedure was performed. The following table shows the results obtained on day 14 following balloon catheterization of the carotid artery on day 0. Results for treatment from day 3 to 13 are also provided.

EFFECT OF RAPAMYCIN ON INTIMAL THICKENING
IN INJURED CAROTID ARTERIES (DAY 14)

| Group | Dose | Treatment Days | Intima Percent ± S.P. |
|---|---|---|---|
| Uninjured Control | | | 0.00 ± 0.00 |
| Untreated Injured Control | | | 44.51 ± 5.03 |
| Rapamycin | 1.5 mg/kg | –3–13[a] | 9.85 ± 1.15 |
| Rapamycin | 1.5 mg/kg | –3–3 | 30.7 ± 6.67 |
| Rapamycin | 1.5 mg/kg | –3–0 | 37.31 ± 4.33 |
| Rapamycin | 1.5 mg/kg | 3–13 | 44.38 ± 5.49 |

[a]Treatment from three days pre-balloon catheterization to day 13 days post-catheterization.

The results in the table above show that rapamycin prevented the development of restenosis following a balloon angioplasty procedure of the carotid artery, when rapamycin was administered from three days pre-angioplasty until day 13. Treatment from day minus 3 until day 3 or day 0 afforded a lesser degree of prevention, and treatment from day 3 to day 13 did not prevent restenosis.

The effect of rapamycin plus mycophenolic acid (MPA) was also evaluated in the angioplasty standard pharmacological test procedure. The table below shows the results obtained where rats underwent a balloon catheterization procedure of the carotid artery on day 0, and were sacrificed and examined morphometrically on day 44. The treatment regimen is described in the table.

EFFECT OF RAPAMYCIN + MPA ON INTIMAL
THICKENING IN INJURED CAROTID ARTERIES
(DAY 44)

| Group | Dose | Treatment Days | Intima Percent ± S.P. |
|---|---|---|---|
| Uninjured Control | | | 0.00 ± 0.00 |
| Untreated Injured Control | | | 62.85 ± 3.63 |
| Rapamycin + MPA | 40/1.5 mg/kg | 0–13 | 50.39 ± 2.58 |

BSC-SJA-0632

5,516,781

| 9 | 10 |

-continued

EFFECT OF RAPAMYCIN + MPA ON INTIMAL
THICKENING IN INJURED CAROTID ARTERIES
(DAY 44)

| Group | Dose | Treatment Days | Intima Percent ± S.E. |
|---|---|---|---|
| Rapamycin + MPA | 40/1.5 mg/kg | 0–39 | 53.55 ± 2.85 |
| Rapamycin + MPA | 40/1.5 mg/kg | –3–13 | 18.76 ± 10.6 |

These results show that treatment with rapamycin and mycophenolic acid from day minus 3 to day 13 did effectively prevent restenosis at day 44, whereas the regimens which did not include drug administration before the angioplasty procedure did not effectively prevent restenosis at day 44.

Similar results were obtained when rat thoracic aortas were subjected to a balloon catheterization procedure, as described above, on day 0. The rats were either sacrificed and examined on day 14 or on day 44. The results obtained with rapamycin and rapamycin plus mycophenolic acid (MPA) are shown in the table below.

EFFECT OF RAPAMYCIN OR RAPAMYCIN + MPA
ON INTIMAL THICKENING IN INJURED
THORACIC AORTAS

| Group | Dose | Treatment Days | Intima Percent ± S.E. |
|---|---|---|---|
| | Day 14 results | | |
| Uninjured Control | | | 0.00 ± 0.00 |
| Untreated Injured Control | | | 15.52 ± 2.99 |
| Rapamycin + MPA | 40/1.5 mg/kg | –3–13 | 0.00 ± 0.00 |
| | Day 44 Results | | |
| Uninjured Control | | | 0.00 ± 0.00 |
| Untreated Injured Control | | | 28.76 ± 6.52 |
| Rapamycin | 1.5 mg/kg | –3–13 | 0.00 ± 0.00 |
| Rapamycin + MPA | 40/1.5 mg/kg | –3–13 | 8.76 ± 3.34 |

The results in the table above show that treatment with rapamycin from 3 days preoperatively until 13 days postoperatively completely prevented the development of restenosis 44 days after a balloon catheterization of the thoracic aorta. Using the same treatment regimen, rapamycin plus mycophenolic acid completely prevented restenosis 14 days after balloon catheterization and significantly prevented restenosis 44 days following balloon catheterization.

Similarly, day minus 3 to day 13 treatment with rapamycin plus mycophenolic acid completely prevented restenosis 14 days after balloon catheterization of the abdominal aortas in rats. These results are shown in the table below.

EFFECT OF RAPAMYCIN + MPA ON INTIMAL
THICKENING IN INJURED ABDOMINAL AORTAS
(DAY 14)

| Group | Dose | Treatment Days | Intima Percent ± S.E. |
|---|---|---|---|
| Uninjured Control | | | 0.00 ± 0.00 |
| Untreated Injured Control | | | 10.17 ± 2.42 |
| Rapamycin + MPA | 40/1.5 mg/kg | –3–13 | 0.00 ± 0.00 |

The results in the tables above show that rapamycin, alone or in combination with mycophenolic acid, is useful in preventing restenosis following invasive procedures that disrupt the vascular endothelial lining, such as percutaneous transluminal coronary angioplasty, vascular catheterization, vascular scraping, vascular surgery, or laser treatment procedures. These data also show that the administration of rapamycin, alone or in combination with mycophenolic acid, from 3 days pre-catheterization to 13 days post-catheterization, allowed the endothelium to heal, while preventing intimal smooth muscle cell proliferation. That intimal proliferation did not occur 31 days after administration with rapamycin, alone or in combination with mycophenolic acid, had been stopped, demonstrates that the endothelial layer had regenerated, as intimal proliferation stops after the reestablishment of the endothelial layer. The reestablishment of an intact endothelial layer was confirmed by microscopic examination of the previously catheterized arteries after removal at 44 days.

From the data above, it is particularly preferred that treatment begin with rapamycin or rapamycin plus mycophenolic acid before the procedure is performed, and that treatment should continue after the procedure has been performed. The length of treatment necessary to prevent restenosis will vary from patient to patient. For percutaneous transluminal angioplasty procedures, it is preferred that treatment be administered from 3 or more days before the procedure and continuing for 8 or more days after the procedure. It is more preferred that administration will be for 3 or more days before the angioplasty procedure and continuing for 13 or more days after the procedure. The same administration protocol is applicable when rapamycin, alone or in combination with mycophenolic acid, is used to prevent restenosis following vascular catheterization, vascular scraping, vascular surgery, or laser treatment procedures.

When rapamycin is employed alone or in combination with mycophenolic acid in the prevention or treatment of hyperproliferative vascular diseases, it can be formulated neat or with a pharmaceutical carrier to a mammal in need thereof. The pharmaceutical carrier may be solid or liquid.

A solid carrier can include one or more substances which may also act as flavoring agents, lubricants, solubilizers, suspending agents, fillers, glidants, compression aids, binders or tablet-disintegrating agents; it can also be an encapsulating material. In powders, the carrier is a finely divided solid which is in admixture with the finely divided active ingredient. In tablets, the active ingredient is mixed with a carrier having the necessary compression properties in suitable proportions and compacted in the shape and size desired. The powders and tablets preferably contain up to 99% of the active ingredient. Suitable solid carriers include, for example, calcium phosphate, magnesium stearate, talc, sugars, lactose, dextrin, starch, gelatin, cellulose, methyl cellulose, sodium carboxymethyl cellulose, polyvinylpyrrolidine, low melting waxes and ion exchange resins.

Liquid carriers are used in preparing solutions, suspensions, emulsions, syrups, elixirs and pressurized compositions. The active ingredient can be dissolved or suspended in a pharmaceutically acceptable liquid carrier such as water, an organic solvent, a mixture of both or pharmaceutically acceptable oils or fats. The liquid carrier can contain other suitable pharmaceutical additives such as solubilizers, emulsifiers, buffers, preservatives, sweeteners, flavoring agents, suspending agents, thickening agents, colors, viscosity regulators, stabilizers or osmo-regulators. Suitable examples of liquid carriers for oral and parenteral administration include water (partially containing additives as above, e.g. cellulose derivatives, preferably sodium carboxymethyl cellulose

BSC-SJA-0633

5,516,781

11

solution), alcohols (including monohydric alcohols and polyhydric alcohols, e.g. glycols) and their derivatives, and oils (e.g. fractionated coconut oil and arachis oil). For parenteral administration, the carrier can also be an oily ester such as ethyl oleate and isopropyl myristate. Sterile liquid carriers are useful in sterile liquid form compositions for parenteral administration. The liquid carrier for pressurized compositions can be halogenated hydrocarbon or other pharmaceutically acceptable propellant.

Liquid pharmaceutical compositions which are sterile solutions or suspensions can be utilized by, for example, intramuscular, intraperitoneal or subcutaneous injection. Sterile solutions can also be administered intravenously. The compound can also be administered orally either in liquid or solid composition form.

Rapamycin, alone or in combination with mycophenolic acid, may be administered rectally in the form of a conventional suppository. For administration by intranasal or intrabronchial inhalation or insufflation, the compounds of this invention may be formulated into an aqueous or partially aqueous solution, which can then be utilized in the form of an aerosol. Rapamycin, alone or in combination with mycophenolic acid, may also be administered transdermally through the use of a transdermal patch containing the active compound and a carrier that is inert to the active compound, is non toxic to the skin, and allows delivery of the agent for systemic absorption into the blood stream via the skin. The carrier may take any number of forms such as creams and ointments, pastes, gels, and occlusive devices. The creams and ointments may be viscous liquid or semisolid emulsions of either the oil-in-water or water-in-oil type. Pastes comprised of absorptive powders dispersed in petroleum or hydrophilic petroleum containing the active ingredient may also be suitable. A variety of occlusive devices may be used to release the active ingredient into the blood stream such as a semipermeable membrane covering a reservoir containing the active ingredient with or without a carrier, or a matrix containing the active ingredient. Other occlusive devices are known in the literature.

Rapamycin, alone or in combination with mycophenolic acid can be administered intravascularly or via a vascular stent impregnated with rapamycin, alone or in combination with mycophenolic acid, during balloon catheterization to provide localized effects immediately following injury.

Rapamycin, alone or in combination with mycophenolic acid, may be administered topically as a solution, cream, or lotion by formulation with pharmaceutically acceptable vehicles containing 0.1–5 percent, preferably 2%, of active compound.

The dosage requirements vary with the particular compositions employed, the route of administration, the severity of the symptoms presented and the particular subject being treated. Based on the results obtained in the standard pharmacological test procedures, projected daily intravenous dosages of rapamycin, when administered as the sole active compound or in combination with mycophenolic acid,

12

would be 0.001–25 mg/kg, preferably between 0.005–10 mg/kg, and more preferably between 0.01–5 mg/kg. Projected daily oral dosages of rapamycin, when administered as the sole active compound or in combination with mycophenolic acid, would be 0.005–50 mg/kg, preferably between 0.01–25 mg/kg, and more preferably between 0.05–10 mg/kg. Projected daily intravenous dosages of mycophenolic acid, when used in combination with rapamycin, would be 0.5–75 mg/kg and preferably between 5–50 mg/kg. Projected daily oral dosages of mycophenolic acid, when used in combination with rapamycin, would be 1–75 mg/kg and preferably between 10–50 mg/kg.

Treatment will generally be initiated with small dosages less than the optimum dose of the compound. Thereafter the dosage is increased until the optimum effect under the circumstances is reached; precise dosages for oral, parenteral, intravascular, intranasal, intrabronchial, transdermal, or rectal administration will be determined by the administering physician based on experience with the individual subject treated. In general, rapamycin is most desirably administered at a concentration that will generally afford effective results without causing any harmful or deleterious side effects, and can be administered either as a single unit dose, or if desired, the dosage may be divided into convenient subunits administered at suitable times throughout the day.

What is claimed is:

1. A method of treating restenosis in a mammal resulting from said mammal undergoing a percutaneous transluminal coronary angioplasty procedure which comprises administering an antirestenosis effective amount of rapamycin to said mammal orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via a vascular stent impregnated with rapamycin.

2. A method of preventing restenosis in a mammal resulting from said mammal undergoing a percutaneous transluminal coronary angioplasty procedure which comprises administering an antirestenosis effective amount of rapamycin to said mammal orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via a vascular stent impregnated with rapamycin.

3. The method according to claim 2, wherein the administration of rapamycin is initiated before the mammal undergoes the percutaneous transluminal coronary angioplasty procedure.

4. The method according to claim 3, wherein the rapamycin is administered for 3 or more days before the mammal undergoes the percutaneous transluminal coronary angioplasty procedure and said administration continues for 8 or more days following the percutaneous transluminal coronary angioplasty procedure.

5. The method according to claim 4, wherein the rapamycin is administered for 13 or more days following the percutaneous transluminal coronary angioplasty procedure.

* * * * *

# EXHIBIT 14

US005508286A

# United States Patent [19]

## Skotnicki et al.

[11]    **Patent Number:**    **5,508,286**

[45]    **Date of Patent:**    **Apr. 16, 1996**

[54]    **RAPAMYCIN AMIDINO CARBAMATES**

[75]    Inventors:    **Jerauld S. Skotnicki**, Allentown, N.J.;
                     **Yvette L. Palmer**, Newtown, Pa.

[73]    Assignee:    **American Home Products Corporation**, Madison, N.J.

[21]    Appl. No.: **450,771**

[22]    Filed:    **May 24, 1995**

### Related U.S. Application Data

[62]    Division of Ser. No. 259,763, Jun. 14, 1994, Pat. No. 5,463,048.

[51]    Int. Cl.⁶ .................... A61K 31/395; C07D 498/16
[52]    U.S. Cl. ................................ 514/291; 540/456
[58]    Field of Search ........................ 540/456; 514/291

[56]    **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,929,992 | 12/1975 | Sehgal et al. | 540/456 |
| 3,993,749 | 11/1976 | Sehgal et al. | 540/456 |
| 4,316,885 | 2/1982 | Rakhit | 540/456 |
| 4,375,464 | 3/1983 | Sehgal et al. | 540/456 |
| 4,401,653 | 8/1983 | Eng | 540/456 |
| 4,650,803 | 3/1987 | Stella et al. | 540/456 |
| 4,885,171 | 12/1989 | Surendra et al. | 540/456 |
| 5,023,262 | 6/1991 | Caufield et al. | 540/456 |
| 5,023,263 | 6/1991 | Von Burg | 540/456 |
| 5,023,264 | 6/1991 | Caufield et al. | 540/456 |
| 5,078,999 | 1/1992 | Warner et al. | 540/456 |
| 5,080,899 | 1/1992 | Storm et al. | 540/456 |
| 5,091,389 | 2/1992 | Ondeyka et al. | 540/456 |
| 5,100,883 | 3/1992 | Schiehser | 540/456 |
| 5,100,899 | 3/1992 | Calne | 540/456 |
| 5,102,876 | 4/1992 | Caufield | 540/456 |
| 5,118,677 | 6/1992 | Caufield | 540/456 |
| 5,118,678 | 6/1992 | Kao et al. | 540/456 |
| 5,120,842 | 6/1992 | Failli et al. | 540/456 |
| 5,130,307 | 7/1992 | Failli et al. | 540/456 |
| 5,138,051 | 8/1992 | Hughes et al. | 540/456 |
| 5,151,413 | 9/1992 | Caufield et al. | 540/456 |
| 5,169,851 | 12/1992 | Hughes et al. | 540/456 |
| 5,177,203 | 1/1993 | Failli et al. | 540/456 |
| 5,194,447 | 3/1993 | Kao | 540/456 |
| 5,221,670 | 6/1993 | Caufield | 540/456 |
| 5,233,036 | 8/1993 | Hughes | 540/456 |
| 5,260,300 | 11/1993 | Hu | 540/456 |
| 5,262,423 | 11/1993 | Kao | 540/456 |
| 5,286,730 | 2/1994 | Caufield et al. | 540/456 |
| 5,286,731 | 2/1994 | Caufield et al. | 540/456 |
| 5,302,584 | 4/1994 | Kao et al. | 540/456 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 507555A1 | 7/1992 | European Pat. Off. | 540/456 |
| WO9113899 | of 0000 | WIPO | 540/456 |

#### OTHER PUBLICATIONS

Commonly owned U.S. Patent Application SN 08/259,763 filed Jun. 14, 1994.
Commonly owned U.S. Patent Application SN 08/160,984 filed Dec. 1, 1993.

Venzina, C., J. Antibiot. 28:721 (1975).
Sehgal, S. N., J. Antibiot. 28:727 (1975).
Baker, H. J., Antibiot. 31:539 (1978).
Martel, R. R., Can. J. Physiol. Pharmacol. 55:48 (1977).
Staruch, M. J., FASEB 3:3411 (1989).
Dumont, F. J., FASEB 3:5256 (1989).
Calne, R. Y., Lancet 1183 (1978).
Morris, R. E., Med. Sci. Res. 17:877 (1989).
Baeder, W. L., Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract) (1990).
Meiser, B. M., J. Heart Lung Transplant. 11 (pt. 2):197 (1992).
Stepkowski, S. M., Transplantation Proc. 23:507 (1991).

*Primary Examiner*—Robert T. Bond
*Attorney, Agent, or Firm*—Arnold S. Milowsky

[57]    **ABSTRACT**

A compound of the structure



wherein R and R¹ are each, independently, hydrogen, or

$R^2$ and $R^3$ are each, independently, hydrogen, alkyl, alkenyl, alkynyl, $-CO_2R^3$, $-COR^5$, $-CN$, $-NO_2$, $-SO_2R^5$, $-SO_3R^5$, $-OR^5$, $-SR^5$, or Ar;

$R^4$ is hydrogen, alkyl, alkenyl, alkynyl, $-CF_3$, $-NR^5R^6$, $-CO_2R^3$, $-COR^5$, $CONR^5R^6$, $-NO_2$, halogen, $-OR^5$, $-SR^5$, $-CN$, $-SO_2R^5$, $-SO_3R^5$, $-SO_2NR^5R^6$, or Ar; $R^5$ and $R^6$ are each, independently, hydrogen, alkyl, alkenyl, alkynyl, or Ar;

Ar is phenyl, naphthyl, or heteryl, wherein the foregoing may be optionally substituted; with the proviso that R and R¹ are both not hydrogen, or a pharmaceutically acceptable salt thereof which is useful as an immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agent.

**1 Claim, No Drawings**

BSC-SJA-0635

5,508,286

1

## RAPAMYCIN AMIDINO CARBAMATES

This is a division of application Ser. No. 08/259,769 filed Jun. 14, 1994, now U.S. Pat. No. 5,463,048.

### BACKGROUND OF THE INVENTION

This invention relates to amidino carbamates of rapamycin and a method for using them for inducing immunosuppression, and in the treatment of transplantation rejection, graft vs. host disease, autoimmune diseases, diseases of inflammation, adult T-cell leukemia/lymphoma, solid tumors, fungal infections, and hyperproliferative vascular disorders.

Rapamycin is a macrocyclic triene antibiotic produced by *Streptomyces hygroscopicus*, which was found to have antifungal activity, particularly against *Candida albicans*, both in vitro and in vivo [C. Vezina et al., J. Antibiot. 28, 721 (1975); S. N. Sehgal et al., J. Antibiot. 28, 727 (1975); H. A. Baker et al., J. Antibiot. 31, 539 (1978); U.S. Pat. No. 3,929,992; and U.S. Pat. No. 3,993,749].

Rapamycin alone (U.S. Pat. No. 4,885,171) or in combination with picibanil (U.S. Pat. No. 4,401,653) has been shown to have antitumor activity. R. Martel et al. [Can. J. Physiol. Pharmacol. 55, 48 (1977)] disclosed that rapamycin is effective in the experimental allergic encephalomyelitis model, a model for multiple sclerosis; in the adjuvant arthritis model, a model for rheumatoid arthritis; and effectively inhibited the formation of IgE-like antibodies.

The immunosuppressive effects of rapamycin have been disclosed in FASEB 3, 3411 (1989). Cyclosporin A and FK-506, other macrocyclic molecules, also have been shown to be effective as immunosuppressive agents, therefore useful in preventing transplant rejection [FASEB 3, 3411 (1989); FASEB 3, 5256 (1989); R. Y. Calne et al., Lancet 1183 (1978); and U.S. Pat. No. 5,100,899].

Rapamycin has also been shown to be useful in preventing or treating systemic lupus erythematosus [U.S. Pat. No. 5,078,999], pulmonary inflammation [U.S. Pat. No. 5,080,899], insulin dependent diabetes mellitus [Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract), (1990)], smooth muscle cell proliferation and intimal thickening following vascular injury [Morris, R. J. Heart Lung Transplant 11 (pt. 2): 197 (1992)], adult T-cell leukemia/lymphoma [European Patent Application 525,960 A1], and ocular inflammation [European Patent Application 532,862 A1].

Mono- and diacylated derivatives of rapamycin (esterified at the 28 and 43 positions) have been shown to be useful as antifungal agents (U.S. Pat. No. 4,316,885) and used to make water soluble aminoacyl prodrugs of rapamycin (U.S. Pat. No. 4,650,803). Recently, the numbering convention for rapamycin has been changed; therefore according to Chemical Abstracts nomenclature, the esters described above would be at the 31- and 42- positions. U.S. Pat. Nos. 5,118,678 and 5,302,584 discloses carbamates of rapamycin that are useful as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents.

### DESCRIPTION OF THE INVENTION

This invention provides derivatives of rapamycin which are useful as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents having the structure

2



wherein R and $R^1$ are each, independently, hydrogen, or



$R^2$ and $R^3$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, $-CO_2R^5$, $-COR^5$, $-CN$, $-NO_2$, $-SO_2R^5$, $-SO_3R^5$, $-OR^5$, $-SR^5$, or Ar;

$R^4$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, $-CF_3$, $-NR^5R^6$, $-CO_2R^5$, $-COR^5$, $CONR^5R^6$, $-NO_2$, halogen, $-OR^5$, $-SR^5$, $-CN$, $-SO_2R^5$, $-SO_3R^5$, $-SO_2NR^5R^6$, or Ar;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, or Ar;

Ar is phenyl, naphthyl, or hetaryl, wherein the foregoing may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, $-SO_3H$, and $-CO_2H$;

with the proviso that R and $R^1$ are both not hydrogen, or a pharmaceutically acceptable salt thereof.

The pharmaceutically acceptable salts are those derived from such inorganic cations as sodium, potassium, and the like; organic bases such as: mono-, di-, and trialkyl amines of 1–6 carbon atoms, per alkyl group and mono-, di-, and trihydroxyalkyl amines of 1–6 carbon atoms per alkyl group, and the like; and organic and inorganic acids as: acetic, lactic, citric, tartaric, succinic, maleic, malonic, gluconic, hydrochloric, hydrobromic, phosphoric, nitric, sulfuric, methanesulfonic, and similarly known acceptable acids.

The terms alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, and alkynyl of 2–7 carbon atoms, include both straight chain as well as branched carbon chains. When any of the generic terms (i.e., $R^5$) are contained more than once in a given compound, each may be the same or different.

