# EXHIBIT 56

US005545208A

# United States Patent [19]

## Wolff et al.

[11] Patent Number: 5,545,208

[45] Date of Patent: Aug. 13, 1996

[54] INTRALUMENAL DRUG ELUTING PROSTHESIS

[75] Inventors: **Rodney G. Wolff**, Minnetonka Beach; **Vincent W. Hull**, Ham Lake, both of Minn.

[73] Assignee: **Medtronic, Inc.**, Minneapolis, Minn.

[21] Appl. No.: 171,361

[22] Filed: Dec. 21, 1993

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 815,360, Dec. 27, 1991, abandoned, which is a continuation of Ser. No. 486,580, Feb. 28, 1990, abandoned.

[51] Int. Cl.$^6$ .................................. A61F 2/06; A61M 29/00; A61K 9/22

[52] U.S. Cl. .................................. 623/1; 606/195; 623/12; 604/891.1

[58] Field of Search .................................. 623/1, 11, 12; 606/191–200; 600/36; 604/891.1

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,306,532 | 4/1982 | Hammar . |
| 4,650,466 | 3/1987 | Luther . |
| 4,655,771 | 4/1987 | Wallsten . |
| 4,678,466 | 7/1987 | Rosenwald . |
| 4,739,762 | 4/1988 | Palmaz . |
| 4,871,365 | 10/1989 | Dumican . |
| 4,872,874 | 10/1989 | Taheri . |
| 4,886,062 | 12/1989 | Wiktor . |
| 4,892,539 | 1/1990 | Koch . |
| 4,923,470 | 5/1990 | Dumican . |
| 4,944,797 | 7/1990 | Barbucci . |
| 5,015,253 | 5/1991 | MacGregor . |
| 5,019,090 | 5/1991 | Pinchuk ...................... 623/1 |
| 5,019,096 | 5/1991 | Fox, Jr. . |
| 5,028,597 | 7/1991 | Kodama . |
| 5,047,030 | 9/1991 | Bau . |
| 5,053,048 | 10/1991 | Pinchuk . |
| 5,059,211 | 10/1991 | Stack . |
| 5,061,275 | 10/1991 | Wallsten . |
| 5,062,829 | 11/1991 | Pryor . |
| 5,102,417 | 4/1992 | Palmaz . |
| 5,152,783 | 10/1992 | Suzuki . |
| 5,152,784 | 10/1992 | Tsilibary . |
| 5,163,919 | 11/1992 | Sauski . |
| 5,171,262 | 12/1992 | MacGregor . |
| 5,213,580 | 5/1993 | Slepian . |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2153235 | 1/1985 | United Kingdom . |
| 8903232 | 4/1989 | WIPO . |

Primary Examiner—Debra S. Brittingham
Attorney, Agent, or Firm—Daniel W. Latham; Harold R. Patton

[57] **ABSTRACT**

A prosthesis for insertion into a lumen to limit restenosis of the lumen. The prosthesis carries restenosis-limiting drugs which elute after the device is positioned in the lumen.

**10 Claims, 7 Drawing Sheets**





FIG. I

FIG. 2

FIG.3A

FIG.4

FIG.5

FIG.3B



FIG.6

FIG.7

FIG.8

FIG.9

FIG.10

FIG.11

BSC-SJA-1159

## FIG. 12



## FIG. 13



## FIG. 14



## FIG. 15



## FIG. 16



## FIG. 17





FIG. 18

BSC-SJA-1161

**U.S. Patent**          Aug. 13, 1996          Sheet 5 of 7          5,545,208



**FIG.19a**



**FIG.19b**



**FIG.19c**

BSC-SJA-1162



**FIG. 19d**



**FIG. 19e**



**FIG. 19f**



FIG. 19g



FIG. 19h



FIG. 19i

BSC-SJA-1164

5,545,208

## 1

### INTRALUMENAL DRUG ELUTING PROSTHESIS

This is a continuation-in-part of U.S. Ser. No. 07/815,560, filed Dec. 27, 1991, which is a continuation of U.S. Ser. No. 07/486,580, filed Feb. 28, 1990, now abandoned.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention related to methods for lessening restenosis of body lumens, and to prosthesis for delivering drugs to treat said restenosis.

2. Description of the Related Art

Restenosis is defined as the reclosure of a previously stenosed and subsequently dilated peripheral or coronary vessel. It occurs at a rate of 20–50% for these procedures and is dependent on a number of clinical and morphological variables. Restenosis may begin shortly following an angioplasty procedure, but usually ceases at the end of approximately six (6) months. There is not a current therapeutic procedure that has been proven to significantly reduce this restenosis rate.

A recent technology that has been developed that assesses the problem of restenosis is intravascular stents. Stents are typically metallic devices that are permanently implanted (expanded) in coronary and peripheral vessels. The goal of these stents is to provide a long-term "scaffolding" or support for the diseased (stenosed) vessels. The theory being, if you can support the vessel from the inside, the vessel will not close down or restenose. Unfortunately, initial data from clinical stent implants indicates that these metallic structures are not very successful in reducing restenosis.

Pharmacologic (biochemical) attempts have been made to reduce the rate of restenosis. All of these attempts have dealt with the systemic delivery of drugs via oral, intravascular or intramuscular introduction. Little, if any success has been achieved with this systemic approach.

For drug delivery, it has been recognized for a long period of time that pills and injections may not be the best mode of administration. It is very difficult with these types of administration to obtain constant drug delivery. Patient noncompliance with instructions is also a problem. Through repeated doses, these drugs often cycle through concentration peaks and valleys, resulting in time periods of toxicity and ineffectiveness. Thus, localized drug treatment is warranted.

### SUMMARY OF THE INVENTION

The invention provides prostheses which may be inserted into a lumen of a body and fixed to the lumen wall adjacent an area needing treatment. Most typically, the lumen will be part of the vascular system which may be subject to restenosis following angioplasty. However, the methods and devices of the invention are also suited to treatment of any body lumen, including the vas deferens, ducts of the gallbladder, prostate gland, trachea, bronchus and liver or any other lumen of the body where medication cannot be applied without a surgical procedure. The invention applies to acute and chronic closure or reclosure of body lumens.

The prostheses of the invention include at least one drug which will release from the device at a controlled rate to supply the drug where needed without the overkill of systemic delivery. The prostheses include means for fixing the device in the lumen where desired. The prostheses may

## 2

be completely biodegradable or may be bioabsorbable in whole or incorporated into the lumen wall as a result of tissue over growth, i.e., endothelialization. Alternatively, the prostheses may be biostable in which case the drug is diffused out from the biostable materials in which it is incorporated.

The prosthesis comprises a generally flexible tubular body which is fixed against the lumen walls by a mechanical action. The device should not cause an appreciable reduction in the lumen cross-section where inserted. Conventional stent designs which provide an expansion of the vessel are suitable, though not required. In all cases, the prostheses of the invention require the presence of an elutable drug compounded to the prosthesis itself. With conventional metal stents, the invention requires a drug-carrying coating overlying at least a portion of the metal.

The drugs in the prosthesis may be of any type which would be useful in treating the lumen. In order to prevent restenosis in blood vessels, migration and subsequent proliferation of smooth muscle cells must be checked. Platelet aggregation and adhesion can be controlled with antiplatelets and anticoagulants. Growth factor and receptor blockers and antagonists may be used to limit the normal repair response.

The current invention contemplates the usage of any prosthesis which elutes drugs locally to treat a lumen in need of repair. Controlled release, via a bioabsorbable polymer, offers to maintain the drug level within the desired therapeutic range for the duration of the treatment. When "stent" is referred to herein, it may include the classical definition of stents as they are used in intravascular applications. "Stent" used herein also includes any prothesis which may be inserted and held where desired in a lumen. It includes, but is not limited to, structures such as those shown and described in U.S. Pat. No. 4,886,062 to Wiktor.

### BRIEF DESCRIPTION OF THE DRAWINGS

A detailed description of the invention is hereafter described with specific reference being made to the drawings in which:

FIG. 1 is a greatly enlarged side view of an intralumenal drug-eluting prosthesis of the invention;

FIG. 2 is a greatly enlarged side view of an alternative embodiment to the prosthesis of FIG. 1;

FIG. 3A is a greatly enlarged fragment of the embodiment of FIG. 1;

FIG. 3B is a greatly enlarged fragment of the embodiment of FIG. 1 in which two layers of polymers are present, each having a different drug;

FIG. 4 is a greatly enlarged fragment of the embodiment of FIG. 2;

FIG. 5 is a greatly enlarged microscopic fragmentary detail of drug shown eluting form the porous structure of a filament or filament coating in a prosthesis into tissue or the vessel lumen;

FIG. 6 is a greatly enlarged cross-section of a blood vessel showing plaque profile immediately post-balloon catheter dilation procedure;

FIG. 7 is a greatly enlarged cross-section of the subject of FIG. 6 at a later date showing restenosis;

FIG. 8 is a greatly enlarged cross-section of a blood vessel showing plaque-prosthesis profile immediately post-prosthesis implant procedure;

BBC-SJA-1165

5,545,208

3

FIG. 9 is a greatly enlarged cross-section of the subject of FIG. 8 after ingrowth has occurred;

FIG. 10 is a greatly enlarged fragmentary perspective view of a blood vessel wall and prosthesis filament of FIGS. 1 and 3 immediately after implantation;

FIG. 11 is a greatly enlarged fragmentary perspective view of the subject of FIG. 10 after about one month;

FIG. 12 is a greatly enlarged fragment of a loose weave of prosthesis filaments;

FIG. 13 is a greatly enlarged fragment of a sound metal filament in a loose weave;

FIG. 14 is a greatly enlarged fragment of a melted junction weave of prosthesis filaments in a loose weave;

FIG. 15 is a greatly enlarged fragment of a kinked junction weave of prosthesis filaments;

FIG. 16 is a greatly enlarged fragment of multistrand weave of prosthesis filaments; and

FIG. 17 is an alternative embodiment to FIG. 16, in which strands are not woven.

FIG. 18 is a partial sectional view of a catheter for delivery of the prosthesis of the present invention.

FIG. 19a-19i are sectional views of the deployment of the prosthesis by the catheter of FIG. 18.

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

Restenosis

In the discussion above, a very simple definition of restenosis was given. As a complement to this definition, there are several more clinical definitions. Several of these definitions are listed below:

1. Reduction of minimal luminal diameter to less than 50% of the normal lumen diameter.

2. Loss of at least 50% of the initial gain achieved in angioplasty.

3. Decrease of at least 30% in the lumen diameter compared to post-angioplasty result.

4. A return to within 10% of the pre-angioplasty diameter stenosis.

5. An immediate post angioplasty diameter stenosis of less than that increases to 70% or greater at follow-up.

6. Deterioration of 0.72 mm in minimal luminal diameter or greater from post-angioplasty to follow-up.

7. As for 6, but with a deterioration of 0.5 mm.

These definitions are used by cardiologists to angiographically define restenosis.

Several hypotheses exist on why and how restenosis occurs. The current, most widely accepted explanation is that restenosis is a natural healing process in response to the arterial injury that occurs during all types of angioplasty procedures. This very complex healing process results in intimal hyperplasia, more specifically migration and proliferation of medial smooth muscle cells (SMC). The problem associated with this arterial healing process is that in some instances, it does not shut off. The artery continues to "heal" until it becomes occluded. It should be noted that restenosis is not a re-deposition of the plaque-like cholesterol material that originally occluded the artery.

The following is a possible scenario for restenosis according to the vessel healing hypothesis. Successful angioplasty of stenotic lesions produces cracking of the plaque, dissec-

4

tion into the media, denudation and destruction of endothelial cells, exposure of thrombogenic collagen, released tissue thromboplastin, and an increased loss of prostacyclin production. All of these lead to the aggregation of active platelets.

FIGS. 6 and 7 show a typical vessel 30 in cross-section after angioplasty procedures showing the interior 32 of the lumen. In FIG. 6 the interior of the lumen is rough and includes intimal flaps 34. Damage causes healing with deposition of platelets, fibrin formation and proliferation of neointima 37 which is as shown in FIG. 7 significantly reduces the interior of the lumen.

Activated platelets release several mitogens including platelet derived growth factor (PDGF), epidermal growth factor, and transforming growth factor. PDGF has both mitogenic and chemotactic properties and thus, may induce both mitigation of SMC from the medial layer to the intimal layer as well as proliferation (intimal hyperplasia). PDGF causes SMC proliferation by binding to specific PDGF receptors. Once the PDGF is bound to the receptors, deoxyribose nucleic acid (DNA) synthesis occurs and new cells are replicated. Minor endothelial injury may cause platelet adhesion and activation with the resultant release of PDGF. Thus, even the deposition of a monolayer of platelets may be sufficient to induce SMC proliferation.

Deeper arterial injury which is sometimes associated with complex stenotic lesions leads to more extensive platelet deposition and activation which may cause an even greater availability of the mitogenic factors. Thus, increased SMC proliferation and intimal hyperplasia. Arterial injury from angioplasty may result in release of PDGF-like compounds from not only platelets but also macrophages, monocytes, endothelial cells, or SMC's themselves.

Activated SMC from human atheroma or following experimental arterial injury secrete PDGF-like molecules which appears to lead to self perpetuation of SMC proliferation by the release of their own PDGF-like substances. Thus, any or all of the cells which can secrete PDGF relate substances (platelets, macrophages, monocytes, endothelia, and smooth muscle cells) may contribute to the cascading effect of restenosis after angioplasty.

The previous restenosis scenario resulted from normal angioplasty procedures. During balloon angioplasty if the balloon is undersized or not totally inflated and the plaque cracking and extensive endothelial denudation does not occur the lesion could still restenose. Rheologic factors contribute as well to the interaction between platelets and the arterial wall. Residual stenosis, resulting from inadequate balloon expansion, produces a high local shear rate and enhances platelet deposition and activation. These stenoses may be important as a stimulus for some proliferation through enhanced platelet deposition and secretion of growth factors. This hypothesis correlates with the increased incidence of restenosis in patients with high-grade residual stenoses or transstenotic gradients.

Prevention of Restenosis

In order to prevent restenosis, one must stop the proliferation of smooth muscle cells. As stated earlier, this is a biochemical process which cannot be treated mechanically. Several hypotheses exist on how to biochemically stop restenosis. Some of which are:

1. Reduce the adhesion and aggregation of the platelets at the arterial injury site.

BSC-SJA-1166

5,545,208

5

2. Block the expression of the growth factors and their receptors.

3. Develop competitive antagonists of the above growth factors.

4. Interfere with the receptor signaling in the responsive cell.

5. Find a "natural" inhibitor of smooth muscle proliferation.

Item #1 is directly related to the formation of thrombus, a major problem with all types of angioplasty procedures. Items #2, #3 and #4 are closely related. They deal with blocking restenosis during the massive cell migration and replication cycle. Unlike item #1, these items address the growth factors that are produced from sources other than platelets. Item #5 is listed to address the question; Why don't 50–80% of the people undergoing angioplasty restenose? There may be some type of natural inhibitor that these people produce that stops the proliferation of smooth muscle cells.

There are at least two (2) different ways to prevent the adhesion and aggregation of platelets. One method is to use an antiplatelet and another is to use an anticoagulant.

Antiplatelet drugs include such as aspirin and dipyridamole. Aspirin is classified as an analgesic, antipyretic, anti-inflammatory, antiplatelet drug. It has been clinically tested and proven to reduce the risk of sudden death and/or non-fatal reinfarction in post myocardial infarction (heart attack) patients. The proposed mechanism of how aspirin works, relates directly to the platelets. It somehow blocks the platelets, restricting coagulation. This prevents the cascading platelet aggregation found in thrombus and subsequently restenosis. Aspirin is therefore a possible restenosis inhibitor. Dipyridamole is a drug similar to aspirin, in that is has anti-platelet characteristics. Dipyridamole is also classified as a coronary vasodilator. It increases coronary blood flow by primary selective dilatation of the coronary arteries without altering systemic blood pressure or blood flow in peripheral arteries. These vasodilation characteristics are thought to be possibly beneficial for restenosis prevention.

Anticoagulant drugs include Heparin, Coumadin, Protamine, and Hirudin. Heparin is the most common anticoagulant used today. Heparin, in one form or another, is used in virtually every angioplasty procedure performed. All four (4) of these drugs function as an anticoagulant by preventing the production of thrombin, a binding agent which causes blood to clot. This too, may reduce the cascading effect of platelet aggregation at the lesion site, thus possibly reducing restenosis. The use of Protamine in the presence of Heparin causes the Protamine to function as a Heparin antagonist, blocking the effect of the Heparin. Protamine, however, used alone, acts as an anticoagulant. Hirudin is singled out because it is not normally found in the human body. Hirudin is a drug that is found in the salivary glands of leeches. It is a very concentrated anticoagulant that functions in a similar manner as Heparin, Coumadin, and Protamine.

There are several types of drugs that interrupt cell replication. Antimitotics (cytotoxic agents) work directly to prevent cell mitosis (replication), whereas antimetabolites prevent deoxyribose nucleic acid (DNA) synthesis, thus preventing replication. The action of the antimitotics and antimetabolites are similar, they can be grouped into one category. This category will be known as the anti-replicate drugs.

Anti-replicate drugs include among others: Methotrexate, Colchicine, Azathioprine, Vincristine, VinBlastine, Fluorouracil, Adriamycin, and Mutamycin. The target systemic

6

molarity desired with methotrexate is on the order of $10^{-6}$M with a range of between $10^{-3}$ to $10^{-8}$ Molar. Locally, the molarity of the drug may be highly variable, which is one of the great disadvantages in systemic administration of the drug. When drugs are delivered locally via the prosthesis of the invention, they may be at therapeutic levels at the diseased site while at the lower limits of detectability in the bloodstream. So little drug is required for effective local treatment of a lumen that the drug may not be detectable in blood samples.

Anti-inflammatory drugs such as glucocorticoids (e.g., dexamethasone, betamethasone) can also be useful to locally suppress inflammation caused by injury to luminal tissue during angioplasty.

If the restenosis process ranges from shortly after injury to about four to six months later, then the generalized elution rates contemplated are such that the drug should ideally start to be released immediately after the prosthesis is secured to the lumen wall to lessen cell proliferation. The drug should then continue to elute for up to about four to six months in total.

Complex systems of drugs may be carried by the prosthesis. An anticoagulant or antiplatelet may be included in the outermost surface of the device in order to elute off very quickly for the first several days. Antiinflammatories and antireplicates can be formulated into the device to continue to elute later, when in contact with non-blood cells after neointima overgrowth has surrounded the device. This usually occurs in about two weeks. The drug elution rate does not need to be uniform, and may be tailored to fit the need of the patient.

## Prosthesis (Stent) Design

The current invention contemplates the usage of any prosthesis which elutes drugs locally to treat a lumen in need of repair. When "stent" is referred to herein, it may include the classical definition of stents as they are used in intravascular applications. "Stent" used herein also includes any prosthesis which may be inserted and held where desired in a lumen.

FIGS. 1 through 17 show features of some of the prostheses which may be used to carry and elute restenosis limiting drugs.

The current preferred stent 10 configuration consists of a single filar, monofilament braided mesh design as shown in FIG. 1. There are sixteen (16) filaments 12, eight (8) of which are wound in one helical direction, and the remaining eight (8) which are wound in the opposite direction. The stent 10 is self-expanding to a predetermined diameter. The profile (diameter) of the stent 10 can be easily reduced by pulling the stent 10 longitudinally. In this reduced profile configuration, the stent 10 can be loaded into a catheter for delivery into the vessel.

The stent 20 shown in FIGS. 2 and 4 is a metallic malleable design which may be forced against a lumen wall by a balloon catheter which fixes it into position. The exterior surface of the metal filaments 22 would include a coating 14 with a drug-eluting polymer described previously. The polymer may be biostable or bioabsorbable. If biostable, the drug would diffuse out of the polymer.

The variations of design shown in the embodiments of FIGS. 1 and 2 show that the prosthesis of the invention must be secured against a lumen wall and must carry a drug-eluting polymer.


BSC-SJA-1167

5,545,208

7

There are many variables in the design of stent 10. The angle (a) of the filaments 12 is a major variable. The angle a can vary from 0 degrees to 180 degrees. The design in the Figures is based on an angle in the 60 degree to 90 degree range.

There are many options for fabricating the drug eluting stents. One option is to have all sixteen (16) filaments be drug eluting. Or, you could have any number of filaments up to sixteen (16) degrade and elute drugs. Another option is to have a multi-filar stent. Instead of a single filament braided into the stent, it is possible to have two (2), three (3), or even four (4) strands 16 braided to form a filament 12 as shown in FIG. 16. This would create a stent with much greater expansile force, but also have much more material in the surface area. This is a common trade-off in stent design. Similar to the single-filar design, the multi-filar form shown in FIG. 16 could have varying numbers of strands 16 that are drug eluting. FIGS. 16 and 17 show that the multi-filar design may be braided or unbraided. One (1), two (2), three (3), or four (4) of the filaments could be impregnated with a drug and biodegradably elute. Alternatively, the polymer may be biostable which allows for diffusion of the drug without degradation.

The stent 10 of FIG. 1 consists of a wound braided mesh which is self-expanding to a predetermined diameter and whose profile diameter can be greatly reduced for catheter introduction. The radial expansile force increases with diameter to the point of the self-expanded diameter limit, at which point the angle between the filaments and the longitudinal axis is a maximum. FIGS. 12 and 15 show alternative construction techniques to alter the radial expansive force. FIG. 12 shows the filaments 12 being woven without any connection. FIG. 13 is similar except the filament 22 is formed with a metal core 16 and a coating 14. In FIG. 14 the individual filaments 12 are shown with a bonded juncture 18. The bonding at the juncture 18 prevents the individual filaments 12 from sliding relative to each other, which improves the radial strength. The mechanically linked junction 19 shown in FIG. 15 also limits the sliding of the filaments to change the radial strength. A heated platen press may be pressed against the wound stent while still on the forming mandrel to form the kinks. Higher temperatures may be used to form the melted junctures 18.

The devices may be made more visible under fluoroscopy and x-ray by incorporating radiopaque materials into marker band 24 to the individual filaments 12 at the ends of the stent 10 as shown in FIG. 1. Such marker bands could help to locate the stent and assure proper placement and patency.

Bioabsorbable Prosthesis (Stent) Materials

Controlled release, via a bioabsorbable polymer, offers to maintain the drug level within the desired therapeutic range for the duration of the treatment. In the case of stents, the prosthesis materials will maintain vessel support for at least two weeks or until incorporated into the vessel wall even with bioabsorbable, biodegradable polymer constructions.

Several polymeric compounds that are known to be bioabsorbable and hypothetically have the ability to be drug impregnated may be useful in prosthesis formation herein. These compounds include: poly-1-lactic acid/polyglycolic acid, polyanhydride, and polyphosphate ester. A brief description of each is given below.

Poly-1-lactic acid/polyglycolic acid has been used for many years in the area of bioabsorbable sutures. It is currently available in many forms, i.e., crystals, fibers,

8

blocks, plates, etc. These compounds degrade into non-toxic lactic and glycolic acids. There are, however, several problems with this compound. The degradation artifacts (lactic acid and glycolic acid) are slightly acidic. The acidity causes minor inflammation in the tissues as the polymer degrades. This same inflammation could be very detrimental in coronary and peripheral arteries, i.e., vessel occlusion. Another problem associated with this polymer is the ability to control and predict the degradation behavior. It is not possible for the biochemist to safely predict degradation time. This could be very detrimental for a drug delivery device.

Another compound which could be used are the polyanhydrides. They are currently being used with several chemotharapy drugs for the treatment of cancerous tumors. These drugs are compounded into the polymer which is molded into a cube-like structure and surgically implanted at the tumor site.

Polyanhydrides have weaknesses in their mechanical properties, due to low molecular weights. This drawback makes them difficult to process into a filament form. Also, polyanhydrides have poor solubility, making characterization and fabrication difficult.

The compound which is preferred is a polyphosphate ester. Polyphosphate ester is a compound such as that disclosed in U.S. Pat. Nos. 5,176,907; 5,194,581; and 5,656,765 issued to Leong which are incorporated herein by reference. Similar to the polyanhydrides, polyphosphate ester is being researched for the sole purpose of drug delivery. Unlike the polyanhydrides, the polyphosphate esters have high molecular weights (600,000 average), yielding attractive mechanical properties. This high molecular weight leads to transparency, and film and fiber properties. It has also been observed that the phosphorous-carbon-oxygen plasticizing effect, which lowers the glass transition temperature, makes the polymer desirable for fabrication.

The basic structure of polyphosphate ester monomer is shown below.

$$\left(\!\!\begin{array}{c}O\\\|\\P\!-\!O\!-\!R1\!-\!O\\|\\OR\end{array}\!\!\right)$$

where

P corresponds to Phosphorous,

O corresponds to Oxygen,

and R and R1 are functional groups.

Reaction with water leads to the breakdown of this compound into monomeric phosphates (phosphoric acid) and diols (see below).

$$\left(\!\!\begin{array}{c}O\\\|\\P\!-\!O\!-\!R1\!-\!O\\|\\OR\end{array}\!\!\right) + H_2O \rightarrow H_3PO_4 + ROH + HO\!-\!R1\!-\!OH$$

It is the hydrolytic instability of the phosphorous ester bond which makes this polymer attractive for controlled drug release applications. A wide range of controllable degradation rates can be obtained by adjusting the hydrophobicities of the backbones of the polymers and yet assure biodegradability.

BSC-SJA-1168

5,545,208

9

The functional side groups allow for the chemical linkage of drug molecules to the polymer. This is shown below.

$$+P-O-R1-O+$$

drug

The drug may also be incorporated into the backbone of the polymer.

$$+P-O-drug-O+$$

In summary, the highly hydrolytically reactive phosphorous ester bond, the favorable physical properties, and the versatile chemical structure make the polyphosphate esters a superior drug delivery system for a prosthesis.

FIGS. 3A and 3B show that the filaments 12 may be made from one or several layers of polymer. In FIG. 3A only a single polymer is present to carry the drugs. In FIG. 3B a second layer of polymer 15 is shown. That layer 15 may be a simple barrier which limits diffusion of drugs in the polymer 14. In that event, the smaller molecules could elute out immediately, while larger compounds would not elute until later when the layer 15 has biodegraded. Alternatively, layer 15 may include a different drug incorporated therein from that found in layer 14. The barrier coating 15 could be as simple as a silicone or polyurethane.

Operation

The prosthesis is inserted into the lumen wherever needed as per the usual procedure for stents. The device is fixed into place either by radial expansion in devices such as shown in FIG. 1 or are deformed by a balloon catheter in the case of devices in accordance with FIG. 2.

FIGS. 8 through 11 show the placement and effects of the drug-eluting prosthesis of the invention. The prosthesis tacks up any intimal flaps and tears caused by any prior ballooning. The initial deposition of platelets and subsequent thrombus formation 38 is controlled and minimized by the stent design and the elution which limits platelet aggregation and other immediate platelet responses described previously. Localized thrombus formations in the areas of cracked and roughened plaques and newly exposed underlying collagen and fibro-muscular tissues is also decreased. This results in limited but quick neointima formation 40 and intimal proliferation over individual stent filaments progressing to mature endothelial lining. Long term significant restenosis is therefore limited. Elution of the anti-replicates along or in conjunction with the initial elution of anticoagulants can also limit the extent of the restenosis which occurs in the natural healing process.

In yet another embodiment of the invention, a purely polymeric prosthesis such as that having the configuration shown in FIG. 1 can be combined with an expandable metal stent to provide additional support for the prosthesis. This can be important since preferred bioabsorbable polymeric materials for the prosthesis may have insufficient resilience to expand an occluded body lumen or to maintain its expansion. By including a metal stent within the lumen of

10

the polymeric prosthesis, the polymeric prosthesis is effectively held against the wall of the body lumen by the strength of the metal stent. In a most preferred aspect of this embodiment, the metal stent is only temporarily implanted so that only the bioabsorbable prosthesis remains implanted in the body lumen on a long term basis. This can be accomplished by including a polymeric stent body and a metal stent body on the distal end of a catheter designed to expand and release the stents. Both of the stent bodies have a number of support elements which make up an open-ended, radially expandable self-supporting tubular structure. In the polymeric stent structure, a bioabsorbable polymeric element (such as a filament made from a bioabsorbable polymer) having drugs incorporated therein can be attached to the support elements of the body so that at least a portion of the bioabsorbable element is exposed at the exterior surface of the polymeric stent body. The stents are arranged on the distal end of the catheter such that the catheter can provide remote, transluminal deployment of the stents, with the metal stent inside the polymeric stent, from an entry point into a selected portion of the body lumen to be treated and also remote actuation of an expansion mechanism from the proximal end of the catheter. The expansion mechanism (e.g. a balloon or the like if the metal stent is made of malleable metal for balloon expansion or a release mechanism if the metal stent is a self-expanding stent made from a resilient metal) is one capable of providing radial expansion of the metal stent body to bring the metal stent into supporting contact with the polymeric stent body and also to press the polymeric stent body so that it expands radially into contact with the wall of the body lumen. This will bring the bioabsorbable element into supporting contact with a body lumen at an interior portion of the body lumen to be treated and will position the bioabsorbable element to deliver drugs to the body lumen. Following the expansion of the stents into luminal contact, the balloon (if the expansion device is a balloon) can be deflated which allows luminal flow to be restored. After the stents have been in place for a predetermined period of time, the metal stent can be removed to leave only the polymeric stent (and its drug delivery component) in position in the body lumen. This can be accomplished, for example, by radially contracting the metal stent and then withdrawing it from the body lumen or by unwinding the metal stent a bit at a time as it is withdrawn from the body lumen.

Referring now to specific embodiments shown in the drawings, one possible configuration for a polymeric prosthesis supported by a metal stent is that of the prosthesis shown in FIG. 1 supported by a metal stent having a configuration such as that taught in U.S. Pat. No. 4,886,062 to Wiktor which is incorporated herein by reference. These devices may be combined by simply placing the polymeric prosthesis over the metal stent and balloon; introducing the prosthesis, stent, and balloon into the body lumen as a unit until it reaches the desired point for expansion; inflating the balloon to radially expand the prosthesis and stent into contact with the body lumen; and removing the balloon. In such an embodiment, the metal stent would be permanently implanted with the polymeric prosthesis. Another embodiment of this concept is shown in FIGS. 18 and 19a–19i in which the metal stent is only implanted for a limited period of time and then removed. Referring now to FIGS. 18 and 19a–19i, a catheter assembly 50 includes a hub assembly 52 at a proximal end, an inflatable balloon 54, a metal stent 56 and a polymeric prosthesis 58 at a distal end and a sheath 60 extending from the proximal to the distal end. The metal stent 56 is crimped onto the balloon 54 and includes an

5,545,208

<table>
<tr><td>11</td><td>12</td></tr>
</table>

elongated lead 62 extending to the proximal end of the catheter assembly 50 where it includes an enlarged portion 64 to enable an operator to securely grip the lead 62. Distal to the balloon 54 is the polymeric prosthesis 58 which is constrained from radial self-expansion by the sheath 60. In operation, a guidewire 66 is inserted into the body lumen 68 and through the point of occlusion 70. The catheter assembly 50 is then passed into the lumen 68 on the guidewire 66 until the prosthesis 58 is positioned at the point of the occlusion 70. The sheath 60 is then drawn back, thereby allowing the prosthesis 58 to be pushed out of the sheath 60 by the leading edge of the balloon assembly where it radially self-expands into luminal contact. The balloon 54 and stent 56 are then advanced out of the sheath 60 as a unit and into the open center of the prosthesis 58. The balloon 54 is then inflated to expand the metal stent 56, the prosthesis 58 and the occlusion 70. The balloon 54 is then deflated and withdrawn from the metal stent 56 and prosthesis 58, leaving the metal stent 56 inside the prosthesis 58 in support of the prosthesis 58 and the occlusion 70. If the body lumen 68 is a blood vessel, blood flow is restored by deflating the balloon 54. If desired, the balloon 54 can then be withdrawn entirely from the sheath 60 and also, if desired, the sheath 60 and guidewire 66 can be withdrawn. However, it is preferred to leave the balloon 54, sheath 60 and guidewire 66 in place in order to provide support for the lead 62 and to avoid entangling the lead 62 with the catheter lumen or guidewire 66 as they are withdrawn. If the balloon 54 or guidewire 66 are to be withdrawn, it may be preferable to modify the sheath 60 by providing a separate lumen in the sheath 60 or another location in the catheter assembly 50 for the lead 62. After a desired period of time which allows the prosthesis to achieve a stable support for the lumen, the lead 62 is pulled at the proximal end of the catheter assembly 50, thereby causing the metal stent 56 to unwind and be taken up into the sheath 60. The metal stent chosen for use in this method should include no edges or ends which can snag the prosthesis 58 and pull it from its intended position in the body lumen 68. The Sheath is then withdrawn, leaving the prosthesis 58 in place in the lumen 68.

This completes the description of the preferred and alternate embodiments of the invention. Those skilled in the art may recognize other equivalents to the specific embodiments described herein which equivalents are intended to be encompassed by the claims attached hereto.

We claim:

1. A device for local intraluminal administration of drugs comprising:

(a) a catheter having proximal and distal ends;

(b) a body including a plurality of support elements forming an open-ended, radially expandable, self-supporting tubular structure having an interior surface and an exterior surface;

(c) at least one flexible, polymeric filament attached to the support elements of the body, at least a portion of the filament exposed at the exterior surface of the tubular body, said body mounted on the catheter at the distal end thereof;

(d) means at the proximal end of the catheter to provide sufficient radial expansion of the tubular body to bring the tubular body and polymeric filament into contact with a body lumen at an interior portion of the body lumen to be treated and for releasing the tubular body from the catheter; and

(e) a drug compounded into the polymeric filament such that the drug is delivered to the body lumen when the tubular body is radially expanded into contact with the portion of the body lumen to be treated.

2. The device of claim 1 wherein the support elements of the tubular body are arranged in a helically wound structure.

3. The device of claim 2 wherein the helically wound structure includes a plurality of helical elements, each of which is wound in a helix configuration along a center line of the tubular body as a common axis, said elements wound in opposing helical directions such that the tubular body is variable in radial diameter under axial movement of opposite ends of the body relative to each other.

4. The device of claim 3 wherein the helical elements are made from a bioabsorbable polymer.

5. The device of claim 2 wherein the support elements are made from a deformable metal.

6. The device of claim 1 wherein the polymeric filament is made from a bioabsorbable polymer.

7. The device of claim 1 also comprising a second polymeric filament having the drug compounded therein such that the drug is delivered to the body lumen more rapidly from the second polymeric filament than from the polymeric filament.

8. The device of claim 1 also comprising a barrier coating of polymeric material on the drug-containing filament to limit the rate of drug elution.

9. The device of claim 1 wherein the drug is selected from the group consisting of antiplatelet drugs, anticoagulant drugs, anti-inflammatory drugs, antireplicate drugs and combinations of said drugs.

10. The device of claim 9 wherein the polymeric filament includes a drug selected from the group consisting of anticoagulant drugs and antiplatelet drugs and wherein the device also comprises a second polymeric filament having a drug compounded therein selected from the group consisting of antiinflammatory drugs and antireplicate drugs such that the drug in the polymeric filament is delivered to the body lumen more rapidly than from the second polymeric filament.

* * * * *

BSC-SJA-1170

# EXHIBIT 57

US005578075A

# United States Patent [19]

## Dayton

[11] Patent Number: 5,578,075

[45] Date of Patent: Nov. 26, 1996

[54] MINIMALLY INVASIVE BIOACTIVATED ENDOPROSTHESIS FOR VESSEL REPAIR

[75] Inventor: Michael P. Dayton, 14802 Hadleigh Way, Tampa, Fla. 33624

[73] Assignees: Michael Peck Dayton, Tampa, Fla.; Kenneth Granke, Morgantown, W. Va.

[21] Appl. No.: 457,850

[22] Filed: Jun. 1, 1995

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 204,947, Mar. 2, 1994, Pat. No. 5,449,382, which is a continuation of Ser. No. 971,217, Nov. 4, 1992, abandoned.

[51] Int. Cl.⁶ ......................................... A61F 2/06
[52] U.S. Cl. .......................... 623/1; 623/12; 623/901; 604/104; 604/107
[58] Field of Search ........................ 623/1, 12, 901; 604/95, 104, 107, 114

[56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,740,207 | 4/1988 | Kreamer | 623/12 |
| 5,019,090 | 5/1991 | Pinchuk | 623/1 |
| 5,123,917 | 6/1992 | Lee | 623/1 |
| 5,234,456 | 8/1993 | Silvestrini | 623/1 |
| 5,342,348 | 8/1994 | Kaplan | 623/13 |
| 5,344,426 | 9/1994 | Lau et al. | 623/1 |
| 5,449,382 | 9/1995 | Dayton | 623/12 |
| 5,464,450 | 11/1995 | Buscemi et al. | 623/12 |

Primary Examiner—Paul B. Prebilic
Attorney, Agent, or Firm—John S. Munday; Stephen G. Stanton

[57]                    ABSTRACT

A minimally invasive bioactivated endoprosthesis device for vessel repair. The device comprises a stent which is formed from metal or polymers into a predetermined shape which may include a plurality of holes patterned with a desired size, shape and number. The stent is then coated with a polymer or is formed from a polymer which contains a bioactive substance which achieves an equilibrium with the surrounding body tissues or fluids, with the equilibrium being controlled by charge distribution, concentration and molecular weight of the bioactive substance in relation to the pore size of the polymeric carrier for controlled prolonged release of said bioactive substance. The bioactive substance may be selected from the group of heparin, hirudin, prostacyclenes and analogs thereof, antithrombogenic agents, steroids, ibuprofen, antimicrobials, antibiotics, tissue plasma activators, rifamicin, monoclonal antibodies, snake venom protein by-products, antifibrosis agents, hyaluronate, cyclosporine and mixtures of these bioactive substances for simultaneous multiple treatments. The stent itself may take several distinct configurations. Preferred is a stent which comprises a substructure selected from flat sheets, flat sheets having holes therein, meshes and stent frames having a sheath thereon, and the substructure is coated with a polymer embedded with a bioactive substance. The stent may be either self-expandable or mechanically expandable, such as by a balloon or other device.

11 Claims, 3 Drawing Sheets





FIG. 1

FIG. 2

FIG. 3

FIG. 4

FIG. 6

FIG. 5

FIG. 7

BSC-SJA-1172



FIG. 8

FIG. 9

FIG. 10

BSC-SJA-1173

**U.S. Patent**          Nov. 26, 1996          Sheet 3 of 3          5,578,075



FIG. 11



FIG. 12



FIG. 13          FIG. 14

BSC-SJA-1174

5,578,075

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## MINIMALLY INVASIVE BIOACTIVATED ENDOPROSTHESIS FOR VESSEL REPAIR

This is a continuation-in-part of my prior application filed Mar. 2, 1994, having Ser. No. 08/204,947, now U.S. Pat. No. 5,449,382, which in turn is a continuation of my prior application filed Nov. 4, 1992, having Ser. No. 07/971, 217, now abandoned.

### FIELD OF THE INVENTION

The present invention relates to an improved percutaneously inserted endoprosthesis device which is permanently or temporarily implanted within a body vessel, typically a blood vessel. More particularly, the present invention relates to a new procedure for administering localized bioactive substances via prostheses designs which are adapted to resist problems associated with restenosis, thrombosis, infection calcification and/or fibrosis after implantation.

### BACKGROUND OF THE INVENTION

In certain medical treatment procedures, a type of endoprosthesis device known as a stent is placed or implanted within a blood vessel for treating various problems such as stenoses, strictures, or aneurysms in the blood vessel. These devices are implanted within the vascular system to reinforce collapsing, partially occluded, weakened or abnormally dilated sections of the blood vessel. Stents may also be implanted in the ureter, urethra, bile duct, or any body vessel which has been narrowed, weakened or in any of the other ways which requires reinforcement.

A common approach for implanting stents in peripheral or coronary arteries is to first open the constricted region of the vessel via a percutaneous transluminally inserted angioplasty balloon catheter. The uninflated balloon at the tip of the catheter is advanced into the narrowed portion of the vessel lumen. The balloon is inflated so as to push the stenotic plaque outward, thereby enlarging the luminal diameter. Thereafter another catheter containing the stent is advanced to the region just enlarged by the balloon catheter and the stent is deployed. The catheter is withdrawn leaving the stent within the vessel.

The concept of implanting transluminally placed coil spring stents within an artery is not new. In one experiment in 1969, six stents were implanted in arteries of dogs. Three stents were stainless steel covered with silicone rubber and the other three stents were bare stainless steel. All three silicone coated stents occluded within 24 hours while two of the three bare stents remained open for thirty months. The stents were deployed using a pusher catheter having the same outer diameter as the stent.

In 1983, thermally expandable stents were reported, in which an alloy wire was shaped at high temperature into a stent configuration. Later it was straightened at room temperature into a configuration suitable for transluminal placement. Once placed within the vessel the stent was exposed to elevated temperatures to cause the alloy to return to its initial coil configuration. Canine studies of these stents, using the alloy nitinol, an alloy of nickel and titanium, demonstrated restenosis and intimal thickening 8 weeks following implant.

In 1984, self-expanding stents were described in which a device was introduced percutaneously after torsion reduction and was deployed by applying a reverse torsion in-vivo. This type of device proved to be complex and limited by a small expansion ration. Another self-expanding stent used

stainless steel wire in a zig zag configuration which resulted in incomplete vascular contact and only partial healing of the device. Yet another mechanical self-expanding stent was reported where a woven multifiliment stainless steel stent was deployed by a catheter with a constricting outer sleeve. Once in place, the outer sleeve was removed allowing self-expansion of the spring stent against the vessel wall.

Thrombosis occurred in these early prototypes, especially when the vessel tapered, and at branch points and at low expansion ratios. Canine aortic implantation resulted in multiple areas of vessel-to-stent adhesion at 3 weeks following implant. The stent exhibited minimal thrombogenicity.

Balloon expandable stents were first reported as being constructed of woven stainless steel wire where the cross points were silver soldered to resist radial collapse. The stent was deployed unexpanded over a balloon catheter, and once in position the stent was expanded by the outward force of the balloon. 8 of 11 stents implanted remained open for 1 to 8 weeks. It has been observed that the amount of intimal hyperplasia to be inversely proportional to the initial vessel lumen diameter. In another version, silver soldering cross points were replaced by the use of a stainless steel tube with rows of offset slots which became diamond shaped spaces. Although neointimal hyperplasia was observed, all stents remained open in rabbit aortas for 6 months.

Placement of a stent in a blood vessel is described in Lindemann et al U.S. Pat. No. 4,878,906 where a combination of sheath covered sleeve and a balloon catheter are used to locate and place the prosthesis. No recognition is given to the problems just discussed herein.

A prosthesis system using an expandable insert is shown in Garza et al U.S. Pat. No. 4,665,918, which is typical of those devices which are implanted without any express concern for the biocompatibility of the device being inserted. One can expect many of the foregoing problems and concerns to be evidenced by this device.

One device which is shown in U.S. Pat. No. 4,768,507 to Fischell et al describes a coil spring stent on which an application of a carbon coating or a carbon coated polytetrafluoroethylene has been applied on the surface of the coil spring. Fischell et al teaches that the thrombogenic potential of the device is reduced, through a passive methodology, but does nothing to address the biological response to the implant as a foreign body. Moreover, no suggestion is made of a way to inhibit neointimal hyperplasia, which inevitably follows balloon catheter induced injury to arterial vessels.

Yasuda U.S. Pat. No. 4,994,298 employs plasma polymerization to form a thin flexible coating on stents, teaching that improved biocompatibility, such as non-thrombogenicity and tissue or blood compatibility may be improved. Again this process is a passive methodology as previously described.

There are essentially two types of stents which have been employed in the prior art. Spring like stents have been inserted using a sheath or restraining element to keep the spring from expanding until it is in place. The other form of stent uses a method of expanding the stent once it is in place, such as a balloon catheter, Kreamer U.S. Pat. No. 4,740,207 describes one version of the balloon catheter version. In this patent, a semi-rigid tube which has a smaller relaxed diameter which is expanded to a larger operating diameter which is maintained by a retaining ledge on the inside of the graft. Concern here, of course, is that the inside located ledge and other retaining means may inadvertently function to cause further blockage of the tube once it is installed. Also,

BSC-SJA-1175

5,578,075

3

Kraemer states that the tube is held in place by friction between the outer periphery of the graft and the inner periphery of the vessel to prevent displacement of the graft once in place In the vessel. The obvious concern is that the size must be precise or the tube will expand too much or too little, either damaging the vessel or escaping from the location for which it was intended.

Prior art devices represent a foreign body that has no biologically active properties and thus are a factor which contributes in a major way to the eventual restenosis or thrombosis of the vessel. These prior art devices attempt to reduce neointimal hyperplasia passively by adjusting mechanical variables such as lowering the stent profile, coating the stent with carbon, or by making the stent more or less rigid or flexible.

Accordingly, it is an object of the present invention to provide a device and method for deploying stents in blood vessels and other regions of the body without concern for the precise size of the stent being employed or the size of the vessel being treated or repaired.

It is an important object of this invention to produce a stent device and delivery system for the stent which produces rapid endothelialization with the least mount of intimal hyperplasia. While this goal has been stated by others, no effective method or device has been proposed to accomplish that goal.

Another object of this invention is to provide an endoprosthesis device and method for its use in which problems associated with restenosis, thrombosis, infection, calcification and/or fibrosis after implantation may be avoided.

Yet another object of the present invention is to provide a device which is effective in administering localized bioactive substances to prevent rejection and side effects from an implanted endoprosthesis device.

Other objects will appear hereinafter.

SUMMARY OF THE INVENTION

It has now been discovered that the above and other objects of the present invention may be accomplished in the following manner. Specifically, an minimally invasive bio-activated endoprosthesis for vessel repair has been discovered which is admirably suited for long term use in a variety of surgical procedures and treatments.

The device is intended for use in those medical treatment procedures where a type of endoprosthesis device known as a stent is placed or implanted within a blood vessel for treating various problems such as stenoses, strictures, or aneurysms in the blood vessel. These devices may also be implanted within the vascular system to reinforce collapsing, partially occluded, weakened or abnormally dilated sections of the blood vessel. Stents of the present invention may also be implanted in the ureter, urethra, bile duct, or any body vessel which has been narrowed, weakened or in any of the other ways which requires reinforcement.

The device comprises a minimally invasive bioactivated endoprosthesis device for vessel repair, including a stent which is formed from metal or polymers into a predetermined shape which includes a plurality of holes patterned with a desired size, shape and number to provide a desired bending modulus. The stent may be fabricated from stainless steel, nitinol or other appropriate metallic alloys or may be formed from a variety of polymers which are known to be suitable for use with the human body.

4

When a metallic stent is employed, it is formed and then coated with a polymer which contains a bioactive substance which achieves an equilibrium with the surrounding body tissues or fluids, with the equilibrium being controlled by charge distribution, concentration and molecular weight of the bioactive substance in relation to the pore size of the polymeric carrier. Among these polymers are polymers having a microporous structure, such as silicons, polyurethane, polyvinyl alcohol, polyethylene, biodegradable polylactic acid polymers, polyglycolic acid polymers, polyesters, hydrogels, tetrafluoroethylene and polytetrafluoroethylene, fluorosilicone, hyaluronic and combinations, copolymers and blended mixtures thereof.

If the stent is formed from a polymer, these same polymeric materials may be employed, although some may need to be structurally reinforced. Also useful as a polymeric stent is polymethylmethacrylate, which is an example of the generic class of structurally adequate polymers without reinforcement.

A bioactive substance is preferably admixed in the polymer for elution from the microporous structure of the stent or coating on the stent after implantation. The rate of elution of the bioactive substance is controlled by selecting a pore size for the microporous structure in response to the concentration and molecular weight of the bioactive substance to achieve equilibrium between the polymer and the tissue or fluids proximate the stent upon implant. This permits a controlled and prolonged release of the bioactive substance as the polymer eluded or when a bioresorbable polymer erodes to release the bioactive substance.

The bioactive substance may be selected from the group of heparin, hirudin, prostacyclenes and analogs thereof, antithrombogenic agents, steroids, ibuprofen, antimicrobials, antibiotics, tissue plasma activators, rifamicin, monoclonal antibodies, snake venom protein by-products, antifibrosis agents, cyclosporine, hyaluronic and mixtures of these bioactive substances for simultaneous multiple treatments.

The stent itself may take several distinct configurations, all of which have a predetermined biasing force acting on the diameter of the stent. A flat, rectangular strip of stent material is formed, with the size being determined by the size of the blood vessel or other body conduit where the stent will be placed. As previously set forth, this strip includes a plurality of holes patterned with a desired size, shape and number to provide a desired bending modulus. Locking tabs are provided to engage the some of the plurality of holes at the maximum expanded size to prevent return to the smaller diameter coiled shape.

Preferred is a rolled stent which is provided with a coiled shape to which it tends to return when expanded. This is accomplished by using the same edge of the strip on which the tabs are formed as a rotational axis to roll the strip into a tight coil so that the tabs are in the center of the coil. Heat is applied to cause the strip to take a set in this coiled shape, so that when the coiled strip is radially expanded or unrolled, the form stresses will bias the strip to roll back into the preferred shape. The tabs which have been formed on what is now the inside edge will engage the holes formed in the strip and prevent collapse to the biased shape. Since a plurality of holes are formed in the strip, the device may be expanded to different sizes, depending upon the particular vessel in which it is placed. Under some circumstances, the device is capable of assuming a stent shape with more than one diameter, for the first time in these applications.

Alternatively the predetermined bias of the stent may be the expanded size so that the stent is coiled against this bias

BSC-SJA-1176

5,578,075

| 5 | 6 |

during insertion. Holes are still placed in the sheet or strip to encourage adoption of the stent by the vessel. However, the relaxed or unbiased position is that of the intended final shape, and therefore locking tabs are not necessary. The stent is compressed or rolled to a smaller diameter prior to use with a built in bias to return to the "in use" shape previously built into the stent. This embodiment is installed using an introducer sheath. A balloon catheter may or may not be needed in view of the built in bias.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the invention, reference is hereby made to the drawings, in which:

FIG. 1 is an isometric view of an endoprosthesis for vessel repair.

FIG. 2 is an isometric view of the device shown in FIG. 1 in the most fully opened position.

FIG. 3 is a sectional view taken on line 3,3 of FIG. 1.

FIG. 4 is a sectional view taken on line 4,4 of FIG. 2.

FIG. 5 is a plan view development of the endoprosthesis blank prior to formation.

FIG. 6 is an end view of the device of FIG. 5 as viewed from the left hand side.

FIG. 7 is a sectional view taken on line 7,7 of FIG. 5.

FIG. 8 is a plan view development of a second embodiment for an endoprosthesis blank.

FIG. 9 is a sectional view taken on line 9,9 of FIG. 8.

FIG. 10 is a sectional view similar to FIG. 4 but showing the endoprosthesis formed from the blank of FIG. 8.

FIG. 11 is a plan view development of a third embodiment for an endoprosthesis blank.

FIG. 12 is a sectional view taken along line 12,12 of FIG. 11.

FIG. 13 is a sectional view similar to FIG. 4 but showing the endoprosthesis formed from the blank of FIG. 11.

FIG. 14 is a view of the endoprosthesis of FIG. 13 after insertion and expansion in its position of intended use.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

As shown in the drawings, the device of this invention comprises a minimally invasive bioactivated endoprosthesis device, 10 generally, for vessel repair in contact with surrounding body tissues or fluids. The device includes a stent 11 which may be installed in the vessel using a catheter 13, and in some cases using a balloon 15 on the end of catheter 13. Stent 11, which contains a plurality of holes 17, is shown in a tightly coiled pre-insertion position in FIG. 1 with a fragment of balloon catheter 13 shown about to be inserted medially within the endoprosthesis. The sectional view shown in FIG. 3 illustrates a tab 19 which does not engage any holes 17 and which is enclosed within the coiled stent 11, as the stent is in its relaxed or steady state with no bias from external forces acting on the stent.

In FIG. 2, the stent 11 is illustrated in its most fully opened and locked position, as expansion has been effected diametrically by means of the medially positioned balloon 13. FIGS. 2 and 4 shows how the tab 19 engage holes 17 and prevent the stent from re-coiling upon itself to return to the position shown in FIG. 3.

The direction of the catheter and the balloon define an axis for reference to the various stents shown herein as part of the present invention. FIG. 5 is a plan view development prior to tightening and assembly of the stent into the predetermined shape. The stent 11 comprises a flat, rectangular strip 21 of a size determined by the size of the blood vessel or other body conduit where stent 11 will be placed. Tabs 19 extend along one end of strip 21 and are angled, as shown in FIG. 7. Strip 21 is coiled and biased to take a smaller diameter coiled shape, as tabs 19 engage some of the plurality of holes 17 at a maximum desired expanded size to prevent return to the smaller diameter coiled shape.

The coiled stent 11 is formed by using that edge of strip 21 on which the tabs 19 are formed as a rotational axis to roll the strip 21 into a tight coiled stent so that the tabs 19 are in the center so that when coiled strip 11 is radially unrolled to the position shown in FIG. 2, the form stresses will bias the strip 21 to roll back into the preferred shape of FIG. 3, and tabs 19 will engage holes 17 formed in strip 21, so as to prevent collapse to the biased shape of FIG. 3.

By using the same edge of the strip 21 on which the tabs 19 are formed as a rotational axis to roll the strip into a tight coil, tabs 19 are in the center of the coiled stent. Heat is applied to cause the strip to take a set in this coiled shape, so that when the coiled strip is radially expanded or unrolled, the form stresses will bias the strip to roll back into the preferred shape. Tabs 19 which have been formed on what is now the inside edge will engage the holes 17 formed in the strip and prevent collapse to the biased shape. Since a plurality of holes 17 are formed in the strip 21, the device may be expanded to different sizes, depending upon the particular vessel in which it is placed. Under some circumstances, the device is capable of assuming a stent shape with more than one diameter.

A slightly different stent layout is shown in FIGS. 8–10, in that tabs 19 are replaced with pointed tabs 20. Again the coiled stent 11 is heated or otherwise biased to move to a collapsed or tightly coiled condition. Pointed tabs 20 engage holes 17 and prevent such recoiling. In addition, pointed tabs 20 engage the side walls of the blood vessel or other part of the anatomy where the stent has been deployed.

Turning now to FIGS. 11–14, an alternative embodiment is shown in which a strip 31 is formed into the desired size and shape, with holes 17 being provided for flexibility and for engagement with the tissue after implantation in some instances. No tabs are needed for this embodiment since this stent will have an outward biasing tendency. The stent assumes the shape shown in FIG. 14 after heating or otherwise forming the rolled stent into a usable configuration. When implantation is desired, the stent 33 is constricted to a smaller diameter as shown in FIG. 13, so that the bias of the design is to expand the stent. An introducer sheath of the type already in use should be used to position the stent in the vessel of choice. It may be only necessary to pull the sheath back to expose the stent.

In all of the devices of this invention, it is intended that a polymer form the exterior surface of the stent, either as a coating or as the stent itself. The drawings should be interpreted to understand that a polymer does form the exterior surface, whether or not a substrate such as a metal stent is used. The polymer should have a microporous structure with a predetermined pore size. Also included in the polymer is a bioactive substance having a charge distribution, concentration and molecular weight selected which achieves an equilibrium in relation to the pore size of the polymeric carrier with said surrounding body tissues or fluids.

Among these polymers are polymers having a microporous structure, such as silicons, polyurethane, poly-

BSC-SJA-1177

5,578,075

**7**

vinyl alcohol, polyethylene, polyesters, hydrogels, tetrafluoroethylene and polytetrafluoroethylene, fluorosilicone, hyaluronate and combinations, copolymers and blended mixtures thereof. One preferred resorbable polymer is biodegradable polylactic acid, and another is polyglycolic acid. These materials are suitable for being formed into a stent that possesses acceptable tensile strength characteristics.

If the stent is formed from a polymer, these same polymeric materials may be employed, although some may need to be structurally reinforced. Also useful as a polymeric stent is polymethylmethacrylate, which is an example of the generic class of polymers having good structural properties. In any event, the bioactive substance is incorporated into the polymer prior to insertion of the stent into the vessel.

Radio opaque substances such as, for example, fluorescein, may also be incorporated into the stent so as to assist in the deployment and subsequent evaluative follow-up of the surgery. A primary purpose of the bioactive substance is to inhibit vessel wall restenosis following vascular balloon angioplasty. In addition, stents of the present invention may be used to improve the diameter of the urethra or fallopian tubes, ureter, bile duct, trachea, esophagus, or other body vessel.

Preferred bioactive substances are heparin, hirudin, prostacyclenes and analogs thereof, antithrombogenic agents, steroids, ibuprofen, antimicrobials, antibiotics, tissue plasma activators, rifamicin, monoclonal antibodies, snake venom protein by-products, antifibrosis agents, cyclosporine, hyaluronate and mixtures of these bioactive substances for simultaneous multiple treatments. Of course, virtually any bioactive substance of need to the patient is a possible agent for treating the patient, depending upon the needs of the treatment.

The preparation of the stents of this invention is as follows. When a metallic stent is contemplated, and any of these stent designs may benefit from the concepts of this invention, a medical grade of polymer is selected. Preferred is a silicone elastomer. A quantity of silicone elastomer is mixed in a 3 to 1 ration with ethyl ether to form a solution suitable for coating a metallic stent. A quantity of bioactive substance required to achieve the desired therapeutic effect is admixed with the polymer and ethyl ether solution. After thorough blending, the now bioactivated polymer solution is ready to be used to coat the stent.

The cleaned metallic stent is coated by the bioactivated polymer using a variety of methods. One method is to completely submerge or dip the stent into a quantity of polymer so that the metallic stent is fully covered. After coating and removing from the dip, the polymer is cured or vulcanized at the desired temperature, depending upon the polymer. Alternatively, the polymer may be sprayed on to the polymer and then cured. Yet another method includes pouring a coating over the stent while the stent is being rotated. Plasma coating is also effective.

A variety of stent designs may be employed within the scope of the present invention as defined above. In one embodiment, the stent may take the form of a metallic wire stent. Alternatively the stent may be a metallic tube with alternating slots which form a wire-like mesh when expanded. The stent may be self-expanding or balloon expanded. With this stent a polymer embedded with a bioactive substance is used to cover the wire, leaving the space between the wire or mesh uncovered. Alternatively the polymer embedded with a bioactive substance may be used to cover the wire or mesh and fill in the spaces between the wires, thereby maximizing the polymer in contact with

**8**

surrounding tissues. In both cases tissue ingrowth is permitted to encourage and facilitate rapid endothelialization, either with the spaces between the wires or in holes formed in the outer surface of the polymer as drugs are released to permit tissue ingrowth. Yet another embodiment would be to coat the outer surface of a fabric or other sheath material which is then used in combination with a metallic stent frame.

In addition, the stents described with respect to FIGS. 1–14 may be modified so that a flat sheet with multiple holes, such as stent 11 of FIGS. 1–4, with holes 17 but without tab 19. In this embodiment the spring-like properties of sheet 21 are sufficient to cause stent 11 to unroll to the desired size. In this embodiment, the polymer embedded with a bioactive substance is used to cover the flat portion 21 of stent 11 without occluding holes 17. Alternatively, holes 17 could also be covered by the polymer embedded with a bioactive substance as previously described with respect to a mesh stent and release of drugs from the outer surface of the polymer embedded with a bioactive substance will leave additional holes to permit and encourage tissue ingrowth.

In yet another embodiment, the flat sheet or mesh configuration may be composed entirely of polymer that is formed into the desired stent configuration directly without an accompanying substructure. The stent thus formed may be comprised of a polymer that is permanent, to give a long term structural support as the drugs are eluted, or the polymer may be biodegradable so that in time, as the treatment succeeds and tissue heals and rebuilds itself, the polymer will be absorbed by the body. Of course, long term treatment by the drugs within the polymer takes place in either case.

Finally, an additional embodiment is contemplated in which the polymer embedded with a bioactive substance is cured in situ at the diseased site so as to structurally support the vessel while treating the tissues via polymeric release. In this method, the non-cured polymer is injected into the vessel site via a catheter so as to 'coat' the surrounding vessel walls. The polymer is cured within the vessel to form a tubular layer or lining in direct contact with the surrounding tissues. As the drug is released, holes are again formed to permit ingrowth as has been described herein, particularly where the polymer is non-resorbable. When resorbable polymers are used to form the in-situ cured stent, tissue quickly displaces the polymer as it biodegrades, this permitting endothelialization.

While particular embodiments of the present invention have been illustrated and described, it is not intended to limit the invention, except as defined by the following claims.

I claim:

1. A minimally invasive bioactivated endoprosthesis device for vessel repair in contact with surrounding body tissues, comprising:

a stent formed from a solid non-biodegradable material presenting a substantial surface to said tissues for use with a blood vessel or other body conduit to form an internally unrestricted stent having a diameter of a selected size for said blood vessel or other body conduit; said stent including a plurality of holes sufficiently large to permit rapid endothelialization; and

a polymer forming at least the exterior surface of said stent for direct polymer to tissue contact with said tissue, said polymer having a porous structure with a predetermined pore size and further including a bioactive substance within said pores for elution from said pores, said pore size being selected in response to the

BSC-SJA-1178

5,578,075

9

concentration and molecular weight of said substance to achieve equilibrium between said polymer and said tissue to provide a controlled and prolonged release of said bioactive substance to said surrounding body tissue in an amount sufficient to substantially prevent hyperplasia or therapeutically treat said tissue, said stent having sufficient amount of said substantial surface to support a quantity of said polymer capable of prolonged release of said amount.

2. A method of making a minimally invasive bioactivated endoprosthesis device for vessel repair in contact with surrounding body tissues, comprising the steps of:

forming a stent from a non-biodegradable material sized to present a substantial surface to said tissues for use with a blood vessel or other body conduit and having a diameter of a selected size for said blood vessel or other body conduit; said material including a plurality of holes sufficiently large to permit rapid endothelialization; and

forming a polymer on at least the exterior surface of said stent for direct polymer to tissue contact with said tissues, said polymer having a porous structure with a predetermined pore size and further including a bioactive substance within said pores for elution from said pores, said pore size being selected in response to the concentration and molecular weight of said substance to achieve equilibrium between said polymer and said tissues to provide a controlled and prolonged release of said bioactive substance to said surrounding body tissues in an amount sufficient to substantially prevent hyperplasia or therapeutically treat said tissues, said stent having a sufficient amount of said substantial surface to support a quantity of said polymer capable of prolonged release of said amount.

3. The device of claim 1, wherein said stent comprises a substructure selected from the group consisting of flat sheets, flat sheets having holes therein, meshes and stent

10

frames having a sheath thereon; said structure being coated with said polymer embedded with a bioactive substance.

4. The device of claim 1, wherein said stent is formed in-situ from said polymer embedded with a bioactive substance wherein the polymer is cured after placement in contact with surrounding tissues.

5. The device of claim 1, wherein said stent comprises a metallic substructure having said polymer as a coating.

6. The device of claim 1 wherein said polymer is selected from the group of silicone, polyurethane, polyvinyl alcohol, polyethylene, biodegradable polylactic acid polymers, polyglycolic acid polymers, polyesters, hydrogels, polytetrafluroethylene, fluorosilicone, hyalurone and combinations, copolymers and blended mixtures thereof.

7. The device of claim 1, wherein said bioactive substance is selected from the group consisting of heparin, hirudin, prostacyclenes or analogs thereof, antithrombogenic agents, steroids, ibuprofen, antimicrobials, antibiotics, tissue plasma activators, rifamicin, monoclonal antibodies, snake venom protein by-products, antifibrosis agents, hyaluronte, cyclosporine and mixtures of these bioactive substances for simultaneous multiple treatments.

8. The device of claim 2 wherein said stent is formed solely from said polymer having sufficient structural integrity to be formed into a stent.

9. The method of claim 2, wherein said stent is formed from a substructure selected from the group consisting of flat sheets, flat sheets having holes therein, meshes and stent frames having a sheath thereon; said structure being coated with said polymer embedded with a bioactive substance.

10. The method of claim 2, wherein said stent is formed in-situ from a polymer embedded with a bioactive substance wherein the polymer is cured after placement in contact with surrounding tissues.

11. The method of claim 2, wherein said stent is selected from the group consisting of self-expanding and mechanically expandable stents.

*  *  *  *  *


BSC-SJA-1179

US005578075B1

# REEXAMINATION CERTIFICATE (3992nd)

## United States Patent [19]

**Dayton**

[11] **B1 5,578,075**

[45] Certificate Issued    *Feb. 8, 2000

[54] **MINIMALLY INVASIVE BIOACTIVATED ENDOPROSTHESIS FOR VESSEL REPAIR**

[75] Inventor: **Michael P. Dayton**, Tampa, Fla.

[73] Assignee: **Daynke Research, Inc.**, Tampa, Fla.

**Reexamination Request:**
No. 90/005,278, Mar. 1, 1999

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 5,578,075 |
| Issued: | Nov. 29, 1996 |
| Appl. No.: | 08/457,850 |
| Filed: | Jun. 1, 1995 |

[ * ] Notice: This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/204,947, Mar. 2, 1994, Pat. No. 5,449,382, which is a continuation of application No. 07/971,217, Nov. 4, 1992, abandoned.

[51] Int. Cl.[7] .............................................. A61F 2/06

[52] U.S. Cl. ................... 623/1; 623/12; 623/901;
604/104; 604/107

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,740,207 | 4/1988 | Kreamer | 623/12 |
| 4,923,464 | 5/1990 | DiPisa . | |
| 4,969,890 | 11/1990 | Sugita . | |
| 4,994,071 | 2/1991 | MacGregor . | |
| 5,019,090 | 5/1991 | Pinchuk | 623/1 |
| 5,102,417 | 4/1992 | Palmaz . | |
| 5,123,917 | 6/1992 | Lee | 623/1 |
| 5,222,971 | 6/1993 | Willard . | |
| 5,234,456 | 8/1993 | Silvestrini | 623/1 |
| 5,282,823 | 2/1994 | Schwartz . | |
| 5,304,121 | 4/1994 | Sahatjian . | |
| 5,342,348 | 8/1994 | Kaplan | 623/13 |
| 5,344,426 | 9/1994 | Lau et al. | 623/1 |
| 5,423,885 | 6/1995 | Williams . | |
| 5,441,515 | 8/1995 | Khosravi et al. | 606/194 |
| 5,443,458 | 8/1995 | Eury . | |
| 5,443,496 | 8/1995 | Schwartz . | |
| 5,449,382 | 9/1995 | Dayton | 623/12 |
| 5,464,450 | 11/1995 | Buscemi et al. | 623/12 |
| 5,512,055 | 4/1996 | Domb . | |
| 5,545,208 | 8/1996 | Wolff . | |
| 5,591,227 | 1/1997 | Dinh . | |
| 5,649,977 | 7/1997 | Campbell | 623/1 |
| 5,700,286 | 12/1997 | Tartaglia et al. | 623/1 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0472246B1 | 6/1995 | European Pat. Off. . |
| WO90/13332 | 11/1990 | WIPO . |
| WO91/12779 | 9/1991 | WIPO . |

*Primary Examiner*—Paul Prebilic

[57]                 **ABSTRACT**

A minimally invasive bioactivated endoprosthesis device for vessel repair. The device comprises a stent which is formed from metal or polymers into a predetermined shape which may include a plurality of holes patterned with a desired size, shape and number. The stent is then coated with a polymer or is formed from a polymer which contains a bioactive substance which achieves an equilibrium with the surrounding body tissues or fluids, with the equilibrium being controlled by charge distribution, concentration and molecular weight of the bioactive substance in relation to the pore size of the polymeric carrier for controlled prolonged release of said bioactive substance. The bioactive substance may be selected from the group of heparin, hirudin, prostacyclenes and analogs thereof, antithrombogenic agents, steroids, ibuprofen, antimicrobials, antibiotics, tissue plasma activators, rifamicin, monoclonal, antibodies, snake venom protein by-products, antifibrosis agents, hyaluronic, cyclosporine and mixtures of these bioactive substances for simultaneous multiple treatments. The stent itself may take several distinct configurations. Preferred is a stent which comprises a substructure selected from flat sheets, flat sheets having holes therein, meshes and stent frames having a sheath thereon, and the substructure is coated with a polymer embedded with a bioactive substance. The stent may be either self-expandable or mechanically expandable, such as by a balloon or other device.



B1 5,578,075

1

## REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

### THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

2

The patentability of claims 1, 2, and 4–11 is confirmed.

Claim 3 is determined to patentable as amended.

3. The device of claim 1, wherein said stent comprises a substructure selected from the group consisting of flat sheets, flat sheets having holes therein, meshes and stent [flames] *frames* having a sheath thereon; said structure being coated with said polymer embedded with a bioactive substance.

*   *   *   *   *

BSC-SJA-1181

# EXHIBIT 58

RECEIVED

APR 1 8 2003

TECHNOLOGY CENTER 2700

Response Under 37 CFR 1.116
EXPEDITED PROCEDURE
EXAMINING GROUP 3743

Docket No. CRD-0924

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants : Robert Falotico et al.

Serial No. : 09/850,482                     Art Unit: 3743

Filed      : May 7, 2001                    Examiner: Fezko, Kathryn P.

For        : DRUG  COMBINATIONS  AND  DELIVERY  DEVICES  FOR  THE
             PREVENTION AND TREATMENT OF VASCULAR DISEASE

I hereby certify that this correspondence is being deposited with the
United States Postal Service as first class mail in an envelope addressed
to: Commissioner for Patents, Washington, D.C. 20231 on

April 7, 2003
[Date]

Carl J. Evens
Name of applicant, assignee, or registered Representative

[Signature]

April 7, 2003
[Date of Signature]

Commissioner for Patents
Box AF
Washington, D.C. 20231

REPLY/AMENDMENT

Dear Sir:

In response to the Final Office Action mailed February 7,

2003, Applicants respectfully request that the referenced patent

application be amended as proposed below.

Cordis et al. v Abbott et al.
C.A. Nos. 07-2365, -2477, -2728, -5636 (D. N.J.)

ABTJDOC004336

BSC-SJA-1182

IN THE CLAIMS

Please amend the claims as follows:

8.    (Amended) The intraluminal medical device according to Claim 7, wherein the substantially tubular structure comprises a plurality of interconnected bands, each band having an inner surface and an outer surface.

## REMARKS

In response to the Final Office Action mailed February 7, 2003, Applicants propose to amend their application and request reconsideration in view of the proposed amendments and the following remarks in this Reply/Amendment.  Claim 8 was amended, no claims have been added, and no claims were cancelled, so that claims 1-9, 5-9 and 11-15 remain pending.  No new matter has been introduced.

Claim 8 was objected to for a minor informality.  Applicants have amended the claim to correct the informality.  Accordingly, reconsideration and withdrawal of the objection is respectfully requested.

- 2 -

ABTDOC004337

BSC-SJA-1183

Claims 1-2, 5-8, 11-22 and 24 were rejected as unpatentable over U.S. Patent Number 6,299,604 to Ragheb et al. (Ragheb) in view of U.S. Patent Number 6,214,901 to Chudzik et al. (Chudzik). This rejection is respectfully traversed.

Ragheb discloses a coated implantable medical device. In specific embodiments, the medical device comprises a vascular device such as a stent. In one embodiment, one surface of the stent is coated with a bioactive material, and in another embodiment, a second bioactive material is attached to a second surface of the stent. Porous layers may be placed over the bioactive layers to precisely control the release rate of the bioactive agents. In yet another alternate exemplary embodiment, the stent is coated with a first coating, then a bioactive agent and then the porous coating to control drug release. In the embodiments wherein the stent comprises holes, the bioactive agent is placed in the holes and then coated with the porous layer.

In all embodiments set forth in Ragheb, the bioactive layer is never mixed with the porous polymer layer(s).

- 3 -

ABTDOC004938

BSC-SJA-1184

Chudjik discloses a coating composition for use in coating
implantable medical devices.  The composition includes a
bioactive agent in combination with one or more polymers.

The present invention, as claimed in independent claim 1,
is directed to an intraluminal medical device.  The device
comprises a stent having a substantially tubular body, the
tubular body having an inner surface and an outer surface, a
layer of one or more anti-proliferative compounds incorporated
in a polymeric matrix and affixed to the outer surface of the
tubular body, and a layer of one or more anti-coagulant
compounds affixed to the inner surface of the tubular body.

The present invention, as claimed in independent claim 7,
is directed to an intraluminal medical device.  The device
comprises a stent having a substantially tubular structure, the
tubular structure having an inner surface and an outer surface,
a layer of one or more anti-proliferative compounds incorporated
in a polymeric matrix and affixed to the outer surface of the
tubular structure, a first layer of one or more anti-coagulant
compounds affixed to the inner surface of the tubular structure,
and a second layer of one or more anti-coagulant compounds

- 4 -

BSC-SJA-1185

affixed to the layer of one or more anti-proliferative compounds incorporated in a polymeric matrix and affixed to the outer surface of the tubular structure.

The present invention, as claimed in independent claim 19; is directed to an intraluminal medical device.  The device comprises a stent having a plurality of bands, the bands expansible within a lumen of a body, and at least one of the bands including at least one reservoir in an inner and outer surface of the bands, a therapeutic dosage of one or more anti-proliferative compounds incorporated in a polymeric matrix and immobilized in at least one reservoir in the outer surface of the bands, and a therapeutic dosage of one or more anti-coagulant compounds immobilized in at least one reservoir in the inner surface of the bands.

The MPEP, in section 706.02(j), sets forth the basic criteria that must be met in order to establish a prima facie case of obviousness:

To establish a prima facie case of obviousness, three basic criteria must be met.  First, there must be some suggestion or

- 5 -

ABTDOC004340

BSC-SJA-1186

motivation, either in the references themselves or in the
knowledge generally available to one of ordinary skill in the art,
to modify the reference or to combine reference teachings.
Second, there must be a reasonable expectation of success.
Finally, the prior art reference (or references when combined)
must teach or suggest all the claim limitations.  The teaching or
suggestion to make the claimed combination and the reasonable
expectation of success must both be found in the prior art and not
based on applicant's disclosure.  In re Vaeck, 947 F.2d 488, 20
USPQ2d 1438 (Fed.Cir. 1991).  See MPEP § 2143 - § 2143.03 for
decisions pertinent to each of these criteria.

Applicants respectfully submit that there is simply no
motivation or suggestion to modify the device of Ragheb based on
the teachings of Chudzik.  The unobviousness test set forth above
is a subjective one and certain rules have been used to determine
patentability.  One such rule for demonstrating that an invention
is unobvious and therefore patentable is where the prior art leads
someone away from the invention, i.e., teaches away.

> "A prior art reference may be considered
> to teach away when a person of ordinary
> skill, upon reading the reference, would
> be discouraged from following the path
> set out in the reference, or would be

- 6 -

Cordis et al. v Abbott et al.
C.A. Nos. 07-2265, -2477, -2728, -5836 (D. N.J.)

ABTDOC004341

BSC-SJA-1187

led in a direction divergent from the
path that was taken by the applicant."
In re Gurley, 27 F. 3d 551, 31 USPQ2d 1130
(Fed. Cir. 1994).

It is respectfully submitted that Ragheb teaches away from
the present invention.  Specifically, at column 19, lines 44-52,
Ragheb discloses as follows:

> The bioactive material layers 18 and/or 22
> are applied to the device 10 independant
> of the application of the porous polymer
> layers 20 and/or 24.  Any mixing of a
> bioactive material from the layers 18 and/or
> 22 into the porous layers 20 and/or 24,
> prior to introducing the device 10 into the
> vascular system of the patient, is unintentional
> and merely incidental.  This gives significantly
> more control over the release rate of the
> bioactive material than the simple dispersal
> of a bioactive material in a polymeric layer.

Ragheb teaches that the bioactive agent and the polymeric
layers should remain separate for better control.  In each of the
independent claims, as well as the rest of the disclosure, the
bioactive agents are incorporated into the polymeric matrix.

In Winner International Royalty Corp., v Wang, 202 F.3d 1340,
53 USPQ2d 1580 (Fed. Cir. 2000) it was held that "If a first prior
art reference 'did in fact teach away from a second reference,

- 7 -

ABTDOC004342

BSC-SJA-1188

then that finding alone can defeat an obviousness claim' based on
a combination of the two references." Therefore, Ragheb cannot be
combined with Chudzik to render the claims unpatentable.
Accordingly, reconsideration and withdrawal of the rejection is
respectfully requested.

Claims 3 and 9 were rejected as being unpatentable over
Ragheb as modified by Chudzik in view of U.S. Patent Number
5,516,781 to Morris et al. (Morris). This rejection is
respectfully traversed.

Morris discloses a method for preventing or treating
hyperproliferative vascular disease in a mammal by administering
an effective amount of an anti-proliferative (rapamycin) alone or
in combination with mycophenolic acid. The delivery method may
include the use of a stent. Specifically, Morris discloses the
use of rapamycin in preventing smooth muscle cell hyperplasia,
restenosis and vascular occlusion resulting from mechanically
mediated injury. Essentially, Morris discloses treating or
preventing hyperproliferative vascular disease in a mammal by
administering an anti-proliferative effective amount of rapamycin
to the mammal in any number of ways, including a stent. Morris

- 8 -

Cordis et al, v Abbott et al.
C.A. Nos. 07-2165, -2477, -2728, -5636 (D. N.J.)

ABTDOC004343

BSC-SJA-1189

also discloses the combination of rapamycin and mycophenolic acid to treat the same condition.

For the reasons given above, Ragheb and Chudzik cannot be combined. Ragheb and Morris and Chudzik and Morris fail to disclose or suggest a device wherein one side of the device is coated with a bioactive agent incorporated into a polymeric matrix and the other side is coated with another bioactive agent. Even more specifically, at column 8, lines 33-37, Ragheb discloses that heparin (anti-coagulant) should be on the outermost layer of the structure so that it would not be readily degraded enzymatically, whereas in the claimed invention. The anti-coagulant is on the inner surface of the device. Accordingly, reconsideration and withdrawal of the rejection is respectfully requested.

Claims 16-21 and 25 were provisionally rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-11 and 15 of copending Application Number 09/575,480, and claims 1-4, 6-10 and 15 were provisionally rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over

- 9 -

ABTDOC004344

BSC-SJA-1190

claims 1-2, 12-15 and 36 of copending Application Number 09/962,496.

Applicants understand that these rejections are to alert Applicants that an actual rejection on the same ground may be issued if one of the applications ultimately issues. However, in light of the amendments to the claims of the present invention and any potential amendments made to the claims of the cited applications, Applicants shall defer any arguments and/or actions until the applications actually issue.

Applicants would be willing to interview the present case if the Examiner so desires. Accordingly, the Examiner is invited to call the undersigned at (732) 524-2519 if such a call would facilitate the prosecution of this application.

The Amendment/Reply raises no new issues and places the application in form for allowance. Therefore, entry is proper and earnestly solicited.

Attached hereto is a marked-up version of the changes made to the claims by the current amendment. The attached pages are captioned "Version With Markings To Show Changes Made."

- 10 -

ABTDOC004345

BSC-SJA-1191

Respectfully submitted,

Carl J. Evens
Reg. No. 33,874
Attorney for applicants

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933-7003
(732) 524-2518

- 11 -

ABTDOC004346

BSC-SJA-1192

# EXHIBIT 59

# REDACTED

# EXHIBIT 60

# REDACTED

# EXHIBIT 61

US005288711A

## United States Patent [19]

Mitchell et al.

[11]  Patent Number: 5,288,711

[45]  Date of Patent: Feb. 22, 1994

[54]  **METHOD OF TREATING HYPERPROLIFERATIVE VASCULAR DISEASE**

[75]  Inventors: Robert D. Mitchell, Doylestown, Pa.; Stephen Skwish, Mercer, N.J.

[73]  Assignee: American Home Products Corporation, Madison, N.J.

[21]  Appl. No.: 874,895

[22]  Filed: Apr. 28, 1992

[51]  Int. Cl.⁵ .................... A61K 31/71; A61K 31/725
[52]  U.S. Cl. ............................... 514/56; 514/291; 424/122
[58]  Field of Search ................... 424/122; 514/291, 56

[56]  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,929,992 | 12/1975 | Sehgal | 424/122 |
| 4,885,171 | 12/1989 | Sehgal | 424/122 |
| 5,078,999 | 1/1992 | Warner | 424/122 |
| 5,080,899 | 1/1992 | Sturm | 424/122 |
| 5,100,899 | 3/1992 | Caine | 514/291 |

OTHER PUBLICATIONS

Drug Res. 39:15 (1989)–Tbozzo.
Circ. Res. 58:839 (1986)–Clowes.
Circ. Res. 56:139 (1985)–Clowes.
Nature 265:625 (1977)–Clowes.
[Proc. Natl. Acad. Sci. U.S.A. 88:8651 (1991)–Bjornsson].
Cell 67:229 (1991)–Klagsbrun.

Arterio 9:147 (1989)–Klein–Soyer.
J. Clin. Invest. 85:2004 (1990)–Lindner.
Molecular and Cellular Biology 12:240 (1992)–Ornitz.
J. Cell Biol. 107:743 (1988)–Sakseia.
Science 222:623 (1983)–Thornton.
Eur. Heart J. 12 (Suppl.):386 (1991) de Vries.
JACC 17(2):181A (1991)–Lehmann.
Can. J. Physiol. Pharmacol. 55:48 (1977)–Martel.
FASEB 3, 3411 (1989)–Staruch.
Med. Sci. Res. 17:877 (1989)–Morris.
J. Heart Lung Transplant 11 (pt. 2): 197 (1992)–Gregory.
U.S. Patent Appl. S.N. 07/819,314 filed Jan. 9, 1992–Morris.
J. Heart Lung Transplant 9:55 (1990)–Meiser.
Lancet 388: 1297 (1991)–Meiser.
Am. Heart J. 117:777 (1989)–Ellis.
FASEB 3, 5256 (1989)–Dument.
Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract) (1990)–Baeder.

*Primary Examiner*—Douglas W. Robinson
*Assistant Examiner*—Jean C. Witz
*Attorney, Agent, or Firm*—Arnold S. Milowsky

[57]  **ABSTRACT**

This invention provides a method of preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative effective amount of a combination of rapamycin and heparin.

13 Claims, No Drawings

BSC-BJA-1199

5,288,711

| 1 | 2 |

# METHOD OF TREATING
# HYPERPROLIFERATIVE VASCULAR DISEASE

## BACKGROUND OF THE INVENTION

Many individuals suffer from heart disease caused by a partial blockage of the blood vessels that supply the heart with nutrients. More severe blockage of blood vessels in such individuals often leads to hypertension, ischemic injury, stroke, or myocardial infarction. Typically vascular occlusion is preceded by vascular stenosis resulting from intimal smooth muscle cell hyperplasia. The underlying cause of the intimal smooth muscle cell hyperplasia is vascular smooth muscle injury and disruption of the integrity of the endothelial barrier and the underlying extracellular matrix. The overall disease process can be termed a hyperproliferative vascular disease because of the etiology of the disease process. Under normal circumstances, the cells of the arterial wall can be looked at as being under stringent negative control and in a quiescent non-proliferating state, probably the consequence of contact with their specialized extracellular matrix. Desquamation of the endothelium, resulting in exposure of and possible disruption of the integrity of the extracellular matrix surrounding the cells, leads to 1) a shift in smooth muscle phenotype from a quiescent, contractile state to a migrating, proliferative form [Manderson, J. A., Arterio 9: (3) (1989)], 2) eventual migration of transformed smooth muscle cells from the medial layer to the sub-lesion intimal layer [Clowes, A. W., Circ. Res. 56: 139 (1985)] and 3) subsequent massive proliferation of the intimal smooth muscle layer resulting in arterial luminal blockage [Clowes, A. W., J. Cardiovas. Pharm. 14 (Suppl 6): S12 (1989)]. Investigations of the pathogenesis of intimal thickening have shown that, following arterial injury, platelets, endothelial cells, macrophages and smooth muscle cells release paracrine and autocrine growth factors (such as platelet derived growth factor, epidermal growth factor, insulin-like growth factor, and transforming growth factor) and other cytokines that result in the smooth muscle cell proliferation and migration. T-cells and macrophages also migrate into the neointima. [Haudenschild, C., Lab. Invest. 41: 407 (1979); Clowes, A., Circ. Res. 56: 139 (1985); Clowes, A., J, Cardiovas. Pharm. 14 (Suppl. 6): S12 (1989); Manderson, J., Arterio. 9: 289 (1989); Forrester, J., J. Am. Coll. Cardiol. 17: 758 (1991)]. This cascade of events is not limited to arterial injury, but also occurs following injury to veins and arterioles.

Vascular injury causing intimal thickening can be broadly categorized as being either biologically or mechanically induced. Atherosclerosis is one of the most commonly occurring forms of biologically mediated vascular injury leading to stenosis. The migration and proliferation of vascular smooth muscle plays a crucial role in the pathogenesis of atherosclerosis. Atherosclerotic lesions include massive accumulation of lipid laden "foam cells" derived from monocyte/macrophage and smooth muscle cells. Formation of "foam cell" regions is associated with a breach of endothelial integrity and basal lamina destruction. Triggered by these events, restenosis is produced by a rapid and selective proliferation of vascular smooth muscle cells with increased new basal lamina (extracellular matrix) formation and results in eventual blocking of arterial pathways. [Davies, P. F., Artherosclerosis Lab. Invest. 55: 5 (1986)].

Until recently, it was generally believed that this proliferation resulted from growth factors released from platelets deposited on the newly exposed matrix surface. However, recent data suggests that this phenomena occurs as a consequence of an intimate interplay between at least three components of the extracellular matrix which act strongly to influence smooth muscle cell phenotype and/or response. These components include: 1) matrix collagen and its subtypes, 2) matrix bound growth factors such as fibroblast growth factor (FGF) and transforming growth factor-β (TGF-β), and 3) the matrix bound proteoglycans, predominantly those containing heparan sulfate glycosaminoglycan chains.

Mechanical injuries leading to intimal thickening result following balloon angioplasty, vascular surgery, transplantation surgery, and other similar invasive processes that disrupt vascular integrity. Intimal thickening following balloon catheter injury has been studied in animals as a model for arterial restenosis that occurs in human patients following balloon angioplasty. Clowes, Ferns, Reidy and others have shown that deendothelialization with an intraarterial catheter that dilates an artery injures the innermost layers of medial smooth muscle and may even kill some of the innermost cells. [Schwartz, S. M., Human Pathology 18: 240 (1987); Fingerle, J., Arteriosclerosis 10: 1082 (1990)] Injury is followed by a proliferation of the medial smooth muscle cells, after which many of them migrate into the intima through fenestrae in the internal elastic lamina and proliferate to form a neointimal lesion.

Vascular stenosis can be detected and evaluated using angiographic or sonographic imaging techniques [Evans, R. G., JAMA 265: 2382 (1991)] and is often treated by percutaneous transluminal coronary angioplasty (balloon catheterization). Within a few months following angioplasty, however, the blood flow is reduced in approximately 30–40 percent of these patients as a result of restenosis caused by a response to mechanical vascular injury suffered during the angioplasty procedure, as described above. [Pepine, C., Circulation 81: 1753 (1990); Hardoff, R., J. Am. Coll. Cardiol. 15 1486 (1990)].

It has been shown that heparin inhibits smooth muscle cell growth both in culture and in vivo. [Tiozzo, R., Arzneim. Forsch./Drug. Res. 39: 15 (1989); [Clowes, A. W., Circ. Res. 58 (6): 839 (1986); Clowes, A. W., Circ. Res. 56: 139 (1985)]. As early as 1977, Clowes and Karnovsky [Clowes, A. W., Nature 265: 625 (1977)] showed that administration of commercial heparin to animals whose carotid arteries have been injured in order to produce a myointimal plaque dramatically reduced the size of the myointimal thickening. The authors, showed that the effect of heparin on the injured arterial wall was to inhibit the growth of smooth muscle cells and that this effect was, in no way, related to the anti-coagulant activity of the heparin. Heparin, through its obligatory role in promoting growth factor binding, also has been shown to promote endothelial growth, a necessary element of vascular healing following vascular injury. [Bjornsson, M., Proc. Natl. Acad. Sci. USA 88: 8651 (1991); Klagsburn, M., Cell 67: 229 (1991); Klein-Soyer, C., Arterio. 9: 147 (1989); Lindner, V. J. Clin. Invest. 85: 2004 (1990); Ornitz, D. M., Molecular and Cellular Biology 12: 240 (1992); Seksela, O., J. Cell Biol. 107: 743 (1988); Thornton, S. C., Science 222: 623 (1983)]. De Vries has also reported efficacious results in preventing restenosis in clinical studies with heparin

BSC-SJA-1200

5,288,711

3

[Eur. Heart J. 12 (Suppl.): 3B6 (1991)], however, Lehmann reported that chronic use of heparin (1000 units/day, s.c.) after successful coronary angioplasty paradoxically appears to increase the likelihood of restenosis, and caused abnormal bleeding in 41% of patients in the study. [JACC 17(2): 181A (1991)].

Rapamycin, a macrocyclic triene antibiotic produced by *Streptomyces hygroscopicus* [U.S. Pat. No. 3,929,992] has been shown to prevent the formation of humoral (IgE-like) antibodies in response to an albumin allergic challenge [Martel, R., Can. J. Physiol. Pharm. 55: 48 (1977)], inhibit murine T-cell activation [Staruch, M., FASEB 3: 3411 (1989)], prolong survival time of organ grafts in histoincompatible rodents [Morris, R., Med. Sci. Res. 17: 877 (1989)], and inhibit transplantation rejection in mammals [U.S. Pat. No. 5,100,899]. Rapamycin has also has been shown to inhibit proliferation of vascular smooth muscle cells in vitro in response to mitogenic and heterotrophic factors, and in vivo following balloon catheterization of the carotid artery. [Morris, R., J. Heart Lung Transplant. 11 (pt. 2): 1992)].

## DESCRIPTION OF THE INVENTION

This invention provides a method of preventing or treating hyperproliferative vascular disease in a mammal in need thereof by administering an antiproliferative effective amount of a combination of rapamycin and heparin to said mammal orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via a vascular stent impregnated with a combination of rapamycin and heparin.

As such, the combination of rapamycin and heparin is useful in preventing or treating intimal smooth muscle cell hyperplasia, restenosis, and vascular occlusion in a mammal, particularly following either biologically or mechanically mediated vascular injury, or under conditions that would predispose a mammal to suffering such a vascular injury. Biologically mediated vascular injury includes, but is not limited to injury attributed to autoimmune disorders including endotoxins and herpes viruses such as cytomegalovirus; metabolic disorders such as atherosclerosis; and vascular injury resulting from hypothermia, hypothermia, and irradiation. Mechanically mediated vascular injury includes, but is not limited to vascular injury caused by catheterization procedures or vascular scraping procedures such as percutaneous transluminal coronary angioplasty; vascular surgery; transplantation surgery; laser treatment, and other invasive procedures which disrupt the integrity of the vascular intima or endothelium.

Preventing includes the prophylactic prevention of hyperproliferative vascular disease in a susceptible

mammal and treating includes arresting the develop-

4

ment, and retarding the progression of hyperproliferative vascular disease in a susceptible mammal.

Administration can also be accomplished via mixed routes of administration. For example, rapamycin may be given orally and heparin given parenterally. A vascular stent can be impregnated with either rapamycin or heparin, and the other component of the combination can be administered orally or parenterally. Other permutations of mixed modes of administration will be appreciated by one skilled in the art.

The effect of the combination of rapamycin and heparin on hyperproliferative vascular disease was established in a standard pharmacological test procedure that emulates the hyperproliferative effects observed in mammals that are undergoing intimal smooth muscle proliferation and are therefore developing restenosis. The procedure used and the results obtained are described below.

Primary rat aorta smooth muscle cell cultures from passage 2–10 were grown to confluence in 100 mm culture dishes (Falcon, 1029) in media 199 (M199; Gibco 320 1150AJ) plus 10% fetal bovine serum (FBS, Gibco 240 6000AG). Cells were washed with calcium, magnesium free Delbecco's phosphate buffered saline (-D-PBS; Gibco, 310-4190AJ) and trypsinized (Gibco, 610-5050AG) for five minutes. Cells were scraped from culture dishes with a rubber policeman and centrifuged out of enzyme (10 minutes × 1000 g). Cells were resuspended in M199 plus 10% FBS containing (³H)-thymidine (0.5 μCi/mL) at 8–15,000 cells/mL, and were plated into either 24 (Falcon, 3047) or 96 (Costar 9102) well plates (1 mL in 24 well plate and 200 μL in 96 well plates.) Drugs were added to each well (20 μL in 24 well plates and 4 μL in 96 well plate; 50 fold dilution) and plates were incubated for 24 hours at 37°; 5% CO₂. Plates were placed on ice and washed three times with ice cold DeBelco's phosphate buffered saline (D-PBS; Gibco 310-4040AJ) and were incubated in ice cold 10% trichloroacetic acid (TCA) for 30 minutes to remove acid soluble proteins (leaving only cell superstructure and DNA). Plates were washed three times with TCA and aspired dry. 96-well plates were snapped apart and placed in scintillation vials, scintillated (10 mL/vial) and counted. 24-well plates were treated with 0.4N NaOH (250 μL/well) for 3–4 hours to solubilize cells. Solution was transferred to scintillation vials containing 0.4N HCl (250 μL/vial; to neutralize NaOH) and each well was rinsed two times with water (250 μL) for a total volume of 1 mL/vial. Vials were scintillated (10 mL/vial) and counted.

The following table shows the results obtained for the combination of rapamycin and heparin on rat aortic smooth muscle cell proliferation.

| RAP | EFFECT OF HEPARIN AND RAPAMYCIN ON CULTURED RAT AORTIC SMOOTH MUSCLE CELL PROLIFERATION (VALUES EXPRESSED AS % OF CONTROL ± STANDARD DEVIATION) | | | | | | |
|---|---|---|---|---|---|---|---|
| | HEPARIN (μg/ml) | | | | | | |
| (nM) | 0 | 0.1 | 1.0 | 10 | 25 | 50 | 200 |
| 0 | 100 ± 1.3 | 101.7 ± 5.1 | 67.2 ± 6.5 | 53.2 ± 2.2 | 38.1 ± 1.9 | 31.5 ± 0.5 | 25.1 ± 1.9 |
| 0.01 | 100.6 ± 3.1 | 102.4 ± 4.4 | 69.1 ± 2.8 | 47.5 ± 2.0 | 36.5 ± 0.8 | 29.1 ± 1.4 | 26.0 ± 1.7 |
| 0.1 | 97.8 ± 2.7 | 104.6 ± 7.0 | 61.0 ± 5.2 | 43.9 ± 3.3 | 29.7 ± 2.5 | 23.8 ± 0.7 | 20.1 ± 1.0 |
| 1.0 | 70.1 ± 1.7 | 75.7 ± 4.3 | 45.6 ± 5.9 | 24.4 ± 0.4 | 13.7 ± 0.3 | 12.0 ± 0.3 | 9.7 ± 0.6 |
| 10.0 | 56.0 ± 2.9 | 53.7 ± 2.1 | 28.7 ± 2.4 | 17.9 ± 0.7 | 11.1 ± 0.5 | 4.4 ± 1.4 | 3.8 ± 1.1 |
| 100.0 | 50.5 ± 3.0 | 50.0 ± 2.5 | 29.0 ± 2.2 | 17.2 ± 1.1 | 10.1 ± 0.2 | 4.4 ± 1.2 | 3.8 ± 0.8 |

The results of this standard test procedure demonstrates that the combination of rapamycin and heparin

BSC-SJA-1201

5,288,711

5

prevented vascular smooth muscle cell proliferation, and is therefore useful in preventing or treating hyperproliferative vascular disease. Specifically, the combination of rapamycin and heparin is useful in preventing or treating intimal smooth muscle cell hyperplasia, restenosis, and vascular occlusion in a mammal, particularly following either biologically or mechanically mediated vascular injury, or under conditions that would predispose a mammal to suffering such a vascular injury.

While the results also show that rapamycin and heparin each are separately effective in preventing vascular smooth muscle cell proliferation, the combination of rapamycin with heparin is distinctly advantageous over either monotherapy as the combination takes advantage of the beneficial aspects of each agent, while minimizing the negative aspects of each agent. Rapamycin is a relatively nonselective, potent antiproliferative agent which inhibits both intimal smooth muscle cell proliferation as well as endothelial cell growth. As endothelial regrowth is necessary to prevent the occurrence of restenosis following the cessation of treatment, it can be expected the nonselective antiproliferative properties of rapamycin would require lengthy treatment periods to provide for endothelial healing. In contrast, heparin has relatively selective antiproliferative properties. Heparin has been shown to prevent smooth muscle cell growth, while promoting endothelial cell growth, thereby inhibiting intimal narrowing, and promoting vascular endothelial healing. [Bjornsson, M., Proc. Natl. Acad. Sci. USA 88: 8651 (1991); Klagsburn, M., Cell 67: 229 (1991); Klein-Soyer, C., Arterio. 9: 147 (1989); Lindner, V. J. Clin. Invest. 85: 2004 (1990); Ornitz, D. M., Molecular and Cellular Biology 12: 240 (1992); Saksela, O., J. Cell Biol. 107: 743 (1988); Thornton, S. C., Science 222: 623 (1983)]. It has been shown that upon reestablishment of the endothelial layer following vascular injury, intimal smooth muscle cell proliferation ceases and restenosis is therefore arrested. [Reidy, M., Lab. Invest. 59: 36 (1988); Chevru, A., Surg. Gynecol. Obstet. 171: 443 (1990); Fishman, J., Lab. Invest. 32: 339 (1975); Haudenschild, C., Lab. Invest 41: 407 (1979)]. Heparin therapy therefore provides the beneficial therapeutic profile of promoting endothelial healing while suppressing intimal smooth muscle cell proliferation. Treatment with heparin, however, is not without side effects. In addition to acting as an antiproliferative agent, heparin is also a powerful anticoagulant, and can cause hemorrhage. [Ellis, S., Am. Heart J. 117: 777 (1989)]. Antibodies to heparin also develop during chronic heparin administration which bind to platelets leading to thrombocytopenia.

As shown in Table 1, the use of rapamycin in combination with heparin provides for dramatically reduced dosages of each agent to produce the same effect. For example, at a combination dose of 1.0 nM rapamycin and 10 µg/mL heparin, smooth muscle cell proliferation occurs is inhibited by 76% (24% of control level), whereas a dose of 200 µg/mL of heparin alone is needed to achieve this degree of inhibition. A dose of 100 nM rapamycin was not able to prevent smooth muscle cell proliferation to this extent. By achieving efficacious results at lower doses of each agent, the negative aspects of each agent can be alleviated. The combined use of rapamycin and heparin allows a minimization of the dose of rapamycin used, as such, the antiproliferative effect on endothelial cell growth is expected to be negated by the proliferative effect of

6

heparin on the endothelium. Additionally, by using lower doses of heparin, the dose dependent side effects associated with heparin can be avoided.

Based on this disclosure, other advantages of using rapamycin in combination with heparin for preventing or treating hyperproliferative vascular disorders will be apparent to one skilled in the art.

When rapamycin is employed in combination with heparin in the prevention or treatment of hyperproliferative vascular disease, it can be formulated neat or with a pharmaceutical carrier to a mammal in need thereof. The pharmaceutical carrier may be solid or liquid.

A solid carrier can include one or more substances which may also act as flavoring agents, lubricants, solubilizers, suspending agents, fillers, glidants, compression aids, binders or tablet-disintegrating agents; it can also be an encapsulating material. In powders, the carrier is a finely divided solid which is in admixture with the finely divided active ingredient. In tablets, the active ingredient is mixed with a carrier having the necessary compression properties in suitable proportions and compacted in the shape and size desired. The powders and tablets preferably contain up to 99% of the active ingredient. Suitable solid carriers include, for example, calcium phosphate, magnesium stearate, talc, sugars, lactose, dextrin, starch, gelatin, cellulose, methyl cellulose, sodium carboxymethyl cellulose, polyvinylpyrrolidine, low melting waxes and ion exchange resins.

Liquid carriers are used in preparing solutions, suspensions, emulsions, syrups, elixirs and pressurized compositions. The active ingredient can be dissolved or suspended in a pharmaceutically acceptable liquid carrier such as water, an organic solvent, a mixture of both or pharmaceutically acceptable oils or fats. The liquid carrier can contain other suitable pharmaceutical additives such as solubilizers, emulsifiers, buffers, preservatives, sweeteners, flavoring agents, suspending agents, thickening agents, colors, viscosity regulators, stabilizers or osmo-regulators. Suitable examples of liquid carriers for oral and parenteral administration include water (partially containing additives as above, e.g. cellulose derivatives, preferably sodium carboxymethyl cellulose solution), alcohols (including monohydric alcohols and polyhydric alcohols, e.g. glycols) and their derivatives, and oils (e.g. fractionated coconut oil and arachis oil). For parenteral administration, the carrier can also be an oily ester such as ethyl oleate and isopropyl myristate. Sterile liquid carriers are useful in sterile liquid form compositions for parenteral administration. The liquid carrier for pressurized compositions can be halogenated hydrocarbon or other pharmaceutically acceptable propellant.

Liquid pharmaceutical compositions which are sterile solutions or suspensions can be utilized by, for example, intramuscular, intraperitoneal or subcutaneous injection. Sterile solutions can also be administered intravenously. The compound can also be administered orally either in liquid or solid composition form.

Rapamycin in combination with heparin may be administered rectally in the form of a conventional suppository. For administration by intranasal or intrabronchial inhalation or insufflation, the compounds of this invention may be formulated into an aqueous or partially aqueous solution, which can then be utilized in the form of an aerosol. Rapamycin in combination with heparin may also be administered transdermally through the use of a transdermal patch containing the active compound and a carrier that is inert to the active

BSC-SJA-1202

5,288,711

7

compound, is non toxic to the skin, and allows delivery of the agent for systemic absorption into the blood stream via the skin. The carrier may take any number of forms such as creams and ointments, pastes, gels, and occlusive devices. The creams and ointments may be viscous liquid or semisolid emulsions of either the oil-in-water or water-in-oil type. Pastes comprised of absorptive powders dispersed in petroleum or hydrophilic petroleum containing the active ingredient may also be suitable. A variety of occlusive devices may be used to release the active ingredient into the blood stream such as a semipermiable membrane covering a reservoir containing the active ingredient with or without a carrier, or a matrix containing the active ingredient. Other occlusive devices are known in the literature.

Rapamycin in combination with heparin can be administered intravascularly or via a vascular stent impregnated with rapamycin in combination with heparin, during balloon catheterization to provide localized effects immediately following injury.

Rapamycin in combination with heparin may be administered topically as a solution, cream, or lotion by formulation with pharmaceutically acceptable vehicles containing 0.1–5 percent, preferably 2%, of active compound.

The dosage requirements vary with the particular compositions employed, the route of administration, the severity of the symptoms presented and the particular subject being treated. Based on the results obtained in the standard pharmacological test procedures, projected daily dosages of rapamycin, when administered in combination with heparin, would be 0.005–50 mg/kg and preferably between 0.05–10 mg/kg. Since non-anticoagulant heparin and anticoagulant heparins are equally effective, dosage for heparin should be established on a mg/kg basis preferably between 1–100 mg/kg, noting that at higher combinations of heparin, a non-anticoagulant form is preferred to avoid hemorrhagic side effects.

Treatment will generally be initiated with small dosages less than the optimum dose of the compound. Thereafter the dosage is increased until the optimum effect under the circumstances is reached; precise dosages for oral, parenteral, intravascular, intranasal, intrabronchial, transdermal, or rectal administration will be determined by the administering physician based on experience with the individual subject treated. In general, the combination of rapamycin and heparin is most desirably administered at a concentration that will generally afford effective results without causing any harmful or deleterious side effects, and can be administered either as a single unit dose, or if desired, the dosage may be divided into convenient subunits administered at suitable times throughout the day.

What is claimed is:

1. A method of treating vascular disease resulting from smooth muscle cell proliferation in a mammal in

8

need thereof which comprises, administering an antiproliferative effective amount of the combination of rapamycin in a concentration of at least 1 nM and heparin in a concentration of at least 1 μg/ml to said mammal orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via an impregnated vascular stent.

2. The method according to claim 1 wherein the vascular disease resulting from smooth muscle cell proliferation is intimal smooth muscle cell hyperplasia or restenosis.

3. The method according to claim 2 wherein the combination of rapamycin and heparin is administered concurrent with said mammal undergoing a percutaneous transluminal coronary angioplasty procedure.

4. The method according to claim 3 wherein the hyperproliferative vascular disease is restenosis.

5. The method according to claim 2 wherein the combination of rapamycin and heparin is administered subsequent to said mammal undergoing a percutaneous transluminal coronary angioplasty procedure.

6. The method according to claim 5 wherein the hyperproliferative vascular disease is restenosis.

7. The method according to claim 2 wherein the combination of rapamycin and heparin is administered concurrent with said mammal sustaining a biologically or mechanically mediated vascular injury.

8. The method according to claim 2 wherein the combination of rapamycin and heparin is administered subsequent to said mammal sustaining a biologically or mechanically mediated vascular injury.

9. A composition for the use in preventing or treating hyperproliferative vascular disease in a mammal which comprises an antiproliferative effective amount of a combination of rapamycin in a concentration of at least 1 nM and heparin in a concentration of at least 1 μg/ml and a pharmaceutically acceptable carrier.

10. The composition according to claim 9 wherein the vascular disease resulting from smooth muscle cell proliferation is intimal smooth muscle cell hyperplasia or restenosis.

11. The method according to claim 1 wherein the vascular disease resulting from smooth muscle cell proliferation is vascular occlusion.

12. The composition according to claim 9 wherein the vascular disease resulting from smooth muscle cell proliferation is vascular occlusion.

13. A method of treating restenosis in a mammal resulting from said mammal undergoing a percutaneous transluminal coronary angioplasty procedure which comprises administering an antirestenosis effective amount of a combination of rapamycin and heparin to said mammal orally, parenterally, intravascularly, intranasally, intrabronchially, transdermally, rectally, or via an impregnated vascular stent.

* * * * *

BSC-SJA-1203

# EXHIBIT 62

US005256790A

## United States Patent [19]

### Nelson

[11] Patent Number: **5,256,790**

[45] Date of Patent: **Oct. 26, 1993**

[54] 27-HYDROXYRAPAMYCIN AND DERIVATIVES THEREOF

[75] Inventor: **Frances C. Nelson**, Yardley, Pa.

[73] Assignee: **American Home Products Corporation**, New York, N.Y.

[21] Appl. No.: **9,605**

[22] Filed: **Jan. 27, 1993**

#### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 930,124, Aug. 13, 1992, abandoned.

[51] Int. Cl.$^5$ .................. C07D 498/16; A61K 31/695
[52] U.S. Cl. .................................... 514/291; 540/456
[58] Field of Search ........................... 540/456; 514/291

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,929,992 | 12/1975 | Sehgal et al. . |
| 3,993,749 | 11/1976 | Sehgal et al. . |
| 4,316,885 | 2/1982 | Rakhit . |
| 4,401,653 | 8/1983 | Eng . |
| 4,650,803 | 3/1987 | Stella et al. . |
| 4,885,171 | 12/1989 | Sehgal et al. . |
| 5,078,999 | 1/1992 | Warner et al. . |
| 5,080,899 | 1/1992 | Sturm et al. . |
| 5,091,389 | 2/1992 | Ondeyka et al. . |
| 5,100,883 | 3/1992 | Schiehser . |
| 5,100,899 | 3/1992 | Calne . |
| 5,102,876 | 4/1992 | Caufield . |
| 5,118,677 | 6/1992 | Caufield . |
| 5,118,678 | 6/1992 | Kao et al. . |
| 5,130,307 | 7/1992 | Failli et al. . |
| 5,138,051 | 8/1992 | Hughes et al. . |
| 5,147,877 | 11/1992 | Goulet ........................... 540/456 |
| 5,151,413 | 9/1992 | Caufield et al. . |
| 5,169,851 | 12/1992 | Hughes et al. . |
| 5,177,203 | 1/1993 | Failli et al. . |
| 5,194,447 | 3/1993 | Kao . |

#### FOREIGN PATENT DOCUMENTS

507555A1  7/1992  European Pat. Off. .

#### OTHER PUBLICATIONS

Venzina, C., J. Antibiot. 28:721 (1975).

Sehgal, S. N., J. Antibiot. 28:727 (1975).
Baker, H. J., Antibiot. 31:539 (1978).
Martel, R. R., Can. J. Physiol. Pharmacol. 55:48 (1977).
Staruch, M. J., FASEB 3:3411 (1989).
Dumont, F. J., FASEB 3:5256 (1989).
Calne, R. Y., Lancet 1183 (1978).
Morris, R. E., Med. Sci. Res. 17:877 (1989).
Meiser, B. J., J. Heart Lung Transplant. 11 (pt. 2):197 (1992).
Stepkowski, S. M., Transplantation Proc. 23:507–8 (1991).

*Primary Examiner*—Marianne M. Cintins
*Assistant Examiner*—John Peabody
*Attorney, Agent, or Firm*—Arnold S. Milowsky

[57] **ABSTRACT**

This invention provides a compound of formula I,



and 27-substituted derivatives thereof which are useful as immunosuppressive, antiinflammatory, antifungal, antitumor, and antiproliferative agents. The compound depicted by formula I is named 27-hydroxyrapamycin, and may also be referred to as 27-deoxo-27-hydroxyrapamycin.

**11 Claims, No Drawings**

5,256,790

1

## 27-HYDROXYRAPAMYCIN AND DERIVATIVES THEREOF

### CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation in part of Ser. No. 07/930,124, filed Aug. 13, 1992, now abandoned.

### BACKGROUND OF THE INVENTION

This invention relates to a compound of formula I, which is named 27-hydroxyrapamycin, and derivatives thereof and a method for using them for inducing immunosuppression, and in the treatment of transplantation rejection, host vs. graft disease, autoimmune diseases, diseases of inflammation, solid tumors, fungal infections, and hyperproliferative vascular disorders.

Rapamycin is a macrocyclic triene antibiotic produced by *Streptomyces hygroscopicus*, which was found to have antifungal activity, particularly against *Candida albicans*, both in vitro and in vivo [C. Vezina et al., J. Antibiot. 28, 721 (1975); S. N. Sehgal et al., J. Antibiot. 28, 727 (1975); H. A. Baker et al., J. Antibiot. 31, 539 (1978); U.S. Pat. No. 3,929,992; and U.S. Pat. No. 3,993,749].

Rapamycin alone (U.S. Pat. No. 4,885,171) or in combination with picibanil (U.S. Pat. No. 4,401,653) has been shown to have antitumor activity. R. Martel et al. [Can. J. Physiol. Pharmacol. 55, 48 (1977)] disclosed that rapamycin is effective in the experimental allergic encephalomyelitis model, a model for multiple sclerosis; in the adjuvant arthritis model, a model for rheumatoid arthritis; and effectively inhibited the formation of IgE-like antibodies.

The immunosuppressive effects of rapamycin have been disclosed in FASEB 3, 3411 (1989). Cyclosporin A and FK-506, other macrocyclic molecules, also have been shown to be effective as immunosuppressive agents, therefore useful in preventing transplant rejection [FASEB 3, 3411 (1989); FASEB 3, 5256 (1989); R. Y. Calne et al., Lancet 1183 (1978); and U.S. Pat. No. 5,100,899].

Rapamycin has also been shown to be useful in preventing or treating systemic lupus erythematosus [U.S. Pat. No. 5,078,999], pulmonary inflammation [U.S. Pat. No. 5,080,899], insulin dependent diabetes mellitus [Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract), (1990)], and smooth muscle cell proliferation and intimal thickening following vascular injury [Morris, R. J. Heart Lung Transplant 11 (pt. 2): 197 (1992)].

Mono- and diacylated derivatives of rapamycin (esterified at the 28 and 43 positions) have been shown to be useful as antifungal agents (U.S. Pat No. 4,316,885) and used to make water soluble prodrugs of rapamycin (U.S. Pat. No. 4,650,803). Recently, the numbering convention for rapamycin has been changed; therefore according to Chemical Abstracts nomenclature, the esters described above would be at the 31- and 42- positions. Under the older numbering convention, 27-hydroxyrapamycin would be named as 24-hydroxyrapamycin.

U.S. Pat. No. 5,102,876 discloses 15-hydroxyrapamycin and 15,27-bis-hydroxyrapamycin, which were prepared by the reduction of rapamycin with diisobutylaluminum hydride, and a method of using them as immunosuppressive, antiinflammatory, and antifungal agents. 27-hydroxyrapamycin cannot be pro-

2

duced via the synthetic methodology disclosed in U.S. Pat. No. 5,102,876.

U.S. Pat. Nos. 5,138,051 and 5,169,851 disclose 33-hydroxyrapamycin which were prepared by the reduction of rapamycin using sodium triacetoxyborohydride, and a method of using them as immunosuppressive, antiinflammatory, and antifungal agents. 27-hydroxyrapamycin cannot be produced via the synthetic methodology disclosed in U.S. Pat. Nos. 5,138,051 and 5,169,851.

### DESCRIPTION OF THE INVENTION

This invention provides a compound of formula I,



which is useful as an immunosuppressive, antiinflammatory, antifungal, antitumor, and antiproliferative agent. The compound depicted by formula I is named 27-hydroxyrapamycin, and may also be referred to as 27-deoxo-27-hydroxyrapamycin. 27-Hydroxyrapamycin may be administered orally, parenterally, intranasally, intrabronchially, transdermally, or rectally when administered in accordance with this disclosure.

This invention also provides derivatives of 27-hydroxyrapamycin which are useful as immunosuppressive, antiinflammatory, antifungal, antitumor, and antiproliferative agents having the formula II:



wherein
R¹ is

5,256,790

**3**



and

$R^2$ is alkyl of 1–10 carbon atoms, arylalkyl of 7–10 carbon atoms, or aryl wherein the aryl group may be optionally mono-, di-, or tri- substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1–6 carbon atoms per alkyl group, alkylthio of 1–6 carbon atoms, —SO₃H, —PO₃H, and —CO₂H;

or a pharmaceutically acceptable salt thereof; or having the formula III:



wherein
$R^1$ is



and

$R^2$ is a mono-, di-, poly-, or per-fluorinated alkyl group of 1–10 carbon atoms; or having the formula IV:



wherein

**4**

$R^1$ is



$R^2$ is



X is —(CH₂)ₘ— or —Ar—;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, —(CH₂)ₙ—Ar, —(CH₂)ₚ—NR⁵R⁶, or —(CH₂)ₙ—N+R⁵R⁶R⁷Y⁻;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, or —(CH₂)ₙ—Ar;

Ar is an optionally mono- or di- substituted group selected from



in which the optional substituents are selected from the group consisting of alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, or perfluoroalkyl of 1–6 carbon atoms;

$R^7$ is alkyl of 1–6 carbon atoms;

Y is a halide, sulfate, phosphate, or p-toluenesulfonate anion;

m=1–6;

n=1–6;

p=1–6;

or a pharmaceutically acceptable salt thereof, or having the formula V:

BSC-SJA-1206

5,256,790

**5**



V

**6**

VI

wherein

$R^1$ is

$$-\overset{\overset{\displaystyle O}{\|}}{C}R^2;$$

$R^2$ is $-NH(CR^3R^4)_n-X;$

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, cycloalkyl of 3–8 carbon atoms, halogen, or trifluoromethyl;

X is hydrogen, lower alkyl of 1–6 carbon atoms, cycloalkyl of 3–8 carbon atoms, trifluoromethyl, nitro, alkoxy of 1–6 carbon atoms, carboalkoxy of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, halo, dialkylamino of 1–6 carbon atoms per alkyl group, thioalkyl of 1–6 carbon atoms, or Y;

Y is a phenyl group which may be optionally mono-, di-, or tri- substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, dialkylamino of 1–6 carbon atoms per alkyl group, or alkylthio of 1–6 carbon atoms, $-SO_3H$, $-PO_3H$, and $-CO_2H$;

n=0–5;

with the proviso that $R^1$ and $R^2$ are not both hydrogen and when n=0, X is lower alkyl of 1–6 carbon atoms, cycloalkyl of 3–8 carbon atoms, arylalkyl of 7–10 carbon atoms, or Y;

or a pharmaceutically acceptable salt thereof;

or having the formula VI:

wherein
$R^2$ is

$$-\overset{\overset{\displaystyle O}{\|}}{C}(CH_2)_m-\underset{\underset{\displaystyle R^3}{|}}{C}H(CH_2)_n N]_p CO_2 R^5;$$

$R^3$ is hydrogen, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, $-(CH_2)_q CO_2 R^6$, $-(CH_2)_r NR^7 CO_2 R^8$, carbamylalkyl of 2–3 carbon atoms, aminoalkyl of 1–6 carbon atoms, hydroxyalkyl of 1–4 carbon atoms, guanylalkyl of 2–4 carbon atoms, mercaptoalkyl of 1–4 carbon atoms, alkylthioalkyl of 2–6 carbon atoms, indolylmethyl, hydroxyphenylmethyl, imidazoylmethyl or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or $-CO_2H$;

$R^4$ and $R^7$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, or arylalkyl of 7–10 carbon atoms;

$R^5$, $R^6$, and $R^8$ are each, independently, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, fluorenylmethyl, or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or $-CO_2H$;

m is 0–4;

n is 0–4;

p is 1–2;

q is 0–4;

r is 0–4;

wherein $R^3$, $R^4$, m, and n are independent in each of the

$$[\overset{\overset{\displaystyle O}{\|}}{C}(CH_2)_m-\underset{\underset{\displaystyle R^3}{|}}{C}H(CH_2)_n]-N]$$

subunits when p=2;

or a pharmaceutically acceptable salt thereof;

or having the formula VII:

5,256,790

7 VII



8 IX



wherein

$R^1$ is alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, $-CH_2YX$, $-C(CH_3)_2YX$, $-CH(CH_3)YX$, or L;

Y is O or S;

X is $-CH_3$, $-(CH_2)_nCH_3$, $-CH_2Ar$, $-(CH_2)_2OCH_3$, $-CH_2CCl_3$, $-CH(CH_3)_2$, or $-CH_2CH_2SiMe_3$;

L is tetrahydrofuran-2-yl, tetrahydrothiophen-2-yl, tetrahydrothiopyran-2-yl, tetrahydropyran-2-yl, 4-methoxytetrahydropyran-2-yl, 4-methoxytetrahydrothiopyran-2-yl, or 4-methoxytetrahydrothiopyran-2-yl S,S dioxide; and

n=1-5;

or having the formula VIII;

VIII



wherein

R is



$-C(CH_2)_mNR^1R^2$;

$R^1$ and $R^2$ are each hydrogen or alkyl of 1-3 carbon atoms or $R^1$ and $R^2$ together with the nitrogen to which they are attached form a saturated heterocyclic ring having 4-5 carbon atoms; and

m=1-3 or a pharmaceutically acceptable salt thereof;

or having the formula IX;

wherein

$R^1$ is $-CONHSO_2-Ar$; and

Ar is phenyl, naphthyl, pyridyl, quinolyl, isoquinolyl, quinoxalyl, thienyl, thionaphthyl, furyl, benzofuryl, benzodioxyl, benzoxazolyl, benzoisoxazolyl, or benzodioxolyl; wherein the Ar group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, alkoxy of 1-6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2-7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1-6 carbon atoms per alkyl group, alkylthio of 1-6 carbon atoms, $-SO_3H$, $-PO_3H$, or $-CO_2H$;

or a pharmaceutically acceptable salt thereof when the Ar group contains a basic nitrogen or when the Ar group is substituted by dialkylamino of 1-6 carbon atoms per alkyl group, $-SO_3H$, $-PO_3H$, or $-CO_2H$;

or a pharmaceutically acceptable salt thereof;

or having formula X;

X



wherein

R is $-SO_2R^1$;

$R^1$ is alkyl, alkenyl, alkynyl containing 1 to 6 carbon atoms; or an aromatic moiety selected from the group consisting of phenyl and naphthyl or a heterocyclic moiety selected from the group consisting of thiophenyl and quinolinyl; or $-NHCOR^2$; and

$R^2$ is lower alkyl containing 1 to 6 carbon atoms;

or a pharmaceutically acceptable salt thereof.

BSC-SJA-1208

5,256,790

9

Pharmaceutically acceptable salts may be formed from the compounds of formulas II, IV–VI, and VII–X from organic and inorganic acids and inorganic cations. Preferred organic and inorganic acids are those such as acetic, lactic, citric, tartaric, succinic, maleic, malonic, gluconic, hydrochloric, hydrobromic, phosphoric, nitric, sulfuric, methanesulfonic, and the like. Preferred inorganic cations are those such as sodium, potassium, and the like. Based on this disclosure, other pharmaceutically acceptable salts that can be formed will be readily apparent to one skilled in the art.

When any of the compounds of formulas II–X contain an aryl or arylalkyl moiety, it is preferred that the aryl portion is a phenyl, naphthyl, pyridyl, quinolyl, isoquinolyl, quinoxalyl, thienyl, thionaphthyl, furyl, benzofuryl, benzodioxyl, benzoxazolyl, benzoisoxazolyl, or benzodioxolyl group that may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1–6 carbon atoms per alkyl group, alkylthio of 1–6 carbon atoms, $-SO_2H$, $-PO_3H$, and $-CO_2H$. It is more preferred that the aryl moiety is a phenyl group that is optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1–6 carbon atoms per alkyl group, alkylthio of 1–6 carbon atoms, $-SO_3H$, $-PO_3H$, and $-CO_2H$.

For the compounds of formula IV, preferred members are those in which X is $-(CH_2)_n-$ and $R^3$ and $R^4$ are alkyl of 1–6 carbon atoms; and those in which X is $-(CH_2)_m-$, $R^3$ is hydrogen, and $R^4$ is and Ar is $-(CH_2)_n-Ar$.

10

For the compounds of formula V, preferred members are those in which n is 0 and X is Y.

For the compounds of formula VI, preferred members are those in which $m=0$, $n=0$, and $p=1$; $m=0$, $n=0$, and $p=2$; $n=0$, and $R^3$ is $-(CH_2)_pCO_2R^6$; $m=0$, $n=0$, and $R^3$ is $-(CH_2)_nNR^7CO_2R^6$; and $m=0$, $n=0$, and $R^3$ is hydrogen.

For the compounds of formula VII, preferred members include those in which Y is O and those in which $R^1$ is alkyl of 1–6 carbon atoms.

The compounds of formulas II–X may be administered orally, parenterally, intranasally, intrabronchially, transdermally, or rectally when administered in accordance with this disclosure.

This invention also provides pharmaceutical compositions comprising an effective amount of 27-hydroxyrapamycin or any of the compounds of formulas II–X, and a pharmaceutical carrier.

It is contemplated that when the compounds of this invention are used as an immunosuppressive or antiinflammatory agent, they can be administered in conjunction with one or more other immunoregulatory agents. Such other antirejection chemotherapeutic agents include, but are not limited to azathioprine, corticosteroids, such as prednisone and methylprednisolone, cyclophosphamide, rapamycin, cyclosporin A, FK-506, OKT-3, and ATG. By combining 27-hydroxyrapamycin or a derivative thereof with such other drugs or agents for inducing immunosuppression or treating inflammatory conditions, the lesser amounts of each of the agents are required to achieve the desired effect. The basis for such combination therapy was established by Stepkowski whose results showed that the use of a combination of rapamycin and cyclosporin A at subtherapeutic doses significantly prolonged heart allograft survival time. [Transplantation Proc. 23: 507 (1991)].

The preparation of 27-hydroxyrapamycin can be accomplished by the sequence of reactions shown below, beginning with rapamycin.

5,256,790

11                                        12



BSC-SJA-1210

5,256,790

13

The 31- and 42-hydroxyl groups of rapamycin are first protected with a suitable protecting group, such as the triethylsilyl ether protecting group. Protection of the hydroxyl groups prior to reduction appears to be necessary to prevent overreduction and ring degradation. Reduction of the 27-ketone was selectively accomplished with L-Selectride (lithium tri-sec-butylborohydride) to provide a compound which was named 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin. Attempted reduction with DIBAL, as disclosed in U.S. Pat. No. 5,102,876, failed to provide any products in which the 27-ketone was the only keto-group that was reduced. Removal of the silyl ether protecting groups was accomplished under mildly acidic conditions, such as with a mixture of acetic acid, water, and THF. Removal of the silyl ether protecting groups can also be accomplished using fluoride ion generating reagents, such as hydrogen fluoride/pyridine. It is also contemplated that the 31- and 42-hydroxy groups can be protected with other silylating reagants, such as triisopropylsilyl chloride or t-butyldimethylsilyl chloride, to allow selective reduction of the 27-ketone of rapamycin.

The derivatives of 27-hydroxyrapamycin that are claimed as part of this invention can be prepared by reacting the intermediate 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with suitable electrophilic agents. The 27-acyl derivatives of formula II can be prepared by the method used in Examples 4 and 5. The 27-acyl derivative of formula II can also be prepared by reacting the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with an acylating agent according the method described in U.S. Pat. No. 4,316,885, the disclosure of which is hereby incorporated by reference, followed by deprotection according to Examples 3 or 5.

The 27-fluorinated esters of formula III can be prepared by reacting the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable fluorinated acylating agent as described in U.S. Pat. No. 5,100,883, the disclosure of which is hereby incorporated by reference, followed by deprotection according to Examples 3 or 5.

The 27-amide esters of formula IV can be prepared by acylating the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable acylating agent as described in U.S. Pat. No. 5,118,677, the disclosure of which is hereby incorporated by reference, followed by deprotection according to Examples 3 or 5.

The 27-carbamates of formula V can be prepared by carbamylating the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable carbamylating agent as described in U.S. Pat. No. 5,118,678, the disclosure of which is hereby incorporated by reference, followed by deprotection according to Examples 3 or 5.

The 27-aminoesters of formula VI can be prepared by acylating the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable acylating agent as described in U.S. Pat. No. 5,130,307, the disclosure of which is hereby incorporated by reference, followed by deprotection according to Examples 3 or 5.

The 27-ethers of formula VII can be prepared by reacting the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable acetal forming reagent as described in U.S. Pat. No. 5,151,413,

14

the disclosure of which is hereby incorporated by reference, followed by deprotection using hydrogen fluoride/pyridine according to standard literature procedures. The alkyl or arylalkyl ethers of formula VII can be formed by alkylating the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable alkylating agent, such as with an alkyl halide in pyridine.

The 27-aminoacyl compounds of formula VIII can be prepared by acylating the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable acylating agent as described in U.S. Pat. No. 4,650,803, the disclosure of which is hereby incorporated by reference, followed by deprotection according to Examples 3 or 5.

The 27-sulfonylcarbamates of formula IX can be prepared by carbamylating the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable carbamylating agent as described in U.S. patent application Ser. No. 07/837,048, filed Feb. 18, 1992, the disclosure of which is incorporated by reference, followed by deprotection according to Examples 3 or 5.

The 27-sulfonates and sulfamates of formula X can be prepared by reacting the 27-hydroxyl group of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin with a suitable sulfonyl halide or (carboxysulfamoyl)triethylammonium hydroxide inner salt as described in U.S. Pat. No. 5,177,203, the disclosure of which is hereby incorporated by reference, followed by deprotection according to Examples 3 or 5.

Based on this disclosure, other derivatives of 27-hydroxyrapamycin will be apparent to one skilled in the art. For example, it is contemplated that other esters of the 27-hydroxyl group can be prepared. These include both organic esters and inorganic esters, such as phosphate, nitrate, sulfinate, sulfonate esters, and the like, and organic esters of these inorganic acids. These compounds are also expected to have a similar activity profile to the compounds of this invention. Additionally, the 27-hydroxyl group may be protected with suitable protecting groups, such as a silyl ether, to provide a 27,31,42-tris-silyl ether of 27-hydroxyrapamycin.

Immunosuppressive activity for representative compounds of this invention was evaluated in an in vitro standard pharmacological test procedure to measure lymphocyte proliferation (LAF) and in an in vivo standard pharmacological test procedure which evaluated the survival time of a pinch skin graft.

The comitogen-induced thymocyte proliferation procedure (LAF) was used as an in vitro measure of the immunosuppressive effects of representative compounds. Briefly, cells from the thymus of normal BALB/c mice are cultured for 72 hours with PHA and IL-1 and pulsed with tritiated thymidine during the last six hours Cells are cultured with and without various concentrations of rapamycin, cyclosporin A, or test compound. Cells are harvested and incorporated radioactivity is determined. Inhibition of lymphoproliferation is assessed as percent change in counts per minute from nondrug treated controls. The results are expressed as an $IC_{50}$.

A representative compound of this invention was also evaluated in an in vivo test procedure designed to determine the survival time of pinch skin graft from male DBA/2 donors transplanted to male BALB/c recipients. The method is adapted from Billingham R. E. and Medawar P. B., J. Exp. Biol. 28:385–402, (1951).



5,256,790

15

Briefly, a pinch skin graft from the donor is grafted on the dorsum of the recipient as a homograft, and an autograft is used as control in the same region. The recipients are treated with either varying concentrations of cyclosporin A as test control or the test compound, intraperitoneally. Untreated recipients serve as rejection control. The graft is monitored daily and observations are recorded until the graft becomes dry and forms a blackened scab. This is considered as the rejection day. The mean graft survival time (number of days ±S.D.) of the drug treatment group is compared with the control group.

The following table summarizes the results of representative compounds of this invention in these three standard test procedures.

TABLE 1

| Compound | LAF (IC50) | Skin Graft (days ± SD) |
|---|---|---|
| 27-Hydroxyrapamycin | 3.7 nM | 8.5 ± 1.2* |
| | | 8.17 ± 0.75* |
| | | 8.00 ± 0.63* |
| | | 9.17 ± 0.98*+ |
| | | 9.17 ± 0.75*+ |
| Example 5 | 99 nM# | |
| Rapamycin | 4.8 nM | 12.0 ± 1.7* |
| No Treatment | | 7.3 ± 0.45 |

*Evaluated in the skin graft procedure at a dose of 4 mg/kg.
*Evaluated in the skin graft procedure at a dose of 16 mg/kg.
#94% inhibition of T-cell proliferation at 1 μM and 69% inhibition at 0.1 μM.

The results of these standard pharmacological test procedures demonstrate immunosuppressive activity both in vitro and in vivo for the compounds of this invention. The results obtained in the LAF test procedure indicates suppression of T-cell proliferation. As a transplanted pinch skin grafts are typically rejected within 6–7 days without the use of an immunosuppressive agent, the increased survival time of the skin graft when treated with the compounds of this invention further demonstrates their utility as immunosuppressive agents.

Because the compounds of this invention are structurally similar to rapamycin and have a similar activity profile to rapamycin, the compounds of this invention also are considered to have antitumor, antifungal, and antiproliferative activities.

As such, the compounds of this invention are useful in the treatment of transplantation rejection such as, heart, kidney, liver, bone marrow, and skin transplants; autoimmune diseases such as lupus, rheumatoid arthritis, diabetes mellitus, myasthenia gravis, and multiple sclerosis; diseases of inflammation such as psoriasis, dermatitis, eczema, seborrhea, inflammatory bowel disease, and eye uveitis; solid tumors; fungal infections; and hyperproliferative vascular diseases such as restenosis.

Additionally, 27-Hydroxyrapamycin was found to have a half life of 17.5 hours in 0.1M phosphate buffer (pH 7.4, 37° C.) whereas rapamycin was found to have a half life of 11.8 hours under the same conditions. Therefore, by virtue of the reduced ketone at the 27-position, 27-hydroxyrapamycin provides an advantage over rapamycin by preventing degredative ring opening reactions, thus resulting in a more stable compound. The 27-hydroxyrapamycin derivatives of formulas II–X are also expected to resist ring degredative reactions better than rapamycin and 31· and/or 42-substituted rapamycin derivatives of rapamycin. The half life of 27-hydroxyrapamycin-27-ester with acetic acid in 0.1M phosphate buffer (pH 7.4, 37° C.) is 34 hours.

16

As 27-hydroxyrapamycin and the compound of Example V was prepared via its 31,42-silylated intermediate (Example 2), the compound of Example 2 is therefore useful as an intermediate of these two compounds. Additionally, 31,42-Bis-triethylsilyl ether of 27-hydroxyrapamycin-27-ester with acetic acid is also a useful intermediate in the preparation of the compound of Example 5.

The compounds of this invention can be formulated neat or with a pharmaceutical carrier to a mammal in need thereof. The pharmaceutical carrier may be solid or liquid.

A solid carrier can include one or more substances which may also act as flavoring agents, lubricants, solubilizers, suspending agents, fillers, glidants, compression aids, binders or tablet-disintegrating agents; it can also be an encapsulating material. In powders, the carrier is a finely divided solid which is in admixture with the finely divided active ingredient. In tablets, the active ingredient is mixed with a carrier having the necessary compression properties in suitable proportions and compacted in the shape and size desired. The powders and tablets preferably contain up to 99% of the active ingredient. Suitable solid carriers include, for example, calcium phosphate, magnesium stearate, talc, sugars, lactose, dextrin, starch, gelatin, cellulose, methyl cellulose, sodium carboxymethyl cellulose, polyvinylpyrrolidine, low melting waxes and ion exchange resins.

Liquid carriers are used in preparing solutions, suspensions, emulsions, syrups, elixirs and pressurized compositions. The active ingredient can be dissolved or suspended in a pharmaceutically acceptable liquid carrier such as water, an organic solvent, a mixture of both or pharmaceutically acceptable oils or fats. The liquid carrier can contain other suitable pharmaceutical additives such as solubilizers, emulsifiers, buffers, preservatives, sweeteners, flavoring agents, suspending agents, thickening agents, colors, viscosity regulators, stabilizers or osmo-regulators. Suitable examples of liquid carriers for oral and parenteral administration include water (partially containing additives as above, e.g. cellulose derivatives, preferably sodium carboxymethyl cellulose solution), alcohols (including monohydric alcohols and polyhydric alcohols, e.g. glycols) and their derivatives, and oils (e.g. fractionated coconut oil and arachis oil). For parenteral administration, the carrier can also be an oily ester such as ethyl oleate and isopropyl myristate. Sterile liquid carriers are useful in sterile liquid form compositions for parenteral administration. The liquid carrier for pressurized compositions can be halogenated hydrocarbon or other pharmaceutically acceptable propellant.

Liquid pharmaceutical compositions which are sterile solutions or suspensions can be utilized by, for example, intramuscular, intraperitoneal or subcutaneous injection. Sterile solutions can also be administered intravenously. The compounds of this invention can also be administered orally either in liquid or solid composition form.

The compounds of this invention may be administered rectally in the form of a conventional suppository.

For administration by intranasal or intrabronchial inhalation or insufflation, the compounds of this invention may be formulated into an aqueous or partially aqueous solution, which can then be utilized in the form of an aerosol. The compounds of this invention may also be administered transdermally through the use of a transdermal patch containing the active compound and

BSC-SJA-1212

17                                                     5,256,790                                                     18

a carrier that is inert to the active compound, is non toxic to the skin, and allows delivery of the agent for systemic absorption into the blood stream via the skin. The carrier may take any number of forms such as creams and ointments, pastes, gels, and occlusive devices. The creams and ointments may be viscous liquid or semisolid emulsions of either the oil-in-water or water-in-oil type. Pastes comprised of absorptive powders dispersed in petroleum or hydrophilic petroleum containing the active ingredient may also be suitable. A variety of occlusive devices may be used to release the active ingredient into the blood stream such as a semipermiable membrane covering a reservoir containing the active ingredient with or without a carrier, or a matrix containing the active ingredient. Other occlusive devices are known in the literature.

In addition, the compounds of this invention may be employed as a solution, cream, or lotion by formulation with pharmaceutically acceptable vehicles containing 0.1-5 percent, preferably 2%, of active compound which may be administered to a fungally affected area.

The dosage requirements vary with the particular compositions employed, the route of administration, the severity of the symptoms presented and the particular subject being treated. Based on the results obtained in the standard pharmacological test procedures, projected daily intravenous dosages of the compounds of this invention would be 0.001-25 mg/kg, preferably between 0.005-5 mg/kg, and more preferably between 0.01-0.5 mg/kg. Projected daily oral dosages of the compounds of this invention would be 0.005-75 mg/kg, preferably between 0.01-50 mg/kg, and more preferably between 0.05-10 mg/kg.

Treatment will generally be initiated with small dosages less than the optimum dose of the compound. Thereafter the dosage is increased until the optimum effect under the circumstances is reached; precise dosages for oral, parenteral, intranasal, intrabronchial, transdermal, or rectal administration will be determined by the administering physician based on experience with the individual subject treated. In general, the compounds of this invention, are most desirably administered at a concentration that will generally afford effective results without causing any harmful or deleterious side effects.

The following examples illustrate the preparation of representative compounds of this invention.

### EXAMPLE 1

#### 31,42-Bis-triethylsilyl ether of rapamycin

To a solution of rapamycin (2 g, 2.18 mmol) in CH$_2$Cl$_2$ (10.9 mL) at 0° C. was added 2,6-lutidine (1.17 mL, 10.1 mmol) and triethylsilyl trifluoromethanesulfonate (1.13 mL, 5.03 mmol) dropwise. The reaction was stirred at 0° C. for an additional 45 min, allowed to warm to room temperature, and stirred overnight. The reaction was then quenched with NaHCO$_3$ and diluted with ethyl acetate. The organic layer was separated and washed with 2N HCl, NaHCO$_3$, brine, dried over Na$_2$SO$_4$ and concentrated in vacuo. The residue was chromatographed using hexane-ethyl acetate (4:1) as eluant to provide 1.04 g (42%) of 31,42-bis-triethylsilyl ether of rapamycin.

IR (KBr) 3500 (m, br), 2925 (s), 2875 (s), 1720 (s), 1640 (s), 1450 (s), 1370 (w), 1235 (w), 1185 (w), 1100 (s), 980 (m), 815 (m), 745 (m); $^1$H NMR (400 MHz, CDCl$_3$) 80.44–0.50 (comp m, 6H), 0.52–0.60 (comp m, 6H), 0.67 (m, 1H), 0.82–0.96 (comp m, 24H), 1.00–1.04 (comp m,

9H), 1.06–1.25 (comp m, 4H), 1.30–1.60 (comp m, 12H), 1.61, 1.64 (d, rotamers, J=3.74, 0.80 Hz, 3H), 1.68–1.83 (comp m, 5H), 1.72, 1.74 (d, rotamers, J=1.04 Hz, 3H), 1.96 (m, 1H), 2.25 (m, 2H), 2.32 (dd, J=3.00, 15.88 Hz, 1H), 2.58 (dd, J=8.09, 16.00 Hz, 1H), 2.68 (m, 1H), 2.87 (m, 1H), 3.10, 3.11 (s, rotamers, 3H), 3.24 (s, 3H), 3.33 (m, 3H), 3.37, 3.39 (s, rotamers, 3H), 3.68 (m, 2H), 3.75 (m, 1H), 3.82 (d, J=6.23 Hz, 1H), 4.10 (d, J=5.60 Hz, 1H), 4.68 (d, J=1.66 Hz, 1H), 5.00 (m, 1H), 5.20 (d, J=10.17 Hz, 1H), 5.28 (d, J=4.57 Hz, 1H), 5.53 (dd, J=8.20, 15.05 Hz, 1H), 6.02 (dd, J=1.04, 10.79 Hz, 1H), 6.14 (m, 1H), 6.34 (qd, J=10.48, 28.94 Hz, 2H); $^{13}$C NMR (100 MHz, CDCl$_3$) 84.63, 4.72, 5.01, 6.68, 6.72, 6.79, 10.14, 12.33, 13.72, 14.94, 15.42, 16.06, 21.46, 25.14, 26.86, 27.31, 31.29, 31.82, 32.97, 35.88, 33.98, 34.08, 35.24, 36.15, 38.60, 38.67, 39.87, 41.70, 42.44, 44.03, 47.03, 51.25, 55.78, 58.07, 58.15, 66.92, 75.61, 79.26, 84.05, 84.11, 84.80, 98.67, 126.81, 127.12, 129.36, 130.68, 132.85, 135.84, 138.16, 139.18, 166.29, 169.61, 193.41, 208.34, 211.46; high resolution mass spectrum (negative ion FAB) m/z 1141.7 [(M-H); calcd for C$_{63}$H$_{105}$NO$_{13}$. Si$_2$: 1141.6].

### EXAMPLE 2

#### 31,42-Bis-triethylsilyl ether of 27-hydroxyrapamycin

To a solution of 31,42-bis-triethylsilyl ether of rapamycin (400 mg, 0.35 mmol) in THF (3.5 mL) at −78° C. was added L-Selectride (0.4 mL, 0.4 mmol, 1M in THF) dropwise. After 2 h, the reaction was quenched with H$_2$O and EtOAc and allowed to warm to room temperature. The aqueous layer was separated and extracted with EtOAc. The organic layers were combined, washed with brine, dried over Na$_2$SO$_4$ and concentrated in vacuo. The residue was purified via flash column chromatography using hexane-ethyl acetate (3:1) as eluant to provide 140 mg (35%) of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin.

IR (KBr) 3300 (s, br), 2950 (s), 2880 (s), 1720 (s), 1640 (s), 1450 (s), 1190 (w), 1100 (s), 1010 (m), 800 (m), 749 (m); $^1$H NMR (400 MHz, CDCl$_3$) 80.47 (m, 6H), 0.49 (m, 6H), 0.57 (m, 1H), 0.81–1.00 (comp m, 27H), 1.01–1.04 (comp m, 6H), 1.14–1.58 (comp m, 16H), 1.60 (d, J=0.83 Hz, 3H), 1.63 (d, J=0.83 Hz, 3H), 1.64–1.82 (comp m, 8H), 2.00 (m, 2H), 2.31 (m, 2H), 2.43 (m, 1H), 2.78 (m, 1H), 2.88 (m, 1H), 3.11 (s, 3H), 3.21, 3.23 (s, rotamers, 3H), 3.37 (m, 3H), 3.40, 3.41 (s, rotamers, 3H), 3.54 (m, 1H), 3.70 (m, 1H), 3.73 (d, J=7.26 Hz, 1H), 3.78 (m, 1H), 4.06 (d, J=7.06 Hz, 1H), 4.81 (s, 1H), 5.02 (m, 1H), 5.23 (d, J=8.72 Hz, 1H), 5.33 (dd, J=0.42, 4.78 Hz, 1H), 5.66 (dd, J=7.15, 15.04 Hz, 1H), 6.00 (d, J=9.75 Hz, 1H), 6.13 (m, 1H), 6.30 (m, 2H); $^{13}$C NMR (100 MHz, CDCl$_3$) 84.69, 4.99, 5.03, 6.74, 6.82, 10.03, 12.12, 13.78, 14.14, 15.42, 16.16, 20.89, 21.38, 25.37, 27.06, 27.36, 29.69, 31.25, 31.86, 33.20, 33.86, 34.07, 34.15, 34.70, 36.17, 36.37, 38.70, 38.74, 39.71, 42.61, 44.21, 51.17, 55.79, 58.15, 58.22, 67.07, 71.59, 75.70, 79.23, 84.23, 84.85, 98.44, 126.78, 129.51, 130.11, 131.12, 133.31, 135.40, 136.02, 139.27, 167.00, 169.73, 192.86, 212.62; high resolution mass spectrum (negative ion FAB) m/z 1143.7 [(M-H); calcd for C$_{63}$H$_{108}$NO$_{13}$Si$_2$: 1143.6].

### EXAMPLE 3

#### 27-Hydroxyrapamycin

31,42-Bis-triethylsilyl ether of 27-hydroxyrapamycin (101 mg, 0.088 mmol) was dissolved in 1.5 mL of

## 19

HOAc:THF:H$_2$O (3:1:1). Additional THF (0.1 mL) was added to effect solution. The reaction was stirred overnight and then diluted with ethyl acetate and washed with NaHCO$_3$. The aqueous layer was back extracted with ethyl acetate. The organic layers were combined, washed with brine, dried over Na$_2$SO$_4$, and concentrated in vacuo. The residue was purified via flash column chromatography using CHCl$_3$:MeOH (95:5) as eluant to provide 57 mg (70%) of 27-Hydroxyrapamycin.

IR (KBr) 3440 (s, br), 2920 (s), 1740 (s), 1650 (s), 1440 (s), 1370 (w), 1190 (w), 1085 (m), 985 (m); $^1$H NMR (400 MHz, CDCl$_3$) 80.68 (m, 1H), 0.83–1.08 (comp m, 15H), 1.16–1.62 (comp m, 12H), 1.66 (s, 3H), 1.68 (s, 3H), 1.71–1.88 (comp m, 8H), 1.98 (m, 2H), 2.14 (m, 3H), 2.28 (m, 2H), 2.39 (m, 1H), 2.66 (s, 1H), 2.84 (m, 1H), 2.94 (m, 1H), 3.13 (s, 3H), 3.28 (d, J=1.18 Hz, 1H), 3.34 (s, 3H), 3.42 (s, 3H), 3.47–3.58 (comp m, 3H), 3.58 (d, J=7.24 Hz, 1H), 3.65 (m, 1H), 3.81 (m, 1H), 4.13 (m, 1H), 4.84 (s, 1H), 4.99 (m, 1H), 5.31 (m, 2H), 5.55 (dd, J=9.0, 24.0 Hz, 1H), 5.94 (d, J=10.5 Hz, 1H), 6.15 (m, 1H), 6.35 (m, 2H); $^{13}$C NMR (100 MHz, CDCl$_3$) 810.09, 12.52, 14.03, 15.67, 16.16, 16.22, 20.56, 21.93, 25.27, 26.94, 27.22, 31.22, 31.27, 31.89, 33.22, 33.31, 33.62, 34.00, 35.37, 35.46, 37.99, 38.77, 38.82, 39.03, 40.09, 40.92, 44.22, 51.33, 55.82, 56.62, 60.03, 67.17, 73.65, 73.92, 78.06, 78.89, 84.46, 85.17, 98.43, 126.25, 129.80, 130.31, 131.01, 133.20, 133.73, 135.16, 140.43, 167.06, 170.14, 192.39, 217.19; high resolution mass spectrum (negative ion FAB) m/z 915.3 [(M-H); calcd for C$_{57}$H$_{83}$NO$_{13}$: 915.2].

### EXAMPLE 4

#### 31,42-Bis-triethylsilyl ether of 27-hydroxyrapamycin-27-ester with acetic acid

To a solution of 31,42-bis-triethylsilyl ether of 27-hydroxyrapamycin (0.74 g, 0.64 mmol) in CH$_2$Cl$_2$ (3.2 mL) at 0° C. was added pyridine (0.2 mL, 2.58 mmol) and acetyl chloride (0.092 mL, 1.29 mmol) dropwise. The reaction was held at 0° C. for 30 min, allowed to warm to room temperature, and stirred for 3 h. Additional equivalents of pyridine (0.050 mL, 0.61 mmol) and acetyl chloride (0.023 mL, 0.32 mmol) were added at 0° C. The reaction was again allowed to warm to room temperature and was quenched after an additional 1.5 h with NaHCO$_3$ and diluted with ethyl acetate. The organic layer was separated and washed with 1N HCl, NaHCO$_3$, brine, dried over Na$_2$SO$_4$, and concentrated in vacuo. The residue was chromatographed using hexane-ethyl acetate (4:1) as eluant to provide 0.237 g (31%) of 31,42-bis-triethylsilyl ether-27-hydroxyrapamycin-27-ester with acetic acid along with 0.154 g (20%) of recovered starting material.

IR (KBr) 3400 (w, br), 2940 (s), 1740 (s), 1650 (m), 1460 (m), 1240 (s), 1105 (s), 1005 (w), 740 (m); $^1$H NMR (400 MHz, CDCl$_3$) 80.46–0.54 (comp m, 6H), 0.57–0.63 (comp m, 6H), 0.75 (m, 1H), 0.81–0.99 (comp m, 27H), 1.05 (m, 6H), 1.34 (s, 3H), 1.22–1.63 (comp m, 16H), 1.64 (d, J=1.8 Hz, 3H), 1.66–1.98 (comp m, 8H), 1.99 (s, 3H), 2.06 (m, 1H), 2.32 (m, 2H), 2.62 (m, 1H), 2.78 (m, 1H), 2.89 (m, 1H), 3.14 (s, 3H), 3.23 (s, 3H), 3.42 (m, 2H), 3.43 (s, 3H), 3.54 (m, 1H), 3.75 (d, superimposed on m, J=7.2 Hz, 1H), 3.76 (m, 2H), 4.08 (d, J=6.7 Hz, 1H), 4.87 (dd, J=0.41, 4.98 Hz, 1H), 4.99 (m, 1H), 5.03 (m, 1H), 5.20 (d, J=0.4 Hz, 1H), 5.41 (m, 1H), 5.78 (m, 1H), 6.00 (m, 1H), 6.13 (m, 1H), 6.37 (m, 2H); $^{13}$C NMR (100 MHz, CDCl$_3$) 84.6, 4.9, 6.7, 6.8, 9.9, 14.0, 14.9, 15.3, 16.2, 20.6, 20.8, 20.9, 25.4, 27.3, 27.4, 30.1, 31.3, 31.7, 33.1, 33.3,

## 20

33.5, 33.9, 34.0, 34.2, 34.2, 38.2, 38.6, 39.9, 42.6, 44.0, 50.8, 55.6, 58.0, 58.3, 66.9, 73.7, 75.6, 75.9, 76.4, 79.1, 84.1, 84.4, 98.2, 126.6, 129.6, 129.9, 130.0, 133.6, 134.5, 135.9, 139.0, 167.1, 169.3, 170.5, 191.6, 212.0; high resolution mass spectrum (negative ion FAB) m/z 1185.7 [(M-H); calcd for C$_{65}$H$_{110}$NO$_{13}$Si$_2$: 1185.6].

### EXAMPLE 5

#### 27-Hydroxyrapamycin-27-ester with acetic acid

31,42-bis-triethylsilyl ether-27-hydroxyrapamycin-27-ester with acetic acid (0.16 g, 0.13 mmol) was dissolved in 2.5 mL of a 3:1:1 solution of HOAc:THF:H$_2$O. The reaction was stirred overnight and was then quenched with NaHCO$_3$ and diluted with ethyl acetate. The organic layer was separated and washed with NaHCO$_3$, brine, dried over Na$_2$SO$_4$, and concentrated in vacuo. The residue was chromatographed using CH$_2$Cl$_2$:MeOH (20:1) as eluant followed by HPLC (70:30 hexane:ethyl acetate gradient over 60 min to 100% ethyl acetate) to provide 0.050 g (40%) of 27-hydroxyrapamycin-27-ester with acetic acid.

$^1$H NMR (400 MHz, CDCl$_3$) 80.68 (m, 1H), 0.95–1.04 (comp m, 15H), 1.13–1.69 (comp m, 18H), 1.59 (s, 3H), 1.66 (d, J=5.6 Hz, 3H), 1.78–1.98 (comp m, 9H), 2.02 (s, 3H), 2.30 (m, 2H), 2.68 (m, 1H), 2.85 (m, 1H), 2.98 (m, 1H), 3.13 (s, 3H), 3.37 (s, 3H), 3.43 (s, superimposed on m, 3H), 3.43 (m, 2H), 3.59–3.70 (comp m, 3H), 3.79 (m, 1H), 4.09 (d, J=7.9 Hz, 1H), 4.80 (m, 2H), 5.17 (s, 1H), 5.25 (d, J=10.0 Hz, 1H), 5.35 (d, J=5.3 Hz, 1H), 5.76 (dd, J=8.9, 19.8 Hz, 1H), 5.90 (d, J=9.1 Hz, 1H), 6.14 (m, 1H), 6.36 (m, 2H); high resolution mass spectrum (negative ion FAB) m/z 957.2 [(M-H); calcd for C$_{53}$H$_{82}$NO$_{14}$: 957.5].

Anal. Calcd for C$_{53}$H$_{83}$NO$_{14}$•0.1Et$_2$O: C, 65.9 H, 8.66 N, 1.45. Found: C, 65.9 H, 8.72 N, 1.34.

The following representative compounds or pharmaceutically acceptable salts thereof could be readily prepared based on the methodology described in this disclosure.

27-Hydroxyrapamycin-27-ester with benzoic acid

27-Hydroxyrapamycin-27-ester with phenylacetic acid

27-Hydroxyrapamycin-27-ester with pyridine-2-carboxylic acid

27-Hydroxyrapamycin-27-ester with trifluoroacetic acid

27-Hydroxyrapamycin-27-ester with 3,3,3-trifluoropropanoic acid

27-Hydroxyrapamycin-27-ester with difluoroacetic acid

27-Hydroxyrapamycin-27-ester with pentafluoropropionic acid

27-Hydroxyrapamycin-27-ester with 4-(dimethylamino)-4-oxobutanoic acid

27-Hydroxyrapamycin-27-ester with 4-oxo-4-[[2-(2-pyridinyl)ethyl]amino]butanoic acid

27-Hydroxyrapamycin-27-ester with 2-[2-[(3-carboxy-1-oxopropyl)amino]ethyl]-1-methyl-pyridinium iodide

27-Hydroxyrapamycin-27-ester with (4-fluorophenyl)carbamic acid

27-Hydroxyrapamycin-27-ester with phenylcarbamic acid

27-Hydroxyrapamycin-27-ester with 4-[(trifluoromethyl)phenyl]carbamic acid

27-Hydroxyrapamycin-27-ester with (4-nitrophenyl)-carbamic acid

27-Hydroxyrapamycin-27-ester with (4-methylphenyl)carbamic acid

BSC-SJA-1214

5,256,790

**21**

27-Hydroxyrapamycin-27-ester with (2,4-difluorophenyl)carbamic acid

27-Hydroxyrapamycin-27-ester with N-[(1,1-dimethylethoxy)carbonyl]-glycylglycine

27-Hydroxyrapamycin-27-ester with N-[(1,1-dimethylethoxy)carbonyl]-N-methylglycine

27-Hydroxyrapamycin-27-ester with 5-(1,1-dimethylethoxy)-2-[[(1,1-dimethylethoxy)carbonyl]amino]-5-oxopentanoic acid

27-Hydroxyrapamycin-27-ester with 2-[[(1,1-dimethylethoxy)carbonyl]amino]-4-oxo-4-(phenylmethoxy)-butanoic acid

27-Hydroxyrapamycin-27-ester with 3-[[(1,1-dimethylethoxy)carbonyl]amino]-4-oxo-4-(phenylmethoxy)-butanoic acid

27-Hydroxyrapamycin-27-ester with 5-(1,1-dimethylethoxy)-4-[[(1,1-dimethylethoxy)carbonyl]amino]-5-oxopentanoic acid

27-Hydroxyrapamycin-27-ester with Nα, Nε-bis[(1,1-dimethylethoxy)carbonyl]-L-lysine

27-Hydroxyrapamycin-27-ether with (1-methoxy-1-methyl)ethanol

27-Hydroxyrapamycin-27-ether with (2-(trimethylsilyl)ethoxy)methanol

27-Hydroxyrapamycin-27-ester with N,N-dimethylglycine

27-Hydroxyrapamycin-27-ester with 3-(N,N-diethylamino)propionic acid

27-Hydroxyrapamycin-27-ester with 4'-(N-pyrrolidino)butyric acid

27-Hydroxyrapamycin-27-ester with phenylsulfonylcarbamic acid

27-Hydroxyrapamycin-27-ester with (4-chlorophenylsulfonyl)carbamic acid

27-Hydroxyrapamycin-27-ester with (3-methylphenylsulfonyl)carbamic acid

27-Hydroxyrapamycin-27-ester with 5-(dimethylamino)-1-naphthalensulfonic acid

27-Hydroxyrapamycin-27-ester with 4-methylbenzenesulfonic acid

27-Hydroxyrapamycin-27-ester with 2-thiophenesulfonic acid

27-Hydroxyrapamycin-27-ester with 4-[[4-(dimethylamino)phenyl]azo]benzenesulfonic acid

27-Hydroxyrapamycin-27-ester with 1-naphthalenesulfonic acid

27-Hydroxyrapamycin-27-ester with 8-quinolinsulfonic acid

27-Hydroxyrapamycin-27-ester with methanesulfonic acid

27-Hydroxyrapamycin-27-ester with 2,2,2-trifluoroethanesulfonic acid

27-Hydroxyrapamycin-27-ester with [(methoxycarbonyl)amino]sulfonic acid

What is claimed is:

1. A compound of the formula

**22**



II

wherein
R$^1$ is

$$-\overset{\text{O}}{\underset{}{C}}R^2$$

and

R$^2$ is alkyl of 1-10 carbon atoms, arylalkyl of 7-10 carbon atoms, or aryl wherein the aryl group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, alkoxy of 1-6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2-7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1-6 carbon atoms per alkyl group, alkylthio of 1-6 carbon atoms, —SO$_3$H, —PO$_3$H, and —CO$_2$H;

or a pharmaceutically acceptable salt thereof.

2. A compound of claim 1 which is 27-hydroxyrapamycin-27-ester with acetic acid.

3. A compound of the formula

III

wherein
R$^1$ is

$$-X-\overset{\text{O}}{\underset{}{C}}-NR^3R^4;$$

and

5,256,790

**23**

R³ is a mono-, di-, poly-, or per-fluorinated alkyl group of 1–10 carbon atoms.

4. A compound of the formula

$$-\overset{\overset{\displaystyle O}{\|}}{C}R^2$$

wherein

R¹ is

IV

R² is

$$-\overset{\overset{\displaystyle O}{\|}}{C}R^2;$$

X is —(CH₂)ₘ— or —Ar—;

R³ and R⁴ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, —(CH₂)ₙ—Ar, —(CH₂)ₚ—NR⁵R⁶, or —(CH₂)ₚ—N⁺R⁵R⁶R⁷Y⁻;

R⁵ and R⁶ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, or —(CH₂)ₙ—Ar;

Ar is an optionally mono- or di-substituted group selected from







in which the optional substituents are selected from the group consisting of alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7

**24**

carbon atoms, or perfluoroalkyl of 1–6 carbon atoms;

R⁷ is alkyl of 1–6 carbon atoms;

Y is a halide, sulfate, phosphate, or p-toluenesulfonate anion;

m=1–6;

n=1–6;

p=1–6;

or a pharmaceutically acceptable salt thereof.

5. A compound of the formula

VI

wherein

R¹ is

$$-[C(CH_2)_m CH(CH_2)_n N]_q CO_2R^3;$$

R³ is hydrogen, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, —(CH₂)ₛCO₂R⁶, —(CH₂)ₜNR⁷CO₂R⁸, carbamylalkyl of 2–3 carbon atoms, aminoalkyl of 1–4 carbon atoms, hydroxyalkyl of 1–4 carbon atoms, guanylalkyl of 2–4 carbon atoms, mercaptoalkyl of 1–4 carbon atoms, alkylthioalkyl of 2–6 carbon atoms, indolylmethyl, hydroxyphenylmethyl, imidazoylmethyl or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or —CO₂H;

R⁴ and R⁷ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, or arylalkyl of 7–10 carbon atoms;

R⁵, R⁶, and R⁸ are each, independently, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, fluorenylmethyl, or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or —CO₂H;

m is 0–4;

n is 0–4;

p is 1–2;

q is 0–4;

r is 0–4;

BSC-SJA-1216

5,256,790

**25**

wherein $R^3$, $R^4$, m, and n are independent in each of the



subunits when p=2;
or a pharmaceutically acceptable salt thereof.

6. A compound of the formula



VII

wherein
  $R^1$ is alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, —$CH_2YX$, —$C(CH_3)_2YX$, —$CH(CH_3)YX$, or $L_4$
  Y is O or S;
  X is —$CH_3$, —$(CH_2)_nCH_3$, —$CH_2Ar$, —$(CH_2)_2OCH_3$, —$CH_2CCl_3$, —$CH(CH_3)_2$, or —$CH_2CH_2SiMe_3$;
  L is tetrahydrofuran-2-yl, tetrahydrothiophen-2-yl, tetrahydrothiopyran-2-yl, tetrahydropyran-2-yl, 4-methoxytetrahydropyran-2-yl, 4-methoxytetrahydrothiopyran-2-yl, or 4-methoxytetrahydrothiopyran-2-yl S,S dioxide; and
  n=1-5.

7. A compound of the formula



VIII

wherein
  R is

**26**

$$-\overset{O}{\underset{||}{C}}(CH_2)_mNR^1R^2;$$

$R^1$ and $R^2$ are each hydrogen or alkyl of 1-3 carbon atoms or $R^1$ and $R^2$ together with the nitrogen to which they are attached form a saturated heterocyclic ring having 4-5 carbon atoms; and
m=1-3 or a pharmaceutically acceptable salt thereof.

8. A compound of the formula



IX

wherein
  $R^1$ is —$CONHSO_2$—Ar; and

Ar is phenyl, naphthyl, pyridyl, quinolyl, isoquinolyl, quinoxalyl, thienyl, thionaphthyl, furyl, benzofuryl, benzodioxyl, benzoxazolyl, benzoisoxazolyl, or benzodioxolyl; wherein the Ar group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, alkoxy of 1-6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2-7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1-6 carbon atoms per alkyl group, alkylthio of 1-6 carbon atoms, —$SO_3H$, —$PO_3H$, and —$CO_2H$;
or a pharmaceutically acceptable salt thereof when the Ar group contains a basic nitrogen or when the Ar group is substituted by dialkylamino of 1-6 carbon atoms per alkyl group, —$SO_3H$, —$PO_3H$, or —$CO_2H$;
or a pharmaceutically acceptable salt thereof.

9. A compound of the formula

BSC-SJA-1217

5,256,790

**27**

**28**

thio of 1–6 carbon atoms, —SO₂H, —PO₂H, and
—CO₂H;

or a pharmaceutically acceptable salt thereof;

or of formula III,

**III**

wherein

R is —SO₂R¹;

R¹ is alkyl, alkenyl, alkynyl containing 1 to 6 carbon
atoms; or an aromatic moiety selected from the
group consisting of phenyl and naphthyl or a heter-
ocyclic moiety selected from the group consisting
of thiophenyl and quinolinyl; or —NHCOR²; and

R² is lower alkyl containing 1 to 6 carbon atoms;

or a pharmaceutically acceptable salt thereof.

10. A method of inducing immunosuppression which
comprises administering an immunosuppressive effec-
tive amount of a compound of formula II,

**II**

wherein

R¹ is

$$-CR^2$$

and

R² is a mono-, di-, poly-, or per-fluorinated alkyl
group of 1–10 carbon atoms;

or of formula IV,

**IV**

wherein

R¹ is

$$-CR^2;$$

and

R¹ is

$$-CR^2$$

R² is

and

$$-X-\overset{O}{\underset{}{C}}-NR^3R^4;$$

R² is alkyl of 1–10 carbon atoms, arylalkyl of 7–10
carbon atoms, or aryl wherein the aryl group may
be optionally mono-, di-, or tri- substituted with a
group selected from alkyl of 1–6 carbon atoms,
arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 car-
bon atoms, cyano, halo, nitro, carbalkoxy of 2–7
carbon atoms, trifluoromethyl, amino, dialkyl-
amino of 1–6 carbon atoms per alkyl group, alkyl-

X is —(CH₂)ₘ— or —Ar—;



5,256,790

**29**

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, —(CH$_2$)$_a$—Ar, —(CH$_2$)$_a$—NR$^5$R$^6$, or —(CH$_2$)$_a$—N$^+$R$^5$R$^6$R$^7$Y—;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, or —(CH$_2$)$_a$—Ar;

Ar is an optionally mono- or di- substituted group selected from



in which the optional substituents are selected from the group consisting of alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, or perfluoroalkyl of 1–6 carbon atoms;

$R^7$ is alkyl of 1–6 carbon atoms;

Y is a halide, sulfate, phosphate, or p-toluenesulfonate anion;

m=1–6;

n=1–6;

p=1–6;

or a pharmaceutically acceptable salt thereof;

or of formula VI,

VI

wherein

$R^2$ is

**30**

$$—[C(CH_2)_m CH(CH_2)_n N]_p CO_2R^5;$$

$R^3$ is hydrogen, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, —(CH$_2$)$_n$CO$_2$R$^6$, —(CH$_2$)$_n$NR$^7$CO$_2$R$^8$, carbamylalkyl of 2–3 carbon atoms, aminoalkyl of 1–4 carbon atoms, hydroxyalkyl of 1–4 carbon atoms, guanylalkyl of 2–4 carbon atoms, mercaptoalkyl of 1–4 carbon atoms, alkylthioalkyl of 2–6 carbon atoms, indolylmethyl, hydroxyphenylmethyl, imidazoylmethyl or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or —CO$_2$H;

$R^4$ and $R^7$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, or arylalkyl of 7–10 carbon atoms;

$R^5$, $R^6$, and $R^8$ are each, independently, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, fluorenylmethyl, or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or —CO$_2$H;

m is 0–4;

n is 0–4;

p is 1–2;

q is 0–4;

r is 0–4;

wherein

$R^3$, $R^4$, m, and n are independent in each of the

$$[C(CH_2)_m CH(CH_2)_n N]$$
$$\quad R^3 \quad\quad R^4$$

subunits when p=2;

or a pharmaceutically acceptable salt thereof;

or of formula VII,

VII

wherein

BSC-SJA-1219

5,256,790

**31**

$R^1$ is alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, —$CH_2YX$, —$C(CH_3)_2YX$, —$CH(CH_3)YX$, or L;

Y is O or S;

X is —$CH_3$, —$(CH_2)_nCH_3$, —$CH_2Ar$, —$(CH_2)_nOCH_3$, —$CH_2CCl_3$, —$CH(CH_3)_2$, or —$CH_2CH_2SiMe_3$;

L is tetrahydrofuran-2-yl, tetrahydrothiophen-2-yl, tetrahydrothiopyran-2-yl, tetrahydropyran-2-yl, 4-methoxytetrahydropyran-2-yl, 4-methoxytetrahydrothiopyran-2-yl, or 4-methoxytetrahydrothiopyran-2-yl S,S dioxide; and

n = 1–5;

or of formula VIII,



VIII

wherein
R is

$$-C(CH_2)_mNR^1R^2;$$

$R^1$ and $R^2$ are each hydrogen or alkyl of 1–3 carbon atoms or $R^1$ and $R^2$ together with the nitrogen to which they are attached form a saturated heterocyclic ring having 4–5 carbon atoms; and

m = 1–3 or a pharmaceutically acceptable salt thereof; or of formula IX,



IX

wherein
$R^1$ is —$CONHSO_2$—Ar; and

**32**

Ar is phenyl, naphthyl, pyridyl, quinolyl, isoquinolyl, quinoxalyl, thienyl, thionaphthyl, furyl, benzofuryl, benzodioxyl, benzoxazolyl, benzoisoxazolyl, or benzodioxolyl; wherein the Ar group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1–6 carbon atoms per alkyl group, alkylthio of 1–6 carbon atoms, —$SO_2H$, —$PO_3H$, and —$CO_2H$;

or a pharmaceutically acceptable salt thereof when the Ar group contains a basic nitrogen or when the Ar group is substituted by dialkylamino of 1–6 carbon atoms per alkyl group, —$SO_3H$, —$PO_3H$, or —$CO_2H$;

or a pharmaceutically acceptable salt thereof; or of formula X,



X

wherein
R is —$SO_2R^1$;

$R^1$ is alkyl, alkenyl, alkynyl containing 1 to 6 carbon atoms; or an aromatic moiety selected from the group consisting of phenyl and naphthyl or a heterocyclic moiety selected from the group consisting of thiophenyl and quinolinyl; or —$NHCOR^2$; and

$R^2$ is lower alkyl containing 1 to 6 carbon atoms; or a pharmaceutically acceptable salt thereof.

II. A pharmaceutical composition which comprises an effective amount of a compound of formula II,



II

BSC-SJA-1220

5,256,790

**33**

wherein

R¹ is

$$-\overset{\overset{\displaystyle O}{\|}}{C}R^2$$

and

R² is alkyl of 1–10 carbon atoms, arylalkyl of 7–10 carbon atoms, or aryl wherein the aryl group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkyl-amino of 1–6 carbon atoms per alkyl group, alkyl-thio of 1–6 carbon atoms, —SO₃H, —PO₃H, and —CO₂H;

or a pharmaceutically acceptable salt thereof;

or of formula III,

**III**

wherein

R¹ is

$$-\overset{\overset{\displaystyle O}{\|}}{C}R^2$$

and

R² is a mono-, di-, poly-, or per-fluorinated alkyl group of 1–10 carbon atoms;

or of formula IV,

**34**

**IV**

wherein

R¹ is

$$-\overset{\overset{\displaystyle O}{\|}}{C}R^2;$$

R² is

$$-X-\overset{\overset{\displaystyle O}{\|}}{C}-NR^3R^4;$$

X is —(CH₂)ₘ— or —Ar—;

R³ and R⁴ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, —(CH₂)ₐ–Ar, —(CH₂-)ₐ—NR⁵R⁶, or —(CH₂)ₐ—N⁺R⁵R⁶R⁷Y—;

R⁵ and R⁶ are each, independently, hydrogen, alkyl of 1–12 carbon atoms, or —(CH₂)ₐ–Ar;

Ar is an optionally mono- or di-substituted group selected from



in which the optional substituents are selected from the group consisting of alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, or perfluoroalkyl of 1–6 carbon atoms;

BSC-SJA-1221

5,256,790

**35**

R$^7$ is alkyl of 1–6 carbon atoms;

Y is a halide, sulfate, phosphate, or p-toluenesulfonate anion;

m=1–6;

n=1–6;

p=1–6;

or a pharmaceutically acceptable salt thereof;

or of formula VI,



wherein

R$^2$ is

R$^3$ is hydrogen, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, —(CH$_2$)$_q$CO$_2$R$^6$, —(CH$_2$)$_r$NR$^7$CO$_2$R$^8$, carbamylalkyl of 2–3 carbon atoms, aminoalkyl of 1–4 carbon atoms, hydroxyalkyl of 1–4 carbon atoms, guanylalkyl of 2–4 carbon atoms, mercaptoalkyl of 1–4 carbon atoms, alkylthioalkyl of 2–6 carbon atoms, indoylmethyl, hydroxyphenylmethyl, imidazoylmethyl or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or —CO$_2$H;

R$^4$ and R$^7$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, or arylalkyl of 7–10 carbon atoms;

R$^5$, R$^6$, and R$^8$ are each, independently, alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, fluorenylmethyl, or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1–6 carbon atoms, alkoxy of 1–6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, or —CO$_2$H;

m is 0–4;

n is 0–4;

p is 1–2;

q is 0–4;

r is 0–4;

wherein R$^3$, R$^4$, m, and n are independent in each of the

**36**

subunits when p=2;

or a pharmaceutically acceptable salt thereof;

or of formula VII,

wherein

R$^1$ is alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, —CH$_2$YX, —C(CH$_3$)$_2$YX, —CH(CH$_3$)YX, or L;

Y is O or S;

X is —CH$_3$, —(CH$_2$)$_n$CH$_3$, —CH$_2$Ar, —(CH$_2$)$_2$OCH$_3$, —CH$_2$CCl$_3$, —CH(CH$_3$)$_2$, or —CH$_2$CH$_2$SiMe$_3$;

L is tetrahydrofuran-2-yl, tetrahydrothiophen-2-yl, tetrahydrothiopyran-2-yl, tetrahydropyran-2-yl, 4-methoxytetrahydropyran-2-yl, 4-methoxytetrahydrothiopyran-2-yl, or 4-methoxytetrahydrothiopyran-2-yl S,S dioxide; and

n=1–5;

or of formula VIII,

wherein

R is

5,256,790

**37**

$$-C(CH_2)_mNR^1R^2;$$

$R^1$ and $R^2$ are each hydrogen or alkyl of 1-3 carbon atoms or $R^1$ and $R^2$ together with the nitrogen to which they are attached form a saturated heterocyclic ring having 4-5 carbon atoms; and

m=1-3 or a pharmaceutically acceptable salt thereof; or of formula IX,



IX

wherein

$R^1$ is —CONHSO₂—Ar; and

Ar is phenyl, naphthyl, pyridyl, quinolyl, isoquinolyl, quinoxalyl, thienyl, thionaphthyl, furyl, benzofuryl, benzodioxyl, benzoxazolyl, benzoisoxazolyl, or benzodioxolyl; wherein the Ar group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, alkoxy of 1-6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2-7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1-6 carbon

**38**

atoms per alkyl group, alkylthio of 1-6 carbon atoms, —SO₂H, —PO₃H, and —CO₂H;

or a pharmaceutically acceptable salt thereof when the Ar group contains a basic nitrogen or when the Ar group is substituted by dialkylamino of 1-6 carbon atoms per alkyl group, —SO₃H, —PO₃H, or —CO₂H;

or a pharmaceutically acceptable salt thereof; or of formula X,

X

wherein

R is —SO₂R¹;

$R^1$ is alkyl, alkenyl, alkynyl containing 1 to 6 carbon atoms; or an aromatic moiety selected from the group consisting of phenyl and naphthyl or a heterocyclic moiety selected from the group consisting of thiophenyl and quinolinyl; or —NHCOR²; and

$R^2$ is lower alkyl containing 1 to 6 carbon atoms;

or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable carrier.

* * * * *

BSC-SJA-1223

# UNITED STATES PATENT AND TRADEMARK OFFICE
# **CERTIFICATE OF CORRECTION**

Page 1 of 8

PATENT NO.  :  5,258,780

DATED  :  October 28, 1993

INVENTOR(S) :  Frances C. Nelson

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

The title page should be deleted and substitute therefor the attached title page.

Columns 11,12, 21,22,23,24,27,28,31,32,33, and 34, should be deleted and substitute therefore the attached pages.

Signed and Sealed this

Fourteenth Day of February, 1995

Attest:

**BRUCE LEHMAN**

Attesting Officer                    Commissioner of Patents and Trademarks

BSC-SJA-1224

Page 2 of 8

# United States Patent [19]

Nelson

[11]  Patent Number:  5,256,790

[45]  Date of Patent:  Oct. 26, 1993

[54]  27-HYDROXYRAPAMYCIN AND DERIVATIVES THEREOF

[75]  Inventor:  Frances C. Nelson, Yardley, Pa.

[73]  Assignee:  American Home Products Corporation, New York, N.Y.

[21]  Appl. No.: 9,605

[22]  Filed:  Jan. 27, 1993

### Related U.S. Application Data

[63]  Continuation-in-part of Ser. No. 930,124, Aug. 13, 1992, abandoned.

[51]  Int. Cl.⁵ .............. C07D 498/16; A61K 31/695

[52]  U.S. Cl. ............................ 514/291; 540/456

[58]  Field of Search .................. 540/456; 514/291

[56]  References Cited

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,929,992 | 12/1975 | Sehgal et al. . |
| 3,993,749 | 11/1976 | Sehgal et al. . |
| 4,316,885 | 2/1982 | Rakhit . |
| 4,401,653 | 8/1983 | Eng . |
| 4,650,803 | 3/1987 | Stella et al. . |
| 4,885,171 | 12/1989 | Sehgal et al. . |
| 5,078,999 | 1/1992 | Warner et al. . |
| 5,080,899 | 1/1992 | Sturm et al. . |
| 5,091,389 | 3/1992 | Ondeyka et al. . |
| 5,100,883 | 3/1992 | Schiehser . |
| 5,100,899 | 3/1992 | Calne . |
| 5,102,876 | 4/1992 | Canfield . |
| 5,118,677 | 6/1992 | Caufield . |
| 5,118,678 | 6/1992 | Kao et al. . |
| 5,130,307 | 7/1992 | Failli et al. . |
| 5,138,051 | 8/1992 | Hughes et al. . |
| 5,147,877 | 11/1992 | Gonlet ................. 540/456 |
| 5,151,413 | 9/1992 | Canfield et al. . |
| 5,169,851 | 12/1992 | Hughes et al. . |
| 5,177,203 | 1/1993 | Failli et al. . |
| 5,194,447 | 3/1993 | Kao . |

#### FOREIGN PATENT DOCUMENTS

507555A1  7/1992  European Pat. Off. .

#### OTHER PUBLICATIONS

Vezina, C., J. Antibiot. 28:721 (1975).

Sehgal, S. N., J. Antibiot. 28:727 (1975).
Baker, H. J., Antibiot. 31:539 (1978).
Martel, R. R., Can. J. Physiol. Pharmacol. 55:48 (1977).
Staruch, M. J., FASEB 3:3411 (1989).
Dumont, F. J., FASEB 3:5256 (1989).
Calne, R. Y., Lancet 1183 (1978).
Morris, R. E., Med. Sci. Res. 17:877 (1989).
Meiser, B. J., J. Heart Lung Transplant. 11 (pt. 2):197 (1992).
Stepkowski, S. M. Transplantation Proc. 23:507–8 (1991).

*Primary Examiner*—Marianne M. Cintins
*Assistant Examiner*—John Peabody
*Attorney, Agent, or Firm*—Arnold S. Milowsky

[57]  **ABSTRACT**

This invention provides a compound of formula I,



and 27-substituted derivatives thereof which are useful as immunosuppressive, antiinflammatory, antifungal, antitumor, and antiproliferative agents. The compound depicted by formula I is named 27-hydroxyrapamycin, and may also be referred to as 27-desoxo-27-hydroxyrapamycin.

11 Claims, No Drawings

BSC-8JA-1225

5,250,190

**21**

27-Hydroxyrapamycin-27-ester with (2,4-difluorophenyl)carbamic acid

27-Hydroxyrapamycin-27-ester with N-[(1,1-dimethylethoxy)carbonyl]-glycylglycine

27-Hydroxyrapamycin-27-ester with N-[(1,1-dimethylethoxy)carbonyl]-N-methylglycine

27-Hydroxyrapamycin-27-ester with 5-[(1,1-dimethylethoxy)carbonyl]amino]-5-oxopentanoic acid

27-Hydroxyrapamycin-27-ester with 2-[[(1,1-dimethylethoxy)carbonyl]amino]-4-oxo-4-(phenylmethoxy)butanoic acid

27-Hydroxyrapamycin-27-ester with 3-[[(1,1-dimethylethoxy)carbonyl]amino]-4-oxo-4-(phenylmethoxy)butanoic acid

27-Hydroxyrapamycin-27-ester with 5-(1,1-dimethylethoxy)-4-[(1,1-dimethylethoxy)carbonyl]amino]-5-oxopentanoic acid

27-Hydroxyrapamycin-27-ester with N⁵, N⁶-bis[(1,1-dimethylethoxy)carbonyl]-L-lysine

27-Hydroxyrapamycin-27-ether with (1-methoxy-1-methyl)ethanol

27-Hydroxyrapamycin-27-ether with (2-(trimethylsilyl)ethoxy)methanol

27-Hydroxyrapamycin-27-ester with N,N-dimethylglycine

27-Hydroxyrapamycin-27-ester with 3-(N,N-diethylamino)propionic acid

27-Hydroxyrapamycin-27-ester with 4'-(N-pyrrolidino)butyric acid

27-Hydroxyrapamycin-27-ester with phenylsulfonylcarbamic acid

27-Hydroxyrapamycin-27-ester with (4-chlorophenyl-sulfonyl)carbamic acid

27-Hydroxyrapamycin-27-ester with (3-methylphenyl-sulfonyl)carbamic acid

27-Hydroxyrapamycin-27-ester with 5-(dimethylamino)-1-naphthalensulfonic acid

27-Hydroxyrapamycin-27-ester with 4-methylbenzenesulfonic acid

27-Hydroxyrapamycin-27-ester with 1-thiophensulfonic acid

27-Hydroxyrapamycin-27-ester with 4-[[4-(dimethylamino)phenyl]azo]benzenesulfonic acid

27-Hydroxyrapamycin-27-ester with 1-naphthalensulfonic acid

27-Hydroxyrapamycin-27-ester with 8-quinolinsulfonic acid

27-Hydroxyrapamycin-27-ester with methanesulfonic acid

27-Hydroxyrapamycin-27-ester with 2,2,2-trifluoroethanesulfonic acid

27-Hydroxyrapamycin-27-ester with [(methoxycarbonyl)amino]sulfonic acid

What is claimed is:

1. A compound of the formula

**22**



wherein R¹ is

and

R² is alkyl of 1–10 carbon atoms, arylalkyl of 7–10 carbon atoms, or aryl wherein the aryl group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1–6 carbon atoms per alkyl group, alkylthio of 1–6 carbon atoms, —SO₃H, —PO₃H, and —CO₂H;

or a pharmaceutically acceptable salt thereof.

2. A compound of claim 1 which is 27-hydroxyrapamycin-27-ester with acetic acid.

3. A compound of this formula

wherein R¹ is

and

$R^6$ is a mono-, di-, poly-, or per-fluorinated alkyl group of 1-10 carbon atoms.

4. A compound of the formula

IV

wherein

$R^1$ is

$-\overset{O}{\overset{\|}{C}}R^6$;

$R^2$ is

$-X-\overset{O}{\overset{\|}{C}}-NR^3R^4$;

X is $-(CH_2)_m-$ or $-Ar-$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1-12 carbon atoms, $-(CH_2)_n-Ar$, $-(CH_2)_p-NR^5R^6$, or $-(CH_2)_p-N^+R^5R^6R^7Y^-$;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1-12 carbon atoms, or $-(CH_2)_n-Ar$;

Ar is an optionally mono- or di-substituted group selected from

or

$R^7$ $Y^-$

$R^7$ $Y^-$

in which the optional substituents are selected from the group consisting of alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, alkoxy of 1-6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2-7



carbon atoms, or perfluoroalkyl of 1-6 carbon atoms;

$R^7$ is alkyl of 1-6 carbon atoms;

Y is a halide, sulfate, phosphate, or p-toluenesulfonate anion;

m=1-6;

n=1-6;

p=1-6;

or a pharmaceutically acceptable salt thereof.

5. A compound of the formula

VI

wherein

$R^2$ is

$-\overset{O}{\overset{\|}{C}}(CH_2)_m-\underset{R^3}{\underset{|}{CH}}(CH_2)_n\underset{R^4}{\underset{|}{N}}CO_2R^5$;

[illegible]

atoms;

$R^5$, $R^6$, and $R^8$ are each, independently, alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, fluorenylmethyl, or phenyl which is optionally mono-, di-, or tri-substituted with a substituent selected from alkyl of 1-6 carbon atoms, alkoxy of 1-6 carbon atoms, hydroxy, cyano, halo, nitro, carbalkoxy of 2-7 carbon atoms, trifluoromethyl, amino, or $-CO_2H$;

m is 0-4;

n is 0-4;

p is 1-2;

q is 0-4;

r is 0-4;

**27**



wherein

R is —SO₂R¹;

R¹ is alkyl, alkenyl, alkynyl containing 1 to 6 carbon atoms; or an aromatic moiety selected from the group consisting of phenyl and naphthyl or a heterocyclic moiety selected from the group consisting of thiophenyl and quinolinyl; or —NHCOR²; and

R² is lower alkyl containing 1 to 6 carbon atoms; or a pharmaceutically acceptable salt thereof.

10. A method of inducing immunosuppression which comprises administering an immunosuppressive effective amount of a compound of formula II.

**II**



wherein

R¹ is



and

R² is alkyl of 1–10 carbon atoms, arylalkyl of 7–10 carbon atoms, or aryl wherein the aryl group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1–6 carbon atoms per alkyl group, alkyl-

**28**

thio of 1–6 carbon atoms, —SO₃H, —PO₃H, and —CO₂H;

or a pharmaceutically acceptable salt thereof, or of formula III.

**III**



wherein

R¹ is



and

R² is a mono-, di-, poly-, or per-fluorinated alkyl group of 1–10 carbon atoms;

or of formula IV,

**IV**



wherein

R¹ is



R² is



X is —(CH₂)ₙ— or —Ar—;

BSC-SJA-1229

**31**

$R^1$ is alkyl of 1–6 carbons atoms, arylalkyl of 7–10 carbon atoms, —$CH_2YX$, —$C(CH_3)_2YX$, —$CH(CH_3)YX$, or L;

Y is O or S;

X is —$CH_3$, —$(CH_2)_nCH_3$, —$CH_2Ar$, —$(CH_2)_nOCH_3$, —$CH_2CCl_3$, —$CH(CH_3)_2$, or —$CH_2CH_2SiMe_3$;

L is tetrahydrofuran-2-yl, tetrahydrothiophen-2-yl, tetrahydrothiopyran-2-yl, tetrahydropyran-2-yl, 4-methoxytetrahydropyran-2-yl, 4-methoxytetrahydrothiopyran-2-yl, or 4-methoxytetrahydrothiopyran-2-yl S,S dioxide; and

n=1–5;

or of formula VIII,

VIII



wherein

R is

—C(CH₂)ₘNR¹R²;

$R^1$ and $R^2$ are each hydrogen or alkyl of 1–3 carbon atoms or $R^1$ and $R^2$ together with the nitrogen to which they are attached form a saturated heterocyclic ring having 4–6 carbon atoms; and

m=1–3 or a pharmaceutically acceptable salt thereof;

or of formula IX,

IX

wherein

$R^1$ is —CONHSO₂—Ar; and

**32**

Ar is phenyl, naphthyl, pyridyl, quinolyl, isoquinolyl, quinoxalyl, thienyl, thionaphthyl, furyl, benzofuryl, benzodioxyl, benzoxazolyl, benzoisoxazolyl, or benzodioxolyl; wherein the Ar group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1–6 carbon atoms per alkyl group, alkylthio of 1–6 carbon atoms, —SO₂H, —PO₃H, and —CO₂H;

or a pharmaceutically acceptable salt thereof when the Ar group contains a basic nitrogen or when the Ar group is substituted by dialkylamino of 1–6 carbon atoms per alkyl group, —SO₂H, —PO₃H, or —CO₂H;

or a pharmaceutically acceptable salt thereof;

or of formula X,

X

wherein

R is —SO₂R¹;

$R^1$ is alkyl, alkenyl, alkynyl containing 1 to 6 carbon atoms; or an aromatic moiety selected from the group consisting of phenyl and naphthyl or a heterocyclic moiety selected from the group consisting of thiophenyl and quinolinyl; or —NHCOR²; and

$R^2$ is lower alkyl containing 1 to 6 carbon atoms;

or a pharmaceutically acceptable salt thereof.

11. A pharmaceutical composition which comprises an effective amount of a compound of formula II.

BSC-SJA-1230

33   5,256,790   34

wherein

R¹ is



and

R² is alkyl of 1-10 carbon atoms, arylalkyl of 7-10 carbon atoms, or aryl wherein the aryl group may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, alkoxy of 1-6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2-7 carbon atoms, trifluoromethyl, amino, dialkylamino of 1-6 carbon atoms per alkyl group, alkylthio of 1-6 carbon atoms, —SO₃H, —PO₃H, and —CO₂H;

or a pharmaceutically acceptable salt thereof;

or of formula III,

III



wherein

R¹ is



and

R³ is a mono-, di-, poly-, or per-fluorinated alkyl group of 1-10 carbon atoms;

or of formula IV,

IV



wherein

R¹ is



R² is



X is —(CH₂)ₙ— or —Ar—;

R³ and R⁴ are each, independently, hydrogen, alkyl of 1-12 carbon atoms, —(CH₂)ₙ-Ar, —(CH₂-)ₙ-NR⁵R⁶, or —(CH₂)ₚ-N+R³R⁶R⁷Y⁻;

R⁵ and R⁶ are each, independently, hydrogen, alkyl of 1-12 carbon atoms, or —(CH₂)ₙ-Ar;

Ar is an optionally mono- or di-substituted group selected from



in which the optional substituents are selected from the group consisting of alkyl of 1-6 carbon atoms, arylalkyl of 7-10 carbon atoms, alkoxy of 1-6 carbon atoms, cyano, halo, nitro, carbalkoxy of 2-7 carbon atoms, or perfluoroalkyl of 1-6 carbon atoms;

# EXHIBIT 63

US005563145A

# United States Patent [19]

## Failli et al.

[11] Patent Number: 5,563,145

[45] Date of Patent: Oct. 8, 1996

[54] **RAPAMYCIN 42-OXIMES AND HYDROXYLAMINES**

[75] Inventors: **Amedeo A. Failli**, Princeton Junction, N.J.; **Guy A. Schiehser**, Yardley; **Oleg I. Bleyman**, Holland, both of Pa.

[73] Assignee: **American Home Products Corporation**, Madison, N.J.

[21] Appl. No.: 350,557

[22] Filed: Dec. 7, 1994

[51] Int. Cl.[6] .................... A61K 31/445; C07D 491/16

[52] U.S. Cl. .................... 514/291; 540/456; 546/14; 514/183

[58] Field of Search .................... 540/456; 514/183, 514/291

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,929,992 | 12/1975 | Sehgal et al. | 434/122 |
| 3,993,749 | 11/1976 | Sehgal et al. | 424/122 |
| 4,316,885 | 2/1982 | Rakhit | 434/122 |
| 4,375,464 | 3/1983 | Sehgal et al. | 424/122 |
| 4,401,653 | 8/1983 | Eng | 434/114 |
| 4,650,803 | 3/1987 | Stella et al. | 514/291 |
| 4,885,171 | 12/1989 | Surendra et al. | 424/122 |
| 5,023,263 | 6/1991 | Canfield et al. | 514/291 |
| 5,023,262 | 6/1991 | Von Burg | 514/291 |
| 5,023,264 | 6/1991 | Canfield et al. | 514/291 |
| 5,078,999 | 1/1992 | Warner et al. | 434/122 |
| 5,080,899 | 1/1992 | Sturm et al. | 424/122 |
| 5,091,389 | 2/1992 | Ondeyka et al. | 514/291 |
| 5,100,883 | 3/1992 | Schiehser | 514/183 |
| 5,100,899 | 3/1992 | Caine | 514/291 |
| 5,102,876 | 4/1992 | Canfield | 514/183 |
| 5,118,677 | 6/1992 | Canfield | 514/183 |
| 5,118,678 | 6/1992 | Kao et al. | 514/183 |
| 5,120,842 | 6/1992 | Failli et al. | 540/452 |
| 5,130,307 | 7/1992 | Failli et al. | 514/321 |
| 5,138,051 | 8/1992 | Hughes et al. | 540/456 |
| 5,151,413 | 9/1992 | Canfield et al. | 514/63 |
| 5,169,851 | 12/1992 | Hughes et al. | 514/291 |
| 5,177,203 | 1/1993 | Failli et al. | 540/456 |
| 5,194,447 | 3/1993 | Kao | 514/542 |
| 5,221,670 | 7/1993 | Canfield | 514/183 |
| 5,233,036 | 8/1993 | Hughes | 540/455 |
| 5,260,300 | 11/1993 | Hu | 514/291 |
| 5,302,584 | 4/1994 | Kao et al. | 514/80 |
| 5,373,014 | 12/1994 | Failli et al. | 514/291 |
| 5,378,836 | 1/1995 | Kao et al. | 540/456 |
| 5,385,908 | 1/1995 | Nelson et al. | 514/291 |
| 5,385,909 | 1/1995 | Nelson et al. | 514/291 |
| 5,385,910 | 1/1995 | Ocain et al. | 514/291 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 507555A1 | 7/1992 | European Pat. Off. | 540/456 |
| WO9405300 | 3/1994 | WIPO | 540/456 |

### OTHER PUBLICATIONS

Vezina, C., J. Antibiot. 28:721 (1975).

Sehgal, S. N., J. Antibiot. 28:727 (1975).

Baker, H. J., Antibiot. 31:539 (1978).

Martel, R. R., Can. J. Physiol. Pharmacol. 55:48 (1977).

Staruch, M. J., FASEB 3:3411 (1989).

Calne, R. Y., Lancet 1183 (1978).

Morris, R. E., Med. Sci. Res. 17:877 (1989).

Baeder, W. L., Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract) (1990).

Meiser, B. M., J. Heart Lung Transplant. 11 (pt. 2):197 (1992).

Stepkowski, S. M., Transplantation Proc. 23:507 (1991).

*Primary Examiner*—Alan L. Rotman

*Attorney, Agent, or Firm*—Arnold S. Milowsky

[57] **ABSTRACT**

A compound of the structure



wherein X-Y is C=NOR[1] or CHNHOR[2];

R[1] and R[2] are each, independently, hydrogen, alkyl, alkenyl, alkynyl, aminoalkyl, alkylaminoalkyl, dialkylaminoalkyl, cycloalkyl, alkyloxy, alkoxyalkyl, cycloalkylaminoalkyl, cyanoalkyl, fluoroalkyl, trifluoromethylalkyl, trifluoromethyl, ArO—, —(CH₂)ₘAr or —COR³;

R³ is alkyl of 1–6 carbon atoms, —NH₂, —NHR⁴, —NR⁴R⁵, or —OR⁴;

R⁴ and R⁵ are each, independently, alkyl, Ar or if both are present can be taken together to form a 4–7 membered ring;

Ar is an aryl or heteroaryl radical which may be optionally substituted; and m=0–6; or a pharmaceutically acceptable salt thereof, which is useful as an immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agent.

**15 Claims, No Drawings**

5,563,145

1

## RAPAMYCIN 42-OXIMES AND HYDROXYLAMINES

### BACKGROUND OF THE INVENTION

This invention relates to rapamycin 42-oximes and hydroxylamines and a method for using them for inducing immunosuppression, and in the treatment of transplantation rejection, graft vs. host disease, autoimmune diseases, diseases of inflammation, adult T-cell leukemia/lymphoma, solid tumors, fungal infections, and hyperproliferative vascular disorders.

Rapamycin is a macrocyclic triene antibiotic produced by *Streptomyces hygroscopicus*, which was found to have antifungal activity, particularly against *Candida albicans*, both in vitro and in vivo [C. Vezina et al., J. Antibiot. 28, 721 (1975); S. N. Sehgal et al., J. Antibiot. 28, 727 (1975); H. A. Baker et al., J. Antibiot. 31,539 (1978); U.S. Pat. No. 3,929,992; and U.S. Pat. No. 3,993,749].

Rapamycin alone (U.S. Pat. No. 4,885,171 ) or in combination with picibanil (U.S. Pat. No. 4,401,653) has been shown to have antitumor activity. R. Martel et al. [Can. J. Physiol. Pharmacol. 55, 48 (1977)] disclosed that rapamycin is effective in the experimental allergic encephalomyelitis model, a model for multiple sclerosis; in the adjuvant arthritis model, a model for rheumatoid arthritis; and effectively inhibited the formation of IgE-like antibodies.

The immunosuppressive effects of rapamycin have been disclosed in FASEB 3, 3411 (1989). Cyclosporin A and FK-506, other macrocyclic molecules, also have been shown to be effective as immunosuppressive agents, therefore useful in preventing transplant rejection [FASEB 3, 3411 (1989); FASEB 3, 5256 (1989); R. Y. Calne et al., Lancet 1183 (1978); and U.S. Pat. No. 5,100,899].

Rapamycin has also been shown to be useful in preventing or treating systemic lupus erythematosus [U.S. Pat. No. 5,078,999], pulmonary inflammation [U.S. Pat. No. 5,080,899], insulin dependent diabetes mellitus [Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract), (1990)], smooth muscle cell proliferation and intimal thickening following vascular injury [Morris, R. J. Heart Lung Transplant 11 (pt. 2): 197 (1992)], adult T-cell leukemia/lymphoma [European Patent Application 525,960 A1], and ocular inflammation [European Patent Application 532,862 A1 ].

Mono- and diacylated derivatives of rapamycin (esterified at the 28 and 43 positions) have been shown to be useful as antifungal agents (U.S. Pat. No. 4,316,885) and used to make water soluble aminoacyl prodrugs of rapamycin (U.S. Pat. No.4,650,803). Recently, the numbering convention for rapamycin has been changed; therefore according to Chemical Abstracts nomenclature, the esters described above would be at the 31- and 42- positions. U.S. Pat. No. 5,023,263 describes the preparation and use of 42-oxorapamycin and U.S. Pat. No. 5,023,264 describes the preparation and use of 27-oximes of rapamycin.

### DESCRIPTION OF THE INVENTION

This invention provides derivatives of rapamycin which are useful as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents having the structure

2



wherein X-Y is C=NOR' or CHNHOR²;

R¹ and R² are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms, alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–77 carbon atoms, fluoroalkyl of 1–6 carbon atoms, trifluoromethylalkyl of 2–77 carbon atoms, trifluoromethyl, ArO—, —(CH₂)ₘAr, or —COR₃;

R³ is alkyl of 1–6 carbon atoms, —NH₃, —NHR⁴, —NR⁴R⁵, or —OR₆;

R⁴ and R⁵ are each, independently, alkyl of 1–6 carbon atoms, Ar or if both are present can be taken together to form a 4–7 membered ring;

Ar is an aryl or heteroaryl radical which may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–77 carbon atoms, alkynyl of 2–77 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–77 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–712 carbon atoms, alkylthio of 1–6 carbon atoms, —SO₃H, and —CO₂H; and

m=0–6;

or a pharmaceutically acceptable salt thereof.

The pharmaceutically acceptable salts are those derived from such inorganic cations such as sodium, potassium, and the like; organic bases such as: mono-, di-, and trialkyl amines of 1–6 carbon atoms, per alkyl group and mono-, di-, and trihydroxyalkyl amines of 1–6 carbon atoms per alkyl group, and the like; and organic and inorganic acids as: acetic, lactic, citric, tartaric, succinic, maleic, malonic, gluconic, hydrochloric, hydrobromic, phosphoric, nitric, sulfuric, methanesulfonic, and similarly known acceptable acids.

The terms alkyl of 1–6 carbon atoms, alkenyl of 2–77 carbon atoms, and alkynyl of 2–77 carbon atoms, include both straight chain as well as branched carbon chains. By virtue of possessing a double bond, the oximes of this invention possess cis-trans isomerism and hence this invention embraces not only geometrical isomer mixtures, but also the individual E and Z isomers, which can be separated by methods known to those skilled in the art. Likewise, the

BSC-SJA-1233

5,563,145

3

hydroxylamines of this invention consist of mixtures of epimers at C-42, and hence this invention embraces not only the isomer mixture, but also the individual isomers, which can be separated by methods known to those skilled in the art.

It is preferred that the aryl and heteroaryl radicals of Ar are phenyl, pyridyl, fury, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl that may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–77 carbon atoms, alkynyl of 2–77 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–77 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 2–77 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, —SO$_3$H, and —CO$_2$H.

When R$^3$ is —NR$^8$R$^9$, the R$^8$ and R$^9$ groups can be the same or different (as defined above) or can be taken together to form a saturated heterocycle having 4–7 atoms in the ring of which 1 atom is a nitrogen and 0–2 other ring atoms can be nitrogen, oxygen, or sulfur. In the case where R$^8$ and R$^9$ are taken together, it is preferred that R4R$^5$ is a carbon chain forming an azetidine, pyrrolidine, piperidine, or homopiperidine ring.

Of the compounds of this invention preferred members are those in which X-Y is C=NOR$^1$; those in which X-Y is C=NOR$^1$ and R$^1$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–77 carbon atoms, alkynyl of 2–77 carbon atoms, alkyloxy of 1–6 carbon atoms, —(CH$_2$)$_m$Ar, or —COR$_3$; those in which X-Y is CHNHOR$^2$; those in which CHNHOR$^2$, and R$^2$ is hydrogen or —(CH$_2$)$_m$Ar.

The compounds of this invention can be prepared from 42-oxorapamycin, which can be prepared in moderate yield by selectively oxidizing the 42-position of rapamycin via a ruthenium mediated oxidation as taught in U.S. Pat. No. 5,023,263, which is hereby incorporated by reference. Alternatively, 42-oxorapamycin can be prepared in approximately 50% yield using tetrapropylammonium perruthenate/ N-methylmorpholine N-oxide, as taught by Holt in PCT Publication U.S. 93/0668. 42-oxorapamycin can then be treated with an appropriately substituted hydroxylamine to provide mixture of 42-(E) and (Z) oximes (X-Y is C=NOR$^1$), which can be separated by standard methodology. The 42-oximes can further reacted with a suitable reducing agent, such as sodium cyanoborohydride/THF/ dioxane/pH 3.5, to provide the hydroxylamines of this invention (X-Y is CHNHOR$^2$).

Compounds of this invention in which X-Y is C=NOR$^1$ and R$^1$ is a carbonyl containing moiety can be prepared from rapamycin 42-oxime (X-Y is C=NOR$^1$ and R$^1$ is hydrogen). For example, rapamycin 42-oxime can be reacted with sodium cyanoate to produce the compound in which R$^1$ is —COR$^3$ and R$^3$ is NH$_2$. Similarly, rapamycin 42-oximes can be treated with a suitable substituted isocyanate or halocarbamine [i.e., R$^4$R$^5$NC(O)Cl] to provide compounds in which R$^1$ is —COR$^3$ and R$^3$ is —NR$^4$R$^5$. Compounds in which R$^1$ is —COR$^3$ and R$^3$ is —NHR$^4$ can be prepared analogously. Additionally, treatment of rapamycin 42-oxime with an appropriate alkyl- or arylchloroformate in pyridine and a solvent such as methylene chloride provides oxime carbonates in which R$^1$ is —COR$^3$, and R$^5$ is alkyl or Ar.

Analogous functionalization can be obtained when X-Y is CHNHOR$^2$, starting from the compound in which R$^2$ is hydrogen (obtained by the cyanoborohydride reduction of rapamycin 42-oxime).

As an alternative to the ruthenium based oxidative preparation of 42-oxorapamycin, this invention also provides a

4

synthetic route to the oximes and hydroxylamines of this invention via the Dess-Martin periodinane oxidation of a 31-O-protected rapamycin. The protection of the 31-position of rapamycin has been described in U.S. Pat. No. 5,120,842, which is hereby incorporated by reference. For example, the treatment of rapamycin with a suitable protecting reagent such as triethylsilyl triflate/2,6-utidine/methylene chloride, followed by acetic acid/THF/water provides 31-O-triethylsilyl rapamycin in quantitative yield. Oxidation with Dess-Martin periodinane provides 31-O-triethylsilyl-42-oxorapamycin in about 65% yield, which can then be treated with a suitable hydroxylamine (and subsequently derivatized) as described above. For the oximes of this invention, the triethylsilyl protecting group can be removed under mildly acidic conditions (acetic acid/THF/water) as described in U.S. Pat. No. 5,120,842. Using this route, the hydroxylamines of this invention can also be produced from the corresponding oximes via cyanoborohydride reduction under acidic conditions, with concomitant removal of the silyl protecting group.

Based on the above described Dess-Martin periodinane methodology, the following compounds are intermediates useful in the preparation of the oximes of this invention.



wherein R$^6$ is —SIR$^7$R$^8$R$^9$; and R$^7$, R$^8$, and R$^9$ are each, independently, alkyl of 1–8 carbon atoms, alkenyl of 2–8 carbon atoms, phenylalkyl of 7–10 carbon atoms, triphenylmethyl, or phenyl.

Of the above intermediates, the compound of Example 1 is the preferred intermediate.

The reagents used in the preparation of the compounds of this invention can be either commercially obtained or can be prepared by standard procedures described in the literature.

Immunosuppressive activity for representative compounds of this invention was evaluated in an in vitro standard pharmacological test procedure to measure the inhibition of lymphocyte proliferation (LAF) and in two in vivo standard pharmacological test procedures. The pinch skin graft test procedure measures the immunosuppressive activity of the compound tested as well as the ability of the compound tested to inhibit or treat transplant rejection. The adjuvant arthritis standard pharmacological test procedure measures the ability of the compound tested to inhibit immune mediated inflammation. The adjuvant arthritis test procedure is a standard pharmacological test procedure for rheumatoid arthritis. The procedures for these standard pharmacological test procedures are provided below.

The comitogen-induced thymocyte proliferation procedure (LAF) was used as an in vitro measure of the immu-

5,563,145

5

nosuppressive effects of representative compounds. Briefly, cells from the thymus of normal BALB/c mice are cultured for 72 hours with PHA and IL-1 and pulsed with tritiated thymidine during the last six hours. Cells are cultured with and without various concentrations of rapamycin, cyclosporin A, or test compound. Cells are harvested and incorporated radioactivity is determined. Inhibition of lymphoproliferation is assessed as percent change in counts per minute from non-drug treated controls. For each compound evaluated, rapamycin was also evaluated for the purpose of comparison. An $IC_{50}$ was obtained for each test compound as well as for rapamycin. When evaluated as a comparator for the representative compounds of this invention, rapamycin had an $IC_{50}$ ranging from 0.5 to 3.3 nM. The results obtained are provided as an $IC_{50}$ and as the percent inhibition of T-cell proliferation at 0.1 μM. The results obtained for the representative compounds of this invention were also expressed as a ratio compared with rapamycin. A positive ratio indicates immunosuppressive activity. A ratio of greater than 1 indicates that the test compound inhibited thymocyte proliferation to a greater extent than rapamycin. Calculation of the ratio is shown below.

$$\frac{IC_{50} \text{ of Rapamycin}}{IC_{50} \text{ of Test Compound}}$$

Representative compounds of this invention were also evaluated in an in vivo test procedure designed to determine the survival time of pinch skin graft from male BALB/c donors transplanted to male $C_3H(H-2K)$ recipients. The method is adapted from Billingham R. E. and Medawar P. B., J. Exp. Biol. 28:385–402, (1951). Briefly, a pinch skin graft from the donor was grafted on the dorsum of the recipient as a allograft, and an isograft was used as control in the same region. The recipients were treated with either varying concentrations of test compounds intraperitoneally or orally. Rapamycin was used as a test compound. Untreated recipients serve as rejection control. The graft was monitored daily and observations were recorded until the graft became dry and formed a blackened scab. This was considered as the rejection day. The mean graft survival time (number of days ±S.D.) of the drug treatment group was compared with the control group. Results are expressed as the mean survival time in days. Untreated (control) pinch skin grafts are usually rejected within 6–7 days. Compounds were tested using a dose of 4 mg/kg, i.p. A survival time of 11.67±0.63 days was obtained for rapamycin at 4 mg/kg, i.p.

The adjuvant arthritis standard pharmacological test procedure measures the ability of test compounds to prevent immune mediated inflammation and inhibit or treat rheumatoid arthritis. The following briefly describes the test procedure used. A group of rats (male inbread Wistar Lewis rats) are pre-treated with the compound to be tested (1 h prior to antigen) and then injected with Freud's Complete Adjuvant (FCA) in the right hind paw to induce arthritis. The rats are then orally dosed on a Monday, Wednesday, Friday schedule from day 0–14 for a total of 7 doses. Both hind paws are measured on days 16, 23, and 30. The difference in paw volume (mL) from day 16 to day 0 is determined and a percent change from control is obtained. The left hind paw (uninjected paw) inflammation is caused by T-cell mediated inflammation and is recorded as % change from control. The right hind paw inflammation, on the other hand, is caused by nonspecific inflammation. Compounds were tested at a dose of 2 mg/kg. The results are expressed as the percent change in the uninjected paw at day 16 versus control; the more negative the percent change, the more potent the compound. Rapamycin provided ~70% change versus control, indicat-

6

ing that rapamycin treated rats had 70% less immune induced inflammation than control rats.

The results obtained in these standard pharmacological test procedures are provided following the procedure for making the specific compounds that were tested.

The results of these standard pharmacological test procedures demonstrate immunosuppressive activity both in vitro and in vivo for the compounds of this invention. The results obtained in the LAF test procedure indicates suppression of T-cell proliferation, thereby demonstrating the immunosuppressive activity of the compounds of this invention. Further demonstration of the utility of the compounds of this invention as immunosuppressive agents was shown by the results obtained in the skin graft and adjuvant arthritis standard pharmacological test procedures. Additionally, the results obtained in the skin graft test procedure further demonstrates the ability of the compounds of this invention to treat or inhibit transplantation rejection. The results obtained in the adjuvant arthritis standard pharmacological test procedure further demonstrate the ability of the compounds of this invention to treat or inhibit rheumatoid arthritis.

Based on the results of these standard pharmacological test procedures, the compounds are useful in the treatment or inhibition of transplantation rejection such as kidney, heart, liver, lung, bone marrow, pancreas (islet cells), cornea, small bowel, and skin allografts, and heart valve xenografts; in the treatment or inhibition of graft vs. host disease; in the treatment or inhibition of autoimmune diseases such as lupus, rheumatoid arthritis, diabetes mellitus, myasthenia gravis, and multiple sclerosis; and diseases of inflammation such as psoriasis, dermatitis, eczema, seborrhea, inflammatory bowel disease, pulmonary inflammation (including asthma, chronic obstructive pulmonary disease, emphysema, acute respiratory distress syndrome, bronchitis, and the like), and eye uveitis.

Because of the activity profile obtained, the compounds of this invention also are considered to have antitumor, antifungal activities, and antiproliferative activities. The compounds of this invention therefore also useful in treating solid tumors, adult T-cell leukemia/lymphoma, fungal infections, and hyperproliferative vascular diseases such as restenosis and atherosclerosis. When used for restenosis, it is preferred that the compounds of this invention are used to treat restenosis that occurs following an angioplasty procedure. When used for this purpose, the compounds of this invention can be administered prior to the procedure, during the procedure, subsequent to the procedure, or any combination of the above.

When administered for the treatment or inhibition of the above disease states, the compounds of this invention can be administered to a mammal orally, parenterally, intranasally, intrabronchially, transdermally, topically, intravaginally, or rectally.

It is contemplated that when the compounds of this invention are used as an immunosuppressive or antiinflammatory agent, they can be administered in conjunction with one or more other immunoregulatory agents. Such other immunoregulatory agents include, but are not limited to azathioprine, corticosteroids, such as prednisone and methylprednisolone, cyclophosphamide, rapamycin, cyclosporin A, FK-506, OKT-3, and ATG. By combining the compounds of this invention with such other drugs or agents for inducing immunosuppression or treating inflammatory conditions, the lesser amounts of each of the agents are required to achieve the desired effect. The basis for such combination therapy was established by Stepkowski whose results showed that the use of a combination of rapamycin and cyclosporin A at



5,563,145

7

subtherapeutic doses significantly prolonged heart allograft survival time. [Transplantation Proc. 23: 507 (1991)].

The compounds of this invention can be formulated neat or with a pharmaceutical carrier to a mammal in need thereof. The pharmaceutical carrier may be solid or liquid. When formulated orally, it has been found that 0.01% Tween 80 in PHOSAL PG-50 (phospholipid concentrate with 1,2-propylene glycol, A. Nattermann & Cie. GmbH) provides an acceptable oral formulation.

A solid carrier can include one or more substances which may also act as flavoring agents, lubricants, solubilizers, suspending agents, fillers, glidants, compression aids, binders or tablet-disintegrating agents; it can also be an encapsulating material. In powders, the carrier is a finely divided solid which is in admixture with the finely divided active ingredient. In tablets, the active ingredient is mixed with a carrier having the necessary compression properties in suitable proportions and compacted in the shape and size desired. The powders and tablets preferably contain up to 99% of the active ingredient. Suitable solid carriers include, for example, calcium phosphate, magnesium stearate, talc, sugars, lactose, dextrin, starch, gelatin, cellulose, methyl cellulose, sodium carboxymethyl cellulose, polyvinylpyrrolidine, low melting waxes and ion exchange resins.

Liquid carriers are used in preparing solutions, suspensions, emulsions, syrups, elixirs and pressurized compositions. The active ingredient can be dissolved or suspended in a pharmaceutically acceptable liquid carrier such as water, an organic solvent, a mixture of both or pharmaceutically acceptable oils or fats. The liquid carrier can contain other suitable pharmaceutical additives such as solubilizers, emulsifiers, buffers, preservatives, sweeteners, flavoring agents, suspending agents, thickening agents, colors, viscosity regulators, stabilizers or osmo-regulators. Suitable examples of liquid carriers for oral and parenteral administration include water (partially containing additives as above, e.g. cellulose derivatives, preferably sodium carboxymethyl cellulose solution), alcohols (including monohydric alcohols and polyhydric alcohols, e.g. glycols) and their derivatives, lethicins, and oils (e.g. fractionated coconut oil and arachis oil). For parenteral administration, the carrier can also be an oily ester such as ethyl oleate and isopropyl myristate. Sterile liquid carriers are useful in sterile liquid form compositions for parenteral administration. The liquid carrier for pressurized compositions can be halogenated hydrocarbon or other pharmaceutically acceptable propellant.

Liquid pharmaceutical compositions which are sterile solutions or suspensions can be utilized by, for example, intramuscular, intraperitoneal or subcutaneous injection. Sterile solutions can also be administered intravenously. The compound can also be administered orally either in liquid or solid composition form.

The compounds of this invention may be administered rectally in the form of a conventional suppository. For administration by intranasal or intrabronchial inhalation or insufflation, the compounds of this invention may be formulated into an aqueous or partially aqueous solution, which can then be utilized in the form of an aerosol. The compounds of this invention may also be administered transdermally through the use of a transdermal patch containing the active compound and a carrier that is inert to the active compound, is non toxic to the skin, and allows delivery of the agent for systemic absorption into the blood stream via the skin. The carrier may take any number of forms such as creams and ointments, pastes, gels, and occlusive devices. The creams and ointments may be viscous liquid or semisolid emulsions of either the oil-in-water or water-in-oil

8

type. Pastes comprised of absorptive powders dispersed in petroleum or hydrophilic petroleum containing the active ingredient may also be suitable. A variety of occlusive devices may be used to release the active ingredient into the blood stream such as a semipermiable membrane covering a reservoir containing the active ingredient with or without a carrier, or a matrix containing the active ingredient. Other occlusive devices are known in the literature.

In addition, the compounds of this invention may be employed as a solution, cream, or lotion by formulation with pharmaceutically acceptable vehicles containing 0.1–5 percent, preferably 2%, of active compound which may be administered to a fungally affected area.

The dosage requirements vary with the particular compositions employed, the route of administration, the severity of the symptoms presented and the particular subject being treated. Based on the results obtained in the standard pharmacological test procedures, projected daily dosages of active compound would be 0.1 $\mu$g/kg–100 mg/kg, preferably between 0.001–25 mg/kg, and more preferably between 0.01–1 mg/kg. Treatment will generally be initiated with small dosages less than the optimum dose of the compound. Thereafter the dosage is increased until the optimum effect under the circumstances is reached; precise dosages for oral, parenteral, nasal, or intrabronchial administration will be determined by the administering physician based on experience with the individual subject treated. Preferably, the pharmaceutical composition is in unit dosage form, e.g. as tablets or capsules. In such form, the composition is subdivided in unit dose containing appropriate quantities of the active ingredient; the unit dosage forms can be packaged compositions, for example, packeted powders, vials, ampoules, prefilled syringes or sachets containing liquids. The unit dosage form can be, for example, a capsule or tablet itself, or it can be the appropriate number of any such compositions in package form.

The following examples illustrate the preparation and biological activities of representative compounds of this invention.

## EXAMPLE 1

### 31-O-(Triethylsilyl)rapamycin-42-oxorapamycin

Step A. 31-O-(Triethylsilyl)rapamycin

To a solution of rapamycin (15.39 g, 16.84 mmole) and 2,6-utidine (7.65 g, 75.76 ml) in dichloromethane (100 ml) at 0° C., triethylsilyl trifluoromethane sulfonate (10 g, 37.88 mmole) was added dropwise over 30 minutes. The mixture was stirred at 0° C. for another 90 minutes, and filtered. The filtrate was diluted with ethyl acetate (500 ml), washed with water (3×250 ml) and brine (1×100 ml), dried (MgSO₄) and evaporated to dryness. The material was redissolved in anhydrous THF (40 ml), cooled to 0° C. and treated with ice-cold glacial acetic acid (150 ml) and water (80 ml). The mixture was stirred for 3 hours at 0° C., diluted with ethyl acetate (500 ml) and carefully brought to pH 7–8 with NaHCO₃ at 0° C. The organic layer was washed with water (2×200 ml), brine (1×100 ml), dried (MgSO₄) and evaporated to dryness to provide the title product in quantitative yield.

$^1$H NMR (CDCl₃, 400 MHz): $\delta$ 1.66 (3H, 6-CH₃C=C), 1.75 (3H, 30-CH₃C=C), 3.14 (3H, 41-OCH₃), 3.27 (3H, 7-CH₃O), 3.40 (3H, 32-CH₃O), 4.12 (m, 1H, 31-CH)

MS (neg. ion FAB, m/z): 1027.4 [M]⁻, 589.3.

Step B. 31-O-(Triethylsilyl)rapamycin-42-oxorapamycin

BSC-SJA-1236

5,563,145

### 9

A mixture of 31-O-(triethylsilyl)rapamycin (17.32 g, 16.84 mmole) and Dess-Martin periodinane (8.65 g, 20.35 mmole) in anhydrous dichloromethane (150 ml) was stirred under nitrogen for 5 hours. The mixture was filtered, the filtrate diluted with ethyl acetate (500 ml) and washed with water (3×250 ml) and brine (1×100 ml), dried (MgSO₄) and evaporated to dryness. The crude material was preabsorbed on a silica Merck-60 column and flashed with hexane-ethyl acetate 95:5 and 7:2, to provide pure title product in 64.9% yield.

¹H NMR (CDCl₃, 400 MHz): δ 0.42–0.48 (m, 9H), 0.80–0.83 (m, 6H), 1.61 (3H, 6 -CH₃C=C), 1.77 (3H, 30-CH₃C=C), 3.04 (3H, 41-OCH₃), 3.16 (3H, 7-OCH₃), 3.28 (1H, 32-CH₂O), 3.90 (m, 1H, 41-CH).

MS (neg. ion FAB, m/z): 1025.3 [M]⁻.

### EXAMPLE 2

#### 42-Deoxo-42-(hydroxyimino)rapamycin

Preparation A

A mixture of 42-oxorapamycin (0.183 g, 0.22 mmole; prepared via the method described in U.S. Pat. No. 5,023, 263), hydroxylamine hydrochloride (0.0143 g, 0.22 mmole) and sodium acetate (0.025 g, 0.3 mmole) in methanol (5 ml), was stirred under nitrogen for 15 minutes. The mixture was evaporated to dryness and the residue was purified by flash chromatography (on Merck-60 silica gel, eluant 50% THF in hexane). The pure fractions were combined, evaporated and the resulting oil was crystallized from isopropyl ether / cyclohexane 20:80 to provide the title product as a mixture of E/Z isomers (0.075 g, 40% yield).

¹H NMR (CDCl₃, 400 MHz): δ 1.65 (3H, 6-CH₂C=C)), 1.75 (3H, 30-CH₃C=C), 3.13 (3H, 41-OCH₃), 3.34 (3H, 7-OCH₃), 3.41 (3H, 32-OCH₃) ¹³C NMR (CDCl₃, 400 MHz): δ 215.28, 208.17, 169.26, 166.72, 158.83, 140.60, 140.07, 135.95, 135.67, 133.56, 130.18, 129.47, 126.62, 126.43, 98.48, 86.33, 84.73, 84.30, 78.90, 67.17, 59.29, 59.13, 57.51, 55.93, 55.88, 51.234, 46.58, 46.04, 44.19, 41.47, 40.65, 40.19, 38.93, 38.41, 37.71, 35.08, 33.78, 33.24, 32.05, 32.00, 31.82, 31.21, 30.92, 27.21, 27.05, 26.89, 25.27, 22.84, 21.97, 21.62, 21.46, 20.64, 16.32, 16.22, 16.09, 15.99, 14.74, 13.60, 13.18, 13.10, 10.33, 10.15

MS (neg. ion FAB, m/z): 590, 334

Anal. Calcd. for C₅₁H₇₈N₂O₁₃: C, 66.07; H, 8.48; N, 3.02; Found: C, 66.25; H, 8.67; N, 3.03.

Preparation B

Step A. 31-O-(Triethylsilyl)-42-deoxo-42-(hydroxyimino)rapamycin

Under anhydrous conditions, a mixture of 31-O-(triethylsilyl)-42-oxorapamycin of Example 1 (0.105 g, 0.102 mmole), hydroxylamine hydrochloride (7.6 mg, 0.109 mmole), and sodium acetate (12.5 mg, 0.153 mmol ) in anhydrous methanol (5 ml) was stirred for 30 minutes. The mixture was filtered and the filtrate evaporated to dryness. The residue was redissolved in ethyl acetate (50 ml), washed with water (2×50 ml) and brine (1×50 ml), dried (MgSO₄), and evaporated to dryness to provide the title product as a mixture of E/Z isomers (0.114 g, 94% yield).

¹H NMR (CDCl₃, 400MHz): δ 0.47–0.55 (m, 9H), 0.84–0.88 (m, 6H), 1.65 (3H, 6-CH₃C=C), 1.75 (3H, 30-CH₃C=C), 3.14 (3H, 41-OCH₃), 3.26 (3H, 7-OCH₃), 3.44 (3H, 32-OCH₃)

MS (neg. ion FAB, m/z): 1040.7 [M]⁻.

Step B. 42-Deoxo-42-(hydroxyimino)rapamycin

### 10

A solution of 31-O-(triethylsilyl)-42-deoxo-42-(hydroxyimino)rapamycin (1 g, 0.974 mmole) in 20 ml of a 10% solution of p-toluenesulfonic acid in methanol, was stirred for one hour under nitrogen at 0° C. The solution was diluted with ethyl acetate and quenched with 5% aqueous NaHCO₃. The organic layer was washed with water and brine, dried (MgSO4) and evaporated to dryness to provide the title product, identical with the material described in Preparation A (0.812 g, 89.9% yield).

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 3.88 nM

LAF ratio: 0.85

Skin graft survival: 10.8±0.4

### EXAMPLE 3

#### 42-Deoxo-42-(hydroxyamino)rapamycin

To a solution of 31-O-(triethylsilyl)-42-deoxo-42-(hydroxyimino)rapamycin of Example 2, Preparation B, Step A (2.08 g, 2 mmol) in anhydrous methanol (75 ml) under nitrogen and at 0° C., were simultaneously added over a 30 minute period, a 1N-solution of sodium cyanoborohydride in tetrahydrofuran (2 ml ) and a 4N HCl solution in dioxane, so as to maintain the pH at 3.5. The mixture was stirred for 30 minutes, diluted with EtOAc and washed with 2.5% NaHCO₃ (100 ml), water (2×250 ml) and brine (1×250 ml), dried (MgSO₄), and evaporated to dryness to provide the title compound as a mixture of isomers (0.763 g, 41% yield).

¹H NMR (CDCl₃, 400MHz): δ 1.60 and 1.63 (3H, 6-CH₂C=C), 1.72 and 1.74 (3H, 30-CH₃C=C), 3.09 and 3.11 (3H, 41-OCH₃), 3.28, 3.32, 3.34 and 3.36 (6H, 7- and 32-OCH₃)

MS (neg. ion FAB, m/z): 928.4 [M]⁻, 590.3, 336.6

Anal.: Calcd. for C₅₁H₈₀N₂O₁₃: C, 65.92; H, 8.68; N, 3.01; Found: C, 65.36; H, 8.53; N, 2.82.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 5.60 nM

LAF ratio: 0.18

Skin graft survival: 9.6±0.0

Percent change in adjuvant arthritis versus control: −84%

### EXAMPLE 4

#### 42-Deoxo-42-oxorapamycin-42-O-carbamoyloxime

A mixture of 42-deoxo-42-(oxyimino)rapamycin of Example 2 (0.813 g, 0.876 mmole), sodium cyanate (0.228 g, 3.5 ), glacial acetic acid (3 ml) and water (3 ml) was stirred for 1.5 hours under nitrogen. The mixture was diluted with ethyl acetate (100 ml) and quenched with aqueous NaHCO₃. The organic layer was washed with water and brine, dried (MgSO₄), and evaporated to dryness. The crude product was dissolved in dichloromethane, preabsorbed on silica gel Merck-60 and purified by flash chromatography (step gradient from 50% ethyl acetate in hexane to pure ethyl acetate) to provide the title product as a mixture of E/Z isomers (0.289 g, 34% yield).

¹H NMR (CDCl₃, 400 MHz): δ 1.66 (3H, 6-CH₃C=C), 1.75 (3H, 30-CH₃C=C),

3.14 (3H, 41-OCH₃), 3.33 (3H, 7-OCH₃), 3.43 (3H, 32-OCH₃) ¹³C NMR (CDC₁₃, 400MHz): d 215.17, 208.11, 169.67, 169.30, 166.73, 164.31, 164.25,

5,563,145

## 11

156.37, 156.33, 140.05, 138.34, 137.28, 136.07,
135.76, 135.09, 133.51, 133.25, 132.17, 130.61,
130.22, 130.05, 129.40, 127.33, 126.81, 126.66,
126.57, 126.44, 125.76, 125.50, 125.22, 98.70, 98.50,
84.73, 84.34, 84.28, 82.70, 78.92, 68.91, 67.21, 59.29,
57.93, 57.82, 56.34, 56.31, 56.16, 56.09, 55.85, 55.96,
52.00, 51.25, 46.55, 46.06, 45.68, 44.54, 44.18, 41.92,
41.83, 41.48, 41.40, 41.26, 41.14, 41.01, 40.88, 40.57,
40.42, 40.35, 40.19, 39.77, 39.30, 39.17, 38.97, 38.83,
38.66, 38.59, 37.98, 37.45, 37.26, 35.53, 35.13, 34.88,
34.79, 34.72, 34.57, 33.83, 33.49, 33.37, 33.31, 33.24,
32.19, 32.03, 31.98, 31.85, 21.70, 31.64, 31.20, 27.35,
27.21, 27.03, 26.80, 25.23, 25.04, 24.45, 24.31, 21.62,
21.51, 21.37, 20.99, 20.74, 20.63, 16.69, 16.30, 16.18,
15.95, 15.80, 15.71, 15.03, 14.57, 13.88, 13.64, 13.18,
13.13, 13.07, 10.16

MS (neg. ion FAB, m/z): 969.8 [M]⁻, 925.8
[M—CONH₂]⁻, 590.6.
Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 2.00 nM
LAF ratio: 0.25
Skin graft survival: 9.5±1.1

### EXAMPLE 5

#### 42-Deoxy-42-oxorapamycin 42-[O-(pyridin-2-ylmethyl)-oxime

The title compound was prepared according to Examples 2, Preparation B, except for replacing hydroxylamine hydrochloride with O-(pyridine-2-ylmethyl) hydroxylamine dihydrochloride (71.1% yield).

[¹H] NMR (CDCl₃, 400MHz): δ 1.654 (3H, 6-CH₃C=C),
1.75 1 (3H, 30-CH₃C=C).

3.138 (3H, 41-OCH₃), 3.334 (3H, 7-OCH₃), 3.538 (3H,
32-OCH₃), 7.17–8.58 (mm, 4H, Haromn).

[¹³C] NMR (CDCl₃, 400MHz): δ 158.96 (42-C=NO—)
MS (neg. ion FAB, m/z): 1017.5 [M]⁻, 590.4, 425.3.
Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 1.50 nM
LAF ratio: 0.40
Skin graft survival: 7.8±0.8
Percent change in adjuvant arthritis versus control: −53%

### EXAMPLE 6

#### 42-Deoxy-42-oxorapamycin 42-[O-(pyridin-4-ylmethyl)-oxime

The title compound was prepared according to Example 2, Preparation B, except for replacing hydroxylamine hydrochloride with O-(pyridine-4-ylmethyl)-hydroxylamine dihydrochloride (34.5% yield).

[¹H] NMR (CDCl₃, 400MHz): δ 1.653 (3H, 6-CH₃C=C),
1.753 (3H, 30-CH₃C=C).

3.153 (3H, 41-OCH₃), 3.29 (2×3H, 7-OCH₃ and
32-OCH₃), 7.2 (m, 2H, Harom), 8.52 (m, 2H, Harom).
MS (neg. ion FAB, m/z): 1017.2 [M]⁻, 590.2, 425.1.
Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 1.80 nM
LAF ratio: 0.31
Skin graft survival: 8.0±0.9

## 12

### EXAMPLE 7

#### 2-Deoxy-42-oxorapamycin 42-[O-(tert-butyl)-oxime

The title compound was prepared according to Examples 2, Preparation B, except for replacing hydroxylamine hydrochloride with O-(tert-butyl)-hydroxylamine hydrochloride (25.6% yield).

[¹H] NMR (CDCl₃, 400MHz): δ 1.28 (9H, tert-butyl),
1.654 (3H, 6-CH₃C=C), 1.75 (3H, 30-CH₃C=C), 3.136
(3H, 41-OCH₃), 3.336 (3H, 7-OCH₃), 3.37 (3H,
32-OCH₃).

[¹³C] NMR (CDCl₃, 400MHz): δ 155.89 (42-C=NO—)
MS (neg, ion FAB, m/z): 982.5 [M]⁻, 590.3, 390.2.
Results obtained in standard pharmacological test procedures:

LAF: 49% inhibition at 0.1 μM

### EXAMPLE 8

#### 42-Deoxy-42-oxorapamycin 42-[O-(phenylmethyl)]-oxime

The title compound was prepared according to Examples 2, Preparation B, except for replacing hydroxylamine hydrochloride with O-(phenylmethyl)-hydroxylamine hydrochloride (29.9% yield).

[¹H] NMR (CDCl₃, 400 MHz): δ 1.652 (3H, 6-CH₃C=C),
1.747 (3H, 30-CH₃C=C).

3.136 (3H, 41-OCH₃), 3.332 (3H, 7-OCH₃), 3.35 (3H,
32-OCH₃), 5.134 (2H, =NOCH₂—, at C-42), 7.27–7.37
(m, 5H, Harom)

[¹³C] NMR (CDCl₃, 400 MHz): δ 158.48 (42-C=NO-)
MS (neg. ion FAB, m/z): 1016.2 [M]⁻, 590.2, 424.1.
Results obtained in standard pharmacological test procedures:

LAF IC50: 21.67 nM
LAF ratio: 0.03

### EXAMPLE 9

#### 42-Deoxy-42-oxorapamycin 43-(O-allyl)-oxime

The title compound was prepared according to Example 2, Preparation B, except for replacing hydroxylamine hydrochloride with O-(allyl)-hydroxylamine hydrochloride (57.1% yield).

[¹H] NMR (CDCl₃, 400 MHz): a 1.655 (3H, 6-CH₃C=C),
1.751 (3H, 30-CH₃C=C).

3.139 (3H, 41-OCH₃), 3.336 (3H, 7-OCH₃), 3.395 (3H,
32-OCH₃), 4.60 (m, 2H,

=NOCH₂C=, at C-42), 5.17–5.31 (m, 2H, —C=CH₂, at
C-42), 5.94–6.03 (m, 1H,

—CCH=C—, at C-42).

[¹³C] NMR (CDCl₃, 400 MHz): δ 158.1 (43-C=N-O-)
MS (neg. ion FAB, m/z): 966.5 [M]⁻, 590.3, 374.2.
Results obtained in standard pharmacological test procedures:

LAF 43% inhibition at 0.1 μM

5,563,145

| 13 | 14 |

### EXAMPLE 10

#### 42-Deoxy-42-oxorapamycin 42-[O-(prop-2-ynyl))-oxime

The title compound was prepared according to Example 2, Preparation B, except for replacing hydroxylamine hydrochloride with O-(prop-2-ynyl)-hydroxylamine hydrochloride (35.4% yield).

[1]H NMR (CDCl_3, 400 MHz): δ 1.66 (3H, 6-CH_3C=C), 1.75 (3H, 30-CH_3C=C).

3.13 (3H, 41-OCH_3), 3.33 (3H, 7-OCH_3), 3.415 (3H, 32-OCH_3), 4.69 (2H, =NOCH_2C at C-42)

[13]C NMR (CDCl_3, 400 MHz): δ 159.5 (42-C=NO-)

MS (neg. ion FAB, m/z): 964.2 [M]⁻, 590.2, 372.1.

Results obtained in standard pharmacological test procedures:

LAF IC50: 8.13 nM

LAF ratio: 0.08

Skin graft survival: 8.0±1.1.

### EXAMPLE 11

#### 42-Deoxo-42-[O-(pyridin-4-ylmethyl)]-hydroxyamino rapamycin

The title compound was prepared according to Example 3, except for replacing 31-O-(triethylsilyl)-42-deoxo-42-hydroxyimino rapamycin with 42-deoxy-42-oxo rapamycin 42-[O-(pyridin-4-ylmethyl)]-oxime of Example 6.

MS (neg. ion FAB, m/z): 1019.5 [M]⁻.

What is claimed is:

1. A compound of the structure



wherein X-Y is C=NOR¹;

R¹ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms, alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–7 carbon atoms, fluoroalkyl of 1–6 carbon atoms, trifluoromethylalkyl of 2–7 carbon atoms, trifluoromethyl, ArO—, or —(CH_2)_mAr

Ar is phenyl, pyridyl, furyl, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl which may be optionally

mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms, alkylthio of 1–6 carbon atoms, —SO_3H, and —CO_2H; and

m=0–6;

or a pharmaceutically acceptable salt thereof.

2. The compound of claim 1, wherein R¹ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, alkyloxy of 1–6 carbon atoms, or —(CH_2)_mAr or a pharmaceutically acceptable salt thereof.

3. The compound of claim 1 which is 42-deoxo-42-(hydroxyimino)rapamycin or a pharmaceutically acceptable salt thereof.

4. The compound of claim 1 which is 42-deoxy-42-oxorapamycin 42-[O -(pyridin-2-ylmethyl)]-oxime or a pharmaceutically acceptable salt thereof.

5. The compound of claim 1 which is 42-deoxy-42-oxorapamycin 42-[O -(pyridin-4-ylmethyl)]-oxime or a pharmaceutically acceptable salt thereof.

6. The compound of claim 1 which is 42-deoxy-42-oxorapamycin 42-[O-(tert-butyl)]-oxime or a pharmaceutically acceptable salt thereof.

7. The compound of claim 1 which is 42-deoxy-42-oxorapamycin 42-[O-(phenylmethyl)]-oxime or a pharmaceutically acceptable salt thereof.

8. The compound of claim 1 which is 42-deoxy-42-oxorapamycin 42-(O-allyl)-oxime or a pharmaceutically acceptable salt thereof.

9. The compound of claim 1 which is 42-deoxy-42-oxorapamycin 42-[O-prop-2 -ynyl)]-oxime or a pharmaceutically acceptable salt thereof.

10. A method of treating transplantation rejection or graft vs. host disease in a mammal in need thereof, which comprises administering to said mammal an antirejection effective amount of a compound of the structure



wherein X-Y is C=NOR¹;

R¹ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms,

BSC-SJA-1239

5,563,145

15

alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–7 carbon atoms, fluoroalkyl of 1–6 carbon atoms, trifluoromethylalkyl of 2–7 carbon atoms, trifluoromethyl, ArO—, or —(CH$_2$)$_m$Ar

Ar is phenyl, pyridyl, fury, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl which may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, —SO$_3$H, and —CO$_2$H; and

m=0–6;

or a pharmaceutically acceptable salt thereof.

11. A method of treating a fungal infection in a mammal in need thereof, which comprises administering to said mammal an antifungal effective amount of a compound of the structure



wherein X-Y is C=NOR$^1$;

R$^1$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms, alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–7 carbon atoms, fluoroalkyl of 1–6 carbon atoms, trifluoromethylalkyl of 2–7 carbon atoms, trifluoromethyl, ArO—, or —(CH$_2$)$_m$Ar

Ar is phenyl, pyridyl, fury, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl which may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trif-

16

uoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, —SO$_3$H, and —CO$_2$H; and

m=0–6;

or a pharmaceutically acceptable salt thereof.

12. A method of treating rheumatoid arthritis in a mammal in need thereof, which comprises administering to said mammal an antiarthritis effective amount of a compound of the structure



wherein X-Y is C=NOR$^1$;

R$^1$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms, alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–7 carbon atoms, fluoroalkyl of 1–6 carbon atoms, trifluoromethylalkyl of 2–7 carbon atoms, trifluoromethyl, ArO—, or —(CH$_2$)$_m$Ar

Ar is phenyl, pyridyl, fury, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl which may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, —SO$_3$H, and —CO$_2$H; and

m=0–6;

or a pharmaceutically acceptable salt thereof.

13. A method of treating restenosis in a mammal in need thereof, which comprises administering to said mammal an antiproliferative effective amount of a compound of the structure

5,563,145

17



18



wherein X-Y is C=NOR[1];

$R^1$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms, alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–7 carbon atoms, fluoroalkyl of 1–6 carbon atoms. trifluoromethylalkyl of 2–7 carbon atoms, trifluoromethyl, ArO—, or —(CH$_2$)$_m$Ar

Ar is phenyl, pyridyl, fury, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl which may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, —SO$_3$H, and —CO$_2$H; and

m=0–6;

or a pharmaceutically acceptable salt thereof.

14. A method of treating pulmonary inflammation in a mammal in need thereof, which comprises administering to said mammal an antiinflammatory effective amount of a compound of the structure

wherein X-Y is C=NOR[1];

$R^1$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms, alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–7 carbon atoms, fluoroalkyl of 1–6 carbon atoms, trifluoromethylalkyl of 2–7 carbon atoms, trifluoromethyl, ArO—, or —(CH$_2$)$_m$Ar

Ar is phenyl, pyridyl, fury, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl which may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, —SO$_3$H, and —CO$_2$H; and

m=0–6;

or a pharmaceutically acceptable salt thereof.

15. A pharmaceutical composition which comprises a compound of the structure



BSC-SJA-1241

5,563,145

19

20

wherein X-Y is C=NOR$^1$;

R$^1$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, aminoalkyl of 1–6 carbon atoms, alkylaminoalkyl of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 1–6 carbon atoms per alkyl group, cycloalkyl of 3–8 carbon atoms, alkyloxy of 1–6 carbon atoms, alkoxyalkyl of 1–6 carbon atoms per alkyl group, cycloalkylaminoalkyl of 4–14 carbon atoms, cyanoalkyl of 2–7 carbon atoms, fluoroalkyl of 1–6 carbon atoms, trifluoromethylalkyl of 2–7 carbon atoms, trifluoromethyl, ArO—, or —(CH$_2$)$_m$Ar

Ar is phenyl, pyridyl, fury, pyrrolyl, thiophenyl, imidazolyl, oxazolyl, or thiazolyl which may be optionally mono-, di-, or tri-substituted with a group selected from alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, arylalkyl of 7–10 carbon atoms, alkoxy of 1–6 carbon atoms, cyano, halo, hydroxy, nitro, carbalkoxy of 2–7 carbon atoms, trifluoromethyl, trifluoromethoxy, amino, dialkylamino of 1–6 carbon atoms per alkyl group, dialkylaminoalkyl of 3–12 carbon atoms, hydroxyalkyl of 1–6 carbon atoms, alkoxyalkyl of 2–12 carbon atoms, alkylthio of 1–6 carbon atoms, —SO$_3$H, and —CO$_2$H; and

m=0–6;

or a pharmaceutically acceptable salt thereof, and a pharmaceutical carrier.

\* \* \* \* \*

BSC-SJA-1242

# EXHIBIT 64

US005362718A

# United States Patent [19]

## Skotnicki et al.

[11]  Patent Number:     **5,362,718**

[45]  Date of Patent:     **Nov. 8, 1994**

[54]  **RAPAMYCIN HYDROXYESTERS**

[75]  Inventors:  **Jerauld S. Skotnicki**, Allentown; **Christina L. Leone**, Princeton, both of N.J.; **Guy A. Schiehser**, Yardley, Pa.

[73]  Assignee:  **American Home Products Corporation**, Madison, N.J.

[21]  Appl. No.:  **229,261**

[22]  Filed:  **Apr. 18, 1994**

[51]  Int. Cl.$^5$ ................. **A61K 31/695; A61K 31/395; C07D 498/16; C07D 7/04**

[52]  U.S. Cl. ...................................... **514/63; 514/291; 540/452; 540/456**

[58]  Field of Search ................ 540/456, 452; 514/291, 514/63

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,929,992 | 12/1975 | Sehgal et al. | 424/122 |
| 3,993,749 | 11/1976 | Sehgal et al. | 424/122 |
| 4,316,885 | 2/1982 | Rakhit | 424/122 |
| 4,375,464 | 3/1983 | Sehgal et al. | 424/122 |
| 4,401,653 | 8/1983 | Eng | 424/124 |
| 4,650,803 | 3/1987 | Stella et al. | 540/456 |
| 4,885,171 | 12/1989 | Surendra et al. | 424/122 |
| 5,023,262 | 6/1991 | Caufield et al. | 540/456 |
| 5,023,263 | 6/1991 | Von Burg | 540/456 |
| 5,023,264 | 6/1991 | Caufield et al. | 514/291 |
| 5,078,999 | 1/1992 | Warner et al. | 424/122 |
| 5,080,899 | 1/1992 | Sturm et al. | 424/122 |
| 5,091,389 | 2/1992 | Ondeyka et al. | 514/291 |
| 5,100,883 | 3/1992 | Schiehser | 514/183 |
| 5,100,899 | 3/1992 | Calne | 514/291 |
| 5,102,876 | 4/1992 | Caufield | 514/18.3 |
| 5,118,677 | 6/1992 | Caufield | 514/183 |
| 5,118,678 | 6/1992 | Kao et al. | 514/183 |
| 5,120,842 | 6/1992 | Failli et al. | 540/452 |
| 5,130,307 | 7/1992 | Failli et al. | 514/291 |
| 5,138,051 | 8/1992 | Hughes et al. | 540/456 |
| 5,151,413 | 9/1992 | Caufield et al. | 540/456 |
| 5,169,851 | 12/1992 | Hughes et al. | 514/291 |
| 5,177,203 | 1/1993 | Failli et al. | 540/456 |
| 5,194,447 | 3/1993 | Kao | 540/456 |
| 5,221,670 | 6/1993 | Caufield | 514/183 |
| 5,233,036 | 8/1993 | Hughes | 540/456 |

| | | | |
|---|---|---|---|
| 5,260,300 | 11/1993 | Hu | 540/456 |
| 5,262,423 | 11/1993 | Kao | 514/291 |
| 5,286,730 | 2/1994 | Caufield et al. | 514/291 |
| 5,286,731 | 2/1994 | Caufield et al. | 514/291 |
| 5,302,584 | 4/1994 | Kao et al. | 514/291 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 507593A1 | 7/1992 | European Pat. Off. | 540/456 |

### OTHER PUBLICATIONS

Venzina, C., J. Antibiot. 28:721 (1975).
Sehgal, S. N., J. Antibiot. 28:727 (1975).
Baker, H. J., Antibiot. 31:539 (1978).
Martel, R. R., Can. J. Physiol. Pharmacol. 55:48 (1977).
Staruch, M. J., FASEB 3:3411 (1989).
Dumont, F. J., FASEB 3:5256 (1989).
Calne, R. Y., Lancet 1183 (1978).
Morris, R. E., Med. Sci. Res. 17-877 (1989).
Baeder, W. L., Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract) (1990).
Meiser, B. M., J. Heart Lung Transplant, 11 (pt. 2):197 (1992).
Stepkowski, S. M., Transplantation Proc. 23:507 (1991).

*Primary Examiner*—Robert T. Bond
*Attorney, Agent, or Firm*—Arnold S. Milowsky

[57]            **ABSTRACT**

A compound of the structure

(Abstract continued on next page.)

BSC-SJA-1243



5,362,718

Page 2



wherein $R^1$ and $R^2$ are each, independently, hydrogen or —$CO(CR^3R^4)_b(CR^5R^6)_dCR^7R^8R^9$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl, alkenyl, alkynyl, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl, alkenyl, alkynyl, —$(CR^3R^4)_fOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_fOR^{10}$;

$R^7$ is hydrogen, alkyl, alkenyl, alkynyl, —$(CR^3R^4)_fOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl, alkenyl, alkynyl, —$(CR^3R^4)_fOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_fOR^{10}$;

$R^{10}$ is hydrogen, alkyl, alkenyl, alkynyl, tri-(alkyl)silyl, tri-(alkyl)silylethyl, triphenylmethyl, benzyl, alkoxymethyl, tri-(alkyl)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl, alkenyl, alkynyl, or phenylalkyl;

X is 5-(2,2-dialkyl)[1,3]dioxanyl, 5-(2,2-dicycloalkyl)[1,3]dioxanyl, 4-(2,2-dialkyl)[1,3]dioxanyl, 4-(2,2-dicycloalkyl)[1,3]dioxanyl, 4-(2,2dialkyl)[1,3]dioxalanyl, or 4-(2,2-dicycloalkyl)[1,3]dioxalanyl;

b=0–6;

d=0–6; and

f=0–6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one —$(CR^3R^4)_fOR^{10}$ X, or —$(CR^3R^4)_fOR^{10}$ substituted cycloalkyl group, or a pharmaceutically acceptable salt thereof which is useful as an immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agent.

24 Claims, No Drawings

5,362,718

1

## RAPAMYCIN HYDROXYESTERS

### BACKGROUND OF THE INVENTION

This invention relates to hydroxyesters of rapamycin and a method for using them for inducing immunosuppression, and in the treatment of transplantation rejection, graft vs. host disease, autoimmune diseases, diseases of inflammation, adult T-cell leukemia/lymphoma, solid tumors, fungal infections, and hyperproliferative vascular disorders.

Rapamycin is a macrocyclic triene antibiotic produced by *Streptomyces hygroscopicus*, which was found to have antifungal activity, particularly against *Candida albicans*, both *in vitro* and *in vivo* [C. Vezina et al., J. Antibiot. 28, 721 (1975); S. N. Sehgal et al., J. Antibiot. 28, 727 (1975); H. A. Baker et al., J. Antibiot. 31,539 (1978); U.S. Pat. Nos. 3,929,992; and 3,993,749].

Rapamycin alone (U.S. Pat. No. 4,885,171) or in combination with picibanil (U.S. Pat. No. 4,401,653) has been shown to have antitumor activity. R. Martel et al. [Can. J. Physiol. Pharmacol. 55, 48 (1977)] disclosed that rapamycin is effective in the experimental allergic encephalomyelitis model, a model for multiple sclerosis; in the adjuvant arthritis model, a model for rheumatoid arthritis; and effectively inhibited the formation of IgE-like antibodies.

The immunosuppressive effects of rapamycin have been disclosed in FASEB 3, 3411 (1989). Cyclosporin A and FK-506, other macrocyclic molecules, also have been shown to be effective as immunosuppressive agents, therefore useful in preventing transplant rejection [FASEB 3, 3411 (1989); FASEB 3, 5256 (1989); R. Y. Calne et al., Lancet 1183 (1978); and U.S. Pat. No. 5,100,899].

Rapamycin has also been shown to be useful in preventing or treating systemic lupus erythematosus [U.S. Pat. No. 5,078,999], pulmonary inflammation [U.S. Pat. No. 5,080,899], insulin dependent diabetes mellitus [Fifth Int. Conf. Inflamm. Res. Assoc. 121 (Abstract), (1990)], smooth muscle cell proliferation and intimal thickening following vascular injury [Morris, R. J. Heart Lung Transplant 11 (pt. 2): 197 (1992)], adult T-cell leukemia/lymphoma [European Patent Application 525,960 AI], and ocular inflammation [European Patent Application 532,862 AI].

Mono- and diacylated derivatives of rapamycin (esterified at the 28 and 43 positions) have been shown to be useful as antifungal agents (U.S. Pat. No. 4,316,885) and used to make water soluble aminoacyl prodrugs of rapamycin (U.S. Pat. No. 4,650,803). Recently, the numbering convention for rapamycin has been changed; therefore according to Chemical Abstracts nomenclature, the esters described above would be at the 31- and 42- positions.

### DESCRIPTION OF THE INVENTION

This invention provides derivatives of rapamycin which are useful as immunosuppressive, antiinflammatory, antifungal, antiproliferative, and antitumor agents having the structure

2



wherein $R^1$ and $R^2$ are each, independently, hydrogen or —$CO(CR^3R^4)_b(CR^5R^6)_dCR^7R^8R^9$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)OR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of 3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_fOR^{10}$;

$R^7$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_fOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_fOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_fOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silyl, tri-(alkyl of 1–6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, or phenylalkyl of 7–10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxalanyl;

b=0–6;

d=0–6; and

f=0–6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one —$(CR^3R^4)_fOR^{10}$, or —$(CR^3R^4)_fOR^{10}$ substituted cycloalkyl of 3–8 carbon atoms group, or a pharmaceutically acceptable salt thereof.

BSC-SJA-1245

5,362,718

**3**

The pharmaceutically acceptable salts are those derived from such inorganic cations such as sodium, potassium, and the like; and organic bases such as: mono-, di-, and trialkyl amines of 1–6 carbon atoms, per alkyl group and mono-, di-, and trihydroxyalkyl amines of 1–6 carbon atoms per alkyl group, and the like.

The terms alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, and alkynyl of 2–7 carbon atoms, include both straight chain as well as branched carbon chains. As the compounds of this invention can contain more than one —$(CR^3R^4)_cOR^{10}$ group, $R^3$, $R^4$, $f$, and $R^{10}$ can be the same or different. Similarly, when other generic substituent descriptions are repeated in the same structure, they can be the same or different.

For a compound in which $R^1$ contains $R^8$ and $R^9$ taken together to form X, where X is 5-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, the alkyl group of X contains 1 carbon atom, and $d=0$, $R^1$ would have the following structure.



Similarly, for a compound in which $R^1$ contains $R^8$ and $R^9$ taken together to form X, where X is 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, the cycloalkyl group of X contains 6 carbon atom, and $d=0$, $R^1$ would have the following structure.



For compounds containing X, preferred compounds include those in which the alkyl group of X, if present, is methyl and the cycloalkyl group of X, if present, is cyclohexyl.

When $R^{10}$ is not hydrogen, alkyl, alkenyl, or alkynyl, it is intended that $R^{10}$ is a group that can serve as an alcohol protecting group. Thus, these groups are intermediates of free hydroxylated compounds, as well as being biologically active in their own right. $R^{10}$ covers tri-(alkyl of 1–6 carbon atoms)silyl, tri-(alkyl of 1–6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silylethoxymethyl, chloroethyl, and tetrahydropyranyl groups. Other alcohol protecting groups are known by one skilled in the art and are also considered part of this invention.

Of the compounds of this invention preferred members are those in which $R^2$ is hydrogen; those in which $R^2$ is hydrogen, $b=0$, and $d=0$; those in which $R^2$ is hydrogen, $b=0$, $d=0$, and $R^8$ and $R^9$ are each, independently hydrogen, alkyl, or —$(CR^3R^4)_fOR^{10}$, or are taken to form X.

Compounds of this invention having the ester group —$CO(CR^3R^4)_b(CR^5R^6)_c(CR^7R^8R^9)_e$ at the 42- or 31,42-positions can be prepared by acylation of rapamycin using protected hydroxy and polyhydroxy acids, alkoxy or polyalkoxy carboxylic acids that have been activated, followed by removal of the alcohol protecting

**4**

groups, if so desired. Several procedures for carboxylate activation are known in the art, but the preferred methods utilize carbodiimides, mixed anhydrides, or acid chlorides. For example, an appropriately substituted carboxylic acid can be activated as a mixed anhydride, with an acylating group such as 2,4,6-trichlorobenzoyl chloride. Treatment of rapamycin with the mixed anhydride under mildly basic condition provides the desired compounds. Alternatively, the acylation reaction can be accomplished with 1-(3-dimethylaminopropyl)-3-ethylcarbodiimide hydrochloride and dimethylaminopyridine. Mixtures of 42- and 31,42-esters can be separated by chromatography.

The 31-ester-42-hydroxy compounds of this invention can be prepared by protecting the 42-alcohol of rapamycin with a protecting group, such as with a tert-butyl dimethylsilyl group, followed by esterification of the 31-position by the procedures described above. The preparation of rapamycin 42-silyl ethers is described in U.S. Pat. No. B1 5,120,842, which is hereby incorporated by reference. Removal of the protecting group provides the 31-esterified compounds. In the case of the tert-butyl dimethylsilyl protecting group, deprotection can be accomplished under mildly acidic conditions, such as acetic acid/water/THF. The deprotection procedure is described in Example 15 of U.S. Pat. No. 5,118,678, which is hereby incorporated by reference.

Having the 31-position esterified and the 42-position deprotected, the 42-position can be esterified using a different acylating agent than was reacted with the 31-alcohol, to give compounds having different esters at the 31- and 42- positions. Alternatively, the 42-esterified compounds, prepared as described above, can be reacted with a different acylating agent to provide compounds having different esters at the 31-and 42-positions.

This invention also covers analogous hydroxy esters of other rapamycins such as, but not limited to, 29-demethoxyrapamycin, [U.S. Pat. No. 4,375,464, 32-demethoxyrapamycin under C.A. nomenclature]; rapamycin derivatives in which the double bonds in the 1-, 3-, and/or 5-positions have been reduced [U.S. Pat. No. 5,023,262]; 29-desmethylrapamycin [U.S. Pat. No. 5,093,339, 32-desmethylrapamycin under C.A. nomenclature]; 7,29-bisdesmethylrapamycin [U.S. Pat. No. 5,093,338, 7,32-desmethylrapamycin under C.A. nomenclature]; and 15-hydroxyrapamycin [U.S. Pat. No. 5,102,876]. The disclosures in the above cited U.S. Patents are hereby incorporated by reference.

Immunosuppressive activity for representative compounds of this invention was evaluated in an in vitro standard pharmacological test procedure to measure the inhibition of lymphocyte proliferation (LAF) and in two in vivo standard pharmacological test procedures. The pinch skin graft test procedure measures the immunosuppressive activity of the compound tested as well as the ability of the compound tested to inhibit or treat transplant rejection. The adjuvant arthritis standard pharmacological test procedure, which measures the ability of the compound tested to inhibit immune mediated inflammation. The adjuvant arthritis test procedure is a standard pharmacological test procedure for rheumatoid arthritis. The procedures for these standard pharmacological test procedures are provided below.

The comitogen-induced thymocyte proliferation procedure (LAF) was used as an in vitro measure of the immunosuppressive effects of representative com-

BSC-SJA-1246

5,362,718

5

pounds. Briefly, cells from the thymus of normal BALB/c mice are cultured for 72 hours with PHA and IL-1 and pulsed with tritiated thymidine during the last six hours. Cells are cultured with and without various concentrations of rapamycin, cyclosporin A, or test compound. Cells are harvested and incorporated radio-activity is determined. Inhibition of lymphoprolifera-tion is assessed as percent change in counts per minute from nondrug treated controls. For each compound evaluated, rapamycin was also evaluated for the pur-pose of comparison. An IC₅₀ was obtained for each test compound as well as for rapamycin. When evaluated as a comparator for the representative compounds of this invention, rapamycin had an IC₅₀ ranging from 0.6–1.5 nM. The results obtained are provided as an IC₅₀ and as the percent inhibition of T-cell proliferation at 0.1 μM. The results obtained for the representative compounds of this invention were also expressed as a ratio com-pared with rapamycin. A positive ratio indicates immu-nosuppressive activity. A ratio of greater than 1 indi-cates that the test compound inhibited thymocyte pro-liferation to a greater extent than rapamycin. Calcula-tion of the ratio is shown below.

$$\frac{IC_{50} \text{ of Rapamycin}}{IC_{50} \text{ of Test Compound}}$$

Representative compounds of this invention were also evaluated in an in vivo test procedure designed to determine the survival time of pinch skin graft from male BALB/c donors transplanted to male C₃H(H-2K) recipients. The method is adapted from Billingham R. E. and Medawar P. B., J. Exp. Biol. 28:385–402, (1951). Briefly, a pinch skin graft from the donor was grafted on the dorsum of the recipient as a allograft, and an isograft was used as control in the same region. The recipients were treated with either varying concentra-tions of test compounds intraperitoneally or orally. Rapamycin was used as a test control. Untreated recipi-ents serve as rejection control. The graft was monitored daily and observations were recorded until the graft became dry and formed a blackened scab. This was considered as the rejection day. The mean graft survival time (number of days±S.D.) of the drug treatment group was compared with the control group. The fol-lowing table shows the results that were obtained. Re-sults are expressed as the mean survival time in days. Untreated (control) pinch skin grafts are usually re-jected within 6–7 days. Compounds were tested using a dose of 4 mg/kg.

The adjuvant arthritis standard pharmacological test procedure measures the ability of test compounds to prevent immune mediated inflammation and inhibit or treat rheumatoid arthritis. The following briefly de-scribes the test procedure used. A group of rats (male inbread Wistar Lewis rats) are pre-treated with the compound to be tested (1 h prior to antigen) and then injected with Freud's Complete Adjuvant (FCA) in the right hind paw to induce arthritis. The rats are then orally dosed on a Monday, Wednesday, Friday sched-ule from day 0–14 for a total of 7 doses. Both hind paws are measured on days 16, 23, and 30. The difference in paw volume (mL) from day 16 to day 0 is determined and a percent change from control is obtained. The left hind paw (uninjected paw) inflammation is caused by T-cell mediated inflammation and is recorded in the above table (% change from control). The right hind paw inflammation, on the other hand, is caused by non-

6

specific inflammation. Compounds were tested at a dose of 5 mg/kg. The results are expressed as the percent change in the uninjected paw at day 16 versus control; the more negative the percent change, the more potent the compound. Rapamycin provided between −70% and −90% change versus control, indicating that rapa-mycin treated rats had between 70–90% less immune induced inflammation than control rats.

The results obtained in these standard pharmacologi-cal test procedures are provided following the proce-dure for making the specific compounds that were tested.

The results of these standard pharmacological test procedures demonstrate immunosuppressive activity both in vitro and in vivo for the compounds of this invention. The results obtained in the LAF test proce-dure indicates suppression of T-cell proliferation, thereby demonstrating the immunosuppressive activity of the compounds of this invention. Further demonstra-tion of the utility of the compounds of this invention as immunosuppressive agents was shown by the results obtained in the skin graft and adjuvant arthritis standard pharmacological test procedures. Additionally, the re-sults obtained in the skin graft test procedure further demonstrates the ability of the compounds of this inven-tion to treat or inhibit transplantation rejection. The results obtained in the adjuvant arthritis standard phar-macological test procedure further demonstrate the ability of the compounds of this invention to treat or inhibit rheumatoid arthritis.

Based on the results of these standard pharmacologi-cal test procedures, the compounds are useful in the treatment or inhibition of transplantation rejection such as kidney, heart, liver, lung, bone marrow, pancreas (islet cells), cornea, small bowel, and skin allografts, and heart valve xenografts; in the treatment or inhibition of autoimmune diseases such as lupus, rheumatoid arthri-tis, diabetes mellitus, myasthenia gravis, and multiple sclerosis; and diseases of inflammation such as psoriasis, dermatitis, eczema, seborrhea, inflammatory bowel disease, pulmonary inflammation (including asthma, chronic obstructive pulmonary disease, emphysema, acute respiratory distress syndrome, bronchitis, and the like), and eye uveitis.

Because of the activity profile obtained, the com-pounds of this invention also are considered to have antitumor, antifungal activities, and antiproliferative activities. The compounds of this invention therefore also useful in treating solid tumors, adult T-cell leuke-mia/lymphoma, fungal infections, and hyperprolifera-tive vascular diseases such as restenosis and atheroscl-osis. When used for restenosis, it is preferred that the compounds of this invention are used to treat restenosis that occurs following an angioplasty procedure. When used for this purpose, the compounds of this invention can be administered prior to the procedure, during the procedure, subsequent to the procedure, or any combi-nation of the above.

When administered for the treatment or inhibition of the above disease states, the compounds of this inven-tion can be administered to a mammal orally, parenter-ally, intranasally, intrabronchially, transdermally, topi-cally, intravaginally, or rectally.

It is contemplated that when the compounds of this invention are used as an immunosuppressive or antiin-flammatory agent, they can be administered in conjunc-tion with one or more other immunoregulatory agents.

BSC-SJA-1247

5,362,718

| 7 | 8 |

Such other immunoregulatory agents include, but are not limited to azathioprine, corticosteroids, such as prednisone and methylprednisolone, cyclophosphamide, rapamycin, cyclosporin A, FK-506, OKT-3, and ATG. By combining the compounds of this invention with such other drugs or agents for inducing immunosuppression or treating inflammatory conditions, the lesser amounts of each of the agents are required to achieve the desired effect. The basis for such combination therapy was established by Stepkowski whose results showed that the use of a combination of rapamycin and cyclosporin A at subtherapeutic doses significantly prolonged heart allograft survival time. [Transplantation Proc. 23: 507 (1991)].

The compounds of this invention can be formulated neat or with a pharmaceutical carrier to a mammal in need thereof. The pharmaceutical carrier may be solid or liquid. When formulated orally, it has been found that 0.01% Tween 80 in PHOSAL PG-50 (phospholipid concentrate with 1,2-propylene glycol, A. Nattermann & Cie. GmbH) provides an acceptable oral formulation.

A solid carrier can include one or more substances which may also act as flavoring agents, lubricants, solubilizers, suspending agents, fillers, glidants, compression aids, binders or tablet-disintegrating agents; it can also be an encapsulating material. In powders, the carrier is a finely divided solid which is in admixture with the finely divided active ingredient. In tablets, the active ingredient is mixed with a carrier having the necessary compression properties in suitable proportions and compacted in the shape and size desired. The powders and tablets preferably contain up to 99% of the active ingredient. Suitable solid carriers include, for example, calcium phosphate, magnesium stearate, talc, sugars, lactose, dextrin, starch, gelatin, cellulose, methyl cellulose, sodium carboxymethyl cellulose, polyvinylpyrrolidine, low melting waxes and ion exchange resins.

Liquid carriers are used in preparing solutions, suspensions, emulsions, syrups, elixirs and pressurized compositions. The active ingredient can be dissolved or suspended in a pharmaceutically acceptable liquid carrier such as water, an organic solvent, a mixture of both or pharmaceutically acceptable oils or fats. The liquid carrier can contain other suitable pharmaceutical additives such as solubilizers, emulsifiers, buffers, preservatives, sweeteners, flavoring agents, suspending agents, thickening agents, colors, viscosity regulators, stabilizers or osmo-regulators. Suitable examples of liquid carriers for oral and parenteral administration include water (partially containing additives as above, e.g. cellulose derivatives, preferably sodium carboxymethyl cellulose solution), alcohols (including monohydric alcohols and polyhydric alcohols, e.g. glycols) and their derivatives, and oils (e.g. fractionated coconut oil and arachis oil). For parenteral administration, the carrier can also be an oily ester such as ethyl oleate and isopropyl myristate. Sterile liquid carriers are useful in sterile liquid form compositions for parenteral administration. The liquid carrier for pressurized compositions can be halogenated hydrocarbon or other pharmaceutically acceptable propellant.

Liquid pharmaceutical compositions which are sterile solutions or suspensions can be utilized by, for example, intramuscular, intraperitoneal or subcutaneous injection. Sterile solutions can also be administered intravenously. The compound can also be administered orally either in liquid or solid composition form.

The compounds of this invention may be administered rectally in the form of a conventional suppository. For administration by intranasal or intrabronchial inhalation or insufflation, the compounds of this invention may be formulated into an aqueous or partially aqueous solution, which can then be utilized in the form of an aerosol. The compounds of this invention may also be administered transdermally through the use of a transdermal patch containing the active compound and a carrier that is inert to the active compound, is non toxic to the skin, and allows delivery of the agent for systemic absorption into the blood stream via the skin. The carrier may take any number of forms such as creams and ointments, pastes, gels, and occlusive devices. The creams and ointments may be viscous liquid or semisolid emulsions of either the oil-in-water or water-in-oil type. Pastes comprised of absorptive powders dispersed in petroleum or hydrophilic petroleum containing the active ingredient may also be suitable. A variety of occlusive devices may be used to release the active ingredient into the blood stream such as a semipermiable membrane covering a reservoir containing the active ingredient with or without a carrier, or a matrix containing the active ingredient. Other occlusive devices are known in the literature.

In addition, the compounds of this invention may be employed as a solution, cream, or lotion by formulation with pharmaceutically acceptable vehicles containing 0.1–5 percent, preferably 2%, of active compound which may be administered to a fungally affected area.

The dosage requirements vary with the particular compositions employed, the route of administration, the severity of the symptoms presented and the particular subject being treated. Based on the results obtained in the standard pharmacological test procedures, projected daily dosages of active compound would be 0.1 μg/kg–100 mg/kg, preferably between 0.001–25 mg/kg, and more preferably between 0.01–5 mg/kg. Treatment will generally be initiated with small dosages less than the optimum dose of the compound. Thereafter the dosage is increased until the optimum effect under the circumstances is reached; precise dosages for oral, parenteral, nasal, or intrabronchial administration will be determined by the administering physician based on experience with the individual subject treated. Preferably, the pharmaceutical composition is in unit dosage form, e.g. as tablets or capsules. In such form, the composition is sub-divided in unit dose containing appropriate quantities of the active ingredient; the unit dosage forms can be packaged compositions, for example, packeted powders, vials, ampoules, prefilled syringes or sachets containing liquids. The unit dosage form can be, for example, a capsule or tablet itself, or it can be the appropriate number of any such compositions in package form.

The following examples illustrate the preparation and biological activities of representative compounds of this invention.

### EXAMPLE 1

Rapamycin 42-ester with
(tetrahydropyran-2-yloxy)acetic acid

2,4,6-Trichlorobenzoyl chloride (0.55 mL, 3.51 mmol) was added via syringe to a solution of the glycolic acid THP-ether (0.562 g, 3.51 mmol) and triethylamine (0.49 mL, 3.51 mmol) in 10 mL THF at 0 ° C. under nitrogen. The mixture was stirred for 4 h at room

BSC-SJA-1248

5,362,718

9 10

temperature, and a white precipitate formed. The white precipitate was removed by vacuum filtration and the filtrate was concentrated with a stream of nitrogen and warm water bath. The residue was dissolved in 10 mL benzene, then rapamycin (2.92 g, 3.19 mmol) and DMAP (0.429 g, 3.51 mmol) were added and the mixture was stirred overnight at room temperature. The mixture was diluted with EtOAc, washed with acid 1N HCl (aq), saturated NaHCO₃ (aq) and brine, dried over MgSO₄, filtered and concentrated to an oily yellow solid. Flash chromatography (2X with 65% EtOAc-hexane) afforded the title compound (1.114 g, 33%) as a white solid.

(−)FAB-MS m/z 1055.5 (M−), 590.3 (southern fragment), 463.2 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.60 (m, 1 H, C(42)H), 4.56 (m, 1H), 4.14 (s, 2H), 3.73 (m, 1H), 3.42 (m, 1H). ¹³C NMR (100.6 MHz, d-6 DMSO) δ 169.2, 97.4, 63.5, 61.2, 29.7, 24.8. 18.8.

## EXAMPLE 2

### Rapamycin 42-ester with hydroxyacetic acid

p-Toluenesulfonic acid (10 mg) was added to a solution of the product of Example 1 (306 mg, 0.29 mmol) in 10 mL CH₃OH at 0° C. The solution was stirred 2 h at room temperature, then quenched with saturated NaHCO₃ solution. The aqueous phase was extracted 3X with EtOAc and the combined organic phases were washed with brine, dried over MgSO₄, filtered and concentrated to a white solid. Purification by flash chromatography (2X with EtOAc) afforded the title compound (145 mg, 51%) as a white solid.

(−) FAB-MS m/z 971.3 (M−), 590 (southern fragment), 379.1 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.60 (m, 1H, C(42)H), 3.98 (s, 2H). ¹³C NMR (100.6 MHz, d-6 DMSO) δ 172.1, 59.7.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 11.90 nM.
LAF ratio: 0.83
Percent change in adjuvant arthritis versus control: −88%

## EXAMPLE 3

### Rapamycin 42-ester with 2,2-dimethyl-3-(tetrahydropyran-2-yloxy)propionic acid

To a solution of the 2,2-dimethyl-3-hydroxypropionic acid THP-ether (0.319 g, 1.58 mmol) and triethylamine (0.22 mL, 1.58 mmol) in 5 mL dry THF at 0° C. under nitrogen was added 2,4,6-trichlorobenzoyl chloride (0.25 mL, 1.58 mmol) dropwise via syringe. The mixture was stirred 4.5 h at room temperature. The white precipitate was removed by vacuum filtration and the filtrate was concentrated with a stream of nitrogen and a warm water bath. The residue was dissolved in 5 mL benzene, then rapamycin (1.31 g, 1.43 mmol) and DMAP (0.193 g, 1.58 mmol) were added. The mixture was stirred overnight at room temperature, diluted with EtOAc, washed with acid 1N HCl (aq), saturated NaHCO₃ (aq), H₂O and brine, dried over MgSO₄, filtered and concentrated to a yellow oily solid. Flash chromatography (1X with 60% EtOAc-hexane, 1X with 55% EtOAc-hexane) afforded the title compound (0.356 g, 23%), as a white solid.

(−)FAB-MS m/z 1097.7 (M−), 590.4 (southern fragment), 505.3 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.55 (m, 1H, C(42)H), 4.55 (m, 1H), 3.69

(m, 1H), 3.60 (m, 2H), 3.42 (m, 1H), 1.13 (s, 3H), 1.11 (s, 3H). ¹³C NMR (100.6 MHz, d-6 DMSO) δ 175.0, 98.0, 73.8, 60.7, 42.6, 30.0, 24.9, 22.0, 21.6, 18.7.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 7.10 nM
LAF ratio: 0.34

## EXAMPLE 4

### Rapamycin 42-ester with 3-hydroxy-2,2-dimethylpropionic acid

p-Toluenesulfonic acid (10 mg) was added to a solution of the product of Example 3 (250 mg, 0.23 mmol) in 10 mL CH₃OH at 0° C. The solution was stirred 2 hours at room temperature, then quenched with saturated NaHCO₃ solution. The aqueous phase was extracted 3X with EtOAc and the combined organic phases were washed with brine, dried over MgSO₄, filtered and concentrated to a white solid. Purification by flash chromatography (2X with 75% EtOAc-hexane) afforded the title compound (103 mg, 45%) as a white solid.

(−) FAB-MS m/z 1013.3 (M³¹), 590.2 (southern fragment), 421.1 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.48 (m, 1H, C(42)H), 3.39 (d, 2H), 106 (s, 6H). ¹³C NMR (100.5 MHz, d-6 DMSO) δ 175.5, 68.0, 44.1, 21.7.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 0.80 nM
LAF ratio: 1.25
Skin graft survival time: 10.7±0.5 days

## EXAMPLES 5 AND 6

### Rapamycin 42-ester with 2,2-dimethyl[1,3]dioxalane-4-carboxylic acid (Ex. 5) Rapamycin 31,42-diester with 2,2-dimethyl[1,3]dioxalane-4-carboxylic acid (EX. 6)

2,4,6-Trichlorobenzoyl chloride (0.56 mL, 3.61 mmol) was added via syringe to a solution of the 2,3-dihydroxypropionic acid isopropylidene ketal (0.527 g, 3.61 mmol) and triethylamine (0.50 mL, 3.61 mmol) in 10 mL THF at 0° C. under nitrogen. The mixture was stirred 4 h at room temperature. The white precipitate was removed by vacuum filtration and the filtrate was concentrated with a stream of nitrogen and warm water bath. The residue was dissolved in 15 mL benzene and rapamycin (3.00 g, 3.28 mmol), then DMAP (0.441 g, 3.61 mmol) were added and the mixture was stirred overnight at room temperature. The mixture was diluted with EtOAc, washed with acid 1N HCl (aq), saturated NaHCO₃ (aq) and brine, dried over MgSO₄, filtered and concentrated to a yellow foam. Flash chromatography on silica gel (gradient elution: 50-60-7-5-100% EtOAc-hexane, 4X with 65% EtOAc-hexane) afforded the title compounds. The less polar 31,42-diester (0.415 g) eluted first and the more polar 42-monoester (0.601 g, 16%) eluted second, and were isolated as white solids.

## EXAMPLE 5

(−)FAB-MS m/z 1041.4 (M−), 590.3 (southern fragment), 449.2 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.6 (m, 1H, C(42)H), 4.6 (m, 1H), 4.20 (dd, 1H), 3.96 (m, 1H), 1.36 (s, 3H), 1.30 (s, 3H). ¹³C

BSC-SJA-1249

11

NMR (100.6 MHz, d-6 DMSO) δ 170.5, 110.2, 73.4, 66.6, 25.7, 25.4.

## EXAMPLE 6

(−)FAB-MS m/z 1169.6 (M−). [1]H NMR (400 MHz, d-6 DMSO) δ 5.3 (m, 1H, C(31)H), 4.6 (m, 1H, C(42)H), 4.6 (m, 2H), 4.19 (t, 1H), 4.13 (t, 1H), 3.9 (m, 2H), 1.36 (s, 3H), 1.33 (s, 3H), 1.30 (s, 3H), 1.28 (s, 3H). [13]C NMR (100.6 MHz, d-6 DMSO) δ 170.5, 169.2, 110.3, 110.2, 73.4, 66.6, 66.5, 25.8, 25.7, 25.4, 25.1.

Results obtained in standard pharmacological test procedures:

### EXAMPLE 5

LAF IC₅₀: 1.20 nM
LAF ratio: 0.74

LAF $IC_{50}$: 1.20 nM
LAF ratio: 0.74

### EXAMPLE 6

LAF $IC_{50}$: 1.30 nM
LAF ratio: 0.5

## EXAMPLE 7

### Rapamycin 42-ester with 2,3-dihydroxypropionic acid

A solution of the product of Example 5 (351 mg, 0.34 mmol) in 10 mL THF and 10 mL 1N HCl was stirred at room temperature for 6 h. The mixture was diluted with EtOAc, washed with saturated NaHCO₃ solution and brine, dried over MgSO₄, filtered and concentrated to an oil. Flash chromatography (1X with EtOAc, 1X with 10% MeOH-CH₂Cl₂, 1X with 5% MeOH-EtOAc) afforded the title compound (78 mg, 23%) as a white solid.

(−)FAB-MS m/z 1001.2 (M−), 590.2 (southern fragment), 409.1 (northern fragment). [1]H NMR (400 MHz, d-6 DMSO) δ 5 4.5 (m, 1H, C(42)H), 3.60 (m, 1H), 3.45 (m, 2H).

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 1.4 nM
LAF ratio: 0.40

## EXAMPLE 8

### Rapamycin 42-ester with 2,2-dimethyl[1.3]dioxane-5-carboxylic acid

2,4,6-Trichlorobenzoyl chloride (0.98 mL, 6.27 mmol) was added via syringe to a solution of the 2-(hydroxymethyl)-3-hydroxypropionic acid isopropylidene ketal (1.000 g, 6.24 mmol) and triethylamine (0.90 mL, 6.46 mmol) in 20 mL THF at 0° C. under nitrogen. The mixture was stirred for 4 h at room temperature, and a white precipitate formed. The white precipitate was removed by vacuum filtration and the filtrate was concentrated with a stream of nitrogen and warm water bath. The residue was dissolved in 20 mL benzene, then rapamycin (5.70 g, 6.24 mmol) and DMAP (0.762 g, 6.24 mmol) were added and the mixture was stirred overnight at room temperature. The mixture was diluted with EtOAc, washed with H₂O and brine, dried over MgSO₄, filtered and concentrated to a yellow solid. Flash chromatography (75% EtOAc-hexane) afforded the title compound (4.17 g, 63%) as a white solid.

(−)FAB-MS m/z 1055.8 (M−), 590.5 (southern fragment), 463.4 (northern fragment). [1]H NMR (400 MHz, d-6 DMSO) δ 4.55 (m, 1H, C(42)H), 3.95 (m, 4H), 1.30 (s, 6H). [13]C NMR (100.6 MHz, d-6 DMSO) δ 170.1, 97.4, 59.5, 24.8, 22.5.

---

12

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 0.76 nM
LAF ratio: 0.45

## EXAMPLE 9

### Rapamycin 42-ester with 3-hydroxy-2-hydroxymethylpropionic acid

A solution of the product of Example 8 (3.30 g, 3.12 mmol) in 50 mL THF and 25 mL 1N HCl was stirred 2 h at room temperature. The solution was diluted with saturated NaHCO₃ solution and extracted with EtOAc (3X). The combined organic phases were washed with saturated NaCl (aq), dried over MgSO₄, filtered and concentrated to a yellow foam. Purification by flash chromatography (1X with EtOAc; 2X with 5% EtOH-EtOAc) afforded the title compound (1.68 g, 53 %) as a white solid.

(−)FAB-MS m/z 1015.5 (M−), 590.3 (southern fragment), 423.3 (northern fragment). [1]H NMR (400 MHz, d-6 DMSO) δ 4.6 (br s, 2H), 4.55 (m, 1H, C(42)H), 3.55 (m, 4H), 2.57–2.53 (m, 1H). [13]C NMR (100.6 MHz, d-6 DMSO) δ 172.2, 59.3, 51.5.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 0.84 nM
LAF ratio: 0.57

## EXAMPLE 10

### Rapamycin 42-ester with 2,2,5-trimethyl[1.3]dioxane-5-carboxylic acid

To a solution of the 2,2-bis(hydroxymethyl)propionic acid isopropylidene ketal (1.041 g, 5.98 mmol) (prepared according to the procedure of Bruice, J. Am. Chem. Soc. 89:3568 (1967)) and triethylamine (0.83 mL, 5.98 mmol) in 20 mL anhydrous THF at 0° C. under nitrogen was added 2,4,6-trichlorobenzoyl chloride (0.93 mL, 5.98 mmol) and the resultant white suspension was stirred 5 h at room temperature. The precipitate was removed by vacuum filtration, rinsing the flask and filter cake with an additional 10 mL dry THF. The filtrate was concentrated by rotary evaporation to a white solid. The residue was dissolved in 20 mL dry benzene, then rapamycin (5.47 g, 5.98 mmol) and DMAP (0.731 g, 5.98 retool) were added. After stirring overnight at room temperature, the mixture was diluted with EtOAc, washed with H₂O and saturated NaCl (aq), dried over MgSO₄, filtered and evaporated to a yellow oil. Flash chromatography (5X with 60% EtOAc-hexane) afforded the title compound (2.2 g, 34%) as a white solid.

(−)FAB-MS m/z 1069.5 (M−), 590.3 (southern fragment), 477.2 (northern fragment). [1]H NMR (400 MHz, d-6 DMSO) δ 4.57 (m, 1H, C(42)H), 4.02 (d, 2H), 3.60 (d, 2H), 1.34 (s, 3H), 1.24 (s, 3H), 1.06 (s, 3H). [13]C NMR (100.6 MHz, d-6 DMSO) δ 173.2, 99.0, 65.0, 22.2, 18.1.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 4.90 nM
LAF ratio: 0.41

Skin graft survival time: 11.0±1.3 days

BSC-SJA-1250

13

5,362,718

14

## EXAMPLE 11

### Rapamycin 42-ester with 2,2-bis-(hydroxymethyl)propionic acid

A solution of the product of Example 10 (2.8 g, 2.65 mmol) in 50 mL THF and 25 mL 1N HCl was stirred at room temperature for 4 h. The mixture was diluted with water and extracted three times with EtOAc. The combined organic phases were washed with saturated NaHCO₃ solution, saturated NaCl solution, dried over MgSO₄, filtered and evaporated to a yellow oily solid. Purification by flash chromatography (3X with EtOAc) afforded the title compound (1.6 g, 59%).

(−)FAB-MS m/z 1029.6 (M⁻), 590.4 (southern fragment), 437.3 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.5 (m, 1H, C(42)H), 3.45 (s, 4H), 1.04 (s, 3H). ¹³C NMR (100.6 MHz, d-6 DMSO) δ 174.2, 63.7, 63.6, 49.9, 16.8.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 0.80 and 1.80 nM

LAF ratio: 1.00 and 0.44

Skin graft survival time: 11.4±1.5 and 12.0±1.1 days

Percent change in adjuvant arthritis versus control: −88%

## EXAMPLE 12

### Rapamycin 42-ester with 2,2-dimethyl-5-(2-trimethylsilanylethoxymethyl)[1,3]dioxane-5-carboxylic acid

2,4,6-Trichlorobenzoyl chloride (0.14 mL, 0.86 mmol) was added via syringe to a solution of the 2,2-bis(hydroxymethyl)-2-(2-trimethylsilylethoxy)propionic acid isopropylidene ketal (0.250 g, 0.86 mmol) and triethylamine (0.12 mL, 0.86 mmol) in 2 mL THF at 0° C. under nitrogen. The mixture was stirred for 4 h at room temperature, and a white precipitate formed. The white precipitate was removed by vacuum filtration and the filtrate was concentrated with a stream of nitrogen and warm water bath. The residue was dissolved in 2 mL benzene, then rapamycin (0.786 g, 0.86 mmol) and DMAP (0.105 g, 0.86 mmol) were added and the mixture was stirred overnight at room temperature. The mixture was diluted with EtOAc, washed with H₂O and brine, dried over MgSO₄, filtered and concentrated to a yellow solid. Flash chromatography (gradient elution: 40–60–80–100% EtOAc-hexane) afforded the title compound (0.559 g, 54%) as a white solid.

(−)FAB-MS m/z 1185.2 (M⁻), 590.1 (southern fragment), 593 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.55 (m, 1H, C(42)H), 3.73 (m, 4H), 3.57 (s, 2 H), 3.43 (t, 2H), 1.29 (s, 6H), 0.79 (t, 2H), −0.04 (s, 9H). ¹³C NMR (100.6 MHz, d-6 DMSO) δ 171.1, 97.7, 70.2, 68.1, 61.3, 46.0, 24.6, 22.1, 14.6, −1.3.

Results obtained in standard pharmacological test procedures:

LAF IC₅₀: 7.20 nM

LAF ratio: 0.05

## EXAMPLES 13 and 14

### Rapamycin 42-ester with 3-methyl-1,5-dioxa-spiro[5.5]undecane 3-carboxylic acid (Ex. 13)

### Rapamycin 31,42-diester with 3-methyl-1,5-dioxa-spiro[5.5]undecane 3-carboxylic acid (Ex. 14)

2,4,6-Trichlorobenzoyl chloride (0.16 mL, 1.0 mmol) was added via syringe to a solution of the 2,3-dihydroxy-

ypropionic acid cyclohexylidene ketal (0.214 g, 1.0 mmol) and triethylamine (0.14 mL, 1.0 mmol) in 2.5 mL THF at 0° C. under nitrogen. The mixture was stirred 4 h at room temperature. The white precipitate was removed by vacuum filtration and the filtrate was concentrated with a stream of nitrogen and warm water bath. The residue was dissolved in 3 mL benzene and rapamycin (0.457 g, 0.5 mmol), then DMAP (0.061 g, 0.5 mmol) were added and the mixture was stirred overnight at room temperature. The mixture was diluted with EtOAc, washed with cold 1N HCl (aq), saturated NaHCO₃ (aq) and brine, dried over MgSO₄, filtered and concentrated to a yellow foam. Flash chromatography on silica gel (45–50% EtOAc-hexane) afforded the title compounds. The 31,42-diester (0.168 g, 26% ) eluted first and the more polar 42-monoester (0.301 g, 52%) eluted second, and the products were isolated as white solids.

## EXAMPLE 13

(−)FAB-MS m/z 1109.5 (M⁻), 590.3 (southern fragment), 517.3 (northern fragment). ¹H NMR (400 MHz, d-6 DMSO) δ 4.55 (m, 1H, C(42)H), 3.61 (t, 4H), 1.04 (s, 3H). ¹³C NMR (100.6 MHz, d-6 DMSO) δ 173.3, 97.2, 64.2.

## EXAMPLE 14

(−)FAB-MS m/z 1305.6 (M⁻). ¹H NMR (400 MHz, d-6 DMSO) δ 5.25 (m, 1H, C(31)H), 4.55 (m, 1H, C(42)H), 3.64–3.54 (m, 8H), 1.03 (s, 3H), 0.97 (s, 3H). ¹³C NMR (100.6 MHz, d-6 DMSO) δ 173.3, 172.1, 97.3, 97.2, 64.3, 64.2, 63.9.

Results obtained in standard pharmacological test procedures:

## EXAMPLE 13

LAF IC₅₀: 0.6 nM

LAF ratio: 2.00

## EXAMPLE 14

LAF: inhibited T-cell proliferation by 43% at 0.1 μM

What is claimed is:

1. A compound of the structure



wherein $R^1$ and $R^2$ are each, independently, hydrogen or —CO(CR³R⁴)ₓ(CR⁵R⁶)ᵧCR⁷R⁸R⁹;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms,

BSC-SJA-1251

15
5,362,718
16

alkynyl of 2–7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of 3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_bOR^{10}$;

$R^7$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or—$CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_bOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms alkynyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silyl, tri-(alkyl of 1–6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, or phenylalkyl of 7–10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxalanyl;

b=0–6;

d=0–6 ; and

f=0–6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one —$(CR^3R^4)_bOR^{10}$, X, or —$(CR^3R^4)_fOR^{10}$ substituted cycloalkyl of 3–8 carbon atoms group, or a pharmaceutically acceptable salt thereof.

2. The compound of claim 1, wherein $R^2$ is hydrogen or a pharmaceutically acceptable salt thereof.

3. The compound of claim 2, wherein b=0 and d=0 or a pharmaceutically acceptable salt thereof.

4. The compound of claim 3, wherein $R^5$ and $R^9$ are each, independently hydrogen, alkyl, or —$(CR^3R^4)_bOR^{10}$, or are taken together to form X or a pharmaceutically acceptable salt thereof.

5. The compound of claim 1 which is rapamycin 42-ester with (tetrahydropyran-2-yloxy)acetic acid or a pharmaceutically acceptable salt thereof.

6. The compound of claim 1 which is rapamycin 42-ester with hydroxyacetic acid or a pharmaceutically acceptable salt thereof.

7. The compound of claim 1 which is rapamycin 42-ester with 2,2-dimethyl-3-(tetrahydropyran-2-yloxy)propionic acid or a pharmaceutically acceptable salt thereof.

8. The compound of claim 1 which is rapamycin 42-ester with 3-hydroxy-2,2-dimethylpropionic acid or a pharmaceutically acceptable salt thereof.

9. The compound of claim 1 which is rapamycin 42-ester with 2,2-dimethyl[1,3]dioxalane-4-carboxylic acid or a pharmaceutically acceptable salt thereof.

10. The compound of claim 1 which is rapamycin 31,42-diester with 2,2-dimethyl[1,3]dioxalane-4-carboxylic acid or a pharmaceutically acceptable salt thereof.

11. The compound of claim 1 which is rapamycin 42-ester with 2,3-dihydroxypropionic acid or a pharmaceutically acceptable salt thereof.

12. The compound of claim 1 which is rapamycin 42-ester with 2,2-dimethyl[1,3]dioxane-5-carboxylic acid or a pharmaceutically acceptable salt thereof.

13. The compound of claim 1 which is rapamycin 42-ester with 3-hydroxy-2-hydroxymethylpropionic acid or a pharmaceutically acceptable salt thereof.

14. The compound of claim 1 which is rapamycin 42-ester with 2,2,5-trimethyl[1,3]dioxane-5-carboxylic acid or a pharmaceutically acceptable salt thereof.

15. The compound of claim 1 which is rapamycin 42-ester with 2,2-bis(hydroxymethyl)propionic acid or a pharmaceutically acceptable salt thereof.

16. The compound of claim 1 which is rapamycin 42-ester with 2,2-dimethyl-5-(2-trimethylsilanylethoxymethyl)[1,3]dioxane-5-carboxylic acid or a pharmaceutically acceptable salt thereof.

17. The compound of claim 1 which is rapamycin 42-ester with 3-methyl-1,5-dioxa-spiro[5.5]undecane 3-carboxylic acid or a pharmaceutically acceptable salt thereof.

18. The compound of claim 1 which is rapamycin 31,42-diester with 3-methyl-1,5-dioxa-spiro[5.5]undecane 3-carboxylic acid or a pharmaceutically acceptable salt thereof.

19. A method of treating transplantation rejection or graft vs. host disease in a mammal in need thereof, which comprises administering to said mammal an antirejection effective amount of a compound of the structure



wherein $R^1$ and $R^2$ are each, independently, hydrogen or —$CO(CR^3R^4)_f(CR^5R^6)_cCR^7R^8R^9$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and R6 are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of

5,362,718

**17**

3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_rOR^{10}$;

$R^7$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_rOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_rOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_rOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silyl, tri-(alkyl of 1–6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, or phenylalkyl of 7–10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxalanyl;

b=0–6;
d=0–6 ; and
f=0–6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one —$(CR^3R^4)_rOR^{10}$, X, or —$(CR^3R^4)_rOR^{10}$ substituted cycloalkyl of 3–8 carbon atoms group, or a pharmaceutically acceptable salt thereof.

20. A method of treating a fungal infection in a mammal in need thereof, which comprises administering to said mammal an antifungal effective amount of a compound of the structure



wherein $R^1$ and $R^2$ are each, independently, hydrogen or —$CO(CR^5R^6)_g(CR^5R^6)_nCR^7R^8R^9$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms,

**18**

alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_rOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of 3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_rOR^{10}$;

$R^7$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_rOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, —$(CR^3R^4)_rOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3–8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_rOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silyl, tri-(alkyl of 1–6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2–7 carbon atoms, tri-(alkyl of 1–6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms, alkynyl of 2–7 carbon atoms, or phenylalkyl of 7–10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1–6 carbon atoms))[1,3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3–8 carbon atoms))[1,3]dioxalanyl;

b=0–6;
d=0–6; and
f=0–6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one —$(CR^3R^4)_rOR^{10}$, X, or —$(CR^3R^4)_rOR^{10}$ substituted cycloalkyl of 3–8 carbon atoms group, or a pharmaceutically acceptable salt thereof.

21. A method of treating rheumatoid arthritis in a mammal in need thereof, which comprises administering to said mammal an antiarthritis effective amount of a compound of the structure



wherein $R^1$ and $R^2$ are each, independently, hydrogen or —$CO(CR^5R^6)_g(CR^5R^6)_nCR^7R^8R^9$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1–6 carbon atoms, alkenyl of 2–7 carbon atoms,

BSC-SJA-1253

5,362,718

**19**

alkynyl of 2-7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_bOR^{10}$;

$R^7$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_bOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silyl, tri-(alkyl of 1-6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, or phenylalkyl of 7-10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms))[3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxalanyl;

b=0-6;

d=0-6; and

f=0-6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one —$(CR^3R^4)_bOR^{10}$, X, or —$(CR^3R^4)_bOR^{10}$ substituted cycloalkyl of 3-8 carbon atoms group, or a pharmaceutically acceptable salt thereof.

22. A method of treating restenosis in a mammal in need thereof, which comprises administering to said mammal an antiproliferative effective amount of a compound of the structure



**20**

wherein $R^1$ and $R^2$ are each, independently, hydrogen or —$CO((CR^3R^4)_fCR^5R^6)_dCR^7R^8R^9$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_bOR^{10}$;

$R^7$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, —$(CR^3R^4)_bOR^{10}$, —$CF_3$, —F, or —$CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with —$(CR^3R^4)_bOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silyl, tri-(alkyl of 1-6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, or phenylalkyl of 7-10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxalanyl;

b=0-6;

d=0-6; and

f=0-6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one —$(CR^3R^4)_bOR^{10}$, X, or —$(CR^3R^4)_bOR^{10}$ substituted cycloalkyl of 3-8 carbon atoms group, or a pharmaceutically acceptable salt thereof.

23. A method of treating pulmonary inflammation in a mammal in need thereof, which comprises administering to said mammal an antiinflammatory effective amount of a compound of the structure

5,362,718

**21**



**22**

24. A pharmaceutical composition which comprises a compound of the structure



wherein $R^1$ and $R^3$ are each, independently, hydrogen or $-CO(CR^3R^4)_b(CR^5R^6)_dCR^7R^8R^9$;

$R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, $-(CR^3R^4)_fOR^{10}$, $-CF_3$, —F, or $-CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with $-(CR^3R^4)_fOR^{10}$;

$R^7$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, $-(CR^3R^4)_fOR^{10}$, $-CF_3$, —F, or $-CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, $-(CR^3R^4)_fOR^{10}$, $-CF_3$, —F, or $-CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with $-(CR^3R^4)_fOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silyl, tri-(alkyl of 1-6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, or phenylalkyl of 7-10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1-6 carbon atoms)[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms)[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxalanyl;

b=0-6;

d=0-6; and

f=0-6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one $-(CR^3R^4)_fOR^{10}$, X, or $-(CR^3R^4)_fOR^{10}$ substituted cycloalkyl of 3-8 carbon atoms group, or a pharmaceutically acceptable salt thereof.

wherein $R^1$ and $R^2$ are each, independently, hydrogen or $-CO(CR^3R^4)_b(CR^5R^6)_dCR^7R^8R^9$; $R^3$ and $R^4$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, trifluoromethyl, or —F;

$R^5$ and $R^6$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, $-(CR^3R^4)_fOR^{10}$, $-CF_3$, —F, or $-CO_2R^{11}$, or $R^5$ and $R^6$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with $-(CR^3R^4)_fOR^{10}$;

$R^7$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, $-(CR^3R^4)_fOR^{10}$, $-CF_3$, —F, or $-CO_2R^{11}$;

$R^8$ and $R^9$ are each, independently, hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, $-(CR^3R^4)_fOR^{10}$, $-CF_3$—F, or $-CO_2R^{11}$, or $R^8$ and $R^9$ may be taken together to form X or a cycloalkyl ring of 3-8 carbon atoms that is optionally mono-, di-, or tri-substituted with $-(CR^3R^4)_fOR^{10}$;

$R^{10}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silyl, tri-(alkyl of 1-6 carbon atoms)silylethyl, triphenylmethyl, benzyl, alkoxymethyl of 2-7 carbon atoms, tri-(alkyl of 1-6 carbon atoms)silylethoxymethyl, chloroethyl, or tetrahydropyranyl;

$R^{11}$ is hydrogen, alkyl of 1-6 carbon atoms, alkenyl of 2-7 carbon atoms, alkynyl of 2-7 carbon atoms, or phenylalkyl of 7-10 carbon atoms;

X is 5-(2,2-di-(alkyl of 1-6 carbon atoms)[1,3]dioxanyl, 5-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxanyl, 4-(2,2-di-(alkyl of 1-6 carbon atoms))[1,3]dioxalanyl, or 4-(2,2-di-(cycloalkyl of 3-8 carbon atoms))[1,3]dioxalanyl;

b=0-6;

d=0-6; and

f=0-6

with the proviso that $R^1$ and $R^2$ are both not hydrogen and further provided that either $R^1$ or $R^2$ contains at least one $-(CR^3R^4)_fOR^{10}$, X, or $-(CR^3R^4)_fOR^{10}$ substituted cycloalkyl of 3-8 carbon atoms group, or a pharmaceutically acceptable salt thereof, and a pharmaceutical carrier.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.    : 5,362,718

DATED         : November 8, 1994

INVENTORS     : Jerauld S. Skotnicki, Christina L. Leone, Guy A. Schiehser

It is certified that errors appear in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Page 2 of the Abstract, first column, and in the Patent column 2, lines 1-19; column 14, lines 45-64; column 16, lines 38-57; column 17, lines 41-60; column 18, lines 45-64; column 19, lines 48-67; column 21, lines 1-19; and column 22, lines 3-22, please delete the structure and insert therefor:



Signed and Sealed this

Twelfth Day of August, 1997

Attest:

BRUCE LEHMAN

Attesting Officer          Commissioner of Patents and Trademarks

BSC-SJA-1256

# EXHIBIT 65

*Inter Partes* Reexamination No. 95/001,097
U.S. Patent No. 7,223,286
Attorney Docket No. CRDS-0108

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Inter Partes Reexamination of
U.S. Patent No. 7,223,286

Examiner: Cary E. O'Connor

Control No.: 95/001,097

Art Unit: 3993

Filed: October 24, 2008

Confirmation No.: 8894

For: Local Delivery Of Rapamycin For Treatment Of Proliferative Sequelae
Associated With PTCA Procedures, Including Delivery Using A Modified
Stent

Mail Stop *Inter Partes* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## PATENT OWNER'S RESPONSE PURSUANT TO 37 C.F.R. §1.945

Patent Owner submits this Response to the Office Action dated January 30, 2009. The
response is timely filed pursuant to the Decision Granting Petition for Extension of Time (37
C.F.R. § 1.956) dated March 20, 2009, which set an extended deadline of May 30, 2009 for
responding to the Action. The Response, exclusive of amendments, appendices and reference
materials, is within the limit of 283 pages established in the Decision dated May 18, 2009
Granting-In-Part Patent Owner's Petition For Increase of Page Limit.

Reconsideration is respectfully requested for the reasons set forth in the remarks and in
view of the amendments to the claims.

The Director is hereby authorized to charge any fees required by this paper to Deposit
Account 23-3050, as well as any and all other fees that have been or may be required from Patent
Owner.

Amendments to the Claims are set forth in Appendix A to this paper.

A complete Listing of the Claims is provided in **Appendix B** to this paper.

**Remarks** begin on page 2 of this paper.

BSC-SJA-1257

*Inter Partes* Reexamination No. 95/001,097
U.S. Patent No. 7,223,286
Attorney Docket No. CRDS-0108

## REMARKS

### I.    Status of Claims

Claims 1-7, 10, 18-30, 32-49, 52, and 60-77 are pending in this reexamination. Claims 8, 9, 11 to 17, 31, 50, 51, and 53 to 59 have been canceled. Claims 1, 10, 27, 28, 32, 40, 52, 69, 70 and 74 have been amended. Independent claims 1 and 40 have been amended to incorporate the elements of dependent claims 9 and 51, respectively. Dependent claims no longer within the scope of the amended independent claims have been canceled, and dependencies have been corrected as needed. No new matter is added. A complete listing of the claims as amended herein is provided in Appendix B.

### II.    Concurrent Litigation

The 3286 Patent is being asserted in concurrent litigation, *i.e.*, *Cordis Corp. v. Abbott Laboratories et al.*, Civil Action No. 07-2265-JAP-TJB (D. N.J.) and *Boston Scientific Corp. et al. v. Johnson & Johnson et al.*, Civil Action No. 07-333-SLR (D. Del.).

### III.    Background of the Invention

#### A.    Development of the Claimed Technology

The claims of the 3286 Patent (as amended herein) are directed to drug-eluting stents. Independent claim 1 recites a stent having a coating applied thereto, wherein the coating comprises a biocompatible polymer/drug mixture. The polymer is a nonabsorbable polymer, and the drug is rapamycin or a macrocyclic lactone analog thereof. Independent claim 40 recites a device comprising a metallic stent, a biocompatible polymeric carrier and a drug. The polymer is a nonabsorbable polymer, the drug is rapamycin or a macrocyclic lactone analog thereof that is present in an amount effective to inhibit neointimal proliferation. The dependent claims specify, for example, particular nonabsorbable polymers, specific percentages of drug, specifics regarding the nature of the drug's release, and other particulars regarding the nature of the stents.

The story of the development of the claimed technology is set forth in the attached Declaration of Robert Falotico, Ph.D. (Appendix C), one of the inventors of the 3286 Patent. As Dr. Falotico explains, restenosis encompasses multiple and distinct biological problems, including thrombosis, inflammation and hyperplasia (Falotico Declaration, ¶ 9, 13). At the time

2



felt but unsolved needs in providing a solution to a problem that numerous others have failed to solve. The Cypher® stent utilizes a therapeutic agent, polymer and provides controlled release of the drug as recited in the 3286 Patent claims, and these components have been critical to the product's commercial success (Croce Declaration, ¶ 17). Accordingly, Patent Owner has established the requisite nexus between the merits of the claimed inventions and the evidence that has been provided. Moreover, as also discussed above, the Cypher® stent has also been copied by others. For example, the Xience™ stent, which is also within the scope of the foregoing claims, but which contains a different active ingredient (everolimus, a macrocyclic analog of rapamycin, instead of sirolimus) and a different nonabsorbable polymeric coating (that contains both an acrylate polymer and a fluorinated polymer, instead of PEVA and PBMA polymers) than are used on the Cypher® stent, has been shown in clinical trials to replicate the effectiveness of the Cypher® stent in preventing restenosis (Rogers Declaration, ¶ 82).

Accordingly, even if the Examiner remains of the view that art cited in the Office Action establishes *prima facie* obviousness, the objective indicia submitted herewith clearly show that the claimed subject matter would not have been obvious.[47]

## V.    Conclusion

For the reasons stated herein, Patent Owner respectfully requests withdrawal of the rejections of record and issuance of a Right of Appeal Notice indicating patentability of all of pending claims 1-7, 10, 18-30, 32-49, 52, and 60-77.

Date: May 29, 2009                              /Joseph Lucci/
                                                Joseph Lucci
                                                Registration No. 33,307
                                                Attorney for Patent Owner

Woodcock Washburn LLP
Cira Centre
2929 Arch Street, 12th Floor
Philadelphia, PA 19104-2891

---

[47]    The Patent Owner is in possession of additional evidence relating to the objective indicia of nonobviousness that has come to light during the ongoing *Cordis Corporation v. Abbott Laboratories et al.* litigations referenced in the Request for Reexamination. However, protective orders that are in effect in these litigations preclude submission of such evidence with this response. Efforts are underway to obtain the requisite permission to submit such evidence to the Office to thereby assure that the record before the Office in this regard is complete.

BSC-SJA-1259

*Inter Partes* Reexamination No. 95/001,097
U.S. Patent No. 7,223,286
Attorney Docket No. CRDS-0108

## APPENDIX A

Please amend the claims of issued U.S. Patent No. 7,223,826 as follows:

Cancel claims 8, 9, 11 to 17, 31, 50, 51, and 53 to 59.

Amend claims 1, 10, 27, 28, 32, 40, 52, 69, 70 and 74 as shown below:

1.      (Currently amended)  A stent having a coating applied thereto, wherein said coating comprises a biocompatible polymer/drug mixture, said polymer is a nonabsorbable polymer, and said drug is rapamycin or a macrocyclic lactone analog thereof.

10.     (Currently amended)  A stent according to claim 1 wherein the coating comprises [a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer;] a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

27.     (Currently amended)  A stent according to any one of claims 1 to 7, 10, or 18 to 26 wherein said drug is a macrocyclic lactone analog of rapamycin.

28.     (Currently amended)  A stent according to any one of claims 1 to 7, 10, or 18 to 26 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

32.     (Currently amended)  A stent according to any one of claims 1 to 7, 10, or 18 to 26 wherein said rapamycin or macrocyclic lactone analog thereof is present in a therapeutically beneficial amount to inhibit neointimal proliferation.

40.     (Currently amended)  A device comprising a metallic stent, a biocompatible polymeric carrier and a drug, wherein said polymer is a nonabsorbable polymer, said drug is rapamycin or a macrocyclic lactone analog thereof and is present in an amount effective to inhibit neointimal proliferation.

*Inter Partes* Reexamination No. 95/001,097
U.S. Patent No. 7,223,286
Attorney Docket No. CRDS-0108

52.     (Currently amended) A device according to claim 40 wherein the polymeric carrier comprises [a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; ]a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

69.     (Currently amended) A device according to any one of claims 40 to 49, 52, or 60 to 68 wherein said drug is a macrocyclic lactone analog of rapamycin.

70.     (Currently amended) A device according to any one of claims 40 to 49, 52, or 60 to 68 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

74.     (Currently amended) A device according to any one of claims 40 to 49, 52, or 60 to 68 that releases said drug over a period of at least 14 days.

BSC-SJA-1261

*Inter Partes* Reexamination No. 95/001,097
U.S. Patent No. 7,223,286
Attorney Docket No. CRDS-0108

### APPENDIX B

**Listing of Claims:**

1.    (Currently amended) A stent having a coating applied thereto, wherein said coating comprises a biocompatible polymer/drug mixture, said polymer is a nonabsorbable polymer, and said drug is rapamycin or a macrocyclic lactone analog thereof.

2.    (Issued) A stent according to claim 1 comprising a generally thin walled cylinder containing a plurality of generally solid struts to which said coating is applied.

3.    (Issued) A stent according to claim 2 further comprising a channel formed in at least one of said struts.

4.    (Issued) A stent according to claim 3, wherein said channel has a closed perimeter on all sides, an open top and a generally rectangular perimeter, and said channel is smaller in all dimensions than said strut.

5.    (Issued) A stent according to claim 1 wherein the coating is dip-coated onto the stent. 

6.    (Issued) A stent according to claim 1 wherein the coating is spray-coated onto the stent.

7.    (Issued) A stent according to claim 1 wherein said rapamycin or macrocyclic lactone analog thereof is contained in the coating at a weight percentage of about 30%.

8-9.   Canceled.

10.   (Currently amended) A stent according to claim 1 wherein the coating comprises [a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; ] a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

11-17. Canceled.

75

BSC-SJA-1262

18.    (Issued)  A stent according to claim 10 wherein the coating comprises a
polydimethylsiloxane.

19.    (Issued)  A stent according to claim 10 wherein the coating comprises a
poly(ethylene)vinylacetate.

20.    (Issued)  A stent according to claim 10 wherein the coating comprises a
poly(hydroxy)ethylmethylmethacrylate.

21.    (Issued)  A stent according to claim 10 wherein the coating comprises an acrylate based
polymer.

22.    (Issued)  A stent according to claim 10 wherein the coating comprises an acrylate based
copolymer.

23.    (Issued)  A stent according to claim 10 wherein the coating comprises a polyvinyl
pyrrolidone.

24.    (Issued)  A stent according to claim 10 wherein the coating comprises a cellulose ester.

25.    (Issued)  A stent according to claim 10 wherein the coating comprises a fluorinated
polymer.

26.    (Issued)  A stent according to claim 10 wherein the fluorinated polymer is
polytetrafluoroethylene.

27.    (Currently amended)  A stent according to any one of claims 1 to 7, 10, or 18 to 26
wherein said drug is a macrocyclic lactone analog of rapamycin.

28.    (Currently amended)  A stent according to any one of claims 1 to 7, 10, or 18 to 26 that
provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a
period of several weeks.

29.    (Issued)  A stent according to claim 28 wherein said drug is a macrocyclic lactone analog
of rapamycin.

BSC-SJA-1263

30.    (Issued) A stent according to any one of claims 1 to 26 that releases said rapamycin or macrocyclic lactone analog thereof over a period of at least 14 days.

31.    Canceled.

32.    (Currently amended) A stent according to any one of claims 1 to 7, 10, or 18 to 26 wherein said rapamycin or macrocyclic lactone analog thereof is present in a therapeutically beneficial amount to inhibit neointimal proliferation.

33.    (Issued) A stent according to claim 32 wherein said drug is a macrocyclic lactone analog of rapamycin.

34.    (Issued) A stent according to claim 33 that releases said macrocyclic lactone analog of rapamycin over a period of at least 14 days.

35.    (Issued) A stent according to claim 34 wherein the coating comprises a fluorinated polymer.

36.    (Issued) A stent according to claim 35 wherein the coating further comprises an acrylate based polymer or copolymer.

37.    (Issued) A stent according to claim 33 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

38.    (Issued) A stent according to claim 37 wherein the coating comprises a fluorinated polymer.

39.    (Issued) A stent according to claim 38 wherein the coating further comprises an acrylate based polymer or copolymer.

40.    (Currently amended) A device comprising a metallic stent, a biocompatible polymeric carrier and a drug, wherein said polymer is a nonabsorbable polymer, said drug is rapamycin or a macrocyclic lactone analog thereof and is present in an amount effective to inhibit neointimal proliferation.

77

BSC-SJA-1264

41.    (Issued)  A device according to claim 40 wherein said polymeric carrier and drug are mixed together.

42.    (Issued)  A device according to claim 40 wherein said polymeric carrier is bound to the drug.

43.    (Issued)  A device according to claim 40 wherein the drug is entrapped on the surface of the stent by said polymeric carrier.

44.    (Issued)  A device according to claim 40 wherein said stent comprises a generally thin walled cylinder containing a plurality of generally solid struts to which said polymeric carrier and drug are applied.

45.    (Issued)  A device according to claim 44 further comprising a channel formed in at least one of said struts.

46.    (Issued)  A device according to claim 45, wherein said channel has a closed perimeter on all sides, an open top and a generally rectangular perimeter, and said channel is smaller in all dimensions than said strut.

47.    (Issued)  A device according to claim 40 wherein the polymeric carrier and drug are dip-coated onto the stent.

48.    (Issued)  A device according to claim 40 wherein the polymeric carrier and drug are spray-coated onto the stent.

49.    (Issued)  A device according to claim 40 wherein the weight ratio of drug to polymeric carrier is about 3:7.

50-51.  Canceled.

52.    (Currently amended)  A device according to claim 40 wherein the polymeric carrier comprises[ a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer;] a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly(hydroxy)ethylmethylmethacrylate; an

78

*Inter Partes* Reexamination No. 95/001,097
U.S. Patent No. 7,223,286
Attorney Docket No. CRDS-0108

acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

53-59. Canceled.

60.     (Issued) A device according to claim 52 wherein the polymeric carrier comprises a polydimethylsiloxane.

61.     (Issued) A device according to claim 52 wherein the polymeric carrier comprises a poly(ethylene)vinylacetate.

62.     (Issued). A device according to claim 52 wherein the polymeric carrier comprises a poly(hydroxy)ethylmethylmethacrylate.

63.     (Issued) A device according to claim 52 wherein the polymeric carrier comprises an acrylate based polymer.

64.     (Issued) A device according to claim 52 wherein the polymeric carrier comprises an acrylate based copolymer.

65.     (Issued) A device according to claim 52 wherein the polymeric carrier comprises a polyvinyl pyrrolidone.

66.     (Issued) A device according to claim 52 wherein the polymeric carrier comprises a cellulose ester.

67.     (Issued) A device according to claim 52 wherein the polymeric carrier comprises a fluorinated polymer.

68.     (Issued) A device according to claim 67 wherein the fluorinated polymer is polytetrafluoroethylene.

69.     (Currently amended) A device according to any one of claims 40 to <u>49, 52, or 60 to</u> 68 wherein said drug is a macrocyclic lactone analog of rapamycin.

79



BSC-SJA-1266

70.    (Currently amended) A device according to any one of claims 40 to 49, 52, or 60 to 68 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

71.    (Issued) A device according to claim 70 wherein said drug is a macrocyclic lactone analog of rapamycin.

72.    (Issued) A device according to claim 71 wherein the polymeric carrier comprises a fluorinated polymer.

73.    (Issued) A device according to claim 72 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

74.    (Currently amended) A device according to any one of claims 40 to 49, 52, or 60 to 68 that releases said drug over a period of at least 14 days.



75.    (Issued) A device according to claim 74 wherein said drug is a macrocyclic lactone analog of rapamycin.

76.    (Issued) A device according to claim 75 wherein the polymeric carrier comprises a fluorinated polymer.

77.    (Issued) A device according to claim 76 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

80

BSC-SJA-1267

# EXHIBIT 66



1 of 4 DOCUMENTS

**PURDUE PHARMA PRODUCTS L.P., NAPP PHARMACEUTICAL GROUP LTD., BIOVAIL LABORATORIES INTERNATIONAL, SRL, and ORTHO-MCNEIL, INC., Plaintiffs/Counterclaim-defendants, v. PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL COMPANIES, INC., Defendants/Counterclaim-plaintiffs.**

Civil Action No. 07-255-KAJ (CONSOLIDATED)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2009 U.S. Dist. LEXIS 72703*

August 14, 2009, Decided

**PRIOR HISTORY:** *Purdue Pharma Prods. L.P. v. Par Pharm., Inc., 2008 U.S. Dist. LEXIS 98178 (D. Del., Dec. 3, 2008)*

**COUNSEL:** [*1] Jack B. Blumenfeld, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware.

Mary W. Bourke, Esq., Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; Counsel for Plaintiffs/Counterclaim-Defendants, Purdue Pharma Products L.P. and Napp Pharmaceutical Group Ltd.

Of Counsel: Robert J. Goldman, Esq. Ropes & Gray LLP, Palo Alto, California.

Sona De, Esq., Ropes & Gray LLP, New York, New York.

Frederick L. Cottrell, III, Esq., Richards, Layton & Finger P.A., Wilmington, Delaware; Counsel for Defendants/Counterclaim-Plaintiffs.

Of Counsel: Daniel G. Brown, Esq., Wilson Sonsini

Goodrich & Rosati, New York, New York.

Ron E. Shulman, Esq., Wilson Sonsini Goodrich & Rosati, Palo Alto, California.

Nicole W. Stafford, Esq., Wilson Sonsini Goodrich & Rosati, Austin, Texas.

**JUDGES:** Kent A. Jordan, United States Circuit Judge.

**OPINION BY:** Kent A. Jordan

**OPINION**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

August 14, 2009

Wilmington, Delaware

**\*2\*TABLE OF CONTENTS**

I. INTRODUCTION

II. FINDINGS OF FACT

A. The Parties

B. Procedural Background

C. Pharmaceutical Background

i. Tramadol

ii. Controlled Release Formulations

iii. Plaintiffs' Development of the Claimed Inventions

iv. The Asserted Claims

D. Therapeutic Effect of Par's Tablets

i. Bioequivalence of Ultram ER and Par's Tablets

ii. Ultram IR

iii. Bioequivalence of Ultram IR and Ultram ER

iv. Therapeutic Effect of Ultram ER

E. Prosecution History of the Patents-in-Suit - Chapter I

i. Background References

ii. The Merck/Bondi Reference

iii. Issuance of the Patents-in-Suit

F. References Not Before the PTO

i. *U.S. Patent No. 5,580,578* ("Oshlack")

ii. *U.S. Patent No. 5,478,577* ("Kaiko")

G. Commercial Success of Ultram ER

H. Par's Copying of Ultram ER

I. Prosecution History of the Patents-in-Suit - Chapter II

i. The Malkowska I Declaration

ii. World Congress of Pain

iii. EP '366 Opposition Proceedings and the Malkowska II

Declaration

iv. Napp Repeat Experiments


III. CONCLUSIONS OF LAW

A. Infringement

i. *'887 Patent*

ii. *'430 Patent*

B. Validity

C. Inequitable Conduct

i. Materiality

ii. Intent to Deceive

iii. Balancing Materiality and Intent

BSC-SJA-1269

IV. SUMMARY OF CONCLUSIONS

/s/ [*2] Kent A. Jordan

**JORDAN, Circuit Judge** [1]

1    Sitting by designation (Docket Item ["D.I."] 241).

## L INTRODUCTION

This is a patent infringement case. Purdue Pharma Products L.P. ("Purdue") and Napp Pharmaceutical Group Ltd. ("Napp") (collectively "Plaintiffs") have sued Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively "Par"), in connection with Par's Abbreviated New Drug Application ("ANDA") and its manufacture, use, and intent to sell generic versions of Ultram(R) ER ("Ultram ER"). Ultram ER is an extended-release tramadol hydrochloride pain relief medication. (Uncontroverted Facts, D.I. 326 at P III.C.(27), (29).) Plaintiffs allege infringement of *U.S. Patent No. 6,254,887* (the "'887 patent"), entitled "Controlled Release Tramadol," and seek a declaratory judgment of infringement of *U.S. Patent No. 7,074,430* (the "'430 patent"), entitled "Controlled Release Tramadol Tramadol [sic] Formulation." Par denies infringement and responds in defenses and counterclaims that the asserted claims of the patents-in-suit are invalid and are unenforceable due to inequitable conduct. A five-day bench trial was held in this action from April 16 to April 22, 2009. The following, [*3] issued pursuant to *Federal Rule of Civil Procedure 52(a)*, are my findings of fact and conclusions of law on the issues of infringement, validity, and enforceability of the patents-in-suit. [2]

2    Throughout these Findings of Fact and Conclusions of Law, I may have adopted without attribution language suggested by one side or the other in this dispute. In all such instances, the finding or conclusion in question has become my own, based upon my review of the evidence and the law. To the extent that any of my findings of fact may be considered conclusions of law, or vice versa, they should be considered as such.

For the reasons that follow, I conclude that Par has

infringed the asserted claims of the patents-in-suit but that those claims are obvious and therefore invalid. I also conclude that Par has not carried its burden of showing by clear and convincing evidence that the patents-in-suit are unenforceable due to inequitable conduct.

## II. FINDINGS OF FACT

### A. *The Parties*

1.    Purdue is a limited partnership organized and existing under the laws of the State of Delaware, having a place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901-3431. (Uncontroverted Facts, [*4] D.I. 326 at P III.A.(1).) Napp is a limited company organized and existing under the laws of England, having a place of business at Cambridge Science Park, Milton Road, Cambridge, CB4 0GW, United Kingdom. (*Id.* at P III.A.(2).)

2.    Purdue and Napp were assigned the patents-in-suit on May 4, 2007 by Euro-Celtique S.A. [3] (*Id.* at PP III.E.(48), F.(60).)

3    Euro-Celtique S.A. is an associated company of Purdue and Napp in whose name the patents-in-suit were prosecuted. (Uncontroverted Facts, D.I. 326 at P III.E.(47).)

3.    Par Pharmaceutical, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a place of business at One Ram Ridge Road, Spring Valley, New York 10977. (*Id.* at P III.A.(5).) Par Pharmaceutical Companies, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a place of business at 300 Tice Boulevard, Woodcliff Lake, New Jersey 07677. Par Pharmaceutical, Inc. is a wholly owned subsidiary of Par Pharmaceutical Companies, Inc. (*Id.* at P III.A.(6).)

### B. *Procedural Background*

4.    Biovail Laboratories International, SRL ("Biovail") submitted New Drug Application ("NDA") 21-692 to the Food and Drug Administration ("FDA") [*5] on December 31, 2003. [4] (Uncontroverted Facts, D.I. 326 at P III.C.(29)-(30).) Biovail's NDA was for a

controlled release tramadol formulation for once-daily dosing, under the proposed trade name "Ralivia ER." The FDA approved the application on September 8, 2005; the trade name for the drug was later changed to Ultram ER. 5 (Id. at P III.C.(29), (30), (32); Trial Transcript ["Tr."] 699:10-700:10; Plaintiffs' Trial Exhibit ["PTX"]-879.)

> 4   Although Biovail continues to appear in the caption as a plaintiff, its claims and the counterclaims against it were dismissed by consent on November 10, 2008, and it is no longer a party. (D.I. 275.)
>
> 5   Because Ralivia ER and Ultram ER are simply different trade names for the same product, I will refer to the extended release tramadol formulation submitted by Biovail to the FDA as Ultram ER.

5.   Ultram ER is indicated for "the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." (PTX-650 at 2.) The label also provides that Ultram ER should be taken "once daily." (Id. at 4.)

6.   In compliance with 21 U.S.C. § 355(b)(1), Biovail certified to the FDA as a part [*6] of its NDA that the '887 patent claims cover Ultram ER. (Uncontroverted Facts, D.I. 326 at P III.E.(49).) Accordingly, the FDA lists Ultram ER as being associated with the '887 patent in a publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluation," which is generally called the "Orange Book." (Id.)

7.   Ortho-McNeil, Inc. (now Ortho-McNeil-Janssen-Pharmaceuticals, Inc.) ("Ortho") sells Ultram ER in the United States pursuant to an agreement with Biovail. (Nature of the Case, D.I. 326 at P 1.2; Uncontroverted Facts, id. at P III.C.(33).) The parties have assumed that Ortho is a licensee of the patents-in-suit. 6 (Nature of the Case, id. at P 1.2.)

> 6   As reflected in the caption, Ortho was a plaintiff in this case as well. In an earlier decision, I ruled that Ortho lacked standing and therefore dismissed it from the suit. Purdue Pharma Prods. L.P. v. Par Pharm., Inc., No. 07-255-KAJ, 2008 U.S. Dist. LEXIS 98178, 2008 WL 5100115 (D. Del., Dec. 3, 2008). At that time, I analyzed Ortho's license to the '887 patent only; if Ortho has a license to the '430 patent, it has not been brought to my attention. 2008 U.S. Dist. LEXIS

98178, [WL] at *1 n.3.

8.   Par has submitted ANDA No. 78-783 to the FDA, pursuant to 21 U.S.C. § 355(j), [*7] seeking approval to market generic extended-release tramadol hydrochloride tablets ("Tramadol ER tablets" or "Par's tablets"). Specifically, Par's ANDA seeks FDA approval for the commercial manufacture, use, or sale of Tramadol ER tablets in 100, 200, and 300 mg dosage strengths. (Uncontroverted Facts, D.I. 326 at P III.B.(7).) Par's ANDA contains a "Paragraph IV Certification," see 21 U.S.C. § 355(j)(2)(A)(vii)(IV), 7 which alleges that the claims of the '887 patent are invalid and/or will not be infringed by Par's tablets. (Uncontroverted Facts, D.I. 326 at P III.E.(52)).

> 7   Under 21 U.S.C. § 355(j)(2)(A)(vii), a generic manufacturer must certify in its ANDA whether its proposed generic drug will infringe any patents listed in the Orange Book as being associated with the branded drug. For each listed patent, the ANDA applicant must make one of four possible certifications. As relevant here, a "Paragraph IV Certification" is one that states that the patent is invalid or will not be infringed by the generic drug. § 355(j)(2)(A)(vii)(IV). A Paragraph IV Certification makes the filing of an ANDA an act of patent infringement, 35 U.S.C. § 271(e)(2)(A), and the applicant must provide notice [*8] to the patent holder of its invalidity or noninfringement position along with the certification. 21 U.S.C. § 355(j)(2)(B). The patent holder has forty-five days after receiving that notice to file a patent infringement suit, and, if an infringement suit is filed, FDA approval of the ANDA is stayed until either thirty months have passed or a court rules that the patent is invalid or not infringed. § 355(j)(5)(B)(iii). See generally Abbott Labs. v. Teva Pharms. USA, Inc., 432 F. Supp.2d 408, 414-415 (D. Del. 2006).

9.   Par notified Plaintiffs of its ANDA filing, and Plaintiffs responded by filing this action, alleging infringement of the '887 patent under 35 U.S.C. § 271(e)(2). (Id. at PP III.B.(8), E.(50).) Plaintiffs also seek a declaratory judgment that the manufacture, use, and substantial preparations for the offering for sale of Par's tablets will constitute infringement, contributory infringement, and active inducement of infringement of the '430 patent. (D.I. 78 8 at 7.) Par's Second Amended

Answer and Counterclaims allege that the claims of the patents-in-suit are invalid, unenforceable, and not infringed. (Uncontroverted Facts, D.I. 326 at P III.E.(53), F.(62).)

8   D.I. 78 is Plaintiffs' [*9] amended complaint.

## C. Pharmaceutical Background

10. At claim construction, I determined that a person of ordinary skill in the art at the time of the invention was one with experience as a formulator (one who makes a drug), a pharmacokineticist (one who researches and characterizes the drug), and a clinician (one with experience in treating pain). Purdue Pharma Prods. L.P. v. Par Pharm., Inc., 584 F. Supp. 2d 664, 670 n.12 (D. Del. 2008) ("Claim Construction Opinion"). The parties do not dispute that determination, and I find that it continues to be the appropriate standard.

### i. Tramadol

11. The patents-in-suit relate to oral controlled release tramadol formulations. ('887 patent, 1:22-25. [9] ) Tramadol is categorized as a weak opioid analgesic used to relieve moderate to moderately severe pain. (Grond, [10] Tr. 981:1-14, 1025:13-17.) It is comparable in potency to codeine. (Id. at 1025:13-17.) An opioid is a drug that has been synthesized from material in the opium poppy and which binds to opioid receptors in the body in order to provide an analgesic response. (Smith, [11] Tr. 15:3-6.)

9   The '430 patent is a continuation of the '887 patent. ('430 patent, cover page.) Thus, the specifications [*10] of the two patents are substantially the same. Transco Prods. Inc. v. Performance Contracting, Inc., 38 F.3d 551, 555-56 (Fed. Cir. 1994). For simplicity, specification references will be made to the '887 patent.

10   Dr. Stefan Grond is a physician specializing in anesthesia and pain management at Hospital Lippe in Detmold, Germany, and a professor of anesthesia at the Medical University of Hannover in Hannover, Germany. (Grond, Tr. 963:3-18.)

11   Dr. Kevin J. Smith is Head of Clinical Pharmacy in Europe for Mundipharma GmbH ("Mundipharma"). (Smith, Tr. 8:4-11.) Smith is a named inventor of the patents-in-suit. Mundipharma is a German company that shares a common owner with, but is otherwise

independent from, Purdue and Napp. (Id. at 11:1-4.)

12. Tramadol has been used to treat moderate to severe pain for many years. ('887 patent, 1:12-23.) It was first synthesized in the early 1960s and was made available for pain treatment in Germany beginning in the late 1970s in immediate release forms. (Grond, Tr. 1023:16-1025:6; Smith, Tr. 12:11-22.) Although tramadol was patented in the United States in 1972 by Grunenthal GmbH ("Grunenthal"), it was not widely available for patient use outside of Germany [*11] until the mid-1990s. (Defendants' Trial Exhibit ["DTX"]-458; Kaiko, [12] Tr. 209:2-4; Smith, Tr. 12:18-13:4.) Tramadol was not added to the World Health Organization ("WHO") guidelines for cancer pain management until 1996. (Grond, Tr. 1051:14-16; Smith, Tr. 13:5-16:7; PTX-557 at 18-19, 50-51.)

12   Dr. Robert F. Kaiko is the Vice President of Research and Development for Portfolio Development at Purdue. (Kaiko, Tr. 204:7-10.)

13. Tramadol has the chemical name (+)-trans-2-[(dimethylamino)methyl]-1-(3-methoxyphenyl) cyclohexanol ('887 patent, 1:10-12), which explains the need for a good nickname like "tramadol." The drug is a racemic compound, in other words a 50%-50% mixture of two compounds that have identical chemical formulas but are mirror images of each other. (Weinberger, [13] Tr. 858:1-6; Grond, Tr. 983:8-22, 987:22-988:15.) Each of the two compounds is called an enantiomer and is given the designation of either (+) or (-); each compound has a different mechanism of action similar to that of antidepressants. (Weinberger, Tr. 858:1-5, 859:21-23; Grond, Tr. 983:8-984:14, 987:22-988:15.) The compound (+)-tramadol acts mainly in the spinal cord as a serotonin reuptake inhibitor. (Weinberger, [*12] Tr. 859:21-860:8; Grond, Tr. 986:4-10.) The compound (-)-tramadol also works in the spinal column but as a norepinephrine reuptake inhibitor. (Weinberger, Tr. 859:22-23; Grond, Tr. 986:11-12.) Both serotonin and norepinephrine are neurotransmitters, and blocking their reuptake inhibits the transmission of pain sensations. (Weinberger, Tr. 859:21-860:8.) Both (+)-tramadol and (-)-tramadol are metabolized by the liver into metabolites, at least one of which, the M[1] metabolite, is important to the effect of the drug. (Weinberger, Tr. 858:10-859:20.) The M[1] metabolite has activity at the [mu] opioid receptor, similar to morphine. (Id.)



13    Dr. Michael Weinberger is a physician and the Director of the Pain Service and the Palliative Care Service at Columbia University Medical Center, New York Presbyterian Hospital. (Weinberger, Tr. 835:15-20.)

14.    All three mechanisms -- (+)-tramadol, (--)-tramadol, and the M[1] metabolite -- add together to produce analgesia. (Id. at Tr. 859:15-860:8.) All of them work in the central nervous system and must therefore cross the blood-brain barrier, a physiological barrier that prevents certain materials in the blood from entering the brain and the spinal [*13] cord. (Grond, Tr. 984:19-987:11.)

15.    In part because of the complexity of the drug, there is no established blood plasma level above which tramadol can be expected to provide analgesia in the average patient. (Smith, Tr. 19:10-21:9; Grond, Tr. 985:8-987:21.) In other words, a minimum effective concentration ("MEC") for tramadol has not been thoroughly established. (Smith, Tr. 19:10-21:9; Grond, Tr. 987:3-993:3; 1036:3-1037:4.) For that reason, it is, and was at the time of the filing of the application for the parent to the patents-in-suit, more difficult to estimate the analgesic effect of tramadol than other opioids, such as fentanyl, morphine, hydromorphone, and oxycodone. (Grond,    Tr.    1028:18-1029:10.) Nonetheless, a relationship is known to exist between the concentration of tramadol in a patient's blood and the pain relief experienced by that patient. (Weinberger, Tr. 885:20-887:8, 922:19-923:11; Katz, [14] Tr. 621:9-622:8.) The patents-in-suit describe tramadol formulations that preferably maintain a drug concentration in the blood "within the therapeutic range" for 12 hours or more. [15] ('887 patent, 1:38-40.)

14    Dr. Warren A. Katz is a rheumatologist who has been practicing medicine [*14] for more than 42 years. Dr. Katz teaches at the University of Pennsylvania through Penn Presbyterian Medical Center, where he was Chief of Rheumatology for approximately 14 years. (Katz, Tr. 474:4-479:7.)
15    The mentioned "therapeutic range" is not defined in the patent.

ii. Controlled Release Formulations

16.    Conventional release, or immediate release, preparations of tramadol are typically administered four to six times per day, ('887 patent, 1:12-18; Grond, Tr. at

1048:12-20; PTX-844 at 3.) Controlled release preparations, in contrast, achieve a slow release of a drug over an extended period of time. ('887 patent, 1:34-36.) The patents-in-suit are directed to controlled release preparations of tramadol that are to be taken one or two times daily. (Id. at 1:23-25.)

17.    Controlled release delivery systems are known to offer advantages over conventional dosage forms, including    increased    patient    compliance    with prescriptions, decreased total drug delivery, and decreased side effects. (DTX-107 at 5; Palmieri, [16] Tr. 1267:25-1268:20.) Those advantages were well known as early as 1980, when one of the inventors of the patents-in-suit, Stewart Leslie, published an article entitled    "Continus    [*15]    Controlled    Release Preparations" (the "Leslie article"), which describes the benefits of controlled release dosage forms. [17] (DTX-107.) More particularly, the Leslie article detailed the advantages of a specific system or template for formulating controlled release drugs. The system, known as the Continus(R) ("Continus") controlled release system, was used by Napp researchers beginning in the 1980s. (DTX-107 at 1, 7.) Plaintiffs acknowledge that Leslie obtained a U.S. patent on the Continus system, No. 3,965,256, which issued on June 22, 1976. (D.I. 334 [18] at P 122; DTX-302.) The patents-in-suit employ the Continus controlled release system. (Miller, [19] Tr. 1233:24-1234:2, 1241:15-18.)

16    Dr. Anthony Palmieri, III, is Clinical Assistant Professor of Pharmaceutics at the University of Florida, College of Pharmacy. (Palmieri, Tr. 1246:13-18.)
17    The named inventors on the patents-in-suit are the same. They are Ronald Brown Miller, Stewart    Thomas    Leslie,    Sandra    Therese Antoinette Malkowska, Kevin John Smith, Walter Wimmer, Horst Winkler, Udo Hahn, and Derek Allan Prater. Accordingly, whenever this opinion refers to an individual as an inventor or a co-inventor, it should be understood to [*16] mean that the individual is an inventor of both of the patents-in-suit.
18    D.I. 334 is Plaintiffs' corrected proposed findings of fact and conclusions of law.
19    Dr. Ronald Miller is an inventor of the patents-in-suit and was Managing Director of the Research & Development Division at Napp from 1994 to 1997. (Miller, Tr. 1232:3-18.)

18. Controlled release oral dosage forms are made with excipients (i.e., inert ingredients) that have certain chemical characteristics. (Palmieri, Tr. 1289:13-22, 1287:11-1288:14, 1291:14-1291:25, 1298:12-16; DTX-839.) Pharmaceutical formulators have been manipulating mixtures, structures, and coatings to make controlled release dose forms since 1955. (Palmieri, Tr. 1286:14-20.) Commercial controlled release products began to appear on the market in the United States in 1960. (Id. at 1286:21-1287:10.) Basic textbooks such as *Introduction to Pharmaceutical Dosage Forms* (1981) describe "delayed action dosage forms," (DTX-476 at 390; Palmieri, Tr. 1290:13-1291:7), and textbooks such as the *Handbook of Pharmaceutical Excipients* (1986) describe excipients appropriate for controlled release formulations. (DTX-839; Palmieri, Tr. 1288:6-1289:25.) Examples of oral controlled [*17] release delivery systems include permeable coatings (Palmieri, Tr. 1264:5-13), controlled release matrices surrounded by cosmetic coatings (id. at 1265:2-15), and osmotic pumps that use semi-permeable coatings (id. at 1265:25-1266:11).

19. The Leslie article explains that controlled release delivery systems generally rely on at least one of four general principles: osmotic pressure, ion exchange, dissolution, and diffusion. (DTX-107 at 6.) The Contimus system uses dissolution and diffusion. (Id. at 7.) "Dissolution" is a reference to the water solubility of the drug and/or the coating as a means to control the delivery of the drug. (Id.) For example, a salt formation can decrease the solubility of a drug with an otherwise high dissolution rate, making it more suitable for use in a controlled release formulation. (Id.) "Diffusion" refers to the movement of drug molecules from a region of high concentration to one of lower concentration, through a water insoluble polymer, for example, again as a means of controlling drug delivery. (Id; Palmieri, Tr. 1264:5-13.) The Leslie article teaches that the Contimus system may be used to realize diffusion and dissolution over a period of 12 hours [*18] *in vivo*, and it provides a sample *in vitro* dissolution rate for a tablet, with aminophylline as the active ingredient, that is controlled to give even release over a period of six hours. (DTX-107 at 7-8.)

20. Through routine experimentation, a formulator can substitute a different active ingredient with a similar physical chemical profile into a once-a-day controlled release formulation and produce a formulation that has a

dissolution rate similar to the original formulation. (Palmieri, Tr. 1287:11-1288:5; DTX-107 at 7.) Par's formulation expert, Dr. Anthony Palmieri, testified that, in order to make a once-a-day dose formulation using a given active ingredient, a formulator would start by evaluating controlled release forms that have active ingredients with similar physical chemical profiles, prepare prototype formulations with reference to the list of excipients that were available, and do dissolution work to optimize the formulation using "routine ordinary quite frankly often dull laboratory experiments." (Palmieri, Tr. 1255:24-1256:2, 1287:11-1288:5.) For example, Dr. Palmieri testified that a formulator could decrease or increase the thickness of the coating or use different excipients [*19] to obtain the desired controlled release profile, (Id. at 1323:21-1324:15.) The Leslie article also explained that, by varying the amounts of the different excipients used, "it is possible to vary the rate of drug diffusion through the matrix and subsequent rate of dissolution." [20] (DTX-107 at 7.) A formulator would then interact with clinicians through an iterative process to tweak the dose form if needed. (Palmieri, Tr. 1292:1-13, 1323:21-1324:6.) In rebuttal, Plaintiffs' expert testified that a formulator "couldn't expect to simply transpose one drug for another into a pharmaceutical[] controlled release formulation and expect to achieve the same dissolution profile, the same pharmacokinetic data and, of course, the same pharmacodynamic data." [21] (Davies, [22] Tr. 1489:16-23.) But Plaintiffs failed to address Par's main point: the alterations that are needed to achieve a successful controlled release formulation would be the result of routine experimentation.

　　　20　　Specifically, the Leslie article teaches the following:

> By varying either: the amount of cellulose; the degree of cellulosic hydration; the amount of higher aliphatic alcohol utilised; the ratio of cellulose to higher aliphatic [*20] alcohol; or the ratio of water soluble to water insoluble cellulose, it is possible to vary the rate of drug diffusion through the matrix and subsequent rate of dissolution.

(DTX-107 at 7.)

　　21　　Pharmacokinetic ("PK") data refers to data

BSC-SJA-1274

that measures the physical disposition of a drug in the body (e.g., absorption rate). *Stedman's Medical Dictionary* at 1473 (28th ed. 2006) ("*Stedman's*"). Pharmacodynamic data refers to data that measures a drug's action (e.g., therapeutic effect). *Id.* at 1472.

22   Dr. Martyn C. Davies is a professor of formulation science, physical pharmaceutics, and drug delivery controlled release technology at the School of Pharmacy at the University of Nottingham in Nottingham, England. (Davies, Tr. 651:6-52:3.)

21. The patents-in-suit describe controlled release matrices as preferred embodiments for the claimed controlled release tramadol, along with suitable excipients for inclusion in such matrices. ('887 patent, 3:39-68.) Normal release matrices having a coating that provides for controlled release of tramadol are also described, along with suitable excipients. ('887 patent, 3:45-47, 4:24-55.) It is undisputed that Par's tablets have a controlled release coating over [*21] a normal release matrix, rather than a controlled release matrix. (Uncontroverted Facts, D.I. 326 at P III.B.(25); Davies, Tr. 661:10-20; PTX-166 at PAR015917.)

### iii. *Plaintiffs' Development of the Claimed Inventions*

22. Before detailing the development of the claimed inventions, it will be helpful to define some terms used in the art to characterize the properties of drugs and drug formulations. As noted earlier, the "minimum effective concentration" of a therapeutic drug, or "MEC," is the minimum amount of drug per unit volume of blood plasma needed to provide a therapeutic effect in the average patient. (Findings of Fact ["FF"] P 15.) "Onset of action" is the time at which a drug formulation begins to provide a therapeutic effect. (Davies, Tr. 695:10-697:1.) Plaintiffs use the term "onset concentration" to mean the blood plasma level of a drug at the onset of action. (D.I. 331 [23] at 15-16.) For convenience, I will use that term as well. As used at trial, the term "trough concentration" refers to the blood plasma level of a drug at the end of a dosing interval. (Grond, Tr. 1056:4-24.) "Steady state" refers to the point at which the average blood plasma level over a dosing interval does [*22] not change with each successive dose. *See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 98 F. Supp. 2d 362, 373-76 (S.D.N.Y. 2000).* "C[max]" refers to the peak blood plasma level of a drug following administration, and

"W[50]" is the duration of time over which the plasma concentrations are equal to or greater than 50% of C[max]. (D.I. 247 [24] at 10.) "T[max]" is the time it takes to get to C[max]. (Palmieri, Tr. 1314:23-1315:5.)

23   D.I. 331 is Plaintiffs' post-trial brief.
24   D.I. 247 is the parties' joint claim construction chart.

23. Scientists at Napp, including Smith, were involved in the development of a twice-a-day tramadol preparation in the early 1990s. (Smith, Tr. 12:3-10.) In August 1991, Dr. Derek Prater, a director of technical development at Mundipharma Research Ltd. ("Mundipharma Research") and a named inventor of the patents-in-suit, suggested that, based on data obtained during the twice-a-day development, Smith should look into a once-a-day formulation. (Prater, Tr. 82:5-83:6; PTX-50 at NAPP0342385.)

24. In April 1992, Smith calculated theoretical dissolution rates and blood plasma profiles for a once-daily formulation. Smith's calculations were based, in part, on a published [*23] 1986 paper by Dr. W. Lintz, et al., entitled "Bioavailability of Enteral Tramadol Formulations" ("Lintz"), which evaluated an oral immediate release preparation of tramadol. Smith relied on the MEC assumed in Lintz, which was 100 ng/ml. (Smith, Tr. 18:5-26:21; PTX-594 at NAPP0041240-41; PTX-42 at NAPP0096248.) Lintz also reported that tramadol has good water solubility, is rapidly absorbed, has a long half-life, and has high bioavailability relative to other centrally acting analgesics. [25] (PTX-594 at NAPP0041240, NAPP0041245.) Thus, Lintz concluded that "the duration of analgesia of tramadol is likely to be longer with equianalgesic doses and equal pain intensity than that of pentazocine and codeine." [26] (PTX-594 at NAPP0041245.)

25   Bioavailability is the proportion of an administered dose that is absorbed into the bloodstream. *Stedman's* at 219. Active ingredients with good bioavailability were known at the time to be good candidates for controlled release dose forms. (Palmieri, Tr. 1292:14-1294:7.)
26   "Equianalgesic" means "having the same analgesic effect as a given dose of another analgesic agent." *Dorland's Illustrated Medical Dictionary* at 646 (31st ed. 2007).

25. Smith disclosed [*24] his calculated theoretical

dissolution rates and blood plasma profiles in a memo to Leslie and Prater dated April 24, 1992. (PTX-42.) To calculate his theoretical data Smith used the "favourabl[e]" elimination half-life that had been reported for tramadol, along with the high bioavailability, and determined the rate at which tramadol would need to enter the blood stream in order to maintain a plasma concentration above the 100 ng/ml level for 24 hours. (Id. at NAPP0096248-49.) After discussing his calculations, Smith concluded that "albeit at an early (and purely theoretical) stage, I think we can be hopeful that a once-a-day preparation is a realistic target." (Id. at NAPP0096249.)

26. In late 1993, formulators supervised by Prater and co-inventor Sandra Malkowska, the Assistant Director of Formulation Laboratories at Napp, created a once-daily tramadol formulation using Smith's theoretical release data. Napp formulators chose hydrogenated vegetable oil ("HVO") to slow the dissolution rate after trying and rejecting several other waxes. They made and tested tablets containing different ratios of tramadol to HVO and determined that an equal amount of tramadol hydrochloride ("tramadol [*25] Hcl") and HVO seemed most promising for a once-daily formulation that would also be suitable in size for patients to swallow. [27] (Malkowska Tr. 1064:3-10, 1160:3-61:2; Prater Tr. 79:3-13, 84:6-86:25, 92:3-93:22; PTX-71 at NAPP0096234; PTX-69 at NAPP0371891 [F474/07], NAPP0371895 [F474/15], NAPP0371903 [F474/J0].)

> 27 Tramadol Hcl is a salt of tramadol. (Uncontroverted Facts, D.I. 326 at P III.B.(24).)

27. In March 1994, Smith supervised TRAM.PKIN4, the first PK pilot study on the once-daily formulation that Prater and Malkowska had developed. TRAM.PKIN4 was a single dose study that compared blood plasma levels produced by 200 mg of the Napp controlled release formulation to a single 100 mg dose of a commercial immediate release tramadol formulation. As Smith explained, a once-daily dose of 200 mg is comparable to 50 mg of an immediate release dose taken four times daily, which is a typical dosing regimen for immediate release tramadol that was known to provide pain relief. [28] (Smith, Tr. 27:3-35:2, 73:4-15; Katz, Tr. 500:2-506:9, 512:17-513:18; Grond, Tr. 1048:15-20, 1051:14-25; PTX-844 at 3.) Accordingly, Smith compared the plasma levels of the Napp controlled release formulation to one-half [*26] the plasma levels of the 100 mg

immediate release control dose, i.e., the plasma levels that would be achieved by a 50 mg dose. TRAM.PKIN4 showed that the Napp controlled release formulation maintained plasma concentrations for more than 24 hours above the six-hour trough concentration, i.e., a trough concentration occurring at six hours after administration of a 50 mg dose. That gave Smith confidence that Napp had successfully made a once-daily formulation. (Smith Tr. 27:3-37:5; PTX-18 at NAPP0093094-95, NAPP0093111; Grond Tr. 1056:4-25.)

> 28 Both sides adopted the concept of dose proportionality with respect to the dosage levels of tramadol at issue in this case. Plaintiffs' pharmacokinetic expert testified that "[t]ramadol is dose proportional in the 100 to 400-miligram range, so the higher the dose, the higher the pharmacokinetic profile." (Davies, Tr. 708:5-7.) Smith believed that halving the plasma levels of the 100 mg immediate release dose would give the plasma levels that would be achieved by a 50 mg dose. (Smith, Tr. 32:21-34:13.) And Par's expert acknowledged that plasma concentrations of tramadol increase linearly over a dosage range of 50 to 400 mg. (Grond, Tr. 1028:3-5.)

28. [*27] TRAM.PKIN4 also showed that the W[50] of the controlled release formulation was greater than the W[50] for the immediate release formulation. Smith took that larger W[50] to mean that the controlled delivery of the formulation was "very strong." (Smith Tr. 38:7-40:11; PTX-18 at NAPP0093103.)

29. The TRAM.PKIN4 study and its results were included as Example 8 and Figure 2 in the specifications of the patents-in-suit. ('887 patent, Fig. 2, 11:35-12:14; Weinberger, Tr. 917:4-16; Smith, Tr. 47:2-20.)

30. Ronald Miller, one of the inventors of the patents-in-suit and the person to whom another inventor, Leslie, reported, testified that, when development began, he expected to successfully create a controlled release formulation of tramadol. (Miller, Tr. 1232:24-25, 1237:1-3.) Napp scientists used the Continus system to develop their controlled release formulation of tramadol (FF P 17) because they believed that it was "reliable" and that it would lead to a successful result. (Miller, Tr. 1236:11-25, 1237:15-1238:12.) That belief was well founded. Napp had used the Continus system to develop various controlled release drugs at Napp for at least six different therapeutic indications. (Id. at [*28]

1233:24-1234:21.) Even with aminophylline, an active ingredient that was "an awkward substance to handle pharmaceutically," Napp had used the Continus system to achieve a controlled release formulation that is "highly effective" and "very stable." (Miller, Tr. 1234:22-1236;25.) Similarly, inventor Udo Hahn testified that he had no reason to think that tramadol could not be used with the Continus system. (Hahn, Tr. 1231:21-23.)

iv. *The Asserted Claims*

31. Plaintiffs are asserting claims 3, 13, 27, and 29 of the '887 patent and claims 5, 7, and 11 of the '430 patent. (D.I. 280.) Those claims all relate to controlled release oral formulations of tramadol suitable for dosing every 24 hours.

32. Specifically, the asserted claims of the '887 patent relate to preparations or tablets of tramadol, or its salt, that are covered by a controlled release coating made out of certain excipients, that have a certain dissolution rate under certain conditions when tested *in vitro* and that have various pharmacokinetic properties. ('887 patent, 12:50-64, 13:53-14:6, 16:1-5, 12-15; Smith, Tr. 23:21.) The claimed formulations are designed to provide pain relief for approximately 24 hours. ('887 patent, 12:32-34, [*29] 14:5-6.)

33. Claim 1 of the '887 patent, from which claim 3 depends, reads:

> A controlled release oral pharmaceutical preparation suitable for dosing every 24 hours comprising
>
>> a substrate comprising a pharmaceutically effective amount of tramadol or a salt thereof;
>>
>> said substrate coated with a controlled release coating;
>>
>> said preparation having a dissolution rate in vitro when measured using the Ph. Eur. Paddle Method at 100 rpm in 900 ml 0,1 N hydrochloric acid at 37[degrees] C. and using

> UV detection at 270 nm, between 0 and 50% tramadol released after 1 hour; between 0 and 75% tramadol released after 2 hours; between 3 and 95% tramadol released after 4 hours; between 10 and 100% tramadol released after 8 hours; between 20 and 100% tramadol released after 12 hours; between 30 and 100% tramadol released after 16 hours; between 50 and 100% tramadol released after 24 hours; and greater than 80% tramadol released after 36 hours, by weight, said preparation providing a therapeutic effect for about 24 hours after oral administration.

(*Id.* at 12:16-35.)

34. Dependent claim 3 provides narrower *in vitro* dissolution ranges than claim 1. (*Id.* at 12:50-64.) In other words, the range of dissolution percentages [*30] at certain time points is smaller. For example, claim 3 requires between 35% and 100% tramadol released after 8 hours, rather than the 10% to 100% called for in claim 1. (*Id.* at 12:62.)

35. Independent claim 13 claims a pharmaceutical "tablet" rather than a "preparation" and requires that the coated tablet provide "a W[50] in the range of 10 to 33 hours when orally administered"; otherwise, claim 13 is identical to claim 1. (*Id.* at 13:53-14:6.)

36. Dependent claim 27 reads:

> A controlled release preparation in accordance with claim 1, wherein said controlled release coating comprises a material selected from the group consisting of a water insoluble wax, a water insoluble polymer, a water insoluble

BSC-SJA-1277

cellulose and mixtures of any of the foregoing.

(*Id.* at 16:1-5.)

37. Claim 29 is similar to claim 27 but depends from claim 13 rather than claim 1. (*Id.* at 16:12-16.)

38. The asserted claims of the *'430 patent* are similar to those asserted in the *'887 patent* but define the structure of the controlled release formulation with more detail.

39. Specifically, claim 1 of the *'430 patent*, from which the asserted claims depend, reads:

> A solid controlled release oral dosage form, comprising,
>
> a therapeutically [*31] effective amount of tramadol or a pharmaceutically acceptable salt thereof incorporated into a normal release matrix,
>
> said matrix overcoated with a controlled release coating comprising a polymethacrylate or a water insoluble cellulose,
>
> said dosage form providing a therapeutic effect for at least about 24 hours.

(*'430 patent,* 12:41-51.)

40. With respect to the duration of therapeutic effect, the *'887 patent* uses the phrase "about 24 hours" and the *'430 patent* uses "at least about 24 hours." (*'887 patent,* 12:33; *'430 patent,* 12:49-50.) As will become apparent, the difference between those two phrases is irrelevant to the issues as I have decided them. Therefore, I will simply refer to the duration of therapeutic effect required by all the asserted claims as "approximately 24 hours."

41. Claim 3, from which asserted claim 5 depends, requires the controlled release coating to comprise a water insoluble cellulose. (*'430 patent,* 12:54-57.) Claim 5 requires the controlled release coating to further comprise a polyvinylpyrrolidone. (*Id.* at 12:61-63.)

42. Claim 7 adds to claim 1 the same narrow *in vitro* dissolution rate as claim 3 of the *'887 patent.* (*Id.* at 13:1-12; *'887 patent,* 12:50-64.) Although [*32] claim 7 adds the term "about" to the dissolution ranges -- claiming, for example, "about 0 to about 50% tramadol released after 1 hour" rather than the "0-50" provided in claim 3 of the *'887 patent* -- that difference is immaterial to this case.

43. Claim 11 adds to claim 1 "a W[50] in the range of 10 to 33 hours." (*'430 patent,* 14:11-12.)

### D. *Therapeutic Effect of Par's Tablets*

44. Plaintiffs' infringement theory as to whether Par's tablets provide a therapeutic effect for approximately 24 hours relies on a comparison of the PK data of Ultram ER to a 50 mg dose of Ultram IR, the latter of which, Plaintiffs say, has an onset of action at 30 minutes. (D.I. 331 at 15-17; *see* FF P 22.) Plaintiffs contend that, because the PK studies for Ultram ER reveal blood plasma concentrations of tramadol for approximately 24 hours above the onset concentration of 50 mg Ultram IR, and because Par's tablets and Ultram ER produce substantially similar PK values and are "therapeutically equivalent," Par's tablets meet the 24-hour limitation in the asserted claims. (D.I. 331 at 18.)

45. Plaintiffs' theory requires me to make a number of factual findings, namely, whether 50 mg Ultram IR has an onset of action [*33] at 30 minutes, whether a dose of 50 mg Ultram IR can be used to measure the efficacy of Ultram ER, how the onset concentrations of Ultram IR compare to the blood plasma concentrations observed with Ultram ER, and the similarity of Ultram ER to Par's tablets.

#### i. *Bioequivalence of Ultram ER and Par's Tablets*

46. Taking the last issue first, I find that the therapeutic effect of Par's tablets will be the same as that provided by Ultram ER. Indeed, Par readily concedes this point: "Par's product will have the same efficacy as Ultram ER because its PK profile is the same throughout the entire curve ... ." (D.I. 337 [29] at 4; *see* PTX-214 at

PAR011462-66; Davies, Tr. 681:16-83:11; Weinberger, Tr. 841:8-17, 873:17-76:17; Grond, Tr. 997:6-21, 1000:3-8; PTX-166 at PAR015918; Elvin, [30] Tr. 452:10-34:14; Katz Tr. 517:23-18:8.) Thus, a demonstration of the therapeutic effect of Ultram ER is necessarily a demonstration of the therapeutic effect of Par's tablets.

29   D.I. 337 is Par's post-trial reply brief.
30   Dr. Alfred Elvin is Par's Director of Biopharmaceutics. (Elvin, Tr. at 450:12-15; D.I. 326, Ex. E at 7.)

ii. *Ultram IR*

47. Moving to the therapeutic effect of Ultram IR, I find for the following reasons [*34] that 50 mg Ultram IR provides a therapeutic effect and that onset of action of that dose occurs at 30 minutes.

48. Plaintiffs' clinical expert, Dr. Warren Katz, testified that, in his experience prescribing Ultram IR to thousands of patients since the product was released in 1995, many of his patients tell him that they have at least some pain relief within the first 30 to 60 minutes of taking a 50 mg pill. (Katz, Tr. 491:9-492:23.) In line with that testimony, Dr. Katz published a peer-reviewed article in 1996 that reported that the onset of action following administration of 50 mg of Ultram IR occurred within one hour. (PTX-857 at 39; Katz, Tr. 495:7-497:7.) Dr. Katz also highlighted another article from the same journal (the "Lee article") that reported that an additional dose of 50 mg immediate release tramadol may be given if pain relief is inadequate at 30 to 60 minutes after the first dose. (PTX-858 at 336; Katz, Tr. 497:12-499:18.) From that statement, Dr. Katz reasonably surmised that some patients did have an adequate response to the first dose of tramadol in 30 minutes. (Katz, Tr. 498:19-24.)

49. Clinical studies support Dr. Katz's testimony. The NDA for Ultram IR contained [*35] twenty single dose pain trials. (PTX-883 at BVF00022012; Davies, Tr. 695:1-698:8; Grond, Tr. 1016:14-17:14.) Twelve of those twenty studies investigated the 50 mg dose of Ultram IR, six in dental pain models and six in surgical pain models. (PTX-883 at BVF00022012-16.) In ten of those twelve studies, 50 mg Ultram IR produced a mean onset of pain relief in about 30 minutes. Specifically, mean onset of action was 22 minutes in the 6-hour dental study TE/TE2 (*id.* at BVF00022029); 38 minutes in the 6-hour dental study TF (*id.* at BVF00022036); 30 minutes in the 6-hour

dental study TG, (*id.* at BVF00022050); 24 minutes in the 8-hour dental study TH (*id.* at BVF00022057); 37 minutes in the 8-hour dental study TI (*id.* at BVF00022064); 21 minutes in the 8-hour post-surgical study TA (*id.* at BVF00022100); 20 minutes in the 6-hour post-surgical study TC (*id.* at BVF00022107); 19 minutes in the 6-hour post-surgical study TJ (no placebo) (*id.* at BVF00022114); 36 minutes in the 6-hour post-surgical study TW (*id.* at BVF00022122); and 16 minutes in the 6-hour cesarean section study TV (*id.* at BVF00022166). Of the remaining two studies, one, TF3, had a mean onset of action of 62 minutes (*id.* at BVF00022043); [*36] and the results of the other, TB, were not analyzed due to insufficient enrollment (*id.* at BVF00022016). In an efficacy test sponsored by Purdue for a separate NDA, the median time to perceptible pain relief following administration of 50 mg Ultram IR was found to be 69 minutes (a mean time is not given); the median time to "meaningful pain relief" was found to be 3.1 hours. (Grond, Tr. 1046:16-1048:11, 1018:2-11.) Taking the reported summary from each of the analyzed studies, the average time to at least some pain relief was 33 minutes.

50. At trial, Par's expert, Dr. Stefan Grond, dismissed the significance of those clinical studies. Relying on a report from an FDA reviewer that concluded that tramadol 50 mg was "positive" in only one of eight of the trials (PTX-883 at BVF00022017; Grond, Tr. 1017:2-8), Dr. Grond testified that, "in my opinion, the FDA concluded ... that 50 mg of Tramadol immediate release has marginal efficacy, and in my opinion, you cannot take only one of eight studies and, using that, ... make an assumption of analgesic efficacy at between 30 minutes and six hours." (Grond, Tr. 1017:9-14.)

51. However, the FDA reviewer's conclusion on which Dr. Grond relies does not [*37] address onset of action. Although the clinical studies measured both pain intensity and pain relief (*e.g.*, PTX-883 at BVF00022025, 26), the FDA reviewer based his one-of-eight conclusion on pain intensity measurements alone. Specifically, the FDA reviewer looked at the pain intensity differences from baseline ("PID"), measured after the first half hour and hourly thereafter, and summed those differences for the first three hours ("3-hour SPID"). (*Id.* at BVF00022012.) The reviewer considered a drug to be "positive" in a given study if the 3-hour SPID for the drug beat placebo. (*Id.* at BVF00022013-16.) In contrast to the 3-hour SPID measurements, the mean pain relief

BSC-SJA-1279

measurements show that 50 mg tramadol was greater than placebo at the first half hour in all but two of the studies. (*Id.* at BVF00022025, 32, 39, 46, 53, 60, 88, 96, 103, 118, 162.)

52. Furthermore, although Dr. Grond is clearly well-credentialed and a recognized authority in his field of anesthesia and pain management, I do not agree with him that the FDA endorsed a conclusion that a 50 mg dose was only marginally effective. To the contrary, the FDA approved the use of an initial 50 mg dose of Ultram IR for the American [*38] public where "rapid onset of analgesic effect is required." (PTX-844 at 3.) Apparently, the FDA did not require that 50 mg Ultram IR provide some pain relief in 30 minutes for all patients before deeming it effective, and there is no basis for me to hold Ultram IR to a more exacting efficacy standard than did the FDA. The Ultram IR label insert states, "Onset of analgesia in humans is evident within one hour after administration"; the FDA approved that label following the submission of the clinical studies. (PTX-844 at 3; PTX 883A at BVF00021883; Katz, Tr. 493:18-94:12; Davies, Tr. 685:9-20, 697:2-9, 698:9-14.) The FDA's approval, the clinical studies, Dr. Katz's clinical experience, Dr. Katz's article, and the Lee article that he referenced in his testimony (FF P 48) all lead me to conclude that Plaintiffs have established, by a preponderance of the evidence, that 50 mg Ultram IR can and frequently does provide an analgesic effect at 30 minutes after oral administration.

### iii. *Bioequivalence of Ultram IR and Ultram ER*

53. Par disputes whether the FDA allowed Biovail [31] to rely on the efficacy of Ultram IR to establish the efficacy of Ultram ER, with the implication being that, if the [*39] FDA did not allow Biovail to do so, I should not allow Plaintiffs to do so either. (D.I. 337 at 4-5; D.I. 336 [32] at 4 n.1.)

> 31  As noted earlier, Biovail is the holder of the NDA for Ultram ER. (FF PP 4, 6.)
> 32  D.I. 336 is Plaintiffs' post-trial reply brief.

54. Biovail's Ultram ER NDA was submitted pursuant to § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (codified at *21 U.S.C. § 355(b)(2)*) and relied on efficacy and safety data for Ultram IR. (Uncontroverted Facts, D.I. 326 at P III.C.(31); PTX-879 at BVF00144032.) In its draft "Guidance for Industry," the FDA has stated that a 505(b)(2) application is

appropriate for a controlled release product that is bioequivalent to a previously approved drug where "1. [t]he proposed product is at least as bioavailable as the approved pharmaceutically equivalent product ... or 2. [t]he pattern of release of the proposed product, although different, is at least as favorable as the approved pharmaceutically equivalent product." (DTX-479 at 6.)

55. Biovail initially sought FDA approval to market Ultram ER for the treatment of "moderate to moderately severe pain," which would encompass both chronic and acute pain. (PTX-833 at BVF00021887.) That [*40] was the same indication for which Ultram IR had been approved in 1995. (Weinberger Tr. 889:5-891:4; PTX-750 at BVF00117572.) As a part of the Ultram ER approval process, Biovail submitted multiple clinical studies comparing the PK data for a single 200 mg Ultram ER tablet to data for a 50 mg Ultram IR dose taken four times a day at regular and at irregular intervals. (PTX-750 at BVF00117578-93.)

56. In October 2004, Biovail received an "approvable" letter from the FDA that identified questions about Biovail's proposed labeling and studies and stated that "upon review of the data presented in [the] NDA, [Ultram ER] is *not* bioequivalent to the reference listed product." (PTX-884 at BVF00529849 (emphasis added).) The letter requested an additional trial demonstrating "robust evidence of efficacy. (*Id.* at BVF00529850.) The FDA also issued two clinical reviews recommending that Biovail's NDA 21-692 not be approved, "based on lack of efficacy in conjunction with the high rate of adverse events." (DTX-354 at SBA 208; DTX-353 at SBA 134.)

57. On March 7, 2005, Biovail submitted a "Complete Response" letter to the FDA, in which Biovail limited the proposed indication for Ultram ER to "chronic [*41] pain" and submitted new analyses of its previously conducted clinical studies to explain how those studies revealed that Ultram ER was, indeed, bioequivalent to Ultram IR. (PTX 770 at BVF00160624, BVF00160636.) Biovail did not conduct additional clinical trials. (*Id.* at BVF00160630, BVF00160635.)

58. Following Biovail's response, the division director responsible for dealing with Biovail's NDA, Dr. Robert Rappaport, issued a "Division Director Review and Basis for Approval Action," in which he noted that he disagreed with the clinical review team and that he had concluded that Biovail had "provided adequate evidence

BSC-SJA-1280

of efficacy in support of [its] marketing application for [Ultram ER]." (PTX-746 at SBA 49.) Following a review of Biovail's March 7 Complete Response, additional FDA reviewers concluded that, although there were still some questions as to the efficacy of Ultram ER at steady state, "the [bioequivalence] of [Ultram ER] to Ultram [IR] was demonstrated after [a] single daily dose in all [of Biovail's] studies." (DTX-356 at SBA 478.) Those reviewers, like Rappaport, concluded that Biovail's application was acceptable. (*Id.* at SBA 477.) The FDA ultimately approved Ultram ER, [*42] on September 8, 2005, and authorized it to be labeled for "moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." (PTX-747 at BVF00190805, 816, 840.)

59. Based on the foregoing record, and contrary to Par's assertion, it appears that the FDA ultimately did conclude that the PK data submitted by Biovail was sufficient to establish bioequivalency. Although the FDA initially asked for direct clinical evidence of efficacy, it did not finally require more studies for approval. Par highlights Plaintiffs' statement in post-trial briefing that the FDA considered bioequivalence at steady state, rather than after an initial dose. (D.I. 337 at 5 n.1 (citing D.I. 331 at 14).) But that statement is not inconsistent with Plaintiffs' argument that PK data from Ultram IR can be used to measure the efficacy of Ultram ER. That Biovail only established bioequivalence as to steady state merely reflects the threshold showing that the FDA required for approval of Ultram ER for chronic pain. In other words, just because Biovail may not have needed to establish a single pill equivalency before the FDA does not mean that it [*43] could not have. In fact, quite the opposite appears to be true in light of the reviewer comments that "the [bioequivalence] of [Ultram ER] to Ultram [IR] *was demonstrated* after [a] single daily dose in all [of Biovail's] studies." (DTX-356 at SBA 478 (emphasis added).)

60. I conclude that Plaintiffs have shown by a preponderance of the evidence that a single dose of 200 mg Ultram ER is bioequivalent to a 50 mg Ultram IR dose taken four times a day and that the efficacy of Ultram IR is a proper basis on which to judge the efficacy of Ultram ER.

### iv. *Therapeutic Effect of Ultram ER*

61. Biovail's Study 2551, submitted as a part of its NDA, compared the PK profile of four 50 mg Ultram IR

tablets taken every six hours to one 200 mg Ultram ER tablet. (Davies, Tr. 700:12-02:22; PTX-750 at BVF00117589-93). That study reveals a 30-minute blood plasma concentration for 50 mg Ultram IR of 40 ng/ml. (Davies, Tr. 703:23-04:19; PTX-750 at BVF00117590.) Plaintiffs' formulation expert, Dr. Martyn Davies, estimated that, based on the same study, a 200 mg dose of Ultram ER provided blood plasma concentrations above that 40 ng/ml level for about 32 hours. (Davies, Tr. 704:13-23; PTX-750 at BVF00117590; DTX-685 [*44] at BVF00123144.)

62. With respect to the 300 mg Ultram ER tablet, the plasma concentrations of tramadol will increase proportionally from the 200 mg Ultram ER tablet. (Grond, Tr. 1028:3-8.) Based on dose proportionality (*see supra* note 28), Dr. Davies determined that, because 200 mg Ultram ER is therapeutically effective for about 24 hours as shown by its plasma levels, the 300 mg Ultram ER tablet has at least the same duration of efficacy given its higher plasma levels. (Davies Tr. 707:5-708:11; PTX-750 at BVF00117609).

63. With respect to the 100 mg Ultram ER tablet, Dr. Davies relied on Biovail's single dose PK Study 2677, also submitted as a part of its NDA, to determine the duration of efficacy. Study 2677 graphed the blood plasma levels provided by a target formulation of 100 mg Ultram ER against those provided by a 100 mg Ultram IR control. Using Study 2677 and the 40 ng/ml onset concentration at 30 minutes from Study 2551 as a reference point, Dr. Davies determined that a 100 mg dose of Ultram ER maintains therapeutic plasma levels above that known therapeutic concentration for about 25 hours. (Davies Tr. 708:17-10:13; PTX-750 at BVF00117643; PTX-878 at BVF00127709.)

64. Par does [*45] not argue that the 30-minute onset concentration for 50 mg Ultram IR was inaccurately measured or that the various dosage strengths of Ultram ER fail to provide blood plasma concentrations above that concentration level for approximately 24 hours. Rather, its argument is pinned on the concept that onset of action for 50 mg Ultram IR does not occur at 30 minutes. I have rejected that position. (FF P 52.) Par also vigorously disagrees with the general notion that 40 ng/ml represents an effective concentration of tramadol. However, as already discussed (FF P 60), and as further explained in my Conclusions of Law ["CL"], *infra*, PP 8-12, I am persuaded that the 40

BSC-SJA-1281

ng/ml blood plasma concentration is a proper marker at which the duration of therapeutic effect can begin to be measured. Thus, Plaintiffs have sufficiently established that the 100 mg, 200 mg, and 300 mg dosage strengths of Ultram ER--and, because of their bioequivalency to Ultram ER, the same dosage strengths of Par's tablets (FF P 46)--provide a therapeutic effect for approximately 24 hours.

## B. Prosecution History of the Patents-in-Suit - Chapter I

65. The prosecution history of the patents-in-suit is relevant to issues of both [*46] obviousness and inequitable conduct. At this point, I will discuss the portion of the prosecution history that relates most directly to the question of obviousness.

66. The application that issued as the '887 patent, Application No. 08/677,798 (the "'798 application"), was filed on July 10, 1996. ('887 patent, cover page.) The '798 application was filed as a division of Application No. 08/241,129 (the "'129 application"), which was filed May 10, 1994 and issued as U.S. Patent No. 5,591,452 (the "'452 patent") on January 7, 1997. ('452 patent, cover page.)

67. The application that issued as the '430 patent, Application No. 09/800,204 (the "'204 application"), was filed on March 6, 2001. ('430 patent, cover page.) The '204 application was filed as a continuation of the application for the '887 patent. (Id.)

68. The '887 patent and its parent, the '452 patent, claim priority to four foreign patent applications filed from May 10, 1993 to March 14, 1994. ('887 patent, cover page.) Under 35 U.S.C. § 119, the claims set forth in a United States application are entitled to the benefit of a foreign priority date if the corresponding foreign application provides a sufficient written description [*47] of what is claimed in the United States patent. In re Gosteli, 872 F.2d 1008, 1010-11 (Fed. Cir. 1989). The earliest of those claimed priority documents is German Patent Application No. DE 4315525 (the "German priority document"). (Uncontroverted Facts, D.I. 326 at P III.G.(64).)

69. The German priority document does not disclose any PK data, any product having a 24-hour therapeutic effect, any of the dissolution ranges stated in the asserted patents to be suitable for once daily administration, controlled release coatings of tablets suitable for

once-a-day dosing, or any W[50] values. (DTX-21; Grond, Tr. 997:22-998:20; Palmieri, Tr. 1271:22-73:12.) Moreover, PK study TRAM.PKIIN4, which underlies Figure 2 and Example 8 of the patents-in-suit, was conducted in March 1994, almost a year after the filing of the German priority document. (FF PP 27-29.) Thus, I agree with Par (D.I. 339 [33] at P 240) that the asserted claims of the '887 patent are not supported in the German priority document and are not entitled to that document's May 10, 1993 filing date. [34]

> 33  D.I. 339 is Par's proposed findings of fact and conclusions of law.

> 34  Although Par alleges that the '430 patent also claims priority [*48] to the German priority document (D.I. 339 at P 19), no such claim is apparent from the face of the '430 patent. Moreover, the prosecution history for the '430 patent reveals that, while the applicants claimed priority based on the same foreign patent applications as they did with the '887 patent (PTX-5 at PUR1109739, 1110465), the examiner determined that the conditions for claiming foreign priority under § 119 were not met (id. at PUR1110461, 65). Although the examiner did not provide his reasons, the content of his conclusion provides further support for mine. The '430 patent was amended during prosecution so that all the claims that included a 12-hour therapeutic effect limitation were deleted. (Compare id. at PUR1110106-07 with PUR1110448.) Such claims, which might more readily find support in the foreign applications, are present in the '887 patent. (E.g., '887 patent, 13:20-40.) Of course, this case gives me no reason to question whether any of the non-asserted claims of the '887 patent are entitled to the filing date of the German priority document.

70. Plaintiffs are silent as to whether the German document entitles them to a foreign priority date. However, they do not dispute [*49] that the references raised by Par are prior art. (See D.I. 331 at 27.)

### i. Background References

71. The references described in this subsection were all before the U.S. Patent Office ("PTO") during the prosecution of the patents-in-suit. ('887 patent at p. 2; '430 patent at pp. 1-2.)

72. *U.S. Patent No. 4,844,909* (the *"'909 patent"*), filed October 26, 1987 and issued July 4, 1989, discloses controlled release formulations of 1 to 100 mg of hydromorphone. (DTX-24 at cover page, 2:41-44; Palmieri, Tr. at 1308;11-1309:7.) The *'909 patent* provides dissolution release rates and plasma profiles (DTX-24 at 1:8-26; Palmieri, Tr. 1314;18-21); it describes a T[max] (*see* FF P 22) between 4 to 8 hours (DTX-24 at 2:11-16; Palmieri, Tr. 1314:18-1315:9); it describes water insoluble cellulose coatings, such as ethylcellulose coatings (DTX-24 al 4:42; Palmieri, Tr. 1315;11-15); and it describes a normal release matrix having a coating that controls the release of the drug (DTX-24 at 3:64-66). Hydromorphone has similar water solubility, molecular weight, and dose size as tramadol. (Palmieri, Tr. 1317;4-20.)

73. *U.S. Patent No. 5,266,331* (the *"'331 patent"*), filed November 27, 1991 and issued November 30, [*50] 1993, discloses controlled release formulations of 1 to 50 mg of oxycodone. (DTX-22 at cover page, 2:46-48.) Even though the *'331* and *'909 patents* specify different active ingredients, they both disclose the identical dissolution release rate profiles, which are within the ranges of the asserted claims. (Palmieri, Tr. 1316:5-22.)

74. *U.S. Patent No. 5,286,493 (the "'493 patent")*, filed January 27, 1992 and issued February 15, 1994, discloses controlled release compositions of a variety of analgesics: hydromorphone, oxycodone, dihydrocodeine, codeine, dihydromorphine, morphine, buprenorphine, "and the like." (PTX-609 at 7:31-37.) The *'493 patent* discloses controlled release coatings (PTX-609 at 2:67-3:5), including Eudragit(R), which is a polymethacrylate (Palmieri, Tr. 1317;23-1318:9); it discloses a dissolution profile within the claimed ranges (PTX-609 at 4:57-67; Palmieri, Tr. 1312:24-1314;11); and it describes a substrate covered by a controlled release coating (PTX-609 at 9:23-30).

### ii. *The Merck/Bondi Reference*

75. On June 7, 2000, the PTO issued an office action rejecting the pending claims of the *'887 patent* as anticipated by or obvious in light of European Patent No. 147,780 (the [*51] "Merck/Bondi reference"). (PTX-2 at PLIR1109663.)

76. The Merck/Bondi reference discloses using a polyvinyl alcohol ("PVA") coating, which is a water insoluble polymer, to control the release of active

pharmaceutical ingredients. (DTX-16 at NAPP0045471; DTX-1456.) It lists tramadol as one of hundreds of possible agents that may be used with PVA coating. (*Id.* at NAPP0045468.) The possible agents in the Merck/Bondi reference are listed in 12 different classes identified by letters (a) through (l), each of which lists multiple agents within the class. (*Id.* at NAPP0045466-70.) Tramadol, which is an opioid analgesic, is listed in Merck/Bondi as a preferred agent, but is misclassified as one of about 60 different agents in the non-steroidal anti-inflammatory drug ("NSAID") class. (*Id.* at NAPP0045468; Palmieri, Tr. 1355:5-17, 1397:10-1400:8.) The reference discloses that the amount of PVA coating can range from 1% to 15% by weight of the entire drug delivery device, with 3% to 10% PVA preferred. (DTX-16 at NAPP0045471.) Sixty-four different examples of controlled release formulations are disclosed in Merck/Bondi, using various active agents and different PVA concentrations. None of the 64 [*52] examples uses tramadol. (*Id.* at NAPP0045472-77.) Claim 2 of Merck/Bondi claims tramadol as one of twelve potential NSAID active ingredients, where the PVA coating constitutes from 2% to 5% of the composition weight. (*Id.* at NAPP0045478-79.)

### iii. *Issuance of the Patents-in-Suit*

77. In the PTO's June 7, 2000 office action, the examiner stated that the Merck/Bondi reference teaches a slow releasing composition of tramadol and that "[a]ny differences are minor modifications and are obvious because a skilled artisan would be motivated to make minor changes ... in order to determine optimal conditions." (PTX-2 at PUR1109664.)

78. The examiner then held a personal interview with the applicants, after which the examiner noted that he "agreed that the large scope of listed compounds in [the Merck/Bondi reference] did not establish a prima facie case of obviousness." (PTX-2 at PUR1109665; Davidson, 35 Tr. 258:15-259:12.)

> 35   Clifford Davidson is Plaintiffs' U.S. patent prosecution counsel. (Davidson, Tr. 236;18-238:5.)

79. According to the applicants' subsequent submission to the PTO, the prior art before the examiner also was discussed during the interview and generally categorized as follows:



(a) prior [*53] art directed to pharmaceutical formulations that list tramadol in a long list of possible drugs to be included in such formulations but do not exemplify any tramadol formulations, namely the [Merck/Bondi reference] relied upon by the Examiner in the last Office Action; (b) prior art directed to controlled release formulations of narcotic opioid analgesics ...; and (c) prior art patents directed to controlled release formulation technology (where tramadol was not mentioned) and their applicability to the claimed invention.

(PTX-2 at PUR1109672.)

80. The '798 application matured into the '887 patent, which issued on July 3, 2001. ('887 patent, cover page.)

81. The '204 application, which ultimately issued as the '430 patent, was filed on March 6, 2001. ('430 patent, cover page.)

82. The same primary examiner reviewed both the '798 application and the '204 application. ('887 patent, cover page; '430 patent, cover page.) On April 23, 2002, after the '887 patent had issued, the examiner rejected the pending claims in the '204 application, stating that it would have been obvious to use the controlled release method taught in the Merck/Bondi reference for making an oral composition of tramadol. [*54] (PTX-5 at PUR1110001-1110002.) The examiner noted that "[t]he claims drawn to specific amounts, specific dosage forms, specific dissolution rates etc., are all obvious since a skilled artisan would reasonably be expected to tweak the controlled release form of tramadol to meet a variety of needs." (Id. at PUR1110002.)

83. In response, the applicants argued that one skilled in the art would not be motivated to select tramadol from the large number of active ingredients disclosed in the Merck/Bondi reference. (Id. at PUR1110110.) They also argued that the prior art did not teach the "24 hour therapeutic effect" limitation of the asserted claims. (Id. at PUR1110112-15.)

84. The examiner maintained his rejection until the applicants amended the claims to limit the claimed "controlled release coating" to one "comprising a

polymethacrylate or a water insoluble cellulose." (Id. at PUR1110125, PUR1110145, PUR1110416.) The applicants argued that the Merck/Bondi reference did not disclose such a controlled release coating. (Id. at PUR1110416.) The claims were then allowed, subject to a terminal disclaimer with respect to the '887 patent. See In re Goodman, 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("To [*55] prevent extension of the patent right beyond statutory limits, the doctrine of obviousness-type double patenting rejects application claims to subject matter different but not patentably distinct from the subject matter claimed in a prior patent."); 37 CFR 1.321(c) (specifying procedures for disclaiming the portion of the patent term following the expiration of a commonly owned patent that fits the description provided by In re Goodman).

85. The '430 patent issued on July 11, 2006. ('430 patent, cover page.)

F. References Not Before the PTO

i. U.S. Patent No. 5,580,578 ("Oshlack")

86. Benjamin Oshlack, former Vice President of Pharmaceutics at Purdue, is an inventor of U.S. Patent No. 5,580,578 (the "'578 patent" or "Oshlack"), filed July 27, 1993, as a continuation in part of the application for the '493 patent (see FF P 74) and issued December 3, 1996. (Oshlack, Tr. 171:7-21, 189:16-19.) Oshlack is directed to a method of increasing the shelf life of solid controlled release formulations. (PTX-601 at 3:3-41; Oshlack, Tr. 186:18-187:10, 189:12-21.) Oshlack teaches that an increased shelf life can be obtained by curing (heating) the controlled release formulation for an extended period. [*56] (PTX-601 at 3:41-64; Oshlack, Tr. 186:18-187:10.)

87. Oshlack describes various controlled release oral dosage formulations that are even closer to the asserted claims than is Merck/Bondi. Oshlack discloses specific examples of controlled release formulations that use morphine, hydromorphone, and acetaminophen as the active ingredients, but the reference broadly claims that it is applicable to controlled release dosage forms containing "systemically active therapeutic agent[s]." (PTX-601 at 20:12-39:26, 43:48-44:19; Oshlack, Tr. 187:17-24, 190:4-14.) Tramadol is claimed as one of 14 different "opioid analgesics" that qualify as appropriate therapeutic agents. (PTX-601 at 44:10-19, 29-36.)

88. Oshlack further describes controlled release coatings comprising either hydrophobic (water-insoluble) acrylic polymers (PTX-601 at 7:37-39) or polymethacrylates such as Budragit(R) (*Id.* at 9:30-41; Palmieri, Tr. 1318:1-12, 1336:24-1337:7).

89. Claim 43 of Oshlack ("Claim 43") describes a dissolution profile through eight hours that falls within the ranges described in claim 1 of the '887 patent. The Claim 43 dissolution profile falls within the ranges of claim 3 of the '887 patent and claim 7 of [*57] the '430 patent for the first four hours and overlaps with the range given at eight hours for those same claims. (PTX-601 at 43:57-44:9.) The dissolution conditions described in Claim 43, the USP paddle or basket method at 100 rpm at 900 ml aqueous buffer at 37[degrees]C, are not the exact same conditions laid out in the asserted claims of the patents-in-suit (which are based on the European method), but the differences are slight and usually do not produce significantly different results. (Palmieri, Tr. 1329:7-24.) Examples 19 and 20 of Oshlack, which use morphine, have dissolution results up to 14 hours that indicate that the dissolution rates are within the narrowest of the asserted claims of the patents-in-suit through 24 hours. (PTX-601 at 37:1-12.)

90. Oshlack claims that the formulations, including those that use tramadol as the active ingredient, provide "effective blood levels of [the] systemically active therapeutic agent for about 24 hours." (*Id.* at 44:8-9.) Although the Oshlack patent describes certain formulations in the examples as potentially being "suitable for once-a-day administration," none of those formulations involve tramadol. (*Id.* at 34:48-58, 36:1-2, 37:30-32, [*58] 45:20-21.)

91. Oshlack does not disclose a W[50] value or a coating comprising polyvinylpyrrolidone.

### ii. U.S. Patent No. 5,478,577 ("Kaiko")

92. Dr. Robert Kaiko, a Purdue scientist (Kaiko, Tr. 204:7-10.), is one of the named inventors of *U.S. Patent No. 5,478,577* (the "577 patent" or "Kaiko"), filed November 23, 1993, and issued December 26, 1995. (PTX-600.) Kaiko discloses 24-hour oral opioid formulations that provide "an initially more rapid opioid release" followed by sustained release of the drug later in the dosing interval but with significant fluctuation. (PTX-600 abstract; Kaiko, Tr. 219:12-220:13.) Kaiko discloses sustained release formulations that include an effective amount of opioid in immediate release form in order to shorten T[max]. (PTX-600 at 6:26-36; *see* FF P 22.)

93. Kaiko discloses tramadol as one of more than 70 opioid analgesic compounds that may be used. (PTX-600 at 6:62-7:17). However, tramadol is not listed as a preferred opioid analgesic, and the examples all use morphine as the active ingredient, with an immediate release morphine coating. (*Id.* at 7:16-20, 13:45-24:5.) At least three of those examples have dissolution profiles for morphine that fall within [*59] the claimed ranges using the USP Apparatus II (Paddle Method) at 100 rpm and 37[degrees]C in simulated gastric fluid. (*Id.* at 14:46-67, 21:13-34.)

94. Kaiko claims that, in general, the disclosed controlled release formulations provide effective pain relief for "at least about 24 hours when administered to a human patient." (*Id.* at 24:18-20.) The patent also generally discloses a dosage form that is suitable for once-a-day administration. (*Id.* at 3:48-53.)

95. The reference describes coatings such as acrylic polymers, cellulosic materials, or a water insoluble wax. (*Id.* at 8:1-9:11, 13:18-21.) Specifically, the patent describes controlled release coatings comprising either polymethacrylate (*id.* at 8:29) or ethylcellulose, a water insoluble cellulose (*id.* at 9:4-11).

96. Neither the Oshlack reference nor the Kaiko reference, both of which were filed after the filing date of the German priority document, was included in the list of documents considered by the PTO during prosecution of the patents-in-suit. ('887 patent at pp. 1-2; '430 patent at pp. 1-2.)

### G. Commercial Success of Ultram ER

97. Ultram ER was launched in the United States in 2006. (Rausser, [36] Tr. 783:20-23.) It is not unusual [*60] for expenses to exceed revenues for a new product during a product launch, and Ultram ER did not become profitable until 2008. (Axenroth, [37] Tr. 411:21-412:6.)

> 36   Dr. Gordon Rausser is the Robert Gordon Sproul Distinguished Professor of Economics at the University of California at Berkeley. (Rausser, Tr. 763:20-764:3.)
> 37   Robert Axenroth is employed by Ortho as Group Product Director for Ultram ER.

(Axenroth, Tr. 387:25-388:21.)

98. The parties dispute how the market for Ultram ER should be defined, but, under either side's market definition, Ultram ER has attained no more than half of a percent of total prescriptions of the relevant market for pain medications. (Rausser, Tr. 804:7-805:6; DTX-1201-01 to 1201-06.) A partial explanation for the low market share is significant generic competition by medications for moderate to moderately severe chronic pain, which is only a subset of the types of pain for which medication is available. Another partial explanation is Ultram ER's "Tier 3" formulary status, which carries with it a high "co-pay" for patients purchasing the medication. 38 (Axenroth, Tr. 398:22-404:15, 410:3-411:4.)

> 38   A formulary lists drugs that managed care companies would have [*61] patients purchase, in order of preference. (Axenroth, Tr. 410:3-6.) Typically, there are three tiers in a managed care formulary: Tier I, Tier II, and Tier III. (Id. at 410:7-9.) Tier I usually contains generic products; Tier II usually contains preferred branded products; and Tier III usually contains non-preferred branded products. (Id. at 410:10-15.) That a drug is listed in Tier III has nothing to do with its efficacy. (Id. at 410:25-411:4.) "Co-pay," of course, refers to the fixed sum of money an insurance company requires its insured to pay when having a prescription filled.

99. Par's internal forecasts for controlled release tramadol projected that its proposed generic would sell 2.5 million bottles and generate $68.5 million in revenue in the first three years in the market. (PTX-321 at PAR052811; Campanelli, 39 Tr. 457:17-458:24.) That forecast indicates significant potential for commercial success of controlled release tramadol products, including Ultram ER. Par's products are typically discounted by 70% to 90% of the price of the branded product. (Saber, 40 Tr. 757:3-18.) Thus, assuming inelastic demand, Par's three-year forecast suggests that a branded controlled release [*62] tramadol product could generate up to $685 million in that same time frame. That estimate reflects an increase over the sales of Ultram ER during the previous three years: from the time of its launch in February 2006 through the first quarter of 2009, sales of Ultram ER have generated approximately $500 million. (Axenroth, Tr. 411:14-20.)

39   Paul Campanelli is president of Par's generics division. (Campanelli, Tr. 455:19-24.)

40   David A. Saber is the director of business development and licensing for Par's generics division. (Saber, Tr. 753:5-24.)

100. It is undisputed that whatever commercial success Ultram ER has enjoyed so far and may enjoy in the future is related to the claimed features of the patents-in-suit. (Rausser, Tr. 811:19-24.)

### H. Par's Copying of Ultram ER

101. Par began work on a generic copy of Ultram ER in 2006. (Mittleberg, Tr. 433:18-21.) From the start, Par assigned the product a very high priority. Par's Executive Vice President of Pharmaceutical Research and Development, Dr. Eric Mittleberg, could not recall at his deposition why Par selected tramadol as an active ingredient for a controlled release formulation. 41 (Mittleberg, Tr. 432:14-433:24.) Nonetheless, Par's [*63] Director of Regulatory Affairs, Ms. Kala Patel, recorded Mittleberg as saying that tramadol ER was a "[v]ery valuable FTF [First To File]" and that he wanted to pursue it with extreme aggressiveness. (Patel Tr. 443:5-444:9; PTX-246.) As mentioned, Par forecasted high sales for the first three years after launch. (FF P 99.) The President of Par's generics division, Paul Campanelli, testified that if Tramadol ER were launched in 2009, it could be one of Par's top 20 products. (Campanelli, Tr. 455:7-21, 457:5-16.)

> 41   Though not true of all of Par's employee witnesses, many were evasive and unconvincingly forgetful with respect to the process of developing their controlled release tramadol product. One particularly memorable example of Par's stonewalling is found in the following excerpt from the deposition of Par's senior scientist in charge of formulating Tramadol ER:
>
> > Q. [A]s senior scientist, ... what are the duties and responsibilities that you have?
> >
> > A. I formulate.
> >
> > Q. And what are the types of activities that are encompassed by when you say you formulate?

BSC-SJA-1286

A. I don't know. I just formulate.

...

Q. How many different formulations did you make of Tramadol ER?

A. I don't remember.

Q. Was it more than [*64] 10?

A. I don't remember.

Q. Was it more than 20?

A. I don't remember.

Q. Was it more than 30?

A. I don't remember.

Q. Was it more than 50?

A. I don't remember.

Q. Was it more than a hundred?

A. I don't remember.

Q. Is it possible you made more than 100 different formulations of Tramadol ER?

A. I don't remember.

Q. Is there anything at all you remember about formulating Tramadol ER?

A. I formulated it.

(Shankar, Tr. 459:19-461:22.) This is only one example of several from different witnesses whose testimony is not discussed because it ultimately does not have a bearing on the disposition of the case. Suffice it to say, however, that, while Par obtains a favorable ruling on invalidity in this case, any success it has had here is in spite of and not because of the impression

left by such obviously elusive tactics. Collective amnesia is an inappropriate and unimpressive litigation stance.

102. Par's strategy was to match the *in vitro* dissolution profile of Ultram ER (Mittleberg, Tr. 436:9-25; PTX-201 at PAR003502), and its dissolution tests showed it succeeded in doing that (Davies, Tr. 675:17-678:23; PTX-220 at PAR003756-57). Par's PK studies demonstrated that its formulation also matches the blood [*65] plasma curve of Ultram ER. (Davies Tr. 682:7-683:22; PTX-214 at PAR011462-66.)

103. Par's formulation is virtually identical to Ultram ER. (Davies, Tr. 665:2-4; PTX-166 at PAR015918.) Like Ultram ER, Par achieves controlled release through a normal release tablet core with a controlled release coating. (Davies Tr. 661:2-662:12; PTX-166 at PAR015917, 921.)

104. A Product Development Report, prepared in support of Par's ANDA, notes that Par relied on a "patent" in the development of its product, although the whereabouts of the file containing that patent are unknown. (PTX-171 at PAR002035; Shankar Tr. 466:1-469:8.) A project status presentation by Par's senior scientist shows that Par particularly studied the '887 patent. (Davies Tr. 665:19-666:6; PTX-375 at PAR024373.) The same presentation shows that Par studied the formulation ingredients and dissolution profile of Ultram ER in making its Tramadol ER tablets. (Davies Tr. 665:11-18; PTX-375 at PAR024374-75.) Par's choice of controlled release coating included water insoluble ethylcellulose, which the patents-in-suit describe as "particularly" suitable for that use, and polyvinylpyrrolidone, as described in claim 5 of the '430 patent. [*66] (Uncontroverted Facts, D.I. 318 at P III.B.(26); Davies Tr. 661:4-662:7; PTX-1 at 4:47-51; PTX-4 at 12:61-63; PTX-166 at PAR015917.)

105. Par seeks FDA approval of its tablets to manage "moderate to moderately severe chronic pain in adults who require around the clock treatment of their pain for an extended period of time" and for once-daily dosing, the same indications that the FDA has approved for Ultram ER. (Uncontroverted Facts, D.I. 326 at P III.B.(12), (21); Weinberger, Tr. 877:2-18; PTX-747 at BVF00190805, 816, 829.)

I. *Prosecution History of the Patents-in-Suit - Chapter II*

BSC-SJA-1287

106. The following discussion of the prosecution history of the patents-in-suit deals with facts that are most directly relevant to the inequitable conduct contentions in the case. The centerpiece of Par's inequitable conduct argument relates to foreign proceedings regarding a foreign counterpart to the '887 and '430 patents, namely, European Patent No. 624,366 ("EP '366"). (Uncontroverted Facts, D.I. 326 at P III.H.(68); see D.I. 337 at 26-36.) EP '366 is entitled "Controlled release formulation containing tramadol."

107. Roger Milnes is head of the patent department of Mundipharma Research and was the in-house [*67] patent agent for Napp most substantively involved with the preparation and prosecution of the asserted patents during the 1990s. (Milnes, Tr. 334:15-335:18; 353:18-354:20.) As noted (supra note 35), Clifford Davidson is Plaintiffs' U.S. patent prosecution counsel. Davidson had primary responsibility for the prosecution of the '452 and '887 patents and supervised prosecution of the '430 patent. (Davidson, Tr. 236:18-238:5.)

i. The Malkowska I Declaration

108. The PTO issued its first office action in the prosecution of the original application for the patents-in-suit, the application for the '452 patent (FF P 66-67), on April 18, 1995 (the "'452 office action"). The examiner rejected the claims as anticipated and/or obvious in light of the Merck/Bondi reference. (FF P 76; Davidson, Tr. 269:13-70:9; DTX-11A at PAR045841-43.)

109. In rejecting the claims, the examiner stated that Merck/Bondi "discloses controlled release compositions wherein the active ingredient may be tramadol." (DTX-11A at PAR045841.) Acknowledging that the reference did not disclose the recited dissolution rates found in some of the claims set forth in the application for the '452 patent, the examiner nonetheless believed [*68] that "the prior art compositions are taught to have controlled release properties and would be expected to inherently possess characteristics within the recited ranges." (Id.)

110. The Merck/Bondi reference was also found to be particularly relevant to the prosecution of EP '366, according to an August 1994 search report from the European Patent Office (the "EPO"). (PTX-603 at 17.)

111. In response to that EPO report but before the

'452 office action, Napp carried out two sets of experiments based on one of the example formulations disclosed in Merck/Bondi. The results of Napp's efforts in that regard were memorialized in the first of two relevant declarations from inventor Sandra Malkowska (the "Malkowska I Declaration"). [42] (PTX 452.) Adrian Brown, a senior formulation scientist at Napp, performed the experiments, designated as Batch numbers F523/86 and F523/106, under Brown's and Malkowska's supervision. (Prater, Tr. 109:2-112:9, 138:18-21; PTX-452; DTX-109.) The experiments used Example 1 of the Merck/Bondi reference, which describes a tablet with L-dopa as the active ingredient, coated by a solution of PVA at 1% to 5% of the total tablet weight, but the experiments substituted [*69] 200 mg of tramadol Hcl as the active ingredient. (PTX-452 at DDK 0006823; DTX-16 at NAPP0045472.) Tramadol Hcl is normally dosed at 100 to 400 mg. Napp chose to use Example 1 of Merck/Bondi because it uses 250 mg of L-dopa, which falls within the 100 to 400 mg dosing range for tramadol Hcl. (PTX-452 at DDK 0006823; DTX-16 at NAPP0045472.) Using 200 mg tramadol rather than 250 mg L-dopa as the active ingredient meant that the target tablet core weight for the tablets in Napp's experiments was to be 352 mg rather than the 402 mg weight disclosed in Example 1. (DTX-16 at NAPP0045472; PTX-452 at DDK0006823.)

42    I will refer to the two Malkowska Declarations by number according to their chronology, but neither of them are numbered on their face. (Tr. 321:3-322:7.) Although Malkowska submitted another declaration to the EPO (id.; PTX-614 at PUR1109643-44), that declaration is not relevant to this case and therefore is referenced only in passing. (See infra note 47.)

112. Brown drafted two file notes dated December 8, 1994, and March 17, 1995, reporting his results. (DTX-109 at NAPP0037293-94; DTX-225.) Both notes state that the target tablet core weight for the experiment was 352 mg, but that [*70] the actual average tablet core weight was 340 mg (Prater, Tr. 161:21-162:1) and that the blend of ingredients during the experiments "exhibited poor flow characteristics." (DTX-109 at NAPP0037294; DTX-225 at NAPP 75930; Palmieri, Tr. 1365:16-1366:4.) "Flow characteristics" is a reference to the flow of powder ingredients within the tablet making machinery. According to Par's expert Dr. Palmieri, the

"poor flow characteristics" that Brown reported were a result of using a gravity-fed tablet press. (Palmieri, Tr. 1364:11-1365:6.) Dr. Palmieri testified that it was known in the art that poor powder flow causes underweight tablets, because the powder does not properly flow into the die of the tablet press, and that the problem of poor flow could be remedied by switching from a gravity-fed tablet press to a force-fed tablet press. (Id. at 1366:5-1367:3.)

113. The dissolution results for Batch numbers F523/86 and F523/106 fell outside the scope of the asserted claims and were included in the Malkowska I Declaration. (Prater, Tr. 156:4-10; DTX-109 at NAP0037292; PTX-452 at DDK0006825.) There were, however, some notable irregularities with the declaration. First, some of the reported data showed [*71] that the percent of dissolved tramadol was above 100%. (PTX-452 at DDK 0006825.) Par asserts that such data would have suggested to a person with ordinary skill in the art that something was wrong with the experiment. (Palmieri, Tr. 1363:2-21.) Second, the Malkowska I Declaration omits the two noted difficulties Brown had in recreating Example 1 of Merck/Bondi. Specifically, the declaration incorrectly reported an average tablet core weight of 352 mg and failed to mention the "poor flow characteristics" Brown had observed during the mixing of the drug. (PTX-452 at DDK 0006823; Prater, Tr. 161:21-62:16, Malkowska, Tr. 1079:22-1080:3, 1090:25-1091:17.) Brown's internal file note contains the following statement: "Tablets were compressed using 3/8" round shallow concave, bevelled edge tooling on a Kilian rotary tablet machine to an average tablet weight of 340 mg and 6 kp hardness. The blend exhibited poor flow characteristics." (DTX-109 at NAP0037294 (emphasis added).) The Malkowska I Declaration included the exact same statement, but with the tablet weight as 352 mg and the "poor flow" comment deleted. (PTX-452 at DDK 0006823.) Third, the Malkowska I Declaration used data from only [*72] one tablet, the one that fell the furthest outside the claimed dissolution ranges, rather than an average of all the tested tablets. (Palmieri, Tr. 1377:24-1378:20.) Prater testified that the reference to the dissolution rate of a single tablet was an "oversight." (Prater, Tr. 1456:20-1458:6.)

114. Milnes prepared and submitted the Malkowska I Declaration to the EPO as a part of the prosecution of EP '366. (PTX-452; Milnes, Tr. 344:24-346:12.) Davidson also relied on the Malkowska I Declaration, including it

in a response to the '452 office action and arguing to the PTO that the Merck/Bondi reference was not enabling. (Davidson, Tr. 270:10-72:24; DTX-11B at PAR045887-88.) Whether Davidson was aware of the differences between the Malkowska I Declaration and Brown's file notes is unclear.

115. As a part of its inequitable conduct argument, Par criticizes the Merck/Bondi experiments on which the Malkowska I Declaration was based. (D.I. 339 at PP 101-03.) At trial, Dr. Palmieri testified that the experiments were flawed because one of ordinary skill in the art would not have conducted dissolution testing on the tablets since they were underweight. (Palmieri, Tr. 1364:11-1365:6.) Par also [*73] relies on the three irregularities with the Malkowska I Declaration discussed above, i.e., the reporting of dissolutions above 100%, the discrepancies between the declaration and Brown's notes, and the reporting of only one tablet's dissolution rate rather than an average rate. (D.I. 339 at PP 99, 104-06.)

116. As discussed below (CL, infra, P 70), I conclude that the omissions and misrepresentations in the Malkowska I Declaration, while disturbing, are not clearly and convincingly material.

117. Both the EP '366 patent and the '452 patent were granted following the submission of the Malkowska I Declaration.

ii. World Congress of Pain

118. In 1996, representatives of Grunenthal and Mundipharma met twice to discuss the companies' patent positions with respect to controlled release tramadol. (DTX-166; DTX-167.) At the second meeting, Grunenthal disclosed to Mundipharma that it had conducted clinical studies with an extended release tramadol formulation before the filing date of the German priority document and that the results of those studies were presented at the Seventh World Congress on Pain in August of 1993 ("World Congress of Pain Abstracts"). (DTX-167 at NAPP0394555.) The existence [*74] and content of those discussions and the World Congress of Pain Abstracts were never disclosed to the PTO.

iii. EP '366 Opposition Proceedings and the Malkowska II Declaration

119. EP '366 subsequently underwent opposition proceedings. (Milnes, Tr. 346:22-47:13.) Parties in the

proceedings criticized the Malkowska I Declaration for reporting dissolution going beyond 100%. (PTX-459 at DDK 7346; PTX-489 at NAPP0078520_002.)

120. In response, and while the prosecution of the '887 *patent* was ongoing, Napp normalized the data of the Malkowska I Declaration, so that the maximum dissolution value was 100%. (DTX-247 at NAPP41839.) The normalized data was closer to the claimed ranges than the results disclosed in the Malkowska I Declaration, but still fell outside of them. Plaintiffs did not disclose the normalized data to the European or U.S. Patent Offices.

121. To better confirm that Merck/Bondi did not inherently disclose the claimed dissolution rates, Napp repeated the experiments underlying the Malkowska I Declaration (Milnes, Tr. 347:14-349:12; PTX-489 at NAPP0078520_002.) An email from Brown, who was again instructed to carry out the experiments, reveals that he did not want [*75] to write up experiments that produced "a documented and unacceptable profile." (DTX-260; *see* Prater, Tr. 118:5-22.)

122. Brown ran the initial coating run at a coating spray rate of 3 g/min, as was done in the 1995 experiments. (PTX-436 at NAPP373632.) That coating run, labeled Batch 616/07, failed "due to over wetting and sticking." [43] (PTX-437 at NAPP406447; Palmieri, Tr. 1386:7-22.)

> 43 "Sticking" refers to the adherence of the drug substance to manufacturing equipment, such as the punch faces of a tablet-making press. *Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1354 (Fed. Cir. 2007).*

123. Although dissolution tests were conducted on Batch 616/07, Par does not argue that the results of those tests should have been submitted to the PTO. (DTX-253 at NAPP0041855; D.I. 340 [44] at 26, 28.) Instead, Par argues that the sticking encountered with Batch 616/07 reflects problems arising out of the use of a 3 g/min spray rate, the same spray rate that was used for the experiments that formed the basis of the Malkowska I Declaration. (D.I. 340 at 29; D.I. 339 at P 118.) Plaintiffs counter that the sticking was due to conditions unrelated to the Malkowska I Declaration, namely the low inlet and outlet [*76] temperatures in the coater. (D.I. 334 at P 146.)

44 D.I. 340 is Par's post-trial brief.

124. I find Plaintiffs' explanation credible. The notes Brown made during coating of tablets for which sticking was a problem reveal that the inlet and outlet temperatures were lower than the target temperatures for the batch. Once the temperatures reached the target level, no sticking occurred even at the 3 g/min spray rate. (PTX-436A at NAPP0373633 [F616/11].)

125. Because of the sticking problem, a second coating run was conducted. (PTX-436 at NAPP373632.) For the second coating run, labeled F616/07B, a slower spray rate of 2 g/min was used, and Brown reported that "the slower spray rate of 2 g/min resulted in a smoother coat." (DTX-252 at NAPP 78521_004.) No sticking comments were reported in the laboratory notebooks for F616/07B, (DTX-252 at NAPP 78521_007; Malkowska, Tr. 1125:25-26:9.)

126. Dissolution tests were performed on the F616/07B batch and identified as LIMS Sample ID code 97000506. [45] (Prater, Tr. 165:11-23; DTX-251; DTX-254, Malkowska, Tr. 1128:9-22.) When Brown obtained the dissolution report for LIMS Sample 97000506 on September 26, 1997, he forwarded the results to Malkowska with [*77] the handwritten notation: "These are the TMDOL/PVA coated tablets corrected for assay." (DTX-251; Malkowska, Tr. 1112:25-13:6.)

> 45 "LIMS" means Laboratory Information Management System. (Prater, Tr. 164:24-165:5.) A LIMS number is a unique number used by Napp to identify particular analytical tests. (*Id.* at 165:7-10.)

127. The average tablet dissolution data from the F616/07B batch minus the standard deviation was within a half percentage point of the claimed dissolution range. (Palmieri, Tr. 1377:19-78:20, 1405:11-1408:13.) The data and results from batch F616/07B were never disclosed to the European or U.S. Patent Offices. (Prater, Tr. 167:13-25.)

128. Malkowska knew about the dissolution results of Batch F616/07B and may have recognized their full import. She asked Brown to find and photocopy the results, and then asked him, "compared with original data is coating same? Need this urgently this afternoon." (DTX-249 at NAPP 41852; Malkowska, Tr. 1105:1-17.)

BSC-SJA-1290

Brown responded to Malkowska's question by forwarding a copy of the LIMS report for Sample 97000506 with the handwritten note: "Second coating run, corrected for assay. Same coating, but slower spray rate used which may have (slightly) [*78] improved the smoothness of the coat." (DTX-249 at NAPP 41853.) Prater, as Brown's direct supervisor, likely knew about the testing results as well. (Malkowska, Tr. 1138:4-8.) Milnes, however, apparently was not made aware of the results. (Id. at 1137:11-11-23.)

129. About two weeks later, Brown went back into the laboratory to do a new coating run, Batch F616/14, as recorded in an entry dated October 24, 1997. (PTX-436 at NAPP 373635.) Brown wrote that "the coating run needs to be repeated using the same coating conditions used for F423/08 and F616/08," which included the coating spray rate of 3 g/min. (PTX-436 at 373635; Palmieri, Tr. 1386:7-22; Malkowska, Tr. 1120:8-1121:24.) There were no comments about sticking in the batch record for F616/14. (Prater, Tr. 149:2-9, 1467:15-68:8; PTX-436A at NAPP0373635.)

130. The dissolution rates of batch F616/14 were tested and fell outside of the claimed ranges. (Prater Tr. 147:4-12,156:11-14; Milnes Tr. 347:14-348:22; PTX-489 at NAPP0078520; PTX-459 at DDK0007346.) The results were included in another Malkowska Declaration (the "Malkowska II Declaration"), which stated that tramadol preparations made according to Merck/Bondi have release rates [*79] "significantly faster than" the EP '366 claims and "demonstrate no real control of the release of tramadol." (PTX-459 at DDK 7346.) As with the Malkowska I Declaration, Milnes drafted the Malkowska II Declaration. (Milnes, Tr. 349:15-350:1.) Malkowska was asked at her videotaped deposition, which was played at trial, why the dissolution results of Batch F616/07B were not included in her declaration. (Tr. 1111:18-20.) She responded that she did not know why, and that response appeared to be genuine. (Id. at 1111:18-1112:24).

131. The Malkowska II Declaration was submitted to the EPO as a part of the opposition proceedings, and the EPO issued a preliminary opinion that EP '366 was valid over the prior art. [46] (PTX-623 at PUR1110054-56; Milnes, Tr. 347:14-17.) Davidson subsequently submitted the Malkowska II Declaration to the PTO during prosecution of the '887 and '430 patents. (PTX-459; PTX-614 at PUR1109644; PTX-623 at PUR1110071. [47])

46  EP '366 was ultimately revoked because an amendment made during prosecution was not of an allowable form. (Milnes, Tr. 350:2-51:18.)

47  PTX-614 and -623 refer to the Malkowska II Declaration as the "third Malkowska Declaration." (See supra note 42.)

iv. [*80] Napp Repeat Experiments

132. In 1998, Napp filed an action against Asta Medica Limited ("Asta") in the United Kingdom alleging infringement of EP '366 ("the U.K. Litigation"). (Uncontroverted Facts, D.I. 326 at P III.H.(73).)

133. In that suit, Napp submitted a report from Dr. Alexander Florence (PTX-473) and, later, a supplemental report ("Florence supplemental report") (PTX-472). (Uncontroverted Facts, D.I. 318 at P III.H.(75).) Asta submitted its own expert report from Dr. John Tasker Fell (PTX-455) and a supplemental report as well ("Fell supplemental report") (PTX-474). (Uncontroverted Facts, D.I. 318 at P III.H.(76).)

134. As a part of the U.K. Litigation, Napp again set out to repeat experiments regarding Merck/Bondi (the "Napp repeat experiments"). (DTX-160.) On November 3, 1998, Napp's U.K. Litigation counsel, Lovell, White & Durant ("LWD"), sent to Davidson and Milnes, among others, an "URGENT" facsimile, which forwarded Napp's Notice of Experiment to be served later that day. (DTX-160; Davidson, Tr. 276:5-277:13.) The Notice indicated that experiments were going to be conducted following Merck/Bondi that were designed to produce the same results as the Malkowska II Declaration. [*81] (Davidson, Tr. 277:2-279:13; DTX-160 at DDK15068, 15078-80; Prater, Tr. 125:5-17; DTX-259.) Napp employees, supervised by Prater, conducted the Napp repeat experiments in the presence of experts and lawyers from both Napp and Asta from December 15 to December 22, 1998. (Prater, Tr. 123:20-124:11; DTX-236; PTX-472 at P 8; PTX-474 at P 11.) Paul Cowcher, a supervisor of laboratory analysis at Napp, performed the analytical work. (Cowcher, Tr. 1173:4-11, 1180:6-11; DTX-235; DTX-259.) Brown again did the formulation work. (Cowcher, Tr. 1180:13-16; DTX-234; DTX-259; Prater, Tr. 126:12-127:15.)

135. On the first day of the experiments, Brown indicated that attempts to make tablets using the Kilian gravity-fed press, the same type of press that was used in the experiments underlying the Malkowska Declarations,

resulted in problems with die fill and tablet weight, so they switched to a force-fed press. No problems were encountered after the switch. (DTX-234; Palmieri, Tr. 128:2-130:14.)

136. The dissolution profile of the tested batch, F644/32D, fell within the claimed ranges. (Prater, Tr. 156:15-18.) These results were reported in the Florence and Fell supplemental reports to the court presiding [*82] over the U.K. Litigation. (PTX-472 at P 8; PTX-474 at P 12.) Both sides' experts in the U.K. Litigation agreed that the repeat experiments gave results that contradicted the Malkowska Declarations. (PTX-472 at P 8; PTX-474 at P 12.) On December 23, 1998, LWD sent a letter to Napp, copying Davidson and Milnes, that stated, "[I]t is necessary that we have a precise understanding of the reasons for the failure of these experiments" and requested a report by January 5, 1999. 48 (DTX-512; Davidson, Tr. 280:13-283:8.) A reasonable patent examiner would have found the results of the Napp repeat experiments relevant to determining whether to allow the claims of the patents-in-suit.

> 48 The use of the term "failure" may be seen as a comment on Napp's mindset, i.e., that the goal of the Napp repeat experiments was to confirm the conclusions found in the Malkowska Declarations. Since the results had the opposite effect, the experiments were, given that goal, a failure.

137. On January 8, 1999, Dr. Margaret Dyer, the section manager of the formulation department at Mundipharma Research, reported to Prater that the tablets in F644/32D had a 6.6% PVA coating instead of the 5% coating described in Example [*83] 1 and claim 2 of the Merck/Bondi reference. (Prater, Tr. 111:15-20, 156:19-158:20; DTX-236 at NAPP0078491_003-004.)

138. In addition to the Napp repeat experiments, experiments based on the Merck/Bondi reference were conducted as a part of the opposition proceedings against EP '366, the foreign counterpart to the patents-in-suit. (See FF P 106.) The results of those experiments were included in the "Posch report," dated February 25, 1999. (PTX-461) Likewise, Asta did experiments, the results of which were included in the "Momberger report," dated July 15, 1998, and the "Report of Repeat Experiment," dated November 26, 1998. (PTX-450; PTX-451.) These reports were consistent with the results in the Malkowska Declarations that tablets coated with 5% or less PVA, in

accordance with Merck/Bondi Example 1 and claim 2, fell outside of the claimed dissolution ranges. (Palmieri, Tr. 1413:10-1414:4; PTX-450 at DDK0007216; PTX-451 at DDK0006806; PTX-461 at DDK0007394.) Those reports also showed that different results falling within the claimed ranges could be obtained by deviating from Merck/Bondi Example 1, such as by using a thicker PVA coat. (See PTX-614 at PUR1109645.)

139. On March 21, 1999, [*84] Asta and Napp executed an agreement settling the U.K. Litigation. (DTX-30.) Pursuant to the Settlement Agreement, Asta obtained a royalty-free license in all countries other than the United States and Canada. (DTX-30 at DDK 13903; 13907-10.)

140. Davidson was included in the discussion of the Napp repeat experiments and knew about the results of those experiments when Napp obtained them in December of 1998, or shortly thereafter. (DTX-160; DTX-512; Davidson, Tr. 275:3-277:21; DTX-162 at DDK013872-875; DTX-976 at 74-75, 80, 82, 157-64, 167-69.) Because he generally received and reviewed documents from the U.K. Litigation in order to determine whether they should be brought to the attention of the PTO, it is very likely that Davidson also received the Florence and Fell supplemental reports shortly after they were submitted to the court in the U.K. Litigation. (Davidson, Tr. 277:14-21.) The copy of the Florence supplemental report in the record here is undated but was in all likelihood finalized before the U.K. Litigation was settled on March 22, 1999. (DTX-30.) The Fell supplemental report is dated March 8, 1999. (PTX-474 at DDK 0007023.)

141. Davidson submitted the Florence and Fell supplemental [*85] reports to the PTO, as well as the Posch report, in an information disclosure statement ("IDS") dated March 10, 2000, during prosecution of the '887 patent. (PTX-614; PTX-2 at PUR1109645, 47-48.) A year before that, on March 1, 1999, contemporaneously with the drafting of the Florence and Fell supplemental reports in the U.K. Litigation, Davidson submitted an IDS to the PTO discussing Asta's arguments in the U.K. Litigation. (PTX-611 at PUR1109610.) Davidson contended that, although Asta argued that experiments based on Merck/Bondi showed that the reference reads on EP '366, "the evidence is to the contrary." (Id.) Davidson's March 1, 1999 IDS included the Momberger Report and the Report of Repeat Experiment but did not

mention the results of the Napp repeat experiments. (*Id.* at PUR1109610-12; Davidson, Tr. 300:15-301:12.) Davidson continued to rely on the Malkowska I Declaration in the March 1999 IDS. (PTX-611 at PUR1109612.)

142. Also on March 1, 1999, Davidson submitted a response to an earlier office action issued by the PTO. (PTX-863.) In that earlier office action, the examiner reported that the application for the '887 *patent* was in condition for allowance except for "formal [*86] matters." (DTX-5A at PAR046253.) Accordingly, the examiner closed prosecution on the merits, but, in response to an earlier IDS that disclosed 129 references raised in the EP '366 opposition proceedings, requested that the applicants submit a brief summary of each of the references and their relevance to the pending claims. (*Id.* at PAR046254.) The examiner warned the applicants that "an applicant may be guilty of inequitable conduct if the applicant is aware that certain references within a large information disclosure statement are more material tha[n] the rest and does not inform the PTO as to which references the applicant considers to be most material." (DTX-5A at PAR46254 (citations omitted).) In his March 1999 response, Davidson "acknowledged and appreciated" the examiner's concern and provided summaries of every reference cited and positions taken by the opponents as to their pertinence. (PTX-863 at PUR1109569-70; PTX-864.) Davidson indicated, however, that the applicants could not choose between the opponents' various positions on the pertinence of the art and urged the examiner to review the underlying documents "separate and apart" from the summaries. (*Id.* at 1109570-71.) [*87] To give the examiner further opportunity to review the submitted documents, Davidson paid an additional fee and filed a continued prosecution application, which had the effect of reopening prosecution on the merits. (Davidson, Tr. 247:2-249:17; PTX-863 at PUR1109581.)

143. In the March 2000 IDS disclosing the Florence and Fell supplemental reports, the first six pages of the March 1999 IDS relating to the U.K. Litigation are repeated almost verbatim. (PTX-611; Davidson, Tr. 329:21-333:8.) The first eight exhibits to the March 2000 IDS were identical to those submitted with the March 1999 IDS. (Davidson, Tr. 317:25-318:9.) On page 10 of the March 2000 IDS, the first page of new material relating to the U.K. Litigation, Davidson referenced the Florence supplemental report and attached the report as

Exhibit "W," near the middle of the submission. (PTX-614 at PUR1109647; Davidson, Tr. 332:2-9.) Davidson stated that the Florence supplemental report noted that the tableting machine had changed as compared to the machine in the original experiment. (PTX-614 at PUR1109647 n.3.) Davidson did not highlight, however, that Professor Florence stated in his supplemental report that the machine was [*88] changed because "the apparent quality of the tablets produced using the original machine was not good enough." (PTX-472 at P 8.)

144. Following the March 2000 IDS, the examiner issued the June 2000 office action (FF PP 75, 77), in which he maintained a rejection based on the Merck/Bondi reference and invited the applicants to schedule a personal interview to discuss the references pertaining to the U.K. Litigation. (PTX-2 at 1109661-64.) Davidson accepted that invitation. (Davidson, Tr. 258:15-259:12.) The experimental evidence with respect to the EP '366 opposition proceedings and the U.K. Litigation was discussed during the interview, but, according to Davidson's subsequent submission to the PTO, the examiner did not rely upon that discussion "as a basis for removing the previous rejection on the merits." (PTX-2 at PUR1109672.)

145. Davidson also submitted a copy of the March 2000 IDS to the PTO during prosecution of the '430 *patent*. (PTX-5 at PUR1110009, PUR1110061.) Even though some of the reports submitted as a part of that IDS arguably revealed that by following Example 1 of the Merck/Bondi reference one can formulate a tablet with dissolution rates that fall within the claimed [*89] ranges, Davidson continued to affirmatively rely on the Malkowska I Declaration in support of patentability. (*Id.* at PUR1110113-14.)

### III. CONCLUSIONS OF LAW

1. Jurisdiction over the subject matter of this action is proper under *28 U.S.C. §§ 1331* and *1338(a)*.

#### A. *Infringement*

2. Patent infringement is making, using, importing, offering to sell, or selling a patented invention without authority. *35 U.S.C. § 271(a)*. Under the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act, Pub. L. No. 98-417, 98 Stat. 1585 (codified as amended at *21 U.S.C.*

§ 355; 35 U.S.C. §§ 156, 271, 282), it is an act of infringement to submit an ANDA for a drug claimed in a patent. 35 U.S.C. § 271(e)(2)(A).

3. An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed, and the second step is comparing the properly construed claims to the accused product. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996).

4. The first step, claim construction, is designated a pure issue of law. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) [*90] (en banc). But see id. at 1478 (Rader, J., dissenting in part) ("[C]laim construction requires assessment of custom and usage in the relevant art, assessment of events during prosecution, assessment of the level of ordinary skill in the art, assessment of the understanding of skilled artisans at the time of invention-to name just a few factual components of the complex process of claim interpretation."). Previously, I construed a number of claim terms as follows:

. "therapeutic effect" means "an effective treatment for pain";

. "A [solid] controlled release oral [dosage form/pharmaceutical preparation/pharmaceutical tablet] ... said [dosage form/pharmaceutical preparation/pharmaceutical tablet] providing a therapeutic effect for [at least] about 24 hours" means "a single tablet, not including additional or previously administered tablets, that provides a therapeutic effect for [at least] about 24 hours";

. "therapeutic effect for about 24 hours after oral administration" means "an effective treatment of pain for about 24 hours from when the treatment begins to provide its intended effect";

. "therapeutic effect for at least about 24 hours" means "an effective treatment for pain for about [*91] 24 hours, or longer, from when the treatment begins to provide its intended effect";

. "a pharmaceutically effective amount of tramadol or a salt thereof" means "an amount of tramadol or its salt sufficient to achieve a therapeutic effect";

. "matrix" means "pharmaceutical preparation that incorporates the active ingredient dispersed within a solid dosage form"; and

. "normal release matrix" means "a matrix that releases the active ingredient as quickly as feasible."

Claim Construction Opinion, 584 F. Supp. 2d at 680.

5. As to the second step of the infringement analysis, Plaintiffs bear the burden of proving that the accused product meets each and every limitation of the construed claims by a preponderance of the evidence. Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1285 (Fed. Cir. 2002). Where the act of infringement is the filing of an ANDA, the analysis is a hypothetical one, comparing the asserted claims against the product that is likely to be sold should the FDA approve the application. Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1248-49 (Fed. Cir. 2000). "This hypothetical inquiry is properly grounded in the ANDA application and the extensive materials [*92] typically submitted in its support." Id. at 1248 (quotation omitted). [49] Therefore, it is proper for me to consider the ANDA itself, materials submitted by the ANDA applicant in support of its ANDA, and any other pertinent evidence. Id. at 1248-49; Glaxo, Inc., 110 F.3d at 1570.

[49] The Bayer analysis is applicable to Plaintiffs' claims of infringement of the '430 patent as well as the '887 patent. The '430 patent was issued following the FDA's approval of Ultram ER, and, unlike the '887 patent, is not listed in the Orange Book. See 21 U.S.C. § 355(b)(1) (requiring an NDA applicant to disclose to the FDA only those patents issued as of the date of the filing of the NDA or those issuing during the pendency of the NDA). But there is no requirement that infringement actions against ANDA filers must be based on patents listed in the Orange Book. See Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1343-44 (Fed. Cir. 2004) (adjudicating patent infringement case triggered by ANDA filing even though patents-in-suit were not listed in Orange

Book); *35 U.S.C. § 271(e)(2)(A)* (making it an act of infringement to submit an ANDA "for a drug claimed in a patent").

For that reason, Plaintiffs may have [*93] been able to make *§ 271(e)(2)(A)* the basis for their claim of infringement of the *'430 patent. See Glaxo Group, 376 F.3d at 1344* (holding that, even though patents-in-suit were not listed in Orange Book, "*[s]ection 271(e)(2)(A)* provides a jurisdictional basis for a declaratory judgment suit against a generic manufacturer"); *see also Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 1569 (Fed. Cir. 1997)* ("*[Section] 271(e)(2)* provided patentees with a defined act of infringement sufficient to create case or controversy jurisdiction to enable a court to promptly resolve any dispute concerning infringement and validity."). Instead, Plaintiffs allege only that, "once the FDA grants tentative approval of Par's ANDA, Par will undertake substantial activities directed toward engaging in infringement ... of the ['] *430 patent* by making, using and undertaking substantial preparations for offering to sell, without authority from plaintiffs, its Tablets." (D.I. 78 at 5-6.) How far an ANDA filing will go in permitting a branded drug manufacturer to bring a declaratory judgment action based on such an allegation is unclear. *See Glaxo, Inc., 110 F.3d at 1568* ("While performing development work and seeking [*94] [ANDA] approval, a generic drug manufacturer is free from liability for patent infringement based solely upon acts necessary to prepare the ANDA.") (citing *35 U.S.C. § 271(e)(1)*). But in this case the *'430 patent* is sufficiently related, as a continuation of the patent used for the *§ 271(e)(2)(A)* claim, to put it in play. In any event, the parties do not dispute that there is an adequate basis for declaratory judgment jurisdiction here, and I agree that there is.

6. I conclude that Par's tablets will literally infringe claims 3, 13, 27, and 29 of the *'887 patent* and claims 5, 7, and 11 of the *'430 patent.*

### i. '887 Patent

7. Claim 1 of the *'887 patent*, from which both claims 3 and 27 depend, and claim 13, from which claim 29 depends, require that the claimed oral pharmaceutical preparation (or oral pharmaceutical tablet) provide a therapeutic effect for approximately 24. (FF P 40.) The parties focus their dispute on whether that limitation has been met. As set out above (FF P 44), Plaintiffs attempt to show that Par's tablets have a 24 hour therapeutic effect by comparing the PK data of Ultram ER and Ultram IR.

8. I have already concluded that the efficacy of Ultram IR is a proper basis [*95] for measuring the efficacy of Ultram ER (FF P 60) and that a 50 mg dose of Ultram IR has an onset of action at about 30 minutes (FF P 52). Dr. Davies opined for Plaintiffs that, because the onset concentration of 50 mg of Ultram IR is 40 ng/ml, one should look to how long a 200 mg Ultram ER dose remains above that 40 ng/ml threshold to determine the duration of the therapeutic effect. (*See* FF P 61.)

9. Par responds that Dr. Davies is effectively establishing an MEC for tramadol (*see* FF P 22), which, Par argues, is contradicted by Dr. Grond's testimony, not to mention Plaintiffs' own concession that an MEC for tramadol has not been established. (Grond, Tr. 987:3-987:21; D.I. 331 at 15.) But accepting that an MEC for tramadol has never been established in scientific studies of the sort Par would acknowledge does not doom Plaintiffs' argument. To the extent that one uses Ultram IR as a marker for efficacy -- an approach that the FDA has sanctioned (FF P 59) and that the Napp scientists used while developing the patents-in-suit (FF P 27) -- the evidence supports a finding that there is some efficacy at 40 ng/ml.

10. Par also responds to Plaintiffs' infringement argument by pointing to Dr. [*96] Grond's testimony that a 40 ng/ml plasma concentration is "much, much, much lower than any value I've ever seen from somebody who has discussed [[minimum effective concentration" of tramadol. (Tr. 1004:1-6.) Dr. Grond highlighted studies that evaluated the effectiveness of intravenous injections of tramadol and that suggested various higher MEC values ranging from 960 ng/ml (Grond, Tr. 991:25-992:5) to 287.7 ng/ml (DTX-95 at NAPP0183181; Grond, Tr. 992:5-7). [50] Par thereby argues that even if one could compare Ultram IR to Ultram ER to establish efficacy, a 40 ng/ml level is simply too low a value to use to conduct that comparison. To emphasize the point, Par highlights that even a single dose of 100 mg Ultram IR appears to maintain a blood plasma concentration above 40 ng/ml for about 24 hours. Thus, according to Par, adopting Plaintiffs' approach has the anomalistic result of



BSC-SJA-1295

demonstrating that a single 100 mg Ultram IR tablet provides a therapeutic effect for about 24 hours, even though the immediate release pill is not normally prescribed with that effect in mind. (Davies, Tr. 739:25-743:10, 746:21-747:3.)

> 50   The paper discussing the study that suggested a 960 ng/ml MEC, Hackl (1986), [*97] is not in the record. Nonetheless, the later paper suggesting a 287.7 ng/ml MEC, Lehmann (1990), discusses the Hackl reference and notes that, because the studies were similar, the reasons for the discrepancy in MEC are unclear. (DTX-95 at NAPP0183181.)

11. Par's critique has some force. Ultimately, however, I am unpersuaded. To the extent that there are studies suggesting a higher MEC, Dr. Grond acknowledges that they are inconclusive. (Grond, Tr. 991:15-993:3.) But more importantly, that studies have suggested a higher MEC of intravenously administered tramadol is not directly relevant to determining at what blood plasma level a 50 mg Ultram IR tablet provides some pain relief. In construing the claims, I have already rejected Par's argument that Plaintiffs could only show that the accused tablets had a therapeutic effect through a clinical study that included controls to account for the placebo effect, noting that the patent itself relied on the generally acknowledged therapeutic effect of tramadol. *Claim Construction Opinion, 584 F. Supp. 2d at 670-71.* Similarly, that studies evaluating the therapeutic effect of Ultram IR fail to account for the placebo effect, and perhaps for that [*98] reason result in an onset concentration that is lower than any published MEC for tramadol standing alone, does not invalidate Plaintiffs' reliance on that onset concentration as a marker for therapeutic effect. Plaintiffs' burden is basically to establish that an "oral pharmaceutical preparation" containing tramadol provides a 24-hour therapeutic effect (*see '887 patent,* claim 1 12:32-34; *'430 patent,* claim 1 12:50-51), not that the tramadol in the preparation is the sole source of that 24-hour effect. The blood plasma level of tramadol at 30 minutes – the time that a 50 mg dose of Ultram IR is effective -- although not an exact measure of the pain relief provided by tramadol, is an adequate proxy for measuring whether and for how long a single dose of a controlled release preparation containing tramadol will provide some therapeutic effect. The 100 mg, 200 mg, and 300 mg doses of Ultram ER provide blood plasma levels above 40 ng/ml for at least 24 hours (*see FF PP*

61-63); and, as noted, given the evidence showing that the onset of action from Ultram IR begins at a point roughly coinciding with a blood plasma concentration of 40 ng/ml, I am persuaded that some therapeutic effect from [*99] Ultram ER will remain for as long as the concentration remains above that level.

12. I am also persuaded that Par's tablets will meet the 24-hour therapeutic effect limitation for one final reason. The "therapeutic effect" limitation generally speaks to whether the product works. That a sophisticated pharmaceutical company like Par would aggressively seek to introduce a generic version of a product, and forecast revenues exceeding $ 65 million over the first three years after launch (FF PP 99, 101), demonstrates Par's high confidence that the branded product indeed works. Par's business actions are more indicative of Ultram ER's efficacy than the litigation driven assertion that the therapeutic effect claimed in the patents-in-suit -- the only limitation that Par argues is lacking in its proposed tablets -- is illusory.[51]

> 51   Par has at times tried to draw a distinction between steady state and single dose efficacy. (*See* D.I. 340 at 3-4.) In theory, one could acknowledge the efficacy of Ultram ER at steady state without acknowledging that a 24-hour therapeutic effect is provided by, as I have construed the limitation, a single dose. But it is hard for me to believe, as a factfinder looking [*100] at the totality of the evidence presented here, that a product would have a market sufficient to warrant the entry of a generic competitor if it regularly took more than a day to adequately relieve moderate to moderately severe chronic pain. That is especially true where, as here, the market is already crowded with drugs that, one may reasonably believe, would provide much quicker pain relief. (*See* Axenroth Tr. 400:15-404:16; PTX-1093.)

13. The presence of the rest of the limitations in the asserted claims is easily established. Claim 1 of the *'887 patent* also requires a "controlled release oral pharmaceutical preparation suitable for dosing every 24 hours." (*'887 patent,* 12:16-17.) Par's product is a pharmaceutical preparation intended for oral administration that provides a controlled release of the drug and is intended to be administered once a day. (Uncontroverted Facts, D.I. 326 at P III.B.(19)-(21);

BSC-SJA-1296

Davies, Tr. 661:10-662:12, 714:9-13.) Claim 1 also requires "a substrate comprising a pharmaceutically effective amount of tramadol or a salt thereof." ('887 patent, 12:18-19). The parties stipulated that the term "substrate" in the '887 patent means "[a] solid pharmaceutical preparation [*101] that contains the active ingredient." (D.I. 247 at 10). Par's product is a solid preparation containing tramadol Hcl, a salt of tramadol, in a pharmaceutically effective amount. (Uncontroverted Facts, D.I. 326 at P III.B.(11), (22)-(24); Davies, Tr. 715:5-18.) Claim 1 further requires that the substrate be "coated with a controlled release coating." ('887 patent, 12:20). Par's product has a controlled release coating. (Davies, Tr. 661:10-662:7; PTX-166 at PAR015917, 921.)

14. Claim 3 of the '887 patent requires a specific in vitro dissolution profile "measured by the Ph. Eur. Paddle method at 100 rpm in 900 ml 0.1 N hydrochloric acid at 37[degrees]C and using UV detection at 270 [n]m." ('887 patent, 12:51-53.) The claimed dissolution ranges are between 0% and 50% tramadol released after 1 hour, between 0% and 75% tramadol released after 2 hours, between 10% and 95% tramadol released after 4 hours, between 35% and 100% tramadol released after 8 hours, between 55% and 100% tramadol released after 12 hours, between 70% and 100% tramadol released after 16 hours, and greater than 90% tramadol released after 24 hours. (Id. at 12:50-65.)

15. Plaintiffs' expert, Dr. Fanfarillo, performed dissolution [*102] tests on all strengths of Par's tablets at the claimed conditions, using the "paddle method" described in the European Pharmacopeia. Dr. Fanfarillo's dissolution tests show that Par's tablets dissolve within the claimed dissolution ranges of all the asserted claims. (Fanfarillo, [52] Tr. 637:3-646:23; Davies, Tr. 667:8-672:21, 678:24-680:15:; PTX-533A, -533C.)

52 Dr. Michael Fanfarillo is Operations Director for Molecular Profiles, a company that tests drug substances and drug products. (Fanfarillo, Tr. 633:9-634:1.)

16. Internal testing by Par on its tablets prior to its ANDA filing confirms Dr. Fanfarillo's results. Although Par's tests were performed using the paddle method set forth in the U.S. Pharmacopeia, rather than the European Pharmacopeia, both parties' experts agree that the differences between these two methods are inconsequential. (Palmieri, Tr. 1329:10-24; Davies, Tr.

675:17-678:23; PTX-220 at PAR003756-57; PTX-365 at PAR021250).

17. Claim 13 of the '887 patent is similar to claim 1 except that claim 13 requires a "pharmaceutical tablet" instead of a "pharmaceutical preparation" and a "tablet" instead of a "substrate." ('887 patent, 13:53-14:16.) Par's product is a tablet. [*103] (Uncontroverted Facts, D.I. 326 at P III.B.(7).)

18. Claim 13 and independent claim 1 of the '887 patent have broader dissolution ranges than claim 3 and add a dissolution range at 36 hours. ('887 patent, 13:62-14:3.) Because the dissolution profile of Par's tablets falls within the claim 3 ranges and provides greater than 80% tramadol released after 36 hours, it also falls within the claim 13 and claim 1 ranges. (Davies, Tr. 666:12-667:10; PTX-533A.)

19. Claim 13 also requires a W[50] value (see FF P 22) "in the range of 10 to 33 hours." ('887 patent, 14:3-4.) All strengths of Par's tablets have a W[50] that is around 15 hours and therefore meet that element. (Davies, Tr. 715:19-717:8; PTX-214 at PAR011463.)

20. Claims 27 and 29 of the '887 patent depend respectively from claims 1 and 13 and further require that the controlled release coating "comprises a material selected from the group consisting of a water insoluble wax, a water insoluble polymer, a water insoluble cellulose and mixtures of any of the foregoing." ('887 patent, 16:1-5, 12-16.) The controlled release coating on Par's tablet contains ethylcellulose, which is a water insoluble cellulose. (Uncontroverted Facts, D.I. 318 [*104] at P III.B.(25)-(26); Davies Tr. 661:10-20; PTX-166 at PAR015917.)

ii. '430 Patent

21. The asserted claims in the '430 patent all depend from claim 1. ('430 patent, 12:54-57, 12:61-63, 13:1-12, 14:11-12.) Similar to the asserted claims in the '887 patent, claim 1 requires that the claimed solid controlled release oral dosage form provide a therapeutic effect for approximately 24 hours. (FF P 40.) I conclude that that limitation is met for the same reasons I discussed with respect to the '887 patent. (CL PP 8-12.)

22. Again, the presence of the remaining limitations are not in serious dispute. Claim 1 also requires a "solid controlled release oral dosage form" containing a

"therapeutically effective amount of tramadol or a pharmaceutically acceptable salt thereof." ('430 patent, 12:41-43.) Par's product is a tablet containing a therapeutically effective amount of tramadol Hcl that provides a controlled release of the drug. (CL PP 13, 17.)

23. The '430 claims also require a "normal release matrix" with a controlled release coating. ('430 patent, 12:45-46.) Par's tablet core is a normal release matrix, as that term has been construed: dissolution tests on Par's uncoated tablet cores indicate [*105] that they release the active ingredient as quickly as feasible. (Davies Tr. 661:10-663:19; PTX-171 at PAR002024.)

24. Claim 3 of the '430 patent, from which asserted claim 5 depends, requires that the controlled release coating "comprises a water insoluble cellulose." ('430 patent, 12:54-56.) The coating on Par's tablet contains ethylcellulose, a water insoluble cellulose. (CL P 20.) '430 claim 5 requires that the controlled release coating "further comprises a polyvinylpyrrolidone." ('430 patent, 12:61-63.) Par's tablet coating contains Povidone, a brand of polyvinylpyrrolidone. (Davies Tr. 662:4-7; PTX-166 at PAR015917.)

25. Claim 7 of the '430 patent requires the same in vitro dissolution profile as claim 3 of the '887 patent and is met for the same reasons. ('430 patent, 13:1-12; CL P 14-16.)

26. Claim 11 of the '430 patent requires the same W[50] value as claim 13 of the '887 patent and is also met for the same reasons. ('430 patent, 14:12; CL P 19.)

B. Validity

27. A patent, along with each of its claims, is presumed valid, and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. Accordingly, [*106] the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence. Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1359 (Fed. Cir. 2007). "That burden of proof never shifts to the patentee to prove validity." Id. Although a patentee has the burden of going forward with rebuttal evidence should a challenger present a prima facie case of invalidity, the trial court has the responsibility to determine whether the challenger has met its burden of proof by clear and convincing evidence by considering the totality of the evidence, "including any

rebuttal evidence presented by the patentee." Id. at 1360.

28. Par challenges the validity of the patents-in-suit on three grounds: a lack of written description, anticipation, and obviousness. The following discussion is limited to obviousness because I conclude that the evidence clearly and convincingly shows that the asserted claims are invalid on that basis. [53]

> 53   In its post-trial papers, Par argues that the Oshlack patent (see FF PP 86-91), among other references, anticipates some of the asserted claims. Par contends that the "suitable for dosing every 24 hours" limitation in the '887 patent is [*107] disclosed because Oshlack teaches a dosage form that "preferably provides a therapeutic effect for about 24 hours." (PTX-601 at 4:56-59; see D.I. 340 at 37.) During claim construction, however, Par advanced the position that the "suitable for dosing" language was an indication of safety, not efficacy. (D.I. 161 at 12.) I adopted that position and accordingly ruled that the use of the term "every" in the "suitable for dosing" limitation did not bear on whether the claimed duration of therapeutic effect was to be measured in a steady state dosing environment. Claim Construction Opinion, 584 F. Supp. 2d at 675. Par's present argument as to anticipation with respect to the '887 patent, which equates "suitable for dosing every 24 hours" with the duration of therapeutic effect, is inconsistent with its position at claim construction, and I will not consider it.
>
> However, the asserted claims of the '430 patent do not have the "suitable for dosing every 24 hours" limitation. Thus, Oshlack might anticipate asserted claims 7 and 11 of that patent as Par contends it does. (See D.I. 340 at 39.) Nonetheless, because I conclude that all of the asserted claims are clearly invalid as obvious in light [*108] of Oshlack, I need not decide whether claims 7 and 11 of the '430 patent are also invalid as anticipated by that reference.

29. A claim is obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The ultimate determination of obviousness is a question of law, based

on underlying factual determinations. *Altana Pharma AG v. Teva Pharms. USA, Inc., 566 F.3d 999, 1007 (Fed. Cir. 2009)*. Those factual determinations include (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, known as objective indicia of non-obviousness. *Id.* (citing *Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966))*.

30. The Supreme Court recently rejected the rigid application of the principle that there should be an explicit "teaching, suggestion, or motivation" in the prior art, the nature of the problem, or the knowledge of a person having [*109] ordinary skill in the art, in order to find obviousness. *KSR Intern. Co. v. Teleflex Inc., 550 U.S. 398, 415, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007)*. Nonetheless, the *KSR* Court did acknowledge the importance of identifying "'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed *new* invention does' in an obviousness determination." *Takeda Chem. Indus. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1356-57 (Fed. Cir. 2007)* (quoting *KSR, 550 U.S. at 418*).

31. When the prior art provides the means of making the invention and predicts the results, and the patentee merely verifies the expectation through "routine testing," the claims are obvious. *Pfizer, 480 F.3d at 1367*. In other words, obviousness exists when "a finite, and in the context of the art, small or easily traversed, number of options ... would convince an ordinarily skilled artisan of obviousness." *Ortho-McNeil Pharmaceutical, Inc. v. Mylan Labs., Inc., 520 F.3d 1358, 1364 (Fed. Cir. 2008)* (citing *KSR, 550 U.S. at 421*).

32. "While the presentation at trial of a reference that was not before the examiner does not change the presumption of validity, the alleged infringer's burden may be [*110] more easily carried because of this additional reference." *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp., 225 F.3d 1349, 1355-56 (Fed. Cir. 2000)*. [54]

54 I do not take the quoted language from *SIBIA* to mean that the use of a new reference at trial somehow changes a patent challenger's burden to something less than clear and convincing. Instead, *SIBIA* instructs that a reference not before the examiner may be strong evidence of obviousness. As a practical matter, assuming a new reference is

closer to the asserted claims than the references before the examiner, one is not left to wonder, as one might be with a reference that was disclosed, why the examiner allowed the claims in light of the reference.

33. A person of ordinary skill in the art at the time of the invention was one with experience as a formulator, a pharmacokineticist, and a clinician. (FF P 10.)

34. Some of the prior art on which Par relies post-dates the foreign priority documents listed on the face of the '887 patent. If Plaintiffs want to use the filing dates of those foreign priority documents to eliminate such prior art, they have the burden of going forward with evidence and argument that the asserted claims [*111] are entitled to the benefit of the foreign filing dates. *Technology Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1327, 1329 (Fed. Cir. 2008)*. Plaintiffs have not carried that burden. Indeed, Plaintiffs do not dispute Par's argument that it has proven that the German priority document fails to provide a written description of the claimed subject matter (FF P 69), nor do they rely on the filing dates of any other foreign document listed on the face of the '887 patent (FF PP 69-70). Thus, Plaintiffs are not entitled to rely on the filing dates of those documents to eliminate any of the prior art on which Par bases its obviousness case. The effective filing date of the patents-in-suit is May 10, 1994, the filing date of the original application for the patents-in-suit. (FF PP 66-67.)

35. The Oshlack and Kaiko patents are prior art under § 102(e) because they were granted on patent applications that were filed before the effective filing date of the patents-in-suit, namely July 27, 1993, and November 23, 1993, respectively. [55] (FF PP 86, 92.)

55 Plaintiffs do not argue that the controlled release tramadol formulation claimed in the patents-in-suit were invented prior to the Oshlack and [*112] Kaiko patent applications. *See 35 U.S.C. § 102(e)(2)* (defining prior art to include "a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent").

36. The Leslie and Lintz articles are prior art publications under § 102(b) because they were published more than a year before the effective filing date of the patents-in-suit, namely 1980 and 1986, respectively. (FF PP 17, 24.)



37. Having considered the competing arguments regarding the prior art, I conclude that the asserted claims are obvious in light of Oshlack.

38. Oshlack describes various controlled release oral dosage formulations, disclosing morphine, hydromorphone, and acetaminophen in specific examples, but broadly claiming that any "systemically active therapeutic agent[s]" may be used. (FF P 87.)

39. Plaintiffs argue that it would not have been obvious for a person of ordinary skill to choose tramadol for a 24-hour controlled release formulation out of the "scores" of other analgesics or combinations disclosed in Oshlack. (D.I. 331 at 32.) Plaintiffs clearly overstate the size of the list in Oshlack, which claims tramadol as one of only 14 different "opioid [*113] analgesics," (FF P 87.) But, more fundamentally, Plaintiffs fail to recognize that a prior art reference's inclusion of a claimed active agent in an undifferentiated list does not necessarily remove the reference from consideration as invalidating. "[T]o the extent [a patentee] suggests that the prior art must point to only a single [active ingredient] for further development efforts, that restrictive view ... would present a rigid test similar to the teaching-suggestion-motivation test that the Supreme Court explicitly rejected in KSR." Altana Pharma, 566 F.3d at 1008.

40. Even before KSR, the patents-in-suit would likely have been considered obvious in light of Oshlack. In Pfizer, a pre-KSR case, the Federal Circuit held that a patent claiming a particular salt of a drug used to treat hypertension, amlopidine besylate, was obvious in light of Pfizer's earlier patent claiming amlopidine along with its pharmaceutically acceptable acid addition salts. 480 F.3d at 1353, 1355. The invalidating reference described pharmaceutically acceptable addition salts of amlopidine generally, and then provided 12 examples, none of which was besylate. Id at 1353. Pfizer argued that amlopidine besylate was [*114] not rendered obvious because the specific salts disclosed in the prior art were different in structure, and another prior art article that disclosed 53 FDA-approved substances that were useful for making pharmaceutically acceptable salts, including besylate, disclosed that besylate had a frequency of use of only 0.25%. Id. at 1361-62. The court rejected Pfizer's arguments, noting that there was only a "small" number of substances listed in the article and that other publications disclosed that besylate had favorable

chemical characteristics. Id. at 1355, 1363. The court found a clear motivation to combine the teachings of Pfizer's prior patent with other prior art to produce amlopidine besylate. Id. at 1364. Here, we are faced with an even clearer case of obviousness than Pfizer, as Oshlack itself discloses the active ingredient at issue, in an even smaller list, without so much as a hint that its use is uncommon.

41. Plaintiffs argue that the characteristics of tramadol that were known at the time made it an unlikely choice as compared to the other analgesics on the list. (D.I. 331 at 31.) For example, a 1992 paper by Dr. Robert Raffa, et al., reported that the clinical analgesic activity [*115] of tramadol is of an "atypical nature." (DTX-506 at 284; Grond, Tr. 982:18-25.) Studies of that sort, Plaintiffs argue, suggested that obstacles existed to successful development and regulatory approval that would have led a person of skill away from selecting tramadol and toward another active ingredient such as hydromorphone or acetaminophen, as Oshlack did in the '578 patent examples. (D.I. 334 at P 128.)

42. But Raffa is far from a reference that teaches away from selecting tramadol. Although it does note tramadol's different mechanisms of action, it emphasizes that such differences actually make tramadol more beneficial as an analgesic:

> Unlike typical opioid analgesics, the therapeutic use of tramadol has not been associated with clinically significant side effects such as respiratory depression, constipation (even after long-term administration) or sedation. In addition, analgesic tolerance has not been a significant problem during repeated administration, and neither psychological dependence nor euphoric effects are observed in long-term clinical trials. In addition, minimal withdrawal signs are observed in naloxone-precipitation studies, and tramadol does not appear to be suitable [*116] as a substitute in opioid-dependent patients. These clinical findings have been reinforced by the recent study of Preston et al. (1991) indicating that morphine-like subjective effects were less than those predicted by its analgesic potency relative to morphine.

BSC-SJA-1300

(DTX-506 at 275-76 (citations omitted).)

43. Similarly, the Lintz article reported that because tramadol has good water solubility, is rapidly absorbed, has a long half-life and has high bioavailability relative to other centrally acting analgesics, "the duration of analgesia of tramadol is likely to be longer with equianalgesic doses and equal pain intensity than that of pentazocine and codeine." (FF P 24.) Raffa and Lintz would each encourage a person of ordinary skill in the art to select tramadol as an active ingredient in a controlled release formulation.

44. Purdue's own Dr. Kaiko recognized as early as November of 1989 that tramadol was possibly more beneficial than other active ingredients, when he stated that tramadol "does not appear to be associated with psychotomimetic side effects," that it "appears to have less abuse liability and less respiratory depressant potential than opioid agonists (e.g. morphine, methadone, [*117] hydromorphone, oxycodone, levorphanol)," that it "has characteristics that make it suitable for oral ... administration," and that "clinical evaluations have generally concluded [tramadol] to be comparable or superior to comparative agents." (PTX-26 at PUR0195200.) Rather than suggesting development and regulatory approval would be difficult, Kaiko counseled against using tramadol for an oral controlled release product simply because such a product would "cannibalize" other such products marketed by Purdue. (Id. at PUR0195201-202.) Perhaps more telling, Smith, one of the inventors listed on the patents-in-suit, wrote a note, later found attached to a translation of the German priority document, that asked "[w]hy is this not obvious (the developments from Lintz)[?]" (DTX-106 (emphasis in original); Smith, Tr. 52:5-54:22.)

45. This case is different from Takeda Chemical, 492 F.3d at 1352, on which Plaintiffs rely. (D.I. 331 at 32.) In Takeda Chemical, the Federal Circuit affirmed a district court's holding that a patent for a compound used to treat Type 2 diabetes was not invalid as obvious. Id. The party challenging the patent argued that a compound that was disclosed in the prior art [*118] would have been an obvious compound to select for further development and that, once selected, the development of the patented compound would have been obvious. Id. at 1354-60. Unlike here, however, the prior art disclosed "hundreds of millions" of available compounds. Id. at 1357. While

the allegedly obvious choice was specifically claimed in some prior art and noted to be "especially important," another reference described the compound as having adverse effects, namely that it caused "considerable increases in body weight and brown fat weight," that would make the compound ill-suited for treatment of Type 2 diabetes. Id. at 1358-59. Because of that reference, the compound would not have been obvious to try. Id. at 1359 (citing KSR, 550 U.S. at 421). In contrast, the references the parties rely on here all would suggest to a person of ordinary skill that tramadol was a particularly appropriate active ingredient for a controlled release analgesic.

46. Plaintiffs argue that the PTO allowed the claims as non-obvious even though it considered the same categories of prior art that are before me now. (D.I. 331 at 30.) That argument is not persuasive. Plaintiffs fail to acknowledge that the [*119] Oshlack and Kaiko references, part of the category of prior art describing pharmaceutical formulations that list tramadol, were not before the PTO and are directly on point. Moreover, the PTO did not have the benefit of the Supreme Court's opinion in KSR. Although I have been careful to give a presumption of validity to the patents-in-suit, the evidence is clear that the selection of tramadol as an active ingredient for a controlled release formulation would have been obvious even under pre-KSR case law and especially after KSR. As noted in that case, "when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." 550 U.S. at 416 (citing United States v. Adams, 383 U.S. 39, 50-51, 86 S. Ct. 708, 15 L. Ed. 2d 572, 174 Ct. Cl. 1293 (1966)).

47. I conclude that Oshlack either expressly discloses the remaining limitations in the asserted claims or contains differences that would have been established as a part of the routine experimentation involved in incorporating tramadol as an active ingredient. (See CL P 31.)

48. Oshlack describes controlled release coatings comprising either hydrophobic [*120] (water-insoluble) acrylic polymers or polymethacrylates such as Eudragit(R), just as is claimed in the '887 patent claims 27 and 29 and the '430 patent claim 1. (FF P 88.)

49. The dissolution profile given in Claim 43 of the Oshlack patent differs slightly from the dissolution

profiles in the patents-in-suit in two related respects. First, Oshlack only provides dissolution ranges up to 8 hours, while the asserted claims provide ranges to 24 and 36 hours. (FF P 89.) Second, the lower limit at 8 hours in claim 43 of Oshlack is lower than the narrowest range claimed by the patents-in-suit. (*Id.*) These differences do not render the asserted claims non-obvious. The upper limit on the ranges provided past eight hours in the asserted claims are all 100% and are therefore of no moment: any formulation would have a dissolution at or below 100%. The lower limits, however, require more attention. As discussed in the claim construction opinion, the specification indicates that the formulation becomes safer for once-a-day dosing as the dissolution range narrows. *Claim Construction Opinion, 584 F. Supp. 2d at 675.* Thus, because the upper limit in the dissolution ranges of the asserted claims are [*121] all at 100%, the lower limit suggests a cutoff that is necessary for the formulation to be suitable for once-a-day dosing. It appears that if the lower limit is too low -- i.e., if only a small amount of the drug is dissolved into the blood stream early in the dosing cycle -- large amounts of later-dissolving drug from the first pill could combine with early-dissolving drug from the second pill, potentially putting an unsafe amount of the drug into the blood stream at once. *Id.* If that is true, the formulation disclosed in Oshlack might not be suitable for once-a-day dosing, as the asserted claims require, if the formulation does not dissolve fast enough past eight hours.

50. Even though Claim 43 of Oshlack does require that the disclosed formulations have effective blood levels for about 24 hours, it does not require that those formulations be suitable for once-a-day dosing. (FF P 90; *supra* note 53.) But controlled release formulations suitable for once-a-day dosing in general were not novel at the time of the filing of the '452 patent, nor were the claimed dissolution ranges. The Oshlack patent itself discloses an example of a controlled release preparation of morphine with dissolution [*122] data that falls within the claimed ranges through 16 hours and expressly notes that it is suitable for once-a-day administration. (FF PP 89-90.) Developing a controlled release formulation of tramadol that would fall within the claimed ranges and would be suitable for once-a-day dosing would have been obvious to one of skill in the art.

51. The obviousness of the dissolution profile in the asserted claims is made even more clear in light of Oshlack in combination with either Kaiko or the Leslie

article. Kaiko discloses examples of controlled release formulations of morphine with dissolution rates that fall within the claimed ranges through 36 hours. (FF P 93.) Even if it were the case that tramadol required dissolution limits on the low end that were higher than those required for other active ingredients such as morphine, perhaps because it takes longer for tramadol to pass the blood-brain barrier (*see* FF P 14), the Leslie article taught a straight-forward way to vary the rate of dissolution through the Contmus system. Napp relied on that system time and again to create successful controlled release products with different active ingredients. (FF PP 19-20, 30.) Although the number [*123] of options established by the prior art for creating a formulation with appropriate dissolution rates appears to have been large (*cf.* FF P 26; *supra* note 20), the evidence here establishes that they were relatively "easily traversed." *Ortho-McNeil, 520 F.3d at 1364.* Plaintiffs have done nothing to rebut the testimony of Dr. Palmieri that such adjustments would have been a result of "routine ... often dull laboratory experiments." (FF P 20.)

52. Oshlack's failure to disclose a W[50] value of 10 to 33 hours is inconsequential for the same reason -- a W[50] value in that range is a characteristic of a once-daily tramadol controlled release formulation that provides a therapeutic effect for approximately 24 hours and would be uncovered through routine experimentation. Indeed, Plaintiffs do not rely on the lack of a W[50] value in Oshlack as a reason to differentiate the reference. Nor do they rely on Oshlack's failure to disclose the use of a polyvinylpyrrolidone as a choice for an excipient, as is required by '430 claim 5. That, too, would have been a routine choice that likely would have resulted from optimizing the controlled release formulation. (*See* FF P 18.) The use of a formulation [*124] with a W[50] value of 10 to 33 hours and a coating comprising polyvinylpyrrolidone yielded no more than a "predictable result." *KSR, 550 U.S. at 416.*

53. Oshlack does not disclose any PK data or show a target blood plasma profile for tramadol. (PTX-601 at 44:8-9; Oshlack, Tr. 191:21-192:5.) However, the Oshlack patent does disclose, in Claim 43, that tramadol controlled release formulations provide "effective blood levels ... for about 24 hours." (FF P 90.) Even if PK data or target blood plasma profiles were required to enable the 24 hour claim limitation in Oshlack, they are not required to render the patents-in-suit obvious, as enablement of the prior art is not a requirement to prove

invalidity under § 103. *Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1357 (Fed. Cir. 2003).* Instead, such information would be obvious based on Oshlack in combination with what was generally known in the art about tramadol (*see* FF P 24 (discussing Lintz)) and controlled release formulations (*see* FF PP 17, 19-20 (discussing the Leslie article) and 93 (discussing Kaiko)).

54. The self-confessed expectation of success that the inventors had before beginning to work on controlled release tramadol, [*125] based on Napp's previous use of the Contirus technology (FF PP 17, 25, 30), makes clear that there existed a "resoundingly" reasonable expectation of success in deriving the claimed invention in light of the teachings of the prior art. *In re Kubin, 561 F.3d 1351, 1360 (Fed. Cir. 2009).*

55. In an effort to stave off a conclusion that the claims at issue are invalid for obviousness, Plaintiffs point to secondary considerations of non-obviousness, including Par's blatant copying and Ultram ER's commercial success. (D.I. 334 at PP 132-133.). However, secondary considerations of non-obviousness do not rebut a clear showing of invalidity. *Agrizap, Inc. v. Woodstream Corp., 520 F.3d 1337, 1344 (Fed. Cir. 2008).* Moreover, a showing of copying, which Plaintiffs have provided here (FF PP 101-105), is not compelling evidence of non-obviousness in the Hatch-Waxman context. *See Eli Lilly & Co. v. Zenith Goldline Pharms., Inc., No. IP 99-38-C H/K, 2001 U.S. Dist. LEXIS 25246, 2001 WL 1397304, at *14 (S.D. Ind. Oct. 29, 2001)* ("[T]he ANDA procedures established by the Hatch-Waxman Act require generic drug manufacturers to copy the approved drug. Variations undermine the FDA's ability to assume that if the patented drug is safe [*126] and effective, the generic competitor will also be safe and effective."). And, as to commercial success, while the promise of it remains (FF P 99), the evidence of Ultram ER's sales to date is underwhelming (FF P 98).

56. In sum, this case presents clear and convincing evidence of a situation where "a technique has been used to improve one [thing], and a person of ordinary skill in the art would recognize that it would improve similar [things] in the same way." *KSR, 550 U.S. at 417.* The asserted claims are therefore invalid as obvious in light of Oshlack, both on its own and in combination with Lintz, Leslie, or Kaiko.

C. *Inequitable Conduct*

57. Although it may not be necessary for me to decide Par's inequitable conduct charges in light of my invalidity ruling, *see Liebel-Flarsheim Co. v. Medrad, Inc., 481 F.3d 1371, 1383 (Fed. Cir. 2007)* (affirming district court's determination that inequitable conduct counterclaim was moot due to its determination that the asserted claims were invalid), I proceed to rule for the sake of completeness and in the interest of making public my opinion that Par has not carried its burden of proving that the Plaintiffs' employees and patent counsel engaged [*127] in inequitable conduct before the PTO.

58. "Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).* To successfully prove inequitable conduct, the accused infringer must prove by clear and convincing evidence at least a threshold level of both materiality and intent to deceive. *Larson Mfg. Co. of South Dakota, Inc. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1326 (Fed. Cir. 2009).*

59. Information is material if a reasonable examiner would have considered such information important in deciding whether to allow the application. *Monsanto Co. v. Bayer Bioscience N.V., 514 F.3d 1229, 1237 (Fed. Cir. 2008).* PTO Rule 56(b) also sets out a definition of material information as follows:

> [information that] is not cumulative to information already of record or being made of record in the application, and [that]
>
>> (1) establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>>
>> (2) ... refutes, or is inconsistent with, a position the applicant [*128] takes in:
>>
>>> (i) Opposing an argument of unpatentability relied on by the Office, or



(ii)    Asserting    an
argument of patentability.

37 C.F.R. § 1.56. A misstatement or omission that is material under that definition is considered material for the purposes of an inequitable conduct inquiry. *Monsanto, 514 F.3d at 1237.*

60. To establish an intent to deceive the patent office, there must be clear and convincing evidence of "culpable" conduct. *Ariad Pharms., Inc. v. Eli Lilly and Co., 560 F.3d 1366, 1380 (Fed. Cir. 2009).* But direct evidence of intent is not necessary, and intent can be inferred from the surrounding facts and circumstances. *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1354 (Fed. Cir. 2005).*

61. If threshold levels of both materiality and intent are found, the court must then determine, as a matter of law, "whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent, with a greater showing of one factor allowing a lesser showing of the other." *Larson Mfg., 559 F.3d at 1327* (quotation omitted); *see Allen Organ Co. v. Kimball Intern., Inc., 839 F.2d 1556, 1567 (Fed. Cir. 1988)* ("findings [of materiality [*129] and intent] ... are then balanced ... to determine whether as a matter of law the scales tilt to a conclusion that inequitable conduct occurred.") (quotation omitted). [56]

> [56]    The Federal Circuit has been concerned with litigants' "'habit of charging inequitable conduct in almost every major patent case,'" calling it "'an absolute plague.'" *Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1196 (Fed. Cir. 2006)* (Newman, J., dissenting) (quoting *Burlington Indus. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988))*; *see Larson Mfg., 559 F.3d at 1342* (Linn, J., concurring) ("[Our] precedent has significantly diverged from the Supreme Court's treatment of inequitable conduct and perpetuates what was once referred to as a 'plague' that our en banc court sought to cure in *Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 n.15 (Fed. Cir. 1988)* ... .").

62. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO, which includes a

duty to disclose all information known to that individual to be material to patentability. *37 C.F.R. § 1.56.* That duty extends to both applicants and their attorneys, *Brasseler, U.S.A. I., L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1375 (Fed. Cir. 2001).*

63. [*130] Inequitable conduct in prosecuting a patent may preclude enforcement of related patents if the inequitable conduct has an "'immediate and necessary relation'" to the enforcement sought, *Consolidated Aluminum Corp. v. Foseco Intern. Ltd., 910 F.2d 804, 810-11 (Fed. Cir. 1990)* (quoting *Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S. Ct. 146, 78 L. Ed. 293, 1934 Dec. Comm'r Pat. 639 (1933)).*

i. *Materiality*

64. Par argues that four pieces of material information were not forthrightly disclosed to the PTO. First, Par alleges that Plaintiffs should have disclosed the World Congress of Pain Abstracts and Grunenthal's prior work on a controlled release tramadol product. (D.I. 340 at 25.) Second, Par argues that Plaintiffs should have disclosed the Batch 616/07 and 616/07B experiments. (*Id.* at 26-27.) Third, Par argues that Plaintiffs failed to disclose the scientifically invalid experimental conditions surrounding the Malkowska I and II Declarations. (*Id.* at 27-28.) Fourth, Par contends that Plaintiffs belatedly submitted the results of the Napp repeat experiments, and, when they finally did submit those results, they buried them so that the examiner would not appreciate their significance. (*Id.* at 31-36.)

65. The World Congress [*131] of Pain Abstracts are not clearly and convincingly material. Par argues that the applicants should have disclosed the World Congress of Pain Abstracts because they rendered false a statement that the applicants made to the PTO in October of 1996, as a part of the prosecution of the original application for the patents-in-suit, that "no one, to the best of Applicants' knowledge and belief, has seriously suggested preparing an orally administragble [sic] controlled release formulation containing tramadol." (D.I. 339 at P 115; DTX-11B at PAR45884-85.) But that was not a position that the applicants took in opposing a statement of unpatentability or asserting an argument of patentability. *37 C.F.R. § 1.56(b)(2).* Instead, it was a throw-away statement made in response to an indefiniteness rejection for a claim that was simultaneously being amended. Specifically, the rejection concerned the claim, "a controlled release preparation comprising tramadol or a

Case 1:07-cv-00333-SLR   Document 299-1   Filed 09/30/09   Page 156 of 160

Page 38

2009 U.S. Dist. LEXIS 72703, *131

pharmaceutically acceptable salt thereof for oral administration." (DTX-11B at PAR045875.) As the applicants acknowledged, the rejection, and necessarily their statement in response, had been rendered "moot" by the amendment to that claim, [*132] which added, among other things, structural and dissolution limitations similar to those found in what is now claim 1 of the '887 patent. (Id. at PAR045875, 85.)

66. Grunenthal's assertions in its 1996 negotiations with Mundipharma that it had been testing controlled-release formulations for years before May 1993 are also not material because there is no indication that they were publicly known or used in the United States and, thus, they would not have qualified as prior art. 35 U.S.C. § 102; see Carella v. Starlight Archery and Pro Line Co., 804 F.2d 135, 139 (Fed. Cir. 1986), amended by 804 F.2d 135, 1 U.S.P.Q.2d 1209 (Fed. Cir. 1986) ("The statutory language, 'known or used by others in this country' (35 U.S.C. § 102(a)), means knowledge or use which is accessible to the public.").

67. The failure of the Batch 616/07 run due to sticking was not material. Par does not contend that the dissolution data from that batch is material, and conditions unrelated to the earlier dissolution data submitted to the PTO were likely to blame for the sticking. (FF P 123-124.) Thus, the problems of Batch 616/07 were irrelevant.

68. The non-disclosure of the Batch 616/07B run is more problematic. Plaintiffs argue [*133] that they did not need to disclose the second coating run because the spray rate was 2 g/min, whereas the tablets underlying the Malkowska I Declaration in 1995 were coated at a rate of 3 g/min (FF PP 125-126), and the purpose of the 1997 experiments was to duplicate the process conditions of the 1995 experiments. (D.I. 336 at 16.) Regardless of the purpose of the 1997 experiments, however, a reasonable examiner would have considered the results important. Merck/Bondi does not specify a spray rate. (DTX-16.) That the lowered spray rate brings the dissolution results closer to the claimed ranges is an indication that one might be able to obtain the claimed controlled release tramadol formulation by following Merck/Bondi and making routine adjustments.

69. Plaintiffs argue that dissolution results that are closer to but not within the claimed ranges are irrelevant because a reference cannot inherently anticipate unless the results will "always occur by following the disclosure

of the reference." (D.I. 334 at P 179 (citing In re Oelrich, 666 F.2d 578, 581-82 (C.C.P.A. 1981)); D.I. 336 at 15.) However, that argument is no more than misdirection. It focuses on anticipation and completely [*134] ignores the pertinence of the Merck/Bondi reference as an obviousness reference. That an apparently routine adjustment in the coating spray rate causes the dissolution results to be significantly closer to the claimed ranges is indeed relevant to obviousness. (See Cl. P 51.) Tellingly, the undisclosed dissolution results belie the statements in the Malkowska II Declaration that the results achieved by following Merck/Bondi were "significantly faster than" the EP '366 claims and "demonstrate no real control of the release of tramadol." (FF P 130.) In view of the data that the applicants had in their possession, those statements in the Malkowska II Declaration were materially misleading. See Monsanto, 514 F.3d at 1240 (holding that internal notes were material because they "directly contradict arguments ... made to the PTO in support of patentability.").

70. The conditions of the experiments underlying the Malkowska I Declaration, however, did not need to be disclosed to the PTO. The above-100% dissolution data included in the declaration did not necessarily indicate that an underlying problem existed with the experiments: Purdue's experts convincingly testified that dissolution data greater [*135] than 100% simply means that the tablet was manufactured with more than the expected dosage of tramadol. (Fanfarillo, Tr. 647:24-648:8; Davies, Tr. 671:6-672:10.) As to the false reporting of the average tablet core weight and the failure to report poor flow characteristics, those facts are clearly not helpful to Plaintiffs but ultimately are not important because the tablet weights were found to be within an acceptable range of the target weight. A contemporaneous laboratory notebook entry for the experiments shows that the tested tablets were weighed before coating and fell within the specified weight range of 352 mg, plus or minus 5 percent. Moreover, Brown remarked in that entry that, although the "flow properties were poor[,] [f]requent tapping of the hopper ... ensure[d] constant tablet weight." (Prater Tr. 140:22-45:6; PTX-490 at NAPP0372447; Prater, Tr. 152:19-53:19.) As to the inclusion of the dissolution data from only one tablet, that disclosure is not materially misleading because even the average dissolution rate fell outside the claimed ranges, and all of the tablets were tested under the same conditions. (Prater Tr. 1462:14-63:15.)

BSC-SJA-1305

71. The results of the Napp repeat experiments [*136] were material, but they were properly disclosed. (FF PP 136, 141.) Par argues that Plaintiffs effectively failed to disclose the results because they did not submit the information immediately and, when they did submit it, they buried it in the middle of a lengthy IDS. (See FF P 141.) That argument finds little support in fact or law.

72. Par argues that Davidson should have submitted the results of the Napp repeat experiments in his March 1999 IDS instead of continuing to rely on the Malkowska Declarations. (D.I. 340 at 33.) However, the evidence suggests that all of the expert reports discussing those experiments might not have been disclosed in the U.K. Litigation until after Davidson submitted his March 1, 1999 IDS. (FF P 140.) Davidson submitted those expert reports in the next IDS he submitted to the Patent Office. (FF P 141.) That submission was sufficiently timely. See Young v. Lumenis, Inc., 492 F.3d 1336, 1349 (Fed. Cir. 2007) ("The essence of the duty of disclosure is to get relevant information before an examiner in time for him to act on it, and that did occur here.").

73. Davidson did not improperly "bury" the results of the Napp repeat experiments by putting the Florence [*137] Supplemental Report in the middle of the March 2000 IDS. Davidson included a summary of each of the reports submitted, referenced the Florence Supplemental Report at the beginning of the section containing updated U.K. Litigation information, and went to the Patent Office to discuss the disclosed reports as a whole. (FF PP 141, 143-144.) Par points to no case that would impose a duty on Plaintiffs to disclose the results of the Napp repeat experiments in any other way. [57]

> 57  There is an undeniable tension between, on the one hand, cases that say that "[a]n applicant can not [sic] be guilty of inequitable conduct if the reference was cited to the examiner," Fiskars, Inc. v. Hunt Mfg. Co., 221 F.3d 1318, 1327 (Fed. Cir. 2000), and those that say, on the other, that "burying' a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith," Molins, 48 F.3d at 1184. Patent lawyers must find the sometimes narrow middle ground between over-disclosure and under-disclosure, with the specter of an inequitable conduct charge on either side. Davidson found that middle ground, because he did more than simply submit the Florence

[*138] and Fell supplemental reports along with a multitude of other references; he provided summaries of the reports and other references. Par might not have put a red flag on the reports that Par now alleges are the most damning, but that fails to demonstrate that the references were improperly "buried." Davidson's earlier argument before the PTO that he could not choose between the various challengers' positions (FF P 142) is persuasive here and helps to satisfy me that he fulfilled his duty of disclosure.

74. In sum, the applicants did withhold material information and made two material misrepresentations to the PTO. Specifically, the Malkowska II Declaration withheld the dissolution test results of Batch 616/07B and instead argued that the teachings of the Merck/Bondi reference resulted in a formulation that dissolved "significantly faster than" the EP '366 claims and demonstrated "no real control of the release of tramadol." In fact, the withheld dissolution tests revealed results that were not significantly faster than those claims and that demonstrated that more control was possible. The conditions of the experiments underlying the Malkowska I Declaration, however, were not material. [*139] nor were the World Congress of Pain Abstracts or the unpublished information Grunenthal disclosed to Mundipharma. The results of the Napp repeat experiments, while material, were properly disclosed.

ii. Intent to Deceive

75. I focus my inquiry here on evidence that bears on whether the omission and misrepresentations relative to the Malkowska II Declaration were motivated by an intent to deceive, since those misrepresentations and related omission are the only material pieces of information that can be a basis for a decision that there was inequitable conduct. That is not to say, however, that deceptive intent with respect to the omission or misrepresentation of other, non-material information is never relevant. To the contrary, it might indeed be relevant to establishing that the applicant was acting deliberately when withholding the material information. Here, although the facts presented are disturbing, I ultimately conclude that Par has not sufficiently established that the applicants had an intent to deceive the PTO.

76. In the context of experiments done pursuant to prior art, the PTO is particularly at the mercy of

applicants because, unlike with prior art searches, the PTO does [*140] not have the resources to conduct its own experiments. "[I]n submitting evidence of comparative tests ... an applicant must be held to be representing that his showing includes a fair and accurate demonstration of the closest prior art of which he is aware." *Norton v. Curtiss, 433 F.2d 779, 792, 57 C.C.P.A. 1384 (C.C.P.A. 1970).*

77. The actions of the applicants in the preparation of the two Malkowska Declarations are striking. Malkowska clearly knew, and Prater likely knew, about the dissolution results of Batch 616/07B. (FF P 128.) Malkowska might also have recognized their full import. (*Id.*) Yet instead of including those results, the Malkowska II Declaration suggested that the teachings of the Merck/Bondi reference were not helpful in obtaining the claimed controlled release formulation. (FF P 130.) *See Monsanto, 514 F.3d at 1241* ("Intent is easily inferred when, as here, an applicant makes arguments to the PTO that it knows, or obviously should have known, are false in light of information not before the examiner, and the applicant knowingly withholds that additional information."). In preparing the Malkowska I Declaration, Malkowska and Milnes altered and omitted certain test conditions, namely, [*141] the average weight of the tablets and the poor flow characteristics of the blend. (FF PP 113-114.) Moreover, for one of the experiments, they included data for only one tablet, the one falling the furthest outside of the claimed ranges, rather than the average tablet dissolution rate. (*Id.*) Had the failure to include the average tablet dissolution rate been the only irregularity, then perhaps I would more readily believe that it was the result of simple oversight and that the one tablet chosen for analysis yielded the results it did by coincidence. But I cannot so easily dismiss that failure when coupled with the other altered and omitted test conditions found here. These facts are troubling.

78. But the standard of proof is high. It goes beyond suspicion and beyond proof by a preponderance of the evidence. The burden is to show by clear and convincing evidence that the applicants intended to deceive the PTO, and Par has failed to carry that burden. There is a plausible view of the evidence that does not involve intentional deceit. It is not far-fetched to conclude that the applicants were overly aggressive in trying to put a positive spin on the results of the experiments but that [*142] they did not intend to deceive anyone at the PTO.

Applicants have a natural incentive to put things in a positive light, and there is a range of behavior, from simple spin to out and out deception, which may result from that incentive. Here, the possibility that the applicants were advocating their position without any deceptive intent is bolstered, to a limited but still significant degree, by three considerations. First, Malkowska's testimony that she did not recall why the dissolution results of Batch 616/07B were not disclosed in her declaration was, at this late date and given her demeanor, believable. (FF P 130.) *Cf. Larson Mfg., 559 F.3d at 1341* ("[A]n accused infringer cannot carry its threshold burden simply by pointing to the absence of a credible good faith explanation."). Second, it is less than clear that the applicants who had knowledge of those dissolution results, applicants who were formulators rather than patent lawyers, recognized the import of those results on patentability. (FF P 128.) *Cf. Dayco Products, Inc. v. Total Containment, Inc., 329 F.3d 1358, 1367 (Fed. Cir. 2003)* ("[I]nequitable conduct requires not intent to withhold, but rather intent to deceive."). [*143] Third, and most importantly, the applicants did disclose the most damaging experimental results once they were completed following the Napp repeat experiments. [58] The Florence and Fell supplemental reports revealed experimental results that fell not just closer to, but within the claimed ranges. (FF P 136.) The Posch report revealed the same thing. (FF P 138.) It is clear from those reports that certain changes to the experimental conditions in Example 1 of Merck/Bondi can result in dissolution ranges that fall within the claimed ranges. That information is what Par correctly argues should have been disclosed to the examiner, and it was. (CL P 74.) Because it ultimately was properly disclosed (CL PP 71-73), I cannot conclude, under the heightened standard of clear and convincing proof, that the applicants' failure to disclose similar information with respect to the Malkowska II Declaration was motivated by an intent to deceive. In short, Par's proof is incriminating, but not incriminating enough.

[58]     That all the relevant information was eventually put before the PTO does not make the omission and misrepresentations contained in the Malkowska II Declaration any less material. The omission [*144] of information that forms the basis of affidavits, as opposed to omissions of prior art references, cannot be excused as cumulative of information otherwise before the PTO. "Affidavits are inherently material, even if



only cumulative." *Refac International, Ltd. v. Lotus Development Corp., 81 F.3d 1576, 1583 (Fed. Cir. 1996).*

### iii. Balancing Materiality and Intent

79. If adequate showings are made as to both materiality and intent, a district court must look to the equities and balance the substance of those showings to determine whether the severe penalty of unenforceability should be imposed. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1367 (Fed. Cir. 2008).* Here, however, Par has failed to prove through clear and convincing evidence that the applicants harbored an intent to deceive the PTO, which leaves me with nothing to balance. *See Ariad Pharms, 560 F.3d at 1380* ("Only after a district court makes independent findings of both materiality and intent may it weigh the two against each other in its ultimate determination of inequitable conduct."). I therefore conclude that Par has not established that the patents-in-suit are unenforceable for inequitable conduct.

## IV. [*145] SUMMARY OF CONCLUSIONS

For the reasons set forth herein, Defendant Par's ANDA filing infringes claims 3, 13, 27, and 29 of the '887 patent and the manufacture, use, and offer to sell controlled release tramadol tablets in 100 mg, 200 mg, and 300 mg dosage strengths would infringe claims 5, 7, and 11 of the '430 patent. However, the asserted claims are invalid as obvious in light of the Oshlack patent and also in light of Oshlack in combination with Kaiko, Leslie, or Lintz. Finally, the patents-in-suit are not unenforceable due to inequitable conduct. An appropriate order follows.

## JUDGMENT ORDER

WHEREAS, the claims of Plaintiff Biovail Laboratories International, SRL ("Biovail") against Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively, "Par") and Par's counterclaims as they relate to Biovail were dismissed by this Court's November 10, 2008 Order of Partial Dismissal;

AND WHEREAS, Plaintiff Ortho-Mcneil, Inc. ("Ortho") was dismissed from this action by this Court's December 3, 2008 Order;

AND WHEREAS, this Court held a bench trial in April 2009 on the remaining Plaintiffs Purdue Pharma Products L.P.'s and Napp Pharmaceutical Group Ltd.'s (collectively, [*146] "Purdue") claims of infringement and Par's counterclaims of invalidity and unenforceability of Purdue's *United States Patent Nos. 6,254,887* (the "'887 patent") and *7,074,430* (the "'430 patent") as asserted against Par;

AND WHEREAS, this Court issued Findings of Fact and Conclusions of Law on August 14, 2009, in which the Court held (i) that Par's filing of Abbreviated New Drug Application ("ANDA") No. 78-783 with the U.S. Food and Drug Administration infringed claims 3, 13, 27, and 29 of the '887 patent and Par's manufacture, use, and offer to sell tramadol extended release tablets in 100 mg, 200 mg, and 300 mg dosage strengths would infringe claims 5, 7, and 11 of the '430 patent; (ii) that those claims are invalid as obvious; and (iii) that the '887 patent and '430 patents were not proven by clear and convincing evidence to be unenforceable due to inequitable conduct;

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. Par has literally infringed Claims 3, 13, 27, and 29 of the '887 patent, and Par's manufacture, use, and offer to sell tramadol extended release tablets in 100 mg, 200 mg, and 300 mg dosage strengths would infringe claims 5, 7, and 11 of the '430 patent.

2. [*147] Claims 3, 13, 27, and 29 of the '887 patent and claims 5, 7, and 11 of the '430 patent are invalid for obviousness.

3. The '887 and '430 patents are not unenforceable due to inequitable conduct.

4. Judgment be and is hereby entered in favor of Purdue and against Par on the issues of infringement of the asserted claims of the '887 and '430 patents and inequitable conduct with respect to the '887 and '430 patents.

5. Judgment be and is hereby entered in favor of Par and against Purdue on the issue of invalidity of the asserted claims of the '887 and '430 patents.

/s/ Kent A. Jordan

United States Circuit Judge

DATE: August 14, 2009                          Wilmington, Delaware .