# EXHIBIT 67

# Rapamycin Inhibits Vascular Smooth Muscle Cell Migration

Michael Poon, Steven O. Marx, Richard Gallo, Juan José Badimon, Mark B. Taubman, and Andrew R. Marks

*Laboratory of Molecular Cardiology, Cardiovascular Institute, Department of Medicine, Mount Sinai School of Medicine, New York 10029*

## Abstract

Abnormal vascular smooth muscle cell (SMC) proliferation and migration contribute to the development of restenosis after percutaneous transluminal coronary angioplasty and accelerated arteriopathy after cardiac transplantation. Previously, we reported that the macrolide antibiotic rapamycin, but not the related compound FK506, inhibits both human and rat aortic SMC proliferation in vitro by inhibiting cell cycle–dependent kinases and delaying phosphorylation of retinoblastoma protein (Marx, S.O., T. Jayaraman, L.O. Go, and A.R. Marks. 1995. *Circ. Res.* 362:801). In the present study the effects of rapamycin on SMC migration were assayed in vitro using a modified Boyden chamber and in vivo using a porcine aortic SMC explant model. Pretreatment with rapamycin (2 ng/ml) for 48 h inhibited PDGF-induced migration (PDGF BB homodimer; 20 ng/ml) in cultured rat and human SMC ($n = 10$; $P < 0.0001$), whereas FK506 had no significant effect on migration. Rapamycin administered orally (1 mg/kg per d for 7 d) significantly inhibited porcine aortic SMC migration compared with control ($n = 15$; $P < 0.0001$). Thus, in addition to being a potent immunosuppressant and antiproliferative, rapamycin also inhibits SMC migration. (*J. Clin. Invest.* 1996. 98:2277–2283.) Key words: immunophilin • restenosis • atherosclerosis • FK506 • FKBP12

## Introduction

Abnormal vascular smooth muscle cell (SMC)[1] proliferation and migration play major roles in the formation of atherosclerotic plaques, in the development of restenosis after percutaneous transluminal angioplasty (PTCA) and in accelerated arteriopathy after cardiac transplantation (1–5). In normal vessels, the majority of SMC reside in the media, where they are quiescent and possess a "contractile" phenotype (1, 6) characterized by the abundance of actin- and myosin-contain-

ing filaments. In disease states, SMC reenter the cell cycle, proliferate, and migrate from the media to the intima (1). PDGF is a potent chemoattractant for SMC (6–8) and is thought to play a major role in stimulating SMC migration in experimental models of vessel injury (9, 10). After vessel injury, intimal SMC demonstrate a synthetic phenotype, secreting extracellular matrix, proteases, growth factors, and cytokines that contribute to further proliferation and migration (1, 5, 6).

Recently, we reported that rapamycin, a macrolide antibiotic, inhibited both human and rat SMC proliferation by blocking cell cycle progression at the G1/S transition (11). This inhibition of cell proliferation was associated with decreases in cell cycle kinase activity and a reduction in the phosphorylation of retinoblastoma protein. We demonstrated that the antiproliferative properties of rapamycin were mediated through binding to the cytosolic receptor, FK506 binding protein (FKBP12) (11). FKBP12 is ubiquitously and abundantly expressed in many cells and tissues and is highly conserved throughout eukaryotic phylogeny (12–16). FKBPs catalyze the *cis–trans* isomerization of peptidyl-prolyl amide bonds of peptides; both rapamycin and FK506 inhibit this rotamase activity. However, the inhibition of rotamase activity is not responsible for the immunosuppressive effects of these agents (17).

In the present study, we demonstrate that rapamycin, but not FK506, blocks rat, porcine, and human SMC migration. The inhibitory effects on migration are competed by molar excesses of FK506, indicating that the effect is mediated through binding to the cytosolic receptor, FKBP12. In rat aortic SMC, the inhibition of rapamycin of both proliferation and migration is mediated through a novel form of FKBP12 which contains three amino acid substitutions compared with the human FKBP12, including a serine substitution for a highly conserved proline at residue 10. The present data indicate that a target of the rapamycin–FKBP12 complex or a downstream effector molecule functions as a critical regulator of SMC migration.

## Methods

*Reagents.* Rapamycin was a gift from Dr. Suren Sehgal (Wyeth-Ayerst Laboratories, Princeton, NJ); FK506 was from Fujisawa (Deerfield, IL); recombinant human PDGF-BB was from Cal Biochem (Stanford, CA).

*Cell culture.* Rat aortic SMC (passages 8–11) were cultured in DME plus 20% FCS (Gibco, Grand Island, NY), 100 U/ml penicillin, and 100 µg/ml streptomycin as previously described (11, 18). The medium was changed every 48 h, and cells were passaged at ~75% confluence. Human aortic SMC (passages 3–5), were obtained from the ascending aorta at the time of cardiac transplantation. The adventitia and connective tissue were removed, the remaining arterial intima and media were cut into 1-cm² segments, and placed in culture dishes with collagenase and 15% FCS. Cells were grown in DME medium supplemented with 20% FCS, 100 U/ml penicillin, and 100 µg/ml streptomycin. Aortic SMC were serially passaged before reaching confluence. Cells were identified as smooth muscle by their typical

M. Poon and S.O. Marx contributed equally to this paper.

Address correspondence to Andrew R. Marks, Box 1269, Mount Sinai School of Medicine, One Gustave L. Levy Place, New York, NY 10029. Phone: 212-241-0309; FAX: 212-996-4498; E-mail: a_marks @smtplink.mssm.edu

*Received for publication 28 June 1996 and accepted in revised form 13 September 1996.*

1. *Abbreviations used in this paper:* FKBP, FK506 binding protein; GAP, Ras-GTPase-activating protein; PI-3′, phosphatidylinositol-3-OH; PLC, phospholipase C; SMC, smooth muscle cell; PTCA, percutaneous transluminal angioplasty.

J. Clin. Invest.
© The American Society for Clinical Investigation, Inc.
0021-9738/96/11/2277/07  $2.00
Volume 98, Number 10, November 1996, 2277–2283

BSC-SJA-1310

appearance on light microscopy and by immunostaining with anti–smooth muscle α-actin 1A4 (M851; Dako Inc., Carpenteria, CA).

*Smooth muscle cell migration assay.* Migration was measured using a 48-well chamber (modified Boyden chamber) housing a polycarbonate filter with 8-µm pores (Nucleopore, Cabin John, MD) (19). Each membrane was coated with 0.1 mg/ml of collagen (Vitrogen 100®; Centrix, Santa Clara, CA) in 0.2 M acetic acid for 24 h before each chemotactic assay. For each assay, 27 µl of PDGF-BB (20 ng/ml) in DME plus 0.2% BSA were loaded in quadruplicate wells in the bottom chamber. BSA (0.2% in DME without PDGF) was used as a negative control. SMC were grown to ~ 30% confluence. Rapamycin or FK506 was then added directly to the culture media of some plates, control was without drug. After 48 h of incubation, cells were trypsinized, washed three times with PBS, and counted with a hemocytometer. Cell viability was determined by trypan blue exclusion. To examine the acute effect of rapamycin on SMC migration, rapamycin (100 ng/ml) was added directly to the upper or lower chamber without pretreatment SMC grown in the absence of rapamycin were loaded in the upper chamber.

Equal numbers of cells ($2 \times 10^3$/ml) in 50 µl were placed in the top chamber. After 6 h of incubation in 5% $CO_2$ at 37°C, nonmigrating cells were scraped from the upper surface of the filter. Cells on the lower surface were fixed with methanol and stained with Diff-Quik (Baxter Healthcare Co., Miami, FL). The number of SMC on the lower surface of the filter was determined microscopically by counting five high power (×400) fields of constant area per well. Values are expressed as the percentage of cells migrating in response to PDGF-BB after subtraction of the negative control (DME + BSA). Experiments were performed at least twice using quadruplicate wells. Statistical significance was determined using the unpaired Student's *t* test; *P* < 0.01 was considered a significant result.

*Northern analyses.* Total RNA was prepared from SMC growing in log phase using the standard guanidinium-isothiocyanate lysis buffer and centrifugation through a cesium chloride cushion as described elsewhere (20). 20 µg of total RNA was size fractionated on a 1% formaldehyde agarose gel, blotted to nitrocellulose, and probed with a-$^{32}$P-labeled FKBP12 cDNA randomly labeled to a specific activity of $10^9$ cpm/µg. The FKBP12 cDNA probe contained the entire coding region of the rabbit FKBP12 (16). Hybridization was at 42°C overnight and final washing at 65°C in 0.2 × SSC. Films were autoradiographed with a single intensifying screen at −70°C for 48 h. Ethidium bromide staining of the 28S ribosomal RNA was used to ensure that equivalent amounts of RNA were loaded in each lane. Northern analyses were repeated at least three times with the same results, a representative blot is shown.

*Immunoblots.* SMC growing in log phase were washed twice with ice-cold PBS and lysates were prepared using modified RIPA buffer (50 mM Tris-HCl, pH 7.4, 250 mM NaCl, 5 mM EDTA, 50 mM NaF, 0.1 mM $Na_3VO_4$, 0.5 mM PMSF, 1 µg/ml aprotinin, 1 µg/ml leupeptin, 1% NP-40, 0.5% sodium deoxycholate, and 0.1% SDS). Cells were scraped off the bottom of the plates and lysates rocked for 1 h at 4°C. Lysates were clarified by centrifugation on a table top centrifuge for 20 min at 14,000 at 4°C. Protein concentration was measured using the Bradford reagent (Bio-Rad Laboratories, Richmond, CA) with BSA as a standard. Protein extracts (50 µg) were size-fractionated on 15% SDS-polyacrylamide gels and transferred to nitrocellulose overnight at 45–60 V. Filters were blocked in PBS containing 0.1% Tween 20 (PBS-T), and 5% dry milk for 1 h at 30°C, followed by incubation overnight at 4°C with either an anti-FKBP12 antibody directed against the amino-terminus of FKBP12 (1/1,000, gift from Dr. Greg Wiederrecht, Merck Research Laboratory). The filters were washed with PBS-T, then incubated with secondary antibody conjugated to peroxidase for 1 h at 4°C and washed; signals were detected using the chemiluminescence detection system (ECL; Bio-Rad) followed by exposure to Kodak XAR film.

*Library screening.* A rat aortic SMC oligo-dT primed cDNA library in λZAPII was screened using a full-length rabbit FKBP12 cDNA that includes the entire coding region of FKBP12 as described

previously (16). A total of $10^6$ recombinants were screened at high stringency (final wash was 0.1 × SSC at 65°C). After tertiary screening, five FKBP12 cDNA clones were isolated. The sequence reported in this study was obtained from five independent cDNA clones using the dideoxy chain termination methodology (20).

*Explant model.* 15 adult Yorkshire albino pigs (body wt 30–35 kg) were randomly assigned to receive either regular pig chow or pig chow plus rapamycin for 7 d. Three animals received 1 mg/kg of rapamycin orally and four animals received 5 mg/kg for 7 d. Animals were euthanized with 10 ml of Sleepaway (26% sodium pentobarbital, 10% isopropyl alcohol, 20% polyethelene glycol; Fort Dodge Laboratories, Fort Dodge, IA). The aortas were perfused in situ with ice-cold physiologic buffer at a pressure of 100 mmHg. The aortas were excised, adventitia and surrounding connective tissue were removed. Aortas were opened by a longitudinal cut and the intima as well as a thin portion of the subjacent media was removed. The media were divided into five 10 × 10-$mm^2$ segments that were cut into multiple 2 × 2-$mm^2$ segments and placed in 100-mm culture dishes containing 10 ml of DMEM + 20% FBS. Culture media were changed every 3–4 d. On days 5, 10, and 15, culture dishes were washed with PBS to remove cellular debris, trypsinized briefly with 1.5 ml of trypsin, resuspended in 2 ml of PBS, and cells were counted (eight times per dish) using a hemocytometer. The results are presented in Fig. 5 as mean values±standard error of the mean for eight determinations from each of eight control, and seven rapamycin-treated animals. Cell viability was assessed using the trypan blue exclusion method. Rapamycin levels in whole blood samples were determined by Wyeth-Ayerst Laboratories. Routine histologic examinations of the aortas to assess the effects if any of rapamycin on SMC morphology were performed using hematoxylin and eosin stained sections.

*Adhesion assay.* Rat aortic SMC were incubated either with or without 20 ng/ml of rapamycin in DMEM supplemented with 10% FBS for 72 h. After 72 h cells were detached from the plates by brief trypsinization in 2 ml of trypsin/EDTA, resuspended in 10 ml DMEM + 10% FBS, and cell number was determined. There were fewer cells in the rapamycin treated samples compared with the control ($4.4 \times 10^6$ vs $8.3 \times 10^6$) due to the antiproliferative effect of rapamycin on smooth muscle cells (11). Four six-well culture plates were precoated with varying concentrations of collagen (from 1 µg/ml to 1,000 µg/ml of Vitrogen). Smooth muscle cells were resuspended in DMEM to give a final concentration of $2.0 \times 10^5$ cells/ml. 1 ml of SMC was added to each well. After 2.5 h, nonadherent cells were removed and the number of cells adhering to the bottom of the wells was determined by counting four separate fields of constant area per well. All experiments were performed in triplicate.

## Results

Rapamycin as low as 2 ng/ml had a significant inhibitory effect (*P* < 0.0001) on PDGF-BB homodimer-induced rat aortic SMC migration (Fig. 1 *A*). Similarly, rapamycin significantly inhibited PDGF-BB induced human SMC migration (Fig. 1 *B*; *P* < 0.0001). The inhibition of migration was concentration dependent with an $IC_{50} = 2$ ng/ml for both rat and human SMC. In contrast, FK506 (1–500 ng/ml) had no significant effect on migration in response to PDGF-BB (Fig. 1 *A*). The inhibition of migration by rapamycin persisted for at least 72 h in the Boyden chamber assays. By 96 h cell viability was substantially decreased in both control and in rapamycin-treated cultures, preventing assessment of cellular migration. There was no difference in cell viability between the control, FK506, and rapamycin treated cells as assessed by trypan blue staining. No difference in morphology was observed comparing rat SMC from rapamycin-treated and untreated cultures (Fig. 1 *C*). As previously described (11), rapamycin inhibited SMC proliferation, whereas FK506 had no effect (data not shown). However,



BSC-SJA-1311



*Figure 1.* Rapamycin but not FK506 inhibits aortic smooth muscle cell migration. (*A*) Rat aortic SMC were cultured with either rapamycin or FK506 for 48 h and then examined for chemotaxis to 20 ng/ml of PDGF-BB in a modified Boyden chamber. $P = 0.01$ for control vs. 1 ng/ml rapamycin, $P < 0.0001$ for control vs. 2 and 100 ng/ml rapamycin. (*B*) Similar experiments were performed using human aortic SMC cultured with rapamycin. $P < 0.0001$ for each concentration of rapamycin compared with control. There is no significant difference between control and FK506-treated rat or human cells (not shown). The results represent mean values obtained from quadruplicate wells from each of two experiments. Error bars represent standard error of the mean. (*C*) Culturing with rapamycin had no effect on rat SMC morphology; compare control cells to cells cultured for 72 h with rapamycin (20 ng/ml).

equal numbers of cells were used in all migration assays. Thus the reduction in migration did not simply reflect a difference in cell number between control, FK506, and rapamycin treated cells.

Addition of rapamycin (100 ng/ml) to the cells immediately before loading into the upper Boyden chamber (Fig. 2), or incubation with rapamycin (100 ng/ml) for up to 6 h (data not shown) had no effect on migration. Similarly, rapamycin, when added together with PDGF to the lower chamber, had no effect on the ability of PDGF to attract normal SMC (Fig. 2). These results indicate that inhibition of SMC migration by rapamycin requires > 6 h exposure to rapamycin. The inhibition of migration of rat aortic SMC by rapamycin (100 ng/ml) was competitively inhibited by 80±10% by a 100-fold molar ex-

BSC-SJA-1312



*Figure 2.* Inhibition of aortic smooth muscle migration requires prolonged exposure to rapamycin. Rat SMC added to the top chamber in the migration assay did not migrate when PDGF-BB was omitted from the bottom chamber (*first bar*). When PDGF-BB (PDGF, 20 ng/ml) was added to the bottom chamber, rat SMC migration was observed (*second bar*). Treatment of rat SMC with rapamycin (Rapa, 100 ng/ml) for 48 h significantly inhibited migration (*third bar*, $P < 0.001$). In contrast, acute administration of rapamycin (100 ng/ml) to the top (*fourth bar*) or bottom (*fifth bar*) chamber had no effect on migration. The y-axis shows the number of cells migrating onto the filter per high power field (see Methods for details).

cesses of FK506, indicating that the inhibition of migration by rapamycin was mediated by the binding to the immunophilin FKBP12, since both rapamycin and FK506 share the same cytosolic receptor.



*Figure 3.* Analyses of FKBP12 mRNA and protein in rat SMC. (*A*) Northern hybridization using a full-length FKBP12 cDNA shows equivalent levels of FKBP12 mRNA (1.5 kb) in a murine muscle cell line (*BC3H1*) and rat aortic SMC (*RASM*). (*B*) Immunoblot analysis using an anti-FKBP12 antibody (16) that recognizes the amino-terminus of the human, rabbit, and murine FKBP12 shows no detectable FKBP12 protein in rat SMC, whereas an immunoblot using an anti-FKBP12 antibody directed at the carboxyl-terminus of FKBP12 shows a 12-kD protein in rat SMC.

FKBP12 is ubiquitously expressed and highly conserved across species. However, immunoblotting with an antibody that recognizes the amino-terminus of the human, rabbit, and murine FKBP12 did not detect FKBP protein in rat aortic SMC (Fig. 3). In contrast, Northern hybridization using a full-length FKBP12 cDNA revealed high levels of FKBP12 mRNA (1.5 kb) in rat aortic SMC (Fig. 3) and an antibody directed at the carboxyl-terminus of FKBP12 identified a 12-kD protein in rat aortic SMC (Fig. 3). To determine the complete structure of the rat smooth muscle FKBP12, five FKBP12 cDNAs were isolated from a rat aortic SMC library and sequenced (Fig. 4). The rat FKBP12 encodes a 108-amino acid protein whose sequence is 95% identical to the human and rabbit form and 98% identical to the murine sequence. Notably, there is a serine for proline substitution at residue 10 in the middle of the epitope recognized by the amino-terminal FKBP12 antibody.

Rapamycin inhibits intimal thickening in rat aortas after mechanical or alloimmune injury (21) and reduces luminal narrowing following PTCA in porcine coronary arteries by 63% (Gallo, R., A. Padurean, J.H. Chesebro, J.T. Fallon, V. Fuster, A.R. Marks, and J.J. Badimon, manuscript submitted for publication). The latter study showed further that the reduction in luminal narrowing after PTCA was due to inhibition of intimal SMC hyperplasia typically observed in the vessel wall after balloon injury. Reduction in intimal SMC hyperplasia in rapamycin-treated animals presumably reflects the fact that the drug causes a block in G1 to S progression in SMC (11). However, SMC migration is also an important component of the intimal thickening after PTCA. SMC have to migrate from the media into the intima to proliferate and cause luminal narrowing. To assess the in vivo effects of oral rapamycin on SMC migration we examined the ability of cells to migrate out of porcine aortic explants and establish cultures. SMC from control untreated animals began to migrate out of the explanted aortic tissue by day 5 and reached near-confluence on day 15. In contrast, SMC from animals receiving 1 mg/kg of rapamycin did not migrate out of the aortic tissue until day 10, and by day 15 the number of cells was significantly reduced despite the fact that the only exposure to rapamycin for these cells had been in the intact animal (Fig. 5). SMC from animals treated with 5 mg/kg of rapamycin exhibited no migration even by day 15 after explant. Histological examination revealed no morphologic differences between SMC in control versus untreated animals, and trypan blue exclusion tests revealed no increase in cell death in SMC from rapamycin treated animals. Rapamycin levels in whole blood were $30\pm2$ng/ml and $85\pm5$ng/ml for the 1 mg/kg and 5 mg/kg dosing regimens, respectively. The concentration of $30\pm2$ng/ml is comparable to that observed in humans receiving rapamycin after renal transplant, whereas the concentration of $85\pm5$ng/ml would be considered above the recommended therapeutic levels. An assay was done to determine whether rapamycin affected the ability of SMC to bind to collagen. Control rat aortic SMC and cells pretreated with rapamycin using the conditions described above for the Boyden chamber assays were plated on collagen coated culture dishes in DMEM. At 2.5 h there were no significant differences between the rapamycin-treated and the control cells in terms of the number of SMC adhering to collagen-coated and the noncoated culture plates (control $55\pm3$, rapamycin $58\pm3$; $P = NS$). These results suggest that rapamycin does not affect the ability of smooth muscle cells to adhere to collagen.

BSC-SJA-1313

```
              1
rat FKBP12    ATG GGA GTG CAG GTG GAG ACC ATC TCT TCT GGA GAC GGG CGC ACC TTC CCG
              Met Gly Val Gln Val Glu Thr Ile Ser Ser Gly Asp Gly Arg Thr Phe Pro
human                                                                          Pro
murine                                                                         Pro

              18
              AAG CGC GTC CAG ACG TGC GTG GTA CAC TAC ACG GGG ATG CTT GAA GAT GTG
              Lys Arg Gln Thr Cys Val Val His Tyr Thr Gly Met Leu Glu Asp Gly

              35
              AAG AAA TTT GAC TCC TCT CGG GAC AGA AAC AAG CCT TTT AAG TTT ACA CTA
              Lys Lys Phe Asp Ser Ser Arg Asp Arg Asn Lys Pro Phe Lys Phe Thr Leu
                                                                              Met

              52
              GGC AAG CAG GAG GTG ATC CTA GGC TGG GAA GAA GGG GTA GCC CAG ATG AGT
              Gly Lys Gln Glu Val Ile Arg Gly Trp Glu Glu Gly Val Ala Gln Met Ser

              69
              GTG GGC CAG AGA GCC AAA CTG ATA ATC TCT CCA GAC TAT GCC TAT GGA GCC
              Val Gly Gln Arg Ala Lys Leu Ile Ile Ser Pro Asp Tyr Ala Tyr Gly Ala
                                              Thr
                                                          Ser

              86
              ACC GGG CAC CCA GGC ATC ATC CCA CCA CAT GCT ACT CTT GTT TTC GAT GTC
              Thr Gly His Pro Gly Ile Ile Pro Pro His Ala Thr Leu Val Phe Asp Val

              103
              GAG CTT CTA AAA CTG GAA TGA
              Glu Leu Leu Lys Leu Glu
```

*Figure 4.* Comparison of the primary structure of the rat, human, and murine FKBP12. The cDNA and predicted amino acid sequence of the rat FKBP12 compared with human (rabbit is identical to human [16]) and murine FKBP12 (12). The open reading frame encodes a 108-amino acid protein that differs from the human and rabbit FKBP12 at three residues, and from the murine FKBP12 at two residues. The epitope recognized by the amino terminal anti-FKBP12 antibody (16) is denoted by the underlined sequence. These sequence data are available from GenBank, BankIt67151, under accession number U69485.

## Discussion

This study demonstrates that rapamycin inhibits rat, porcine, and human SMC migration. We have previously demonstrated that rapamycin has antiproliferative effects on rat and human aortic SMC mediated by binding to FKBP12 and inhibiting cell



*Figure 5.* In vivo administration of oral rapamycin inhibits SMC migratory potential. Migratory potential of SMC was examined by determining the ability of cells to move out from porcine aortic tissue samples taken from animals treated with rapamycin compared to control (see Methods for experimental detail). SMC migrating out from the explanted tissue from both control and rapamycin (1 mg/kg per day)–treated animals were able to grow in culture. However, there was a 5-d delay in migration exhibited by SMC in the treated versus control animals resulting in significantly larger numbers of cells (*Cell Number*) in explant cultures from control animals. No SMC migration was observed in aortas from animals treated with the higher concentration of rapamycin (5 mg/kg), even by day 15 after explant. When the standard deviation is small no error bars are seen.

cycle kinases and delaying phosphorylation of retinoblastoma protein (11). The inhibitory effects of rapamycin on SMC migration are also mediated by its binding to FKBP12. Recently, a mammalian target of the rapamycin-FKBP12 complex (mTOR) has been identified (22, 23). While the immediate downstream target of mTOR has not been identified, a common theme in many cell types is that rapamycin-FKBP12 inhibits p70 S6 kinase (24, 25), cell cycle kinases, hyperphosphorylation of Rb, and up-regulates the cyclin inhibitor p27 (26). Whether the antimigratory actions of rapamycin-FKBP12 in SMC involve any of these signaling molecules remains unproven. However, the present study suggests that rapamycin can be used as a "molecular probe" to dissect signaling pathways regulating SMC migration in much the same way as the drug is being used to gain insight into mechanisms controlling cell growth.

In the present study acute administration of rapamycin had no effect on the rat aortic SMC migration, suggesting that longer exposure to rapamycin (> 6 h) is required. Cellular locomotion required for migration is mediated by the coordinated changes in the polymerization and depolymerization of actin containing microfilaments (27, 28), although the mechanism regulating these changes remain uncertain. Recently, it has been reported that recruitment of signaling proteins including the PDGF receptor and phospholipase C (PLC)-γ and phosphatidylinositol-3-OH (PI-3') kinase association with the PDGF receptor triggers migration (29). Upon stimulation by PDGF, the PDGF receptor-β autophosphorylates and forms a complex with src homology 2-domain containing proteins such as phosphatidylinositol-specific PLC-γ, Ras-GTPase-activating protein (GAP), and PI-3' kinase (29). The association of activated PDGF receptor-β with either PLC-γ or PI-3' kinase promotes migration, whereas association with GAP retards

BSC-SJA-1314

migration in response to PDGF-β (29). PLC-γ and PI-3' kinase have been shown to modulate actin assembly (30). Both calcium and polyphosphoinositides have been proposed to regulate actin formation (32). A recent study demonstrated that activation of calcium/calmodulin-dependent protein kinase II (CaM kinase II) is a critical event for the migration of SMC. Inhibiting CaM kinase II blocked migration by > 90%, whereas the inhibition of protein kinase C activation had no significant effect on migration (28). Although mTOR has no apparent PI-3' kinase activity, its counterpart in yeast, TOR, is a PI-3' kinase homologue (32).

Moreover, FKBP12 is physically associated with the type I TGF-β receptor, suggesting that FKBP12 may have a direct role in modulating signal transduction mediated by growth factor receptors (33). These observations suggest that one mechanism whereby the rapamycin–FKBP12 complex could block SMC migration might be via inhibition of a growth factor-mediated pathway, possibly one that links migration to cell cycle progression.

The morphology of SMC from treated and untreated cultures (Fig. 1 C) and tissue sections was indistinguishable, suggesting that rapamycin does not appear to have an effect on the cytoskeletal components that have been associated with migration. Moreover, rapamycin does not alter the ability of SMC to bind collagen, suggesting that the antimigratory effects of the drug are not due to an inability to interact with the extracellular matrix.

The immunosuppressant drugs rapamycin and FK506 bind to the same site on FKBP12 (34, 35). FKBP12 also binds to naturally occurring cellular targets (36) including three forms of intracellular calcium release channels, calcineurin, and the type I TGF-β receptor (16, 33, 37–40). The immunosuppressant drugs mimic hydrophobic domains found in the cellular targets of FKBP12. The presence of a serine for proline substitution at residue 10 in the rat form of FKBP12 would be expected to introduce a significant structural change at the amino terminus of the rat protein by removing a bend due to the proline residue at this position that is present in the human, rabbit, and murine forms of FKBP12. Thus, it is unlikely that the amino-terminal domain of FKBP12 is involved in mediating the antimigratory effects of the drug.

FKBP12 is physically associated with the skeletal muscle and cardiac ryanodine receptors (37, 38) and the inositol 1,4,5-trisphosphate receptor (39), all of which are calcium release channels located on the sarcoplasmic and endoplasmic reticuli. FKBP12 appears to stabilize the tetrameric structures of these large ion channel complexes and modulates channel gating (37). Moreover, both rapamycin and FK506 interfere with FKBP12's ability to stabilize calcium release channel structures resulting in leaky channels (37). Since the inhibition of migration was specific for rapamycin, and not FK506, it is unlikely that this effect involved modulation of calcium release channels resulting in altered calcium homeostasis.

Our results also demonstrate that administration of rapamycin in vivo inhibits the ability of SMC to migrate. Significantly, this inhibitory effect on migration persists for 2 wk after exposure to rapamycin was stopped. This prolonged inhibitory effect on SMC migration suggests that a 1-wk treatment with oral rapamycin should reduce intimal hyperplasia, even if the stimulus associated with a vascular intervention lasts for up to 3 wk after the procedure.

## Acknowledgments

We thank Valentin Fuster for reviewing this manuscript, Greg Wiederrecht for providing the carboxy terminal anti-FKBP12 antibody, Stuart Schreiber for helpful discussions, and Arthur Lee and Bin Liu for excellent technical assistance.

This work was supported by grants to A.R. Marks from the National Institutes of Health (RO1NS29814 and RO1HL56180), the American Heart Association (AHA), and the Muscular Dystrophy Association. A.R. Marks is a Bristol-Meyers Squibb Established Investigator of the American Heart Association. S.O. Marx is an AHA Clinician-Scientist awardee and a recipient of the Glorney-Raisbeck Fellowship from the NY Academy of Medicine. M. Poon is an AHA Clinician-Scientist awardee and a recipient of the Arthur Ross Scholarship in Cardiovascular Medicine. M.B. Taubman is a recipient of a Career Scientist award from the Irma T. Hirschl-Monique Weill-Caulier Charitable Trusts. The sequence of the rat FKBP12 cDNA has been deposited in Genbank, BankIt67151 U69485, and the cDNA will be made available upon request to A.R. Marks.

## References

1. Ross, R. 1993. The pathogenesis of atherosclerosis: a perspective for the 1990s. *Nature (Lond.).* 362:801–809.

2. Ip, J., V. Fuster, D. Israel, L. Badimon, J. Badimon, and J. Chesebro. 1991. The role of platelets, thrombin and hyperplasia in restenosis after coronary angioplasty. *J. Am. Coll. Cardiol.* 77B–88B.

3. Billingham, M. 1987. Cardiac transplant atherosclerosis. *Transplantation Proc.* 19 (Suppl. 5):19–25.

4. Casscells, W. 1992. Migration of smooth muscle and endothelial cells: critical events in restenosis. *Circulation.* 86:723–729.

5. Pauly, R.R., A. Passaniti, C. Bilato, R. Monticone, L. Cheng, N. Papadopoulos, Y.A. Gluzband, L. Smith, C. Weinstein, E.G. Lakata, and M.T. Crow. 1994. Migration of cultured vascular smooth cells through a basement membrane requires type IV collagenase activity and inhibited by cellular differentiation. *Circ. Res.* 75:41–54.

6. Clowes, A., and S.M. Schwartz. 1985. Significance of quiescent smooth muscle migration in the injured rat carotid artery. *Circ. Res.* 56:139–145.

7. Grotendorst, G.R., H.E.J. Seppa, H.K. Kleinman, and G.R. Martin. 1981. Attachment of smooth muscle cells to collagen and their migration toward platelet derived growth factor. *Proc. Natl. Acad. Sci. USA.* 78:3669–3672.

8. Ihnatowycz, I.O., P.D. Winocour, and S. Moore. 1981. A platelet-derived factor chemotactic for rabbit smooth muscle cells in culture. *Artery.* 9:316–317.

9. Ferns, G., E. Raines, K. Sprogel, A. Motani, M. Reidy, and R. Ross. 1991. Inhibition of neointimal smooth muscle accumulation after angioplasty by an antibody to PDGF. *Science (Wash. DC).* 253:1129–1132.

10. Jawien, A., D.F. Bowen-Pope, V. Lindner, S.M. Schwartz, and A.W. Clowes. 1992. Platelet-derived growth factor promotes smooth muscle migration and intimal thickening in a rat model of balloon angioplasty. *J. Clin. Invest.* 89:507–511.

11. Marx, S.O., T. Jayaraman, L.O. Go, and A.R. Marks. 1995. Rapamycin-FKBP inhibits cell cycle regulators of proliferation in vascular smooth muscle cells. *Circ. Res.* 76:412–417.

12. Nelson, P.A., J.A. Lippke, M.A. Mareko, S.L. Rosborough, and D.A. Peattie. 1991. cDNA encoding murine FK506-binding protein (FKBP): nucleotide and deduced amino acid sequences. *Gene.* 109:255–258.

13. Sewell, T.J., E. Lam, M.M. Martin, J. Leszyk, J. Weidner, J. Calaycay, P. Griffin, H. Williams, S. Hung, J. Cryan et al. 1994. Inhibition of calcineurin by a novel FK-506-binding protein. *J. Biol. Chem.* 269:21094–21102.

14. Standaert, R.F., A. Galat, G. Verdine, and S.L. Schreiber. 1990. Molecular cloning and overexpression of the human FK506-binding protein FKBP. *Nature (Lond.).* 346:671–674.

15. Hendrickson, B.A., W. Zhang, R.J. Craig, Y.J. Jin, B.E. Bierer, S. Burakoff, and A.G. DiLella. 1993. Structural organization of the genes encoding human and murine FK506-binding protein (FKBP) 13 and comparison to FKBP1. *Gene.* 134:271–275.

16. Jayaraman, T., A.-M.B. Brillantes, A.P. Timerman, H. Erdjument-Bromage, S. Fleischer, P. Tempst, and A.R. Marks. 1992. FK506 binding protein associated with the calcium release channel (ryanodine receptor). *J. Biol. Chem.* 267:9474–9477.

17. Bierer, B., P.K. Somers, T.J. Wandless, S.J. Burakoff, and S.L. Schreiber. 1990. Probing immunosuppressant action with a nonnatural immunophilin ligand. *Science (Wash. DC).* 250:556–559.

18. Taubman, M.B., J.D. Marmur, C.L. Rosenfield, A. Guha, S. Nichtberger, and Y. Nemerson. 1993. Agonist-mediated tissue factor expression in cultured vascular smooth muscle cells: role of Ca²⁺ mobilization and protein kinase C activation. *J. Clin. Invest.* 91:547–552.

UNIVERSITY OF WISCONSIN LIBRARY



BSC-SJA-1315

19. Bornfeldt, K.E., E.W. Raines, T. Nakano, L.M. Graves, E.G. Krebs, and R. Ross. 1994. Insulin-like growth factor-1 and platelet-derived growth factor-BB induce directed migration of human arterial smooth muscle cells via signaling pathways that are distinct from those of proliferation. *J. Clin. Invest.* 93:1266–1274.

20. Sambrook, J., E.F. Fritsch, and T. Maniatis. 1989. Molecular Cloning: A Laboratory Manual. Cold Spring Harbor Laboratory, Cold Spring Harbor, NY. 709 pp.

21. Gregory, C., P. Huie, M. Billingham, and R. Morris. 1993. Rapamycin inhibits arterial intimal thickening caused by both alloimmune and mechanical injury. *Transplantation.* 55:1409–1418.

22. Brown, E., M. Albers, T. Shin, K. Ichikawa, C. Keith, W. Lane, and S. Schreiber. 1994. A mammalian protein targeted by G1-arresting rapamycin–receptor complex. *Nature (Lond.).* 369:756–758.

23. Sabatini, D., H. Erdjument-Bromage, M. Lui, P. Tempst, and S. Snyder. 1994. RAFT1: a mammalian protein that binds to FKBP12 in a rapamycin-dependent fashion and is homologous to yeast TORs. *Cell.* 78:35–43.

24. Kuo, C.J., J. Chung, D.F. Florentino, W.M. Flanagan, J. Blenis, and G.R. Crabtree. 1992. Rapamycin selectively inhibits interleukin-2 activation of p70 S6 kinase. *Nature (Lond.).* 358:70–73.

25. Price, D.J., J.R. Grove, V. Calvo, J. Avruch, and B.E. Bierer. 1992. Rapamycin-induced inhibition of the 70-kilodalton S6 protein kinase. *Science (Wash. DC).* 257:973–977.

26. Nourse, J., E. Firpo, M.W. Flanagan, M. Meyerson, K. Polyak, M.-H. Lee, J. Massagué, G.R. Crabtree, and J.M. Roberts. 1994. Rapamycin prevents IL-2-mediated elimination of the cyclin-CDK kinase inhibitor, p27Kip1. *Nature (Lond.).* 372:570–573.

27. Stossel, T. 1989. From signal to pseudopod. *J. Biol. Chem.* 264:18621–18624.

28. Pauly, R.R., C. Bilato, S.J. Sollott, R. Monticone, P.T. Kelly, E.G. Lakatta, and M.T. Crow. 1995. Role of calcium/calmodulin-dependent protein kinase II in the regulation of vascular smooth muscle cell migration. *Circulation.* 91:1107–1115.

29. Kundra, V., J.A. Escobedo, A. Kazlauskas, H.K. Kim, S.G. Rhee, L.T. Williams, and B.R. Zetter. 1994. Regulation of chemotaxis by the platelet-derived growth factor receptor-β. *Nature (Lond.).* 367:474–476.

30. Shariff, A., and E.J. Luna. 1992. Diacylglycerol-stimulated formation of actin nucleation sites at plasma membranes. *Science (Wash. DC).* 256:245–247.

31. Rijken, P.J., W.J. Hage, P.M.P. van Bergen en Henegouwen, A.J. Verkleij, and J. Boonstra. 1991. Epidermal growth factor induces actin organization of the actin microfilament system in human A431 cells. *J. Cell Sci.* 100:491–499.

32. Heitman, J., N.R. Movva, and M.N. Hall. 1991. Targets for cell cycle arrest by the immunosuppressant rapamycin in yeast. *Science (Wash. DC).* 253: 905–909.

33. Wang, T., P.K. Donahoe, and A.S. Zervos. 1994. Specific interaction of type I receptors of the TGF-beta family with the immunophilin FKBP-12. *Science (Wash. DC).* 265:674–676.

34. Michnick, S.W., M.K. Rosen, T.J. Wandless, M. Karplus, and S.L. Schreiber. 1991. Solution structure of FKBP, a rotamase enzyme and receptor for FK506 and rapamycin. *Science (Wash. DC).* 252:836–839.

35. Van Duyne, G.D., R.F. Standaert, P.A. Karplus, S.L. Schreiber, and J. Clardy. 1993. Atomic structures of the human immunophilin FKBP-12 complexes with FK506 and rapamycin. *J. Mol. Biol.* 229:105–124.

36. Marks, A.R. 1996. Cellular functions of immunophilins. *Physiol. Rev.* 76:631–649.

37. Brillantes, A.-M.B., K. Ondrias, A. Scott, E. Kobrinsky, E. Ondriasova, M.C. Moschella, T. Jayaraman, M. Landers, B.E. Ehrlich, and A.R. Marks. 1994. Stabilization of calcium release channel (ryanodine receptor) function by FK-506 binding protein. *Cell.* 77:513–523.

38. Timerman, A.P., T. Jayaraman, G. Wiederrecht, H. Onoue, A. Marks, and S. Fleischer. 1994. The ryanodine receptor from canine heart sarcoplasmic reticulum is associated with a novel FK-506 binding protein. *BBRC.* 198:701–706.

39. Cameron, A.M., J.P. Steiner, D.M. Sabatini, A.I. Kaplin, L.D. Walensky, and S.H. Snyder. 1995. Immunophilin FK506 binding protein associated with inositol 1,4,5-triphosphate receptor modulates calcium influx. *Proc. Natl. Acad. Sci. USA.* 92:1784–1788.

40. Cardenas, M.E., C. Hemenway, R.S. Muir, R. Ye, D. Florentino, and J. Heitman. 1995. Immunophilins interact with calcineurin in the absence of exogenous immunosuppressive ligands. *EMBO (Eur. Mol. Biol. Organ.) J.* 13:5944–5957.

BSC-SJA-1316

# JCI

HEALTH SCIENCES LIBRARY
University of Wisconsin

DEC - 3 1996

1305 Linden Drive
Madison, WI 53706

## The Journal of Clinical Investigation
### Founded 1924



- molecular medicine / genetic disorders

- infection / inflammation / immunity

- hormones / cytokines / signaling

- cell growth & differentiation

- cellular, transport & organ physiology

- atherosclerosis / thrombosis / metabolism

BSC-SJA-1317

# EXHIBIT 68

412

# Rapamycin-FKBP Inhibits Cell Cycle Regulators of Proliferation in Vascular Smooth Muscle Cells

Steven O. Marx, Thottala Jayaraman, Loewe O. Go, Andrew R. Marks

*Abstract* Multiple growth factors can stimulate quiescent vascular smooth muscle cells to exit from G0 and reenter the cell cycle. The macrolide antibiotic rapamycin, bound to its cytosolic receptor FKBP, is an immunosuppressant and a potent inhibitor of cellular proliferation. In the present study, the antiproliferative effects of rapamycin on human and rat vascular smooth muscle cells were examined and compared with the effects of a related immunosuppressant, FK520. In vascular smooth muscle cells, rapamycin, at concentrations as low as 1 ng/mL, inhibited DNA synthesis and cell growth. FK520, an analogue of the immunosuppressant FK506, is structurally related to rapamycin and binds to FKBP but did not inhibit vascular smooth muscle cell growth. Molar excesses of FK520 blocked the antiproliferative effects of rapamycin, indicating that the effects of rapamycin required binding to FKBP. Rapamycin-FKBP inhibited retinoblastoma protein phosphorylation at the G1/S transition. This inhibition of retinoblastoma protein phosphorylation was associated with a decrease in p33$^{cdk2}$ kinase activity. These observations suggest that rapamycin, but not FK520, inhibits vascular smooth muscle cell proliferation by reducing cell-cycle kinase activity. (*Circ Res.* 1995;76:412-417.)

*Key Words* • immunophilin • accelerated arteriosclerosis • antiproliferation • transplantation • FK506

Abnormal vascular smooth muscle cell (VSMC) proliferation is involved in restenosis following percutaneous transluminal angioplasty (PTCA) and accelerated arteriosclerosis after cardiac transplantation.[1-3] Restenosis occurs after ≈30% to 40% of the procedures,[1,6] limiting the utility of PTCA. Accelerated arteriosclerosis in coronary arteries of the donor heart is a major factor limiting long-term survival of cardiac transplant recipients.[3,5,6] Common to both pathological processes is an injury to the vascular endothelial cell barrier resulting in activation of VSMC proliferation. Multiple signaling pathways can trigger a proliferative response in VSMC. The complexity of cell growth signaling has made it difficult to achieve adequate control of VSMC proliferation in patients.

Much attention has focused on understanding the mechanisms underlying the proliferative response in VSMC. It has been proposed that identifying the regulators of this proliferative response in VSMC may lead to therapeutic strategies aimed at blocking or inhibiting VSMC growth. After deendothelialization of arteries by mechanical injury during PTCA, or by an immune mechanism in transplant recipients, VSMC leave their quiescent state (G0/G1) and enter the cell cycle. Recent studies have shown that early response genes including c-*fos* and c-*myc* are induced after exit from G0.[7,9] Cell-cycle kinases including p34$^{cdk2}$ and mitogen-activated protein kinase homologues appear to be involved in signaling VSMC growth, leading to induction of

early response genes.[9] On the other hand, transforming growth factor-β, inhibits smooth muscle cells causing a G1 arrest[10,11] that is associated with a decrease in p34$^{cdk2}$ kinase activity.[12] These and other similar observations have led a number of investigators to focus on cell-cycle regulators as potential therapeutic targets for inhibiting VSMC proliferation. For example, antisense oligonucleotides to c-*myc*, c-*myb*, c-*fos*, cyclin A, p34$^{cdk2}$ kinase, and proliferating cell nuclear antigen have been used with varying degrees of success to inhibit VSMC proliferation.[11,13,14]

Recent studies in a rat heart transplantation model have suggested that the macrolide antibiotic FK506, currently used as an immunosuppressant after some types of organ transplant, may accelerate transplant coronary arteriosclerosis.[15-17] In animal models, rapamycin, also a macrolide antibiotic, appears to retard the development of accelerated arteriosclerosis after allograft transplantation and restenosis following mechanical injury.[15,16,18-20]

In the present study, we sought to compare the effects of rapamycin and FK520 on VSMC proliferation. We found that rapamycin, but not FK520, inhibits cell growth in both human and rat VSMC. This inhibition of cell growth by rapamycin was associated with decreases in cell-cycle kinase activity at the G1/S and G2/M transitions. Phosphorylation of retinoblastoma protein (pRb), a marker for cell-cycle progression, was also reduced. Our data suggest that inhibition of cell-cycle kinases by rapamycin contributes to its potent antiproliferative effects in VSMC. Moreover, because the mechanism of the antiproliferative effect of rapamycin involves inhibition of cell-cycle kinases, rapamycin should block VSMC growth regardless of the stimulus that initiates the VSMC proliferative response. FK520, an analogue of FK506, nonsignificantly accelerated VSMC growth and increased the activity of the cell-cycle regu-

Received September 7, 1994; accepted December 2, 1994.

From the Cardiovascular Institute, Molecular Medicine Program, Department of Medicine, and Brookdale Center for Molecular Biology, Mount Sinai School of Medicine, New York, NY.

Correspondence to Andrew R. Marks, Box 1269, Mount Sinai School of Medicine, One Gustave L. Levy Pl, New York, NY 10029.

© 1995 American Heart Association, Inc.

lators. Thus, compared with FK520, rapamycin has antiproliferative properties that might make it a better choice for use in cardiac transplant recipients in whom VSMC proliferation is a potentially serious problem.

## Materials and Methods

### Reagents

Rapamycin was a gift from Wyeth-Ayerst Research Laboratory (Dr Suren Sehgal), and FK520 (an FK506 analogue) was provided by Dr John Siekierka (Merck). [³H]Thymidine was from NEN, and polyclonal anti-p34^cdk2 kinase antibody was a gift from Dr Hiroaki Kiyokawa (Memorial Sloan-Kettering Cancer Institute). Polyclonal antibodies to cyclin D (raised against the C-terminal domain of human cyclin D) and cdk2 (raised against a synthetic peptide in the C-terminal domain of human cdk2) were from Upstate Biotechnology Inc. pRb antibody was from Pharmingen.

### Cell Culture

Rat aortic smooth muscle cells (RASM, isolation No. 1120)[21-23] and human aortic smooth muscle cells were gifts from Dr Mark Taubman (Mount Sinai School of Medicine). RASM (passages 8 to 11) were cultured in Dulbecco's modified essential medium (DMEM) plus 20% fetal calf serum (FCS, GIBCO), 100 U/mL penicillin, and 100 μg/mL streptomycin as previously described.[21] Medium was changed every 48 hours. When cultured in 20% FCS, RASM double approximately every 16 to 20 hours. Human aortic smooth muscle cells from ascending aorta obtained from the donor at the time of cardiac transplantation were cultured in DMEM plus 20% FCS. After plating, rapamycin (100 ng/mL) and FK520 (100 ng/mL) were added directly to DMEM. Cell proliferation analyses were performed by counting triplicate plates at the indicated times during a 7-day period by using a Coulter counter. Cell viability was determined with trypan blue stain for each experiment. Results represent the mean values from three separate experiments; error bars represent the standard error of the mean.

### DNA Synthesis

For determination of DNA synthesis, [³H]thymidine incorporation was measured, and microcultures of 5000 cells were established in quadruplicates in flat-bottom 96-well microtiter plates in the presence and absence of varying concentrations of drugs. After 48 hours, each culture was pulsed with 1 μCi [³H]thymidine and harvested 16 to 20 hours later by using a Cambridge Technology PHD Harvester. [³H]Thymidine incorporation was measured in a liquid scintillation counter. The competition experiment with FK520 was performed with 2 ng/mL rapamycin and concentrations of FK520 between 2 and 500 ng/mL.

### Flow Cytometric Analysis

Cells were treated with either 100 ng/mL rapamycin or FK520 for 24 hours, harvested, and washed in ice-cold phosphate-buffered saline (PBS), fixed in 70% ethanol, and stored overnight at 4°C before analysis. Cells were then washed once with ice-cold PBS treated with RNAse (1 hour at 37°C, 500 U/mL). Cellular DNA was stained with propidium iodide (50 μg/mL). Cell-cycle determination was performed by using a Coulter analyzer. Results represent a minimum of 3000 cells assayed for each determination.

### Preparation of Cellular Lysates

RASM growing in log phase were plated at ≈30% confluence. After 24 hours in DMEM+20% FCS, plates were washed twice with PBS and transferred to DMEM+0.5% FCS for 72 hours to achieve quiescence. Plates were then stimulated with 20% FCS and treated with either no drugs (control), 100 ng/mL rapamycin, or 100 ng/mL FK520. After the indicated time period, plates were washed twice with ice-cold PBS, and cell

lysates were prepared using Rb lysis buffer (50 mmol/L Tris-HCl, pH 8.0, 120 mmol/L NaCl, 1 mmol/L EDTA, 0.1 mmol/L NaF, 0.2 mmol/L Na₄VO₄, 10 mmol/L β-glycerophosphate, 1 mmol/L dithiothreitol, 0.5 mmol/L phenylmethylsulfonyl fluoride, 1 μg/mL aprotinin, 1 μg/mL leupeptin, 10 μg/mL soybean trypsin inhibitor, and 0.5% Nonidet P-40). Cells were scraped off the bottom of the plates, and lysates were rocked for 1 hour at 4°C. Lysates were stored at −70°C. Protein concentration was measured by using the Bradford reagent (Bio-Rad), with bovine serum albumin used as a standard.

### Determination of Cyclin-Dependent Kinase Activities

Activities of p34^cdk2 and p33^cdk2 kinases were analyzed essentially as described previously,[24] with some modifications. Protein extracts (100 μg) were diluted to 500 μL with RIPA buffer (50 mmol/L Tris-HCl, pH 7.4, 250 mmol/L NaCl, 5 mmol/L EDTA, 50 mmol/L NaF, 0.1 mmol/L Na₄VO₄, 0.5 mmol/L phenylmethylsulfonyl fluoride, 1 μg/mL aprotinin, 1 μg/mL leupeptin, 1% Nonidet P-40, 0.5% sodium deoxycholate, and 0.1% sodium dodecyl sulfate [SDS]). RASM lysates were immunoprecipitated with either anti-p34^cdk2 kinase C-terminus-specific antiserum[25] or a human polyclonal anti-p33^cdk2 kinase antibody. Protein A–Sepharose beads (20 μL) were added and gently rocked for 1 hour at 4°C. Samples were centrifuged and washed twice with RIPA buffer, twice with RIPA without NaCl, and twice with kinase assay buffer (mmol/L: Tris-HCl 50, pH 7.4, MgCl₂ 10, and dithiothreitol 1). Phosphorylation was carried out in 25 μL of kinase buffer with the addition of 0.1 mg/mL of histone H1 (Boehringer Mannheim) and 50 μCi [γ-³²P]ATP for 15 minutes at 28°C. The reaction was terminated with the addition of 6 μL of 6× Laemmli's sample loading buffer and boiled for 5 minutes. Samples (15 μL) were analyzed on a 12% SDS-polyacrylamide gel. Gels were dried for 2 hours and analyzed by using [γ-³²P]ATP standards and a phosphorimager.

### Measurement of Retinoblastoma Protein Levels

Protein extracts (50 μg) were size-fractionated on 7.5% gels and transferred to nitrocellulose overnight at 60 V. Filters were blocked in PBS containing 0.1% Tween-20 (PBS-T) and 5% dry milk for 1 hour at 30°C, followed by incubation overnight with anti-pRb antibody (1/1000 dilution) at 4°C. The filters were washed with PBS-T, then incubated with the secondary antibody conjugated to peroxidase (goat anti-mouse IgG) for 1 hour at 4°C, and washed; signals were detected by using the chemiluminescence detection system (ECL) followed by exposure to Kodak XAR film. Autoradiographic signals were quantified by scanning the gels by use of a Macintosh computer with ADOBE PHOTOSHOP and IMAGE 1.44 software. The ratio of hyperphosphorylated to hypophosphorylated pRb was calculated for each time point and plotted. Results are shown for a representative experiment. This experiment was repeated three times, and similar results were obtained each time.

### Measurement of Cyclin-Dependent Kinase and Cyclin Protein Levels

Protein extracts (50 μg) were electrophoresed on separate 12% SDS-polyacrylamide gels and transferred to nitrocellulose overnight at 45 V. Filters were blocked in PBS containing 0.1% Tween 20 and 5% dry milk for 1 hour at room temperature, followed by incubation overnight with anti-p34^cdk2 antibody (1/1000 dilution), anti-p33^cdk2 antibody (2.5 μg/mL), or anti-cyclin D antibody (2.5 mg/mL). The filters were then washed, incubated with goat anti-rabbit IgG conjugated to peroxidase for 1 hour at 4°C, and washed again; signals were detected by using the chemiluminescence detection system (Bio-Rad) and exposed to Kodak XAR films. Results are shown for representative experiments. These experiments were repeated three times, and similar results were obtained each time.

BSC-SJA-1319



Fig 1. Bar graph showing the time course for rapamycin-induced inhibition of cultured rat aortic smooth muscle cell (RASM) proliferation. The inset shows similar data for human aortic smooth muscle cells at 72 hours. Cells were treated with either no drug, 100 ng/mL rapamycin, or 100 ng/mL FK520. The results are expressed in mean cell numbers of triplicate plates; error bars represent standard deviation of the mean. The results are representative of three similar experiments. P<.05 for the comparison between control and rapamycin for both RASM and human aortic smooth muscle cells at each time point after 48 hours.

## Results

Rapamycin as low as 1 ng/mL, but not FK520 at any dose tested, inhibited RASM proliferation (P<.05, Fig 1). Rapamycin also decreased [³H]thymidine incorporation in a dose-dependent manner (P<.01, Fig 2A). The inhibition of proliferation produced by rapamycin persisted at least through 7 days (168 hours) of cell culture. Similarly, rapamycin inhibited human aortic smooth muscle cell proliferation by 50% after 72 hours (P<.05; Fig 1, inset). In contrast, FK520 increased cell growth compared with control, but the differences were not significant. Cell viability, as assessed by trypan blue staining, was >99% in control, rapamycin-treated, and FK520-treated cells. The effect of rapamycin in terms of inhibiting DNA synthesis was competed by a molar excess of FK520 (Fig 2B). This result indicates that the

reduction in [³H]thymidine incorporation was probably mediated by rapamycin binding to the immunophilin FKBP, since both rapamycin and FK520 share this same cytosolic receptor. FK520 at low concentrations (eg, 2.5 ng/mL) caused a small but significant (P<.05) decrease in DNA synthesis (Fig 2A), and there was a small additive effect of FK520 (only at low concentrations, eg, 8 and 16 ng/mL) combined with rapamycin in terms of decreasing DNA synthesis (Fig 2B).

Rapamycin, but not FK520, delayed progression from G1 to S as assessed by cell-cycle analysis using propidium iodide staining. After stimulation with 20% FCS, ≈30% of cells progressed from G1/S and G2/M. The effect of rapamycin was to reduce progression from G1/S and G2/M to ≈10% of cells. pRb phosphorylation is believed to be a marker for progression from G1 to S. Hypophosphorylated pRb suppresses the progression from G1 to S,[25] and hyperphosphorylation generally occurs 1 to 2 hours before the G1/S transition.[27,28] Cells in early G1 contain exclusively hypophosphorylated pRb. At an undefined point in late G1, pRb is hyperphosphorylated and remains hyperphosphorylated until M. In quiescent RASM (maintained in 0.5% FCS for 72 hours), pRb phosphorylation occurred 6 to 8 hours after stimulation with 20% FCS. Culturing cells with rapamycin (100 ng/mL) delayed the onset of pRb hyperphosphorylation in RASM by 6 hours to ≈12 hours after G0 and reduced the levels of phosphorylation at each time point sampled (Fig 3). In contrast, FK520 nonsignificantly accelerated the time course of pRb phosphorylation (Fig 3).

Progression through the cell cycle is dependent on the activity of specific cell-cycle kinases, several of which, including cdk2 and cdk4, are thought to phosphorylate pRb. We examined the effects of rapamycin and FK520 on the activity of several cell-cycle kinases in VSMC. In RASM compared with control cells, p34^cdc2 kinase activity was decreased ≈16 to 20 hours after G0 by rapamycin but not by FK520 (Fig 4A). Protein levels of p34^cdc2 kinase were unchanged throughout the cell cycle (Fig 4A, insets). The decrease in p34^cdc2 kinase activity at ≈16 to 20 hours corresponds to the G2/M transition in RASM. At earlier time points (during the G1/S transi-





Fig 2. A, Bar graph showing the effect of immunosuppressive drugs rapamycin and FK520 on the incorporation of [³H]thymidine in cultured rat aortic smooth muscle cells. B, Bar graph showing that FK520 competes with rapamycin for binding to FKBP12 and inhibits the effects of rapamycin on [³H]thymidine uptake in cultured rat aortic smooth muscle cells. The results are a mean of quadruplicate wells, and the error bars represent standard deviation of the mean. P<.05 for the comparison between rapamycin-treated and control cells at each concentration above 0.0025 ng/mL. The results are representative of three similar experiments.

BSC-SJA-1320



Fɪɢ 3. Bar graph showing the effects of rapamycin and FK520 on phosphorylation of retinoblastoma protein in cultured rat aortic smooth muscle cells. Cells were treated with either no drug, 100 ng/mL rapamycin, or 100 ng/mL FK520. The indicated times are in hours after G0. The positions indicating hyperphosphorylation and underphosphorylation (ppRb and pRb, respectively) are indicated at the left of each gel panel (inset above graph). The results shown are from a representative experiment. Similar results were obtained in three experiments.

tion), p34cdc2 kinase activity was low despite steady levels of p34cdc2 protein, suggesting that it may have little effect at this point in the cell cycle in RASM (Fig 4A).

Compared with control cells, rapamycin (100 ng/mL) decreased p33cdk2 kinase activity beginning at 10 hours

through 16 hours after G0 (Fig 4B). The period from 10 to 16 hours after G0 corresponds to the time during which pRb phosphorylation is decreased by rapamycin-FKBP (Fig 3). Protein levels for p33cdk2 kinase were unchanged throughout the cell cycle compared with control cells (Fig 4B, insets), indicating that the decrease in p33cdk2 kinase activity was not due to a decrease in p33cdk2 synthesis. These data suggest that the inhibition of pRb phosphorylation could at least in part be due to a decrease in p33cdk2 kinase activity.

A regulatory role for cyclin D1 has been proposed with regard to pRb phosphorylation.[29,30] Interactions between cyclin D1 and a variety of cyclin-dependent kinases have been reported, and the expression of D-type cyclins is regulated by growth factors.[31] We sought to determine, on the basis of these observations, whether the antiproliferative effects of rapamycin in RASM were associated with regulation of cyclin D1. Cyclin D1 levels were elevated in control RASM at ≈10 hours after G0, corresponding to the onset of pRb phosphorylation. Rapamycin delayed the onset of this rise in cyclin D1 levels by 4 to 6 hours (data not shown). The reduction in cyclin D1 levels by rapamycin occurred at the point when pRb phosphorylation was reduced.

## Discussion

Our data show that the antiproliferative effects of rapamycin in VSMC are associated with an inhibition of cell-cycle kinases, cyclins, and pRb phosphorylation. These data imply that phosphorylation of pRb plays an important role in signaling during smooth muscle proliferation. In contrast, FK520, another potentially useful drug for immunosuppression following cardiac transplantation, induces a nonsignificant increase in VSMC proliferation associated with an acceleration of the time



Fɪɢ 4.   A, Bar graph showing that rapamycin, but not FK520, decreases p34cdk4 kinase activity at the G2/M transition in cultured rat aortic smooth muscle cells. The insets are immunoblots showing p34cdk4 protein levels. Cells were treated with either no drug, 100 ng/mL rapamycin, or 100 ng/mL FK520. B, Bar graph showing that rapamycin, but not FK520, decreases p33cdk2 kinase activity at the G1/S transition. The insets are immunoblots showing p33cdk2 protein levels. With the exception of the earliest two time points in the control samples, the level of p33cdk2 protein remained constant throughout the cell cycle. The results shown are from representative experiments. Similar results were obtained in three experiments.

BSC-SJA-1321

course and extent of pRb phosphorylation (Figs 1 and 3). The antiproliferative effects of rapamycin appear to be mediated by binding to the cytosolic receptor FKBP because they are competed by FK520, a drug that shares the same receptor. However, these studies do not exclude the possibility that these drugs also interact with other binding sites in RASM.

We observed small but significant effects only at low concentrations of FK520 (2 to 20 ng/mL) in terms of inhibiting DNA synthesis. However, the physiological importance of these effects was questionable because we never observed any inhibition of RASM proliferation when using either FK520 or FK506 at any concentration. Indeed, to the contrary, we have consistently observed a small nonsignificant increase in proliferation when using either FK520 or FK506. Moreover, FK520 increases pRb phosphorylation and cell-cycle kinase activity (Figs 3 and 4), suggesting that it accelerates cell-cycle progression.

Cyclin-dependent kinases, including cdk2, have been implicated as regulators of pRb function.[32-34] Although the data suggest that a cyclin-dependent kinase phosphorylates pRb in vitro, there remains some controversy as to which kinase and how many actually carry out this function in vivo. We found that rapamycin did not FK520 decreased the activity of $p33^{cdk2}$ kinase[35] in VSMC. This finding does not indicate that pRb phosphorylation is dependent on $p33^{cdk2}$ kinase but suggests that this kinase could be involved in regulating pRb function in VSMC. We did not examine the activities of other kinases that similarly could be playing a role in phosphorylating pRb. Indeed, determining the specific kinase(s) that phosphorylates pRb would be interesting but is not required to support the main point of the present study; which is that the antiproliferative effects of rapamycin in VSMC are associated with inhibition of regulators of cell-cycle progression. Similarly, the finding that rapamycin decreased the activity of cell-cycle kinases and the levels of a cyclin (D1) does not rule out the possibility that rapamycin could have effects on other regulators of cell growth as well.

$p34^{cdc2}$ kinase is thought to play an important regulatory role in the G2/M transition.[36,37] The time course for inhibition of $p34^{cdc2}$ kinase activity by rapamycin suggests that this kinase may play an important role in the G2/M transition in VSMC. In another myogenic cell line, BC3H1 cells, we had previously shown that rapamycin inhibited proliferation and induced differentiation and that these effects were also associated with a reduction in $p34^{cdc2}$ kinase activity.[24] However, in BC3H1 cells, the decrease in $p34^{cdc2}$ kinase activity occurs at the G1/S transition. The $p34^{cdc2}$ kinase may have multiple roles in the cell cycle, depending on which cell type is examined.

The growth-inhibitory effects of rapamycin (Fig 1) in VSMC are long lasting. In contrast, inhibition of pRb phosphorylation (Fig 3) and cell-cycle kinase activity (Fig 4) appears to be more of a transient delay rather than a complete block. Moreover, examination of the cell growth data in Fig 1 shows that although growth is significantly suppressed by rapamycin, there is some slow growth in the rapamycin-treated cells. Indeed, taken together, these data suggest that rapamycin significantly lengthens the cell cycle by introducing delays at the G1/S and G2/M transition points. These delays appear to result in a marked prolongation of the doubling time for the VSMC exposed to rapamycin (Fig 1). Some of the

cell-cycle kinase activity and phosphorylation of pRb observed later in the cell cycle (eg, at 16 to 20 hours) in the rapamycin-treated cells may reflect the fact that the cell cultures were not synchronized. Thus, a subset of cells was past the G1/S transition at the start of the experiment, despite culturing in low-serum medium for 72 hours to induce quiescence.

It is believed that immunologic events linked to HLA incompatibility between the donor and host may result in vascular injury, leading to VSMC proliferation. Moreover, accelerated arteriosclerosis is not limited to cardiac transplant patients, as other organ allografts are subject to similar processes.[38] Cyclosporin A, one of the most widely used immunosuppressants, appears to have a neutral effect on accelerated arteriosclerosis.[5,15,38,39] The mechanisms underlying post-cardiac transplant–accelerated arteriosclerosis remain poorly understood.[5,15,38,40] Nevertheless, VSMC proliferation is the fundamental pathology. Accelerated arteriosclerosis after cardiac transplantation occurs with similar frequency despite the use of newer immunosuppressant agents, including cyclosporin A and FK506. FK506 is currently being used as a therapeutic agent for the prevention of post–cardiac transplant rejection in humans. Our findings predict that FK506 would either be neutral in terms of VSMC proliferation or could have an adverse effect by accelerating the time course and the extent of posttransplant arteriosclerosis. Conversely, since rapamycin both immunosuppresses and blocks VSMC proliferation, it could be the preferred therapeutic agent to reduce accelerated arteriosclerosis following cardiac transplantation and might even prolong survival in cardiac transplant recipients.

Many studies have attempted to identify the factor or factors contributing to VSMC proliferation following vascular injury, particularly after PTCA.[2,9,13,21,22,41-46] The fact that rapamycin inhibits cell-cycle dependent kinases and phosphorylation of pRb suggests that its effects on VSMC proliferation would not depend on which of the many agents capable of triggering VSMC proliferation after injury are causative. As such, rapamycin might also be a useful agent for reducing or blocking the component of post-PTCA restenosis that is due to VSMC proliferation.

## Acknowledgments

This study was supported by grants from the National Institutes of Health (NS-29814), the New York Heart Association, the Sarah Chait and the Louis B. Mayer Foundations (Dr Marks), and a Sable grant (Dr Marx). Dr Marks is a Bristol Myers-Squibb Established Investigator of the American Heart Association. Drs Marx and Go are ACC/Merck Fellows. We thank Drs Valentin Fuster and Mark B. Taubman for helpful discussions, Dr Taubman for providing rat and human aortic smooth muscle cells, Dr Süren Sehgal of Wyeth-Ayerst for providing rapamycin, and Dr Hiroaki Kiyokawa (Memorial Sloan-Kettering Cancer Institute), for providing anti-$p34^{cdc2}$ kinase antibody.

## References

1. Ip J, Fuster V, Israel D, Badimon L, Badimon J, Chesebro J. The role of platelets, thrombin and hyperplasia in restenosis after coronary angioplasty. *J Am Coll Cardiol*. 1991;17:77B-88B.
2. Casscells W. Migration of smooth muscle and endothelial cells: critical events in restenosis. *Circulation*. 1992;86:723-729.
3. Billingham M. Cardiac transplant arteriosclerosis. *Transplant Proc*. 1987;19(suppl 5):19-25.

4. Landau C, Lange R, Hillis L. Percutaneous transluminal coronary angioplasty. *N Engl J Med*. 1994;330:981-993.

5. Hosenpud J, Shipley G, Wagner C. Cardiac allograft vasculopathy: current concepts, recent developments, and future directions. *J Heart Lung Transplant*. 1992;11:9-23.

6. Armitage J, Kormos R, Morita S, Fung J, Marrone G, Hardesty R, Griffith B, Starzl T. Clinical trial FK 506 immunosuppression in adult cardiac transplantation. *Ann Thorac Surg*. 1992;54:205-211.

7. Gorski D, LePage D, Patel C, Copeland N, Jenkins N, Walsh K. Molecular cloning of a diverged homeobox gene that is rapidly down-regulated during the G0/G1 transition in vascular smooth muscle cells. *Mol Cell Biol*. 1993;13:3722-3733.

8. Campan M, Desgranges C, Gadeau A, Millet D, Belloc F. Cell cycle dependent gene expression in quiescent stimulated and asynchronously cycling arterial smooth muscle cells in culture. *J Cell Physiol*. 1992;150:493-500.

9. Watson MH, Venance SL, Pang SC, Mak AS. Smooth muscle cell proliferation: expression and kinase activities of $p34^{cdc2}$ and mitogen-activated protein kinase homologues. *Circ Res*. 1993;73:109-117.

10. Grainger D, Kirchenlohr H, Metcalfe J, Weissberg P, Wade D, lipoprotein (a). *Science*. 1993;260:1655-1658.

11. Casscells W, Lappi D, Baird A. Molecular atherectomy for restenosis. *Trends Cardiovasc Med*. 1993;3:235-250.

12. Reddy K, Howe P. Transforming growth factor β1-mediated inhibition of smooth muscle cell proliferation is associated with a late G1 cell cycle arrest. *J Cell Physiol*. 1993;156:48-55.

13. Morishita R, Gibbons G, Ellison K, Nakajima M, Zhang L, Kaneda Y, Ogihara T, Dzau V. Single intraluminal delivery of antisense cdc2 kinase and proliferating-cell nuclear antigen oligonucleotides results in chronic inhibition of neointimal hyperplasia. *Proc Natl Acad Sci U S A*. 1993;90:8474-8478.

14. Foegh M, Virmani R. Molecular biology of intimal proliferation. *Curr Opin Cardiol*. 1993;8:938-950.

15. Meiser B, Billingham M, Morris R. Effects of cyclosporin, FK506, and rapamycin on graft-vessel disease. *Lancet*. 1991;338:1297-1298.

16. Shibata T, Ogawa N, Koyama I, Kazneko N, Hokazono K, Omoto R. Does FK 506 accelerate the development of coronary artery disease in the transplanted heart as well as the native heart? *Transplant Proc*. 1993;25:1145-1148.

17. Wu G, Cramer D, Chapman P, Cajulis E, Wang H, Starzl T, Makowka L. FK 506 inhibits the development of transplant arteriosclerosis. *Transplant Proc*. 1991;23:3272-3274.

18. Gregory C, Huie P, Billingham M, Morris R. Rapamycin inhibits arterial intimal thickening caused by both alloimmune and mechanical injury. *Transplantation*. 1993;55:1409-1418.

19. Gregory C, Pratt R, Huie P, Shorthouse R, Dzau V, Billingham M, Morris R. Effects of treatment with cyclosporine, FK506, rapamycin, mycophenolic acid, or deoxyspergualin on vascular muscle proliferation in vitro and in vivo. *Transplant Proc*. 1993;25:770-771.

20. Gregory C, Huie P, Shorthouse R, Wang J, Rowan R, Billingham M, Morris R. Treatment with rapamycin blocks arterial intimal thickening following mechanical and alloimmune injury. *Transplant Proc*. 1993;25:120-121.

21. Taubman M, Berk B, Izumo S, Tsuda T, Alexander R, Nadal-Ginard B. Angiotensin II induces *c-fos* mRNA in aortic smooth muscle. *J Biol Chem*. 1989;264:526-530.

22. Berk B, Taubman M, Griendling K, Cragoe E, Fenton J, Brock T. Thrombin-stimulated events in cultured vascular smooth-muscle cells. *Biochem J*. 1991;274:799-805.

23. Poon M, Marmur JD, Rosenfield CL, Rollins BJ, Taubman MB. The *KC* gene is induced *in vivo* by vascular injury and in smooth muscle culture by growth factors. *Circulation*. 1990;82(suppl III):III-209. Abstract.

24. Jayaraman T, Marks AR. Rapamycin-FKBP blocks proliferation, induces differentiation and inhibits cdc2 kinase activity in a myogenic cell line. *J Biol Chem*. 1993;268:25385-25388.

25. Kiyokawa H, Ngo L, Kurosaki T, Rifkind R, Marks P. Changes in $p34^{cdc2}$ kinase activity and cyclin A during induced differentiation of murine erythroleukemia cells. *Cell Growth Differ*. 1992;3:377-383.

26. Mihara K, Cao X, Yen A, Chandler S, Driscoll B, Murphee A, T'Ang A, Fung Y. Cell cycle dependent regulation of phosphorylation of the human retinoblastoma gene product. *Science*. 1989;246:1300-1303.

27. Hollingsworth R, Chen P, Lee W. Integration of cell cycle control with transcriptional regulation by the retinoblastoma protein. *Curr Opin Cell Biol*. 1993;5:194-200.

28. Gu W, Schneider JW, Condorelli G, Kaushal S, Mahdavi V, Nadal-Ginard B. Interaction of myogenic factors and the retinoblastoma protein mediates muscle cell commitment and differentiation. *Cell*. 1993;72:309-324.

29. Hannon G, Demetrick D, Beach D. Isolation of the Rb-related p130 through its interaction with CDK2 and cyclins. *Genes Devel*. 1993;7:2378-2391.

30. Dowdy S, Hinds P, Louie K, Reed S, Arnold A, Weinberg R. Physical interaction of the retinoblastoma protein with human D cyclins. *Cell*. 1993;73:499-511.

31. Matsushime H, Roussel M, Ashmun R, Sherr C. Colony-stimulating factor 1 regulates novel cyclins during the G1 phase of the cell cycle. *Cell*. 1991;66:701-713.

32. Lees J, Buchkovich K, Marshak D, Anderson C, Harlow E. The retinoblastoma protein is phosphorylated on multiple sites by human cdc2. *EMBO J*. 1991;10:4279-4290.

33. Hinds PW, Mittnacht S, Dulic V, Arnold A, Reed SI, Weinberg RA. Regulation of retinoblastoma protein functions by ectopic expression of human cyclins. *Cell*. 1992;70:993-1006.

34. Hu Q, Lees J, Buchkovich K, Harlow E. The retinoblastoma protein physically associates with the human cdc2 kinase. *Mol Cell Biol*. 1992;12:971-980.

35. Koff A, Giordano A, Desai D, Yamashita K, Harper J, Elledge S, Nishimoto T, Morgan D, Franza B, Roberts J. Formation and activation of a cyclin E-cdk2 complex during the G1 phase of the human cell cycle. *Science*. 1992;257:1689-1694.

36. Pagano M, Pepperkok R, Lukas J, Beldin V, Ansorge W, Bartek J, Draetta G. Regulation of the cell cycle by the cdk2 protein kinase in cultured human fibroblasts. *J Cell Biol*. 1993;121:101-111.

37. Clarke P, Karsenti E. Regulation of $p34^{cdc2}$ protein kinase: new insights into protein phosphorylation and the cell cycle. *J Cell Sci*. 1991;100:409-414.

38. Ewel C, Foegh M. Chronic graft rejection: accelerated transplant arteriosclerosis. *Immunol Rev*. 1993;134:21-31.

39. Muskett A, Burton N, Eichwald E, Shelby J, Hendrickson M, Sullivan J. The effect of antiplatelet drugs on graft arteriosclerosis in rat heterotopic cardiac allografts. *Transplant Proc*. 1987;19(suppl 5):74-76.

40. Meiser BM, Wenke K, Dewens G, Wolf S, Thiery J, Seidel D, Hammer C, Billingham ME, Reichart B. Prevention of accelerated graft vessel disease (acc GVD) after heart transplantation (HTx). *J Heart Lung Transplant*. 1992;11:198a. Abstract.

41. Berk B, Vekshtein V, Gordon H, Tsuda T. Angiotensin II-stimulated protein synthesis in cultured vascular smooth muscle cells. *Hypertension*. 1989;13:305-314.

42. Berk B, Brock T, Gimbrone M, Alexander R. Early agonist-mediated ionic events in cultured vascular smooth muscle cells. *J Biol Chem*. 1987;262:5065-5072.

43. Austin G, Ratliff N, Hollman J, Tabei S, Phillips D. Intimal proliferation of smooth muscle cells as an explanation for recurrent coronary artery stenosis after percutaneous transluminal coronary angioplasty. *J Am Coll Cardiol*. 1985;6:369-375.

44. Ferns G, Raines E, Sprugel K, Motani A, Reidy M, Ross R. Inhibition of neointimal smooth muscle accumulation after angioplasty by an antibody to PDGF. *Science*. 1991;253:1129-1132.

45. Klagsbrun M, Dluz S. Smooth muscle cell and endothelial cell growth factors. *Trends Cardiovasc Med*. 1993;3:213-217.

46. Speir E, Epstein S. Inhibition of smooth muscle cell proliferation by an antisense oligodeoxynucleotide targeting the messenger RNA encoding proliferating cell nuclear antigen. *Circulation*. 1992;86:538-547.



# American Heart Association℠

*Fighting Heart Disease and Stroke*

# Circulation Research

Volume 76, Number 3   March 1995

## Original Contributions

Cysteine Modification in $Ca^{2+}$ and $Na^+$ Channels • Heterologous Coexpression of Channels and Receptors • Cloning and Functional Expression of IRKs • Characteristics of $I_K$ in Canine Ventricle • Stochastic Nature of Cardiac Propagation • Connexins in Rat Cardiac Myocytes • $Ca^{2+}$ and Protein Synthesis in Oxidative Stress • $Na^+$-$Ca^{2+}$ Exchange in Intact Endothelium • Recombinant ApoA-$I_{Milano}$ Inhibits Neointimal Formation • Inhibition of Vascular Smooth Muscle Proliferation • Nitric Oxide and Sepsis • Nitric Oxide Modulation of Baroreceptor Activity • Bradykinin in Cardiac Anaphylaxis • Neurogenic Edema Formation: Role of Nitric Oxide • Heparin and Peripheral Arterial Insufficiency • Lipoxygenase Metabolites in Ischemic Preconditioning • Arterial Wall Mechanics in Conscious Dogs • Myocardial Dysfunction in Conscious Pigs • Induction of Cardiac Protein Synthesis by Angiotensin II

## Rapid Communication

Endothelial and Smooth Muscle Dye Coupling

HEALTH SCIENCES LIBRARY
University of Wisconsin

FEB 22 1995

1305 Linden Drive
Madison, WI 53706

73-6189(5P)   ISSN 0009-7330

BSC-SJA-1324

# Circulation Research

An Official Journal of the American Heart Association

## Editorial Correspondence

Editorial correspondence should be addressed to Stephen F. Vatner, MD, Circulation Research Editor, Harvard Medical School, New England Regional Primate Research Center, One Pine Hill Drive, PO Box 9102, Southborough, MA 01772-9102. Telephone 508-624-0014. Fax 508-624-0980.

Instructions to Authors appear twice a year, in the January and July issues. Authors should consult these instructions before submitting manuscripts to Circulation Research.

Author Costs include page charges, cost of color figures, and cost of offprints, if ordered.

Statements, opinions and results of studies published in Circulation Research are those of the authors and do not reflect the policy or position of the American Heart Association, and the American Heart Association provides no warranty as to their accuracy or reliability.

## Business Correspondence

Business correspondence should be addressed to Scientific Publishing, American Heart Association, 7272 Greenville Avenue, Dallas, TX 75231-4596. Telephone 214-706-1310. Fax 214-691-6342.

Change of Address: Please supply old and new addresses. Allow 4 weeks for changes.

Subscription Rates: In the United States, individuals may subscribe to Circulation Research for their personal use at the annual rates of $143 for members of an American Heart Association scientific council and $190 for nonmembers. Outside the United States, add $66 for postage.

Medical professionals and scientists in training may subscribe for $98 in the United States and $128 outside the United States if payment is accompanied by a letter from the department chairman verifying post held and completion date.

Prepayment is required. Make check, draft, or money order payable to the American Heart Association in US dollars drawn on a US bank, with Circulation Research on the face of the check. To charge on Visa, American Express, or MasterCard, include account number, expiration date, and name as it appears on card.

Contact AHA for single copy rates and subscription rates for libraries, reading rooms, and other multiple-use institutions.

Offprints: For orders of fewer than 100, offprints are available from corresponding authors. For orders of 100 or more, contact Scientific Publishing, Reprint Specialist. Telephone 214-706-1466.

## Advertising Correspondence

Advertising Sales: The Jackson-Gaeta Group, Inc., 3 Prospect Street, Morristown, NJ 07960. Telephone 201-538-0829. Fax 201-538-1076. Contact Joe Jackson, Tony Gaeta, or Richard O'Donnell.

Advertising Production: American Heart Association, Krista Curnutt, 7272 Greenville Avenue, Dallas, TX 75231-4596. Telephone 214-706-1488. Fax 214-691-6342. Advertising forms close 45 days before the first day of publication month.

Advertisements in this issue have been reviewed to comply with the principles governing advertising in American Heart Association publications. A copy of these principles is available on request. The appearance of an advertisement in an AHA publication is neither an AHA guarantee nor endorsement of the product or service or the claims for the product or service made by the advertiser.

## Secondary Services

Indexed or Abstracted in Biological Abstracts, Chemical Abstracts, CIS Abstracts, Excerpta Medica, Index Medicus, Life Sciences Collection, and PREV.

Microform Edition available from University Microfilms International, 300 North Zeeb Road, Ann Arbor, MI 48106-1346. Telephone 313-761-4700. Also available from Princeton Microfilm Corporation, Alexander Road, Box 2073, Princeton, NJ 08540. Telephone 609-452-2066.

Full-text, CD-ROM Edition of five AHA journals on one compact disk (1988-1993) available from Appleton and Lange, 25 Van Zant Street, Norwalk, CT 06855-5830. Telephone 900-423-1359. Fax 203-857-4149.

Authorization to photocopy items from this publication for personal and internal use, the personal or internal use of specific clients, or for educational use, is granted by the American Heart Association on the condition that the copier pay the appropriate fee to the Copyright Clearance Center, Inc. (CCC), 222 Rosewood Dr, Danvers, MA 01923. Telephone 508-750-8400. Fax 508-750-4744. This consent does not extend to copying for advertising or promotional purposes, for creating new collective works, or for resale. Individuals may make single photocopies for personal, noncommercial use without obtaining permission. For all other use, permission should be sought directly from the American Heart Association. Telephone 214-706-1309.

Circulation Research (ISSN 0009-7330) is published monthly by the American Heart Association, 7272 Greenville Avenue, Dallas, TX 75231-4596.

GST Registration Number: R 130 875 641

Printed in the USA.

© 1995 American Heart Association, Inc.

⊗ This paper meets the requirements of ANSI/NISO Z39.48-1992 (Permanence of Paper).

# EXHIBIT 69

0041-1337/93/5506-1409$03.00/0
TRANSPLANTATION
Copyright © 1993 by Williams & Wilkins

Vol. 55, 1409–1418, No. 6, June 1993
Printed in U.S.A.

# Transplantation®

## RAPID COMMUNICATION

# RAPAMYCIN INHIBITS ARTERIAL INTIMAL THICKENING CAUSED BY BOTH ALLOIMMUNE AND MECHANICAL INJURY

### ITS EFFECT ON CELLULAR, GROWTH FACTOR, AND CYTOKINE RESPONSES IN INJURED VESSELS

CLARE R. GREGORY,[1,3] PHILIP HUIE,[2] MARGARET E. BILLINGHAM,[2] AND RANDALL E. MORRIS[1,4]

Laboratory for Transplantation Immunology, Department of Cardiothoracic Surgery and Department of Pathology, Stanford University School of Medicine, Stanford 94305-5247; and Department of Surgery, School of Veterinary Medicine, University of California, Davis, California 95616-8745

Although vascular narrowing produced by graft vascular disease is the major complication that limits long-term survival after heart transplantation, it also occurs in all other solid

[1] Laboratory for Transplantation Immunology in the Department of Cardiothoracic Surgery, Stanford University.

[2] Department of Pathology, Stanford University.

[3] Department of Surgery, School of Veterinary Medicine, University of California, Davis.

[4] Address correspondence to: Dr. Randall E. Morris, Laboratory for Transplantation Immunology, Department of Cardiothoracic Surgery and Department of Pathology, Stanford University School of Medicine, Stanford, CA 94305-5247.

organ allografts (1). The migration and proliferation of smooth muscle cells and deposition of extracellular matrix accounts for much of the arterial intimal thickening in organ allografts, arterial isografts, and in coronary arteries after balloon angioplasty (2, 3–6). Inflammation and the release of cytokines and growth factors cause concentric luminal narrowing in all types of vascular injury (2, 7, 8). Although the specific events responsible for the accumulation of smooth muscle cells in injured vessels have not been identified, the common pathologic response to different types of injury is vascular repair leading to intimal thickening. In the present study, arterial injury was produced by two different methods: rejection of femoral arterial allografts (alloimmune injury) and balloon-catheter injury of carotid arteries (mechanical injury). The cellular responses and expression of mRNAs for cytokines and growth factors associated with these two types of injury were investigated and compared by histopathologic, immunocytochemical, and DNA oligoprobe in situ hybridization techniques.

We also investigated the efficacy of rapamycin (RPM*) for the prevention of intimal thickening after alloimmune and mechanical injury. RPM was chosen to suppress the response to alloimmune injury because it prolongs allograft survival in many species and prevents graft vascular disease in rat heart allografts more effectively than CsA (9). Although RPM inhibits lymphoid cell proliferation and other immune responses by unique, relatively selective, and highly effective mechanisms (10), its antiproliferative effects are not restricted solely to immune cells. Because RPM also inhibits the proliferation of hepatocytes, endothelial cells, fibroblasts, and smooth muscle cells stimulated by nonimmune growth factors (10–12), we evaluated the ability of RPM to suppress the response to mechanical injury. The effects of treatment with RPM on intimal thickening, cellular infiltration, and expression of mRNAs for growth factors and cytokines were assessed after both types of vascular injury.

## MATERIALS AND METHODS

Arterial intimal thickening was produced using a new model for alloimmune vascular injury in which femoral vessels from 250–300 g

* Abbreviations: bFGF, basic fibroblast growth factor; PDGFα, platelet-derived growth factor-α; RPM, rapamycin; TGFβ, transforming growth factor-β.

BSC-SJA-1326

male Brown Norway (RT-1$^b$) rat donors were transplanted orthotopically to 250–300 g male Lewis (RT-1$^1$) rat recipients (n=5) {13; C. R. Gregory, R. E. Morris, in preparation). Orthotopic femoral artery transplantation was also performed between Lewis donors and Lewis recipients (n=5). Forty days after surgery, rats were euthanized and the allografts and isografts were excised, imbedded in optimal cutting temperature compound (Miles Inc., Elkhart IN), and immediately frozen in liquid nitrogen. All specimens were stored at −70°C. The microscopic changes in arterial allografts from untreated rats were compared to changes in isograft vessels and allografts from rats treated i.p. daily (days 1–41) with 1.5 mg/kg/day RPM (Wyeth-Ayerst Research, Princeton, NJ) suspended in 1% high-viscosity carboxymethylcellulose (n=5) or with 6 mg/kg/day RPM (days 0–7) and then 3 mg/kg/day (days 8–39) (n=5).

Intimal thickening was also produced by balloon-catheter (mechanical) injury to left carotid arteries of 400–500 g male Sprague-Dawley rats (14). Fourteen days after injury, the rats were euthanized and the injured left and noninjured control right carotid arteries were prepared and stored as described above. Microscopic changes in the arteries from untreated rats (n=5) were compared to arteries from rats treated i.p. with 1.5 mg/kg/day RPM from days 0–13 (n=5).

Arteries from all rats were examined using histopathologic, morphometric, immunocytochemical, and in situ hybridization (mRNA) techniques. Histopathology and morphometry were performed on 4–6, 8-$\mu$m transverse sections taken from the central two-thirds of arterial allografts or isografts, and the central one-third of balloon-injured left or noninjured control right carotid arteries. All sections for histopathology and morphometry were stained with hematoxylin and eosin. Intimal cross-sectional areas were estimated by point counting (15). An eyepiece grid with 100 points (line intersections) was used, which covered the entire artery cross-section. The area of the grid in square millimeters was determined with a stage micrometer at the same magnification used for point counts. The number of points (P) lying over the intima or media were counted separately, and the areas of each were estimated by 0.01P × grid area. Intima per cent was defined as: area of intima (mm$^2$)/area of media + intima (mm$^2$) × 100. Groups were statistically compared using a two-tailed Student's t test for two means.

Immunohistochemistry and in situ hybridization were performed on 6-$\mu$m, transverse cross-sections from the same regions sampled for histopathology and morphometry. Immunocytochemistry was performed by an indirect immunoperoxidase technique (16) using the following mAbs: pan T cell ($\alpha$/$\beta$ T cell receptor, R 7.3); T helper/granulocyte (W3/25); T cytotoxic/suppressor (OX 8); macrophage (ED 1, ED 2); class II (OX 6); IL-2R (OX 39); and human antismooth muscle actin (Bioproducts for Science, Indianapolis, IN). In situ hybridization was performed using 33-mer DNA probes with a newly developed biotin-avidin enzyme-linked detection system (P. Huie, C. R. Gregory, R. Shorthouse, R. E. Morris, R. K. Sibley, unpublished data). Growth factor and cytokine mRNAs assayed in test and control tissues were: platelet-derived growth factor-$\alpha$ (PDGFa), basic fibroblast growth factor (bFGF), transforming growth factor-$\beta$ (TGFb), IL-2, IL-1, and INF-$\gamma$. Poly-T and an oligoprobe to EBV were used as positive and negative control probes, respectively. Normal and 40-day untreated allograft arteries were used as negative and positive control tissues. Hybridization solution alone, without labeled probe, was used to detect the presence of endogenous alkaline phosphatase. Each oligoprobe was hybridized to a complete set of experimental and control tissues on a single slide. This ensured that the hybridization, washing, and development steps were consistent, enabling reliable comparisons of mRNA expression to be made among different tissues. To ensure that the signal was specific for mRNA, positive control tissue was incubated in 10 mM Tris, 0.1 M KCl, 1 mM MgCl$_2$, at pH 7.6 buffer with and without 1.0 $\mu$g/$\mu$l RNase IIa or 200 U/ml RNase for 1 hr at room temperature before fixation. After fixation, the tissues were hybridized with labeled probe, developed, and checked for a lack of, or greatly diminished, signal when compared to untreated tissue. To ensure the specificity of the signal, hybridization solutions of labeled probe were incubated with 25–100× concentrations of unlabeled probe on positive control tissue. Competitive inhibition was demonstrated by a lack of signal.

## RESULTS

Before describing the effects of treatment with RPM on arterial allografts and arteries injured by balloon catheterization, we will describe results of our analysis of injured arteries removed from untreated rats. Both allograft rejection and balloon-catheter injury produced arterial intimal thickening that comprised approximately 50% of the vascular area (Figs. 1 and 2). Intimal thickening comprised approximately 5% of the vascular area in the femoral artery isograft vessels (Figs. 1 and 2). The neointima, media, and adventitia of the allograft vessels contained many T cells without the predominance of either CD4 or CD8 cells (Fig. 3). There were few T cells present in the adventitia of the isografts. T cells were only occasionally found in the adventitia of balloon-injured arteries. In allograft vessels, macrophages were present in large numbers in the neointima, media, and adventitia (Fig. 3). In isograft vessels, macrophages were found in small numbers surrounding small vessels in the adventitia. In balloon-injured arteries, macrophages were found in small numbers in the adventitia; fewer cells were present in the media and neointima. IL-2R was expressed in the neointima and adventitia of the allograft vessels (Fig. 4), was minimally present in the adventitia of isograft vessels, and was not detected in balloon-injured vessels. Allograft vessels had marked class II expression in the neointima, media, and adventitia (Fig. 4); a few vessels from rats in the balloon-injured group had traces of intimal class II expression, and both isograft and balloon-injured vessels had moderate class II expression in the media and adventitia. In all groups, class II expression was found principally in the adventitia. In allograft vessels, approximately 50% of the intimal cells contained smooth muscle actin compared to greater than 95% of the neointima cells in the isograft and balloon-injured vessels (data not shown).

Allograft vessels from untreated rats had diffuse expression of mRNAs for PDGFa, bFGF, TGFb, IL-1, IL-2, and INF-$\gamma$ in the neointima, media, and adventitia (Figs. 5 and 6). There was trace to moderate expression of these growth factors and cytokines in the adventitia of isograft vessels (data not shown). PDGFa, bFGF, and TGFb mRNAs were expressed in the neointima and adventitia of the balloon-injured vessels; IL-1 was expressed in the adventitia (Fig. 7).

Treatment with 1.5 mg/kg RPM did not measurably reduce intimal thickening (Fig. 2) or expression of IL-2R, class II Ag, growth factor, or cytokine mRNAs in arterial allografts. The dose of 1.5 mg/kg/day was initially selected because this dose prevented rejection of heterotopic cardiac allografts, Brown Norway rat donors (RT-1$^b$) to Lewis rat recipients (RT-1$^1$), in a previous study (9). Increasing the dose to 6 mg/kg RPM followed by 3 mg/kg did reduce intimal thickening by 98% (P<0.0001) and reduced the infiltration of T cells (both CD4 and CD8) and macrophages and the expression of IL-2R, class II Ag, and mRNAs for growth factors and cytokines (Figs. 2–6). The medial layers of these arteries were structurally intact and free of infiltration of T cells and macrophages. The neointima, when present, contained only smooth muscle cells. Treatment with 1.5 mg/kg RPM reduced intimal thickening by 45% (P=0.0245) 14 days after balloon-catheter injury (Fig. 2). There was no evidence of T cells, and the number of macrophages and expression of class II Ag were reduced compared to control





FIGURE 2. Percent intima ((area of intima (mm³)/area of media + intima (mm²) × 100)) of 5 rat carotid arteries 14 days after balloon catheter injury and 5 rat femoral allografts (Brown Norway to Lewis) or isografts (Lewis to Lewis) 40 days after orthotopic transplantation. RPM was administered starting the day of surgery and for 15 days after balloon catheter injury or 39–40 days after transplantation. * P≤0.05, Student's *t* test (two-tailed) for two means.

vessels. Within the neointima area, mRNAs for PDGFa, bFGF, and TGFb were expressed (Fig. 7).

## DISCUSSION

Although allograft rejection and balloon angioplasty injure arteries by different mechanisms, arterial intimal thickening is the culmination of the responses to both forms of injury. In this study, rat peripheral arteries were injured either by rejection (alloimmune injury) after orthotopic femoral artery transplantation or by balloon-catheterization of carotid arteries (mechanical injury). To compare and contrast the responses to both types of injury in these models, we used immunohistochemical and in situ hybridization techniques to characterize cell populations and cytokine mRNA expression in vessel walls. Balloon-catheter injury is an acute, severe, and finite injury that produces substantial intimal thickening in 2 weeks. In contrast, allograft rejection is a progressive, continuous injury that requires over a month to produce the same degree of intimal thickening. When arteries were evaluated microscopically 2 weeks after balloon-catheter injury or 40 days after transplantation, there were similarities and differences. For example, macrophages, IL-1 mRNA, and class II Ags were present in the adventitia of all injured arteries regardless of the type of injury. The intima of all injured vessels contained mRNAs for growth factors (PDGFa, bFGF, TGFb). On the other hand, not only was there a greater variety of cell types and cytokine mRNAs in allografted arteries compared to balloon-injured arteries, but these cells and mRNAs were also

BSC-SJA-1328

TRANSPLANTATION

Vol. 55, No. 6



FIGURE 3. Immunocytochemistry using an indirect immunoperoxidase technique performed on 6-μm frozen cross-sections of rat femoral allografts (Brown Norway to Lewis) 40 days after orthotopic transplantation (400×). The left column displays sections from an untreated rat. The right column displays sections from a rat treated with RPM (6 mg/kg/day, days 0–7, and then 3 mg/kg/day, days 8–39). mABs employed were: panT = T cells (α/β T cell receptor, R 7.3); CD4 = T helper/granulocyte (W325); CD8 = T cytotoxic/suppressor (OX 8); and Mφ = macrophage (ED 1).

BSC-SJA-1329



allografts (Brown Norway to Lewis) 40 days after orthotopic transplantation (400×). The left column displays sections from an untreated rat. The right column displays sections from a rat treated with RPM (5 mg/kg/day, days 0–7, and then 3 mg/kg/day, days 8–39). mAbs employed were: IL-2R = IL-2 receptor (OX 39) and II = class II surface Ag (OX 6).

more widely distributed throughout the segments of the vessel wall. Vessel allografts contained T cells and macrophages in large numbers in the adventitia, media, and intima. Although IL-2R expression was limited to the adventitia and intima of allograft vessels, class II Ags and mRNAs for growth factors were expressed in all vessel layers. Similarly, cytokine (IL-1, -2, INF-$\gamma$) mRNAs were detected in all layers of allograft vessels.

Our findings, combined with data from other studies, suggest mechanisms that are responsible for intimal thickening after allograft rejection or balloon-catheter injury. Growth factors appear to be responsible for the regulation of vascular smooth muscle migration and proliferation after injury (2, 17–19). The media and developing neointima of arteries injured by immune and nonimmune processes contain mRNAs for PDGFa, bFGF, and TGFb, and PDGFa appears to play an important role in the response to injury caused by rejection and balloon-catheterization (20). This growth factor is produced by many cell types, including arterial endothelial cells, activated monocytes and macrophages, smooth muscle cells, and stimulated fibroblasts; it is both a mitogen and chemoattractant for smooth muscle cells. The relevance of PDGFa to the two forms of injury used in our study is reinforced by the following findings: (1) administration of exogenous PDGFa increases intimal thickening after balloon-catheter injury (21), and (2) T cells induce the secretion of a PDGF-like protein from endothelial cells (22).

bFGF and TGFb may also affect the responses to arterial injury caused by rejection and balloon-catheterization. For example, bFGF is stored locally in the subendothelial extracellular matrix and is released by plasmin or heparinase from these sites immediately after acute injury (23). hFGF is also produced by platelets and macrophages and is a potent mitogen for smooth muscle and endothelial cells (20). Prolonged administration of bFGF increases arterial neointima thickening after balloon-catheter injury (18). The effects of TGFb are complex, because in vitro it inhibits and stimulates smooth muscle cell proliferation and affects the deposition and composition of extracellular matrix; its primary effects in vivo are not clear (20, 24).

Because IL-1 is a cytokine associated with inflammation and produced by macrophages, it was not surprising that we found that it was the only cytokine for which mRNA was detected in arteries injured by both rejection and balloon-catheterization. IL-1 may contribute to an artery's response to injury by: (1) being a mitogen for smooth muscle cells, (2) stimulating secretion of PDGFa from smooth muscle cells, (3) being chemotactic for macrophages and inducing PG production by these cells, and (4) promoting fibroblast growth (25, 26).

IL-2 and INF-$\gamma$ are primarily associated with cellular immune responses (25, 27) and were detected only in allografted arteries. The major function of IL-2 is to act as a growth factor for T cells, but it also enhances the biosynthesis of other T

BSC-SJA-1330

TRANSPLANTATION

Vol. 55, No. 6



FIGURE 5. Expression of mRNA for PDGFa, bFGF, and TGFb in 6-μm frozen cross-sections of rat femoral allografts (Brown Norway to Lewis) 40 days after orthotopic transplantation (400×). The left column displays sections from an untreated rat. The right column displays sections from a rat treated with RPM (6 mg/kg/day, days 0–7, and then 3 mg/kg/day, days 8–39). In situ hybridization for mRNA was performed using 30-mer DNA oligoprobes with a biotin-avidin enzyme-linked detection system (P. Huie, C. R. Gregory, R. Shorthouse, R. E. Morris, R. K. Sibley, unpublished data). Oligoprobes employed were: Poly T = positive control probe to the poly A tail of mRNA; EBV = negative control probe to human EBV mRNA; PDGF = PDGFa; FGF = bFGF; TGF = TBFb.

BSC-SJA-1331



FIGURE 6. Expression of mRNA for IL-2, IL-1, and INF-γ in 6-μm frozen cross-sections of rat femoral allografts (Brown Norway to Lewis) 40 days after orthotopic transplantation (400×). The left column displays sections from an untreated rat. The right column displays sections from a rat treated with RPM (6 mg/kg/day, days 0–7, and then 3 mg/kg/day, days 8–39). In situ hybridization for mRNA was performed using 30-mer DNA oligoprobes with a biotin-avidin enzyme-linked detection system (Huie et al., unpublished data). Oligoprobes employed were IL-2, IL-1, and INF-γ.

cell-derived lymphokines. The direct effects of IL-2 on smooth muscle proliferation are unknown. The presence of INF-γ in rejected allograft arteries in our study may account for the extensive expression of class II Ag, because others have shown that this cytokine increases class II Ag on smooth muscle cells (27). INF-γ, in the absence of growth factors, also inhibits smooth muscle cell proliferation; intimal thickening after balloon-catheterization has been reduced by 50% after administration of this cytokine (28).

RPM is an unusual molecule because in vitro experiments have shown that it interferes with signal transduction subsequent to the interaction between cytokines and growth factors with their cell surface receptors. The inhibition of the action of ILs may account for some of the immunosuppressive effects of RPM in vivo (29). We reasoned that the pharmacologic profile of RPM might not be restricted to suppression of

immune cell function, because RPM also inhibits the actions of growth factors (epidermal growth factor, hepatocyte growth factor) that do not affect immune cells (11, 12). We have also found that RPM blocks bFGF-induced smooth muscle proliferation in vitro as well as protein, but not RNA synthesis in these cells after stimulation with angiotensin II (30, 31). Although RPM does not block the synthesis of immune cytokines directly, inhibition of paracrine cytokine effects could indirectly block additional cytokine and growth factor production.

We decided to evaluate the effects of RPM on arterial allograft rejection and on the response to arterial balloon-catheter injury for two reasons: (1) RPM appears to act by inhibiting cytokine and growth factor action, and (2) it is believed that both rejection and the response to balloon-catheter injury depends on the actions of cytokines and growth factors. Although we have previously shown that daily treatment of Lewis recip-

BSC-SJA-1332

TRANSPLANTATION

Vol. 55, No. 6



FIGURE 7. Expression of mRNA for PDGFa, bFGF, and TGFb in 6-μm frozen cross-sections of rat left carotid arteries 14 days after balloon catheter injury (400×). The left column displays sections from an untreated rat. The right column displays sections from a rat treated with RPM (1.5 mg/kg/day, days 0–13). In situ hybridization for mRNA was performed using 30-mer DNA oligoprobes with a biotin-avidin enzyme-linked detection system (Huie et al., unpublished data). Oligoprobes employed were: Poly T = positive control probe to the poly A tail of mRNA; EBV = negative control probe to human EBV mRNA; PDGF = PDGFa; FGF = bFGF; TGF = TGFb.

BSC-SJA-1333

ients of Brown Norway heart allografts with 1.5 mg/kg RPM prevents intimal thickening in graft coronary arteries 50 days after transplantation (9), this dose did not inhibit the rejection of femoral arterial allografts 40 days after transplantation. This dose may have suppressed rejection less effectively in isolated arterial allografts compared to whole heart allografts for the following reasons: (1) arterial grafts are more immunogenic than heart grafts, (2) arterial grafts fail to shed donor cells or Ags that could down-modulate the recipient immune system, or (3) tissue levels of RPM are lower in arterial grafts. Higher doses of RPM did prevent arterial allograft rejection; in these allograft vessels, there was a good correlation between the paucity of immune cells, cytokine, and growth factor mRNAs and lack of intimal proliferation. In this model, it is most likely that the primary effect of RPM treatment was to inhibit lymphoid cell infiltration into the graft. As a result, smooth muscle cell destruction was prevented and the synthesis and release of cytokines and growth factors that cause intimal thickening was blocked.

Most interesting was the ability of RPM treatment to inhibit intimal proliferation in carotid arteries 14 days after balloon-catheter injury (Fig. 2). This effect cannot be attributed to the immunosuppressive effects of RPM because alloantigen-mediated T cell activation is not responsible for intimal thickening in this model. Therefore, after balloon-catheter injury, RPM may have inhibited intimal proliferation by interfering with growth factor and cytokine actions that attract and activate macrophages and cause smooth muscle cells to migrate and proliferate. In these vessels, mRNAs for growth factors and cytokines were expressed extensively, yet intimal thickening was less than in injured vessels from untreated rats. We are investigating different RPM doses and treatment schedules in an attempt to inhibit intimal thickening after balloon-catheter injury more effectively.

The intimal thickening we observed in femoral arterial isografts in untreated rats is another example of nonimmune-mediated injury; the minimal extent of intimal thickening in these vessels was most likely a response to the injury caused by ischemia and trauma during transplantation. Therefore, although the intimal thickening in rejecting allograft vessels is primarily the result of immune-mediated injury, nonimmune injury probably also plays a role. Because intimal thickening in allograft vessels from rats treated with the highest doses of RPM was less than the intimal thickening in isograft vessels from untreated rats (Fig. 2), these findings suggest that RPM suppressed the response to both forms of injury in allograft vessels.

RPM is the first member of a new class of drugs that inhibit both immune and nonimmune growth factors. As a result, RPM is both an immunosuppressant and a drug that can be used in nonimmunological diseases to treat the pathological consequences of growth factor or cytokine actions. Because the response to arterial injury appears to involve many different growth factors with redundant activity, RPM and drugs in its class may be preferable to other therapeutic strategies that are limited to the inhibition of a single cytokine or growth factor.

Acknowledgments. The authors would like to acknowledge the efforts of Dr. Jian Wang and Randi Shorthouse in the Department of Cardiothoracic Surgery for performing surgical procedures and for assistance with histopathology, and Reed Rowan in the Department of Pathology for performing the morphometry.

## REFERENCES

1. Miller LW. Allograft vascular disease: a disease not limited to hearts. J Heart Lung Transplant 1992; 11: 832.
2. Gordon D. Growth factors and cell proliferation in human transplant arteriosclerosis. J Heart Lung Transplant 1992; 11: S7.
3. Billingham ME. Histopathology of graft coronary disease. J Heart Lung Transplant 1992; 11: S38.
4. Ip JH, Fuster V, Badimon L, Badimon J, Tuabman MB, Chesebro JH. Syndromes of accelerated atherosclerosis: role of vascular injury and smooth muscle cell proliferation. J Am Coll Cardiol 1990; 15: 1667.
5. Liu MW, Roubin GS, King SB. Restenosis after coronary angioplasty; potential biologic determinants and role of intimal hyperplasia. Circulation 1989; 79: 1374.
6. Painter TA. Myointimal hyperplasia: pathogenesis and implications. 1. In vitro characteristics. Artif Organs 1991; 15: 42.
7. Foegh ML. Chronic rejection—graft arteriosclerosis. Transplant Proc 1990; 22: 119.
8. Hansson GK, Jonasson L, Seifert PS, Stemme S. Immune mechanisms in atherosclerosis. Arteriosclerosis 1989; 9: 567.
9. Meiser BM, Billingham ME, Morris RE. Graft vessel disease: the role of rejection and the effect of cyclosporine, FK506, and rapamycin. Lancet 1991; 338: 1297.
10. Morris RE. Rapamycins: antifungal, antitumor, antiproliferative, and immunosuppressive macrolides. Transplant Rev 1992; 6: 39.
11. Akselband Y, Harding MW, Nelson PA. Rapamycin inhibits spontaneous and fibroblast growth factor beta-stimulated proliferation of endothelial cells and fibroblasts. Transplant Proc 1991; 23: 2833.
12. Francavilla A, Starzi TE, Carr B, et al. The effects of FK506, cyclosporine, and rapamycin on liver growth in vitro and in vivo. Transplant Proc 1991; 23: 2817.
13. Schmitz-Rixen T, Megerman J, Colvin RB, Williams AM, Abbott WM. Immunosuppressive treatment of aortic allografts. J Vasc Surg 1988; 7: 82.
14. Clowes AW, Clowes MM, Reidy MA. Kinetics of cellular proliferation after arterial injury. III. Endothelial and smooth muscle cell growth in chronically denuded vessels. Lab Invest 1986; 54: 295.
15. Aherne WA, Dunnill MS. Morphometry. London: Edward Arnold, 1982.
16. Stites DP, Channing RP. Clinical laboratory methods for detection of antigens and antibodies. In: Stites DP, Stobo JD, Wells JV, eds. Basic and clinical immunology. Los Altos, CA: Appleton and Lange, 1987: 241.
17. Ross R. Growth factors in the pathogenesis of atherosclerosis. Acta Med Scand 1989; 715: 33.
18. Lindner V, Lappi DA, Baird A, Majack RA, Reidy MA. Role of basic fibroblast growth factor in vascular lesion formation. Circ Res 1991; 64: 106.
19. Majesky MW, Lindner V, Twardzik DR, Schwartz SM, Reidy MA. Production of transforming growth factor $B_1$ during repair of arterial injury. J Clin Invest 1991; 88: 904.
20. Casscells W. Smooth muscle cell growth factors. Prog Growth Fac Res 1991; 3: 177.
21. Ohniahi H, Yamaguchi K, Shimada S et al. An evidence for "response to injury" hypothesis. Life Sci 1982; 31: 2595.
22. Shaddy RE, Hansen JC, Cowley CG. Effects of T cells on platelet-derived growth factor-like protein secretion from endothelial cells. J Heart Lung Transplant 1992; 11: 48.
23. Voldavsky I, Fuks Z, Ishai-Michaeli R, et al. Extracellular matrix-resident basic fibroblast growth factor; implication for the control of angiogenesis. J Cell Biochem 1991; 45: 167.
24. Sporn MB, Roberts AB. TGF-B; problems and prospects. Cell Regul 1990; 1: 875.
25. Schreiber RD. Cytokines: structure, function, and role in immune response amplification. In: Schwartz BD, ed. Immunology. Kal-

1418                                    TRANSPLANTATION                                    Vol. 55, No. 6

amazoo, MI: Upjohn, 1991: 81.

26. Ikeda U, Ikeda M, Oohara T, Kano S, Yaginuma T. Mitogenic action of interleukin-1α on vascular smooth muscle cells mediated by PDGF. Atherosclerosis 1990; 84: 183.

27. Hansson GK, Jonasson L, Holm J, Clqwes MM, Clowes AW. γ-interferon regulates vascular smooth muscle proliferation and Ia antigen expression in vivo and in vitro. Circ Res 1988; 63: 712.

28. Hanseon GK, Holm J. Interferon-γ inhibits arterial stenosis after injury. Circulation 1991; 84: 1266.

29. Sigal NG and Dumont FJ. Cyclosporin A, FK-506 and rapamycin: pharmacologic probes of lymphocyte signal transduction. Annu

Rav Immunol 1992; 10: 519.

30. Gregory CR, Morris RE, Pratt RE, et al. Use of antiproliferative agents for the treatment of occlusive vascular disease. FASEB J 1992; 6: A940.

31. Gregory CR, Morris R, Pratt R, et al. The use of new antiproliferative immunosuppressants is a novel and highly effective strategy for the prevention of vascular occlusive disease. J Heart Lung Transplant 1992; 11: A197.

Received 3 November 1992.
Accepted 27 January 1993.

0041-1337/93/5506-1418$03.00/0
TRANSPLANTATION
Copyright © 1993 by Williams & Wilkins

Vol. 55, 1418–1421, No. 6, June 1993
Printed in U.S.A.

# XENOTRANSPLANTATION: BABOONS AS POTENTIAL LIVER DONORS?

## SCIENTIFIC AND ETHICAL ISSUES

LAURENCE CHICHE[1,3] RENÉ ADAM[1], SOPHIE CAILLAT-ZUCMAN,[2] DENIS CASTAING,[1] JEAN FRANÇOIS BACH[2], AND HENRI BISMUTH[1]

Groupe de Recherche de Chirurgie Hépatique, Hopital Paul Brousse, UER Kremlin Bicêtre, 94800 Villejuif, France; and INSERM 25, Hopital Necker, Paris, France

The dramatic development of liver transplantation compared to a relative shortage of donors has brought a renewed interest to xenotransplantation. Because of anatomical and immunological compatibilities, nonhuman primates are the most appropriate donors. The aim of this work was to analyze the different problems of a baboon-to-man liver xenotransplantation. Thirty baboons bred in a French Primatology Center were studied. The analysis of anatomical, microbiological, and immunological data showed that only 8 baboons out of 30 were suitable as donors for xenotransplantation. Considering these data and the ethical issues, the actual feasibility of xenotransplantation programs is discussed.

During the 1960s and the 1970s, several xenotransplantations (XT*) were performed in humans using chimpanzees or baboons as donors (1–7). Even if some xenogenic grafts had relatively long and promising survival, like some of the chimpanzee kidneys in Reemtsa's experience or the baboon heart in Bailey's case (8), the outcome of xenotransplants was constantly poor. Recent developments in surgical techniques and advances in immunology, with a resultant shortage of donor organs, have brought a renewed perspective and interest to XT,

which was tremendously enhanced by the recent case of Starzl, who transplanted a baboon liver into a man (9).

The purpose of this work was to study the suitability and the validity of inbred baboons from a French primatology center as potential liver donors. The question was to determine, out of this population of available animals, how many were actually suitable for transplantation. As a matter of fact, because chimpanzees, which are the most appropriate animal for xenotransplantation in man, can no longer be used for this purpose, baboons, which are easily bred in captivity, are currently the available animals most closely related to man.

## MATERIALS AND METHODS

There are several mandatory requirements for animals to be suitable as potential donors. These include easy animal procurement, a very close anatomical and immunological concordance with man, a low risk of infectious diseases, and ethical approval.

### Scientific Data

Thirty baboons, Papio cynocephalus and Papio anubis, born and bred in the primatology Center of Villejuif, France, have been investigated. Those animals were, for the majority, bred from baboons both in the same center. There were 12 males and 18 females with an age range from 8 to 30 years. The mean weight of the males was 24 kg (20–29 kg), and that of the females was 15 kg (10–21 kg).

During the period of this work, 2 old baboons died and their livers were studied for anatomy.

Because the purpose was to select potential donors, a first "clinical selection" was done, excluding too small animals or baboons with a

[1] Groupe de Recherche de Chirurgie Hépatique.

[2] INSERM.

[3] Address correspondance to: L. Chiche, Hopital Paul Brousse, 12 Ave P.V. Couturier, 92804 Villejuif Cedex, France.

* Abbreviation: XT, xenotransplantation.

BSC-SJA-1335

# Transplantation®

ISSN 0041-1337 TRPLAU

VOLUME 55 · NUMBER 6   June 1993



CSC

Official Journal of
The Transplantation Society

Published by Williams & Wilkins
Baltimore, MD 21202 U.S.A.

# EXHIBIT 70

# United States Patent [19]

**MacGregor**

[11]   **4,101,984**

[45]   **Jul. 25, 1978**

[54] **CARDIOVASCULAR PROSTHETIC DEVICES AND IMPLANTS WITH POROUS SYSTEMS**

[76] Inventor: David C. MacGregor, 81 Wimbleton Rd., Islington, Ontario, Canada

[21] Appl. No.: 683,382

[22] Filed: May 5, 1976

[30]   **Foreign Application Priority Data**

May 9, 1975 [CA]   Canada ................................ 226993
Dec. 22, 1975 [GB]   United Kingdom ............... 52474/75

[51] Int. Cl.² ........................... A61F 1/22; A61F 1/24
[52] U.S. Cl. ................................... 3/1.5; 3/1;
3/1.4; 3/1.7; 128/1 D; 128/92 C; 128/419 P;
427/2
[53] Field of Search ................. 3/1.5, 1.7, 1.4, 1,
3/1.9; 128/92 C

[56]   **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,689,942 | 9/1972 | Rapp | 3/1.5 |
| 3,855,638 | 12/1974 | Pilliar | 3/1 |
| 3,914,802 | 10/1975 | Reick | 3/1.4 |
| 4,017,911 | 4/1977 | Kafesjian et al. | 3/1.5 |

OTHER PUBLICATIONS

"An Experimental Study of the Use of Polyvinyl Sponge for Aortic Grafts" by N.E. Shumway et al., Surgery, Gynecology & Obstetrics, Jun. 1955, pp. 703-706.
"Porous Segmented Polyurethanes--Possible Candidates as Biomaterials" by Garth L. Wilkes et al., Journal of Biomedical Materials Research, vol. 7, No. 6, Nov. 1973, pp. 541-554.
"Aortic Valve Prosthesis," The Bulletin of the Dow Corning Center for Aid to Medical Research, vol. 1, No. 1, Oct. 1959.

Primary Examiner—Ronald L. Frinks
Attorney, Agent, or Firm—Sim & McBurney

[57]   **ABSTRACT**

A novel cardiovascular prosthetic device or implant having many useful cardiovascular applications comprises a porous surface and a network of interconnected interstitial pores below the surface in fluid flow communication with the surface pores. Tissue forms a smooth thin adherent coating of self-determining thickness on the porous surface making it resistant to the formation of the blood clots normally associated with the presence of foreign bodies in the blood stream.

6 Claims, 10 Drawing Figures



BSC-SJA-1337



FIG. 1

FIG. 2

FIG. 3

FIG. 4



BSC-SJA-1338



FIG. 5

FIG. 6

FIG. 7

FIG. 8

BSC-SJA-1339



FIG.9



FIG. 10

BSC-SJA-1340

4,101,984

1

## CARDIOVASCULAR PROSTHETIC DEVICES AND IMPLANTS WITH POROUS SYSTEMS

### FIELD OF INVENTION

This invention relates to novel prosthetic devices and implants for cardiovascular use.

### BACKGROUND OF THE INVENTION

It is well known that the introduction of foreign bodies into the blood stream, for example, the polished metal surfaces of artificial heart valves, tends to cause the formation of blood clots which may break loose and embolize to various parts of the body. Such thromboembolic problems have led to the administration of anticoagulants to patients with artificial heart valves. The effects of these anticoagulants on the blood clotting mechanism cause difficulties in stopping the flow of blood through even a minor flesh wound. In addition, flexible plastic conduits are used for vascular graft purposes and such surfaces also are thrombogenic.

Attempts have been made to overcome the thromboembolic problems of polished metal heart valves by providing a porous fabric covering over blood-engaging metal parts. When such porous fabrics have been used for covering metal heart valve parts, pores of typical size 500 to 700 microns have been provided and some tissue ingrowth has been observed. While the fabric covering has resulted in a decreased incidence of thromboembolism, apparently due to the observed tissue ingrowth, such valves do suffer from other defects, notably wear of the fabric, causing cloth fragment embolism and chronic hemolytic anemia as a result of turbulence of the blood over disrupted fabric coverings.

To date, the prior art has been unable to provide a heart valve which not only overcomes the thromboembolic problems of a smooth metal surface but also does not exhibit the wear failure problem of the prior art fabric covered heart valves.

### SUMMARY OF THE INVENTION

The present invention provides a heart valve which overcomes the prior art defects by providing the blood-engaging metallic parts in the form of a solid substrate having an adherent porous metallic surface coating which has a network of interconnected pores therein. It has been found that the rigid nature of the metal coating, the strength of the substrate-coating interface and the strength of the particle-particle bond in the coating provide excellent strength and wear resistance characteristics while nucleated cells circulating in the blood stream colonize onto the blood-engaging surface of the porous coating and subsequently differentiate into other cell types to form a thin, smooth, generally uniformly-thick, firmly attached tissue covering on the surface. The tissue covering is formed rapidly over about a one month period, does not appear to increase significantly in thickness thereafter, and includes flattened endothelial-like cells at the surface thereof. The tissue formation is not accompanied by thrombosis or embolism owing to its blood-compatible nature, and once the maximum thickness has been attained, the tissue covering is self-regenerating.

### BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a photograph of uncoated metal strut members of a heart valve cage at 25 times magnification;

2

FIG. 2 is a photograph of the strut members in FIG. 1 coated with −500 mesh metallic powder at 25 times magnification;

FIG. 3 is a close-up photograph of the surface of the coating of FIG. 2 at 750 times magnification;

FIG. 4 is a close-up photograph of the surface of the coating of FIG. 2 at 3500 times magnification;

FIG. 5 is a thin section taken through a porous coated metal heart valve element after positioning in the blood stream of a dog for 2 months at 300 times magnification showing the formation and ingrowth of smooth-surfaced endothelialized tissue on the porous surface;

FIG. 6 is an electron micrograph of the tissue surface of composite porous coated metal body after positioning in the blood stream of a dog for 3 months at 700 times magnification showing endothelial cells in the tissue;

FIG. 7 is a photograph of a porous hydrophilic polyurethane element at 20 times magnification;

FIG. 8 is a photograph of the porous surface of FIG. 7 at 100 times magnification;

FIG. 9 is a photograph of a porous polymethylmethacrylate surface at 17 times magnification; and

FIG. 10 is a photograph of the porous surface of FIG. 9 at 90 times magnification.

### GENERAL DESCRIPTION OF INVENTION

In U.S. Pat. No. 3,855,638, there is described a surgical prosthetic device consisting of a metal substrate with a porous metal coating into which bone tissue may grow for incorporation of the prosthesis into the body. The porous coating used in this prior art device has several essential requirements, including restrictions on coating thickness, interstitial pore size and coating porosity. These parameters are dictated by the strength requirements of the surgical prosthetic device, namely, that the coating and the coating-substrate interface have strengths at least that of bone, so that there is no danger of failure of the prosthesis after ingrowth of bone tissue.

In cardiovascular uses, however, strength is a less important consideration, and the ranges of parameters chosen are dictated to some degree by the intended use of the prosthetic device or implant.

Further, the mechanism of incorporation of the surgical prosthetic device of this prior art into the body is by ingrowth of tissue into the coating while the present invention involves quite a different mechanism which arises from the different environment of the devices of the invention as compared with that of the prior art.

Heart valves include a plurality of components including an occluder, typically a ball or disc, an occluder seating ring, occluder guide struts, muscle guards to prevent interference by muscle with movement of the occluder and a sewing ring to attach the valve to the heart. The occluder seating ring, occluder guide struts and muscle guards usually are constructed of metal. The occluder may be metal or other material.

In accordance with this invention, the engaging elements of a heart valve are formed as composites having a dense coherent metallic substrate and a rigid metallic porous coating which is adhered to the substrate and consists of metallic particles joined to adjacent particles to form an interconnected network of pores which is substantially uniformly distributed throughout the coating. It may be desirable to omit such coating from substrate surfaces where there is relative movement between members. It is preferred to form the coating from fine metallic particles, typically of −500 mesh size, in

BSC-SJA-1341

4,101,984

3

order to minimize abrasion between heart valve elements and hemolysis of the blood. It has been found that porous coatings formed from finer particles provide smoother tissue coatings than porous coatings formed from coarser particles.

It is also preferred to provide a thin porous coating on the metal substrate surfaces in order to provide the maximum orifice for blood flow, and typically the thickness is about 20 to 300 microns, preferably about 50 to about 150 microns.

The shear strength of the composite surface is important, especially where heart valve surfaces are in relative motion, and it is necessary that the composite have a high fatigue tolerance, the endurance limit ($10^7$ cycles) being greater than 500 psi. It is preferred for the surface coating interface and the coating itself to have shear strengths greater than about 1000 psi, more particularly greater than about 3000 psi.

The porosity of the coating portion of the composite varies between about 10 and about 50%.

The invention is not restricted to heart valves but is applicable to a wide variety of cardiovascular prosthetic devices or implants having blood engaging surfaces. In accordance with the invention, the blood engaging surface is porous in nature and has an interconnected network of pores in the subsurface thereof.

The cardiovascular phosthetic devices or implants used in the present invention may be, in some cases, as in the heart valve case as mentioned above, in the form of a porous coating on a coherent substrate, with the network of interconnected pores extending throughout the coating only. Alternatively, the prosthetic device or implant may be wholly porous with the network of interconnected pores extending throughout the body of the device.

An example of the use of the latter type of device is as the metal electrode tip of a heart pacemaker, although the electrode tip also may be provided in the composite form, if desired.

The pacemaker electrode tip and the heart valves use metal as the material of construction. The term "metal" as used herein is intended to include metal alloys. The metal utilized is one which is non toxic to the blood and body tissue. One such material is the cobalt alloy that is known by the trade mark "VITALLIUM".

Where such metal prosthetic devices and implants are of the composite type, they may be formed by a number of techniques involving sintering, the particular sintering procedure depending to some extent on the size of the particles from which the porous coating is formed.

The metal particles from which the porous coating is formed generally fall into one of four categories, namely $-500$ mesh (less than about 20μ, $-325 + 500$ mesh (about 20 to about 50μ, $-100 + 325$ mesh (about 50 to about 200μ and $+100$ mesh (greater than about 55 $+200μ$. The term "mesh" used herein refers to the U.S. Standard Sieve mesh size.

In each case, the smooth coherent substrate is first roughened, for example, by blasting with abrasive material.

The coating of metal particles then is formed on the roughened surface. The metal in the substrate and coating usually are the same, but different metals may be used.

In one procedure, a binder for the metal particles first is sprayed onto the roughened metal surface and the device then is suspended in a fluidized bed of powder metal particles to form a coating on the roughened

surface. The coated body is withdrawn from the fluidized bed and the binder allowed to dry. This procedure has been found to be satisfactory for each of the particle sizes, except for the $-500$ mesh particles.

In an alternative procedure, the powder metal particles are mixed with a binder to form a fairly viscous slurry which is spray applied to the roughened surface to form the coating thereon, the coating thereafter being dried. It has been found that this procedure is satisfactory for $-325$ mesh size particles and below.

In a further procedure, the metal particles and binder are slurried and the roughened surface is dipped into the slurry. Excess material is allowed to run off and the coated body is dried.

In each case, the preform of dried coating and substrate is sintered to cause metal fusion interconnection of the metal particles one with another and with the roughened substrate surface to provide a rigid porous structure having a network of interconnected pores substantially uniformly distributed throughout the coating.

It is possible to build up any desired thickness of porous coating on the coherent substrate by presintering the dried coating to provide some strength thereto and then repeat the coating and presintering operation for as many cycles as is required to build up the desired thickness. When the desired thickness has been achieved, the composite is sintered to provide the required particle-particle and particle-substrate adhesions.

The presintering and sintering temperatures which are preferably utilized depend on the particle size of the metal particles, lower temperatures generally being used for smaller particle sizes.

Thus, for $-500$ mesh metal particles, presintering preferably is carried out by heating at a temperature of about 2000° F (about 1100° C) momentarily or up to about 10 minutes and then cooling while sintering preferably is carried out by heating at a temperature of about 2150° F (about 1175° C) for about 60 to about 90 minutes in a hydrogen or other reducing gas atmosphere, or under vacuum.

For the $-325 + 500$ mesh metal particles, presintering preferably is carried out by heating at a temperature of about 2100° F (about 1150° C) for about 8 minutes, while sintering preferably is carried out by heating at a temperature of about 2200° F (about 1200° C) for about 60 to about 90 minutes in a hydrogen or other reducing gas atmosphere, or under vacuum.

When metal particles of particle size $+325$ mesh are used, the presintering preferably is carried out at a temperature of about 2200° F (about 1200° C) and sintering preferably is carried out at a temperature of about 2200° to about 2300° F (about 1200° C to about 1250° C) for about 2 to about 3 hours, in a hydrogen or other reducing gas atmosphere, or under vacuum.

Following formation of the porous coating, it may be machined and refined, if desired, to improve its surface characteristics.

The metal particles generally are substantially spherical, although other geometrical shapes and mixtures of shapes may be used. FIGS. 1 to 4 illustrate part of a typical device provided in accordance with this invention wherein the coating is formed from $-500$ mesh metal particles.

Thus, the normal polished metal surface struts (FIG. 1) of a heart valve cage, the apex of which is seen in FIGS. 1 and 2, is coated with an adhered rigid porous coating of substantially spherical metal particles, giving

BSC-SJA-1342

4,101,984

5

the struts the appearance seen in FIG. 2. In the highly magnified photographs of FIGS. 3 and 4, it can be seen that the metal particles are adhered one to another by diffusion bonded regions to define a plurality of surface pores. The surface pores communicate with a subsurface interconnected network of interstitial pores, as may be seen from the thin section of FIG. 5.

Wholly porous metallic devices may be formed by sintering the metal particles in a mold at the sinter temperatures specified above for the porous coatings. Binders may be used, if necessary.

The present invention is not limited to metal as the material of construction of the prosthetic device or implant and many other constructional materials inert to blood may be used, either alone or in combinations of two or more such materials, provided that they can be provided in a porous form. Typical materials include flexible or rigid plastics, ceramics and carbon.

When plastic materials are used in this invention, they may be provided in rigid form or in flexible form and in wholly porous or composite form. The rigid plastics may be used in similar applications to the rigid metal bodies, as outlined below. The flexible plastic materials, however, have particular utilities not enjoyed by the metal bodies owing to the rigid nature of the metal bodies.

One method of forming a porous polymer structure involves pulverizing the polymer to the required particle size and then compressing the polymer powder at pressures below about 100 psi and at a temperature in the range of about 20° to about 100° F (about 7° to about 38° C).

Another method of formation of porous structures for use in the present invention is to blend together a moldable flexible polymeric material and solvent-elutable particles in quantities to provide a continuous phase of polymer and a dispersed phase of solvent-elutable particles in the blend. The blend may be subjected to compression molding to the desired shape, if desired. The resultant body then is contacted with solvent to remove the solvent-elutable particles to leave an open network of interconnected pores throughout the body.

The solvent-elutable particles and the elution solvent should be non-toxic in nature so that any residual material is not harmful to body tissues or blood in use. Typically, the solvent elutable particles are water-soluble, for example, sodium chloride or sodium carbonate particles.

The particle size of the particles to a large degree dictates the pore size in the polymer body, although irregular shapes generally result.

The pore size, volume and shape in the product may be controlled by varying the size, shape and distribution of the solvent-elutable particles and the weight ratio of the polymer to particles.

As may be seen in FIGS. 7 and 8, a flexible porous hydrophilic polyurethane product formed by the above procedure and using −200 +500 mesh sodium chloride particles, has an open porous structure in which the continuous polymer phase is irregularly shaped.

If desired, the totally porous product may be laminated in a mold or by solvent techniques with a solid coherent flexible polymer body.

Porous flexible polymeric materials have particular utility in the suture or sewing rings of heart valves. Suture rings often are formed of fabric filled with closed cell polymeric foam material. The porous flexible poly-

6

meric material having interconnected pores may be used as the polymeric filler of the suture ring.

Alternatively, the flexible porous polymeric material having interconnected pores may be provided as the outer surface of a conventional foam-filled fabric suture ring, either by direct attachment thereto or by attachment through an intermediate solid substrate.

A composite of a porous polymeric material and a solid coherent substrate may be utilized as the suture ring by direct secure attachment to the occluder seating ring. The attachment may be achieved by causing the solid substrate to flow into a porous metal surface of the character described in detail above on the seating ring and harden in the subsurface pores to interlock with the network of interconnected pores, for example, by pressure molding.

The latter procedure may be used, if desired, to provide flexible or rigid solid and/or porous plastic external coatings on rigid metal coatings on other heart valve components, by pressure molding a polymer to the metal coating.

In an alternate procedure for the formation of the flexible porous products, there may be first formed beads of polymer having a core of solvent-elutable material by solution coating of the core material. The beads then are compression molded to the desired shape and the product is leached to remove the solvent-elutable material to leave the porous material. The beads may be pressure molded to a solid polymer body, if desired, to provide a laminated structure after completion of the elution. Alternatively, the wholly porous product from the elution may be attached to a solid polymer body.

A further method of formation of the porous polymeric material is to form a casting solution of the polymer and solvent-elutable particles, cast the solution onto a casting surface, which may be a solid polymer substrate, if a composite structure is desired, and elute the solvent-elutable particles from the cast material.

Polymer coated solvent-elutable particles may be extruded to form tubes or the like when the device is to take this form. Following extrusion, or possibly molding, the tube is leached to remove the elutable particles. The tube may be provided in wholly porous form or may be formed as a laminate having a coherent solid polymeric substrate which has adhered inner and/or outer porous coatings. The laminate structures may be formed by lamination of the polymer coated solvent-elutable particle layers to the core layer prior to leaching. Alternatively, lamination may be carried out after leaching of the solvent-elutable particles from the polymer.

Tubular flexible polymeric materials which are wholly porous or have inner and/or outer porous surfaces adhered to coherent substrate are particularly useful as vascular grafts, particularly small diameter grafts of diameter less than about 6 mm.

Another procedure for the formation of a porous polymeric material is to cast the polymer around a lattice work which may then be rolled or formed into the desired shape.

A further procedure for formation of a porous polymeric material involves providing a powdered solid polymer phase and a solvent phase including a solvent for the polymer. The liquid monomer phase is drawn rapidly through the powder particles so as to allow dissolving of polymer at the surface of the polymer particles only and to cause the formation of particle-to-

BSC-SJA-1343

4,101,984

7

particle joints. A typical rigid polymeric porous product formed in this way from polymethylmethacrylate particles of size −100 +325 mesh is shown in in FIGS. 9 and 10. The interconnection of the polymer particles and the porous nature of the product are clearly illustrated therein.

The wholly porous product formed in this latter procedure may be combined with a rigid polymeric member to form a composite structure, if desired.

The present invention may be used for a variety of cardiovascular applications in addition to those specifically mentioned above, including partially or totally implantable blood pumps, such as artificial hearts and ventricular assist devices, heart valve components, such as flexible flap-type valve members, other heart pacemaker electrode parts, rigid or flexible blood vessel grafts and patches, particularly small diameter grafts of diameter less than about 6 mm, blood stream filters, intracardiac patches, diaphragms or baffles and in vascular access tubes.

In the latter case, typically for use in haemodialysis, the inner surface of the tube is porous coated to promote colonization and tissue growth, while the outer surface also may be porous coated for soft tissue ingrowth.

In many applications of the present invention, the promotion of colonization and tissue growth is accompanied by true soft tissue ingrowth into the porous surface at the margins or on the outer surface from adjacent body tissue, to provide bonding between the host and the member, as described in my copending U.K. application Ser. No. 52474/75 filed Dec. 22, 1975.

The body tissue ingrowth combined with promotion of tissue growth on the porous surface from the nucleated blood stream cells is important in many applications of the present invention.

For example, in an artificial heart, a porous coating on all the elements provides a means of fixation to host tissues by soft tissue ingrowth and provides surfaces which are blood compatible arising from colonization and tissue formation on the blood-contacting surfaces.

The formation of the adherent tissue coating from nucleated blood cells also allows the cardiovascular prosthetic device or implant of the present invention to be incorporated into the cardiovascular system, thereby achieving a more secure attachment than has previously been the case.

The porous system interfacing blood in accordance with this invention in order to result in a tissue coating on the porous system also has other uses. Thus, non-cellular material may be sampled through the porous system, for detection of the presence and/or concentration of the constituents.

The interface between the circulating blood stream and an artificial endocrine organ may be porous. For example, an artificial pancreas may be provided in which glucose is sampled through a porous system interfacing with flowing blood and insulin and/or glucagon is released through the porous system and the tissue coating thereon interfacing with flowing blood. The source of the hormones and/or the control circuitry and/or the energy sources may be provided external to the body or may be implanted.

A slow release device interfacing blood may be provided, the device providing slow, sustained release of a substance into the blood through the porous system and its associated tissue coating interfacing the blood. The substance may be a drug, for example for long term

8

antibiotic therapy, or hormones, for example, estrogens and/or progestigens providing a chronic implanted birth control device.

The parameters of the porous surface for use in the cardiovascular prosthetic devices and implants of this invention may vary widely and those chosen depend somewhat on the particular end use of the prosthetic device or implant. The surface must, however, have an interconnected network of pores underneath the surface in fluid flow communication with the surface pores to promote the colonization by nucleated cells and subsequent differentiation into other cell types so that the tissue which is formed and grows in the surface is interlocked in the subsurface network.

The interstitial surface pore size may vary widely, typically from about 1 micron up to about 1000 microns, although it may be preferred to use pore sizes below about 20 microns. As the pore size decreases, the surface becomes smoother, decreasing blood turbulence and abrasion on moving parts of the device.

The porosity also may vary widely, from about 8% upwards, although the porosity is usually in the range of about 10 to about 50%. Where a coating is provided on a coherent substrate, the thickness may vary from a single layer of particles upwards, for example, from about 1 to about 10,000 microns. Thin layers are preferred in devices having close tolerances.

## EXAMPLES

The invention is illustrated by the following Examples:

## EXAMPLE 1

Twenty-six prosthetic aortic ball valve cages were obtained and the poppets and sewing rings were removed. The metallic surfaces of fourteen of the cages were roughened, ultrasonically cleaned and coated with cobalt-base alloy powders (Vitallium) of various particle sizes to a depth of from about 100 to about 300 microns using the temperatures and times outlined in the following Table I:

### TABLE I

| Powder Size | | No. of | | |
|---|---|---|---|---|
| Mesh | (μ) | cages | Temperature | Time |
| −500 | less than 20 | 2 | 2300° F (1300° C) | 1 hr |
| −325 +500 | 20 to 50 | 6 | 2330° F (1220° C) | 2½ hrs |
| −100 +325 | 50 to 200 | 6 | 2330° F (1220° C) | 2½ hrs |

The cages were implanted in the right atria of thirteen dogs, six of the dogs having implanted +500 mesh coated cages, one of the dogs having implanted the −500 mesh coated cages and the remaining six dogs having implanted uncoated cages as controls. The seating ring of each valve cage was fastened to the orifice of either the superior vena cava (SVC) or inferior vena cava (IVC) by an encircling umbilical tape such that the valve struts and their trifurcation were freely suspended in the right atrial cavity. No anticoagulants were given to any of the dogs.

One experimental dog and one control dog were sacrificed at 2 weeks, 1 month, 6 weeks, 2 months, 3 months and 6 months after implantation. Upon removal, each valve cage was examined grossly for evidence of tissue growth as well as thrombus formation. The thrombus formation was graded on a scale of 0 to ++++, 0 representing a total absence of thrombus

BSC-8JA-1344

4,101,984

| 9 | 10 |

and ++++ representing total occlusion of the valve cage orifice by thrombus.

Additionally, the lungs were examined grossly for evidence of pulmonary embolism and representative sections of each lobe were taken for light microscopy.

At each time interval, one valve cage was examined by scanning electron microscopy and a special thin section of the other valve cage was prepared for transmitted and incident light microscopy using a low-speed diamond cut-off wheel. After the sections had been prepared, the tissue component was stained with a dilute solution of methylene blue.

The experimental dog containing the 2 valve cages with the −500 mesh powder-made metal surface was sacrified at 2 months. The tissue covering was torn of a portion of one of the valve struts and this area, as well as an area where the tissue covering remained intact, were examined by scanning electron microscopy. A special thin section was prepared from the second valve cage as described above, and is shown in FIG. 8.

All the porous-coated valve cages were found to have developed a thin, semi-transparent, smooth, firmly attached tissue covering with absolutely no evidence of thrombosis or embolism to the lungs. In most instances, the seating ring and base of the struts were totally incorporated into the walls of either the SVC or IVC at their points of attachment. In contrast, no tissue growth occurred on the uncoated valve struts and varying degrees of thrombus formation were observed in 10 of the 12 control valve cages. Additionally there was gross and microscopic evidence of pulmonary embolism in the control dogs sacrified at 2 weeks, 6 weeks, and 3 months.

The results are reproduced in the following Table II:

### TABLE II

| Dog Number | Site | Particle Size (Microns) | Implant Time (months) | Thrombus Formation |
|---|---|---|---|---|
| Experimental | | | | |
| 1 | SVC | 50 to 200 | 0.5 | 0 |
| | IVC | 20 to 50 | 0.5 | 0 |
| 2 | SVC | 20 to 50 | 1.0 | 0 |
| | IVC | 50 to 200 | 1.0 | 0 |
| 3 | SVC | 50 to 200 | 1.5 | 0 |
| | IVC | 20 to 50 | 1.5 | 0 |
| 4 | SVC | 20 to 50 | 2.0 | 0 |
| | IVC | 50 to 100 | 2.0 | 0 |
| 5 | SVC | 50 to 200 | 3.0 | 0 |
| | IVC | 20 to 50 | 3.0 | 0 |
| 6 | SVC | 20 to 50 | 6.0 | 0 |
| | IVC | 50 to 200 | 6.0 | 0 |
| Control | | | | |
| 7 | SVC | uncoated | 0.5 | +++ |
| | IVC | uncoated | 0.5 | ++++ |
| 8 | SVC | uncoated | 1.0 | 0 |
| | IVC | uncoated | 1.0 | + |
| 9 | SVC | uncoated | 1.5 | ++ |
| | IVC | uncoated | 1.5 | + |
| 10 | SVC | uncoated | 2.0 | + |
| | IVC | uncoated | 2.0 | 0 |
| 11 | SVC | uncoated | 3.0 | + |
| | IVC | uncoated | 3.0 | ++ |
| 12 | SVC | uncoated | 6.0 | ++ |
| | IVC | uncoated | 6.0 | ++ |

der-made surface (particle size −500 mesh), as can be seen from FIG. 8.

Examination of the region in which the tissue covering was torn off the fine powder-made metal surface showed that the tissue had sheared off at the surface of the porous coating leaving fragments of tissue still affixed to the underlying pore structure.

Transmission light microscopy of the thin sections of the porous-coated struts showed the following evolution of the tissue covering. At 2 weeks the porous coating was covered with a material which resembles a platelet-fibrin mesh. Within this mesh were large mononuclear cells which have the ability to differentiate into other cell types. By 6 weeks, fibroblast-like cells had appeared and the porous coating was infiltrated and covered with connective tissue which was loosely textured within the porous coating and more compact towards the surface. Sections examined at 2 months showed well organized connective tissue within and over the surface of the porous coating. Pigment-filled macrophages had appeared and on the outer surface there were flattened endothelial-like cells. By 3 months, there was a uniform layer of connective tissue covering the entire surface of the porous metal coating which was quite compact even in its deeper layers. Again the surface was seen to be covered by flattened endothelial-like cells. Although some blood vessels were observed near the base of the struts where they had been in contact with the caval walls, no blood vessels were present in the tissue covering the struts which were freely suspended within the right atrial cavity. It would appear that the tissue growing on the valve struts was nourished by diffusion from the bloodstream and, as such, can survive without a blood vessel supply from the host.

Finally, the thickness of the tissue over and above the porous coating reached a maximum thickness of about 100µ which was independent of the underlying coating particle size.

### EXAMPLE 2

A heart valve cage was coated with −325 +500 mesh Vitallium powder as described in Example 1 and was positioned in the descending thoracic aorta of a dog. After 6 months, the dog was still alive and well, indicating absence of major thromboembolism.

From a comparison of the results of Examples 1 and 2, it is apparent that the prevention of thromboembolism is independent of blood oxygen concentration and blood pressure.

### EXAMPLE 3

A composite of a polymethyl methacrylate powder and a coherent polymethyl methacrylate base was mounted to the strut of a porous metal coated heart valve cage and placed in the right atrium of a dog. After 6 months, the dog was still alive and well, indicating probable endothelialization of the polymethyl methacrylate porous surface.

### EXAMPLE 4

A 20% solution of a hydrophilic polyurethane consisting of urea interlinked blocks of polyether and chain extended urethane in dimethyl formamide and containing 4 g of polymer was slurried with 10 g of sodium chloride crystals of average size −200 +500 mesh. The slurry was dried in a vacuum oven to remove the solvent. The polymer coated salt was placed in a mold and

BSC-SJA-1345

4,101,984

**11**

compression molded at 300° to 350° F (150° to 175° C) for about 15 minutes. The mold was cooled and the sample removed.

After removal from the mold, the sample was immersed in a beaker of hot water and squeezed from time to time to assist in salt removal. After completion of the salt leaching, a porous spongy polymer product with interconnected pores resulted. The product had the microscopic appearance seen in FIGS. 7 and 8.

## SUMMARY

The present invention, therefore, provides novel cardiovascular devices or implants which have biocompatibility and hence avoid the prior art thrombogenic problems. Modifications are possible within the scope of the invention.

What I claim is:

1. A heart valve structure comprising an occluder, an occluder seating ring and occluder guide means, each of said occluder seating ring and occluder guide means being constructed of metal inert to blood and consisting of a dense rigid, coherent metal substrate and a rigid porous metal coating adhered to at least a substantial portion of said substrate, said porous metal coating including a plurality of metal particles bonded together at their points of contact with each other and with said substrate to form a network of interconnected pores substantially uniformly distributed through the coating, said porous coating having a porosity of about 10 to about 50% and a thickness of about 20 to about 300 microns, said porous coating and the coating-substrate interface having a shear strength greater than about 1000 psi, the composite of said porous coating and substrate having a high fatigue tolerance, said metal particles having a particle size of −300 mesh.

2. The heart valve structure of claim 1 wherein said porous coating has a thickness of about 50 to about 150 microns, said shear strength is greater than about 3000 psi, and said composite has an endurance limit after 10⁷ cycles of greater than about 500 psi.

**12**

3. The heart valve structure of claim 1 including metal muscle guard means consisting of a dense rigid coherent metal substrate and said rigid porous metal coating adhered thereto.

4. The heart valve of claim 3 including a layer of polymeric material overlying and adhering to said porous metal coating on at least said occluder guide means, said layer of polymeric material comprising a dense coherent polymeric substrate interlocking with the interconnected pore network of the porous metal coating.

5. The heart valve of claim 4 wherein said polymeric substrate has an adhered porous polymeric coating having a plurality of interconnected pores therein.

6. A heart valve structure comprising an occluder, an occluder seating ring having sewing ring mounting means, occluder guide means, and a flexible sewing ring constructed of polymeric material inert to blood and body fluids and adhered to said sewing ring mounting means, each of said occluder seating ring and occluder guide means being constructed of metal inert to blood,

an least a substantial proportion of each of occluder seating ring and occluder guide means consisting of a dense rigid coherent metal substrate and a rigid porous metal coating adhered to said substrate,

said porous coating including a plurality of metal particles bonded together at their points of contact with each other and with said substrate to form a network of interconnected pores substantially uniformly distributed throughout said coating,

said sewing ring comprising an outer layer of porous polymeric material having a plurality of interconnected pores distributed therethrough adhered to a flexible coherent polymeric substrate,

said sewing ring being adhered to said sewing ring mounting means by interlock of said flexible coherent polymeric substrate in the interconnected pore network of the porous metal coating on said sewing ring mounting means.

* * * * *

# EXHIBIT 71

US005507766A

## United States Patent [19]

### Kugo et al.

[11] **Patent Number:** 5,507,766

[45] **Date of Patent:** Apr. 16, 1996

[54] **VASCULAR DILATATION INSTRUMENT AND CATHETER**

[75] Inventors: Takahiro Kugo; Akihiko Umeno, both of Fujinomiya; Kiyoshi Yamauchi, Sendai; Hiroshi Ishikawa, Sendai; Tadashi Seto, Sendai, all of Japan

[73] Assignees: Terumo Kabushiki Kaisha, Tokyo; Tokin Corporation, Sendai, both of Japan

[21] Appl. No.: 186,563

[22] Filed: Jan. 26, 1994

[30] **Foreign Application Priority Data**

Jan. 26, 1993 [JP] Japan ............................ 5-031473
Dec. 28, 1993 [JP] Japan ............................ 5-352876

[51] Int. Cl.6 .......................... A61M 29/06; A61B 17/58
[52] U.S. Cl. .......................... 606/194; 605/95
[58] Field of Search .......................... 606/194, 192, 606/191, 193, 95-96; 604/101, 27, 40, 43, 96; 128/656-658

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,323,071 | 4/1982 | Simpson et al. | 128/343 |
| 4,573,470 | 3/1986 | Samson et al. | 128/344 |
| 4,840,623 | 6/1989 | Hardy | 604/264 |
| 4,969,890 | 11/1990 | Sugita et al. | 606/192 |
| 4,998,923 | 3/1991 | Samson et al. | 606/194 |
| 5,038,694 | 7/1991 | Kasprzyk et al. | 606/192 X |
| 5,089,005 | 2/1992 | Harada | 606/194 |
| 5,105,363 | 4/1992 | Nobuyoshi et al. | 606/194 X |
| 5,147,370 | 9/1992 | McNamara et al. | 606/194 X |

| | | | |
|---|---|---|---|
| 5,180,376 | 1/1993 | Fischell | 604/282 |
| 5,342,396 | 9/1993 | Evard | 606/194 X |
| 5,250,069 | 10/1993 | Nobuyoshi et al. | 606/192 |
| 5,279,562 | 1/1994 | Sirhan et al. | 604/96 |
| 5,290,230 | 3/1994 | Ainsworth et al. | 604/96 |
| 5,312,340 | 5/1994 | Keith | 604/96 |
| 5,346,505 | 9/1994 | Leopold | 606/194 |
| 5,348,537 | 9/1994 | Wiesner et al. | 604/96 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0279959 | 8/1988 | European Pat. Off. . |
| 0374459A1 | 6/1990 | European Pat. Off. . |
| 0437793A1 | 7/1991 | European Pat. Off. . |
| 4104087A1 | 8/1991 | Germany . |
| WO89/08473 | 9/1989 | WIPO . |

*Primary Examiner*—Stephen C. Pellegrino
*Assistant Examiner*—Nancy Mulcare
*Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis

[57] **ABSTRACT**

A vascular dilatation instrument 1 includes an outer tube 2, an inner tube 5 extending through the outer tube 2, and an inflatable member 3 having one end attached to the inner tube 5 and another end attached to the outer tube 2. The outer tube 2 includes a superelastic or pseudoelastic metal tube 2b and a synthetic resin tube 2a covering the metal tube, the metal tube 2b having a distal zone provided with a slit or perforations 2e so that the distal zone is more flexible and deformable than the remainder of the metal tube. Also provided is a catheter 100 comprising a main body section which includes a superelastic metal tube 101 and a synthetic resin layer 104 covering the metal tube, the metal tube 101 having a distal zone provided with a slit or perforations 106 so that the distal zone is more flexible and deformable than the remainder of the metal tube.

**31 Claims, 28 Drawing Sheets**





FIG.1

BSC-SJA-1348



FIG. 2

BSC-SJA-1349

# F I G . 3



# F I G . 4



# F I G . 5



BSC-SJA-1350



FIG. 6

BSC-SJA-1351



FIG. 7



FIG. 8

BSC-SJA-1353



FIG.9

BSC-SJA-1354



F I G . 10

BSC-SJA-1355



FIG. 11

BSC-SJA-1356



F I G . 12





F I G . 13



*FIG. 14*

BSC-SJA-1359

# F I G . 15



BSC-SJA-1360



F I G. 16

BSC-SJA-1361



FIG. 17



FIG. 18

BSC-SJA-1363

# F I G . 19



# F I G . 20



BSC-SJA-1364

# F I G . 21



# F I G . 22



# F I G . 23



BSC-SJA-1365



*F I G . 24*

BSC-SJA-1366

FIG.25

BSC-SJA-1367

## F I G . 26



## F I G . 27



## F I G . 28



# F I G . 29



# F I G . 30





F I G . 31

# F I G . 32



BSC-SJA-1371

# F I G . 33



LOAD CELL

25

φ4   φ4

BSC-SJA-1372

5,507,766

1

# VASCULAR DILATATION INSTRUMENT AND CATHETER

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to a vascular dilatation instrument for use in curing a stricture or stenosis portion inside a blood vessel by dilating the stricture for improving blood flow to the peripheral side of the stricture. It also relates to a catheter intended to insert into fine blood vessels, for example, brain and heart vessels for curing and inspection purposes.

### 2. Prior Art

For curing a stenosed vessel by arterial sclerosis or the like, percutaneous transluminal coronary angioplasty (PTCA) has heretofore been practiced in the art wherein a catheter having a dilator at its distal end is inserted into the vessel until it reaches the stenosis and the dilator is inflated to dilate the stenosis for improving blood flow to the peripheral side thereof.

Known catheters with a dilator include those of the over-the-wire type wherein a guide wire is movable back and forth within a catheter as typified by that disclosed in U.S. Pat. No. 4,323,071 and those of time on-the-wire type wherein a catheter is fixed to a guide wire as typified by that disclosed in U.S. Pat. No. 4,573,470.

The demand for introducing vascular dilatation instruments into finer blood vessels is increasing year by year. There is a need for a vascular dilatation instrument which can be introduced into a finer or more peripheral blood vessel.

Currently available are vascular dilatation instruments and catheters of the over-the-wire and on-the-wire types both using a superelastic metal tube. These instruments are fully effective in transmitting translational and torsional forces (pushing force and torque) from the proximal end to the distal end of the instrument.

However, vascular dilatation instruments of the over-the-wire type can be folded at an angle where the superelastic metal tube terminates, that is, near the distal end of the superelastic metal tube. Vascular dilatation instruments of the on-the-wire type suffer from a loss of flexibility at their distal portion because the tubular member is entirely formed of a superelastic metal tube. Although attempts were made to render the distal portion flexible, none of them succeeded in providing flexibility as available with resins probably because of the superelastic metal tube.

Therefore, an object of the present invention is to provide a novel and improved vascular dilatation instrument which is effective for transmitting translational and torsional forces, which has a fully flexible distal portion and a highly stiff body portion, which prevents angular bending due to a change of physical properties at the interface between the stiff body portion and the flexible distal portion, and which is convenient to manipulate.

Conventional catheters to be inserted into blood vessels, for example, angiographic catheters and catheters for administering medicament into vessels are made of relatively flexible thermoplastic resins. One recent design includes a rigidity imparting member in the form of a metal wire (often a stainless steel wire) disposed around the catheter for preventing angular bending or collapse of the catheter and improving torque transmission while maintaining a flexible state.

With the recent advance of medical technology, it is now required to introduce a catheter into such a site as a smaller

2

diameter vessel as found in the heart and brain. Diseases in cerebral vessels include aneurysm, arteriovenous malformation (AVM), and dual AVM. For inspection and treatment of such diseases, it is desired to have a catheter which can be inserted into a finer blood vessel or more peripheral blood vessel site.

However, the above-mentioned catheter has a main body portion made of a synthetic resin tube, which must have a certain wall thickness. It is thus inevitable that the outer diameter is increased by the extra wall thickness. Since the blood vessel into which the catheter can be introduced is restricted by its outer diameter, the catheter could only be introduced into a blood vessel sufficiently larger than the outer diameter of the catheter. If the catheter is made of a more rigid material, then the catheter as a whole is harder, leaving problems including the risk of the distal end causing damage to the vessel wall upon insertion and difficulty of insertion.

Therefore, another object of the present invention is to provide a novel and improved catheter which is reduced in wall thickness and hence, outer diameter and includes a fully flexible distal portion.

## SUMMARY OF THE INVENTION

According to a first aspect of the present invention, there is provided a vascular dilatation instrument comprising an inner tube defining a first lumen extending between an open distal end and a proximal portion. An outer tube is disposed coaxially around the inner tube, has a distal end retracted a predetermined distance from the distal end of the inner tube and a proximal portion and defines a second lumen with the outside surface of the inner tube. An inflatable member or dilator has one end attached to the inner tube and another end attached to the outer tube and defines an interior space in fluid communication with the second lumen in the vicinity of the other end. A first opening is disposed in the proximal portion of the inner tube in communication with the first lumen, and a second opening disposed in the proximal portion of the outer tube in fluid communication with the second lumen. At least one of the inner tube and the outer tube includes a main body section made of a superelastic or pseudoelastic metal tube covered with a synthetic resin and a distal section made of a synthetic resin. The superelastic metal tube includes a deformable distal zone which is more flexible than the remainder of the metal tube.

According to a second aspect of the present invention, there is provided a vascular dilatation instrument comprising a tubular member having a lumen therethrough and an opening in fluid communication with the lumen, a leading head, and an inflatable member or dilator having one end attached to the tubular member and another end attached to the leading head and defining an interior space in fluid communication with the lumen through the opening. The tubular member includes a main body portion made of a superelastic or pseudoelastic metal tube covered with a synthetic resin and a distal portion made of a synthetic resin. The superelastic metal tube includes a deformable distal zone which is more flexible than the remainder.

According to a third aspect of the present invention, there is provided a catheter comprising a main body section including a superelastic or pseudoelastic metal tube and a synthetic resin layer covering the metal tube, and a distal section made of a synthetic resin. The superelastic metal tube includes a deformable distal zone which is provided with a slit or a plurality of perforations.

BSC-SJA-1373

5,507,766

3

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an overall, partially omitted, schematic view of a vascular dilatation instrument according to one embodiment of the invention.

FIG. 2 is an enlarged cross-sectional view of the distal portion of the instrument shown in FIG. 1.

FIG. 3 is a cross section taken along lines A—A in FIG. 2.

FIG. 4 is a cross section taken along lines B—B in FIG. 2.

FIG. 5 is a cross section taken along lines C—C in FIG. 2.

FIG. 6 is an enlarged cross-sectional view of the proximal portion of the instrument shown in FIG. 1.

FIGS. 7, 8, 9, 10, 11 and 12 are enlarged cross-sectional views of modified distal portions of vascular dilatation instruments according to the invention.

FIG. 13 is an overall, partially omitted, schematic view of a vascular dilatation instrument according to another embodiment of the invention.

FIG. 14 is an enlarged cross-sectional view of the distal portion of the instrument shown in FIG. 13.

FIG. 15 is a cross section taken along lines D—D in FIG. 14.

FIG. 16 is an enlarged cross-sectional view of the proximal portion of the instrument shown in FIG. 13.

FIG. 17 is an enlarged cross-sectional view of a modified distal portion of a vascular dilatation instrument according to the invention.

FIG. 18 is an overall, partially omitted, cross-sectional view of a vascular dilatation instrument according to a further embodiment of the invention.

FIG. 19 is an enlarged cross-sectional view of a portion of the instrument shown in FIG. 18.

FIGS. 20, 21, 22, and 23 are enlarged cross-sectional views similar to FIG. 19, showing different examples.

FIG. 24 is an overall, partially omitted, schematic view of a catheter according to a still further embodiment of the invention.

FIG. 25 is a cross-sectional view of distal and proximal portions of the catheter shown in FIG. 24.

FIG. 26 is a partially cut-away perspective view of the distal portion of the catheter shown in FIG. 24.

FIGS. 27, 28, 29, and 30 are partially cut-away perspective views of modified distal portions of the catheter.

FIG. 31 is an overall, partially omitted, cross-sectional view of a catheter according to a still further embodiment of the invention.

FIG. 32 is a partially cut-away perspective view of the distal portion of the catheter shown in FIG. 31.

FIG. 33 illustrates how to measure the modulus of elasticity of a catheter.

## DETAILED DESCRIPTION OF THE INVENTION

The vascular dilatation instrument of the present invention is described with reference to various embodiments shown in FIGS. 1 through 33.

In the first aspect, the vascular dilatation instrument is defined as comprising an inner tube 5 defining a first lumen 4 extending between an open distal end and a proximal

4

portion; an outer tube 2 disposed coaxially around the inner tube 5, having a distal end retracted a predetermined distance from the distal end of the inner tube and a proximal portion, and defining a second lumen 6 with the outside surface of the inner tube; an inflatable member or dilator 3 having one end attached to the inner tube 5 and another end attached to the outer tube 2 and defining an interior space in fluid communication with the second lumen 6 in the vicinity of the other end; a first opening 9 disposed in the proximal portion of the inner tube 5 in communication with the first lumen 4; and a second opening 11 disposed in the proximal portion of the outer tube 2 in fluid communication with the second lumen 6. At least one of the inner tube 5 and the outer tube 2 includes a main body section based on a superelastic metal tube and a distal section made of a synthetic resin. The superelastic metal tube includes a deformable distal zone which is more flexible than the remainder.

Referring to FIGS. 1 to 6, there is illustrated a vascular dilatation instrument according to one embodiment of the invention. The instrument generally designated at 1 comprises a main body including an inner tube 5, an outer tube 2, and a dilator 3 and a branch hub or adapter 20.

The outer tube 2 of the vascular dilatation instrument 1 includes a main body portion 2d including a superelastic metal tube 2b and a distal portion 2c made of a synthetic resin. The superelastic metal tube 2b includes a distal zone which forms a junction between the main body portion 2d and the distal portion 2c and is more flexible than the remainder of the metal tube.

More particularly, the outer tube 2 includes the superelastic metal tube 2b and a synthetic resin tube 2a enclosing and covering the surface of the metal tube. The synthetic resin tube 2a protrudes beyond the distal end of the superelastic metal tube 2b where it forms the distal portion 2c of the outer tube 2.

As shown in FIG. 2 and FIG. 5 which is a C—C cross section of FIG. 2, the superelastic metal tube 2b includes a distal zone which is provided with slits 2e extending from the distal end (left end in FIG. 2) toward the proximal end. Provision of the slits 2e ensures that the distal zone of the superelastic metal tube 2b is a deformable zone which is more flexible than the remainder. More particularly, the distal zone of the superelastic metal tube 2b is flexible in that its side wall is deformable radially inward or outward. As shown in FIG. 2, each slit 2e is gradually decreased in width from the distal end toward the proximal end of the superelastic metal tube 2b, or differently stated, gradually increased in width toward the distal end. The slit has the maximum width at the distal end of the metal tube 2b. Then as one goes toward the distal end, the superelastic metal tube 2b is more flexible and deformable and the side wall is more deformable radially inward and outward. Preferably two to eight slits 2e are formed at approximately equal intervals. Also preferably, the slits 2e have a maximum width of about 0.05 to 0.5 mm at the distal end (as measured in a circumferential direction) and a length of about 100 to 1,000 mm, especially about 150 to 500 mm (as measured in a longitudinal direction).

In the vascular dilatation instrument 1 of the illustrated embodiment, the superelastic metal tube 2b includes a distal zone which is tapered as shown in FIGS. 1 and 2. More particularly, the side wall defining the distal zone where the slits are formed is bent radially inward. This tapered distal zone can be formed by working the slit distal zone of the metal tube 2b to the configuration shown in FIG. 2. Alternatively, the synthetic resin tube 2a is molded or fitted over

BSC-SJA-1374

5,507,766

5

the metal tube 2b such that the outer diameter of that portion of the resin tube 2a surrounding the metal tube distal zone is reduced. That is, the metal tube distal zone is deformed radially inward by the resin tube 2a. Then that portion of the resin tube 2a extending forward (to the left in FIG. 2) beyond the metal tube 2b has a smaller diameter than that portion of the resin tube 2a around the metal tube 2b. Since the forward or protruding portion 2c formed solely of the resin tube 2a has a smaller diameter than the main body portion including the metal tube 2b, it becomes possible to insert the distal portion of the vascular dilatation instrument 1 into a vessel on a more peripheral side. Since the transition between the main body portion 2d and the distal portion 2c of the outer tube 2 (which corresponds to the distal zone of the metal tube 2b) is tapered forward, insertion into a vessel is facilitated.

Since the main body portion 2d of the outer tube 2 has the superelastic metal tube 2b, the vascular dilatation instrument 1 is effective in transmitting translational and torsional forces from the proximal end to the distal end of the instrument, that is, improved in pushability and torque transmission. The distal portion 2c made solely of synthetic resin has sufficient flexibility. The transition between the main body portion 2d and the distal portion 2c of the outer tube 2b (which corresponds to the distal zone of the metal tube 2b) is a more flexible deformable portion and is effective in preventing acute bending at the interface between the relatively stiff main body portion and the relatively flexible distal portion.

Typically the outer tube 2 has an outer diameter of about 0.6 to 2.8 mm, preferably 0.8 to 2.6 mm and an inner diameter of about 0.5 to 2.7 mm, preferably 0.6 to 2.0 mm. The difference between the outer diameter of the inner tube 5 and the inner diameter of the outer tube 2 is about 0.05 to 1.2 mm, preferably 0.1 to 1.2 mm. The outer tube 2 has a wall thickness of about 0.05 to 0.75 mm, preferably 0.07 to 0.3 mm.

The superelastic or pseudoelastic metal tube 2b is preferably made of a superelastic alloy. The superelastic alloys are generally known as shape memory alloys and exert superelasticity at the living body temperature (about 37° C.) or higher. Preferred examples of the superelastic alloy include Ti—Ni binary alloys consisting essentially of 49 to 53 atom % of nickel and the balance of titanium, Cu—Zn binary alloys consisting essentially of 38.5 to 41.5% by weight of zinc and the balance of copper, Cu—Zn—X ternary alloys containing 1 to 10% by weight of X wherein X is Be, Si, Sn, Al or Ga, and Ni—Al binary alloys consisting essentially of 36 to 38 atom % of aluminum and the balance of nickel, with the Ti—Ni alloys being most preferred. Mechanical properties may be properly controlled by replacing part of Ti—Ni alloy by 0.01 to 10.0 atom % of X to form Ti—Ni—X alloys wherein X is Co, Fe, Mn, Cr, V, Al, Nb, W or B or replacing part of Ti—Ni alloy by 0.01 to 30.0 atom % of X to form Ti—Ni—X alloys wherein X is Cu, Pd or Zr and/or selecting the conditions of cold working and/or final heat treatment. By the term "superelasticity" it is meant that when an alloy is deformed (bent, stretched or compressed) at service temperature to the extent where conventional metals undergo plastic deformation and then released from deformation, the alloy resumes the original shape without a need for heating.

Typically the superelastic metal tube 2b has an outer diameter of about 0.6 to 2.0 mm, preferably 0.8 to 1.6 mm, a wall thickness of about 50 to 200 μm, preferably 80 to 150 μm, a length of about 500 to 4,000 mm, preferably 1,000 to 3,000 mm, a buckling strength (yield stress under load) of

6

about 5 to 200 kg/mm², preferably 8 to 150 kg/mm² at 22° C., and a restoring stress (yield stress upon unloading) of about 3 to 180 kg/mm², preferably 5 to 130 kg/mm² at 22° C.

Slits or perforations are formed in the superelastic metal tube by any of conventional techniques including laser machining (e.g., YAG laser), electric discharge machining, chemical etching, machining, and combinations thereof.

For the synthetic resin tube 2a of the outer tube 2, materials having a certain degree of flexibility are used, for example, thermoplastic resins such as polyolefins (e.g., polyethylene, polypropylene, and ethylene-propylene copolymers), polyvinyl chloride, ethylene-vinyl acetate copolymers, polyamide elastomers, and polyurethane, and silicone rubber. Preferred are the thermoplastic resins, especially polyolefins. That portion of the synthetic resin tube 2a surrounding and covering the superelastic metal tube 2b preferably has a wall thickness of about 5 to 300 μm, more preferably 10 to 200 μm.

The outside surface of the outer tube 2 (more specifically, the outside surface of synthetic resin tube 2a) may be coated with a biocompatible, especially anti-thrombotic, resin. Preferred anti-thrombotic resins are poly(hydroxyethyl methacrylate) and hydroxyethyl methacrylate-styrene copolymers (e.g., HEMA-St-HEMA block copolymers).

Although part of the resin material of which the resin tube 2a is made may flow into the slits 2e in the superelastic metal tube 2b, it is preferred that the slits 2e be substantially free of the resin material and empty. In the absence of the resin material flowing into the slits, deformation of the superelastic metal tube 2b is never obstructed.

Alternatively, a heat-shrinkable tube may be used as the synthetic resin tube 2a of the outer tube 2. The heat-shrinkable tube used herein is a tube which has an inner diameter larger than the outer diameter of the superelastic metal tube 2b prior to heating and thus allows the superelastic metal tube to be inserted therethrough, but on heating, shrinks substantially uniformly over its entirety to come in close contact with the outside surface of the metal tube. Such a heat-shrinkable tube is preferably prepared by molding a resin into a tube having an inner diameter equal to or slightly smaller than the outer diameter of the superelastic metal tube, and expanding the tube over its entirety so as to increase its diameter so that upon heating, it may shrink to a diameter equal to or substantially equal to the diameter as molded. The heat-shrinkable tube is made of the material which can be expanded, but shrinks upon heating as mentioned above, for example, polyolefins (e.g., polyethylene, polypropylene, and ethylene-propylene copolymers), ethylene-vinyl acetate copolymers, and polyamide elastomers.

The inner tube 5 has an open distal end and defines the first lumen 4. The first lumen 4 longitudinally extends through the inner tube 5 for allowing a guide wire to be inserted into the tube and is in communication with the first opening 9 disposed in a branch hub 20 to be described later for defining a guide wire port. Typically the inner tube 5 has an outer diameter of 0.40 to 2.50 mm, preferably 0.55 to 2.40 mm and an inner diameter of 0.25 to 2.35 mm, preferably 0.30 to 1.80 mm.

Although the inner tube 5 has an identical diameter throughout its length in FIGS. 1 to 6, the distal portion of the inner tube 5 may be tapered or reduced in diameter toward the distal end because tapering facilitates insertion of the vascular dilatation instrument into a vessel.

For the inner tube 5, materials having a certain degree of flexibility are used, for example, thermoplastic resins such

BSC-SJA-1375

5,507,766

7

as polyolefins (e.g., polyethylenes, polypropylene, and ethylene-propylene copolymers), polyvinyl chloride, ethylene-vinyl acetate copolymers, polyamide elastomers, and polyurethane, and silicone rubber and latex rubber. Preferred are the thermoplastic resins, especially polyolefins.

The inner tube 5 is inserted through the outer tube 2 until the distal portion of the inner tube 5 protrudes beyond the outer tube 2 as shown in FIG. 2. As best shown in FIG. 2 and FIG. 3 which is a A—A cross section of FIG. 2, the outside surface of the inner tube 5 defines the second lumen 6 with the inside surface of the outer tube 2. The second lumen 6 then longitudinally extends from near the distal portion to the proximal end and has a sufficient volume. The second lumen 6 is in fluid communication on the distal side with the interior space of the inflatable member 3 and on the proximal side with the second opening 11 disposed in the branch hub 20 for defining an injection port for injecting a fluid (for example, vasographic contrast liquid) for inflating the dilator 3.

The inflatable member or dilator 3 is a contractible or foldable sleeve membrane so that it may be folded flat on the outside surface of the inner tube 5 in its deflated state. The inflatable member 3 includes a substantially cylindrical portion 3a having an approximately uniform diameter at least a part of which is substantially cylindrical, when inflated, for dilating the stricture in a blood vessel and is foldable in close contact with the inner tube 5 when deflated. The cylindrical portion 3a need not be completely cylindrical, but may be polygonal. The inflatable member 3 has one end 8 which is secured in a liquid tight manner to the distal end of the outer tube 2 by adhesion, fusion welding or the like and another end 7 which is similarly secured in a liquid tight manner to the distal portion of the inner tube 5. As shown in FIG. 4 which is a B—B cross section of FIG. 2, the inflatable member 3 defines an interior space 15 between its inside surface and the outside surface of the inner tube 5 when inflated. The inflation interior space 15 is in fluid communication with the second lumen 6 at the one end 8 of the inflatable member 3 over its entire circumference. Since the inflatable member 3 at one end 8 is in communication with the second lumen 6 having a relative large volume, it is easy to inject a fluid into the inflatable member 3 interior space through the second lumen 6.

For the inflatable member 3, materials having flexibility and elasticity are used, for example, thermoplastic resins such as polyolefins (e.g., polyethylene, polypropylene, and ethylene-propylene copolymers), polyvinyl chloride, ethylene-vinyl acetate copolymers, crosslinked ethylene-vinyl acetate copolymers, polyurethanes, polyesters (e.g., polyethylene terephthalate), and polyamide elastomers, and silicone rubber and latex rubber. Preferred are the thermoplastic resins, especially crosslinked ethylene-vinyl acetate copolymers.

The inflatable member 3 includes tapered transition portions between the cylindrical portion 3a and the opposed ends 7 and 8 attached to the inner and outer tubes 5 and 2, respectively. With respect to the dimensions of the inflatable member 3, the cylindrical portion 3a when inflated preferably has an outer diameter of about 1.5 to 35.0 mm, more preferably 2.0 to 30.0 mm and a length of about 10.0 to 80.0 mm, more preferably 15.0 to 75.0 mm. The inflatable member 3 preferably has an overall length of about 15 to 120 mm, more preferably 20 to 100 mm.

Markers 14 are preferably provided on the outside surface of the inner tube 5. More particularly, as shown in FIG. 2, the markers 14 are disposed at a position rearward of and

8

near the attachment between the dilator 3 and the inner tube 5 and a position forward of and near the attachment between the dilator 3 and the outer tube 2, that is, in alignment with the opposed ends of the cylindrical portion 3a. The markers 14 are made of a radiopaque material, for example, gold, platinum or alloys thereof. The provision of the markers 14 ensures easy location of the dilator 3 under radiological imaging. The markers 14 are preferably formed by fastening a ring of the above-mentioned metal around the inner tube 5 as by crimping whereby their clear radiographic images are always obtained.

In order to facilitate insertion of the vascular dilatation instrument 1 of the invention into a blood vessel or a guide catheter, the outer tube 2 and dilator 3 on their outside surface are preferably treated so that the outside surface may exhibit lubricity when contacted with blood or body fluid. Such treatments include coating and fixation of hydrophilic polymers such as poly(2-hydroxyethyl methacrylate), poly-(hydroxyethyl acrylate), hydroxypropyl cellulose, methyl vinyl ether-maleic anhydride copolymers, polyethylene glycol, polyacrylamide, and polyvinyl pyrrolidons.

As shown in FIGS. 1 and 6, the branch hub or adapter 20 is attached to the proximal end of the instrument. The branch hub 20 includes fixedly mated inner and outer hub segments 22 and 23. The inner hub segment 22 is fixedly connected to the inner tube 5 and has the first opening 9 in communication with the first lumen 4 and forming a guide wire port. The outer hub segment 23 is fixedly connected to the outer tube 2 (which is a composite body of synthetic resin tube 2a and superelastic metal tube 2b) and has the second opening 11 in communication with the second lumen 6 and forming an injection port.

The branch hub 20 is made of thermoplastic resins such as polycarbonates, polyamides, polysulfones, polyarylates, and methacrylate-butylene-styrene copolymers.

The branch hub 20 is configured as shown in FIG. 6 in which the left-hand side is proximal or rear. An anti-flection sleeve 50 is fitted over the outer tube 2a at the proximal end. The sleeve 50 is formed from a heat-shrinkable material and set in place by molding it into a tubular sleeve such that its inner diameter may be slightly smaller than the outer diameter of the outer tube 2 after heat shrinkage, fitting the sleeve over the outer tube 2 from the proximal end, and heating (by blowing hot air) the sleeve for shrinkage fit over the outer tube 2. The anti-flection sleeve 50 is fixedly secured to the outer hub segment 23 by a locking member 52. More particularly, the locking member 52 includes a cylindrical portion having an outer diameter substantially equal to the inner diameter of the outer tube 2 and a flared rear portion. The locking member 52 is inserted into the outer tube 2 until the flared portion abuts the edge of the outer tube 2. Then the outer tube 2 is inserted into a bore of the outer hub segment 23 until the locking member flared portion reaches a recess defined in the bore of the outer hub segment 23 by an annular hump 53. An adhesive may be applied to the outside surface of the sleeve 50 to be in contact with the outer hub segment 23, thereby achieving a firm joint therebetween. Note that the locking member 52 has a larger inside diameter than the inner tube or is a split one. The outer hub segment 23 is preferably made of thermoplastic resins such as polycarbonates, polyamides, polysulfones, polyarylates, and methacrylate-butylene-styrene copolymers.

Another anti-flection sleeve 60 is fitted over the inner tube 5 at the proximal end. The sleeve 60 is formed from a heat-shrinkable material and set in place by molding it into a tubular sleeve such that its inner diameter may be slightly

5,507,766

9

smaller than the outer diameter of the inner tube 5 after heat shrinkage, fitting the sleeve over the inner tube 5 from the proximal end, and heating (by blowing hot air) the sleeve for shrinkage fit over the inner tube 5. The inner tube 5 with anti-flection sleeve 60 is fixedly secured to the inner hub segment 22. This attachment is assisted by a locking member 62. More particularly, the locking member 62 includes a cylindrical portion having an outer diameter substantially equal to the inner diameter of the inner tube 5 and a flared rear portion. The locking member 62 is inserted into the inner tube 5 until the flared portion abuts the edge of the inner tube 5. Then the inner tube 5 is inserted into a bore of the inner hub segment 22 until the locking member flared portion reaches a recess defined in the bore of the inner tube hub 22 by an annular hump 63. An adhesive may be applied to the outside surface of the sleeve 60 to be in contact with the inner hub segment 22, thereby achieving a firm joint therebetween. The inner hub segment 22 is preferably made of thermoplastic resins such as polycarbonates, polyamides, polysulfones, polyarylates, and methacrylate-butylene-styrene copolymers.

The inner and outer hub segments 22 and 23 are engaged as shown in FIG. 6. This engagement is achieved by attaching the outer hub segment 23 to the proximal end of the outer tube 2, attaching the inner hub segment 22 to the proximal end of the inner tube 5, inserting the inner tube 5 from its distal end into the bore of the outer hub segment 23 at the proximal end until the inner hub segment 22 contacts the outer hub segment 23, and tightly coupling the inner and outer hub segments 22 and 23. At this point, an adhesive may be applied to the interface between the inner and outer hub segments 22 and 23 to form a firm joint.

Instead of the branch hub 20, tubing sections each having a port member defining an opening at a proximal end may be liquid-tightly attached to the first and second lumens, respectively.

The structure of the outer tube 2 is not limited to that shown in FIG. 2. Another exemplary structure of the outer tube is shown in FIG. 7. Unlike the embodiment of FIG. 2, a vascular dilatation instrument 30 of this embodiment includes an outer tube 2 having a substantially identical outer diameter over its entirety. The outer tube 2 includes a superelastic metal tube 2b having slits 2e formed at a distal zone thereof as in FIG. 2, but having an identical width while extending parallel from the distal end toward the proximal side. Preferably two to eight slits 2e are formed at substantially equal intervals. The slits 2e preferably have a circumferential width of about 0.05 to 0.5 mm and a length of about 50 to 200 mm.

In the vascular dilatation instrument 30 of this embodiment, the inner tube 5 further includes a rigidity imparting member or reinforcement 13 which is effective for preventing flection of the instrument main body at the distal portion and enhancing the torque property of the instrument main body. The reinforcement 13 preferably extends from the proximal end of the inner tube 5 to near the distal end of the outer tube 2. If desired, the reinforcement 13 extends throughout the length of the inner tube 5.

The reinforcement 13 is preferably in the form of a network reinforcement. The network reinforcement is preferably formed of a braided wire of stainless steel, elastic metal, superelastic or pseudoelastic alloy, shape memory alloy or the like, having a diameter of about 0.01 to 0.2 mm, especially 0.03 to 0.1 mm. By wrapping such a metal wire around the inner tube 5, a reinforcement is formed. More preferably, a reinforced inner tube is prepared by molding an

10

inner tube from a thermoplastic resin, wrapping a metal wire around the inner tube, and passing the tube through a heating die (while externally heating the tube) for thereby burying the wire in the inner tube wall.

Alternatively, the reinforcement may be formed by wrapping around the inner tube 5 a braided strand of synthetic filaments such as polyamide, polyester and polypropylene filaments. It is also possible that not only the inner tube, but also the outer tube be provided with such reinforcement.

A further exemplary structure of the outer tube is shown in FIG. 8. Unlike the embodiment of FIG. 2, a vascular dilatation instrument 35 of this embodiment includes an outer tube 2 having a substantially identical outer diameter over its entirety. The outer tube 2 includes a superelastic metal tube 2b. The metal tube 2b is cut at an angle with respect to its axis. That is, the metal tube 2b has a beveled distal zone which is more flexible and deformable than the remainder. The cutting angle is preferably from about 5° to 45°.

FIG. 9 illustrates a vascular dilatation instrument according to a further embodiment of the invention.

The basic construction of this embodiment is the same as that shown in FIGS. 1 to 6 and like parts are designated by the same numerals as in FIGS. 1 to 6. The difference is the shape of slits in the superelastic metal tube of the outer tube. More particularly, the vascular dilatation instrument 36 of this embodiment includes an outer tube 2 which includes a synthetic resin tube 2a and a superelastic metal tube 2b having a distal zone where a spiral slit 2e is formed. The provision of spiral slit 2e makes the distal zone of the metal tube 2b more flexible and bendable than the remainder. The flexible distal zone of the metal tube 2b is effective for reducing the difference in physical properties between the superelastic metal tube 2b and the synthetic resin tube 2a for providing a smoother transition, thereby preventing separation and differential motion therebetween. The instrument is more smooth and convenient to manipulate. In the vascular dilatation instrument 36 of this embodiment, the synthetic resin tube 2a is provided not only on the outside surface, but also on the inside surface of superelastic metal tube 2b. Although resin coverage only on the metal tube outside surface is satisfactory, double coverage prevents the risk of the slit edge (or spiral turns) of the metal tube causing damage to the inner tube.

The spiral slit 2e in the superelastic metal tube 2b has a width as measured in an axial direction of the tube. The slit width is not fixed since it is determined in consideration of the outer diameter of the outer tube or the like. The slit width is preferably 0.1 to 1.5 mm, more preferably 0.5 to 1.0 mm. In other words, the slit width is preferably about ⅛ to ½, more preferably ⅓ to ⅓ of the outer diameter of the metal tube. Within this range, the distal portion of the metal tube is fully flexible and not broken during operation. The spiral slit 2e has a pitch between adjacent turns. Where the spiral slit 2e has a constant pitch, the pitch is preferably about 0.3 to 2.0 mm, more preferably 0.5 to 1.0 mm because within this range, the metal tube distal zone is fully flexible and not broken during operation. The extent of the distal zone of the metal tube where the slit is formed is determined by taking into account the length of the instrument or the like. Typically the slit is formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

In another example and preferably, the spiral slit 2e is formed at increasing pitches. As shown in FIG. 9, the slit pitch is shorter at the distal end (left-hand side) and longer

5,507,766

11

at the proximal end (right-hand side). Then the superelastic metal tube $2b$ distal zone becomes more flexible toward its distal end. Such a gradual change of physical properties ensures smoother bending of the metal tube distal zone and easier manipulation of the instrument. Where the slit has a varying pitch, the pitch is preferably about 0.3 to 3.0 mm at the distal end and about 5 to 10 mm at the proximal end, and an intermediate value at an intermediate region. It is also acceptable that the pitch be continuously increased from the distal end to the proximal end. Within this range, the metal tube distal zone is fully flexible and not broken during operation. A single spiral slit is formed in the embodiment of FIG. 9 although two or more slits may be formed.

FIG. 10 shows another example of the slit. The vascular dilatation instrument 37 of this embodiment has the same basic construction as the embodiments of FIGS. 1 to 6 and FIG. 9 and like parts are designated by the same numerals. The difference of the instrument 37 of this embodiment from the instruments of the previous embodiments resides in the configuration of the slit $2e$ in the superelastic metal tube $2b$ of the outer tube 2.

In the vascular dilatation instrument 37, the superelastic metal tube $2b$ is provided with a spiral slit $2e$ having a width which is greater at the distal end and smaller at the proximal end of the distal zone. The slit width is reduced from the distal end toward the proximal end. Then the metal tube becomes more flexible toward the distal end, ensuring smoother bending of the metal tube distal zone and easier manipulation of the instrument.

Although the slit width is determined in consideration of the outer diameter of the outer tube or the like, it is preferably about 1.0 to 2.0 mm at the distal end and about 0.1 to 0.5 mm at the proximal end. The slit width is preferably about one-half to twice the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. In an intermediate region between the distal end and slit terminus, the slit width may have an intermediate value or be gradually decreased from the distal end to the slit terminus. The pitch of the slit $2e$ may be fixed or decreased continuously or stepwise from the distal end toward the proximal end. The extent of the distal zone of the metal tube where the slit is formed is determined by taking into account the length of the instrument or the like. Typically the slit is formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof. A single spiral slit is formed in the embodiment of FIG. 10 although two or more slits may be formed.

Although part of the resin material of which the resin tube $2a$ is made may flow into the slits $2e$ in the superelastic metal tube $2b$, it is preferred that the slits $2e$ be substantially free of the resin material and empty. In the absence of the resin material flowing into the slits, deformation of the superelastic metal tube $2b$ is never obstructed.

FIG. 11 shows a vascular dilatation instrument according to a further embodiment of the invention. The vascular dilatation instrument 38 of this embodiment has the same basic construction as the embodiment of FIGS. 1 to 6 and like parts are designated by the same numerals. The difference of the instrument 38 of this embodiment from the instrument 1 of the previous embodiments resides in the construction of the outer tube 2. In the instrument 38, the outer tube 2 includes a superelastic metal tube $2b$ and a synthetic resin tube covering both the outside and inside surfaces of the metal tube $2b$ which includes a main portion $2f$ covering the metal tube $2b$ and a distal portion $2g$

12

extending forward from the distal end of the portion $2f$. The junction of the main portion $2f$ to the distal portion $2g$ is tapered such that the outer diameter is reduced toward the distal end.

The superelastic metal tube $2b$ in a distal zone is provided with a plurality of perforations $2e$ so that the metal tube distal zone is flexible and bendable the flexible distal zone of the metal tube $2b$ reduces the difference in physical properties between the metal tube $2b$ and the resin tube $2f$, thereby preventing separation and differential motion therebetween and enhancing manipulation of the instrument.

The diameter of perforations $2e$ is not fixed since it is determined in accordance with the number of perforations, the outer diameter of metal tube and the like. Typically the perforations $2e$ have a diameter of about 0.1 to 0.4 mm, preferably 0.2 to 0.3 mm. The pore diameter is preferably about 1/10 to 1/3 of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. The perforations $2e$ are preferably spaced a distance of about 0.1 to 0.5 mm. Within this range, the metal tube distal portion is fully flexible and not broken during operation. The extent of the distal zone of the metal tube where the perforations are formed is determined by taking into account the length of the instrument or the like. Typically the perforations are formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

With respect to the shape, the perforations need not be true circle and may be ellipsoidal, for example, oval holes elongated in a circumferential or axial direction of the metal tube or polygonal such as square or pentagonal holes. Each perforation preferably has an area of about 0.007 to 0.13 mm$^2$.

As shown in FIG. 11, more perforations $2e$ are distributed near the distal end than near the proximal end of the perforated zone. Then the superelastic metal tube $2b$ becomes more flexible toward the distal end. Such a gradual change of physical properties ensures smoother bending of the metal tube distal zone and more convenient manipulation of the instrument. More specifically, the number of perforations $2e$ is gradually increased from the proximal end to the distal end of the perforated zone as shown in FIG. 11. Then the superelastic metal tube $2b$ becomes more flexible toward the distal end, ensuring smoother bending of the metal tube distal zone and easier manipulation of the instrument. Where the perforation distribution is varied in this way, the spacing between perforations is about 0.1 to 0.2 mm at the distal end and about 0.3 to 0.5 mm at the proximal end. In an intermediate region between the distal and proximal ends, the spacing between perforations has an intermediate value or is gradually varied.

Instead of the varying perforation distribution, the diameter or area of perforations may be varied such that the diameter or area is greater near the distal end than near the proximal end of the perforated zone.

Although part of the resin material of which the resin tube portion $2f$ is made may flow into the perforations $2e$ in the superelastic metal tube $2b$, it is preferred that the perforations $2e$ be substantially free of the resin material and void. In the absence of the resin material flowing into the perforations, deformation of the metal tube $2b$ is never obstructed.

FIG. 12 shows a vascular dilatation instrument according to a further embodiment of the invention. The vascular dilatation instrument 39 of this embodiment has the same basic construction as the embodiment of FIGS. 1 to 6 and like parts are designated by the same numerals. The differ-

BSC-SJA-1378

5,507,766

13

ence of the instrument 39 of this embodiment from the instrument 1 of the previous embodiment resides in the construction of the outer tube 2. In the instrument 39, the outer tube 2 includes a synthetic resin tube 2a and a superelastic metal tube 2b including a distal zone which is tapered and provided with a spiral slit 2e. The provision of spiral slit 2e allows the metal tube distal zone to flex more softly. The distal zone of the metal tube is tapered such that the outer diameter is reduced toward the distal end. Such a tube can be prepared by forming a tube having a tapered end portion from superelastic metal and machining a slit in the tapered portion. The tube having a tapered end portion can also be prepared by machining a spiral slit in one end portion of a fixed diameter and axially stretching the slit portion. Alternatively, the tube having a tapered end portion can be prepared by machining a spiral slit in one end portion of a metal tube of a fixed diameter and twisting the slit portion such that it is reduced in diameter toward the distal end.

The synthetic resin tube 2a surrounding and covering the outside surface of the superelastic metal tube having a tapered end portion is preferably a heat-shrinkable tube as previously mentioned.

Moreover, the spiral slit 2e is formed at such a pitch that the pitch is shorter at the distal end and longer at the proximal end of the slit region as shown in FIG. 12. Also preferably, the slit pitch is gradually increased from the distal end to the proximal end of the slit region as shown in FIG. 12.

The slit width is not fixed since it is determined in accordance with the outer diameter of the outer tube or the like. The slit width is preferably about 0.1 to 1.5 mm, more preferably 0.5 to 1.0 mm. In other words, the slit width is preferably about ¼ to ¾, more preferably about ⅓ to ½ of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. Where the spiral slit 2e has a constant pitch, the pitch is preferably about 0.3 to 2.0 mm, more preferably 0.5 to 1.0 mm because within this range, the metal tube distal zone is fully flexible and not broken during operation. Where the slit has a varying pitch, the pitch is preferably about 0.5 to 3.0 mm at the distal end and about 5 to 10 mm at the proximal end of the slit zone and an intermediate value at an intermediate region. It is also acceptable that the pitch be continuously increased from the distal end toward the proximal end. Within this range, the metal tube distal zone is fully flexible and not broken during operation. The extent of the distal portion of the metal tube where the slit is formed is determined by taking into account the length of the instrument or the like. Typically the slit is formed in a distal region of the metal tube which extends 100–1,000 mm, preferably 150–500 mm from the distal edge thereof. A single spiral slit is formed in the embodiment of FIG. 12 although two or more slits may be formed.

Referring to FIGS. 13 through 16, there is illustrated a vascular dilatation instrument according to a further embodiment of the invention. The instrument generally designated at 41 in this embodiment is different from the instrument shown in FIGS. 1 through 6 in that a superelastic metal tube is included in an inner tube.

In the instrument 41 of this embodiment, as shown in FIG. 13 and FIG. 14 which is an enlarged cross-sectional view of a distal portion of the instrument and FIG. 15 which is a D—D cross section of FIG. 14, the inner tube 5 includes a superelastic metal tube 5b and a synthetic resin tube 5a covering the inside surface of the metal tube. The synthetic

14

resin tube 5a protrudes beyond the distal end of the metal tube 5b to form a distal section 5c. The superelastic metal tube 5b is provided with a plurality of slits 5e extending from the distal end toward the proximal end thereof. The provision of slits 5e makes the distal zone of the metal tube more flexible than the remainder.

As shown in FIG. 14, the triangular slits 5e are gradually decreased in width from the distal end toward the proximal end of the superelastic metal tube 5b, or differently stated, gradually increased in width toward the distal end. The slit has the maximum width at the distal end of the metal tube 5b. Then as one goes toward the distal end, the superelastic metal tube 5b is more flexible and deformable and the side wall is more deformable radially inward and outward. Preferably two to eight slits 5e are formed at approximately equal intervals. Also preferably, the slits 5e have a maximum width of about 0.05 to 0.5 mm at the distal end (as measured in a circumferential direction) and a length of about 50 to 200 mm (as measured in a longitudinal direction).

Also the distal portion of the metal tube is not limited to the shape shown in FIG. 14 while either a distal zone with parallel slits of fixed width as shown in FIG. 7 or a beveled distal zone as shown in FIG. 8 may be employed.

The vascular dilatation instrument 41 of this embodiment includes an outer tube 2 having an identical outer diameter throughout its length. If desired, the outer tube 2 may be provided with a distal portion having a smaller diameter than the remainder as in the embodiment of FIG. 1. The outer tube 2 may be either a synthetic resin tube or a composite body of synthetic resin tube and superelastic metal tube.

As shown in FIGS. 13 and 16, a branch hub or adapter 20 is attached to the proximal end of the instrument. The branch hub 20 includes fixedly mated inner and outer hub segments 22 and 23. The inner hub segment 22 is fixedly connected to the inner tube 5 (which is a composite body of synthetic resin tube 5a and superelastic metal tube 5b) and has a first opening 9 in communication with the first lumen 4 and forming a guide wire port. The outer hub segment 23 is fixedly connected to the outer tube 2 and has a second opening 11 in communication with the second lumen 6 and forming an injection port.

Although part of the resin material of which the resin tube 5a is made may flow into the slits 5e in the superelastic metal tube 5b, it is preferred that the slits 5e be substantially free of the resin material and void. In the absence of the resin material flowing into the slits, deformation of the metal tube 5b is never obstructed.

The remaining components are substantially the same as in the instrument 1 of the first embodiment.

FIG. 17 illustrates a vascular dilatation instrument according to a further embodiment of the invention. The basic construction of this embodiment is the same as that shown in FIGS. 13 to 16 and like parts are designated by the same numerals as in FIGS. 13 to 16. The difference is in the shape of slits in the superelastic metal tube of the inner tube. More particularly, the vascular dilatation instrument 45 of this embodiment includes an inner tube 5 which includes a synthetic resin tube 5a and a superelastic metal tube 5b having a distal zone where a spiral slit 5e is formed. The provision of spiral slit 5e makes the distal zone of the metal tube 5b more flexible and bendable. The flexible distal zone of the metal tube 5b is effective for reducing the difference in physical properties between the superelastic metal tube 5b and the synthetic resin tube 5a, thereby preventing separation and differential motion therebetween. The instrument is more smooth and easy to manipulate.

5,507,766

| 15 | 16 |

The slit width is not fixed since it is determined in consideration of the outer diameter of the outer tube or the like. The slit width is preferably about 0.1 to 1.5 mm, more preferably 0.5 to 1.0 mm. The slit width is preferably about ⅛ to ¾, more preferably ⅓ to ½ of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. Where the spiral slit 5e has a constant pitch, the pitch is preferably about 0.2 to 2.0 mm, more preferably 0.3 to 0.5 mm because within this range, the metal tube distal zone is fully flexible and not broken during operation. The extent of the distal portion of the metal tube where the slit is formed is determined by taking into account the instrument length or the like. Typically the slit is formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

In a preferred example, the spiral slit 5e is formed at increasing pitches. As shown in FIG. 17, the slit pitch is shorter at the distal end (left-hand side) and longer at the proximal end (right-hand side) of the distal zone. Then the superelastic metal tube 5b becomes more flexible toward the distal end. Such a gradual change of physical properties ensures smoother bending of the metal tube distal zone and easier manipulation of the instrument. Where the slit has a varying pitch, the pitch is preferably about 0.3 to 2.0 mm at the distal end and about 5 to 10 mm at the proximal end of the slit zone, and an intermediate value at an intermediate region. It is also acceptable that the pitch be continuously increased from the distal end toward the proximal end. Within this range, the metal tube distal zone is fully flexible and not broken during operation. A single spiral slit is formed in the embodiment of FIG. 17 although two or more slits may be formed.

The slit 5e may have another shape, for example, a spiral slit whose width is greater at the distal end than at the proximal end as found in the instrument 37 shown in FIG. 10. Instead of the slit, perforations may be provided as in the embodiment of FIG. 11.

FIG. 18 illustrates in a schematic cross-sectional view a vascular dilatation instrument according to the second aspect of the invention.

The vascular dilatation instrument generally designated at 81 is illustrated as comprising a tubular member 82 defining a lumen 90 therethrough and having an opening in fluid communication with the lumen 90, a leading head 87, and an inflatable member 83 having one end 83b attached to the tubular member 82 and another end 83a attached to the leading head 87 and defining an interior space in fluid communication with the lumen 90 through the opening. The tubular member 82 includes a main body section 82d and a distal section 82c made of a synthetic resin. The superelastic metal tube 82b includes a deformable distal zone which is more flexible than the remainder.

In the enlarged view of FIG. 19 is shown the transition between the main and distal sections 82d and 82c of the tubular member 82.

The vascular dilatation instrument 81 includes a main body including a tubular member 82, a dilator 83, an elastic core 84, and a leading head 87 and a hub or adapter 91.

In the instrument 81, the tubular member 82 includes a main body section 82d consisting of a superelastic metal tube 82b and a distal section 82c consisting of the synthetic resin tube. The transition between the main body section 82d and the distal section 82c which corresponds to a distal zone of the superelastic metal tube

82b is a deformable zone which is more flexible than the remainder of the metal tube.

More particularly, the tubular member 82 includes the superelastic metal tube 82b and the synthetic resin tube 82a surrounding and covering the outside surface of the metal tube 82b in the main body section. The synthetic resin tube 82a protrudes beyond the distal end of the superelastic metal tube 82b to form the distal section 82c of the tubular member 82.

As shown in FIG. 18 and FIG. 19 which is an enlarged cross-sectional view of the transition between the main and distal sections 82d and 82c, the superelastic metal tube 82b in a distal zone is provided with a plurality of slits 82e extending from the distal end toward the proximal end. The provision of slits 82e makes the distal zone of the metal tube more flexible than the remainder. As shown in FIG. 19, the slits 82e are gradually decreased in width from the distal end to the proximal end of the distal zone of the superelastic metal tube 82b, or differently stated, gradually increased in width toward the distal end. The slit has the maximum width at the distal end of the metal tube 82b. Then as one goes toward the distal end, the superelastic metal tube 82b is more flexible and deformable and the side wall is more deformable radially inward and outward. Preferably two to eight slits 82e are formed at approximately equal intervals. Also preferably, the slits 82e have a maximum width of about 0.05 to 0.5 mm at the distal end and a length of about 50 to 200 mm.

In the vascular dilatation instrument 81 of the illustrated embodiment, the superelastic metal tube 82b includes the distal zone which is tapered as shown in FIGS. 18 and 19. More particularly, the side wall defining the distal zone where the slits are formed is bent radially inward. This tapered distal zone can be formed by working the slit distal zone of the metal tube 82b to the configuration shown in FIG. 19. Alternatively, the synthetic resin tube 82a is molded or fitted over the metal tube 82b such that the outer diameter of that portion of the resin tube 82a surrounding the metal tube distal zone is reduced. That is, the metal tube distal zone is deformed radially inward by the resin tube 82a. Then that portion of the resin tube 82a extending forward (leftward in FIGS. 18 and 19) beyond the metal tube 82b has a smaller diameter than that portion of the resin tube 82a around the metal tube 82b. Since the distal or protruding portion 82c formed solely of the resin tube 82a has a smaller diameter than the main body portion including the metal tube 82b, it becomes possible to insert the distal portion of the vascular dilatation instrument 81 into a vessel on a more peripheral side. Since the transition between the main body section 82d and the distal section 82c of the tubular member 82 (which corresponds to the distal end of the main body section 82d) is tapered forward, insertion into a vessel is facilitated.

Since the main body section 82d of the tubular member 82 has the superelastic metal tube, the vascular dilatation instrument 81 is effective for transmitting the translational and torsional forces from the proximal end to the distal end of the instrument, that is, improved in pushability and torque transmission. The distal section 82c made of synthetic resin has sufficient flexibility. The transition between the main body section 82d and the distal section 82c of the tubular member 82 (which corresponds to the distal end of the superelastic metal tube 82b) is a more flexible, deformable zone and is effective in preventing angular bending at the interface between the rigid main body section and the flexible distal section.

The tubular member 82 is disposed coaxial with and around the elastic core or shaft 84 and includes the distal

5,507,766

17

section 82c which terminates at a position retraced a predetermined distance from the distal end of the shaft 84.

The tubular member 82 includes the main body section 82d consisting of the superelastic metal tube 82b and the synthetic resin tube 82a surrounding and covering the outside surface of the metal tube 82b and the distal section 82c consisting solely of the synthetic resin tube 82a. Differently stated, the tubular member 82 includes the superelastic metal tube 82b and the synthetic resin tube 82a surrounding and covering the outside surface of the metal tube 82b while the synthetic resin tube 82b protrudes beyond the distal end of the superelastic metal tube 82b to form the distal section 82c of the tubular member 82.

Typically the tubular member 82 has a length of about 300 to 4,000 mm, preferably 500 to 1,600 mm and an outer diameter of about 0.3 to 1.5 mm, preferably 0.4 to 1.2 mm.

The superelastic or pseudoelastic metal tube 82b is preferably made of a superelastic alloy. The superelastic alloys are generally known as shape memory alloys and exert superelasticity at the living body temperature (about 37° C.) or higher. Preferred examples of the superelastic alloy include Ti—Ni binary alloys consisting essentially of 49 to 53 atom % of nickel and the balance of titanium, Cu—Zn binary alloys consisting essentially of 38.5 to 41.5% by weight of zinc and the balance of copper, Cu—Zn—X ternary alloys containing 1 to 10% by weight of X wherein X is Be, Si, Sn, Al or Ga, and Ni—Al binary alloys consisting essentially of 36 to 38 atom % of aluminum and the balance of nickel, with the Ti—Ni alloys being most preferred. Mechanical properties may be properly controlled by replacing part of Ti—Ni alloy by 0.01 to 10.0 atom % of X to form Ti—Ni—X alloys wherein X is Co, Fe, Mn, Cr, V, Al, Nb, W or B or replacing part of Ti—Ni alloy by 0.01 to 30.0 atom % of X to form Ti—Ni—X alloys wherein X is Cu, Pd or Zr and/or selecting the conditions of cold working and/or final heat treatment. By the term "superelasticity" it is meant that when an alloy is deformed (bent, stretched or compressed) at service temperature to the extent where conventional metals undergo plastic deformation and then released from deformation, the alloy resumes the original shape without a need for heating.

Typically the superelastic metal tube 82b has an outer diameter of about 0.2 to 1.5 mm, preferably 0.3 to 1.2 mm, a wall thickness of about 30 to 200 μm, preferably 50 to 150 μm, a length of about 350 to 4,000 mm, preferably 550 to 1,800 mm, a buckling strength (yield stress under load) of about 5 to 200 kg/mm², preferably 8 to 150 kg/mm² at 22° C., and a restoring stress (yield stress upon unloading) of about 3 to 180 kg/mm², preferably 5 to 130 kg/mm² at 22° C.

For the synthetic resin tube 82a, materials having flexibility are used, for example, thermoplastic resins such as polyolefins (e.g., polyethylene, polypropylene, ethylene-propylene copolymers, and ethylene-vinyl acetate copolymers), polyvinyl chloride, polyamide elastomers, and polyurethane, and polyimides. Preferred are the polyolefins and polyimides. That portion of the synthetic resin tube 82a surrounding and covering the superelastic metal tube 82b preferably has a wall thickness of about 5 to 300 μm, more preferably 10 to 200 μm.

Alternatively, a heat-shrinkable tube may be used as the synthetic resin tube 82a of the tubular member 82. The heat-shrinkable tube used herein is a tube which has an inner diameter larger than the outer diameter of the superelastic metal tube 82b prior to heating and thus allows the superelastic metal tube to be inserted therethrough, but on heat-

18

ing, shrinks substantially uniformly over its entirety to come in close contact with the outside surface of the metal tube. Such a heat-shrinkable tube is preferably prepared by molding a resin into a tube having an inner diameter equal to or slightly smaller than the outer diameter of the superelastic metal tube, and expanding the tube over its entirety so as to increase its diameter so that upon heating, it may shrink to a diameter equal to or substantially equal to the diameter as molded. The heat-shrinkable tube is made of the material which can be expanded, but shrinks upon heating as mentioned above, for example, polyolefins (e.g., polyethylene, polypropylene, and ethylene-propylene copolymers), ethylene-vinyl acetate copolymers, and polyamide elastomers.

Although part of the resin material of which the resin tube 82a is made may flow into the slits 82e in the superelastic metal tube 82b, it is preferred that the slits 82e be substantially free of the resin material and empty. In the absence of the resin material flowing into the slits, flexural motion of the metal tube 82b is never obstructed.

Preferably, markers 96 are provided on the outside surface of the elastic shaft 84 for radiological localization purposes. More particularly, the markers 96 are disposed in alignment with the opposed ends of the cylindrical portion of the inflatable member 83 as shown in FIG. 18. The markers 14 are in the form of coil springs or rings made of a radiographic high contrast material, for example, platinum, platinum alloys, tungsten, tungsten alloys, silver and silver alloys.

The elastic core or shaft 84 is an elongated member having a distal end and a proximal end and extending throughout the tubular member 82, with the leading head 85 secured to the distal end. In the embodiment illustrated in FIG. 18, the elastic shaft 84 includes a main body section of the shaft 84 corresponding to the main body section 82d of the tubular member 82 and a distal section 84a which includes a base portion 84b corresponding to the distal section 82c of the tubular member 82 and a tip portion corresponding to the inflatable member 83.

More particularly, the leading head 85 which is attached to the distal end of the elastic shaft 84 includes a wire 86 axially extending from the distal end of the shaft 84 and a coil spring 87 enclosing the wire 86 and secured to the wire 86 at opposed ends. The wire 86 prevents stretching of the coil spring 87. Desirably the distal section 84a of the elastic shaft 84 is more flexible toward the distal extremity (the left end in FIG. 18). To this end, the shaft 84 is reduced in diameter toward the distal extremity. The shaft 84 has a relatively small diameter in the main body section and a relatively large diameter in the base portion 84b, with the diameter gradually decreasing from the base portion 84b to the tip portion. The base portion 84b of the elastic shaft distal section has a larger diameter than the main body section of the shaft 84 for the purpose of preventing angular folding of the distal section 82c of the tubular member 82 (consisting solely of synthetic resin tube). As a result, the space or lumen 90 between the tubular member 82 and the shaft 84 is narrow around the base portion 84b.

Useful for the elastic core or shaft 84 are stainless steel (preferably highly tensile stainless steel for springs), tungsten, tungsten-cobalt alloys, piano wire (preferably nickel or chromium plated piano wire), and superelastic alloys. Preferred examples of the superelastic alloy include Ti—Ni binary alloys consisting essentially of 49 to 53 atom % of nickel and the balance of titanium, Cu—Zn binary alloys consisting essentially of 38.5 to 41.5% by weight of zinc and the balance of copper, Cu—Zn—X ternary alloys containing

5,507,766

19

1 to 10% by weight of X wherein X is Be, Si, Sn, Al or Ga, and Ni—Al binary alloys consisting essentially of 36 to 38 atom % of aluminum and the balance of nickel, with the Ti—Ni alloys being most preferred. Mechanical properties may be properly controlled by replacing part of Ti—Ni alloy by 0.01 to 10.0 atom % of X to form Ti—Ni—X alloys wherein X is Co, Fe, Mn, Cr, V, Al, Nb, W or B or replacing part of Ti—Ni alloy by 0.01 to 30.0 atom % of X to form Ti—Ni—X alloys wherein X is Cu, Pd or Zr and/or selecting the conditions of cold working and/or final heat treatment. By the term "superelasticity" it is meant that when an alloy is deformed (bent, stretched or compressed) at service temperature to the extent where conventional metals undergo plastic deformation and then released of stresses, the alloy resumes the original shape without a need for heating.

Typically the elastic shaft 84 has a length of about 350 to 4,000 mm, preferably 550 to 1,800 mm, a buckling strength (yield stress under load) of about 30 to 100 kg/mm², preferably 40 to 55 kg/mm² at 22° C., and a restoring stress (yield stress upon unloading) of about 20 to 80 kg/mm², preferably 30 to 55 kg/mm² at 22° C. The distal section 84a of the shaft 84 has an outer diameter of about 0.1 to 1.0 mm, preferably 0.15 to 0.7 mm, a bending load of about 0.1 to 10 g, preferably 0.3 to 6.0 g, and a restoring load of about 0.1 to 10 g, preferably 0.3 to 6.0 g.

These values are not critical. The distal section 84a of the shaft 84, which is moderately pointed, need not have an outer diameter within the above-mentioned range and may locally have such an outer diameter. The main and distal section of the shaft need not have an identical value of restoring stress and it is rather preferred that the shaft is locally heat treated such that different regions may have appropriate physical properties for their diameter. Preferably the main and distal sections of the shaft are separately heat treated such that the main section may have a greater restoring stress and the distal section be flexible. The elastic shaft need not be a single wire member. Shafts consisting of parallel extending or braided wires are also useful. Such a multi-wire shaft may also be modified to have the above-mentioned functions, that is, such that physical properties are changed stepwise or continuously.

The leading head 85 is to lead or guide the vascular dilatation instrument 81 to the destined vascular site. It is formed by the coil spring 87 in the embodiment illustrated in FIG. 18. The leading head 85 should be flexible such that when the leading edge (the left end in FIG. 18) of the head 85 abuts against a blood vessel wall, the head readily flexes to find a way forward in another direction without concentrating stresses at the leading edge. Since the leading head 85 is also the distal end of the vascular dilatation instrument 81, it is preferred that the head be readily located under radiological observation. In this regard, the head 85 is preferably made of a radiographic high contrast material, for example, platinum, platinum alloys, tungsten, tungsten alloys, silver and silver alloys.

As mentioned above, the leading head 85 should preferably be flexible. In this regard, the coil spring 87 may be made of superelastic or pseudoelastic metal wires or elastic metal wires. Preferably the head 85 has an outer diameter of about 0.2 to 1.0 mm and a length of about 2 to 50 mm. When the head is made of a superelastic metal wire, it preferably has a buckling strength (yield stress under load) of about 5 to 200 kg/mm², preferably 8 to 150 kg/mm² at 22° C. and a restoring stress (yield stress upon unloading) of about 3 to 180 kg/mm², preferably 5 to 150 kg/mm² at 22° C.

The leading edge 85a of the leading head 85 is preferably formed as a head piece having a blunt convex curved surface

20

by heating and melting the coiled fine metal wire. The coil spring 87 forming the head 85 is joined to the distal end of the shaft 84 by brazing. Instead of the wire 86 for preventing the coil spring 87 from stretching, the shaft 84 may be extended to reach the leading edge of the head 85 where the end of the extension is secured to the coil spring 87.

The inflatable member or dilator 83 has one end 83c attached to the proximal end of the leading head 87 and another end 83b attached to the distal end of the tubular member 82. The inflatable member 83 defines an interior space 92 which is in flow communication with the lumen 90 defined between the tubular member 82 and the elastic shaft 84 through the distal opening of the tubular member 82 so that a fluid can be fed into the interior space of the member 83 for inflation. The inflatable member 83 is a contractible or foldable sleeve membrane and includes a substantially cylindrical portion 83a having an approximately uniform diameter at least a part of which is substantially cylindrical, when inflated, for dilating the stricture in a blood vessel and is foldable in close contact with the shaft 84 when deflated. The cylindrical portion 83a need not be completely cylindrical, but may be polygonal.

With respect to the dimensions of the inflatable member 83, the cylindrical portion 83a when inflated preferably has an outer diameter of about 1.0 to 10.0 mm, more preferably 1.0 to 5.0 mm and a length of about 5 to 50 mm, more preferably 10 to 40 mm. The inflatable member 83 preferably has an overall length of about 10 to 70 mm, more preferably 15 to 60 mm.

For the inflatable member 83, materials having a certain degree of flexibility and capable of dilating the stricture are used, for example, thermoplastic resins such as polyolefins (e.g., polyethylene, polypropylene, and ethylene-propylene copolymers), polyesters (e.g., polyethylene terephthalate), polyvinyl chloride, ethylene-vinyl acetate copolymers, crosslinked ethylene-vinyl acetate copolymers, polyurethane, and polyamide elastomers, and silicone rubber and latex rubber.

As shown in FIG. 18, the branch hub 91 is attached to the proximal end of the instrument. The branch hub 91 includes fixedly mated first and second hub segments 88 and 89. The first segment 88 is fixedly connected to the tubular member 82 at the proximal end with an adhesive 94 and has a first opening 93 in communication with the lumen 90 and forming a port for injecting a fluid for inflation. The second segment 89 is fixedly connected to the elastic shaft 84 at the proximal end. More particularly, the second segment 89 defines a cylindrical cavity which receives a diametrically enlarged portion 84c of the shaft 84 at its proximal end. The proximal end of the shaft 84 including the enlarged portion 84c is secured within the second segment cavity with an adhesive 95.

The first and second hub segments 88 and 89 are engaged as shown in FIG. 18. This engagement is achieved by attaching the first segment 88 to the proximal end of the tubular member 82, attaching the second segment 89 to the proximal end of the shaft 84, inserting the shaft 84 from its distal end into the lumen 90 of the tubular member 82 at the rear end until the second segment 89 contacts the first segment 88, and tightly coupling the first and second segments 88 and 89. At this point, an adhesive may be applied to the interface between the first and second segments 88 and 89 to form a firm joint.

The branch hub 91 is made of thermoplastic resins such as polyolefins (e.g., polyethylene and polypropylene), polycarbonates, polyamides, polysulfones, polyarylates, buty-

5,507,766

21

lene-styrene copolymers, and methacrylate-butylene-styrene copolymers.

Preferably the tubular member 82, inflatable member 83 and leading head 85 on their outside surface are treated so that the outside surface may exhibit lubricity. Such treatments include coating and fixation of hydrophilic polymers such as poly(2-hydroxyethyl methacrylate), poly(hydroxyethyl acrylate), hydroxypropyl cellulose, methyl vinyl ethermaleic anhydride copolymers, polyethylene glycol, polyacrylamide, and polyvinyl pyrrolidone.

The structure of the tubular member 82 is not limited to that shown in FIGS. 18 and 19. Another exemplary structure of the tubular member is shown in FIG. 20. Unlike the embodiment of FIG. 19, a vascular dilatation instrument of this embodiment includes a tubular member 82 having a substantially identical outer diameter over its entirety. The tubular member 82 includes a superelastic metal tube 82b having slits 82e formed at a distal zone thereof as in FIG. 19, but having an identical width while extending parallel from the distal end to the proximal end of the flexible zone. Preferably two to eight slits 82e are formed at substantially equal intervals. The slits 82e preferably have a circumferential width of about 0.05 to 0.5 mm and a length of about 50 to 200 mm.

Also the distal portion of the metal tube 82b can be a beveled distal portion as shown in FIG. 8 wherein the metal tube is cut at an angle of about 5° to 45° with respect to its axis.

Another exemplary structure of the tubular member 82 is shown in FIG. 21.

In the vascular dilatation instrument of the embodiment shown in FIG. 21, the tubular member 82 includes a synthetic resin tube 82a and a superelastic metal tube 82b having a distal zone where a spiral slit 82e is formed. The provision of spiral slit 82e makes the distal zone of the metal tube 82b more flexible and bendable. The flexible distal zone of the metal tube 82b is effective for reducing the difference in physical properties between the superelastic metal tube 82b and the synthetic resin tube 82a, thereby preventing separation and differential motion therebetween. The instrument is more smooth and easy to manipulate.

The slit width is not fixed since it is determined in consideration of the outer diameter of the tubular member or the like. The slit width is preferably about 0.1 to 1.5 mm, more preferably 0.5 to 1.0 mm. In other words, the slit width is preferably about ¼ to ¾, more preferably ⅓ to ¼ of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. Where the spiral slit 82e has a constant pitch, the pitch is preferably about 0.2 to 2.0 mm, more preferably 0.3 to 0.5 mm because within this range, the metal tube distal zone is fully flexible and not broken during operation. The extent of the distal portion of the metal tube where the slit is formed is determined by taking into account the length of the instrument or the like. Typically the slit is formed in a distal region of the metal tube which extends 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

In a preferred example, the spiral slit 82e is formed at increasing pitches. As shown in FIG. 21, the slit pitch is shorter at the distal end (left-hand side) and longer at the proximal end (right-hand side). Then the distal zone of the superelastic metal tube 82b becomes more flexible toward the distal end. Such a gradual change of physical properties ensures smoother bending of the metal tube distal zone and easier manipulation of the instrument. Where the slit has a varying pitch, the pitch is preferably about 0.3 to 2.0 mm at

22

the distal end and about 5 to 10 mm at the proximal end of the slit region, and an intermediate value at an intermediate region. It is also acceptable that the pitch be continuously increased from the distal end toward the proximal end. Within this range, the metal tube distal zone is fully flexible and not broken during operation.

A single spiral slit is formed in the embodiment of FIG. 21 although two or more slits may be formed. Also employable is a spiral slit having an increased width at the distal end and a reduced width at the proximal end as shown in FIG. 10.

FIG. 22 shows a further exemplary structure of the tubular member 82. The superelastic metal tube 82b of the tubular member 82 includes a distal zone which is tapered or diametrically reduced toward the distal end (left-hand end in FIG. 22). A spiral slit 82e is formed in the tapered distal zone of the metal tube 82b. This spiral slit 82e has a reduced pitch at the distal end and an increased pitch at the proximal end of the distal zone.

FIG. 23 shows a still further exemplary structure of the tubular member 82. The superelastic metal tube 82b of the tubular member 82 includes a distal zone which is perforated with a plurality of holes 82e. Preferably more holes 82e are distributed at the distal end than at the proximal end of the distal zone of the metal tube 82b as shown in FIG. 23.

The diameter of perforations 82e is not fixed since it is determined in accordance with the number of perforations, the outer diameter of metal tube and the like. Typically the perforations 82e have a diameter of about 0.1 to 0.4 mm, preferably 0.2 to 0.3 mm. The pore diameter is preferably about ⅛ to ⅓ of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. The perforations 82e are preferably spaced a distance of about 0.1 to 0.5 mm. Within this range, the metal tube distal zone is fully flexible and not broken during operation. Where the perforation distribution is varied over the distal zone, the spacing between perforations preferably is about 0.1 to 0.2 mm at the distal end and about 0.3 to 0.5 mm at the proximal end. In an intermediate region between the distal and proximal ends, the spacing between perforations has an intermediate value or is gradually varied. The extent of the distal portion of the metal tube where the perforations are formed is determined by taking into account the length of the instrument or the like. Typically the perforations are formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

Instead of the varying perforation distribution, the diameter or area of perforations may be varied such that the diameter or area is greater near the distal end than near the proximal end of the metal tube distal zone.

With respect to the shape, the perforations need not be true circle and may be ellipsoidal, for example, oval holes elongated in a circumferential or axial direction of the metal tube or polygonal such as square or pentagonal holes. Each perforation preferably has an area of 0.007 to 0.13 mm².

Although part of the resin material of which the resin tube 82f is made may flow into the perforations 82e in the superelastic metal tube 82b, it is preferred that the perforations 82e be substantially free of the resin material and empty. In the absence of the resin material flowing into the perforations, flexural motion of the metal tube 82b is never obstructed.

Next, a catheter according to the third aspect of the invention is described.

Referring to FIGS. 24 and 25, there is illustrated a catheter generally designated at 100 as comprising a main body

5,507,766

section 102b including a superelastic metal tube 101 and a synthetic resin layer 104 covering the metal tube 101, and a distal section 102a made of a synthetic resin. The superelastic metal tube 101 includes a distal zone 102c which is provided with a slit 106 or a plurality of perforations 107 (see FIG. 23). The distal zone 102c is more flexible and deformable than the remainder.

Since the main body section 102b has the superelastic metal tube 101 therein, the catheter is effective for transmitting translational and torsional forces from the proximal end to the distal end, that is, improved in pushability and torque transmission. Then the catheter over its entirety can be reduced in wall thickness and hence in diameter. The distal zone 102c of the superelastic metal tube 101 is provided with a slit 106 or a plurality of perforations 107 and thus forms a flexible zone which mitigates the change in physical properties between the superelastic metal tube 101 and the distal section solely of synthetic resin tube, thereby preventing angular folding at the interface therebetween. The catheter is more smooth and convenient to insert or manipulate and will not cause damage to a vascular wall upon insertion. The provision of a spiral slit or perforations makes the distal zone of the metal tube more flexible and bendable. The flexible distal zone of the metal tube 101 is effective for reducing the difference in physical properties between the superelastic metal tube 101 and the synthetic resin layer 104, thereby preventing separation and differential motion therebetween. The catheter is more smooth and convenient to manipulate.

The catheter of the invention finds use as vascular insertion catheters, typically vasographic catheters for heart and brain blood vessels and medication catheters for administering medicament to heart and brain blood vessels.

In the embodiment of FIGS. 24 and 25, the catheter 100 is illustrated as a medication catheter for administering medicament to heart and brain blood vessels.

The catheter 100 having distal and proximal ends includes the main body section 102b and the distal section 102a. It also includes a lumen 103 extending from the proximal end to the distal end where a distal opening 109 is defined.

The main body section 102b includes the superelastic metal tube 101 and synthetic resin layers 104a and 104b covering the outside and inside surfaces of the metal tube 101. The distal section 102a is a tip member 105 made of a synthetic resin which is fixedly connected to the distal end of the main body section 102b.

The superelastic metal tube 101 is preferably made of a superelastic alloy. The superelastic alloys are generally known as shape memory alloys and exert superelasticity at the living body temperature (about 37° C.) or higher. Preferred examples of the superelastic alloy include Ti—Ni binary alloys consisting essentially of 49 to 53 atom % of nickel and the balance of titanium, Cu—Zn binary alloys consisting essentially of 38.5 to 41.5% by weight of zinc and the balance of copper, Cu—Zn—X ternary alloys containing 1 to 10% by weight of X wherein X is Be, Si, Sn, Al or Ga, and Ni—Al binary alloys consisting essentially of 36 to 38 atom % of aluminum and the balance of nickel, with the Ti—Ni alloys being most preferred. Mechanical properties may be properly controlled by replacing part of Ti—Ni alloy by 0.01 to 10.0 atom % of X to form Ti—Ni—X alloys wherein X is Co, Fe, Mn, Cr, V, Al, Nb, W or B or replacing part of Ti—Ni alloy by 0.01 to 30.0 atom % of X to form Ti—Ni—X alloys wherein X is Cu, Pd or Zr and/or selecting the conditions of cold working and/or final heat treatment. By the term "superelasticity" it is meant that when an alloy

is deformed (bent, stretched or compressed) at service temperature to the extent where conventional metals undergo plastic deformation and then released from deformation, the alloy resumes the original shape without a need for heating.

Typically the superelastic metal tube 101 has an outer diameter of about 0.4 to 1.0 mm, preferably 0.5 to 0.8 mm, a wall thickness of about 50 to 200 mm, preferably 80 to 150 μm, a length of about 500 to 4,000 mm, preferably 1,000 to 3,000 mm, a buckling strength (yield stress under load) of about 5 to 200 kg/mm², preferably 8 to 150 kg/mm² at 22° C., and a restoring stress (yield stress upon unloading) of about 3 to 180 kg/mm², preferably 5 to 130 kg/mm² at 22° C.

In the catheter 100 of this embodiment, the superelastic metal tube 101 has a distal zone 102c where a spiral slit 106 is formed as shown in FIG. 25 and FIG. 26 which is an enlarged partially cut-away view of the distal zone in FIG. 25. The slit width is not fixed since it is determined in consideration of the catheter outer diameter or the like. The slit width is preferably 0.1 to 1.5 mm, more preferably 0.5 to 1.0 mm. In other words, the slit width is preferably about ⅛ to ¾, more preferably ⅓ to ½ of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. Where the spiral slit 106 has a constant pitch, the pitch is preferably about 0.5 to 2.0 mm, more preferably 0.5 to 1.0 mm because within this range, the metal tube distal zone is fully flexible and not broken during operation. The extent of the distal portion of the metal tube where the slit is formed is determined by taking into account the length of the catheter or the like. Typically the slit is formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

In one preferred example, the spiral slit 106 is formed at increasing pitches. As shown in FIGS. 25 and 26, the slit pitch is shorter at the distal end (left-hand side) and longer on the proximal end (right-hand side) of the distal zone 102c. Then the superelastic metal tube 101 becomes more flexible toward the distal end. Such a gradual change of physical properties ensures smoother bending of the metal tube distal zone and easier manipulation of the catheter. Where the slit has a variable pitch, the pitch is preferably about 0.5 to 3.0 mm at the distal end and about 5 to 10 mm at the proximal end of the distal zone 102c, and an intermediate value at an intermediate region. It is also acceptable that the pitch be continuously increased from the distal end toward the proximal end. Within this range, the metal tube distal zone is fully flexible and not broken during operation.

A single spiral slit is formed in the embodiment of FIGS. 25 and 26 although two or more slits may be formed.

The superelastic metal tube 101 is covered with the synthetic resin layer 104. More particularly, the synthetic resin layer 104 covering the metal tube 101 includes outside and inside layers 104a and 104b covering the outside and inside surfaces of the metal tube 101, respectively. Past the distal end of the metal tube 101, the outside and inside resin layers 104a and 104b merge into an integral layer. It is only required that the resin layer covers at least the outside surface of the metal tube while the inside resin layer 104b may be omitted.

Although part of the resin material of which the resin layer is made may flow into the slits 106 in the superelastic metal tube 101, it is preferred that the slits be substantially free of the resin material and empty. In the absence of the resin material flowing into the slits 106, flexural motion of the metal tube 101 is never obstructed.

5,507,766

25

In the catheter 100 of this embodiment, the distal section 102a is the tip member 105 made of synthetic resin which is fixedly connected to the distal end of the main body section 102b or integrated resin layer 104. In the illustrated embodiment, the synthetic resin layer 104 is tapered forward while the base portion of the tip member 105 is also tapered in conformity with the tapered layer 104. The distal end 109 of the tip member 105 and hence the catheter 100 has a smaller diameter than the remainder. It is preferred that the leading edge 109 of the tip member 105 and hence the catheter 100 presents a blunt curved surface for preventing damage to the vascular wall and improving manipulation of the catheter.

Instead of the tip member 105, the synthetic resin layer 104 covering the metal tube 101 may be extended forward (leftward in FIG. 25) to form the distal section 102a integral with the resin layer 104.

Synthetic resins are used to form the synthetic resin layer 104 and tip member 105. Examples include thermoplastic resins such as polyolefins (e.g., polyethylene and polypropylene), polyolefin elastomers (e.g., ethylene elastomers, polypropylene elastomers, and ethylene-propylene copolymer elastomers), polyvinyl chloride, ethylene-vinyl acetate copolymers, polyamide elastomers, and polyurethane, and fluoro-resins, and silicone rubber. Preferred are the polyethylene, polyamide elastomers, and polyurethane. Particularly when the catheter is applied to a catheter for administering an embolic substance (e.g., a dimethyl sulfoxide solution of cyanoacrylate or ethylene-vinyl alcohol copolymers) into a cerebral blood vessel, those synthetic materials which are insoluble in such solvents as dimethyl sulfoxide are preferred. Preferred synthetic resins for such catheters are solvent-resistant resins such as polyamide elastomers.

The synthetic resin layer 104 should preferably be flexible enough not to obstruct bending of the superelastic metal tube 101. It is also preferred to incorporate into the synthetic resin of the layer 104 and tip member 105 a radiopaque contrast substance in powder form, for example, elemental metals such as barium, tungsten and bismuth and compounds thereof. This facilitates the operator to locate the catheter over its entirety during insertion into a blood vessel. Preferably the synthetic resin layers 104a and 104b covering the metal tube each have a thickness of about 5 to 300 μm, more preferably 10 to 200 μm.

Typically, the main body section 102b of the catheter has an outer diameter of about 0.9 to 7.0 mm, preferably 1.0 to 6.0 mm. The distal section 102a has an outer diameter of about 0.4 to 1.0 mm, preferably 0.5 to 0.8 mm.

The outside surface of the catheter (more specifically, the outside surface of outside resin layer 104a) may be coated with a biocompatible, especially anti-thrombotic, resin. Preferred anti-thrombotic resins are poly(hydroxyethyl methacrylate) and hydroxyethyl methacrylate-styrene copolymers (e.g., HEMA-St-HEMA block copolymers). Especially when a radiopaque contrast substance is mixed with a synthetic resin, such coating is preferred for eliminating the surface roughness associated with the radiopaque powder. While biocompatible resins are preferred, the same synthetic resin as used in forming the layer or tip member, but free of radiopaque powder may be thinly coated.

Also the catheter (outside resin layer 104a) on its outside surface is preferably treated so that the surface may exhibit lubricity when contacted with blood or body fluid. Such treatments include coating and fixation of hydrophilic polymers such as poly(2-hydroxyethyl methacrylate), poly(hydroxyethyl acrylate), hydroxypropyl cellulose, methyl vinyl

26

ether-maleic anhydride copolymers, polyethylene glycol, polyacrylamide, and polyvinyl pyrrolidone.

To the catheter 100 at the proximal end (right end in FIG. 25) is fixedly mounted a hub 120. More particularly, a reinforcing sleeve 108 is fitted over the proximal end of the main body section 102b. The reinforcing sleeve 108 and the main body section 102b are inserted into a bore in the hub 120 and adhesively bonded thereto.

The shape of slit is not limited to that shown in FIG. 26. FIG. 27 shows another example of the slit.

The catheter 111 of this embodiment has the same basic construction as the embodiment of FIGS. 25 and 26. In the catheter 111, the superelastic metal tube 101 is provided with a spiral slit 106 having a width which is greater at the distal end and smaller at the proximal end of the flexible zone. The slit width is reduced from the distal end toward the proximal end. Then the metal tube becomes more flexible toward the distal end, ensuring smoother bending of the metal tube distal zone and more effective manipulation of the catheter.

Although the slit width is determined in consideration of the catheter's outer diameter or the like, it is preferably about 0.1 to 2.0 mm at the distal end and about 0.1 to 0.5 mm at the proximal end. In other words, the slit width is preferably about ⅛ to ¾, more preferably about ½ to ¼ of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. In an intermediate region between the distal and proximal ends, the slit width may have an intermediate value or be gradually decreased from the distal end to the proximal end of the metal tube distal zone. The pitch of the slit 106 may be fixed or decreased continuously or stepwise from the distal end toward the proximal end. The extent of the distal zone of the metal tube where the slit is formed is determined by taking into account the length of the catheter or the like. Typically the slit is formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof. A single spiral slit is formed in the embodiment of FIG. 27 although two or more slits may be formed.

FIG. 28 shows a further example of the slit. The catheter 125 of this embodiment has the same basic construction as the embodiment of FIGS. 25 and 26. In the catheter 125, the superelastic metal tube 101 is provided with a plurality of equally spaced linear slits 106 extending parallel to the tube axis. The slits 106 render the distal zone of the metal tube flexible, ensuring smoother bending of the metal tube distal zone and easier manipulation of the catheter.

The slit width is not fixed since it is determined in accordance with the catheter outer diameter or the like. The slits preferably have a circumferential width of about 0.1 to 0.5 mm. Two to twelve slits 106 are preferably formed because within this range, the distal zone of the metal tube is fully flexible and not broken during operation. The slits preferably have a length of about 100 to about 1,000 mm, more preferably 150 to 500 mm.

FIG. 29 shows a further example of the slit. The catheter 126 of this embodiment has the same basic construction as the embodiment of FIGS. 25 and 26. In the catheter 126, the superelastic metal tube 101 is provided with a plurality of triangular slits 106 extending from the distal end to the proximal end of the distal zone 102c. The provision of slits 106 makes the distal zone of the metal tube more flexible than the remainder. As shown in FIG. 29, the slits 106 are gradually decreased in width from the distal end to the proximal end of the distal zone of the superelastic metal tube 101, or differently stated, gradually increased in width

BSC-SJA-1385

5,507,766

27

toward the distal end. The slit has the maximum width at the distal end of the metal tube 101. Then as one goes toward the distal end, the superelastic metal tube 101 is more flexible and deformable and the side wall is more deformable radially inward and outward. Preferably two to eight slits 106 are formed at approximately equal intervals. Also preferably, the slits 106 have a maximum width of about 0.05 to 0.5 mm at the distal end and a length of about 100 to 1,000 mm, more preferably 150 to 500 mm.

A still further example of the superelastic metal tube and slit is illustrated in FIG. 30.

In the catheter 127 of this embodiment shown in FIG. 30, the superelastic metal tube 101 includes a distal portion which is tapered or diametrically reduced toward the distal end (left-hand end in FIG. 30). A spiral slit 106 is formed in the tapered distal zone of the metal tube 101. Such a tube can be prepared by forming a tube having a tapered end portion and machining a spiral slit in the tapered portion. The tube having a tapered end portion can also be prepared by machining a spiral slit in one end portion of a metal tube of a fixed diameter and axially stretching the slit portion.

The slit width is not fixed since it is determined in accordance with the catheter outer diameter or the like. The slit width is preferably about 0.1 to 1.5 mm, more preferably 0.5 to 1.0 mm. Where the spiral slit 106 has a constant pitch, the pitch is preferably about 0.5 to 2.0 mm, more preferably 0.5 to 1.0 mm. The extent of the distal portion of the metal tube where the slit is formed is determined by taking into account the length of the catheter or the like. Typically the slit is formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

Also preferably, the spiral slit 106 has a reduced pitch at the distal end and an increased pitch at the proximal end of the metal tube distal zone. Where the slit has a variable pitch, the pitch is preferably about 0.5 to 3.0 mm at the distal end and about 5 to 10 mm at the proximal end of the distal zone and an intermediate value at an intermediate region. It is also acceptable that the pitch be continuously increased from the distal end toward the proximal end. A single spiral slit is formed in the embodiment of FIG. 30 although two or more slits may be formed.

Referring to FIGS. 31 and 32, there is illustrated a catheter according to a further embodiment of the invention.

The catheter 128 of the illustrated embodiment has the same basic construction as that shown in FIGS. 24 to 26 and like parts are designated by the same numerals. The difference of the catheter 128 of this embodiment from the catheter 100 of the previous embodiment resides in the construction of the superelastic metal tube 101 and tip member 105. In the catheter 128, the synthetic resin layer 104a covering the superelastic metal tube 101 terminates at a position retracted a distance from the distal end of the metal tube toward the proximal end, that is, the distal end of the metal tube 101 is not covered with the resin. Instead, the tip member 105 defines an extra cylindrical rear bore into which is inserted the exposed distal portion of the metal tube 101. The tip member 105 and the synthetic resin layer 104 are joined together with the distal portion of the metal tube 101 inserted in the cylindrical bore of the tip member 105.

The superelastic metal tube 101 in a distal zone is provided with a plurality of perforations 107 so that the metal tube distal zone is more flexible and bendable than the remainder. The flexible distal zone of the metal tube 101 reduces the difference in physical properties between the metal tube 2b and the resin layer 104 and tip member 105,

28

thereby preventing separation and differential motion therebetween and facilitating manipulation of the catheter.

The diameter of perforations is not fixed since it is determined in accordance with the number of perforations, the outer diameter of metal tube and the like. Typically the perforations 107 have a diameter of about 0.1 to 0.4 mm, preferably 0.2 to 0.3 mm. In other words, the pore diameter is preferably about 1/10 to 1/3 of the outer diameter of the metal tube. Within this range, the metal tube distal zone is fully flexible and not broken during operation. The perforations 107 are preferably spaced a distance of about 0.1 to 0.5 mm. Within this range, the metal tube distal zone is fully flexible and not broken during operation. The extent of the distal zone of the metal tube which is perforated is determined by taking into account the catheter length or the like. Typically the perforations are formed in a distal region of the metal tube which extends about 100–1,000 mm, preferably 150–500 mm from the distal edge thereof.

As shown in FIGS. 31 and 32, more perforations 107 are distributed near the distal end than near the proximal end of the perforated zone. Then the superelastic metal tube 101 becomes more flexible toward the distal end. Such a gradual change of physical properties ensures smoother bending of the metal tube distal zone and more adequate manipulation of the catheter. More specifically, the number of perforations 107 is gradually increased from the proximal end to the distal end of the perforated zone as shown in FIGS. 31 and 32. Then the superelastic metal tube 101 becomes more flexible toward the distal end, ensuring smoother bending of the metal tube distal zone and more convenient manipulation of the catheter. Where the perforation distribution is varied in this way, the spacing between perforations is about 0.1 to 0.2 mm at the distal end and about 0.3 to 0.5 mm at the proximal end. In an intermediate region between the distal and proximal ends, the spacing between perforations has an intermediate value or is gradually varied.

Instead of the varying perforation distribution, the diameter or area of perforations may be varied such that the diameter or area is greater near the distal end than near the proximal end.

With respect to the shape, the perforations need not be true circle and may be ellipsoidal, for example, oval holes elongated in a circumferential or axial direction of the metal tube or polygonal such as square or pentagonal holes. Each perforation preferably has an area of 0.007 to 0.13 mm².

Although part of the synthetic resin material of which the resin layer 104 and tip member 105 are made may flow into the holes 107 in the superelastic metal tube 101, it is preferred that the holes 107 be substantially free of the resin material and empty. In the absence of the resin material flowing into the holes, the metal tube 101 undergoes free flexural motion.

Slits or holes are formed in the superelastic metal tube by any of conventional techniques including laser machining (e.g., YAG laser), electric discharge machining, chemical etching, machining, and combinations thereof.

## EXAMPLE

Examples of the catheter according to the invention are given below by way of illustration and not by way of limitation.

A catheter as shown in FIGS. 24 and 25 was fabricated. A pipe of Ti—Ni alloy containing 51 atom % of nickel was cold worked into a superelastic metal tube having an outer diameter of 1.0 mm, an inner diameter of 0.85 mm, and a

BSC-SJA-1385

5,507,766

29

length of 100 cm. A spiral slit was cut in a distal zone of the
metal tube which extended 20 cm from the distal end, using
a YAG laser machine model ML-4140A (Miyachi Technos
K.K., laser irradiation at a power of 4 W and an irradiation
rate of 10 mm/min.). The spiral slit had a constant width of
0.5 mm and a pitch which gradually increased from 1 mm
at the distal end to 10 mm at the terminus. The metal tube
including the slit portion was covered on both the inside and
outside surfaces with polyethylene. The polyethylene coat-
ing did not substantially flow into the slit and the slit
remained empty. The resin coated superelastic metal tube
constituted a catheter main body section. The resin layer
covering the metal tube was 0.04 mm thick on the outside
and 0.03 mm on the inside. The catheter main body section
was 1.08 mm in outer diameter and 0.79 mm in inner
diameter.

A tip member constituting a catheter distal section was
molded from polyethylene to a length of 20 cm, an outer
diameter of 0.9 mm and an inner diameter of 0.8 mm. The
tip member was connected to the distal end of the resin-
coated superelastic metal tube by fusion welding.

A hub as shown in FIG. 25 was molded from polycar-
bonate and adhesively joined to the proximal end of the
resin-coated superelastic metal tube, completing the cath-
eter.

The catheter was measured for modulus of elasticity at
different positions. For measurement, Autograph AGS-100D
manufactured by Shimazu Mfg. K.K. was used. Measure-
ment was done as shown in FIG. 33 by setting a pair of rods
having a diameter of 4 mm at a center-to-center distance of
25 mm, resting a selected area of the catheter on the rods,
and loading the span portion by means of a pusher having a
semispherical lower end.

Test conditions are shown below.

Test mode: cycle (down start)

Load cell: 5000 gf

F.S. load: 2500 gf (×2)

Test speed: 5 mm/min.

Minimum stroke: 0.00 mm stop

Maximum stroke: 2.00 mm return

Chart control: X-P C (×50)

The results of measurements are shown in Table 1.

TABLE 1

| Catheter | Load |
|---|---|
| Main body section, no slit area | 274 g |
| Main body section, slit, 10 mm pitch area | 135 g |
| Main body section, slit, 5 mm pitch area | 79 g |
| Main body section, slit, 2 mm pitch area | 26 g |
| Distal section (solely polyethylene) | 14 g |

As is evident from Table 1, the catheter of the invention
has a gradual change in physical property from the main
body portion of the metal tube to the most distal end of the
catheter through the metal tube distal zone. There has been
described a vascular dilatation instrument having a fully
flexible distal zone and capable of transmitting translational
and torsional forces from the proximal end to the distal end
of the instrument (improved in pushability and torque trans-
mission). The distal zone of the superelastic metal tube is
more flexible and deformable than the main body portion.
The flexible distal zone of the metal tube provides a smooth
transition from the main body portion to the leading resinous
portion. When a load is applied to the transition between the
relatively stiff main body portion and the relatively flexible

30

distal portion, the distal portion follows the load and
deforms in the loading direction. This prevents angular
folding at the transition which would otherwise occur due to
the difference in physical properties between the metal tube
and the synthetic resin.

The same applies to the catheter.

When a spiral slit or perforations are formed in the distal
zone of the metal tube, the distal zone becomes more flexible
and bendable. This minimizes the difference in physical
properties between the metal tube and the synthetic resin
layer, eliminating separation and differential motion ther-
ebetween. The instrument or catheter is thus more smooth
and effective to manipulate.

Although some preferred embodiments have been
described, many modifications and variations may be made
thereto in the light of the above teachings. It is therefore to
be understood that within the scope of the appended claims,
the invention may be practiced otherwise than as specifically
described.

What is claimed is:

1. A vascular dilatation instrument comprising:

an inner tube defining a first lumen extending between an
open distal end and a proximal portion,

an outer tube disposed coaxially around said inner tube,
having a distal end retracted a predetermined distance
from the distal end of said inner tube and a proximal
portion, and defining a second lumen with the outside
surface of said inner tube,

an inflatable member having one end attached to said
inner tube and another end attached to said outer tube,
and defining an interior space in fluid communication
with said second lumen,

a first opening disposed in the proximal portion of said
inner tube in communication with said first lumen, and

a second opening disposed in the proximal portion of said
outer tube in fluid communication with said second
lumen,

wherein

at least one of said inner tube and said outer tube includes
a main body section based on a superelastic metal tube
and a distal section made of a synthetic resin, the
superelastic metal tube including a deformable distal
zone which is more flexible than the remainder of the
metal tube, and the deformable distal zone of said
superelastic metal tube is gradually increased in flex-
ibility from the proximal end to the distal end of the
zone.

2. A vascular dilatation instrument according to claim 1
wherein said outer tube includes the superelastic metal tube
and a synthetic resin tube covering the surface of said metal
tube, said synthetic resin tube protruding beyond the distal
end of said metal tube to form the distal section of said outer
tube.

3. A vascular dilatation instrument according to claim 1
wherein said inner tube includes the superelastic metal tube
and a synthetic resin tube covering the surface of said
superelastic metal tube, said synthetic resin tube protruding
beyond the distal end of said superelastic metal tube to form
the distal section of said inner tube.

4. A vascular dilatation instrument according to claim 1
wherein said superelastic metal tube is provided with a slit
extending from the distal end toward the proximal end.

5. A vascular dilatation instrument according to claim 1
wherein said superelastic metal tube is provided with a
plurality of perforations in the distal zone thereof.

6. A vascular dilatation instrument according to claim 4
wherein said slit is a spiral slit.

5,507,766

31

7. A vascular dilatation instrument according to claim 6 wherein the width of said spiral slit in an intermediate region between the distal and proximal ends of said deformable distal zone is an intermediate value between a distal end and proximal ends of said deformable distal zone.

8. A vascular dilatation instrument according to claim 6 wherein the pitch of said slit is decreased stepwise from a distal end of said deformable distal zone toward a proximal end of said deformable distal zone.

9. A vascular dilatation instrument according to claim 6 wherein said spiral slit is gradually reduced in pitch toward the distal end of said metal tube.

10. A vascular dilatation instrument according to claim 6 wherein said spiral slit is gradually increased in width toward the distal end of said metal tube.

11. A vascular dilatation instrument comprising:

a tubular member having a lumen therethrough and an opening in fluid communication with said lumen,

a leading head, and

an inflatable member having one end attached to said tubular member and another end attached to said leading head and defining an interior space in fluid communication with said lumen through said opening,

said tubular member including a main body portion based on a superelastic metal tube and a distal portion made of a synthetic resin, the superelastic metal tube including a deformable distal zone which is more flexible than the remainder of the metal tube, and the deformable distal zone of said superelastic metal tube is gradually increased in flexibility from the proximal end to the distal end of the zone.

12. A vascular dilatation instrument according to claim 11 further comprising an elastic shaft extending through said lumen and having a distal end connected to said leading head.

13. A vascular dilatation instrument according to claim 11 wherein said tubular member includes the superelastic metal tube and a synthetic resin tube covering the surface of said metal tube, said synthetic resin tube protruding beyond the distal end of said metal tube to form the distal portion of said tubular member.

14. A vascular dilatation instrument according to claim 11 wherein said superelastic metal tube is provided with a slit extending from the distal end toward the proximal end thereof.

15. A vascular dilatation instrument according to claim 11 wherein said superelastic metal tube is provided with a plurality of perforations in the distal zone thereof.

16. A vascular dilatation instrument according to claim 11 wherein the deformable distal zone of said superelastic metal tube is more flexible at the distal end than at the proximal end of the zone.

17. A vascular dilatation instrument according to claim 14 wherein said slit is a spiral slit.

18. A vascular dilatation instrument according to claim 17 wherein the width of said spiral slit in an intermediate region between the distal and proximal ends of said deformable

32

distal zone is an intermediate value between a distal end and proximal ends of said deformable distal zone.

19. A vascular dilatation instrument according to claim 17 wherein the pitch of said slit is decreased stepwise from a distal end of said deformable distal zone toward a proximal end of said deformable distal zone.

20. A vascular dilatation instrument according to claim 17 wherein said spiral slit is gradually reduced in pitch toward the distal end of said metal tube.

21. A vascular dilatation instrument according to claim 17 wherein said spiral slit is gradually increased in width toward the distal end of said metal tube.

22. A catheter comprising:

a main body section including a superelastic metal tube and a synthetic resin layer covering said metal tube, and

a distal section made of a synthetic resin,

the superelastic metal tube including a deformable distal zone which is more flexible than the remainder of the metal tube, and the deformable distal zone of said superelastic metal tube is gradually increased in flexibility from the proximal end to the distal end of the zone.

23. A catheter according to claim 22 wherein said superelastic metal tube is provided with a slit extending from the distal end toward the proximal end thereof.

24. A catheter according to claim 23 wherein said slit is a spiral slit.

25. A catheter according to claim 24 wherein the width of said spiral slit in an intermediate region between the distal and proximal ends of said deformable distal zone is an intermediate value between a distal end and proximal ends of said deformable distal zone.

26. A catheter according to claim 24 wherein the pitch of said slit is decreased stepwise from a distal end of said deformable distal zone toward a proximal end of said deformable distal zone.

27. A catheter according to claim 24 wherein said spiral slit is gradually reduced in pitch toward the distal end of said metal tube.

28. A catheter according to claim 24 wherein said spiral slit is gradually increased in width toward the distal end of said metal tube.

29. A catheter according to claim 22 wherein said superelastic metal tube is provided with a plurality of perforations in the distal zone thereof.

30. A catheter according to claim 22 wherein the deformable distal zone of said superelastic metal tube is more flexible at the distal end than at the proximal end of the zone.

31. A vascular dilatation instrument according to claim 1 wherein the deformable distal zone of said superelastic metal tube is more flexible at the distal end than at the proximal end of the zone.

*   *   *   *   *



UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :  5,507,766

DATED       :  April 16, 1996

INVENTOR(S) :  Takahiro KUGO et al

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Column 1, line 24, delete "time" and insert -- the --.

In Column 4, line 14, delete "superelasLic" and insert -- superelastic --.

In Column 11, line 46, delete "100-1,000 ms," and insert -- 100-1,000 mm, --.

In Column 24, line 8, delete "50 to 200 mm" and insert -- 50 to 200 $\mu$m --.

Signed and Sealed this

Eighth Day of October, 1996

Attest:

BRUCE LEHMAN

Attesting Officer              Commissioner of Patents and Trademarks

BSC-SJA-1389

# EXHIBIT 72

# United States Patent [19]

Karwoski et al.

[11] Patent Number: 4,718,907

[45] Date of Patent: Jan. 12, 1988



[54] VASCULAR PROSTHESIS HAVING FLUORINATED COATING WITH VARYING F/C RATIO


[75] Inventors: Theodore Karwoski; Yasuo Matsuzawa, both of Nashua, N.H.

[73] Assignee: Atrium Medical Corporation, Hollis, N.H.



[21] Appl. No.: 747,034

[22] Filed: Jun. 20, 1985

[51] Int. Cl.[4] ........ A61F 2/04; A61F 2/06

[52] U.S. Cl. ........ 623/12; 623/1; 623/66; 427/2; 427/255.6; 427/296; 427/41; 427/40; 128/334 R; 204/169; 428/395; 428/421

[58] Field of Search ........ 427/2, 255.5, 296, 255.6, 427/39, 40; 623/1, 11, 12, 66; 128/334 R, DIG. 14; 428/394, 395, 409, 422, 420, 421; 204/158 HA, 158.19, 169; 66/178 A, 194–197; 139/421–423



[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,068,510 | 12/1962 | Coleman | 18/2 |
| 3,663,265 | 5/1972 | Lee et al. | 117/93.1 |
| 3,839,743 | 10/1974 | Schwarcz | 3/1 |
| 4,076,916 | 2/1978 | Lagow | 526/43 |
| 4,188,426 | 2/1980 | Auerbach | 427/40 |
| 4,193,138 | 3/1980 | Okita | 3/1.4 |
| 4,229,838 | 10/1980 | Mano | 3/1.4 |
| 4,252,848 | 2/1981 | Datta et al. | 428/64 |
| 4,264,750 | 4/1981 | Anand et al. | 525/356 |
| 4,286,341 | 9/1981 | Greer et al. | 3/1.4 |
| 4,349,582 | 9/1982 | Beerwald et al. | 427/38 |
| 4,404,256 | 9/1983 | Anand et al. | 428/409 |
| 4,488,954 | 12/1984 | Hatada et al. | 204/169 |
| 4,632,842 | 12/1986 | Karwoski et al. | 427/2 |
| 4,652,263 | 3/1987 | Herweck et al. | 128/334 R X |
| 4,656,083 | 4/1987 | Hoffman et al. | 427/2 X |

FOREIGN PATENT DOCUMENTS

54-56672 7/1979 Japan .

OTHER PUBLICATIONS

Garfinkle, Hoffman, Ratner, Reynolds, & Hanson–"Effects of a Tetrafluoroethylene Glow Discharge on Patency of Small Diameter Dacron Vascular Grafts", vol. XXX Trans Am. Soc. Artif. Intern Organs, 1984—pp. 432–440.

Yasuda, H.–"Glow Discharge Polymerization", vol. 16, Journal of Polymer Science: Macromolecular Reviews, pp. 199–293, 1981.

Yasuda & Hirotsu–"Critical Evaluation of Conditions of Plasma Polymerization" Materials Research Center, University of Missouri-Rolla, Rolla, Missouri 1977.

Yasuda & Hsu, "Some Aspects of Plasma Polymerization of Fluorine-Containing Organic Compounds. II. Comparison of Ethylene and Tetrafluoroethylene", vol. 16, Journal of Polymer Sci., 415–425 (1978).

Soong & Bell–"The Effects of Hydrogen on the Plasma Polymerization of Tetrafluoroethylene", vol. 21, Polymer Engineering & Science, Aug., No. 11 (1981).


(List continued on next page.)


*Primary Examiner*—Richard J. Apley
*Assistant Examiner*—Alan W. Cannon
*Attorney, Agent, or Firm*—Lahive & Cockfield


[57] ABSTRACT


[illegible]


15 Claims, 6 Drawing Figures



**4,718,907**

Page 2

## OTHER PUBLICATIONS

Morosoff & Yasuda—"Plasma Polymerization of Tetrafluoroethylene II. Capacitive Radio Frequency Discharge", vol. 23, Journal of Applied Polymer Science, pp. 3449–3470, (1979).

Masuoka & Yasuda—"Plasma Polymerization of Tetrafluoroethylene III. Reproducibility and Effects of Substrate and Reactor Materials", vol. 19, Journal of Polymer Sci., pp. 2937–2946 (1981).

Morosoff & Yasuda—"Plasma Polymerization of Tetrafluoroethylene III. Capacitive Audio Frequency (10 kHz) & AC Discharge", vol. 23, Journal of Applied Polymer Sci., pp. 3471–3488, (1979).

Yanagihara & Yasuda, "Plasma Polymerization of Tetrafluoroethylene IV. Comparison of Ethylene & Tetrafluoroethylene by Measurement of Electron Temperature & Density of Positive Ions", vol. 20, Journ. of Polymer Sci., pp. 1833–1846, (1982).

Yasuda & Gazicki, "Biomedical Applications of Plasma Polymerization & Plasma Treatment of Polymer Surfaces, vol. 3, Biomaterials—pp. 68–77, Apr. (1982).

Cohen & Beddour—"Surface Modification of Low Density Polyethylene in a Fluorine Gas Plasma", vol. 22, Polymer, pp. 361–371, Mar. (1981).

Corbin, Cohen & Baddour—"Kinetics of Polymer Surface Fluorination: Elemental and Plasma-Enhanced Rreactions", vol. 23, Polymer, pp. 1546–1548, Sep. (1982).

Yasuda & Hirotsu—"Distribution of Polymer Deposition in Plasma Polymerization II. Effect of Reactor Design", vol. 16, Journal of Polymer Science: Polymer Chemistry Edition, pp. 313–326, (1978).

Yasuda—"Glow Discharge Polymerization", vol. 3, pp. 102–122, Contemporary Topics in Polymer Science, (1979).

Yasuda et al. "Glow Discharge Polymers as Coatings for Implanted Devices", pp. 109–113 ISA (1981).

Matsuzawa & Yasuda, "Semi-Continuous Plasma Polymerization Coating Onto the Inside Surface of Plastic Tubing", pp. 2–21.

Dept. of Chemical Engineering & Graduate Center for Materials Research University of Missouri-Rolla, Rolla, MO 65401.

Garfinkle et al. "Improved Patency in Small Diameter Dacron Vascular Grafts after a Tetrafluoroethylene Glow Discharge Treatment", p. 337, Second World Congress on Biomaterials, 10th Ann. Mtg., Apr. 27–May 1 (1984).

Ratner et al, "RF Plasma-Deposited Films as Model Substrates for Studying Biointeractions", p. 129, Second World Congress on Biomaterials, 10th Ann Mtg, Apr. 27–May 1, 1984.

Yasuda et al, "Blood Surface Interaction Investigated with Ultrathin Coatings of Glow Discharge Polymers Applied onto the Inner Surface of Small Diameter Silastic Tubing"–Second World Congress on Biomaterials, 10th Ann Mtg., Apr. 27–May 1, 1984.

Hoffman, Garfinkle, Ratner, "Surface Modification of Small Diameter Dacron Vascular Grafts After a Tetrafluoroethylene Glow Discharge Treatment"–Second World Congress on Biomaterials–10th Annual Mtg., Apr. 27–May 1, 1984.

Dr. Hirotsugu K. Yasuda Abstract, "Method and Design of Equipment to Coat Inside Surface of Long Plastic Tubing, Univ. of Missouri.





FIG. 1

FIG. 2

FIG. 1A

FIG. 2A



BSC-SJA-1393

# VASCULAR PROSTHESIS HAVING FLUORINATED COATING WITH VARYING F/C RATIO

## BACKGROUND OF THE INVENTION

This invention relates to methods of coating materials intended for implantation and to the coated materials. More particularly, it relates to the deposition of fluoropolymer coatings on the surfaces of tubular and other substrates to improve the substrate's biocompatibility properties.

Devices intended for use within the body such as vascular prostheses often comprise materials which have limited biocompatibility and non-thrombogenic properties. The surfaces of such devices may be coated to improve biocompatibility without compromising other properties such as durability and flexibility. One technique for coating such materials is plasma polymerization. The surfaces of tubes comprising polymeric materials can be modified by deposition of a thin layer of a fluorine-containing polymer using plasma polymerization techniques, also known as glow discharge. The technique involves introducing a polymerizable organic monomer in the gaseous state into a vacuum containing the substrate material to be coated. The gas is then subjected to an electric discharge to initiate polymerization reactions, generating ions or free radicals which react with and deposit on the substrate. The polymer formed is normally deposited as a thin layer over the substrate material present in the reaction vessel. The bulk substrate characteristics are preserved, but the surface properties, which are major determinants of biocompatibility and non-thrombogenicity, can be modified or improved by plasma polymerization.

Plasma polymerization was used to prepare biomaterials as early as 1969 (J. R. Hollahan, et al., *J. Appl. Polymer Science* 13, 807, 1969). A leader in the area, Dr. H. Yasuda, conducted blood coagulation studies on glow discharge (plasma) polymer surfaces in 1976. A. W. Hahn investigated biomedical applications as reported in an *NBS Spec. Publ.* 415 (May 1975). More recently, other investigators have also reported the results of experiments on plasma polymerization treatments of substrates intended for use within the body.

There has been a general lack of success and relatively few publications in the plasma polymerization biomaterials area (Yasuda, H. and Gazicki, M., Biomedical Applications of Plasma Polymerization in Plasma Treatment of Polymer Surfaces, *Biomaterials* vol. 3: 68, April 1982). It is believed that no glow discharge-coated implantable devices are available commercially, because the problems with the prior art are several. The difficulties with plasma polymerization techniques include variable plasma monomer forms in the gas, variable energies introduced to initiate polymerization, infinitely adjustable gas pressures and concentrations, and poor reactor designs. The prior art techniques generally produce non-uniform coatings or non-continuous coatings, especially on larger substrates. For example, some methods of coating tubes result in a heavy coating accumulation near the end of the tubing where the flow of gas is initiated. In treating the surfaces of elongate substrates there are typically regions along the length of the surface which are uncoated or which have a coating composition different from that intended.

Much of the prior art discloses substrate "treatment" as opposed to substrate "coating". "Treatment" involves extracting atoms and substituting others within the surface of the substrate, for example, a hydrogen atom in a polymer substrate is extracted and replaced with a fluorine atom. For example, U.S. Pat. No. 4,264,750 discloses a process whereby the surface of a hydrocarbon polymer may be fluorinated by replacing hydrogen atoms with a fluorinated species. "Treatment" techniques are generally limited to gases that will not polymerize, but rather form species which replace atoms in the substrate surface. The coating process, on the other hand, involves the build-up of a covalently bonded coating onto a substrate. This technique results in a three-dimensional cross-linked network upon the existing surface of the substrate.

It is an object of this invention to provide cross-linked polymerized coatings by glow discharge on the surfaces of elongate, e.g., tubular, substrates, and to control the ion density and field strength along the length of the tubes during plasma polymerization to provide a uniform coating. Another object is to coat both the inside and outside of a porous tube, so that the fluorine to carbon (F/C) atomic ratio along the length of the tube is substantially uniform, at least on its inside surface, and the F/C ratio of the coating on the interior surface of the tube is greater than the F/C ratio on the exterior. It is another object of the invention to provide a method for producing an F/C ratio gradient in a fluorine-containing coating through a porous substrate wall. Another object is to provide a coating comprising a substantially uniform three-dimensional, cross-linked fluoropolymer, covalently bonded onto a surface, and to provide prosthetic devices or other devices intended for implantation having a low surface energy. Another object of the invention is to provide a method of uniformly and reproducibly coating materials intended for implantation with a fluorine containing, low-energy suface coating having a F/C ratio greater than 1.5. Another object is to provide a porous, coated elastic prosthetic device having a coating which does not break when the device is stretched. Yet another object is to provide a prosthetic device with a thin film coating to achieve a substantially non-thrombogenic blood contact surface. Another object is to provide a process for uniformly coating implantable devices which does not alter or significantly change any mechanical or physical properties of the substrate, except those related to surface energy and composition.

These and other objects of the invention will be apparent from the description and claims which follow.

## SUMMARY OF THE INVENTION

[illegible]

[illegible]

[illegible]

4,718,907

3

greater than 140°. The uniform, low surface energy coatings are extremely hydrophobic and substantially non-thrombogenic. The coatings may be applied to a variety of organic tubular substrates of various dimensions, and advantageously may be applied to elongate substrates such as threads, fibers, and porous or nonporous, planar or tubular webs. The substrate may comprise a woven, nonwoven, or knitted fabric. Preferably, the fabric comprises threads composed of fibers having a diameter of less than about 15 microns. Polyethylene terephthalate is a preferred substrate material. Substrates having a wall thickness less than about 0.60 mm are preferred.

An important embodiment of the invention comprises an implantable device consisting of a hollow tubular substrate having a non-thrombogenic inside surface and a biocompatible outside surface. The inside surface comprises a first crosslinked coating of a fluorine-containing polymer bonded to the substrate having a first, relatively high F/C ratio. The outside surface of the substrate comprises a second crosslinked coating of a fluorine-containing polymer bonded to the outside surface of the substrate and having an F/C ratio lower than that of the interior coating.

In preferred aspects the F/C ratio across the inside of the surface of the tube is substantially uniform, i.e., differs by no more than about 10–12%, and the ratio is at least 1.5, preferably greater than 1.7. The substrate is preferably porous, and the first and second fluorine-containing coatings are contiguous and define a fluorine to carbon ratio gradient through a wall of the substrate.

While the tubular substrate may comprise any desired organic porous material, preferably it comprises a polyethylene terephthalate woven fabric tube consisting of a multiplicity of circumferentially oriented threads interwoven with a multiplicity of axially oriented substantially nonelastic threads. Individual ones of the axially oriented threads define loops extending radially outwardly between adjacent circumferential threads. The loops are set to return to a loop configuration upon release of tension applied axially to the tube. The radially outermost portions of the loops together define an outer macroscopically smooth porous surface. Porous vascular grafts embodying the invention are substantially non-thrombogenic at surfaces designed for contact with blood flow and are relatively biocompatible and non-inflammatory on exterior surfaces. Pores among the threads and fibers of the tube and adjacent the radially extending loops provide a substantially non-inflammatory site for tissue ingrowth. Furthermore, the tube is elastic, smooth, easily sutured, readily handled by the surgeon, and will not develop cracks or voids in the coating by being stretched.

By following the teachings disclosed herein, those skilled in the art will be able to produce non-thrombogenic materials useful as sutures, valves, vascular prostheses, shunts, catheters, and various other devices designed for permanent or temporary implantation. The high F/C ratio non-thrombogenic coating may be applied substantially uniformly over a desired surface of a device and will minimize its tendency to induce thrombus formation.

These and other features of the invention will be apparent from the drawing, description, and claims which follow.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates schematically a portion of an interwoven fabric tube substrate before compaction;

4

FIG. 1A shows a portion of an interwoven fabric tube before compaction as it appears under the microscope;

FIG. 2 illustrates schematically the tube portion of FIG. 1 after compaction treatment to produce axially oriented loops formed between the circumferential threads;

FIG. 2A shows the fabric tube portion of FIG. 1A after compaction treatment as it appears under the microscope;

FIG. 3 diagrammatically illustrates apparatus used for practicing the plasma discharge coating method;

FIG. 4 depicts a coated fabric tube manufactured in accordance with the process disclosed herein.

Like reference characters in the respective drawn figures indicate corresponding parts. The dimensions of the threads and their spacing in FIGS. 1 and 2 are not to scale but rather have been drawn to promote clarity of description.

DESCRIPTION

It has now been discovered that it is possible to deposit a uniform coating of a fluoropolymer having a high fluorine content over the surface of variously shaped organic substrates by exploiting a tubular reactor, controlling gas flow therethrough, and successively exposing relatively small portions of the surface of the substrate to an RF field to induce glow discharge. The coating is characterized by a desireably high fluorine to carbon ratio and by an extremely low surface energy and correspondingly large water contact angle, typically greater than 120° and often exceeding 140°. Such surfaces have been observed to be substantially non-thrombogenic.

Materials coated in accordance with the invention are well suited for fabricating various prosthetic and other devices and objects designed for implantation in the body. By following the teachings disclosed herein, those skilled in the art will be able to produce vascular and other prosthetic devices, sutures, heart valves, shunts, catheters, and other devices. The surfaces of these devices having the polymerized fluorine-containing coating characterized by the properties disclosed herein may be placed in contact with blood with significantly reduced risk of thrombus formation as compared to other materials known to the inventors.

While plasma polymerization techniques are known, including those using fluorine-containing gases such as tetrafluoroethylene, in practice the deposition of such coatings on substrates has been characterized by nonuniformity both from the point of view of the fluorine to carbon ratio and the coating thickness. The unsolved problem has been to control, over the extended surface of a substrate, both the RF field which induces ion generation and the resulting deposition of polymer, and the density of species present in the plasma available for reaction. For example, the present inventors initially experimented with tubular and other elongate substrates disposed between a pair of parallel plate electrodes while maintaining various gas pressures within a large cylindrical reactor. These experiments showed that while the deposition from a plasma of a fluorine-containing polymer could be achieved, its F/C ratio could not be controlled with any precision. Furthermore, the thickness of the coating varied at different regions of the substrate surface, and little or no coating was produced in some regions of the surface. Attempts to coat tubular substrates with such apparatus resulted

BSC-SJA-1395

4,718,907

5

## Substrate Selection

BSC-SJA-1396

4,718,907

7

vary depending on the degree of elasticity desired in the product, on the diameter of the threads, and on the tightness of the weave.

The height and spacing of the loops depends on several factors which include the thickness of the material of the threads, the tightness of the weave, and the length to which the original tube is reduced by compaction.

The fibers are then set in the loop-oriented, compacted form by conventional treatment with a reagent, heat, or some combination thereof while on the mandrel. Using the preferred polyethylene terephthalate threads, excellent results have been achieved by heating the compacted tube to 380° F. for 5-10 minutes. Of course, the temperature to which the tube is heated or whether a reagent treatment is used depends on the particular material from which the threads are made.

The product is a macroscopically smooth, microporous elastic tube section. The loops formed between fill threads return to the loop configuration upon release of tension applied axially to the tube. The loops are smooth and porous because of the fine fibers preferably used, and the compacted fabric has multiple interstices of various dimensions uniformly about its surface which receive connective or other tissue in-growth after implantation. These features facilitate the integration of the tube into surrounding natural tissue upon implantation.

While the above-described elastic tubular substrate is a preferred structure for the manufacture of vascular prostheses, it should be clear that many other types of elongate substrates may be coated in accordance with the teachings disclosed herein. Thus, the non-compacted porous fabric tube of FIG. 1A may be used if desired, and other types of porous or non-porous tubes, planar webs, threads, fibers, and the like may also be coated. In general, the substrate should be composed of an organic material which can form carbon-carbon and carbon-fluorine covalent bonds. Thus, the process can coat stretched or non-stretched polytetrafluoroethylene, amides, esters, vinyls, rubbers and other types of polymeric substrates. Because a uniform, void-free, biocompatible surface coating may be applied in accordance with the process disclosed herein, the process permits the use of materials which heretofore have been considered unsuitable for the manufacture of implantable devices because of their tendency to produce thrombi or inflammation.

## Coating Apparatus

4,718,907

9

ter of 5 mm and a length of 1 meter can be coated on its interior with a covalently bonded, cross-linked fluorine-containing polymer having an F/C ratio greater than 1.5, which ratio differs no more than 10–12% along the length of the tube. For smaller diameter tubes, the variation in F/C ratio along the length of the tube may be greater.

This variation in F/C ratio may be minimized by regulating the amount of gas released into the tube as the RF field traverses the tube by adjusting flow controller 40, by increasing the vacuum drawn through vacuum control 48, or by some combination of the two. This technique permits one to compensate for the decreasing gas pressure and gas density in the downstream directions in the tube by altering gas flow progressively or periodically such that the density of available molecular species in the moving RF field remains more or less constant as the field traverses the reactor. Employing non-tubular substrates such as fibers, threads, or planar webs, the F/C ratio variation along the length of the substrate is smaller as there is far less restriction to flow, and uniformity of the coating is achieved more easily.

In accordance with the invention an excellent vascular graft can be produced which has an interior lumen whose surfaces are extraordinarily nonthrombogenic and has an exterior surface which minimizes inflammatory response upon implantation. The vascular graft has an inside surface coated with a fluorine-containing polymer having an F/C ratio in all regions above 1.5, its outside surface is coated with a fluorine-containing polymer having a lower ratio, e.g., 0.5. Preferably, the substrate used is a microporous fabric tube, knitted, woven, or nonwoven, made of known materials, preferably polyethylene terephthalate. The currently preferred substrate is the elastic tube describe in detail above.

To coat the tube, a suitable pressure differential is established at the inlet 36 and outlet 46 of tubular reactor 30 with tetrafluoroethylene gas flow set at a suitable rate as described below. With the substrate tube 32 in close fitting relation to the interior walls of tubular reactor 30, the fluorine-containing gas flows along the length of the lumen of the substrate, and a portion of it diffuses through the porous walls. The RF field generating device, in FIG. 3 depicted as a pair of spaced apart electrodes 54, is then moved along the length of the tube, preferably from its outlet end 46 to its inlet end 36, resulting in the creation of a plasma within a portion of the volume of the reactor 30, both inside and outside of the tubular substrate 32.

The density of available reactive species adjacent the interior walls of the tubular substrate is such that a coating having a high F/C ratio is uniformly deposited over the tube's interior surface. Within the pores traversing the wall of the substrate, a coating which exhibits an F/C ratio gradient decreasing from the interior wall toward the exterior wall is formed, and on the outside surfaces of the tube a coating with a significantly lower F/C ratio than that of the interior surfaces is produced. Thus, on surfaces of the tube designed for contact with blood, the coating is of very low energy, and substantially nonthrombogenic, whereas, at exterior surfaces, the coating is inert and noninflammatory, making it well suited for tissue ingrowth. Experiments with such tubes implanted in animals indicate that the tubes are characterized by outstanding patency and biocompatibility.

10



Determining Glow Discharge Coating Parameters

The factors which control the F/C ratio of the coating are the type of gas used, the gas flow rate and pressure, and the RF field strength. These factors can be expressed by W/FM, where W denotes discharge power (which is proportional to field strength), F is the flow rate of the gas, and M is the molecular weight of the gas. The F/C ratio varies with any given gas as the values of W/FM vary. To obtain an F/C ratio higher than 1.5, W/FM generally must be within the range of $5 \times 10^7$ joules/Kg to $2 \times 10^8$ joules/Kg. The coatings of the invention have been achieved using a pair of aluminum straps electrodes 2 cm apart, 2 mm from the central axis of the reactor tube, while applying 10–100 watts of power. In the examples disclosed herein, an external capacitive electrode couple was used, powered at 13.56 megahertz.

The RF field produced by such an apparatus obviously can be generated by different types of electrodes, and as noted above, a radio frequency coil may be used. Plasma or glow discharge can be produced by many available sources of radio frequency or microwave excitation or with electrode systems. The radio frequency commonly used is 10 kilohertz to 20 megahertz. Wattage or operating power can vary generally between 0 and 1000 watts.

To obtain the coating on the interior lumen of a tube, the inside diameter of the tube must be taken into account. For example, an 8 mm tubular substrate disposed in a tubular reaction vessel having an inside diameter of 8.2 mm, can be coated on its interior surface with a covalently bonded, cross-linked fluorine-containing polymer having an F/C ratio greater than 1.5 by applying 50 watts of power to the electrodes, moving the RF field at a rate of 40 cm per minute, and flowing pure tetrafluoroethylene gas at a rate of 7 cubic centimeters per minute (as measure at standard temperature and pressure, SCCM) through the tube. Inlet pressure should be maintained at 300 millitorr; outlet pressure at about 100 millitorr. These conditions will not produce high F/C ratio coatings on smaller diameter tubes. For example, for 4 mm tubes, the inside diameter of the reaction vessel should be about 4.2 mm, flow rate 4 SCCM, inlet pressure about 500 millitorr, and outlet pressure 100 millitorr.

Attempts to discern a relationship between tube diameter and length, field strength, flow rate, and speed of travel of the RF field which would enable prediction of successful coating parameters have been unsuccessful. However, for a substrate of a given shape these variables may be determined empirically. Once the parameters are set, coatings may be applied on as many individual substrates of the same type as desired.

The table set forth below defines a set of discharge powers, tetrafluoroethylene monomer flow rates, and

BSC-SJA-1398

4,718,907

11

inlet pressures (6.2 mm tubular reactor containing a 6 mm porous fabric tubular substrate) which result in an interior plasma deposited coating. In the table, DP refers to discharge power in watts, FR refers to actual flow rate, in standard cubic centimeters per minute, and P represents the pressure of the system at the inlet end detected by the pressure monitor in millitorr. A plus sign indicates that glow discharge was achieved; a minus sign indicates the absence of a glow discharge; a double plus sign indicates the region whereis a coating having a fluorine to carbon ratio greater than 1.5 on the inside surface of the tube is produced.

TABLE 1

| DF | FR P | 167 | 2.3 250 | 5.0 360 | 10 510 | 15 610 | 25 930 |
|---|---|---|---|---|---|---|---|
| 10 | | – | – | – | – | – | – |
| 25 | | – | ++ | ++ | ++ | + | – |
| 50 | | – | ++ | ++ | ++ | + | – |
| 75 | | – | + | + | ++ | + | + |
| 100 | | + | + | + | + | + | + |

To determined the parameters which will achieve the high F/C ratio coating for a given system, it is best to run a series of tests with the particular substrate involved starting with an energy input in the vicinity of $1 \times 10^5$ joules/Kg, a flow rate of 2–10 standard cubic centimeters per minute, and a pressure at the inlet end on the order of 200–500 millitorr. By independently varying discharge power, flow rate and/or pressure, a set of parameters become evident which produce the desired high fluorine content, low surface energy coating. For substrates in excess of about 15 cm long, it may be necessary to alter the flow rate of the gas as the RF field traverses the tubular reactor to minimize variations along the length of the substrate. The flow rate of the gas has been determined to be one of the most important variable in controlling the F/C ratio of the coating. Changes in the ratio are the most sensitive to this parameter. Coating thickness depends primarily on the time duration of the glow discharge per unit area of the substrate. In the preferred system wherein the field is transported, this correlates to the speed of movement of the RF field.

A fluorine to carbon ratio greater than 1.5 is most readily achieved if oxygen or oxygen-containing compounds are absent or present at only low concentration. Using tetrafluoroethylene gas, coatings having an F/C ratio as high as 1.98 have been produced. These outstanding results require the use of a gas having a fluorine to carbon atomic ratio of 2 or more. Tetrafluoroethylene, $C_2F_4$, is currently preferred. The coating may also be deposited from $C_3F_6$ with addition of hydrogen. The fluorine to carbon ratio in a given coating may readily be determined by conventional assay techniques, e.g., electron spectroscopy for chemical analysis (ESCA).

The preferred coatings of the invention have a water contact angle, as measured using a goniometer on water drops disposed on coated surfaces, greater than 120°. In fact, the higher ratio coatings have water contact angles of 140° to 150°. Generally, coatings applied in accordance with the process disclosed herein result in water contact angles equal to or greater than polytetrafluoroethylene surfaces. The water contact angle of the coating surface will depend on the particular F/C ratio of the applied coating, and on the geometry and microstructure of the substrate. Porous and non-porous substrate materials, or texturized and smooth, substrate

12

materials, having identical coatings will nevertheless have different water contact angles. Stretched polytetrafluoroethylene vascular grafts coated as disclosed herein typically exhibit little or no change in surface properties versus uncoated grafts. Polytetrafluoroethylene sheets having a water contact angle of about 108° exhibit an angle of 112°–130° when coated. The surfaces of polyvinyl chloride and polyethylene tubing can be coated to achieve significant increases in water contact angle. PVC catheters having inside surfaces characterized by an angle of 120° to 130° are possible.

The invention will be further understood from the following nonlimiting examples.

EXAMPLE 1–7.4 mm Coated Graft

A polyethylene terephthalate flat ribbon woven fabric tube of warp yarns (3 ply 50 denier/72 filaments) and fill yarns (single ply, 100 denier/96 filaments) in a simple weave pattern was loaded onto a teflon-coated stainless steel mandrel. The tube, having an inside diameter of about 6.5–7.0 mm, was loaded onto a 6.7 millimeter (outside diameter) mandrel. The contact between the mandrel and tube material was such that all fibers are pulled and stretched to create a smooth, consistent pattern, eliminating any loose spots or wrinkling. The loaded mandrel was then heat set at 380° F. for 15 minutes to reduce further any looseness of the fabric and to create a smooth internal surface. After cooling, a monofilament of medical grade polypropylene was helically wrapped around the fabric for external support. The polypropylene wrapped fabric was then subjected to heat (380° F. for 5 minutes) to melt and subsequently attach the polypropylene to the fiber structure of the fabric. After cooling, the fabric was mechanically axially compressed so as to minimize the gap between individual circumferential threads or yarns creating a tightly compacted smooth internal surface in contact with the mandrel. The external threads not constrained from radial movement by the fixed wall of the mandrel were thereby deformed to produce radially outwardly spaced loops. These loops create an elasticity in the axial direction improving handling characteristics of the synthetic graft. This external surface also promotes good tissue anchoring while the internal surface maintains a smooth flattened blood contact surface. The compacted tube was then subjected to an elevated temperature (e.g., 360° F. for 3 minutes) to heat set this microscopic loop structure imparting a "memory" to the individual threads.

This compaction procedure converted a 110 cm tube which is inelastic to a 80 cm elastic tube.

After all processing steps, the compacted fabric tube was washed in pyrogen-free detergent water to remove any contaminants. After drying and dehumidification, the elastic fabric tube was ready for coating.

The fabric tube was then loaded into a glass tube that forms the reaction vessel of the plasma deposition system. The ratio of the inside diameter of the glass tube to outside diameter of the fabric tube was about 1.1 to 1. In this case, the outside diameter of the compacted fabric tube was about 8.1–8.3 mm, and the inside diameter of the glass tube was about 8.9 mm. A vacuum of $3 \times 10^{-5}$ mm Hg was then imposed on the plasma system by pumping out gas from one end of the tubular reactor to substantially eliminate any oxygen present. A monomer gas, in this case tetrafluoroethylene, was fed into the system by a mass flow controller from the other end of

BSC-SJA-1399

4,718,907

**13**

the tube. The gas flow rate was 7 standard cubic centimeters per minute. The pumping speed and rate was adjusted to produce a system pressure of 900 millitorr at the inlet end and about 300 millitorr at the outlet end. The pressure drop through the tube between the upstream and downstream ends creates a fluorine to carbon ratio gradient and an uneven thickness of polymer deposited onto the fabric tube due to varying energy and mass at each point. These variations over the length of the tube are no greater than about 10–12%. The F/C ratio of the coating ranged on the inside of the tube from 1.6–1.8. To control the F/C ratio further, the mass flow of monomer gas may be adjusted relative to the position of the energy input of the system so that the number of molecules polymerized is independent of the location or length of the plasma zone.

The energy input or discharge power is supplied by a pair of 6.3 mm wide aluminum band electrodes with an air gap of 2.5 cm which restricts the plasma zone. The electrodes were mounted on a traveling block which traverses the length of the tube to be coated at a speed of one cm per seven seconds. A power input of 50 watts was used. The coating is approximately 300 angstroms thick. A portion of the monomer gas passing through the tube traverses its pores. This results in a fluorinated coating on the outside surface of the tube which has a lower F/C ratio than the inside coating. After plasma polymerization, the elastic synthetic artery is removed from the reactor system, packaged, and sterilized.

**EXAMPLE 2**

A fabric tube of the type set forth in Example 1 about 60 cm long and having an outside diameter of about 10 millimeters was loaded into a 10 mm inside diameter glass tube and placed in the apparatus depicted in FIG. 3. An inlet pressure of 500 millitorr was established in the tube while maintaining a flow rate of tetrafluoroethylene gas of 10 sccm. Coating was conducted at a discharge power of 50 watts and an electrode velocity of one centimeter per 7 seconds. ESCA indicated that the fluorine to carbon ratio of the coating deposited on the inside of the tube was 1.7.

**EXAMPLE 3**



**EXAMPLE 4**



**14**

whereas after coating the angle increased to 108°. ESCA revealed a coating rich in CF₃, CF₂, and CF.

**EXAMPLE 5**

A piece of non-porous polyethylene tubing 50 cm long having an inside diameter of 3.3 mm was provided with a uniform, low energy surface coating extending along the length of its interior surface using the apparatus of FIG. 3 fitted with a glass tube having an inside diameter matching the outside diameter of the tubular substrate. A tetrafluoroethylene gas flow of 20 sccm at an inlet pressure of 500 millitorr was established, and the coating was applied using 30 watts of power while moving the electrode at a rate of 1 cm per 7 seconds. This resulted in deposition of a uniform, void-free fluorinated coating. The integrity of the coating was assessed by circulating an oil soluble dye (sudan red) through the coated tube and an uncoated polyethylene control tube for one hour. The tube samples were then both thoroughly washed to remove residual dye. The interior of the coated tube was uniformly impervious to the red dye whereas the uncoated tube was uniformly stained a deep red color.

The invention may be embodied in other specific forms without departing from the spirit and scope thereof. Accordingly, other embodiments are within the claims which follow:

What is claimed is:

1. An implantable device comprising a hollow porous tubular substrate having a non-thrombogenic inside surface and a biocompatible outside surface, said inside surface comprising a first cross-linked substantially uniform coating of a fluorine-containing polymer bonded to said substrate and characterized by a first F/C ratio greater than 1.3, said outside surface comprising a second cross-linked coating of a fluorine-containing polymer bonded to said substrate and characterized by an F/C ratio lower than said first ratio.

2. The device of claim 1 wherein said first coating has a substantially uniform F/C ratio across said inside surface.

3. The device of claim 1 wherein said first and second coatings are contiguous and define an F/C ratio gradient through a wall of said substrate.

4. The device of claim 1 wherein said tubular substrate comprises a fabric.

5. The device of claim 4 wherein said fabric comprises threads composed of fibers having a diameter of less than approximately 15 microns.

6. The device of claim 4 wherein said fabric comprises polyethylene terephthalate.

7. The device of claim 1 wherein said substrate has a wall thickness less than 0.60 mm.

8. The device of claim 4 wherein said fabric comprises a microporous tube having a longitudinal axis, said tube comprising a multiplicity of circumferentially oriented fill threads interwoven with a multiplicity of axially oriented substantially non-elastic warp threads, individual ones of said axially oriented warp threads defining loops extending radially outwardly between adjacent circumferential fill threads, said loops being set to return to a loop configuration upon release of tension applied axially to said tube, said tube defining an outer macroscopically smooth porous surface.

9. The device of claim 1 wherein said substrate is elastic.

10. An implantable device comprising a tubular substrate having a non-thrombogenic interior surface

BSC-SJA-1400

4,718,907

## 15

greater than about 15 centimeters long in at least one dimension, said surface comprising a first cross-linked coating of a fluorine-containing polymer bonded to said substrate and characterized by an F/C ratio greater than 1.5.

11. The device of claim 10 wherein said coating is characterized by an F/C ratio greater than 1.7.

12. The device of claim 10 wherein said substrate comprises a fabric.

## 16

13. The device of claim 10 wherein said substrate comprises polyethylene terephthalate.

14. The device of claim 10 wherein said substrate defines a wall defining pores and having a thickness no greater than about 0.60 mm.

15. The device of claim 10 wherein said substrate comprises fibers less than approximately 15 microns in diameter.

* * * * *

# EXHIBIT 73

US005246451A

## United States Patent [19]

### Trescony et al.

[11] Patent Number: **5,246,451**

[45] Date of Patent: **Sep. 21, 1993**

[54] VASCULAR PROSTHESIS AND METHOD

[75] Inventors: Paul V. Trescony, Robbinsdale, Minn.; Patrick Cahalan, Stein, Netherlands; Kenneth Kerney, Forest Lake, Minn.

[73] Assignee: Medtronic, Inc., Minneapolis, Minn.

[21] Appl. No.: 693,753

[22] Filed: Apr. 30, 1991

[51] Int. Cl.⁵ ............................................... A61F 2/06
[52] U.S. Cl. ..................................... 623/1; 427/2;
427/490; 427/539; 435/240.23
[58] Field of Search ............. 427/2, 40, 41, 490,
427/538, 536, 539; 623/1; 435/240.23

[56]                  References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,312,575 | 1/1982 | Feynman et al. | 427/490 |
| 4,613,517 | 9/1986 | Williams et al. | 427/2 |
| 4,632,842 | 12/1986 | Karwoski et al. | 427/2 |
| 4,652,263 | 3/1987 | Herweck et al. | 623/1 |
| 4,656,083 | 4/1987 | Hoffman et al. | 427/41 |
| 4,718,907 | 1/1988 | Karwoski et al. | 623/12 |
| 4,919,659 | 4/1990 | Horbett et al. | 623/1 |
| 4,927,876 | 5/1990 | Williams et al. | 427/2 |
| 4,946,628 | 8/1990 | Montgomery et al. | 427/41 |
| 4,994,298 | 2/1991 | Yasuda | 427/41 |
| 5,034,265 | 7/1991 | Hoffman et al. | 427/490 |
| 5,055,316 | 10/1991 | Hoffman et al. | 427/40 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3326376 | 1/1985 | Fed. Rep. of Germany | 427/490 |
| 61-070060 | 4/1986 | Japan | 427/490 |
| 3-014617 | 1/1991 | Japan | 427/490 |
| 8910377 | 11/1989 | World Int. Prop. O. | |

#### OTHER PUBLICATIONS

Morosoff, N. et al., A Study of Electroless Glow Discharge as a Means of Modifying the Surface of Polymers, National Technical Information Service publication PB-293570, Feb. 1979, pp. 19-20.

Morosoff, et al., A Study of Electroless Glow Discharge as a Means of Modifying the Surface of Polymers, National Technical Information Service publication PB80-212715, 1980, pp. 142-133. (no month available).

Yasuda, H. et al, Biomedical Applications of Plasma Polymerization and Plasma Treatment of Polymer Surfaces, Biomaterials 1982, vol. 3 Apr. pp. 69-70.

Gombotz, W. et al, Gas-Discharge Techniques for Biomaterial Modification, CRC Critical Reviews in Biocompatability, vol. 4, Issue 1 (1988) pp. 14-24 (no month available).

Sharma, C. et al. Inhibition of Platelet Adhesion to Glow Discharge Modified Surfaces, Journal of Biomaterials Application, vol. 1, Apr., 1987 pp. 537-539.

Yeh, Y. S. et al., Blood Compatibility of Surfaces Modified by Plasma Polymerization, Journal of Biomedical Materials Research, vol. 22, 795-818 (1988) (no month available).

Kaplan, S. L. et al., Medical Polymers and Plasma Technology, Plasma Science, Inc., 8/88 No. 5 Oct., 1988.

(List continued on next page.)

Primary Examiner—Shrive Beck
Assistant Examiner—Diana L. Dudash
Attorney, Agent, or Firm—Daniel W. Latham; Harold R. Patton

[57]                  ABSTRACT

A vascular graft with improved endothelial cell adhesion can be achieved on a fluoropolymer surface of a vascular graft by treating the fluoropolymer with a plasma in the presence of a non-polymerizing gas capable of providing the fluoropolymer with anionic groups and binding a protein to the treated fluoropolymer. In a preferred embodiment, the fluoropolymer surface is a plasma deposited fluoropolymer. Also in a preferred embodiment, autologous endothelial cells are seeded onto the vascular graft prior to implantation of the vascular graft in the human body.

5 Claims, 3 Drawing Sheets

5,246,451

Page 2

## OTHER PUBLICATIONS

Chinn, J. A. et al., Enhancement of Serum Fibronectin Adsorption and the Clonal Plating Efficiencies of Swiss Mouse 3T3 Fibroblast and MM14 Mouse Myoblast Cells on Polymer Substrates Modified by Radiofrequency Plasma Deposition, Journal of Colloid and Interface Science, vol. 127, No. 1, Jan. 1989.

Klein-Soyer, C. et al., Culture of Human Vascular Endothelial Cells on a Positively Charged Polystyrene Surface, Primaria Comparison with Fibronectin-Coated Tissue Culture Grade Polystyrene, Biomaterials Mar. 1989, v. 10.

Pratt, K. J. et al, Enhanced Adherence of Human Adult Endothelial Cells to Plasma Discharge Modified Polyethylene terephthalate, Journal of Biomedical Materials Research, vol. 23, 1131–1147 (1989). (no month available).

BSC-SJA-1403



## FIG.1



## FIG.2

BSC-SJA-1404



FIG.3

FIG.4

BSC-SJA-1405



FIG. 5

FIG. 6

# VASCULAR PROSTHESIS AND METHOD

## BACKGROUND OF THE INVENTION

This invention relates to artificial vascular grafts and in particular to vascular grafts made with a fluoropolymer surface.

The autogenous saphenous vein or internal mammary arteries are preferred materials for small-diameter arterial replacement but are not always available or suitable, necessitating the use of a prosthetic graft. A variety of synthetic grafts are available for small diameter arterial replacement but their long-term patency has been less than satisfactory due to intimal hyperplasia and thrombosis.

Autologous endothelial cell seeding can reduce the thrombogenicity of synthetic graft surfaces and is gaining acceptance as a useful adjunct to prosthetic graft implantation. However, vascular graft surfaces tend to be poor substrates for cell adhesion and the fraction of seeded cells which adhere in the time frame dictated by graft implantation procedures is relatively low. Some investigators have pre-coated vascular prostheses with various extracellular matrix proteins in an attempt to improve cell adhesion but the poor binding of many of such proteins to graft material also causes cell adhesion to remain poor.

Plasma discharge, the exposure of biomaterials to a plasma or ionized gas, with the resulting creation of functional groups or surface coatings on a material surface have also been used in the preparation of vascular grafts. For example, in U.S. Pat. No. 4,718,907 vascular prosthesis material is provided with a coating of fluorine-containing polymer on its luminal surfaces having a ratio of fluorine to carbon greater than 1.5 to improve patency of the implanted graft. Also, for example, plasma discharge treatment of some vascular prosthesis material in the presence of some non-polymerizing gases (such as ammonia plasma treatment of polystyrene and polytetrafluoroethylene graft material) have been shown to increase protein binding and endothelial cell adhesion.

However, none of these methods have proven entirely successful in providing a small-diameter vascular graft of synthetic material with good endothelial cell attachment for long term patency.

It is therefore an object of the present invention to provide a vascular graft material with improved binding of extracellular matrix proteins such as fibronectin and laminin.

It is also an object of the present invention to provide a vascular graft material with improved binding of endothelial cells for autologous endothelial cell seeding of prosthetic vascular grafts.

It is also an object of the present invention to provide a small-diameter vascular graft prosthesis having improved prospects for long-term patency.

## SUMMARY OF THE INVENTION

[illegible]

bodiment, the fluoropolymer surface is a plasma deposited fluoropolymer. Also in a preferred embodiment, autologous endothelial cells are seeded onto the vascular graft prior to implantation of the vascular graft in the human body.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph showing time-dependent binding of laminin (solid data points) and fibronectin (open data points) to fluoropolymer deposited on vascular graft material according to the prior art.

FIG. 2 is a graph showing concentration-dependent binding of laminin (solid data points) or fibronectin (open data points) to fluoropolymer deposited on vascular graft material according to the prior art.

FIG. 3 is a graph showing time-dependent dissociation of fibronectin (open data points) and laminin (solid data points) from fluoropolymer deposited on vascular graft material according to the prior art.

FIG. 4 is a bar graph comparing the binding of fibronectin to fluoropolymer deposited on vascular graft material according to the prior art and the binding of fibronectin to the plasma treated vascular graft material of the present invention. The total bound fibronectin and the amount remaining bound after one hour are shown.

FIG. 5 is a bar graph comparing the binding of laminin to fluoropolymer deposited on vascular graft material according to the prior art and the binding of laminin to the plasma treated vascular graft material of the present invention. The total bound laminin and the amount remaining bound after one hour are shown.

FIG. 6 is a graph comparing the retention of fibronectin and laminin to fluoropolymer deposited on vascular graft material and plasma treated according to the present invention (the first and second lines respectively) with the retention of fibronectin and laminin on fluoropolymer deposited on vascular graft material according to the prior art and also with the retention of fibronectin and laminin on fluoropolymer deposited on vascular graft material and plasma treated to make it cationic.

## DETAILED DESCRIPTION OF THE INVENTION

The vascular graft and method of the present invention provides improved protein binding to vascular grafts and improved potential for endothelial cell adhesion and long term patency over vascular grafts known in the prior art. A fluoropolymer vascular graft surface is first treated by plasma while in contact with a non-polymerizing gas capable of providing anionic groups on the deposited fluoropolymer and then a protein is bound to the anionic fluoropolymer. In a preferred embodiment, the fluoropolymer surface is a plasma deposited fluoropolymer. Also in a preferred embodiment, autologous endothelial cells are seeded onto the vascular graft prior to implantation of the vascular graft in the human body.

The vascular graft of the present invention can be made from any base material capable of plasma treatment according to the present invention. Preferably, however, the base is a material which is substantially biocompatible such as polyesters, polyamides, polyurethanes, polyolefins, polytetrafluoroethylene and the like. For example, a conventional woven vascular graft material of polyethylene teraphthalate can be used. In a

preferred embodiment, a microfiber fabric vascular graft woven as taught in U.S. Pat. No. 4,652,263 is used and such teachings are incorporated herein by reference.

The surface which is treated by plasma in the present invention is a fluoropolymer surface. This can include polytetrafluoroethylene (PTFE), fluorinated ethylene propylene and other materials. In a preferred embodiment, the vascular graft base material is subjected to plasma treatment in a polymerizing fluorocarbon gas under conditions which provides a deposited fluoropolymer on the vascular graft base material. For example, a coating can be applied according to U.S. Pat. No. 4,632,842 and/or U.S. Pat. No. 4,718,907 which teachings are hereby incorporated by reference. Generally, a tube made from the desired vascular graft base material is introduced into a tubular glow discharge apparatus, the apparatus is evacuated and a flow of fluorinated gas such as tetrafluoroethylene, hexafluoropropane, or other plasma polymerizable fluorinated hydrocarbon is established within the apparatus. The radio frequency glow discharge is then activated within the apparatus, thereby inducing the deposition of the fluorine-containing polymer onto the base material.

In yet another preferred embodiment, the base material itself is the fluoropolymer polytetrafluoroethylene (PTFE). A preferred form of PTFE is tubing that has been stretched to create a uniform porous structure such as that taught in U.S. Pat. Nos. 3,953,566 and 3,962,153; which teachings are incorporated herein by reference.

The fluorine-containing polymer on the vascular graft surface is subjected to plasma treatment using a non-polymerizing gas. The gas selected must be capable of providing anionic groups on the fluoropolymer. Such gases are well known by those skilled in the art and can include, for example, oxygen, carbon dioxide, water, nitrous oxide, or mixtures of gases including such non-polymerizing gases. If desired, the apparatus used can be the same apparatus used to deposit a fluoropolymer coating and the treatment can take place immediately following the deposition of the fluoropolymer coating or at some later time. Apparatus suitable for plasma treatment are well known by those skilled in the art. For example, one apparatus suitable for use in the present invention is the apparatus shown and described in U.S. Pat. No. 4,632,842 or 4,718,907. The vascular graft, usually tubular in shape, is first placed into the plasma apparatus. A vacuum in the range of 0.02 to 0.1 mm Hg is then applied to remove undesirable gaseous components. The non-polymerizing gas, for example, oxygen, is then introduced by bleeding in gas at one end of the apparatus combined with pumping at the other end of the apparatus such that flow of the gas is maintained and internal pressure is maintained in the range of about 0.1 to 1.0 mm Hg. RF energy is then applied through electrodes in close proximity to the vascular graft and the deposited fluoropolymer coating. Energy inputs in the range of about 1 to 100 watts may be used for a duration of about 10 to 600 seconds on each portion of the vascular graft to be treated.

The resulting vascular graft material contains surface anionic groups available for bonding with various proteins. The protein to be applied is preferably an extracellular matrix protein which promotes endothelial cell attachment such as laminin or fibronectin or mixtures of such proteins. However, type I, type III or type IV collagen and other proteins such as fibrin, vitronectin,

[illegible]

[illegible]

EXAMPLE

[illegible]

TABLE 1

Dye Binding Of Vascular Graft Material

| Sample | Treatment | Anionic Dye | Cationic Dye | Charge |
|---|---|---|---|---|
| 1 | None | – | – | Neutral |
| 2 | $O_2$ + PLASMA | – | + | Negative |
| 3 | $NH_3$ + PLASMA | + | – | Positive |

Fibronectin was isolated from a fibronectin- and fibrinogen-rich byproduct of human factor VIII production by sequential gelatin and heparin affinity chromatography. Laminin was isolated from the murine Engelbreth-Holmes-Swarm tumor and purified by Sephacryl S-300 chromatography. Laminin purified in this manner migrated as two distinct bands at 200 and 400 kilodaltons (KDa). These procedures are well known to those in the art and may be found in greater detail in Herbst, T. et al, Differential Effects of Laminin, Intact Type IV Collagen, and Specific Domains of Type IV Collagen on Endothelial Cell Adhesion and Migration, J. Cell

5,245,451

5

Biol, 106:1365–1373, 1988 and Mooradian, D. L., et al, Transforming growth factor Beta-1 Binds to Immobilized Fibronectin, J. Cell Biochem. 41(4):189–200, 1989. In all instances, the purity of these isolated proteins was determined using the SDS-PAGE test for protein molecular weight.

The fibronectin and laminin were labeled with $^{125}I$ using immobilized chloramine T iodination reagent (Iodo-bead TM, Pierce, Rockford, Ill.). Generally, the protein to be iodinated was combined in a sealed container with $Na^{125}I$ and Iodo-beads followed by chromatographic separation of the iodinated protein. The radiolabeled proteins were analyzed by the SDS-PAGE test followed by autoradiography and were found to be intact.

To determine protein binding and retention, radiolabeled fibronectin or laminin were first applied to vascular graft material which received no additional plasma treatment. These test samples were not, therefore, made according to the present invention. Vascular grafts 10 mm in diameter were first cut to form a sheet and then cut into 6 mm discs. Proteins were then added to the discs in phosphate buffered saline (PBS) (pH 7.4) (100 μl) containing 0.01% of a nonionic wetting agent (NP-40, Sigma Chemical Company, St. Louis, Mo.). Unbound protein was removed by washing the discs three times with the PBS solution (200 μl). The retention of radiolabeled laminin and fibronectin was determined by measuring radioactivity of the individual samples. As shown in FIG. 1, the binding of fibronectin and laminin was rapid and time-dependent, reaching a plateau after fifteen minutes. As shown in FIG. 2, the binding of these proteins was also dependent on protein concentration. As shown in FIG. 3, dissociation of both fibronectin and laminin from vascular graft material was also rapid, and only about 10% of the bound fibronectin and laminin was retained 60 minutes after washing.

Similarly, samples were made employing vascular graft material that had been plasma treated to produce anionic functional groups (samples made according to the present invention), and also plasma treated to produce cationic functional groups. These samples were compared with samples of vascular graft material that had received no additional plasma treatment. As shown in FIG. 4, the binding of fibronectin to vascular graft material having a plasma treated anionic surface was approximately fivefold greater than the binding of fibronectin to the vascular graft material having no such treatment. Also, as shown in FIG. 4, after one hour the retention of bound fibronectin by the anionic vascular graft material was markedly greater than that of the untreated vascular graft material. Also, as shown in FIG. 5, the binding of laminin to vascular graft material having a plasma treated anionic surface was much greater than the binding of laminin to the vascular graft material having no such treatment. Also, as shown in FIG. 5, after one hour the retention of bound laminin by the anionic vascular graft material was markedly greater than that of the untreated vascular graft material. As shown in FIG. 6, retention over a 24 hour period was poor for untreated vascular graft material and no improvement was noted for vascular material which had been plasma treated to make it cationic but in the samples made according to the present invention, greater than 85% of the protein remained bound after 24 hours.

The effectiveness of the present invention for a cell seeding procedure was tested for vascular graft material

6



| Endothelial Cell Adherence (%) | | | |
|---|---|---|---|
| Sample | Treatment | No Protein | Fibronectin | Laminin |
| 1 | None | 24.3 | 34.0 | 26.0 |
| 2 | $O_2$ + PLASMA | 23.0 | 68.0 | 36.0 |
| 3 | $NH_3$ + PLASMA | 22.0 | 38.0 | 37.0 |

TABLE 2

It should be evident to those skilled in the art that a variety of factors may influence the suitability of a particular adhesion-promoting protein for use as a substrate for autologous endothelial cell seeding. Such proteins can have a variety of effects on endothelial cell behavior in addition to their effects on cell adhesion. For example, proteins that promote cell adhesion may not promote cell spreading or cell migration. Cell spreading and cell migration may play an important role in the formation of stable functionally normal endothelial layer covering the luminal surface of the vascular graft following cell adhesion. Extracellular cell matrix proteins can also influence endothelial cell proliferation and endothelial cell proliferation may also play a role in attaining a completely endothelialized graft surface after seeding with limited numbers of autologous endothelial cells. The present invention is therefore not limited only to improvements in cell adhesion but extends also to the attachment of proteins that otherwise promote the formation of a stable, functionally normal endothelial cell layer covering the vascular graft after implantation in the human body.

While the invention has been described above in connection with particular embodiments and examples, one skilled in the art will appreciate that the invention is not necessarily so limited and that numerous other embodiments, examples, uses and modifications of and departures from the embodiments, examples nd uses may be made without departing from the inventive concepts.

We claim:

1. A method for making a vascular prosthesis comprising in sequence the steps of:
   a. plasma coating a vascular graft material with a fluoropolymer;
   b. separately treating the deposited fluoropolymer with a plasma in an atmosphere including only non-polymerizing gases and including at least one

BSC-SJA-1409

7                    5,246,451                    8

non-polymerizing gas capable of producing anionic groups; and

c. binding a protein to the treated fluoropolymer.

2. The method of claim 1 further comprising the step of seeding endothelial cells onto the bound protein.

3. The method of claim 1 wherein the non-polymerizing gas is oxygen.

4. The method of claim 1 wherein the protein is selected from the group consisting of fibronectin, laminin, type I collagen, type III collagen and type IV collagen.

5. A vascular prosthesis made according to the method of any one of claims 1, 2, 3 or 4.

* * * * *

10

15

20

25

30

35

40

45

50

55

60

65

BSC-SJA-1410

BSC-SJA-1411

# EXHIBIT 74

# TRANSACTIONS

# American Society For
# Artificial Internal Organs

## VOLUME XXX
## 1984

BSC-SJA-1412

© American Society for Artificial Internal Organs, Inc., 1984

BSC-SJA-1413

# EFFECTS OF A TETRAFLUOROETHYLENE GLOW DISCHARGE ON
## PATENCY OF SMALL DIAMETER DACRON VASCULAR GRAFTS

A. M. Garfinkle, A. S. Hoffman, B. D. Ratner,
L. O. Reynolds, and S. R. Hanson*

Improvement of the small diameter vascular prosthesis represents a major research challenge today. Despite the large number of available products, the "gold standard" remains the saphenous vein[1-4]. This situation is a reflection of the limited understanding regarding the key factors which influence the patency of small diameter grafts. Clearly, graft material composition, surface texture, porosity and compliance are important variables. These are in addition to host-related variables and to the surgical technique. It has been very difficult to independently investigate these properties. Thus, there has been much speculation and debate regarding the relative importance of each of these factors in a given usage situation.

Radio frequency glow discharge (RFGD) treatment has been used to modify biomaterial surface compositions without changing bulk material properties[5-7]. In plasma or glow discharge polymerization, an organic compound (monomer) in the gas phase is introduced into a vacuum system containing the substrate material to be treated. The monomer gas is then subjected to an electric discharge, typically a capacitively or inductively coupled discharge. Active species are generated in the gas due to absorption of this energy and these species may react with and covalently bond to the surface of the substrate. Polymer films generated in this manner have been shown to be ultra-thin, tightly bound and pinhole free[8].

Electron spectroscopy for chemical analysis (ESCA) provides a unique means of analyzing the surface composition of these films, where extensive monomer rearrangement in the deposited polymer is very common[9]. ESCA is particularly useful in the structural analysis of fluorocarbon films. Much surface compositional information not readily obtainable by other techniques can be gotten by analyzing the $C_{1s}$ level binding energy shifts resulting from carbons which are covalently bound to fluorine atoms.

We have investigated RFGD treated grafts in the ex vivo femoral shunt baboon model. This model provides a quantitative experimental system for comparing the thrombotic response to different materials in a manner which is clinically relevant to man[10-18]. Platelet interactions and blood flow may be measured in the chronic AV baboon shunts. Results are strongly dependent on material surface properties, with increasingly thrombogenic materials showing a higher platelet reactivity and a more rapid thrombus buildup. Finally, we have carried out laser scattering embolization studies in this model, in order to evaluate graft surface properties as they relate to this important phenomenon[19-21].

## MATERIALS AND METHODS

Uncrimped Sauvage® dacron external velour knit prostheses of average porosity 3000 ml of water/cm²-minute and uncrimped DeBakey® dacron woven prostheses of 200 ml of water/cm²-minute were supplied by USCI (Division of C. R. Bard, Inc., Billerica, MA). All grafts were between 4.5-5.0 mm ID and were not previously sterilized. All surfaces were cleaned by ultrasonic treatment for 20 mins in trichloroethylene followed by a similar treatment in methanol and then deionized water. Materials were dried under vacuum to less than 0.01 torr prior to treatment.

### A. Glow Discharge Treatment

Glow discharge surface treatment of the cleaned vascular graft materials was carried out in the apparatus shown schematically in Figure 1. A Tegal Plasmod (Tegal Corporation, Richmond, CA) reactor system was used to supply the RF power (0-100 watts at 13.5 MHz) and the matching network for the generation of an inductively coupled electrodeless glow discharge. Both the reactor and the gas flow system of the Plasmod were modified to facilitate luminal treatment of approx. 10 cm long dacron vascular grafts. The reactor design is shown in Figure 2. The position in the reactor is expressed as the distance from a zero point, represented by the center of the graft as it is located within the reactor. The radio frequency inductive coil extended from an upstream position at -10 cm to a downstream position at +4 cm. During surface treatment of the vascular grafts, the most concentrated visible glow discharge region was located over the graft by adjustment of system parameters such as gas flow rate and RF power. System pressure was measured as a function of the thermal conductivity of gas present using a Hastings vacuum gauge system (Model VT-6). Typical flow rates of monomer gas corrected to standard temperature and pressure were 3-5 ml/min.

Based on ESCA studies, an optimal method was developed for the reproducible and uniform glow discharge treatment of the vascular grafts. Each graft was first etched in an argon atmosphere at 15 watts power with a pressure of 0.2 torr maintained throughout the 5 min etching period. The grafts were then subjected to a 30 min

From the Center for Bioengineering and Department of Chemical Engineering, University of Washington, Seattle, WA. *Currently at the Scripps Clinic and Research Foundation, La Jolla, CA. Supported by the NHLBI, Devices and Technology Branch, Grant No. HL-22163-03 to -05.

BSC-SJA-1414

Garfinkle et al.   Vascular graft prosthess

glow discharge treatment with the monomer TFE gas (PCR Chemical, FL), again at 0.2 torr pressure and 15 watts power.  Scanning electron microscopy at 7000X showed no observable change in treated dacron graft surface morphology.  Graft porosity was remeasured and did not change after RFGD treatment.

### B.  Electron Spectroscopy for Chemical Analysis (ESCA)

ESCA spectra were measured using a Hewlett-Packard system (model 5950B).  Areas under the various overlapping peaks comprising the $C_{1s}$ spectra of each material were resolved assuming Gaussian peak shape.  Elemental ratios were calculated using photoemission correction factors tabulated by Wagner[22].  A detailed characterization of the deposited glow discharge fluoropolymer film surface was obtained in this manner.

### C.  The Baboon Model

The thrombotic response to variations in graft surface composition was investigated using the ex vivo baboon femoral shunt model[11,16].  Twenty healthy male baboons (papio cynocephalus), each supporting an external femoral arterial-venous shunt, were studied at the Regional Primate Center at the University of Washington.  Animals weighing between 9-15 kg were supported in restraining chairs during the experiments.  All were free from drugs and were maintained on a regular diet.  This model has yielded measurements which have been shown to be unaffected by the surgical shunting procedure, independent of the implanted silastic AV shunt and reproducible between the different experimental animals[15,18].

### D.  Preparation of Graft Materials

Cleaned, untreated or recently glow discharge TFE treated dacron prosthetic arterial grafts were rendered impervious to blood leakage by a surrounding layer of heat-shrink teflon.  All segments studied were approximately 10 cm in length and were kept rigid by this surrounding layer.  Two cm long segments of silastic tubing (1/8 inch ID, Dow Corning) were forced over the heat-shrink covered graft at either end to facilitate connection into the AV shunt system.  Graft materials were filled with sterile Ringer's citrated dextrose solution (RCD) and the bubbles were removed by ultrasonic treatment prior to use.  The graft segment once filled with RCD was connected with 3/4 inch long teflon adaptors to the two 35 cm silastic segments of the implanted AV shunt.  The graft materials were assigned randomly to the various animals for study.

### E.  Blood Flow Measurements

Blood flow through the shunt-vascular graft system was measured using a Doppler ultrasonic flowmeter (L & M Electronics, Daly City, CA).  The transducer probe was a clip-on variety with a fixed crystal designed to fit snugly on the silastic shunt itself.  Flow measurements were made by attaching the probe to the downstream silastic shunt and recording for one minute the mean system blood flow.  Blood flow, which rarely varied more than 15% over the one minute measurement interval, was then averaged to yield a single value.  The probe was moved at regular time intervals between the various animals being simultaneously studied.  This type of probe set-up thus permitted repetitive and reproducible flow measurements.

Blood flow was always checked in the silastic shunt before graft placement.  A minimum blood flow of 100 ml/min was required before starting an experiment.  Flow rates lower than this indicated shunts which were likely to occlude.  Blood flow rates before and after graft placement and before and after sampling were regularly compared to check for problems resulting from handling.  While large changes in blood flow occurred rarely, changes which typically led to occlusion were more gradual and showed a continued downward trend over time periods greater than one hour.  The range of initial shunt blood flow rates in the different animals which were studied was 140-320 ml/min, with a mean of 285 ml/min.

### F.  In Vitro Microembolization Studies

A laser light scattering system has been developed for the detection of microemboli in whole blood flowing under real time conditions[19-21].  The size and number of these aggregates was detected using a computer-based optical sizing system.  The detectable size range was from 20 $\mu m$ to 800 $\mu m$ diameter particles.  Provisions were made for continuous recirculation of fresh whole baboon blood within the flow system at a velocity of 100 ml/min.  The barrel of a 20 ml polypropylene syringe served to dampen the pulsatile flow generated by the roller pump.  It also served as a reservoir where entrapped air bubbles could be removed.

Five centimeter lengths of graft material were prepared using the procedure from the ex vivo shunt study.  The system was first filled with a pH balanced Isoton solution to pre-wet the material surfaces.  Fresh whole baboon blood stabilized with ACD was introduced into the syringe barrel.  This was pumped through the graft system, displacing all of the Isoton.  This procedure insured that there were no material-air interfaces.  Each material was tested a minimum of 5 times and each time blood was drawn from a different baboon donor.  Embolization measurements were made from 1 mil ID cuvettes for a period of 1 min every other minute for the 90 min time period of a typical experiment.

## RESULTS AND DISCUSSION

### A.  RFGD Treatment and Surface Characterization

ESCA was used to evaluate the degree of substrate coverage and the chemical structure of the deposited fluoropolymer films.  The ESCA spectra of the TFE treated surfaces exhibited multiple $C_{1s}$ peaks which were

BSC-SJA-1415

Garfinkle et al.  Vascular graft prostheses

resolved into 5 characteristic curves. This complex spectrum implies that a considerable rearrangement of the monomer structure occurred during glow discharge polymerization. This effect may have been due to fragmentation and recombination of TFE monomer. The surfaces were also quite different from PTFE teflon, which yields a singlet $CF_2$ peak in the $C_{1s}$ region of the ESCA spectrum. Representative ESCA data are shown in Table I for high porosity dacron knits that were TFE treated.

There is a significant proportion of carbons in the polymer surface which are bound to fewer than 2 fluorine atoms, indicating that the RFGD fluoropolymer coating is probably highly crosslinked. A significant concentration of $CF_3$ groups was also detected in the surface. The presence of these low energy groups was reflected by the critical surface tension values of about 13.0 dynes/cm which were measured on these surfaces. These are lower than the $\gamma_c$ values reported for PTFE teflon of about 18.5 dynes/cm[28]. It was found that the RFGD surface treatment procedure reproducibly yielded a uniform luminal fluoropolymer surface coating on dacron vascular grafts of varying porosities and textures.

TABLE I.  COMPOSITION OF RFGD FLUOROPOLYMER COATINGS ON THE LUMEN
OF HIGH POROSITY DACRON KNIT VASCULAR GRAFTS

| ESCA Sample Location (cm)* | C/F | $C_{1s}$ Peak Area (% of Total) | | | | |
|---|---|---|---|---|---|---|
| | | CH | C | CF | $CF_2$ | $CF_3$ |
| +3 | 0.64 | 0 | 12 | 22 | 38 | 28 |
| -3 | 0.62 | 0 | 17 | 24 | 33 | 26 |
| +3 | 0.68 | 0 | 18 | 22 | 37 | 23 |
| -3 | 0.72 | 3 | 23 | 23 | 29 | 22 |
| +3 | 0.68 | 0 | 24 | 20 | 32 | 24 |
| -3 | 0.71 | 0 | 19 | 22 | 33 | 26 |
| PTFE (theor.) | 0.5 | 0 | 0 | 0 | 100 | 0 |

*0 = center of sample

### B.  The Baboon Model: An Ex Vivo Patency Study

The thrombotic response to changes in graft surface composition was investigated in the baboon model for the different porosity grafts. Graft patency was markedly improved for TFE treated woven and knit dacron grafts when compared with the untreated grafts, for all time periods studied. These results are shown in Figures 3 and 4. Woven grafts that were glow discharge treated with argon alone occluded more rapidly than the untreated dacron grafts. This result suggests that the specific gas treatment chosen, and not the glow discharge process per se, is responsible for the improved patency. Although the high porosity, untreated dacron knit grafts occluded more rapidly than the untreated woven dacron, after one week the patency results were equally poor. Vascular graft surface chemistry thus appears to be a more important determinant of short-term patency than either porosity or surface texture.

TABLE II.  RELATIVE IN VITRO EMBOLIZATION RATES OF SILASTIC TUBING AND TFE TREATED
AND UNTREATED VASCULAR GRAFT MATERIALS

| | Gore-Tex | Dacron Knit | Dacron Weave | Silastic Tubing |
|---|---|---|---|---|
| Untreated Control | 6.56 ± 4.39 | 8.68 ± 0.34 | 8.32 ± 1.28 | 1.0 ± 0.27 |
| TFE Treatment | 1.55 ± 0.32 | 2.69 ± 0.78 | 3.72 ± 0.89 | -- |

Units = (platelets/$cm^2$-day) x $10^{-8}$

### C.  In Vitro Microembolization Studies

In addition to thrombotic occlusion, an important further consideration is the tendency of these treated surfaces to produce thromboemboli. Table II shows results of in vitro embolization studies using fresh whole baboon blood. These laser scattering studies indicate that all TFE treated graft surfaces produce significantly fewer emboli than the untreated control graft surfaces. Thus, the improved ex vivo patency of the TFE treated dacron graft materials is probably not due to increased embolization. It should be noted that the rate of embolus production on Gore-Tex graft surfaces is also markedly reduced by the TFE glow discharge treatment. These

434

BSC-SJA-1416

data support the conclusion that the in vitro embolization from graft surfaces is strongly dependent on chemical composition and is less influenced by surface texture.

### D. Doppler Blood Flow Studies

Ex vivo graft blood flow rates in the baboon were measured using a Doppler flowmeter. The values were normalized for each experiment to the initial graft blood flow rate using the relationship:

$$\frac{\text{graft blood flow rate}}{\text{initial blood flow rate}} \times 100 = \text{relative blood flow}$$

For all similar materials, the relative blood flow measurements were averaged across each sampling time period to yield a mean relative graft blood flow value ($\pm 1$ SD). The changes in mean relative graft blood flow with time after graft placement are shown in Figures 5 to 8.

Blood flow rates in the acute contact time period, 0–2 hrs, proved to be a good indicator of subsequent graft patency. In this time period, flow rates in the untreated grafts decreased more rapidly with time and to a greater extent than was observed for the TFE treated grafts. Woven grafts which were glow discharge treated only with argon exhibited an even more rapid decrease in blood flow rate over the initial 2 hrs than the untreated dacron weaves. These results suggest that the cross-sectional area available for blood flow is reduced by luminal thrombus buildup which is strongly dependant on graft surface chemical composition. Ultimately, this selective thrombus accumulation is reflected in the improved patency exhibited by the TFE treated grafts.

Surface texture had less influence than surface chemistry on both early blood flow changes and graft patency. For the untreated dacron grafts, blood flow did decrease most rapidly in the very textured, high porosity velour knits, as seen by comparing Figures 5 and 7. However, this poor response was also similar to that of the argon glow discharge treated weaves with smoother surfaces. Finally, patency at one week did not correlate with graft surface texture as seen by comparing Figures 3 and 4.

### General Discussion

In the acute contact time period, the rapid changes in blood flow observed for all grafts reflect the development of a thrombus layer on the graft surface. This process appears to be highly dependent on graft surface chemical composition. With increasing time, the flow rates in the untreated grafts continued to decrease, while the TFE treated grafts maintained relatively high flow rates. This result is shown in Figures 6 and 8. The cross-sectional area available for blood flow is probably being progressively reduced by thrombus buildup in the untreated grafts, as seen by the blood flow decrease with time. The character of the initial thrombus layer thus appears to have a strong influence on subsequent thrombus accumulation and related graft patency.

As noted before, increased embolization was observed in vitro for untreated control grafts, when compared with TFE treated graft materials. This increase in in vitro embolus production could be due to differences in the adhesiveness or uniformity of the deposited thrombus layer. In addition, embolization could re-expose underlying material and therefore delay the formation of a stable, potentially less reactive thrombus layer.

Didisheim et al[24] have recently suggested that texture is probably a more important variable than chemistry in blood-surface interactions. This conclusion was based on platelet attachment to glow discharge TFE treated smooth-walled silastic tubing and woven dacron material. An ex vivo canine experimental model was used. This conclusion is not supported by our studies in the ex vivo baboon model. Differences between the 2 animal models may account for these contrasting results.

### CONCLUSION

The RFGD treatment of small diameter dacron vascular grafts with TFE monomer results in a dramatic improvement in patency when studied in the ex vivo femoral shunt baboon model. Blood flow rates proved to be a good early indicator of subsequent graft patency. In vitro embolization rates were found to markedly decrease after the TFE treatment of graft materials. This result indicates that improved ex vivo patency was probably not due to increased embolization. This decrease in embolization also occurred with Gore-Tex grafts, indicating that TFE glow discharge treatment results in a different and potentially more biocompatible fluoropolymer surface even when compared with PTFE teflon.

We are investigating the mechanism for the improved patency and decreased embolization exhibited by the TFE glow discharge treated grafts. We are testing the hypothesis that the mechanism involves modified initial protein adsorption, resulting in differences in the adherent thrombus layer and its subsequent reorganization. Further studies are planned to investigate the longer term in vivo performance of all of the grafts in these experiments.

### REFERENCES

1. Dardik H, ed. Graft Materials in Vascular Surgery. Chicago: Year Book Medical Publishers, 1978.
2. Mortensen JD. Safety and performance of currently available vascular prostheses. asaio J 4:125, 1981.



BSC-SJA-1417

Garfinkle et al.   Vascular graft prostheses

3.  Sawyer PN, Kaplitt MJ, eds.  Vascular Grafts.  New York: Appleton-Century-Crofts, 1978.

4.  Vascular Prosthesis Workshop, sponsored by Devices and Technology Branch, NHLBI, Bethesda, MD, May 14, 1981.  NIH Publ No 82-1215, 1981.

5.  Bell AT, Hollahan JR, eds.  Techniques and Application of Plasma Chemistry.  New York: John Wiley and Sons, 1974.

6.  Yasuda H, Morosoff N.  Plasma polymerization of tetrafluoroethylene.  II.  Capacitive radio frequency discharge.  J Appl Polymer Sci 23:1003, 1979.

7.  O'Kane DF, Rice DW.  Preparation and characterization of glow discharge fluoropolymer-type polymers.  J Macromol Sci-Chem A10(3):567, 1976.

8.  Hollahan JR, Wydeven T, Johnson CC.  Combination moisture resistant and antireflection plasma polymerized thin films for optical coatings.  Appl Opt 13:1844, 1974.

9.  Clark CT, Feast WJ, Kilcast D, Musgrave WKR.  Applications of ESCA to polymer chemistry.  III.  Structure and bonding in homopolymers of ethylene and the fluoroethylenes and determination of the compositions of fluoropolymers.  J Polymer Sci, Polymer Chem Ed 11:389, 1973.

10.  Harker LA, Slichter SJ, Sauvage LR.  Platelet consumption by arterial prostheses: the effects of endothelialization and pharmacologic inhibition of platelet function.  Ann Surg 186:594, 1977.

11.  Hanson SR, Harker LA, Ratner BD, Hoffman AS.  In vivo evaluation of artificial surfaces with a nonhuman primate model of arterial thrombosis.  J Lab Clin Med 95:289, 1980.

12.  Garfinkle AM, Hoffman AS, Ratner BD, Hanson SR.  Improved patency in small diameter Dacron vascular grafts after a tetrafluoroethylene glow discharge treatment.  Trans Soc Biomater, VII:337, 1984, Washington DC.

13.  Hoffman AS, Garfinkle AM, Ratner BD.  Surface modification of small diameter Dacron vascular grafts after a tetrafluoroethylene glow discharge treatment.  Trans Soc Biomater VII:196, 1984, Washington DC.

14.  Hoffman AS, Ratner BD, Garfinkle AM, Hanson SR.  Plasma gas discharge treatment for improving the biocompatibility of biomaterials.  Patent Pending.

15.  Callow AD, Ladig CB, O'Donnell TF, Gembarowicz R, Raough E, Ranberg-Laskaris K, Valeri R.  Platelet-arterial synthetic graft interaction and its modification.  Arch Surg 117:1447, 1982.

16.  Harker LA, Hanson SR.  Experimental arterial thromboembolism in baboons.  J Clin Invest 64:559, 1979.

17.  Hanson SR, Harker LA, Ratner BD, Hoffman AS.  Evaluation of arterial surfaces using baboon arterio-venous shunt model.  In: Winter G, Gibbons D, Plenk H, eds.  Biomaterials, 1980.  London: John Wiley and Sons, 1982, pp 519-528.

18.  Hoffman AS, Ratner BD, Horbett TA, Reynolds LO, Cho CS, Harker LA, Hanson SR.  Unusual biological interactions at biomaterial interfaces: influence of molecular surface character.  Artif Organs (in press).

19.  Reynolds LO, Johnson C, Ishimaru A.  Diffuse reflectance from a finite blood medium- applications to the modeling of fiberoptic catheters.  J Appl Optics 15:2059, 1976.

20.  Reynolds LO, Simon T.  Size distribution measurements of microaggregates in stored whole blood.  Transfusion 20:669, 1980.

21.  Reynolds LO, Sanchez R.  Radiative transport solution for microparticulate sizing.  Proc 36th Annu Conf Eng Med Biol 25:66, 1983.

22.  Wagner CD.  Sensitivity of detection of the elements by photoelectron spectrometry.  Anal Chem 44:1050, 1972.

23.  Zisman WA.  Influence of constitution on adhesion.  Ind Eng Chem 55:19, 1963.

24.  Didisheim P, Tirrell MV, Lyons CS, Stropp JQ, Dewanjee MK.  Relative role of surface chemistry and surface texture in blood-material interactions.  Trans Am Soc Artif Intern Organs 29:169, 1983.

BSC-SJA-1418

Garfinkle et al. Vascular graft prostheses



1. Backstreaming filter
2. Liquid N₂ trap
3. Outflow solenoid valve
4. Pressure sensor
5. Pressure meter
6. Micrometer flow valve
7. Gas selector valve
8. Inflow solenoid valve
9. Flexible stainless steel tubing

Figure 1. Glow discharge polymerization apparatus.



Figure 2. Glow discharge reaction vessel.



Figure 3. Graft patency for small diameter, low porosity dacron weave grafts before and after argon and TFE glow discharge treatments.



Figure 4. Graft patency for small diameter, high porosity dacron knit grafts before and after TFE glow discharge treatment.

437

BSC-SJA-1419

Garfinkle et al.  Vascular graft prostheses







Figure 5.  Variation of mean relative graft blood flow with time for small diameter, low porosity dacron weave grafts before and after argon and TFE glow discharge treatments.

Figure 6.  Variation of mean relative graft blood flow with time for small diameter, low porosity dacron weave grafts before and after argon and TFE glow discharge treatments.





Figure 7.  Variation of mean relative graft blood flow with time for small diameter, high porosity dacron knit grafts before and after TFE glow discharge treatment.

Figure 8.  Variation of mean relative graft blood flow with time for small diameter, high porosity dacron knit grafts before and after TFE glow discharge treatment.

438

BSC-SJA-1420

# EXHIBIT 75



# HANDBOOK *of*
# CORONARY STENTS

*Rotterdam Thoraxcentre*
*International Cardiology Group*

Editor-in-Chief
Patrick W Serruys

BSC-SJA-1421

# HANDBOOK *of*
# CORONARY STENTS

*Rotterdam Thoraxcentre Group*

Editor-in-Chief
Patrick W Serruys
University Hospital Dijkzigt
Rotterdam
The Netherlands

 Mosby

St. Louis  Baltimore  Boston  Carlsbad  Chicago  Naples  New York  Philadelphia  Portland
London  Madrid  Mexico City  Singapore  Sydney  Tokyo  Toronto  Wiesbaden

MARTIN DUNITZ

BSC-SJA-1422

© Martin Dunitz Ltd 1997

First published in the United Kingdom in 1997 by
Martin Dunitz Ltd
The Livery House
7–9 Pratt Street
London NW1 0AE


Mosby
Dedicated to Publishing Excellence

A Times Mirror
Company

Distributed in the U.S.A. and Canada by

Mosby–Year Book                     Times Mirror Professional Publishing Ltd,
11830 Westline Industrial Drive     130 Flaska Drive
St. Louis, Missouri 63146           Markham, Ontario L6G 1B8

All rights reserved. No part of this publication may be reproduced, stored in a retrieval
system, or transmitted, in any form or by any means, electronic, mechanical, photo-
copying, recording or otherwise, without the prior permission of the publisher or in
accordance with the provisions of the Copyright Act 1988, or under the terms of any
licence permitting limited copying issued by the Copyright Licensing Agency, 33–34
Alfred Place, London WC1E 7DP.

A CIP catalogue record for this book is available from the British Library

ISBN 1-85317-357-6

Composition by Scribe Design, Gillingham, Kent
Printed and bound in Spain by Grafos, S.A. Arte sobre papel

BSC-SJA-1423

# 1. THE CORONARY WALLSTENT

*Schneider (Europe) AG, Bülach, Switzerland*

## Peter Ruygrok and Pim de Feyter

| Description | Self-expanding wire-mesh stent constrained by a retractable rolling membrane |
|---|---|

| History | |
|---|---|
| | • Early 1980s canine experiments |
| | • March 1986 first human coronary Wallstent implantation by Jacques Puel, Toulouse |
| | • 1987 first clinical experience reported by Ulrich Sigwart |
| | • 1991 less shortening Wallstent introduced |
| | • 1995 approved for coronary native vessels and vein grafts |



*Figure 1.1: The coronary Wallstent. The upper panel shows the self-expanding mesh constrained by the rolling membrane. The middle panel shows partial retraction of the membrane with expansion of the distal stent to its non-constrained diameter. The lower panel displays the released stent with the delivery catheter remaining within the lumen. Note shortening of the stent to the length indicated by the new most proximal markers.*

1

BSC-SJA-1424

PETER RUYGROK AND PIM DE FEYTER



*Figure 1.2:* Illustration of the Wallstent delivery system. The upper part shows a longitudinal section of the stent delivery catheter with the constrained stent surrounded by the coaxial rolling membrane. Once the rolling membrane is pressurized it can be retracted, in the direction of the arrow, to allow release and expansion of the stent within the vessel lumen.



*Figure 1.3:* Scanning electron microscope of a Wallstent three days following implantation in a saphenous vein bypass graft. The patient underwent elective reoperation because of bleeding complications related to anticoagulation, with excision of the stented segment. Deposits of leucocytes, platelets and thrombus are observed to be adherent to the wire mesh along with some protrusion of the vessel wall into the lumen. (By courtesy of Heleen van Beusekom).

2

BSC-SJA-1425





BSC-SJA-1426

PETER RUYGROK AND PIM DE FEYTER

---

## Tips and tricks for delivery

| Problem | Solution |
|---|---|
| 1 Poor opacification of vessel to be stented | • follow contrast with saline flush<br>• frequent cineangiography and replay<br>• larger lumen guiding catheter 8 Fr large lumen or 9 Fr |
| 2 Threatened malposition | • release first 0.5 cm distally, deflate rolling membrane and withdraw to desired position |
| 3 Precise positioning required | • use a larger diameter stent with resultant less shortening |
| 4 Protective sheath will not retract | • withdraw and straighten guiding catheter in aorta if necessary<br>• use Schneider guide wire (PTFE coated)<br>• use guiding catheter with PTFE lining<br>• inflate rolling membrane to 5 atmospheres<br>• prepare system immediately prior to implantation to avoid crystallization of contrast within rolling membrane |

---

## Indications for clinical use

• Venous bypass graft
• Native coronary lesions – shorter and long with no major sidebranches

---

## Studies

Past: • Registries only

Present • Wallstent restenosis study – randomized versus balloon angioplasty
• Wallstent and Wallstent studies – native and bypass lesions, non-comparative (open design)

4

BSC-SJA-1427



*Figure 1.4:* In the upper panel an eccentric stenotic lesion is seen in the saphenous vein bypass graft anastomosed onto the left anterior descending artery of a 80-year-old man with unstable angina. The middle panel shows a Wallstent (5.0 X 27 mm unconstrained dimensions) following implantation. The new model Wallstent is made from a cobalt-based alloy with a platinum core, making it more radiopaque than the earlier model. The lower panel shows the final angiographic result following post-dilatation with a 4.0 mm non-compliant balloon. The patient was discharged the following day on ticlopidine and aspirin.



*Figure 1.5:* The left-hand panel shows a diffuse lesion in a 4-year-old venous jump graft spanning the posterolateral artery anastomosis in a 65-year-old woman with unstable angina pectoris. The right-hand panel shows the same segment of bypass graft following implantation of a 5.0 X 37 mm (unconstrained dimensions) Wallstent which was post-dilated with a 4 mm non-compliant balloon to a pressure of 14 atmospheres.

5

BSC-SJA-1428

PETER RUYGROK AND PIM DE FEYTER



*Figure 1.6: A 53-year-old man referred for an attempt at recanalisation of an occluded segment of proximal right coronary artery with an excimer laser wire following failure with conventional wire techniques. Opacification of the mid-right coronary artery displayed in the left-hand panel was augmented by collateral filling following a simultaneous contrast injection into the left coronary artery. Following successful passage with a 0.018 inch prima laser guide wire (Spectranetics Co, USA), the vessel was dilated and a Wallstent implanted (5.0 × 35 mm unconstrained dimensions) with the final angiographic result displayed in the right-hand panel.*



*Figure 1.7: A long diffusely diseased segment (type C lesion) of the proximal left anterior descending artery in a 54-year-old man with unstable angina pectoris is shown before (left) and after (right) elective Wallstent implantation. The stent whose unconstrained dimensions were 5.5 × 35 mm was post-dilated with a 4.5-mm non-compliant balloon to 14 atmospheres proximally and a 4.0-mm balloon to 16 atmospheres distally. The patient was discharged the following day on ticlopidine and aspirin.*

6

BSC-SJA-1429



*Figure 1.8:* Intracoronary ultrasound images of a Wallstent implanted in an aorto-coronary bypass graft. The upper left panel displays a cross-sectional image of the proximal stent segment, with the struts clearly seen. The stent is symmetrically expanded with good apposition to the vessel wall. The lower left panel shows a longitudinal view of the stented segment and a three-dimensional reconstruction using a blood-speckle identification technique is displayed in the right-hand panel. These data have been displayed as a cylindrical tube which has been opened longitudinally (clam-shell view). (Reproduced, with permission, from von Birgelen et al. J Cardiovasc Surg 1995.)



*Figure 1.9:* Angioscopic examination following optimal deployment of a Wallstent within a saphenous vein bypass graft in a 63-year-old woman. The visible mesh lattice of the stent can be seen well opposed to the vessel wall. No protrusion of intima or thrombus is seen. The guidewire is seen in the upper left-hand corner of the photograph.

BSC-SJA-1430

PETER RUYGROK AND PIM DE FEYTER



*Figure 1.10:* Four images obtained from a patient with stable angina following coronary bypass surgery nine years earlier. The upper left panel shows the lesion proximally in the venous jump graft on the left anterior descending, diagonal and postero-lateral arteries and the upper right panel shows the same segment following Wallstent implantation. In the lower left panel is an intravascular ultrasound image obtained from within the well deployed stent, with some small white frond-like protrusions consistent with white platelet thrombi.



*Figure 1.11:* The stent is clearly visible. There are three X-ray markers: one at each end of the stent and one at the distal end of the protective sheath. The markers at the distal stent-end and that of the distal-end of the protective sheath are very closely located to each other.

9

**BSC-SJA-1431**

1. THE CORONARY WALLSTENT



a



b

Figure 1.12: (a) The protective sheath is partly withdrawn. The withdrawal of the sheath can be closely monitored by the closing of the position of the marker at the distal end of the sheath. (b) The distal end of the stent is deployed.

9

BSC-SJA-1432

PETER RUYGROK AND PIM DE FEYTER



*Figure 1.13: The protective sheath is almost completely withdrawn, which can easily be followed by the sheath-marker and onset deployment.*



*Figure 1.14: Complete release of the stent. The position of the distal sheath marker is now proximal to the proximal stent end marker.*

10

BSC-SJA-1433



# MAGIC WALLSTENT

| Description | Delivery catheter with stent protective sheath. |
|---|---|



11

BSC-SJA-1434

PETER RUTGRINK AND PIM DE FEYTER



---

**Tips and tricks for delivery**

*Problem*                                   *Solution*

                                            Distal repositioning:
1 Not correct distal positioning            Fully repositionable up to a
  or                                        half released stent; stent recapture
2 Precise overlapping distal stent          first, then distal repositioning

---

**Indications for clinical use**

CE marked for
  • Venous bypass graft
  • Native coronary lesions

---

**Studies**

Present    • Registry

12



## References

1. Rousseau H, Puel J, Joffre F, Sigwart U, Dubouchet C, Lambert C, Knight C, Kropf L, Wallsten H. Self-expanding endovascular prosthesis: an experimental study. Radiology 1987;164:709–714.

2. Sigwart U, Puel J, Mirkovitch V, Joffre F, Kappenberger L. Intravascular stents to prevent occlusion and restenosis after transluminal angioplasty. N England J Med 1987;316:701–706.

3. Sigwart U, Urban P, Golf S, Kaufmann U, Imbert C, Fischer A, Kappenberger L. Emergency stenting for acute occlusion after coronary balloon angioplasty. Circulation 1988;79:1121–1127.

4. Serruys PW, Strauss BH, Beatt KJ, et al. Angiographic follow-up after placement of a self-expanding coronary artery stent. N Engl J Med 1991;324:13–17.

5. Strauss BH, Serruys PW, Bertrand ME, et al. Quantitative angiographic follow-up of the coronary Wallstent in native vessels and bypass grafts. Am J Cardiol 1992;69:475–481.

6. De Scheerder IK, Strauss BH, de Feyter PJ, et al. Stenting of venous bypass grafts. A new treatment modality of patients who are poor candidates for reintervention. Am J 1992;123:1046–1054.

BSC-SJA-1436

7. Keane D, Buis B, Reifart N, et al. Clinical and angiographic outcome following implantation of the new less shortening Wallstent in aorto-coronary vein grafts: introduction of the second generation stent in the clinical arena. J International Cardiol 1994;7:557-64.

8. Keane D, de Jaegere P, Serruys PW. Structural design, clinical experience and current indications of the coronary Wallstent. Cardiology Clinics 1994;12:689-97.

9. Ozaki Y, Keane D, Ruygrok P, et al. Six-month clinical and angiographic outcome of the new leg shortening Wallstent in native coronary arteries. Circulation 1996. In press

The Publishers would like to thank Schneider (Europe) AG for their support.



SCHNEIDER

INTERNATIONAL

14

BSC-SJA-1437

# EXHIBIT 76

# REDACTED

# EXHIBIT 77



(19) Europäisches Patentamt
European Patent Office
Office européen des brevets



(11)  **EP 0 893 996 B1**

(12)  **EUROPEAN PATENT SPECIFICATION**

(45) Date of publication and mention
of the grant of the patent:
**18.09.2002  Bulletin 2002/38**

(51) Int Cl.⁷: **A61K 31/435, A61P 9/00,
A61P 43/00**

(21) Application number: **97915441.6**

(22) Date of filing: **25.03.1997**

(86) International application number:
**PCT/EP97/01548**

(87) International publication number:
**WO 97/035575 (02.10.1997 Gazette 1997/42)**

(54) **USE OF A RAPAMYCIN DERIVATIVE IN VASCULOPATHIES AND XENOTRANSPLANTATION**

VERWENDUNG EINES RAPAMYCINDERIVATES ZUR BEHANDLUNG VON GEFÄSS
ERKRANKUNGEN UND XENOTRANSPLANTATIONEN

UTILISATION D'UN DERIVE DE LA RAPAMICINE DANS LES VASCULOPATHIES ET LES
XENOTRANSPLANTATIONS

(84) Designated Contracting States:
AT BE CH DE DK ES FI FR GB GR IE IT LI LU NL
PT SE
Designated Extension States:
RO SI

(30) Priority: **27.03.1996  GB 9606452**

(43) Date of publication of application:
**03.02.1999  Bulletin 1999/05**

(60) Divisional application:
**01116282.5 / 1 146 881**

(73) Proprietors:
• Novartis AG
4056 Basel (CH)
Designated Contracting States:
BE CH LI DE DK ES FI FR GB GR IE IT LU NL PT
SE
• Novartis-Erfindungen Verwaltungsgesellschaft
m.b.H.
1235 Wien (AT)
Designated Contracting States:
AT

(72) Inventors:
• SCHULER, Walter
D-79639 Grenzach-Wyhlen (DE)
• SCHUURMAN, Hendrik
CH-4057 Basel (CH)
• WECKBECKER, Gisbert
CH-4105 Biel-Benken (CH)
• ZERWES, Hans-Günter
D-79539 Lörrach (DE)

(74) Representative: Becker, Konrad et al
Novartis AG
Patent- und Markenabteilung CH
Lichtstrasse 35
4002 Basel (CH)

(56) References cited:
EP-A- 0 651 182          EP-A- 0 568 310
EP-A- 0 691 130          WO-A-94/09010
WO-A-96/41807            US-A- 5 362 718

**EP 0 893 996 B1**

Note: Within nine months from the publication of the mention of the grant of the European patent, any person may give
notice to the European Patent Office of opposition to the European patent granted. Notice of opposition shall be filed in
a written reasoned statement. It shall not be deemed to have been filed until the opposition fee has been paid. (Art.
99(1) European Patent Convention).

Printed by Jouve, 75001 PARIS (FR)

BSC-P0132649
BSC-SJA-1440

EP 0 693 996 B1

Description

[0001]    The present invention relates to a new use, in particular a new use for a derivative of rapamycin of formula



also named 40-O-(2-hydroxyethyl)-rapamycin (referred thereafter as Compound A).

[0002]    Compound A is disclosed in WO 94/09010.

[0003]    Compound A has, on the basis of observed activity, e.g. binding to macrophilin-12 (also known as FK-506 binding protein or FKBIP-12), e.g. as described in WO 94/09010, been found to be useful e.g. as immunosuppressant, e.g. in the treatment of acute allograft rejection.

[0004]    EP-A-0 551 182 discloses the use of rapamycin, i.e. the known antibiotic produced by Streptomyces hygroscopicus, to prevent or treat intimal smooth muscle cell hyperplasia, restenosis and vascular occlusion. USP 5,362,718 describes a group of rapamycin hydroxyesters useful in the treatment or inhibition of graft rejection including heart valve xenografts, and in hyperproliferative vascular diseases such as restenosis and atherosclerosis.

[0005]    Organ transplants of liver, kidney, lung and heart are now regularly performed as treatment for endstage organ disease. Because of the current shortage of human donors for transplantable allografts, attention has focused on the possibility of using xenografts (transplants between species) in transplantation. One of the major obstacles in transplanting successfully xenografts in humans is immunological.

[0006]    A further obstacle in allo- and xenotransplantation is the chronic rejection and thus organ transplantation is not yet a clinically viable solution to irreversible organ disease.

[0007]    Chronic rejection, which manifests as progressive and irreversible graft dysfunction, is the leading cause of organ transplant loss, in some cases already after the first postoperative year. The clinical problem of chronic rejection is clear from transplantation survival times; about half of kidney allografts are lost within 5 years after transplantation, and a similar value is observed in patients with heart allografts.

[0008]    Chronic rejection is considered as a multifactorial process in which not only the immune reaction towards the graft but also the response of the blood vessel walls in the grafted organ to injury ["response-to-injury" reaction} plays a role. The variant of chronic rejection with the worst prognosis is an arteriosclerotic-like alteration, also called transplant vasculopathy, graft vessel disease, graft arteriosclerosis, transplant coronary disease, etc. This vascular lesion is characterized by migration and proliferation of smooth muscle cells, probably under influence of growth factors that are amongst others synthesized by endothelial cells. This leads to intimal proliferation and thickening, smooth muscle cell hypertrophy repair, and finally to gradual luminal obliteration (vascular remodelling). It appears to progress also through repetitive endothelial injury induced amongst others by host antibody or antigen-antibody complexes; also so-called non-immunological factors like hypertension, hyperlipidemia, hypercholesterolemia etc. play a role.

[0009]    Chronic rejection appears to be inexorable and uncontrollable because there is no known effective treatment or prevention modality. Thus, there continues to exist a need for a treatment effective in preventing, controlling or reversing manifestations of chronic graft vessel diseases.

[0010]    There also continues to exist a need to prevent or treat restenosis or vascular occlusions as a consequence of proliferation and migration of intimal smooth muscle cell, e.g. induced by vascular surgeries such as angioplasty.

[0011]    In accordance with the present invention, it has now surprisingly been found that Compound A inhibits vasculopathies such as vascular remodelling and are particularly indicated to prevent or combat chronic rejection in a transplanted organ.

[0012]    In accordance with the particular findings of the present invention, there is provided:

2

BSC-P0132650
BSC-SJA-1441

EP 0 893 995 B1

1. Use of Compound A in the preparation of a pharmaceutical composition for use in a method for preventing or treating neointimal proliferation and thickening in a subject in need thereof, wherein the Compound A is to be administered to said subject at a therapeutically effective amount A.

[0013]   In a series of further specific or alternative embodiments, the present invention also provides:

2.1. Use of Compound A in the preparation of a pharmaceutical composition for use in a method for preventing or combating manifestations of chronic rejection in a recipient of organ or tissue transplant wherein the Compound A is to be administered to said recipient at a therapeutically effective amount A.

2.2. Use of Compound A in the preparation of a pharmaceutical composition for use in a method for preventing or combating graft vessel diseases, e.g. transplant vasculopathies, arteriosclerosis or atherosclerosis, in a recipient of organ or tissue transplant, wherein the Compound A is to be administered to said recipient at a therapeutically effective amount A.

By manifestations of chronic rejection are meant the conditions resulting from the immune reaction towards the graft and the response of the blood vessel walls in the grafted organ or tissue as indicated above. Compound A is useful for reducing chronic rejection manifestations or for ameliorating the conditions resulting from chronic rejection.

The organ or tissue transplantation may be performed from a donor to a recipient of a same or different species. Among such transplanted organs or tissues and given illustratively are heart, liver, kidney, spleen, lung, small bowel, and pancreas, or a combination of any of the foregoing.

[0014]   In a further or alternative embodiment the invention provides:

3. Use of Compound A in the preparation of a pharmaceutical composition for use in a method for preventing or treating intimal smooth muscle cell proliferation and migration, e.g. restenosis, and/or vascular occlusion following vascular injury, e.g. angioplasty, in a subject in need thereof, wherein the Compound A is to be administered to said subject at a therapeutically effective amount A.

[0015]   In a further or alternative embodiment, the present invention also provides:

4. Use of Compound A in the preparation of a pharmaceutical composition for use in a method for preventing or combating acute or chronic rejection in a recipient of organ or tissue xenograft transplant, wherein the Compound A is to be administered to said recipient at a therapeutically effective amount A.

Xenograft organ or tissue transplants include e.g. heart, liver, kidney, spleen, lung, small bowel, pancreatic (complete or partial, e.g. Langerhans islets), skin and bone marrow xenografts.

[0016]   As alternative to the above the present invention also provides:

5. Use of Compound A in the preparation of a pharmaceutical composition for use in any method as defined under 1 to 4 above, wherein the pharmaceutical composition comprises Compound A together with one or more pharmaceutically acceptable diluents or carriers therefor.

[0017]   Utility of Compound A in treating diseases and conditions as hereinabove specified, may be demonstrated in animal tests, for example in accordance with the methods hereinafter described.

A. Chronic Allograft Rejection

[0018]   The kidney of a male DA (RT1$^a$) rat is orthotopically transplanted into a male Lewis (RT1$^1$) recipient. In total 24 animals are transplanted. All animals are treated with cyclosporine A at 7.5 mg/kg/day per os for 14 days starting on the day of transplantation, to prevent acute cellular rejection. Contralateral nephrectomy is not performed. Each experimental group treated with a distinct dose of a compound of formula I or placebo comprises six animals. Starting at day 53-64 after transplantation, the recipient animals are treated per os for another 69-72 days with Compound A or receive placebo. At 14 days after transplantation animals are subjected to graft assessment by magnetic resonance imaging (MRI) with perfusion measurement of the kidneys (with comparison of the grafted kidney and the own contralateral kidney). This is repeated at days 53-64 after transplantation and at the end of the experiment. The animals are then autopsied. Rejection parameters such as MRI score, relative perfusion rate of the grafted kidney and histologic score of the kidney allograft for cellular rejection and vessel changes are determined and statistically ana-

S

BSC-P0132851
*BSC-SJA-1442

EP 0 693 996 B1

lyzed. In this assay, animals treated per os with 2.5 mg/kg/day of Compound A have a significantly lower MRI score of rejection, histologic score for cellular rejection and vessel changes and a significantly lower reduction in perfusion rate assessed by MRI than the animals of the placebo group.

B. Aorta transplantation

[0019]   In this model of aorta transplantation in the rat, an allogeneic response to the graft does not destroy the graft, but it evokes pathological changes resembling those of chronic rejection in clinical transplantation. These include infiltration into the adventitia of mononuclear cells (lymphocytes, macrophages, some plasma cells), and thickening of the intima.

[0020]   Donor aorta between the branch of the renal artery and the start of the caudal mesenteric aorta, about 1 cm in length, is harvested from a male DA (RT1$^a$) rat and transplanted orthotopically in a male Lewis (RT1$^l$) rat. Weekly after transplantation, the body weight is recorded. At autopsy, the graft with part of the aorta of the recipient just above and below the transplant is removed. It is perfused ex vivo with phosphate-buffered saline supplemented with 2% paraformaldehyde and 2.5% glutaraldehyde for about 2 minutes, then for 24 hours fixed by immersion fixation in the same solution, and thereafter fixed in 4% buffered formalin. Pieces of the graft are embedded in paraffin, in such a way that both a transversal section and a longitudinal section is made of the grafted aorta and the recipient's own aorta. Sections of 4 μm thickness are stained by hematoxylin-eosin, elastica-von-Gieson and periodic-acid -Schiff. Apart from conventional light microscopy, images are recorded by confocal laser scanning microscopy. From each section, four areas are scanned, and from each area the thickness of the intima and intima+media is measured at five locations. At autopsy, weight and histology is performed for thymus, spleen, liver, kidney, testes and seminal vesicles.

[0021]   A first experiment includes 4 groups, each comprising 4 animals. In one group isogeneic transplantations (Lewis to Lewis) are performed, and animals receive a placebo microemulsion, the other groups comprise allogeneic transplantations, and animals receive per os either placebo microemulsion or Compound A in microemulsion at 2.5 mg/kg/day. The experiment is terminated at 7 weeks after transplantation.

A second experiment includes 4 groups, each comprising 4 animals. In all cases allogeneic transplants are performed, and animals receive per os either placebo microemulsion or Compound A in microemulsion at 0.63, 1.25, 2.5 or 5.0 mg/kg/day. The experiment is terminated 11 weeks after transplantation.

[0022]   In both experiments, Compound A significantly inhibits graft infiltration and neointima formation.

C. Angioplasty

[0023]   Studies on angioplasty are done in the model of balloon-catheter injury: Balloon catheterization is performed on day 0, essentially as described by Powell et al. (1989). Under isofluorane anaesthesia, a Fogarty 2F catheter is introduced into the left common carotid artery via the external carotid and inflated (distension ≈ 10 μl H2O). The inflated balloon is withdrawn along the length of the common carotid three times, the latter two times whilst twisting gently to obtain a uniform de-endothelialization. The catheter is then removed, a ligature placed around the external carotid to prevent bleeding and the animals allowed to recover.

[0024]   2 groups of 12 RoRo rats (400 g, approximately 24 weeks old) are used for the study: one control group and one group receiving Compound A. The rats are fully randomized during all handling, experimental procedures and analysis.

[0025]   Compound A is administered p.o. (gavage) starting 3 days before balloon injury (day -3) until the end of the study, 14 days after balloon injury (day +14). Rats are kept in individual cages and allowed food and water ad libitum.

[0026]   The rats are then anaesthetized with isofluorane, a perfusion catheter inserted through the left ventricle and secured in the aortic arch, and an aspiration cannula inserted into the right ventricle. Animals are perfused under a perfusion pressure of 150 mmHg, firstly for 1 min. with 0.1 M phosphate buffered saline solution (PBS, pH 7.4) and then for 15 min. with 2.5 % glutaraldehyde in phosphate buffer (pH 7.4). The perfusion pressure is 150 mmHg at the tip of the cannula (≈ 100 mmHg in the carotid artery), as determined in a preliminary experiment by introducing a cannula attached to a pressure transducer into the carotid). Carotid arteries are then excised, separated from surrounding tissue and immersed in 0.1 M cacodylate buffer (pH 7.4) containing 7 % saccharose and incubated overnight at 4° C. The following day the carotids are immersed and shaken for lh at room temperature in 0.05 % KMnO4 in 0.1 M cacodylate. The tissues are then dehydrated in a graded ethanol series; 2 x 10 min in 75%, 2 x 10 mm in 85 %, 3 x 10 min in 95% and 3 x 10 min in 100 % ethanol. The dehydrated carotids are then embedded in Technovit 7100 according to the manufacturers recommendation. The embedding medium is left to polymerize overnight in an exsiccator under argon, since oxygen is found to inhibit proper hardening of the blocks.

[0027]   Sections 1-2 μm thick are cut from the middle section of each carotid with a hard metal knife on a rotary microtome and stained for 2 min with Giemsa stain. About 5 sections from each carotid are thus prepared and the cross-sectional area of the media, neointima and the lumen morphometrically evaluated by means of an image analysis

4

BSC-P0132652
BSC-SJA-1443

EP 0 693 996 B1

system (MCID, Toronto, Canada).

[0028]   Intimal thickening is significantly less in the vessels of the rats that receive Compound A compared to the control animals, e.g. at 0.5 mg/kg statistical inhibition of neointima formation of 60 %, at 2.5 mg/kg significant inhibition of 75 %.

D. In vivo heart xenotransplantation (hamster-to-rat)

[0029]   The hamster-into-rat xenograft combination is a so-called difficult concordant combination. Rats do not have natural anti-hamster antibody in sufficient amounts to yield immediate hyperacute rejection as observed in concordant combinations; however, rejection in untreated recipients occurs within 3-4 days, by antibodies in combination with complement. This is visualized in histology by destruction of blood vessels, exudation and extravasation of erythrocytes, and influx by polymorphonuclear granulocytes; often there are signs of hemorrhage and thrombosis. Once this rejection has been overcome by effective inhibition of antibody synthesis or complement inactivation, a cellular rejection can emerge later on. This is visualized in histology by influx of mononuclear cells, including lymphocytes, lymphoblastoid cells, and macrophages, and destruction of the myocyte parenchyma. The inhibition of cellular rejection requires more immuno-suppression than that of allografts.

Congenitally athymic (nu/nu) rats lack a competent (thymus-dependent) cellular immune system and generally are unable to reject allografts. Such animals do reject a hamster xenograft within 3-4 days in a similar fashion as euthymic rats, indicative that (at least part of) anti-hamster antibody synthesis in rats occurs following a thymus-independent B-cell response. Such recipients are useful in hamster xenografting to evaluate rejection by thymus-independent antibody-mediated rejection.

[0030]   The heart of a Syrian hamster is heterotopically transplanted in the abdomen of a male Lewis (RT1[1]) rat with anastomoses between the donor and recipient's aorta and the donor right pulmonary artery to the recipient's inferior vena cava. The graft is monitored daily by palpation of the abdomen. Rejection is concluded in case of cessation of heart beat. Animals are weighed weekly. In the present series of experiments, the endpoint is set to 28 days. Animals are subjected to autopsy; apart from the graft, weight and histology is assessed for thymus, spleen, liver, seminal vesicles and testes. Blood is taken and processed to serum for the determination of cytolytic anti-hamster erythrocyte antibody and hemolytic complement activity.

[0031]   In this assay, Compound A results in prolonged graft survival, in both athymic and euthymic recipients.

[0032]   Daily dosages required in practicing the method of the present invention will vary depending upon, for example, the host, the mode of administration and the severity of the condition to be treated. A preferred daily dosage range is about from 0.25 to 25 mg as a single dose or in divided doses.

Suitable daily dosages for patients are on the order of from e.g. 0.2 to 25 mg p.o. preferably 5 to 25. Compound A may be administered by any conventional route, in particular enterally, e.g. orally, e.g. in the form of tablets, capsules, drink solutions, nasally, pulmonary (by inhalation) or parenterally, e.g. in the form of injectable solutions or suspensions. Suitable unit dosage forms for oral administration comprise from ca. 0.05 to 12.5 mg, usually 1 to 10 mg Compound A, together with one or more pharmaceutically acceptable diluents or carriers therefor.

[0033]   When used to prevent or treat chronic rejection or xenotransplant rejection as hereinabove specified Compound A may be administered as the sole active ingredient or together with other drugs in immunomodulating regimens. Compound A may be used in combination with cyclosporins or ascomycins, or their immunosuppressive analogs, e. g. cyclosporin A, cyclosporin G, FK-506, etc.; corticosteroids; cyclophosphamide; azathioprene; methotrexate; brequinar; leflunomide; mizoribine; mycophenolic acid; mycophenolate mofetil; 15-deoxyspergualine, immunosuppressive monoclonal antibodies, e.g., monoclonal antibodies to leukocyte receptors, e.g., MHC, CD2, CD3, CD4, CD7, CD25, CD28, B7, CD45, or CD58 or their ligands; or other immunomodulatory compounds, e.g. CTLA4Ig.

[0034]   Compound A is administered in conjunction with other immunosuppressive / immunomodulatory therapy, e. g. for preventing or treating chronic rejection or xenotransplant rejection as hereinabove specified, dosages of the co-administered immunosuppressant or immuno-modulatory compound will of course vary depending on the type of co-drug employed, e.g. whether it is a steroid or a cyclosporin, on the specific drug employed, on the condition being treated, and so forth.

[0035]   The method as defined above comprises co-administration, e.g. concomitantly or in sequence, of a therapeutically effective amount of Compound A and a second drug substance, said second drug substance being an immunosuppressant or immunomodulatory drug, e.g. as indicated above.

| Formulation Example: capsules | |
|---|---|
| Ethanol | 20.0 mg |
| 1,2-propylene glycol | 81.0 mg |

5

BSC-P0132653
BSC-BJA-1444

EP 0 893 696 B1

(continued)

Formulation Example: capsules

| | |
|---|---|
| Refined oil | 121.5 mg |
| Cremophor RH40 | 202.5 mg |
| Compound A | 20.0 mg |
| Total | 500 mg |

[0036]   Compound A is well tolerated at dosages required for use in accordance with the present invention. For example, the NTEL for Compound A in a 4-week toxicity study is 0.5 mg/kg/day in rats and 1.5 mg/kg/day in monkeys.

Claims

1.   Use of 40-0-(2-hydroxy)ethyl-rapamycin in the preparation of a pharmaceutical composition for preventing or treating neointimal proliferation and thickening.

2.   Use of 40-0-(2-hydroxy)ethyl-rapamycin according to claim 1 in the preparation of a pharmaceutical composition for preventing or treating graft vessel disease.

3.   Use of 40-0-(2-hydroxy)ethyl-rapamycin according to claim 1 in the preparation of a pharmaceutical composition for preventing or treating restenosis and/or vascular occlusion following vascular injury.

4.   Use of 40-0-(2-hydroxy)ethyl-rapamycin in the preparation of a pharmaceutical composition, for preventing or combating acute or chronic rejection in a recipient of organ or tissue xenograft transplant.

5.   Use according to claim 1 or 2 wherein the pharmaceutical composition is used in combination with cyclosporin A, FK-506, azathioprine, methotrexate, mycophenolic acid, mycophenolate mofetil, 15-deoxyspergualine, CTLA4-Ig or monoclonal antibodies to leucocyte receptors or to their ligands.

6.   Use according to claim 5, wherein the monoclonal antibodies are monoclonal antibodies to MHC, CD2, CD3, CD4, CD7, CD25, CD28, B7, CD45 or CD58.

7.   Use according to claim 5, wherein the monoclonal antibodies are monoclonal antibodies to the ligands of MHC, CD2, CD3, CD4, CD7, CD25, CD28, B7, CD45 or CD58.

Patentansprüche

1.   Verwendung von 40-O-(2-Hydroxy)ethylrapamycin zur Herstellung einer pharmazeutischen Zusammensetzung zur Prävention oder Behandlung der neointimalen Proliferation und Verdickung.

2.   Verwendung von 40-O-(2-Hydroxy)ethylrapamycin nach Anspruch 1 zur Herstellung einer pharmazeutischen Zusammensetzung zur Prävention oder Behandlung einer Transplantatgefäßerkrankung.

3.   Verwendung von 40-O-(2-Hydroxy)ethylrapamycin nach Anspruch 1 zur Herstellung einer pharmazeutischen Zusammensetzung zur Prävention oder Behandlung der Restenose und/oder des vaskulären Verschlusses nach einer Gefäßverletzung.

4.   Verwendung von 40-O-(2-Hydroxy)ethylrapamycin zur Herstellung einer pharmazeutischen Zusammensetzung zur Prävention oder Bekämpfung einer akuten oder chronischen Abstoßung bei einem Empfänger eines Organ- oder Gewebexenotransplantats.

5.   Verwendung nach Anspruch 1 oder 2, worin die pharmazeutische Zusammensetzung in Kombination mit Cyclosporin A, FK 506, Azathioprin, Methotrexat, Mycophenolsäure, Mycophenolatmofetil, 15-Desoxyspergualin, CTLA4-Ig oder monoklonalen Antikörpern gegen Leukozytenrezeptoren oder ihre Liganden verwendet wird.

6

BSC-P0132654
BSC-SJA-1445

EP 0 893 996 B1

6. Verwendung nach Anspruch 5, worin die monoklonalen Antikörper monoklonale Antikörper gegen MHC, CD2, CD3, CD4, CD7, CD25, CD28, B7, CD45 oder CD58 sind.

7. Verwendung nach Anspruch 5, worin die monoklonalen Antikörper monoklonale Antikörper gegen die Liganden von MHC, CD2, CD3, CD4, CD7, CD25, CD28, B7, CD45 oder CD58 sind.

**Revendications**

1. Utilisation de la 40-O-(2-hydroxy)-éthyl-rapamycine dans la préparation d'une composition pharmaceutique pour la prévention ou le traitement d'une prolifération et d'un épaississement néointimal.

2. Utilisation de la 40-O-(2-hydroxy)-éthyl-rapamycine de la revendication 1 dans la préparation d'une composition pharmaceutique pour la prévention ou le traitement de la maladie du vaisseau du greffon.

3. Utilisation de la 40-O-(2-hydroxy)-éthyl-rapamycine conformément à la revendication 1 dans la préparation d'une composition pharmaceutique pour la prévention ou le traitement d'une resténose et/ou d'une occlusion vasculaire faisant suite à une lésion vasculaire.

4. Utilisation de la 40-O-(2-hydroxy)-éthyl-rapamycine dans la préparation d'une composition pharmaceutique, pour prévenir ou combattre le rejet aigu ou chronique dans une transplantation de xénogreffe d'organe ou de tissu chez un receveur.

5. Utilisation suivant la revendication 1 ou 2, dans laquelle la composition pharmaceutique est utilisée en association avec la cyclosporine A, la FK-506, l'azathioprine, le méthotrexate, l'acide mycophénolique, le mycophénolate-mofétil, la 15-désoxyspergualine, le CTLA4-Ig ou des anticorps monoclonaux dirigés contre des récepteurs leucocytaires ou contre leurs ligands.

6. Utilisation suivant la revendication 5, dans laquelle les anticorps monoclonaux sont des anticorps monoclonaux dirigés contre CMH, CD2, CD3, CD4, CD7, CD25, CD28, B7, CD45 ou CD58.

7. Utilisation suivant la revendication 5, dans laquelle les anticorps monoclonaux sont des anticorps monoclonaux dirigés contre les ligands de CMH, CD2, CD3, CD4, CD7, CD25, CD28, B7, CD45 ou CD58.

BSC-P0132655
BSC-SJA-1446

# EXHIBIT 78

*18*

**UEXKÜLL & STOLBERG**
PATENTANWÄLTE

BESELERSTRASSE 4
D-22607 HAMBURG

DR. J.-D. FRHR. von UEXKÜLL (-1992)
DR. ULRICH GRAF STOLBERG (-1988)
EUROPEAN PATENT ATTORNEYS
EUROPEAN TRADEMARK ATTORNEYS
DIPL.-ING. JÜRGEN SUCHANTKE
DIPL.-ING. ARNULF HUBER
DR. ALLARD von KAMEKE
DIPL.-BIOL. INGEBORG VOELKER
DR. PETER FRANCK
DR. GEORG BOTH
DR. ULRICH-MARIA GROSS
DR. HELMUT von HEESCH
DR. JOHANNES AHME
DR. HEINZ-PETER MUTH
DR. MARTIN WEBER-QUITZAU
DR. BERND JANSSEN
DR. ALBRECHT von MENGES
DR. MARTIN NOHLEN
MÜNCHEN
DIPL.-ING. LARS MANKE
DR. OLGA BEZZUBOVA
RECHTSANWÄLTE IN HAMBURG
DR. FRANK DETTMANN
ASKAN DEUTSCH, LL.M.

**FAX & MAIL**

Europäisches Patentamt

Erhardstr. 27

80331 München

18. 6. 2003

E 63754 We/Cbs

| | | |
|---|---|---|
| Publication No.: | 0 893 996 B1 | |
| Application No.: | 97915441.6 | |
| Proprietors: | Novartis AG, 4056 Basel (CH); | |

**Zur Kasse**
(A) 6 610,-

Novartis-Erfindungen Verwaltungsges.m.b.H.,

1235 Wien (AT)

Opponent: Cordis Medizinische Apparate GmbH

Rheinische Str. 2

42781 Haan (DE)

In the name of Cordis Medizinische Apparate GmbH we herewith give Notice of

**O P P O S I T I O N**

to European patent 0 893 996 entitled "Use of a Rapamycin Derivative in Vasculopathies and Xenotransplantation".

Empfangen 18. Jun. 15:20   POSTMASTER@UEX.DE   FAX:(040) 899 654-88
R.-RING 9, D-80539 MÜNCHEN, TEL.: (089) 29 68 170

BSC-P0113984
BSC-SJA-1447

2

We request that the patent be revoked in its entirety.

The opposition is filed on the grounds of Article 100 (a) and (c) EPC. The subject-matter of the opposed patent is not patentable under Articles 54 and 56 EPC.

Oral proceedings are requested if the Opposition Division will not feel able to revoke the patent in the light of the written submissions.

For the sake of completeness, EPO Form 2300 is attached.

The opposition fee amounting to EURO 610.-- shall be debited to the deposit account of the representatives; a corresponding voucher is attached.

### I. CITED DOCUMENTS

The Opponent relies on the following documents which will be referred to by the numbers given below:

E1: WO 94/09010 (International application No. PCT/EP93/ 02604), Sandoz Ltd. et al.- "O-Alkylated Rapamycin Derivatives and their use, particularly as Immunosuppressants" - Publication date: April 28, 1994.

E2: EP 0 568 310 A1 (European application No. 93303269.0), American Home Products Corp. - "Composition comprising heparin and rapamycin" - Publication date: November 3, 1993.

Empfangszeit 18.Juni 15:20

BSC-P0113985
BSC-SJA-1448

3

E3: EP 0 551 182 A1 (European application No. 93300052.3), American Home Products Corp. - "Method of treating hyperproliferative vascular disease using rapamycin, eventually in combination with mycophenolic acid." - Publication date: July 14, 1993.

E4: C. Gregory et al., FASEB Journal Abstracts Part I (1992) A940 No. 21 - "Use of Antiproliferative Agents for the Treatment of Occlusive Vascular Disease" - Presentation of the corresponding poster: April 5 - 9, 1992.

E5: C.R. Gregory et al., Transplantation 55 (6) (1993) 1409-1418 - "Rapamycin Inhibits Arterial Intimal Thickening Caused By Both Alloimmune And Mechanical Injury" - Published: June 1993.

Two copies of the cited documents are enclosed.

## II. THE SUBJECT-MATTER OF THE OPPOSED PATENT

The opposed patent relates to the use of the rapamycin compound 40-O-(2-hydroxy)ethyl-rapamycin (cf. [0001]) in the treatment of pathologies related with transplantation.

Specifically the opposed patent relates to the use of 40-O-(2-hydroxy)ethyl-rapamycin for preventing and combating chronic rejection in a transplanted organ (cf. [0011]) and, more specifically,

• for preventing and treating neointintimal proliferation and thickening (claim 1; cf. [0012], page 3, lines 1/2),

BSC-P0113986
BSC-SJA-1449

4

- for preventing and treating graft vessel disease (claim 2),

- for preventing and treating restenosis and/or vascular occlusion following vascular injury (claim 3; cf. [0014], page 3, lines 25-27) and

- for preventing and combating acute or chronic rejection in a recipient of organ or tissue xenograft transplant (claim 4; cf. [0015], page 3, lines 32/33).


### III. THE PRIOR ART

It is well known in the prior art that rapamycin is an antibiotic showing a well-established efficacy as immunosuppressant (see E1, para. bridging pages 2 and 3). It is also used for treating hyperproliferative vascular disease (e.g. intimal smooth muscle cell hyperplasia, restenosis, vascular occlusion), either alone or in combination with other agents, such as antiproliferative antimetabolites (cf. E2, page 3, lines 19-21; E3, page 3, lines 24-52 and lines 28 ff.).

Further, several rapamycin compounds, in particular 40-O-alkylated derivatives (see E1), have been developed to address problems associated with restricted bioavailability and low solubility of this compound. One particularly preferred compound known in the art is 40-O-(2-hydroxy)ethyl-rapamycin (cf. E1, page 3, last line). The compounds referred to in E1 exhibit "an improved pharmacologic profile over rapamycin, exhibit greater stability and bioavailability, and allow for greater ease in producing galenic formulations" (see E1, page 2, 1st full para.).

Empfangszeit 18.Juni 15:20

BSC-P0113987
BSC-SJA-1450

5

The use of a variety of rapamycin compounds as immunosuppressant was well-established and efficacy proven for the treatment - amongst others - of transplantation rejection, graft vs. host disease and hyperproliferative disorders (see E1, page 5, last para., item a).

Besides the phenomenon of acute transplant rejection, chronic rejection is another grave problem associated with transplantation, which manifests as progressive and irreversible graft dysfunction caused by the response of the blood vessel walls in the grafted organ to injury (cf. [0006] - [0008] of the opposed patent).

The opposed patent suggests the use of 40-O-(2-hydroxy)ethyl-rapamycin as a solution to these problems.

As will be discussed in more detail below, the solution is not patentable since the prior art provides evidence that the claimed invention of the opposed patent lacks both novelty and inventive step.

## IV. LACK OF NOVELTY

The subject-matter of claim 4 lacks novelty over E1

The subject-matter of claim 4 of the opposed patent relates to the use of 40-O-(2-hydroxy)ethyl-rapamycin for preventing or treating acute or chronic rejection of organ or tissue xenograft transplant.

E1 teaches the use of 40-O-(2-hydroxy)ethyl-rapamycin (page 3, last line) for treatment and prevention of organ or tissue transplant rejection (page 5, item a).

Empfangszeit 18.Juni 15:20

BSC-P0113988
BSC-SJA-1451

6

Since in the prior art both allograft and xenograft transplantations were well-known, Document E1 implicitly discloses the use of the above-mentioned compound for at least one of the alternatives covered by claim 4, namely acute rejection in a recipient of organ or tissue xenograft transplant.

Therefore, the subject-matter of claim 4 of the opposed patent lacks novely over E1.


## V. LACK OF INVENTIVE STEP


### Introduction

It will be shown below that it was well known in the prior art to use rapamycin for the prevention and treatment of the same pathologies or disorders as those referred to in the claims of the opposed patent.

It was further known that 40-O-(2-hydroxy)ethyl-rapamycin, which is structurally identical in all important respects to rapamycin, inter alia had the same activity with respect to inhibiting transplant rejection and inhibiting T cell proliferation as rapamycin.

Since the skilled artisan knew that 40-O-(2-hydroxy)ethyl-rapamycin would not only have an improved pharmacological profile over rapamycin but exhibit greater stability and bioactivity, a reasonable expectation of success existed for using said compound for the same purposes as rapamycin.

Hence, the claimed subject-matter does not involve an inventive step.

Empfangszeit 18.Juni 15:20

BSC-P0113989
BSC-SJA-1452

7

1.   The subject-matter of claim 1 lacks inventive step over E4
     or E5 in combination with E1:

With regard to the subject-matter of claim 1 document E4 is
considered as closest prior art.

E4 discloses the use of inter alia rapamycin for the
prevention of vascular occlusive disease. Of the compounds
tested, rapamycin had the most pronounced antiproliferative
effect against vascular smooth muscle cells (lines 4/5 and
14). Rapamycin further showed the greatest effect in
decreasing intimal thickening (lines 18/19) and was therefore
said to be the most effective agent in vivo for preventing
intimal smooth muscle thickening following arterial injury
(lines 29/30) and may provide therapeutical strategies for the
control of graft vascular disease (lines 31/32).

Reference is also made in this regard to E5, which is a full
paper of the same authors, which discloses the same results in
more detail. Specifically, rapamycin was shown to reduce
intimal thickening by 98%.

In this context, the opposed patent also teaches that chronic
rejection is a multifactorial process, where graft vessel
disease is a variant, which is characterized by migration and
proliferation of smooth muscle cells, leading to intimal
proliferation and thickening (cf. [0008]).

In view of the disclosure of E4 or E5, the technical problem
to be solved was the provision of rapamycin compounds which
allow for the prevention and treatment of neointimal
proliferation and thickening.

Empfangszeit 18.Juni 15:20

BSC-P0113990
BSC-SJA-1453

3

In this context, it was already known from E1 that certain rapamycin compounds exhibit greater stability and bioavailability and allow for greater ease in producing galanic formulations than rapamycin itself (cf. E1, page 2, first full paragraph). The compound 40-O-(2-hydroxy)ethyl-rapamycin is particularly disclosed as a preferred compound (cf. page 3, line 9 from the bottom and last line). Furthermore, it was known from E1 that this compound was suitable for treating proliferative disorders (cf. page 6, item e).

In view of the fact that E4 and E5 disclose the use of rapamycin for preventing intimal thickening (cf. page 1409, right column, second para.) and intimal proliferation (cf. page 1417, left column, first full para.), and considering that E1 discloses the 40-O-rapamycin derivatives exhibiting inter alia greater stability and bioavailability than rapamycin (E1, first full paragraph), the skilled artisan would have used the 40-O-(2-hydroxy)ethyl-rapamycin for preventing or treating graft vessel disease, in particular since said compound is referred to as a "preferred rapamycin" (cf. E1, page 3, line 9 from the bottom and last line), suitable for treating proliferative disorders (cf. page 6, item 2).

Therefore, the subject-matter of claim 1 lacks inventive step in view of E4 or E5 in combination with E1.

2.   The subject-matter of claim 2 lacks inventive step over E4 or E5 in combination with E1:

Graft vessel disease is a vascular lesion characterized by migration and proliferation of smooth muscle cells leading inter alia to intimal proliferation and thickening (cf.

Empfangszeit 18.Juni 15:20

BSC-P0113991
BSC-SJA-1454

9

[0008], page 2, lines 44-46 of the opposed patent; lines 1/2
of E4).

E4 and E5 both refer to graft vascular disease (GVD, another
name for graft vessel disease), and the positive therapeutic
effects of rapamycin are emphasized (cf. item V. 1. above).
The use of rapamycin for treating graft vascular disease was
suggested (cf. e.g. E4, last sentence).

Therefore, in view of the fact that E1 discloses that 40-O-(2-
hydroxy)ethyl-rapamycin inter alia has greater stability and
bioavailability as rapamycin, the skilled artisan would have
used the rapamycin compound for the claimed purpose.
Consequently, the subject-matter of claim 2 lacks inventive
step in view of E4 or E5 in combination with E1.


3.   The subject-matter of claim 3 lacks inventive step over E3
     in combination with E1:

E3 discloses a method of preventing or treating hyper-
proliferative vascular disease using rapamycin (page 3, line
24), and more specifically the use of rapamycin in preventing
or treating restenosis and vascular occlusion in a mammal,
particularly following vascular injury (page 3, lines 28-30).

Thus, the pathologies to be treated according to claim 3 were
already known in the prior art in connection with rapamycin as
active agent.

The argumentation concerning the prevention and treatment of
neointimal proliferation and thickening or treatment of graft
vessel disease using rapamycin (see V.1 and V.2 above) applies
mutatis mutandis to the use of 40-O-(2-hydroxy)ethyl-rapamycin
for preventing or treating restenosis and/or vascular

Empfangszeit 18.Juni 15:20

BSC-P0113992
BSC-SJA-1455

10

occlusion following vascular injury. Specifically, it was obvious to the skilled person to use the rapamycin compounds disclosed in E1, and in particular the preferred compound 40-O-(2-hydroxy)ethyl-rapamycin, already known as inter alia having improved properties over rapamycin, such as greater stability and bioavailability (cf. E1, first full paragraph) for the claimed purposes.

Therefore, the subject-matter of claim 3 lacks inventive step over E3 in combination with E1.

4.    The subject-matter of claim 4 lacks inventive step over E1:

In case the Opposition Division would not follow the argumentation as to lack of novelty (cf. item IV), the subject-matter of claim 4 is at least not inventive over E1.

E1 discloses the use of 40-O-(2-hydroxy)ethyl-rapamycin (page 3, last line) for the treatment and prevention of organ or tissue transplant rejection (page 5, item a). Should the proprietor take the position – as was done during examination proceedings (see response of June 27, 2001) – that D1 would relate to prevention or treatment of "acute allograft rejection which is distinct from chronic graft rejection or graft vessel disease", it is submitted that claim 4 encompasses both acute and chronic rejection.

The skilled artisan, knowing from E1 that 40-O-(2-hydroxy)ethyl-rapamycin is suitable for treatment and prevention of organ or tissue transplant rejection would not only have been motivated to use the compound also in the case of xenograft transplantations but would have used it with a reasonable expectation of success.

Empfangszeit 18.Juni 15:20

BSC-P0113993
BSC-SJA-1456

11

Consequently, the subject-matter of claim 4 does not involve an inventive step over E1.


5.   The subject-matter of claims 5-7 do not involve an inventive step.

The subject-matter of claims 5-7 relate to the use of 40-O-(2-hydroxy)ethyl-rapamycin in combination with other active agents.

The combination with most agents which are mentioned in claims 4 to 7, however, was already known from E1, referring to, for example, cyclosporin, FK-506, azathioprine, immunosuppressive monoclonal antibodies, e.g. monoclonal antibodies to CD3, CD4, CD25, CD28, or CD45 (cf. e.g. page 8, second full para.).

Thus, the skilled artisan would also have considered this combination for preventing or treating the indications referred to in claim 5.

For this reason, an inventive step cannot be acknowledged for the subject-matter of claims 5-7.


## VI. THE SUBJECT-MATTER OF THE EUROPEAN PATENT
## EXTENDS BEYOND THE CONTENT OF THE APPLICATION AS FILED

In response to the Communication dated March 1, 2003, Applicant filed amended claims and pages of the description adapted to the new claims.

Empfangszeit 18.Juni 15:20

BSC-P0113994
BSC-SJA-1457

12

In this context, the application as originally filed contained the following sentence at page 7 (second sentence from the bottom): "*Administration of a compound of formula I, e.g. Compound A, at a dose of 0.5 to 2.5 mg/kg in this rat kidney allograft model yields a reduction in all above mentioned rejection parameters*". This sentence, however, was deleted with Applicant's response dated June 27, 2001.

Further, the application as originally filed contained the following sentence at page 10, second full paragraph: "*In this assay, the compounds of formula I inhibit myointimal proliferation when administered per os at a daily dose of from 0.5 to 2.5 mg/kg*". This sentence, however, was deleted with Applicant's response dated June 27, 2001.

The deletions consequently imply that 40-O-(2-hydroxy)ethyl-rapamycin would neither yield said reduction in all rejection parameters referred to at page 7 nor inhibit "myointimal proliferation". This, however, is information which was not contained in the application as filed.

Therefore, the subject-matter of the European patent extends beyond the content of the application as filed (Article 100 c) EPC).

### VII. SUMMARY

In summary it can be stated that the claimed subject-matter is not patentable according to Article 100 (a) EPC for lack of novelty and lack of inventive step. Furthermore, the subject-matter of the European patent extends beyond the content of the application as filed (Article 100 c) EPC).

Empfangszeit 18.Juni 15:20

BSC-P0113995
BSC-SJA-1458

13

The request for revocation of the patent in its entirety is
therefore justified.

M. Weber-Quitzau

(Association No. 1)

Encls:   E1 to E5 (2-fold)
         EPO Form 2300 (2-fold)
         Copy of this Brief
         Voucher

Empfangszeit 18.Juni 15:20

BSC-P0113996
BSC-SJA-1459

# EXHIBIT 79



**Dörries**

**Frank-Molnia**

**& Pohlman**

patents • trademarks • designs

Mail Postfach 22 16 61, D - 80506 München • Visitors Triftstrasse 13, D - 80538 München
Phone +49 89 210296 0 • Fax +49 89 210296 33 • info@df-mp.com • www.df-mp.com

European Patent Office
Erhardtstrasse 27

80331 Munich

EPO · Munich
59

**1 8. Juni 2003**

**June 18, 2003**

Opposition against European patent EP 0 893 996 (Application No. 97 915 441.6)
Proprietor:   Novartis AG (for all designated Contracting States except AT)
            Novartis–Erfindungen Verwaltungsgesellschaft mbH (for AT)
Opponent:    Wyeth
Our Ref.:    WYE10472OP

## NOTICE OF OPPOSITION

On behalf of

Wyeth
Five Giralda Farms
Madison, NJ 07940
U.S.A.

we herewith file Opposition pursuant to Art. 99(1) EPC against

**European Patent No. 0 893 996**
**(European Appl. No. 97 915 441.6)**
**Publication and mention of the**
**grant: September 18, 2002**

Title of the Patent :

"Use of a Rapamycin Derivative in Vasculopathies and
Xenotransplantation"

Proprietor:

(for all designated contracting states except AT:)
Novartis AG
Lichtstrasse 35
4056 Basel
Switzerland

**Zur Kasse** €610,~ (A)

H. Ulrich Dörries • Dr. Sc. Nat., Dipl.-Biol., Patentanwalt, European Patent & Trademark Attorney
David Molnia • M.S. Elec. Eng., Patentanwalt, European Patent & Trademark Attorney, U.S. Patent Agent
Sandra Pohlman • B.S. Biology, U.S. Patent Attorney, Solicitor (England & Wales)
Michael Eder • Dr. Sc. Nat., Dipl.-Chem., Patentanwalt, European Trademark Attorney
Gisela Gerstberger • Dr. Rer. Nat., Dipl.-Chem., Patentanwältin, European Trademark Attorney

BSC-P0133232
BSC-SJA-1460

**df-mp**
patents • trademarks • designs

- 2 -

(for AT:)
Novartis-Erfindungen Verwaltungsgesellschaft m.b.H.
Brunner Strasse 59
1235 Wien
Austria

The opposition fee in the amount of EUR 610,- is paid by means of the enclosed cheque. A corresponding EPO Form 1010 is enclosed.

## I.   Extent of the Opposition and Requests

The Opposition is directed against all claims of European Patent EP 0 893 996 (hereinafter referred to as "the opposed patent").

It is requested that the opposed patent be revoked in its entirety pursuant to Art. 102(1) EPC. Oral proceedings are requested in accordance with Art. 116(1) EPC in the event that the Opposition Division does not consider the above requests justified on the basis of our written submissions.

## II.   Grounds in Support of the Opposition

The opposition is based on the grounds of Art. 100(a) and 100(c) EPC, in particular on the grounds that

(i)     the subject matter of the opposed patent is not based on an inventive step (Art. 56 EPC); and

(ii)    the subject matter of the opposed patent extends beyond the content of the application as filed (Art. 123(2) EPC).

BSC-P0133233
BSC-SJA-1461

**df-mp**
patents • trademarks • designs

- 3 -

### III.   The Claimed Subject Matter

The opposed patent contains seven claims, claims 1 and 4 of which are independent.
Claims 2 and 3 are dependent upon claim 1, claim 5 is dependent upon claims 1 and 2,
and claims 6 and 7 are dependent upon claim 5.

Independent claim 1 relates to the

"[u]se of 40-O-(2-hydroxy)ethyl-rapamycin in the preparation of a
pharmaceutical composition for preventing or treating neointimal proliferation
and thickening."

Claims 2 and 3 specifically relate to the prevention and treatment of graft vessel
disease (claim 2), and restenosis and/or vascular occlusion following vascular injury
(claim 3).

Independent claim 4 relates to the

"[u]se of 40-O-(2-hydroxy)ethyl-rapamycin in the preparation of a
pharmaceutical composition, for preventing or combating acute or chronic
rejection in a recipient of organ or tissue xenograft transplant."

Finally, claims 5 to 7 relate to uses wherein 40-O-(2-hydroxy)ethyl-rapamycin is
combined with another (immunomodulatory) agent.

### V.   The Documents Relied Upon

The documents relied upon in the present opposition brief will hereinafter be referred
to as follows:

D1:   WO 94/09010

D2:   EP 0 551 182 A1

D3:   US 5,362,718

D4:   S.O. Marx, T. Jayaraman, L.O. Go, and A.R. Marks, "Rapamycin Inhibits
Phosphorylation of Retinoblastoma Protein and Blocks Vascular Smooth
Muscle Cell Proliferation", *Circulation*, Abstract No. 1646, Vol. 90, No. 4,
Part 2, October 1994, I-306.

BSC-P0133234
BSC-SJA-1462

**df-mp**                                                                                    - 4 -
patents • trademarks • designs

## VI.   Disclosure Content of D1 to D4

## 1.    Document D1

In the first paragraph at page 2, D1 states that rapamycin is an extremely potent
immunosuppressant that had also previously been shown to have antitumor and
antifungal activity (cf. page 2, first paragraph). However, rapamycin is described to
have the disadvantage of being rather insoluble and exhibiting a low and variable
bioavailability.

The skilled reader of D1 would therefore understand the goal of D1 to be to provide
rapamycin in a form that overcomes the drawbacks described above and exhibits
enhanced physicochemical properties and bioavailability while maintaining its
antiproliferative, antifungal, and in particular its potent immunosuppressant activity.
In other words, the skilled reader would conclude that D1 seeks to provide another
rapamycin with the advantageous pharmacological activities of the compound
originally isolated from *Streptomyces hygroscopicus* (page 1, 2nd para. of D1), but
with certain improvements regarding the other properties mentioned above.

Consistent with that, D1 praises the rapamycin compounds described therein to "have
an improved pharmacological profile over rapamycin, exhibit greater stability and
bioavailability, and allow for greater ease in producing galenic formulations." The
skilled reader would furthermore understand from D1 that these rapamycin
compounds have retained the desirable basic pharmacological properties of the parent
compound of being active as antifungal and antitumor agent, and in particular having
an immunosuppressive effect (see page 3, last line, page 4, penultimate para., page 6,
lines 22-24, and page 7, 2nd full para. of D1). 40-O-(2-hydroxy)ethyl-rapamycin, also
named „Compound A" in the opposed patent, is a particularly preferred rapamycin
compound of D1 that meets the above criteria (cf., e.g., claim 4 of D1).

In Example 8 of D1, the activities of 40-O-(2-hydroxy)ethyl-rapamycin are compared
side-by-side to those of natural rapamycin and FK506 (another naturally occurring
macrolide that has immunosuppressive properties) also on the cellular and molecular
level. In particular, this example shows that 40-O-(2-hydroxy)ethyl-rapamycin has
activities at least comparable to rapamycin in the mixed lymphocyte reaction (MLR)
and the IL-6 dependent proliferation assay. Moreover, its binding to the so-called
macrophilin binding protein was at least comparable to FK506 (cf. page 16, first para.,
and page 21, last para. to page 22, penultimate para. of D1). D1 states that rapamycin

BSC-P0133235
BSC-SJA-1463

and FK506 were known to bind to the macrophilin binding protein (also referred to as macrophilin-12, FK506 binding protein, or FKBP-12; see page 10, 2nd para. of D1) *in vivo*. D1 further states that this binding was thought to be related to the immunosuppressive activity of these compounds (see again page 10, 2nd para. of D1), and indicates that this in turn was understood to be a consequence of their anti-proliferative effect on lymphocytes involved in the immune response (cf. page 13, 2nd para. of D1).

Thus, the skilled reader would conclude that D1 alleges the rapamycin "Compound A" described therein to have improved physicochemical properties and bioavailability compared to the parent compound; but that this compound is a rapamycin in all other relevant aspects, i.e., in terms of its biological activity and its mechanism of action, both on the cellular and the molecular level.

It is noted that D1 furthermore mentions that in immunosuppressive applications the rapamycin compounds disclosed therein may be administered in combination with another immunosuppressive agent, e.g., cyclosporin, FK-506, azathioprine, and immunosuppressive monoclonal antibodies, such as to CD3, CD4, CD25, CD45 (cf. page 8, second full paragraph of D1).

2.    **Document D2**

D2 relates to the use of rapamycin in the prevention or treatment of hyperproliferative vascular diseases in a mammal, and specifically intimal smooth muscle cell hyperplasia, restenosis, and vascular occlusion, particulary following either biologically or mechanically mediated vascular injury (page 3, lines 28 to 30 of D2). The term "mechanically mediated vascular injury" includes vascular injury caused by catheterization procedures or vascular scraping procedures, such as percutaneous transluminal coronary angioplasty etc. (page 3, lines 34 to 37 of D2).

D2 not only relates to the use of rapamycin for the prevention or treatment of hyperproliferative vascular diseases when administered alone, but also in combination with mycophenolic acid (an antiproliferative antimetabolite), cf. page 3, lines 41 to 47. D2 even points to further combinations of rapamycin with another agent, such as another antiproliferative antimetabolite (page 3, lines 46 to 47).

The Examples provided in D2 demonstrate that rapamycin, either alone or in combination with MPA (mycophenolic acid), considerably decreases intimal thickening in rat carotid arteries after injury via balloon catheterization (cf. page 5, line 29 to page 6, line 26, see in particular the table on page 6).

3.   **Document D3**

D3 pertains to hydroxyesters of rapamycin. Again, these rapamycin hydroxyesters are described as suitable for medical applications similar to those for which the parent compound is suitable, i.e., treatment of transplant rejection, graft versus host disease, autoimmune diseases, inflammatory diseases, adult T-cell leukemia/lymphoma, solid tumors, fungal infections and hyperproliferative vascular diseases (cf. column 1, lines 6 to 51). A more detailed explanation of the pharmacological activity of rapamycin hydroxyesters according to D3 may be found in column 6, lines 32 to 59. It is emphasized that the rapamycin hydroxyesters are not only useful in the treatment or inhibition of transplant rejection in the recipient of certain allografted organs or tissues, but also for inhibiting the rejection of heart valve xenografts (column 6, line 37). Furthermore, as indicated above, rapamycin hydroxyesters are described as useful in treating vascular diseases such as restenosis, e.g. following angioplasty, and atherosclerosis (column 6, lines 51 to 55 of D3).

Finally, D3 also mentions that the disclosed rapamycin hydroxyesters may be administered in combination or in conjunction with other immunomodulatory agents, such as azathioprine, rapamycin itself, cyclosporin A, FK-506 etc. (column 6, line 65 to column 7, line 5).

4.   **Document D4**

D4 relates to the activity of rapamycin in inhibiting phosphorylation of retinoblastoma protein, and thus, blocking of vascular smooth muscle cell proliferation. It is first explained that vascular smooth muscle cell proliferation contributes to the pathological processes leading to restenosis (following coronary artery angioplasty) and accelerated transplant atherosclerosis (following cardiac transplantation). It is then explained that rapamycin is known as a potent inhibitor of T cell proliferation.

BSC-P0133237
BSC-SJA-1465

Subsequently, the authors of this abstract report that rapamycin is capable of inhibiting vascular smooth muscle cell proliferation in rat via an antiproliferative mechanism (G1/S cell cycle arrest) similar to that operating in the inhibition of T-cell proliferation. More specifically, it is explained that rapamycin inhibits $p34^{cdc2}$ and $p33^{cdk2}$ kinase activity and thus delays phosphorylation of retinoblastoma protein.

Due to rapamycin's inhibitory activity against vascular smooth muscle cell proliferation, the authors suggest its usefulness "to prevent restenosis and accelerated transplant atherosclerosis".

## VII   Lack of Inventive Step (Art. 56 EPC)

### 1.   Claims 1 and 3

Independent claim 1 and dependent claim 3 relate to the use of 40-O-(2-hydroxy)ethyl-rapamycin for the preparation of a pharmaceutical composition for preventing or treating neointimal proliferation and thickening, and in particular for preventing or treating restenosis and/or vascular occlusion following vascular injury.

As outlined above, D2 relates to the use of rapamycin (alone or in combination with mycophenolic acid) for the preparation of a pharmaceutical composition for preventing or treating intimal smooth muscle cell hyperplasia (involving intimal proliferation and thickening), restenosis and vascular occlusion following either biologically or mechanically mediated vascular injury (cf. page 3, lines 28 to 30 of D2). The medical indications D2 pertains to are therefore identical to those mentioned in claims 1 and 3 of the opposed patent.

Thus, D2 may be regarded as a suitable candidate to represent the closest prior art for the evaluation of inventive step of the subject matter of claims 1 and 3 of the opposed patent.

The only (slight) difference between D2 and the opposed patent is that according to the results reported in D2, rapamycin is used as the pharmaceutically active agent to treat the above medical conditions, while the opposed patent proposes the use for the same purposes of a rapamycin compound having an insert of an inert 2 carbon atom

BSC-P0133238
BSC-SJA-1466

df-mp
patents • trademarks • designs

- 8 -

spacer behind the hydroxy group at position 40 (which compound will hereinafter be referred to as "rapamycin compound A").

Thus, the objective technical problem underlying the alleged invention claimed in claims 1 and 3 of the opposed patent with respect to closest prior art D2 could be formulated as the provision of a pharmaceutical composition suitable for use in preventing or treating the above-mentioned disease states, which composition is based on a *further* pharmaceutically active agent.

The solution to this objective technical problem is the use of rapamycin compound A according to claims 1 and 3 of the opposed patent. However, this use is not based on an inventive step vis-à-vis a combination of D2 and D1 for the following reasons:

A person skilled in the art seeking to solve the above-stated objective technical problem and being aware of the ability of rapamycin to inhibit intimal thickening and restenosis and/or vascular occlusion following vascular injury as disclosed in D2 would certainly first try pharmaceutical agents that are structurally close to rapamycin and exhibit a similar overall pharmaceutical activity as a consequence of a similar mechanism of action, both on the cellular and molecular level, as rapamycin. When turning to D1, which would be a natural reference to consult in this regard, the skilled person would be taught that rapamycin compound A is a useful compound that meets these criteria, i.e., that exhibits the same pharmaceutical (e.g., immunosuppressive, antitumor and antifungal) activity as rapamycin as a result of the same mechanism of action, while (allegedly) having improved properties regarding bioavailability and stability as compared to the parent drug.

Thus, for a person skilled in the art it would be obvious to try rapamycin compound A to solve the above technical problem. Moreover, the skilled person would also have a reasonable expectation of success in this regard. Since it is known from D1 that rapamycin compound A has in essence the same overall immunosuppressive and antiproliferative activities as rapamycin, the skilled person would have expected the activity profiles of both compounds to be similar, if not identical, also regarding the more specific applications of preventing intimal proliferation and thickening and restenosis and/or vascular occlusion, in respect of which rapamycin's usefulness had already been established.

Therefore, the subject matter of claims 1 and 3 of the opposed patent is not based on an inventive step vis-à-vis D2 in combination with D1.

BSC-P0133239
BSC-SJA-1467

**df-mp**
patents • trademarks • designs

- 9 -

The same applies to a combination of D4 and D1. As mentioned above, D4 discloses that rapamycin may be a useful agent for preventing restenosis and accelerated transplant atherosclerosis due to its activity in inhibiting vascular smooth muscle cell proliferation.

Therefore, D4 also qualifies as possible closest prior art for evaluating inventive step of the subject matter of claims 1 and 3 of the opposed patent. The objective technical problem in this case could be formulated in a manner similar to that formulated above vis-à-vis D2.

A combination of reference D4 with D1 would render the claimed solution obvious to the skilled person for the same reasons and based on analogous arguments as outlined above for the combination of references D2 and D1. Therefore, the subject matter of claims 1 and 3 of the opposed patent is not based on an inventive step vis-à-vis a combination of D4 with D1 either.


2.    **Claim 2**

Dependent Claim 2 relates to the use of 40-O-(2-hydroxy)ethyl-rapamycin according to claim 1 for the preparation of a pharmaceutical composition for preventing or treating graft vessel disease (GVD).

D4, as mentioned above under item VI.4, discloses that rapamycin is an effective inhibitor of accelerated transplant atherosclerosis (which term according to the opposed patent is identical in meaning to "graft vessel disease" as used in claim 2; cf. page 2, lines 42 to 44 of the opposed patent).

Thus, the difference between D4 and the alleged invention as claimed in claim 2 of the opposed patent is that according to D4, rapamycin is used for inhibiting GVD or graft atherosclerosis, while according to claim 2 the rapamycin compound A is used for the same purpose.

Accordingly, the objective technical problem underlying the alleged invention as claimed in claim 2 of the opposed patent vis-à-vis D4 may be formulated as the provision of a pharmaceutical composition that is useful for treating or preventing GVD, which pharmaceutical composition is based on a *further* pharmaceutically active agent.

BSC-P0133240
BSC-SJA-1468

**df-mp**
patents • trademarks • designs

- 10 -

The solution to this technical problem as claimed is the use of rapamycin compound A for the preparation of a pharmaceutical composition for preventing or treating GVD. Again, this solution is not based on an inventive step vis-à-vis a combination of D4 and D1 for essentially the same reasons as outlined above with respect to the combination of D2 and D1 (cf. item VII.1 above with respect to the lack of inventive step of the subject matter of claims 1 and 3 of the opposed patent):

In particular, a person skilled in the art, starting from D4 and seeking a solution to the objective technical problem defined above would readily expect that the rapamycin compound A claimed by Novartis is equally suitable for this purpose just like rapamycin itself, since he/she would be taught by D1 that this compound exhibits the same pharmaceutical activities (and differs only in bioavailability and stability) as its parent compound, rapamycin. Thus, for a skilled person it would have been obvious to try rapamycin compound A with a reasonable expectation of success in the prevention and treatment of GVD.

Thus, the subject matter of claim 2 of the opposed patent is not based on an inventive step vis-à-vis a combination of D4 and D1.


3.    **Claim 4**

Claim 4 of the opposed patent relates to the use of 40-O-(2-hydroxy)ethyl-rapamycin for the preparation of a pharmaceutical composition for preventing or treating ("combating") acute or chronic rejection in a recipient for organ or tissue xenograft transplant.

As mentioned above under item VI.1, D1 discloses that rapamycin compound A (just like the other 40-O-alkylated rapamycin compounds of D1) is useful in the treatment and prevention of organ or tissue transplant rejection (cf. page 4, penultimate para., and page 5, item a) at the bottom of the page). Therefore, D1 may be regarded as closest prior art with respect to the subject matter of claim 4 of the opposed patent.

The only difference between the teaching of D1 and claim 4 of the opposed patent is that claim 4 explicitly refers to a xenograft transplant, while D1 only mentions transplants in general.

BSC-P0133241
BSC-SJA-1469

**df-mp**
patents • trademarks • designs

- 11 -

It seems safe to assume that the skilled reader of D1 at the priority date of the opposed patent would have understood the general term "transplant" as comprising allograft and xenograft transplants. Even if D1 *per se* would have been understood as exclusively referring to allograft transplants, the subject matter claimed in claim 4 of the opposed patent would still not be based on an inventive step for the following reasons:

The objective technical problem underlying the alleged invention according to claim 4 of the opposed patent vis-à-vis D1 would seem to be to provide a further, specific application of 40-O-(2-hydroxy)ethyl-rapamycin within the general field of inhibiting transplant rejection.

The solution to this objective technical problem is to use rapamycin compound A for the treatment or prevention of *xeno*graft transplant rejection. However, this solution to the "problem" is not based on an inventive step vis-à-vis a combination of D1 and D3.

As already outlined above in item VI.3, D3 relates to another type of rapamycin compounds, i.e., rapamycin hydroxyesters. It is mentioned in column 6, lines 32 to 37 that these rapamycin compounds are useful in the treatment or inhibition of transplant rejection, not only in connection with allografts, but also with certain *xeno*grafts, i.e., heart valve xenografts. Thus, the skilled person starting out from D1 and looking for further applications of rapamycin compound A within the area of transplant rejection would learn from D3 that rapamycin and its derivatives in general are apparently not only suitable for treating allograft rejection, but also for treating and preventing xenograft rejection. Therefore, in view of the suggestions provided by D3 to the skilled reader of D1 it was obvious to try with a reasonable expectation of success to use rapamycin compound A for the preparation of a pharmaceutical composition for treating or preventing organ or tissue xenograft transplant rejection.

Thus, the subject matter of claim 4 of the opposed patent is not based on an inventive step vis-à-vis a combination of D1 and D3.

In this regard it is noted that the feature of claim 4 of the opposed patent referring to "acute or chronic rejection" does not distinguish this claim over D1 (or D3). Even if D1 were to be construed as referring to the prevention and treatment of *acute* transplant rejection only — as was alleged by the former applicants of the opposed patent during prosecution (cf. submission of June 27, 2001) — as opposed to *chronic* transplant rejection, it should be kept in mind that claim 4 of the opposed patent of

BSC-P0133242
BSC-SJA-1470

course covers both alternatives and is therefore not based on an inventive step vis-à-vis a combination of D1 and D3 as explained above.

Furthermore, it is noted that D4 discloses that rapamycin is useful for preventing accelerated transplant atherosclerosis (cf. last sentence of D4). According to the opposed patent, at page 2, lines 43 to 44, graft atherosclerosis, graft vessel disease, transplant coronary disease etc. are different terms for the same condition, i.e., an atherosclerosis-like alteration which is a variant of chronic rejection. Therefore, the aspect of claim 4 covering the prevention and treatment of chronic xenograft rejection is not based on an inventive step vis-à-vis the prior art either.

4.    Claims 5 to 7

Dependent claims 5 to 7 of the opposed patent relate to the combination of 40-O-(2-hydroxy)ethyl-rapamycin with a further agent for use in the preparation of a pharmaceutical composition for treating or preventing the conditions referred to in claims 1 and 2 of the opposed patent. The additional agent may be selected from the list of compounds given in claim 5 (among them are cyclosporin A, FK-506, azathioprine and mycophenolic acid) or the monoclonal antibodies specified in claims 6 and 7.

It was known from D1, page 8, second full paragraph, that the rapamycin compounds described therein may be administered either alone or combined with other active agents, such as cyclosporin, FK-506, azathioprine, monoclonal antibodies to CD3, CD4, CD25, CD28, or CD45 or other immunomodulatory compounds.

Furthermore, it is known e.g. from D2 that rapamycin may be advantageously administered in combination with mycophenolic acid (cf. page 3, line 41 of D2). Mycophenolic acid is another agent that is listed among those specified in claim 5 of the opposed patent.

Thus, since the subject matter of claims 1 and 2 upon which claims 5 to 7 of the opposed patent depend, is not based on an inventive step vis-à-vis a combination of D2 or D4 and D1, and since D2 and D1 also disclose the combination therapy of rapamycin compound A or rapamycin with the majority of the additional compounds specified in claims 5 to 7, the subject matter of dependent claims 5 to 7 is not based on



**df-mp**
patents • trademarks • designs

- 13 -

an inventive step for the same reasons as explained above with respect to claims 1 and 2.

## VIII. Added Matter (Art. 100(c) and 123(2) EPC)

We submit that claims 5 to 7, in addition to being invalid due to a lack of inventive step as explained above in item VII, contain subject matter which is not clearly and unambiguously disclosed in the application as filed.

Claim 5 relates to the use according to claims 1 and 2 (i.e., for the treatment or prevention of neointimal proliferation and thickening as well as graft vessel disease), wherein 40-O-(2-hydroxy)ethyl-rapamycin is combined with another immunomodulatory agent. In the application as filed, the claims related to the use of O-alkylated rapamycin derivatives such as 40-O-(2-hydroxy)ethyl-rapamycin without mentioning any additional accompanying agents. Claim 5 has thus been added during prosecution.

We submit that the subject matter of claim 5 as granted cannot be derived from the application as filed. At page 12, second paragraph of the international publication (WO 97/35575) it is stated that

"[w]hen used to prevent or treat <u>chronic rejection</u> or <u>xenotransplant</u> rejection as hereinabove specified the compounds of formula I may be administered as the sole active ingredient or together with other drugs in immunomodulating regimens." (Emphasis added.)

Subsequently, the description lists exemplary immunomodulating compounds suitable for the stated purpose. These compounds are identical to the compounds listed in claims 5 to 7.

The combination therapy described in the above-cited paragraph of the original application is clearly restricted to the treatment or prevention of chronic rejection or xenotransplantation. Claim 5 as granted, in contrast, refers back to claims 1 and 2, relating to the treatment or prevention of neointimal proliferation and thickening as well as graft vessel disease (GVD). Although page 4, third paragraph of the original application mentions that GVD (and graft atherosclerosis, transplant coronary disease etc., which are identical in meaning to GVD) is a variant of "chronic rejection", this

BSC-P0133244
BSC-SJA-1472

**df-mp**                                                                              - 14 -
patents • trademarks • designs

certainly does not apply to neointimal proliferation and thickening. Intimal smooth muscle cell proliferation may be the explanation or the reason for conditions of chronic rejection, such as GVD. However, intimal smooth muscle cell proliferation itself certainly has not been equated in the application as filed with the term "chronic rejection". Moreover, if GVD is a "variant" of chronic rejection, as the opposed patent puts it, then at least it does not seem to be a synonym for this condition.

Thus, claim 5 insofar as it refers back to claims 1 and 2 encompasses subject matter (i.e., the use of the combination of 40-O-(2-hydroxy)ethyl-rapamycin with another immunomodulatory agent in the treatment or prevention of neointimal proliferation and thickening or GVD) that extends beyond the content of the application as filed. Claim 5, and similarly dependent claims 6 and 7, therefore do not comply with Art. 123(2) and 100(c) EPC.

**IX.    Conclusion**

Since, as demonstrated above under items VII and VIII, the subject matter of claims 1 to 7 of the opposed patent is not based on an inventive step and furthermore comprises subject matter that has been inadmissibly added to the original application during prosecution, opponent's request for revocation of the opposed patent in its entirety is fully justified.

Dr. H. Ulrich Dörries
European Patent Attorney

**Enclosures:**
Notice of Opposition (original and 3 copies)
Documents D1 to D4 (4 copies each)
EPO Form 1010
Cheque no. 2726156

BSC-P0133245
BSC-SJA-1473

# EXHIBIT 80

# REDACTED

# EXHIBIT 81

# REDACTED

# EXHIBIT 82

# REDACTED

# EXHIBIT 83

# REDACTED

# EXHIBIT 84



WorldWide

Scientific Synergies Fuel the New Product Pipeline

Johnson-Johnson

CORD000001

## IN THIS ISSUE *MARCH 2001*

**3** *Feature: Driving Operational Excellence with Credo-based Values*
Early consideration of environmental, safety and health issues in product and process design yields broad benefits

**6** *Company Focus: DePuy*
New products and technologies keep DePuy at the head of the field
*www.DePuy.com*

**10** *Feature: Ortho-Clinical Diagnostics' Blood Banking Business*
Promoting change in the U.S. Blood Industry
*http://www.orthoclinical.com*

**12** *Cover Story: Scientific Synergies Fuel the New Product Pipeline*
The Sirolimus-coated BX VELOCITY Stent highlights the value of "interdependent partnering"

**15** *Feature: "The Pill" at 40*
Looking back on a medical and cultural revolution
*http://www.ortho-tri-cyclen.com/*

**18** *Feature: Corporate Television Studio*
A center for excellence in video communication
*INSIGHT CD-ROM (JJCUS)*

**20** *Feature: A New Approach to Tonsillectomy*
Ethicon Endo-Surgery's HARMONIC SCALPEL minimizes discomfort and shortens healing time
*www.jnj.com/innovations/in_ultra cision.html*

**22** *The AD Pages: Ringing The Bell*
The "Baby Natural" campaign in Taiwan

**24** *Short Takes*
ONE TOUCH Ultra Blood Glucose Monitoring System... Atrionix...RoC RETINOL ACTIF PUR...Women's TYLENOL



## COMING NEXT ISSUE...

In our June issue, WorldWide will continue its coverage of the Company's e-business with a feature on Johnson & Johnson GATEWAY. The issue also will include an exploration of the new global customer development initiative by the Consumer & Personal Care Group, and a review of the autobiography, Voices, by Ken Steele, a remarkable man whose life was transformed by Janssen's RISPERDAL Antipsychotic.

## ON THE COVER...

The development of Cordis' new Sirolimus-coated BX VELOCITY Stent (pictured at bottom of cover) highlights Johnson & Johnson's unique ability to capitalize on synergies involving our decentralized entities to create truly innovative products. Our cover story traces the extraordinary evolution of the pharmaceutical-coated stent and looks at some of the mechanisms now in place to facilitate "interdependent partnering" company-wide.

*Johnson & Johnson*

# WorldWide

Volume 25 Number 1 March 2001
Published by Corporate Communications,
New Brunswick, NJ 08933
Copyright Johnson & Johnson 2001
Executive Editor: Robert Andrews
Executive Director of Corporate Communications
Editorial Assistant: Kathy Duncan
Editorial and Production: Management group/group
Design: Riccell Design Associates, Inc.
Printing: L.P. Thebault Company
Contributing Writers: Stefan Abyth, Alan Dubrow, Randy Young
Names appearing in all capitals are trademarks of Johnson & Johnson. Trademarks appearing in italics are the property of other companies.

Printed on recycled paper with vegetable-based inks.

CORD000002

BSC-SJA-1488

# DRIVING OPERATIONAL EXCELLENCE WITH CREDO-BASED VALUES

BSC-SJA-1489

This past October, the Public Policy Advisory Committee (PPAC) of the Board of Directors got some excellent insights into those challenges — and the many successes being realised throughout the organization — during a visit to the Skillman, New Jersey headquarters of Johnson & Johnson Consumer Products Company and Personal Products Company.

"The PPAC acts on behalf of the Board on health, safety and environmental issues," explained Board Member and PPAC Chairman, John Mayo, Ph.D. "Our activities include sponsoring an annual report to the Board and periodic visits to operating companies."

At Skillman, Dr. Mayo and his colleagues were treated to a detailed presentation outlining the results of initiatives to incorporate health, safety and environmental considerations in the early phases of new product development and manufacturing system design. With new products making up 26.4 percent of the consumer group's sales in 1999, the impact of these initiatives is considerable. "We saw excellent work and people at Skillman," Dr. Mayo emphasized. "We are seeing the large payoff available by making these considerations an upfront issue in system design."

As part of its visit, the committee reviewed initiatives involving adhesive bandages, dental floss, baby powder, shampoos, pantiliners and other products. In broad terms, the PPAC learned the following:

- Global new product development is actively incorporating health, safety and environmental assessments, while at the same time driving for speed to market.
- Major health and safety benefits, including significant reduction in lost workday cases (LWDC) have been achieved.
- Consumption or production of energy, hazardous waste, toxic materials, packaging and solid waste has been significantly reduced.
- Major cost savings have been achieved.

"Our presentation really highlighted the broad benefits we've been able to achieve with this forward-looking approach to product development," said Neal Matheson, vice president, research & development, Consumer Products Worldwide (CPWW). "Companies that consider environmental, health and safety issues during the development of new products," added Brenda Davis, vice president, technical resources, "come up with more robust products and processes that save money, protect employees and are better for the planet."

### Global Manufacturing Platforms

One of the key innovations demonstrated at Skillman involved a new standardized global manufacturing platform for CAREFREE Pantiliners (see sidebar, page 5), which — according to current estimates — is helping the Company save $20 million annually. "Traditionally, we developed equipment focusing only on performance," explained Gerson Montenegro, vice president of operations and engineering, Personal Products Worldwide (PPWW). "Now we have combined our focus on performance and flexibility for new products, incorporating safety into the design."

By creating global manufacturing platforms, Worldwide Engineering is eliminating differences from one production site to the next. That means cross-training, which facilitates faster learning and improves safety, can take place from site-to-site, a critical consideration for the ASX platform used to manufacture pantiliners in Canada, Argentina, Thailand and Italy. "Also," said Lee Adams, vice president engineering for CPWW, "standardization facilitates the reuse of assets and provides a tremendous opportunity for cost reductions."

The result is a manufacturing platform that delivers efficient production and low cost, with safety built into the design.

A second manufacturing innovation highlighted during the PPAC visit to Skillman is UNIBAP (Universal BAND-AID



BSC-SJA-1490



Platform). "This is a versatile and efficient method of converting raw materials to finished adhesive bandages," said Montenegro. The genius of UNIBAP lies in its modular design, which enables the system to produce virtually any BAND-AID product. Changeovers require only 22 minutes as opposed to eight hours for the older system.

On the environment, health and safety side, UNIBAP reduces noise from 80 to 73 decibels, cuts waste by 66 percent and requires 30 percent less energy. But the real kicker for UNIBAP is its unique laser-based machine guarding system. "You have a laser 'mapping' on the machine," explained Montenegro. "This means that instead of having a physical guard on the machine, you have a laser that determines where the risks are. It will slow down or stop the machine depending on how close someone gets to it."

**Integrating the Thinking Process throughout the Company**

Russell C. Deyo, corporate vice president, administration, and a member of the Executive Committee and PPAC, has long been an advocate of the thinking process involved in global manufacturing platforms. "Early consideration of environmental, health and safety issues in new products and processes has provided extraordinary benefits," he emphasized. "As people throughout Johnson & Johnson drive toward the kind of operational excellence we saw in Skillman, they are taking out cost. By working closely with our worldwide Engineering and R&D Groups, we are increasingly seeing this approach built into our development processes and institutionalized across all our businesses."

As for the overall benefits, PPAC Chairman John Mayo couldn't agree more. "What we saw at Skillman is an important step in the direction of using technology to build more efficient and competitive systems," he added. "We saw numerous examples where smart systems are helping us achieve our environmental, health and safety goals, reduce cost and make a better product."

## Standardized Platform for CAREFREE Pantiliners

The ASX is a prime example of a fully automated, globally standardized manufacturing platform that combines high performance with flexibility and environmental, health and safety (EHS) benefits. With nine lines currently installed — or in the process of being installed — in North America, Latin America, Europe and Asia Pacific, the ASX accounts for only 30 percent of pantiliner production equipment, but a full 60 percent of pantiliner production volume worldwide. Here is a quick look at both the business and EHS benefits of the new equipment.

### Business Benefits

* Average production speed on the ASX is 200 percent faster than the older CPS manufacturing platform.
* Zero gap cutting design reduces waste by 60 percent.
* Changeover time on the production lines has been reduced from hours to minutes.
* Process reliability has been increased one and one-half times.
* Estimated annual worldwide savings is $20 million.

### EHS Benefits

* A proven low risk production line with incident-free start-up.
* Ergonomic benefits: fully automatic packaging systems eliminate repetitive motion.
* Energy consumption is reduced by 11 percent.
* Average process waste reduced from 9 percent to 5 percent (342 tons per year).

CORD000005

BSC-SJA-1491



**COMPANY FOCUS:
DEPUY**

# A COMMANDING PRESENCE
## IN THE ORTHOPAEDIC MARKETPLACE

Franchise Group Chairman, Medical Devices and Member of the Executive Committee Mike Dormer, with the GLOBAL ARTICUREX Shoulder

## NEW PRODUCTS AND TECHNOLOGIES KEEP DEPUY AT THE HEAD OF THE FIELD

The 1998 acquisition of DePuy, Inc. — one of the largest ever undertaken by Johnson & Johnson — created a true orthopaedic powerhouse. But it also posed some of the most difficult challenges the Company had ever faced. Could DePuy be seamlessly merged to create a successful orthopaedic franchise? Would the merger achieve synergies and efficiencies that would enable DePuy to keep pace with its very tough competition? Could the franchise continue its admirable record of growth?

According to Franchise Group Chairman, Medical Devices and Member of the Executive Committee Mike Dormer, the answer to all three questions is a resounding affirmative. "DePuy's results for 2000 are pretty exceptional and above the market rate of growth for the industry. The true underlying performance of our business was very strong double digits in a market that's probably growing around the seven or eight percent mark."

**The Integration Effort Gets High Marks…and Excellent Business Results**
Citing several examples, Dormer said he is "very happy with how DePuy fits within Johnson & Johnson. We're maintaining the entrepreneurial approach that is, in essence, Johnson & Johnson, but we haven't been shy about getting support from the corporate departments on the quality, clinical and regula-

6

CORD000006

BSC-SJA-1492

tory side. Brenda Davis and her group, for example, have given us tremendous help. And Ather Williams and the Safety Group have done a superb job in helping us reduce our lost workday rate."

The key challenge, however, involved integrating two sales forces. "In our business the physician values not only the product, but also the relationship with the sales person," said Dormer. "When you're putting companies together with two marketing departments and two sales forces, you face real challenges. But this has been our biggest success. We were able to put the two sales forces together, particularly in the joint reconstruction area, and really maintain the momentum of that business."

### Products, Products, Products

DePuy is involved in five distinct business areas including joint reconstruction, trauma, spinal, neurology and casting (see sidebar). At the heart of DePuy's joint reconstruction strategy is what people at DePuy are calling the Big Five (see sidebar, page 8). "In our joint reconstruction area," explained DePuy Orthopaedics President Kevin Sidow, "we have many products. The fact that people refer to the Big Five is indicative of just how many new products we're actually bringing to market. These are the Big Five, but there are many more."

DePuy's spinal business, AcroMed, is also generating strong growth through new products. In 1998, several months after DePuy acquired the industry's #2 spine business, AcroMed, the two companies were consolidated into a leased facility in Cleveland. A few months later, with the acquisition of DePuy by Johnson & Johnson, the business was moved to Raynham, Massachusetts, where a larger facility provided substantial room for expansion.

"We went through two physical corporate moves in one year," explained Earl Fender, president, DePuy AcroMed, "and yet we continued to grow and were rated #1 in the spine business by industry analysts."

Fender believes the spine market will continue to represent double-digit growth over the next five-plus years. The market is basically divided in two: the spinal implant market and the emerging markets for new spine technologies. AcroMed has understood that the market is transitioning from metal implants to bone and bone substitutes or orthobiologics. "We've structured the company with different groups targeting each of the markets, so we don't miss opportunities."

### International Business Continues to Grow

In Europe and Asia, Johnson & Johnson met the challenge of integration with enormous success. "We decided to migrate DePuy's business to many of the Johnson & Johnson umbrella companies in stages," said Dormer. "But we handed over a lot of the business ahead of schedule and now we're seeing the umbrella companies perform very well in orthopaedics."

Greg Franks, president, DePuy International, agrees, "Internationally," he explained, "we had a lot of work to do post-integration, but now our Asian business is growing at high double-digit rates, particularly in Japan. In the U.K. we command large market shares for our knee, hip and spine businesses, and Germany continues to grow well."

Internationally, as well as in the U.S., DePuy's spinal and trauma businesses offer high growth potential. To seize the major opportunities, DePuy has reorganized to give focus to those areas. "We have dedicated spinal and trauma business units now," said Franks, "and we will continue to develop new products through our own R&D capabilities and the aggressive exploration of licensing opportunities, particularly in orthobiologics. The strength of the Johnson & Johnson name has opened doors for us in terms of business development, as well as in discussions with our customer base."



BSC-SJA-1493



## Making a Mark in Orthopaedic Technology

According to Alan Ashby, vice president, business development in new technologies, DePuy has active new product development initiatives in three exciting technology areas: bone substitutes, cartilage repair and meniscal repair. Each constitutes a $1 billion market and offers outstanding growth potential for DePuy. At present, the following products are being marketed in Europe or the U.S.:

SYMPHONY Platelet Concentrate System — SYMPHONY is a system that allows platelet-rich plasma to be rapidly prepared from a small volume of a patient's own blood. Currently in U.S. distribution, it is the first product that DePuy is co-marketing with DePuy AcroMed, DePuy ACE and DePuy Orthopaedics.

ARTHRESE — ARTHRESE produces hyaluronic acid — a natural constituent of synovial fluid — through bacterial fermentation and uses it to treat osteo-arthritis. It is a minimally invasive therapy, may slow down the disease process, and can be used to delay the need for joint replacement. The system is currently marketed in Europe.

RESTORE Orthobiologic Implant System — This versatile product is a collagen patch derived from porcine intestinal submucosa. It forms a scaffold in or around joints and is cleared for marketing in the U.S. as a soft tissue reinforcement for shoulder cuff repair and general applications.

## Building Market Share

Continued growth for DePuy will be built on home-grown technological advances, licensing of promising technologies, and acquisitions. "We want to become the clearly designated #1 company in the orthopaedic marketplace," concluded Mike Dormer. "We have an appetite for more acquisitions, but we want the appropriate candidates. We also look for technology that enables us to keep growing above the market rate. The key is to continue to develop our businesses in the high-growth trauma and spinal markets."

## The "Big Five" Product Lineup

At the center of DePuy's joint reconstruction business are five recently-launched, or about-to-be-launched, products:

P.F.C. Sigma RP — The P.F.C. Sigma Knee System, the world's leading knee system, offers surgeons and their patients many operative solutions, including a recently added mobile-bearing option, P.F.C. Sigma RP.

PINNACLE Acetabular Cup System — A coated metal cup that serves as a socket in a hip replacement system. Because it accepts a metal or polyethylene insert, it provides a variety of options for the surgeon.

GLOBAL ADVANTAGE Shoulder System — The GLOBAL ADVANTAGE Shoulder builds on the clinical success of the market-leading GLOBAL Shoulder, introduced in 1991. By incorporating a variety of modern features designed to address a broader range of patients and surgical applications (disease states). The new precision instrumentation affords surgeons a more streamlined, reproducible surgical technique that translates into superior outcomes for their patients. The GLOBAL ADVANTAGE joins the GLOBAL FX and the newly released GTA Humeral Heads to provide DePuy the most complete shoulder system in the industry.

LCS Complete Total Knee System — Defining the future of knee replacement surgery for over twenty years as the world's leading mobile-bearing knee system, the LCS Knee is designed to help provide a durable, long-lasting knee implant.

SUMMIT Total Hip System — This is a comprehensive implant system featuring a series of tapered proximally coated POROCOAT stems, premium cobra-flanged cemented stems, and a line of fracture stems designed specifically for press-in and cemented applications.

CORD000008

BSC-SJA-1494



FEATURE: ORTHO-CLINICAL
DIAGNOSTICS

# PROMOTING CHANGE IN THE U.S.
# BLOOD INDUSTRY

Ortho-Clinical Diagnostics:
President Catherine Burzik with
Tim Ong, vice president, Marketing

"The public just doesn't understand the fragility of the blood industry in the U.S." declared Catherine Burzik, president, Ortho-Clinical Diagnostics (OCD), the market leader in providing the instrument and reagent systems that ensure the safety of blood at both the donor and transfusion ends of the supply chain. "Over time, there's been an increasing demand for safer and safer blood and blood-related products, but tremendous downward economic pressure on all entities that must provide them."

CORD000010

BSC-SJA-1496

The deteriorating environment for players like OCD has featured a rising cost structure prompted in large part by new mandated government safety requirements, flat to declining prices for products, and an insurance-reimbursement system (both private and Medicare) that hasn't begun to keep pace with the changing needs of the blood-banking industry.

Why remain in a business, then, that makes it so tough to make a profit? "Because we've been one of the industry leaders and innovators since the 1950s, and that continues to give us a major responsibility for ensuring the safety of the blood supply," responded Burzik without hesitation. "When you also consider that this business is closely aligned with our corporate Credo, the reasons are compelling for us to remain — and to work proactively with others on the improvements and corrections needed to bring the industry back to sound health."

Ortho-Clinical Diagnostics has been doing just that — and for the first time in years the signs are encouraging. More specifically, it's been working hard to build a strong, unified industry voice around major participants like the American Red Cross, the American Association of Blood Banks (AABB) and America's Blood Centers (ABC). "We've taken a leadership role in making sure that the industry, the general public and government leaders are aware of what the issues and implications are in the blood industry," observed John Hakanson, group marketing director, Blood Bank, for OCD. "And we've in turn seen some good signs."

Indeed, in the wake of intense lobbying by this new industry coalition and the OCD management team, Congress passed and the President signed into law on Dec. 21 of last year the Benefits Improvement and Protection Act (BIPA). This act restores to hospitals and other providers $11.5 billion in Medicare funding over five years that had been cut by the Balanced Budget Act of 1997. It is expected that this infusion will lend some stability to financially strapped hospitals, enabling them to invest in their blood bank's technology needs and help offset the increased cost of blood transfusions. BIPA also requires the Health Care Financing Administration (HCFA), which oversees Medicare, to include increases in the price of blood and blood products in its inflationary index measure (known as the "market basket"), and mandates a study of ways to improve Medicare reimbursement to ensure continued blood safety.

### New Pricing Initiative

In addition to its industry offensive, Ortho-Clinical Diagnostics has been making a bold economic statement through its pricing activities. "We realized that to start making ourselves healthy enough to remain in this field, we needed to take price increases on our products," explained Tim Orr, vice president, Marketing. Accordingly, in 2000 OCD began to raise the average price of blood typing and blood cross-matching products — used in the hospital to ensure that the recipient's blood is compatible with the donor's blood — from 30 cents per transfusion to 50 cents, as the company seeks to more fully align pricing with its actual costs. Those costs include a $70 million investment over the past three years to comply with stringent new Good Manufac-



turing Practices (GMPs) required by the government and the blood-banking industry. Even with this price increase, Orr pointed out, the company's products account for a very small part of the average blood cost of $400 per transfusion. Just as critical as equitable pricing to the future of the blood-banking industry, experts agree, is technology. Here, Ortho-Clinical Diagnostics is again the undisputed leader, bringing new technologies and automated systems to the marketplace that not only significantly reduce the cost of typing and cross-matching blood, but also help to improve transfusion safety and prevent errors. One of those technologies is the ID-MICRO TYPING SYSTEM (ID-MTS), which uses an innovative gel technology to revolutionize the pre-transfusion process. ID-MTS — which is being used by 35 percent of OCD's blood-banking customers — standardizes the testing process, improves labor efficiency and increases transfusion safety. Outside the U.S., OCD has a dominant position in hospitals, with its automated BIOVUE and AUTOVUE products. SAFETRACE TX is a state-of-the-art blood bank software system for tracking and managing blood products, from donor collection to patient transfusion.

"We believe our customers are starting to realize that new technology in the blood bank laboratory is absolutely essential if they're going to be successful," stated Hakanson. "But we also know that getting an industry that's been under severe cost pressure to buy into that technology is going to be one of our greatest challenges in the period ahead."

The ID-MICRO TYPING SYSTEM (below) uses an innovative gel technology to revolutionize the pre-transfusion process.



BSC-SJA-1497



BSC-SJA-1498





In a sprawling, decentralized global organization like Johnson & Johnson — with nearly 100,000 employees at hundreds of sites around the world — synergizing formidable, but very widespread, resources to create new products would seem like a daunting, if not impossible, challenge. But throughout the Company, people from wide-ranging operating companies, corporate teams, marketing groups and research organizations are putting their heads together to capitalize on each other's know-how and resources.

This growing company-wide commitment to "interdependent partnering" has recently manifested itself in a steady flow of pioneering new products. Perhaps none has been as widely hailed as the Sirolimus-coated BX VELOCITY Stent from Cordis (see sidebar), currently in its pivotal stage of clinical trials. The evolution of this remarkable device is a case study in how operating companies can work with one another and with Johnson & Johnson's corporate resources to seize high-potential business opportunities.

### COSAT Gets the Ball Rolling

The story of the Sirolimus-coated stent begins at the Corporate Office of Science and Technology (COSAT), where several programs are in place to provide support for external research and bring together the Johnson & Johnson scientific community (see sidebar, page 14). One of these, the Focused Giving Program, is designed to stimulate scientific developments that lead to new medicines and technologies. Central to the program is the promotion of mutually beneficial relationships between Johnson & Johnson scientists and external grant recipients. For example, as part of each grant, a scientist with appropriate technical expertise from one of the Johnson & Johnson companies is designated to act as liaison with the grant recipient, and all grant recipients participate in the annual Focused Giving Symposium.

In the early 1990s, grant recipient Dr. Robert Abraham of Duke University and Dr. John Siekierka of the Robert Wood Johnson Pharmaceutical Research Institute (PRI) formed a collaborative effort to study the mechanism of Sirolimus inhibition of lymphocyte proliferation. Independently, grant recipient Dr. Andrew Marks, a cardiologist and researcher in molecular biology at Columbia University, was investigating the effects of Sirolimus on smooth muscle cell proliferation and migration, a process that is also involved in restenosis — the reblockage of an artery that can occur after the placement of a stent.

During a visit by Dr. Marks to the laboratory of Dr. Siekierka, his Johnson & Johnson scientific liaison, discussions led to Sirolimus research. Dr. Marks provided compelling data that Sirolimus could be effective in pre-

#### The Sirolimus-Coated BX VELOCITY Stent: Preventing Restenosis

Stents are tiny, tubular-shaped expandable scaffolds that are delivered to a clogged vessel site by a catheter. By compressing obstructions and plaque buildup against the vessel wall, a stent restores blood flow. Restenosis or reblockage can occur after stent placement. In pilot clinical trials, the Sirolimus-coated BX VELOCITY Stent has been shown to prevent the occurrence of restenosis.



13

CORD000013

BSC-SJA-1499





Left: Dr. Angelo Scopellanos

## More New Products Through Company-Wide Synergies

At Johnson & Johnson's Corporate Biomaterials Center (CBC) in Somerville, New Jersey, Dr. Angelo Scopellanos, vice president, and his team are working closely with the professional and pharmaceutical operating companies on projects involving materials, devices and engineering processes that may lead to new products.

"We currently have over 20 programs involving implantable devices, drug delivery and tissue engineering," explained Dr. Scopellanos.

CBC makes the operating companies aware of its capabilities through regular visits with their management or R&D organizations. CBC also communicates its capabilities through the R&D council, which meets on a quarterly basis and includes vice presidents of R&D from all the affiliates.

When an operating company wants to partner with CBC on a product development project, said Dr. Scopellanos, "the VPs of R&D and Marketing submit a request that we evaluate on the basis of market potential, fit, strategic significance, time to market and required resources. We present our evaluation to the R&D council and, based on its approval and recommendation, we can make a decision to go forward. We then create a multi-disciplinary team combining CBC and operating company representatives. Finally, a milestone contract, identifying specific goals within a fixed timeframe, is established."

Dr. Scopellanos cited two recent collaborative efforts that led to breakthrough products:

The Cranial Fixation System from Codman allows surgeons to remove cranial flaps in order to access the brain and re-fix them with a system that is absorbed by the patient within one year. This system is critical in pediatric procedures. As the skull continues to grow, the fixation device disappears and normal growth can occur.

The ACL Fixation Pin from Mitek is another absorbable system for reconstructing the anterior cruciate ligament in the knee. The pin disappears after a six-month period.

venting restenosis. At a subsequent COSAT-sponsored meeting, explained Dr. Siekierka, "I ran into my colleague Dr. Bob Falotico of Cordis and I relayed the exciting news from Dr. Marks."

Since joining Cordis, said Dr. Falotico, he had been focused on using stents as a platform to deliver therapeutics and he was quick to pursue the opportunity afforded by Sirolimus, which is owned by Wyeth-Ayerst. In 1998, Cordis completed a licensing agreement and began to pursue development of the coated stent. As part of the development process, another Johnson & Johnson organization, the Corporate Biomaterials Center (CBC), was enlisted to assist with polymer technology that would control the release of the drug after the stent had been placed in the artery.

Pilot clinical trials have already shown the coated stent to be remarkably effective in eliminating the occurrence of restenosis. By first quarter 2002 in Europe and first quarter 2003 in the United States, Cordis now hopes to launch a product that will make a powerful impact in the $2 billion-a-year market for stents.

"The drug Sirolimus sat on the shelf at Wyeth-Ayerst for 15 years," said Dr. Marks. "They weren't sure what to do with it. Now it may prove to be one of our most important discoveries for treating vascular disease."



BSC-SJA-1500



# "The Pill" at 40

## Looking Back on a Medical and Cultural Revolution

It's considered to be one of the most significant "inventions" of the 20th century, a product so powerful that it transcended the field of medicine and became an icon for an entire social and cultural revolution. No wonder that amid the thousands of prescription products that have entered the market over the years, only one has become universally known as "The Pill."

The birth control pill is celebrating 40 years of contraceptive choice and protection for women. Since its approval by the U.S. Food and Drug Administration (FDA) on May 9, 1960, the Pill has become the most popular form of reversible birth control among American women, growing from 1.2 million users in 1962 to more than 16 million by the 1990s. Today, women even rely on the birth control pill for a host of non-contraceptive health benefits — more regular menstrual

CORD000015

BSC-SJA-1501



Dr. DoWon Hahn (left), distinguished research fellow, whose efforts led to the discovery of norgestimate, with Al Alomari, vice president, Women's Health Care Franchise, Ortho-McNeil.

cycles, reduced cramping, and reduced incidence of benign breast cysts, endometrial and ovarian cancer and iron-deficiency anemia, and, in the case of one brand, ORTHO TRI-CYCLEN, treatment of moderate acne.

The Pill has indeed left a mark on medicine and society as few other products in history have — and no other company has played a more critical role in its evolution than Ortho-McNeil Pharmaceutical. Since the launch of its first birth control pill in 1963 (ORTHO-NOVUM Tablets), the company has orchestrated a chorus of industry firsts. They include the first progestin-only pill for breast-feeding women and those unable to take estrogen (1973); one of the first low-dose pills (1975); the first bi-phasic and tri-phasic pills that mimic the body's hormonal rhythms (1982 and 1984, respectively); and the first and only birth control pill clinically proven — and FDA approved — to treat moderate acne (1996).

### Commitment to the Field

It has not always been a smooth journey, however. The 1970s were a particularly turbulent period for the Pill as the safety of oral contraception came under withering public attack. "Several companies bailed out at the first sign of trouble," recalled Ernie Thompson, director, Professional Affairs for Women's Health Care at Ortho-McNeil, who began selling ORTHO-NOVUM as a representative in 1969. "But Johnson & Johnson and Ortho Pharmaceuticals realized that oral contraception was an important part of medicine that they were going to defend. We began by reassuring the public and health care professionals that our products were safe and efficacious for patients."

That perseverance paid off. Ortho-McNeil today holds nearly a 40 percent share of the oral contraceptive market in the U.S., and ORTHO TRI-CYCLEN is the #1 prescribed birth control pill in the US. The company's entry into the contraception field actually pre-dates the Pill by some 30 years: in 1931, it introduced ORTHO GYNOL, the first prescription contraceptive jelly. In the late 1930s, scientists began to discover how the natural hormones estrogen and progesterone work in the body to suppress ovulation. That paved the way for Dr. Gregory Pincus to develop in 1956, with the help of government and private funding, the first birth control pill. It wasn't until four years later, however, that the FDA gave its approval to market the first product — Enovid — from G.D. Searle. Ortho Pharmaceuticals was soon a major player in this rapidly unfolding field with ORTHO-NOVUM.

Because the early pills contained relatively high levels of hormones, research was soon under way to achieve contraception through different pill formulations that reduced patient side effects. In the thick of that discovery process was DoWon Hahn, Ph.D., a young research scientist with Ortho Pharmaceuticals who began screening hundreds of compounds in the late 1960s in search of an effective new product. His labors led to the discovery in 1972 of norgestimate, a chemically different progestin that allowed for better efficacy with fewer side effects when combined with estrogen. It was not until 1992 that norgestimate entered the U.S. marketplace as ORTHO TRI-CYCLEN and ORTHO CYCLEN — the first new progestin in more than two decades.

"There's no question that Ortho has been the leader over the years in developing what we call the minimal effective hormonal dose," explained Dr. Hahn, today a Distinguished Research Fellow and holder of the Johnson Medal, the Company's highest honor for employees who have created products that have become commercial successes. "The latest birth control pills contain only a fraction of the progestin and estrogen of the earliest formulations, while maintaining efficacy and reducing potential side effects," Dr. Hahn added.

Underscoring the versatility of ORTHO TRI-CYCLEN is the fact that in 1996 it received FDA approval as a treatment for

CORD000016

BSC-SJA-1502



moderate acne in adult women seeking contraception. This marked the first and only time a birth control pill had gained FDA approval for a non-contraceptive indication.

### Sidi #1

Given the towering societal and medical roles the birth control pill has been handed over the years, it's not surprising that it's been the subject of some 73,000 published articles, scientific reviews and studies. While not always favorable, this information blitz has for the most part been a valuable contributor to mainstream acceptance and use of the Pill, asserted Al Altomari, vice president, Women's Health Care Franchise, Ortho-McNeil.

"There have been some world-class studies — many of them conducted by Ortho-McNeil or funded by us — that have calmed a lot of the fears and misconceptions that people had about the birth control pill," Altomari explained. The preponderance of those studies, he added, "show that this is a safe and effective product if used under the supervision of a health care professional, and with the necessary precautions."

Judging by the unshakable popularity of the Pill, most American women seem to agree. Consider: four of 10 women between the ages of 18 and 29 currently take the Pill, and nearly half of all women choosing their first birth control method opt for an oral contraceptive. According to a recent Ortho-McNeil survey, eight of 10 women in the U.S. have used the birth control pill at some point in their lives, and 98 percent of Pill users say they are satisfied with it.

"Despite all the favorable and unfavorable reviews it's received over the years, the Pill has endured as the #1 contraceptive choice for most women, and for most physicians," summed up Ernie Thompson with Professional Affairs. "It's really been an incredible success story."

### Advancing the Science of Contraception

Ortho-McNeil has doggedly advanced the science of contraception over the years, delivering new and safer versions of the Pill without any loss of efficacy. At the same time, Ortho-McNeil has been the leader in innovative contraceptive packaging, with the original ORTHO DIALPAK Tablet Dispenser evolving into today's stylish, discreet and easy-to-use ORTHO PERSONAL PAK. It seemed only fitting that to commemorate the 40th anniversary of the birth control pill, Ortho-McNeil should present The Smithsonian Institution's National Museum of American History with a donation of historic contraceptive items, including the original ORTHO DIALPAK and advertising materials.

"We've not only given women and their doctors a wide range of choices in the contraception field, but we're continued to innovate," emphasized Al Altomari, vice president, Women's Health Care Franchise. "Here we are the market leader, and yet we keep saying, 'We can do better.'"

Other major Ortho-led innovations include the bi-phasic and tri-phasic birth control pills. In contrast to the earlier monophasic oral contraceptives, which delivered constant levels of estrogen and progestin throughout the month, bi-phasic and tri-phasic provide varying doses in sync with the body's hormonal rhythms. ORTHO TRI-CYCLEN, a tri-phasic pill, delivers three different doses of norgestimate and one constant dose of estrogen throughout the woman's menstrual cycle.

77

CORD000017

BSC-SJA-1503



# VIDEO COMMUNICATION

"The headquarters campus is frequently chosen to videotape segments for the many programs we produce in the Corporate Television facilities," explained Rob Halper, assistant director, Corporate Communications and executive producer of Johnson & Johnson's Corporate Television Studio. "That's not surprising, for a couple of reasons. The building, which was designed by the world-renowned architect, I.M. Pei, offers many unique visual settings; and, of course it's certainly cost-effective to be able to use 'sets' that are just a few steps from

our production studio." Halper added, "but we're equipped to go just about anywhere in the world to capture a story or create a special video for our many businesses."

Johnson & Johnson made an investment in what is known as business television when the Company was building its Corporate Headquarters in the early 1980s. Its commitment to television as a key tool in its worldwide corporate communications program was reaffirmed in the 1990s with significant investments in equipment and talent. As Bill Nielsen,

CORD000018

BSC-SJA-1504



corporate vice president, Public Affairs, and head of the Corporate Communications Division explained: "We decided that television was a critical technology and core competency that would be crucial for effective worldwide, multi-cultural communications. We have invested in the equipment and the talent to assure that we can produce the finest television programs anywhere."

## INSIGHT: Must-See TV

"Employees around the world know us today primarily as the producers of INSIGHT," said Halper. The quarterly television news magazine was launched in the early 1990s and promoted to management groups all over the world as "must-see TV." Each program includes an interview with a top executive commenting on the most recent earnings results.

The 30-minute program, which has been judged among the best of such programs produced by corporations, is anchored by Jim Hartz, former host of NBC Television's "Today" show. Hartz also anchored the public television program "Innovation," which was sponsored by Johnson & Johnson. He is a familiar face to the corporation and is able to elicit relaxed and informative interviews from its top executives.

In addition to its availability on videocassette, INSIGHT is now also produced on CD-ROM. (A copy of the latest edition is being distributed with this issue of WorldWide.)

"The CD format gives viewers another choice of formats in which to see the program," Halper said. "It also positions us to move the program to desktop computers, once we achieve appropriate line capacity. When we move to that stage, I think we will be realizing the full potential of television and the wisdom of investing in this technology," he added.

The Johnson & Johnson television studios are located in the basement level of the Corporate Headquarters. Complete with edit suites and a master production center, the unit creates over 200 productions per year, many supporting operating companies for product launches and technical presentations.

"There really isn't anything in television that we can't do," Halper said. "We employ the best freelance talent from the New York City television market for our productions and they really enjoy working in a state-of-the-art facility."

Rob Halper, above left, assistant director, corporate communications, with Michael Palumbo, manager, corporate television.

INSIGHT would like your feedback. Please e-mail the following address if you would like to receive future copies of INSIGHT on CD-ROM: INSIGHT CD-ROM (JJCUS)



BSC-SJA-1505



# A NEW APPROACH TO TONSILLECTOMY

Today, however, Ethicon Endo-Surgery's HARMONIC SCALPEL is transforming the science of tonsillectomy by using ultrasonic vibration instead of heat to cut and seal the wound. The new approach is proving less painful and is speeding recovery times for patients.

### A Surprising Recovery

One day in her Joplin, Missouri clinic, Dr. Renee Walker was amused to see a three-year old patient eating hard, crunchy snack food instead of ice cream the day after his tonsils had been removed. A pediatric otolaryngologist at McEntire Ear, Nose and Throat Center in Joplin, Dr. Walker had just tried Ethicon Endo-Surgery's HARMONIC SCALPEL. "We heard anecdotally that the HARMONIC SCALPEL decreased pain and recovery time for tonsillectomies," she said, "but there were no numbers to prove it."

The remarkable recovery of her patient made Dr. Walker curious. Less deep-tissue burning means less pain; but while the Food and Drug Administration (FDA) had approved the HARMONIC SCALPEL for tonsillectomies over a year earlier, Johnson & Johnson had yet to prove it better than standard procedures. So Dr. Walker and Joplin's Freeman Hospital initiated an independent study on 316 pediatric patients to compare the HARMONIC SCALPEL with electrocautery; 155 received the HARMONIC SCALPEL (HS) technique and 161 received electrocautery (EC). The results were dramatic (see chart).

Clearly, the HARMONIC SCALPEL significantly shortened post-operative recovery time. More "numbers" are on the way: Dr. Walker and co-author Dr. Zubair Syed have begun a study comparing the HARMONIC SCALPEL with "cold steel" (scalpel and snare); and Ethicon Endo-Surgery has just concluded a study focusing on pain reduction. "Dr. Walker's study demonstrated that patients recovered and advanced their diets more quickly," said Dr. Robert Honigberg, vice president of clinical affairs at Ethicon Endo-Surgery, Cincinnati. "For our study, we've developed a validated way to gauge pain in kids in order to look specifically at pain reduction."

As Ethicon Endo-Surgery's HARMONIC SCALPEL comes into wider use for the 390,000 tonsillectomies conducted annually, Dr. Walker cautions parents that the new technique might not have every child feeling good in days. "But," she said, "the odds are in their favor. Patients feel better sooner and return to play or school sooner, which allows parents to return to work sooner. It gives the surgeon happier and healthier patients."



### Ultrasonic Energy: Faster Cutting, Less Burning

Developed in the early 1990s, Ethicon Endo-Surgery's HARMONIC SCALPEL uses ultrasonic vibration to move a cutting blade 55,000 times a second. These vibrations break up tissue protein and seal bleeding at far lower temperatures than cauterization, thus reducing tissue damage and making it ideal for less invasive videoscopic and open surgical procedures such as gastroesophageal anti-reflux surgery to treat chronic heartburn.

"The HARMONIC SCALPEL is truly a revolutionary tool, in that the surgeon can cut, coagulate and dissect with a single instrument," said Dr. Honigberg.

"Possibly the most exciting thing about the HARMONIC SCALPEL," concluded Dr. Honigberg, "is the succession of procedural expansions as it continues to be used in new ways and for new procedures, from mastectomies to radial artery harvesting for coronary bypasses, and now tonsillectomies. The more specialists exposed to it, the more advantages discovered, and the more reasons to use it."

The result is the development of a variety of specialized new blades and handpieces and sophisticated new generators with complex software, and more units sold. "Our revenues for the global franchise have increased more than tenfold since 1996," said Dr. Honigberg. "And our vision is to more than double current revenue by 2006. We will do that by expanding the existing ultrasonic coagulation market,"

### The Numbers Tell the Story

Dr. Renee Walker conducted an independent study on pediatric tonsillectomy patients with an average age of 7.1 to compare the HARMONIC SCALPEL to electrocautery. Among patients (or parents) responding to Dr. Walker's questionnaire, the results were dramatic:



Return to normal diet:

In 24 hours / In 72 hours

HARMONIC SCALPEL patients   Electrocautery patients

27



### RoC Introduces First Cellulite Treatment with Retinol

RoC, the developer of Retinol, has introduced RETINOL ACTIF PUR Anti-Cellulite Treatment, the first and only such treatment to use retinol. Based on patented technology, the new product is clinically proven to reduce the appearance of cellulite by 39 percent after only eight weeks of regular use. Cellulite, the accumulation of excess fat cells that results in visible fat nodules (orange peel skin), occurs in 95 percent of women. Until now, the only treatments available were those that drained off excess moisture, or those that hydrated and plumped the skin's surface. Through its unique combination of retinol, caffeine and ruscus, which activates micro-circulation to accelerate the elimination of fat, RETINOL ACTIF PUR helps make skin appear firmer and smoother.



### Atrionix, a Pioneer in Treating Atrial Fibrillation, Joins Cordis

Johnson & Johnson's Cordis Corporation, a leader in circulatory disease management, has acquired Atrionix of Palo Alto, California, developer of a proprietary, catheter-based system of products for the diagnosis and treatment of atrial fibrillation. A major cause of stroke, atrial fibrillation is the prevalent form of cardiac arrhythmia, affecting approximately 4.5 million worldwide. Atrionix's catheter system uses ultrasound energy delivered through a balloon catheter to block electrical impulses originating in the pulmonary veins, thereby eliminating the need for surgical intervention and reducing patient morbidity and recovery time. Atrionix is the first company to offer a complete product line for this emerging branch of cardiology; its technology complements the current line of Cordis balloons and catheters, as well as the electrophysiology product portfolio of Biosense Webster Inc., a Cordis Division.



### ONE TOUCH Ultra Makes Glucose Monitoring Faster, Less Painful

LifeScan, a Johnson & Johnson company based in Milpitas, California, and the leading maker of blood glucose monitoring products, has introduced the ONE TOUCH Ultra Blood Glucose Monitoring System, which makes daily monitoring significantly less painful and more convenient. Recently cleared by the U.S. FDA, it is the first product to combine a less painful alternative to traditional fingerstick testing with the fastest test time and the broadest operating temperature range of any system now available. The new system allows users to test on the arm, which has fewer nerve endings than the fingertips. It provides clinically accurate results in five seconds — compared with the 30-to-45 seconds required by most other products — and its broad operating temperature range allows users to test their blood glucose under a wide variety of hot and cold conditions. https://www.lifescan.com/



### First TYLENOL Product Formulated Specifically for Women

Women's TYLENOL Menstrual Relief caplets is the first TYLENOL product developed exclusively for women to treat the common symptoms of menstrual pain. The product combines 500 mgs. of acetaminophen for cramps, headache and backache, with the diuretic Pamabrom to reduce water-weight gain, bloating, swelling and that "full" feeling. The pain reliever in Women's TYLENOL is unlikely to cause the stomach irritation associated with aspirin, naproxin sodium or ibuprofen, and it is less likely to interact with other medications. "For the women who face pain and bloating associated with their menstrual cycle and want comfort from a brand they can trust, Women's Tylenol Menstrual Relief is the solution," said Mary Ellen Mortensen, M.D., executive director of Medical Affairs, McNeil Consumer Healthcare. http://tylenol.com/products/adult/women/index.htm

COBD000022

BSC-SJA-1508

# EXHIBIT 85

# REDACTED

# EXHIBIT 86

# REDACTED

# EXHIBIT 87

# REDACTED

# EXHIBIT 88

# REDACTED

# EXHIBIT 89

# REDACTED

# EXHIBIT 90

# REDACTED

# EXHIBIT 91

# REDACTED

# EXHIBIT 92

# REDACTED

# EXHIBIT 93

# REDACTED

# EXHIBIT 94

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION and
BOSTON SCIENTIFIC SCIMED, INC.,

      Plaintiffs,

      v.

JOHNSON & JOHNSON, INC. and
CORDIS CORPORATION,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 07-333-SLR
Civil Action No. 07-348-SLR
Civil Action No. 07-409-SLR

BOSTON SCIENTIFIC CORPORATION and
BOSTON SCIENTIFIC SCIMED, INC.,

      Plaintiffs,

      v.

JOHNSON & JOHNSON, INC.,
CORDIS CORPORATION, and WYETH

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 07-765-SLR

## JOHNSON & JOHNSON AND CORDIS CORPORATION'S RESPONSES TO BOSTON SCIENTIFIC'S SECOND SET OF INTERROGATORIES (NOS. 7-20)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants

Johnson & Johnson, Inc. and Cordis Corporation (collectively, "Defendants") hereby object and

respond to Boston Scientific Corporation and Boston Scientific Scimed, Inc.'s (collectively,

"Boston Scientific") Second Set of Interrogatories (Nos. 7-20) as follows:

### GENERAL OBJECTIONS

Each of Defendants' responses to Boston Scientific's Second Set of Interrogatories

is subject to, and incorporates, the following General Objections. Defendants specifically

BSC-SJA-1548

**INTERROGATORY NO. 16:**

For each asserted claim of the Cordis Patents, identify each and every apparatus or method, practiced or used by anyone, or proposed to be practice or used, that Cordis contends embodies the subject matter of that claim, and for each such apparatus or method, identify the apparatus's or method's name and model number (if an apparatus) or occasion and location of practice (if a method); provide a statement of whether the apparatus or method was manufactured, sold, offered for sale, used, or practiced by or for Cordis, or any licensee under any of the Cordis Patents; provide an element-by-element recitation of how the apparatus or method incorporates each element of that asserted claim; and identify (where possible by production number) all documents and things as well as all persons knowledgeable concerning the foregoing.

**RESPONSE:**

Defendants hereby incorporate by reference the foregoing General Objections and as though fully set forth herein.

Defendants object that this interrogatory constitutes multiple separate and distinct interrogatories in violation of Fed. R. Civ. P. 33(a).

Defendants object to this interrogatory as overly broad, as unduly burdensome, as not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it is not relevant to the claims or defenses of the parties in this action. Defendants further object to the extent this interrogatory requests information about third-party products not sold by the parties to this action. Defendants will respond as to products made by Plaintiffs or Defendants

Defendants also object to this interrogatory to the extent it seeks information that is covered by the attorney-client privilege, work product doctrine, or similar immunities.

Subject to the foregoing General and specific objections, Defendants state that Plaintiffs' Promus stent (and its use) infringes the asserted claims of the patents-in-suit. The manner in which the Promus stent satisfies the asserted claims is set forth in Defendants' response to Interrogatory No. 7 above.

Defendants further state that Cordis's Cypher Sirolimus-Eluting Coronary Stent System ("Cypher") is covered by the following claims of the patents-in-suit:  U.S. Patent No.

BSC-SJA-1549

7,300,662, claims 1-3, 5-7, 9-11, 13-15, and 17-25;  U.S. Patent No. 7,217,286, claims 1, 3, and

5;  U.S. Patent No. 7,223,286, claims 1-2, 6-7, 9-10, 19, 21, 28, 30, 32, 40-41, 44, 48-49, 51-52,

61, 63, 70, and 74; and U.S. Patent No. 7,229,473, claims 1 and 5.  The claim charts in

Attachment 4 provide an element-by-element recitation of how Cypher incorporates each

element of each asserted claim.

### INTERROGATORY NO. 17:

Identify each product that has been marked with any of the Cordis Patents, and for
each such product:  identify the specific patent(s) marked; identify the date of the first sale of
such product; state whether any units of such product were not marked with the patent number at
any time after issuance of the patent and explain how many units were not marked and why; and
identify (where possible by production number) all documents and things as well as all persons
knowledgeable concerning the foregoing.

### RESPONSE:

Defendants hereby incorporate by reference the foregoing General Objections and

as though fully set forth herein.

Defendants object that this interrogatory constitutes multiple separate and distinct

interrogatories in violation of Fed. R. Civ. P. 33(a).

Defendants object to this interrogatory as overly broad, as unduly burdensome, as

not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it is

not relevant to the claims or defenses of the parties in this action.

Defendants also object to this interrogatory to the extent it seeks information that

is covered by the attorney-client privilege, work product doctrine, or similar immunities.

Subject to the foregoing General and specific objections, Defendants state that Cypher

Sirolimus-eluting Coronary Stent Delivery System (on Raptor and RaptorRail) were not marked

with the patents-in-suit prior to Boston Scientific's May 25, 2007 Complaint in Civil Action No.

BSC-SJA-1550

filings. For example, a description of the December 2004 acquisition agreement between Johnson & Johnson and Guidant can be found in Johnson & Johnson's filings with the Securities and Exchange Commission including, for example, its December 16, 2004 and December 20, 2004 8-K statements.

ASHBY & GEDDES



Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants Johnson and
Johnson, Inc. and Cordis Corporation*

*Of Counsel:*

David T. Pritikin
William H. Baumgartner, Jr.
Russell E. Cass
Andrew R. Hein
Jon M. Spanbauer
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Dated: July 24, 2008

{00253073;v1}

26

BSC-SJA-1551

# EXHIBIT 95

# REDACTED

# EXHIBIT 96

# REDACTED

# EXHIBIT 97

# REDACTED

# EXHIBIT 98

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC SCIMED, INC. and
BOSTON SCIENTIFIC CORPORATION

            Plaintiff,

    v.                                         C.A. No. 03-283-SLR

CORDIS CORPORATION and
JOHNSON & JOHNSON, INC.,

            Defendants.

## CORDIS' REPLY BRIEF IN FURTHER SUPPORT FOR
## ITS MOTION FOR JMOL OR, IN THE ALTERNATIVE,
## A NEW TRIAL ON THE DING '536 PATENT

*Of counsel:*

Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
Scott B. Howard
Melissa Mandrgoc
Irena Royzman
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

Theodore B. Van Itallie, Jr.
Eric L Harris
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

Dated: October 24, 2005

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
ASHBY & GEDDES
222 Delaware Avenue
Wilmington, DE  19801
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Cordis Corporation*

BSC-SJA-1566

silicone as a suitable coating was a teaching of the use of a non-thrombogenic material. See D.I. 385 at Tr. 288:17-289:4 (Helmus); see Cordis' Opening Brief at 31-33. Once again, using the proper level of ordinary skill, Dr. Hanson's testimony was both fully supported by the record and undisputed.

Dr. Hanson was the only witness who applied the correct level of skill in the art in addressing the prior art references. Applying the correct skill level, the record provides undisputed evidence of obviousness, "particularly in light of the minimal [or non-existent] differences between the prior art ... and the claimed invention, and the high degree of skill of the ordinary artisan." Brown & Williamson Tobacco Corp. v. Philip Morris, Inc., 229 F.3d 1120, 1131 (Fed. Cir. 2000). The record does not include any testimony applying the correct skill level and reaching a contrary conclusion. JMOL of obviousness is appropriate here. Princeton Biochemicals, Inc. v. Beckman Coulter, Inc. 411 F.3d 1332 (Fed. Cir. 2005) (affirming the grant of JMOL of obviousness).

**B.     Secondary Considerations**

Secondary considerations reinforce the conclusion of obviousness. BSC points to supposed failures by others. But what BSC calls "failures" are not failures to develop a technology for coating a stent to elute drugs. Rather, BSC points to the difficulty in finding an appropriate drug and to Cordis' exploration of other technologies, such as bioabsorable coatings, instead of drug-eluting coatings. It is true, of course, that Cordis looked at other technologies and it is also true that it considered over 800 different drugs before it was able to identify sirolimus as an appropriate drug for its Cypher stent. D.I. 387 at Tr. 864:24-865:4 (R. Anderson); D.I. 390 at Tr. 1335:8 (Hanson) ; D.I. 391 at Tr. 1624:5-1625:12 (Hanson).

But there is no nexus between these facts relating to Cordis' development program and the claimed invention. The claimed invention does not address bioabsorable coatings and it

-18-

BSC-SJA-1567

does not address the appropriate drug for use in a stent. Rather, it simply provides a description
of the appropriate coatings to place on a stent, if one wanted to use a stent to elute a drug. That
technology was well-known and – as Dr. Hanson's uncontradicted testimony demonstrated –
developing a polymer coating for a drug-eluting stent was not a challenge for persons of skill in
this art. See D.I. 389 at Tr. 16:9-17:16, 18:5-12, 23:2-25:18, 40:2-11 (Anderson); D.I. 386 at
541:21-543:10 (Barry); D.I. 390 at 1477:4-1478:6, 1478:18-1479:3, 1481:24-1482:22, 1522:21-
1523:18 (Hanson); CX 132 at 3:49-54 and 6:9-23; CX 265; CX 262. BSC fails to identify any
scientist of appropriate skill who failed to develop a drug eluting coating for a stent when he or
she desired to do so. There is simply no nexus between Cordis' search for the correct drug and
Cordis' consideration of other coating technologies and the claimed invention.

C.    At a Minimum, a New Validity Trial is Appropriate

As discussed above and in Cordis' Opening Brief, the verdict on validity is not
supported by substantial evidence. Indeed, BSC failed to present any evidence addressing the
prior art references through the "prism or lens," Al-Site, 174 F.3d at 1324 of the correct level of
skill in the art. At a minimum, the verdict on validity is against the weight of the relevant
evidence, making a new trial appropriate. See Richardson-Vicks, Inc. v. Upjohn Co., 1996 WL
31209 (D. Del. Jan. 17, 1996) (Robinson, J.) (Ex. 4 to D.I. 440) (granting JMOL of obviousness
and a conditional new trial on obviousness), aff'd 122 F.3d 1476 (Fed. Cir. 1997).

In addition, a new trial on validity would be necessary if this Court grants JMOL
or a new trial on infringement because BSC relied – and continues to rely (D.I. 453 at 33) – on
the commercial success of the BX Velocity as a secondary consideration of nonobviousness.
See Cordis' Opening Br. (D.I. 440) at 33-34.

BSC argues (D.I. 453 at 35) that substantial evidence could support a verdict on
validity even if the infringement verdict is overturned. That is not the law. As this Court has

-19-

BSC-SJA-1568

recognized, a court "'must ... vacate a jury verdict and remand for a new trial if a jury may have relied on an impermissible basis in reaching its verdict.'" D.I. 1153 in the 97-550 action (Ex. 3 hereto), quoting Litton Sys., Inc. v. Honeywell, Inc., 140 F.3d 1449, 1465 (Fed. Cir. 1998); see also Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1000 (3d Cir. 1988).

## CONCLUSION

For the reasons set forth above and in Cordis' Opening Brief (D.I. 440), this Court should grant JMOL or, in the alternative, a new trial on the Ding '536 patent.

ASHBY & GEDDES

/s/ Tiffany Geyer Lydon

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue
Wilmington, DE 19801
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

Attorneys for Cordis Corporation

Of counsel:

Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
Scott B. Howard
Melissa Mandrgoc
Irena Royzman
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

Theodore B. Van Itallie, Jr.
Eric I. Harris
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

Dated: October 24, 2005

162738.1

-20-

# EXHIBIT 99

# REDACTED

# EXHIBIT 100

# REDACTED

# EXHIBIT 101

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC SCIMED, INC. and )
BOSTON SCIENTIFIC CORPORATION, )
)
)
Plaintiffs, )
)
v. )                                   Civil Action No. 03-283-SLR
)
CORDIS CORPORATION and )
JOHNSON AND JOHNSON, INC. )
)
)
Defendants. )

### OPENING EXPERT REPORT OF STEPHEN R. HANSON, PH.D.

I am submitting this expert report at the request of counsel for defendants Johnson & Johnson and Cordis Corporation (collectively "Cordis") regarding the invalidity of the asserted claims of U.S. Patent No. 6,120,536 to Ding ("the '536 patent"). It is my opinion that claims 1, 6, 7 and 8 of the '536 patent are anticipated by or obviousness in light of the prior art.

### Qualifications

I am currently Professor of Biomedical Engineering and Adjunct Professor of Medicine at Emory University School of Medicine in Atlanta, Georgia. I have been involved in the research of the blood compatibility of polymers and other materials since 1972. In particular, I have been actively involved in research into the blood compatibility of different coating materials for stents since 1988, when I served as a co-founder of Biogold, Inc., a company devoted to making commercial use of thin-film polymer coatings on stents. In 1994, I founded XRT Corporation in Minneapolis, Minnesota, an entrepreneurial venture based on, among other things, technologies for the local intravascular delivery of drugs. I am a named inventor on sixteen United States patents, the first issued in 1987, relating to vascular devices and methods of

BSC-SJA-1578

drugs from implantable medical devices, and the use of coatings to combat the thrombogenic nature of metallic implants. Neither idea, nor the combination were new in 1995.

It was well known that metal implants, such as stents were subject to thrombus formation. As I explained in U.S. Patent No. 5,383,928, filed in 1992, "[a]lthough stents have been shown to be very effective in restoring vessel patency and decreasing myocardial ischemia, the exposure of the metal prosthetic surfaces to circulating blood initiates platelet and coagulation reactions that frequently result in thrombus formation and acute thrombotic occlusion of the stent." Col. 3, lines 6-11. One of the problems quickly foreseen with the use of metallic stents was this early acute and sub-acute thrombus formation. Patients were treated with anticoagulant drugs to combat this problem, which is now of less concern.

From the beginning, coatings, particularly polymers for use on stents, were used to combat thrombus. As I stated in 1992: "the concept of coating a stent with a polymer has been described several years ago and is discussed in the literature regularly." U.S. Patent No. 5,383,928 at col. 3, lines 49-51. In fact, as I described earlier, my initial reaction upon learning of the first stent implant was that my work on arterial grafts would be directly applicable to avoiding thrombi caused by stents. Thus my work with coating the Wallstent with a polymer and the formation of a company to achieve this (Biogold, Inc.).

The literature is full of references to using coatings on stents to avoid thrombosis. Julio Palmaz disclosed inert coatings for use on metallic, balloon expandable stents, specifically polyurethane and Teflon, which can be thrombo-resistant polymers. U.S. Patent No. 4,739,762 at col. 10, lines 26-36. In the late 1980's to early 1990's, Dr. Palmaz reported the use of polymer coatings on metal stents to address problems of thrombosis. Bailey et al., "Polymer Coating of Palmaz-Schatz Stent Attenuates Vascular Spasm after Stent Placement;" Alvarado, et al.,

916150v1

BSC-SJA-1579

"Evaluation of Polymer Coated Balloon Expandable Stents in Bile Ducts," Radiology 165 (suppl.):331 (1987).

Other patents related to the use of coatings on stents to avoid thrombus formation. See U.S. Patent No. 4,768,507 to Fischell et al. at Figure 6, col. 2, lines 4-32 and col. 5, lines 9-23; U.S. Patent No. 5,059,166 to Fischell et al. at col. 1, lines 18-30, col. 2, lines 39-43 and Figure 4; U.S. Patent No. 4,300,244 to Bokros at col. 1, lines 67 – col. 2, line 2, and col. 3, lines 39-58.

Coatings for localized delivery of drugs to sites within the body were well known well before the filing of the '536 patent. Research in this area had been pursued since the early 1970's, with the use of benzalkonium chloride to release heparin. See, e.g., U.S. Patent No. 3,526,005 to Bokros, et al., col. 7 lines 30-35. As I wrote in 1992, "local delivery of drug(s) using stents has centered around two concepts: (1) directly coating the stent wires with a drug or a drug-polymer combination . . . and (2) incorporating a drug into a stent that was constructed not of metal but of a biodegradable polymer. . . Most investigators and stent companies have focused their efforts on directly coating the metal stent wires with a polymer." U.S. Patent No. 5,383,928 at col. 3, lines 51-61. That patent was directed to a polymer sheath for use around a stent for localized drug delivery. See U.S. Patent No. 5,383,928 to Scott, et al. Abstract.

Dr. Palmaz described a metal stent with a polymer coating for releasing drugs. U.S. Patent No. 5,102,417 at col. 11, lines 26-34.

My review of the Ding file histories confirms that controlled, timed release of drugs from polymers on stents was well known before Ding. The original Ding application, U.S. Application No. 08/424,884 was directed to the use of a coating on a stent for timed delivery of drugs. See claim 1. That application was rejected a number of times because it was anticipated

916150v1

BSC-SJA-1580

by Berg.  European Patent App. No. 0623354A1 to Berg, et al. and U.S. Patent No. 5,464,650 to Berg, et al.  As clearly stated in the Berg Abstract:

> The invention provides a method for making an intravascular stent by applying to the body of a stent a solution which comprises a solvent, a polymer dissolved in the solvent and then evaporating the solvent. . . .  By this method, drugs such as dexamethasone can be applied to a stent, retained on a stent during expansion of the stent and elute at a controlled rate.  European Patent App. No. 0623354A1 to Berg, et al.

The Ding et al. application directed to a drug eluting polymer coating was abandoned.

By the early 1980's, it was well known in the art that drugs could be time-released from a polymer matrix or from a reservoir covered by a polymer.  See Kost, J, Langer, R., "Controlled Release of Bioactive Agents," Trends in Biotechnology, Vol. 2, No. 2, 1984, pp. 47-51.  It was also well understood that a simple strategy for slowing the rate of drug release from a polymeric substrate is to place a second polymeric layer without any drug in it on top of the first layer to serve as an obstacle to drug release.  See Wolff et al., U.S. Patent No. 5,545,208 and Nash, et al., U.S. Patent No. 4,292,965.

No material is completely "non-thrombogenic."  During my work with coatings, I have identified some coatings that are relatively non-thrombogenic in the intended environment for stents, i.e. arteries.  Silicone is one of those coatings.  Hanson, et al., Biomaterials Science at 235-36 ("These studies in primates are consistent with observations in man that certain commonly used polymers [e.g., polytetrafluoroethylene, polyethylene, poly (vinyl chloride) silicone rubbers] and some vascular grafts [e.g., polytetrafluoroethylene] are relatively nonthrombogenic in extracorporeal circuits and arteries."); U.S. Patent No. 4,687,482; Hanson, et al., "In vivo evaluation of artificial surfaces with a nonhuman primate model of arterial thrombosis," J. Lab. Clin. Med. 95:289-304; 1980.

- 12 -

916150v1

BSC-SJA-1581

The patentees, Ding and Helmus, represented to the Patent Office that silicone is a "biostable," "non-thrombogenic" material that "provides long term non-thrombogenicity to the device portion during and after release of the biologically active material." Declaration of Ni Ding and Michael Helmus Under 37 C.F.R. § 1.131 at paragraphs 5b and 7. This statement is consistent with what was already known in the art in 1994-96, that a silicone topcoat was relatively non-thrombogenic. Based on this statement and my knowledge that silicone is relatively non-thrombogenic, for the purposes of this exercise, I have applied the prior art teachings of materials which were known to be relatively non-thrombogenic in 1994-96 to this claim language.[1]

## The Asserted Claims are Anticipated or Obvious

It is my opinion that each of the asserted claims is either anticipated or obvious over the prior art, including U.S. Patent No. 5,019,096 to Fox, et al.; U.S. Patent No. 5,512,055 to Domb, et al.; U.S. Patent No. 5,474,563 to Myler, et al.; U.S. Patent No. 5,545,208 to Wolff, et al.; and/or U.S. Patent No. 5,591,227 to Dinh, et al. In addition, should it be determined that U.S. Patent No. 5,624,411 to Tuch was invented prior to the invention by Ding, that patent also anticipates or renders obvious the claims of the '536 patent. While I address below my analysis of the individual prior art references, it is also clear to me that the totality of the prior art, including the prior art I discussed above in the Qualifications and Background sections, would have made the claimed combination obvious to one of ordinary skill in the art in 1994-96.

---

[1] The broad claim language of the '536 patent raises issues as to whether one of ordinary skill in the art would have been enabled by Ding to make and use the full scope of the claim, i.e., "non-thrombogenic" top coats which provide "long term non-thrombogenicity." It has been explained to me that patentees are required to provide a written description of the claimed invention and the manner and process of making and using that claimed invention to enable any person skilled in the art to make and use the invention without undue experimentation. Because the art is so unpredictable, it would take undue experimentation based on the limited teaching in Ding for one of ordinary skill in the art to practice the entire scope of the claimed invention. While I do not intend to address the enablement of the claims for the purposes of this preliminary injunction, I reserve the right, after discovery and at the full trial on the merits in this case, to address the issue of enablement.

- 13 -

BSC-SJA-1582

FROM : INDIAN VALLEY RANCH          FAX NO. : 805 467-3753        May. 23 2003 09:19AM  P1
   05/23/2003 12:54 FAX 01212 356 2222       PATTERSON BELKVAP

**Compensation**

&250 per hour.

**Other Cases**

None.

**Supplementation**

I reserve the right to supplement this report and the opinions set forth herein to address arguments that BSC or its witnesses subsequently raise or additional information that comes to my attention as this matter proceeds, including but not limited to, the Court's construction of the claims at issue. Moreover, I may comment on or testify in response to the testimony of other witnesses, including witnesses who testify on behalf of the plaintiffs.

Dated: May 23, 2003

Stephen R. Hanson, Ph.D.

516190v1

- 27 -

BSC-SJA-1583

# EXHIBIT 102

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC SCIMED, INC, and           )
BOSTON SCIENTIFIC CORPORATION,               )
                                             )
                                             )
                  Plaintiffs,                )        C.A. No. 03-283-SLR
                                             )
                                             )
            v.                               )
                                             )
CORDIS CORPORATION and                       )
JOHNSON AND JOHNSON, INC.                     )
                                             )
                  Defendants.                )

**CORDIS' ANSWERING BRIEF IN OPPOSITION TO BSC'S MOTION
FOR SUMMARY JUDGMENT THAT CLAIMS 6 AND 8 OF THE DING
'536 PATENT ARE NOT ANTICIPATED BY THE ASSERTED PRIOR ART**

ASHBY & GEDDES
Steven J. Balick (#2114)
John G. Day (#2403)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801
(302) 654-1888

*Attorney for Defendants Cordis Corporation
and Johnson & Johnson*

Of Counsel:

Gregory L. Diskant
William F. Cavanaugh, Jr.
Michael J. Timmons
Scott B. Howard
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
(212) 336-2000

Theodore B. Van Itallie, Jr.
Eric I. Harris
Paul A. Coletti
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

Dated: April 14, 2005

At the preliminary injunction hearing, Dr. Hanson testified that claim 8 of the Ding patent is "anticipated or, at its very least rendered obvious by the prior art." DI. 83 in 03-027 at 716. Dr. Hanson walked through his '928 patent (D.I. 304 at Ex. 2) that explained the state of the art as of 1992 (3 years prior to Ding's first filing). Based on that disclosure, Dr. Hanson explained that as of 1992:

> (1)    Stents and stent wires had been coated with polymer
> coatings with drugs for controlled delivery;
>
> (2)    A variety of polymer systems had been described by
> Langer and others in the 1980's for controlled drug delivery;
>
> (3)    The systems for controlled drug delivery included barrier
> layers to control the rate of drug release from polymer matrices.

D.I. 83 in 03-027 at 726-27. Dr. Hanson discussed the Bokros, Palmaz and Fischell patents as examples of prior art stent patents that disclose stents coated with polymers to reduce thrombogenicity as well as to deliver drugs in a controlled manner. D.I. 83 in 03-027 at 733-739; D.I. 19 at Ex. 20; D.I. 18 at Exs. 15, 19. None of this early prior art was brought to the attention of the Patent Office. D.I. 83 in 03-027 at 739.

Dr. Hanson also reviewed the disclosure of six other prior art references. (Domb (D.I. 295 at Ex. 3; D.I. 83 in 03-027 at 739-746); Fox (D.I. 295 at Ex. 3; D.I. 83 in 03-027 at 746-749); Tuch (D.I. 295 at Ex. 8; D.I. 83 in 03-027 at 749-750); Wolff (D.I. 295 at Ex. 5; D.I. 83 in 03-027 at 750-754); Dinh (D.I. 295 at Ex. 7; D.I. 83 in 03-027 at 755-757); and Myler (D.I. 295 at Ex. 4; D.I. 83 in 03-027 at 757-759). Dr. Hanson presented demonstratives that set forth his positions and identified the portion of the prior art references that disclosed the elements of the claims. (Exs. 37-42) Based on his analysis, Dr. Hanson concluded:

> My opinion - and this is a strongly-held opinion - is that Claim 8 of
> Ding is almost certainly anticipated or at the very least rendered
> obvious by this prior art.

7

BSC-SJA-1585

D.I. 83 in 03-027 at 758-59. After that hearing the Court denied BSC's motion, finding that "there is a substantial question as to the validity of the '536 patent, based on the testimony of Dr. Hanson." D.I. 96 at 8-9.

Subsequent to the hearing, Dr. Hanson submitted an expert report on the validity of the asserted claims (Ex. 32)[2] and was deposed. Drs. Hanson, Storey and Buller will provide detailed testimony as to the state of the prior art of stent coating as of the time of Ding's filing.

### D.    The Discovery Record

Discovery has confirmed the invalidity of the Ding patent. The technology utilized by Ding – and by Cypher – is many years old. (What is novel about Cypher is not its technology, but the use of the drug sirolimus, which is not mentioned in the Ding patent.) BSC's expert, Dr. Hopfenberg, characterizes the Cypher stent as using the "well-known phenomenology of ideal, membrane-reservoir, controlled delivery systems." D.I. 297 at Ex. 1, Hopfenberg Opening Report at ¶ 32. In such a system (used in all of the anticipating references), a topcoat is used as an outer membrane or diffusion barrier and is disposed on a drug-containing under coat. D.I. 297 at Ex. 1, Hopfenberg Opening Report at ¶ 33. As Dr. Hopfenberg testified, the membrane reservoir system technology used to deliver drug from Cypher has been known since at least 1986. Ex. 12, Hopfenberg Dep. Tr. 72:2-12.

If the prior art discloses that the membrane reservoir system technology used in Ding and in Cypher existed since at least 1986, what does BSC contend that Ding and Helmus invented? Incredibly, BSC's expert, Dr. Hopfenberg, asserts that their "invention" is simply the application of that well-known technology to a metal stent:

---

[2] Dr. Hanson has submitted a declaration stating, under penalty of perjury, that his expert report is true and correct.

BSC-SJA-1586

Q.    My question is whether or not Drs. Helmus and Ding
invented the use of a silicone membrane around a polymer
reservoir that included drug in a controlled-release device?

A.    And I answered the question, I believe, that although the
notion of a silicone rate-control membrane over a drug-containing
matrix was known, the contribution of Ding and Helmus in that
regard regarding that embodiment was the extension of that the
specific embodiment of these ultra-thin coatings on polymeric
stents – on metal stents.

Ex. 12, Hopfenberg Dep. Tr. 246:11-22 (emphasis added).

If that is BSC's contention, one of ordinary skill considering the anticipating
references in 1995 would know it to be incorrect. As set forth in detail below, the well-known
technology of polymer matrices for controlled drug delivery was applied to stents years prior to
the '536 patent. Dr. Palmaz, who described a metal stent with a polymer coating for releasing
drugs, taught such a device in his '417 patent. D.I. 304 at Ex. 7, U.S. Patent No. 5,102,417 at
col. 11, lines 26-34. The anticipating references all apply polymer coatings to a stent.

All the elements of the Ding "invention" were in the prior art. Cordis will prove
at trial that a number of prior art patents anticipate all the claim elements. Moreover, taken
together and in light of all of the prior art, the prior art clearly and convincingly renders the '536
patent obvious. BSC's motion for summary judgment should be denied.

## ARGUMENT

### A.    There Are Genuine Issues of Material Fact as to Anticipation

#### 1.    Fox U.S. Patent No. 5,019,096

Dr. Hanson explained at the preliminary injunction hearing that the Fox patent,
U.S. Patent No. 5,019,096 (D.I. 295 at Ex. 2), discloses metallic medical devices, including
implants and vascular grafts, that are coated with an undercoat of biomedical polyurethanes and
silicones. The undercoat of Fox has a biologically active material including heparin and dextran

9

BSC-SJA-1587



or no platelet deposition). Thus, the pore size of Tuch renders the porous nature of Tuch exactly what Dr. Hanson testified it would be: "irrelevant."

Therefore, there is at least a genuine issue of material fact as to whether Tuch anticipates all the asserted claims of the Ding '536 patent.

## CONCLUSION

For the reasons set forth above, this Court should deny BSC's motion for summary judgment that claims 6 and 8 of the '536 patent are not anticipated by the asserted prior art.

ASHBY & GEDDES

/s/ John G. Day

Steven J. Balick (#2114)
John G. Day (#2403)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801
(302) 654-1888

*Attorneys for Defendants Cordis Corporation and Johnson & Johnson*

*Of Counsel:*

Gregory L. Diskant
William F. Cavanaugh, Jr.
Michael J. Timmons
Scott B. Howard
PATTERSON, BELKNAP, WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
(212) 336-2000

Theodore B. Van Itallie, Jr.
Eric I. Harris
Paul A. Coletti
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

Dated: April 14, 2005
135885.1

21

BSC-SJA-1588

# EXHIBIT 103

Appeal No. 2008-1073

# United States Court of Appeals

## *for the*

# Federal Circuit

BOSTON SCIENTIFIC SCIMED, INC.
and BOSTON SCIENTIFIC CORPORATION,

*Plaintiffs-Appellees,*

— v. —

CORDIS CORPORATION
and JOHNSON & JOHNSON, INC.,

*Defendants-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IN CASE NO. 03-CV-283,
JUDGE SUE L. ROBINSON

## DEFENDANTS-APPELLANTS' RESPONSE TO PLAINTIFFS-APPELLEES' PETITION FOR REHEARING AND REHEARING *EN BANC*

<div style="display:flex">

Of Counsel:

Constantine L. Trela, Jr.
SIDLEY AUSTIN LLP
One South Dearbord Street
Chicago, Illinois 60603

March 11, 2009

</div>

Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
Scott B. Howard
Irena Royzman
PATTERSON BELKNAP WEBB
  & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendants-Appellants
Cordis Corporation and Johnson &
Johnson*

BSC-SJA-1589

*the claim is apparent in light of these factors, summary judgment [or JMOL] is appropriate.* (Emphasis added).

In this case, none of the factors that *KSR* identifies – "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art" – was "in material dispute." *Id.* On these facts, "reasonable minds could come to but one conclusion," *Sundance*, 550 F.3d at 1365, on the "legal determination" of obviousness – that "the obviousness of the claim [was] apparent" in light of Wolff, making JMOL "appropriate." *KSR*, 127 S. Ct. at 1745-46; *see also Muniauction*, 532 F.3d 1318; *Agrizap*, 520 F.3d at 1342-1344; *PharmaStem*, 491 F.3d at 1359-67; *Dystar*, 464 F.3d at 1372 (all reversing the denial of JMOL of obviousness);

## III.  The Panel Appropriately Gave Non-controlling Weight to the Secondary Considerations

Last, BSC offers an incorrect argument that the panel failed to give appropriate weight to secondary considerations of nonobviousness. In fact, the panel considered the evidence and concluded – correctly – that "'given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that [the claim] would have been obvious.'" Op. at 17, quoting *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

That determination was correct on the facts and on the law. Using a barrier topcoat to control the release of drug from a reservoir undercoat was old

13

BSC-SJA-1590

technology. By the admission of BSC's co-inventor, this technology "goes back decades." A829/Tr.255:10-13. The challenge in developing a drug-eluting stent was not creating a barrier topcoat – that was well-known. Rather, the challenge was identifying an appropriate drug. Cordis tested 800 different drugs before identifying sirolimus as a safe and effective agent for delivery on a stent to reduce restenosis. A1060/Tr.864:24-865:4. Once Cordis identified the right drug, developing a polymer coating was a straightforward application of old technology. *See* A1255/Tr.34:17-35:5; A1256-57/Tr.40:2-42:6.

At trial, BSC's expert cited Medtronic's difficulties in developing a drug-eluting stent, A989-90/Tr.680:23-681:21, but was unable to link those difficulties to the polymer coating. In fact, the trial record demonstrates that Medtronic's difficulties related to the problem of finding a suitable drug – not developing a polymer coating. A1437/Tr.1624:52-1626:18. Such evidence deserves no weight in an obviousness analysis. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312-1313 (Fed. Cir. 2006).

The panel's conclusion – that the evidence of secondary considerations evidence was inadequate to overcome the prima facie case of obviousness – is consistent with Supreme Court precedent, *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 60 (1969) (secondary considerations "'without invention will not make patentability'"), *Great Atlantic & Pacific Tea Co.*

14

BSC-SJA-1591

*v. Supermarket Equipment Corp.*, 340 U.S. 147, 153 (1950) (same), and numerous decisions of this Court.[2] "Even … presum[ing] the jury found the objective evidence of nonobviousness favored [BSC], this evidence is insufficient to overcome the overwhelming strength of [Cordis's] prima facie case of obviousness." *Agrizap*, 520 F.3d at 1344.

## CONCLUSION

For the reasons set forth above, BSC's petition for rehearing and rehearing *en banc* should be denied.

In the event the Court reaches a different conclusion, it then would become necessary to consider issues that the panel did not need to address in view of its decision concerning Wolff, *e.g.*, whether the district court erred in denying JMOL of noninfringement and JMOL of obviousness over the Domb reference.

Dated: March 11, 2009

Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
Scott B. Howard
Irena Royzman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
*Attorneys for Defendants-Appellants*

*Of Counsel:*

Constantine L. Trela, Jr.
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603

---

[2] *E.g.*, *Leapfrog*, 485 F.3d at 1162; *Rothman v. Target Corp.*, __ F.3d __, 2009 WL 349474, *8 (Fed. Cir. Feb. 13, 2009); *Ball Aerosol*, __ F.3d __, 2009 WL 291184, *8; *Sundance*, 550 F.3d at 1368; *Muniauction*, 532 F.3d at 1328; *Agrizap*, 520 F.3d at 1344.

BSC-SJA-1592

# EXHIBIT 104

Page 1

IN THE UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

```
-----------------------»
BOSTON SCIENTIFIC   :
                    :
v.                  : NO. 2008-1073
                    :
                    :
CORDIS CORP         :
-----------------------
```

Wednesday,
November 5, 2008

Washington, D.C.

The above-entitled matter came on
for oral argument, pursuant to notice.

BEFORE:

THE HONORABLE ALAN D. LOURIE, Judge
THE HONORABLE RANDALL R. RADER, Judge
THE HONORABLE SHARON PROST, Judge

APPEARANCES:

On Behalf of Boston Scientific:

CHARLES A. WEISS, ESQ.
of:  KENYON & KENYON LLP
ONE BROADWAY
NEW YORK, NEW YORK 10004
(212) 908-6287

On Behalf of Cordis Corp:

GREGORY L. DISKANT, ESQ.
of:  PATTERSON BELKNAP WEBB & TYLER LLP
1133 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
(212) 336-2000

Neal R. Gross & Co., Inc.
(202) 234-4433

BSC-SJA-1593

Page 14

```
 1              MR. DISKANT:  Actually, no.  Although
 2    I think the District Court's claim construction
 3    makes it easy.  But the argument that Judge Rader
 4    was just espousing was one Boston espoused only
 5    on appeal.  It's not an argument supported by the
 6    trial record.
 7              THE COURT: Judge Rader espouses is no
 8    argument.
 9              MR. DISKANT:  I'm sorry.
10              THE COURT:  I did pose the question
11    to you that -- let me ask you what you do with
12    the secondary considerations.
13              MR. DISKANT:  Secondary
14    considerations all run our way.  I mean,
15    basically, you've got the Cypher Stent, which was
16    a great success by the undisputed testimony, it
17    was a great success because it identified the
18    drug rapamycin, which treats restenosis.  It had
19    nothing to do with anything in Ding.  There was
20    no long felt need for how to come up with coated
21    stents.  You see Ding, you see Wolff, you see
22    Domb, there are dozens of ideas.
23              The -- you know, when Cordis came
24    upon Cypher, it was easy for it to create the
25    drug eluting, the drug coated surface.  That was
```

BSC-SJA-1594

1   child's play.  The validity arguments are

2   extraordinarily strong.  Domb was just as strong

3   as Wolff and Domb is exactly the same idea.  It

4   has got -- it's a medical device for esophageal

5   or bronchial stents.  It has got a drug -- it's

6   undercoating has a drug in it.  Its top coating

7   is silicone.  Its top coating is drug-free.  And

8   their only argument at trial, which they repeated

9   on appeal, is that well, a person of skill in the

10  art wouldn't know an esophageal or bronchial

11  stent could be made with metal and have an open

12  lattice structure.  Boston, itself, had approval

13  for such a stent.  These are essentially

14  laughable arguments for those of skill in the art

15  and the skill in the art is very, very high.

16  Thank you.

17          THE COURT:  You'll save the rest of

18  your argument for rebuttal.

19          MR. DISKANT:  Thank you.

20          THE COURT:  Mr. Weiss?

21          MR. WEISS:  Thank you, Your Honor.

22      ORAL ARGUMENT OF CHARLES A. WEISS, ESQ.

23         ON BEHALF OF BOSTON SCIENTIFIC

24          MR. WEISS: Thank you Your Honor, May

25  it please the Court.

BSC-SJA-1595

# EXHIBIT 105

# REDACTED

# EXHIBIT 106

Claimant
Campbell David Kinsey Rogers
First Report
"CDKR. 1" to "CDKR.7"
August 2005

HC 2005 No C 00376

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
PATENT'S COURT

BETWEEN:

### CONOR MEDSYSTEMS INC.

Claimant

-and-

### (1) ANGIOTECH PHARMACEUTICALS INC.
### (2) THE UNIVERSITY OF BRITISH COLUMBIA

Defendants

---

## EXPERT REPORT OF
## PROFESSOR CAMPBELL DAVID KINSEY ROGERS

---

Professor CAMPBELL DAVID KINSEY ROGERS of 75 Francis Street, Boston, Massachusetts 02115, USA, STATES:

1.  I am currently an Associate Professor of Medicine at Harvard Medical School, Boston, MA, and Affiliated Faculty, Harvard-MIT Division of Health, Science and Technology, Cambridge, Massachusetts. I am also the Director of the Cardiac Catheterization Laboratory, Brigham and Women's Hospital, Boston, Massachusetts, which is a primary teaching hospital for Harvard Medical School. I am also the Director of the Experimental Cardiovascular Interventional Laboratory at Brigham and Women's Hospital. A copy of my CV is at Exhibit CDKR.1.

2.  I received an A.B. cum laude from Harvard College in 1983. In 1988, I received my M.D. degree from Harvard Medical School.

CORD118913

BSC-SJA-1602

3.  I did my internship, residency, and fellowship at Brigham and Woman's Hospital from 1988-1995 in internal medicine and cardiology. In 1991, I was elected a Diplomate of the American Board of Internal Medicine. From 1994-1995, I was the Chief Medical Resident at Brigham and Women's Hospital. In 1995, I was elected a Diplomate in Cardiovascular Diseases of the American Board of Internal Medicine. In 1996, I was elected a Fellow of the American College of Cardiology. In 1999, I was elected a Diplomate in Interventional Cardiology of the American Board of Internal Medicine.

4.  My primary research focus is in the area of cellular and extracellular responses to mechanical arterial injury (typically by the placement of a stent) and therapeutic solutions to these injuries. I conduct this research in animal models and in human clinical trials. I have published extensively on these topics.

5.  I have been involved in pre-clinical and clinical investigations relating to the treatment of arterial injury for all the major coronary stent companies through the non-profit Center for Biological Sciences and Engineering Trust. I have been a principal investigator in large animal experiments for Abbott Laboratories, Inc., Boston Scientific Corporation (the exclusive licensee under the patent in suit), Cordis Corporation (a subsidiary of Johnson & Johnson), Guidant Corporation and Medtronic, Inc., among others. In addition, I have carried out one animal study for Conor Medsystems Inc. ("Conor"), the Claimant in this action by whom I am retained. I am currently carrying out stent-related animal trials for a number of medical device manufacturers, whose identity is confidential.

6.  Brigham and Women's Hospital has been hired to carry out human clinical trials on virtually all of the drug eluting stents that have been evaluated in humans in the United States. I have been an investigator in trials of stents manufactured by Cordis, Guidant, Medtronic and Boston Scientific. A full list of the human clinical trials that I have participated in as an investigator is provided in my CV on pages 6-10. In particular, I was an investigator in the "SIRIUS" trial (2000-2002) which was the pivotal human clinical trial on the rapamycin-eluting stent ("CYPHER", sold by Johnson & Johnson), and the "TAXUS IV" trial which was the large pivotal human trial on the efficacy of the Boston Scientific paclitaxel-coated stent to treat restenosis ("pivotal" clinical trials are the equivalent for medical devices to phase III clinical trials for drugs, and are the full-scale trials leading to application to the FDA for marketing approval). I have recently been

CORD118914

BSC-SJA-1603

asked to be an investigator in the COSTAR II trial in the United States sponsored by Conor.  The COSTAR II trial will evaluate the efficacy in preventing restenosis of the Conor COSTAR stent.  The COSTAR stent is a cobalt-chromium alloy stent with holes drilled in it which are filled with a mixture of polymer and paclitaxel.  People generally refer to paclitaxel as Taxol, and I will do so in the remainder of the report.

7.   During the late 1990s, I, and some of my colleagues, carried out pre-clinical work for Boston Scientific and Medinol, who were collaborating at that time on a family of stents referred to as "NIR" stents, and on examining how these stents could be used to deliver Taxol from a polymer material coating.  In Spring 2000, this collaboration with Boston Scientific essentially ended.

8.   I have recently been retained by Boston Scientific to carry out pre-clinical studies in the area of vascular filters.

9.   I have been retained as an independent expert in various law suits in the United States.  In addition to being retained in various malpractice suits, I have been retained:

9.1   For Guidant Corporation in a contract dispute between Cook, Boston Scientific and Angiotech, in which I provided an expert report, but was not deposed;

9.2   For Medinol in a trade secrets suit against Boston Scientific which is in trial July 2005 in the United States; and

9.3   For Boston Scientific in a patent suit against Cordis Corporation pertaining to angioplasty balloons.

10.   I understand that it is my duty to help the Court on matters within my own expertise, and that this duty overrides any obligation I have to the person from whom I have received instructions, or by whom I am paid.  I have been made fully aware of this duty by Simmons & Simmons.  Simmons & Simmons have also shown me an extract from the judgment of Cresswell J in a case called 'The Ikarian Reefer' which includes seven numbered paragraphs setting out the duties and responsibilities of expert witnesses in greater detail.  I understand my responsibilities and my duties to the Court, and I confirm that I have fully complied, and will comply, with them.

CORD118915

BSC-SJA-1604

11.   I have been asked to provide a background summary of the technology relevant
to this case.  I have also been asked to review and comment on certain
documents and to provide my expert opinion on questions posed to me.

## Background

## Common General Knowledge

12.   Interventional cardiology is the field of treating vascular disease, particularly
narrowing or blockage of arteries, using a "percutaneous" approach to introduce
into the artery devices which in turn act to reduce the degree of blockage
without true surgery.  Most interventional cardiologists are physicians whose
entire practice involves treating patients.  In the early 1990s (and still today)
there was also a smaller community of interventional cardiologists who, in
addition to treating patients, also conducted research to understand more
completely what happens when such devices are used and on the basis of that
understanding to come up with improved therapeutic methods.  Researchers
with backgrounds in other areas, such as pathology, vascular cell biology,
radiology, etc. were also interested, and conducting research, in this area by the
early 1990s, although the nature of the field was such that researchers did not
generally become involved in the field until they had several years of more
general experience following their Ph.D. or M.D..  Although each had his or her
own specialized areas of research, most of us attended or read the proceedings
of the major meetings of interventional cardiologists and other researchers in
the field where recent results were presented.  I was among the group of
investigative interventional cardiologists in 1991-1993 and was studying the
vascular responses to stenting, how stent design and/or material or stent-based
or other local drug delivery affected those responses.  I continue to be involved
in this area of investigation at the present time.

13.   Exhibit CDKR.2 is a primer (not prepared by me, but I agree with its contents)
which explains some basic concepts relevant to this case.  In the following
section of this report, I will describe what I believe the typical investigative
interventional cardiologist would have known in 1993.  This is based on what
my own state of knowledge was at that time, as a relatively junior researcher in
the field, including my recollection of what other researchers talked about at that
time.

CORD118916

BSC-SJA-1505

Atherosclerosis

14.    Atherosclerosis is a deposit or "plaque" within the wall of an artery resulting
       from a build up of, among other things, inflammatory cells and cholesterol. As a
       result, the lumen of the artery is narrowed, restricting blood flow. When this
       happens in a coronary artery supplying blood to the heart muscle, it can result
       in angina and breathlessness, and the plaque can eventually rupture, triggering
       a heart attack.

Revascularization for atherosclerosis

15.    Prior to the late 1970's, the main coronary revascularization treatment for
       patients with atherosclerosis, who required more than medical therapy, was a
       bypass operation carried out by a cardiac surgeon, where a blood vessel from
       another part of the body was grafted onto the coronary artery to bypass the
       narrowed section. This procedure is referred to as coronary artery bypass graft
       surgery ("CABG").   CABG is major open-heart surgery under general
       anesthesia.

16.    In 1977, Dr. Andreas Grüntzig in Switzerland carried out the first coronary
       angioplasty procedure to treat atherosclerosis, in which a catheter equipped
       with a balloon was threaded through a groin artery up into the narrowed
       coronary artery, and the balloon expanded to widen the narrowed section. This
       procedure was gradually accepted by the medical community and was referred
       to as "balloon angioplasty".

17.    Balloon angioplasty was a real alternative to CABG surgery and increasingly a
       preferred and less invasive procedure than heart surgery for some patients with
       atherosclerosis. By 1993, between 40 and 50% of patients needing coronary
       revascularization were treated by balloon angioplasty. This procedure was
       carried out by interventional cardiologists with local anesthetic, with a very short
       recovery time.

18.    While balloon angioplasty represented a significant advance in the treatment of
       atherosclerosis, it also created its own new problems.   Two problems
       encountered with balloon angioplasty were (i) abrupt closure and (ii) restenosis.

18.1   Abrupt closure is where the lumen of the coronary artery becomes completely
       occluded within hours after removal of the angioplasty balloon. When this
       happened, a heart attack was often caused, and an emergency bypass

CORD118917

BSC-SJA-1606

operation was sometimes necessary, even despite which patients often died. It occurred in about 5% of angioplasty patients.

18.2    Restenosis is a re-narrowing of the lumen of the coronary artery, at the site of an angioplasty, and usually develops over 4-6 months following the procedure. Restenosis is rarely a life-threatening problem, and unlike atherosclerosis, restenosis only very rarely causes heart attacks. It does cause angina (chest pain) and breathlessness.

Restenosis

19.    It was understood in the early 1990s that restenosis differed from atherosclerosis in that restenosis was a disease caused by mechanical intervention and atherosclerosis was a naturally occurring disease. Restenosis is distinguished from atherosclerosis by: (i) the time course of progression (atherosclerosis occurs over decades while restenosis occurs over a period of months); (ii) the composition of cells (atherosclerosis involves intracellular and extracellular lipids and foam cells in a complex and heterogeneous pattern while restenosis primarily involves the proliferation of inflammatory and smooth muscle cells); and (iii) the natural history of the disease (atherosclerosis is subject to sudden and abrupt changes while restenosis is generally gradual and progressive, not subject to rapid change).

20.    The vascular response to injury, for example that caused by balloon angioplasty, exhibits: (i) a reduction in the overall diameter of the artery, which can occur shortly after the angioplasty ("elastic recoil") or over a period of months ("negative remodelling"); and (ii) the rapid proliferation and growth of smooth muscle cells in the intima (the inner part of the blood vessel wall) ("neointimal hyperplasia"). When this response is particularly abundant, a significant narrowing of the lumen may ensue (i.e. "restenosis"). Neointimal hyperplasia is an exaggerated healing response following damage to the arterial wall caused by the angioplasty. Neointimal hyperplasia was identified as a cause of restenosis in the early 1980s, but elastic recoil and negative remodelling were not generally recognised as important to restenosis until roughly 1994 - 1995.

21.    Once it was recognized that balloon angioplasty caused restenosis, methods began to be proposed to prevent or treat the restenotic lesion. It is important to distinguish between prevention and treatment of restenosis. Prevention of

CORD118918

BSC-SJA-1607

restenosis involves taking steps that cause the restenosis not to occur or to occur in a lesser amount than would be the case otherwise. Treatment of restenosis involves alleviating a formed restenotic lesion, and (unlike prevention) requires that the patient undergo another procedure.

### Stents

22.   A cardiovascular stent is a small metal scaffold, placed inside an artery using a catheter. The stent's scaffolding acts to hold the artery open at the site of the angioplasty. Stents can be self-expanding or can be expanded by an angioplasty balloon. Stents for preventing constrictions of body passageways such as the esophagus, trachea or bile ducts have been known for many years, but cardiovascular stents were only developed during the mid 1980s. I will use the term "stent" below to refer to a cardiovascular stent.

23.   The first stents were implanted in about 1985 in Europe and some time afterwards in the United States. They were being used in Europe in the treatment of threatened or actual abrupt closure after balloon angioplasty in the early 1990s. At this time in the United States, stents were undergoing clinical trials for FDA approval. In mid-1993, the Gianturco-Roubin stent became the first coronary stent to be approved by the U.S. Food and Drug Administration for acute or threatened closure following coronary intervention (balloon angioplasty). The Palmaz-Schatz stent was approved shortly thereafter.

24.   It was observed that bare metal stents provided an improvement over balloon angioplasty, in that they reduced the incidence of acute closure, and greatly simplified its treatment when it occurred. However, restenosis still occurred.

25.   Restenosis after implantation of a stent was first reported by Ulrich Sigwart in Switzerland in about 1988 (the paper was published in French, but a copy of an abstract in English is at exhibit CDKR.3), and it was well recognised by 1993. Initially it was assumed that the mechanism for this was the same as that for post-balloon angioplasty restenosis. However, as a result of work carried out in the early 1990s, in large part by the group with which I was working, it became known that stent-induced restenosis differed from post-balloon angioplasty restenosis in a number of ways. First, there was no (or very little) elastic recoil or negative remodelling, because the vessel was held open by the stent. Secondly, stent-induced restenosis usually involved several-fold more tissue growth (neointimal hyperplasia) than post-balloon angioplasty restenosis. (The

CORD118919

BSC-BJA-1608

combined overall effect of these two factors was, in most cases, less overall narrowing of the lumen.) Thirdly, the tissue contained a greater number and different types of inflammatory cells than did post-balloon angioplasty restenosis. These second and third differences probably resulted from differences between the injury caused to the artery wall by a metal stent as compared to that caused by a balloon.

26. We first published work relating to this, as an abstract in the American Heart Association annual meeting in November 1992. A copy is at tab 9 in Exhibit CDKR.4 (see below). These differences between post-angioplasty restenosis and in-stent restenosis are well-recognised now, but I do not believe they were generally recognised in 1993.

27. Many people believed at that time (although it was not generally proved yet) that bare metal stents reduced the incidence of restenosis. Two large scale clinical trials named "STRESS" and "BENESTENT" were conducted to test this theory. These trials compared restenosis occurrence in balloon angioplasty patients vs. patients who also received a Palmaz-Schatz bare metal stent. The results of these trials, published in 1994, confirmed that these stents significantly reduced the rate of (i.e. prevented) restenosis. In the years following the publication of these trials, the use of bare metal stents grew considerably, both in terms of overall case numbers and as a percentage of total angioplasties.

Drug Eluting Stents

28. During the 1991-1993 period, one of the topics discussed at conferences that I attended was using a stent coated with a therapeutic drug, which could be delivered via a polymeric coating. Such drugs could act to combat thrombosis and/or restenosis. One of the most widely investigated drugs at this time was heparin, which can have both anti-thrombotic and anti-proliferative properties. At the same time, there were many efforts to develop polymers that would be safe as a coating or stent material and which could be used to deliver drugs. Researchers were primarily focussing on anti-thrombotic drugs and anti-proliferative drugs for delivery, although certain other classes of drugs were also of interest.

29. Examples of relevant papers and abstracts are in Exhibit CDKR.4. Items 1, 3 to 4 and 7 to 13 come from the annual Scientific Sessions (most of which I

843916-1/RGF[D0057722]          LN 1E3A1RIL_17[1]



CORD118920


BSC-SJA-1609

attended) of the American Heart Association and the American College of Cardiology, whose abstracts were published in the journals *Circulation* and *JACC* respectively. Even when I did not attend the meeting, I read the abstracts in detail. Items 14 to 16 come from the Restenosis V conference in May 1993. I did not attend this conference, but I recall reading the papers and abstracts in the conference book brought back from the conference by one of my colleagues. The outline by S Bailey at item 15 is a useful summary of the substance of discussions in the community at that time. I also recall attending other specialist conferences where there was discussion of using anti-proliferative drugs on stents to prevent restenosis, but I have been unable to find copies of agendas or papers from these conferences.

30.   I have been shown copies of materials from the First and Second International Symposia on Invasive Cardiology in the 1990's, held in 1991 and 1992, which are items 2, 5 and 6 in Exhibit CDKR.4. I did not attend these symposia, and I do not recall seeing the materials at the time. The relevant portions of the panel discussions are, in item 2, the question to Dr Roubin and his answer on page 96, and in item 6, Dr George's questions and Dr Sigwart's answers.

31.   Between 1990 and 1993, I was conducting experimental animal work, including pre-clinical work for Guidant. The leader of our laboratory group was Morris Karnovsky, who had been studying heparin for many years. Our work involved inserting stents into animals (rabbits) and analysing the effects. The work started in 1990, and during 1990-1991 we worked with bare metal stents. In approximately 1991 Guidant began providing us with stents coated with heparin, first without a polymer and later impregnated into a polymer. Heparin had been selected because it was anti-thrombotic, and was also known as having anti-proliferative and also anti-inflammatory properties. It was known to be effective against experimental restenosis when administered in a local fashion peri-vascularly (implanted surgically outside, but close to, the artery). This work had been carried out by Morris Karnovsky's group, and was first published as *'Effect of controlled adventitial heparin delivery on smooth muscle cell proliferation following endothelial injury'* by Edelman ER, Adams DH, Karnovsky MJ, in Proc Natl Acad Sci U S A, 1990 May; 87(10):3773-7. A copy of this paper is at Exhibit CDKR.5. However, attempts to administer heparin intra-vascularly (via balloon or stent) proved not to be successful at reducing neointimal hyperplasia (experimental restenosis) as the heparin tended to be washed away from the site by the blood or rapidly lost from the arterial wall (due

CORD118921

BSC-SJA-1610

in large part to the hydrophilic nature of the drug). This confirmed in our minds that water soluble drugs might not be ideal agents for intra-vascular local delivery to prevent restenosis.

## Stent deliverability

32.   Early stents were relatively inflexible and this made it difficult to push them through the coronary arteries, which can have many twists and turns: although the stent catheter follows a guide wire, it is difficult to push a relatively rigid stent around the turns, especially if the vessel walls were affected by atherosclerotic disease. Poor deliverability of early stent designs (e.g. the Palmaz-Schatz stent) meant that stents could not be easily delivered in many settings. There was a substantial rise in the use of stents after 1997, following the launch of improved, more flexible stents by AVE (which was later bought by Medtronic), Guidant, Boston Scientific (together with Medinol), and later Johnson & Johnson.

## Prior Art - Wolff

33.   I have been asked to comment on an International Patent Application number WO 91/12779 entitled "Intralumenal Drug eluting Prosthesis" ("Wolff"). The applicant was Medtronic Inc, which was well-known to researchers prior to 1993 as a company working on stents. The inventors were Rodney Wolff and Vincent Hull. I understand that this document was first published on September 5, 1991. It describes drug eluting stents for use in the prevention of restenosis.

34.   Wolff describes the type of work that my group, and a number of other groups, were involved in, in the early 1990s. It is essentially the same as conversations and talks that I participated in during the 1990-1993 time period regarding methods to prevent stent-induced restenosis (as mentioned in paragraphs 28 to 30 above). The document generally describes ideas and technology that are sensible and reasonable, and there is nothing in the document which is incorrect or untenable, as of the date of publication. I address a few specific passages below.

35.   On page 5, the document gives a number of definitions of restenosis, and (lines 18 to 30) lays out an explanation of how it occurs. I recognise this description of restenosis and confirm that it represents the sort of sequence we, and other groups, understood in 1993 to be going on during restenosis. In the final

CORD118922

BSC-SJA-1611

paragraph on page 6, to the top of page 7, Wolff gives a fairly accurate description of the "cascade" which results in restenosis according to the state of knowledge at the time. On page 7, lines 19-34, under the heading "prevention of restenosis", Wolff sets out a list of hypotheses "on how to biochemically stop restenosis", indicating mechanisms that might be considered when identifying suitable drugs. Overall, Wolff's description on pages 5 to 7 is a fair reflection of the state of thinking in the 1991-1993 timeframe.

36.    From pages 8 through the top of page 10, Wolff describes classes of drugs that might be delivered to prevent restenosis. In particular, on page 9, he points out that there are several types of drugs that interrupt cell replication, and goes on to state that:

> Antimitotics (cytotoxic agents) work directly to prevent cell mitosis (replication), whereas antimetabolites prevent deoxyribose nucleic acid (DNA) synthesis, thus preventing replication. The action of the anti-mitotics and antimetabolites are so similar, they will be grouped into one category. This category will be known as the anti-replicate drugs.
>
> Antireplicate drugs include among others: Methotrexate, Asathioprine, Vincristine, Vinblastine, Fluorouracil, Adriamycin and Mutamycin.

37.    If I or another investigator wanted to choose an "anti-replicate" drug to conduct research into coated stents following what Wolff says, we would know that anti-mitotics were most commonly used in cancer chemotherapy. In order to consider possible drugs, and to gauge each one's potential suitability for stent-based release, we would consult an oncologist or someone else familiar with cancer drugs. He or she would not only provide a list, but also relevant insight into properties, mechanisms of action, toxicity, etc. Most investigative interventional cardiologists worked in hospitals where there were such people, and it would have been very easy to consult one.

38.    In lines 22-27 on page 9, Wolff sets out the drug concentrations found with systemic delivery of certain drugs, and points out that local concentrations are highly variable, which is indeed one of the disadvantages of systemic drug delivery. In lines 27-32, he explains how local delivery of drugs using a stent allows a high local dosage to be achieved, with very low, possibly undetectable levels of the drug in the blood. This means that the side effects of a toxic anti-cancer drug could potentially be avoided through local delivery. These are among the reasons why a number of workers in the field were looking at using stents for local drug delivery.

CORD118923

BSC-SJA-1612

39. Wolff discusses stent design on pages 10 to 12 under the heading "Prosthesis (Stent) Design". Most of the discussion relates to a braided wire stent design. From page 10, line 32 to page 11, line 3, it is clear, however, that the invention applies equally to any coated stent. On page 3 at lines 4 to 6, Wolff states: "With conventional metal stents, the invention requires a drug-carrying coating overlaying at least a portion of the metal".

### Prior Art -- Kopia

40. I have also been asked to comment on an International Patent Application number WO 93/11120 entitled "Compounds, Compositions and Methods for Binding Bio-affecting Substances to Surface Membranes of Bio-particles" ("Kopia"). The applicant was Zynaxis Technologies Inc. The inventors were Gregory Kopia and others. I understand that it was published on June 10, 1993. The patent application describes methods for delivering a "bioaffecting moiety" to the surface membrane of a "biocompatible particle." The term "bioaffecting moiety" is defined on page 15 of the document as a substance useful in the therapeutic, diagnostic, prophylactic or other treatment of humans or animals, and that it includes any substance that is capable of exerting a biological effect, i.e., any drug. The term "biocompatible particle" is defined on page 15 to include cells. The invention involves linking the "bioaffecting moiety" to a lipophilic carrier to deliver it to the biocompatible particle. In more simple terms, the invention includes the delivery of any drug to a cell via a lipophilic linker that helps the drug bind to the cell.

41. One of the major aspects of Kopia is the treatment of post-angioplasty restenosis, which is mentioned in the abstract on the front page of the document, as well as in the first heading at the bottom of page 2 in the Background Information section. I was aware of Zynaxis in about 1993, and would have been quite interested to read what drugs the company was proposing to use to treat post-angioplasty restenosis. Since I was primarily interested in drug-eluting stents at the time, I would have read Kopia with interest for information on which drugs were being considered for the treatment of post-angioplasty restenosis, so that I could consider the merits of incorporating the drug into a drug-eluting polymer coated stent.

42. Kopia notes on page 2 that a difficulty with antiproliferatives is that by definition they must be toxic to certain cell types and that this difficulty (potential toxicity to non-target tissues) can be circumvented by administering anti-proliferative

12

CORD118924

BSC-SJA-1613

agents directly to the site of the undesired cell proliferation. This is also the concept behind drug-eluting stents.

43.   On pages 10-11, Kopia notes that chemotherapeutic substances may be delivered to cells using the invention, and mentions colchicine, vinca alkaloids, and Taxol and its derivatives. As discussed above, I was aware at the time that chemotherapeutic agents in general represented potential agents to treat restenosis.

44.   On page 49, Kopia deals with "Treatment of Specific Diseases or Pathological Conditions by Direct Delivery of Therapeutically Active Substances". The first condition is "Post-Angioplasty Reocclusion and Restenosis".

45.   The passage on page 49, lines 17 to 24, is in accordance with the "cascade" concept, namely that if the events that lead to restenosis can be stopped in the early stages, restenosis can be prevented. Kopia discusses at lines 24 to 33, that anti-proliferative agents should be used, and that local delivery enables higher doses to be given for a longer period at the site where they are needed than through systemic delivery. Specific anti-proliferative agents, mentioned on page 50 at lines 13 to 17, are "antiproliferative agents, such as heparin, hirudin, colchicine, vinca alkaloids, Taxol and derivatives thereof."

46.   If I had read the Kopia PCT in June 1993, I would have taken from it the portion I was interested in, namely, the drugs to be used to treat restenosis. I would have ignored the fancy molecular engineering as something that I was not working on at the time, but would have considered how to use a stent to deliver the drugs. I believe that any investigator in my position would have done the same.

### Suitability of Taxol

47.   If I were given a list of drugs and their properties, including Taxol, either from an oncologist or other cancer drug expert consulted on the basis of Wolff, or from the list in Kopia in 1993, I believe that Taxol would have been an attractive drug to use because it was an effective cancer drug which was not particularly toxic (i.e. it was tolerated by patients and was not as toxic as some other cancer treatments). The fact that Taxol was hydrophobic would have led me to think it was a particularly suitable candidate for incorporation into a polymer on a stent,

CORD118925

BSC-SJA-1614

as it would be less likely than a hydrophilic drug like heparin or methotrexate to be washed away by the bloodstream.

## The Patent In Suit

48.     I have been provided with a copy of European Patent (UK) 0 706 376, together with a copy of the claims as proposed to be amended.   It is entitled "Anti-Angiogenic Compositions and Methods of Use" ("the '376 Patent").

49.     The invention described in the '376 Patent appears to be the general delivery of anti-angiogenic agents in a polymeric carrier, which can be on a stent. I note that the patent includes Taxol in a list of anti-angiogenic agents that can be delivered (see pages 6 to 7).

50.     There is one reference to the treatment of restenosis, on page 12, lines 33 to 37, and particularly the sentence in line 36:  "Briefly, stents may be placed in a wide variety of blood vessels, both arteries and veins, to prevent recurrent stenosis at the site of failed angioplasties, to treat narrowings that would likely fail if treated with angioplasty, ..."  There is no indication of what dosage should be used, or over what period the drug needs to be eluted in order to be effective.   There is a reference to neointimal hyperplasia in the passage on page 16, lines 41 to 49, but this is not in the context of coronary artery restenosis or of stents. There are also several references to vascular stents, for example, on page 3 at lines 13 to 21, page 10 line 35, page 10 line 57 to page 11 line 1.   On page 13, line 44, atherosclerotic plaques are identified in a list of "non-tumorigenic angiogenesis-dependant diseases", but they are not further mentioned in the discussion which follows.

## Commercial Success

51.     I have been told that the Defendants rely on "commercial success" in support of their case that the Patent in Suit is non-obvious.   I have been asked to address a number of questions in this regard.

(a)     What was the problem which the patented development addressed?

52.     I have been asked to focus on claim 12 which relates to a vascular stent coated with a factor which is anti-angiogenic by the CAM assay, namely Taxol or an analogue or derivative, and a polymeric carrier, for treating or preventing

CORD118926

BSC-SJA-1615

recurrent stenosis (which I understand to mean restenosis). The problem is accordingly, the treatment or prevention of restenosis.

(b)   **How long had that problem existed?**

53.   Post-balloon angioplasty restenosis had been known since at least 1980. Restenosis following stenting was first reported by Sigwart in 1988 (see Exhibit CDKR.3).

(c)   **How significant was the problem seen to be?**

54.   The problem of restenosis was not as serious as the original problem of atherosclerosis (which was addressed by balloon angioplasty), and was/is rarely fatal.   Nevertheless, it was prevalent and it affected a substantial percentage of angioplasty patients.

(d)   **How widely known was the problem and how many were likely to be seeking a solution?**

55.   The problem was generally known to cardiologists and investigative interventional cardiologists. For many investigative interventional cardiologists, research into restenosis formed at least part of their work. Such research was often directed to understanding the biological mechanisms involved, as well as investigating methods of prevention or treatment.   The community of investigative interventional cardiologists conducting research into biological mechanisms of restenosis was relatively small – probably fewer than 25 groups, and in fact, many of us knew each other or knew of each other.

(e)   **What prior art would have been likely to have been known to all or most of those who would have been expected to be involved in finding a solution?**

56.   I have addressed, in paragraphs 28 to 30 above, my observations on what that state of the art was in the early 1990s. In general, researchers were discussing the coating of stents with anti-thrombotic and/or anti-proliferative agents at conferences, meetings and in the literature.

57.   In 1993, I was not aware of Wolff, and I do not believe that it would have been widely read. However, as discussed above, researchers like me in 1993 were aware that a potential solution to the problem of restenosis caused by bare

CORD118927

BSC-8JA-1616

metal stents would be to coat the stent with a polymer that elutes an anti-proliferative drug.

58. As indicated above, the Zynaxis drug delivery system (the subject of the Kopia patent) was known in general terms in 1993, but researchers generally did not know the details – In particular, many would not have known what drugs Zynaxis was working with.

(f) **What other solutions were put forward in the period leading up to the publication of the Patentee's development?**

59. There was no single "breakthrough" in finding a successful way to prevent restenosis.   Rather, there was a general development of researchers' understanding of the problem and of ways to prevent it.

60. Thus, in the early 1980s, the main focus of research was into what restenosis was, at a fairly basic cellular level.   Research in this area is continuing – for example, the differences between post-angioplasty restenosis and in-stent restenosis are not yet fully understood.

61. Once restenosis had been identified as primarily smooth muscle cell migration and proliferation, attempts were made during the second half of the 1980s to treat it using anti-proliferative drugs, delivered systemically.   A number of successes were reported in animal trials, but it did not appear to be possible to replicate these results in humans. This was generally attributed to the fact that the doses which could be safely administered in humans so as to avoid unacceptable side effects were proportionally lower than the doses usable in animal studies.   By the start of the 1990s, when I became involved in this field, it was becoming clear that systemic delivery was not succeeding and the focus was moving towards local delivery of anti-proliferative drugs (although research into systemic delivery did continue during the early 1990s).

62. During the early 1990s, the main effort was on local delivery of drugs through permeable balloons, or otherwise using an angioplasty type catheter to deliver the drug directly to the site.   Most of the papers and presentations on local delivery were about local delivery by balloons.  However, there were roughly half a dozen academic groups in the US working on stent based drug delivery systems, and a number of groups in Europe.

CORD118928

BSC-SJA-1617

63. The first stent-based proposal which led to a commercial product was advanced by American Home Products ("AHP"), which was the use of rapamycin on a stent. I have been shown a copy of AHP's European patent application number 0 551 182 (a copy of which is at Exhibit CDKR.6). The priority date was January 9, 1992, and the application was published on July 14, 1993. Its subject matter can be summarised by reference to the abstract – "a method of preventing or treating hyperproliferative vascular disease in a mammal by administering an antiproliferative amount of rapamycin alone or in combination with mycophenolic acid". On page 7, line 28 of the European Application, it says that the drugs "can be administered intravascularly or via a vascular stent impregnated with rapamycin ...". This invention is embodied in the CYPHER stent, a rapamycin-eluting stent manufactured by Cordis and launched in Europe in 2002, and in the US in 2003, about 1 year before TAXUS, the Taxol-eluting stent marketed by Boston Scientific, which I understand is the Defendants' licensee. Thus the AHP patent application provided the first successful drug-eluting stent to prevent restenosis.

64. I have described above drug therapies which were the subject of research in the early 1990s. Other techniques for treating restenosis, which were actually in use by clinicians in 1993, were as follows. Interventional treatments included repeat balloon angioplasty and atherectomy (using a cutting device inserted through the catheter to remove restenotic tissue). In suitable patients without complicating factors the success rate of these treatments in preventing recurrence of restenosis was as high as 80%, although in patients with complications such as diabetes, it could be as low as 20%. Bare metal stents were being used generally in Europe and in clinical trials in the US. These were more successful in preventing restenosis than balloon angioplasty alone. It is also generally considered that bare metal stents were better than repeat angioplasty or atherectomy for treating restenosis in suitable patients. A surgical alternative for treating restenosis was a coronary by-pass operation.

65. One proposed restenosis prevention and treatment, which was investigated and proceeded to trials in humans in the period 1990 to 1993, but which was not effective, was intravascular laser therapy.

66. The techniques which were used to treat restenosis following angioplasty were also applied to in-stent restenosis after stents began to be used after 1993 in the US, and earlier in Europe, with broadly similar success rates. One

17

CORD118929

BSC-SJA-1618

additional treatment (approved in the late 1990s by the FDA for treatment of in-stent restenosis) was brachytherapy (radiation therapy using a radioactive source introduced to the site of the restenosis using a catheter) which, when used in conjunction with angioplasty or atherectomy, improved outcomes and reduced failure rates by several fold. Brachytherapy was trialled for the prevention (as opposed to treatment) of restenosis in the mid-1990s, but was not generally effective for prevention, and therefore was an example of a method that was approved for treatment but not prevention of restenosis.

(g)   **To what extent were there factors which would have held back the exploitation of the solution even if it was technically obvious?**

67.   As I have indicated above, researchers in the field generally were fairly confident that anti-proliferative drugs would work to treat restenosis. The substantial challenge was to establish what dosage to deliver over what period of time, and to develop drug-elution systems to achieve this. The '376 Patent contains no information as to the dose or duration that would be required to treat restenosis, and determining these would require considerable further research. Once a suitable system was developed, further time would be taken in clinical trials.

(h)   **How well has the patentee's development been received?**

68.   The CYPHER was the first anti-proliferative drug-eluting stent on the market. As the pioneer, it was seen as the big breakthrough in preventing restenosis after angioplasty (by the time the CYPHER stent was launched, stents were used in about 90% of angioplasty procedures in the United States).

69.   The TAXUS stent is seen as a follow-on of the technology in the CYPHER drug-eluting stent. TAXUS has enjoyed much success for reasons which I discuss below.

70.   Following the introduction of the CYPHER and TAXUS drug-eluting stents, the proportion of atherosclerosis patients being treated by intervention rather than bypass surgery has increased. A very substantial proportion of stent procedures in the United States now use one or the other of these drug-eluting products.

CORD118930

BSC-SJA-1619

(i)    To what extent can it be shown that the whole or much of the commercial success is due to the technical merits of the development, i.e. because it solves the problem?

71.    Compared to what was available before drug eluting stents, namely bare metal stents, CYPHER and TAXUS both represent a significant advance in the prevention of restenosis.  This is because they both elute an anti-proliferative drug in a suitable dose for a suitable duration, so they have solved the major challenge of identifying a polymer system that achieves the correct release kinetics.   There have been a number of studies published recently which compare the effectiveness of CYPHER and TAXUS.    These include the REALITY trial, sponsored by Johnson & Johnson, whose results were presented at the American College of Cardiology Scientific Sessions in March, 2005, and three independent trials, the SIRTAX trial, the ISAR DIABETES trial, and the ISAR DESIRE trial among others.  Copies of slides which contain the essential findings of the REALITY, SIRTAX and ISAR DIABETES trials are at Exhibit CDKR.7, along with a copy of the published paper reporting of the ISAR DESIRE trial in JAMA.  The primary end point of the REALITY trial was restenosis as measured by angiograms, and by this criterion no significant difference was found between the two products.

72.    Some endpoints within the REALITY trial, and others of the other comparative trials listed above, did show better results with the CYPHER stent than with the TAXUS stent.  At present, there is much debate in the field as to whether the CYPHER stent provides better anti-restenotic efficacy than the TAXUS stent or whether the two are equivalent.   There is essentially no evidence that the TAXUS stent provides better efficacy.

73.    I believe therefore that a significant part of the commercial success enjoyed by the CYPHER and TAXUS stents is attributable to their technical merits, in that they are significantly more effective at preventing restenosis than bare metal stents.  However, there is nothing in the data from the REALITY and other trials referred to above that the use of Taxol on the TAXUS stent as opposed to any other anti-proliferative drug is the reason for this.  As outlined above, when the efficacies of Taxol (at least as delivered by the TAXUS stent) and rapamycin (at least as delivered by the CYPHER stent) have been compared, it appears that rapamycin may be superior.

CORD118931

BSC-SJA-1620

74. There is an indication in the ISAR DESIRE trial that the CYPHER stent is more effective than the TAXUS stent at treating (as opposed to preventing) restenosis.

75. In my practice, I have always tended to use CYPHER stents preferentially, but I do sometimes use TAXUS stents. On the other hand, some of my colleagues use them equally, or tend to prefer TAXUS. In the wake of the REALITY trial and the other trials presented recently comparing the 2 stents, there has been a noticeable shift by many physicians toward CYPHER stent use rather than TAXUS.

76. I believe that the larger market share enjoyed by TAXUS is not the result of any actual or perceived superiority in preventing restenosis, but rather is due to the following three factors.

77. First, in part because the CYPHER stent has only a three month shelf life, Johnson & Johnson is challenged to supply all hospitals adequately with CYPHER stents. In particular, I understand that they have not supplied completely hospitals which do not have high usage, as they risk having to take back large numbers of expired stents. At my hospital, the CYPHER salespeople review our stocks of CYPHER stents and put an orange mark on those packs which are within a month of their expiration date. We are encouraged to use the marked stents before the other stents.

78. Secondly, Johnson & Johnson seem to have manufacturing and supply problems above and beyond the challenges imposed by their 3 month shelf life, so that even at our hospital, we are sometimes unable to obtain certain sizes of CYPHER stents.

79. Thirdly, the TAXUS stent is somewhat more deliverable within the coronary arteries than the CYPHER stent. This results in greater ease of use which is of great importance to many interventional cardiologists. Coupled with many physicians believing that there is little significant difference between the drugs used, this means that many clinicians prefer to use TAXUS stents.

CORD118932

BSC-SJA-1621

I believe that the facts stated in this report are true and I honestly hold the opinions expressed.


Dated: _____, 2005          _____

                                   Campbell David Kinsey Rogers



CORD118933

BSC-SJA-1622

Claimant
Campbell David Kinsey Rogers
First Report
"CKDR.1" to "CKDR.7"
August 2005

HC 2005 No C 00376

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
PATENTS COURT

B E T W E E N:

CONOR MEDSYSTEMS INC.

Claimant

-and-

(1) ANGIOTECH PHARMACEUTICALS INC.
(2) THE UNIVERSITY OF BRITISH COLUMBIA

Defendants

---

EXPERT REPORT OF PROFESSOR
CAMPBELL DAVID KINSEY ROGERS

---

Simmons & Simmons
One Ropemaker Street
London
EC2M 9SS
Solicitors for the Claimant
9/6915-1/RBF/PMI

9/6915-1/RBF/(X006782)                                    LN 1 B5A1 P5_1)(1)

CORD118934

BSC-SJA-1623

# EXHIBIT 107

Claimant
Campbell David Kinsey Rogers
Second Report
"CDKR. 6" to "CDKR.14"
September 2005

HC 2005 No C 00376

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
PATENTS COURT

B E T W E E N:

CONOR MEDSYSTEMS INC.                                Claimant

-and-

(1) ANGIOTECH PHARMACEUTICALS INC.
(2) THE UNIVERSITY OF BRITISH COLUMBIA          Defendants

---

## SECOND EXPERT REPORT OF
## PROFESSOR CAMPBELL DAVID KINSEY ROGERS

---

Professor CAMPBELL DAVID KINSEY ROGERS of 75 Francis Street, Boston, Massachusetts 02115, USA, STATES:

### Introduction

1.   I am the same Campbell David Kinsey Rogers who signed an Expert Report in these proceedings on 06 August 2005.

2.   I have been asked to read the Expert Reports and Witness Statements submitted by the Defendants. I comment below on certain of the matters covered in these reports and statements. I have been asked to state at the outset that where I do not deal with a particular point made by one of these witnesses, that does not mean that I necessarily agree with that point.

1

CORD116827

BSC-SJA-1624

3.   I have also been asked to read the Expert Report of Nicholas Robert Lemoine dated July 27, 2005. I understand that Dr. Lemoine's statement was served on behalf of the Claimant, which also submitted my first Expert Report.

4.   I am reminded of my duty to the Court referenced in Paragraph 10 of my first Expert Report and understand that this duty extends to these reply comments.

## Expert report of Professor David Charles Cumberland dated 29 July 2005

5.   While I agree with some of the statements made by Professor Cumberland, I disagree with others and with some of his perspectives. I provide comments below on certain of those statements and perspectives.

### Sections 3, 4 and 5 - Common General Knowledge

6.   In Sections 3, 4 and 5, Professor Cumberland provides a discussion of stenosis, restenosis and stents. Much of this discussion is uncontroversial. He refers in Paragraph 4.6 to three review articles. I remember reading the Hermann and Lee papers at the time at the time[1]; I am not sure when I read the Myler paper. They are reasonable overviews of the understanding of restenosis as at 1993, and of some of the research that had by then been conducted in this field. One comment I do have about these sort of review papers is that I believe that researchers working in the field did not rely on the review papers for keeping up to date with the field, but read the underlying research papers. This is an important point, because, for example, the conclusion in the Hermann paper about cytostatic agents (end of section 3.3.5 on page 46-47) is not in fact supported by the papers referred to, nor is it consistent with the conventional wisdom in 1993. I recall that, at that point in time, anti-proliferative drugs were generally seen as very promising candidates to treat and prevent restenosis, although concerns about systemic administration had led researchers to investigate local delivery as opposed to systemic delivery.

7.   In Sections 4.5-4.12 (and in particular, Section 4.8), Professor Cumberland goes into substantial detail regarding the mechanism of restenosis with the perspective that the "mechanisms were complex, involving many interrelated biological pathways - any one of which presented itself as being sites of potential pharmacological intervention in order to combat the problem of

---

[1]   I also remember reading the Forrester article referred to in paragraph 4.5

CORD116828

BSC-SJA-1625

restenosis." This statement is technically correct, but in fact, most researchers at the time focused on two aspects - the risk of thrombosis and the induced proliferation of smooth muscle cells. Because of that, the majority of the research was directed to identifying anti-thrombotic or anti-proliferative drugs in suitable carriers that would deliver the drug at the correct rate in an effective dosage to treat the disease. To the extent that Professor Cumberland's statements suggest that researchers at the time were spending most of their efforts trying to identify which types of drugs or which pathways (other than thrombosis and proliferation) should be targeted, I disagree.

### Section 6 - Systemic and local approaches to treating restenosis

8.  In Section 6.2, Cumberland provides a list of categories of drugs that were thought to act on specific stages of the restenotic process in 1993. While I agree that all of the classes were of theoretical interest, some were given more attention than others in 1993 for local delivery on stents. As mentioned above, the anti-coagulants/anti-thrombotics and the anti-proliferatives were the subject of the most attention for local stent delivery. The lipid lowering agents were only really considered for systemic therapy, and would have been of less research interest on a drug-eluting stent at that time (although since 1993 there may have been some work with local delivery of these agents). In 1993, it is my recollection that less attention was given to drugs that were exclusively anti-platelet agents or vasodilators (calcium channel antagonists), although I was aware of one group[3] which was working with forskolin, a drug with combined anti-platelet and vasodilator activity.

9.  I have also reviewed Annex DCC10, which describes reports of systemic delivery of agents. Since the reports did not deal with local delivery, they were not necessarily directly relevant to drug eluting stent research. Some of the drugs mentioned would not be appropriate for local delivery in any event such as lipid lowering agents, and some would be of little interest for local delivery, such as strict anti-platelet agents.

10. In Section 6.2(g), Professor Cumberland refers to molecular biology based agents (anti-sense oligonucleotides, antibodies and gene therapy oligonucleotides), which apparently reflects his own research interests at the time. He also emphasizes this approach in Sections 6.3 - 6.8. While I agree

---

[3]   One of their publications is referred to in paragraph 7.12 of Professor Cumberland's report.

CORD116829

B8C-SJA-1626

that molecular biological therapeutics were (and continue to be) intriguing, my recollection is that they were not "mainstream" in 1993. There were few if any approved molecular biology based products of any sort in 1993, and, as far as I knew, not a single approved anti-sense or gene therapy drug existed for any indication, and no proof of principle of an anti-sense therapy or gene therapy in a human in clinical trials at that time (for any indication). The earliest antibody-based product in the cardiovascular field (Reopro – an anti-platelet drug) was not approved until after 1993.

11. As regards research into local delivery at this time, I agree with paragraph 7.2 of Professor Cumberland's report, that there was a lot of research into local delivery.

12. Each of the papers relating to local delivery referred to in paragraphs 7.3 to 7.12 of Professor Cumberland's report were well known by the research community in 1993 and I recall reading each of them. A number of the papers (Wolinsky and Thung at para 7.3; Gimple at 7.6; Muller at 7.8; and Wilensky at 7.9) discussed local application by perforated balloon. This means of local delivery suffered not only from the fact that the balloon could only remain inflated and delivering drug for a matter of minutes, but also from the fact that the drug might not be retained at the site for sufficient time to act (as is reported in Wilensky's paper).

13. The Villa (at 7.10) and Simons (at 7.11) papers related to surgical implantation of polymers or gels that eluted drugs, both of which appeared to prevent experimental "restenosis". The Ebecke (at 7.4) paper investigated the elution rates of certain polymers rather than investigating the effect of the drugs on restenosis.

14. In relation to the Cox abstract at 7.5, Professor Cumberland reports the result of the study without mentioning the authors' own interpretation of their data in the full paper, "Effect of local delivery of heparin and methotrexate on neointimal proliferation in stented porcine coronary arteries", in Coronary Artery Disease 1992, 3:237-248. Cox reported that neither heparin nor methotrexate provided significant results against restenosis when delivered from a proprietary cellulose polymer coating on a stent. In Table 1 of the Cox paper, it is seen that approximately 90% of the drug was released in the first hour, and then 10% over the next three weeks. The authors interpreted their results by noting that 'effort on concentrating this drug and improving delivery by changing polymer

4

CORD116830

BSC-SJA-1627

design or delivery surface area may produce more neointimal inhibition with methotrexate in vivo than noted in our study." The failure of Cox to observe an effect with methotrexate appears to be a drug delivery problem. The ability of methotrexate to treat restenosis when delivered from a stent was confirmed in 2004 by Huang et al. (Heart 2004 90: 195-199) (a copy of which is at exhibit CDKR.8) who demonstrated that stents coated with a biological polymer, SAE, containing methotrexate effectively reduced neointimal hyperplasia (restenosis) in a porcine coronary stent model. In the Huang model, 90% of the methotrexate was released over one week instead of over one hour (Cox) with positive results.

15. Taking all of the papers referred to by Professor Cumberland in this section, there is nothing in the papers which would have discouraged investigations into anti-proliferative drugs on a stent. Indeed, the Cox paper specifically suggests that further work with more potent agents and better delivery machinery may well produce an effective result.

16. In paragraph 8.6 Professor Cumberland suggests that in 1993 the work on local delivery was viewed as a "history of disappointments". I cannot agree. First, as of 1993, researchers had been working on drug-eluting stents for only a few years, and therefore, there was not time to accumulate a "history of disappointments." This was a new field that was evolving quickly. There was great enthusiasm about the potential of drug-eluting stents as indicated by discussions at conferences (see Sections 26-30 of my first Expert Report). Second, the field was sufficiently new that each failure was a learning experience in drug delivery design, and not some sort of omen that the field was doomed to failure. As one example, my work on heparin coated stents led me, and I believe others, to the conclusion that a water soluble drug is not preferred and we should be looking at lipophilic drugs. The Cox work suggested that the polymer/drug interaction can be crucial to the rate of delivery of the drug, and thus the success of the device. This suggested that if one polymer did not provide adequate release kinetics, one should try another polymer. The fact that one group could fail while a later group succeeded with the same drug suggests that technique and design, not necessarily the drug, were the keys to success.

17. The scientific response to any unsuccessful trial is to identify why it was unsuccessful and to learn from it so that appropriate changes can be made with

5

CORD116831

BSC-SJA-1628

a view to achieving better results. This is indeed what happened. Systemic delivery of anti-proliferatives in animals gave encouraging results with a number of different drugs. Trials using systemic delivery in humans were unsuccessful, but an analysis of the reasons for this led to a new focus on local delivery, which, with both rapamycin and taxol, has ultimately proven successful. Accordingly, I do not think Professor Cumberland's statement in paragraph 8.6 is a fair representation of the general feeling at the time. Local delivery of anti-thrombotic and anti-proliferative drugs to prevent and treat restenosis was still by far and away the mainstream area of research in this field at the time. The general sense in the field was not that stent-based delivery was the only likely approach to succeed; more researchers were involved in research on, and probably thought that the answer lay with, local delivery by balloon. Nevertheless, as I said in paragraph 52 of my first report, several groups were working on delivery of drugs via stents. The community generally was aware of the challenges, which primarily rested in successful drug delivery, which involved finding the correct drug/polymer combination.

### Expert reports of Professor Alan Hilary Calvert dated 29 July 2005 and Nicholas Robert Lemoine dated 27 July 2005

18.   In my first report, I indicated that if given Wolff, I would have consulted an oncologist or other person familiar with cancer drugs to obtain information on what anti-replicate drug to test on a stent to treat restenosis. When I submitted my Report, I had not read the Expert Report submitted by Nicholas Lemoine. I read Dr. Lemoine's statement and Dr. Calvert's statement at the same time and was therefore was able to assess them in light of each other. In general, I note that when speaking to experts in a field that I am not trained in, I take the most reasonable suggestions from each person I speak to in light of my own goals, and dismiss the suggestions that don't make sense to me or are not in line with the current thinking in the field I am working in. I try to create a synthesis of the best ideas of each contributor. If I had spoken to both Professor Calvert and Professor Lemoine at the relevant time, I would have combined their suggestions to arrive at a proposed course of action, which I discuss below.

19.   At a high level, Professor Calvert's report appeared to me to be somewhat negative and not quite the tone I would expect when talking with a proposed collaborator about potential research areas. It also appeared to me that, while he had read Wolff, he had formed his own view as to the value of Wolff's

CORD116832

BSC-SJA-1629

teaching and did not have an understanding of the general thinking in the field of interventional cardiology. In particular, the fact that he repeatedly rejected anti-proliferative drugs as possible options to prevent restenosis tells me that his advice was out of step with the thinking in the field at the time. In addition, his strong emphasis on the systemic side effects of potential drugs suggests that he was not sufficiently focusing on the fact that the drug would be delivered locally, and in fact the motivation for local delivery was in part to avoid the concerns that he had. We knew that the drugs would be delivered locally at dosages which were exponentially lower than systemic dosages, and in certain respects, incapable of or at low risk of inducing the systemic effects that he referred to.

20. If I had received the advice which Professor Calvert gives, I would have explained to him that anti-proliferatives had by that time been given systemically in animals, and had been shown successfully to prevent neointimal hyperplasia in animal models studying the problems of restenosis. There had also been certain promising results using anti-proliferative drugs locally. Some drugs had worked in animal models, and so there was good reason to think (as Wolff says) that such drugs might well work with local administration if the dose and method of delivery could be refined, so that the systemic dose would be extremely small even though the local dose could be high enough to be effective. This is my recollection of the current thinking in 1993.

21. In the field of stents, the main research effort at the time had been directed to suitable polymer systems, and very little work had been done on dosage. It was appreciated that the loading of drug on a stent was likely to vary depending on the drug and the polymer system, but it was accepted that the total dose on a stent would be in the region of tens or hundreds of micrograms, and this quantity would be designed to be eluted over a period of time ranging from as little as a week to the 4 months mentioned by Wolff. This is what I would have told the cancer specialist in 1993 when seeking advice as to which drugs to consider for use on a stent.

22. Professor Lemoine's report meshes more with what I would have expected from his interaction with a cardiologist and the positive tone is more what one would expect from an academic collaborator. He also appeared to appreciate the potential advantage of selecting a lipophilic drug. Professor Calvert did not mention the drug's solubility characteristics in his selection criteria.

7

CORD116833

BSC-SJA-1630

23.   Had I been in a collaboration, in 1993, with an oncologist or other cancer specialist with a view to developing a drug-eluting stent for the treatment of restenosis, the areas I would have wanted to explore with him would have been in relation to the effectiveness of the drug (if known) on the proliferation and migration of vascular smooth muscle cells and endothelial cells. I would also want to know about the drug's lipophilicity, as I knew from the general experience with heparin and methotrexate that water soluble drugs are harder to deliver into a blood vessel wall. I would also have wanted to know about its half life in tissue (as opposed to plasma), whether there would be general tissue or receptor binding in the vessel wall, and how fast it is metabolised in tissue.

24.   When listening to information about a potential drug candidate from an expert, I would have created three lists, one for positive attributes of the drug, one for negative attributes of the drug that would have to be evaluated during preclinical and clinical trials but which would not dissuade me from proceeding with the drug, and a third list with negative attributes that would eliminate the drug from further consideration.

25.   Professor Lemoine suggested the use of taxol and Professor Calvert admonished against its use. I would have to have balanced the comments of both experts to reach a conclusion on what to do, by considering each "pro" and "con" and then categorizing each in one of the three lists described above.

26.   In the positive list for taxol, would be that (i) it acts to inhibit cell proliferation; (ii) it acts to inhibit cell migration; (iii) it was not directly toxic to the heart muscle (unlike, for example, adriamycin and 5 fluorouracil); (iv) it was known to be lipophilic; and (v) it was generally considered to be of low toxicity.

27.   Professor Calvert listed a number of reasons why he would eliminate taxol from consideration in Paragraph 7.7(i) but after evaluation I would have placed these in the list of issues to watch out for during preclinical and clinical trials but which would not stop me from trying the drug. He first indicates that taxol had been associated with cardiac disturbances. This is something which I believe any cardiologist would have wanted to know more about, and I would probably have tried to find out what the experience had been regarding cardiac disturbances in clinical trials on taxol.

28.   I have read the Rowinsky paper cited by Professor Calvert at exhibit ACH.5 ("Rowinsky 1992"), and also the paper 'Cardiac Disturbances During the

8

CORD116834

BSC-SJA-1631

Administration of Taxol by Rowinsky et al (J Clin Oncol 9: 1704-1712 (September 1991) ("Rowinsky 1991") (a copy of which is at CDKR.9), which is referenced in that paper.

29. In Rowinsky 1991, Rowinsky reported the observation of certain cardiac disturbances in patients taking taxol in combination with cisplatin or alone. In Rowinsky 1992, a review article a year later, Rowinsky described and interpreted his 1991 results as follows (page 650) (emphasis added):

> Cardiac rhythm disturbances have also been observed but the clinical significance is not yet known. The most common effect, a transient asymptomatic bradycardia, was noted in up to 29% of patients with ovarian cancer in one Phase II trial. Asymptomatic bradycardia is not an indication for discontinuing taxol. More significant bradyarrhythmias have also been noted, including Mobitz I (Weckebach syndrome) and Mobitz II atrioventricular (AV) blocks. More profound AV blocks culminating in third degree block, requiring placement of a cardiac pacemaker or external cardiac pacing have also been reported. In addition, a fatal myocardial infarction and atypical chest pains have occurred during taxol infusions. Asymptomatic bundle branch block and short runs of spontaneously resolving ventricular tachycardia have also been noted in patients treated with taxol alone or with the combination of taxol with cisplatin. These cardiac rhythm disturbances have been documented in trials where continuous cardiac monitoring was performed. However, the background incidence of these arrhythmias in a similar population that was not treated with taxol is unknown. Nevertheless, once these problems were documented, most trials limited eligibility to patients without a history of congestive heart failure, angina, myocardial infarction within the past six months, or cardiac conduction abnormalities and to those who were not taking medications known to alter cardiac conduction (e.g., digoxin, propranolol, and calcium channel blockers).

30. Rowinsky 1992 also noted (page 658) that "Studies to determine the precise origin (eg, taxol, Cremophor EL, and H₂-histamine antagonists), mechanisms, and optimal therapy for these cardiac effects would be useful."

31. Consistent with this, Rowinsky 1991 stated that "It is not clear whether taxol or its Cremophor EL formulation vehicle is responsible for these cardiac disturbances. In the case of HSRs, the Cremophor EL vehicle is known to induce histamine release, and identical reactions have been reported in patients treated with other similarly formulated drugs such as cyclosporine, didemnin B, teniposide, and intravenous vitamin K. ... One cannot absolutely exclude Cremophor EL as a contributor to the cardiotoxicity as cardiac monitoring has not been routinely performed during the administaration of other similarly formulated agents. However, it is possible that the vehicle may induce clinically

CORD116835

BSC-SJA-1632

inapparent cardiac disturbances in patients receiving these other agents that would be detected only by continuous ECG monitoring. Of note, taxol is formulated with the highest concentration of Cremophor EL per dose of all agents in clinical use." (page 1709-1710)

32. Professor Calvert refers to these observed cardiac disturbances in Paragraph 4.5 of his statement. He appears to assume that taxol caused the cardiac effects. However, as is apparent from the above passages, Rowinsky, the investigator, was not able to conclude whether taxol is the culprit or not[a] and therefore proposed only that possible effects should be monitored. This would have moved me to categorize this whole topic as "to be studied", rather than a "negative attribute which removes taxol from contention as a stent-based drug to prevent restenosis."

33. Further, although one would need to be aware of the potential for rhythm disturbances, and would need to test for them in pre-clinical and clinical work, I believe that most cardiologists would have thought that they would be unlikely as a result of the local delivery of tens or hundreds of micrograms over a number of weeks on a stent and would not use this to rule out working with taxol for local antirestenotic therapy. I understand that Professor Lemoine has noted that the cardiac events reported in connection with the administration of taxol all occurred after the administration of much higher doses than were contemplated for the use of taxol on a stent.

34. I would certainly be concerned if a drug directly damages the heart muscle. There were some drugs which were so clearly cardiotoxic that one would exclude them from a list of candidate drugs at the outset. Adriamycin (doxorubicin) is an example of such a cardiotoxic drug, which produces a cumulative toxic effect directly on the heart muscle. However, the cardiac effects mentioned by Professor Calvert and reported by Rowinsky are not of this nature.

35. Second, Professor Calvert said in paragraph 7.7(f) that taxol was still an investigational drug for all indications other than ovarian cancer in 1993, and

---

[a] Reports of at least three other Phase I studies did not report observations of serious cardiac disturbances: Holmes, "Phase II Trial of Taxol, an active Drug in the Treatment of Metastatic Breast Cancer", Journal of the National Cancer Institute, Vol 83, No. 24, December 18, 1991; Spriggs, et al, "Taxol administered as a 120 hour infusion", Investigational New Drugs 10: 275-278, 1992; and Markman, et al, "Phase I Trial of Intraperitoneal Taxol: A Gynecologic Oncology Group Study", Journal of Clinical Oncology, Vol 10, no. 9, September, 1992, pages 1485-1491. (Copies of these papers are at exhibits CDKR.10, CDKR.11 and CDKR.12, respectively)

CORD116836

BSC-SJA-1633

therefore "there was an absence of any clinical experience which meant that little was known about its long term safety profile." This statement seems odd given that taxol was approved by the FDA in December 1992 and thus had to have gone through a battery of Phase I toxicity testing for systemic administration, and was deemed by the FDA to be sufficiently non-toxic at least in cancer patients to allow administration at orders of magnitude higher levels than would be used on a stent.  Furthermore, part of the preclinical experimental strategy for drug eluting stents, then and now, includes long term studies seeking late adverse effects of the drug long after its delivery has been completed.

36.   Professor Calvert also cautioned against taxol on the basis that it would cause unacceptable hypersensitivity reactions.  I understand that Professor Lemoine has noted that there is doubt in the literature whether these reactions are indeed caused by the taxol, and that the threshold dose appears to be significantly greater than would be used on a stent.  I agree with these comments, and concern about possible hypersensitivity reactions would not dissuade me from trying taxol on a stent in an ordered series of experiments.

37.   In practice, both Professor Calvert and Professor Lemoine raise useful issues that would need to be taken into account in the further pre-clinical and clinical research with taxol in the doses to be administered on a stent.  In the end I believe that I would place the disadvantages Professor Calvert identifies on the list of issues to watch out for during further trials, and they would not stop me from trying taxol (especially in light of the published Phase I results on the systemic administration of taxol and the FDA's acceptance of the Phase I data in the Dec 1992 drug approval), although we would test for these issues as well as others.  Furthermore, there are good reasons (as explained by Professor Lemoine in his second report) why we might not expect to see these effects with local delivery on a stent.

## Kopia

38.   In paragraphs 8.14 to 8.23 of Professor Cumberland's report, he discusses the Kopia patent.  My first comment is that Professor Cumberland's view in paragraph 8.21, that Kopia "was of no discernible value in the context of angioplasty and restenosis" seems to me to be absurd.  As I said in paragraph 41 of my first report, prevention of post-angioplasty restenosis is one of the major aspects of the Kopia document - it is mentioned both in the abstract on

11

CORD116837

BSC-SJA-1634

the front page of the document, and in the first heading at the bottom of page 2. I believe that researchers in my position in 1993 would have been interested to read what drugs Zynaxis (the patentee) was proposing to use to treat post-angioplasty restenosis. Although Professor Cumberland emphasises (for example in paragraph 8.19) the fact that Kopia discusses the drug as being inactivated while in the conjugate, and only activated once it reaches the target cell, this is clearly because Kopia is delivering the conjugates systemically, and does not want the drug to act on tissues before it reaches its target. However, if the drugs he discusses were to be delivered locally on a coating on a stent, they would not need to be inactive on their way to the site of action.

39.   As regards the ranking of the drugs Kopia suggests into "primary" compounds and other compounds, a distinction Professor Cumberland makes in paragraph 8.23, I do not agree that there is any ranking in the lists of drugs which Kopia gives. Each of them seems to me to be a potential candidate for investigation.

**Katsuda**

40.   I have been provided with a copy of the abstract of Katsuda et al at the 8th International Symposium on Atherosclerosis held in Rome on October 9-13, 1988. Katsuda states:

> The proliferation of smooth muscle cells in the intima with subsequent accumulation of extracellular connective tissue matrix component is the principal feature of atherosclerosis. Therefore, suppression of their proliferation seems to be important to prevent the progression of the disease... .

> The fact that microtubule stabilization lead to inhibit initiation of DNA synthesis in cultured smooth muscle cells was proved by a series of experiments of taxol, a promoter and stabilizer of microtubules. Treatment of cells with 1-10 µM taxol completely inhibited DNA synthesis and cell growth, and resulted in a remarkable increase in cytoplasmic microtubules.

41.   I did not read the Katsuda abstract at the time nor did I attend the conference. The data suggest that taxol is useful to treat smooth muscle cell proliferation. This is exactly the sort of smooth muscle cell tissue culture data that a researcher in the field would be looking for were he or she seeking suitable drugs to try on a stent to prevent restenosis. Although there is a reference to atherosclerosis, they pertain also to restenosis, as the data are *in vitro* data relating to smooth muscle cells, important in both atherosclerosis and in restenosis.

CORD116838

BSC-SJA-1635

42.  As I indicated in paragraphs 20 and 57 of my first report, researchers in the field were aware that restenosis involved smooth muscle cell proliferation, and were aware that a potential solution to the problem was to coat a stent with a polymer that elutes an anti-proliferative drug. If the Katsuda paper was given to me or another researcher in the field, in 1993, I believe it would have led me or such researcher to place taxol on the list of potential candidates and to investigate the properties further with a cancer specialist.

**Witness Statement of Dr David Muller dated 04 August 2005**

43.  In paragraph 20 of his statement, the description of what Dr Muller did is a little unclear. It is my understanding that Dr Muller did not wrap the polymer around the stent and then insert it in an artery; rather, he placed the stent in an artery, and then wrapped the polymer around the outside of the artery (see the papers referred to in Dr Muller's footnotes 2 & 3) using a surgical procedure. This is not, therefore, stent-based drug delivery, and the doses used in this technique tend to be much higher.

44.  In paragraph 22, Dr Muller suggests that he was deterred from using anti-proliferative and anti-neoplastic drugs because of the death of three mini pigs using colchicine. This seems very odd, since colchicine has been used systemically both in animals and humans without killing them, so deaths following local delivery would be unexpected and therefore of great interest. However, Dr Muller gives no indication of what effect on the body by the colchicine caused the death of the pigs, and in the absence of any explanation, his prejudice against anti-proliferative and anti-neoplastic drugs referred to in his paragraph 26 seems overstated.

45.  Further, as indicated above, the drug in Dr Muller's mini-pig model used a larger dose of drug than on a stent, and was outside rather than inside the carotid artery. It is possible that the drug could have permeated surrounding tissue, and could for example have affected the nerves in the neck of the pigs which affected their breathing.

46.  In paragraph 25, Dr Muller suggests that "by the end of 1993, there was no scientific evidence that an anti-proliferative would work better than an anti-inflammatory or an anti-thrombotic in preventing restenosis". This, I believe, was contrary to mainstream thinking. The summary by Professor Cumberland in his exhibit DCC10 indicates that there was at least as much investigation of

CORD116839

BSC-SJA-1636

anti-proliferatives as anti-thrombotic agents, but only two trials on anti-inflammatory agents (the main work on anti-inflammatory agents took place after 1993). The work with anti-proliferatives reported by Professor Cumberland indicates that a number of them did show efficacy in animal models.

**Witness Statement of Paul Citron 30 July 2005**

47.    Mr Citron states that, despite devoting huge resources to the problem, Medtronic failed to develop a drug eluting stent that solves the restenosis problem. However, my understanding is that the project identified by Dr Muller did not proceed to testing any particular drugs because of problems with the polymer delivery system. I base this understanding on the fact that the workers identified by Dr Muller, and others, published a paper in 1996[4] (a copy of which is at Exhibit CDKR.13) reporting that all the polymers with which they were working had produced unacceptable inflammatory responses (in this their experience differed from that of the Ebecke group referred to by Professor Cumberland in paragraph 7.4 of his report, and indeed my own experience). Medtronic's main work in the early and mid 1990s was on a heparin-coated stent. I believe that this was not designed to elute heparin, but rather to have heparin bound to the stent so as to prevent thrombus formation on the stent. More recently, Medtronic invested in the anti-sense compound Resten-NG (as mentioned by Dr Hunter in his paragraph 31(c)). Medtronic's failure appears to be because, although as Dr Muller indicates they contemplated work with anti-proliferatives, the main research efforts and expenditure of resources were in other classes of drugs.

48.    As Dr Hunter reports, Medtronic has now obtained CE mark approval for a stent which elutes Zotarolimus (ABT 578). This is an anti-proliferative drug[8].

**Witness Statement of Dr William Hunter dated 04 August 2005**

49.    In paragraph 27 of his statement, Dr Hunter refers to rapamycin as "immunosuppressant". Rapamycin is primarily an anti-proliferative drug, and its immunosuppressant effect arises because it suppresses the proliferation of immune cells. It is effective against restenosis because it suppresses

---

[4]    "Marked inflammatory sequelae to implantation of biodegradable and nonbiodegradable polymers in porcine coronary arteries" by van der Giessen et al (Circulation 94(7): 1690-7 (1996)

[8]    "Effects of Rapamycin Derivative ABT-578 on Canine Smooth Muscle Cells and Endothelial Cell Proliferation", Xue et al, Preclinica, Nov/Dec 2004, Vol. 2, No. 6. (a copy of which is at Exhibit CDKR.14)

CORD116840

BSC-SJA-1637

proliferation of smooth muscle cells, although suppression of proliferating immune cells may also play a part. As mentioned in my first report, American Home Products' original patent application was filed in 1992. The first clinical trials with the CYPHER stent were in December 1999.

50.   Dr Hunter refers to the licence to Boston Scientific Corporation ("Bostson") and Cook Inc. ("Cook"). The first clinical trials of Boston's TAXUS stent were in late 2000, and of Cook's taxol eluting stent were in early 2000.

I believe that the facts stated in this report are true and I honestly hold the opinions expressed.

Dated: _____, 2005              _____

                                      Campbell David Kinsey Rogers

CORD116841

BSC-SJA-1638

<u>HC 2005 No C 00375</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>CHANCERY DIVISION</u>
<u>PATENTS COURT</u>

B E T W E E N:

CONOR MEDSYSTEMS INC.

<u>Claimant</u>

-and-

(1) ANGIOTECH PHARMACEUTICALS INC.
(2) THE UNIVERSITY OF BRITISH COLUMBIA

<u>Defendants</u>

---

EXPERT REPORT OF PROFESSOR
CAMPBELL DAVID KINSEY ROGERS

---

Simmons & Simmons
One Ropemaker Street
London
EC2M 9SS
Solicitors for the Claimant
9/6915-1/RBF/PMI

CORD116842

BSC-SJA-1639

# EXHIBIT 108

# REDACTED

# EXHIBIT 109

# REDACTED

# EXHIBIT 110

# THREE-YEAR FOLLOW-UP AFTER IMPLANTATION OF METALLIC CORONARY-ARTERY STENTS

Takeshi Kimura, M.D., Hiroyoshi Yokoi, M.D., Yoshihisa Nakagawa, M.D., Takashi Tamura, M.D.,
Satoshi Kaburagi, M.D., Yoshihiro Sawada, M.D., Yasukazu Sato, M.D., Hiroatsu Yokoi, M.D.,
Naoya Hamasaki, M.D., Hideyuki Nosaka, M.D., and Masakiyo Nobuyoshi, M.D.

**Abstract** *Background.* Coronary-artery stents are known to reduce rates of restenosis after coronary angioplasty, but it is uncertain how long this benefit is maintained.

*Methods.* We evaluated clinical and angiographic follow-up information for up to three years after the implantation of Palmaz–Schatz metallic coronary-artery stents in 143 patients with 147 lesions of native coronary arteries.

*Results.* The rate of survival free of myocardial infarction, bypass surgery, and repeated coronary angioplasty for stented lesions was 74.6 percent at three years. After 14 months, revascularization of the stented lesion was necessary in only three patients (2.1 percent). In contrast, coronary angioplasty for a new lesion was required in 11 patients (7.7 percent). Follow-up coronary angiography of 137 lesions at six months, 114 lesions at one year, and 72 lesions at three years revealed

a decrease in minimal luminal diameter from 2.54±0.44 mm immediately after stent implantation to 1.87±0.56 mm at six months, but no further decrease in diameter at one year (in patients with paired angiograms, 1.95±0.49 mm at both six months and one year). Significant late improvement in luminal diameter was observed at three years (in patients with paired angiograms, 1.94±0.48 mm at six months and 2.09±0.48 mm at three years; P<0.001).

*Conclusions.* Clinical and angiographic outcomes up to three years after coronary-artery stenting were favorable, with a low rate of revascularization of the stented lesions. Late improvement in luminal diameter appears to occur between six months and three years. (N Engl J Med 1996;334:561-6.)

©1996, Massachusetts Medical Society.

$S$INCE the initial report by Sigwart et al.[1] of the placement of metallic stents in coronary arteries, coronary-artery stenting has been shown to optimize the geometry of the coronary lumen after balloon angioplasty,[2,3] reducing procedural complications[4,5] and late restenosis.[6,3] Two recent randomized trials (the Stent Restenosis Study [STRESS][9] and the Benestent study[10]) comparing stenting with standard balloon angioplasty in primary focal lesions clearly demonstrated the efficacy of the Palmaz–Schatz stent in reducing the rate of angiographically detected restenosis. In the Benestent trial, there was both angiographic and clinical benefit, as reflected by a reduction in major clinical end points, especially repeated coronary angioplasty. Colombo et al.[11,12] revolutionized the technique of stent implantation by demonstrating that high-pressure balloon dilatation at the end of the procedure, with confirmation by intravascular ultrasonography of adequate stent expansion and full coverage of the lesion, was associated with a low rate of stent thrombosis without anticoagulant therapy.

Despite these promising observations, one of the uncertainties of coronary stenting concerns the long-term outcome after the permanent placement of metallic prosthetic devices.[13] To address this issue, we evaluated clinical data as well as serial quantitative angiographic information six months, one year, and three years after the placement of single Palmaz–Schatz stents in native coronary arteries.

## METHODS

### Study Patients

From June 1990 through January 1992, 160 consecutive patients underwent the implantation of a Palmaz–Schatz stent. One patient

had multiple stents, 16 patients had saphenous-vein grafts as their target lesions, and 143 patients underwent the implantation of single Palmaz–Schatz stents in 147 native coronary lesions. All the patients gave informed consent for the procedure and the follow-up treatment, which was approved by the institutional review board.

### Stent Placement and Anticoagulant Therapy

All stents were implanted with a commercially available stent-delivery system (Johnson & Johnson) by standard techniques.[5] The mean (±SD) size of the expanded balloon was 3.48±0.39 mm for vessels 3.12±0.61 mm in diameter. The final inflation pressure was 9.7±2.1 atmospheres. Procedural success was defined as the successful deployment of the stent, resulting in stenosis of less than 50 percent as measured by quantitative coronary angiography. Clinical success was defined as procedural success with no major in-hospital complications, such as death, myocardial infarction, or the need for bypass surgery. The conventional regimen of anticoagulant therapy included aspirin, dipyridamole, dextran, heparin, and warfarin and has been described in detail elsewhere.[8]

### Clinical Follow-up

Clinical follow-up data were obtained by either a review of the hospital records or telephone contact with the patients or their referring physicians. The major clinical events studied were death, myocardial infarction, bypass surgery, revascularization of the target lesion, and coronary angioplasty of nonstented lesions. Death was defined to include death from any cause. Myocardial infarction was defined as an increase in serum creatine kinase activity to more than twice the normal value, in association with new, pathologic Q waves. In the event of "bailout" stenting when there was abrupt closure of the lumen, an elevation in creatine kinase was not considered to constitute a stent-related myocardial infarction if the procedure resulted in the restoration of grade 3 flow according to the criteria of the Thrombolysis in Myocardial Infarction trial.[14] Bypass surgery was defined as any surgical revascularization, even if the stented segment was patent. Revascularization of the target lesion was defined as either bypass surgery or balloon angioplasty involving the stented segments. Clinical follow-up events were studied according to the intention-to-treat principle. In-hospital events were included in the analysis of follow-up events. Repeated balloon angioplasty for subacute stent thrombosis was considered to constitute revascularization of the target lesion.

### Angiographic Follow-up

According to the study protocol, follow-up angiography was to be performed six months, one year, and three years after the procedure.

From the Department of Cardiology, Kokura Memorial Hospital, 1-1 Kifune-machi, Kokurakita-ku, Kitakyushu, 802, Japan, where reprint requests should be addressed to Dr. Nobuyoshi.

Downloaded from www.nejm.org on November 6, 2008 . For personal use only. No other uses without permission.
Copyright © 1996 Massachusetts Medical Society. All rights reserved.

BSC-SJA-1647

THE NEW ENGLAND JOURNAL OF MEDICINE

Although many patients in the study cohort actually underwent multiple angiographic procedures within the first six months after follow-up,[3] angiograms obtained less than three months after the procedure were considered as having been obtained at six months if they revealed restenosis requiring revascularization of the target lesion; similarly, angiography performed between four and nine months after stent implantation was included among the studies done at six months. Although repeated coronary angioplasty performed to treat subacute stent thrombosis was considered revascularization of the target lesion in the analysis of clinical follow-up data, subacute stent thrombosis was not considered to constitute angiographic restenosis, because the underlying mechanisms seemed to be different. Therefore, lesions that underwent successful revascularization for subacute stent thrombosis were considered to be eligible for subsequent angiographic follow-up. The 1-year follow-up studies were defined as those performed between 10 and 18 months, and the 3-year follow-up studies as those performed after 27 months.

Quantitative angiographic analysis was performed with the commercially available Cardiovascular Angiography Analysis System II.[15] The view showing the most stenosis after stent implantation but with no substantial overlapping of the study vessel with other branches and no foreshortening was selected from among multiple projections. Quantitative analysis of the control and follow-up angiograms was performed in nearly identical views, with an intracoronary injection of 2.5 to 5 mg of isosorbide dinitrate administered before each study. Catheters that did not contain contrast medium were used for calibration whenever possible. Proximal and distal reference points were defined by the operator before the intervention, and the length of the lesion, minimal luminal diameter, reference diameter (as derived by interpolation), and percentage of stenosis between those points were calculated by the computer. In the post-intervention and follow-up studies, the same reference points were selected by the operator, and the minimal luminal diameter between the two points was determined by the computer even when the most severe narrowing was outside the stent. Restenosis was defined as stenosis of 50 percent or more observed at follow-up.

To assess intraobserver variability and the reproducibility of the quantitative angiographic analysis, 30 randomly selected pairs of follow-up angiograms obtained at six months and three years were analyzed, with the observer kept unaware of when the angiogram had been obtained. The variations in the readings of minimal luminal diameter were $0.002 \pm 0.11$ mm for the six-month studies and $0.003 \pm 0.11$ mm for the three-year studies; the correlation coefficients for repeated measurements were 0.98 at six months and 0.98 at three years ($P<0.001$ for both).

### Statistical Analysis

Values are expressed as means ±SD. Categorical variables were compared by the chi-square test. Paired numerical data obtained by serial angiography were compared by the paired t-test, and other continuous variables by the unpaired t-test. Linear regression analysis was used to assess the reproducibility of quantitative angiography and predictors of long-term increase in luminal diameter. Rates of event-free survival were studied with Kaplan–Meier analysis.[16] All tests of significance were two-tailed, and P values of less than 0.05 were considered to indicate statistical significance.

## RESULTS

### In-Hospital Outcome

The base-line characteristics of the patients and the coronary lesions are shown in Table 1. Among the 143 patients (with 147 coronary lesions), 139 patients (97.2 percent) and 143 lesions (97.3 percent) underwent successful stent implantation. There was clinical success in 135 patients (93.0 percent). The major complications included death in three patients (2.1 percent), myocardial infarctions with Q waves in seven (4.9 percent), and non–Q-wave myocardial infarctions in three patients

**Table 1. Base-Line Characteristics of the Patients and Lesions.**

| CHARACTERISTIC | VALUE |
|---|---|
| **Patients** | |
| No. | 143 |
| Mean (±SD) age — yr | 62.6±9.8 |
| Sex — M/F | 112/31 |
| Extent of coronary artery disease — no. (%) | |
| Single-vessel disease | 67 (47) |
| Multivessel disease | 63 (45) |
| Prior bypass surgery | 11 (8) |
| Prior myocardial infarction — no. (%) | 78 (55) |
| Left ventricular ejection fraction <40% — no. (%) | 19 (13) |
| Class III or IV angina — no. (%) | 70 (49) |
| Diabetes mellitus — no. (%) | 33 (23) |
| Multilesion balloon angioplasty — no. (%) | 37 (26) |
| **Lesions** | |
| No. | 147 |
| Artery affected — no. (%) | |
| Left anterior descending coronary | 67 (46) |
| Right coronary | 54 (37) |
| Circumflex coronary | 16 (11) |
| Left main coronary | 10 (7) |
| Restenosis — no. (%) | 67 (46) |
| Calcification — no. (%) | 46 (31) |
| Ulceration — no. (%) | 48 (33) |
| Ostial stenosis — no. (%) | 17 (12) |
| Circumstances of stent placement — no. (%) | |
| Planned | 105 (71) |
| Unplanned | 42 (29) |
| Suboptimal | 22 (15) |
| To treat abrupt closure | 20 (14) |

(2.1 percent). Emergency bypass surgery was not needed to treat any patient. Bleeding complications requiring either surgery or blood transfusion were observed in four patients (2.8 percent). Six patients (4.2 percent) had subacute thrombosis of the stent between three and seven days after stent implantation; five of these patients underwent successful revascularization and were discharged with patent stents. Therefore, including those 5 patients (with 140 lesions) who survived to discharge with patent stents were eligible for the six-month angiographic follow-up.

### Clinical Follow-up

The cumulative survival rates were 93.7 percent one year after implantation of the stent, 92.2 percent after two years, and 90.8 percent after three years (Fig. 1). Besides the three patients who died in the hospital, six additional patients died during the first 14 months (Table 2). One patient who had previously had bypass surgery and in whom bailout stenting for the circumflex coronary artery was unsuccessful died of cardiogenic shock due to occlusion of the venous graft to the left anterior descending coronary artery. One patient died of congestive heart failure that was presumably related to restenosis of the stented lesion. Two patients died suddenly, although angiography at six months confirmed that they did not have restenosis. Two other patients died from noncardiac causes (meningitis and an accident). Four additional patients died after 14 months from definite noncardiac causes (renal fail-

Downloaded from www.nejm.org on November 6, 2008 . For personal use only. No other uses without permission.
Copyright © 1996 Massachusetts Medical Society. All rights reserved.



BSC-SJA-1648



EVENT AND NO. AT RISK

| | | | | |
|---|---|---|---|---|
| Death (□) | 143 | 132 | 128 | 117 |
| Death, myocardial infarction, or bypass (□) | 143 | 124 | 118 | 107 |
| Above events or target-lesion revascularization (○) | 148 | 113 | 106 | 97 |

Figure 1. Kaplan–Meier Curves for Event-free Survival in the Study Patients.

The number of patients at risk for each event or combination of events is shown below the graph for each time point. The percentages in the figure are the event-free survival rates at three years (indicated by the vertical line).

ure in one, subarachnoid hemorrhage in one, and cancer in two).

The rates of survival free of myocardial infarction, bypass surgery, and revascularization of the target lesion were 80.4 percent at one year, 76.8 percent at two years, and 74.6 percent at three years (Fig. 1). Revascularization of the target lesion was performed in 24 patients (16.8 percent). However, when repeated coronary angioplasty related to subacute stent thrombosis was not counted, the rate of revascularization of the target lesion at three years was only 12.6 percent. Revascularization of the target lesion was performed in only three patients (2.1 percent) after 14 months. Two revascularization procedures were related to asymptomatic restenosis at 15 and 37 months, after the 1-year and 3-year angiography, respectively. The other case of revascularization of the target lesion was related to symptomatic restenosis at 27 months. Thus, there was only one case (0.7 percent) in which revascularization of a target lesion was performed because of clinical symptoms after 14 months. In contrast, coronary angioplasty was required for a new lesion in 11 patients (7.7 percent) after 14 months.

### Outcome of Angiographic Follow-up

Among 136 patients and 140 lesions eligible for the six-month angiographic follow-up, 133 patients and 137 lesions (98 percent) underwent angiography at six months, a mean of 184±34 days after stent implantation. Subsequently, 5 patients died

and 13 patients had revascularization of their target lesions within 12 months, leaving 122 lesions in 118 patients eligible for subsequent angiographic follow-up. One-year angiography was performed in 114 lesions (110 patients, or 93 percent) 375±32 days after implantation, and three-year angiography was performed in 72 lesions (66 patients, or 59 percent) after a mean period of 1071±103 days.

The specific reasons for the failure of patients to undergo angiography after three years were refusal by either the patient or the referring physician (in 36 asymptomatic patients), death (in 3), repeated angioplasty after the one-year angiography (in 3), concomitant medical problems (in 2), and loss to follow-up (in 3). In three other patients, angiography demonstrating the absence of restenosis was actually performed at three years, but the cine films were not available for study. In an effort to compensate for the incomplete three-year data, the characteristics of patients and lesions were compared between the group that had angiography at three years and the group that did not (Table 3). Both base-line characteristics and quantitative angiographic variables at six months of follow-up were similar between these two groups.

The results of immediate and long-term quantitative angiography are shown in Table 4. Minimal luminal diameter was increased from 1.05±0.37 mm to 2.54±0.44 mm immediately after stent implantation, but by six months it had decreased to 1.87±0.56 mm. Angiographic restenosis was documented in 25 lesions (18.2 percent).

In 114 lesions for which there were paired angiograms obtained at six months and one year, there was no further decrease in minimal luminal diameter during the period from six months to one year (diameter at both study times, 1.95±0.49 mm; P=0.73) (Fig. 2A). In 72 lesions for which sequential studies were completed for up to three years, there was significant improvement in minimal luminal diameter at three years (diameter at six months, 1.94±0.48 mm; at three years, 2.09±0.48 mm; P<0.001) (Fig. 3). Among seven patients who had angiographic restenosis at six months, only one still had more than 50 percent stenosis at three years. A case of marked luminal improvement

Table 2. Frequency of Events Studied during Clinical Follow-up.

| EVENT | FOLLOW-UP PERIOD | | | | CUMULATIVE FOLLOW-UP |
|---|---|---|---|---|---|
| | 14 DAYS OR LESS | 15 DAYS TO 3 MONTHS | 9 TO 14 MONTHS | 15 TO 38 MONTHS | |
| | *no. of patients (%)* | | | | |
| Death | 3 (2.1) | 5 (3.5) | 1 (0.7) | 4 (2.8) | 13 (9.1) |
| Myocardial infarction | 7 (4.9) | 0 | 0 | 1 (0.7) | 8 (5.6) |
| Coronary-artery bypass grafting | 0 | 4 (2.8) | 0 | 1 (0.7) | 5 (3.5) |
| Target-lesion revascularization | 6 (4.2) | 12 (8.4) | 3 (2.1) | 3 (2.1) | 24 (16.8) |
| Coronary angioplasty | | | | | |
| New lesion | 0 | 5 (3.5) | 2 (1.4) | 11 (7.7) | 18 (12.6) |
| Restenosis of nonstented lesion | 0 | 10 (7.0) | 3 (2.1) | 0 | 13 (9.1) |

Downloaded from www.nejm.org on November 6, 2008 . For personal use only. No other uses without permission.
Copyright © 1996 Massachusetts Medical Society. All rights reserved.

BSC-SJA-1649

564                           THE NEW ENGLAND JOURNAL OF MEDICINE                    Feb. 29, 1996

three years after stent implantation is shown in Figure 4. Only two lesions (2.8 percent) were observed to have substantial luminal renarrowing after six months (Fig. 2B).

Late increases in luminal diameter between six months and three years were significantly correlated with early decreases in luminal diameter during the time from immediately after the procedure to the six-month follow-up (r = 0.34, P = 0.004). The index for later increase in diameter, defined as the increase in luminal diameter during the period from six months to three years after stent implantation divided by the decrease in diameter from immediately after the procedure to the six-month follow-up, was 0.27 ± 1.27. Later increases in luminal diameter at three years were also negatively correlated with minimal luminal diameter at six months (r = 0.4, P<0.001).

The formation of an aneurysm was noted on angiography at six months in one patient; at the three-year follow-up, the aneurysm had nearly the same appearance. No other potentially deleterious vascular effects were observed during the three years of follow-up.

## DISCUSSION

This study was designed to evaluate the long-term safety and efficacy of the placement of metallic stents in

Table 3. Comparison of Patients and Lesions Studied Angiographically at Three Years with Those Not So Studied.

| CHARACTERISTIC | ANGIOGRAPHIC STUDIES AT 3 YR* | | P VALUE |
|---|---|---|---|
| | YES | NO | |
| **Patients** | | | |
| No. | 68 | 50 | — |
| Age — yr | 61.4±8.7 | 63.9±9 | 0.15 |
| Sex — M/F | 54/14 | 38/12 | 0.66 |
| Multivessel disease — no. (%) | 37 (54) | 23 (46) | 0.51 |
| Prior myocardial infarction — no. (%) | 38 (56) | 25 (50) | 0.53 |
| Left ventricular ejection fraction <40% — no. (%) | 8 (12) | 5 (10) | 0.76 |
| Class III or IV angina — no. (%) | 33 (49) | 22 (44) | 0.63 |
| Diabetes mellitus — no. (%) | 14 (21) | 11 (22) | 0.76 |
| **Lesions** | | | |
| No. | 72 | 50 | — |
| Artery affected — no. (%) | | | 0.36 |
| Left anterior descending coronary | 33 (46) | 24 (48) | |
| Right coronary | 30 (42) | 19 (38) | |
| Circumflex coronary | 8 (11) | 3 (6) | |
| Left main coronary | 1 (1) | 4 (8) | |
| Restenosis — no. (%) | 31 (43) | 25 (50) | 0.45 |
| Circumstances of stent placement — no. (%) | | | 0.63 |
| Planned | 52 (72) | 37 (74) | |
| Unplanned | 20 (28) | 13 (26) | |
| Minimal luminal diameter at 6 mo — mm | 1.94±0.48 | 2.0±0.5 | 0.58 |
| Percent stenosis at 6 mo | 35.3±11.1 | 34.8±13.1 | 0.81 |

*Plus–minus values are means ±SD.

Table 4. Immediate and Long-Term Results of Quantitative Angiography.*

| VARIABLE | TIME ANGIOGRAPHY PERFORMED | | | | |
|---|---|---|---|---|---|
| | BEFORE PROCEDURE | AFTER PROCEDURE | 6 MO | 1 YR | 3 YR |
| **Lesions studied at 6 mo (n = 137)** | | | | | |
| Length (mm) | 8.02±3.56 | — | — | — | — |
| Reference diameter (mm) | 3.12±0.61 | 3.41±0.51 | 3.04±0.59 | — | — |
| Minimal luminal diameter (mm) | 1.03±0.37 | 2.54±0.44 | 1.87±0.56 | — | — |
| Percent stenosis | 65.3±12.3 | 25.3±9.3 | 38.1±15.1 | — | — |
| Restenosis rate (%) | — | — | 18.1 | — | — |
| **Lesions studied at 1 yr (n = 114)** | | | | | |
| Reference diameter (mm) | 3.14±0.61 | 3.42±0.52 | 3.03±0.56 | 3.03±0.56 | — |
| Minimal luminal diameter (mm) | 1.05±0.38 | 2.57±0.44 | 1.95±0.49 | 1.95±0.49 | — |
| Percent stenosis | 63.7±12.7 | 24.7±8.7 | 35.4±12.2 | 35.6±11.6 | — |
| **Lesions studied at 3 yr (n = 72)** | | | | | |
| Reference diameter (mm) | 3.14±0.58 | 3.39±0.56 | 3.02±0.57 | 3.00±0.54 | 3.03±0.56 |
| Minimal luminal diameter (mm) | 1.00±0.40 | 2.55±0.46 | 1.94±0.48 | 1.95±0.46 | 2.00±0.48 |
| Percent stenosis | 67.6±12.3 | 24.6±7.8 | 35.3±11.1 | 34.8±10.5 | 30.9±11.2 |

*Plus–minus values are means ±SD.

coronary arteries. Quantitative angiographic outcome at three years was analyzed, as well as clinical outcome, to establish late patency of the stent and confirm the absence of deleterious angiographic findings related to stent implantation.

In this study, the patients' rate of survival free of myocardial infarction, bypass surgery, and revascularization of the target lesion was 80.4 percent at one year, a figure similar to the values of 80.5 percent in the stent group studied in the STRESS[9] trial at eight months and 79.9 percent in the corresponding group in the Benestent[10] trial at seven months; apparently, this was a higher rate than has been attained with other interventional devices. Detre et al.[17] reported an event-free survival rate of 66 percent one year after standard balloon angioplasty; in the Coronary Angioplasty versus Excisional Atherectomy Trial,[18] this rate was 66.1 percent one year after balloon angioplasty and 63.5 percent after directional coronary atherectomy. The favorable clinical outcome noted at one year in the present study remained at three years (74.6 percent event-free survival). Schömig et al. reported a similarly slow decline in event-free survival during the period from one to two years after Palmaz–Schatz coronary stenting.[5] The low rate of events beyond one year associated with coronary stenting compared well with that reported for balloon coronary angioplasty.[17,19] In accordance with the favorable long-term clinical outcome, serial quantitative coronary angiography performed for up to three years demonstrated no further decline in minimal luminal diameter during the period six months after coronary stenting, a finding similar to those of previous studies with follow-up periods of up to one year.[20,21] The length of this period free of restenosis compared well with those we observed with balloon coronary angioplasty.[22] Thus, it is unlikely that coronary stenting simply delayed clinical restenosis instead of preventing it. Although we noticed the formation of an aneurysm in one patient, we did not observe any

Downloaded from www.nejm.org on November 6, 2008 . For personal use only. No other uses without permission.
Copyright © 1996 Massachusetts Medical Society. All rights reserved.



BSC-SJA-1650



**Figure 2. Minimal Luminal Diameters of the Study Vessels Six Months after Stent Implantation, as Compared with the Diameters Measured at One Year (Panel A) and Three Years (Panel B).**

At the one-year follow-up, the values for all the lesions, including those that later underwent revascularization, were clustered along the line of identity, indicating little change from the six-month values. The mean (±SD) change in minimal luminal diameter during this period was a decrease of 0.002±0.24 mm. Mean minimal luminal diameter at three years was increased by 0.15±0.36 mm from the diameter measured at six months. Only two lesions decreased substantially in minimal luminal diameter during this interval.

other potentially deleterious angiographic findings suggestive of late migration of stents, metal fatigue, or endarteritis.

This study demonstrated late regression of lesions more than six months after coronary stenting, as detected by well-validated quantitative coronary angiography. Restenosis inside the stent has been reported to be due to neointimal hyperplasia in studies in animals[23,24] and also in the autopsy report of a human[2] and in a study using intravascular ultrasonography.[25] Schatz et al.[25] demonstrated regression of intimal hyperplasia inside the stent over time in a study in animals. In a study of disease in humans, we showed a decrease in the extracellular matrix of the newly proliferating intima and subsequent fibrotic change during the first two to three years after balloon angioplasty.[26] Therefore, fibrotic maturation of the intimal hyperplasia inside the stent may be one of the mechanisms of the observed improvement in the lumen at three years.

We could not address the issue of changes in the diameter of the stent over time as evidence of the compression or expansion of the stent itself, because the extremely radiolucent nature of the Palmaz–Schatz stent precluded accurate angiographic quantitation of stent diameter in most patients. However, a recent serial study using intravascular ultrasonography revealed no significant change in the cross-sectional area of the metallic slotted-tube stent during four months of follow-up after implantation.[37] It is unlikely, therefore, that changes in the diameter of a stent play an important part in either restenosis or late regression of the lesion.

In this study, late increases in luminal diameter (during the period from six months to three years after implantation) were significantly correlated with early de-

creases in diameter (during the period from immediately after the procedure to the six-month follow-up), suggesting that the earlier intimal hyperplasia occurs, the greater the potential for late regression. These data imply that when a relatively small lumen is found six months after coronary stenting, it may safely be observed, without repeated coronary intervention, unless the patient is highly symptomatic. Asymptomatic restenosis has been reported to occur frequently, with a good prognosis, in patients with negative exercise tests after balloon angioplasty,[28] directional coronary atherectomy, or Palmaz–Schatz coronary-artery stenting.[29] Given the low incidence of angiographically detected restenosis, the need for angiographic follow-up after each implantation of a single stent in a native coronary artery must be seriously questioned in clinical practice.

This study has several important limitations. This series of patients represented our very early experience with stent implantation, and current modifications of the technique (with high-pressure dilatation at the end of the procedure) and the regimen of anticoagulant therapy (with the use of more potent antiplatelet agents) would probably improve the clinical outcome. On the other hand, extending the application of coronary-artery stenting to longer lesions, smaller arteries, or both might produce a different clinical and angiographic outcome. Our study did not include a comparison group of patients who underwent standard balloon



**Figure 3. Serial Changes in the Mean (±SD) Minimal Luminal Diameter of 72 Lesions for Which Sequential Studies over a Three-Year Period Were Completed (●), as Compared with a Reference Diameter (○).**

There was significant improvement in minimal luminal diameter during the period from one year to three years after implantation of the stent. P<0.001 for the comparison between the points linked by brackets.

Downloaded from www.nejm.org on November 6, 2008 . For personal use only. No other uses without permission.
Copyright © 1996 Massachusetts Medical Society. All rights reserved.

**BSC-SJA-1651**



**Figure 4. Angiograms Showing Marked Luminal Improvement in a Patient after Three Years.**

Coronary-stent implantation was performed electively in this patient for a primary lesion of the left anterior descending coronary artery. The minimal luminal diameter of the vessel improved from 0.66 mm before the intervention (upper left) to 2.63 mm immediately after the implantation of the stent (upper right). At six months (lower left), the diameter had decreased to 1.49 mm, but at three years (lower right), it had increased to 2.31 mm.

angioplasty without stenting. In comparing our follow-up data with those of studies using historical controls to evaluate other interventions, one must keep in mind the differences in base-line characteristics. Also, although a well-validated system of quantitative coronary angiography was used, the analysis was not done in a core laboratory. Finally, although not all the patients returned for study after three years, base-line characteristics and quantitative angiographic variables measured after six months were similar between the group that had angiography at three years and the group that did not. Despite these limitations of the study, the safety and efficacy of the implantation of a single stent in a native coronary artery appeared to persist for at least three years.

We are indebted to the staff members of the cardiac catheterization laboratory and to Miss Tamami Shimizu for secretarial assistance.

### REFERENCES

1. Sigwart U, Puel J, Mirkovitch V, Joffre F, Kappenberger L. Intravascular stents to prevent occlusion and restenosis after transluminal angioplasty. N Engl J Med 1987;316:701-6.

2. Schatz RA, Baim DS, Leon M, et al. Clinical experience with the Palmaz-Schatz coronary stent: initial results of a multicenter study. Circulation 1991; 83:148-61.

3. Herrmann NC, Buchbinder M, Clemme MW, et al. Emergent use of balloon-expandable coronary artery stenting for failed percutaneous transluminal coronary angioplasty. Circulation 1992;86:812-9.

4. Roubin GS, Cannon AD, Agrawal SK, et al. Intracoronary stenting for acute and threatened closure complicating percutaneous transluminal coronary angioplasty. Circulation 1992;85:916-27.

5. Schomig A, Kastrati A, Mudra H, et al. Four-year experience with Palmaz-Schatz stenting in coronary angioplasty complicated by dissection with threatened or present vessel closure. Circulation 1994;90:2716-24.

6. Carrozza JP Jr, Kuntz RE, Levine MJ, et al. Angiographic and clinical outcome of intracoronary stenting: immediate and long-term results from a large single-center experience. J Am Coll Cardiol 1992;20:328-37.

7. Ellis SG, Savage M, Fischman D, et al. Restenosis after placement of Palmaz-Schatz stents in native coronary arteries: initial results of a multicenter experience. Circulation 1992;86:1836-44.

8. Kimura T, Nosaka H, Yokoi H, Iwabuchi M, Nobuyoshi M. Serial angiographic follow-up after Palmaz-Schatz stent implantation: comparison with conventional balloon angioplasty. J Am Coll Cardiol 1993;21:1557-63.

9. Fischman DL, Leon MB, Baim DS, et al. A randomized comparison of coronary-stent placement and balloon angioplasty in the treatment of coronary artery disease. N Engl J Med 1994;331:496-501.

10. Serruys PW, de Jaegere P, Kiemeneij F, et al. A comparison of balloon-expandable-stent implantation with balloon angioplasty in patients with coronary artery disease. N Engl J Med 1994;331:489-95.

11. Nakamura S, Colombo A, Gaglione A, et al. Intracoronary ultrasound observations during stent implantation. Circulation 1994;89:2026-34.

12. Colombo A, Hall P, Nakamura S, et al. Intracoronary stenting without anticoagulation accomplished with intravascular ultrasound guidance. Circulation 1995;91:1676-88.

13. Topol EJ. Caveats about elective coronary stenting. N Engl J Med 1994; 331:539-41.

14. The TIMI Study Group. The thrombolysis in myocardial infarction (TIMI) trial: Phase I findings. N Engl J Med 1985;312:932-6.

15. Serruys PW, Foley DP, de Feyter PJ, eds. Quantitative coronary angiography in clinical practice. Dordrecht, the Netherlands: Kluwer Academic, 1994.

16. Matthews DE, Farewell VT. Using and understanding medical statistics. 2nd ed. Basel, Switzerland: Karger, 1988.

17. Detre KM, Holmes DR Jr, Holubkov R, et al. Incidence and consequences of periprocedural occlusion: the 1985-1986 National Heart, Lung, and Blood Institute Percutaneous Transluminal Coronary Angioplasty Registry. Circulation 1990;82:739-50.

18. Elliott JM, Berdan LG, Holmes DR, et al. One-year follow-up in the Coronary Angioplasty Versus Excisional Atherectomy Trial (CAVEAT I). Circulation 1995;91:2158-66.

19. King SB III, Schlumpf M. Ten-year completed follow-up of percutaneous transluminal coronary angioplasty: the early Zurich experience. J Am Coll Cardiol 1993;22:353-60.

20. Kastrati A, Schomig A, Dietz R, Neumann FJ, Richardt G. Time course of restenosis during the first year after emergency coronary stenting. Circulation 1993;87:1498-505.

21. Savage MP, Fischman DL, Schatz RA, et al. Long-term angiographic and clinical outcome after implantation of a balloon-expandable stent in the native coronary circulation. J Am Coll Cardiol 1994;24:1207-12.

22. Nobuyoshi M, Kimura T, Nosaka H, et al. Restenosis after successful percutaneous transluminal coronary angioplasty: serial angiographic follow-up of 229 patients. J Am Coll Cardiol 1988;12:616-23.

23. Schatz RA, Palmaz JC, Tio FO, Garcia F, Garcia O, Reuter SR. Balloon-expandable intracoronary stents in the adult dog. Circulation 1987;76:450-7.

24. White CJ, Ramee SR, Banks AK, Mesa FU, Chokshi S, Isner JM. A new balloon-expandable tantalum coil stent: angiographic patency and histologic findings in an atherogenic swine model. J Am Coll Cardiol 1992;19:870-6.

25. Mintz GS, Pichard AD, Kent KM, et al. Endovascular stents reduce restenosis by eliminating geometric arterial remodeling: a serial intravascular ultrasound study. J Am Coll Cardiol 1993;23:36A. abstract.

26. Nobuyoshi M, Kimura T, Ohishi H, et al. Restenosis after percutaneous transluminal coronary angioplasty: pathologic observations in 20 patients. J Am Coll Cardiol 1991;17:433-9.

27. Painter JA, Wong SC, Mintz GS, Popma JJ, Pichard AD, Satler LR. Does stent recoil contribute to restenosis? A serial intravascular ultrasound study. Circulation 1994;90:I-163. abstract.

28. Hernandez RA, Macaya C, Iñiguez A, et al. Midterm outcome of patients with asymptomatic restenosis after coronary balloon angioplasty. J Am Coll Cardiol 1992;19:1402-9.

29. Gordon PC, Friedrich SP, Piana RN, et al. Is 40% to 70% diameter narrowing at the site of previous stenting or directional coronary atherectomy clinically significant? Am J Cardiol 1994;74:26-32.

Downloaded from www.nejm.org on November 6, 2008 . For personal use only. No other uses without permission.
Copyright © 1996 Massachusetts Medical Society. All rights reserved.



# EXHIBIT 111

European Heart Journal (1998) 19, 263–272

# Acute and one year follow-up results after vessel size adapted PTCA using intracoronary ultrasound

K. K. Haase, A. Athanasiadis, H. Mahrholdt, A. Treusch, B. Wullen, C. Jaramillo, A. Baumbach, W. Voelker, C. Meisner* and K. R. Karsch

Medical Clinic III, University of Tuebingen, *Institute for Medical Information Processing, Tuebingen, Germany

**Aims** Recent randomized clinical trials have reported a reduction in restenosis with intracoronary stents and have suggested that this restenosis reduction is a result of the higher immediate luminal gain, in comparison to conventional percutaneous transluminal coronary angioplasty (PTCA). The hypothesis of this study is based on the assumption that PTCA results may be optimized by determining vessel dimensions before intervention, using intravascular ultrasound. This may lead to long-term PTCA results equivalent to PTCA and the additional placement of a stent. The purpose of this prospective non-randomized single-centre study was to evaluate (1) the safety and efficacy and (2) the long-term outcome of vessel-size adapted PTCA in patients with native coronary artery obstructions.

**Methods and results** From January 1995 to December 1995 the morphological dimensions of target lesions were determined in 144 patients with 152 lesions by intravascular ultrasound prior to conventional balloon angioplasty. Quantitative assessment of the vascular dimensions was assessed on-line and the diameter of the balloon catheter was adapted to the external elastic membrane diameter at the lesion site. Using this strategy, mean balloon diameter was 4·0 · 0·5 mm and mean pressure for complete balloon

expansion was 7 · 2 atmospheres. Acute and one year follow-up results were obtained in all 144 patients. Acute events occurred in two patients (one death and one acute surgical revascularization). During one year follow-up, 18 patients (12%) had a clinical event including one cardiac death, two transmural myocardial infarctions, 10 repeat PTCAs within the target lesion and three elective coronary artery bypass grafts (CABG). In 75% (n:112) control angiography was performed and revealed an angiographic restenosis rate of 21% using the NHLBI criteria of a diameter stenosis > 50%.

**Conclusion** Intravascular ultrasound provides an accurate and precise description of vascular dimensions at the site of the stenotic lesion. The use of balloon diameters following these measurements appears to be (1) safe in the acute setting with a low number of in-hospital events and (2) gives a low restenosis rate and number of clinical events at one year follow-up. These promising results warrant verification in larger-scale randomized trials.

*(Eur Heart J 1998; 19: 263–272)*

**Key Words:** Balloon angioplasty, intracoronary ultrasound, restenosis.

## Introduction

Percutaneous transluminal coronary angioplasty is a widely used revascularization technique in patients with coronary artery disease, but is limited by a restenosis rate ranging from 30% to 50%[1–7]. Stents have been developed to improve the acute, and long-term results of coronary angioplasty. Compared to conventional balloon angioplasty, stents have demonstrated their ability to reduce restenosis in several randomized clinical trials with restenosis rates between 22% to 32% during 6

months follow-up[8,9]. The reduction in restenosis rates following stent implantation was mainly attributed to the improved luminal diameter, in comparison to conventional balloon angioplasty using quantitative angiographic analysis. However, numerous reports have shown that the assessment of vascular dimensions using intravascular ultrasound provides a more accurate measure than angiography especially in diseased vascular segments[10–16].

The safety of intravascular ultrasound with a very low rate of complications has been demonstrated previously[17,18]. It has been shown conclusively that this technique not only provides information on the extent, location, and composition of the atherosclerotic plaque but also permits exact visualization of arterial dimensions[19]. Lumen size, vessel wall morphology, and

Revision submitted 10 June 1997, and accepted 20 June 1997.

Correspondence: Karl R. Karsch, MD, FESC, FACC, University of Tuebingen, Medical Clinic III, Otfried Muelerstr. 10, 72076 Tuebingen, Germany.

0195-668X/98/020263+10 $18.00/0 hj970614

· 1998 The European Society of Cardiology



264   K. K. Haase et al.

Table 1 Baseline clinical characteristics of the 144 patients included in the trial

| Characteristic | n = 144 (%) |
|---|---|
| Age (years)* | 61 ± 9 |
| Male sex | 127 (88) |
| Female sex | 17 (12) |
| Ever smoked | 91 (63) |
| Current smokers | 15 (10) |
| Diabetes mellitus | 38 (27) |
| Myocardial infarction | 79 (55) |
| Hyperlipidaemia | 75 (52) |
| Hypertension | 68 (47) |
| Exertional angina pectoris pre PTCA (CCS class)** | |
| I | 44 (34) |
| II | 67 (44) |
| III | 28 (19) |
| IV | 5 (3) |

*Plus-minus values are means± SD; **According to the classification system of the Canadian Cardiovascular Society (CCS).

dimensions as determined by intravascular ultrasound have been shown to correlate well with histopathological post-mortem examinations[20,21]. Since the reduction in restenosis rates using stents is thought to be the result of an improved acute minimal lumen diameter, in combination with a reduction of elastic recoil, optimized, intravascular ultrasound guided PTCA might also result in a reduction of restenosis during late follow-up. However, sizing of the balloon diameters using the external elastic membrane diameter at the lesion site might result in a high rate of vascular complications due to severe dissections and may not lead to a reduction of restenosis rates, although an 'optimal' balloon angioplasty was attempted. Thus, the aim of this prospective non-randomized single-centre study was to evaluate (1) the safety and efficacy and (2) the long-term outcome of vessel size adapted PTCA of patients with native coronary artery obstructions.

## Methods

### Patients

This prospective, non-randomized single-centre trial was initiated on 3 January 1995 and completed at the end of December 1995. One hundred and forty-four patients with 152 lesions, accounting for 23% of all angioplasty patients in 1995, were included in the study. In all patients morphological dimensions of the target lesion were determined by intravascular ultrasound prior to conventional balloon angioplasty. The patients' clinical and angiographic baseline characteristics are provided in Tables 1 and 2. The specific angiographic criteria for enrolment included an at least 70% stenosis, according to the estimate of the investigator and the absence of severe vessel angulations (>90°) pre- or at the lesion site.

Reasons for study exclusion were left main stem disease, bypass graft lesions, restenotic lesions, total occlusions, type C lesions, vessel diameters of less than 2·0 mm as determined by angiography, and acute myocardial infarction. Vessel calcifications were not an exclusion criterion. Twenty-seven patients were excluded from the study, in whom the pre-interventional intracoronary ultrasound examination could not be completed with sufficient quality. The residual 144 patients had a clinical follow-up evaluation at least 12 months post-intervention with an angiographic follow-up rate of 75%.

All patients had given oral and written informed consent prior to the intervention. The protocol was approved by the Ethical committee of the University of Tuebingen.

### Procedure

Prior to the intervention, baseline angiograms of the target lesion were recorded in at least two projections. The angiograms were stored on a computer disk of the biplane digital acquisition X-ray system (DCI, Philips, Inc., Eindhoven, The Netherlands). After the guidewire was introduced in the periphery of the target vessel and before angioplasty the vessel and lesion site were visualized with an ultrasound imaging catheter (Cardiovascular Imaging Systems Inc., Sunnyvale, CA, U.S.A.). The 30 MHz, 3·2 F diameter monorail ultrasonic catheter consists of a single ultrasound transducer at the end of a flexible motor-driven shaft with a mirror at 45° that reflects the beam perpendicular to the long axis of the catheter. Continuous ultrasound images were obtained as the catheter was moved back from at least 1 cm distal to the lesion site to the proximal part of the target vessel by slow manual pull-back. The position of the ultrasound catheter was controlled by fluoroscopy and displayed on the same videoscreen as the ultrasound images, to ensure correlation between cross-sectional ultrasound images and the position of the angiogram along the length of the artery. In addition, landmarks of the artery, such as calcifications, take off of side branches or specific stenosis patterns were used for identification of intravascular catheter location. The images were recorded on super VHS videotape and stored on a computer disk. After the ultrasound images were obtained, the ultrasound catheter was withdrawn from the artery and balloon angioplasty was performed. Balloon sizing was performed by online measurements of the external elastic membrane in two perpendicular angles at the tightest lesion site as well as in the pre- and post-stenotic vessel segment. A balloon to artery ratio of 0·8 to 1 was considered to be optimal.

Before angioplasty (as the first step of the procedure), after angioplasty (as the last step of the procedure), and at follow-up (before any subsequent intervention), 0·2 mg intracoronary nitroglycerin was administered, and pre- and post-intervention a complete ultrasound imaging run was performed from beyond the target lesion to the aorto-ostial junction.

BSC-SJA-1654

## Quantitative angiographic analysis

All cineangiograms were analysed by two independent observers using the on-line analysis software QANSAD (ARRI, Munich, Germany). This method has been validated and described in detail elsewhere[22]. The outer diameter of the contrast-filled catheter was used for calibration. Minimal lumen diameter, minimal lumen cross-sectional area, percent diameter stenosis, reference diameter and reference cross-sectional area before and after the intervention were measured using multiple projections, and the results from the 'worst' view recorded[23]. The final balloon diameter was measured by using the flow chart provided by the balloon-company.

The mean variability for repeated measurements performed on different days was 0·12 mm for minimal lumen diameter and 3·8% for percent diameter stenosis.

## Quantitative and qualitative intravascular ultrasound measurements

Validation of cross-sectional measurements by intravascular ultrasound has been reported previously[24–29]. By use of computerized planimetry, the external elastic membrane diameter, minimal lumen diameter and the minimal luminal cross-sectional area were measured at the lesion site[30]. The external elastic membrane cross-sectional area (which represents the area within the border between the hypoechoic media and the echo-reflective adventitia) has been shown to be a reproducible measure of total arterial cross-sectional area[31]. When the atherosclerotic plaque encompassed the catheter, the lumen was assumed to be the physical size of the imaging catheter.

The occurrence of calcium was identified as plaque that was brighter than the reference adventitia with acoustic shadowing of deeper arterial structures. The arc of calcium was then measured with a protractor centred on the lumen. The extent of calcium deposition was considered as mild if the calcium arc occupied less then 180° of the vessel circumference. A lesion was considered as severely calcified if a calcium arc of more than 180° of the vessel circumference was present.

The same anatomical image slice was analysed before intervention, after intervention, and the differences were compared. By using one or more reproducible axial landmarks, identical cross-sectional slices could be identified for comparison. The anatomical slice selected for the serial analysis had an axial location within the target lesion at the smallest follow-up lumen cross-sectional area.

To account for reproducibility, all cross-sectional measurements were made by the same individual, who was blinded to the angiographic results. To assess reproducibility and intra-observer variability of sequential intravascular ultrasound measurements, a consecutive series of 30 pre- and post-intervention ultrasound studies were analysed at least 3 months later. This analysis included the error in repeatedly selecting the same image slice as well as the error involved in performing the cross-sectional measurements.

The differences in the pre-intervention measurements were as follows external elastic membrane cross-sectional area (0·02–0·08 mm²) and lumen cross-sectional area (0·04–1·01 mm²). The intra-class correlation coefficient[32] for repeated pre-intervention measurements of the external elastic membrane cross-sectional area was 0·98 and of lumen cross-sectional area was 0·94. The differences in the post-intervention measurements were as follows: external elastic membrane cross-sectional area (0·03–0·70 mm²) and lumen cross-sectional area (0·13–0·28 mm²). The intra-class correlation coefficient for repeated follow-up measurement of the external elastic membrane cross-sectional area was 0·99 and of the lumen cross-sectional area was 0·96.

## Definitions

### Success

Angiographic success was defined as an increase of >50% in luminal diameter with a final percent diameter stenosis of <30% and no major complications. The following criteria determined by post-interventional intravascular ultrasound were used to define a successful PTCA: (1) luminal cross-sectional area gain of at least 20% as compared to the external elastic membrane cross-sectional area and/or (2) ultrasonic evidence of a dissection creating a second lumen with an angiographically patent flow (TIMI 3) to the distal vessel segment that persisted 20 min after PTCA[27,33,34]. In this clinical situation with sufficient flow to the periphery of the target vessel, implantation of vascular stents was avoided. These criteria for intravascular ultrasound success were used in guiding the angioplasty procedure. Post-intervention angiographic evidence of dissections was defined according to the modified classification of the Heart, Lung, and Blood Institute[35].

### Complications

The occurrence of repeat PTCA, bypass surgery, Q wave myocardial infarction, and death within the study period were considered major complications. The following criteria were considered as minor complications: transient in-lab vessel closure, side branch compromise, hypotension, transient atrioventricular blocks requiring the implantation of a pacemaker and reversible vasospasm of the target vessel.

### Angiographic restenosis

The angiographic definition of restenosis was defined according to the NHLBI criterion as a follow-up diameter stenosis of >50%[36].

## Statistics

The data were collected by the Clinical Study Centre (Medical Clinic III). After the closing of the database

BSC-SJA-1655

the data were transferred to the Institute for Medical Information Processing, which performed the final statistical analysis.

Continuous variables were described by their means and standard deviations; discrete variables as counts and percentages. Missing data were excluded; the number of valid cases are given in the tables.

The incidence of major complications was determined in two ways: (1) considering all major complications and (2) considering only major complications, which had occurred as a result of restenosis or vessel occlusion at the site of the target lesion. Kaplan–Meier curves were plotted to describe the relationship between the clinical events and the time of their occurrence. Patients without end-points were censored at the time of the clinical follow-up.

To describe the change in minimal lumen diameter and in diameter stenosis from pre-PTCA to post-PTCA, and to follow-up angiography cumulative distribution curves were only plotted for patients in whom follow-up angiography had been obtained. To assess the value of intravascular ultrasound and angiography for the prediction of restenosis, the patient population was separated into two groups (with and without restenosis) and the distribution of these variables was compared using the Wilcoxon rank-sum test. Mantel–Haenszel chi-squared tests were conducted to define the optimal cut-o• for characterizing risk groups. The point with the maximum chi-square was chosen as the cut o•. All analyses were carried out using the SAS system for Windows.

## Results

### Acute clinical events

In-hospital events occurred in two patients. One patient su•ered acute vessel closure of the left anterior descending artery despite therapy with GP IIb/IIIa antagonists; the attempt to place a stent at the lesion site was unsuccessful and the patient was transferred to immediate bypass surgery. Three days post surgery this patient died due to recurrent ventricular tachycardia and emerging left ventricular failure with the signs of extensive anterior myocardial infarction. The second patient suffered early reocclusion 3 h after PTCA and underwent primary successful re-PTCA within 1 h. Because of recurrent chest pain and triple vessel disease, he underwent successful bypass surgery 2 days later without any further event.

Following PTCA, contrast angiography detected dissections in 57% and intravascular ultrasound imaging revealed dissections in 67% of the patient population. The majority of these dissections (63%) were angiographically classified as type B or C. Only 11% were classified as type D or E. On intravascular ultrasound imaging, however, 68% of the dissections were classified as severe, thus fulfilling one of the two arbitrary criteria

for acute success. None of these patients developed acute vessel closure and no vessel required the additional placement of a stent due to a severe dissection with impairment of flow (TIMI <3).

### Serial angiographic results

Overall, the pre-intervention minimal lumen diameter measured 0·50• 0·41 mm and the diameter stenosis was 82·2• 12·5%. The post-intervention minimal lumen diameter increased to 2·23• 0·58 mm, and the diameter stenosis decreased to 28·6• 12·9%. Angiographic follow-up data were obtained for 75% of the eligible patients at a time interval of 12• 1 months (range 3 to 21 months). At follow-up, there was attrition in minimal lumen diameter to 1·76• 0·81 mm (see Fig. 1), with an associated increase in diameter stenosis to 38·5• 25·1% (see Fig. 2). Thirty one target lesions (21%) were classified as restenotic lesions (see Table 3).

Univariate analysis of angiographic predictors of restenosis at the $P < 0.05$ level (minimal lumen diameter, % diameter stenosis, and reference diameter pre- and post-PTCA) showed no statistical significance for late lumen narrowing. Other predictors, which were also not significantly associated with the incidence of restenosis, included (1) vessel tortuosity (2) pre-interventional TIMI flow 3 vs 2 (3) left anterior descending artery disease (4) ostial lesion location and (5) target lesion calcification.

### Serial intravascular ultrasound measurements

Pre-intervention, the in-lesion site cross-sectional area was 1·67• 1·3 mm² which increased to 5·07• 2·45 mm² following PTCA. The minimal lumen diameter was 1·46• 0·5 mm pre-PTCA, which increased to 2·38 mm• 0·81 mm following balloon angioplasty, corresponding to a gain in luminal diameter of 0·92• 0·63 mm. External elastic membrane cross-sectional area was found to be 14·5• 6·48 mm² pre-intervention and this increased to an external elastic membrane cross-sectional area of 17·2• 7·4 mm² post-PTCA, indicating an over-extension of the stenotic vessel segment (see Table 4). The external elastic membrane diameter pre-PTCA was 4·38• 1·63 mm. The average balloon diameter was 4·0• 0·5 mm, corresponding to a balloon-to-vessel diameter (external elastic membrane) ratio of 0·84• 0·11 (see Table 5).

Table 6 lists the univariate intravascular ultrasound predictors of restenosis at the $P < 0.05$ level. Ultrasound variables that were not predictive at the $P < 0.05$ level included plaque composition (dominant soft vs fibrotic vs calcific plaque), calcium location and arc of superficial calcium, minimal wall thickness and dissections after intervention.

BSC-SJA-1656



Figure 1   Cumulative frequency distribution curves showing minimal lumen diameters measured before and after intervention and at follow-up. ♦ = pre-PTCA; * = post-PTCA; ● = follow-up.



Figure 2   Cumulative frequency distribution curves of the percentage of stenosis. Symbols as for Fig. 1.

## Long-term clinical events

All patients had a clinical follow-up after at least 12± 3 months following intervention. One patient died 4 weeks after PTCA following bypass surgery due to three-vessel disease. In 13 patients PTCA was performed (in 10 of these patients re-PTCA for restenosis at the target lesion site). Three patients had had a myocardial infarction (two in the perfusion area of the target vessel). The

cumulative event rate (including acute and follow-up events) for the total group was 18% and for the target vessel 12% (see Fig. 3).

## Discussion

The novel findings of this study are as follows: (1) the use of vessel size-adapted intravascular ultrasound

BSC-SJA-1657

268   K. K. Haase et al.

Table 2   Base line angiographic and ultrasound characteristics of the 144 patients included in the trial

| Characteristic | n=152 lesions (%) |
|---|---|
| One-vessel disease | 93 (64) |
| Multi-vessel disease | 51 (36) |
| Target lesion | |
| LAD | 99 (65) |
| LCX | 14 (9) |
| RCA | 39 (26) |
| Type of lesion | |
| A | 16 (11) |
| B1 | 49 (30) |
| B2 | 59 (59) |
| Average lesion length (mm)* | 7·68· 3·89 |
| Incidence of calcifications | 93 (61) |
| Mild | 34 (22) |
| Severe | 59 (39) |

*Plus-minus values are means· SD; LAD=left anterior descending artery; LCX=left circumflex artery; RCA=right coronary artery.

Table 3   Serial angiographic measurements, pre PTCA, post PTCA and at follow-up

| | n=152 |
|---|---|
| Reference diameter (mm)* | |
| Before angioplasty | 2·61 · 1·00 |
| After angioplasty | 2·61 · 1·01 |
| At follow-up | 2·61 · 1·01 |
| Minimal luminal diameter (mm) | |
| Before angioplasty | 0·50 · 0·41 |
| After angioplasty | 2·23 · 0·58 |
| At follow-up | 1·76· 0·81 |
| Gain | 1·75 · 0·71 |
| Late loss | 0·50· 0·90 |
| Net gain | 1·25 · 0·87 |
| Stenosis (%) | |
| Before angioplasty | 82·2· 12·5 |
| After angioplasty | 29·6· 12·9 |
| At follow-up | 30·5· 25·1 |
| Gain | 54·6· 18·6 |
| Late loss | 8·6· 2·1 |
| Net gain | 46·1· 8·1 |
| Restenosis rate (%)** | 21 |

*Plus-minus values are means· SD; **Definition of restenosis according to NHLBI criterion as a follow-up diameter stenosis of >50%; PTCA=percutaneous transluminal coronary angioplasty.

guided PTCA results in the selection of larger diameter balloons; (2) this does not lead to an increased rate of acute complications; (3) angiographic success can be achieved in the majority of cases; (4) vessel-size adapted PTCA conveyed a low 1 year clinical event rate (16%) and subsequently a reduced angiographic restenosis rate (21%).

## Procedural outcome

The high success rate of vessel-size adapted PTCA may be attributed to a number of factors. First, the luminal

Table 4   Serial intravascular ultrasound measurements pre- and post PTCA

| Parameter | Pre-PTCA | Post-PTCA | Gain |
|---|---|---|---|
| MLD (mm)* | 1·48· 0·5 | 2·38· 0·61 | 0·92· 0·03 |
| Lumen CSA (mm²) | 1·87· 1·3 | 5·07· 2·45 | 3·20· 2·6 |
| EEM (mm) | 4·38· 1·63 | 4·45· 1·16 | |
| EEM CSA (mm²) | 14·5· 6·46 | 17·2· 7·4 | |

*Plus-minus values are means· SD.
IVUS= intravascular ultrasound; PTCA=percutaneous transluminal coronary angioplasty; MLD=minimal lumen diameter; CSA= cross-sectional area; EEM=external elastic membrane.

Table 5   Procedural parameters of balloon angioplasty

| Parameter | |
|---|---|
| Dilatations (per patient)* | 1·5 · 1 |
| Dilatation time (s) | 130· 60 |
| Balloon diameter (mm) | 4·0· 0·5 |
| Balloon pressure (atm) | 7·0· 2·0 |
| Balloon/EEM ratio | 0·84· 0·13 |
| Balloon diameter/angiographic vessel diameter ratio | 1·36· 0·25 |

*Plus-minus values are means· SD; EEM=external elastic membrane.

diameter achieved by angiography (2·23· 0·58 mm¹) and by intravascular ultrasound (5·07· 2·45 mm²) prevents vessel closure despite a rather high rate of severe vessel dissections (57%). Second, the control of the procedural success, primarily by intravascular ultrasound, does not result in a higher rate of re-dilatations using higher pressures. Third, the interventions were performed by only those investigators who had extensive experience with PTCA and with intravascular ultrasound.

## Late outcome

While the reported angiographic restenosis rates (>50% diameter stenosis at follow-up) have ranged from 22% to 45% for the di· erent stents[5,9,37-40] and 13% for the heparin coated Palmaz–Schatz stent[41], the angiographic restenosis rate in this study was 21%. In our study, vessel-size adapted interventions resulted in an acute net gain of 3·4· 2·3 mm² (external elastic membrane cross-sectional area), which corresponded to a gain of 1·75· 0·71 mm by QCA criteria. These results compare favourably to previous trials with stents, which had an acute luminal gain ranging from 1·4 mm to 1·7 mm by QCA and a late loss at follow-up from 0·68 mm to 0·75 mm, associated with restenosis rates ranging from 22% to 32%[5,9]. In this study, acute luminal gain at the site of PTCA was 1·75 mm and late loss at follow-up was 0·5 mm, which was associated with an angiographic restenosis rate of 21%. This late low loss index of 0·28 and large net gain of 1·25 mm indicates that the policy of 'angiographic oversizing'



BSC-SJA-1658

Table 6    Univariate IVUS predictors of restenosis

| Variable | No restenosis (n=90) | Restenosis (n=22) | P |
|---|---|---|---|
| Reference site | | | |
|   Reference diameter (mm)* | 5·19· 0·58 | 5·39· 0·38 | 0·14 |
|   Reference CSA (mm²) | 21·30· 4·63 | 20·68· 6·18 | 0·40 |
| Pre-intervention lesion site | | | |
|   MLD at lesion site (mm) | 1·50· 0·45 | 1·46· 0·49 | 0·74 |
|   CSA at lesion site (mm²) | 1·94· 1·20 | 1·87· 1·58 | 0·52 |
|   EEM diameter (mm) | 4·62· 0·74 | 4·85· 0·81 | 0·31 |
|   EEM CSA (mm²) | 17·08· 5·41 | 19·40· 5·68 | 0·16 |
| Post-intervention lesion site | | | |
|   MLD at lesion site (mm) | 2·60· 0·47 | 2·33· 0·25 | 0·02 |
|   CSA at lesion site (mm²) | 5·75· 2·03 | 4·68· 0·80 | 0·01 |
|   EEM diameter (mm) | 4·91· 0·56 | 5·05· 0·75 | 0·44 |
|   EEM CSA (mm²) | 19·17· 4·26 | 20·59· 3·91 | 0·62 |

* Plus-minus values are means· SD .
IVUS=intravascular ultrasound; MLD=minimal lumen diameter; CSA=cross-sectional area;
EEM=external elastic membrane.



Figure 3    Kaplan–Meier survival curves for major cardiac events (death, myocardial infarction, coronary-artery bypass surgery, and repeated angioplasty). ———= per patient; – – – = per target vessel.

results in sufficient mechanical remodelling of the vessel, which enables accommodation of a rather low luminal loss and results subsequently in a low restenosis rate. The increased arterial distensibility resulting from dissection and 'overstretch' injury might also contribute to an improved long-term angiographic outcome using the vessel size-adapted technique, as compared with vessels treated with the conventional approach (see Fig. 4).

The clinical event rate during 1 year follow-up substantiates the favourable results of the QCA analysis. A clinical event rate of 12% per target vessel or 16% per patient compares favourably to trials using the con-

ventional technique of PTCA and even to those trials using stent deployment to reduce restenosis rates[2,3,8,9]. When initiating this non-randomized prospective trial we decided not to limit follow-up to 6 months but rather to extend the observation period to 12 months. The obvious problem of a longer follow-up period is the reduced rate of angiographic controls, since patients will refuse an invasive re-study when free of angina pectoris. It is well known that there is a rather limited correlation between the clinical and angiographic restenosis rate. In our study, both the clinical (16%) and the angiographic (21%) restenosis rates suggest that the approach of using

BSC-SJA-1659



Figure 4   (a) Coronary angiogram from a patient with a proximal left anterior descending artery stenosis before angioplasty. (b) After a 0·014 inch guidewire has been placed in the periphery of the target vessel, a 5·0 mm balloon (Schneider, Bypass Speedy) is positioned in the stenotic vessel segment and inflated with a pressure of 7 atmospheres over a time period of 120 s. (c) The result immediately post-PTCA shows a 20% residual stenosis with no visible dissection. (d) Control angiography 1 year following the intervention shows an excellent long-term result. (e) In the pre-interventional intravascular ultrasound images, the catheter was stuffed into the lesion; the lesion contained almost exclusively 'soft' plaque elements (the plaque elements were less dense than the reference adventitia). External elastic membrane diameter of this vessel was 5·4 mm, external elastic membrane cross-sectional area was 22·2 mm². (f) The post-interventional intravascular ultrasound image shows a cross-sectional area at the lumen site of 13 mm² indicating a sufficient luminal gain achieved by balloon angioplasty (f).

vessel size-adapted balloon angioplasty may indeed lead to a reduction in restenotic lesions. This results from the different 'healing' effects of the vessel wall, rather than pure mechanical scaffolding, as can be achieved by stents. The promising results of this study warrant verification in larger-scale randomized trials.

## Study limitations

Although this study represents a series of patients studied pre-intervention and post-intervention in whom follow-up angiography was available at a rate of 75%, it is a study of patients presenting for angiographic

BSC-SJA-1660

follow-up largely because of symptomatic recurrence. Thus, because of the nature of the 'clinical' follow-up, it may represent a population of patients with an increased rate of restenosis, and no conclusion about the absolute restenosis rate (which was 21%) should be inferred from these data.

The results of this study were dependent on accurate identification of the same anatomical cross section on serial ultrasound studies. The lack of a motorized pull-back of the ultrasound catheter is a limitation of the study. Careful attention to lesional and peri-lesional markings, however, helped ensure identification of the same anatomical cross-section on repeated imaging. This is attested by the high reproducibility and low variability of the serial measurements.

Differences in vascular tone could have contributed to measurements of lumen dimensions. However, all patients were studied only after administration of significant doses of intracoronary nitroglycerin, and differences in vascular tone should not have affected measurements of lumen dimensions significantly.

It also has to be stated that arbitrary intravascular ultrasound end-points were used for definition of acute success. It is therefore not clear if the adoption of different end-points with selective usage of stenting for unsuccessful results would have led to a better outcome.

This study involved a rather homogeneous patient population. Restenotic lesions, bypass graft lesions, vessel diameters of less than 2·0 mm as determined by angiography, vessel occlusions, and vessels with severe angulations were excluded from this study. Intravascular ultrasound-guided PTCA was not performed in these lesions and the clinical event rate, as well as the incidence of angiographic restenosis cannot be extrapolated from the data of this study.

## Clinical implications

Treatment strategies to prevent restenosis have focused on limitation of elastic recoil, platelet aggregation with release of growth factors and cellular proliferation[8–9,43]. So far, reduction in the incidence of restenosis in some focal lesions of native coronary arteries has been confined to stents. In this prospective, non-randomized trial it could be demonstrated that intravascular ultrasound-guided size-adapted PTCA also results in a reduction in the clinical event rate and the angiographic restenosis rate during a follow-up period of 1 year. The results of this study underline that 'vessel-size adapted' PTCA may be equally effective or better than treatment strategies using stents for achieving long-term success following percutaneous interventions of obstructive coronary artery disease. A large-scale randomized trial is warranted to verify the results of this trial.

## References


[1] Holmes DR Jr, Vliestra RE, Smith HC et al. Restenosis after percutaneous transluminal coronary angioplasty (PTCA): a

report from the PTCA Registry of the National Heart, Lung, and Blood Institute. Am J Cardiol 1984; 53: 77C–81C.
[2] Gruentzig AR, King III SB, Schlumpf M, Siegenthaler W. Long-term follow-up after percutaneous transluminal coronary angioplasty: the early Zurich experience. N Engl J Med 1987; 316: 1127–32.
[3] Nobuyoshi M, Kimura T, Nosaka H et al. Restenosis after successful percutaneous transluminal coronary angioplasty: serial angiographic follow-up of 229 patients. J Am Coll Cardiol 1988; 12: 616–23.
[4] Hirshfeld JW Jr, Schwartz JS, Jugo R et al. and the M-Heart Investigators. Restenosis after coronary angioplasty: a multivariate statistical model to relate lesion and procedure variables to restenosis. J Am Coll Cardiol 1991; 18: 647–56.
[5] Weintraub WS, Boccuzzi SJ, Klein J et al. and the Lovastatin Restenosis Trial Study Group. Lack of effect of lovastatin on restenosis after coronary angioplasty. N Engl J Med 1994; 331: 1331–7.
[6] Faxon DP, on Behalf of the Multicenter American Research Trial with Cilazapril after Angioplasty to Prevent Transluminal Coronary Obstruction and Restenosis (MARCATOR) Study Group. J Am Coll Cardiol 1995; 2: 362–9.
[7] Faxon DP, Spiro TE, Minor S et al. and the ERA Investigators. Low molecular weight heparin in prevention of restenosis after angioplasty. Circulation 1994; 90: 908–14.
[8] Serruys PW, De Jaegere P, Kiemeneij F et al. for the BENESTENT Study Group. A comparison of balloon-expandable stent implantation with balloon angioplasty in patients with coronary artery disease. N Engl J Med 1994; 331: 489–95.
[9] Fishman DL, Leon MB, Baim DS et al. for the STENT RESTENOSIS Study Investigators. A randomized comparison of coronary-stent placement and balloon angioplasty in the treatment of coronary artery disease. N Engl J Med 1994; 331: 496–51.
[10] Mintz GS, Popma JJ, Pichard AD et al. Patterns of calcification in coronary artery disease: a statistical analysis of intravascular ultrasound and coronary angiography in 1155 lesions. Circulation 1995; 91: 1959–65.
[11] Mintz GS, Painter JA, Pichard AD et al. Atherosclerosis in angiographically "normal" coronary artery reference segments: An intravascular ultrasound study with clinical correlations. J Am Coll Cardiol 1995; 25: 1479–85.
[12] Hodgson JMcB, Reddy KG, Suneja R, Nair RN, Lesnefsky EJ, Sheehan HM. Intracoronary ultrasound imaging: correlation of plaque morphology with angiography, clinical syndrome and procedural results in patients undergoing coronary angioplasty. J Am Coll Cardiol 1993; 21: 35–44.
[13] Tenaglia AN, Buller CE, Kisslo KB, Stack RS, Davidson CJ. Mechanisms of balloon angioplasty and directional atherectomy as assessed by intracoronary ultrasound. J Am Coll Cardiol 1992; 20: 685–91.
[14] De Franco AC, Tuzcu EM, Moliterno DJ, Elliot J, Berkalp B, Franco J, Raymond RE, Whitlow PL, Guyer S, Nissen SE. Overestimation of lumen size after coronary interventions. Implications for randomized trials of new devices. Circulation 1994; 90 (Suppl I): I-550.
[15] Matar FA, Mintz GS, Pinnow E et al. Multivariate predictors of intravascular ultrasound end points after directional atherectomy. J Am Coll Cardiol 1995; 25: 318–24.
[16] Popma JJ, Mintz GS, Satler LF et al. Clinical and angiographic outcome after directional coronary atherectomy: a qualitative and quantitative analysis using coronary arteriography and intravascular ultrasound. Am J Cardiol 1993; 72: 55E–64E.
[17] Batko-BW, Linker DT. Safety of intracoronary ultrasound: Data from a multicenter European Registry. Cathet Cardiovasc Diagn 1993; 28: 238–41.
[18] Hausmann D, Erbel R, Alibelli-Chemarin MJ. The safety of intracoronary ultrasound: A multicentre survey of 2207 examinations. Circulation 1995; 91: 623–30.
[19] Nissen SE, Gurley JC, Grines CL et al. Intravascular ultrasound assessment of lumen size and wall morphology in

BSC-SJA-1661

normal subjects and patients with coronary artery disease. Circulation 1991; 84: 1087–99.

[20] Pandian NG, Kreis A, O'Donnell T. Intravascular ultrasound estimation of arterial stenosis. J Am Soc Echocardiogr 1989; 6: 330–7.

[21] Schmid KM, Voelker W, Mewald J et al. In vitro assessment of luminal dimensions of coronary arteries by intravascular ultrasound with and without application of echogenic contrast dye. Basic Res Cardiol 1994; 89 (Suppl 1): 129–35.

[22] Fleck E, Maier R, Oswald H. Coronary angiography and interventional cardiology. Curr Opin Radiol 1991; 3: 550–6.

[23] Popma JJ, Bashore TD. Qualitative and quantitative angiography. In: Topol E, ed. Textbook of Interventional Cardiology. Philadelphia: W. B. Saunders, 1994: 1052–68.

[24] Tobis JM, Mallery J, Mahon D et al. Intravascular ultrasound imaging of human coronary arteries in vivo. Analysis of tissue characterizations with comparison to in vitro histological specimens. Circulation 1991; 83: 913–26.

[25] Potkin BN, Bartorelli AL, Gessert JM et al. Coronary artery imaging with intravascular high-frequency ultrasound. Circulation 1990; 81: 1575–85.

[26] Nissen SE, Grines CL, Gurley JC et al. Application of a new phased-array ultrasound imaging catheter in the assessment of vascular dimensions: in vivo comparison to cineangiography. Circulation 1990; 81: 660–6.

[27] Tobis JM, Mallery JA, Gessert J et al. Intravascular ultrasound cross-sectional arterial imaging before and after angioplasty in vitro. Circulation 1989; 80: 873–82.

[28] Nishimura RA, Edwards WD, Warnes CA et al. Intravascular ultrasound imaging: in vitro validation and pathologic correlation. J Am Coll Cardiol 1990; 16: 145–54.

[29] Hodgson JMcB, Graham SP, Sarakus AD et al. Clinical percutaneous imaging of a coronary anatomy using an over-the-wire ultrasound system. Int J Cardiac Imaging 1989; 4: 186–93.

[30] Mintz GS, Popma JJ, Pichard AD et al. Arterial remodeling after coronary angioplasty: A serial intravascular ultrasound study. Circulation 1996; 94: 35–43.

[31] Mallery JA, Tobis JM, Gri• th J et al. Assessment of normal and atherosclerotic arterial wall thickness with an intravascular ultrasound imaging catheter. Am Heart J 1990; 6: 1392–400.

[32] Ebel RL. Estimation of the reliability of ratings. Psychometrika 1951; 16: 407–24.

[33] Potkin BN, Keren G, Mintz GS et al. Arterial responses to balloon coronary angioplasty: an intravascular ultrasound study. J Am Coll Cardiol 1992; 20: 942–51.

[34] Pandian NG, Kreis A, Weintraub A, Kumer R. Intravascular ultrasound assessment of arterial dissections, intimal flaps, and intraarterial thrombi. Am J Cardiol 1991; 5: 72–7.

[35] Hermans WRM, Rensing BJ, Foley DP et al. Therapeutic dissections after successful coronary angioplasty: no influence on restenosis or on clinical outcome in 693 patients. J Am Coll Cardiol 1992; 25: 174–85.

[36] Holmes DR, Vliestra RE, Smith HC et al. Restenosis after percutaneous transluminal coronary angioplasty: A report from the PTCA registry of the NHLBI. Am J Cardiol 1984; 53: 77C–81C.

[37] De Jaegere P, Serruys PW, Bertrand M et al. Wiktor stent implantation in patients with restenosis following balloon angioplasty of a native coronary artery. Am J Cardiol 1992; 69: 598–602.

[38] De Jaegere P, Serruys PW, Bertrand M et al. Angiographic predictors of recurrence of restenosis after Wiktor stent implantation in native coronary arteries. Am J Cardiol 1993; 72: 165–70.

[39] Vrolix M, Piessens J, for the European Wiktor Stent Study Group. Usefulness of the Wiktor stent for treatment of threatened or acute closure complicating coronary angioplasty. Am J Cardiol 1994; 73: 737–41.

[40] Eckhout E, Kappenberger L, Goy J-J. Stents for intracoronary placement. Current status and future directions. J Am Coll Cardiol 1996; 27: 757–65.

[41] Serruys PW, Emanuelsson H, Van der Giessen W et al. on behalf of the BENESTENT-II Study Group. Heparin-coated Palmaz–Schatz stents in human coronary arteries. Early outcome of the Benestent-II Pilot Study. Circulation 1996; 93: 412–22.

[42] Topol EJ, Cali• RM, Weisman HF et al. on behalf of the EPIC Investigators. Randomized trial of coronary intervention with antibody against platelet IIb/IIIa integrin for reduction of clinical restenosis: results at six months. Lancet 1994; 343: 881–6.



BSC-SJA-1662

# EXHIBIT 112

# REDACTED

# EXHIBIT 113

# REDACTED

# EXHIBIT 114

# REDACTED

# EXHIBIT 115

# REDACTED

# EXHIBIT 116

# REDACTED