Hetaryl is defined as an unsaturated or partially saturated heterocyclic radical of 5–12 atoms having 1 ring or 2 fused

BSC-SJA-0636

5,508,286

3

rings. Preferred heterocyclic radicals include unsaturated heterocyclic radicals such as furanyl, thiophenyl, pyrrolyl, pyrazolyl, imidazolyl, 1,2,3-triazolyl, 1,2,4-triazolyl, 1,2-dithiolyl, 1,3-dithiolyl, 1,2,3-oxathiolyl, isoxazolyl, oxazolyl, thiazolyl, isothiazolyl, 1,2,3-oxadiazolyl, 1,2,5-oxadiazolyl, 1,3,4-oxadiazolyl, 1,2,3,4-oxatriazolyl, 1,2,3,5-oxatriazolyl, 1,2,3-dioxazolyl, 1,2,4-dioxazolyl, 1,3,2-dioxazolyl, 1,3,4-dioxazolyl, 1,2,5-oxathiazolyl, 1,3-oxathiolyl, 1,2-pyranyl, 1,4-pyranyl, pyridinyl, pyridazinyl, pyrimidinyl, pyrazinyl, 1,3,5-triazinyl, 1,2,4-triazinyl, 1,2,3-triazinyl, 1,2,4-oxazinyl, 1,3,2-oxazinyl, 1,2,6-oxazinyl, 1,4-oxazinyl, isoxazinyl, 1,2,5-oxathiazinyl, 1,4-oxazinyl, o-isoxazinyl, p-isoxazinyl, 1,2,5-oxathiazinyl, 1,2,6-oxathiazinyl, 1,3,5,2-oxadiazinyl, azepinyl, oxepinyl, thiepinyl, 1,2,4-diazepinyl, benzofuranyl, isobenzofuranyl, thionaphthenyl, indolyl, indolenyl, 2-isobenzazolyl, 1,5-pyrindinyl, pyrano[3,4-b]pyrrolyl, benzpyrazolyl, benzisoxazolyl, benzoxazolyl, anthranilyl, 1,2-benzopyranyl, quinolinyl, isoquinolinyl, cinnolinyl, quinazolinyl, naphthyridinyl, pyrido[3,4-b]pyridinyl, pyrido[4,3-b]pyridinyl, pyrido[2,3-b]pyridinyl, 1,3,2-benzoxazinyl, 1,4,2-benzoxazinyl, 2,3,1-benzoxazinyl, 3,1,4-benzoxazinyl, 1,2-benzisoxazinyl, 1,4-benzisoxazinyl, carbazolyl, purinyl, and partially saturated heterocyclic radicals selected from the list above. All of the preferred heterocyclic radicals contain at least one double bond. When the heterocyclic radical is partially saturated, one or more of the olefins in the unsaturated ring system is saturated; the partially saturated heterocyclic radical still contains at least one double bond. It is more preferred that hetaryl is pyridinyl.

Of the compounds of this invention preferred members are those in which $R^1$ is hydrogen.

Compounds of this invention having the amidino carbamate moiety at the 42- or 31,42-positions can be prepared by conversion of rapamycin to the 4-nitrophenylcarbonate (as illustrated in Example 1), followed by reaction with an appropriately functionalized amidine. Mixtures of 42- and 31,42-carbamates can be separated by chromatography.

The 31-amidino carbamates of this invention can be prepared by protecting the 42-alcohol of rapamycin with a protecting group, such as with a tert-butyl dimethylsilyl group, followed by carbamylation at the 31-position by the procedures described above. The preparation of rapamycin 42-silyl ethers is described in U.S. Pat. No. B1 5,120,842, which is hereby incorporated by reference. Removal of the protecting group provides the 31-esterified compounds. In the case of the tert-butyl dimethylsilyl protecting group, deprotection can be accomplished under mildly acidic conditions, such as acetic acid/water/THF. The deprotection procedure is described in Example 15 of U.S. Pat. No. 5,118,678, which is hereby incorporated by reference.

Having the 31-position carbamylated and the 42-position deprotected, the 42-position can be carbamylated using a different amidine agent that was reacted with the 31-carbonate, to give compounds having different amidino carbamates at the 31- and 42- positions. Alternatively, the 42-carbamylated compounds, prepared as described above, can be converted to the 31-carbonate-42-carbamate and reacted with a different amidine to provide compounds having different carbamates at the 31- and 42-positions.

This invention also covers analogous carbamates of other rapamycins such as, but not limited to, 29-demethoxyrapamycin, [U.S. Pat. No. 4,375,464, 32-demethoxyrapamycin under C.A. nomenclature]; rapamycin derivatives in which the double bonds in the 1-, 3-, and/or 5-positions have been reduced [U.S. Pat. No. 5,023,262]; 29-desmethylrapamycin [U.S. Pat. No. 5,093,339, 32-desmethylrapamycin under

4

C.A. nomenclature]; 7,29-bisdesmethylrapamycin [U.S. Pat. No. 5,093,338, 7,32-desmethylrapamycin under C.A. nomenclature]; and 15-hydroxyrapamycin [U.S. Pat. No. 5,102,876]. The disclosures in the above cited U.S. Patents are hereby incorporated by reference.

Immunosuppressive activity for representative compounds of this invention was evaluated in an in vitro standard pharmacological test procedure to measure the inhibition of lymphocyte proliferation (LAF) and in two in vivo standard pharmacological test procedures. The pinch skin graft test procedure measures the immunosuppressive activity of the compound tested as well as the ability of the compound tested to inhibit or treat transplant rejection. The adjuvant arthritis standard pharmacological test procedure, which measures the ability of the compound tested to inhibit immune mediated inflammation. The adjuvant arthritis test procedure is a standard pharmacological test procedure for rheumatoid arthritis. The procedures for these standard pharmacological test procedures are provided below.

The comitogen-induced thymocyte proliferation procedure (LAF) was used as an in vitro measure of the immunosuppressive effects of representative compounds. Briefly, cells from the thymus of normal BALB/c mice are cultured for 72 hours with PHA and IL-1 and pulsed with tritiated thymidine during the last six hours. Cells are cultured with and without various concentrations of rapamycin, cyclosporin A, or test compound. Cells are harvested and incorporated radioactivity is determined. Inhibition of lymphoproliferation is assessed as percent change in counts per minute from non-drug treated controls. For each compound evaluated, rapamycin was also evaluated for the purpose of comparison. An $IC_{50}$ was obtained for each test compound as well as for rapamycin. When evaluated as a comparator for the representative compounds of this invention, rapamycin had an $IC_{50}$ ranging from 0.4–1.0 nM. The results obtained are provided as an $IC_{50}$ and as the percent inhibition of T-cell proliferation at 0.1 μM. The results obtained for the representative compounds of this invention were also expressed as a ratio compared with rapamycin. A positive ratio indicates immunosuppressive activity. A ratio of greater than 1 indicates that the test compound inhibited thymocyte proliferation to a greater extent than rapamycin. Calculation of the ratio is shown below.

$$\frac{IC_{50} \text{ of Rapamycin}}{IC_{50} \text{ of Test Compound}}$$

Representative compounds of this invention were also evaluated in an in vivo test procedure designed to determine the survival time of pinch skin graft from male BALB/c donors transplanted to male C3H(H-2K) recipients. The method is adapted from Billingham R. E. and Medawar P. B., J. Exp. Biol. 28:385–402, (1951). Briefly, a pinch skin graft from the donor was grafted on the dorsum of the recipient as a allograft, and an isograft was used as control in the same region. The recipients were treated with either varying concentrations of test compounds intraperitoneally or orally. Rapamycin was used as a test control. Untreated recipients serve as rejection control. The graft was monitored daily and observations were recorded until the graft became dry and formed a blackened scab. This was considered as the rejection day. The mean graft survival time (number of days ±S.D.) of the drug treatment group was compared with the control group. The following table shows the results that were obtained. Results are expressed as the mean survival time in days. Untreated (control) pinch skin grafts are usually rejected within 6–7 days. Compounds were tested using a dose of 4 mg/kg.

BSC-SJA-0637

5,508,286

5

The adjuvant arthritis standard pharmacological test procedure measures the ability of test compounds to prevent immune mediated inflammation and inhibit or treat rheumatoid arthritis. The following briefly describes the test procedure used. A group of rats (male inbred Wistar Lewis rats) are pre-treated with the compound to be tested (1 h prior to antigen) and then injected with Freud's Complete Adjuvant (FCA) in the right hind paw to induce arthritis. The rats are then orally dosed on a Monday, Wednesday, Friday schedule from day 0–14 for a total of 7 doses. Both hind paws are measured on days 16, 23, and 30. The difference in paw volume (mL) from day 16 to day 0 is determined and a percent change from control is obtained. The left hind paw (uninjected paw) inflammation is caused by T-cell mediated inflammation and is recorded in the above table (% change from control). The right hind paw inflammation, on the other hand, is caused by nonspecific inflammation. Compounds were tested at a dose of 5 mg/kg. The results are expressed as the percent change in the uninjected paw at day 16 versus control; the more negative the percent change, the more potent the compound. Rapamycin provided −90% change versus control, indicating that rapamycin treated rats had 90% less immune induced inflammation than control rats.

The results obtained in these standard pharmacological test procedures are provided following the procedure for making the specific compounds that were tested.

The results of these standard pharmacological test procedures demonstrate immunosuppressive activity both in vitro and in vivo for the compounds of this invention. The results obtained in the LAF test procedure indicates suppression of T-cell proliferation, thereby demonstrating the immunosuppressive activity of the compounds of this invention. Further demonstration of the utility of the compounds of this invention as immunosuppressive agents was shown by the results obtained in the skin graft and adjuvant arthritis standard pharmacological test procedures. Additionally, the results obtained in the skin graft test procedure further demonstrates the ability of the compounds of this invention to treat or inhibit transplantation rejection. The results obtained in the adjuvant arthritis standard pharmacological test procedure further demonstrate the ability of the compounds of this invention to treat or inhibit rheumatoid arthritis.

Based on the results of these standard pharmacological test procedures, the compounds are useful in the treatment or inhibition of transplantation rejection such as kidney, heart, liver, lung, bone marrow, pancreas (islet cells), cornea, small bowel, and skin allografts, and heart valve xenografts; in the treatment or inhibition of graft vs. host disease; in the treatment or inhibition of autoimmune diseases such as lupus, rheumatoid arthritis, diabetes mellitus, myasthenia gravis, and multiple sclerosis; and diseases of inflammation such as psoriasis, dermatitis, eczema, seborrhea, inflammatory bowel disease, pulmonary inflammation (including asthma, chronic obstructive pulmonary disease, emphysema, acute respiratory distress syndrome, bronchitis, and the like), and eye uveitis.

Because of the activity profile obtained, the compounds of this invention also are considered to have antitumor, antifungal activities, and antiproliferative activities. The compounds of this invention therefore also useful in treating solid tumors, adult T-cell leukemia/lymphoma, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. When used for restenosis, it is preferred that the compounds of this invention are used to treat restenosis that occurs following an angioplasty procedure. When used for this purpose, the compounds of this invention can be administered prior to the procedure, during

6

the procedure, subsequent to the procedure, or any combination of the above.

When administered for the treatment or inhibition of the above disease states, the compounds of this invention can be administered in a mammal orally, parenterally, intranasally, intrabronchially, transdermally, topically, intravaginally, or rectally.

It is contemplated that when the compounds of this invention are used as an immunosuppressive or antiinflammatory agent, they can be administered in conjunction with one or more other immunoregulatory agents. Such other immunoregulatory agents include, but are not limited to azathioprine, corticosteroids, such as prednisone and methylprednisolone, cyclophosphamide, rapamycin, cyclosporin A, FK-506, OKT-3, and ATG. By combining the compounds of this invention with such other drugs or agents for inducing immunosuppression or treating inflammatory conditions, the lesser amounts of each of the agents are required to achieve the desired effect. The basis for such combination therapy was established by Stepkowski whose results showed that the use of a combination of rapamycin and cyclosporin A at subtherapeutic doses significantly prolonged heart allograft survival time. [Transplantation Proc. 23: 507 (1991)].

The compounds of this invention can be formulated neat or with a pharmaceutical carrier to a mammal in need thereof. The pharmaceutical carrier may be solid or liquid. When formulated orally, it has been found that 0.01% Tween 80 in PHOSAL PG-50 (phospholipid concentrate with 1,2-propylene glycol, A. Nattermann & Cie. GmbH) provides an acceptable oral formulation.

A solid carrier can include one or more substances which may also act as flavoring agents, lubricants, solubilizers, suspending agents, fillers, glidants, compression aids, binders or tablet-disintegrating agents; it can also be an encapsulating material. In powders, the carrier is a finely divided solid which is in admixture with the finely divided active ingredient. In tablets, the active ingredient is mixed with a carrier having the necessary compression properties in suitable proportions and compacted in the shape and size desired. The powders and tablets preferably contain up to 99% of the active ingredient. Suitable solid carriers include, for example, calcium phosphate, magnesium stearate, talc, sugars, lactose, dextrin, starch, gelatin, cellulose, methyl cellulose, sodium carboxymethyl cellulose, polyvinylpyrrolidine, low melting waxes and ion exchange resins.

Liquid carriers are used in preparing solutions, suspensions, emulsions, syrups, elixirs and pressurized compositions. The active ingredient can be dissolved or suspended in a pharmaceutically acceptable liquid carrier such as water, an organic solvent, a mixture of both or pharmaceutically acceptable oils or fats. The liquid carrier can contain other suitable pharmaceutical additives such as solubilizers, emulsifiers, buffers, preservatives, sweeteners, flavoring agents, suspending agents, thickening agents, colors, viscosity regulators, stabilizers or osmo-regulators. Suitable examples of liquid carriers for oral and parenteral administration include water (partially containing additives as above, e.g. cellulose derivatives, preferably sodium carboxymethyl cellulose solution), alcohols (including monohydric alcohols and polyhydric alcohols, e.g. glycols) and their derivatives, lecithins, and oils (e.g. fractionated coconut oil and arachis oil). For parenteral administration, the carrier can also be an oily ester such as ethyl oleate and isopropyl myristate. Sterile liquid carriers are useful in sterile liquid form compositions for parenteral administration. The liquid carrier for pressurized compositions can be halogenated hydrocarbon or other pharmaceutically acceptable propellant.

BSC-SJA-0638

5,508,286

<table>
<tr><td>7</td><td>8</td></tr>
</table>

Liquid pharmaceutical compositions which are sterile solutions or suspensions can be utilized by, for example, intramuscular, intraperitoneal or subcutaneous injection. Sterile solutions can also be administered intravenously. The compound can also be administered orally either in liquid or solid composition form.

The compounds of this invention may be administered rectally in the form of a conventional suppository. For administration by intranasal or intrabronchial inhalation or insufflation, the compounds of this invention may be formulated into an aqueous or partially aqueous solution, which can then be utilized in the form of an aerosol. The compounds of this invention may also be administered transdermally through the use of a transdermal patch containing the active compound and a carrier that is inert to the active compound, is non toxic to the skin, and allows delivery of the agent for systemic absorption into the blood stream via the skin. The carrier may take any number of forms such as creams and ointments, pastes, gels, and occlusive devices. The creams and ointments may be viscous liquid or semi-solid emulsions of either the oil-in-water or water-in-oil type. Pastes comprised of absorptive powders dispersed in petroleum or hydrophilic petroleum containing the active ingredient may also be suitable. A variety of occlusive devices may be used to release the active ingredient into the blood stream such as a semipermeable membrane covering a reservoir containing the active ingredient with or without a carrier, or a matrix containing the active ingredient. Other occlusive devices are known in the literature.

In addition, the compounds of this invention may be employed as a solution, cream, or lotion by formulation with pharmaceutically acceptable vehicles containing 0.1–5 percent, preferably 2%, of active compound which may be administered to a fungally affected area.

The dosage requirements vary with the particular compositions employed, the route of administration, the severity of the symptoms presented and the particular subject being treated. Based on the results obtained in the standard pharmacological test procedures, projected daily dosages of active compound would be 0.1 μg/kg–100 mg/kg, preferably between 0.001–25 mg/kg, and more preferably between 0.01–5 mg/kg. Treatment will generally be initiated with small dosages less than the optimum dose of the compound. Thereafter the dosage is increased until the optimum effect under the circumstances is reached; precise dosages for oral, parenteral, nasal, or intrabronchial administration will be determined by the administering physician based on experience with the individual subject treated. Preferably, the pharmaceutical composition is in unit dosage form, e.g. as tablets or capsules. In such form, the composition is subdivided in unit dose containing appropriate quantities of the active ingredient; the unit dosage forms can be packaged compositions, for example, packeted powders, vials, ampoules, prefilled syringes or sachets containing liquids. The unit dosage form can be, for example, a capsule or tablet itself, or it can be the appropriate number of any such compositions in package form.

The following examples illustrate the preparation and biological activities of representative compounds of this invention.

EXAMPLE 1

42-O-(4-Nitro-phenoxycarbonyl)rapamycin

To a solution of 5.15 g (5.633 mmol) of rapamycin in 40 ml of methylene chloride cooled to -78° C. with dry ice/acetone bath, was added 0.7 ml dry pyridine and 1.70 g

(8.450 mmol) of p-nitrophenylchloroformate dissolved in 10 ml methylene chloride. The reaction mixture was allowed to warm to ambient and stirred overnight under nitrogen. The reaction mixture was concentrated in vacuo and partitioned between ether and water. The organic phase was washed with 0.1N HCl (3X), then with a saturated sodium chloride solution (2X), dried over magnesium sulfate, filtered and concentrated under vacuum to give a pale yellow solid. Purification by flash column chromatography (elution with 40% then 50% ethyl acetate/hexanes) gave 5.41 g (88%) of the title compound as a pale yellow solid.

[1]H NMR (DMSO) δ 8.3 and 7.5 (d and d, aromatic-II, 4H), 4.5 (m, 42C-H, 1H).

MS (–) FAB m/z: 1078 (M⁻), 590 (Southern Fragment).

EXAMPLE 2

Rapamycin 42-ester with
(imino-phenyl-methyl)carbamic acid

To a solution of 1.0024 g (0.9287 mmol) of 42-O-(4-Nitrophenoxycarbonyl)rapamycin in 5 ml of DMF was added 0.2231 g (1.8574 mmol) of benzamidine. The reaction mixture was allowed to stir under nitrogen for 2 hours at ambient temperature, then was diluted with ethyl acetate and washed with portions of H₂O and brine. The organic phase was dried over magnesium sulfate, filtered and concentrated under vacuum to yield crude product. Purification by flash column chromatography (elution with 60% then 80% ethyl acetate/hexanes) gave 0.1032 g (10%) of the title compound as a pale yellow solid.

[1]H NMR (DMSO) δ 9.05 (m, N-H, 2H), 7.98–7.48 (m, aromatic-H, 5H), 4.48 (m, 42C-H, 1H).

MS (–) FAB m/z: 1059 (M⁻), 590 (Southern Fragment), 467 (Northern Fragment).

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 2.05 nM
LAF ratio: 0.47
Skin graft survival: 9.8±0.8
Percent change in adjuvant arthritis versus control: –91%

EXAMPLE 3

Rapamycin 42-ester with
(imino-pyridin-2-yl)methyl)carbamic acid

To 0.585 g (3.7 mmol) of 2-amidinopyridine hydrochloride was added one equivalent of 0.1M sodium hydroxide/methanol after which the solvent was removed in vacuo. To the solution of the free base in 20 ml of DMF was added 4.0 g (3.7 mmol) of 42-O-(4-Nitro-phenoxycarbonyl)rapamycin. The reaction mixture was allowed to stir under nitrogen for 6 hours at ambient temperature, then was diluted with ethyl acetate and washed with portions of H₂O and brine. The organic phase was dried over magnesium sulfate, filtered and concentrated under vacuum to yield crude product. Purification by flash column chromatography (elution with 1:1 ethyl acetate: hexanes, then 100% ethyl acetate) gave 0.47 g (12%) of the title compound as an off-white solid.

[1]H NMR (DMSO) δ 9.05 (m, N-H, 2H), 8.68–8.72 (m, Ar-H, 1H), 8.28–8.24 (m, Ar-H, 1H), 8.0–7.94 (m, Ar-H, 1H), 7.66–7.62 (m, Ar-H, 1H), 4.4 (m, 42C-H, 1H).

MS (–) FAB m/z: 1060 (M⁻), 590 (Southern Fragment), 468 (Northern Fragment).

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 0.60 and 0.55 nM

BSC-SJA-0639

5,508,286

**9**

LAF ratio: 1.50 and 0.78
Skin graft survival: 11.7±1.0
What is claimed is:

1. A method of treating transplantation rejection graft vs. host disease in a mammal in need thereof, which comprises administering to said mammal an antirejection effective amount of a compound of the structure:



wherein R and $R^1$ are each, independently, hydrogen, or



$R^2$ and $R^3$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, $-CO_2R^5$, $-COR^5$, $-CN$, $-NO_2$, $-SO_2R^5$, $-SO_3R^5$, $-OR^5$, $-SR^5$, or Ar;

$R^4$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, $-CF_3$, $-NR^5R^6$, $-CO_2R^5$, $-COR^5$, $CONR^5R^6$, $-NO_2$, halogen, $-OR^5$, $-SR^5$, $-CN$, $-SO_2R^5$, $-SO_3R^5$, $-SO_2NR^5R^6$, or Ar;

**10**

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, or Ar;

Ar is phenyl, naphthyl, or hetaryl, wherein the foregoing may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, $-SO_3H$, and $-CO_2H$;

hetaryl is a heterocyclic radical selected from the group consisting of furanyl, thiophenyl, pyrrolyl, pyrazolyl, imidazolyl, 1,2,3-triazolyl, 1,2,4-triazolyl, 1,2-dithiolyl, 1,3-dithiolyl, 1,2,3-oxathiolyl, isoxazolyl, oxazolyl, thiazolyl, isothiazolyl, 1,2,3-oxadiazolyl, 1,2,5-oxadiazolyl, 1,3,4-oxadiazolyl, 1,2,3-oxatriazolyl, 1,2,3,5-oxatriazolyl, 1,2,3-dioxazolyl, 1,2,4-dioxazolyl, 1,3,2-dioxazolyl, 1,3,4-dioxazolyl, 1,2,5-oxathiazolyl, 1,3-oxathiolyl, 1,2-pyranyl, 1,4-pyranyl, pyridinyl, pyridazinyl, pyrimidinyl, pyrazinyl, 1,3,5-triazinyl, 1,2,4-triazinyl, 1,2,3-triazinyl, 1,2,4-oxazinyl, 1,3,2-oxazinyl, 1,2,6-oxazinyl, 1,4-oxazinyl, isoxazinyl, 1,2,5-oxathiazinyl, 1,4-oxazinyl, o-isoxazinyl, p-isoxazinyl, 1,2,5-oxathiazinyl, 1,2,6-oxathiazinyl, 1,3,5,2-oxadiazinyl, azepinyl, oxepinyl, thiepinyl, 1,2,4-diazepinyl, benzofuranyl, isobenzofuranyl, thionaphthenyl, indolyl, indolenyl, 2-isobenzazolyl, 1,5-pyrindinyl, pyrano[3,4-b]pyrrolyl, benzpyrazolyl, benzisoxazolyl, benzoxazolyl, anthranilyl, 1,2-benzopyranyl, quinolinyl, isoquinolinyl, cinnolinyl, quinazolinyl, naphthyridinyl, pyrido[3,4-b]pyridinyl, pyrido[4,3-b]pyridinyl, pyrido[2,3-b]pyridinyl, 1,3,2-benzoxazinyl, 1,4,2-benzoxazinyl, 2,3,1-benzoxazinyl, 3,1,4-benzoxazinyl, 1,2-benzisoxazinyl, 1,4-benzisoxazinyl, carbazolyl, and purinyl;

with the proviso that R and $R^1$ are both not hydrogen, or a pharmaceutically acceptable salt thereof.

\*    \*    \*    \*    \*

BSC-SJA-0640

# EXHIBIT 15



Europäisches Patentamt

European Patent Office

Office européen des brevets

(19)



(11)     **EP 0 970 711 A2**

(12)                        **EUROPEAN PATENT APPLICATION**

(43) Date of publication:
12.01.2000  Bulletin 2000/02

(51) Int Cl.⁷: **A61L 31/10, A61L 31/16,**
**A61L 33/16, A61L 33/14,**
**A61L 33/10**

(21) Application number: 99305134.1

(22) Date of filing: 29.06.1999

(84) Designated Contracting States:
AT BE CH CY DE DK ES FI FR GB GR IE IT LI LU
MC NL PT SE
Designated Extension States:
AL LT LV MK RO SI

(30) Priority: 30.06.1998 US 91217 P
19.04.1999 US 294164

(71) Applicant: Ethicon, Inc.
Somerville, NJ 08876 (US)

(72) Inventors:
• Hossainy, Syed F.A.
Edison, NJ 08820 (US)

• Roller, Mark B.
North Brunswick, NJ 08902 (US)
• Llanos, Gerard H.
Stewartsville, NJ 08886 (US)
• Kopia, Gregory A.
Neshanic, NJ 08853 (US)

(74) Representative: Mercer, Christopher Paul
Carpmaels & Ransford
43, Bloomsbury Square
London WC1A 2RA (GB)

(54)     Process for coating stents

(57)     A process is provided for coating stents having a first and second surface with passages there between to avoid blockage and bridging of the passages. The process comprises contacting the stent with a liquid coating solution containing a film forming biocompatible polymer under conditions suitable to allow the film forming biocompatible polymer to coat at least one surface of the stent while maintaining a fluid flow through said passages sufficient prevent the film forming biocompatible polymer from substantially blocking said passages. Also described are stents coated by this process.

EP 0 970 711 A2

Printed by Jouve, 75001 PARIS (FR)

BSC-SJA-0641

EP 0 970 711 A2

Description

Field of the Invention

5      [0001]   This application claims benefit from U.S. Provisional Application No. 60/91,217 filed June 30, 1999, which is hereby incorporated by reference herein. The invention relates generally to a process for coating surgical devices. More specifically this invention relates to an improved process for coating stents and the like.

Background of the Invention

10
       [0002]   Stents, which are generally open tubular structures, have become increasingly important in medical procedures to restore the function of body lumens. Stents are now commonly used in transluminal procedures such as angioplasty to restore an adequate blood flow to the heart. However, stents may stimulate foreign body reactions that result in thrombosis or restenosis. To avoid these complications a variety of stent coatings and compositions have been
15     proposed in the literature both to reduce the incidence of these complications or other complications and restore tissue function by itself or by delivering therapeutic compound to the lumen.
       [0003]   Stents generally are coated by simple dip or spray coating of the stent with polymer or polymer and a pharmaceutical/therapeutic agent or drug. These methods are acceptable for early stent designs that were of open construction fabricated from wires (Wiktor stent ) or from ribbons (Gianturco). Dip coating with relatively low coating weights
20     (about 4% polymer) could successfully coat such stents without any problems such as excess coating bridging (i.e. forming a film across) the open space between structural members of the device. This bridging is of particular concern when coating more modern stents that are of less open construction, such as the Palmaz-Schatz, Crown, Multilink or GFX stents. Bridging of the open space (slots) is undesirable because it can interfere with the mechanical performance of the stent, such as expansion during deployment in a vessel lumen. Bridges may rupture upon expansion and provide
25     sites that activate platelet deposition by creating flow disturbances in the adjacent hemodynamic environment or pieces of the bridging film may break off and cause further complications. Bridging of the open slots may also prevent endothelial cell migration complicating the endothelial cell encapsulation of the stent.
       [0004]   Similarly, spray coating can be problematic in that there is a significant amount of spray lost during the process and many of the pharmaceutical agents that one would like to incorporate in the device are quite costly. In addition, in
30     some cases it would be desirable to provide coated stents with high levels of coating and drug. High concentration coatings (~15% polymer with additional drug) are the preferred means to achieve high drug loading. Multiple dip-coating has been described in the literature as a means to build thicker coatings on the stent. However, composition and phase dispersion of the pharmaceutical agents affect sustained release. In addition, the application of multiple dip coats from low concentration solutions often has the effect of reaching a limiting loading level as an equilibrium is reached between
35     the solution concentration and the amount of coating, with or without pharmaceutical agent, deposited on the stent.

Summary of the Invention

       [0005]   We have discovered a process for coating stents that avoids bridging and allows for preferential coating of
40     stent surfaces. The process comprises contacting a stent having a first and second surface with passages there between with a liquid coating solution containing a film forming biocompatible polymer under conditions suitable to allow the film forming biocompatible polymer to coat at least one surface of the stent while maintaining a fluid flow through said passages sufficient to prevent the film forming biocompatible polymer from substantially blocking said passages.
       [0006]   In a preferred embodiment of the present invention the coating process would comprise placing a tubular
45     stent having a first and second surface with passages there between on a mandrel and contacting the stent and mandrel with a liquid coating solution containing a film forming biocompatible polymer under conditions suitable to allow the film forming biocompatible polymer to coat at least one surface of the stent while moving the stent relative to the mandrel to cause fluid flow through said passages sufficient to prevent the film forming biocompatible polymer from substantially blocking said passages.
50     [0007]   In another embodiment of the present invention there is provided a coated stent, comprising a tubular stent having a first and second surface with passages there between, coated with a film-forming biocompatible polymer wherein the polymer coating is greater than 0.5 percent by weight of the coated stent and the passages are not substantially blocked by the bridging of the polymer coating.

55     Brief Description of the Figures

       [0008]   Figure 1 illustrates a perspective view of a stent prior to coating.
       [0009]   Figure 2 is a perspective view that illustrates the placement of a stent on a mandrel prior to coating.

2

BSC-SJA-0642

EP 0 970 711 A2

[0010] Figure 3 illustrates the movement of the stent relative to the mandrel in the after removal from the coating bath during the coating process.

[0011] Figure 4 is an enlarged view of a portion of the coated stent that illustrates the substantial absence of bridging of the stent slots or passages.

[0012] Figure 5 is a pictomicrograph that illustrates a stent that has been coated by conventional dip coating process with about a 4 weight percent coating solution.

[0013] Figure 6 is a pictomicrograph that illustrate a stent that has been coated by the inventive coating process with about a 13 weight percent coating solution.

[0014] Figure 7 is a graphical illustration of the in vitro release profile of a coated stent.

[0015] Figure 8 is a graphical illustration of the in vivo release profile of a coated stent.

Detailed Description

[0016] The present invention provides a process for coating medical devices. The process described herein is well suited to coating medical devices that have passages that may otherwise be blocked or have bridges formed by conventional dip coating. As previously discussed avoiding the formation of bridges is especially important in the coating of perforated structures such as stents. Bridging is a significant problem with stents with passages with a minor dimension less than about 125 mils, especially with passages having a minor dimension smaller than 50 mils.

[0017] Stents are generally cylindrical and perforated with passages that are slots, ovoid, circular or the like shape. Stents may also be composed of helically wound or serpentine wire structures in which the spaces between the wires form the passages. Stents may be flat perforated structures that are subsequently rolled to form tubular structures or cylindrical structures that are woven, wrapped, drilled, etched or cut to form passages. Examples of stents that may be advantageously coated by the present process include but are not limited stents described in the following U.S. Patent Nos. 4,733,665 (hereinafter the Palmaz stent which is illustrated in Figure 1); 4,800,882 (hereinafter the Gianturco stent); 4,886,062 (hereinafter the Wiktor stent) and 5,514,154 (hereinafter the Guidant RX Multilink™ stent). These stents can be made of biocompatible materials including biostable and bioabsorbable materials. Suitable biocompatible metals include, but are not limited to, stainless steel, tantalum, titanium alloys (including nitinol), and cobalt alloys (including cobalt-chromium-nickel alloys). Suitable nonmetallic biocompatible materials include, but are not limited to, polyamides, polyolefins (i.e. polypropylene, polyethylene etc.), nonabsorbable polyesters (i.e. polyethylene terephthalate), and bioabsorbable aliphatic polyesters (i.e. homopolymers and copolymers of lactic acid, glycolic acid, lactide, glycolide, para-dioxanone, trimethylene carbonate, e-caprolactone, etc. and blends thereof).

[0018] The present invention utilizes fluid flow or movement through the passages in the perforated medical device to avoid the formation of blockages or bridges. The fluid flow can be provided by active flow systems such as a perforated manifold inserted in the stent to circulate the coating fluid through the passages or can be created by placing the stent on a mandrel or in a small tube that is moved relative to the stent during the coating process to create sufficient fluid flow through the passages and thereby avoid the formation of blockages or bridges.

[0019] In one embodiment of the present invention as illustrated in Figure 2, a stent 2 is placed over a mandrel 6 that is smaller than the inner diameter d of the stent's intraluminal passage way 12 and dipped into the coating solution. The coated stent is moved relative to the mandrel after it is removed from the coating solution (preferably in one direction). Figure 3 illustrates the movement of the stent 2 relative to the mandrel 6 after it is removed from bath. The relative outer diameter of the mandrel and inner diameter of the stent are such that after dipping, while the coating is still wet, the movement of the stent along the mandrel's length clears the passages (slots) 10 which remain so on drying. The relative motion of the stent and mandrel, with limited clearance between the stent and mandrel, generates high shear rates which break the surface tension associated with the coating film filling the slots and provides smooth, defect free coating on the stent. Preferably the stent will be moved to an area of the mandrel that has not contacted the coating solution. As illustrated in Figure 3 that provides a perspective view of the stent 2 after being coated with coating 14. There are additional advantages: the coatings can be of high concentration and by proper choice of the mandrel diameter to stent diameter (the clearance), the relative thickness of the inner and outer coating of the stent can be controlled. For example, the stent coating can be thicker on the outer surface to contact the luminal wall or thicker on the interior surface to interact with the fluid stream.

[0020] The mandrel may be of varying designs (i.e. tapered cones, cylindrical, slotted cylinders, mandrels having cross-sections that are ovoid, triangular or polygonal and would include shafts with veins or paddles). Additionally, the movement of the mandrel relative to the stent may not only be laterally, but may also consist of rotational movement. Object of the mandrel design being to assure sufficient shear flow relative to the passages to insure that the passages do not become blocked.

[0021] Film-forming polymers that can be used for coatings in this application can be absorbable or non-absorbable and must be biocompatible to minimize irritation to the vessel wall. The polymer may be either biostable or bioabsorbable depending on the desired rate of release or the desired degree of polymer stability, but a bioabsorbable polymer

3

BSC-SJA-0643

EP 0 970 711 A2

is preferred since, unlike biostable polymer, it will not be present long after implantation to cause any adverse, chronic local response. Furthermore, bioabsorbable polymers do not present the risk that over extended periods of time there could be an adhesion loss between the stent and coating caused by the stresses of the biological environment that could dislodge the coating and introduce further problems even after the stent is encapsulated in tissue.

5    [0022]   Suitable film-forming bioabsorbable polymers that could be used include polymers selected from the group consisting of aliphatic polyesters, poly(amino acids), copoly(ether-esters), polyalkylenes oxalates, polyamides, poly (iminocarbonates), polyorthoesters, polyoxaesters, polyamidoesters, polyoxaesters containing amido groups, poly(anhydrides), polyphosphazenes, biomolecules and blends thereof. For the purposes of this invention aliphatic polyesters include homopolymers and copolymers of lactide (which includes lactic acid d-,l- and meso lactide), ε-caprolactone,

10   glycolide (including glycolic acid), hydroxybutyrate, hydroxyvalerate, para-dioxanone, trimethylene carbonate (and its alkyl derivatives), 1,4-dioxepan-2-one, 1,5-dioxepan-2-one, 6,6-dimethyl-1,4-dioxan-2-one and polymer blends thereof. Poly(iminocarbonate) for the purpose of this invention include as described by Kemnitzer and Kohn, in the Handbook of Biodegradable Polymers, edited by Domb, Kost and Wiseman, Hardwood Academic Press, 1997, pages 251-272. Copoly(ether-esters) for the purpose of this invention include those copolyester-ethers described in Journal of Bioma-

15   terials Research, Vol. 22, pages 993-1009, 1988 by Cohn and Younes and Cohn, Polymer Preprints (ACS Division of Polymer Chemistry) Vol. 30(1), page 498, 1989 (e.g. PEO/PLA). Polyalkylene oxalates for the purpose of this invention include Patent Nos. 4,208,511; 4,141,087; 4,130,639; 4,140,678; 4,105,034; and 4,205,399 (incorporated by reference herein). Polyphosphazenes, co-, ter- and higher order mixed monomer based polymers made from L-lactide, D,L-lactide, lactic acid, glycolide, glycolic acid, para-dioxanone, trimethylene carbonate and ε-caprolactone such as are

20   described by Allcock in The Encyclopedia of Polymer Science, Vol. 13, pages 31-41, Wiley Intersciences, John Wiley & Sons, 1988 and by Vandorpe, Schacht, Dejardin and Lemmouchi in the Handbook of Biodegradable Polymers, edited by Domb, Kost and Wiseman, Hardwood Academic Press, 1997, pages 161-182 (which are hereby incorporated by reference herein). Polyanhydrides from diacids of the form HOOC-$C_6H_4$-O-$(CH_2)_m$-O-$C_6H_4$-COOH where m is an integer in the range of from 2 to 8 and copolymers thereof with aliphatic alpha-omega diacids of up to 12 carbons.

25   Polyoxaesters polyoxaamides and polyoxaesters containing amines and/or amido groups are described in one or more of the following U.S. Patent Nos. 5,464,929; 5,595,751; 5,597,579; 5,607,687; 5,618,552; 5,620,698; 5,645,850; 5,648,088; 5,698,213 and 5,700,583; (which are incorporated herein by reference). Polyorthoesters such as those described by Heller in Handbook of Biodegradable Polymers, edited by Domb, Kost and Wiseman, Hardwood Academic Press, 1997, pages 99-118 (hereby incorporated herein by reference). Film-forming polymeric biomolecules for the

30   purpose of this invention include naturally occurring materials that may be enzymatically degraded in the human body or are hydrolytically unstable in the human body such as fibrin, fibrinogen, collagen, elastin, and absorbable biocompatible polysaccharides such as chitosan, starch, fatty acids (and esters thereof), glucoso-glycans and hyaluronic acid.
     [0023]   Suitable film-forming biostable polymers with relatively low chronic tissue response, such as polyurethanes, silicones, poly(meth)acrylates, polyesters, polyalkyl oxides (polyethylene oxide), polyvinyl alcohols, polyethylene gly-

35   cols and polyvinyl pyrrolidone, as well as, hydrogels such as those formed from crosslinked polyvinyl pyrrolidinone and polyesters could also be used. Other polymers could also be used if they can be dissolved, cured or polymerized on the stent. These include polyolefins, polyisobutylene and ethylene-alphaolefin copolymers; acrylic polymers (including methacrylate) and copolymers, vinyl halide polymers and copolymers, such as polyvinyl chloride; polyvinyl ethers, such as polyvinyl methyl ether; polyvinylidone halides such as polyvinylidene fluoride and polyvinylidone chloride; polyacry-

40   lonitrile, polyvinyl ketones; polyvinyl aromatics such as polystyrene; polyvinyl esters such as polyvinyl acetate; copolymers of vinyl monomers with each other and olefins, such as ethylene- methyl methacrylate copolymers, acrylonitrilo-styrene copolymers, ABS resins and ethylene-vinyl acetate copolymers; polyamides,such as Nylon 66 and polycaprolactam; alkyd resins; polycarbonates; polyoxymethylenes; polyimides; polyethers; epoxy resins, polyurethanes; rayon; rayon-triacetate, cellulose, cellulose acetate, cellulose acetate butyrate; cellophane; cellulose nitrate; cellulose propi-

45   onate; cellulose ethers (i.e. carboxymethyl cellulose and hydoxyalkyl celluloses); and combinations thereof. Polyamides for the purpose of this application would also include polyamides of the form -NH-$(CH_2)_n$-CO- and NH-$(CH_2)_x$-NH-CO-$(CH_2)_y$-CO, wherein n is preferably an integer from 6 to 13; x is an integer in the range of form 6 to 12; and y is an integer in the range of from 4 to 16. The list provided above is illustrative but not limiting.
     [0024]   The polymers used for coatings must be film-forming polymers that have molecular weight high enough as

50   to not be waxy or tacky. The polymers also must adhere to the stent and not be so readily deformable after deposition on the stent as to be able to be displaced by hemodynamic stresses. The polymers molecular weight must be high enough to provide sufficient toughness so that the polymers will not to be rubbed off during handling or deployment of the stent and must not crack during expansion of the stent. The melting point of the polymer used in the present invention should have a melting temperature above 40°C, preferably above about 45°C, more preferably above 50°C and most prefer-

55   ably above 55°C.
     [0025]   The preferable coatings to use for this application are bioabsorbable elastomers, more preferably aliphatic polyester elastomers. In the proper proportions aliphatic polyester copolymers are elastomers. Elastomers present the advantage that they tend to adhere well to the metal stents and can withstand significant deformation without cracking.

4

EP 0 970 711 A2

The high elongation and good adhesion provide superior performance to other polymer coatings when the coated stent is expanded. Examples of suitable bioabsorbable elastomers are described in U.S. Patent No. 5,468,253 hereby incorporated by reference. Preferably the bioabsorbable biocompatible elastomers based on aliphatic polyester, including but not limited to those selected from the group consisting of elastomeric copolymers of ε-caprolactone and glycolide

5 (preferably having a mole ratio of ε-caprolactone to glycolide of from about 35:65 to about 65:35, more preferably 45: 55 to 35:65) elastomeric copolymers of ε-caprolactone and lactide, including L-lactide, D-lactide blends thereof or lactic acid copolymers (preferably having a mole ratio of ε-caprolactone to lactide of from about 35:65 to about 90:10 and more preferably from about 35:65 to about 65:35 and most preferably from about 45:55 to 30:70 or from about 90: 10 to about 80:20) elastomeric copolymers of p-dioxanone (1,4-dioxan-2-one) and lactide including L-lactide, D-lactide

10 and lactic acid (preferably having a mole ratio of p-dioxanone to lactide of from about 40:60 to about 60:40) elastomeric copolymers of ε-caprolactone and p-dioxanone (preferably having a mole ratio of ε-caprolactone to p-dioxanone of from about 30:70 to about 70:30) elastomeric copolymers of p-dioxanone and trimethylene carbonate (preferably having a mole ratio of p-dioxanone to trimethylene carbonate of from about 30:70 to about 70:30), elastomeric copolymers of trimethylene carbonate and glycolide (preferably having a mole ratio of trimethylene carbonate to glycolide of from

15 about 30:70 to about 70:30), elastomeric copolymer of trimethylene carbonate and lactide including L-lactide, D-lactide, blends thereof or lactic acid copolymers (preferably having a mole ratio of trimethylene carbonate to lactide of from about 30:70 to about 70:30) and blends thereof. As is well known in the art these aliphatic polyester copolymers have different hydrolysis rates, therefore, the choice of elastomer may in part be based on the requirements for the coatings adsorption. For example ε-caprolactone-co-glycolide copolymer (45:55 mole percent, respectively) films lose 90% of

20 their initial strength after 2 weeks in simulated physiological buffer whereas the ε-caprolactone-co-lactide copolymers (40:60 mole percent, respectively) loses all of its strength between 12 and 16 weeks in the same buffer. Mixtures of the fast hydrolyzing and slow hydrolyzing polymers can be used to adjust the time of strength retention.

[0026]   The preferred bioabsorbable elastomeric polymers should have an inherent viscosity of from about 1.0 dL/g to about 4 dL/g, preferably an inherent viscosity of from about 1.0 dL/g to about 2 dL/g and most preferably an inherent

25 viscosity of from about 1.2 dL/g to about 2 dL/g as determined at 25°C in a 0.1 gram per deciliter (g/dL) solution of polymer in hexafluoroisopropanol (HFIP).

[0027]   The solvent is chosen such that there is the proper balance of viscosity, deposition level of the polymer, solubility of the pharmaceutical agent, wetting of the stent and evaporation rate of the solvent to properly coat the stents. In the preferred embodiment, the solvent is chosen such the pharmaceutical agent and the polymer are both

30 soluble in the solvent. In some cases, the solvent must be chosen such that the coating polymer is soluble in the solvent and such that pharmaceutical agent is dispersed in the polymer solution in the solvent. In that case the solvent chosen must be able to suspend small particles of the pharmaceutical agent without causing them to aggregate or agglomerate into collections of particles that would clog the slots of the stent when applied. Although the goal is to dry the solvent completely from the coating during processing, it is a great advantage for the solvent to be non-toxic, non-carcinogenic

35 and environmentally benign. Mixed solvent systems can also be used to control viscosity and evaporation rates. In all cases, the solvent must not react with or inactivate the pharmaceutical agent or react with the coating polymer. Preferred solvents include by are not limited to: acetone, N-methylpyrrolidone (NMP), dimethyl sulfoxide (DMSO), toluene, methylene chloride, chloroform, 1,1,2-trichloroethane (TCE), various freons, dioxane, ethyl acetate, tetrahydrofuran (THF), dimethylformamide (DMF), and dimethylacetamide (DMAC).

40 [0028]   The film-forming biocompatible polymer coatings are generally applied to reduce local turbulence in blood flow through the stent, as well as, adverse tissue reactions. The coating may also be used to administer a pharmaceutically active material to the site of the stents placement. Generally, the amount of polymer coating to be placed on the stent will vary with the polymer and the stent design and the desired effect of the coating. As a guideline the amount of coating may range from about 0.5 to about 20 as a percent of the total weight of the stent after coating and preferably

45 will range from about 1 to about 15 percent. The polymer coatings may be applied in one or more coating steps depending on the amount of polymer to be applied. Different polymers may also be used for different layers in the stent coating. In fact it is highly advantageous to use a dilute first coating solution as primer to promote adhesion of a subsequent coating layers that may contain pharmaceutically active materials.

[0029]   Additionally, a top coating can be applied to delay release of the pharmaceutical agent, or they could be used

50 as the matrix for the delivery of a different pharmaceutically active material. The amount of top coatings on the stent may vary, but will generally be less than about 2000 μg, preferably the amount of top coating will be in the range of about 10 μg to about 1700 μg and most preferably in the range of from about 300 μg to about 1600 μg. Layering of coating of fast and slow hydrolyzing copolymers can be used to stage release of the drug or to control release of different agents placed in different layers. Polymer blends may also be used to control the release rate of different

55 agents or to provide desirable balance of coating (i.e. elasticity, toughness etc.) and drug delivery characteristics (release profile). Polymers with different solubilities in solvents can be used to build up different polymer layers that may be used to deliver different drugs or control the release profile of a drug. For example since ε-caprolactone-co-lactide elastomers are soluble in ethyl acetate and ε-caprolactone-co-glycolide elastomers are not soluble in ethyl acetate. A

5

BSC-SJA-0645

EP 0 970 711 A2

first layer of ε-caprolactone-co-glycolide elastomer containing a drug can be over coated with ε-caprolactone-co-glycolide elastomer using a coating solution made with ethyl acetate as the solvent. Additionally, different monomer ratios within a copolymer, polymer structure or molecular weights may result in different solubilities. For example, 45/55 ε-caprolactone-co-glycolide at room temperature is soluble in acetone whereas a similar molecular weight copolymer of 35/65 ε-caprolactone-co-glycolide is substantially insoluble within a 4 weight percent solution. The second coating (or multiple additional coatings) can be used as a top coating to delay the drug deliver of the drug contained in the first layer. Alternatively, the second layer could contain a different drug to provide for sequential drug delivery. Multiple layers of different drugs could be provided by alternating layers of first one polymer then the other. As will be readily appreciated by those skilled in the art numerous layering approaches can be used to provide the desired drug delivery.

[0030]  The coatings can be used to deliver therapeutic and pharmaceutic agents such as, but not limited to: antiproliferative/antimitotic agents including natural products such as vinca alkaloids (i.e. vinblastine, vincristine, and vinorelbine), paclitaxel, epidipodophyllotoxins (i.e. etoposide, teniposide), antibiotics (dactinomycin (actinomycin D) daunorubicin, doxorubicin and idarubicin), anthracyclines, mitoxantrone, bleomycins, plicamycin (mithramycin) and mitomycin, enzymes (L-asparaginase which systemically metabolizes L-asparagine and deprives cells which don't have the capacity to synthesize their own asparagine); antiproliferative/antimitotic alkylating agents such as nitrogen mustards (mechlorethamine, cyclophosphamide and analogs, melphalan, chlorambucil), ethylenimines and methylmelamines (hexamethylmelamine and thiotepa), alkyl sulfonates-busulfan, nitrosoureas (carmustine (BCNU) and analogs, streptozocin), trazenes - dacarbazinine (DTIC) ; antiproliferative/antimitotic antimetabolites such as folic acid analogs (methotrexate), pyrimidine analogs (fluorouracil, floxuridine, and cytarabine), purine analogs and related inhibitors (mercaptopurine, thioguanine, pentostatin and 2-chlorodeoxyadenosine[cladribine]) ; platinum coordination complexes (cisplatin, carboplatin), procarbazine, hydroxyurea, mitotane, aminoglutethimide; hormones (i.e. estrogen); Anticoagulants (heparin, synthetic heparin salts and other inhibitors of thrombin); fibrinolytic agents (such as tissue plasminogen activator, streptokinase and urokinase); antiplatelet (aspirin, dipyridamole, ticlopidine, clopidogrel, abciximab); antimigratory; antisecretory (breveldin); antiinflammatory: such as adrenocortical steroids (cortisol, cortisone, fludrocortisone, prednisone, prednisolone, 6α-methylprednisolone, triamcinolone, betamethasone, and dexamethasone), non-steroidal agents (salicylic acid derivatives i.e. aspirin; para-aminophenol derivatives i.e. acetominophen; indole and indene acetic acids (indomethacin, sulindac, and etodolac), heteroaryl acetic acids (tolmetin, diclofenac, and ketorolac), arylpropionic acids (ibuprofen and derivatives), anthranilic acids (mefenamic acid, and meclofenamic acid), enolic acids (piroxicam, tenoxicam, phenylbutazone, and oxyphenthatrazone), nabumetone, gold compounds (auranofin, aurothioglucose, gold sodium thiomalate); immunosuppressive: (cyclosporine, tacrolimus (FK-506), sirolimus (rapamycin), azathioprine, mycophenolate mofetil); Angiogenic: vascular endothelial growth factor (VEGF), fibroblast growth factor (FGF); nitric oxide donors; anti-sense olgio nucleotides and combinations thereof.

[0031]  Coating may be formulated by mixing one or more therapeutic agents with the coating polymers in a coating mixture. The therapeutic agent may be present as a liquid, a finely divided solid, or any other appropriate physical form. Optionally, the mixture may include one or more additives, e.g., nontoxic auxiliary substances such as diluents, carriers, excipients, stabilizers or the like. Other suitable additives may be formulated with the polymer and pharmaceutically active agent or compound. For example hydrophilic polymers selected from the previously described lists of biocompatible film forming polymers may be added to a biocompatible hydrophobic coating to modify the release profile (or a hydrophobic polymer may be added to a hydrophilic coating to modify the release profile). One example would be adding a hydrophilic polymer selected from the group consisting of polyethylene oxide, polyvinyl pyrrolidone, polyethylene glycol, carboxymethyl cellulose, hydroxymethyl cellulose and combination thereof to an aliphatic polyester coating to modify the release profile. Appropriate relative amounts can be determined by monitoring the in vitro and/or in vivo release profiles for the therapeutic agents.

[0032]  The best conditions for the coating application are when the polymer and pharmaceutic agent have a common solvent. This provides for a coating that is a true solution. Less desirable, yet still usable are coatings that contain the pharmaceutic as a solid dispersion in a solution of the polymer in solvent. Under the dispersion conditions, care must be taken to ensure that the particle size of the dispersed pharmaceutical powder, both the primary powder size and its aggregates and agglomerates, is small enough not to cause an irregular coating surface or to clog the slots of the stent that we need to keep coating-free. In cases where a dispersion is applied to the stent and we want to improve the smoothness of the coating surface or ensure that all particles of the drug are fully encapsulated in the polymer, or in cases where we may want to slow the release rate of the drug, deposited either from dispersion or solution, we can apply a clear (polymer only) top coat of the same polymer used to provide sustained release of the drug or another polymer that further restricts the diffusion of the drug out of the coating. The top coat can be applied by dip coating with mandrel as previously described or by spray coating (loss of coating during spray application is less problematic for the clear topcoat since the costly drug is not included). Dip coating of the top coat can be problematic if the drug is more soluble in the coating solvent than the polymer and the clear coating redissolves previously deposited drug. The time spent in the dip bath may need to be limited so that the drug is not extracted out into the drug-free bath. Drying should be rapid so that the previously deposited drug does not completely diffuse into the topcoat.

6

BSC-SJA-0646

EP 0 970 711 A2

[0033]   The amount of therapeutic agent will be dependent upon the particular drug employed and medical condition being treated. Typically, the amount of drug represents about 0.001% to about 70%, more typically about 0.001% to about 60%, most typically about 0.001% to about 45% by weight of the coating.

[0034]   The quantity and type of polymers employed in the coating layer containing the pharmaceutic agent will vary depending on the release profile desired and the amount of drug employed. The product may contain blends of the same or different polymers having different molecular weights to provide the desired release profile or consistency to a given formulation.

[0035]   Absorbable polymers upon contact with body fluids including blood or the like, undergoes gradual degradation (mainly through hydrolysis) with concomitant release of the dispersed drug for a sustained or extended period (as compared to the release from an isotonic saline solution). Nonabsorbable and absorbable polymers may release dispersed drug by diffusion. This can result in prolonged delivery (over, say 1 to 2,000 hours, preferably 2 to 800 hours) of effective amounts (say, 0.001 µg/cm²-min to 100 µg/cm²-min) of the drug. The dosage can be tailored to the subject being treated, the severity of the affliction, the judgment of the prescribing physician, and the like.

[0036]   Individual formulations of drugs and polymers may be tested in appropriate in vitro and in vivo models to achieve the desired drug release profiles. For example, a drug could be formulated with a polymer (or blend) coated on a stent and placed in an agitated or circulating fluid system (such as PBS 4% bovine albumin). Samples of the circulating fluid could be taken to determine the release profile (such as by HPLC). The release of a pharmaceutical compound from a stent coating into the interior wall of a lumen could be modeled in appropriate porcine system. The drug release profile could then be monitored by appropriate means such as, by taking samples at specific times and assaying the samples for drug concentration (using HPLC to detect drug concentration). Thrombus formation can be modeled in animal models using the [111] In-platelet imaging methods described by Hanson and Harker, Proc. Natl. Acad. Sci. USA 85:3184-3188 (1988). Following this or similar procedures, those skilled in the art will be able to formulate a variety of stent coating formulations.

Example 1

[0037]   An absorbable elastomer based on 45:55 mole percent copolymer of ε-caprolactone and glycolide, with an IV of 1.59 (0.1 g/dl in hexafluoroisopropanol[HFIP] at 25°C) was dissolved five percent (5%) by weight in acetone and separately fifteen percent (15%) by weight in 1,1,2-trichloroethane. The synthesis of the elastomer is described in U. S. Patent 5,468,253 incorporated herein by reference. Gentle heating can be used to increase the dissolution rate. The high concentration coating could be formulated with or without pharmaceutical agent present. An initial primer coat of only the polymer is put on Cordis P-S 153 stent (commercially available from Cordis, a Johnson & Johnson Company) by dip coating in the five percent (5%) solution while the stent is placed on a 0.032 inch (0.81mm) diameter mandrel. The mandrel, with the stent on it, is removed from the dip bath and before the coating has a chance to dry the stent is moved along the mandrel in one direction. This wiping motion applies high shear to the coating trapped between the stent and the mandrel. The high shear rate forces the coating out through the slots cut into the tube from which the stent is formed. This wiping action serves to force the coating out of the slots and keeps them clear. The "primed stent" is allowed to air dry at room temperature. The prime coat is about 100 micrograms of coating. After 1-2 hours of air drying, the stent is remounted on a 0.0355 inch (0.9mm) clean mandrel and dipped into a second, concentrated coat solution. This can be drug free or can contain about six percent (6%) by weight drug in addition to about fifteen percent (15%) polymer by weight in the coating solution. The dip and wipe process is repeated. The final coated stent is air dried for 12 hours and then put in a 60°C vacuum oven (at 30 in Hg vacuum) for 24 hours to dry. This method provides a coated stent with about 270 micrograms of polymer and about 180 micrograms of drug.

Example 2

[0038]   This example describes experiments that demonstrate the ability of the dip and wipe coating approach to incorporate a bioactive agent in the coating and that the bioactive agent retains its biological activity. An initial primer coat of only the polymer described in Example 1 was placed on Cordis P-S 153 stent by dip coating in the five percent (5%) solution by weight while the stent is placed on a 0.032 inch (0.81mm) diameter mandrel. And primed as described in Example 1. The coated stent was then coated a second time with a coating solution of polymer and drug. The coated stent was dipped and wipe coated using the mandrel and a high concentration drug-polymer (15% polymer, 1:100 drug: polymer, and 2000 U/ml heparin-benzalkonium chloride [HBAC]; all in 70/30 acetone/DMSO) solution by the method described in Example 1. The HBAC coated stents had a total coating weight of about 350 micrograms. Coated stents were sent to North American Science Associates Inc. (Northwood, Ohio USA) for a standard rabbit whole blood clotting time assay. The assay was performed by placing the stents on the surface of the Tryptic Soy Agar (TSA) plate along with a negative control sample (glass tubing) and a positive control (HBAC coated glass tubing). The 15 X 150 mm TSA plate was flooded with 35 ml of whole rabbit blood, obtained by arterial draw of a euthanized rabbit. The test

7

BSC-SJA-0647

EP 0 970 711 A2

plate was incubated in ambient room temp. For 20-40 minutes. Following the incubation period, the samples were removed from the thrombus formed in the plate using forceps. The test and control sections were observed for evidence of adherence to the thrombus formation upon removal.

[0039] The heparinized stents were proven to be nonthrombogenic as compared with the non-heparinized controls.

5

Example 3

[0040] This example describes experiments that demonstrate the ability of the dip and wipe coating approach to provide coated stent with high coating loading and no bridging of the slots in the stent. A Cordis P-S 153 stent was
10 taken and dip coated into a five percent (5%) solution of the elastomeric 45:55 mole percent of ε-caprolactone and glycolide copolymer (IV = 1.58) described in Example 1. The stent was removed and allow to air dry for 1-2 hours at room temperature. The coating added to the stent was about 100-150 micrograms. The slots in the stent were bridged with dry coating film (Figure 5). A second Cordis P-S 153 was dipped and wipe coated with the coating solution containing fifteen percent (15%) polymer as described in Example 1. The stent was found to have slots free of coating and
15 to be loaded with 300 micrograms of coating. Similar experiments were performed with the Cordis Crown™ stent, the Guidant RX MultiLink™ stent and the AVE GFX™ stent. The results were identical, dipping and wiping over a mandril allows high concentration coatings to provide high coating build on a variety of stents without the adverse effect of bridging the slots.

20 Example 4

[0041] This example demonstrates the differential solubility of elastomeric ε-caprolactone and glycolide copolymers and elastomeric ε-caprolactone and lactide copolymers in ethyl acetate. 0.2 g of ε-caprolactone and glycolide copolymer (45/55, IV=1.5, Tm ~62°C) were placed in a flat bottom glass vial along with 4 grams of ethyl acetate. These were
25 heated to about 50°C on a hot plate with stirring bar over night. The result was partial solution with clear polymer on the walls and a cloudy solution at 50°C but the polymer precipitated out and coated the walls of the vial when the temperature came back to room temperature (~25°C). Similarly, 0.2 g of ε-caprolactone and lactide copolymer (40/60, IV=1.5, Tm ~132°C) were placed in a flat bottom glass vial with 4 g of ethyl acetate made in a manner similar to that described in Example 11. These were heated to about 50°C on a hot plate with stirring bar over night. The particles
30 first swelled and then went into solution. On cooling to room temperature the solution remained clear and uniform.

Example 5

[0042] Multiple Dipping.
35 P-S stents were coated from a 5% w/w 45:55 ε-caprolactone and glycolide solution as described in the example 1. The initial coating resulted in ~ 100 micrograms of total solid on the stent. The stents were dried and then coated from a 15% w/w 45:55 ε-caprolactone and glycolide and 5% w/w drug solution. The second step resulted in ~ 170 micrograms of total solid and ~ 50 micrograms of drug on the stent. Stents were coated again from the same second solution and an increment of 50 micrograms (a total of 200 micrograms) of total solid and an increment of 20 micrograms of drug
40 (a total of 80 micrograms) was observed. However when the dried stents were coated again with the same second solution total weight gain of the solid and the drug remain same.

Example 6

45 [0043] This Example describes applying a top coating to a coated stent with an ultrasonic spraying device.
[0044] A five percent by weight coating solution is made using 45:55 ε-caprolactone and glycolide described in Example 1 in a solvent solution of TCE : Acetone (1:1, w/w)
[0045] The ultrasonic spray unit is composed of a SonoTek (New York, U.S.A.) broadband ultrasonic generator (model 60-05108) attached to a nozzle (model 06-04010) an oscillated at 50KHz to generate a mean droplet size of 31 microns.
50 The power at which the system was operated is 5.8 mWatts. The flow rate was adjusted to about 0.3 ml/min. The ultrasonic spray system was placed in a plastic bag containment system to eliminate air currents and to slow evaporation. Stents would be positioned 1.5-5 cm distance from the nozzle and had a dwell time in the spray cloud of about 15-40 seconds.
[0046] The stent would than be dried in ambient conditions for 18-24 hours and subsequently vacuum dried at 80°C
55 for 24 hours. Approximately, 100-150 micrograms of polymer was deposited per top coating run. A mandrel can be used to prevent coating the inside of the stent if desired.

8

BSC-SJA-0648

EP 0 970 711 A2

Example 7

[0047]   This Example describes the preparation of coated stents containing various levels of rapamycin for in vitro drug release testing.

[0048]   0.06 gms of Rapamycin was dissolved into 0.8 gms of 15% CAP/GLY solution in 1,1,2 TCE. The resulting coating solution contained 33.3% w/w drug on a dry, solid-only basis. Stents were coated by the method described in Example 1 and the coated stents were designated as 'Std 33%'.

[0049]   0.015 gms of Rapamycin was dissolved into 0.5 gms of 18% CAP/GLY solution in 1,1,2 TCE. The resulting coating solution contained 14.3% w/w drug on a dry, solid-only basis. Stents were coated by the method described in Example 1 and the coated stents were designated as '14%'.

[0050]   0.028 gms of rapamycin was dissolved into 0.5 gm of 18% CAP/GLY solution in 1,1,2 TCE. The resulting coating solution contained 23.7% w/w drug on a dry, solid-only basis. Stents were coated by the method described in Example 1. The dip coated stents were spray coated with polymer-only solution as described in Example 6. The final coated stents were designated as '24-TC%'.

[0051]   0.028 gms of rapamycin was dissolved into 0.5 gm of 18% CAP/GLY solution in 1,1,2 TCE. The resulting coating solution contained 23.7% w/w drug on a dry, solid-only basis. Stents were coated by the method described in Example 1. The dip-coated stents were spray coated with polymer-only solution as described in Example 6; However, a total volume of 200 microliters of spray solution was used in this case. The final coated stents were designated as '24- Thick TC%'.

[0052]   0.06 gms of rapamycin was dissolved into 0.8 gm of 15% CAP/GLY solution in 1,1,2 TCE. The resulting coating solution contained 33.3% w/w drug on a dry, solid-only basis. The dip-coated stents were spray coated twice with ε-caprolactone-co-lactide (Cap/Lac) solution as described in Example 4. The final coated stents were designated as '33-TC%'.

[0053]   0.06 gms of rapamycin was dissolved into 0.8 gm of 15% CAP/LAC solution in 1,1,2 TCE. The resulting coating solution contained 33.3% w/w drug on a dry, solid-only basis. Stents were coated by the method described in example 1. The dip-coated stents were spray coated twice with polymer-only solution as described in Example 6 (except ε-caprolactone-co-lactide was used as the copolymer). The final coated stents were designated as '33-C/L TC%'.

Example 8

[0054]   This example describes the results of testing the in vitro drug release of rapamycin from coated stent. Coated stents were prepared as described in Example 7 with varying concentrations of rapamycin were tested for the in vitro release of rapamycin into an aqueous ethanol solution. As is indicated in Figure 7, the stents denoted by the diamonds had a primer coating and a base coating that contained rapamycin. The total weight of the coating and rapamycin on the each stent was approximately 450 μg and contained 33 percent of rapamycin. The coating was a copolymer of ε-caprolactone-co-glycolide (45:55 mole percent) applied by dip coating. The squares represent data points for stents having a primer coating and a base coating containing rapamycin. The total weight of the coating and drug was approximately 450 μg, which contained 14 percent by weight rapamycin. The coating material was also a copolymer of ε-caprolactone-co-glycolide (45:55 mole percent) applied by dip coating. The triangles represent data points for stents that had a primer coating and a base coating containing rapamycin. A primer coating and base coating (ε-caprolactone-co-glycolide 45:55 mole percent) were applied by dip coating the stent. A top coat of 200 μg (ε-caprolactone-co-glycolide 45:55 mole percent) was then applied using an ultrasonic spray device. The total weight of the coating and rapamycin was 650-700 μg, which contained 24 percent by weight rapamycin. The Xs represent data points for stents that had a primer coat and a base coating containing rapamycin. The primer coating and base coating (ε-caprolactone-co-glycolide 45:55 mole percent) were applied by dip coating the stent. A top coat of 100 μg (ε-caprolactone-co-glycolide 45:55 mole percent) was then applied using an ultrasonic spray device. The total weight of the coating and rapamycin was 550-600 μg, which contained 24 percent by weight rapamycin. The asterisk represents data points for stents that was coated with a primer, a base coat and two top coats. The primer coating and base coating (ε-caprolactone-co-glycolide; 45:55 mole percent) were applied by dip coating the stents. A top coat of 100 μg (ε-caprolactone-co-glycolide; 45:55 mole percent) was then applied using an ultrasonic spray device. The total weight of the coating and rapamycin was approximately 550 μg, which contained 33 percent by weight rapamycin. The circles represent data points for stents that were dip coated with ε-caprolactone-co-lactide (40:60 mole percent). The stents were then top coated with an ultrasonic spray with approximately 100 μg of ε-caprolactone-co-lactide. The total coating weighed about 550 μg and contained 33 percent by weight rapamycin.

[0055]   Each stent was placed in a 2.5mL of release medium (aqueous ethanol; 15 percent by volume at room temperature) contained in a 13 X 100 mm culture tube. The tube was shaken in a water bath (INNOVA™ 3100; New Brunswick Scientific) at 200 rpm while maintaining ambient conditions. After a given time interval (ranging from 5 minutes to one day) the tubes were removed from the shaker and the respective stents carefully transferred to a fresh 2.5

9

BSC-SJA-0649

EP 0 970 711 A2

ml Aliquot of release medium. The new tube was placed on the shaker and agitation resumed. A sample was removed from the aliquot, which had previously contained the stent and placed in a HPLC vial for determination of the rapamycin content by HPLC.

[0056]  The HPLC system used to analyze the samples was a Waters Alliance with a PDA 996. This system is equipped with a photodiode array detector. 20μL of each sample was withdrawn and analyzed on a $C_{18}$-reverse phase column (Waters Symmetry™ Column: 4.6mm X 100mm $RP_{18}$ 3.5 μm with a matching guard column) using a mobile phase consisting of acetonitrile/methanol/water (36:34:28 v/v) delivered at a flow rate of 1.2 mL/min. The column was maintained at 60°C through the analysis. Under these analytical conditions rapamycin had a retention time of 4.75± 0.1 minutes. The concentration was determined from a standard curve of concentration versus response (area-under the curve) generated from rapamycin standards in the range of from 50ng/mL to 50μg/mL.

[0057]  The results from testing the coated stents described above is shown in Figure 7.

## Example 9

[0058]  The goal of this study was to assess the rate of release of rapamycin from polymer-coated stents introduced in vivo into the coronary arteries of Yorkshire pigs. At various times after introduction of stents, the pigs were euthanized and the coronary arteries removed, the stents dissected free of the artery and analysed for rapamycin content using loading assay previously described. Through comparison with the amount of rapamycin contained on control, non-implanted stents, the in vivo rate of rapamycin release from the polymer coatings could be determined.

## Experimental Procedure:

[0059]  Male Yorkshire pigs weighing were used for these experiments. Animals were anesthetized with xylazine (2 mg/kg, IM), ketamine (17mg/kg, IM) and atropine (0.02 mg/kg IM). Pigs were then intubated using standard procedure, and placed on flow-by oxygen with 1-2.5% volatile isoflurane for maintenance anesthesia via the endotracheal tube. Peripheral intravenous access was achieved by insertion of a 20 gauge Angiocath into the marginal ear vein; a 20 gauge arterial catheter was also placed in the ear for continuous blood pressure and heart rate monitoring.

[0060]  To minimize the chance for clot formation at the stent site, animals were started on oral aspirin 325 mg per day three days prior to the planned procedure. Upon confirmation of adequate depth of anesthesia, the right inguinal region was shaved and sterilized, and sterilely draped. Aseptic technique was used throughout the remainder of the procedure. A linear incision parallel to the femoral vessels was made and the subcutaneous tissues dissected to the level of the artery. After adequate exposure, the femoral artery was isolated proximally with umbilical tape and distally with a 3.0 silk tie for hemostasis. Using surgical scissors, an arteriotomy was made, and an 8 Fr sheath inserted in the artery. Heparin 4,000 units and bretylium 75 mg were then administered intravenously after sheath insertion. Electrocardiogram, respiratory pattern, and hemodynamics were continuously monitored.

[0061]  A hockey stick guiding catheter was inserted via the femoral sheath, and advanced to the left coronary ostium, whereupon left coronary cineangiography was performed. A single frame anteroposterior radiogram was developed, and the luminal diameters of the left anterior descending and circumflex arteries measured, in order to size the balloon-stent assembly for a prespecified balloon-to-artery ratio of approximately 1.1 - 1.2:1. Using guide catheter support and fluoroscopic guidance, a 0.014" guidewire was advanced into the lumen of the left anterior descending artery. Intracoronary stenting was performed by advancing a stent mounted on a conventional angioplasty balloon into position in the mid-portion of the left anterior descending artery. The stent was deployed by inflating the mounting balloon to 8 atmospheres for 30 seconds. Upon confirmation of vessel patency, the balloon and guidewire were removed from the left anterior descending artery, and the identical procedure was performed in the left circumflex artery. Upon completion of stent delivery in the left circumflex artery, the balloon and guidewire were withdrawn.

[0062]  The guiding catheter and femoral arterial sheath were then removed, the femoral artery tied proximally with 3-0 silk suture for hemostasis and the inguinal incision was closed. After discontinuation of anesthesia, were returned to colony housing. Daily aspirin 325 mg was continued until euthanasia.

[0063]  At various times after stent implantation, euthanasia was performed by overdose of pentobarbital administered IV. The chest was opened via a mid-sternal incision and the heart removed. Both the LAD and LCX were carefully dissected free of surrounding tissue. The stent was then dissected free of the arterial tissue and placed in a vial. The arterial tissue was frozen and stored for laser analysis by HPLC.

[0064]  Figure 7 illustrates a typical in vivo release curve for a stent coating consisting of 33% rapamycin in polycaprolactone-co-glycolide.

## Example 10

[0065]  This Example describes the in vivo testing of coated stents in a porcine coronary artery model.

10

BSC-SJA-0650

EP 0 970 711 A2

[0066] This preliminary study was conducted to assess the ability of rapamycin released from e-caprolactone-co-glycolide copolymer coated stents to inhibit intimal hyperplasia in vivo. Fourteen days after receiving rapamycin-loaded or control polymer coated stents, the male Yorkshire pigs were euthanized and the coronary arteries removed, the vessels prepared for histological evaluation and analysed for the amount of intimal growth. Through comparison control metal stents and stents containing polymer only, the in vivo ability of rapamycin to prevent neointimal growth could be determined.

[0067] Ethylene oxide-sterilized Palmaz-Schatz stents were implanted under sterile conditions in anesthetized farm pigs weighing 38 to 48 kg. Twenty-four hours prior to stent implantation, animals were given aspirin (325 mg, p.o., qd) and ticlopidine (250 mg, p.o., qd) to control chronic thrombosis; both aspirin and ticlopidine were continued daily until sacrifice. Anesthesia was induced with ketamine (20 mg/kg, i.m.), xylazine (2 mg/kg, i.m.) and sodium pentobarbital (10 mg/kg as needed) and maintained on 1-2% isoflurane in oxygen. An 8 Fr sheath was placed in an aseptically isolated left carotid artery and used subsequently to conduct either an 8 Fr JL 3.5 guide catheter for coronary angiography or to place a 0.014 inch guidewire for balloon delivery of stents to the appropriate coronary arteries. Heparin (150 unit/kg) was administered intraprocedurally to prevent acute thrombosis. Four experimental groups were employed; 1) metal stent control; 2) metal stent coated with 45/55 (w/w) ε-caprolactone glycolide copolymer (CAP/GLY); 3) 32 μg rapamycin/stent formulated in CAP/GLY; 4) 166 μg rapamycin/stent formulated in CAP/GLY. Stents were deployed in both the LAD and LCX coronary arteries. Angiography was performed prior to, during, and immediately after stenting to both size the vessel for choice of balloon diameter (3.0, 3.5 or 4.0 mm) and to obtain measurements for determination of the balloon/artery ratio. Stents were deployed by inflating the delivery balloon to 8-10 ATM for 30 sec. Angiography was also performed at 14 days post-implantation to obtain final vessel diameter. Treatment groups were randomized and individual stents were implanted by an investigator who was blinded as to the treatment. However, only one treatment was employed in any given pig. Fourteen days after implantation, animals were killed, the vessels were perfusion fixed for 10 minutes at 100 mm Hg with 10% formalin and then stored in 10% buffered formalin.

[0068] For histological assessment, the stented vessel was embedded in glycol methacrylate. Four 3 - 5 μm thick cross-sections taken at equal intervals along the length of the stent were placed on glass slides and prepared with Miller's Elastin stain. Histomorphometric measurements were determined in each section via microscopy and computerized image analysis. Individual values obtained for each vessel represent the average of the 4 measured sections. Differences between treatments were assessed by ANOVA and Dunnett's test.

Table 1.

| Treatment | Histology | | Angiography | |
|---|---|---|---|---|
| | Intima/Med ia ratio | Intimal Area (mm²) | % Diameter Stenosis | B/A Ratio |
| Metal Control (n=10) | 0.90 ± 0.05 | 3.65 ± 0.82 | 24.8 ± 3.9[1] | 1.27 ± 0.05 |
| CAP/GLY (n=8) | 0.91 ± 0.11 | 4.15 ± 0.23 | 36.0 ± 4.0 | 1.32 ± 0.04 |
| CAP/GLY ± 32 μg rapamycin (n=10) | 0.75 ± 0.04 | 3.27 1 ± 0.16 | 21.6 1 3.6[1] | 1.23 1 0.03 |
| CAP/GLY ± 166 μg rapamycin (n=8) | 0.65 ± 0.04[1,2] | 2.87 1 0.31 | 23.9 1 2.3[1] | 1.27 1 0.05 |

[1] p<0.05 from CAP/GLY
[2] p<0.05 from Metal Control

All values are mean±sem. B/A ratio = balloon to artery ratio, an index of the consistency of stent expansion from group to group.

[0069] As can be seen in Table 1, local delivery of rapamycin to injured coronary arteries resulted in a significant (p<0.05) reduction in intima:media ratio in the 166 μg treatment group and a small but non-significant reduction in the 32 μg treatment group when compared with the polymer and bare metal control groups. Rapamycin delivered from the CAP/GLY coating also resulted in non-significant dose-related decreases in neointimal area in both the 32 μg and 166 μg treatment groups. The percent diameter stenosis as assessed by angiography was also significantly reduced in the 2 rapamycin treatment groups when compared to the CAP/GLY group, although the reduction in this parameter from the metal control was small and non-significant. Never-the-less, in this preliminary 14 day study, these data suggest that local release of rapamycin from a biodegradable hydrophobic polymer coating may be capable of limiting the amount of neointimal proliferation which occurs as a result of stent deployment.

BSC-SJA-0651

EP 0 970 711 A2

Example 11

[0070]   In the glove box, 100 μL (33 μmol) of a 0.33 M stannous octoate solution in toluene, 115 μL (1.2 mmol) of diethylene glycol, 24.6 grams (170 mmol) of L-lactide, and 45.7 grams (400 mmol) of ε-caprolactone were transferred
5   into a silanized, flame dried, two neck, 250 mL round bottom flask equipped with a stainless steel mechanical stirrer and a nitrogen gas blanket. The reaction flask was placed in an oil bath already set at 190°C and held there. Meanwhile, in the glove box, 62.0 grams (430 mmol) L-lactide were transferred into a flame dried, pressure equalizing addition funnel. The funnel was wrapped with heat tape and attached to the second neck of the reaction flask. After 8 hours at 190°C, the molten L-lactide was added to the reaction flask over 5 minutes. The reaction was continued overnight for
10   a total reaction time of 24 hours at 190°C. The reaction was allowed to cool to room temperature overnight. The copolymer was isolated from the reaction flask by freezing in liquid nitrogen and breaking the glass. Any remaining glass fragments were removed from the copolymer using a bench grinder. The copolymer was again frozen with liquid nitrogen and broken off the mechanical stirring paddle. The copolymer was ground into a tared glass jar using a Wiley Mill and allowed to warm to room temperature in a vacuum oven overnight. 103.13 grams of 40:60 poly(ε-caprolactone-
15   co-L-lactide) were added to a tared aluminum pan and then devolitilized under vacuum at 110°C for 54 hours. 98.7 grams (95.7% by weight) of copolymer were recovered after devolitilization.

Claims

20

1.   A method for coating a stent having an outer surface and inner surface with passages between the outer and inner surfaces comprising:

25   (a) contacting the stent with a liquid coating solution containing a film forming biocompatible polymer under conditions suitable to allow the film forming biocompatible polymer to coat at least one surface of the stent;
   (b) before the coating solution dries creating fluid movement out of the passages of the stent sufficient to prevent the film forming biocompatible polymer from substantially blocking said passages thereafter;
   (c) drying the stent to provide at least a partially coated stent with a first coating.

30   2.   The method of claim 1 wherein the stent is contacted with the coating solution by dipping the stent into the coating solution or by spraying the coating solution on to the stent.

3.   The method of claim 1 or claim 2 wherein fluid movement is created: by contacting a mandrel with the inner surface of the stent and moving the mandrel relative to the stent to prevent bridges from forming in said passages; or by
35   contacting the outer surface of the stent with the inner surface of a tube and moving the tube relative to the stent to prevent bridges from forming in said passages.

4.   The method of any of claims 1 to 3 wherein the film forming biocompatible polymer is an aliphatic polyester, a poly (amino acid), a copoly(other-ester), a polyalkylene oxalate, a polyamide, a poly(iminocarbonate), a polyorthoester,
40   a polyoxaester, a polyamidoester, a polyoxaester containing amido groups, a poly(anhydride), a polyphosphazene, a biomolecule or a blend thereof.

5.   The method of claim 4 wherein the film forming polymer is a biocompatible aliphatic polyester, which is preferably elastomeric.

45

6.   The method of claim 5 wherein the biocompatible aliphatic polyester is an elastomeric copolymer of ε-caprolactone and glycolide, an elastomeric copolymer of ε-caprolactone and lactide, an elastomeric copolymer of p-dioxanone and lactide, an elastomeric copolymer of ε-caprolactone and p-dioxanone, an elastomeric copolymer of p-diox-anone and trimethylene carbonate, an elastomeric copolymer of trimethylene carbonate and glycolide, an elasto-
50   meric copolymer of trimethylene carbonate and lactide or blend thereof.

7.   The method of any one of claims 1 to 6 wherein additionally contained in the coating solution is a pharmaceutically active compound.

55   8.   The method of claim 7 wherein the pharmaceutically active compound is: an antiproliferative/antimitotic agent; an antibiotic; an enzyme; an antiproliferative/antimitotic alkylating agent; an antiproliferative/antimitotic antimetabolite; a hormone; an anticoaglant; a fibrinolytic agent; an antiplatelet agent; an antimigratory agent; an antisecretory agent; an antiinflammatory agent; an immunosuppressive agent; an angiogenic agent; a nitric oxide donor; an anti-

12

BSC-SJA-0652

**EP 0 970 711 A2**

sense oligonucleotide or a combination thereof, and is preferably rapamycin.

9. The method of any one of claims 1 to 8, wherein additionally present is a biocompatible hydrophilic polymer.

5   10. The method of any one of claims 1 to 9 wherein after the stent is dried a second coating is applied.

10

15

20

25

30

35

40

45

50

55

13

BSC-SJA-0653

EP 0 970 711 A2



**FIG. 1**



**FIG. 2**

14

BSC-SJA-0654

EP 0 970 711 A2

# FIG. 3



# FIG. 4



BSC-SJA-0655

EP 0 970 711 A2

# FIG. 5



1 mm

# FIG. 6



100 μm

18

BSC-SJA-0656

EP 0 970 711 A2



**FIG. 7**

Release in 15% Ethanol

BSC-SJA-0657

EP 0 970 711 A2

# FIG. 8



In Vivo Rapamycin Release

BSC-SJA-0658

# EXHIBIT 16



(19)

Europäisches Patentamt

European Patent Office

Office européen des brevets



(11)   **EP 0 950 386 A2**

(12)   **EUROPEAN PATENT APPLICATION**

(43) Date of publication:
20.10.1999   Bulletin 1999/42

(51) Int Cl.⁶: **A61F 2/06**

(21) Application number: 99302918.0

(22) Date of filing: 15.04.1999

(84) Designated Contracting States:
**AT BE CH CY DE DK ES FI FR GB GR IE IT LI LU
MC NL PT SE**
Designated Extension States:
**AL LT LV MK RO SI**

(30) Priority: 16.04.1998  US 61568

(71) Applicant: Cordis Corporation
Maimi Lakes, Florida 33014 (US)

(72) Inventors:
• **Wright, Carol**
  Somerset, NJ 08873 (US)

• Llanos, Gerard H.
  Stewartsville, NJ 08886 (US)
• Rakos, Ronald
  Monmouth Jct., NJ 08852 (US)
• King, Kirsten
  Hoboken, NJ 07030 (US)

(74) Representative: Fisher, Adrian John
CARPMAELS & RANSFORD
43 Bloomsbury Square
London WC1A 2RA (GB)

(54)   **Stent with local rapamycin delivery**

(57)   Delivery of rapamycin locally, particularly from an intravascular stent, directly from micropores in the stent body or mixed or bound to a polymer coating applied on stent, to inhibit neointimal tissue proliferation and thereby prevent restenosis. This invention also facilitates the performance of the stent in inhibiting restenosis.

## FIG. 4



45    40

Printed by Jouve, 75001 PARIS (FR)

EP 0 950 386 A2

BSC-SJA-0659

1                                EP 0 950 386 A2                                2

## Description

## Field of the Invention:

[0001] Delivery of rapamycin locally, particularly from an intravascular stent, directly from micropores in the stent body or mixed or bound to a polymer coating applied on stent, to inhibit neointimal tissue proliferation and thereby prevent restenosis. This invention also facilitates the performance of the stent in inhibiting restenosis.

## Background of the invention:

[0002] Re-narrowing (restenosis) of an artherosclerotic coronary artery after percutaneous transluminal coronary angioplasty (PTCA) occurs in 10-50% of patients undergoing this procedure and subsequently requires either further angioplasty or coronary artery bypass graft. While the exact hormonal and cellular processes promoting restenosis are still being determined, our present understanding is that the process of PTCA, besides opening the artherosclerotically obstructed artery, also injures resident coronary arterial smooth muscle cells (SMC). In response to this injury, adhering platelets, infiltrating macrophages, leukocytes, or the smooth muscle cells (SMC) themselves release cell derived growth factors with subsequent proliferation and migration of medial SMC through the internal elastic lamina to the area of the vessel intima. Further proliferation and hyperplasia of intimal SMC and, most significantly, production of large amounts of extracellular matrix over a period of 3-6 months results in the filling in and narrowing of the vascular space sufficient to significantly obstruct coronary blood flow.

[0003] Several recent experimental approaches to preventing SMC proliferation have shown promise although the mechanisms for most agents employed are still unclear. Heparin is the best known and characterized agent causing inhibition of SMC proliferation both in vitro and in animal models of balloon angioplasty-mediated injury. The mechanism of SMC inhibition with heparin is still not known but may be due to any or all of the following: 1) reduced expression of the growth regulatory protooncogenes c-fos and c-myc, 2) reduced cellular production of tissue plasminogen activator; are 3) binding and dequestration of growth regulatory factors such as fibroblast growth factor (FGF).

[0004] Other agents which have demonstrated the ability to reduce myointimal thickening in animal models of balloon vascular injury are angiopeptin (a somatostatin analog), calcium channel blockers, angiotensin converting enzyme inhibitors (captopril, cilazapril), cyclosporin A, trapidil (an antianginal, antiplatelet agent), terbinafine (antifungal), colchicine and taxol (antitubulin antiproliferatives), and c-myc and c-myb antisense oligonucleotides.

[0005] Additionally, a goat antibody to the SMC mi-

togen platelet derived growth factor (PDGF) has been shown to be effective in reducing myointimal thickening in a rat model of balloon angioplasty injury, thereby implicating PDGF directly in the etiology of restenosis. Thus, while no therapy has as yet proven successful clinically in preventing restenosis after angioplasty, the in vivo experimental success of several agents known to inhibit SMC growth suggests that these agents as a class have the capacity to prevent clinical restenosis and deserve careful evaluation in humans.

[0006] Coronary heart disease is the major cause of death in men over the age of 40 and in women over the age of fifty in the western world. Most coronary artery-related deaths are due to atherosclerosis. Atherosclerotic lesions which limit or obstruct coronary blood flow are the major cause of ischemic heart disease related mortality and result in 500,000-600,000 deaths in the United States annually. To arrest the disease process and prevent the more advanced disease states in which the cardiac muscle itself is compromised, direct intervention has been employed via percutaneous transluminal coronary angioplasty (PTCA) or coronary artery bypass graft (CABG).

[0007] PTCA is a procedure in which a small balloon-tipped catheter is passed down a narrowed coronary artery and then expanded to re-open the artery. It is currently performed in approximately 250,000-300,000 patients each year. The major advantage of this therapy is that patients in which the procedure is successful need not undergo the more invasive surgical procedure of coronary artery bypass graft. A major difficulty with PTCA is the problem of post-angioplasty closure of the vessel, both immediately after PTCA (acute reocclusion) and in the long term (restenosis).

[0008] The mechanism of acute reocclusion appears to involve several factors and may result from vascular recoil with resultant closure of the artery and/or deposition of blood platelets along the damaged length of the newly opened blood vessel followed by formation of a fibrin/red blood cell thrombus. Recently, intravascular stents have been examined as a means of preventing acute reclosure after PTCA.

[0009] Restenosis (chronic reclosure) after angioplasty is a more gradual process than acute reocclusion; 30% of patients with subtotal lesions and 50% of patients with chronic total lesions will go on to restenosis after angioplasty. While the exact mechanism for restenosis is still under active investigation, the general aspects of the restenosis process have been identified:

[0010] In the normal arterial wall, smooth muscle cells (SMC) proliferate at a low rate (<0.1%/day; ref). SMC in vessel wall exists in a 'contractile' phenotype characterized by 80-90% of the cell cytoplasmic volume occupied with the contractile apparatus. Endoplasmic reticulum, golgi bodies, and free ribosomes are few and located in the perinuclear region. Extracellular matrix surrounds SMC and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining



2

BSC-SJA-0660

SMC in the contractile phenotypic state.

[0011]  Upon pressure expansion of an intracoronary balloon catheter during angioplasty, smooth muscle cells within the arterial wall become injured. Cell derived growth factors such as platelet derived growth factor (PDGF), basic fibroblast growth factor (bFGF), epidermal growth factor (EGF), etc. released from platelets (i. e., PDGF) adhering to the damaged arterial luminal surface, invading macrophages and/or leukocytes, or directly from SMC (i.e., BFGF) provoke a proliferation and migratory response in medial SMC. These cells undergo a phenotypic change from the contractile phenotype to a 'synthetic' phenotype characterized by only few contractile filament bundles but extensive rough endoplasmic reticulum, golgi and free ribosomes. Proliferation/migration usually begins within 1-2 days post-injury and peaks at 2 days in the media, rapidly declining thereafter (Campbell et al., in: *Vascular Smooth Muscle Cells in Culture*, Campbell, J.H. and Campbell, G.R., Eds, CRC Press, Boca Raton, 1987, pp. 39-55) ; Clowes, A.W. and Schwartz,. S.M., Circ. Res. 56:139-145, 1985).

[0012]  Finally, daughter synthetic cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate. Proliferation and migration continues until the damaged luminal endothelial layer regenerates at which time proliferation ceases within the intima, usually within 7-14 days postinjury. The remaining increase in intimal thickening which occurs over the next 3-6 months is due to an increase in extracellular matrix rather than cell number. Thus, SMC migration and proliferation is an acute response to vessel injury while intimal hyperplasia is a more chronic response. (Liu et al., Circulation, 79:1374-1387, 1989).

[0013]  Patients with symptomatic reocclusion require either repeat PTCA or CABG. Because 30-50% of patients undergoing PTCA will experience restenosis, restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease. Because SMC proliferation and migration are intimately involved with the pathophysiological response to arterial injury, prevention of SMC proliferation and migration represents a target for pharmacological intervention in the prevention of restenosis.

## Summary of the Invention:

## Novel Features and Applications to Stent Technology

[0014]  Currently, attempts to improve the clinical performance of stents have involved some variation of either applying a coating to the metal, attaching a covering or membrane, or embedding material on the surface via ion bombardment. A stent designed to include reservoirs is a new approach which offers several important advantages over existing technologies.

## Local Drug Delivery from a Stent to Inhibit Restenosis

[0015]  In this application, it is desired to deliver a therapeutic agent to the site of arterial injury. The conventional approach has been to incorporate the therapeutic agent into a polymer material which is then coated on the stent. The ideal coating material must be able to adhere strongly to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). To date, the ideal coating material has not been developed for this application.

[0016]  An alternative would be to design the stent to contain reservoirs which could be loaded with the drug. A coating or membrane of biocompatable material could be applied over the reservoirs which would control the diffusion of the drug from the reservoirs to the artery wall.

[0017]  One advantage of this system is that the properties of the coating can be optimized for achieving superior biocompatibility and adhesion properties, without the addition requirement of being able to load and release the drug. The size, shape, position, and number of reservoirs can be used to control the amount of drug, and therefore the dose delivered.

## Description of the Drawings:

[0018]  The invention will be better understood in connection with the following figures in which Figures 1 and 1A are top views and section views of a stent containing reservoirs as described in the present invention;

Figures 2a and 2b are similar views of an alternate embodiment of the stent with open ends;

Figures 3a and 3b are further alternate figures of a device containing a grooved reservoir; and

Figure 4 is a layout view of a device containing a reservoir as in Figure 3.

## Detailed Description of the Invention

[0019]  Pharmacological attempts to prevent restenosis by pharmacologic means have thus far been unsuccessful and all involve systemic administration of the trial agents. Neither aspirin-dipyridamole, ticlopidine, acute heparin administration, chronic warfarin (6 months) nor methylprednisolone have been effective in preventing restenosis although platelet inhibitors have been effective in preventing acute reocclusion after an-

BSC-SJA-0661

gioplasty. The calcium antagonists have also been un-
successful in preventing restenosis, although they are
still under study. Other agents currently under study in-
clude thromboxane inhibitors, prostacyclin mimetics,
platelet membrane receptor blockers, thrombin inhibi-
tors and angiotensin converting enzyme inhibitors.
These agents must be given systemically, however, and
attainment of a therapeutically effective dose may not
be possible; antiproliferative (or anti-restenosis) con-
centrations may exceed the known toxic concentrations
of these agents so that levels sufficient to produce
smooth muscle inhibition may not be reached (Lang et
al., 42 Ann. Rev. Med., 127-132 (1991); Popma et al.,
84 Circulation, 1426-1436 (1991)).

[0020]  Additional clinical trials in which the effective-
ness for preventing restenosis of dietary fish oil supple-
ments, thromboxane receptor antagonists, cholesterol
lowering agents, and serotonin antagonists has been
examined have shown either conflicting or negative re-
sults so that no pharmacological agents are as yet clin-
ically available to prevent post-angioplasty restenosis
(Franklin, S.M. and Faxon, D.P., 4 Coronary Artery Dis-
ease, 232-242 (1993); Serruys, P.W. et al., 88 Circula-
tion, (part 1) 1588-1601, (1993).

[0021]  Conversely, stents have proven useful in pre-
venting reducing the proliferation of restenosis. Stents,
such as the stent 10 seen in layout in Figure 4, balloon-
expendable slotted metal tubes (usually but not limited
to stainless steel), which when expanded within the lu-
men of an angioplastied coronary artery, provide struc-
tural support to the arterial wall. This support is helpful
in maintaining an open path for blood flow. In two rand-
omized clinical trials, stents were shown to increase an-
giographic success after PTCA, increase the stenosed
blood vessel lumen and to reduce the lesion recurrence
at 6 months (Serruys et al., 331 New Eng Jour. Med,
495, (1994); Fischman et al., 331 New Eng Jour. Med,
496-901 (1994). Additionally, in a preliminary trial,
heparin coated stents appear to possess the same ben-
efit of reduction in stenosis diameter at follow-up as was
observed with non-heparin coated stents. Additionally,
heparin coating appears to have the added benefit of
producing a reduction in sub-acute thrombosis after
stent implantation (Serruys et al., 93 Circulation,
412-422, (1996). Thus, 1) sustained mechanical expan-
sion of a stenosed coronary artery has been shown to
provide some measure of restenosis prevention, and 2)
coating of stents with heparin has demonstrated both
the feasibility and the clinical usefulness of delivering
drugs to local, injured tissue off the surface of the stent.

[0022]  Numerous agents are being actively studied as
antiproliferative agents for use in restenosis and have
shown some activity in experimental animal models.
These include: heparin and heparin fragments (Clowes
and Karnovsky, 265 Nature, 25-826, (1977); Guyton, J.
R. et al. 46 Circ. Res., 625-634, (1980); Clowes, A.W.
and Clowes, M.M., 52 Lab. Invest., 611-616, (1985);
Clowes, A.W. and Clowes, M.M., 58 Circ. Res., 839-845

(1986); Majesky et al., 61 Circ Res., 296-300, (1987);
Snow et al., 137 Am. J. Pathol., 313-330 (1990); Okada,
T. et al., 25 Neurosurgery, 92-898, (1989) colchicine
(Currier, J.W. et al., 80 Circulation, 11-66, (1989), taxol
(ref), agiotensin converting enzyme (ACE) inhibitors
(Powell, J.S. et al., 245 Science, 186-188 (1989), angi-
opeptin (Lundergan, C.F. et al., 17 Am. J. Cardiol. (Sup-
pl. B); 132B-136B (1991), Cyclosporin A (Jonasson, L.
et. al., 85 Proc. Nati, Acad. Sci., 2303 (1988), goat-anti-
rabbit PDGF antibody (Ferns, G.A.A., et al., 253 Sci-
ence, 1129-1132 (1991), turbinafine (Nemecek, G.M. et
al., 248 J. Pharmacol. Exp. Thera., 1167-1174? (1989),
trapidil (Liu, M.W. et al., 81 Circulation, 1089-1093
(1990), interferon-gamma (Hansson, G.K. and Holm, 84
J. Circulation, 1266-1272 (1991), steroids (Colburn, M.
D. et al., 15 J. Vasc. Surg., 510-518 (1992), see also
Berk, B.C. et al., 17 J. Am. Coll. Cardiol., 111B-1 17B
(1991), ionizing radiation (ref), fusion toxins (ref) anti-
sense oligonucleotides (ref), gene vectors (ref), and ra-
pamycin (see below).

[0023]  Of particular interest in rapamycin. Rapamycin
is a macrolide antibiotic which blocks IL-2- mediated T-
cell proliferation and possesses antiinflammatory activ-
ity. While the precise mechanism of rapamycin is still
under active investigation, rapamycin has been shown
to prevent the $G_1$ to S phase progression of T-cells
through the cell cycle by inhibiting specific cell cyclins
and cyclin-dependent protein kinases (Siekierka, Immu-
nol. Res. 13: 110-116, 1994). The antiproliferative action
of rapamycin is not limited to T-cells; Marx et al. (Circ
Res 76:412-417, 1995) have demonstrated that ra-
pamycin prevents proliferation of both rat and human
SMC in vitro while Poon et al. have shown the rat, por-
cine, and human SMC migratin can also be inhibited by
rapamycin (J Clin Invest 98: 2277-2283, 1996). Thus,
rapamycin is capable of inhibiting both the inflammatory
response known to occur after arterial injury and stent
implantation, as well as the SMC hyperproliferative re-
sponse. In fact, the combined effects of rapamycin have
been demonstrated to result in a diminished SMC hy-
parproliferative response in a rat femoral artery graft
model and in both rat and porcine arterial balloon injury
models (Gregory et al., Transplantation 55:1409-1418,
1993; Gallo et al., in press, (1997)). These observations
clearly support the potential use of rapamycin in the clin-
ical setting of post-angioplasty restenosis.

[0024]  Although the ideal agent for restenosis has not
yet been identified, some desired properties are clear.
Inhibition of local thrombosis without the risk systemic
bleeding complications and continuous and prevention
of the dequate of arterial injury, including local inflam-
mation and sustained prevention smooth muscle prolif-
eration at the site of angioplasty without serious system-
ic complications. Inasmuch as stents prevent at least a
portion of the restenosis process, an agent which pre-
vents inflammation and the proliferation of SMC com-
bined with a stent may provide the most efficacious
treatment for post-angioplasty restenosis.



BSC-SJA-0662

7                    EP 0 950 386 A2                    8

## Experiments

[0025]  Agents: Rapamycin (sirolimus) structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression.

### Delivery Methods:

[0026]  These can vary:

- Local delivery of such agents (rapamycin) from the struts of a stent, from a stent graft, grafts, stent cover or sheath.

- Involving combinations with polymers (both degradable and nondegrading) to hold the drug to the stent or graft.

- or entrapping the drug into the metal of the stent or graft body which has been modified to contain micropores or channels, as will be explained further herein.

- or including covalent binding of the drug to the stent via solution chemistry techniques (such as via the Carmeda process) or dry chemistry techniques (e. g. vapour deposition methods such as rf-plasma polymerization) and combinations thereof.

- Catheter delivery intravascularly from a tandem balloon or a porous balloon for intramural uptake

- Extravascular delivery by the pericardial route

- Extravascular delivery by the advential application of sustained release formulations.

[0027]  Uses: for inhibition of cell proliferation to prevent neointimal proliferation and restenosis.

prevention of tumor expansion from stents
prevent ingrowth of tissue into catheters and shunts inducing their failure.

### 1. Experimental Stent Delivery Method - Delivery from Polymer Matrix:

[0028]  Solution of Rapamycin, prepared in a solvent miscible with polymer carrier solution, is mixed with solution of polymer at final concentration range 0.001 weight % to 30 weight % of drug. Polymers are biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation) and degradable, such as lactone-based polyesters or copolyesters, e.g., polylactide,    polycaprolacton-glycolide,polyorthoesters, polyanhydrides;  poly-aminoacids;  polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof. Nonabsorbable biocom-

patible polymers are also suitable candidates. Polymers such as polydimethylsiloxane; poly(ethylene-vinylacetate); acrylate based polymers or copolymers, e.g., poly (hydroxyethyl methylmethacrylate, polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters.

[0029]  Polymer/drug mixture is applied to the surfaces of the stent by either dip-coating, or spray coating, or brush coating or dip/spin coating or combinations thereof, and the, solvent allowed to evaporate to leave a film with entrapped rapamycin.

### 2. Experimental Stent Delivery Method - Delivery from Microporous Depots in Stent Through a Polymer Membrane Coating:

[0030]  Stent, whose body has been modified to contain micropores or channels is dipped into a solution of Rapamycin, range 0.001 wt% to saturated, in organic solvent such as acetone or methylene chloride, for sufficient time to allow solution to permeate into the pores. (The dipping solution can also be compressed to improve the loading efficiency.) After solvent has been allowed to evaporate, the stent is dipped briefly in fresh solvent to remove excess surface bound drug. A solution of polymer, chosen from any identified in the first experimental method, is applied to the stent as detailed above. This outerlayer of polymer will act as diffusion-controller for release of drug.

### 3. Experimental Stent Delivery Method - Delivery via lysis of a Covalent Drug Tether

[0031]  Rapamycin is modified to contain a hydrolytically or enzymatically labile covalent bond for attaching to the surface of the stent which itself has been chemically derivatized to allow covalent immobilization. Covalent bonds such as ester, amides or anhydrides may be suitable for this.

### 4. Experimental Method - Pericardial Delivery

[0032]  A: Polymeric Sheet Rapamycin is combined at concentration range previously highlighted, with a degradable polymer such as poly(caprolactone-gylcolide) or non-degradable polymer, e.g., polydimethylsiloxane, and mixture cast as a thin sheet, thickness range 10µ to 1000µ. The resulting sheet can be wrapped perivascularly on the target vessel. Preference would be for the absorbable polymer.

[0033]  B: Conformal coating: Rapamycin is combined with a polymer that has a melting temperature just above 37°C, range 40°-45°C. Mixture is applied in a molten state to the external side of the target vessel. Upon cooling to body temperature the mixture solidifies conformally to the vessel wall. Both non-degradable and absorbable biocompatible polymers are suitable.

[0034]  As seen in the figures it is also possible to mod-

5

BSC-SJA-0663

9                                    EP 0 950 386 A2                         10

ity currently manufactured stents in order to adequately provide the drug dosages such as rapamycin. As seen in Figures 1a, 2a and 3a, any stent strut 10, 20, 30 can be modified to have a certain reservoir or channel 11, 21, 31. Each of these reservoirs can be open or closed as desired. These reservoirs can hold the drug to be delivered. Figure 4 shows a stent 40 with a reservoir 45 created at the apex of a flexible strut. Of course, this reservoir 45 is intended to be useful to deliver rapamycin or any other drug at a specific point of flexibility of the stent. Accordingly, this concept can be useful for "second generation" type stents.

[0035]   In any of the foregoing devices, however, it is useful to have the drug dosage applied with enough specificity and enough concentration to provide an effective dosage in the lesion area. In this regard, the reservoir size in the stent struts must be kept at a size of about 0.0005" to about 0.003". Then, it should be possible to adequately apply the drug dosage at the desired location and in the desired amount.

[0036]   These and other concepts will are disclosed herein. It would be apparent to the reader that modifications are possible to the stent or the drug dosage applied. In any event, however, the any obvious modifications should be perceived to fall within the scope of the invention which is to be realized from the attached claims and their equivalents.

Claims

1.   A stent comprising:
         a generally thin walled cylinder, said cylinder containing a plurality of struts, said struts expandable dependent on the amount of force applied to said strut, and said struts having a generally uniform thickness; and a channel formed in at least one of said struts, said channel having a closed perimeter on all sides and an open top, and said channel smaller in all dimensions than said strut, said channel containing a therapeutic agent applied therein.

2.   A stent according to claim 1 wherein said channel has a generally rectangular perimeter.

3.   A stent according to claim 2 wherein said therapeutic agent is rapamycin coated to said channel.

4.   The stent of claim 9 wherein said channel is rectangular in shape.

5.   The stent of claim 3 containing struts with said channels.

6.   The stent of claim 3 wherein said channel is laser cut into said strut.

7.   The stent of claim 1 wherein the therapeutic agent

is rapamycin.

8.   A stent comprising a generally thin walled structure containing a plurality of struts, the struts expandable to assume the shape of a lumen into which the stent is emplaced, said struts having a thickness, and a channel formed in at least one of said struts, said channel having a closed perimeter on all sides and an open top, and said channel smaller in all dimensions than said strut, said channel containing a therapeutic agent applied therein.

6



BSC-SJA-0664

EP 0 950 386 A2

# FIG. 1

# FIG. 1a



# FIG. 2a



# FIG. 2b



7

BSC-SJA-0665

EP 0 950 386 A2

## FIG. 3a



## FIG. 3b



## FIG. 4



8

BSC-SJA-0666

# EXHIBIT 17

Please type a plus sign (+) inside this box → [+]

## UTILITY
## PATENT APPLICATION
## TRANSMITTAL

*(only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| Attorney Docket No. | JJL-43 |
| First Named Inventor or Application Identifier | Carol Wright, et al. |
| Express Mail Label No. | TB123968152 |

### APPLICATION ELEMENTS

See MPEP Chapter 600 concerning utility patent application contents.

### ADDRESS TO:
Assistant Commissioner for Patents
Box Patent Application
Washington, DC 20231

1. ☒ Fee Transmittal Form *(attached herein in duplicate)*
2. ☒ Specification [Total Pages 10]
   *(Preferred arrangement set forth below)*
   - Descriptive Title of the Invention
   - Cross References to Related Applications
   - Statement Regarding Fed sponsored R&D
   - Reference to Microfiche Appendix
   - Background of the Invention
   - Brief Summary of the Invention
   - Brief Description of the Drawings *(If filed)*
   - Detailed Description
   - Claim(s)
   - Abstract of the Disclosure
3. ☒ Drawing(s) (35 USC 113)   [Total Sheets  2  ]
4. Oath or Declaration
   a. ☐ Newly executed (original or copy)
   b. ☒ Unexecuted original
   c. ☐ Copy from a prior application (37 CFR 1.63(d))
      *(for continuation/divisional check boxes 5 and 16)*
      i. ☐ Deletion of Inventor(s)
         Signed statement attached deleting
         inventor(s) named in the prior application,
         see 37 CFR 1.63(d)(2) and 1.33(b).
   ☐ Incorporation by Reference
      *(usable if Box 4b is checked)*
      The entire disclosure of the prior application, from
      which a copy of the oath or declaration is supplied
      under Box 4b, is considered as being part of the
      disclosure of the accompanying application and is
      hereby incorporated by reference therein.

6. ☐ Microfiche Computer Program (Appendix)
7. ☐ Nucleotide and/or Amino Acid Sequence
   Submission (if applicable, all necessary)
   a.☐ Computer Readable Copy
   b.☐ Paper Copy (identical to computer copy)
   c.☐ Statement verifying identity of above copies

### ACCOMPANYING APPLICATION PARTS

8. ☐ Assignment Papers (cover sheet &
   document(s)
9. ☐ 37 CFR 3.73(b) Statement
   *(when there is an assignee)* ☐ Power of Attorney
10. ☐ English Translation Document *(if applicable)*
11. ☐ Information Disclosure Statement
   (IDS)/PTO-1449 ☐ Copies of IDS Citations
12. ☐ Preliminary Amendment
13. ☒ Return Receipt Postcard (MPEP 503)
   *(Should be specifically itemized)*
14. ☐ Certified Copy of Priority Document(s)
   *(if foreign priority is claimed)*

15. ☐ Other:

16. If a CONTINUING APPLICATION, check appropriate box and supply the requisite information:
☒ Continuation ☐ Divisional ☐ Continuation-In-Part (CIP)   of prior application No. 60/044,592

17. For this divisional application, please cancel original Claims        of the prior application before calculating the filing fee.

### 18.   CORRESPONDENCE ADDRESS

☐ Customer Number or Bar Code Label           or ☒ Correspondence Address below

| | |
|---|---|
| Name: | Audley A. Ciamporcero, Jr., Esq. |
| Address: | Johnson & Johnson |
| | One Johnson & Johnson Plaza |
| | New Brunswick, NJ 08933-7003   USA |

### 19.   TELEPHONE CONTACT

Please direct all telephone calls or telefaxes to Paul A. Coletti at:
Telephone:   (732) 524-2815         Fax:   (732) 524-5889

### 19.  SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

| | | |
|---|---|---|
| NAME | Paul A. Coletti | Reg. No. 32019 |
| SIGNATURE | *[signature]* | |
| DATE | April 16, 1998 | |

VIA EXPRESS MAIL NO. TB 123968152
MAILED APRIL 16, 1998

BSC-SJA-0667

## FEE TRANSMITTAL

| | Complete if Known | |
|---|---|---|
| Application Number | | |
| Filing Date | | |
| First Named Inventor | Carol Wright et al. | |
| Group Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | JJI-43 | |

## FEE CALCULATION

### CLAIMS AS FILED

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| FOR: | NUMBER   FILED | NUMBER EXTRA | RATE | BASIC FEE $790.00 |
| TOTAL CLAIMS | 3 – 20 = | 0 | x 22.00 | $ 0.00 |
| INDEPENDENT CLAIMS | 3 – 3 = | 0 | x 82.00 | $ 0.00 |
| MULTIPLE DEPENDENT CLAIMS | ☐ | N/A | $270.00 | |
| | | | TOTAL FEES | $ 790.00 |

## METHOD OF PAYMENT

☒ Please charge Deposit Account No. 10-0750/JJI-43/PAC in the amount of $790.00.  Three copies of this sheet are enclosed.

☒ The Commissioner is hereby authorized to charge any additional fees which may be required in connection with the filing of this communication, or credit any overpayment, to Account No. 10-0750/JJI-43/PAC. Three copies of this sheet are enclosed.

| SUBMITTED BY: | | Complete (if applicable) |
|---|---|---|
| Typed or Printed Name | Paul A. Coletti | Reg. No. 32,019 |
| Signature | | Date: 4/16/98 | Deposit Account No. 10-0750 |

VIA EX RESS MAIL NO. T0123968152
— MAILED APRIL 16, 1998

BSC-SJA-0668

BH
n.24-00

This application claims the benefit of provisional
application Ser No. 60/044,692, filed on Apr. 18, 1997.

– 1 –

5    LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE
SEQUELAE ASSOCIATED WITH PTCA PROCEDURES,
INCLUDING DELIVERY USING A MODIFIED STENT

### Field of the Invention:

10    Delivery of rapamycin locally, particularly from an
intravascular stent, directly from micropores in the stent
body or mixed or bound to a polymer coating applied on
stent, to inhibit neointimal tissue proliferation and
thereby prevent restenosis. This invention also
facilitates the performance of the stent in inhibiting
restenosis.

### Background of the Invention:

Re-narrowing (restenosis) of an artherosclerotic
coronary artery after percutaneous transluminal coronary
20    angioplasty (PTCA) occurs in 10-50% of patients undergoing
this procedure and subsequently requires either further
angioplasty or coronary artery bypass graft. While the
exact hormonal and cellular processes promoting restenosis
25    are still being determined, our present understanding is
that the process of PTCA, besides opening the
artherosclerotically obstructed artery, also injures
resident coronary arterial smooth muscle cells (SMC). In
response to this injury, adhering platelets, infiltrating
30    macrophages, leukocytes, or the smooth muscle cells (SMC)
themselves release cell derived growth factors with
subsequent proliferation and migration of medial SMC
through the internal elastic lamina to the area of the
vessel intima. Further proliferation and hyperplasia of

JJI-43

VIA EXPRESS MAIL NO. TB123968152
MAILED APRIL 16, 1993

BSC-SJA-0869

- 2 -

5   intimal SMC and, most significantly, production of large
amounts of extracellular matrix over a period of 3-6
months results in the filling in and narrowing of the
vascular space sufficient to significantly obstruct
coronary blood flow.

10

Several recent experimental approaches to preventing
SMC proliferation have shown promise although the
mechanisms for most agents employed are still unclear.
Heparin is the best known and characterized agent causing
15   inhibition of SMC proliferation both in vitro and in
animal models of balloon angioplasty-mediated injury. The
mechanism of SMC inhibition with heparin is still not
known but may be due to any or all of the following: 1)
reduced expression of the growth regulatory protooncogenes
20   c-fos and c-myc, 2) reduced cellular production of tissue
plasminogen activator; are 3) binding and dequestration of
growth regulatory factors such as fibrovalent growth
factor (FGF).

25   Other agents which have demonstrated the ability to
reduce myointimal thickening in animal models of balloon
vascular injury are angiopeptin (a somatostatin analog),
calcium channel blockers, angiotensin converting enzyme
inhibitors (captopril, cilazapril), cyclosporin A,
30   trapidil (an antianginal, antiplatelet agent), terbinafine
(antifungal), colchicine and taxol (antitubulin
antiproliferatives), and c-myc and c-myb antisense
oligonucleotides.

JJI-43

3

BSC-SJA-0670

- 3 -

Additionally, a goat antibody to the SMC mitogen
platelet derived growth factor (PDGF) has been shown to be
effective in reducing myointimal thickening in a rat model
of balloon angioplasty injury, thereby implicating PDGF
directly in the etiology of restenosis. Thus, while no
therapy has as yet proven successful clinically in
preventing restenosis after angioplasty, the *in vivo*
experimental success of several agents known to inhibit
SMC growth suggests that these agents as a class have the
capacity to prevent clinical restenosis and deserve
careful evaluation in humans.

Coronary heart disease is the major cause of death in
men over the age of 40 and in women over the age of fifty
in the western world. Most coronary artery-related deaths
are due to atherosclerosis. Atherosclerotic lesions which
limit or obstruct coronary blood flow are the major cause
of ischemic heart disease related mortality and result in
500,000-600,000 deaths in the United States annually. To
arrest the disease process and prevent the more advanced
disease states in which the cardiac muscle itself is
compromised, direct intervention has been employed via
percutaneous transluminal coronary angioplasty (PTCA) or
coronary artery bypass graft (CABG).

PTCA is a procedure in which a small balloon-tipped
catheter is passed down a narrowed coronary artery and
then expanded to re-open the artery. It is currently
performed in approximately 250,000-300,000 patients each

JJI-43

4

BSC-SJA-0671

- 4 -

year.   The major advantage of this therapy is that patients in which the procedure is successful need not undergo the more invasive surgical procedure of coronary artery bypass graft.  A major difficulty with PTCA is the problem of post-angioplasty closure of the vessel, both immediately after PTCA (acute reocclusion) and in the long term (restenosis).

The mechanism of acute reocclusion appears to involve several factors and may result from vascular recoil with resultant closure of the artery and/or deposition of blood platelets along the damaged length of the newly opened blood vessel followed by formation of a fibrin/red blood cell thrombus.  Recently, intravascular stents have been examined as a means of preventing acute reclosure after PTCA.

Restenosis (chronic reclosure) after angioplasty is a more gradual process than acute reocclusion: 30% of patients with subtotal lesions and 50% of patients with chronic total lesions will go on to restenosis after angioplasty.  While the exact mechanism for restenosis is still under active investigation, the general aspects of the restenosis process have been identified:

In the normal arterial will, smooth muscle cells (SMC) proliferate at a low rate (<0.1%/day; ref).  SMC in vessel wall exists in a 'contractile' phenotype characterized by 80-90% of the cell cytoplasmic volume occupied with the contractile apparatus.   Endoplasmic

JJI-43

5

BSC-SJA-0672

— 5 —

reticulum, golgi bodies, and free ribosomes are few and located in the perinuclear region. Extracellular matrix surrounds SMC and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining SMC in the contractile phenotypic state.

Upon pressure expansion of an intracoronary balloon cathetar during angioplasty, smooth muscle cells within the arterial wall become injured. Cell derived growth factors such as platelet derived growth factor (PDGF), basic fibroblast growth factor (bFGF), epidermal growth factor (EGF), etc. released from platelets (i.e., PDGF) adhering to the damaged arterial luminal surface, invading macrophages and/or leukocytes, or directly from SMC (i.e., BFGF) provoke a proliferation and migratory response in medial SMC. These cells undergo a phenotypic change from the contractile phenotype to a 'synthetic' phenotype characterized by only few contractile filament bundles but extensive rough endoplasmic reticulum, golgi and free ribosomes. Proliferation/migration usually begins within 1-2 days post-injury and peaks at 2 days in the media, rapidly declining thereafter (Campbell et al., In: Vascular Smooth Muscle Cells in Culture, Campbell, J.H. and Campbell, G.R., Eds, CRC Press, Boca Ration, 1987, pp. 39-55); Clowes, A.W. and Schwartz, S.M., Circ. Res. 56:139-145, 1985).

Finally, daughter synthetic cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate. Proliferation and migration continues until

JJI-43

6

BSC-SJA-0673

- 6 -

the damaged luminal endothelial layer regenerates at which time proliferation ceases within the intima, usually within 7-14 days postinjury. The remaining increase in intimal thickening which occurs over the next 3-5 months is due to an increase in extracellular matrix rather than cell number. Thus, SMC migration and proliferation is an acute response to vessel injury while intimal hyperplasia is a more chronic response. (Liu et al., Circulation, 79:1374-1387, 1989).

Patients with symptomatic reocclusion require either repeat PTCA or CABG. Because 30-50% of patients undergoing PTCA will experience restenosis, restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease. Because SMC proliferation and migration are intimately involved with the pathophysiological response to arterial injury, prevention of SMC proliferation and migration represents a target for pharmacological intervention in the prevention of restenosis.

Summary of the Invention:

Novel Features and Applications to Stent Technology

Currently, attempts to improve the clinical performance of stents have involved some variation of either applying a coating to the metal, attaching a covering or membrane, or embedding material on the surface via ion bombardment. A stent designed to include

7

BSC-SJA-0674

- 7 -

reservoirs is a new approach which offers several important advantages over existing technologies.

## Local Drug Delivery from a Stent to Inhibit Restenosis

In this application, it is desired to deliver a therapeutic agent to the site of arterial injury. The conventional approach has been to incorporate the therapeutic agent into a polymer material which is then coated on the stent. The ideal coating material must be able to adhere strongly to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). To date, the ideal coating material has not been developed for this application.

An alternative would be to design the stent to contain reservoirs which could be loaded with the drug. A coating or membrane of biocompatible material could be applied over the reservoirs which would control the diffusion of the drug from the reservoirs to the artery wall.

One advantage of this system is that the properties of the coating can be optimized for achieving superior

JJI-43

8

BSC-SJA-0875

- 8 -

biocompatibility and adhesion properties, without the addition requirement of being able to load and release the drug. The size, shape, position, and number of reservoirs can be used to control the amount of drug, and therefore the dose delivered.

## Description of the Drawings:

The invention will be better understood in connection with the following figures in which Figures 1 and 1a are top views and section views of a stent containing reservoirs as described in the present invention;

Figures 2a and 2b are similar views of an alternate embodiment of the stent with open ends;

Figures 3a and 3b are further alternate figures of a device containing a grooved reservoir; and

Figure 4 is a layout view of a device containing a reservoir as in Figure 3.

## Detailed Description of the Invention

Pharmacological attempts to prevent restenosis by pharmacologic means have thus far been unsuccessful and all involve systemic administration of the trial agents. Neither aspirin-dipyridamole, ticlopidine, acute heparin administration, chronic warfarin (6 months) nor methylprednisolone have been effective in preventing restenosis although platelet inhibitors have been

JJI-43

9

BSC-SJA-0676

- 9 -

effective in preventing acute reocclusion after
angioplasty. The calcium antagonists have also been
unsuccessful in preventing restenosis, although they are
still under study. Other agents currently under study
include thromboxane inhibitors, prostacyclin mimetics,
platelet membrane receptor blockers, thrombin inhibitors
and angiotensin converting enzyme inhibitors. These
agents must be given systemically, however, and attainment
of a therapeutically effective dose may not be possible;
antiproliferative (or anti-restenosis) concentrations may
exceed the known toxic concentrations of these agents so
that levels sufficient to produce smooth muscle inhibition
may not be reached (Lang et al., 42 Ann. Rev. Med., 127-
132 (1991); Popma et al., 84 Circulation, 1426-1436
(1991)).

Additional clinical trials in which the effectiveness
for preventing restenosis of dietary fish oil supplements,
thromboxane receptor antagonists, cholesterol lowering
agents, and serotonin antagonists has been examined have
shown either conflicting or negative results so that no
pharmacological agents are as yet clinically available to
prevent post-angioplasty restenosis (Franklin, S.M. and
Faxon, D.P., 4 Coronary Artery Disease, 232-242 (1993);
Serruys, P.W. et al., 88 Circulation, (part 1)  1588-1601,
(1993).

Conversely, stents have proven useful in preventing
reducing the proliferation of restenosis. Stents, such as
the stent 18, seen in layout in Figure 4, balloon-

JJI-43

IC

BSC-SJA-0677

- 10 -

expandable slotted metal tubes (usually but not limited to
stainless steel), which when expanded within the lumen of
an angioplastied coronary artery, provide structural
support to the arterial wall. This support is helpful in
maintaining an open path for blood flow.    In two
randomized clinical trials, stents were shown to increase
angiographic success after PTCA, increase the stenosed
blood vessel lumen and to reduce the lesion recurrence at
6 months (Serruys et al., 331 New Eng Jour. Med, 495,
(1994); Fischman et al., 331 New Eng Jour. Med, 496-501
(1994).    Additionally, in a preliminary trial, heparin
coated stents appear to possess the same benefit of
reduction in stenosis diameter at follow-up as was
observed with non-heparin coated stents.    Additionally,
heparin coating appears to have the added benefit of
producing a reduction in sub-acute thrombosis after stent
implantation (Serruys et al., 93 Circulation, 412-422,
(1996).    Thus, 1) sustained mechanical expansion of a
stenosed coronary artery has been shown to provide some
measure of restenosis prevention, and 2) coating of stents
with heparin has demonstrated both the feasibility and the
clinical usefulness of delivering drugs to local, injured
tissue off the surface of the stent.

Numerous agents are being actively studied as
antiproliferative agents for use in restenosis and have
shown some activity in experimental animal models.   These
include: heparin and heparin fragments (Clowes and
Karnovsky, 265 Nature, 25-626, (1977); Guyton, J.R. et al.
46 Circ. Res., 625-634, (1980); Clowes, A.W. and Clowes,

JJI-43

*11*

BSC-SJA-0678

- 11 -

M.M., 52 Lab. Invest., 611-616, (1985); Clowes, A.W. and
Clowes, M.M., 58 Circ. Res., 839-845 (1986); Majesky et
al., 61 Circ Res., 296-300, (1987); Snow et al., 137 Am.
J. Pathol., 313-330 (1990); Okada, T. et al., 25
Neurosurgery, 92-898, (1989) colchicine (Currier, J.W. et
al., 80 Circulation, 11-66, (1989), taxol (ref),
agiotensin converting enzyme (ACE) inhibitors (Powell,
J.S. et al., 245 Science, 186-188 (1989), angiopeptin
(Lundergan, C.F. et al., 17 Am. J. Cardiol. (Suppl. B);
132B-136B (1991), Cyclosporin A (Jonasson, L. et. al., 85
Proc. Nati, Acad. Sci., 2303 (1988), goat-anti-rahbit PDGF
antibody (Ferns, G.A.A., et al., 253 Science, 1129-1132
(1991), terbinafine (Nemecek, G.M. et al., 248 J.
Pharmacol. Exp. Thera., 1167-11747 (1989), trapidil (Liu,
M.W. et al., 81 Circulation, 1089-1093 (1990), interferon-
gamma (Hansson, G.K. and Holm, 84 J. Circulation, 1266-
1272 (1991), steroids (Colburn, M.D. et al., 15 J. Vasc.
Surg., 510-518 (1992), see also Berk, B.C. et al., 17 J.
Am. Coll. Cardiol., 111B-1 17B (1991), ionizing radiation
(ref), fusion toxins (ref) antisense oligonucleotides
(ref), gene vectors (ref), and rapamycin (see below).

Of particular interest in rapamycin. Rapamycin is a
macrolide antibiotic which blocks IL-2- mediated T-cell
proliferation and possesses antiinflammatory activity.
While the precise mechanism of rapamycin is still under
active investigation, rapamycin has been shown to prevent
the $G_1$ to S phase progression of T-cells through the cell
cycle by inhibiting specific cell cyclins and cyclin-
dependent protein kinases (Siekierka, Immunol. Res. 13:

JJ1-43

12

BSC-SJA-0679

- 12 -

110-116, 1994). The antiproliferative action of rapamycin is not limited to T-cells; Marx et al. (Circ Res 76:412-417, 1995) have demonstrated that rapamycin prevents proliferation of both rat and human SMC *in vitro* while Poon et al. have shown the rat, porcine, and human SMC migratin can also be inhibited by rapamycin (J Clin Invest 98: 2277-2283, 1996). Thus, rapamycin is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the SMC hyperproliferative response. In fact, the combined effects of rapamycin have been demonstrated to result in a diminished SMC hyperproliferative response in a rat femoral artery graft model and in both rat and porcine arterial balloon injury models (Gregory et al., Transplantation 55:1409-1418, 1993; Gallo et al., in press, (1997)). These observations clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis.

Although the ideal agent for restenosis has not yet been identified, some desired properties are clear: inhibition of local thrombosis without the risk systemic bleeding complications and continuous and prevention of the dequale of arterial injury, including local inflammation and sustained prevention smooth muscle proliferation at the site of angioplasty without serious systemic complications. Inasmuch as stents prevent at least a portion of the restenosis process, an agent which prevents inflammation and the proliferation of SMC

JJI-43

13

BSC-SJA-0680

- 13 -

5      combined with a stent may provide the most efficacious
treatment for post-angioplasty restenosis.

Experiments

10      Agents:    Rapamycin (sirolimus) structural analogs
(macrocyclic   lactones)   and   inhibitors  of  cell-cycle
progression.

Delivery Methods:

15      These can vary:

-   Local delivery of such agents (rapamycin) from
the struts of a stent, from a stent graft, grafts, stent
20   cover or sheath.

-   Involving   comixture   with   polymers   (both
degradable and nondegrading) to hold the drug to the stent
or graft.

25      -   or entrapping the drug into the metal of the
stent or graft body which has been modified to contain
micropores or channels, as will be explained further
herein.

30      -   or including covalent binding of the drug to the
stent via solution chemistry techniques (such as via the
Carmeda process) or dry chemistry techniques (e.g. vapour

JJI-43

14

BSC-SJA-0681

— 14 —

5      deposition methods such as rf-plasma polymerization) and
combinations thereof.

—      Catheter delivery intravascularly from a tandem
balloon or a porous balloon for intramural uptake

10

—      Extravascular delivery by the pericardial route

—      Extravascular delivery by the advential
application of sustained release formulations.

Uses:    for inhibition of cell proliferation to
prevent neointimal proliferation and restenosis.
prevention of tumor expansion from stents
prevent ingrowth of tissue into catheters and
20     shunts inducing their failure.

1.   Experimental Stent Delivery Method — Delivery
from Polymer Matrix:

25     Solution of Rapamycin, prepared in a solvent miscible
with polymer carrier solution, is mixed with solution of
polymer at final concentration range 0.001 weight % to 30
weight % of drug.  Polymers are biocompatible (i.e., not
elicit any negative tissue reaction or promote mural
30     thrombus formation) and degradable, such as lactone-based
polyesters    or   copolyesters,    e.g.,    polylactide,
polycaprolacton-glycolide, polyorthoesters, polyanhydrides;
poly-aminoacids;    polysaccharides;    polyphosphazenes;
poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends

BSC-SJA-0682

- 15 -

5    thereof.    Nonabsorbable biocompatible polymers are also
suitable candidates.    Polymers such as polydimethyl-
sioIxane;    poly(ethylene-vingylacetate);    acrylate based
polymers    or    copolymers,    e.g.,    poly(hydroxyethyl
methylmethacrylate, polyvinyl pyrrolidinone; fluorinated
10    polymers    such    as    polytetrafluoroethylene;    cellulose
esters.

Polymer/drug mixture is applied to the surfaces of
the stent by either dip-coating, or spray coating, or
15    brush coating or dip/spin coating or combinations thereof,
and the solvent allowed to evaporate to leave a film with
entrapped rapamycin.

2.    Experimental Stent Delivery Method — Delivery from
20    Microporous Depots in Stent Through a Polymer Membrane
Coating:

Stent, whose body has been modified to contain
micropores or channels is dipped into a solution of
25    Rapamycin, range 0.001 wt% to saturated, in organic
solvent such as acetone or methylene chloride, for
sufficient time to allow solution to permeate into the
pores.    [The dipping solution can also be compressed to
improve the loading efficiency.]    After solvent has been
30    allowed to evaporate, the stent is dipped briefly in fresh
solvent to remove excess surface bound drug.    A solution
of polymer, chosen from any identified in the first
experimental method, is applied to the stent as detailed

JJI-43

16

BSC-SJA-0683

- 16 -

5    above.  This outerlayer of polymer will act as diffusion-
controller for release of drug.

3.  Experimental Stent Delivery Method - Delivery via
lysis of a Covalent Drug Tether

10       Rapamycin is modified to contain a hydrolytically or
enzymatically labile covalent bond for attaching to the
surface of the stent which itself has been chemically
derivatized to allow covalent immobilization.  Covalent
15   bonds such as ester, amides or anhydrides may be suitable
for this.

4.  Experimental Method - Pericardial Delivery

   A:  Polymeric Sheet   Rapamycin is combined at
20   concentration range previously highlighted, with a
degradable polymer such as poly(caprolactone-gylcolide) or
non-degradable polymer, e.g., polydimethylsiloxane, and
mixture cast as a thin sheet, thickness range 10µ to
25   1000µ.  The resulting sheet can be wrapped perivascularly
on the target vessel.  Preference would be for the
absorbable polymer.

   B:  Conformal Coating:  Rapamycin is combined with a
30   polymer that has a melting temperature just above 37°C,
range 40°-45°C.  Mixture is applied in a molten state to
the external side of the target vessel.  Upon cooling to
body temperature the mixture solidifies conformally to the

JJI-43

17

BSC-SJA-0684

- 17 -

vessel wall.    Both non-degradable and absorbable
biocompatible polymers are suitable.

As seen in the figures it is also possible to modify
currently manufactured stents in order to adequately
provide the drug dosages such as rapamycin.   As seen in
Figures 1a, 2a and 3a, any stent strut 10, 20, 30 can be
modified to have a certain reservoir or channel 11, 21,
31.  Each of these reservoirs can be open or closed as
desired.    These reservoirs can hold the drug to be
delivered.   Figure 4 shows a stent 40 with a reservoir 45
created at the apex of a flexible strut.  Of course, this
reservoir 45 is intended to be useful to deliver rapamycin
or any other drug at a specific point of flexibility of
the stent.  Accordingly, this concept can be useful for
"second generation" type stents.

In any of the foregoing devices, however, it is
useful to have the drug dosage applied with enough
specificity and enough concentration to provide an
effective dosage in the lesion area.  In this regard, the
reservoir size in the stent struts must be kept at a size
of about 0.0005" to about 0.003".   Then, it should be
possible to adequately apply the drug dosage at the
desired location and in the desired amount.

These and other concepts will are disclosed herein.
It would be apparent to the reader that modifications are
possible to the stent or the drug dosage applied.  In any
event, however, the any obvious modifications should be

JJI-43

$1 \, \mathcal{S}$

BSC-SJA-0685

- 18 -

5      perceived to fall within the scope of the invention which
is to be realized from the attached claims and their
equivalents.

JJI-43

19

BSC-SJA-0886

- 19 -

**WHAT IS CLAIMED IS:**

1. A stent containing reservoirs for drug delivery.

2. A stent capable of delivering drugs comprising a stent with a reservoir.

3. A stent with a strut containing a channel.

*Add a'*

*add (i)*

JJI-43

20

BSC-SJA-0687

- 20 -

5

## ABSTRACT

Delivery of rapamycin locally, particularly from an
intravascular stent, directly from micropores in the stent
body or mixed or bound to a polymer coating applied on

10   stent, to inhibit neointimal tissue proliferation and
thereby prevent restenosis. This invention also
facilitates the performance of the stent in inhibiting
restenosis.

JJI-43

BSC-SJA-0688





FIG. 1

FIG 1A



FIG 2A



FIG 2B

BSC-SJA-0689



FIG 3A

FIG 3B

FIG 4.

BSC-SJA-0690

PRINT OF DRAWING
AS ORIGINALLY FIL

2-1



FIG. 1

FIG 1A



FIG 2A



FIG 2B

PRINT OF DRAWING
AS ORIGINALLY FIL



FIG 3A

FIG 3B

FIG 4.

BSC-SJA-0692

# EXHIBIT 18

SCANNED

PROVISIONAL
APPLICATION
NUMBER

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 60/044,692 PROVISIONAL | 04/18/97 | | | | |

GERARD H. LLANOS, STEWARTSVILLE, NJ.

**CONTINUING DATA************************
VERIFIED

**FOREIGN/PCT APPLICATIONS*************
VERIFIED

FOREIGN FILING LICENSE GRANTED 10/30/97

| Foreign priority claimed 35 USC 119 conditions met | ☐ yes ☐ no ☐ yes ☐ no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEYS DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| Verified and Acknowledged  Examiner's Initials | | | NJ | 0 | | | 150.00 | III-34 |

AUDLEY A CIAMPORCERO JR
JOHNSON AND JOHNSON
ONE JOHNSON AND JOHNSON PLAZA
NEW BRUNSWICK NY 08933

TITLE  LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES

U.S. DEPT. OF COMM./PAT. & TM—PTO-436L (Rev.12-94)

Form
(Rev.

(FACE)

65703 U.S. PTO
50044692

04/18/97

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

06/19/1997 GMCKETT 00000024 N#:100750    50044692
01 FC:114         150.00 CR

PTO-1556
(5/87)

BSC-SJA-0694

## PROVISIONAL APPLICATION COVER SHEET

This is a request for filing a PROVISIONAL APPLICATION under 37 CFR 1.53 (b)(2).

| DOCKET NUMBER | JJI-34 | TYPE A PLUS SIGN IF ISSUE FEES BOX |
|---|---|---|

### INVENTOR(S)/APPLICANT(S)

| LAST NAME | FIRST NAME | MIDDLE INITIAL | RESIDENCE (CITY AND EITHER STATE OR FOREIGN COUNTRY) |
|---|---|---|---|
| LLANOS | GERARD | H. | Stewartsville, New Jersey |

### TITLE OF THE INVENTION

LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE
ASSOCIATED WITH PTCA PROCEDURES

### CORRESPONDENCE ADDRESS

Audley A. Ciamporcero, Jr., Johnson & Johnson, One Johnson & Johnson Plaza, New Brunswick

| STATE | New Jersey | ZIP CODE | 08933-7003 | COUNTRY | USA |
|---|---|---|---|---|---|

### ENCLOSED APPLICATION PARTS (check all that apply)

| | | | | | |
|---|---|---|---|---|---|
| ☒ | Specification | Number of Pages | 10 | ☐ | Small Entity Statement |
| ☐ | Claims | Number of Claims | | ☐ | Other (specify) |
| ☐ | Drawing(s) | Number of Sheets | | | |

### METHOD OF PAYMENT (check one)

| | | |
|---|---|---|
| ☐ A check or money order is enclosed to cover the Provisional filing fees. | Provisional Filing Fee Amount ($) | $ 150.00 |
| ☒ The Commissioner is hereby authorized to charge filing fees and credit Deposit Account No. 10-0750/JJI-34/PAC | | |

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☒ No

☐ Yes, the name of the U.S. Government agency and the Government contract number are:

Respectfully submitted,

| SIGNATURE | *[signature: Paul A. Coletti]* | Date: April 18, 1997 |
|---|---|---|
| TYPED OR PRINTED NAME | Paul A. Coletti | REGISTRATION NO.  32,019 |

☐ Additional inventors are being named on separately numbered sheets attached hereto.

### PROVISIONAL APPLICATION FILING ONLY

Telephone No. (908) 524-2815                    Facsimile No. (908) 524-2808

BSC-SJA-0696

DOCKET NO. JJI-34

IN THE UNITED STATES
PATENT AND TRADEMARK OFFICE

Applicant: Gerard Llanos

For     : LOCAL   DELIVERY   OF   RAPAMYCIN   FOR   TREATMENT   OF
PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES

Express Mail Certificate

"Express Mail" mailing number:   TB568851063

Date of Deposit:                 April 18, 1997

I hereby certify that this request for filing a provisional
application under 37 CFR 1.53(b)(2), including specification pages,
is being deposited with the United States Postal Service "Express
Mail Post Office to Addressee" service under 37 CFR 1.10 on the
date indicated above and is addressed to the Assistant Commissioner
for Patents, BOX PROVISIONAL, Washington, D.C. 20231.

Paul A. Coletti
(Typed or printed name of person mailing paper or fee)

(Signature of person mailing paper or fee)

BSC-SJA-0696

A/Prov

# Local Delivery Of Rapamycin For Treatment Of Proliferative Sequelae Associated With PTCA Procedures

## Field of the Invention

5

Delivery of rapamycin locally, particularly from an intravascular stent, directly from micropores in the stent body or mixed or bound in a polymer coating applied on stent, to inhibit neointimal tissue proliferation and thereby prevent restenosis. To facilitate the performance of the stent in inhibiting restenosis.

10

## Background of the Invention

Re-narrowing (restenosis) of an atherosclerotic coronary artery after percutaneous transluminal coronary angioplasty (PTCA) occurs in 30-50% of patients undergoing this
15 procedure and subsequently requires either further angioplasty or coronary artery bypass graft. While the exact hormonal and cellular processes promoting restenosis are still being determined, our present understanding is that the process of PTCA, besides opening the atherosclerotically obstructed artery, also injures resident coronary arterial smooth muscle cells (SMC). In response to this injury, adhering platelets, infiltrating macrophages,
20 leukocytes, or the SMC themselves release cell derived growth factors with subsequent proliferation and migration of medial SMC through the internal elastic lamina to the area of the vessel intima. Further proliferation and hyperplasia of intimal SMC and, most significantly, production of large amounts of extracellular matrix over a period of 3-6 months result in the filling in and narrowing of the vascular space sufficient to significantly obstruct coronary blood
25 flow.

Several recent experimental approaches to preventing SMC proliferation have shown promise although the mechanisms for most agents employed are still unclear. Heparin is the best known and characterized agent causing inhibition of SMC proliferation both *in vitro* and
30 in animal models of balloon angioplasty-mediated injury. The mechanism of SMC inhibition with heparin is still not known, but it is perceived that it may be due to any or all of the

JJI-34

BSC-SJA-0697

following: 1) reduced expression of the growth regulatory proto-oncogenes c-fos and c-myc, 2) reduced cellular production of tissue plasminogen activator 3) binding and sequestration of growth regulatory factors such as FGF. Other agents which have demonstrated the ability to reduce myointimal thickening in animal models of balloon vascular injury are angiopeptin (a somatostatin analog), calcium channel blockers, angiotensin converting enzyme inhibitors (captopril, cilazapril), cyclosporin A, trapidil (an antianginal, antiplatelet agent), terbinafine (antifungal), colchicine and taxol (antitubulin antiproliferatives), and c-myc and c-myb antisense oligonucleotides. Additionally, a goat antibody to the SMC mitogen PDGF was shown to be effective in reducing myointimal thickening in a rat model of balloon angioplasty injury, thereby implicating PDGF directly in the etiology of restenosis. Thus, while no therapy has as yet proven successful clinically in preventing restenosis after angioplasty, the in vivo experimental success of several agents known to inhibit SMC growth suggests that these agents as a class have the capacity to prevent clinical restenosis and deserve careful evaluation in humans.

## A: Coronary atherosclerosis -- pathology and treatment

Coronary heart disease is the major cause of death in men over the age of 40 and in women over the age of fifty in the western world. Most coronary artery-related deaths are due to atherosclerosis. Atherosclerotic lesions which limit or obstruct coronary blood flow are the major cause of ischemic heart disease related mortality and result in 500,000-600,000 deaths in the United States annually. To arrest the disease process and prevent the more advanced disease states in which the cardiac muscle itself is compromised, direct intervention has been employed via percutaneous transluminal coronary angioplasty (PTCA) or coronary artery bypass graft (CABG).

PTCA is a procedure in which a small balloon-tipped catheter is passed down a narrowed coronary artery and then expanded to re-open the artery. It is currently performed in approximately 250,000-300,000 patients each year. The major advantage of this therapy is that patients in which the procedure is successful need not undergo the more invasive surgical procedure of coronary artery bypass graft. A major difficulty with PTCA is the problem of

2

BSC-SJA-0698

post-angioplasty closure of the vessel, both immediately after PTCA (acute reocclusion) and in the long term (restenosis).

The mechanism of acute reocclusion appears to involve several factors and may result
5    from vascular recoil with resultant closure of the artery and/or deposition of blood platelets along the damaged length of the newly opened blood vessel followed by formation of a fibrin/red blood cell thrombus. Recently, intravascular stents have been examined as a means of preventing acute reclosure after PTCA.

10    Chronic restenosis after angioplasty is a more gradual process than acute reocclusion: 30% of patients with subtotal lesions and 50% of patients with chronic total lesions will go on to restenosis after angioplasty. While the exact mechanism for restenosis is still under active investigation, the general aspects of the restenosis process have been identified:

15
• In the normal arterial wall, smooth muscle cells (SMC) proliferate at a low rate (<0.1%/day; ref). SMC in vessel wall exists in a 'contractile' phenotype characterized by 80-90% of the cell cytoplasmic volume occupied with the contractile apparatus. Endoplasmic reticulum, Golgi, and free ribosomes are few and located in the
20    perinuclear region. Extracellular matrix surrounds SMC and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining SMC in the contractile phenotypic state (Campbell and Campbell, 1985).

• Upon pressure expansion of an intracoronary balloon catheter during angioplasty,
25    smooth muscle cells within the arterial wall become injured. Cell derived growth factors such as platelet derived growth factor (PDGF), basic fibroblast growth factor (bFGF), epidermal growth factor (EGF), released from platelets (i.e., PDGF) adhering to the damaged arterial luminal surface, invading macrophages and/or leukocytes, or directly from SMC (i.e., BFGF) provoke a proliferation and migratory response in
30    medial SMC. These cells undergo a phenotypic change from the contractile phenotyope to a 'synthetic' phenotype characterized by only few contractile filament bundles but extensive rough endoplasmic reticulum, Golgi and free ribosomes.

3

BSC-SJA-0699

Proliferation/migration usually begins within 1-2 days post-injury and peaks at 2 days in the media, rapidly declining thereafter (Campbell *et al*, in *Vascular Smooth Muscle Cells in Culture*, Campbell, J.H. and Campbell, G.R., Eds., CRC Press, Boca Raton, 1987, pp. 39-55); Clowes, A.W. and Schwartz, S.M., Circ. Res. 56:139-145, 1985).

• Daughter synthetic cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate. Proliferation and migration continues until the damaged luminal endothelial layer regenerates at which time proliferation ceases within the intima, usually within 7-14 days postinjury. The remaining increase in intimal thickening which occurs over the next 3-6 months is due to an increase in extracellular matrix rather than cell number. Thus, SMC migration and proliferation is an acute response to vessel injury while intimal hyperplasia is a more chronic response. (Liu *et al.*, Circulation, 79:1374-1387, 1989).

Patients with symptomatic reocclusion require either repeat PTCA or CABG. Because 30-50% of patients undergoing PTCA will experience restenosis, restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease. Because SMC proliferation and migration are intimately involved with the pathophysiological response to arterial injury, prevention of SMC proliferation and migration represents a target for pharmacological intervention in the prevention of restenosis.

**B: Restenosis — Clinical**

Pharmacological attempts to prevent restenosis by pharmacologic means have thus far been unsuccessful and all involve systemic administration of the trial agents. Neither aspirin-dipyridamole, ticlopidine, acute heparin administration, chronic warfarin (6 months) nor methylprednisolone have been effective in preventing restenosis although platelet inhibitors have been effective in preventing acute reocclusion after angioplasty. The calcium antagonists have also been unsuccessful in preventing restenosis, although they are still under study. Other agents currently under study include thromboxane inhibitors, prostacyclin mimetics, platelet membrane receptor blockers, thrombin inhibitors and angiotensin converting enzyme inhibitors. These agents must be given systemically, however, and attainment of a

4

BSC-SJA-0700

therapeutically effective dose may not be possible; antiproliferative (or anti-restenosis) concentrations may exceed the known toxic concentrations of these agents so that levels sufficient to produce smooth muscle inhibition may not be reached (See, Lang et al., Ann. Rev. Med., 42:127-132, 1991; Popma et al., Circulation, 84:1426-1436, 1991).

5

Additional clinical trials in which the effectiveness for preventing restenosis of dietary fish oil supplements, thromboxane receptor antagonists, cholesterol lowering agents, and serotonin antagonists has been examined have shown either conflicting or negative results so that no pharmacological agents are as yet clinically available to prevent post-angioplasty restenosis

10 (Franklin, S.M. and Faxon, D.P., Coronary Artery Disease, 4:232-242, 1993; Serruys, P.W. et al., Circulation, 88 (part 1):1588-1601, 1993).

Conversely, stents have proven useful in combating restenosis. Stents, typically balloon

15 expandable slotted metal tubes (usually, but not limited to stainless steel as disclosed by Palmaz US Patent 4,733,665), which when expanded within the lumen of an angioplastied coronary artery, provide structural support to the arterial wall. This support is helpful in maintaining an open path for blood flow. In two randomized clinical trials, stents were shown to increase angiographic success after PTCA, increase the stenosed blood vessel lumen and to

20 reduce the lesion recurrence at 6 months (Serruys et al., N Eng J Med 331: 489-495, 1994; Fischman et al., N Eng J Med 331: 496-501, 1994).

Additionally, in a preliminary trial, heparin coated stents appear to possess the same benefit of reduction in stenosis diameter at follow-up as was observed with non-heparin coated stents.

25 Additionally, heparin coating appears to have the added benefit of producing a reduction in sub-acute thrombosis after stent implantation (Serruys et al., Circulation 93: 412-422, 1996). Thus:

1) sustained mechanical expansion of a stenosed coronary artery has been shown to provide some measure of restenosis prevention; and

30    2) coating of stents with heparin has demonstrated both the feasibility and the clinical usefulness of delivering drugs to local, injured tissue off the surface of the stent.

5

BSC-SJA-0701

### C: Restenosis -- Experimental Drugs

Numerous agents are being actively studied as antiproliferative agents for use in restenosis and have shown some activity in experimental animal models. These include: heparin and heparin fragments (Clowes and Karnovsky, Nature, 265:625-626, 1977; Guyton, J.R. et al. Circ. Res. 46:625-634, 1980; Clowes, A.W. and Clowes, M.M., Lab. Invest. 52:611-616, 1985; Clowes, A.W. and Clowes, M.M., Circ. Res. 58:839-845, 1986; Majesky et al., Circ Res. 61:296-300, 1987; Snow et al., Am. J. Pathol. 137:313-330, 1990; Okada, T. et al., Neurosurgery 25:892-898, 1989), colchicine (Currier, J.W. et al., Circulation, 80: 11-66, 1989), taxol (ref), angiotensin converting enzyme (ACE) inhibitors (Powell, J.S. et al. Science 245:186-188, 1989), angiopeptin (Lundergan, C.F. et al., Am. J. Cardiol. 17(Suppl. B): 132B-136B, 1991), cyclosporin A (Jonasson, L. et. al., Proc. Natl. Acad. Sci. 85: 2303, 1988), goat-anti-rabbit PDGF antibody (Ferns, G.A.A., et al., Science 253:1129-1132, 1991), terbinafine (Nemecek, G.M. et al., J. Pharmacol. Exp. Thera. 248: 1167-11747, 1989), trapidil (Liu, M.W., et al., Circulation, 81: 1089-1093, 1990), interferon-gamma (Hansson, G.K. and Holm, J. Circulation 84:1266-1272, 1991), steroids (Colburn, M.D. et al., J. Vasc. Surg. 15:510-518, 1992. see also Berk, B.C. et al., J. Am. Coll. Cardiol. 17:1 I I B-1 17B, 1991), ionizing radiation (ref), fusion toxins (ref) antisense oligonucleotides (ref), gene vectors (ref), and rapamycin, as discussed below.

Of particular interest herein is rapamycin. Rapamycin is a macrolide antibiotic which blocks IL-2- mediated T-cell proliferation and possesses anti-inflammatory activity. While the precise mechanism of rapamycin is still under active investigation, rapamycin has been shown to prevent the G₁ to S phase progression of T-cells through the cell cycle by inhibiting specific cell cyclins and cyclin-dependent protein kinases (Siekierka, Immunol. Res. 13: 110-116, 1994). The antiproliferative action of rapamycin is not limited to T-cells, Marx et al. (Circ Res76:412-417, 1995) have demonstrated that rapamycin prevents proliferation of both rat and human SMC *in vitro* while Poon et al. have shown the rat, porcine, and human SMC migration can also be inhibited by rapamycin (J Clin Invest 98: 2277-2283, 1996). ). Thus, rapamycin is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation () as well as the SMC hyperproliferative response. In fact, the combined effects of rapamycin have been demonstrated to result in a diminished SMC

6

BSC-SJA-0702

hyperproliferative response in a rat femoral artery graft model and in both rat and porcine arterial balloon injury models (Gregory et al., Transplantation 55: 1409-1418, 1993; Gallo et al., in press, 1997. These observations clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis.

5

## Detailed Description of the Invention

## Restenosis — conclusion

10      Although the ideal agent for restenosis has not yet been identified, some desired properties are clear: inhibition of local thrombosis without the risk systemic bleeding complications and continuous and prevention of the sequalæ of arterial injury, including local inflammation and sustained prevention smooth muscle proliferation at the site of angioplasty without serious systemic complications. Inasmuch as stents prevent at least a portion of the
15  restenosis process, an agent which prevents inflammation and the proliferation of SMC combined with a stent may provide the most efficacious treatment for post-angioplasty restenosis.

        The present invention, therefore, discusses the use of rapamycin in its various forms
20   and how such use will succeed in combating restenosis.

Agents: Rapamycin (sirolimus) its structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression

25

Delivery methods:
Various delivery methods are perceived to be useful in providing rapamycin to the lesion. Among them are:

30   - Local delivery of such agents (rapamycin) from the struts of a stent, from a stent graft, grafts, stent cover or sheath, for instance as disclosed in US 5,383,928.

7

BSC-SJA-0703

- Involving comixture with polymers (both degradable and nondegrading) to hold the drug to the stent or graft.

- Entrapping the drug into the metal of the stent or graft body which has been modified to contain micropores or channels.

5 - Including covalent binding of the drug to the stent via solution chemistry techniques (such as those disclosed in a series of patents owned by Carmeda, Stockholm, Sweden)

- Dry chemistry techniques (e.g. vapour deposition methods such as rf-plasma polymerization and combinations thereof).

- Catheter delivery intravascularly from a tandem balloon or a porous balloon for intramural 10 application.

- Extravascular delivery by the pericardial route.

- Extravascular delivery by the adventital application of sustained release formulations.

Uses: for inhibition of cell proliferation to prevent neointimal proliferation and restenosis and 15 the prevention of tumor expansion by use of such coated stents, as well as to prevent ingrowth of tissue into catheters and shunts inducing their failure.

Experimental Stent Delivery. Method #1. Delivery from polymer matrix:

20        Solution of Rapamycin, prepared in a solvent that would be miscible with polymer carrier solution, is mixed with solution of polymer at final concentration range 0.001weight% to 30 weight % of drug. Polymers should be biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation) and can be degradable such as lactone-based polyesters or copolyesters, e.g., polylactide, polymprolactone-glycolide, polyorthoesters,

25 polyanhydrides; polyaminoacids; polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof. Nonabsorbable biocompatible polymers are also suitable candidates. Poylmers such as polydimethylsiloxane; poly(ethylene-vinylacetate); acrylate based polymers or copolymers, eg., poly(hydroxyethyl methylmethacrylate); polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters.

30       Polymer/drug mixture is applied to the surfaces of the stent by either dip-coating, or spray coating, or brush coating or dip/spin coating or combinations thereof, and the solvent allowed to evaporate to leave a film with entrapped rapamycin.

8

BSC-SJA-0704

Experimental Stent Delivery Method #2 Delivery from microporous depots in stent through a polymer membrane coating:

5      Stent, whose body has been modified to contain micropores or channels as is known in the art by creating holes in metal tubes to act as drug depots,  is dipped into a solution of Rapamycin, range 0.001 wt% to saturated, in organic solvent such as acetone or methylene chloride, for sufficient time to allow solution to permeate into the pores. The dipping solution could also be compressed to improve the loading efficiency. After solvent has been allowed to evaporate, the stent is dipped briefly in fresh solvent to remove excess surface bound drug. A

10     solution of polymer, chosen from any identified in the first experimental method, is applied to the stent as detailed above. This outerlayer of polymer will act as diffusion-controller for release of drug.

Experimental Stent Delivery Method#3 Delivery via lysis of a covalent drug tether:

15     Rapamycin is modified to contain a hydrolytically or enzymatically labile covalent bond for attaching to the surface of the stent which itself has been chemically derivatized to allow covalent immobilization. Covalent bonds such as ester, amides or anhydrides are perceived to be suitable for this coating method.

20
Experimental Method #4 Pericardial delivery

       A: Polymeric Sheet: Rapamycin is combined at concentration range previously highlighted, with a degradable polymer such as poly(caprolactone-gylcolide) or non-

25     degradable polymer, e.g., polydimethylsiloxane, and mixture cast as a thin sheet, thickness range 10μ to 1000μ. The resulting sheet can be wrapped perivascularly on the target vessel. The preference of the type of polymer used would be for an absorbable polymer, to more effectively place the rapamycin into the bloodstream.

30     B: Conformal coating: Rapamycin is combined with a polymer that has a melting temperature just above 37°C, range 40° - 45°C. Mixture is applied in a molten state to the external side of the target vessel. Upon cooling to body temperature the mixture solidifies

9

BSC-SJA-0705

conformally to the vessel wall. Both non-degradable and absorbable biocompatible polymers are suitable for this purpose.

10

BSC-SJA-0706

PTO/SB/68 (11-98)
Approved for use through 10/31/98. OMB 0651-0031
Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## REQUEST FOR ACCESS OF ABANDONED APPLICATION UNDER 37 CFR 1.14(a)

| In re Application of |
|---|

| Application Number | Filed |
|---|---|
| 60 044 692 | Ap 18/97 |
| Group Art Unit | Examiner |

**RECEIVED**

SEP 1 7 2001

File Information Unit

Paper No. #2

Assistant Commissioner for Patents
Washington, DC 20231

I hereby request access under 37 CFR 1.14(a)(3)(iv) to the application file record of the above-identified ABANDONED application, which is: (CHECK ONE)

___ (A) referred to in United States Patent Number 6 273 913 column _____

___ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11, i.e.,
Application No. _____ filed _____ on page _____ of paper number _____

___ (C) an application that claims the benefit of the filing date of an application that is open to public inspection, i.e., Application No. _____ filed _____ or

___ (D) an application in which the applicant has filed an authorization to lay open the complete application to the public.

Please direct any correspondence concerning this request to the following address:

_____

_____

_____

Signature _____   Date Sept 17/0

Typed or printed name: Stelle Pina

| FOR PTO USE ONLY |
|---|
| Approved by: _____ (Initials) |
| Unit: F _____ |

This form is estimated to take 0.2 hours to complete. ... This may vary depending upon the needs of the individual case. ... IF YOU NEED ... SEND TO: ... SEND TO COMMISSIONER ... DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO:

BSC-SJA-0707

PTO/SB/68 (
Approved for use through 10/31/99.  OMB 0651-
Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control n

## REQUEST FOR ACCESS OF ABANDONED APPLICATION UNDER 37 CFR 1.14(

| In re Application of | | |
|---|---|---|
| Wright | | |
| Application Number | | Filed |
| 60/044 692 | | 4-18-97 |
| Group Art Unit | Examiner | |

**RECEIVED**

NOV 0 5 2001

File Information Unit

Paper No. #3

Assistant Commissioner for Patents
Washington, DC 20231

I hereby request access under 37 CFR 1.14(e)(3)(iv) to the application file record of the above-identified ABANDONED application, which is: (CHECK ONE)

___ (A) referred to in United States Patent Number 6273913 column _____

___ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11, i.
Application No. _____ filed _____ on page _____
paper number _____

___ (C) an application that claims the benefit of the filing date of an application that is open to public inspection, i.e., Application No. _____ filed _____

___ (D) an application in which the applicant has filed an authorization to lay open the complete application to the public.

Please direct any correspondence concerning this request to the following address:

_____

_____

| Amber Click | 11-5-01 |
|---|---|
| Signature | Date |
| Amber Click | |
| Typed or printed name | |

| FOR PTO USE ONLY | |
|---|---|
| Approved by: | ge (Initials) |
| Unit: | |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete...

BSC-SJA-0708

PTO/SB/68 [04-01]
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

In re Application of

**RECEIVED**

MAR 0 6 2002

File Information Unit

| Application Number | Filed |
|---|---|
| 60/044,698 | 4-16-98 |
| Art Unit | Examiner |

Paper No. 4

Assistant Commissioner for Patents
Washington, DC 20231

1. ☐ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

☐ (A) referred to in:

United States Patent Application Publication No. 6273913 , page _____, line _____.

United States Patent Number _____, column _____, line _____, or

an International Application which was filed on or after November 29, 2000 and which

designates the United States, WIPO Pub. No. _____, page _____, line _____.

☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or

1.14(e)(2)(i), i.e., Application No. _____, paper No. _____, page _____, line _____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

_____
Signature

Tuan Chau
Typed or printed name

3-6-02
Date

| FOR PTO USE ONLY |
|---|
| Approved by: _____ (initials) |
| Unit: _____ |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

BSC-SJA-0709

PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

| | In re Application of |
| --- | --- |

**RECEIVED**

**MAR 8 2002**

File Information Unit

| Application Number | Filed |
| --- | --- |
| 60/044692 | 04-18-97 |
| Art Unit | Examiner |

Paper No. #5

Assistant Commissioner for Patents
Washington, DC 20231

1. ☑ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

   ☑ (A) referred to in:

   United States Patent Application Publication No. _____, page ____, line _____.

   United States Patent Number 627 3913 _____, column ____, line ____, or

   an international Application which was filed on or after November 29, 2000 and which

   designates the United States, WIPO Pub. No. _____, page ____, line ____.

   ☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or 1.14(e)(2)(i), i.e., Application No. _____, paper No. ____, page ____, line ____

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant has filed an authorization to lay open the complete application to the public.

_Signature_

**Date** 03.08.02

_Shoaib Chagani_
Typed or printed name

| FOR PTO USE ONLY |
| --- |
| Approved by **RECEIVED** |
| (Initials) |
| Unit: **MAR 8 2002** |
| **File Information Unit** |

Burden Hour Statement: This form is estimated to take 0.1 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

BSC-SJA-0710

Form PTO-1350
(REV 3-94)

PACE DATA ENTRY CODING SHEET

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

| 1ST EXAMINER | DATE |
| 2ND EXAMINER | DATE |

64593 U.S. PTO
60044692
04/18/97

PTO APPLICATION NUMBER

CONT STATUS
CODE    CODE

PARENT APPLICATION
SERIAL NUMBER

FOREIGN
PRIORITY
CLAIMED

COUNTRY
CODE

TOTAL
CLAIMS

INDEPENDENT
CLAIMS

TYPE
APPL    O

SMALL
ENTITY?    O

FILING DATE
MONTH  DAY  YEAR
O 4 | 1 8 | 9 7

FILING FEE
1 1 5 O

FOREIGN
LICENSE

SPECIAL
HANDLING    O

GROUP
ART UNIT

ATTORNEY DOCKET NUMBER

CLASS

SHEETS OF
DRAWING

CONTINUITY DATA

PCT APPLICATION SERIAL NUMBER

P C T /
P C T /
P C T /
P C T /

PARENT PATENT
NUMBER

PARENT FILING
DATE
MONTH  DAY  YEAR

PCT/FOREIGN APPLICATION DATA

PCT/FOREIGN APPLICATION SERIAL NUMBER

FOREIGN
FILING DATE
MONTH  DAY  YEAR

| POSITION | | ID NO. | DATE |
|---|---|---|---|
| CLASSIFIER | | | |
| EXAMINER | | | |
| TYPIST | JB | 90595 | 10-29-97 |
| VERIFIER | | | |
| CORPS CORR. | | | |
| SPEC. HAND | | | |
| FILE MAINT | | | |
| DRAFTING | | | |

(LEFT INSIDE)

BSC-SJA-0712



65703 U.S. PTO
60044692
04/18/97

**PATENT APPLICATION**

60044692

...ceived
or
Mailed

...pplication _____ papers.

2.

3.

4.

11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.
29.
30.
31.
32.

(FRONT)

BSC-SJA-0713